UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

SHABTAI SCOTT SHATSKY, individually
and as personal representative of the Estate of
Keren Shatsky, JO ANNE SHATSKY,
individually and as personal representative of
the Estate of Keren Shatsky, TZIPPORA
SHATSKY SCHWARZ, YOSEPH SHATSKY,
SARA SHATSKY TZIMMERMAN, MIRIAM
SHATSKY, DAVID RAPHAEL SHATSKY,
GINETTE LANDO THALER, individually and as
personal representative of the Estate of Rachel
Thaler, MICHAEL THALER, individually and as
personal representative of the Estate of Rachel
Thaler, LEOR THALER, ZVI THALER, ISAAC
THALER, HILLEL TRATTNER, RONIT
TRATTNER, ARON S. TRATTNER, SHELLEY
TRATTNER, EFRAT TRATTNER, HADASSA
DINER, YAEL HILLMAN, STEVEN BRAUN,
CHANA FRIEDMAN, ILAN FRIEDMAN,
MIRIAM FRIEDMAN, YEHIEL FRIEDMAN,
ZVI FRIEDMAN and BELLA FRIEDMAN,

Plaintiffs,

- against -

THE PALESTINE LIBERATION
ORGANIZATION and THE PALESTINIAN
AUTHORITY (a/k/a "The Palestinian Interim
Self-Government Authority" and/or "The
Palestinian National Authority"),

Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 18 Civ. 12355 (MKV)

First Amended and
Supplemental Complaint

Jury Trial Demanded

Plaintiffs Shabtai Scott Shatsky, individually and as personal representative of

the Estate of Keren Shatsky, Jo Anne Shatsky, individually and as personal representative of

the Estate of Keren Shatsky, Tzippora Shatsky Schwarz, Yoseph Shatsky, Sara Shatsky

Tzimmerman, Miriam Shatsky, David Raphael Shatsky, Ginette Lando Thaler, individually and

as personal representative of the Estate of Rachel Thaler, Michael Thaler, individually and as

personal representative of the Estate of Rachel Thaler, Leor Thaler, Zvi Thaler, Isaac Thaler, Hillel Trattner, Ronit Trattner, Aron S. Trattner, Shelley Trattner, Efrat Trattner, Hadassa Diner, Yael Hillman, Steven Braun, Chana Friedman, Ilan Friedman, Miriam Friedman, Yehiel Friedman, Zvi Friedman and Bella Friedman (together, "Plaintiffs"), by their attorneys Cohen & Gresser LLP, upon information and belief, which includes a review of public documents and the record in prior litigation, for their First Amended and Supplemental Complaint against Defendants The Palestine Liberation Organization and The Palestinian Authority (a/k/a "The Palestinian Interim Self-Government Authority" and/or "The Palestinian National Authority"), allege as follows:

<u>Nature of the Action</u>

1.      This action arises from a suicide bombing carried out at a pizzeria located at a shopping center in the Israeli town of Karnei Shomron on February 16, 2002 (the "Terrorist Bombing").    An officer and employee of Defendant The Palestinian Authority ("PA") planned the attack while on the PA's payroll.  Agents of Defendants PA and The Palestine Liberation Organization ("PLO") executed the Terrorist Bombing, and Defendants PLO and PA (together, "Defendants") provided material support and resources to, and conspired with the Popular Front for the Liberation of Palestine, the U.S.-designated foreign terrorist organization that carried out the Terrorist Bombing.  Plaintiffs in this action are the estates of two teenaged United States citizens who were murdered in the Terrorist Bombing, four other United States citizens who were injured in the attack, and members of the victims' immediate families.  They seek redress from Defendants pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, and on non-federal causes of action.

Jurisdiction and Venue

2.      Plaintiffs' claims under the ATA fall within this Court's subject matter jurisdiction pursuant to 18 U.S.C. §§ 2333 and 2334, and 28 U.S.C. § 1331.

3.      Plaintiffs' non-federal claims are related to, and form part of the same case and controversy as, Plaintiffs' claims under the ATA, and accordingly fall within this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

4.      This Court may exercise personal jurisdiction over Defendants in this action pursuant to the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. 116-94, div. J, tit. IX, § 903 (codified at 18 U.S.C. § 2334(e)).  Under the PSJVTA, Defendants are "deemed to have consented to personal jurisdiction" in ATA actions like this one, because, after April 18, 2020, Defendants made payments, directly or indirectly, (i) to the designees of individuals who, after being fairly tried or pleading guilty, were imprisoned for committing acts of terrorism that injured or killed nationals of the United States and such payments were made by reason of such imprisonment, and (ii) to family members of individuals, following such individuals' deaths while committing acts of terrorism that injured or killed nationals of the United States, and such payments were made by reason of the deaths of such individuals.  18 U.S.C. § 2334(e)(1)(A).

5.      Defendants also are deemed to have consented to personal jurisdiction under the PSJVTA because, after January 4, 2020, Defendants have conducted non-exempt activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority.  18 U.S.C. § 2334(e)(1)(B)(iii).

6.      Furthermore, Defendants are deemed to have consented to jurisdiction under the PSJVTA because, after January 4, 2020, Defendants have continued to maintain a non-

exempt office, headquarters, premises, or other facility or establishment in the United States. 18 U.S.C. § 2334(e)(1)(B)(i).

7.      Because Defendants have consented to personal jurisdiction with respect to Plaintiffs' federal ATA claims, because 18 U.S.C. § 2334(a) authorizes nationwide service of process, and because Plaintiffs' non-federal causes of action arise out of the same common nucleus of facts as their ATA claims, this Court may exercise pendent personal jurisdiction over Defendants with respect to Plaintiffs' non-federal causes of action.

8.      Separately, this Court may also exercise personal jurisdiction over Defendants in this action because, as set forth below, elements of Defendants' liability-creating conduct were targeted at the society and government of the United States.

9.      This Court is a proper venue for this action pursuant to 18 U.S.C. § 2334(a), because Defendants have been served in this district (Dkt. Nos. 33, 34, and 37) and reside and have agents in this district.

<u>Parties</u>

10.      Plaintiffs Shabtai Scott Shatsky and Jo Anne Shatsky are, and at all times relevant hereto were, citizens of the United States.  They are the parents and heirs of Keren Shatsky, a 14-year-old United States citizen murdered in the Terrorist Bombing, and the personal representatives of the Estate of Keren Shatsky.  Plaintiffs Shabtai Scott Shatsky and Jo Anne Shatsky bring this action individually and on behalf of the Estate of Keren Shatsky.

11.      Plaintiffs Tzippora Shatsky Schwarz, Yoseph Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky, and David Raphael Shatsky are, and at all times relevant hereto were, citizens of the United States.  They are the siblings of decedent Keren Shatsky.

12.     Plaintiffs Ginette Lando Thaler and Michael Thaler are the parents and heirs of Rachel Thaler, a 15-year-old United States citizen murdered in the Terrorist Bombing, and the personal representatives of the Estate of Rachel Thaler.  Plaintiff Michael Thaler is, and at all times relevant hereto was, a citizen of the United States.  Plaintiffs Ginette Lando Thaler and Michael Thaler bring this action individually, and on behalf of the Estate of Rachel Thaler.

13.     Plaintiffs Leor Thaler, Zvi Thaler, and Isaac Thaler are, and at all times relevant hereto were, citizens of the United States.  They are the siblings of decedent Rachel Thaler.

14.     Plaintiff Leor Thaler suffered severe physical and other injuries in the Terrorist Bombing.

15.     Plaintiff Hillel Trattner is, and at all times relevant hereto was, a citizen of the United States.  He suffered severe physical and other injuries in the Terrorist Bombing.

16.     Plaintiff Ronit Trattner is, and at all times relevant hereto was, the spouse of Plaintiff Hillel Trattner.  She suffered severe physical and other injuries in the Terrorist Bombing.

17.     Plaintiffs Aron S. Trattner and Shelley Trattner are, and at all times relevant hereto were, citizens of the United States.  They are the parents of Plaintiff Hillel Trattner.

18.     Plaintiffs Efrat Trattner, Hadassa Diner, and Yael Hillman are, and at all times relevant hereto were, citizens of the United States.  They are the sisters of Plaintiff Hillel Trattner.

19.     Plaintiff Steven Braun is, and at all times relevant hereto was, a citizen of the United States.  He suffered severe physical and other injuries in the Terrorist Bombing.

20.     Plaintiff Chana Friedman is, and at all times relevant hereto was, a citizen of the United States.  She suffered severe physical and other injuries in the Terrorist Bombing.

21.     Plaintiffs Ilan Friedman, Yehiel Friedman, Zvi Friedman, and Miriam Friedman are, and at all times relevant hereto were, citizens of the United States.  They are the siblings of Plaintiff Chana Friedman.

22.     Plaintiff Bella Friedman is, and at all times relevant hereto was, a citizen of the United States.  She is the mother of Plaintiff Chana Friedman.

23.     Defendant PLO is, and at all times relevant hereto was, a legal person as defined in 18 U.S.C. § 2331.  Defendant PLO facilitated, caused, and executed the Terrorist Bombing.

24.     Defendant PA (also known as The Palestinian Interim Self-Government Authority and/or The Palestinian National Authority) is, and at all times relevant hereto was, a legal person as defined in 18 U.S.C. § 2331.  Defendant PA facilitated, caused, and executed the Terrorist Bombing.  At all relevant times, Defendant PA served as the non-sovereign governing authority for certain areas in the West Bank and the Gaza Strip.

<u>Facts Relating to Personal Jurisdiction Under the PSJVTA</u>

A.  *The Relationship Between Defendants PLO and PA*

25.     In 1993, Defendant PLO and the State of Israel signed a Declaration of Principles ("DOP").  The DOP anticipated Palestinian self-rule in Gaza and Jericho (DOP Art. V), the transfer of power and responsibilities to Palestinians in the West Bank (DOP Art. VI), and an agreement on self-government and the election of a Palestinian council (DOP Art. III).

26.     Following further negotiations, Defendant PLO and the State of Israel entered into a series of bilateral agreements.  These agreements included, *inter alia*, the Gaza-Jericho Agreement, signed in Cairo in 1994; the Agreement on Preparatory Transfer of Powers and Responsibilities, also signed in 1994; and the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (the "Interim Agreement"), signed in 1995.

27.     Following the 1995 execution of the Interim Agreement, Defendant PLO created Defendant PA.

28.     Defendant PA's ultimate authority is Defendant PLO, and Defendant PA is accountable to the PLO Executive Committee.  Defendant PA cannot assume roles or functions not delegated to it by Defendant PLO.

29.     In the Interim Agreement, Defendant PLO and the State of Israel assigned certain governmental duties in the West Bank and Gaza to Defendant PA.

30.     Since its creation by Defendant PLO, Defendant PA has provided many government services, including local policing and civil authority over traditional matters such as agriculture, banking, employment, environmental protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, and water and sewage, and Defendant PA has a police force and levies taxes.

