# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————————————  )
SHABTAI SCOTT SHATSKY, *et al*.,          )
                                          )
                        Plaintiffs,       )      Case No. 18-cv-12355 (MKV) (DCF)
                                          )
            v.                            )
                                          )
THE PALESTINE LIBERATION                  )
ORGANIZATION and                          )
THE PALESTINIAN AUTHORITY,                )
                                          )
                        Defendants.       )
———————————————————————  )


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

**SQUIRE PATTON BOGGS (US) LLP**

Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Joseph S. Alonzo (JA-1378)
joseph.alonzo@squirepb.com
1211 Avenue of the Americas
26th Floor
New York, NY 10036
Telephone: (212) 872-9800
Facsimile: (212) 872-9815

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ii

Introduction ................................................................................................................... 1

Legal Standard .............................................................................................................. 2

Argument ....................................................................................................................... 3

      I.      Exercising Personal Jurisdiction over Defendants Would Violate Due
            Process ........................................................................................................... 3

            A.     Defendants Lack Sufficient Contacts with the United States to
                   Support the Exercise of Personal Jurisdiction ........................................... 3

            B.     Defendants Have Not "Consented" to Personal Jurisdiction.................... 6

                 1.     Consent to Jurisdiction Must Be Free and Voluntary.................... 7

                 2.     Implied Consent Statutes Must Offer a Benefit that the
                      Defendant May Accept to Demonstrate Consent to
                      Jurisdiction................................................................................ 10

                 3.     Defendants Have Not Impliedly Agreed to Personal
                      Jurisdiction................................................................................ 15

             C.     Applying the PSJVTA's "Deemed Consent" Provision to
                   Defendants in this Case Would Be Unconstitutional............................... 18

                 1.     The Fiction of "Deemed Consent" Cannot Displace the
                      Requirements of the Due Process Clause ................................... 18

                 2.     Allowing Congress to Dictate that Defendants Shall Be
                      "Deemed" to "Consent" to Personal Jurisdiction Violates
                      Separation of Powers ................................................................ 22

      II.     The PSJVTA's U.S. Activities Prong Has Not Been Met ................................... 24

Conclusion ................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Dairy Queen Corp. v. W.B. Mason Co.*,
  No. 18-cv-693, 2019 U.S. Dist. LEXIS 3314 (D. Minn. Jan. 8, 2019)................................8, 12

*Armstrong v. Pomerance*,
  423 A.2d 174 (Del. 1980) .....................................................................................................12

*Bank Markazi v. Peterson*,
  136 S. Ct. 1310 (2016).....................................................................................................22, 23

*Brewer v. Williams*,
  430 U.S. 387 (1977)...............................................................................................................22

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016)...................................................................................1, 7, 11, 12

*Carnival Cruise Lines v. Shute*,
  499 U.S. 585 (1991)...............................................................................................................21

*Chen v. Dunkin' Brands, Inc.*,
  954 F.3d 492 (2d Cir. 2020)......................................................................................12, 13, 20

*Chirag v. MT Marida Marguerite Schiffahrts*,
  604 F. App'x 16 (2d Cir. 2015) ...............................................................................................2

*City of Boerne v. Flores*,
  521 U.S. 507 (1997).....................................................................................................22, 23, 24

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999).................................................................................................9, 10,13, 15

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986)...............................................................................................................24

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)............................................................................................4, 12, 13, 19, 20

*Dickerson v. United States*,
  530 U.S. 428 (2000)...............................................................................................................23

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021).......................................................................................................4, 15

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*,
    636 F.2d 1300 (D.C. Cir. 1980) ..................................................................21

*Fuld v. PLO*,
    No. 20-CV-3374 (S.D.N.Y. July 23, 2021) ...............................................14, 15, 22

*Genuine Parts Co. v. Cepec*,
    137 A.3d 123 (Del. 2016) ..........................................................................12

*Gilmore v. Palestinian Auth.*,
    843 F.3d 958 (D.C. Cir. 2016) .....................................................................7

*Gilson v. Republic of Ir.*,
    682 F.2d 1022 (D.C. Cir. 1982) ..................................................................21

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) .............................................................................12, 21

*Hess v. Pawloski*,
    274 U.S. 352 (1927) .................................................................1, 8, 10, 11, 13

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...................................................................................23

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) ..............................................................................7, 21

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................................24

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) .............................................................................18, 19

*Estate of Klieman v. Palestinian Auth.*,
    923 F.3d 1115 (D.C. Cir. 2019) .................................................3, 4, 5, 14, 17, 23

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) .....................................................................6, 17

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ................................................................................18

*Krepps v. Reiner*,
    588 F. Supp. 2d 471 (S.D.N.Y. 2008) ...........................................................6

*Laker Airways Ltd. v. Sabena*,
    731 F.2d 909 (D.C. Cir. 1984) ...................................................................21

*Lanham v. BNSF Ry. Co.*,
   939 N.W.2d 363 (Neb. 2020)................................................................12

*Leonard v. USA Petroleum Corp.*,
   829 F. Supp. 882 (S.D. Tex. 1993) ..................................................8, 18

*Litecubes, LLC v. N. Light Prods.*,
   523 F.3d 1353 (Fed. Cir. 2008)............................................................21

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) ......................................................4, 21, 23

*Lugones v. Pete & Gerry's Organic*,
   440 F. Supp. 3d 226 (S.D.N.Y. 2020)....................................................3

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803)................................................................24

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988).......................................................16

*In re Mid-Atl. Toyota Antitrust Litig.*,
   525 F. Supp. 1265 (D. Md. 1981) ......................................................8, 11

*Moscato v. MDM Grp.*,
   No. 05-cv-10313, 2008 U.S. Dist. LEXIS 58030 (S.D.N.Y. July 30, 2008)............................6

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)................................................................................23

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) ................................................................21

*R.S.W.W., Inc. v. Keego Harbor*,
   397 F.3d 427 (6th Cir. 2005) ................................................................18

*Reynolds-Naughton v. Norwegian Cruise Line*,
   386 F.3d 1 (1st Cir. 2004)......................................................................25

*Roell v. Withrow*,
   538 U.S. 580 (2003)..................................................................................7

*Seetransport Wiking Trader Schiffarhtsgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993)...................................................................23

*Shaffer v. Heitner*,
   433 U.S. 186 (1977)................................................................................19

*Shatsky v. PLO*,
  955 F.3d 1016 (D.C. Cir. 2020) ...................................................3, 4, 5, 6, 8, 16

*Siemer v. Learjet Acquisition Corp.*,
  966 F.2d 179 (5th Cir. 1992) ...............................................................22

*Sullivan v. A.W. Chesterton, Inc. (In re Asbestos Prods. Liab. Litig.)*,
  384 F. Supp. 3d 532 (E.D. Pa. 2019) ..............................................12, 18

*Sun Forest Corp. v. Shvili*,
  152 F. Supp. 2d 367 (S.D.N.Y. 2001) ......................................................7

*Swenson v. Thibaut*,
  250 S.E.2d 279 (N.C. Ct. App. 1978) ....................................................12

*In re Terrorist Attacks*,
  714 F.3d 659 (2d Cir. 2013) ..................................................................2