31.     Article 9.5 of the Interim Agreement provides that Defendant PA "will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions."

32.     Defendant PLO has delegated a role in its conduct of foreign activities to Defendant PA, including activities at the UN Permanent Observer Mission in New York.  In 2005, Defendant PA adopted "The Diplomatic Corps Law No. 13-2005."  According to this law, Defendant PA's Ministry of Foreign Affairs is charged with "[o]verseeing all missions politically, administratively and financially" (§ 3).  All staff with the rank of "Ambassador" are appointed by Defendant PA's President (§§ 7, 9), who is also the Chairman of Defendant PLO.

33.     In accordance with this law, PA President and PLO Chairman Mahmoud Abbas appointed Riyad Mansour to head the Palestinian UN Permanent Observer Mission on September 10, 2005, with the civil service rank of "Ambassador" within Defendant PA's Foreign Ministry, serving as Defendant PLO's Permanent Observer to the United Nations.

34.     Dr. Mansour has continued in this position after January 4, 2020.

35.     Defendant PLO has received substantially all of its current funding from Defendant PA at all relevant times, including after January 4, 2020.

36.     Defendant PLO holds itself out to be, and carries out conduct in the name of, the State of Palestine in connection with official business of the United Nations.

37.     Defendant PA's Ministry of Foreign Affairs acts as Defendant PLO's agent in connection with activities in the United States.  For example, Dr. Mansour holds an appointment as an officer of Defendant PA.

38.     Both Defendants hold themselves out as the "State of Palestine" in connection with official business of the United Nations.

39.     Dr. Mansour holds himself out as "Ambassador, Permanent Observer of the State of Palestine to the United Nations."

B.   *Defendants' Consent to Jurisdiction Under 18 U.S.C. § 2334(e)(1)(A)*

40.    Defendants have consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(A), which provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after April 18, 2020, it "makes any payment, directly or indirectly – (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual."

1.   *Defendants' Practice of Making "Martyr" and Prisoner Payments*

41.    Defendants have a longstanding practice pursuant to which they provide monthly payments and other financial benefits to designees of individuals currently or formerly imprisoned for murdering or injuring civilians (and others) in terrorist attacks against Israeli and Jewish targets, and to the families of suicide terrorists killed in such attacks.  According to the Congressional Research Service, "[t]he Palestinian practice of compensating families who lost a member (combatant or civilian) in connection with Israeli-Palestinian violence reportedly dates back to the 1960s.  Palestinian payments on behalf of prisoners or decedents in their current form apparently 'became standardized during the second *intifada* [uprising] of 2000 to 2005.'  Various PA laws and decrees since 2004 have established parameters for payments."  Jim Zanotti, Cong. Research Service, RS22967, U.S. Foreign Aid to the Palestinians 12 (Dec. 12, 2018) (footnotes omitted) (available at https://crsreports.congress.gov/product/pdf/RS/RS22967/59).

42.    Defendants call their payments to the families of suicide terrorists "martyr" payments.  According to the Washington Post, Defendant PA's "Foundation for the

Care of the Families of Martyrs has an annual budget of $173 million and operates within the Palestinian Authority's Ministry of Social Affairs.  The foundation gives support to any individual 'wounded, killed, or otherwise affected as a result of their joining the revolution or the presence of the revolution. . . .'"  David Makovsky, Ghaith al-Omari and Lia Weiner, *If Palestinians are Serious about Peace, "Martyr" Violence Should Not Pay,* Wash. Post (April 6, 2017) (available at  https://www.washingtonpost.com/news/global-opinions/wp/2017/04/06/if-palestinians-are-serious-about-peace-martyr-violence-should-not-pay/).

43.     In 2004, Defendants enacted a law providing that the designee of any individual imprisoned for committing any offense while "participating in the struggle against the occupation" − *i.e.*, against Israelis and Jews in Israel and the region − is eligible for such payments.  This law codified prior practice.  This law was described in detail in trial testimony in *Sokolow v. Palestine Liberation Organization*, No. 04 Civ. 397 (GBD) ("*Sokolow*").

44.     There are thousands of individuals serving sentences in Israel for crimes involving ideologically motivated violence, or who served sentences for such crimes in the past. For example, in 2015, counsel for Defendants PLO and PA elicited testimony in open court in *Sokolow* that there were approximately 4,000 such prisoners in Israel.

45.     In 2018, the *Washington Post*'s "Fact Checker" column reported that "[a]bout 13,000 Palestinian men and women are beneficiaries of the prisoner payments" and approximately "33,700 families (19,700 in the Palestinian territories) shared in about $183 million in martyr payments."  Glenn Kessler, *Does the Palestinian Authority Pay $350 Million a Year To "Terrorists and Their Families"?* Wash. Post (March 14, 2018) (available at https://www.washingtonpost.com/news/fact-checker/wp/2018/03/14/does-the-palestinian-authority-pay-350-million-a-year-to-terrorists-and-their-families/).

46.    Defendants' practices with respect to prisoner payments and "martyr" payments were described in detail in the Declaration of Arieh Spitzen filed on November 19, 2020 at Docket No. 1020 in *Sokolow* (the "Spitzen Decl."). Mr. Spitzen served as Department Head for Palestinian Issues in the Administered Territories in the office of the Coordinator of Government Activities in the Territories ("COGAT") for the Government of Israel. As such, he was "the top authority regarding the socio-economic civilian situation in the Palestinian arena in the West Bank and Gaza Strip," and wrote "hundreds of surveys and studies" on diverse issues connected to the Palestinian realm, including terrorist organizations. Spitzen Decl. ¶ 6. He has served as an expert witness about Palestinian terrorism in ten federal civil terrorism cases in the United States. *Id.* ¶ 7. According to Mr. Spitzen:

> The Institution for Families of the Martyrs and the Injured (hereafter, "the Institution") makes payments to the families of terrorists killed or injured in the course of carrying out terrorist attacks. The Institution provides payments to families of terrorists killed while perpetrating terror attacks specifically because of the relevant individual's death. If not for the death of the family member while executing a terrorist attack, the family would be ineligible for payments or benefits from the Institute.
>
> The practice of the Institution is to make monthly payments to families of all shahids [suicide terrorists]. The Institution also pays for additional benefits to the families – for example, it covers tuition fees. The Institution evaluates the case of each shahid using a "Social Examination" form. Using the Social Examination form, the Institution evaluates information about the deceased and the family, the date, place, [and] circumstances of his or her death, and proof of death. As an example, I have attached the file relating to Wafa Idris, a suicide terrorist who was killed perpetrating a terror attack on the Sokolow family. The file contains information about Idris, her family, the date and place of the "event" (January 27, 2002), and a "description of the event" which states, in part: "Wafa Ali Khalil Idris" "blew herself up in a crowd . . . that resulted in killing one and injuring more than one hundred in addition to her immediate death." The Institution's staff concluded, "She was martyred during a heroic martyrdom operation against the Zionists in the occupied city of Jerusalem. Therefore we recommend that she is considered one of the al-Aqsa Intifada Martyrs according to the regulations." The Director of the Institution approved the application,

"with an allocation of 600 shekels a month" approximately two weeks after Idris' death.

The Institution will not provide payments in respect of persons engaged in ordinary street crime.  Thus, in a 2016 decision, the PA's Supreme Court of Justice decided that the Institution was justified in refusing to pay benefits in the case of a Palestinian man who was shot by Israeli soldiers during the course of a regular (i.e., non-terrorist) crime, because the man was not shot in the course of "resistance activities" or "militant activities."

The Institution is an official part of the PLO.  The Institution was founded in 1965 by Fatah, and in 1971 the PLO's Palestinian National Council declared it an official institution of the PLO.  In 1994, it was transferred to the PA's Ministry of Social Affairs.  At that time (as now) the head of the Institution was Ms. Intisar al-Wazir, who became a minister in the PA in 1994.  In 2005, following the conclusion of Ms. al-Wazir's service as a PA minister, the Institution was transferred back to PLO in a decree by Mahmoud Abbas, signed in his capacity both as Chairman of the PLO and as President of the PA.  The Institution continues to be part of the PLO.

The Institution is also a part of the PA.  The PA's website states that the Institution is part of its organizational structure.  Moreover, the Institution is funded by the PA's Ministry of Finance.  In March 2019, for example, Ms. al-Wazir announced that some salaries would not be paid in full that month, adding: "We sent all the names to the Finance Ministry as usual, but they answered that we must reduce the names, and sent us a disc with names for which the salaries had been stopped this month."

The Commission for Prisoners and Ex-Prisoners (the "Commission") makes payments to the designees of prisoners imprisoned for perpetrating terror attacks.  The Commission pays the prisoners' designees specifically because of the relevant individual's imprisonment for terrorism.  If not for the imprisonment, the designee would be ineligible for payments or benefits from the Commission.

The Commission's website describes the functions of the Commission, which provides monthly payments and benefits to prisoners, ex-prisoners, and their families.  The Commission's website says that these payments and other benefits are provided in "recognition of the legitimacy of the Palestinian and Arab prisoners' and detainees' national struggle and of their resistance to occupation."

The benefits provided by the Commission are also detailed on the official website of the PA Council of Ministers, under the heading "Guide to Government Services."  The guide states that the Commission provides payments and other benefits to prisoners if "the prisoner was imprisoned as a result of his participation in the struggle against the Occupation," and

details seventeen types of benefits to which prisoners and ex-prisoners and their designees are entitled.

As detailed on the PA's website under the heading "Payment of salaries to prisoners and ex-prisoners," the amounts of the monthly salaries are set according to the length of the prisoner's sentence.  The longer the sentence, the higher the salary.  The highest salary on the scale – 12,000 shekels (more than $3,500 in today's terms) – goes to a prisoner sentenced to 30 years' imprisonment or more, a punishment imposed on those convicted of committing or attempting murder.  The salaries are not needs-based, and in practice they significantly improve the conditions of the recipients as compared with the general population.  This is illustrated by economic figures from 2018.  According to data from the PA, the basic monthly grant for a prisoner serving 30 years in prison (with no increment for wife and children) is 12,000 shekels (as of 2018, roughly $3,500), a sum approximating the *annual* local GDP per person.  In other words, a terrorist serving a 30-year sentence is able to direct to his family or other designees – every month – the equivalent of a full year's worth of economic activity for the average Palestinian.  Each monthly prisoner salary is *five* times the average monthly salary in the West Bank ($700) and more than *eight* times the average monthly salary in Gaza ($408).

The Commission also pays salaries to the designees of ex-prisoners (who are typically the ex-prisoners themselves).  In 2011 the PA's Minister for Prisoners and Ex-Prisoners, Issa Qaraqi, told WAFA, the official PLO and PA press service, that the Ministry had paid $1.2 million in salaries to 1,212 former prisoners released in 2007, 2008, and 2009.