*United States v. PLO*,
  695 F. Supp. 1456 (S.D.N.Y. 1988) ...................................................16, 17

*Vasquez v. H. K. & Shanghai Banking Corp.*,
  477 F. Supp. 3d 241 (S.D.N.Y. 2020) ...........................................2, 3, 24

*Walden v. Fiore*,
  571 U.S. 277 (2014) ..............................................................................4

*Waldman v. PLO*,
  835 F.3d 317 (2d Cir. 2016) .........................................................4, 5, 6, 20

*Waldman v. PLO ("Waldman II")*,
  925 F.3d 570 (2d Cir. 2018) .....................................................14, 17, 20, 23

*Wellness Int'l Network v. Sharif*,
  135 S. Ct. 1932 (2015) ..................................................................1, 7, 24

*WorldCare Ltd. Cor. v. World Ins. Co.*,
  767 F. Supp. 2d 341 (D. Conn. 2011) ...................................................22

*Wuchter v. Pizzutti*,
  276 U.S. 13 (1928) ...............................................................................11

*Zapata v. HSBC Holdings*,
  414 F. Supp. 3d 342 (E.D.N.Y. 2019) .....................................................6

**Statutes**

18 U.S.C. § 2334(e) .......................................................1, 6, 3, 7, 13, 17, 25

22 U.S.C. § 2378c-1 ................................................................................................16

22 U.S.C. § 5201 ......................................................................................................16

22 U.S.C. § 5202 ......................................................................................................16

22 U.S.C. § 5203 ......................................................................................................16

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ..................................................................25

Oxford English Dictionary (Online ed., 2020) .......................................................25

Statement of Sen. Leahy, Cong. Rec.—Sen., S267, 116th Cong. (Jan. 28, 2020).   ....................25

The Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012) ...........................25

Webster's Third New Int'l Dictionary, Unabridged (2002) ....................................25

**Introduction**

Time and again, courts evaluating the same conduct asserted by Plaintiffs in this case have held that personal jurisdiction cannot be exercised over Defendants without violating the Due Process Clause. That judicial application of constitutional principles has been subject to repeated legislative attack, of which the PSJVTA is just the latest example. But Congress cannot legislate around the Due Process Clause, nor can it supplant Defendants' due process rights by "deem[ing]" that they "consent[ ]" to jurisdiction (18 U.S.C. § 2334(e)(1)) when it is clear that they do not.

"Consent" jurisdiction is a very narrow doctrine, and due process requires that any such "consent" be "free and voluntary." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016); *see also Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1948 (2015) ("It bears emphasizing … consent—whether express or implied—must still be knowing and voluntary."). Where, as here, the legislature attempts to "deem" consent by statute, the due process requirement of reciprocity protects defendants from unilateral, legislatively-imposed jurisdiction. Consent may be inferred from a defendant's conduct only when the conduct itself reflects defendant's implicit agreement to submit to jurisdiction in exchange for the "privilege" or "benefit" of engaging in the specified activity—which the forum conditions on consent. *See, e.g.*, *Hess v. Pawloski*, 274 U.S. 352, 354-57 (1927) (holding "acceptance by a non-resident of the rights and privileges [to drive on public roads]" constituted "signification of his agreement" to consent to jurisdiction); *Brown*, 814 F.3d at 632-33 (explaining business registration statutes condition the benefit of doing business in the state on consent to jurisdiction in state court).

The PSJVTA fails this due process test. The activities purportedly giving rise to "deemed" consent to jurisdiction do *not* evince any implied agreement to jurisdiction because they do not involve the acceptance of any benefit from the forum (the United States). Pre-existing U.S. law already prohibits, or purports to impose liability or other restrictions for, each type of activity on

1

which "deemed" consent is based, and the PSJVTA does not offer to waive these prohibitions.  In the absence of a benefit offered to Defendants in the PSJVTA, there is nothing for them to accept or reject through their conduct, and thus no implied agreement to consent to jurisdiction.

Accordingly, the PSJVTA does not fit within the narrow window of "consent" jurisdiction, but instead improperly attempts to bypass constitutional due-process requirements.   The courts have already determined that Defendants' alleged activities are constitutionally inadequate to give rise to personal jurisdiction.  Allowing Congress to transform those same activities into "consent" to jurisdiction would strip Defendants of these constitutional protections, and undermine the Supreme Court's modern jurisprudence on personal jurisdiction.  This Court should therefore conclude that Plaintiffs have not established valid "consent" to personal jurisdiction and reaffirm that exercising personal jurisdiction over Defendants would violate due process.

## Legal Standard

On a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *Vasquez v. H. K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 250 (S.D.N.Y. 2020).   The court does "not draw argumentative inferences in the plaintiff's favor," nor will it "accept as true a legal conclusion couched as a factual allegation."  *In re Terrorist Attacks*, 714 F.3d 659, 673 (2d Cir. 2013).  "A prima facie case [for personal jurisdiction] requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place."  *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015).  Where, as here, jurisdictional discovery has taken place, a plaintiff must move beyond a *prima facie* showing and demonstrate that its claims are "factually supported; in other words, it must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant.'"  *Vasquez,* 477 F. Supp. 3d at 250 (citation omitted).  In addition, after

jurisdictional discovery, the court "may consider only *admissible* evidence." *Id.* at 251.

Even when a plaintiff invokes "a statutory basis for personal jurisdiction" like the PSJVTA, "the exercise of personal jurisdiction [still] must comport with constitutional due process principles." *Lugones v. Pete & Gerry's Organic*, 440 F. Supp. 3d 226, 234 (S.D.N.Y. 2020) (quoting *Waldman v. PLO*, 835 F.3d 317, 327 (2d Cir. 2016)). The PSJVTA purports to create "deemed consent" jurisdiction over Defendants if they made certain payments, after April 18, 2020, to persons who have been "fairly tried" or "ple[d] guilty" and have been imprisoned for "any act of terrorism" that injured or killed a U.S. national (or to the families of those who died while committing such acts). 18 U.S.C. § 2334(e)(1)(A). The PSJVTA also "deems" that Defendants "consent" to jurisdiction if, after January 4, 2020, they maintain "any office" or other facility "in the United States," or engage in "any activity while physically present in the United States," not expressly exempted. 18 U.S.C. § 2334(e)(1)(B) & (e)(3). Defendants do not contest that they made at least one payment fitting within the first category, enabling the Court to determine whether the PSJVTA can constitutionally be applied to provide jurisdiction over Defendants.

<u>Argument</u>

**I.    Exercising Personal Jurisdiction over Defendants Would Violate Due Process.**

**A.    Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction.**

In both this case and in cases asserting similar claims, federal courts have repeatedly held that exercising personal jurisdiction over the PA and the PLO for their alleged involvement in attacks in Israel or Palestine would violate the Due Process Clause. *See Shatsky v. PLO*, 955 F.3d 1016, 1036-38 (D.C. Cir. 2020) (directing dismissal of Plaintiffs' claims because Defendants "are not now and were not at the time they were served subject to the district court's personal jurisdiction"); *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1118 (D.C. Cir. 2019)

(holding Fifth Amendment "barred U.S. courts from exercising jurisdiction" over "the PA/PLO"), *vacated on other grounds*, 140 S. Ct. 2713 (2020); *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-58 (D.C. Cir. 2017) (holding plaintiffs failed to demonstrate that exercising personal jurisdiction "would meet the requirements of the Fifth Amendment's Due Process Clause"); *Waldman*, 835 F.3d at 344 (holding the court "could not constitutionally exercise either general or specific personal jurisdiction over the defendants").