Other benefits, which are detailed on the PA's website, include loans to ex-prisoners and their families; free legal advice and assistance for terrorist prisoners; free medical insurance; free tuition; and an end-of-imprisonment grant.

In order to renew allocations and to obtain other financial benefits, the designee of the prisoner must fill out a form and provide documentation to the Commission.  For "sentenced prisoners," the "required documents" includes [sic], ". . . a Red Cross certificate stating the period of the sentence and the verdict itself, in Hebrew."

The prisoners' entitlements are set forth in numerous laws and regulations of the PLO and the PA, which have developed over a period of years.  In 2004, the PLO and PA adopted the Prisoners and Ex-Prisoners Law, No. 19, of 2004.  The law entitles "each prisoner, without discrimination, [to] a monthly allowance while he is in prison" (Article 6).  In addition to the

monthly allowance, the law further requires each prisoner to select a designee to receive a monthly salary:

1.  The Authority must give every prisoner a monthly salary specified by the system, to be proportionate with the cost of living.

2.  Prisoners' family members shall receive a portion of the prisoners' salary based on the standard of legal expenditure in effect.

3.  The prisoner shall appoint an agent to collect his monthly salary or what remains of it.

Additionally, in 2008, the PA's Council of Ministers issued a determination that a prisoner's "period of captivity" in Israeli prison would be included as "national service" for the purpose of computing the pensions of employees of the PLO.  In 2011, the PA issued a decree providing that prisoners shall be treated as PA employees and formally protecting the prisoners' right to a salary; a table sets out the monthly salaries according to the recipient's period of imprisonment, with longer sentences entitling the prisoner to a higher monthly salary.

The PA's Ministry of Finance funds the Commission.  By law, the Commission has an independent line-item in the PA's general budget and is subject to the PA's rules of financial and administrative oversight.  Details of the budget appear annually in the published Palestinian Authority's Budget Book.  In July 2020, Qadri Abu Bakr, the Commission's Chairman, said that the PA's Ministry of Finance had transferred the prisoner payments to the bank accounts of the prisoners and ex-prisoners, adding that the Commission was monitoring the payments along with the Prime Minister's Office and the Palestinian Monetary Authority. . . .

As a matter of form, the PLO and the PA have transferred the administration of the prisoner payment program back and forth between themselves numerous times.  Before the PA was formed, support for prisoners was handled by the PLO's Institution (described above).  In 1998, Yasser Arafat, in his capacity as Chairman of the PLO and President of the PA, issued a decree, based on a previous decree (Decree No. 1 from 1996), establishing a Ministry for Prisoners' Affairs among other ministries of the government.  In 2014, the PLO and PA established the Commission and transferred the Ministry's functions to it, pursuant to a decree issued by Mr. Abbas in his capacities as both Chairman of the PLO and President of the PA.  And in 2018, the PLO and PA adopted a law, also signed by Mr. Abbas in his capacities as Chairman of the PLO and President of the PA, which transferred the Commission and its functions

- 14 -

back to the PA. At present, the Commission's website is located on the PA's official internet domain, "gov.ps."

In practice, the prisoner payment program has been and remains simultaneously controlled and operated by both the PLO and the PA. As noted above, the PA's website lists the Commission as a provider of "Government Services." The PLO website also describes the Commission as a part of the PLO. The relevant laws and decrees have all been signed by the Chairman of the PLO and the President of the PA, who is the same person, in the exercise of both capacities. The Chairman of [the] Commission itself, Qadri Abu Bakr, is also a member of the PLO's Palestinian National Council, and has remained at the head of the Commission from his appointment in 2015 to today without change as the Commission has shifted from the PLO to the PA. And no significant administrative change has been announced as a consequence of the formal transfer of the Commission from the PLO back to the PA.

*Id.* ¶¶ 12-28 (footnotes and citations omitted).

47. With regard to the payments described above, Defendants PLO and PA act in coordination and/or common control with one another. According to Hanan Ashrawi, a witness called by Defendants at trial in *Sokolow*, both the Martyr's Foundation and the Ministry for Prisoners and Ex-Prisoners have been "moved" between Defendants PLO and PA, and the decision to move these institutions is made by Mahmoud Abbas, President of Defendant PA and Chairman of Defendant PLO. Trial Transcript at 3132-33, *Sokolow*, Dkt. No. 869 (filed Mar. 4, 2015).

48. In October 2020, the U.S. State Department reported to Congress that during the previous six months "the PA continued to make payments through the PLO to Palestinians connected to terrorism," and that "[t]he recipients of the payments included Palestinian terrorists in Israeli prison, released Palestinian terrorists, and the families of Palestinians who were wounded or died while committing terrorist acts or in connection with terrorism." *See* Adam Kredo, *Palestinian Government Continues Payments to Terrorists Despite*

- 15 -

*Cash Crunch*, Wash. Free Beacon (Oct. 30, 2020) (available at https://freebeacon.com/national-security/palestinian-government-continues-payments-terrorists-despite-cash-crunch/).

49.     On information and belief, Defendant PA has provided funds to Defendant PLO with the knowledge and/or intent that Defendant PLO would make the payments described above.

2.     *Defendants Gave Up Hundreds of Millions of Dollars in Aid In Order To Continue "Martyr" and Prisoner Payments*

50.     Prior to 2018, the United States provided billions of dollars in financial assistance to Defendants PLO and PA.

51.     In 2018, Congress enacted the Taylor Force Act, which mandated that specified foreign assistance to Defendant PA was forbidden unless the Secretary of State certified that Defendants PLO and PA "have terminated payments for acts of terrorism against Israeli citizens and United States citizens to any individual, after being fairly tried, who has been imprisoned for such acts of terrorism and to any individual who died committing such acts of terrorism, including to a family member of such individuals."  Taylor Force Act, Pub. L. 115-141, Title X, § 1004(a)(1)(B) (codified at 22 U.S.C. § 2378c-1(a)(1)(B)).

52.     Notwithstanding the threatened substantial loss in funding, Defendants vowed that the payments to prisoners and "martyrs" would continue.  For example, on July 9, 2018, Mahmoud Abbas, Chairman of Defendant PLO and President of Defendant PA, said in a public speech, as announced by WAFA, the official PA news agency:  "We will not allow anyone to interfere with the stipends of our martyrs and detainees."

53.     Beginning in 2018, the United States has withheld hundreds of millions of dollars per year in foreign assistance from Defendant PA pursuant to the Taylor Force Act.

54.     Notwithstanding the substantial loss in funding, Defendants have repeatedly confirmed that the payments described above would continue and have continued. For example:

a.  On September 26, 2019, Chairman Abbas stated in a speech to the United Nations General Assembly: "Even if I only have one penny left, I will give this penny to the families of the martyrs, to our prisoners and heroes . . . ."

b.  On March 29, 2020, Defendant PA's Prime Minister Mohammed Shtayyeh declared that "we will pay full salaries this month over several days to prevent the public from crowding in front of banks . . . [t]he third day for prisoners and martyrs," as announced by WAFA, the official PA news agency.

c.  On April 16, 2020 – two days before the PSJVTA's trigger date – Chairman Abbas declared that "[t]he issue of the prisoners will remain our first priority despite all the difficulties we are facing.  This is to preserve the just, inalienable rights of our people," as announced by WAFA, the official PA news agency.

55.     Defendants' public statements since April 18, 2020 confirm that Defendants have continued to make prisoner and "martyr" payments after the trigger date for the PSJVTA's deemed-consent provisions, 18 U.S.C. § 2334(e)(1)(A).  For example, as Exhibits 4 through 12 to the Spitzen Declaration reflect:

a.  On May 8, 2020, Defendant PA's official spokesman, Ibrahim Milham, announced:

The government confirms that it refuses to bow to Israeli pressure, will remain loyal to the prisoners and the martyrs, and

will preserve their rights, regardless of how much pressure is applied.

b.  On May 19, 2020, Mahmoud Abbas, the Chairman of Defendant PLO and President of Defendant PA, said in a speech to the Palestinian leadership in Ramallah that:

> We vow to our honorable martyrs and heroic prisoners (just now, the Israelis have asked the banks not to pay the prisoners, but we shall keep paying them, no matter how much the [Israelis] scream) . . . .

c.  On June 1, 2020, WAFA (Defendant PA's official news agency) reported that Qadri Abu Bakr, Chairman of the Prisoners and Ex-Prisoners Commission, stated that "the banks would continue paying the salaries of prisoners and of martyrs' families until a dedicated banking institution is set up for them."   WAFA reported that the proposed bank "would be considered a national achievement, since stopping the payment of those allowances would belittle the martyrs' history and sacrifices, and act against their struggle."

d.  On June 8, 2020, Mohammad Shtayyeh, Defendant PA's Prime Minister, gave an interview on PA TV in which he said, "we continued to pay the prisoners and the shahids in full" and "[w]e will remain committed to this until Judgment Day, until we are victorious, until the bloodbath stops, and until the prisons are closed.   This is one issue to which we remain committed."

e.  On June 8, 2020, in response to an order from the Israel Defense Forces that banks which continued to administer terrorist prisoners' accounts would be in violation of Israeli law, Shtayyeh stated:

> The Israelis said: "You have to close 40,000 bank accounts that belong to prisoners."  Some banks were afraid and all that, but we said to these banks: "That is a political decision.  It is forbidden for Israel to expand its military rule to the Palestinian lands.  Stay steadfast on this issue!"  The Israelis backtracked.  Just as they backtracked on this, on that, and on other things when [we] were steadfast and we persevered, I believe that on July 1 we will be in a different position.

f.   On July 5, 2020, WAFA carried a press release from Chairman Abu Bakr announcing that four banks had failed to transfer salaries to approximately 150 relatives of prisoners.  According to WAFA:

> Abu Bakr demanded that all banks commit to paying the prisoners' allowances and refrain from closing any of the accounts, or cancelling any of the ATM cards, considering that failing to pay the prisoners' allowances would violate the directives of the [Palestine] Monetary Authority and the government, and that it would violate the agreement that had previously been concluded.

g.   On July 9, 2020, Abu Bakr gave an interview in which he said: "Regarding the salaries, everything was fine.  On Wednesday [July 8], obviously, after having discussions with some of the banks that were disbursement stations, almost all of the prisoners . . . we didn't receive almost any phone call from any prisoner."

h.   On July 27, 2020, WAFA announced that Defendant PA's General Intelligence Service had provided more than 30 special grants to families of prisoners and shahids from a single town – Jenin.  WAFA reported that the payments were made "to implement what Mahmoud Abbas had repeatedly stated – that if we were left with just one penny, it would be given to the families of martyrs and prisoners."

i. On September 7, 2020, Abu Bakr gave a televised interview in which he said:

> Question: . . . you've said you'd submit your resignation, and then came the responses and the discussion, and conversations on the topic [of payments to prisoners] . . .
>
> Qadri Abu Bakr: I mean, look, we're under tremendous pressure.
>
> Question: Yes.  From whom?
>
> Qadri Abu Bakr: From the people, of course.  The prisoners' families.  From incarcerated prisoners.  From ex-prisoners.  We have an enormous amount of requests that we're unable of [sic] handle. . . . And as you've said, everyone is suffering from this situation, but the prisoners are especially suffering.  As for myself, I personally feel that not enough is being done, in general, and in regard to us as well.  We're the ones not doing enough.
>
> Question: Ok.  This failure, I mean, prisoner affairs should be a priority for everyone, including the payment of financial allowances to them.  Mr. Qadri, do you believe that there is negligence, that the prisoners' issue is being neglected, and that it isn't one of the priorities concerning financial allocations?
>
> Abu Bakr: No.  I don't think so.  That's because when the Israelis blocked the clearinghouse, a full salary was paid to them.  One hundred percent was paid to the prisoners, and fifty percent was paid to the employees.

j. On September 28, 2020, WAFA quoted Palestinian Prime Minister Shtayyeh as saying that despite financial hardships, Defendant PA continues to pay each month various kinds of salaries, including salaries to the families of prisoners and shahids:

> The Prime Minister explained that 350,000 salaries are paid every month, which go to military and civilian personnel, the needy families who amount to 120,000, including 81,000 families in the Gaza Strip, 140,000 employees in the West Bank and Gaza, in addition to 75,000 retired military and civilian

personnel in the West Bank and Gaza, as well as the families of prisoners and martyrs at home and in the Diaspora.