As these courts consistently recognize, Defendants are not subject to <u>general</u> jurisdiction in the United States because "neither one is 'at home'" here.  *Shatsky*, 955 F.3d at 1036; *see also Waldman*, 835 F.3d at 332 (holding Defendants are fairly regarded as "'at home' in Palestine, where they govern"); *Livnat*, 851 F.3d at 56; *Klieman*, 923 F.3d at 1123; *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (describing due process limitations on general jurisdiction).

Defendants also are not subject to <u>specific</u> jurisdiction in the United States because their "suit-related conduct"—namely, their alleged involvement in attacks overseas (which Defendants dispute)—is "not sufficiently connected to the United States."  *Waldman*, 835 F.3d at 335-44.  As relevant here, to warrant the exercise of specific jurisdiction, a defendant "must take some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum," and the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum."  *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021); *see Walden v. Fiore*, 571 U.S. 277, 284, 291 (2014) (focusing on "the relationship among the defendant, the forum, and the litigation" and requiring that defendant's "suit-related conduct" creates a "substantial connection" with the forum).  In this case, Defendants engage in UN-related activities, which are not deemed to be in the United States, and in any event are unrelated to the alleged conduct that gave rise to Plaintiffs' claims—which occurred entirely in the West Bank and did not

target the United States.  The requisite "connection" between Defendants' "suit-related conduct" and the forum is therefore lacking.  *See Waldman*, 835 F.3d at 335-44 (holding Defendants' "suit-related conduct"—their alleged "role in the six terror attacks at issue"—was not "sufficiently connected" to the U.S.); *Shatsky*, 955 F.3d at 1037 (no specific jurisdiction because there was no "link" between alleged attack and Defendants' U.S. activities); *Klieman*, 923 F.3d at 1125-26 (holding "plaintiffs' prima facie case for specific jurisdiction does not meet the Constitution's requirements" because "the planning, carrying out, and occurrence of [the attack] all took place in the West Bank," and Defendants' alleged conduct was not "connect[ed]" to the U.S.).

Notably, the precedent described above specifically rejected plaintiffs' attempts to establish personal jurisdiction based on the *same activities* described in the First Amended Complaint.  Plaintiffs assert this Court can exercise personal jurisdiction over Defendants based on (1) certain payments made to prisoners and families in Palestine; (2) social media posts, press conferences, and media statements by Palestine's UN Mission; and (3) Defendants' purported efforts to "influence the public within the United States" and to "affect United States foreign policy."  *See, e.g.*, First Am. Compl. ¶¶ 4-8, 72-81, 119, 122, 147.

But the courts—including the D.C. Circuit in this very case—have consistently held that such activities are *insufficient* to support the exercise of personal jurisdiction over Defendants.  *See, e.g.*, *Shatsky*, 955 F.3d at 1022-23, 1037 (holding Plaintiffs' allegations that Defendants "provid[ed] what the Families call 'martyr payments'" and conducted "a public relations campaign designed to influence the United States' policy toward Israel" were insufficient to establish personal jurisdiction); *Klieman*, 923 F.3d at 1123-26 (rejecting "plaintiffs' theory of specific jurisdiction" that Defendants "supported acts of terrorism . . . in part with the goal of advancing their campaign in the United States to influence or affect United States foreign policy") (cleaned

up); *Waldman*, 835 F.3d at 335-44 (holding allegations that Defendants conducted "lobbying activities" and "intended to influence United States policy" insufficient to confer personal jurisdiction); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (holding Palestine's UN Mission cannot "properly be considered as a basis of jurisdiction").

In light of this precedent, Defendants lack sufficient contacts to support the exercise of personal jurisdiction.  The sole question before this Court is whether Plaintiffs can evade the requirements of the Due Process Clause by relying upon these same, constitutionally-inadequate activities to confer "deemed consent" jurisdiction under the PSJVTA.[1]  As explained below, the constitutional protections afforded to litigants by the Due Process Clause are not so easily avoided.

## B.   Defendants Have Not "Consented" to Personal Jurisdiction.

Although the conduct alleged in the amended complaint is insufficient to establish personal jurisdiction over Defendants under traditional due process standards, Plaintiffs allege that those same activities may be "deemed" consent to personal jurisdiction under the PSJVTA.  Section 3 of the Act provides that "for purposes of any civil action under [the Anti-Terrorism Act]," Defendants "shall be deemed to have consented to personal jurisdiction" if they either (1) made "any payment," after April 18, 2020, to defined recipients in relation to a terrorist act that injured or killed a U.S. national; or (2) maintained "any office" or other physical facility, or engaged in "any activity," in the United States after January 4, 2020, that is not expressly exempted.  18 U.S.C.

---

[1] "Separately" from the PSJVTA, Plaintiffs allege the Court can exercise personal jurisdiction over Defendants because their conduct "targeted … the society and government of the United States" and was part of a broader campaign to influence U.S. policy toward Israel.  Am. Compl. ¶¶ 8, 91-122.  Plaintiffs advanced the same arguments in *Shatsky I*, which the D.C. Circuit flatly rejected.  *See Shatsky I*, 955 F.3d at 1037.  Plaintiffs are thus collaterally estopped from re-litigating those same issues here.  *See Zapata v. HSBC Holdings*, 414 F. Supp. 3d 342, 348 (E.D.N.Y. 2019) (holding collateral estoppel applies to jurisdictional determinations).  Plaintiffs' "separate" jurisdictional arguments are "identical" to *Shatsky I* for preclusion purposes, and they cannot dispute the issue was fully and fairly litigated.  *Id.* at 349; *see also Krepps v. Reiner*, 588 F. Supp. 2d 471, 478-79 (S.D.N.Y. 2008); *Moscato v. MDM Grp.*, No. 05-cv-10313, 2008 U.S. Dist. LEXIS 58030, at *13 (S.D.N.Y. July 30, 2008).  The D.C. Circuit also necessarily resolved the issue, vacating the district court's judgment entirely on personal jurisdiction grounds.  *Shatsky I*, 955 F.3d at 1038.

§ 2334(e)(1).  Latching onto these provisions, Plaintiffs assert that Defendants "are 'deemed to have consented to personal jurisdiction'" because they engaged in such conduct.  *See* Am. Compl. ¶¶ 4-7.  But Plaintiffs cannot rely on the PSJVTA's "deemed consent" provisions to transform constitutionally-insufficient contacts into "consent" to personal jurisdiction, for several reasons.

### 1.     Consent to Jurisdiction Must Be Free and Voluntary.

When the legislature attempts to force consent to jurisdiction, due process requires courts to analyze whether consent is "free and voluntary."  *Brown*, 814 F.3d at 640; *see also Wellness Int'l*, 135 S. Ct. at 1948 ("emphasizing" that consent to jurisdiction must be "knowing and voluntary").  A party may expressly consent to jurisdiction in the forum, or consent may be "inferred from [its] conduct."  *Roell v. Withrow*, 538 U.S. 580, 582, 589 (2003) (explaining that a party may "signal[] consent … through actions rather than words").  To establish that a defendant impliedly consented to jurisdiction, the plaintiff bears the burden of demonstrating some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court."  *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee* ("*Bauxites*"), 456 U.S. 694, 704-05 (1982).