3.  *Prisoner and "Martyr" Payments Include Payments to Terrorists Who Killed or Injured U.S. Nationals*

56.  Hundreds of nationals of the United States have been killed or injured in terror attacks in Israel.

57.  The chart attached as Exhibit A, filed in *Sokolow*, lists more than one hundred individuals who, on information and belief, have been imprisoned after being fairly tried or pleading guilty for committing acts of terrorism that killed or injured one or more nationals of the United States.

58.  This chart includes the following individuals:

a.  Abdullah, Mohamed Sami;

b.  Aweis, Abdel Karim;

c.  Aweis, Nasser;

d.  Barghouti, Abdullah;

e.  Barghouti, Ahmed;

f.  Ghanem, Faras;

g.  Haliel, Ali;

h.  Hamash, Hilmi;

i.  Hamed, Ibrahim;

j.  Ma'ali, Mohammed;

k.  Al-Masri, Majid;

l.  Maqdad, Abdel Rahman;

m.  Mousleh, Mohamed;

n.  Noor, Munzar;

    o.  Sa'ad, Ahmed;

    p.  Salah, Ahmed;

    q.  Sa'di, Kahira;

    r.  Shawish, Nasser; and

    s.  Shehadeh, Sana'a.

59.    Payment records showing monthly and other payments by Defendants to the designees of each of the individuals identified in paragraph 58, due to their incarceration for committing acts of terrorism that killed or injured one or more nationals of the United States, pursuant to the practices described above, were admitted as evidence at trial in *Sokolow,* and, in a filing on October 31, 2014 at Docket No. 632-1 in *Sokolow* (the "Stipulation"), Defendants PLO and PA stipulated that "the Palestinian Authority's practices concerning the promotions of prisoners, payments to prisoners' families, and payments to martyrs' families have not materially changed" since the close of fact discovery in 2012.

60.    Exhibit A also lists more than 65 individuals who, on information and belief, have died while committing acts of terrorism that killed or injured one or more nationals of the United States.

61.    This list includes:

    a.  Awada, Sa'id;

    b.  Hashaika, Mohammed;

    c.  Ja'ara, Ali;

    d.  Idris, Wafa Ali Kaliel; and

    e.  Ramadan, Said Ibrahim Said.

62.     Payment records showing monthly and other payments by Defendants to the families of each of the individuals identified in paragraph 61, due to their deaths while committing acts of terrorism that killed or injured one or more nationals of the United States, pursuant to the practices described above, were admitted as evidence at trial in *Sokolow*, and, in the Stipulation, Defendants PLO and PA stipulated that "the Palestinian Authority's practices concerning the promotions of prisoners, payments to prisoners' families, and payments to martyrs' families have not materially changed" since the close of fact discovery in 2012.

63.     On information and belief, Defendants' practices concerning the payments described above, including those documented in *Sokolow*, have continued until today.

64.     On information and belief, after April 18, 2020, Defendants have made, directly or indirectly, monthly and other payments to the designees and/or families of one or more of the individuals identified in Exhibit A.

65.     On information and belief, after April 18, 2020, Defendants have, directly or indirectly, made payments to designees and/or family members of more than one hundred additional terrorists (in addition to those listed on Exhibit A) who were killed while perpetrating, or who, after being fairly tried or pleading guilty, were imprisoned for committing, acts of terrorism that injured or killed nationals of the United States, and such payments were made by reason of such death or imprisonment.  18 U.S.C. § 2334(e)(1)(A).

C.   *Defendants' Consent to Jurisdiction Under 18 U.S.C. § 2334(e)(1)(B)(iii)*

66.     Defendants have consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(iii), which provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after January 4, 2020, the defendant "conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority," subject to specified exceptions.

1.   *Defendants' Consular Activities*

67.   Defendants have for many years provided "consular services," such as the authentication of birth and death certificates and other forms, through agents located in the United States, including Ahmad Alahmad, Samir Farhat, and Awni Abu Hdba.

68.   For example, in 2019, Defendants' agent Awni Abu Hdba participated in the authentication of a document on behalf of Defendants while located in New Jersey. Declaration of David C. Russell, App. to Supp. Mem. in Support of Mot. to Recall Mandate at A278-82, *Waldman v. Palestine Liberation Org.*, No. 15-3135 (2d Cir. filed Mar. 25, 2019), Dkt. No. 305-5.

69.   On information and belief, after January 4, 2020, one or more agents described in paragraph 67 have participated in the authentication and/or consideration of documents for authentication on behalf of Defendants PA and PLO while physically located in the United States, including by transmitting documents for authentication to employees of Defendant PA's Ministry of Foreign Affairs.

2.   *Defendants' Political Propaganda Activities and Proselytizing*

70.   After January 4, 2020, while physically in the United States, Defendants have conducted press conferences and created and distributed informational materials.

71.   For example, on February 11, 2020, Chairman Abbas held a press conference with a retired Israeli politician in New York City, during which Chairman Abbas criticized the United States-proposed Israel-Palestine Peace Plan.  Chairman Abbas said:  "A few days ago, the so called deal of the century was introduced by America and totally went against international law and does not make way for a two-state solution.  This cannot be a basis for any future negotiations as it will not make way for a joint peace."

72.    Defendants' communications made while physically in the United States, on information and belief, were adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect United States foreign policy.

73.    After January 4, 2020, Defendants have maintained and updated a website in the name of the State of Palestine, through which they publish communications in English that, on information and belief, were adapted to or intended to influence the public within the United States.

74.    Defendants' website is maintained on a server physically located in the United States maintained by a service provider physically located in the United States, according to reports provided using the WHOIS lookup tool from the Internet Corporation for Assigned Names and Numbers and the State of Arizona Corporation Commission, copies of which were filed on November 12, 2020 at Docket No. 1018-37 in *Sokolow*.

75.    After January 4, 2020, Defendants have used their website to publish communications in English that, on information and belief, were adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect United States foreign policy.  For example:

a.   On or about January 10, 2020, Defendants published a letter on their website asserting that Israel is carrying out a "frenzied, illegal colonization campaign."

b.   On or about February 14, 2020, Defendants published a letter on their website asserting that Israel was engaging in "relentless crimes, provocation, incitement and inflammatory rhetoric."

c.  On or about February 20, 2020, Defendants published a letter on their website asserting that Israel was engaged in "continuing illegal settlement activities, land grab and annexation schemes."

d.  On or about February 26, 2020, Defendants published a letter on their website asserting that Israel "persists in rabid pursuit of its illegal colonization schemes."

e.  On or about March 13, 2020, Defendants published a letter on their website asserting that Israel "escalates the pace of its illegal annexation and colonization schemes and its aggressions and inflammatory rhetoric against the Palestinian people."

f.  On or about April 2, 2020, Defendants published a letter on their website asserting that Israel "has not for a minute ceased its illegal policies and practices."

g.  On or about April 15, 2020, Defendants published a letter on their website asserting that "Israel continues to cynically exploit the international community's focus on the life and death circumstances imposed by the COVID-19 pandemic, to entrench its illegal occupation, advance annexation, and escalate its repression of Palestinians."

h.  On or about April 29, 2020, Defendants stated on their website that Israel's accusations of antisemitism were being used to "taint legitimate criticism" by those who "dare to denounce Israel's violations of the Palestinian people's rights and its colonization of their land."

i.   On or about May 13, 2020, Defendants published a letter on their website asserting that "not a day has passed where Israel has not cynically exploited the COVID-19 crisis, globally and locally, to forge ahead with its annexationist plans and in full coordination with the current US administration."

j.   On or about June 4, 2020, Defendants published a letter on their website asserting that Israel "continues its depraved dehumanization of the Palestinian people and colonization of Palestinian land."

k.   On or about July 24, 2020, Defendants published a letter on their website asserting that Israel "forges ahead with its expansionist policies in the West Bank, cementing its illegal occupation and escalating its aggression against the Palestinian people, their land and their rights."

l.   On or about August 6, 2020, Defendants published a letter on their website asserting that the "continuing and escalating illegal policies and practices of Israel, the occupying Power, and its extremist military and settler forces" imposed a "grim situation" on the Palestinian people.

m.   On or about August 17, 2020, Defendants published a letter on their website asserting that "Israel carries on with its illegal colonization and annexation measures in our land and with its repression of the Palestinian people through measures of collective punishment, dispossession, displacement and other violations of their rights."

76.   After January 4, 2020, Defendants also have published on their website English translations of speeches given by Palestinian representatives at the United Nations.  On

information and belief, these translations were adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect United States foreign policy, including statements that:

    a.  The proposed United States peace plan "contains diktats, consecrates occupation and annexation by military force, and would lead to an Apartheid system, an anachronistic reality being implemented today in Palestine. It rewards occupation instead of holding it accountable for the crimes it has committed for decades against our people and land." (February 11, 2020.)

    b.  Israel should "stop its colonization and de facto annexation of Palestinian land; end its immoral blockade on the Gaza Strip; and release the thousands of Palestinians, including children, that it has imprisoned . . . . Instead, Israel carries on with its illegal policies and practices, business as usual." (April 23, 2020.)

    c.  "Israel has demonstrated time and time again its contempt for the rule of international law and for Palestinian rights and lives." (May 27, 2020.)

    d.  Israel is "drunk on power, propelled by infinite impunity, motivated by one single thought that it has been under the influence of for decades: grabbing maximum Palestinian land with minimum Palestinians." (June 24, 2020.)

    e.  The Palestinian people have been "dispossessed, exiled, occupied, colonized, annexed and deprived of their fundamental human rights." (July 21, 2020.)