In some cases, determining whether a defendant freely and voluntarily consented to personal jurisdiction is straightforward.  A party may <u>expressly</u> agree—through a forum-selection clause, for example—to submit to jurisdiction in a particular forum.  *See id.* at 703-04; *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 379-80 & n.21 (S.D.N.Y. 2001) (finding voluntary "consent" based on forum-selection clause).  Courts may also infer consent to jurisdiction based on a party's actions <u>in the litigation itself</u>.  *See Bauxites*, 456 U.S. at 703-04 (holding party may consent to jurisdiction by invoking certain state judicial procedures, stipulating to jurisdiction, appearing in the case without objecting to jurisdiction, or violating court-ordered jurisdictional discovery); *Gilmore v. Palestinian Auth.*, 843 F.3d 958, 964-65 (D.C. Cir. 2016) (holding defendant consented

to jurisdiction by failing to object in responsive pleading).  These canonical forms of consent are not at issue in this case, however, because Plaintiffs do not claim Defendants expressly consented to jurisdiction or took any action in the litigation itself evincing their intent to submit to the jurisdiction of the court.  To the contrary, throughout the prolonged history of this case, Defendants have challenged the exercise of personal jurisdiction at every turn.  *See Shatsky I*, 955 F.3d at 1028-31 (holding Defendants never waived jurisdictional objections).

In the absence of express consent or some action in the litigation itself evincing submission to jurisdiction, a court may also find implied consent when a defendant accepts a benefit from the forum conditioned on such consent.  *See Hess*, 274 U.S. at 354-57 (holding defendant's "acceptance" of the "rights and privileges" of driving on public roads constituted "signification of his agreement" to consent to jurisdiction in state court); *Am. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-cv-693, 2019 U.S. Dist. LEXIS 3314, at *7 (D. Minn. Jan. 8, 2019) ("Consent to personal jurisdiction may be established in a number of ways, including as a condition of performing some activity in the state.").  When the defendant chooses to take advantage of a forum's offerings (e.g., driving on public roadways, doing business in the state), courts properly assume that the defendant has freely and voluntarily accepted the conditions (including consent to personal jurisdiction) that the forum places on such activities.  By accepting the benefit of engaging in the regulated activity, the defendant enters a "'bargain' with the state" whereby it consents to jurisdiction in exchange for permission to engage in conduct that the state could otherwise prohibit. *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993); *see also In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (describing consent to jurisdiction under business registration statute as "part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state").

As discussed below, this narrow line of "implied consent" cases provides the appropriate framework for gauging the PSJVTA's constitutionality. When the legislature attempts to "deem" consent by statute, the due process requirement of reciprocity (or an exchange of "consent" for some government "benefit") protects defendants from unilateral, legislatively-imposed jurisdiction. The defendant's choice to engage in the specified activity constitutes free and voluntary consent to jurisdiction only when the defendant's ability to engage in that activity depends on accepting the conditions imposed by the forum. When the activity purportedly giving rise to "consent" does not depend on the forum's permission, the defendant's choice to engage in that activity does not reflect any implicit agreement to submit to jurisdiction because the defendant gained nothing by way of exchange; the defendant's ability to engage in the activity did not depend on any "benefit" conferred by the forum in the first instance.

The Supreme Court has recognized in other contexts that legislatively-imposed "consent" to jurisdiction is not knowing and voluntary simply because a statute provides advance notice that certain activities are deemed consent. In *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), for example, the Court rejected the Government's argument that a State defendant impliedly consented to jurisdiction for false advertising claims by knowingly and voluntarily engaging in interstate marketing, after a statute made clear that such activity would subject it to suit. *Id.* at 671-72. The defendant, a state agency, objected to jurisdiction based on state sovereign immunity. *Id.* Relying on the same implied "waiver" theory presented in this case, the Government argued that the State impliedly waived its objection to jurisdiction so long as two conditions were met: "First, Congress must provide unambiguously that the State will be subject to suit if it engages in certain specified conduct governed by federal regulation. Second, the State must voluntarily elect to engage in the federally regulated conduct

that subjects it to suit." *Id.* at 679.

The Supreme Court emphatically rejected this "constructive-waiver" theory, holding: "[t]here is a fundamental difference between a State's expressing unequivocally that it waives its immunity, and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity.  In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals.  That is very far from concluding that *the State* made an 'altogether voluntary' decision to waive its immunity." *Id.* at 680-81.  Rejecting a mere "notice" standard, the Court held that this type of legislatively-imposed "consent" to jurisdiction is not knowing and voluntary:  "[T]here is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation.… '[C]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights.'" *Id*.  As the Court recognized, more is required to show that the defendant "*in fact consents* to suit." *Id.* at 680 (emphasis added).

### 2.     Implied Consent Statutes Must Offer a Benefit that the Defendant May Accept to Demonstrate Consent to Jurisdiction.

Because mere notice and federal regulatory authority do not suffice to impose jurisdiction by deemed "consent," courts confronting claims of implied consent instead examine whether the defendant's decision to engage in the specified activity actually reflects its implicit agreement to jurisdiction.  Beginning with the Supreme Court's decision in *Hess*, courts consistently hold that acceptance of a government "benefit" or "privilege" conditioned by the forum on agreement to jurisdiction may constitute valid "consent."  This requirement of reciprocity or an exchange of benefits is evident in the courts' analysis of other implied consent statutes.  The Supreme Court has long held, in analogous contexts, that Congress may condition the grant of such benefits on a party's willingness to consent to jurisdiction in a federal forum. *See Coll. Savings Bank*, 527 U.S.

at 686-87 (holding Congress may condition the grant of federal funds or "gratuit[ies]" on a State's waiver of sovereign immunity and "acceptance of the funds entails an agreement" to that condition).  Conversely, Defendants are not aware of a single case upholding an implied consent statute in the <u>absence</u> of some benefit conferred upon the defendant in exchange for its consent.

Many states, for example, have enacted statutes conditioning the "privilege" of driving on public roads on the non-resident's consent to personal jurisdiction in the state for any suits arising from such conduct.  *See, e.g.*, *Hess*, 274 U.S. at 354-57.  Because the state has inherent authority "to regulate the use of its highways" and to "exclude" non-residents from such use, the Supreme Court has held the state may also require non-residents to consent to jurisdiction "in advance of the operation of a motor vehicle on its highway."  *Id.* at 356-57.  By accepting the privilege of driving on public roads, a non-resident in turn demonstrates its implicit agreement to personal jurisdiction.  *Id.* ("[H]aving the power so to exclude [a non-resident motorist], the State may declare that the use of the highway … is the equivalent of the appointment of the registrar as agent on whom process may be served."); *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a non-resident in using the highways of another state may properly be declared to be an agreement to accept service of summons in a suit growing out of the use of the highway…").