77.   In addition, after January 4, 2020, Defendants have maintained and updated accounts in the name of the State of Palestine with U.S. social media companies Twitter and Facebook, though which they publish communications in English that, on information and belief, are adapted to or intended to influence the public within the United States.

78.   After January 4, 2020, Defendants have updated their Twitter account more than 200 times and their Facebook account more than 125 times.

79.   On information and belief, some or all of these Twitter and Facebook updates were done by persons and/or on computers that were physically present in the United States.

80.   On information and belief, Defendants' Twitter and Facebook accounts are maintained by Twitter and Facebook, respectively, on servers in data centers physically located in the United States.

81.   Defendants' Twitter and Facebook updates after January 4, 2020 have included communications in English that, on information and belief, were adapted to and/or intended to influence the public within the United States in furtherance of Defendants' political interests and/or to affect United States foreign policy, including:

   a.   The "official Palestinian position" concerning the United States proposed peace plan, entitled "Palestine Liberation Organization Position Paper Regarding the Trump Administration's so-called Plan."   (February 4, 2020.)

   b.   "They (#Israelis) are strengthening the #apartheid regime . . . this plan is a plan to put an end to the Question of #Palestine . . ." (ellipses in original). (February 11, 2020.)

c.  "US lawmakers call on their administration to oppose Israeli demolition of Palestinian homes."  (March 17, 2020.)

d.  "With resilience and strength, we will defeat [COVID-19] despite the continued Israeli violations against the land and people of Palestine." (March 30, 2020.)

e.  "Infographic: Summary of Israeli violations since the State of #Palestine declared a state of emergency over the outbreak of #COVID19."  (April 10, 2020.)

f.  "While the world works on saving lives, US and Israel working on killing prospects of peace through annexation."  (April 12, 2020.)

g.  "Palestinian prisoners are hostages to Israel's Gratuitous Cruelty and Must be Released."  (April 17, 2020.)

h.  "#Palestinian leadership will confront Israel's United Agenda of Permanent Aggression and #Annexation."  (April 20, 2020.)

i.   "We reiterate: the #US plan will not bring peace. This plan – and #Israels decision to proceed w/ #annexation – will destroy the two-State solution & entrench Israel's military control over the #Palestinian ppl and land." (April 23, 2020.)

j.  "Ever since Trump took office in 2016, Israel has built more illegal settlements on Palestinian land and displaced more families than in previous years."  (April 28, 2020.)

k.   An article entitled "Nakba is a Continuum of Injustice that Must End." The article begins: "Seventy-two years ago, the Nakba (Catastrophe) that

was forced upon the Palestinian people began with a systematic campaign of ethnic cleansing, expulsion, mass murder, theft, and destruction by Zionist militias that later formed the Israeli army."  (May 15, 2020.)

l.  "[T]he Palestinian Govt. will meet to discuss how we will move forward in response to Israel's announcement on the looming #annexation plan scheduled to take place this July."  (May 18, 2020.)

m.  A declaration by the Organization of Islamic Cooperation opposing the annexation plan.  (May 19, 2020.)

n.  A press release to "mobilize efforts to combat Israel's unlawful annexation plans in the Occupied Palestinian Territory."  (May 21, 2020.)

o.  Portions of a letter written by eighteen United States Senators expressing "grave concern regarding unilateral annexation of Palestinian territory." (May 22, 2020.)

p.  A series of videos entitled "one voice against Israel's annexation."  (June 7-11, 2020.)

q.  An "open letter to the Israeli Government concerning Annexation" by legal scholars.  (June 11, 2020.)

r.  A statement from the President of Sinn Féin that "[t]he global community must stand w/the Palestinian people at this time."  (June 12, 2020.)

s.  A statement denouncing "the Threat of Annexation: Israel's Acquisition of Lands Belonging to the State of #Palestine by Force."  (June 16, 2020.)

t.   A letter from European lawmakers "condemning Israel's latest plan to illegally #annex #Palestinian territory in the occupied #WestBank." (June 25, 2020.)

u.   A statement from Churches for Middle East Peace arguing that "[a]nnexing any (part) of the West Bank will entrench inequalities and abuses of Palestinian human rights." (June 26, 2020.)

v.   A letter stating that Israel is engaged in "institutionalized violence, terror and racism." (June 26, 2020.)

w.   A "call for immediate targeted sanctions to stop Israel's #Annexation and Apartheid" and a position paper for "all those interested to know more about the illegality of Israel's annexation and its impact on the lives of the people of #Palestine." (July 1, 2020.)

x.   A "call by international women leaders against Israeli annexation." (July 2, 2020.)

y.   A statement by retired politicians urging European politicians "to maintain their resolve against #Israel's plans to annex swathes of the #WestBank." (July 3, 2020.)

z.   A video captioned: "The reality of occupation and #annexation in #Jerusalem summed up. Ethnic cleansing, land theft, oppression, persecution and other #IsraeliCrimes continue in the absence of #accountability." (July 29, 2020.)

aa.   A retweeted assertion that "Israel must immediately allow entry of fuel and other essential items into #Gaza. (August 31, 2020.)

bb. A retweeted statement by Dr. Hanan Ashrawi, a member of Defendant PLO's Executive Committee, that "#crimes are perpetrated and perpetuated by Israeli occupation soldiers because they are part of a regime that awards criminality and ensures #impunity for crimes, domestically and internationally."  (October 25, 2020.)

82. On information and belief, Defendants have updated their website and/or their U.S.-based social-media accounts while physically inside the United States.

83. In summary, after January 4, 2020, Defendants have conducted non-exempt activities while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority.  18 U.S.C. § 2334(e)(1)(B)(iii).

D.  *Defendants' Consent to Jurisdiction Under 18 U.S.C. § 2334(e)(1)(B)(i)*

84. Defendants have consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(i), which provides that a defendant has consented to jurisdiction if it "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States" unless "used exclusively for the purpose of conducting official business of the United Nations."  18 U.S.C. § 2334(e)(3)(A).

85. Defendants own and maintain an office, premises, or other facility located in a townhouse on at 115 East 65th Street in New York City (the "East 65th Street Facility").

86. Defendants own the building in which the East 65th Street Facility is located in the name of the "Permanent Observer Mission of Palestine to the United Nations."

87. Agents, officers, and/or employees of Defendant PLO used the East 65th Street Facility after January 4, 2020.

88. Agents, officers, and/or employees of Defendant PA used the East 65th Street Facility after January 4, 2020.

89.     On information and belief, after January 4, 2020, one or more employees or agents of each Defendant has used the East 65th Street Facility to publish one or more communications described in paragraphs 76, 75, and 81 above.

90.     On information and belief, Defendants' East 65th Street Facility was used after January 4, 2020 for purposes in addition to conducting official business of the United Nations.

<u>Additional Facts Relating to Plaintiffs' Claims</u>

A.   *Defendants' Material Support of the Popular Front for the Liberation of Palestine*

91.     Defendant PLO was formed in 1964.  Since its establishment, Defendant PLO has funded, planned, and carried out tens of thousands of terrorist bombings and shootings, resulting in the deaths of thousands of innocent civilians and the wounding of thousands more. Hundreds of United States citizens have been killed or injured by terrorist attacks carried out by Defendant PLO and its constituent groups.

92.     In 1987, Congress explicitly found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad" and that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law . . . ."  22 U.S.C. § 5201.  At all relevant times, Defendant PLO utilized terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals, including the expulsion of Jews from the West Bank and Gaza Strip.

93.     Defendant PLO has rarely, if ever, carried out terrorist attacks in its own name.  Rather, at all times relevant hereto, Defendant PLO has funded, planned and carried out terrorist attacks through its officials, agents and employees, who are and were organized into various factions, units, cells and groups that plan and execute terrorist attacks on behalf of and

for Defendant PLO, and/or as agents and/or as alter egos of Defendant PLO, using various and sundry appellations and *noms de guerre* (collectively hereinafter referred to as PLO "organs").

94.     One of Defendant PLO's terrorist organs is a faction of Defendant PLO known as the Popular Front for the Liberation of Palestine ("PFLP").    The PFLP is Defendant PLO's second-largest faction and is one of Defendant PLO's "constituent groups" referenced by Congress in 22 U.S.C. § 5201.  Defendant PLO and the PFLP do not have separate legal personalities: the PFLP is simply a subdivision and/or department of Defendant PLO, all members of the PFLP are per se members of Defendant PLO, and all actions of the PFLP, including the Terrorist Bombing, constitute actions of Defendant PLO.

95.     The PFLP is a radical Marxist-Leninist terrorist faction of Defendant PLO. The PFLP's openly declared goals include the expulsion of Jews from the West Bank and Gaza Strip, which goal Defendants PLO and PA openly and expressly share.  The PFLP seeks to achieve this goal by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank, and elsewhere.  The PFLP proudly and openly acknowledges that it uses terrorism to achieve its political goals.

96.     The PFLP subscribes and is loyal to Defendant PLO's Charter, which sets forth Defendant PLO's ideology and goals (including the expulsion of Jews from the West Bank and Gaza Strip).  In 2002, soon after the Terrorist Bombing, a senior PA and PLO spokesperson, Yasser Abed Rabbo, stated that the "PFLP . . . is committed to the principles of the PLO."  And in official public statements issued by the PFLP soon before the Terrorist Bombing, in late 2001, the PFLP confirmed that the "Popular Front for the Liberation of Palestine is a basic component of the Palestine Liberation Organization," and that the PFLP's relations with Defendant PA are "relations of mutual support and unity."

97.     The PFLP is also extremely hostile to the United States, which it considers to be predatory, imperialistic, capitalistic, and an ally of Israel.

98.     Between the 1960s and February 2002 (and through the present day), the PFLP carried out hundreds of terrorist attacks, including hijackings of United States aircraft, in which scores of Israeli, American, and other civilians were murdered, and hundreds more injured.

99.     Accordingly, the PFLP has been continuously designated by the United States government as a Specially Designated Terrorist ("SDT") since 1995, as a Foreign Terrorist Organization ("FTO") since 1997, and as a Specially Designated Global Terrorist ("SDGT") since 2001.

100.    The provision of funding, or other material support or resources, to an SDT, an FTO, or an SDGT, such as the PFLP, is a crime under numerous provisions of United States law, including the provisions of Chapter 113B of Title 18 of the U.S. Code.

101.    Notwithstanding the PFLP's bloody record of terrorism, including anti-American terrorism, and the grave United States criminal prohibitions on providing the PFLP with funds or other material support or resources, Defendant PLO continuously provided the PFLP with many millions of dollars in funding, and other material support and resources, from the 1960s until (and after) February 2002.  Between 1994 and until (and after) February 2002, Defendant PA also provided the PFLP with funding, and other material support and resources, worth millions of dollars.