Many courts have similarly held that a foreign defendant impliedly consents to personal jurisdiction under state business registration statutes, which condition the privilege of doing business in the state on consent to jurisdiction in state courts.  *See Brown*, 814 F.3d at 632–33 (tracing the history of such statues and describing implied consent as "a promise, fairly extracted, to appear in state court" in exchange for the right to do business in the state).  By registering to do business in the state, a foreign corporation demonstrates its implicit agreement to submit to personal jurisdiction.  *See In re Mid-Atl.*, 525 F. Supp. at 1278 (foreign corporation consents to

jurisdiction "in return for the right to do business in the state"); *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 133, 147 (Del. 2016) (business registration statutes "exact[]" consent to personal jurisdiction as the "mere price of doing any business" in the state); *American Dairy Queen Corp.*, 2019 U.S. Dist. LEXIS 3314 at \*9 ("although registered corporations in Minnesota receive many advantages, in return … they are subject to general personal jurisdiction within the state").[2]

Courts apply the same analysis to state corporate director statutes, which "deem" that non-resident defendants "consent" to jurisdiction by accepting appointment to a corporation's board of directors.  *See, e.g.*, *Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (analyzing Delaware corporate director statute).  By accepting the benefits afforded to directors under state law (e.g., eligibility for interest-free, unsecured loans from the corporation), non-resident directors impliedly consent to personal jurisdiction in the state in suits related to the corporation.  *Id.*; *see Swenson v. Thibaut*, 250 S.E.2d 279, 289-91 (N.C. Ct. App. 1978) (same for non-resident director who purposefully availed himself of state law benefits by "voluntarily accept[ing] a directorship … which is possessed of both privileges and responsibilities").

In each of these and similar instances, the defendant's decision to accept a benefit or privilege conferred by the government signals its implicit agreement to consent to the forum's jurisdiction.  Importantly, these implied consent statutes did not pass constitutional muster merely

---

[2] As the Second Circuit's decision in *Brown* illustrates, the continued vitality of business registration statutes as a valid grounds for consent to personal jurisdiction is very much in question following *Daimler*.  *See Brown*, 814 F.3d at 637-40.  Post-*Daimler*, several courts have concluded that mere registration to do business is not a sufficient basis to warrant the exercise of personal jurisdiction.  *See, e.g.*, *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 498-99 (2d Cir. 2020) (holding that, "in light of *Daimler*," "a foreign corporation does not consent to general personal jurisdiction in New York by merely registering to do business in the state and designating an in-state agent for service of process"); *Sullivan v. A.W. Chesterton, Inc. (In re Asbestos Prods. Liab. Litig.)*, 384 F. Supp. 3d 532, 540-41 (E.D. Pa. 2019) (holding that "a mandatory statutory regime purporting to confer consent to general jurisdiction in exchange for the ability to legally do business in a state is contrary to the rule in *Daimler* and, therefore, can no longer stand"); *Genuine Parts Co.*, 137 A.3d at 126, 145 (holding that "after *Daimler*, it is not tenable to read Delaware's registration statutes" as conferring personal jurisdiction based on implied consent, and noting that "the majority of federal courts that have considered the issue … after *Daimler* have taken the position that we adopt"); *Lanham v. BNSF Ry. Co.*, 939 N.W.2d 363, 371 (Neb. 2020) ("Since *Daimler AG* was decided, the vast majority of state and federal courts have rejected consent by registration as being irreconcilable with [*Goodyear*] and [*Daimler*].").

because they provided advance notice of jurisdictional consequences. Rather, the courts analyzed the nature of the underlying activity—and the forum's concomitant ability to restrict or prohibit that activity if the defendant did not consent—to determine whether the defendant's conduct demonstrated an implied agreement to jurisdiction. *See Hess*, 274 U.S. at 356-57 (defendant's acceptance of privilege of driving on public roadways served as "equivalent" of agreeing to consent to jurisdiction). Merely providing advance notice of jurisdictional consequences does not establish free and voluntary consent to jurisdiction, if implying consent would violate other due process limits. *See Chen*, 954 F.3d at 499 (holding New York's business registration statute, historically construed as conditioning the right to do business on consent to jurisdiction, could no longer be read to imply consent after *Daimler*); *Coll. Savings Bank*, 527 U.S. at 679-82 (rejecting argument that consent to suit is established by defendant's conduct undertaken "after being put on notice by the clear language" of federal statute).

The United States made precisely this reciprocity or exchange-of-benefits point concerning the PSJVTA's predecessor statute, the Anti-Terrorism Clarification Act of 2018 ("ATCA"), 18 U.S.C. § 2334(e)(1) (2018) (superseded by the PSJVTA). The ATCA provided that Defendants "shall be deemed to have consented to personal jurisdiction" if they accepted either (1) U.S. foreign aid or (2) a Presidential waiver of prior prohibitions on Defendants' activities in the U.S., which would allow them to maintain an embassy in Washington. *Id*.

In defending the constitutionality of the ATCA, the government argued that because "[t]he political branches have long imposed conditions on these benefits," it was therefore "reasonable and consistent with the Fifth Amendment for Congress and the Executive to determine that the [PLO's] maintenance of an office in this country after a waiver …, or the [PA's] continued receipt of certain foreign assistance, should be 'deemed' consent to personal jurisdiction in civil cases

under the ATA[.]"  U.S. Brief at 12-13, *Klieman v. Palestinian Auth*., No. 15-7034 (D.C. Cir. Mar. 13, 2019) (emphasis added).  The ATCA was constitutional, in other words, because it grounded "deemed consent" in Defendants' choice to accept either of two distinct benefits—benefits the government had long conditioned on compliance with U.S. foreign policy goals.

Both the Second and D.C. Circuits thereafter held the ATCA did <u>not</u> supply personal jurisdiction over Defendants <u>because they had not accepted either type of benefit</u> specified in the Act.  *See Klieman*, 923 F.3d at 1128-31 (holding plaintiffs failed to establish jurisdiction under ATCA and quoting letter from Defendants "unambiguously mak[ing] the choice not to accept such assistance" from U.S.); *Waldman v. PLO* ("*Waldman II*"), 925 F.3d 570, 574-75 (2d Cir. 2018) (holding plaintiffs failed to show "either factual predicate of [the ATCA] has been satisfied" because "neither the PLO nor the PA accept United States assistance" or "benefit from an express waiver or suspension [of the ATA]"), *vacated on other grounds*, 140 S. Ct. 2714 (2020).  By declining to accept government benefits conditioned upon consent, Defendants freely and voluntarily chose <u>not</u> to submit to U.S. jurisdiction.

The Government recently attempted to walk back its interpretation of the ATCA in a brief addressing the constitutionality of the PSJVTA filed in the *Fuld* case, currently pending before Judge Furman.  *See* U.S. Brief, *Fuld v. PLO*, No. 20-CV-3374 (S.D.N.Y. July 23, 2021).  The Government now asserts that while an exchange of benefits may be "evidence that the person waiving a right did so voluntarily," such reciprocity is not *required* to "deem" consent.  *Id.* at 14-15 & n.7.  Despite that assertion, however, the Government's brief does not identify a single case upholding an implied consent statute *absent* some benefit conferred by the forum in exchange for the defendant's consent.  Moreover, the Government's discussion of the ATCA in *Fuld* mirrors its prior statements in *Klieman*: under the ATCA, Defendants were "deemed" to consent to

jurisdiction *only* if they accepted either of two government "benefits" that Congress had long conditioned on compliance with US foreign policy goals. *See id.* at 15 & n.7. That interpretation, of course, is consistent with the Supreme Court's decision in *Coll. Savings Bank*, which held that although Congress cannot simply decree the circumstances under which a state consents to federal jurisdiction, the acceptance of a federal benefit or "gratuity" conditioned upon consent may constitute a valid waiver of jurisdictional defenses. *See* 527 U.S. at 679-87.