102.    Since its establishment in 1994, Defendant PA has also funded, planned and carried out thousands of terrorist bombings and shootings, resulting in the deaths of thousands of civilians and the wounding of thousands more.  Defendant PA funded, planned and

carried out these terrorist attacks through its officials, agents, and employees, including particularly through its so-called "police," "security" and "intelligence" agencies, and through PLO organs including the PFLP.  Many United States citizens have been murdered, and many more maimed, by terrorist attacks carried out by Defendant PA through its officials, agents, and employees, and through Defendant PLO's organs acting on behalf of, and with funding and other assistance from, Defendant PA.  At all relevant times, Defendant PA utilized these terrorist attacks as an established and systematic policy and practice to advance and achieve its political goals, including the expulsion of Jews from the West Bank and the Gaza Strip.

103.   In 2000, Defendants launched an intensive terrorist campaign known as the "al-Aqsa Intifada" or the "Second Intifada," which continued until 2005.  Throughout the Second Intifada (and prior), Defendants recruited notorious terrorists, including PFLP terrorists, into Defendant PA's "police," "security" and "intelligence" agencies, armed them, and put them on Defendant PA's payroll.  Defendants released known terrorists from their jails.  Through their official publications, television stations, and newspapers that they controlled, Defendants directed the members of Defendant PA's own "police," "security" and "intelligence" agencies, and Defendant PLO's organs including the PFLP, to commit acts of terrorist violence against Jews and Israelis.  They provided weapons, funding, safe houses, personnel, and other resources and support to terrorists and terrorist organizations, including the PFLP.  They glorified and rewarded the perpetrators of violence with money, promotions, state-sponsored funerals, and media accolades.   Officers and employees of Defendant PA's "police," "security" and "intelligence" agencies imprisoned for terrorist attacks by Israel remained on Defendants' payrolls, collecting generous salaries and promotions in rank while Defendants publicly lionized them as national heroes.  Non-employees (including non-Palestinians) imprisoned by Israel for

terrorism were also rewarded by Defendants PLO and PA with monthly "salaries" during their incarceration and after their release.  Defendants also made "martyr" payments to the families of terrorists killed in terrorist attacks, both as a reward for their attacks and as a financial safety net for the terrorists' families, aimed at inducing and encouraging more such attacks.  Defendants incited, induced, directed, supported, orchestrated, executed, and then ratified the Terrorist Bombing, as part of their "Intifada" terrorist campaign.

104.    The purpose of Defendants' Second Intifada terror campaign was to intimidate and coerce the civilian population of Israel, to influence the policy of the United States and Israeli governments by intimidation and coercion, and to affect the conduct of the United States and Israeli governments by mass destruction.  Specifically, Defendants carried out this campaign of terrorism with the goal of ending the Israeli Jewish presence in the West Bank and Gaza Strip.  It was a classic protection racket:  Defendants caused and carried out terrorist attacks resulting in the deaths and maiming of thousands of civilians, disingenuously condemned that violence, and then announced that the violence would end only if Israel withdrew from territory Defendants demanded.

105.    At all relevant times, Defendants were alter egos of one another, acted in complete unison, and were controlled by one man – Yasser Arafat.  Arafat was the Chairman of Defendant PLO from 1969 until his death in 2004, and the President of Defendant PA from 1994 to 2004.

106.    Arafat controlled the day-to-day operations, budgets, spending, personnel decisions and activities of both Defendants.

107.    Through media outlets owned and controlled by Defendants PLO and PA, and through speeches by PA and PLO officials, Defendants directed, authorized, and incited

terrorist violence against Jews and Israelis.   Most important and horrific were magazines published for PA "police," "security" and "intelligence" agencies – published by Defendant PA, edited and authored in many cases by Defendants' so-called "Political Guidance" apparatus, and distributed to PA "police," "security" and "intelligence" personnel.  This "Political Guidance" apparatus had representatives in all such PA agencies.  Its job was to "educate" PA personnel by delegitimizing the existence of the State of Israel, and inciting them to hatred against Jews and Israelis, thereby encouraging terrorist attacks on Jews and Israelis by PA personnel.

108.    Furthermore, PA TV – which Defendants owned and controlled – broadcast programs in which children expressed their wish to engage in "*shahada*" (suicide martyrdom) because *shahada* was "beautiful."  Moreover, PLO and PA leader Arafat appeared in public with his machine gun and made public speeches encouraging violence – including a notorious one to a group of children in which he glorified a child who committed suicide and then led the children in a chant of "a million martyrs marching to Jerusalem."  Programming on PA TV encouraged viewers to "kill the Jews, and the Americans who are just like them."

109.    In 2000, soon after the start of the Second Intifada, Defendants and the PFLP (and other terrorist groups) established and participated in a joint steering committee called "the National and Islamic Forces," to plan and coordinate terrorist violence against Israeli targets.  As the Anti-Defamation League explained: "The National and Islamic Forces group was formed shortly after the outbreak of the second intifada in 2000. It is a committee comprised of representatives from each of the most important Palestinian political factions, both mainstream and radical, including Hamas, the PFLP and the PLFP-GC.  It was formed with the authorization of former Palestinian leader Yasser Arafat and was led by Marwan Barghouti, who was

incarcerated in 2002.  The National and Islamic Forces coordinates the agenda of its members and helps plan and execute joint terror operations against Israel."

110.    As a result of Defendants' pro-terror activities and policies during the Second Intifada, hundreds of Defendant PA's "police," "security" and "intelligence" employees are in prison in Israel, after having executed terrorist crimes during that period at Defendants' behest – as Defendants' own officials and websites proudly confirm.  Many other such PA officials and employees were killed while carrying out terrorist attacks at Defendants' behest.

111.    During the period relevant hereto, the President of the United States, the United States Department of State, special United States envoys, the Congress of the United States and others repeatedly demanded that Defendants PA and PLO halt terrorist attacks by their employees and agents, and by PLO organs and other terrorist groups operating from PA-governed territory.

112.    Defendants PLO and PA refused and/or ignored these American demands. On the contrary, during the years prior to the Terrorist Bombing, Defendants PLO and PA, by and through their officials, employees and agents acting within the scope and course of their employment and agency, pursuant to authorization and instructions of Arafat and other agents and employees of Defendants PLO and PA, knowingly and intentionally provided the PFLP and other terrorists with material support and resources in the form of weapons, personnel, safe harbor, training, funding, communications equipment and other material support for their terrorist activities, including without limitation as described below.

113.    Defendants provided the PFLP with a crucial safe haven and a base of operations free from interdiction or interference by Israeli security forces, by permitting and encouraging the PFLP to freely operate and conduct activities in the territory governed by

- 40 -

Defendant PA, and to advocate, encourage, solicit, facilitate, incite, sponsor, organize, plan and execute acts of violence, murder and terrorism against innocent civilians in Israel and the West Bank.  Defendants permitted the PFLP to maintain and operate headquarters and offices in the West Bank cities of Qalqilya, Nablus, Jenin, Ramallah, and Tulkarem, and in various locations in the Gaza Strip, all of which were areas within Defendant PA's security and law enforcement jurisdiction.

114.   Defendants paid the rent for the PFLP's many headquarters and offices operating within the territory governed by Defendant PA, thereby vastly increasing the PFLP's ability to plan and execute terrorist attacks in many respects.  For example, the PFLP regularly utilized its offices for terrorist and terrorism-related activities, including as follows:

a. Nuraddin Said Daoud, a Qalqilya resident who was a member of the PFLP's "military" (i.e., terrorist) wing and was convicted of carrying out numerous terrorist shooting attacks and an attempted bombing, was inducted into the PFLP in the PFLP's Qalqilya office in 1998;

b. In October 2000, the PFLP's offices in the West Bank were used by senior PFLP leader Ahmed Saadat (then head of the PFLP in the West Bank) to meet with the commander of a PFLP "military" cell, Fares Nasser Sabti Barghouti, in order to arrange for the provision of assistance to Barghouti's "military" cell for the specific purpose of carrying out terrorist attacks;

c. Hassan Judeh, who was in charge of the PFLP's office in Nablus in 2001 and 2002, personally recruited terrorists into a PFLP "military" cell, and instructed them to carry out shooting attacks;

d.   During the spring of 2001 (at least) the PFLP had a sign on the door of its office in Ramallah calling on any operative interested in participating in military activity to contact PFLP leader Ahed Gholmeh;

e.   Gholmeh met with PFLP operatives in the Ramallah PFLP office in order to induct them into the "military" wing of the PFLP for the purpose of executing terrorist attacks;

f.   PFLP terrorist operative Samer Ghazi Issa Mutaeb, who was convicted for his role in carrying out two attempted bombings in Jerusalem in August 2001 (a car bomb and a bomb hidden inside a watermelon placed on a public bus), was recruited into the PFLP in one of the PFLP's offices, where he was told about the PFLP's terrorist activities; and

g.   The PFLP used its publication office in the Gaza Strip to hold meetings between the leader of the PFLP's "military" wing in the area, Imad Ahmed, and other members of that terrorist wing, in order to recruit additional operatives to carry out terrorist attacks, including bombings.

115.   Moreover, during the relevant period, even the supposedly "civilian" activities conducted by the PFLP in its offices were intended to assist and serve as an infrastructure for the "military" activity, and accordingly there was no genuine separation between the "civilian" and "military" activities.

116.   Defendants also brandished and leveraged the threat of violence against Israel to successfully engineer the early release of numerous PFLP operatives serving sentences in Israeli prisons for terrorist activities.  By doing so, Defendants provided the PFLP with large cadres of experienced and dedicated terrorist personnel.  For example, in September 1999,

Defendants demanded and obtained the early release from Israeli prisons of 60 PFLP terrorists, thereby significantly boosting the PFLP's operational abilities in the year prior to the Second Intifada. One of the PFLP terrorists whose release was obtained by Defendants at this time was Ra'ed Nazal (a/k/a Ra'ed Madhi), who was serving a life sentence for murder. Immediately upon his release Ra'ed Nazal resumed his PFLP terrorist activities, became the head of the PFLP "military" wing in Qalqilya, and masterminded the Terrorist Bombing.

117.    Defendants paid "salaries" and other financial benefits to hundreds of PFLP operatives in the West Bank and Gaza Strip who had previously been imprisoned by Israel for terrorist activities (including both those whose release Defendants engineered, and others), purely by reason of their having been incarcerated for terrorist activities. This financial support, in return for which the freed terrorists were not required to perform any work, enabled and encouraged these experienced PFLP terrorists to continue their PFLP terrorist activities as their full-time occupation. By doing so, Defendants provided the PFLP with a large number of leaders and operatives.