As these implied consent cases illustrate, the hallmarks of due process in this context are reciprocity and fairness. The Supreme Court recently reiterated this theme in *Ford*, explaining that the exchange of "reciprocal obligations" between a defendant and the forum is what makes the exercise of personal jurisdiction "fair." *Ford Motor Co.*, 141 S. Ct. at 1030. Because Ford enjoyed "the benefits and protections" of state law while doing business in the forum, "allowing jurisdiction in these cases treats Ford fairly." *Id.* at 1029. By the same token, when the defendant accepts some benefit from the forum conditioned upon consent to jurisdiction, inferring that the defendant thereby consented to jurisdiction treats the defendant "fairly."

### 3.    Defendants Have Not Impliedly Agreed to Personal Jurisdiction.

Unlike the implied consent statutes described above, the PSJVTA does not confer any benefit on Defendants, or offer to waive pre-existing laws penalizing or prohibiting the U.S. activities listed in the statute. Instead, the PSJVTA declares that Defendants shall be "deemed" to have consented to jurisdiction if they continue to engage in precisely the same activities—payments in Palestine and activities by Palestine's UN Mission personnel—they conducted prior to enactment of the PSJVTA. Because those activities do not require permission from the U.S. government or rely on the acceptance of any government benefit, Defendants' decision to continue engaging in such conduct does not reflect an implied agreement to consent to personal jurisdiction.

The first type of conduct identified by the PSJVTA—payments in Palestine to prisoners or families—occurs entirely outside the United States.  While Congress has declared such payments may support Anti-Terrorism Act <u>liability</u>, the courts have already held such payments do not support <u>jurisdiction</u> over Defendants because they are not sufficiently connected to the United States or to plaintiffs' claims.  *See Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" did not confer specific jurisdiction over Defendants).  Defendants' decision to make such payments in Palestine does not depend on U.S. government authorization, and Defendants do not avail themselves of any U.S. government benefit in making such payments.[3]  Defendants' unilateral decision to continue making such payments thus reflects its own domestic policy choice, rather than any intent to freely and voluntarily consent to jurisdiction in the United States.

The same is also true of the second type of conduct relied upon by Plaintiffs: the operation of Palestine's UN Mission, and activities such as social-media posts and press statements conducted in furtherance of the Mission's work.  Since long before passage of the PSJVTA, the Anti-Terrorism Act of 1987 has expressly denied Defendants the "benefit" of operating in the United States.[4]  *See* 22 U.S.C. § 5202; *United States v. PLO*, 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988).  As the courts have recognized, the 1987 Act is a "wide gauged restriction of PLO activity within the United States," *id.*, that Congress enacted for the express purpose of "<u>deny[ing] the PLO the benefits of operating in the United States</u>."  *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) (emphasis added); *see also* 22 U.S.C. § 5201(b) (declaring Congress' intent to

---

[3] To the contrary, as described above, Defendants' decision to continue making such payments actually required them to <u>forego</u> accepting a U.S. foreign aid.  *See supra* at 13-15 (discussing the ATCA); *see also* Taylor Force Act, 22 U.S.C. § 2378c-1 (prohibiting U.S. aid to Palestine if Defendants continue making such payments).

[4] The ATA of 1987 prohibits the PLO from operating in the United States by making it unlawful to (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO.  *See* 22 U.S.C. § 5202.  The Attorney General is authorized to enforce these provisions by proceedings in district court.  22 U.S.C. § 5203.

deny the PLO the "benefit" of operating in the United States).

This prohibition, however, is subject to an exception. Under longstanding judicial interpretation of the UN Headquarters Agreement ("UNHQA"), the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission." *PLO*, 695 F. Supp. at 1471. The UNHQA guarantees Defendants "entry, access, and residence" to the UN Headquarters District, and authorizes them to maintain the "continuity" of the Mission's operations. *Id.* at 1465-68; *see also Klinghoffer*, 937 F.2d at 51 (holding UNHQA authorizes operation of Mission by "effectively remov[ing] control over the UN Headquarters and related areas from [U.S.] jurisdiction"); *infra* at 24-25 (describing scope of Mission's protected UN activities).

The PSJVTA does not remove any of the prohibitions on Defendants' U.S. activities under the 1987 ATA,[5] nor does it alter the scope of permissible UN-related activities under the UNHQA.[6] Defendants' decision to continue operating Palestine's UN Mission and to conduct activities in furtherance of the Mission's operations therefore does not reflect any implied agreement to submit to jurisdiction, as those activities are independently authorized by the UNHQA and do not rely on any government benefit conferred on Defendants by the PSJVTA.

The PSJVTA thus stands in stark contrast to its predecessor statute, the ATCA. Under the ATCA, a defendant was "deemed" to "consent" to jurisdiction if it accepted U.S. financial aid or the "benefit" of an express waiver of the 1987 Act's prohibitions. *See* 18 U.S.C. §§ 2334(e)(1)(A), (B) (2018) (superseded by PSJVTA). In other words, the ATCA permitted Defendants to

---

[5] As the Second Circuit recognized in *Waldman*, any waiver of the ATA's prohibitions on Defendants' U.S. activities must be express. *Waldman II*, 925 F.3d at 574-75; *see also Klieman*, 923 F.3d at 1130-31.

[6] In fact, the PSJVTA mirrors longstanding judicial interpretation of the UNHQA by providing that "no court may consider" any office or activity "undertaken exclusively for the purpose of conducting official business of the [UN]" when determining "whether a defendant shall be deemed to have consented to personal jurisdiction." 18 U.S.C. § 2334(e)(3). Consistent with the precedent above, this provision guarantees the continuity of the Palestine Mission's operations by exempting "any personal or official activities conducted ancillary to" such activities. *Id.*

exchange submission to U.S. jurisdiction in return for a distinct government "benefit."[7]

The PSJVTA, by contrast, does not confer any benefit on Defendants in exchange for their purported "consent."  The PSJVTA does not authorize Defendants to engage in activities in the United States prohibited by the ATA, nor does it extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction.  Accordingly, "there is no bargain—no social compact" between the parties that could evince Defendants' implied agreement to submit to jurisdiction in the United States.  *Leonard*, 829 F. Supp. at 889.