118.    Defendants provided a salary, office, car and other valuable material benefits to the Deputy Secretary General of the PFLP, Abdel Rahim Malouh, who served as the PFLP representative on Defendant PLO's Executive Committee.

119.    Contemporaneously with their Second Intifada terror campaign in Israel, the West Bank and the Gaza Strip, Defendants PLO and PA launched an extensive influence campaign to use that terror campaign to manipulate the United States government into pressuring the Israeli government into accommodating Defendants' political goals. This influence campaign was expressly directed at the society and government of the United States. For example, between 2000 and 2002, Hassan Abdel Rahman, the Chief Representative of

Defendants PLO and PA in the United States at the time, repeatedly asserted to United States leaders and the American public that the terrorist attacks against Jewish and Israeli targets would end only if the United States pressured Israel to withdraw from the West Bank.  A small sampling of Abdel Rahman's statements demonstrates the linkage made between the terrorist attacks and the demand for a change in United States policy.  He appeared on CNN on April 12, 2002 and stated that the Israeli Jewish presence in the West Bank constituted "one of the most brutal occupations in modern history.  That's what turns people into suicide bombers."  He appeared on PBS, on March 29, 2002 and stated: "Mr. Colin Powell is missing the point . . . He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories . . . if the occupation continues . . . no one can stop the Palestinians."

120.    Abdel Rahman made other appearances on national TV in the United States.  On CNN on February 3, 2002 – less than two weeks before the Terrorist Bombing – he demanded and ominously threatened: "[t]he Jewish settlements . . . have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel."  Also on CNN, on April 14, 2002, he stated: "I think the involvement of the United States on the site would be very, very helpful because obviously the two parties trust the United States and they want the United States to be involved. . . .  We feel that 35 years of foreign, illegal occupation is more than enough."

121.    Similarly, top PLO leader Marwan Barghouti published an op-ed piece in the *Washington Post* in January 2002 entitled "Want Security? End the Occupation."  This was at the very same time that Barghouti himself was orchestrating multiple terror attacks in Israel.

122.    Defendants PLO and PA caused and executed acts of terrorism that killed and injured many Americans, including Plaintiffs here and their decedents, all the while

pressuring the United States government, under false pretenses, to act on their behalf. Defendants' attempt to influence the United States depended on continued terror attacks in Israel, the West Bank, and Gaza, which were being orchestrated by Defendants at the same time. Defendants' U.S.-media campaign, directed to the society and government of the United States, formed an element of their liability-creating conduct because, *inter alia,* that campaign manifested Defendants' apparent and actual intent to influence the government and policy of the United States through acts of violence.

B.   *The Terrorist Bombing*

123.    On Saturday evening, February 16, 2002, fourteen-year-old Keren Shatsky and fifteen-year-old Rachel Thaler went for pizza at a busy pizzeria located at an outdoor shopping mall in Karnei Shomron, a West Bank town just 14 miles from Qalqilya, an area governed by Defendant PA.  Hundreds of American citizens live, work and shop daily in Karnei Shomron.

124.    Rachel's teenage brother, Leor, and a friend, Chana Friedman, joined them.  Others dining that evening included Plaintiffs Hillel Trattner, his wife Ronit, and Steven Braun.

125.    At approximately 7:55 p.m., Sadeq Abdel Hafez, a PFLP operative, arrived at the pizzeria, walked to the table where Rachel Thaler, Leor Thaler, and Chana Friedman sat chatting amiably in English, and detonated the explosive device he was carrying.

126.    Keren Shatsky died at the scene.  Rachel Thaler, left severely injured and suffering, lived for another 11 days before dying.  The others survived but with severe injuries.

127.    The Israeli governmental agency responsible for preventing and investigating terrorist attacks in Israel and the West Bank is the Israel Security Agency ("ISA"), whose functions and duties are generally analogous to those of the FBI.

- 45 -

128.    In 2007, the ISA issued a report titled "Suicide Terrorists in the Current Conflict September 2000 – September 2007" (the "2007 ISA Report").

129.    In respect to the Terrorist Bombing, the 2007 ISA Report made the investigative finding that the attack was planned and executed by the PFLP military network in Qalqilya, under the direction of Ra'ed Madhi, in collaboration with the PFLP network in Nablus, headed by Ahed Gholmeh.  Plaintiffs hereby incorporate this ISA finding into this complaint by reference.

130.    Ra'ed Madhi, more commonly known as Ra'ed Nazal ("Nazal"), was both a Captain in Defendant PA's National Security force and the leader of the PFLP in Qalqilya when he masterminded the Terrorist Bombing.

131.    Nazal was imprisoned by Israel for his PFLP-related activities in 1985.  In prison, Nazal continued actively recruiting young people into the PFLP, and tortured to death a fellow Palestinian prisoner whom he suspected of cooperating with Israel against terrorism.

132.    Defendants PLO and PA successfully demanded Nazal's early release from prison in September 1999, as part of negotiations with Israel.  Defendants sought Nazal's release because of his history of and dedication to deadly anti-Israel violence.

133.    Additionally, because of Nazal's history of and dedication to murderous anti-Israel terrorist activity, upon his release Nazal was hired by Defendant PA as an officer with the rank of Captain in the PA's National Security force in Qalqilya, with commensurate salary.

134.    Simultaneous with his employment by the PA, immediately upon release from prison, Nazal assumed a leadership role in the PFLP's cell in Qalqilya and its environs.  He was elected General Secretary of the PFLP for the Qalqilya Governorate in December 1999.

135.     Defendant PA paid Nazal a regular monthly salary for his position as a Captain in its National Security force, but assigned him no duties or responsibilities, in order to enable him to serve full-time as the PFLP commander in the Qalqilya region.  Also, during this time, Defendant PA funded the PFLP headquarters in Qalqilya.

136.     While employed and paid by Defendant PA, and with the full, real-time knowledge of the defendants, Nazal perpetrated terrorist activities on behalf of the PFLP and recruited Palestinian youth to the PFLP.  One such recruit was Sadeq Abdel Hafez, the PFLP operative who committed the Terrorist Bombing.

137.     Within months of Nazal's prison release in 1999, another PFLP member introduced the then-16-year-old Hafez to Nazal.  Two years later, under the command of PA "security" Captain and PFLP leader Nazal, Hafez detonated the bomb in the Karnei Shomron pizzeria and died in the explosion.  It was Nazal and the PFLP, with the aid, financial support and approval of Defendants, who planned, initiated and caused the Karnei Shomron bombing.

138.     Nazal died two months after the Karnei Shomron bombing in a stand-off with Israeli forces that were pursuing him in connection with his role in the Karnei Shomron attack.  As a reward for, and as an endorsement of, Nazal's role in the bombing, Defendant PA posthumously promoted Nazal from Captain in its National Security apparatus to the rank of Major, and Defendants began regularly making "martyr" payments to Nazal's family.

139.     Sadeq Abdel Hafez's family also received "martyr" payments from Defendants as a reward for and endorsement of Hafez's role in the bombing.

140.     The "PFLP network in Nablus," which the 2007 ISA Report identified as having assisted Nazal to carry out the Terrorist Bombing, included, among others, the following PFLP leaders and operatives: Ahed Gholmeh; Allam Kaabi; Yamen Faraj; Amjad Melitat; Kamil

Abu Hanish; Mahmoud Assad Issa; Munzar Khalaf Mufleh; and Fakher Nasser.  In 2016 Kaabi publicly admitted in a video interview that the Nablus PFLP network assisted Nazal to carry out the Terrorist Bombing.  Just a week before the Terrorist Bombing, Faraj and other members of the Nablus PFLP network sent Fakher Nasser to carry out a suicide bombing in Tel Aviv.

141.    The PFLP, in conspiracy with and materially supported by Defendants, committed, planned, and authorized the Terrorist Bombing.  Hafez was a PFLP operative, at all relevant times acting at the behest, instruction, and authorization both of the PFLP and of Nazal in his capacity as an employee and officer of Defendant PA.

142.    The Terrorist Bombing was planned and carried out by Nazal, Hafez and others acting as Defendants' agents and employees and within the scope of their agency and employment, pursuant to Defendants' prior authorization, instructions, solicitation and directives, in furtherance of Defendants' goals and policies, and using personnel, funds, and other material support and resources that Defendants supplied them, for the express purpose of carrying out this attack and terrorist attacks of this type.

143.    Defendants agreed, conspired and acted in concert with the PFLP, Nazal, Hafez and others to carry out the Terrorist Bombing, knowingly provided substantial assistance to them, aided and abetted them in carrying out the bombing, and authorized, ratified and participated in the bombing.

144.    In a televised interview in February 2005, the President of  Defendant PA and Chairman of Defendant PLO, Mahmoud Abbas, explained the rationale behind the demand made by Defendants that Israel free all Palestinians convicted and imprisoned for terrorist violence, stating: "I demand [the release of] prisoners because they . . . did what we, we, ordered them to do. We - the [Palestinian] Authority."

First Claim for Relief
(By All Plaintiffs Against Both Defendants)
Civil Liability for International Terrorism Under the ATA

145.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 144.

146.    The acts of Defendants PLO and PA constituted a violation of the criminal laws of the United States and of the several States, and/or would constitute criminal violations if committed within the jurisdiction of the United States and of the several States.  The actions of Defendants violate, or if committed within United States jurisdiction would violate, literally scores of federal and state criminal statutes prohibiting, *inter alia* and without limitation: the provision of material support to FTOs, SDTs and SDGTs and/or for terrorist activities (18 U.S.C. §§ 2339A and 2339B); homicide; battery; assault; and the construction and use of explosive devices; as well as the criminal prohibitions against aiding and abetting, serving as an accessory to, solicitation of, and conspiracy to commit, these and other such felonies.

147.    Defendants' actions described herein were carried out pursuant to, and as implementation of, an established policy of utilizing terrorist attacks to achieve their goals. Specifically, Defendants' acts appeared and were in fact intended to terrorize, intimidate and coerce the civilian population in Israel into acquiescing to Defendants' political goals and demands.  These acts also appeared and were in fact intended to influence the policy of the United States and Israeli governments by intimidation or coercion, and to affect the conduct of the United States and Israeli governments by mass destruction, in order to induce those governments to accept Defendants' political goals and demands.   Moreover, Defendants, themselves and through their respective officials, representatives, spokesmen, communications media and other agents: (1) repeatedly admitted to committing acts of terrorism and violence against the civilian population in Israel and the West Bank, (2) expressly stated that these acts

were intended to intimidate and coerce that civilian population into acquiescing to Defendants'
political goals and demands and to influence the policy of the United States and Israeli
governments by intimidation or coercion in favor of Defendants' political goals and demands,
and (3) expressly threatened the further occurrence of such terrorist acts if their political goals
and demands were not achieved.  Many such statements were made inside the United States
and/or were directed to or at the United States government.

148.    The acts of Defendants described herein therefore appear to be and were in
fact intended to intimidate and coerce a civilian population, and to influence the policy of a
government by intimidation or coercion, within the meaning of 18 U.S.C. § 2331.