### C.  Applying the PSJVTA's "Deemed Consent" Provision to Defendants in this Case Would Be Unconstitutional.

#### 1.  The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause.

In the absence of any actual or implied consent to personal jurisdiction by Defendants, the PSJVTA's "deemed consent" provision is no different than the "fictions" of "implied consent" and "presence" discarded in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  As the Supreme Court explained, prior decisions asserting personal jurisdiction over foreign defendants had often "resort[ed] to the legal fiction that [the defendant] has given its consent to service and suit, consent being implied from its presence in the state through the acts of its authorized agents."  *Id.* at 318. "But more realistically it may be said that those authorized acts were of such a nature as to justify the fiction," meaning the "nature and quality" of the defendant's forum activities were "sufficient

---

[7] This is not to say that the ATCA itself, or an implied consent statute structured like the ATCA, would be free of constitutional defects.  *See supra* n.2.  Under the unconstitutional conditions doctrine, the government cannot condition the receipt of a government benefit on the surrender of constitutional rights.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *R.S.W.W., Inc. v. Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005). Courts have applied this principle in the business-registration context to invalidate statutes conditioning the right to do business in the state (a government benefit) on the forfeiture of constitutional defenses to personal jurisdiction. *See, e.g.*, *Sullivan*, 384 F. Supp. 3d at 540-42.  To the extent Plaintiffs assert the PSJVTA confers some "benefit" on Defendants, the same rule would apply: the government cannot condition the receipt of any such government benefit on Defendants' "consent" to forego jurisdictional defenses under the Due Process Clause.  The Court need not reach that issue, however, because the PSJVTA does not confer any benefit or privilege on Defendants.

to render [the defendant] liable to suit." *Id*. "Implied consent," in other words, was simply an obscure (and unhelpful) way of saying the defendant's contacts with the forum were sufficient to warrant the exercise of jurisdiction under the Due Process Clause. *See Shaffer v. Heitner*, 433 U.S. 186, 202-03 (1977) (explaining that courts analyzing "implied consent" "were in fact attempting to ascertain what dealings make it just to subject a foreign corporation to local suit" (cleaned up)).

Plaintiffs' reliance on "deemed consent" is no different. Stripped of the "legal fiction" of "consent," Plaintiffs assert this Court can exercise jurisdiction over Defendants based on payments made outside the United States and the activities of Palestine's UN Mission. Yet federal courts have uniformly held that the nature and quality of those same activities are insufficient to warrant the exercise of personal jurisdiction under the Due Process Clause. *See supra* at 3-6. Merely calling the same conduct grounds for "deemed consent" does not alter that conclusion.

Accepting Plaintiffs' assertion that incanting the words "deemed consent" allows Congress to transform constitutionally-inadequate contacts into grounds for "consent" jurisdiction would swallow the "minimum contacts" test. In *Daimler*, for example, the Supreme Court held the Due Process Clause prohibited a California court from exercising general jurisdiction over a car manufacturer and its US subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere. *See* 571 U.S. at 139. Despite achieving "sizable" sales in the state, the Court held defendants' activities were insufficient for general jurisdiction because they were not "essentially at home" in the forum. *Id*.

Under Plaintiffs' novel interpretation of due process, California could circumvent that holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state. The same would also be true of virtually any decision holding that a defendant's forum-related

activities were insufficient to confer personal jurisdiction.  If constitutionally-inadequate activities in a forum can serve as a valid basis for implied consent to personal jurisdiction divorced from any accompanying benefit provided by the forum, there is no end to the types of activities that could serve as the basis for "deemed consent" to jurisdiction.

Courts, however, have consistently rejected attempts to extend legislatively-imposed jurisdiction beyond constitutional limits.  In *Chen*, for example, the Second Circuit held that New York's business registration statute—which had long been interpreted to confer general jurisdiction over all registered corporations—could not supplant the protections afforded to non-resident defendants under the Due Process Clause.  *See* 954 F.3d at 498-99.  As the court explained, allowing states to impose "consent" on any corporation doing business in the state threatened to "rob [*Daimler*] of meaning by a back-door thief."  *Id.* at 499 (quoting *Brown*, 814 F.3d at 640) (cleaned up).  The Second Circuit reached the same conclusion in *Waldman*, rejecting plaintiffs' argument that Defendants "consented to personal jurisdiction under the ATA" merely by accepting service of process in the forum.  835 F.3d at 337; *see also* Pls.' Br., *Waldman v. PLO*, No. 15-3135, at 32 (2d Cir. Dec. 11, 2015) (arguing Defendants were "on notice" that acceptance of service conferred personal jurisdiction under ATA).  Although it was clear the ATA "permitted service of process on the representative of PLO and PA in Washington," the Second Circuit held that the Act "does not answer the constitutional question of whether due process is satisfied."  835 F.3d at 343 (holding "due process analysis—considerations of minimum contacts and reasonableness—applies even when federal service-of-process statutes are satisfied").

As these cases illustrate, Congress cannot circumvent the constitutional protections afforded to litigants simply by redefining what constitutes "consent" to personal jurisdiction.  Rather, the Due Process Clause "sets the outer boundaries of [a court's] authority to proceed

against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 923 (2011). "Due process protections" must be applied "to limit personal jurisdiction in [ATA] cases" even when doing so might "thwart Congress's intent to provide redress," because "Congress cannot wish away a constitutional provision."[8] *Livnat*, 851 F.3d at 50, 53; *see also Gilson v. Republic of Ir.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982) ("a statute cannot grant personal jurisdiction where the Constitution forbids it"); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (same). Exercising personal jurisdiction over Defendants based on the fiction that they have "consented" to jurisdiction simply by continuing activity that fails the minimum contacts test—particularly when the forum offers no benefit in exchange for purported "consent"—would transgress those constitutional boundaries.

Whatever the source of personal jurisdiction, the Court has also emphasized that the exercise of jurisdiction must "not offend traditional notions of fair play and substantial justice." *Bauxites*, 456 U.S. at 702-03; *see also Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991) (holding forum selection clauses are still "subject to judicial scrutiny for fundamental fairness"). Exercising jurisdiction over Defendants in this case would violate traditional notions of fair play and substantial justice, given Defendants' "paltry" contacts with the forum, the lack of any suit-related conduct in (or targeting) the United States, and the prior holdings of both the

---

[8] These cases illustrate the critical distinction between <u>prescriptive</u> and <u>adjudicative</u> jurisdiction. Although Congress can prohibit conduct "beyond the territorial boundaries of the United States" (prescriptive jurisdiction), it cannot impose personal jurisdiction over foreign defendants unless constitutional due process requirements are satisfied (adjudicative jurisdiction). *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008) (personal jurisdiction serves as "an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is independent of the extraterritorial reach of a federal statute"). While Congress has the authority to create a remedy for victims of overseas terrorist attacks (as it did with the ATA), such authority fails to address the separate question whether Defendants are subject to personal jurisdiction in the U.S. for alleged involvement in such attacks. *See Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984) (Congress's "prescriptive jurisdiction"—its authority to make federal law applicable to parties and their conduct—"is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'"); *FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1318-19 (D.C. Cir. 1980) (explaining that "a court may not exercise its adjudicatory authority over an individual unless it has power to reach him, as circumscribed by the due process clause").