149.    The acts of Defendants were violent, and were dangerous to human life,
by their nature and as evidenced by their consequences.

150.    The acts of Defendants occurred outside the territorial jurisdiction of the
United States.

151.    The actions of Defendants are therefore "acts of international terrorism" as
defined under 18 U.S.C. §§ 2331 and 2333.

152.    As a direct and proximate result of the acts of international terrorism
committed by Defendants, including the Terrorist Bombing, Keren Shatsky and Rachel Thaler
(the "Decedents") were murdered and Plaintiffs suffered severe injuries and harm.

153.    Decedent Keren Shatsky was murdered in the Terrorist Bombing.  The
murder of Keren Shatsky caused decedent, her estate and Plaintiffs Shabtai Scott Shatsky, Jo
Anne Shatsky, Tzippora Shatsky Schwarz, Yoseph Shatsky, Sara Shatsky Tzimmerman, Miriam
Shatsky and David Raphael Shatsky severe injury, including: death; pain and suffering;

pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

154.    Decedent Rachel Thaler was murdered in the Terrorist Bombing.   The murder of Rachel Thaler caused decedent, her estate and Plaintiffs Ginette Lando Thaler, Michael Thaler, Leor Thaler, Zvi Thaler and Isaac Thaler severe injury, including: death; pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

155.    Plaintiffs Leor Thaler, Hillel Trattner, Ronit Trattner, Steven Braun and Chana Friedman suffered severe physical, psychological and other injuries as a result of the Terrorist Bombing, including: burns, disfigurement, blindness, loss of physical and mental functions and shrapnel wounds; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

156.    The injuries suffered by Plaintiffs Leor Thaler, Hillel Trattner, Ronit Trattner, Steven Braun and Chana Friedman in the Terrorist Bombing caused them and Plaintiffs Ginette Lando Thaler, Michael Thaler, Zvi Thaler, Isaac Thaler, Aron S. Trattner, Shelley Trattner, Efrat Trattner, Hadassa Diner, Yael Hillman, Bella Friedman, Ilan Friedman, Miriam Friedman, Yehiel Friedman and Zvi Friedman severe harm, including: loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and pecuniary loss and loss of income.

157.    Defendants are therefore jointly and severally liable for all of Plaintiffs' damages, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

158.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

Second Claim for Relief
(By All Plaintiffs Against Both Defendants)
Aiding and Abetting and Conspiracy Under 18 U.S.C. § 2333(d)

159.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 158.

160.    The Terrorist Bombing constituted a violation of the criminal laws of the United States, and was violent and dangerous to human life.  The Terrorist Bombing occurred outside the territorial jurisdiction of the United States, and appeared and was in fact intended to influence the civilian population in Israel by intimidation or coercion into acquiescing in the shared political goals and demands of Defendants and the PFLP.  The Terrorist Bombing also appeared and was in fact intended to influence the policy of the United States and Israeli governments by intimidation or coercion, and to affect the conduct of the United States and Israeli governments by mass destruction in order to induce those governments into accepting the shared political goals and demands of Defendants and the PFLP.

161.    Therefore, the Terrorist Bombing constituted an "act of international terrorism" as defined in 18 U.S.C. § 2331.

162.    The PFLP committed, planned, and authorized the Terrorist Bombing.

163.    The PFLP was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it committed, planned, and authorized the Terrorist Bombing.

164.    The PFLP, Nazal and Hafez are each a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

165.    The PFLP, Nazal and Hafez committed the Terrorist Bombing.

166.    Defendants knowingly aided and abetted the PFLP, Nazal and Hafez in the commission of the Terrorist Bombing, by providing them with substantial assistance that they knew and intended would enable, facilitate, support and assist them in carrying out terrorist attacks including the Terrorist Bombing.

167.    Defendants also engaged in an extensive, long-term criminal scheme with the PFLP and Nazal, involving the funding, promotion and use of terrorism to achieve their shared goal of removing all Jews from the West Bank.  Defendants and the PFLP created, maintained and participated in a standing steering committee, called the National and Islamic Forces, to jointly plan and coordinate terrorist attacks against Israeli targets.  Pursuant to and in furtherance of that common scheme with Defendants, the PFLP, Nazal and Hafez carried out the Terrorist Bombing.

168.    Defendants are therefore jointly and severally liable, as aiders and abettors and as co-conspirators, for all of the damages due to Plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

169.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

Third Claim for Relief
(By All Plaintiffs Against Both Defendants)
Negligence Under the Law of the State of Israel

170.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 169.

171.    Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968 ("CWO").  The CWO provides that any person injured or

harmed by the torts enumerated in the CWO is entitled to relief from the person liable or responsible for the tort.

172.   Section 35 of the CWO creates a tort of Negligence.

173.   CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances, he is obligated not to act as he did.

174.   Under CWO § 35, any person who causes damage to another by his negligence commits a civil wrong.

175.   CWO § 36 provides that the obligation stated in CWO § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

176.   The Israeli courts construe the tort of Negligence to include intentional and/or reckless conduct.

177.   Defendants committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

178.    Defendants did not, in the performance of their occupations, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO.

179.    Defendants acted negligently in connection with Plaintiffs and the Decedents, toward whom, in the circumstances described herein, Defendants had an obligation not to act as they did.  Defendants were obligated not to act as they did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, Plaintiffs and the Decedents were liable to be injured by Defendants' acts described herein.

180.    Defendants' behavior therefore constitutes Negligence under the CWO, and as a result of the Defendants' negligent behavior the Terrorist Bombing was carried out, the Decedents were murdered and they and Plaintiffs suffered severe injuries and harm.

181.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

182.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

## Fourth Claim for Relief
### (By Plaintiffs Michael Thaler and Isaac Thaler Against Both Defendants)
### Intentional or Negligent Infliction of Emotional Distress Under Florida Law

183.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 182.

184.    Defendants' conduct was willful and malicious, and/or grossly negligent; was outrageous and dangerous to human life; and violated applicable criminal law, all international standards of civilized human conduct, and common decency.

185.    Defendants' conduct terrorized Plaintiffs Michael Thaler and Isaac Thaler, who were domiciliaries of the State of Florida at the time of the Terrorist Bombing, and caused them egregious emotional distress.

186.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs Michael Thaler's and Isaac Thaler's damages, in such sums as may hereinafter be determined.

187.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

Fifth Claim for Relief
(By All Plaintiffs Against Both Defendants)
Civil Conspiracy Under Florida Law and the Law of the State of Israel

188.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 187.

189.    Defendants knowingly and willingly conspired, agreed and acted in concert with each other and with the PFLP, Nazal and Hafez, in a common plan and design to facilitate and cause acts of international terrorism, including the Terrorist Bombing.

190.    Defendants' conspiracy with the PFLP, Nazal and Hafez caused, facilitated and resulted in the Terrorist Bombing, and hence the murder of the Decedents and severe damage to Plaintiffs.

191.    The claims of Plaintiffs Michael Thaler and Isaac Thaler under this Fifth Claim for Relief are governed by civil conspiracy principles under Florida law.  The claims of all other Plaintiffs under this Fifth Claim for Relief are governed by civil conspiracy principles under Israeli law.

192.    Civil conspiracy principles are recognized in Israeli law in section 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an

act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

193.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

194.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

Sixth Claim for Relief
(By All Plaintiffs Against Both Defendants)
Aiding and Abetting Under Florida Law and the Law of the State of Israel

195.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 194.

196.    Defendants provided the PFLP and Nazal with substantial material support and resources, and aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of international terrorism, including the Terrorist Bombing.

197.    Defendants' provision of material support and resources and other acts of aiding and abetting caused, facilitated and resulted in the Terrorist Bombing, and hence the murder of the Decedents and severe damage to Plaintiffs.

198.    The claims of Plaintiffs Michael Thaler and Isaac Thaler under this Sixth Claim for Relief are governed by aiding and abetting principles under Florida law.  The claims of all the other Plaintiffs under this Sixth Claim for Relief are governed by aiding and abetting principles recognized under Israeli law.

199.    Aiding and abetting principles are recognized in Israeli law in section 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

200.    Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

201.    Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

Seventh Claim for Relief
(By All Plaintiffs Against Both Defendants)
Vicarious Liability/*Respondeat Superior*
Under Florida Law and the Law of the State of Israel

202.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 201.

203.    At all relevant times, Nazal was an agent, officer and employee of Defendants acting within the scope of his agency, office and employment.  Nazal engaged in the actions described herein within the scope of his agency, office and employment and in furtherance of the interests of Defendants.

204.    At all relevant times, the PFLP and Hafez were agents of Defendants acting within the scope of their agency.  The PFLP and Hafez engaged in the actions described herein within the scope of their agency, in furtherance of the interests of the Defendants.

205.    Defendants authorized, ratified and condoned the actions described herein of the PFLP, Nazal and Hafez.

206.    Therefore, Defendants are vicariously liable for the acts of the PFLP, Nazal and Hafez.

207.    The claims of Plaintiffs Michael Thaler and Isaac Thaler under this Seventh Claim for Relief are governed by *respondeat superior* and vicarious liability principles recognized under Florida law.  The claims of all the other Plaintiffs under this Seventh Claim for

Relief are governed by *respondeat superior* and vicarious liability principles recognized under Israeli law.

208.   *Respondeat superior* and vicarious liability principles are recognized in the CWO.  Section 13 of the CWO provides that an employer is liable for an act committed by his employee, if the employer authorized or ratified the act, or if the employee committed the act in the course of his employment.  Section 14 of the CWO provides that a person who employs an agent for the performance of an act or a category of acts is liable for everything the agent does in the performance of that act or category of acts, and for the manner in which the agent performs them.

209.   Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages, in such sums as may hereinafter be determined.

210.   Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large, therefore warranting an award of punitive damages.

<u>Jury Demand</u>

211.   Plaintiffs demand trial by jury of all issues in this action that are so triable.

WHEREFORE, Plaintiffs demand judgment as follows:

a.   Awarding them compensatory damages against both Defendants, jointly and severally, in an amount to be proved at trial, but in no event less than $350,000,000;

b.   Awarding them treble damages pursuant to 18 U.S.C. § 2333;

c.  Awarding them punitive damages against both Defendants, jointly and severally, in an amount to be proved at trial, but in no event less than $1,000,000,000;

d.  Awarding them their fees, costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

e.  Awarding them all other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 25, 2020

Respectfully submitted,

Cohen & Gresser LLP


By: _____ */s/ Stephen M. Sinaiko* _____
      Stephen M. Sinaiko
800 Third Avenue
New York, New York   10022
(212) 957-7600
*ssinaiko@cohengresser.com*

Ronald F. Wick (Admitted *Pro Hac Vice*)
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC   20006
(202) 851-2070
*rwick@cohengresser.com*

Attorneys for Plaintiffs