Second and D.C. Circuits that Defendants lack sufficient contacts to support jurisdiction.  *See Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183-84 (5th Cir. 1992) (holding defendant can only impliedly "consent" to jurisdiction "where such jurisdiction is constitutionally permissible"); *WorldCare Ltd. Cor. v. World Ins. Co.*, 767 F. Supp. 2d 341, 361, 364 (D. Conn. 2011) (holding foreign defendant's "paltry" forum contacts failed the "reasonableness test").  "Expansive, non-explicit consent to being haled into court on *any claim whatsoever* in a [forum] in which one lacks minimum contacts goes against the longstanding notion that personal jurisdiction is primarily concerned with *fairness*."  *Id.* at 355.  "Deeming" that Defendants "have consented" to jurisdiction would be doubly unfair in this case, given that any such ruling would retroactively undo the courts' prior uniform rulings based on conduct that took place long after the conduct giving rise to suit.

### 2. Allowing Congress to Dictate that Defendants Shall Be "Deemed" to "Consent" to Personal Jurisdiction Violates Separation of Powers.

Allowing Congress to require courts conclusively to find knowing and voluntary consent to jurisdiction when the PSJVTA's factual predicates are met would also violate separation of powers.  Determining whether a party has waived its constitutional defenses requires the "application of constitutional principles to the facts as found."  *Brewer v. Williams*, 430 U.S. 387, 403 (1977).  Such questions are reserved for the judiciary—particularly where, as here, the judiciary has already provided the constitutional standard ("knowing and voluntary" consent).  *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1323 (2016) ("Congress, no doubt, 'may not usurp a court's power to interpret and apply the law to the [circumstances] before it.'"); *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (holding "[w]hen the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch … to say what the law is," and "contrary expectations" of the "political branches" "must be disappointed").  Contrary to the Government's brief in *Fuld*, courts have repeatedly held that the judiciary owes no deference to the other branches

on this type of constitutional issue. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role."); *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("Our respect for Congress's policy judgments … can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed.").

The PSJVTA attempts to usurp the judicial function by dictating that, in any ATA case against these Defendants, certain activities must be "deemed" knowing and voluntary "consent" to personal jurisdiction. In doing so, the PSJVTA violates basic principles of separation of powers by supplying a legislative rule of decision on knowing and voluntary "consent" in every ATA case against these Defendants. *See Bank Markazi*, 136 S. Ct. at 1324 (explaining that a statute violates separation of powers if it "attempt[s] to direct the result without altering the legal standards governing the effect of [the specified activity]"). In such circumstances, "it is this Court's precedent, not [the statute], which must control." *City of Boerne*, 521 U.S. at 536.

It is also well-settled that "Congress may not legislatively supersede" the decisions of federal courts "interpreting and applying the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000) (invalidating federal statute designed to overrule *Miranda*); *Seetransport Wiking Trader Schiffarhtsgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) (a statute "cannot create personal jurisdiction where the Constitution forbids it"). In *Shatsky I*, *Waldman*, *Livnat*, and *Klieman*, the courts unequivocally held that Defendants' U.S. activities are insufficient to support personal jurisdiction under the Due Process Clause. The PSJVTA attempts to override the courts' consistent application of constitutional principles simply by declaring that those same activities shall be conclusively "deemed" consent to jurisdiction. Permitting Congress to supersede the courts' jurisdictional holdings would make the Constitution, "like other acts, …

23

alterable when the legislature shall please to alter it," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and render due process protections subject to the whims of "shifting legislative majorities." *City of Boerne*, 521 U.S. at 529. "[T]he Framers vested the executive, legislative, and judicial powers in separate branches" precisely to avoid this outcome. *INS v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring).[9]

## II.     The PSJVTA's U.S. Activities Prong Has Not Been Met.

Plaintiffs cannot meet their burden to "establish jurisdiction over the defendant" under the PSJVTA's US-activities prong. *Vasquez*, 477 F. Supp. 3d at 250. Palestine's UN Mission itself is not "in the United States" under the rule of construction in §2334(e)(4) of the PSJVTA, which exempts any office also "exempted by paragraph (3)(A)." Paragraph 3(A) specifically exempts any office used exclusively for official UN activities—which exempts the business of the UN Mission. *Id.* §2334(e)(3)(A).

Nor can Plaintiffs support their factual claims. Depositions revealed that the U.S. notaries do nothing more than provide services to Palestinian-Americans and have no authority or ability to act on behalf of Defendants in the United States. Alonzo Decl. at ¶ 2. The posts and social media cited in the complaint refer to official UN communications, and the other communications Plaintiffs refer to (generally, political speech or grievances against Israel) are also official UN business—they are no different from communications from UN organs and UN Missions. Alonzo Decl. at ¶¶ 3-5. The modern reality is that the UN and UN Missions communicate official business through social media. Plaintiffs would turn the PSJVTA into a gag order, leaving Palestine's

---

[9] Notably, a party cannot waive or "consent" to a separation-of-powers violation. *See Wellness Int'l*, 135 S. Ct. at 1943. "When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850-51 (1986). Separation of powers thus provides an independent ground to hold the "deemed consent" provisions of the PSJVTA are unconstitutional as applied to Defendants, regardless of whether Plaintiffs demonstrate that Defendants have purportedly "consented" to jurisdiction under the Act.

mission as the only one unable to use social media or a website.

Plaintiffs also err by ignoring the PSJVTA's "ancillary" catch-all, which exempts "*any personal or official activities*" ancillary to UN business or government meetings.   PSJVTA, §2334(e)(3) (emphasis added).   Ancillary means "supplementary," Black's Law Dictionary (11th ed. 2019), "incidental or peripheral," The Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012), or "subordinate, subsidiary," Webster's Third New Int'l Dictionary, Unabridged (2002). The Oxford English Dictionary (Online ed., 2020) lists hotels, "road vehicles," and canals as services ancillary to a railway, which are "supplementary" and not "essential" or "necessary"— words other plaintiffs in other cases use to define ancillary.

Under the "ancillary" provision, Defendants cannot be "deemed" to have "consented" to jurisdiction merely because they "meet with advocates regarding relevant issues, make public statements, and otherwise engage in public advocacy and civil society activities."   Statement of Sen. Leahy, Cong. Rec.—Sen., S267, 116th Cong. (Jan. 28, 2020).   Worried about an earlier version of the bill (which was supported by Senator Lankford), Senator Leahy formed a "bipartisan" group for a "negotiation that resulted in" the ancillary activities exemption on the "understand[ing] that it is in our national interest to permit certain activities related to the official representation of the PA and PLO."   *Id.*   Senator Leahy voted for the final bill.   Having voted for the bill and negotiated the language at issue, his views deserve "special weight."   *Reynolds-Naughton v. Norwegian Cruise Line*, 386 F.3d 1, 5 (1st Cir. 2004) ("the sponsors of the language [at issue] ... would ordinarily get special weight").

## <u>Conclusion</u>

This Court should dismiss this case for lack of personal jurisdiction.

Respectfully Submitted,

August 20, 2021

**SQUIRE PATTON BOGGS (US) LLP**

/s/  *Gassan A. Baloul*
Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Joseph S. Alonzo (JA-1378)
joseph.alonzo@squirepb.com
1211 Avenue of the Americas
26th Floor
New York, NY  10036
Telephone: (212) 872-9800
Facsimile: (212) 872-9815

Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2021, a true and correct copy of the foregoing was served through the Court's CM/ECF System on all counsel of record in this action.

/s/  *Gassan A. Baloul*
Gassan A. Baloul