# Exhibit I

Exhibit 53

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/30/21 Page 3 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 2 of 156

Page 1



Copyright (c) 1997 American Society of International Law, Washington, D.C.
International Legal Materials

Volume 36, Number 3

May, 1997

*36 I.L.M. 551;* (1997)

**SECTION:** TREATIES AND AGREEMENTS


ISRAEL-PALESTINE LIBERATION ORGANIZATION: INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP, WITH SELECTED ANNEXES*


* [Reproduced from the text provided by the Israeli Ministry of Foreign Affairs. The maps have been reproduced in black and white, rather than the original color scheme, and have been reduced in size thus affecting the details as well as indicated scales. The consolidated map of Maps 1, 3, 4 and 7 of the Interim Agreement is included as a folded insert under the front cover.

[The Israel-Palestine Liberation Organization Agreement on the Temporary International Presence in the City of Hebron, January 21, 1997, appears at 36 I.L.M. 547 (1997); the Israel-P.L.O. Protocol Concerning the Redeployment in Hebron, January 21, 1997, appears at 36 I.L.M. 650 (1997); the P.L.O. Letter transmitting the National Council's Resolution to Amend the Palestinian National Charter, May 4, 1996, appears at 36 I.L.M. 771 (1997); the Israel-Jordan-P.L.O. Joint Statement on Co-operation on Water-Related Matters, February 13, 1996, appears at 36 I.L.M. 761 (1997); the Israel-P.L.O. Agreement on Preparatory Powers and Responsibilities, August 29, 1994, appears at 34 I.L.M. 455 (1995); the Israel-P.L.O. Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, with Annexes containing the Protocols on the withdrawal of Israeli military forces, civil affairs, legal matters and economic relations, appears at 33 I.L.M. 622 (1994); and the Declaration of Principles on Interim Self-Government Arrangements between Israel and the P.L.O., September 13, 1993, appears at 32 I.L.M. 1525 (1993).

[For additional information contact either the Ministry of Foreign Affairs, Office of Legal Adviser, Hakiryia, Romema, Jerusalem 91950, Israel (tel.: 972 2 5303761; fax: 972 2 5303251) or the Palestinian National Authority, Ministry of Planning and International Cooperation, Gaza City, Gaza, Gaza Strip (tel.: 972 7 829260; fax: 972 7 824090).]

**DATE:** September 28, 1995, Done at Washington, D.C.

**LENGTH:** 63225 words

36 I.L.M. 551, *

**INTRODUCTION:**

I.L.M. Content Summary

GENERAL INDEX . . . . I.L.M. Page 557

PREAMBLE . . . . I.L.M. Page 558

[Recognizing, among other things, the aim to establish a Palestinian Interim Self-Government Authority]

CHAPTER 1 - THE COUNCIL . . . . I.L.M. Page 558

ARTICLES I-IX [Transfer of Israeli authority to the Council (see Annexes I and III); Palestinian elections (see Annex II); structure of the Palestinian Council; size of the Council; the Executive Authority of the Council; other Committees of the Council; all meetings are open to the public except meetings of the Executive Authority and meetings that the Council rules are subject to security or confidentiality concerns; judicial review; powers and responsibilities of the Council]

CHAPTER 2 - REDEPLOYMENT AND SECURITY ARRANGEMENTS . . . . I.L.M. Page 561

ARTICLES X-XVI [Redeployment of Israeli military forces for external security; Palestinian Police for the internal security of Palestinians; phased-in jurisdiction of the Council over the West Bank and Gaza Strip; arrangements for security and public order; the Palestinian Police; prevention of hostile acts; confidence building measures such as Israel's release of Palestinian detainees and prisoners]

CHAPTER 3 - LEGAL AFFAIRS . . . . I.L.M. Page 564

ARTICLES XVII-XXI [Territorial jurisdiction of the Council over the West Bank and the Gaza Strip; exceptions; legislative powers of the Council; application of human rights and the rule of law; rights, liabilities and obligations; dispute settlement through the Liaison Committee, negotiations, conciliation, and arbitration; an Arbitration Committee will be established]

CHAPTER 4 - COOPERATION . . . . I.L.M. Page 566

ARTICLES XXII-XXVIII [Relations between Israel and the Council; cooperation with regard to transfer of powers and responsibilities; economic relations (see Annex V); cooperation programs (see Annex VI); the Joint Israeli-Palestinian Liaison Committee; Monitoring and Steering Committee (subcommittee of the Liaison Committee); liaison and cooperation with Jordan and Egypt; missing persons]

CHAPTER 5 - MISCELLANEOUS PROVISIONS . . . . I.L.M. Page 567

ARTICLES XXIX-XXXI [Safe passage between the West Bank and the Gaza Strip (see Annex I); final clauses]

[Done at Washington on 28 September 1995]
[Signatures]

ANNEX I . . . . I.L.M. Page 569

PROTOCOL CONCERNING REDEPLOYMENT AND SECURITY ARRANGEMENTS

ARTICLE I Redeployment of Israeli Military Forces and Transfer of Responsibility . . . . I.L.M. Page 569

[Description of first phase; further redeployments will take place after inauguration of the Palestinian Council]

ARTICLE II Security Policy for the Prevention of Terrorism and Violence

ARTICLE III Coordination and Cooperation in Mutual Security Matters . . . . I.L.M. Page 570

[Joint Security Coordination and Cooperation Committee; responsibilities; Regional Security Committees; District Coordination Offices; joint patrols; joint mobile units; joint liaison bureaus]

ARTICLE IV The Palestinian Police . . . . I.L.M. Page 572

[Duties and functions; structure and composition; deployment; recruitment; arms, ammunition and equipment; movement (see Art. X on passage)]

ARTICLE V Security Arrangements in the West Bank . . . . I.L.M. Page 574

[Location of 8 District Coordination Offices in the West Bank; security arrangements in Areas A through C, Jewish holy sites, the Jericho Area, and Rachel's Tomb; operational locations of joint patrols and joint mobile units]

ARTICLE VI Security Arrangements in the Gaza Strip . . . . I.L.M. Page 576

ARTICLE VII Guidelines for Hebron . .. . I.L.M. Page 578

ARTICLE VIII Passages . . . . I.L.M. Page 579

ARTICLE IX Movement Into, Within and Outside the West Bank and the Gaza Strip . . . . I.L.M. Page 582

ARTICLE X Safe Passage . . . . I.L.M. Page 583

ARTICLE XI Rules of Conduct in Mutual Security Matters . . . . I.L.M. Page 584

[Human rights and the rule of law; possession and use of weapons]

ARTICLE XII Security Arrangements Concerning Planning, Building and Zoning . . . . I.L.M. Page 585

ARTICLE XIII Security of the Airspace . . . . I.L.M. Page 586

ARTICLE XIV Security along the Coastline to the Sea of Gaza . . . . I.L.M. Page 587

[3 Maritime Activity Zones; Palestinian Coastal Police; Maritime Coordination and Cooperation Center; Gaza Strip Port]

APPENDIX 1 Redeployment of Israeli Military Forces . . . . I.L.M. Page 588

APPENDIX 2 Deployment of Palestinian Policemen . . . . I.L.M. Page 589

APPENDIX 3 [Palestinian Civil] Police Stations and Posts [in Area B]

APPENDIX 4 Jewish Holy Sites . . . . I.L.M. Page 590

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 6 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 6 of 156

Page 4

36 I.L.M. 551, *

APPENDIX 5 Protocol Regarding Arrangements with Respect to Passages

SECTION A Definitions

SECTION B Entry and Exit through the Palestinian Wing

SECTION C Control and Management of the Passages . . . I.L.M. Page 591

SECTION D Weapons in the Passages . . . . I.L.M. Page 594

SECTION E Liaison Bureau . . . . I.L.M. Page 595

SECTION F Passage of VIPs . . . . I.L.M. Page 596

SECTION G Passenger Fee . . . . I.L.M. Page 598

SECTION H Passenger Customs Lane . . . . I.L.M. Page 599

SECTION I Document Control in the Palestinian Wing

APPENDIX 6 List of Hamlets included in Area B . . . . I.L.M. Page 601

[ANNEX II is not reproduced]

ANNEX III . . . . I.L.M. Page 603

PROTOCOL CONCERNING CIVIL AFFAIRS

ARTICLE I Liaison and Coordination in Civil Affairs . . . . I.L.M. Page 603

[Joint Civil Affairs Coordination and Cooperation Committee; 2 Joint Regional Civil Affairs
Subcommittees; District Civil Liaison Offices]

ARTICLE II Transfer of Civil Powers and Responsibilities [see Appendix 1] . . . . I.L.M. Page 604

ARTICLE III Modalities of Transfer

[See Art. I of, and Appendix 1 to, Annex I]

ARTICLE IV Special Provisions concerning Area C

[See Appendix 1 to this Annex and Art. XVII of this Agreement]

APPENDIX 1 Powers and Responsibilities for Civil Affairs . . . . I.L.M . Page 605

[Powers and responsibilities of the Israeli military government and its Civil Administration shall be
transferred to the Council as provided below]

ARTICLE 1 Agriculture

ARTICLE 2 Archeology

ARTICLE 3 Assessments . . . . I.L.M. Page 606

ARTICLE 4 Banking and Monetary Issues

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/30/21 Page 7 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 6 of 156

Page 5

36 I.L.M. 551, *

ARTICLE 5 Civil Administration Employees

ARTICLE 6 Commerce and Industry

ARTICLE 7 Comptrol

ARTICLE 8 Direct Taxation . . . . I.L.M. Page 607

ARTICLE 9 Education and Culture

ARTICLE 10 Electricity

ARTICLE 11 Employment . . . . I.L.M. Page 608

ARTICLE 12 Environmental Protection

ARTICLE 13 Fisheries . . . . I.L.M. Page 610

ARTICLE 14 Forests

ARTICLE 15 Gas, Fuel and Petroleum

ARTICLE 16 Government and Absentee Land and Immovables . . . . I.L.M. Page 611

ARTICLE 17 Health

ARTICLE 18 Indirect Taxation . . . . I.L.M . Page 612

ARTICLE 19 Insurance

ARTICLE 20 Interior Affairs . . . . I.L.M. Page 613

ARTICLE 21 Labor

ARTICLE 22 Land Registration

ARTICLE 23 Legal Administration . . . . I.L.M. Page 614

ARTICLE 24 Local Government . . . . I.L.M. Page 615

ARTICLE 25 Nature Reserves

ARTICLE 26 Parks . . . . I.L.M. Page 616

ARTICLE 27 Planning and Zoning

ARTICLE 28 Population Registry and Documentation

ARTICLE 29 Postal Services . . . . I.L.M. Page 618

ARTICLE 30 Public Works and Housing

ARTICLE 31 Quarries and Mines . . . . I.L.M. Page 619

ARTICLE 32 Religious Sites

36 I.L.M. 551, *

ARTICLE 33 Social Welfare

ARTICLE 34 Statistics . . . . I.L.M. Page 620

ARTICLE 35 Surveying

ARTICLE 36 Telecommunications

ARTICLE 37 Tourism . . . . I.L.M. Page 622

ARTICLE 38 Transportation . . . . I.L.M. Page 623

ARTICLE 39 Treasury . . . . I.L.M. Page 624

ARTICLE 40 Water and Sewage . . . . I.L.M. Page 625

    [Establishment of a Joint Water Committee (JWC) and Joint Supervision and Enforcement Teams (JSET)]

Schedule 1 Archeological Sites of Importance to the Israeli Side . . . . I.L.M. Page 627

Schedule 2 [Environmental Protection]

Schedule 3 [Health] . . . . I.L.M. Page 628

Schedule 4 [Religious Sites] . . . . I.L.M. Page 629

Schedule 5 List of Approved Frequencies

Schedule 6 List of Approved TV Channels and the Location of Transmitters . . . . I.L.M. Page 631

Schedule 7 Transportation Arrangements . . . . I.L.M. Page 632

Schedule 8 Joint Water Committee

Schedule 9 Supervision and Enforcement Mechanism

[Water and sewage]

Schedule 10 Data Concerning Aquifers . . . . I.L.M. Page 633

Schedule 11 The Gaza Strip . . . . I.L.M. Page 634

[Water and sewage]

    Side letter dated 22 September 1995 regarding the signing of a Commercial Agreement with Bezeq, Israel Telecommunications Corp. Ltd

ANNEX IV . . . . I.L.M. Page 635

PROTOCOL CONCERNING LEGAL MATTERS

    ARTICLE I Criminal Jurisdiction . . . . I.L.M. Page 635

36 I.L.M. 551, *

[Delineation of authority of the Council and Israel]

ARTICLE II Legal Assistance in Criminal Matters . . . . I.L.M. Page 636

  [Areas of cooperation and assistance include investigations, arrests, the execution of restraining orders,
  the transfer of suspects and defendants, and the conduct of judicial proceedings]

ARTICLE III Civil Jurisdiction . . . . I.L.M. Page 638

[Jurisdiction of the Palestinian courts]

ARTICLE IV Legal Assistance in Civil Matters

[Service of documents; taking of evidence; enforcement of judgments]

ANNEX V . . . . I.L.M. Page 639

PROTOCOL ON ECONOMIC RELATIONS

  . . . .

  Supplement to the Protocol on Economic Relations . . . . I.L.M. Page 639

    [Concerning the clearance of revenues from all import taxes and levies and from excise on fuel products
    between Israel and the Council; Arts. V and VI of the Protocol are replaced by the Articles attached as
    Appendices 1 and 2]

  APPENDIX 1 ARTICLE V - DIRECT TAXATION . . . . I.L.M. Page 640

    [Delineation of taxation authority; rules regarding the remittance of payments from Palestinians to
    Israelis and vice versa; avoidance of double taxation; see Schedule 1]

  APPENDIX 2 ARTICLE VI - INDIRECT TAXES ON LOCAL PRODUCTION . . . . I.L.M. Page 641

  [Rules regarding the application of a value added tax]

  SCHEDULE 1 . . . . I.L.M. Page 642

  Certificate of Non-Deduction of Income Tax at Source by the Palestinian Tax Administration

  Certificate of Non-Deduction of Income Tax at Source by the Israeli Tax Administration . . . . I.L.M. Page 643

[Maps]

Map Number 2 . . . . I.L.M. Page 644

  Security Arrangements in the Gaza Strip

Map Number 5 . . . . I.L.M. Page 645

  Deployment of Palestinian Police in the Gaza Strip

Map Number 6 . . . . I.L.M. Page 646

  Safe Passage Routes

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/09/21   Page 10 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 9 of 156

Page 8

36 I.L.M. 551, *

Map Number 8 . . . . I.L.M. Page 647

    Maritime Activity Zones

Map Number 9 . . . . I.L.M. Page 648

    Hebron

Consolidated Map of Map Number 1 (Map delineating Areas A and B in the West Bank), Map Number 3 (Deployment of Palestinian Police in the West Bank), Map Number 4 (Joint Activities in the West Bank), and Map Number 7 (Zoning) . . . . Folded Insert Under Front Cover

**TEXT:**

    [*557]  ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP

    WASHINGTON, D.C., SEPTEMBER 28, 1995

GENERAL INDEX 9

| | | | [I.L.M. Page] |
|---|---|---|---|
| 1. | INTERIM AGREEMENT | | 558 |
| 2. | ANNEX I | Protocol concerning Redeployment and Security Arrangements | 569 |
| | APPENDIX 1 | Redeployment of Israeli Military Forces | 588 |
| | APPENDIX 2 | Deployment of Palestinian Policemen | 589 |
| | APPENDIX 3 | Palestinian Civil Police Stations and Posts | 589 |
| | APPENDIX 4 | Jewish Holy Sites | 590 |
| | APPENDIX 5 | Protocol Regarding Arrangements with Respect to Passages | 590 |
| | APPENDIX 6 | List of Hamlets included in Area B | 601 |
| 3. | ANNEX II | Protocol Concerning Elections | Not Reproduced |
| | APPENDIX 1 | Agreed Format for Canvass Information | Not Reproduced |
| | APPENDIX 2 | Common Terms of Reference for International | Not Reproduced |

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 11 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 10 of 156

Page 9

36 I.L.M. 551, *557

|  |  | Observers |  |
|  | APPENDIX 3 | Privileges and Immunities of International Observer Delegations | Not Reproduced |
| 4. | ANNEX III | Protocol concerning Civil Affairs | 603 |
|  | APPENDIX 1 | Powers and Responsibilities for Civil Affairs | 605 |
| 5. | ANNEX IV | Protocol Concerning Legal Matters | 635 |
| 6. | ANNEX V | Protocol on Economic Relations | 639 |
| 7. | ANNEX VI | Protocol Concerning Israeli-Palestinian Cooperation Programs | Not Reproduced |
| 8. | ANNEX VII | Protocol Concerning Release of Palestinian Prisoners and Detainees | Not Reproduced |
| 9. | MAPS |  |  |
|  | 1. | Map delineating Areas A and B in the West Bank | Consolidated insert |
|  | 2. | Security Arrangements in the Gaza Strip (Map No. 1 of the Gaza-Jericho Agreement) | 644 |
|  | 3 . | Deployment of Palestinian Police in the West Bank | Consolidated insert |
|  | 4. | Joint Activities in the West Bank | Consolidated insert |
|  | 5. | Deployment of Palestinian Police in the Gaza Strip (map No. 4 of the Gaza-Jericho Agreement) | 645 |
|  | 6. | Safe Passage Routes | 646 |
|  | 7. | Zoning | Consolidated insert |
|  | 8. | Maritime Activity Zones (Map No. 6 of the Gaza-Jericho Agreement) | 647 |
|  | 9. | Hebron | 648 |

[*558] INTERIM AGREEMENT

[Index not reproduced]

The Government of the State of Israel and the Palestine Liberation Organization (hereinafter "the PLO"), the

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 12 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 11 of 156

Page 10

36 I.L.M. 551, *558

representative of the Palestinian people;

PREAMBLE

WITHIN the framework of the Middle East peace process initiated at Madrid in October 1991;

REAFFIRMING their determination to put an end to decades of confrontation and to live in peaceful coexistence, mutual dignity and security, while recognizing their mutual legitimate and political rights;

REAFFIRMING their desire to achieve a just, lasting and comprehensive peace settlement and historic reconciliation through the agreed political process;

RECOGNIZING that the peace process and the new era that it has created, as well as the new relationship established between the two Parties as described above, are irreversible, and the determination of the two Parties to maintain, sustain and continue the peace process;

RECOGNIZING that the aim of the Israeli-Palestinian negotiations within the current Middle East peace process is, among other things, to establish a Palestinian Interim Self-Government Authority, i.e. the elected Council (hereinafter "the Council" or "the Palestinian Council"), and the elected Ra'ees of the Executive Authority, for the Palestinian people in the West Bank and the Gaza Strip, for a transitional period not exceeding five years from the date of signing the Agreement on the Gaza Strip and the Jericho Area (hereinafter "the Gaza-Jericho Agreement") on May 4, 1994, leading to a permanent settlement based on Security Council Resolutions 242 and 338;

REAFFIRMING their understanding that the interim self-government arrangements contained in this Agreement are an integral part of the whole peace process, that the negotiations on the permanent status, that will start as soon as possible but not later than May 4, 1996, will lead to the implementation of Security Council Resolutions 242 and 338, and that the Interim Agreement shall settle all the issues of the interim period and that no such issues will be deferred to the agenda of the permanent status negotiations;

REAFFIRMING their adherence to the mutual recognition and commitments expressed in the letters dated September 9, 1993, signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO;

DESIROUS of putting into effect the Declaration of Principles on Interim Self-Government Arrangements signed at Washington, DC on September 13, 1993, and the Agreed Minutes thereto (hereinafter "the DOP") and in particular Article III and Annex I concerning the holding of direct, free and general political elections for the Council and the Ra'ees of the Executive Authority in order that the Palestinian people in the West Bank, Jerusalem and the Gaza Strip may democratically elect accountable representatives;

RECOGNIZING that these elections will constitute a significant interim preparatory step toward the realization of the legitimate rights of the Palestinian people and their just requirements and will provide a democratic basis for the establishment of Palestinian institutions;

REAFFIRMING their mutual commitment to act, in accordance with this Agreement, immediately, efficiently and effectively against acts or threats of terrorism, violence or incitement, whether committed by Palestinians or Israelis;

FOLLOWING the Gaza-Jericho Agreement; the Agreement on Preparatory Transfer of Powers and Responsibilities signed at Erez on August 29, 1994 (hereinafter "the Preparatory Transfer Agreement"); and the Protocol on Further Transfer of Powers and Responsibilities signed at Cairo on August 27, 1995 (hereinafter "the Further Transfer Protocol"); which three agreements will be superseded by this Agreement;

HEREBY AGREE as follows:

CHAPTER 1 - THE COUNCIL

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 13 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 12 of 156

Page 11

36 I.L.M. 551, *558

ARTICLE I

Transfer of Authority

1. Israel shall transfer powers and responsibilities as specified in this Agreement from the Israeli military government and its Civil Administration to the Council in accordance with this Agreement. Israel shall continue to exercise powers and responsibilities not so transferred.

 [*559]  2. Pending the inauguration of the Council, the powers and responsibilities transferred to the Council shall be exercised by the Palestinian Authority established in accordance with the Gaza-Jericho Agreement, which shall also have all the rights, liabilities and obligations to be assumed by the Council in this regard. Accordingly, the term "Council" throughout this Agreement shall, pending the inauguration of the Council, be construed as meaning the Palestinian Authority.

3. The transfer of powers and responsibilities to the police force established by the Palestinian Council in accordance with Article XIV below (hereinafter "the Palestinian Police") shall be accomplished in a phased manner, as detailed in this Agreement and in the Protocol concerning Redeployment and Security Arrangements attached as Annex I to this Agreement (hereinafter "Annex I").

4. As regards the transfer and assumption of authority in civil spheres, powers and responsibilities shall be transferred and assumed as set out in the Protocol Concerning Civil Affairs attached as Annex III to this Agreement (hereinafter "Annex III").

5. After the inauguration of the Council, the Civil Administration in the West Bank will be dissolved, and the Israeli military government shall be withdrawn. The withdrawal of the military government shall not prevent it from exercising the powers and responsibilities not transferred to the Council.

6. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC"), Joint Regional Civil Affairs Subcommittees, one for the Gaza Strip and the other for the West Bank, and District Civil Liaison Offices in the West Bank shall be established in order to provide for coordination and cooperation in civil affairs between the Council and Israel, as detailed in Annex III.

7. The offices of the Council, and the offices of its Ra'ees and its Executive Authority and other committees, shall be located in areas under Palestinian territorial jurisdiction in the West Bank and the Gaza Strip.

ARTICLE II

Elections

1. In order that the Palestinian people of the West Bank and the Gaza Strip may govern themselves according to democratic principles, direct, free and general political elections will be held for the Council and the Ra'ees of the Executive Authority of the Council in accordance with the provisions set out in the Protocol concerning Elections attached as Annex II to this Agreement (hereinafter "Annex II").

2. These elections will constitute a significant interim preparatory step towards the realization of the legitimate rights of the Palestinian people and their just requirements and will provide a democratic basis for the establishment of Palestinian institutions.

3. Palestinians of Jerusalem who live there may participate in the election process in accordance with the provisions contained in this Article VI of Annex II (Election Arrangements concerning Jerusalem).

4. The elections shall be called by the Chairman of the Palestinian Authority immediately following the signing of this Agreement to take place at the earliest practicable date following the redeployment of Israeli forces in accordance with

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 14 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 13 of 156

Page 12

36 I.L.M. 551, *559

Annex I, and consistent with the requirements of the election timetable as provided in Annex II, the Election Law and the Election Regulations, as defined in Article I of Annex II.

ARTICLE III

Structure of the Palestinian Council

1. The Palestinian Council and the Ra'ees of the Executive Authority of the Council constitute the Palestinian Interim Self-Government Authority, which will be elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip for the transitional period agreed in Article I of the DOP.

2. The Council shall possess both legislative power and executive power, in accordance with Articles VII and IX of the DOP. The Council shall carry out and be responsible for all the legislative and executive powers and responsibilities transferred to it under this Agreement. The exercise of legislative powers shall be in accordance with Article XVIII of this Agreement (Legislative Powers of the Council).

3. The Council and the Ra'ees of the Executive Authority of the Council shall be directly and simultaneously elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip, in accordance with the provisions of this Agreement and the Election Law and Regulations, which shall not be contrary to the provisions of this Agreement.

4. The Council and the Ra'ees of the Executive Authority of the Council shall be elected for a transitional period not exceeding five years from the signing of the Gaza-Jericho Agreement on May 4, 1994.

5. Immediately upon its inauguration, the Council will elect from among its members a Speaker. The Speaker will preside over the meetings of the Council, administer the Council and its committees, decide on the agenda of each meeting, and lay before the Council proposals for voting and declare their results.

6. The jurisdiction of the Council shall be as determined in Article XVII of this Agreement (Jurisdiction).

7. The organization, structure and functioning of the Council shall be in accordance with this Agreement and the Basic Law for the Palestinian Interim Self-Government Authority, which Law shall be adopted by the Council. The Basic Law and any regulations made under it shall not be contrary to the provisions of this Agreement.

 [*560]  8. The Council shall be responsible under its executive powers for the offices, services and departments transferred to it and may establish, within its jurisdiction, ministries and subordinate bodies, as necessary for the fulfillment of its responsibilities.

9. The Speaker will present for the Council's approval proposed internal procedures that will regulate, among other things, the decision-making processes of the Council.

ARTICLE IV

Size of the Council

The Palestinian Council shall be composed of 82 representatives and the Ra'ees of the Executive Authority, who will be directly and simultaneously elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip.

ARTICLE V

The Executive Authority of the Council

1. The Council will have a committee that will exercise the executive authority of the Council, formed in accordance with paragraph 4 below (hereinafter "the Executive Authority").

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 15 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 14 of 156

Page 13

36 I.L.M. 551, *560

2. The Executive Authority shall be bestowed with the executive authority of the Council and will exercise it on behalf of the Council. It shall determine its own internal procedures and decision making processes.

3. The Council will publish the names of the members of the Executive Authority immediately upon their initial appointment and subsequent to any changes.

4. a. The Ra'ees of the Executive Authority shall be an ex officio member of the Executive Authority.

    b. All of the other members of the Executive Authority, except as provided in subparagraph c. below, shall be members of the Council, chosen and proposed to the Council by the Ra'ees of the Executive Authority and approved by the Council.

    c. The Ra'ees of the Executive Authority shall have the right to appoint some persons, in number not exceeding twenty percent of the total membership of the Executive Authority, who are not members of the Council, to exercise executive authority and participate in government tasks. Such appointed members may not vote in meetings of the Council.

    d. Non-elected members of the Executive Authority must have a valid address in an area under the jurisdiction of the Council.

ARTICLE VI

Other Committees of the Council

1. The Council may form small committees to simplify the proceedings of the Council and to assist in controlling the activity of its Executive Authority.

2. Each committee shall establish its own decision-making processes within the general framework of the organization and structure of the Council.

ARTICLE VII

Open Government

1. All meetings of the Council and of its committees, other than the Executive Authority, shall be open to the public, except upon a resolution of the Council or the relevant committee on the grounds of security, or commercial or personal confidentiality.

2. Participation in the deliberations of the Council, its committees and the Executive Authority shall be limited to their respective members only. Experts may be invited to such meetings to address specific issues on an ad hoc basis.

ARTICLE VIII

Judicial Review

Any person or organization affected by any act or decision of the Ra'ees of the Executive Authority of the Council or of any member of the Executive Authority, who believes that such act or decision exceeds the authority of the Ra'ees or of such member, or is otherwise incorrect in law or procedure, may apply to the relevant Palestinian Court of Justice for a review of such activity or decision.

ARTICLE IX

Powers and Responsibilities of the Council

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 16 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 15 of 156

Page 14

36 I.L.M. 551, *560

1. Subject to the provisions of this Agreement, the Council will, within its jurisdiction, have legislative powers as set out in Article XVIII of this Agreement, as well as executive powers.

2. The executive power of the Palestinian Council shall extend to all matters within its jurisdiction under this Agreement or any future agreement that may be reached between the two Parties during the interim period. It shall include the power to formulate and conduct Palestinian policies and to supervise their implementation, to issue any rule or regulation under powers given in approved legislation and administrative decisions necessary for the realization of [*561] Palestinian self-government, the power to employ staff, sue and be sued and conclude contracts, and the power to keep and administer registers and records of the population, and issue certificates, licenses and documents.

3. The Palestinian Council's executive decisions and acts shall be consistent with the provisions of this Agreement.

4. The Palestinian Council may adopt all necessary measures in order to enforce the law and any of its decisions, and bring proceedings before the Palestinian courts and tribunals.

5. a. In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

    b. Notwithstanding the provisions of this paragraph, the PLO may conduct negotiations and sign agreements with states or international organizations for the benefit of the Council in the following cases only:

        (1) economic agreements, as specifically provided in Annex V of this Agreement;

        (2) agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council;

        (3) agreements for the purpose of implementing the regional development plans detailed in Annex IV of the DOP or in agreements entered into in the framework of the multilateral negotiations; and

        (4) cultural, scientific and educational agreements.

    c. Dealings between the Council and representatives of foreign states and international organizations, as well as the establishment in the West Bank and the Gaza Strip of representative offices other than those described in subparagraph 5.a above, for the purpose of implementing the agreements referred to in subparagraph 5.b above, shall not be considered foreign relations.

6. Subject to the provisions of this Agreement, the Council shall, within its jurisdiction, have an independent judicial system composed of independent Palestinian courts and tribunals.

CHAPTER 2 - REDEPLOYMENT AND SECURITY ARRANGEMENTS

ARTICLE X

Redeployment of Israeli Military Forces

1. The first phase of the Israeli military forces redeployment will cover populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets - as set out in Annex I, and will be completed prior to the eve of the Palestinian

Case 1:18-cv-12255-MKV-DCF   Document 130-9   Filed 02/29/21   Page 17 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 16 of 156

Page 15

36 I.L.M. 551, *561

elections, i.e., 22 days before the day of the elections.

2. Further redeployments of Israeli military forces to specified military locations will commence after the inauguration of the Council and will be gradually implemented commensurate with the assumption of responsibility for public order and internal security by the Palestinian Police, to be completed within 18 months from the date of the inauguration of the Council as detailed in Articles XI (Land) and XIII (Security), below and in Annex I.

3. The Palestinian Police shall be deployed and shall assume responsibility for public order and internal security for Palestinians in a phased manner in accordance with Article XIII (Security) below and Annex I.

4. Israel shall continue to carry the responsibility for external security, as well as the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

5. For the purpose of this Agreement, "Israeli military forces" includes Israel Police and other Israeli security forces.

ARTICLE XI

Land

1. The two sides view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

2. The two sides agree that West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations, will come under the jurisdiction of the Palestinian Council in a phased manner, to be completed within 18 months from the date of the inauguration of the Council, as specified below:

   a. Land in populated areas (Areas A and B), including government and Al Waqf land, will come under the jurisdiction of the Council during the first phase of redeployment.

    [*562]  b. All civil powers and responsibilities, including planning and zoning, in Areas A and B, set out in Annex III, will be transferred to and assumed by the Council during the first phase of redeployment.

   c. In Area C, during the first phase of redeployment Israel will transfer to the Council civil powers and responsibilities not relating to territory, as set out in Annex III.

   d. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

   e. During the further redeployment phases to be completed within 18 months from the date of the inauguration of the Council, powers and responsibilities relating to territory will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

   f. The specified military locations referred to in Article X, paragraph 2 above will be determined in the further redeployment phases, within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations.

3. For the purpose of this Agreement and until the completion of the first phase of the further redeployments:

   a. "Area A" means the populated areas delineated by a red line and shaded in brown on attached map No.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 18 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 17 of 156

Page 16

36 I.L.M. 551, *562

1;

b. "Area B" means the populated areas delineated by a red line and shaded in yellow on attached map No. 1, and the built-up area of the hamlets listed in Appendix 6 to Annex I; and

c. "Area C" means areas of the West Bank outside Areas A and B, which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in accordance with this Agreement.

ARTICLE XII

Arrangements for Security and Public Order

1. In order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council shall establish a strong police force as set out in Article XIV below. Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air, as well as the responsibility for overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order, and will have all the powers to take the steps necessary to meet this responsibility.

2. Agreed security arrangements and coordination mechanisms are specified in Annex I.

3. A Joint Coordination and Cooperation Committee for Mutual Security Purposes (hereinafter "the JSC"), as well as Joint Regional Security Committees (hereinafter "RSCs") and Joint District Coordination Offices (hereinafter "DCOs"), are hereby established as provided for in Annex I.

4. The security arrangements provided for in this Agreement and in Annex I may be reviewed at the request of either Party and may be amended by mutual agreement of the Parties. Specific review arrangements are included in Annex I.

5. For the purpose of this Agreement, "the Settlements" means, in the West Bank - the settlements in Area C; and in the Gaza Strip - the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as shown on attached map No. 2.

ARTICLE XIII

Security

1. The Council will, upon completion of the redeployment of Israeli military forces in each district, as set out in Appendix 1 to Annex I, assume the powers and responsibilities for internal security and public order in Area A in that district.

2. a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(1) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 2 to Annex I and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 19 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 18 of 156

Page 17

36 I.L.M. 551, *562

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

 [*563]  (3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b(1) above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post.

    The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in Annex 1.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

ARTICLE XIV

The Palestinian Police

1. The Council shall establish a strong police force. The duties, functions, structure, deployment and composition of the Palestinian Police, together with provisions regarding its equipment and operation, as well as rules of conduct, are set out in Annex I.

2. The Palestinian police force established under the Gaza-Jericho Agreement will be fully integrated into the Palestinian Police and will be subject to the provisions of this Agreement.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 09/29/21   Page 20 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 19 of 156

Page 18

36 I.L.M. 551, *563

3. Except for the Palestinian Police and the Israeli military forces, no other armed forces shall be established or operate in the West Bank and the Gaza Strip.

4. Except for the arms, ammunition and equipment of the Palestinian Police described in Annex I, and those of the Israeli military forces, no organization, group or individual in the West Bank and the Gaza Strip shall manufacture, sell, acquire, possess, import or otherwise introduce into the West Bank or the Gaza Strip any firearms, ammunition, weapons, explosives, gunpowder or any related equipment, unless otherwise provided for in Annex I.

ARTICLE XV

Prevention of Hostile Acts

1. Both sides shall take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property, and shall take legal measures against offenders.

2. Specific provisions for the implementation of this Article are set out in Annex I.

ARTICLE XVI

Confidence Building Measures

With a view to fostering a positive and supportive public atmosphere to accompany the implementation of this Agreement, to establish a solid basis of mutual trust and good faith, and in order to facilitate the anticipated cooperation and new relations between the two peoples, both Parties agree to carry out confidence building measures as detailed herewith:

1. Israel will release or turn over to the Palestinian side, Palestinian detainees and prisoners, residents of the West Bank and the Gaza Strip. The first stage of release of these prisoners and detainees will take place on the signing of this Agreement and the second stage will take place prior to the date of the elections. There will be a third stage of release of detainees and prisoners. Detainees and prisoners will be released from among categories detailed in Annex VII (Release of Palestinian Prisoners and Detainees). Those released will be free to return to their homes in the West Bank and the Gaza Strip.

2. Palestinians who have maintained contact with the Israeli authorities will not be subjected to acts of harassment, violence, retribution or prosecution. Appropriate  [*564]  ongoing measures will be taken, in coordination with Israel, in order to ensure their protection.

3. Palestinians from abroad whose entry into the West Bank and the Gaza Strip is approved pursuant to this Agreement, and to whom the provisions of this Article are applicable, will not be prosecuted for offenses committed prior to September 13, 1993.

CHAPTER 3 - LEGAL AFFAIRS

ARTICLE XVII

Jurisdiction

1. In accordance with the DOP, the jurisdiction of the Council will cover West Bank and Gaza Strip territory as a single territorial unit, except for:

    a. issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, specified
    military locations, Palestinian refugees, borders, foreign relations and Israelis; and

Case 1:18-cv-12355-MKV-DCF  Document 130-9  Filed 08/30/21  Page 21 of 157
Case 1:02-cv-02280-RJL  Document 930-36  Filed 01/29/16  Page 20 of 156

Page 19

36 I.L.M. 551, *564

b. powers and responsibilities not transferred to the Council.

2. Accordingly, the authority of the Council encompasses all matters that fall within its territorial, functional and personal jurisdiction, as follows:

a. The territorial jurisdiction of the Council shall encompass Gaza Strip territory, except for the Settlements and the Military Installation Area shown on map No. 2, and West Bank territory, except for Area C which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council. At this time, the jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

Territorial jurisdiction includes land, subsoil and territorial waters, in accordance with the provisions of this Agreement.

b. The functional jurisdiction of the Council extends to all powers and responsibilities transferred to the Council, as specified in this Agreement or in any future agreements that may be reached between the Parties during the interim period.

c. The territorial and functional jurisdiction of the Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement.

d. Notwithstanding subparagraph a. above, the Council shall have functional jurisdiction in Area C, as detailed in Article IV of Annex III.

3. The Council has, within its authority, legislative, executive and judicial powers and responsibilities, as provided for in this Agreement.

4. a. Israel, through its military government, has the authority over areas that are not under the territorial jurisdiction of the Council, powers and responsibilities not transferred to the Council and Israelis.

b. To this end, the Israeli military government shall retain the necessary legislative, judicial and executive powers and responsibilities, in accordance with international law. This provision shall not derogate from Israel's applicable legislation over Israelis in personam.

5. The exercise of authority with regard to the electromagnetic sphere and air space shall be in accordance with the provisions of this Agreement.

6. Without derogating from the provisions of this Article, legal arrangements detailed in the Protocol Concerning Legal Matters attached as Annex IV to this Agreement (hereinafter "Annex IV") shall be observed. Israel and the Council may negotiate further legal arrangements.

7. Israel and the Council shall cooperate on matters of legal assistance in criminal and civil matters through a legal committee (hereinafter "the Legal Committee"), hereby established.

8. The Council's jurisdiction will extend gradually to cover West Bank and Gaza Strip territory, except for the issues to be negotiated in the permanent status negotiations, through a series of redeployments of the Israeli military forces. The first phase of the redeployment of Israeli military forces will cover populated areas in the West Bank - cities, towns,

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 22 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 21 of 56

Page 20

36 I.L.M. 551, *564

refugee camps and hamlets, as set out in Annex I - and will be completed prior to the eve of the Palestinian elections, i.e. 22 days before the day of the elections. Further redeployments of Israeli military forces to specified military locations will commence immediately upon the inauguration of the Council and will be effected in three phases, each to take place after an interval of six months, to be concluded no later than eighteen months from the date of the inauguration of the Council.

ARTICLE XVIII

Legislative Powers of the Council

1. For the purposes of this Article, legislation shall mean any primary and secondary legislation, including basic laws, regulations and other legislative acts.

2. The Council has the power, within its jurisdiction as defined in Article XVII of this Agreement, to adopt legislation.

 [*565]  3. While the primary legislative power shall lie in the hands of the Council as a whole, the Ra'ees of the Executive Authority of the Council shall have the following legislative powers:

> a. the power to initiate legislation or to present proposed legislation to the Council;

> b. the power to promulgate legislation adopted by the Council; and

> c. the power to issue secondary legislation, including regulations, relating to any matters specified and within the scope laid down in any primary legislation adopted by the Council.

4. a. Legislation, including legislation which amends or abrogates existing laws or military orders, which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this Agreement, or of any other agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio.

> b. The Ra'ees of the Executive Authority of the Council shall not promulgate legislation adopted by the Council if such legislation falls under the provisions of this paragraph.

5. All legislation shall be communicated to the Israeli side of the Legal Committee.

6. Without derogating from the provisions of paragraph 4 above, the Israeli side of the Legal Committee may refer for the attention of the Committee any legislation regarding which Israel considers the provisions of paragraph 4 apply, in order to discuss issues arising from such legislation. The Legal Committee will consider the legislation referred to it at the earliest opportunity.

ARTICLE XIX

Human Rights and the Rule of Law

Israel and the Council shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms and principles of human rights and the rule of law.

ARTICLE XX

Rights, Liabilities and Obligations

1. a. The transfer of powers and responsibilities from the Israeli military government and its civil administration to the

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/30/21 Page 23 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 22 of 156

Page 21

36 I.L.M. 551, *565

Council, as detailed in Annex III, includes all related rights, liabilities and obligations arising with regard to acts or omissions which occurred prior to such transfer. Israel will cease to bear any.financial responsibility regarding such acts or omissions and the Council will bear all financial responsibility for these and for its own functioning.

b. Any financial claim made in this regard against Israel will be referred to the Council.

c. Israel shall provide the Council with the information it has regarding pending and anticipated claims brought before any court or tribunal against Israel in this regard.

d. Where legal proceedings are brought in respect of such a claim, Israel will notify the Council and enable it to participate in defending the claim and raise any arguments on its behalf.

e. In the event that an award is made against Israel by any court or tribunal in respect of such a claim, the Council shall immediately reimburse Israel the full amount of the award.

f. Without prejudice to the above, where a court or tribunal hearing such a claim finds that liability rests solely with an employee or agent who acted beyond the scope of the powers assigned to him or her, unlawfully or with willful malfeasance, the Council shall not bear financial responsibility.

2. a. Notwithstanding the provisions of paragraphs 1.d through 1.f above, each side may take the necessary measures, including promulgation of legislation, in order to ensure that such claims by Palestinians, including pending claims in which the hearing of evidence has not yet begun, are brought only before Palestinian courts or tribunals in the West Bank and the Gaza Strip, and are not brought before or heard by Israeli courts or tribunals.

b. Where a new claim has been brought before a Palestinian court or tribunal subsequent to the dismissal of the claim pursuant to subparagraph a. above, the Council shall defend it and, in accordance with subparagraph 1.a above, in the event that an award is made for the plaintiff, shall pay the amount of the award.

c. The Legal Committee shall agree on arrangements for the transfer of all materials and information needed to enable the Palestinian courts or tribunals to hear such claims as referred to in subparagraph b. above, and, when necessary, for the provision of legal assistance by Israel to the Council in defending such claims.

3. The transfer of authority in itself shall not affect rights, liabilities and obligations of any person or legal entity, in existence at the date of signing of this Agreement.

4. The Council, upon its inauguration, will assume all the rights, liabilities and obligations of the Palestinian Authority.

5. For the purpose of this Agreement, "Israelis" also includes Israeli statutory agencies and corporations registered in Israel.

[*566] ARTICLE XXI

Settlement of Differences and Disputes

Any difference relating to the application of this Agreement shall be referred to the appropriate coordination and cooperation mechanism established under this Agreement. The provisions of Article XV of the DOP shall apply to any such difference which is not settled through the appropriate coordination and cooperation mechanism, namely:

1. Disputes arising out of the application or interpretation of this Agreement or any related agreements pertaining to the

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 08/30/21    Page 24 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 23 of 156

Page 22

36 I.L.M. 551, *566

interim period shall be settled through the Liaison Committee.

2. Disputes which cannot be settled by negotiations may be settled by a mechanism of conciliation to be agreed between the Parties.

3. The Parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both Parties, the Parties will establish an Arbitration Committee.

CHAPTER 4 - COOPERATION

ARTICLE XXII

Relations between Israel and the Council

1. Israel and the Council shall seek to foster mutual understanding and tolerance and shall accordingly abstain from incitement, including hostile propaganda, against each other and, without derogating from the principle of freedom of expression, shall take legal measures to prevent such incitement by any organizations, groups or individuals within their jurisdiction.

2. Israel and the Council will ensure that their respective educational systems contribute to the peace between the Israeli and Palestinian peoples and to peace in the entire region, and will refrain from the introduction of any motifs that could adversely affect the process of reconciliation.

3. Without derogating from the other provisions of this Agreement, Israel and the Council shall cooperate in combating criminal activity which may affect both sides, including offenses related to trafficking in illegal drugs and psychotropic substances, smuggling, and offenses against property, including offenses related to vehicles.

ARTICLE XXIII

Cooperation with Regard to Transfer of Powers and Responsibilities

In order to ensure a smooth, peaceful and orderly transfer of powers and responsibilities, the two sides will cooperate with regard to the transfer of security powers and responsibilities in accordance with the provisions of Annex I, and the transfer of civil powers and responsibilities in accordance with the provisions of Annex III.

ARTICLE XXIV

Economic Relations

The economic relations between the two sides are set out in the Protocol on Economic Relations, signed in Paris on April 29, 1994, and the Appendices thereto, and the Supplement to the Protocol on Economic Relations, all attached as Annex V, and will be governed by the relevant provisions of this Agreement and its Annexes.

ARTICLE XXV

Cooperation Programs

1. The Parties agree to establish a mechanism to develop programs of cooperation between them. Details of such cooperation are set out in Annex VI.

2. A Standing Cooperation Committee to deal with issues arising in the context of this cooperation is hereby established as provided for in Annex VI.

ARTICLE XXVI

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 25 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 24 of 156

Page 23

36 I.L.M. 551, *566

The Joint Israeli-Palestinian Liaison Committee

1. The Liaison Committee established pursuant to Article X of the DOP shall ensure the smooth implementation of this Agreement. It shall deal with issues requiring coordination, other issues of common interest and disputes.

2. The Liaison Committee shall be composed of an equal number of members from each Party. It may add other technicians and experts as necessary.

3. The Liaison Committee shall adopt its rules of procedures, including the frequency and place or places of its meetings.

4. The Liaison Committee shall reach its decisions by agreement.

 [*567]  5. The Liaison Committee shall establish a subcommittee that will monitor and steer the implementation of this Agreement (hereinafter "the Monitoring and Steering Committee"). It will function as follows:

   a. The Monitoring and Steering Committee will, on an ongoing basis, monitor the implementation of this Agreement, with a view to enhancing the cooperation and fostering the peaceful relations between the two sides.

   b. The Monitoring and Steering Committee will steer the activities of the various joint committees established in this Agreement (the JSC, the CAC, the Legal Committee, the Joint Economic Committee and the Standing Cooperation Committee) concerning the ongoing implementation of the Agreement, and will report to the Liaison Committee.

   c. The Monitoring and Steering Committee will be composed of the heads of the various committees mentioned above.

   d. The two heads of the Monitoring and Steering Committee will establish its rules of procedures, including the frequency and places of its metings.

ARTICLE XXVII

Liaison and Cooperation with Jordan and Egypt

1. Pursuant to Article XII of the DOP, the two Parties have invited the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives on the one hand, and the Governments of Jordan and Egypt on the other hand, to promote cooperation between them. As part of these arrangements a Continuing Committee has been constituted and has commenced its deliberations.

2. The Continuing Committee shall decide by agreement on the modalities of admission of persons displaced from the West Bank and the Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder.

3. The Continuing Committee shall also deal with other matters of common concern.

ARTICLE XXVIII

Missing Persons

1. Israel and the Council shall cooperate by providing each other with all necessary assistance in the conduct of searches for missing persons and bodies of persons which have not been recovered, as well as by providing information about missing persons.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 26 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 25 of 156

Page 24

36 I.L.M. 551, *567

2. The PLO undertakes to cooperate with Israel and to assist it in its efforts to locate and to return to Israel Israeli soldiers who are missing in action and the bodies of soldiers which have not been recovered.

CHAPTER 5 - MISCELLANEOUS PROVISIONS

ARTICLE XXIX

Safe Passage between the West Bank and the Gaza Strip

Arrangements for safe passage of persons and transportation between the West Bank and the Gaza Strip are set out in Annex I.

ARTICLE XXX

Passages

Arrangements for coordination between Israel and the Council regarding passage to and from Egypt and Jordan, as well as any other agreed international crossings, are set out in Annex I.

ARTICLE XXXI

Final Clauses

1. This Agreement shall enter into force on the date of its signing.

2. The Gaza-Jericho Agreement, except for Article XX (Confidence-Building Measures), the Preparatory Transfer Agreement and the Further Transfer Protocol will be superseded by this Agreement.

3. The Council, upon its inauguration, shall replace the Palestinian Authority and shall assume all the undertakings and obligations of the Palestinian Authority under the Gaza-Jericho Agreement, the Preparatory Transfer Agreement, and the Further Transfer Protocol.

4. The two sides shall pass all necessary legislation to implement this Agreement.

5. Permanent status negotiations will commence as soon as possible, but not later than May 4, 1996, between the Parties. It is understood that these negotiations shall cover remaining issues, including: Jerusalem, refugees, settlements, security arrangements, borders, relations and cooperation with other neighbors, and other issues of common interest.

 [*568]  6. Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

7. Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations.

8. The two Parties view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

9. The PLO undertakes that, within two months of the date of the inauguration of the Council, the Palestinian National Council will convene and formally approve the necessary changes in regard to the Palestinian Covenant, as undertaken in the letters signed by the Chairman of the PLO and addressed to the Prime Minister of Israel, dated September 9, 1993 and May 4, 1994.

10. Pursuant to Annex I, Article IX of this Agreement, Israel confirms that the permanent checkpoints on the roads

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 27 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 26 of 156

Page 25

36 I.L.M. 551, *568

leading to and from the Jericho Area (except those related to the access road leading from Mousa Alami to the Allenby Bridge) will be removed upon the completion of the first phase of redeployment.

11. Prisoners who, pursuant to the Gaza-Jericho Agreement, were turned over to the Palestinian Authority on the condition that they remain in the Jericho Area for the remainder of their sentence, will be free to return to their homes in the West Bank and the Gaza Strip upon the completion of the first phase of redeployment.

12. As regards relations between Israel and the PLO, and without derogating from the commitments contained in the letters signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO, dated September 9, 1993 and May 4, 1994, the two sides will apply between them the provisions contained in Article XXII, paragraph 1, with the necessary changes.

13. a. The Preamble to this Agreement, and all Annexes, Appendices and maps attached hereto, shall constitute an integral part hereof.

   b. The Parties agree that the maps attached to the Gaza-Jericho Agreement as:

      a. map No. 1 (The Gaza Strip), an exact copy of which is attached to this Agreement as map No. 2 (in this Agreement "map No. 2");

      b. map No. 4 (Deployment of Palestinian Police in the Gaza Strip), an exact copy of which is attached to this Agreement as map No. 5 (in this Agreement "map No. 5"); and

      c. map No. 6 (Maritime Activity Zones), an exact copy of which is attached to this Agreement as map No. 8 (in this Agreement "map No. 8");

   are an integral part hereof and will remain in effect for the duration of this Agreement.

14. While the Jeftlik area will come under the functional and personal jurisdiction of the Council in the first phase of redeployment, the area's transfer to the territorial jurisdiction of the Council will be considered by the Israeli side in the first phase of the further redeployment phases.

Done at Washington DC, this 28th day of September, 1995

   [ILLEGIBLE TEXT]

   For the Government of the State of Israel

   [ILLEGIBLE TEXT]

   For the PLO

   [ILLEGIBLE TEXT]

   The United States of America

   [ILLEGIBLE TEXT]

   The Arab Republic of Egypt

   [ILLEGIBLE TEXT]

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 28 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 27 of 156

Page 26

36 I.L.M. 551, *568

The Kingdom of Norway

[ILLEGIBLE TEXT]

The Russian Federation

[ILLEGIBLE TEXT]

The Hashemite Kingdom of Jordan

[ILLEGIBLE TEXT]

The European Union

 [*569]  ANNEX I

PROTOCOL CONCERNING REDEPLOYMENT AND SECURITY ARRANGEMENTS

[Index not reproduced]

ARTICLE I

Redeployment of Israeli Military Forces and Transfer of Responsibility

First Phase of Redeployment

1. The first phase of Israeli military forces redeployment will cover populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets, as shown on map No. 1. This redeployment will be effected in stages, as set out in the schedule attached to this Annex as Appendix 1, and will be completed prior to the eve of the Palestinian elections, i.e., 22 days before the day of elections.

2. In order to maintain the territorial integrity of the West Bank and the Gaza Strip as a single territorial unit, and to promote their economic growth and the demographic and geographical links between them, both sides shall implement the provisions of this Annex, while respecting and preserving without obstacles, normal and smooth movement of people, vehicles, and goods within the West Bank, and between the West Bank and the Gaza Strip.

3. Any security arrangements and measures which become effective commensurate with the redeployment of the Israeli military forces will not undermine the importance of, nor will they prejudice, the Palestinian development programs and projects for reconstruction and development of the West Bank and the Gaza Strip, as well as the moral and physical dignity of the Palestinian people in the West Bank and the Gaza Strip.

4. After the inauguration of the Palestinian Council, the unity and integrity of the Palestinian people in the West Bank and the Gaza Strip shall be maintained and respected. All Palestinian people residing in the West Bank and the Gaza Strip will be accountable to the Palestinian Council only, unless otherwise provided in this Agreement.

5. After the inauguration of the Palestinian Council, the Israeli Civil Administration will be dissolved and the Israeli military government will be withdrawn.

6. The Council will assume powers and responsibilities for civil affairs, as well as for public order and internal security, according to this Agreement.

7. Nothing in this Article shall derogate from Israel's security powers and responsibilities in accordance with this Agreement.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 29 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 28 of 156

Page 27

36 I.L.M. 551, *569

8. There will be a period of 10 days prior to each stage of redeployment according to paragraph 1 of this Article, during which the commanders of the Israeli military forces will acquaint the respective commanders of the different echelons of the Palestinian Police with the respective area and its specific problems.

Further Redeployments After the Inauguration of the Palestinian Council

9. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

10. The specified military locations referred to in Article X, paragraph 2 of this Agreement will be determined in the further redeployment phases within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations.

ARTICLE II

Security Policy for the Prevention of Terrorism and Violence

1. The Palestinian security policy as defined by the Palestinian Authority on March 9, 1995, for the Gaza Strip and the Jericho Area will also be implemented in the rest of the West Bank in areas which come under Palestinian security responsibility as follows:

a. The Palestinian Police is the only Palestinian security authority.

b. The Palestinian Police will act systematically against all expressions of violence and terror.

c. The Council will issue permits in order to legalize the possession and carrying of arms by civilians. Any illegal arms will be confiscated by the Palestinian Police.

d. The Palestinian Police will arrest and prosecute individuals who are suspected of perpetrating acts of violence and terror.

2. Both sides will, in accordance with this Agreement, act to ensure the immediate, efficient and effective handling of any incident involving a threat or act of

 [*570]  (2) deal with security issues referred to it by the DCOs;

(3) ensure proper transfer of information and guidelines to the relevant DCOs; and

(4) propose to the JSC security policy guidelines, and forward issues to the JSC for determination.

c. The Israeli side and the Palestinian side in the RSCs will maintain contact with each other as follows:

(1) regular as well as special meetings shall be held between the commander of the Israeli military forces and the commander of the Palestinian Police in the West Bank or in the Gaza Strip, as appropriate; and

(2) each side will operate a regional security coordination office 24 hours a day, with direct and constant communication links between the two sides.

d. The RSCs shall commence operations immediately upon the signing of this Agreement and shall determine by agreement their mode of procedure.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 30 of 157
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 29 of 156

Page 28

36 I.L.M. 551, *570

3. District Coordination Offices

    a. DCOs are hereby established in the West Bank and the Gaza Strip, as set out below.

    b. The location of the DCOs is as detailed on attached map Nos. 2 and 4.

    c. Each DCO shall:

        (1) monitor and manage matters requiring coordination as determined by the JSC and/or the relevant RSC, according to the policy and guidelines established by either of them;

        (2) monitor and manage all matters of a joint nature within the respective district of the DCO, including the coordination of activities by one side which may affect the other side;

        (3) review, investigate and report to the relevant RSC on the overall situation within the DCO's respective district, with special regard to specific events, incidents and activities occurring in the district; and

        (4) direct the Joint Patrols and the Joint Mobile Units set up in accordance with paragraphs 4 and 5 of this Article and Article V, paragraph 2.c below, operating within the DCO's respective district.

    d. The DCOs shall commence operations immediately upon the signing of this Agreement.

    e. Each DCO will be continuously staffed by a team of up to six officers from each side, comprising one commander and five duty officers.

    f. The DCOs will be operated jointly by both sides, 24 hours a day. At least one duty officer from each side, as well as the necessary number of assistants, will be present during each eight-hour shift.

    g. With a view to preventing friction and to enabling the two sides to deal with possible incidents, both sides shall ensure that the relevant DCO shall immediately be notified of any of the following events:

        (1) routine, scheduled or unscheduled activity or deployment by the Israeli military forces or the Palestinian Police that directly affects the security responsibility of the other side. This includes activity or deployment in the proximity of Settlements or Palestinian populated localities, as the case may be;

        (2) events that pose a threat to public order;

        (3) activities that disturb the regular flow of traffic on the main roads, including roadblocks and roadworks;

        (4) incidents involving both Israelis and Palestinians, such as road accidents, rescue of casualties or persons in mortal danger, engagement steps or any incident in which a weapon is used;

        (5) a terrorist action of any kind and from any source;

        (6) infiltrations between the West Bank, the Gaza Strip and Israel; and

        (7) all cases in which Israelis are hospitalized in the West Bank or the Gaza Strip, or in which Palestinians of the West Bank or the Gaza Strip are hospitalized in Israel.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 31 of 57
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 30 of 156

Page 29

36 I.L.M. 551, *570

h. Each DCO shall notify the relevant Israeli and Palestinian headquarters, as well as the Joint Patrols operating in the relevant district, of the occurrence of any of the events listed in subparagraph g. above.

i. The JSC may modify the content of the list of events included in subparagraph g. above.

j. Any event involving injury to Israelis, at any location within the West Bank or the Gaza Strip, shall be immediately reported to Israel through the relevant DCO. Israel may employ any means necessary for the evacuation and treatment of such injured persons, and will coordinate such activity through the relevant DCO.

k. The DCOs shall be equipped with the necessary means of communication to enable direct and immediate contact both with the Joint Patrols and the relevant RSC, as well as with each side's respective police or military district headquarters.

 [*571] terrorism, violence or incitement, whether committed by Palestinians or Israelis. To this end, they will cooperate in the exchange of information and coordinate policies and activities. Each side shall immediately and effectively respond to the occurrence or anticipated occurrence of an act of terrorism, violence or incitement and shall take all necessary measures to prevent such an occurrence.

3. With a view to implementing the above, each side shall, in accordance with the provisions of this Agreement, carry out the following functions in the areas under its security responsibility:

a. protect all residents of, and all other persons present in, these areas;

b. actively prevent incitement to violence, including violence against the other side or persons under the authority of the other side;

c. apprehend, investigate and prosecute perpetrators and all other persons directly or indirectly involved in acts of terrorism, violence and incitement; and

d. prevent and deal with any attempt to cause damage or harm to infrastructure serving the other side, including, inter alia, roads, water, electricity, telecommunications and sewage infrastructure.

4. Both sides undertake to deal with the issue of persons who are present in the areas in violation of this Agreement, and to take further measures in accordance with procedures to be determined by the JSC.

ARTICLE III

Coordination and Cooperation In Mutual Security Matters

1. Joint Security Coordination and Cooperation Committee

a. A Joint Coordination and Cooperation Committee for Mutual Security Purposes is hereby established (hereinafter "the JSC"). It will deal with all security matters of mutual concern regarding this Agreement in the West Bank and the Gaza Strip.

b. The JSC shall:

(1) recommend security policy guidelines for the approval of the Joint Israeli-Palestinian Liaison Committee and implement such approved guidelines;

(2) deal with security issues raised by either side;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 32 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 31 of 156

Page 30

36 I.L.M. 551, *571

(3) provide the proper channel for exchanging information between the two sides, needed to solve security problems;

(4) provide directives for the Joint Regional Security Committees (hereinafter "the RSCs") and for the Joint District Coordination Offices (hereinafter "the DCOs"); and

(5) subject to the provisions of Article XXVI (the Joint Israeli Palestinian Liaison Committee), and Article XXI (Settlement of Differences and Disputes) of this Agreement, deal with alleged violations, as well as differences relating to the application or implementation of the security arrangements set out in this Agreement.

c. The JSC shall comprise between five and seven members from each side. Decisions of the JSC will be reached by agreement between the two sides.

d. The JSC shall determine its rules of procedure. Meetings of the JSC shall be held every two weeks. In the event that either side requests a special meeting, it shall be convened within forty-eight (48) hours.

e. Unless otherwise agreed by the two sides, JSC meetings will be hosted by each of the sides alternately.

f. The JSC shall develop a comprehensive plan to ensure full coordination between the Israeli military forces and the Palestinian Police during the interim period, starting from the date of signing of this Agreement.

g. This coordination will be implemented through the RSCs in the West Bank and the Gaza Strip and the DCOs, as mentioned hereafter in this Article.

h. The comprehensive plan will include a plan for the West Bank, consisting of arrangements for the entry of the Palestinian Police and the introduction of police arms, ammunition and equipment, as well as arrangements intended to facilitate the smooth transfer of authority and assumption by the Palestinian Police of its security responsibilities according to this Agreement.

i. The above mentioned comprehensive plan will also include two regional plans that will include arrangements for coordination and cooperation in security matters after the redeployment is effected.

j. These regional plans will be reviewed every six months, or whenever needed, by the JSC and the relevant RSC.

2. Regional Security Committees

a. Two RSCs are hereby established, one in the West Bank and one in the Gaza Strip.

b. Each RSC shall:

(1) guide the relevant DCOs with security policy guidelines;

[*572] 4. Joint Patrols

a. The mission of the Joint Patrols shall be to assist in ensuring free, unimpeded and secure movement along the roads designated in Articles V and VI below.

b. Unless the JSC decides otherwise, the Joint Patrols shall each be composed of two 4-wheel drive

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 33 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 32 of 156

Page 31

36 I.L.M. 551, *572

vehicles, one Palestinian and one Israeli, equipped with adequate communications systems. The vehicles shall be marked so as to be easily distinguishable from all other vehicles in the area. In each vehicle there will be an officer and three uniformed and armed guards.

c. The Joint Patrols will patrol 24 hours a day, in vehicles along their routes of activity, or as directed by the relevant DCO. Joint Patrols on the Lateral Roads in the Gaza Strip will also patrol on foot along their routes of activity, and on the adjacent sides of the roads upon which the security of the traffic along these roads is dependent.

d. On roads under Israeli security responsibility, the Israeli vehicle will be the leading vehicle. On roads under Palestinian security responsibility, the Palestinian vehicle will be the leading vehicle. The Joint Patrols will be under the direction of the relevant DCO.

e. The Joint Patrols shall continuously monitor movement within their area of operation and shall act to prevent and deal with incidents that may threaten or endanger persons using the roads. They shall report any such incident or threat thereof, as well as any action taken, to the relevant DCO, and to the respective Israeli military and Palestinian police district headquarters.

f. On reaching the scene of an incident, the Joint Patrol will take all measures necessary to deal with the incident, and provide assistance as necessary. The Joint Patrol shall verify that the appropriate measures have been taken and report to the relevant DCO accordingly.

5. Joint Mobile Units

a. The mission of the Joint Mobile Units (hereinafter "JMUs") is to provide rapid response in the event of incidents and emergency situations, in order to ensure free, unimpeded and secure movement along their designated routes of activity, or in their areas of activity.

b. The composition of the JMUs will be similar to that of the Joint Patrols.

c. In areas under Israeli security responsibility, the Israeli vehicle will be the leading vehicle. In areas under Palestinian security responsibility, the Palestinian vehicle will be the leading vehicle. The Joint Mobile Units will be under the direction of the relevant DCO.

d. The functions of the JMUs are:

(1) to monitor movement along their designated routes of activity from their stationary locations, from where they may patrol on agreed roads as directed by the relevant DCO, in which case their duties will be the same as those of the Joint Patrols;

(2) in the event of an incident involving both Israelis and Palestinians, to reach the site of the incident in order to provide assistance and to investigate; and

(3) any other function determined by the relevant DCO.

6. Joint Liaison Bureaus

Joint Liaison Bureaus established by the two sides shall operate at crossing points and at terminals as described in Articles V, VI and VIII of this Annex.

7. Other joint activities may be agreed upon in the JSC and/or the RSC.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 34 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 33 of 156

Page 32

36 I.L.M. 551, *572

ARTICLE IV

The Palestinian Police

1. Duties and Functions

As detailed in the Palestinian law, the Palestinian Police shall carry out its duties and functions in accordance with this Agreement as follows:

    a. maintaining internal security and public order;

    b. protecting the public and all other persons present in the areas, as well as protecting their property, and acting to provide a feeling of security, safety and stability;

    c. adopting all measures necessary for preventing crime in accordance with the law;

    d. protecting public installations, infrastructure and places of special importance;

    e. preventing acts of harassment and retribution;

    f. combating terrorism and violence, and preventing incitement to violence; and

    g. performing any other normal police functions.

[*573]  2. Structure and Composition

    a. The Palestinian Police shall consist of one integral unit under the control of the Council. It shall be composed of six branches:

        (1) Civil Police (Al Shurta);

        (2) Public Security;

        (3) Preventive Security;

        (4) Amn Al Ri'asah;

        (5) Intelligence; and

        (6) Emergency Services and Rescue (Al Difa'a Al Madani).

    In each district, all members of the six Police branches shall be subordinate to one central command.

    b. The Palestinian Police shall have a Palestinian Coastal Police unit in accordance with Article XIV of this Annex.

3. Deployment

    a. During the interim period, the total number of policemen of the Palestinian Police in all its branches in the West Bank and the Gaza Strip will be no more than 30,000 out of which up to 12,000 policemen may be deployed in the West Bank and up. to 18,000 policemen in the Gaza Strip. These numbers may be

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 35 of 157
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 34 of 156

Page 33

36 I.L.M. 551, *573

changed by agreement, if necessary. The Palestinian side will notify Israel of the names of the policemen recruited to the Palestinian Police in the Gaza Strip.

b. In accordance with the stages of the first phase of redeployment of Israeli forces in the West Bank, up to 6,000 of the above-mentioned 12,000 Palestinian policemen may be deployed in the West Bank in Area A and, as set out in paragraph 3 of Article V, in Area B, as detailed in Appendix 2.

c. The remaining 6,000 Palestinian policemen will be deployed in the West Bank according to the phases of the further redeployments or as needed, as agreed upon by the two Parties.

d. The Palestinian Police shall be deployed as shown on attached map Nos. 3 and 5.


4. Recruitment

a. The Palestinian Police shall consist of policemen recruited locally, and from abroad (from among individuals holding Jordanian passports or Palestinian documents issued by Egypt). The number of Palestinian recruits from abroad shall not exceed 5,000 in the West Bank and 7,000 in the Gaza Strip.

b. Palestinian policemen coming from abroad may be accompanied by their spouse and sons and daughters.

c. The Palestinian policemen to be recruited pursuant to this Agreement shall be West Bank or Gaza Strip residents who will be duly trained to perform police functions.

d. The Palestinian side will notify Israel of any candidate for recruitment to the Palestinian Police. Should Israel object to the recruitment of any such candidate, that person shall not be recruited.

e. In accordance with Palestinian law, the employment of policemen who have been convicted of serious crimes, or have been found to be actively involved in terrorist activities subsequent to their recruitment, will be immediately terminated, and their weapons and police identification documentation will be confiscated.


5. Arms, Ammunition and Equipment

a. In the West Bank and the Gaza Strip, uniformed policemen may carry arms, and plainclothes policemen on duty who hold special accreditation may carry personal light arms concealed in their clothing, in accordance with this Agreement.

b. In the West Bank, the Palestinian Police will possess the following arms and equipment:

    (1) up to 4,000 rifles;

    (2) up to 4,000 pistols;

    (3) up to 120 machine guns of 0.3" or 0.5" caliber; and

    (4) up to 15 light, unarmed riot vehicles of a type to be agreed on between the two sides in the JSC.

c. In the Gaza Strip, the Palestinian Police will possess the following arms and equipment:

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 36 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 35 of 156

Page 34

36 I.L.M. 551, *573

(1) 7,000 light personal weapons;

(2) up to 120 machine guns of 0.3" or 0.5" caliber; and

(3) up to 45 wheeled armored vehicles of a type to be agreed on between the two sides, and of which 22 will be deployed in protecting Council installations. The use of wheeled armored vehicles in the Security Perimeter, on the Lateral Roads and on their adjacent [*574] sides, or in the vicinity of the Settlements shall be approved through the relevant DCO. Movement of such vehicles along the central North-South road (Road No. 4) in the Gaza Strip may take place only after providing notification to the relevant DCO.

d. The number of arms or items of equipment specified in subparagraphs b. and c. above may be increased subject to the agreement of both sides.

e. The Palestinian Police will maintain an updated register of all weapons held by its personnel.

f. The Palestinian Police may possess communication systems, subject to Article 36 of Annex III, and distinctive uniforms, identification badges and vehicle markings.

g. In this Annex, the term "weapons" includes firearms, ammunition and explosives of all kinds.

6. Introduction of Arms, Equipment and Foreign Assistance

a. All foreign contributions and other forms of assistance to the Palestinian Police must comply with the provisions of this Agreement.

b. The introduction of arms, ammunition or equipment intended for the Palestinian Police shall be coordinated through the JSC, in accordance with its established practices.

7. Movement

Movement of Palestinian policemen between the West Bank and the Gaza Strip will be conducted in accordance with Article X of this Annex.

ARTICLE V

Security Arrangements in the West Bank

1. Coordination and Cooperation in the West Bank

As shown on map No. 4, eight DCOs will function in the West Bank, as follows:

a. a DCO for the Jenin District, located at the Quabatiya junction or in its vicinity;

b. a DCO for the Nablus District, located at the Hawara Junction;

c. a DCO for the Tulkarm District, located at the Kaddouri Junction;

d. a DCO for the Qalqilya District located at Tsufin Junction;

e. a DCO for the Ramallah District, located at the Beth El junction or in its vicinity;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 37 of 157
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 36 of 156

Page 35

36 I.L.M. 551, *574

f. a DCO for the Bethlehem District, located at the Panorama Hills in Beit Jala;

g. a DCO for the Hebron District, located at Har Manoakh (Jabal Manoah); and

h. a DCO for the Jericho District, located at Vered Yericho, that will maintain a subordinate Joint Liaison Bureau in the Allenby Terminal.

2. Area A

a. The Council will, upon completion of the redeployment of Israeli military forces in each district, as set out in Appendix 1 to this Annex, assume the powers and responsibilities for internal security and public order in Area A in that district.

b. Jewish Holy Sites

(1) The following provisions will apply with respect to the security arrangements in Jewish holy sites in Area A which are listed in Appendix 4 to this Annex:

(a) While the protection of these sites, as well as of persons visiting them, will be under the responsibility of the Palestinian Police, a JMU shall function in the vicinity of, and on the access routes to, each such site, as directed by the relevant DCO.

(b) The functions of each such JMU shall be as follows:

(i) to ensure free, unimpeded and secure access to the relevant Jewish holy site; and

(ii) to ensure the peaceful use of such site, to prevent any potential instances of disorder and to respond to any incident.

(c) Given the Jewish religious nature of such sites, Israeli plainclothes guards may be present inside such sites.

(2) The present situation and the existing religious practices shall be preserved.

c. Clarifications Concerning the Jericho Area

With regard to the definition of the Jericho Area, as delineated on attached map No. 1, it is hereby clarified that Route No. 90 crossing Auja from South to North and the East-West road connecting Route No. 90 with [*575] Yitav, and their adjacent sides, shall remain under Israeli authority. For the purpose of this Article, the width of each such road and its adjacent sides, as shown on attached map No. 1, shall extend at least 12 meters on each side measured from its center.

3. Areas B and C

a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 38 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 37 of 156

Page 36

36 I.L.M. 551, *575

shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(1) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 3 to this Annex and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

(3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b.1 above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post.

The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in this Annex.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

4. Joint Patrols

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 08/20/21    Page 39 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 38 of 156

Page 37

36 I.L.M. 551, *575

a. Joint Patrols led by a Palestinian vehicle will operate on each of the following roads, as indicated on map No. 4:

> (1) the main north-south road (Route No. 60) crossing Jenin;

> (2) the main north-south road (Route No. 60) crossing Nablus;

> (3) the main east-west road (Route Nos. 57 and 60) crossing Nablus;

> (4) the main east-west road (Route No. 57) crossing Tulkarm;

> (5) the main east-west road (Route No. 55) crossing Qalqilya;

> (6) the main north-south road (Route No. 60) crossing Ramallah;

> (7) the main east-west road (Route No. 3) crossing Ramallah;

> (8) the main north-south road (Route No. 60) crossing Bethlehem;

> (9) the main east-west road crossing Beit Jala;

> (10) the main north-south road (Route No. 90) crossing Jericho; and

> (11) the road crossing Hebron, as set out in Article VII (Hebron) below.

> The operation of the Joint Patrols in each district will commence after the completion of redeployment in the respective district.

 [*576]  b. Each DCO will be allowed, within 3 months after the completion of the redeployment in its respective district, to decide that Joint Patrols will function on roads crossing areas A, B and C.

5. Joint Mobile Units

a. Joint Mobile Units will operate in Area B and will be led by the Israeli vehicle. Three such Joint Mobile Units shall be located at each DCO. One will be on alert 24 hours a day. The two others will perform missions as directed by the DCO during daylight hours.

b. A Joint Mobile Unit shall be located at the Auja junction being the intersection of Route No. 90 and the road to Yitav. This unit shall be led by the Israeli vehicle, and may be directed by the DCO to deal with certain incidents occurring on the road between Auja and Jericho in which Palestinians are involved.

c. A Joint Mobile Unit shall be located at the Nahal Elisha junction on the road from Jericho to the Mousa Allami project.

6. Movement of Palestinian Policemen

Movement of uniformed policemen, whether armed or unarmed, as well as armed on-duty plainclothes policemen, in Area C, will be confirmed and coordinated by the relevant DCO. Movement of such policemen between Area A and Area B will be approved by the relevant DCO.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 40 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 39 of 156

Page 38

7. Rachel's Tomb

    a. Without derogating from Palestinian security responsibility in the City of Bethlehem, the two sides hereby agree on the following security arrangements regarding Rachel's Tomb which will be considered a special case during the Interim Period:

        (1) While the Tomb, as well as the main road leading from Jerusalem to the Tomb, as indicated on map No. 1, will be under the security responsibility of Israel, the free movement of Palestinians on the main road will continue.

        (2) For the purpose of protecting the Tomb, three Israeli guard posts may be located in the Tomb, the roof of the Waqf building, and the parking lot.

    b. The present situation and existing practices in the Tomb shall be preserved.

ARTICLE VI

Security Arrangements in the Gaza Strip

1. The Delimiting Line

    a. For the purpose of the present Agreement only, and without prejudice to the permanent status negotiations on borders, the line delimiting the northern and eastern edge of the Gaza Strip follows the fence on the ground, as delineated on attached map No. 2 by an unbroken green line (hereinafter "the Delimiting Line") and shall have no other effect.

    b. The Parties reaffirm that, as long as this Agreement is in force, the security fence between the Gaza Strip and Israel shall remain in place, and that the line demarcated by the fence shall be authoritative only for the purpose of this Agreement.

2. Security Perimeter

    a. There will be a security perimeter along the Delimiting Line inside the Gaza Strip as delineated on attached map No. 2 by a broken green line (hereinafter "the Security Perimeter").

    b. In accordance with the provisions of this Agreement, the Palestinian Police will be responsible for security in the Security Perimeter.

    c. The Palestinian Police will enforce special security measures aimed at preventing infiltrations across the Delimiting Line or the introduction into the Security Perimeter of any arms, ammunition or related equipment, except for the arms, ammunitions or equipment of the Palestinian Police, authorized through the relevant DCO.

    d. Activities of the Palestinian Police inside the Security Perimeter will be coordinated through the relevant DCO. Security activities in Israel in the vicinity of the Delimiting Line that directly affect the other side will be coordinated with the Palestinian Police through the relevant DCO.

3. The Israeli Settlements

    a. In accordance with the DOP, during the interim period, the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as delineated on attached map No. 2 by a blue line, will be

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 01/29/21 Page 41 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 40 of 156

Page 39

36 I.L.M. 551, *576

under Israeli authority.

b. Palestinians will be free to move along the coast road and along the road from the Netzarim Junction to the seashore.

4. The Yellow Area

a. In the areas delineated by a broken red line and shaded in yellow in attached map No. 2 (hereinafter "the Yellow Area"), and without  [*577]  derogating from Palestinian authority, responsibility will be shared as follows: the Israeli authorities will have the overriding responsibility and powers for security, and the Council will have the responsibility and powers for civil affairs, subject to this Agreement. In addition, with regard to the Yellow Area, cooperation and coordination in security matters, including Joint Patrols, as agreed, will be implemented.

b. Entry of Palestinian policemen into the Yellow Area and their activity therein may take place as agreed upon through the relevant DCO.

c. Without derogating from the above, while the Palestinian side shall have responsibility and powers for public order for Palestinians in the Mawasi Area, Israel shall retain the responsibility and powers for internal security. Accordingly, the area shall be treated as Area B throughout the interim period in accordance with the provisions of paragraph 3 of Article V above. For the purpose of exercising Palestinian public order responsibility and powers, Palestinian uniformed Civil Police (Al Shurta) policemen may enter the Mawasi Area after coordination and confirmation of their movement and activity through the relevant DCO.

5. The Mawasi Area

a. As shown on map No. 2, two Joint Patrols will operate in the Mawasi area, the fishermen's wharves of Rafah and Khan Yunis and along the coast road, led by the Israeli vehicle.

b. Access of Palestinians to the Mawasi area, as delineated on attached map No. 2, will be by the following roads:

(1) Rafah - Tel Sultan - Mawasi;

(2) Khan Yunis - El Bahr Village; and

(3) Deir El Ballah - along the beach to the Mawasi.

c. The Mawasi Beach

(1) Notwithstanding Israeli authority over the Gush Katif settlement area, the Council may operate sections of the Mawasi beach extending to the east up to the coast road, totaling, together with the Rafah and Khan Yunis wharves, five (5) kilometers. Israel has notified the Palestinian Authority of the locations of these sections.

(2) These sections may be used for the following purposes:

(a) sport and recreation, including boat hire facilities;

(b) operating food establishments;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 42 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 41 of 156

Page 40

36 I.L.M. 551, *577

(c) enlarging the wharves;

(d) expanding the facilities for fishermen, such as offices, warehouses and cold storage facilities; and

(e) an hotel.

(3) In these sections, the Council, in exercising its civil authority, will be able to grant licenses for businesses, collect fees and taxes, set and enforce public health standards and develop and manage the tourist sector.

(4) In each of the fishermen's wharves, the Council may have an office building which shall be protected.

(5) There will not be any construction by Israelis of new sites along the beach.

(6) During a period of three months from the signing of this Agreement, Israel may consider, in light of the security situation, the use by the Council of additional beach sections.

## 6. The Egyptian Border

The Military Installation Area along the Egyptian border in the Gaza Strip, as delineated on attached map No. 2 by a blue line and shaded in pink, will be under Israeli authority.

The village of Dahaniya will remain part of the Military Installation Area pending a declaration of a general amnesty for the residents of the village, and provision having been made for their protection. Upon realization of the above amnesty and protection, the village of Dahaniya will become part of the Yellow Area.

## 7. Lateral Roads to the Settlements

a. Without derogating from Palestinian authority and in accordance with the Declaration of Principles:

(1) On the three lateral roads connecting the Israeli settlements in the Gaza Strip to Israel, namely: the Kissufim-Gush Katif road; the Sufa-Gush Katif road; and the Karni-Netzarim road, as indicated by a light blue line on attached map No. 2, including the adjacent sides upon which the security of traffic along these roads is dependent (hereinafter "the Lateral Roads"), the Israeli authorities will have all necessary responsibilities and powers in order to conduct independent security activity, including Israeli patrols.

(2) Joint Patrols will operate along the Lateral Roads. Such joint patrols will be led by the Israeli vehicle.

(3) Where the Israeli authorities carry out engagement steps, they will do so with a view to transferring, at the earliest opportunity, the  [*578]  continued handling of the incidents falling within the Palestinian responsibility, to the Palestinian Police.

(4) Overpasses will be constructed on intersections between the Lateral Roads and the central North-South road (Road No. 4).

Case 1:18-cv-12255-MRVDC5 Document 130-9 Filed 08/20/21 Page 43 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 42 of 156

Page 41

36 I.L.M. 551, *578

b. Where the Lateral Roads overlap the Security Perimeter, the two sides, in the exercise of their respective powers and responsibilities, will fully coordinate their activity in order to prevent friction.

8. The Central North-South Road (Road No. 4)

A Joint Patrol led by the Palestinian vehicle will be operated along the central North-South road (Road No. 4) in the Gaza Strip between Kfar Darom and Wadi Gaza.

9. Joint Mobile Units

a. Joint Mobile Units will be located at the following junctions:

(1) the Nissanit junction;

(2) the Netzarim junction;

(3) the Deir el-Ballah junction; and

(4) the Sufa-Morag junction.

b. At the Netzarim junction, the Israeli side of this Joint Mobile Unit will check Israeli vehicles, which will then be able to continue their journey without interference. This Joint Mobile Unit will also operate as a Joint Patrol between the Netzarim junction and Wadi Gaza under the direction of the relevant DCO.

10. Coordination and Cooperation in the Gaza Strip

Two DCOs will function in the Gaza Strip as follows:

a. A DCO for the Gaza district, located at the Erez crossing point with subordinate Joint Liaison Bureaus at the Erez and Nahal Oz crossing points.

b. A DCO for the Khan Yunis district, located at the Nuriya Camp with subordinate Joint Liaison Bureaus at the Sufa crossing points and at the Rafah Terminal.

ARTICLE VII

Guidelines for Hebron

1. a. There will be a redeployment of Israeli military forces in the city of Hebron except for places and roads where arrangements are necessary for the security and protection of Israelis and their movements. The areas of such redeployment are delineated by red and blue lines and shaded in orange stripes on a yellow background on attached map No. 9 (hereinafter "Area H-1").

b. This redeployment will be completed not later than six months after the signing of this Agreement.

2. a. The Palestinian Police will assume responsibilities in Area H-1 similar to those in other cities in the West Bank.

b. All civil powers and responsibilities, set out in Annex III of this Agreement, will be transferred to the Council in the City of Hebron as in the other cities in the West Bank.

c. Palestinian police stations or posts will be established in Area H-1, manned by a total of up to 400

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 44 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 43 of 156

Page 42

36 I.L.M. 551, *578

policemen, equipped with 20 vehicles and armed with 200 pistols, and 100 rifles for the protection of those stations.

d. The Palestinian Police shall operate freely in Area H-1. Any activity or movement by it outside this area will be carried out after coordination and confirmation through the DCO established in paragraph 6 of this Article.

e. The Imara will be turned over to the Palestinian side upon the completion of the redeployment, and will become the headquarters of the Palestinian Police in the city of Hebron.

3. According to the DOP, Israel will continue to carry the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

4. a. In the area of the city of Hebron from which Israel military forces will not redeploy, as delineated by red and blue lines on attached map No. 9 (hereinafter "Area H-2"), Israel will retain all powers and responsibilities for internal security and public order.

b. In Area H-2, the civil powers and responsibilities will be transferred to the Council, except for those relating to Israelis and their property which shall continue to be exercised by Israeli Military Government.

c. In Area H-2, plainclothes unarmed municipal inspectors will monitor and enforce vis-a-vis Palestinians, compliance with the laws and regulations, within the civil powers and responsibilities transferred to the Council in Hebron.

[*579]  5. The municipality of Hebron will continue to provide all municipal services to all parts of the city of Hebron.

6. a. A DCO will be located at Har Manoakh (Jabal Manoah).

b. Upon completion of the redeployment of Israeli military forces, a JMU will operate throughout the city of Hebron, including in the Old City, if required to do so by the abovementioned DCO.

c. A Joint Patrol will function in Hebron on the road from Ras e-Jura to the north of the Dura junction via E-Salaam road and on Route No. 35.

d. Three months after the completion of the redeployment, the DCO will consider the reassignment of the Joint Patrol to other parts of Hebron.

7. Measures and procedures for normalizing life in the Old City and on the roads of Hebron will be taken immediately after the signing of this Agreement, as follows:

a. opening of the wholesale market - Hasbahe, as a retail market;

b. removal of the barrier on the road leading from Abu Sneineh to Shuhada Road in order to facilitate the movement on these roads;

c. reopening of the main entrance to the Islamic College;

d. replacement of the closed roadblock at the Ras e-Jura junction by a normally open traffic supervision system;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 45 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 44 of 56

Page 43

36 I.L.M. 551, *579

e. replacement of the roadblock at the Harsina junction by a regular position;

f. opening of the route from the Sa'air Shiukh road to Hebron;

g. opening of the Tnuva Road; and

h. removal of the two barriers in the vicinity of the Raranta School near the North Dura junction.

8. A high level Joint Liaison Committee will be established in order to deal with the security situation in Hebron after completion of the redeployment.

9. a. Since the two sides are unable to reach agreement regarding the Tomb of the Patriarchs / Al Haram Al Ibrahimi, they have agreed to keep the present situation as is.

   b. Three months after the redeployment the high level Joint Liaison Committee will review the situation.

10. There will be a Temporary International Presence in Hebron (TIPH). Both sides will agree on the modalities of the TIPH, including the number of its members and its area of operation.

11. Immediately after the completion of the redeployment, measures must be taken to ensure a stable and secure situation throughout the Hebron area, free from efforts to undermine this Agreement or the peace process.

12. Hebron will continue to be one city, and the division of security responsibility will not divide the city.

ARTICLE VIII

Passages

1. General

   a. While Israel remains responsible during the interim period for external security, including along the Egyptian and Jordanian borders, border crossing shall take place according to the arrangements included in this Article. These arrangements aim at creating a mechanism that facilitates the entry and exit of people and goods, reflecting the new reality created by the DOP, while providing full security for both sides.

   b. The arrangements included in this Article shall apply to the following border crossings:

      (1) the Allenby Bridge crossing; and

      (2) the Rafah crossing.

   c. A joint Israeli-Palestinian committee will decide on applying the arrangements included in this Article to the Damya Bridge crossing and, in parallel, on alternatives.

   d. The provisions of the Protocol Regarding Arrangements with Respect to Passages, signed on October 31, 1994 in Casablanca, as amended and attached to this Annex as Appendix 5 (hereinafter "Appendix 5"), will continue to be applicable for the duration of this Agreement, unless otherwise agreed upon. Immediately upon the signing of this Agreement, the CAC shall review the amended Protocol and, in this context, consider the Palestinian request that with regard to the administration of the passages, the Israel Airport Authority be replaced by the Israeli military government.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/30/21 Page 46 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 45 of 156

Page 44

36 I.L.M. 551, *579

e. The same arrangements will be applied by the Parties, with the necessary adjustments, to agreed seaports, airports or other international crossings, such as the Abdullah bridge.

f. The two sides are determined to do their utmost to maintain the dignity of persons passing through the border crossings. To this end, the mechanism created will rely heavily on brief and modern procedures.

 [*580]  g. In each border crossing there will be one terminal, consisting of two wings. The first wing will serve Palestinian residents of the West Bank and the Gaza Strip and visitors to these areas (hereinafter "the Palestinian Wing"). The second wing will serve Israelis and others (hereinafter "the Israeli Wing"). There will be a closed Israeli checking area and a closed Palestinian checking area, as set out below.

h. Special arrangements applicable to VIPs crossing through the Palestinian Wing, are set out in Appendix 5.

2. Control and Management of the Passages

a. For the purpose of this Article, "passage" is defined to mean the area from the crossing barrier at the Egyptian border or the Allenby Bridge, passing through and including the terminal and:

(1) with regard to the Allenby Bridge crossing, from the terminal up to the Jericho Area; and

(2) with regard to the Rafah crossing, from the terminal up to the outer limit of the Israel military location along the Egyptian border.

b. (1) Israel will have the responsibility for security throughout the passage, including for the terminal.

(2) An Israeli director-general will have the responsibility for the management and security of the terminal.

(3) The director-general will have two deputies who will report to him:

(a) an Israeli deputy who will be the manager of the Israeli Wing. Israel will have exclusive responsibility for the management of the Israeli Wing; and

(b) a Palestinian deputy, appointed by the Council, who will be the manager of the Palestinian Wing.

(4) Each deputy will have an assistant for security and an assistant for administration. The assignments of the Palestinian deputies for security and administration are set out in Appendix 5.

(5) The Palestinian deputy director-general at the Allenby Bridge terminal will be able to travel between this terminal and the Jordanian terminal for the purpose of exercising his functions.

(6) There will be maximum coordination between the two sides. Both sides will maintain cooperation and coordination on matters of mutual concern.

(7) The director-general will continue to use Palestinian contractors to provide bus

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 47 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 46 of 156

Page 45

36 I.L.M. 551, *580

services and other administrative and logistical services.

(8) Palestinian policemen present at the terminal will be armed with handguns. Their deployment is set out in Appendix 5. Other Palestinian officials present at the terminal will be unarmed.

(9) The details of management and security including those relating to the Liaison Bureau referred to in subparagraph 5 below, are set out in Appendix 5.

(10) The two sides will work together in order to seek ways for additional arrangements in the Rafah terminal.

c. Except for all the arrangements included in this Article, the current procedures and arrangements applicable outside the terminal shall continue to apply throughout the passage.

d. (1) Once incoming passengers have crossed the terminal, they will proceed to the West Bank or the Gaza Strip, as appropriate, without any interference from Israeli authorities (safe passage).

(2) Outgoing passengers may proceed to the terminal without any interference from Israeli authorities after joint verification that such passengers hold the necessary documentation for exiting the area to Jordan or Egypt, as set out in this Agreement.

3. Arrangements for Entry from Egypt and Jordan Through the Palestinian Wing

a. At the entrance to the Palestinian Wing there will be a Palestinian policeman and a raised Palestinian flag.

b. Before entering the Palestinian Wing, passengers will identify their personal luggage and it will be placed on a conveyor belt. Each side will be able to inspect such luggage inside its own checking area, using its own personnel and, if necessary, may open the luggage for inspection in the presence of the owner and a Palestinian policeman.

c. Persons entering the Palestinian Wing will pass through a magnetic gate. An Israeli policeman and a Palestinian policeman will be posted on each side of this gate. In the event of suspicion, each side will be entitled to require a physical inspection to be conducted in inspection booths to be located adjacent to the gate. Passengers will be inspected by a Palestinian policeman in the presence of an Israeli policeman. Accompanying personal belongings may also be inspected at this point.

d. Having completed the above phase, persons entering the Palestinian Wing will pass through one of two lanes for the purpose of identification and document control, as follows:

(1) The first lane will be used by Palestinian residents of the West Bank and the Gaza Strip. These passengers will pass via a Palestinian counter, where their documents and identity will be checked. Their documents will be checked by an Israeli officer who will also check their identity indirectly in an invisible manner.

[*581] (2) The second lane will serve visitors to the West Bank and the Gaza Strip. These passengers will first pass via an Israeli counter, where their documents and identity will be checked. Then they will continue via a Palestinian counter, where their documents and identity will be checked. The two counters will be separated by tinted glass and a revolving door.

Case 1:18-cv-12255-MKV-DCF   Document 130-9   Filed 08/20/21   Page 48 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 47 of 156

Page 46

36 I.L.M. 551, *581

e. In the event of suspicion regarding a passenger in any of the two lanes described in subparagraph d. above, each side may question such passengers in its closed checking area. Suspicion justifying questioning in the closed checking area may be one of the following:

> (1) the passenger was involved, directly or indirectly, in criminal or planned criminal activity, or in terrorist or planned terrorist activity, and is not a beneficiary of the amnesty provisions of this Agreement;

> (2) the passenger conceals arms, explosives or related equipment;

> (3) the passenger holds forged or non-valid documentation or the details included in the documentation are inconsistent with those included in the population registry (in case of a resident) or in the data base (in case of a visitor), except that questions relating to such inconsistency will initially be raised at the counter and the passenger will be questioned in the closed checking area only if the suspicion has not been removed, or

> (4) the passenger acts in an obviously suspicious behavior during the passage via the terminal.

> If, at the conclusion of this questioning, the suspicion has not been removed, such passenger may be apprehended, after the other side has been notified. In case of a Palestinian suspect being apprehended by the Israeli side, a Palestinian policeman will be asked to meet with the suspect. Following notification to the Liaison Bureau, any further treatment of the apprehended person will be in accordance with Annex IV.

f. In the Palestinian Wing, each side will have the authority to deny the entry of persons who are not residents of the West Bank and the Gaza Strip.

> For the purpose of this Agreement, "residents of the West Bank and the Gaza Strip" means persons who, on the date of entry into force of this Agreement, are registered as residents of these areas in the population registry maintained by the military government of the West Bank and the Gaza Strip and by the Council, as well as persons who have subsequently obtained permanent residency in these areas with the approval of Israel, as set out in this Agreement.

g. Following the above procedure, the passengers will collect their luggage and proceed to the customs area as described in Annex V, and as set out in Appendix 5.

h. The Palestinian side will provide passengers whose entry is approved with an entry permit stamped by the Palestinian side and attached to their documents.

> At the conclusion of the direct and indirect checking of the documents and identity of passengers passing via the first lane and stamping their entry permits, the Palestinian officer will provide the passenger with a white card issued by the Israeli officer. A Palestinian official posted at the exit of the Palestinian Wing will verify that the passenger holds such white card and will collect the cards with indirect and invisible-Israeli checking.

> For passengers going through the second lane, the Israeli officer will provide the passengers with a blue card, after checking their documents and identity, and verifying

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 49 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 48 of 156

Page 47

36 I.L.M. 551, *581

their entry permits. An Israeli and a Palestinian official posted at the exit of the Palestinian Wing will verify and collect the cards. White and blue cards collected will be checked by Israeli and Palestinian officials.

In cases where either side denies the entry of a non-resident passenger, that passenger will be escorted out of the terminal and sent back to Jordan or Egypt, as appropriate, after notifying the other side.

## 4. Arrangements for Exit to Egypt and Jordan Through the Palestinian Wing

Passengers exiting to Egypt or Jordan through the Palestinian Wing will enter the terminal without their luggage. Thereafter, the same procedures described in paragraph 3 above will apply to them, except that the order of passing via the Israeli and Palestinian counters will be reversed.

## 5. Joint Liaison Bureau

a. There will be a Joint Liaison Bureau at each crossing point in order to deal with matters arising regarding passengers passing through the Palestinian Wing, issues regarding coordination, and differences regarding the implementation of these arrangements. Without derogating from Israel's responsibility for security, the bureau will also deal with incidents.

b. This bureau will be comprised of an equal number of representatives from each side and will be located at a specified location inside each terminal.

c. This bureau will be subordinate to the relevant subcommittee of the CAC.

## 6. Miscellaneous

a. Special arrangements will be agreed upon by the two sides regarding the passage of goods, buses, trucks and privately-owned vehicles. Pending this agreement, the current arrangements will continue to apply. The above-mentioned arrangements will be agreed upon within six months from the date of signing this Agreement.

[*582]  b. In order to cross through the border crossings into and out of the West Bank and the Gaza Strip, residents of these areas will use documents as detailed in Annex III.

c. The Allenby Bridge terminal will operate from Sunday through Thursday, between the hours of 08:00 and 24:00, and on Fridays and Saturdays, between the hours of 08:00 and 15:00, except on Yom Kippur.

ARTICLE IX

Movement Into, Within and Outside the West Bank and the Gaza Strip

## 1. General

a. Israel declares that work to relocate the Erez crossing point currently within the Gaza Strip to a location within Israel adjacent to the Delimiting Line, is underway. Israel will make every effort to complete this work as soon as possible. A joint Israeli-Palestinian committee will decide, within one month from the signing of this Agreement, the timeframe for completing this work and all related issues. Pending the completion of this work, Israel shall retain control over this crossing point and operate it in

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 50 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 49 of 156

Page 48

36 I.L.M. 551, *582

accordance with the provisions of this Article.

b. Israelis entering the West Bank and the Gaza Strip shall carry Israeli documentation (if they are above the age of 16) and, if driving a vehicle, a driving license and vehicle registration documentation recognized in Israel. Tourists to Israel entering the West Bank and the Gaza Strip shall be subject to Palestinian laws in accordance with the provisions of this Agreement, shall carry their passports and other relevant documentation, and may be required by the Palestinian Police to identify themselves by presenting their passport or documentation, unless otherwise provided in this Article.

c. Entry of persons from the West Bank and the Gaza Strip to Israel shall be subject to Israeli laws and procedures regulating entry into Israel, and residents of these areas shall be required to carry the identity card as agreed upon in this Agreement, as well as documentation specified by Israel and notified through the CAC to the Council.

d. The provisions of this Agreement shall not prejudice Israel's right, for security and safety considerations, to close the crossing points to Israel and to prohibit or limit the entry into Israel of persons and of vehicles from the West Bank and the Gaza Strip. In addition, the provisions of this Agreement shall not prejudice the use of safe passage.

e. Tourists to the West Bank and the Gaza Strip from countries having diplomatic relations with Israel, who have passed through an international crossing, will not be required to pass any additional entry control before entry into Israel.

2. Passage within the West Bank and between the West Bank and Israel

a. Without derogating from Israel's security powers and responsibilities in accordance with this Agreement, movement of people, vehicles and goods in the West Bank, between cities, towns, villages and refugee camps, will be free and normal, and shall not need to be effected through checkpoints or roadblocks.

b. Movement between the West Bank and Israel shall be governed by the applicable laws, regulations and rules regulating the movement of persons and vehicles between the West Bank and Israel, while respecting the importance of the economic and social life, development programs and projects, and emergency health care services of the Palestinian population.

c. The Palestinian Police shall set up checkpoints in areas under its security responsibility on roads connecting the West Bank and Israel, for the purpose of inspection and identification of Palestinian vehicles and passengers, in order to prevent illegal introduction of weapons into or from Israel.

3. Passage between the Gaza Strip and Israel

a. Passage between the Gaza Strip and Israel will be via one or more of the following crossing points:

(1) the Erez crossing point;

(2) the Nahal Oz crossing point;

(3) the Sufa crossing point; and

(4) the Karni (commercial) crossing point (for goods only).

Case 1:18-cv-12255-MKV-DCF   Document 130-9   Filed 08/20/21   Page 51 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 50 of 156

Page 49

36 I.L.M. 551, *582

b. The Council may set up a checkpoint, within the Gaza Strip, on the road leading to the Erez crossing point and on the road leading to the Nahal Oz crossing point, at locations to be coordinated between the two sides, for the purpose of inspection and identification of passengers and vehicles. Israelis and tourists to Israel passing through these checkpoints may be only required to identify themselves by presenting Israeli documentation or a passport, as set out in subparagraph 1.b above. The above requirements shall not apply to uniformed members of the Israeli military forces.

c. The Council may set up a checkpoint, within the Gaza Strip, on the road leading to the Sufa crossing point, at a location acceptable to both sides, for the purpose of inspection and identification of Palestinian passengers and vehicles. Israeli vehicles may bypass this checkpoint unimpeded.

d. The Council will allow passage of Israelis and tourists to Israel between the Gaza Strip and Israel, in addition, via the following crossing points:

(1) the Karni (non-commercial) crossing point;

 [*583]  (2) the Kisufim crossing point;

(3) the Kerem Shalom crossing point; and

(4) the Elei Sinai crossing point.

e. Israelis, and tourists to Israel, who have passed through any of the above crossing points into the West Bank and the Gaza Strip shall not be required to undergo inspection, identification or other requirements in addition to the stated provisions for entry into the West Bank and the Gaza Strip outlined in this Article.

f. Arrangements for the movement of goods between the Gaza Strip and Israel through the crossing points are set out in Annex V.

g. A Palestinian liaison officer will be present at each of the crossing points on the Lateral Roads.

ARTICLE X

Safe Passage

1. General

a. There shall be a safe passage connecting the West Bank with the Gaza Strip for movement of persons, vehicles and goods, as detailed in this Article.

b. Israel will ensure safe passage for persons and transportation during daylight hours (from sunrise to sunset) or as otherwise agreed by the JSC, but in any event not less than 10 hours a day.

c. Safe passage through Israel between the West Bank and the Gaza Strip will be effected via the following designated crossing points:

(1) the Erez crossing point (for persons and vehicles only);

(2) the Karni (commercial) crossing point (for goods only);

(3) the Tarkumya crossing point; and

(4) an additional crossing point around Mevo Horon.

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 08/30/21    Page 52 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 51 of 156

Page 50

36 I.L.M. 551, *583

d. Israel will make such passage available through the routes indicated on attached map No. 6.

e. Consistent with Article XXXI, paragraph 6 of the Agreement, the arrangements included in this Article are without prejudice to the permanent status negotiations.

2. Use of Safe Passage

a. As detailed below, persons using the safe passage shall carry, in addition to personal and vehicle documentation, the following documents:

(1) a safe passage card; and

(2) (for drivers only) a vehicle safe passage permit.

Arrangements for the implementation of the safe passage usage, as well as modalities for the issuance by Israel of safe passage cards and vehicle safe passage permits, shall be discussed and agreed in the JSC, in consultation with the CAC.

b. Residents of the West Bank and the Gaza Strip in possession of a permit enabling them to enter Israel will be able to use this permit as a safe passage card.

c. Safe passage cards and vehicle safe passage permits shall be stamped by the Israeli authorities at the crossing point, with the time of departure from the crossing point and the estimated time of arrival.

d. Israel may deny the use of its territory for safe passage by persons who have seriously or repeatedly violated the safe passage provisions detailed in this Article.

e. Persons who are denied entry into Israel will use safe passage by means of shuttle buses which will be escorted by the Israel Police and which will operate from 7:00 AM to 2:00 PM on two days of every week. The exact date and times of such operation will be coordinated through the JSC. Applications by persons denied entry to Israel to use safe passage must be submitted to, and agreed upon in, the relevant DCO at least five days prior to the planned journey.

f. Special arrangements will apply with respect to the passage of Palestinian leaders, senior Council officials, distinguished personalities and guests of the Ra'ees of the Council. The CAC will define the scope and nature of the special arrangements, in consultation with the JSC.

g. The movement of Palestinian policemen on duty through the safe passage between the West Bank and the Gaza Strip will be coordinated through the JSC.

h. Any additional matters relating to the usage of safe passage will be coordinated through the JSC.

3. Mode of Use of Safe Passage

a. Persons and vehicles using safe passage under these arrangements shall neither break their journey nor depart from the designated routes, and shall  [*584]  complete the passage within the designated time stamped on their safe passage cards and permits, unless a delay is caused by a medical emergency or a technical breakdown.

b. Persons using the safe passage through Israel shall be subject to Israeli law.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 53 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 52 of 156

Page 51

36 I.L.M. 551, *584

c. Persons and vehicles using the safe passage shall not carry explosives, firearms or other weapons or ammunition, except for special cases that may be agreed in the JSC.

4. General Provisions Regarding the Safe Passage Routes

a. The above arrangements shall in no way affect the status of the safe passage and its routes.

b. The safe passage arrangements will not be available on Yom Kippur, Israel's Memorial Day and Israel's Independence Day.

c. Israel may, for security or safety reasons, temporarily halt the operation of a safe passage route or modify the passage arrangements while ensuring that one of the routes is open for safe passage. Notice of such temporary closure or modification shall be given to the JSC.

d. Israel shall notify the Council of incidents involving persons using safe passage routes, through the JSC.

ARTICLE XI

Rules of Conduct in Mutual Security Matters

1. Human Rights and the Rule of Law

Subject to the provisions of this Agreement, the Palestinian Police and the Israeli military forces shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms of human rights and the rule of law, and shall be guided by the need to protect the public, respect human dignity and avoid harassment.

2. Weapons

a. Each side shall enforce upon civilians, Palestinians or Israelis, in the West Bank and the Gaza Strip, in accordance with their security responsibility, a prohibition on possession or carrying of weapons without a license.

b. The Palestinian Police may grant licenses to possess or carry pistols for civilian use. The modalities for granting such licenses, as well as categories of persons who may be granted such licenses, will be agreed upon in the JSC.

c. Upon the assumption of security responsibility, and in accordance with the Palestinian law, the Palestinian Police shall declare a period of grace of one month, during which period holders of unlicensed weapons will be required to declare that they hold such weapons and to apply for licenses. The Palestinian Police may grant such licenses in accordance with subparagraph b. above, and will enforce the Palestinian security policy set out in Article II, paragraph 1 of this Annex, against persons who hold unlicensed weapons.

d. Israelis may carry weapons licensed in accordance with subparagraph a. above.

e. The Palestinian Police will maintain an updated register of all weapons licensed by it.

f. The Palestinian Police will prevent the manufacture of weapons as well as the transfer of weapons to persons not licensed to possess them.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 54 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 53 of 156

Page 52
36 I.L.M. 551, *584

g. The use of explosives in quarries and for other civilian purposes will be only in accordance with modalities and procedures agreed upon in the JSC.

3. Engagement Steps

a. For the purpose of this Article, "engagement" shall mean an immediate response to an act or an incident constituting a danger to life or property that is aimed at preventing or terminating such an act or incident, or at apprehending its perpetrators.

b. Within the territory under the security responsibility of the Council, in places where Israeli authorities exercise their security functions in accordance with this Annex and in their immediate vicinities, the Israeli authorities may carry out engagement steps in cases where an act or incident requires such action. In such cases, the Israeli authorities will take any measures necessary to bring to an end such an act or incident with a view to transferring, at the earliest opportunity, the continued handling of the incident falling within the Palestinian responsibility to the Palestinian Police. The Palestinian Police will immediately be notified, through the relevant DCO, of such engagement steps.

c. Engagement with the use of firearms in responding to such acts or incidents shall not be allowed, except as a last resort after all attempts at controlling the act or the incident, such as warning the perpetrator or shooting in the air, have failed, or are ineffective or without any promise of achieving the intended result in the circumstances. Use of firearms should be aimed at deterring or apprehending, and not at killing, the perpetrator. The use of firearms shall cease once the danger is past.

d. Any activity involving the use of firearms other than for immediate operational purposes shall be subject to prior notification to the relevant DCO.

 [*585]  If a person is injured or otherwise in need of assistance, such assistance will be provided by the side that first reaches the site. If such a person is under the security responsibility of the other side, the assisting side shall notify the relevant DCO and appropriate arrangements shall be made, pursuant to this Agreement, for treatment and hospitalization.

4. Rules of Conduct on Roads for Israelis

a. Israeli military forces and Israeli civilians may continue to use roads freely within the West Bank and the Gaza Strip.

b. On the main roads that are jointly patrolled, vehicles bearing Israeli license plates shall not be stopped except for identification, which shall be conducted by a Joint Patrol, pursuant to the provisions of Article III of this Annex. The Israeli side of such a patrol may carry out identity and vehicle documentation checks. In the event that a vehicle bearing a license plate issued by either the Council or the Civil Administration is stopped, the Palestinian side of the Joint Patrol may carry out identity and vehicle documentation checks.

c. On other roads, vehicles bearing Israeli license plates shall not be stopped by the Palestinian Police, except that such vehicles may be stopped in the Gaza Strip, in Area A or in places in Area B where there is a police station or post, for the purpose of identification checks of the above-mentioned documentation.

d. Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities. However, where an Israeli is suspected of having committed an offense, he or she may be

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 55 of 157
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 54 of 156

Page 53

36 I.L.M. 551, *585

detained in place by the Palestinian Police while ensuring his or her protection, in accordance with the provisions of Annex IV, until the arrival of a Joint Patrol, called immediately by the Palestinian Police, or of other Israeli representatives dispatched by the relevant DCO.

e. Israeli pedestrians may be required to produce identity documentation (if above the age of sixteen). Thereafter, they shall be treated in accordance with the provisions of this Article.

f. Uniformed members of the Israeli military forces, as well as vehicles of the Israeli military forces, shall not be stopped by the Palestinian Police in any circumstances, and shall not be subject to any identification requirements. Without derogating from the above, in the event of suspicion regarding such a person or vehicle, the Palestinian Police may notify the Israeli authorities through the relevant DCO, in order to request appropriate assistance.

g. Verification, pursuant to this Article, of the identity of persons who claim to be Israelis but cannot present appropriate identification documentation, will be confirmed by the Israeli side of a Joint Patrol, called by the Palestinian Police, or by other Israeli representatives dispatched by the relevant DCO.

ARTICLE XII

Security Arrangements Concerning Planning, Building and Zoning

1. General Provisions

a. Notwithstanding the provisions relating to planning, building and zoning set out elsewhere in this Agreement, the provisions of this Article shall apply with respect to the areas specified below.

b. These arrangements will be reviewed within a period of six months from the signing of this Agreement, and, thereafter, every six months, with a view to modifying them, with due consideration to Palestinian plans for establishing economic projects, and to the security concerns of both sides.

c. The limitations set out below on the construction of buildings and installations in specific areas shall not require the demolition or removal of existing buildings or installations.

2. Provisions regarding the West Bank

a. Buildings or installations shall not be constructed or erected and natural and artificial culture shall not be altered, on either side of the roads delineated in blue on map No. 7 up to a distance of 50 meters from the center of these roads.

b. Bridges or other structures will not be built which may prevent the movement on roads of vehicles of a height of up to 5.25 meters.

c. In the areas shaded in purple on map No. 7, construction will be limited to a height of 15 meters.

d. Any buildings or installations constructed or erected contrary to this paragraph shall be dismantled.

3. Provisions regarding the Gaza Strip

a. The existing buildings, installations and natural and artificial culture in the Gaza Strip within a distance of 100 meters from the Delimiting Line shall remain as they are at present.

b. Within the next 500 meters of the Security Perimeter, and within the Yellow Area, buildings or

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/29/21 Page 56 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 55 of 156

Page 54

36 I.L.M. 551, *585

installations may be constructed, provided that:

> (1) one building or installation may be constructed on each plot, the size of which shall not be less than 25 dunams; and

> (2) such building or installation shall not exceed two floors, of a size not exceeding 180 sq. meters per floor.

> The Council shall maintain the predominantly agricultural character of the remaining areas of the Security Perimeter.

 [*586]  c. Buildings or installations shall not be constructed on either side of the Lateral Roads up to a distance of 75 meters from the center of these Roads.

d. For the purpose of enforcing this Article, the United States has provided both sides with satellite photographs of the Gaza Strip depicting the buildings, installations and natural and artificial culture existing at the time of the signing of the Gaza-Jericho Agreement.

ARTICLE XIII

Security of the Airspace

1. Operation of aircraft for the use of the Council in the West Bank and the Gaza Strip shall be initially as follows:

> a. Two (2) transport helicopters for VIP transportation within and between the West Bank and the Gaza Strip.

> b. Up to 3 helicopters for the purpose of transport missions to approved landing pads.

> c. 3 fixed-wing transport aircraft with up to 35 persons capacity, for transporting persons between the West Bank and the Gaza Strip.

2. Changes in the number, type and capacity of aircraft may be discussed and agreed upon in a Joint Aviation Subcommittee of the JSC (hereinafter "the JAC").

3. The Council may immediately establish and operate in the West Bank and the Gaza Strip provisional airstrips for the helicopters and fixed wing aircraft referred to in paragraph 1 above, in accordance with arrangements and modalities to be discussed and agreed upon in the JAC.

4. All aviation activity or use of the airspace by any aerial vehicle in the West Bank and the Gaza Strip shall require prior approval of Israel. It shall be subject to Israeli air traffic control including, inter alia, monitoring and regulation of air routes as well as relevant regulations and requirements to be implemented in accordance with the Israel Aeronautical Information Publication, the relevant parts of which will be issued after consultation with the Council.

5. Aircraft taking off from, and landing in the West Bank and the Gaza Strip shall be registered and licensed in Israel or in other states members of International Civil Aviation Organization (ICAO). Air crews of such aircraft shall be licensed in Israel or in such other states, provided that such licenses have been approved and recommended by the Council and validated by Israel.

6. Palestinian Civil Aviation and airline staff may be recruited locally and from abroad. The number of Palestinians recruited from abroad shall not exceed 400. This number may be changed by agreement, if necessary.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 57 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 56 of 156

Page 55

36 I.L.M. 551, *586

7. Aircraft referred to in this Article shall not carry firearms, ammunition, explosives or weapons systems, unless otherwise approved by both sides. Special arrangements for armed guards escorting high ranking officials, will be agreed upon in the JAC.

8. The location of navigational aids and other aviation equipment will be approved by Israel through the JAC.

9. a. The Council shall ensure that only the aviation activity in accordance with this Agreement will take place in the West Bank and the Gaza Strip.

     b. Further powers and responsibilities may be transferred to the Council through the JAC.

     c. The Council may establish a Palestinian Civil Aviation Department to act on its behalf in accordance with the provisions in this Article and of this Agreement.

10. a. Aviation activity by Israel will continue to be operated above the West Bank and the Gaza Strip, with the same limitations applicable in Israel regarding civil and military flights over densely-populated areas.

     b. Israel will notify the Council of emergency rescue operations, searches and investigation of aerial accidents in the West Bank and the Gaza Strip. Searches and investigations of civilian aircraft accidents in which Palestinians or their property are involved, will be conducted by Israel with the participation of the Council.

11. Guided by the principle that the two sides view the West Bank and Gaza Strip as a single territorial unit, as set out in Article IV of the DOP, and in order to enable the smooth operation of flights between the West Bank and the Gaza Strip:

     a. The JAC will agree on special arrangements to facilitate flights of the Ra'ees of the Executive Authority of the Council between the West Bank and the Gaza Strip. The Ra'ees and his spouse, and family members of the Ra'ees, his body guards and VIPs when accompanying the Ra'ees will fly without prior inspection of their person, personal belongings, and luggage.

     b. The minimum time of notification of VIPs' flights will be four hours. The notification will include the list of passengers.

     c. Flights of other persons will be handled in accordance with the procedures agreed in the JAC.

12. Flights between the West Bank and the Gaza Strip may be operated through the Gaza-Tel Aviv (sea shore) corridor.

    Monitoring and regulations of this air route will be discussed in the JAC.

[*587] 13. Commercial, domestic and international air services to, from and between the West Bank and the Gaza Strip may be operated by Palestinian, Israeli or foreign operators approved by both sides, certified and licensed in Israel or in ICAO member states maintaining bilateral aviation relations with Israel. Arrangements for such air services, beginning with a service between Gaza and Cairo using two (2) fixed-wing aircraft with capacity up to fifty passengers each, as well as arrangements regarding the establishment and operation of airports and air terminals in the West Bank and the Gaza Strip, will be discussed and agreed upon by the two sides in the JAC.

     Any such international commercial air services will be carried out in accordance with Israel's bilateral aviation agreements. The implementation phase will be discussed and agreed on in the JAC.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 58 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 57 of 156

Page 56

36 I.L.M. 551, *587

ARTICLE XIV

Security along the Coastline to the Sea of Gaza

1. Maritime Activity Zones

  a. Extent of Maritime Activity Zones

    The sea off the coast of the Gaza Strip will be divided into three Maritime Activity Zones, K, L, and M as shown on map No. 8 attached to this Agreement, and as detailed below:

    (1) Zones K and M

      (a) Zone K extends to 20 nautical miles in the sea from the coast in the northern part of the sea of Gaza and 1.5 nautical miles wide southwards.

      (b) Zone M extends to 20 nautical miles in the sea from the coast, and one (1) nautical mile wide from the Egyptian waters.

      (c) Subject to the provisions of this paragraph, Zones K and M will be closed areas, in which navigation will be restricted to activity of the Israel Navy.

    (2) Zone L

      (a) Zone L bounded to the south by Zone M and to the north by Zone K extends 20 nautical miles into the sea from the coast.

      (b) Zone L will be open for fishing, recreation and economic activities, in accordance with the following provisions:

        (i) Fishing boats will not exit Zone L into the open sea and may have engines of up to a limit of 25 HP for outboard motors and up to a maximum speed of 18 knots for inboard motors. Four months after the signing of this Agreement the Maritime Coordination and Cooperation Center (hereinafter "the MC"), as referred to in paragraph 3 below, will consider raising the limit for outboard motors up to 40 hp. in accordance with the types of the boats. The boats will neither carry weapons nor ammunition nor will they fish with the use of explosives.

        (ii) Recreational boats will be permitted to sail up to a distance of 6 nautical miles from the coast unless, in special cases, otherwise agreed within the Maritime Coordination and Cooperation Center as referred to in paragraph 3 below. Recreational boats may have engines up to a limit of 10 horsepower. Marine motor bikes and water jets will neither be introduced into Zone L nor be operated therein.

        (iii) Yachts may sail up to a distance of 6 nautical miles from the coast at a maximum speed of 15 knots.

        (iv) Foreign vessels entering Zone L will not approach closer than 12 nautical miles from the coast except as regards activities covered in paragraph 4 below.

  b. General Rules of the Maritime Activity Zones

Case 1:02-cv-02280-RJL Document 130-9 Filed 01/29/21 Page 59 of 157
Case 1:02-cv-02280-RJL Document 130-9 Filed 01/29/16 Page 58 of 156

Page 57

36 I.L.M. 551, *587

(1) The aforementioned fishing boats and recreational boats and their skippers sailing in Zone L shall carry licenses issued by the Council, the format and standards of which will be coordinated through the JSC.

(2) The boats shall have identification markings determined by the Council. The Israeli authorities will be notified through the JSC of these identification markings.

(3) Residents of Israeli settlements in the Gaza Strip fishing in Zone L will carry Israeli licenses and vessel permits.

(4) As part of Israel's responsibilities for safety and security within the three Maritime Activity Zones, Israel Navy vessels may sail throughout these zones, as necessary and without limitations, and may take any measures necessary against vessels suspected of being used for terrorist activities or for smuggling arms, ammunition, drugs, goods, or for any other illegal activity. The Palestinian Police will be notified of such actions, and the ensuing procedures will be coordinated through the MC.


2. The Palestinian Coastal Police

a. The Palestinian Coastal police (hereinafter the "PCP") may function in Zone L, up to a distance of 6 nautical miles from the coast. In special [*588] cases, it may also exercise control over Palestinian fishing boats fishing in Zone L in an additional area of 6 nautical miles, up to the limit of 12 nautical miles from the coastline, after clearance and coordination through the MC.

b. The PCP shall have up to 10 boats, with a displacement of up to 50 tons and maximum speed of up to 25 knots.

c. The boats shall carry weapons of up to a 7.62 mm caliber.

d. Boats of the PCP shall fly a Palestinian flag, have police identification markings and shall operate identification lights.

e. The two sides shall cooperate on all sea matters, including mutual help at sea, and pollution and environmental issues.

f. The boats of the Palestinian Coastal Police will initially use the Gaza Wharf.

g. Boats belonging to Israelis are solely subject to the control, authority and jurisdiction of Israel and the Israel Navy.


3. Maritime Coordination and Cooperation Center

a. The MC shall function as part of the JSC, to coordinate civil maritime activities and coastal police affairs off the coast of the Gaza Strip.

b. The MC shall function within the relevant DCO, and will determine its own rules of procedure.

c. The MC shall function 24 hours a day.

d. The MC shall be staffed by members of the Israel Navy and the PCP, each providing a liaison officer and an assistant liaison officer.

e. A direct radio telephone link (hot line) shall be set up between the Israel Navy vessels and the PCP

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 60 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 59 of 156

Page 58

36 I.L.M. 551, *588

vessels.

f. The role of the MC is to coordinate:

> (1) assistance between the PCP and the Israel Navy as may be necessary to deal with incidents arising at sea;

> (2) PCP training involving the use of firearms;

> (3) joint activities between the PCP and the Israel Navy when pre-planning is operationally necessary;

> (4) radio contact between PCP and Israel Navy vessels in the event that "hot line" communication between vessels of the two sides has not been established;

> (5) search and rescue operations; and

> (6) maritime activities related to an agreed port, when established in the Gaza Strip.

4. Gaza Strip Port

> a. Plans for the establishment of a port in the Gaza Strip in accordance with the DOP, its location, and related matters of mutual interest and concern, as well as licenses for vessels and crews sailing on international voyages will be discussed and agreed upon between Israel and the Council taking into consideration the provisions of Article XXX (Passages) of this Agreement. To this end a special committee will be established by the two sides.

> b. The Gaza Sea Port Authority referred to in the DOP shall act on behalf of the Council in accordance with the provisions of this Agreement.

> c. Pending construction of a port, arrangements for entry and exit of vessels, passengers and goods by sea, as well as licenses for vessels and crews sailing on international voyages in transit to the West Bank and the Gaza Strip, shall be through Israeli ports in accordance with the relevant rules and regulations applicable in Israel and in accordance with the provisions of Annex V.

APPENDIX 1

Redeployment of Israeli Military Forces

A. Stages of the First Phase of Redeployment of Israeli Military Forces

Pursuant to Article I paragraph 1 of this Annex:

> The first phase of Israeli military forces redeployment will commence 10 days after the signing of this Agreement. The Israeli Government intends to complete the first phase of redeployment in all areas but the city of Hebron by the end of December 1995, in which redeployment will be completed by six months after the signing of this Agreement. Within two weeks of the signing of this Agreement, the two sides will decide on a precise redeployment schedule on a district-by-district basis.

B. Phases of the Further Redeployment of Israeli Military Forces

> Pursuant to Article I paragraph 9 of this Annex, the further redeployments of Israeli military forces to

Case 1:18-cv-12255-MLW DCF   Document 330-9   Filed 08/2021   Page 61 of 157
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 60 of 156

Page 59

36 I.L.M. 551, *588

specified military locations will take place in phases as follows:

[*589]  Phase 1

Six months after the inauguration of the Council.

Phase 2

Twelve months after the inauguration of the Council.

Phase 3

Eighteen months after the inauguration of the Council.

APPENDIX 2

Deployment of Palestinian Policemen

1. Pursuant to paragraph 3.b of Article IV of this Annex, the details of the deployment of the 6,000 Palestinian policemen in Areas A and B will be as follows:

(1) in the Jenin District: 1,000 policemen;

(2) in the Tulkarm District: 400 policemen;

(3) in the Qalqilia District: 400 policemen;

(4) in the Nablus District: 1,200 policemen;

(5) in the Ramallah District: 1,200 policemen;

(6) in the Bethlehem District: 850 policemen;

(7) in the Hebron District: 950 policemen including 400 policemen in the City of Hebron; and

(8) in the Jericho District: 600 policemen that will be considered part of the number of policemen allocated to the Gaza Strip in accordance with Article IV of this Annex.

2. Changes in the numbers of policemen in each district during the further redeployment phases, when the number of policemen in the West Bank will increase to 12,000, will be agreed upon in the West Bank RSC.

APPENDIX 3

Police Stations and Posts in Area B

1. The Palestinian Police shall establish 25 Civil Police (Al Shurta) police stations and posts in the towns, villages and other places listed below and shown on map No. 3, with personnel and equipment as follows:

a. Jenin District

(1) El-Yamun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Meithalun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/29/21 Page 62 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 61 of 156

Page 60

36 I.L.M. 551, *589

(3) Kafr Rai: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(4) Jalqamus: 45 policemen, 2 vehicles, 8 rifles, 15 pistols; and

(5) Burqin: 45 policemen, 2 vehicles, 8 rifles, 15 pistols.

b. Nablus District

(1) Asiraat A-Shumaliyya: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Talouza: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(3) Tell: 30 policemen, 2 vehicles, 5 rifles, 10 pistols;

(4) Talfit: 60 policemen, 2 vehicles, 12 rifles, 20 pistols;

(5) Tamun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols; and

(6) Aqraba: 50 policemen, 2 vehicles, 9 rifles, 17 pistols.

c. Tulkarm and Qalqilya District

(1) Shuweika: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(2) Kafr Zibad: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(3) Anabta: 50 policemen, 2 vehicles, 9 rifles, 17 pistols; and

(4) Illar: 45 policemen, 2 vehicles, 8 rifles, 15 pistols.

d. Ramallah District

(1) Arura: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Deir Ghassana: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(3) Khirbat Abu Falah: 45 policemen, 2 vehicles, 8 rifles, 15 pistols; and

 [*590]  (4) Bir Zeit: 70 policemen, 3 vehicles, 14 rifles, 23 pistols;

e. Bethlehem District

Tuqua: 50 policemen, 3 vehicles, 9 rifles, 17 pistols.

f. Hebron District

(1) Yata: 80 policemen, 3 vehicles, 15 rifles, 27 pistols;

(2) Dhahiriya: 70 policemen, 3 vehicles, 14 rifles, 23 pistols;

(3) Nuba: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(4) Dura: 70 policemen, 3 vehicles, 14 rifles, 23 pistols; and

(5) Bani-Naiem: 45 policemen, 3 vehicles, 8 rifles, 17 pistols.

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 63 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 62 of 156

Page 61

36 I.L.M. 551, *590

2. The rifles in each of these police stations will be used only for the purpose of guarding the police station. In special cases, where the use of rifles outside the police station is required for the exercise of public order responsibility, prior notification shall be given to the DCO.

APPENDIX 4

Jewish Holy Sites

Pursuant to Article V of this Annex, the Jewish Holy Sites are as follows:

1. Joseph's Tomb (Nablus)

2. Shalom Al Israel synagogue (Jericho)

APPENDIX 5

Protocol Regarding Arrangements with Respect to Passages (as amended)

Pursuant to paragraph 1.d of Article VIII to this Annex:

SECTION A

Definitions

For the purpose of this Protocol:

a. "The Agreement" means the Interim Agreement:

b. "Annex I" means Annex I to the Interim Agreement;

c. All other terms will have the same meaning as in the Agreement.

SECTION B

Entry and Exit through the Palestinian Wing

Pursuant to Article VIII of Annex I to the Agreement, the following arrangements will apply with respect to the terminals at the Rafah and Allenby Bridge crossings:

1. Entry from Egypt and Jordan

a. At the entrance to the Palestinian wing there will be a Palestinian policeman and a raised Palestinian flag.

b. Before entering the Palestinian wing, passengers will identify their personal luggage and it will be placed on a conveyor belt. Each side will be able to inspect such luggage inside its own checking area, using its own personnel and, if necessary, may open the luggage for inspection in the presence of the owner and a Palestinian policeman.

c. Persons entering the Palestinian Wing will pass through a magnetic gate. An Israeli policeman and a Palestinian policeman will be posted on each side of this gate. In the event of suspicion, each side will be entitled to require a physical inspection to be conducted in inspection booths to be located adjacent to the gate. Passengers will be inspected by a Palestinian policeman in the presence of an Israeli policeman. Accompanying personal belongings may also be inspected at this point.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 64 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 63 of 156

Page 62

36 I.L.M. 551, *590

d. Having completed the above phase, persons entering the Palestinian wing will pass through one of two lanes for the purpose of identification and document control, as follows:

(1) the first lane will be used by Palestinian residents of the West Bank and the Gaza Strip. These passengers will pass via a Palestinian counter, where their documents and identity will be checked. Their documents will be checked by an Israeli officer who will also check their identity indirectly in an invisible manner;

(2) the second lane will serve visitors to the Gaza Strip and West Bank. These passengers will first pass via the Israeli counter, where their documents and identity will be checked. Then they will continue via the Palestinian counter, where their documents and identity will be checked. The two counters will be separated by tinted glass and a revolving door.

e. In the event of suspicion regarding a passenger in any of the two lanes described in subparagraph 1.d above, each side may question such passenger in its closed checking area. Suspicion justifying questioning in the closed checking area may be one of the following:

 [*591]  (1) the passenger was involved, directly or indirectly, in criminal or planned criminal activity, in terrorist or planned terrorist activity and is not a beneficiary of the amnesty provisions of the Agreement;

(2) the passenger conceals arms, explosives or related equipment;

(3) the passenger holds forged or non-valid documentation or the details included in the documentation are inconsistent with those included in the population registry (in the case of a resident) or in the data base (in case of a visitor), except that questions relating to such inconsistency will initially be raised at the counter and the passenger will be questioned in the closed checking area only if the suspicion has not been removed; or

(4) the passenger acts in an obviously suspicious behavior during the passage via the terminal.

If, at the conclusion of this questioning, the suspicion has not been removed, such passenger may be apprehended, after the other side has been notified. In case of a Palestinian suspect being apprehended by the Israeli side, a Palestinian policeman will be asked to meet with the suspect. Following notification to the Liaison Bureau, any further treatment of the apprehended person will be in accordance with Annex IV to the Agreement.

f. In the Palestinian wing, each side will have the authority to deny the entry of persons who are not residents of the Gaza Strip and West Bank.

For the purpose of the Agreement and this Protocol, "residents of the Gaza Strip and West Bank" means persons who, on the date of entry into force of the Gaza-Jericho Agreement, were registered as residents of these areas in the population registry maintained by the military government of the Gaza Strip and West Bank, as well as persons who have subsequently obtained permanent residency in these areas with the approval of Israel, as set out in the Agreement.

g. Following the above procedure, the passengers will collect their luggage and proceed to the customs

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 65 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 64 of 156

Page 63

36 I.L.M. 551, *591

area where they will be dealt with as set out in Section H of this Protocol.

h. The Palestinian side will provide passengers whose entry is approved with an entry permit stamped by the Palestinian side and attached to their documents.

> At the conclusion of the direct and indirect checking of the documents and identity of passengers passing via the first lane and stamping their entry permits, the Palestinian officer will provide the passenger with a white card issued by the Israeli officer. A Palestinian official posted at the exit of the Palestinian wing will verify that the passenger holds such a white card and will collect the cards with indirect and invisible Israeli checking.

> For passengers going through the second lane, the Israeli officer will provide the passengers with a blue card, after checking their documents and identity, and verifying their entry permits. An Israeli and a Palestinian official posted at the exit of the Palestinian wing will verify and collect the cards. White and blue cards collected will be checked by Israeli and Palestinian officials.

> In cases where either side denies the entry of a non-resident passenger, that passenger will be escorted out of the terminal and sent back to Jordan or Egypt, as appropriate, after notifying the other side.

## 2. Exit to Egypt and Jordan

Passengers exiting to Egypt or Jordan through the Palestinian wing will enter the terminal without their luggage.

Thereafter the same procedures described in paragraph 1 above will apply to them, except that the order of passing via the Israeli and Palestinian counters will be reversed.

SECTION C

Control and Management of the Passages

1. General

a. Israel will have the responsibility for security throughout the passage, including for the terminal.

b. An Israeli Director-General will have the responsibility for the management and security of the terminal (hereinafter - "the Director-General").

c. Israel will have exclusive responsibility for the management of the Israeli wing

d. The Director-General will have two deputies who will report to him:

> (1) A Palestinian deputy, appointed by the Council, who will be the manager of the Palestinian wing (hereinafter - "the Manager of the Palestinian wing"); and

> (2) An Israeli deputy who will be the manager of the Israeli wing (hereinafter - "the Manager of the Israeli wing").

e. The Israeli Director-General will be assisted by a professional team appointed at his discretion. Such

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 09/29/21   Page 66 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 65 of 156

Page 64

36 I.L.M. 551, *591

team shall include:

> (1) an officer who will assist the Director-General with respect to the general security of the terminal (hereinafter - "the security officer");

> (2) an expert who will advise the Director-General and the wing managers with respect to the general administration of the terminal (hereinafter - "the administration expert"); and

> [*592] (3) an expert who will be responsible for the performance of those duties which the Director-General shall require him to perform when the need arises (hereinafter - "the duty officer").

f. The Director-General may appoint any of the persons set out in paragraphs 1.d.(2) and 1.e above or another specialized Israeli official employed in the terminal to fulfill the role of the Director-General in his absence (hereinafter - "the substitute officer").

g. Each wing Manager will have an assistant for security and an assistant for administration. The assignments of the Palestinian assistants are set out in paragraphs 3 and 4 of this Section.

h. All assignments and functions of the Manager of the Palestinian wing, the Assistant for administration of the Manager of the Palestinian wing and the Assistant for security of the Manager of the Palestinian wing and any other Palestinian employee shall be exercised in a manner consistent with the Agreement and with this Protocol.

2. Assignments of the Manager of the Palestinian wing

The assignments of the Manager of the Palestinian wing shall be the following:

a. employment of Palestinian staff in the Palestinian wing. The list of Palestinian candidates for employment in the Palestinian wing shall be passed by the Manager of the Palestinian wing to the Director-General for security clearance, which shall be a pre-requisite to their engagement. The Council shall have, through the Manager of the Palestinian wing, full responsibility for all personnel matters of the Palestinians employed in the Palestinian wing including, inter alia, their salary, their social insurance and claims by such employees with respect to their employment;

b. release of Palestinian staff from employment in the Palestinian wing, whilst informing the Director-General. Upon consultation with the Manager of the Palestinian wing, the Director-General may also decide to release a Palestinian from employment in the Palestinian wing due to security reasons of substantial nature. The Manager of the Palestinian wing shall inform the employee of his release.

> Other non-security related grounds for the release of Palestinian employees from employment in the Palestinian wing shall be specified in a procedure to be promulgated by the Director-General upon consultation with the Manager of the Palestinian wing and his two Assistants.

> For the purpose of this Protocol, "Palestinians employed in the Palestinian wing" means all Palestinians employed in the Palestinian wing, except the Manager of the Palestinian wing;

c. general training and briefing of Palestinian employees in the Palestinian wing and handling of their

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 09/29/21   Page 67 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 66 of 156

Page 65

36 I.L.M. 551, *592

work related problems;

d. supervision of the daily opening and closing of the Palestinian wing itself;

e. declaration of an emergency situation in the Palestinian wing. This assignment is without prejudice to the power of the Director-General, the substitute officer and/or the security officer to declare a state of emergency in the Palestinian wing and to act forthwith as deemed fit within their complete discretion, in full cooperation with the Manager of the Palestinian wing.

f. other powers and responsibilities assigned to him under paragraph 3 of Article VIII of Annex I;

g. professional guidance of the Palestinian document control officials with respect to the performance of their assignments;

h. appointment of a person as his substitute and appointment of a duty officer for the Palestinian wing;

i. with respect to the Rafah crossing, the Manager of the Palestinian wing shall also have the following assignments:

> (1) responsibility for the efficient movement of passengers traveling abroad, from the entrance to the terminal, through the Palestinian wing and up to their embarkation on the bus or other vehicle leaving the terminal in the direction of Egypt;

> (2) responsibility for the efficient movement of passengers arriving from abroad from the sheltered waiting area located near the entrance to the Palestinian wing, through the Palestinian wing and up to their embarkation on the bus or other vehicle leaving the terminal in the direction of the Gaza Strip;

> (3) responsibility for the orderly functioning of the service car defined in Section F of this Protocol with respect to the transportation of VIPs traveling abroad, from the entrance to the terminal to the entrance to the Palestinian wing;

> (4) responsibility for the canteen serving passengers traveling abroad through the Palestinian and the Israeli wing;

> (5) responsibility to allocate tasks to specific Palestinian service personnel employed and assigned by the Director-General to work in the Palestinian wing;

> (6) responsibility to contact Palestinian contractors and to pass to the Director-General their offers regarding tenders with respect to administrative and logistical services in the terminal; and

> (7) responsibility for the orderly functioning of the emergency clinic to be established in the Palestinian wing. This clinic will be staffed by a Palestinian physician and a nurse.

> These assignments shall also apply, at a later stage, with respect to the Allenby Bridge crossing, with the necessary adjustments; and

 [*593]  j. within the framework of the functions assigned to him pursuant to this paragraph, the promulgation of procedures for the Palestinian employees in the Palestinian wing.

Case 1:18-cv-12255-MKV DC5   Document 130-9   Filed 08/20/21   Page 68 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 67 of 156

Page 66

36 I.L.M. 551, *593

3. Assignments of the Palestinian Assistant for Security

The Palestinian Assistant for Security shall be appointed from the ranks of the Palestinian Police, shall be subordinate to the Manager of the Palestinian wing and his assignments shall be within the Palestinian wing, as follows:

a. implementation of standard security procedures promulgated by the Director-General pursuant to Paragraph 5 of this Section;

b. implementation of other security related measures pursuant to the instructions of the Director-General, the substitute officer and in emergencies or exceptional cases, the security officer;

c. in conjunction with the Manager of the Palestinian wing and after duly informing the Director-General and the security officer, training and briefing of each Palestinian employee in the Palestinian wing as to the performance of his specific security related task;

d. supervision, maintenance and storage of all handguns in the possession of Palestinian policemen present in the Palestinian wing;

e. responsibility for ensuring the due and proper execution of the procedures set out in paragraph 3 of Article VIII of Annex I;

f. ensuring the immediate arrival of a Palestinian policeman pursuant to an Israeli demand for his presence, made pursuant to paragraphs 3.b, 3.c, and/or 3.e of Article VIII of Annex I;

g. ensuring maintenance of secrecy amongst the Palestinian employees with respect to the nature of their employment, the layout of the terminal, security procedures, and all other information, the revelation of which could compromise the general security of the terminal;

h. ensuring decorum and good public order in a routine working context;

i. declaration of an emergency situation in the Palestinian wing, without prejudice to the provisions of paragraph 2.e of this Section; and

j. upon discovery of a suspicious object, immediately to notify the security officer and the Manager of the Palestinian wing. The security officer will then have complete discretion to act as he deems fit in the circumstances.

4. Assignments of the Palestinian Assistant for Administration

The Palestinian Assistant for Administration shall be subordinate to the Manager of the Palestinian wing and shall deal with matters relating to manpower, organization and logistics within the Palestinian wing, as follows:

a. ensuring the efficient movement of passengers in the Palestinian wing;

b. implementation of standard administration procedures promulgated by the Director-General pursuant to paragraph 5 of this Section;

c. implementation of other non-security related matters pursuant to the instructions of the Manager of the Palestinian wing given upon consultation with the Director-General;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 69 of 157
Case 1:02-cv-02280-RJL   Document 830-36   Filed 01/29/16   Page 68 of 156

Page 67

36 I.L.M. 551, *593

d. escorting the elderly, the ill, children and disabled;

e. ensuring orderly behavior and presentable appearance of Palestinian employees;

f. ensuring cleanliness, the presence and efficient functioning of fire fighting facilities and the supply of provisions;

g. training and briefing of each Palestinian employee in the Palestinian wing, engaged in non-security related matters with respect to the specific nature of his employment; and

h. uninterrupted functioning of the section of the conveyor belt under Palestinian supervision as set out in paragraph 3 of Article VIII of Annex I.

5. Standard Security and Administration Procedures

The Director-General, upon consultation with the Israeli and Palestinian wing Managers, shall determine and shall furnish to the persons set out in Paragraphs 1.d, 1.e and 1.g above and to the Liaison Bureau a compendium detailing standard procedures with respect to security and administration of the terminal. Such procedures shall include:

a. procedures in a state of emergency;

b. procedures with respect to inspection of persons, personal belongings and/or luggage pursuant to paragraphs 3.b, 3.c and/or 3.e of Article VIII of Annex I;

c. procedures with respect to road-markings, signs, plaques and flags in the terminal;

d. procedures with respect to handling of luggage and the loading of the conveyor belt;

e. procedures with respect to operation of the conveyor belt;

f. procedures with respect to media and public relations;

g. procedures with respect to public transportation and taxis passing through the terminal, as will be agreed upon between the two sides;

h. procedures with respect to maintenance and upkeep of the terminal;

i. procedures with respect to supply of provisions and services;

 [*594]  j. procedures with respect to general conduct and behavior of employees within the terminal and changing of work shifts;

k. procedures with respect to escorting the elderly, the ill, children and disabled;

l. procedures with respect to escorting VIPs;

m. procedures with respect to people denied exit or entry through the Palestinian wing; and

n. procedures with respect to comportment, personal appearance and identification tags of employees in the terminal.

The Director-General may promulgate, upon consultation with the Israeli and the Palestinian wing

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 70 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 69 of 156

Page 68
36 I.L.M. 551, *594

Managers, additional procedures not provided for in this paragraph.

All of the above-mentioned procedures will be consistent with the Agreement and with this Protocol, and will be reviewed at a later date by the two sides if the circumstances so necessitate.

SECTION D

Weapons in the Passages

1. General

a. Pursuant to paragraph 2.b(8) of Article VIII of Annex I, the Palestinian policemen present in the terminals will be armed with handguns.

b. The Palestinian officials entitled to carry handguns in the terminals shall be those Palestinian policemen explicitly provided for in paragraph 2 of this Section and other Palestinian officials explicitly provided for in Section F below.

2. Functions of Armed Palestinian Policemen in the Terminals

Palestinian policeman present in the terminals will be entitled to carry a handgun. In the initial stage, only the Palestinian policemen deployed as detailed below will carry a handgun;

a. In the Palestinian wing of the terminals serving passengers arriving from Egypt or Jordan;

(1) one policeman posted at the entrance to the Palestinian wing as provided for in paragraph 3.a of Article VIII of Annex I;

(2) one policeman who may be called for from the Palestinian checking area when an Israeli official requires the opening of luggage for inspection within the Israeli checking area, as provided for in paragraph 3.b of Article VIII of Annex I;

(3) one policeman posted at the side of the magnetic gate serving all persons entering the Palestinian wing, as provided for in paragraph 3.c of Article VIII of Annex I; and

(4) one policeman who may be requested by an Israeli official, when necessary, to carry out a physical inspection in an inspection booth in the presence of an Israeli policeman as provided for in paragraph 3.c of Article VIII of Annex I;

b. In the Palestinian wing of the terminals serving passengers leaving for Egypt or Jordan;

(1) one policeman posted at the entrance to the Palestinian wing;

(2) one policeman posted at the side of the magnetic gate serving all persons leaving for Egypt and Jordan; and

(3) one policeman who may be requested by an Israeli official, when necessary, to carry out a physical inspection in an inspection booth in the presence of an Israeli policeman;

c. The Palestinian Assistant for Security; and

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 08/20/21    Page 71 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 70 of 156

Page 69

36 I.L.M. 551, *594

d. The Palestinian Liaison Bureau coordinating officer defined in paragraph 2.c of Section E below.

The number of armed Palestinian policemen may be increased in cases in which both sides agree that the circumstances so necessitate. Such agreement will also include the deployment of the additional Palestinian policemen.

3. Licensing of Weapons

Palestinian policemen entitled to carry handguns within the Palestinian wing in the course of their duty pursuant to Paragraph 2 above, shall be required to obtain a written license from all of the following:

a. The Council;

b. The Manager of the Palestinian wing; and

c. The Director-General.

4. Handguns and Ammunition

The Palestinian policemen entitled to carry handguns in the Palestinian wing pursuant to paragraph 2 above, shall:

a. carry handguns which shall be:

  (1) of 0.22 inch, 7.65 mm or 9 mm caliber; and

  (2) secured and tied safely to their body;

 [*595]  b. carry one magazine with regular ammunition; and

c. carry their handguns in a uniform and visible manner, as fixed in procedures promulgated by the Director-General pursuant to Section C of this Protocol.

5. Registration and Storage

a. Handguns carried by the Palestinian policeman;

  (1) shall be passed to the Director-General for the purpose of examination before they are brought into the terminal;

  (2) their registration numbers shall be noted by the Director-General;

  (3) shall be allocated to one user only and not exchanged between Palestinian policemen working in the terminal unless coordinated through the Director-General or whoever was appointed by him for that purpose, and registrated by him;

  (4) shall be substituted with other handguns only after the new handgun has been passed to the Director-General for the purpose of examination;

  (5) shall not be taken out of the Palestinian wing; and

  (6) shall, when the Palestinian policemen are not present in the Palestinian wing, be stored

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 72 of 157
Case 1:02-cv-02280-RJL   Document 830-36   Filed 01/29/16   Page 71 of 156

Page 70

36 I.L.M. 551, *595

in a safe in the office of the Palestinian Assistant for Security.

b. The Director-General shall promulgate procedures with respect to the storage of handguns, in accordance with Section C of this Protocol.

6. Use of Handguns

a. A Palestinian policeman shall be authorized to use his handgun in the following cases:

(1) where there is a substantial and immediate danger to his life, in which case the handgun may only be used in a reasonable manner in the circumstances;

(2) pursuant to the instructions of the Director-General, the substitute officer or the Security officer; or

(3) pursuant to a security procedure to be agreed with respect to this matter.

b. The Director-General shall promulgate procedures with respect to the use of handguns, in accordance with Section C of this Protocol.

7. Weapons Outside the Terminals

In accordance with the provisions of the Agreement:

a. with respect to the Rafah crossing, all outgoing passengers destined for the Palestinian wing shall not enter the Military Installation Area armed with a weapon; and

b. with respect to the Allenby Bridge crossing, all outgoing passengers destined for the Palestinian wing shall not leave the Jericho Area towards the terminal armed with a weapon.

The Council shall do its utmost to ensure compliance with paragraphs 7.a and 7.b above.

8. Weapons in the Terminals

a. Persons destined for the Palestinian wing and who are not subject to paragraph 7 above shall deposit their weapon with the Joint Verification Team established by Section E below.

b. Notwithstanding the provisions of paragraph 8.a above, VIPs and bodyguards who are entitled to enter the terminals with a handgun pursuant to Section F below, shall carry the handgun in accordance with procedures to be promulgated by the Director-General in accordance with Section C of this Protocol.

9. The Palestinian Policemen

Palestinian policemen present in the Palestinian wing as set out in paragraph 2 above shall wear a Palestinian police uniform.

SECTION E

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 73 of 157
Case 1:02-cv-02280-RJL   Document 830-36   Filed 01/29/16   Page 72 of 156

Page 71

36 I.L.M. 551, *595

Liaison Bureau

1. General

A Joint Liaison Bureau (hereinafter "Liaison Bureau") shall be set up at the Rafah crossing and at the Allenby Bridge crossing, pursuant to paragraph 5 of Article VIII of Annex I.

2. Structure of the Liaison Bureau

Each Liaison Bureau will be composed of 6 persons, 3 from each side, as follows:

a. an Israeli coordinating officer and a Palestinian coordinating officer who shall both be members of the relevant JRCAC and whose assignments shall be:

(1) to coordinate the routine activity of the Palestinian wing in conjunction with the relevant Joint Regional CAC (hereinafter - "the JRCAC);

(2) to coordinate the passage of VIPs through the Palestinian wing, pursuant to Section F below;

 [*596]  b. an Israeli official and a Palestinian official, who shall both be members of the relevant JRCAC, and who shall deal with:

(1) complaints with respect to passage through the Palestinian wing; and

(2) other problems relating to such passage; and

c. an Israeli coordinating officer and a Palestinian coordinating officer who shall both be members of the relevant DCO and whose assignments shall be to coordinate the passage of members of the Palestinian police and their equipment.

3. Functions of the Liaison Bureau

a. The functions of each Liaison Bureau shall be to coordinate and to facilitate the following activities with respect to the Palestinian wing:

(1) verification of the status of VIPs and the implementation of the special arrangements provided for them by virtue of Section F below;

(2) passage of members of the Palestinian police;

(3) passage of the elderly, the ill and the disabled;

(4) transfer of the deceased;

(5) resolution of problems with respect to documentation, luggage and passenger delay;

(6) resolution of differences regarding the implementation of procedures with respect to passage; and

(7) provision of guidance to the JVT with respect to its assignments.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 74 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 73 of 156

Page 72

36 I.L.M. 551, *596

b. The Liaison Bureau shall be notified of the apprehension of persons in the Palestinian wing pursuant to paragraph 3.e of Article VIII of Annex I.

c. Without derogating from Israel's responsibility for security, the Liaison Bureau will also deal with incidents.

d. The execution of each Liaison Bureau's functions shall not prejudice the powers and responsibilities set out in Section C of this Protocol.

e. The Liaison Bureau shall carry out its functions in full cooperation and coordination with the Director-General, the Palestinian and the Israeli wing managers and shall seek to promote coordination between the Director-General and the two wing managers.

f. The Liaison Bureau shall be subordinate to the relevant JRCAC.

4. Joint Verification Team

a. A Joint Verification Team (hereinafter - the "JVT") shall be established, in order to verify that outgoing passengers destined for the Palestinian wing hold the necessary documentation for exiting the area to Jordan or Egypt, as set out in the Agreement.

b. The JVT will be composed of one officer and one official from each side, and shall be subordinate to the Liaison Bureau.

c. (1) With respect to the Rafah crossing, the JVT shall be based at the outer limit of the northern entrance gate to the terminal.

(2) With respect to the Allenby Bridge crossing, the JVT shall be based at the entrance to the Mousa Allami project.

(3) Once incoming passengers have crossed the terminal, they will proceed to the Jericho Area or the Gaza Strip, as appropriate, without any interference from Israeli authorities.

(4) Outgoing passengers may proceed to the terminal without any interference from Israeli authorities once the JVT has verified that such passengers hold the necessary documentation for exiting the area to Jordan or Egypt, as set out in the Agreement.

d. The JVT shall inform the Liaison Bureau of the imminent arrival of a VIP pursuant to Section F below.

e. The JVT shall also regulate the traffic coming from the Jericho Area or the Gaza Strip towards the terminals in order to prevent congestion.

SECTION F

Passage of VIPs

1. General

a. Whilst representing the special status of certain persons and at the same time without prejudicing the dignity of other persons, the two sides have agreed upon a standard procedure for the treatment of VIPs passing through the Palestinian wing of the terminals, as detailed below.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 75 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 74 of 156

Page 73

36 I.L.M. 551, *596

b. VIPs may include the following:

(1) holders of the most senior positions within the Council and officers of the Palestinian Police of the rank of Major-General (hereinafter - category 1");

(2) director-generals of departments in the Council, officials of the Council of equivalent rank to such persons and officers of the Palestinian Police of the rank of Brigadier-General (hereinafter - "category 2"); and

(3) heads of units in departments in the Council, officials of the Council of equivalent rank to such persons and officers of the Palestinian Police of the rank of Commander ('Aqid) (hereinafter - "category 3").

[*597]  The extent of the categories 1-3 above shall be determined by the CAC. Any exceptions to categories 1-3 may be dealt with by the CAC.

2. Procedures for the Granting of VIP Status

a. Only the CAC may grant or withdraw VIP status.

b. The Council may present the CAC with a list of persons eligible for VIP status and shall specify the registration-plates number of the vehicles to be used by individuals entitled to enter or pass through the terminal with a vehicle.

c. Upon approving VIP status, the CAC will issue to the person concerned a certificate confirming such status. The duration of such status shall be for one year or until the completion of the term of duty of the person in his VIP capacity, whichever be the sooner.

d. Prior to the expiration of the duration of the VIP certificate, the Council may request that the CAC renew the VIP-status.

e. The Palestinian representatives to the CAC shall, every six months or whenever the need shall arise, whichever be the sooner:

(1) review the list of VIPs in order to ensure that every recipient of VIP status retains a valid entitlement to such status; and

(2) inform the Israeli representatives to the CAC of the results of such review.

f. Categories I and 2 VIPs may submit to the CAC a list of persons who shall also be granted VIP status. Such persons shall only be:

(1) the spouse, children and parents;

(2) one chauffeur; and

(3) one bodyguard;

of the VIP (hereinafter - "Secondary VIPs").

3. Arrangements With Respect to Passage of VIPs

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 09/29/21   Page 76 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 75 of 156

Page 74

36 I.L.M. 551, *597

a. Category 1 VIPs shall give prior notification of their arrival to the Liaison Bureau and upon arrival at the terminal, shall be accommodated in a VIP lounge pending:

> (1) a brief visual inspection of their vehicle by an Israeli official;

> (2) transfer of their documentation by an employee of the Palestinian wing for the purpose of the immediate performance of all the necessary procedures with respect to the documentation, as set out in Article VIII of Annex I; and

> (3) transfer of their vehicle through the terminal by their chauffeur, whereupon those VIPs shall continue their journey.

b. For the purpose of clarification:

> (1) cargo and freight other than personal luggage brought by category 1 VIPs shall be subject to the same procedures and customs arrangements which apply to all passengers passing through the Palestinian wing; and

> (2) only category 1 VIPs and one bodyguard accompanying them shall be entitled to enter the terminal with a handgun, once the registration number of the handgun has been noted by the JVT.

c. Category 2 VIPs who arrive at the terminal with a vehicle shall, after their vehicle has been subjected to a brief visual inspection at the entrance to the terminal:

> (1) be accommodated in the VIP lounge whilst an employee of the Palestinian wing shall take that VIP's luggage and documentation for the purpose of the immediate and full performance of all the necessary procedures with respect to the luggage and documentation, as set out in Article VIII of Annex I; and

> (2) pass through the terminal in a service car which shall be provided for them or in a taxi, unless otherwise agreed pursuant to paragraph 4.c of Section H of this Protocol.

d. Category 3 VIPs shall:

> (1) be transported from the entrance to the terminal to the Palestinian wing in a service car which shall be provided for them or in a taxi;

> (2) be subject to the inspection procedures set out in paragraph 3 of Article VIII of Annex I, which shall be performed immediately with an employee of the Palestinian wing accompanying them throughout this process; and

> (3) pass through the terminal in a service car which shall be provided for them or in a taxi, unless otherwise agreed pursuant to paragraph 4.c of Section H of this Protocol.

e. Secondary VIPs:

> (1) when traveling with the VIP in whose name they are registered, shall be accorded the same treatment as is accorded to that VIP;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 77 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 76 of 156

Page 75

36 I.L.M. 551, *597

(2) when traveling without the VIP in whose name they are registered:

    (a) if they are the spouse, parents and/or children of that VIP, shall be accorded equal treatment to that VIP;

    (b) if they are the chauffeur or bodyguard of that VIP, shall receive the treatment accorded to category 3 VIPs.

[*598]  f. In the event of a duly substantiated suspicion within the course of the aforementioned inspection procedures, the Director-General, after consulting his superiors and after informing the Manager of the Palestinian wing of the suspicion, shall be entitled, upon consultation with the Manager of the Palestinian wing, temporarily to withdraw the preferential treatment accorded to a VIP until the matter has been dealt with in accordance with the provisions of the Agreement. Category 1 and Category 2 VIPs will be transferred to the Council if the suspicion is proved to be well founded, and their VIP privileges will be canceled by the CAC.

4. Foreign VIPs visiting the Gaza Strip or the West Bank

a. The Liaison Bureau established pursuant to Section E of this Protocol shall have the power to grant VIP status to a visitor to the Gaza Strip or the West Bank passing through the Palestinian wing, and to specify the treatment that that person shall receive according to one of the categories set out in paragraph 1 above.

b. Thereafter, the arrangements set out in paragraph 3 above shall apply.

5. Miscellaneous

a. With respect to persons destined for the Palestinian wing, the Liaison Bureau established pursuant to Section E of this Protocol shall have the power to make arrangements, in conjunction with the Director-General, regarding access to the terminals and to other areas of the passages of persons greeting incoming VIPs or escorting and parting from exiting VIPs, and to coordinate the implementation of these arrangements.

b. The following procedure will apply with respect to the passage of category 1 VIPs, family members of the Ra'ees of the Executive Authority of the Council except the spouse of the Ra'ees of the Executive Authority of the Council, bodyguards of the Ra'ees of the Executive Authority of the Council and other persons approved by the CAC, when any of these persons are accompanying the Ra'ees of the Executive Authority of the Council in his vehicles:

(1) notification of their arrival at the terminal shall be given to the Liaison Bureau as soon as possible and not later than 4 hours prior to such arrival. The Liaison Bureau shall, on receipt thereof, coordinate:

    (a) passage of these persons without delay;

    (b) passage of these persons without inspection of their person, personal belongings, luggage or vehicle; and

    (c) completion of all necessary documentary procedures prior to these persons' arrival.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 78 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 77 of 156

Page 76

36 I.L.M. 551, *598

The above will be coordinated in a conference to be attended by a Palestinian and an Israeli representative and the members of the Liaison Bureau, in the duty officer's office, not less than one hour prior to such passage. During this conference, the documents of persons subject to this paragraph shall be presented.

The two officers defined in paragraph 2.a of Section E of this Protocol shall hand over to these persons their documentation, upon their arrival at the terminal; and

(2) the abovementioned prior notification will also mention the number of bodyguards accompanying the Ra'ees of the Executive Authority of the Council. These bodyguards shall be entitled to enter the terminal with a handgun, once the registration number of the handgun has been noted by the JVT.

c. Passage of the Ra'ees of the Executive Authority of the Council and the spouse of the Ra'ees of the Executive Authority of the Council will be performed pursuant to paragraph 5.b above, except that paragraph 3.f of this Section will not apply. No prior notification will be required with respect to such passage.

SECTION G

Passenger Fee

1. General

a. Passengers exiting through the Rafah passage to Egypt and through the Allenby Bridge passage to Jordan shall pay a passenger fee equivalent to 26 USA dollars.

b. This passenger fee will be collected by Israel. The Council may sell passenger fee vouchers to passengers passing through the Palestinian wing of the terminals, after having purchased them from Israel by means of a letter of guarantee given by an Israeli bank for each quota of vouchers transferred to the Council, or any other method of payment to be agreed upon. The design and content of the vouchers or stamps used will be agreed.

c. Diplomats and children under two years of age will be exempt from the passenger fee.

2. Use of Passenger Fee

a. Passenger fee income from up to a total of 750,000 paying passengers each year will be equally divided between the two sides. With respect to these 750,000 passengers, the Council will pay Israel the equivalent of 1 USA dollar for services, maintenance and development of the terminals.

b. As from the first paying passenger thereafter during the same year, Israel will receive the equivalent of 10 USA dollars of the passenger fee and the Council will receive the equivalent of 16 USA dollars thereof.

[*599] 3. Miscellaneous

a. The Council will be responsible for the 90 Palestinian personnel employed in the Allenby Bridge crossing by the Director-General and the 20 Palestinian personnel employed at the Rafah crossing by the Director- General, in accordance with the provisions of paragraph 2.a of Section C of this Protocol.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 79 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 78 of 156

Page 77

36 I.L.M. 551, *599

b. Israel will be responsible for maintenance and development costs with respect to the terminals.

c. With respect to the Rafah crossing:

> (1) taxis arriving from the Gaza Strip in the direction of the terminal will be permitted entry to the terminal, in accordance with procedures to be promulgated by the Director-General pursuant to Section C of this Protocol; and

> (2) upon request by the Council, the present bus service transporting passengers destined for the Palestinian wing from the entrance to the terminal to the entrance to the Palestinian wing will be replaced by a bus service to be chosen by the Council. Such replacement will be effected not less than one month after the date of signing of this Protocol, and will be fully coordinated with the Director-General.

d. Arrangements will be agreed upon by the two sides with respect to the passage of buses, trucks and privately owned vehicles. Until such arrangements are established, the current arrangements will continue to apply.

e. Israel will transfer to the Council the agreed share of the collected fees pursuant to paragraph 2 above, at the end of each calendar month following the month in which those fees were collected.

SECTION H

Passenger Customs Lane

1. General

In the Palestinian wing there will be one passenger customs hall consisting of a passenger customs lane administered by customs officials of the Council and serving residents of the West Bank and the Gaza Strip and visitors thereto.

2. Procedures with regard to the Customs Lane

a. Israeli customs officials shall be present in this lane and shall be entitled to request the Palestinian customs officials to conduct an inspection of goods and the collection of taxes when due.

b. The inspection of goods and the collection of taxes will be conducted by a Palestinian customs official in a separate room in the presence of an Israeli customs official.

c. Inspection of goods and the collection of taxes shall be carried out in accordance with Annex V to this Agreement.

d. With respect to veterinary matters, plant protection, medicines and goods, all of the procedures referred to above shall apply, except that the customs officials shall be replaced by Palestinian and Israeli Agriculture Service and Health Service officials.

3. Miscellaneous

a. Any other matters regarding the abovementioned passenger customs lane shall be dealt pursuant to the provisions of Annex V to the Agreement.

b. Arrangements will be agreed upon by the two sides with respect to goods and freight shipment.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 80 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 79 of 156

Page 78

36 I.L.M. 551, *599

Until such arrangements are established, the current arrangements will continue to apply.

c. (1) A branch of a Palestinian bank may be opened in the Palestinian wing.

(2) Commercial aspects of the terminals, including the number of commercial projects, will be agreed between the two sides.

SECTION I

Document Control in the Palestinian Wing

1. General

a. Pursuant to paragraphs 3 and 4 of Article VIII of Annex I, Palestinian and Israeli officials shall check the documents and the identity of passengers in the Palestinian wing.

b. This Section sets out the agreed-upon document control procedures with respect to the Palestinian wing with due respect to the distinction between the following categories of persons mentioned in Article VIII of Annex I:

(1) residents of the West Bank and the Gaza Strip; and

(2) visitors to the Gaza Strip and the West Bank passing through the Palestinian wing.

c. In the Palestinian wing, there will be a Palestinian and an Israeli document control manager. There will also be, in every working shift, a Palestinian and an Israeli document control duty officer.

 [*600]  d. Any required coordination between the Israeli and the Palestinian document control officials shall be done through the document control duty officers.

2. Passengers Exiting to Egypt or Jordan

In the Palestinian exit wing, the following procedures shall apply:

a. with respect to a resident of the West Bank and the Gaza Strip:

(1) the passenger will pass via a Palestinian counter, where his documents and identity will be checked by a Palestinian official according to a procedure promulgated by the Manager of the Palestinian wing;

(2) having completed examining the documents of the passenger, the Palestinian official shall compare the passenger's identity card number with the population registry records of the West Bank and the Gaza Strip residents, and then pass the documents to the Israeli official via a drawer installed for that purpose;

(3) the documents to be passed by the Palestinian official shall be a valid passport/travel document, or Palestinian passports/travel documents.

Residents of the West Bank and the Gaza Strip accompanying a passenger shall be subject to the procedures detailed in subparagraph a(1) - (3) above, unless their personal details, including their identity card number, are detailed in the passenger's documents, in which case they will be processed together with the passenger;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 81 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 80 of 156

Page 79

36 I.L.M. 551, *600

(4) thereafter:

    (a) the passenger and the persons accompanying him shall wait in front of the Palestinian counter;

    (b) the documents shall be checked by an Israeli official without unjustified delay. The Israeli official shall also check the passenger's identity indirectly;

    (c) in case of a delay with respect to the checking of a passenger's documents or identity, the passenger shall wait in a special waiting area pending resolution of the matter;

(5) the Israeli official will return the documents to the Palestinian official after having identified the passenger and checked and approved the documents, together with the white card referred to in paragraph 3.h of Article VIII of Annex I;

(6) the Palestinian official will return the stamped documents and the abovementioned white card to the passenger;

(7) the passenger will be directed to the exit of the Palestinian wing, where he will then hand over the white card to a Palestinian official; and

(8) the Palestinian official will pass the white card to the Israeli official, and will allow the passenger to pass if the card is valid;

b. with respect to a visitor to the Gaza Strip or the West Bank passing through the Palestinian wing:

(1) the passenger will pass via an Israeli counter where his documents and identity will be checked by an Israeli official. The Israeli official shall then return the documents to the passenger, together with the abovementioned blue card;

(2) the passenger will continue via a Palestinian counter, where his documents and identity will be checked by a Palestinian official according to a procedure promulgated by the Manager of the Palestinian wing; and

(3) the passenger will be directed to the exit of the Palestinian wing, where he will then hand over the abovementioned blue card to the Israeli and Palestinian officials posted there.

3. Passengers Entering from Egypt or Jordan

a. The procedure set out in paragraph 2.a above will also apply with respect to the entry of residents of the West Bank and the Gaza Strip.

b. The procedure set out in paragraph 2.b above will also apply with respect to the entry of visitors to the Gaza Strip and West Bank passing through the Palestinian wing, with the following adjustments:

(1) without prejudice to each side's authority to deny the entry of visitors passing through the Palestinian wing pursuant to Article VIII of Annex I, only visitors holding a passport or travel document valid for at least six months shall be permitted entry;

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 82 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 81 of 156

Page 80

36 I.L.M. 551, *600

(2) in exceptional cases, visitors holding a passport or a travel document valid for less than six months shall be permitted entry for a stay of 30 days. Such passengers' visitor's permits will not be extended by the Council unless the validity of their passport or their travel document has been extended for at least six months; and

(3) the extension of the abovementioned visitor's permit shall be carried out in accordance with Appendix 1 to Annex III of the Agreement.

4. Miscellaneous

a. Should a passenger in the Palestinian wing be apprehended by either side pursuant to paragraph 3.e of Article VIII of Annex I:

 [*601]  (1) the document control duty officer of the apprehending side shall notify the document control duty officer of the other side of the apprehension;

(2) if the passenger is apprehended by an Israeli official, the Palestinian document control duty officer will ensure the immediate arrival of a Palestinian policeman to meet with the apprehended passenger; and

(3) following notification to the Liaison Bureau, any further treatment of the apprehended passenger will be in accordance with Annex IV to the Agreement.

b. A passenger shall be denied exit abroad in the following circumstances:

(1) if the passenger has been duly apprehended in accordance with the Agreement;

(2) if the passenger is not in possession of the required documents to travel abroad pursuant to Appendix 1 to Annex III of the Agreement; or

(3) if a restraining order has been issued with respect to the passenger pursuant to paragraph 5of Article II of Annex IV to the Agreement.

c. Special document control arrangements will apply to certain categories of passengers, as follows:

(1) with respect to VIPs, the arrangements are set out in Section F of this Protocol;

(2) passengers will be considered disabled if they are connected to medical equipment separation from which could endanger their lives, or if they cannot pass through the magnetic gate. Such passengers will wait in an ambulance whilst their documents, luggage and personal belongings undergo a full inspection as set out in Article VIII of Annex I.

      The Director-General shall specify, in procedures to be promulgated pursuant to Section C, any other matters regarding treatment to be accorded to the disabled;

(3) residents of the West Bank and the Gaza Strip between the ages of 12 and 16 who have not been issued with a passport/travel document and do not have an identity card, may travel abroad alone only if they possess an exit permit issued by the CAC. A recent photograph shall be stamped and attached to the exit permit;

Case 1:18-cv-12855-MKV-DCF    Document 130-9    Filed 08/20/21    Page 83 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 82 of 156

Page 81

36 I.L.M. 551, *601

(4) residents of the West Bank and the Gaza Strip between the ages 5 and 12 may travel abroad as set out above, only when accompanied by a person over the age of 16;

(5) Palestinian policemen and other employees of the Council who have not been issued with passports/travel documents and do not have identity cards, shall only be allowed to travel abroad if they possess the documents that enabled them to enter the West Bank and the Gaza Strip and an exit permit issued by the CAC, and have a copy of a request form for an identity card;

(6) upon the arrival of a Palestinian policeman or another employee of the Council for the first time to the West Bank and the Gaza Strip, a request for an identity card will be filled out in triplicate at the terminal. This request shall be registered once the name of the person has been cleared by the relevant Israeli official and after he has presented a valid travel document and a computerized number has been issued.

A stamp indicating that the passenger is a Palestinian policeman or an employee of the Council shall then be placed on the request form. After the document control procedures have been carried out, the form will be stamped with an entry stamp;

(7) arrangements for the entry of spouse and children of Palestinian policemen and of other employees of the Council will be established by the CAC. The present procedures will continue to apply until such arrangements are established; and

(8) residents of the West Bank and the Gaza Strip who have lost their documentation abroad may apply to the Council from abroad, through their relatives. In such circumstances, they will be issued with documents of temporary nature by the same side which issued the original lost documents.

d. Palestinian document control officials will stamp the documents of residents of the West Bank and the Gaza Strip and of visitors to the Gaza Strip and to the West Bank.

e. The CAC may alter the arrangements set out in this section when the circumstances so necessitate.

APPENDIX 6

List of Hamlets included in Area B

Pursuant to Article XI, paragraph 3.b of the Agreement, the list of hamlets included in Area B is as follows:

A. Tulkarm District

1. Akkaba

2. Al Nazla Al Wusta

[*602]  3. Koor

4. Kife

B. Nablus District

1. Jalood

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 84 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 83 of 156

Page 82

36 I.L.M. 551, *602

    2. Al-Juneid

    3. Al-Aqrabinya

    4. Nisf Jbeil

    5. Yanoon

    6. Iraq Bureen

    7. A'mouria

C. Salfit District

    Khirbat Qays

D. Jericho District

    Al-Zubeidet

E. Qalqilva District

    1. Seer

    2. Khirbat Salman

    3. Falamiya

    4. Khirbat Ras Tera

    5. Asalah

    6. Al-Funduq

    7. Al-Modawar

F. Jenin District

    1. Toura Al-Gharbiyyah

    2. Al-Zawiyyah

    3. Mashrou' Beit Qad

    4. Al Kafir

    5. Al Mutla

    6. Talfit

    7. Toura-Al Sharqiyyah

G. Hebron District

    1. Al Aziz

2. Khirbat Al-salam

3. Abu Al-A'sja

4. Sikka

5. Wadi Al-Shajna

6. Beit Marseem

7. Al-Hijra

8. Deir Razeh

9. Khilat Al-Mayat

10. Khilat Al A'qd

11. Um Lasafa

12. Qinan Jaber

13. Raboud

14. Shweik

15. Khirbat Skeik

16. Jroun Al-Louz

17. Beit Makdoum

18. Al-Mouriq

19. Al Beira

20. Al Juba

21. Beit I'mra

22. Turama

23. Hadb Al-Alaka

24. Deir Al-A'sal Al Tahta

25. Beit Al Roush Al-Tahata

26. Al-Deir

27. Kuezeiba

28. Hitta

29. Korza

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 86 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 85 of 156

Page 84

36 I.L.M. 551, *602

H. Ramallah District

    1. Jibya

    2. Ein Qinya

    3. Yabroud

    4. Deir Nitham

    5. Um Saffa

    6. Burham

    7. Al-Nabi Saleh

    8. Shibteen

    9. Khirbat Um-Al-Lahm

    10. Beit Ijza

I. Bethlehem District

    1. Wadi Al-Neis

    2. Mirah Rabah

    3. Al Mas'ara

    4. Um Salamouna

    5. Al-Khas

    6. Khilat Al-louz

    7. Abu-Nijem

    8. Beit Faloh

    9. Breide'a

    10. Khirbat Al-Deir

    11. Daher Al-Nada

    12. Al-Minshya

    13. Khilat al-Hadad

    14. Keisan

    15. Al-Rashaida

    16. Harmala

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 87 of 157
Case 1:02-cv-02280-RJL   Document 830-36   Filed 01/29/16   Page 86 of 156

Page 85

36 I.L.M. 551, *602

17. Mrah Mia'alla

[*603] ANNEX III

PROTOCOL

CONCERNING CIVIL AFFAIRS

[Index not reproduced]

ARTICLE I

Liaison and Coordination in Civil Affairs

1. Joint Civil Affairs Coordination and Cooperation Committee

a. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC") is hereby established.

b. The CAC will function with regard to policy matters under the direction of the Joint Liaison Committee, with ongoing coordination being provided by the Monitoring and Steering Committee.

c. The CAC will deal with the following matters:

(1) Civil affairs, including issues concerning the transfer of civil powers and responsibilities from the Israeli military government and its Civil Administration to the Council.

(2) Matters arising with regard to infrastructures, such as roads, water and sewage systems, power lines and telecommunication infrastructure, which require coordination according to this Agreement.

(3) Questions regarding passage to and from the West Bank and the Gaza Strip, and safe passage between the West Bank and the Gaza Strip, including crossing points and international crossings.

(4) The relations between the two sides in civil matters, in issues such as granting of permits.

(5) Matters dealt with by the various professional subcommittees established in accordance with this Annex, which require further discussion or overall coordination.

(6) Other matters of mutual interest.

d. The CAC shall convene at least once a month, unless otherwise agreed.

e. Each side may initiate the convening of a special meeting on short notice.

f. The CAC shall determine by agreement its mode of procedure.

2. Joint Regional Civil Affairs Subcommittees

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 88 of 157
Case 1:02-cv-02280-RJL   Document 330-36-9   Filed 01/29/16   Page 87 of 156

Page 86

36 I.L.M. 551, *603

a. Two Joint Regional Civil Affairs Subcommittees will operate under the CAC, one for the West Bank and one for the Gaza Strip (hereinafter "the RCACs").

b. The RCACs in the West Bank and in the Gaza Strip shall deal with the regional civil affairs matters in the West Bank and in the Gaza Strip respectively, detailed in paragraph 1.c above, and with civil matters referred to them by the District Civil Liaison Offices.

c. Each RCAC may establish ad hoc working groups if and when the need arises.

d. Each RCAC shall convene no less than once every two weeks.

e. Matters of principle and policy not settled within the RCACs shall be passed on to the CAC.

3. District Civil Liaison Offices

a. Each side will establish and operate District Civil Liaison Offices in the West Bank (hereinafter "DCLs"). Such DCLs will be established in the following areas: Jenin, Tulkarem, Qalqilya, Nablus, Ramallah, Bethlehem, Hebron and Jericho.

b. In the Gaza Strip DCLs may be established to operate in the districts assigned for the DCOs, as specified in Annex I.

c. The DCLs shall deal with the day to day civil affairs, detailed in paragraph 1.c above, in their respective areas of operation.

d. The DCLs shall operate on a daily basis, representatives of the respective DCLs shall meet daily and the heads of the respective DCLs shall convene official meetings at least once a week.

4. General

a. Means of communication shall be set up with a view to ensuring efficient and direct contact 24 hours a day, in order to deal with any urgent matter arising in the civil affairs field.

b. The CAC and the RCACs shall be comprised of an equal number of representatives from Israel and from the Council.

 [*604]  c. Each side shall inform the other of its representatives to the CAC and the RCACs prior to meetings. Meetings of the CAC and the RCACs shall be organized and hosted by the two sides alternately, unless otherwise agreed.

d. The provisions of this Article shall not impede daily contacts between representatives of Israel and of the Council in all matters of mutual concern.

ARTICLE II

Transfer of Civil Powers and Responsibilities

Powers and responsibilities of the Israeli military government and its Civil Administration shall be transferred to and assumed by the Council in accordance with the provisions of this Annex and of Appendix 1.

ARTICLE III

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 89 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 88 of 156

Page 87

36 I.L.M. 551, *604

Modalities of Transfer

1. In the first phase of redeployment, the transfer of civil powers and responsibilities will be effected concurrently with the stages of this redeployment, as detailed in Annex I, Article I.1 and Appendix 1 thereto.

2. The transfer of civil powers and responsibilities shall be coordinated through the CAC and implemented in accordance with the arrangements set out in this Annex, in a smooth, peaceful and orderly manner.

3. Preparations for the implementation of this Annex shall commence immediately upon the signing of this Agreement.

4. The Israeli authorities shall provide all necessary assistance to the Council including access to offices, registers, records, systems and equipment and all necessary information, data and statistics, required for the transfer of powers and responsibilities.

5. In accordance with the stages of transfer of powers and responsibilities, Israel will transfer from the possession of the Israeli military government and its Civil Administration to the Council, offices located in areas under Palestinian territorial jurisdiction, equipment, registers, files, computer programs, reports, archives, records, maps, scientific data, relevant licenses, installations, registrations (including registrations regarding land situated in the areas under the territorial jurisdiction of the Council) and other movable and immovable property necessary for its functioning.

6. Arrangements regarding the transfer of funds, assets, and contracts, are set out in Article 39 of Appendix 1 (Treasury).

ARTICLE IV

Special Provisions concerning Area C

1. In Area C, in the first phase of redeployment, powers and responsibilities not related to territory, as set out in Appendix 1, will be transferred to and assumed by the Council in accordance with the provisions of that Appendix.

2. During the further redeployment phases, powers and responsibilities relating to territory, as set out in Appendix 1, will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

3. In accordance with the DOP, in Area C, the Council will have functional jurisdiction with regard to the powers and responsibilities transferred pursuant to this Annex. This jurisdiction shall not apply to issues that will be negotiated in the permanent status negotiations, as set out in Article XVII, paragraph 1 of this Agreement.

4. The transfer of powers and responsibilities in Area C shall not affect Israel's continued authority to exercise its powers and responsibilities with regard to internal security and public order, as well as with regard to other powers and responsibilities not transferred.

5. The closure of areas or the imposing of other restrictions on the movement of persons or goods in Area C, required for the implementation of the powers and responsibilities transferred to the Council in accordance with this Annex (such as for the prevention of the spreading of diseases), shall require prior Israeli consent.

6. a. The Council may appoint civilian inspectors to monitor compliance with laws and regulations within the powers and responsibilities transferred to it in Area C, in a number necessary for the fulfillment of its functions as agreed in the CAC.

    b. Arrangements regarding the operation of such inspectors, including agreed identification documentation, shall be as agreed within the CAC.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 90 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 89 of 156

Page 88

36 I.L.M. 551, *604

c. The civilian inspectors shall not conduct activity which involves arrests or detention of persons, seizure of property or any other activity involving the use of force.

d. These inspectors shall neither wear uniforms of a police or military nature nor carry arms.

[*605]  APPENDIX 1

Powers and Responsibilities for Civil Affairs

In accordance with Article II of this Annex, powers and responsibilities of the Israeli military government and its Civil Administration shall be transferred to and assumed by the Council in accordance with this Annex and the following provisions:

ARTICLE 1

Agriculture

1. This sphere includes, inter alia, veterinary services, animal husbandry, all existing experimental stations, irrigation water (i.e. usage of irrigation water which has been allocated for this purpose), scientific data, forestry, pasture and grazing, licensing and supervision of agriculture, the farming and marketing (including export and import) of crops, fruit and vegetables, nurseries, forestry products, and animal produce.

2. Irrigation water, as well as facilities, water resources, installations and networks used in agriculture are dealt with in Article 40 (Water and Sewage).

3. Relations in the agricultural sphere between the Israeli side and the Palestinian side, including the movement of agricultural produce, are dealt with in Annex V (Protocol on Economic Relations).

4. The two sides will cooperate in training and research, and shall undertake joint studies on the development of all aspects of agriculture, irrigation and veterinary services.

5. Forestry is part of the Agriculture sphere and is dealt with in Article 14 (Forests).

ARTICLE 2

Archaeology

1. Powers and responsibilities in the sphere of archaeology in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the protection and preservation of archaeological sites, management, supervision, licensing and all other archaeological activities.

2. In Area C, powers and responsibilities related to the sphere of Archaeology will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall protect and safeguard all archaeological sites, take all measures necessary to protect such sites and to prevent damage to them and take all precautions when carrying out activities, including maintenance and construction activities, which may affect such sites.

4. A Joint Committee of experts from both sides shall be established by the CAC to deal with archaeological issues of common interest.

Case 1:18-cv-12855-MKV DC5   Document 130-9   Filed 08/20/21   Page 91 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 90 of 156

Page 89

36 I.L.M. 551, *605

5. The Palestinian side shall respect academic freedom and rights in this sphere.

6. Subject to academic considerations, and in accordance with the law, when the Palestinian side grants excavation licenses to archaeologists, researchers and academics, it shall do so without discrimination.

7. The Palestinian side shall ensure free access to archaeological sites, open to the public without discrimination.

8. Both sides shall inform each other, through the Joint Committee, of the discovery of new archaeological sites in the West Bank and the Gaza Strip.

9. Each side undertakes upon itself to respect sites in the West Bank and the Gaza Strip which are regarded as holy, or which hold archaeological value. Each side shall have the right to raise issues relating to those sites before the Joint Committee which will consider the issue raised and reach an agreement upon such issue.

> The sites listed in Schedule 1 are of archaeological and historical importance to the Israeli side. The Israeli side may notify the Palestinian side of other sites which shall be added to this list. The Palestinian side will take into consideration that actions which may affect these sites shall be referred to the Joint Committee for full cooperation.

10. In areas transferred to the territorial jurisdiction of the Palestinian side, the Israeli side shall provide the Palestinian side with all archaeological records, including, inter alia, a list of all excavated sites and a detailed list and description of archaeological artifacts found since 1967.

> With due consideration to the Palestinian demand that Israel shall return all archaeological artifacts found in the West Bank and the Gaza Strip since 1967, this issue shall be dealt with in the negotiations on the final status.

11. a. Both sides shall take all necessary steps to prevent the theft of archaeological artifacts.

> b. Both sides shall enforce the prohibitions on illegal trading in archaeological artifacts and shall, in this context, prevent any transfer of such artifacts to Israel or abroad.

> [*606] c. In this regard, and with a view to safeguarding their common interests, Israel and the Palestinian side shall cooperate, exchange information and take necessary measures to combat the theft of, and illegal trade and transport of archaeological artifacts, including between areas under the territorial jurisdiction of the two sides, coordinating such activity through the Joint Committee.

ARTICLE 3

Assessments

Powers and responsibilities in the sphere of Assessments in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the licensing of assessors.

ARTICLE 4

Banking and Monetary Issues

1. This sphere includes, inter alia, issues relating to foreign currency services, regulation, licensing, supervision and inspection of banking activities, and the regulation and supervision of capital activities, and powers and responsibilities

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 92 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 91 of 156

Page 90

36 I.L.M. 551, *606

relating to monetary policies, all as formulated in Annex V (Protocol on Economic Relations).

2. The Bank of Israel (BOI) shall furnish the Palestinian Monetary Authority (PMA) with the relevant information and reports relating to the activities of the banks operating in the West Bank prior to the transfer of powers and responsibilities in this sphere.

3. The BOI and the PMA will continue to have ongoing discussions and exchange of information on matters of mutual interest, including, in particular, banking and monetary issues.

4. The BOI and PMA will cooperate in order to facilitate the movement of" notes" between commercial banks and other financial institutions and between them and the PMA in, within and between the West Bank and the Gaza Strip.

ARTICLE 5

Civil Administration Employees

1. The Palestinian side will continue to employ the Palestinian employees of the Civil Administration who are currently employed, without derogating from the powers and responsibilities of the Palestinian side to deal with all employee related matters. The Palestinian side shall maintain the rights, including pension rights, of present and former employees.

2. In accordance with Article XX of the Agreement (Rights, Liabilities and Obligations):

   a. The Palestinian side shall assume the Civil Administration's statutory and contractual obligations towards Palestinian employees and pensioners, regarding their rights and the payment of their pensions, and Israel will cease to bear any financial responsibility in this regard.

   b. If Israel is sued with regard to the aforesaid rights, the Palestinian side will reimburse Israel for the full amount awarded by any court or tribunal. The Israeli side shall notify the Palestinian side about any claim against it in this respect and shall enable the Palestinian side to participate in defending the claim.

3. a. The Palestinian side will deduct from the salaries and pensions paid in accordance with paragraph 1 above, those sums owing in respect of loan repayments to Yahav Bank for Government Employees Ltd., and will transfer these to Yahav bank through the Israeli side.

   b. The Israeli side will provide the Palestinian side with a list detailing the monthly loan repayments to be deducted and transferred in respect of each employee or pension receiver under subparagraph 3.a above.

ARTICLE 6

Commerce and Industry

1. This sphere includes, inter alia, import and export, the planning, formulation and implementation of policies, as well as the licensing and supervision of all industrial and commercial activities, including commodities, services, weights and measures and the regulation of commerce.

2. In authorizing the establishment and operation of industrial plants, factories or concerns in the West Bank and the Gaza Strip, both sides shall ensure that there is no detrimental impact on the environment, and on the safety of the other side. Matters regarding the environment are dealt with in Article 12 (Environmental Protection).

3. The production and use of weapons, ammunition or explosives are dealt with in Article XIV of the Agreement and in

Case 1:18-cv-12855-MLR-DCF   Document 130-9   Filed 08/20/21   Page 93 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 92 of 156

Page 91

36 I.L.M. 551, *606

Annex I.

4. The economic aspects of this sphere are dealt with in Annex V (Protocol on Economic Relations).

ARTICLE 7

Comptrol

Powers and responsibilities in the sphere of Comptrol in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side.

 [*607]  This sphere includes, inter alia, the institution of controls and proper supervision over the activities of all offices of the Palestinian side, and the licensing of auditors.

ARTICLE 8

Direct Taxation

1. Powers and responsibilities in the sphere of Direct Taxation in the West Bank and the Gaza Strip will be transferred from the Israeli side to the Palestinian side. This sphere includes, inter alia, income tax on individuals and corporations, property taxes, municipal taxes and fees, in accordance with Article V of the Protocol on Economic Relations as replaced by Appendix 1 of the Supplement to the Protocol (hereinafter - "Article V").

2. a. In Area C, the powers and responsibilities regarding property tax will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council. However, the property tax will be collected by the Israeli side, in cooperation and coordination with the Palestinian side, and the income will be transferred to the Council.

> b. The powers and responsibilities of the Israeli side for levying and collection of income tax and deduction at source, with regard to Israelis (including corporations in which the majority of shares which grant rights to distribution of profits are held by Israelis) in respect of income accrued or derived in Area C outside the Settlements and military locations, will be exercised according to the Palestinian tax code and the tax collected will be remitted to the Palestinian side.

3. Tax enforcement in the West Bank and the Gaza Strip shall be in accordance with applicable laws and in accordance with the provisions of this Agreement.

4. The provisions of this Article and of Article V shall be implemented on 1.1.96. The provisions set forth in paragraphs 5-8 of Article V shall be in force until 31.12.96, and will continue for an additional period upon the mutual agreement of the two tax authorities.

ARTICLE 9

Education and Culture

Powers and responsibilities in the sphere of Education and Culture in the West Bank and in the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, responsibility over schools, teachers, higher education, special education and private, public, non- governmental and other cultural and educational activities, institutions and programs and all movable and immovable education property.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 94 of 157
Case 1:02-cv-02280-RJL   Document 830-36   Filed 01/29/16   Page 93 of 156

Page 92

36 I.L.M. 551, *607

ARTICLE 10

Electricity

Both sides have agreed to continue the negotiations concerning the sphere of Electricity after the signing of this Agreement, with a view to reaching an agreement within three months, based on the following merged version, pending which the existing status quo in the sphere of electricity in the West Bank and the Gaza Strip shall remain unchanged. IEC personnel and equipment shall be guaranteed free, unrestricted and secure access to the electricity grid.

(Merged Version)

1. The Israeli side shall transfer to the Palestinian side, and the Palestinian side shall assume, all powers and responsibilities in this sphere [I: in Areas A and B] [P: in the West Bank] that are presently held by the military government and its Civil Administration, including the power to set tariffs and issue licenses [P:, as well as all existing property related to this sphere and the grid, as defined in paragraph 4]. [I: In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.]

2. The Palestinian Energy Authority (PEA) will have the authority to issue licenses and to set rules, tariffs and regulations in order to develop electricity systems [I: under the responsibility of the Palestinian side] in the West Bank. In addition, the PEA shall have the right to construct transmission lines, distribution lines, power stations and the [I: Palestinian part of the] inter-regional electricity connection [I: scheme], in the West Bank. [I: Such construction which is intended to be connected or related to the IEC grid, or which is in Area C, shall be subject to prior Israeli consent.]

3. Pending the establishment of an independent Palestinian electricity supply system or of other supply sources, the Israel Electric Company (IEC) shall continue to supply the electricity in order to meet existing and future expected demand in the West Bank. All aspects of supply of electricity to the Palestinian side by IEC shall be dealt with in a commercial agreement, similar to commercial agreements and prices agreed upon for major bulk Israeli consumers.

4. For the purpose of this Article the term "grid" shall include lines, cables, transformers, substations, circuit-breakers, switches, protection devices and metering equipment, of all different voltage levels. [P: The grid in the West Bank shall be transferred to the Palestinian side] [I: IEC will retain full responsibility for the operation, maintenance and development of the IEC grid. For this purpose IEC personnel, vehicles and equipment shall be entitled to free, unrestricted and secure access to this grid.]

5. The Israeli side shall retain full responsibility for the [I: supply of electricity to the Israeli settlements and the military locations through the IEC grid.] [P: operation and maintenance of the electricity supply systems within the Israeli settlements and the military locations.]

 [*608]  6. [I: Subject to the terms of the commercial agreement referred to in paragraph 3 above, which shall include, inter alia, provisions concerning safety and technical standards, dedicated feeders and segments of lines branching from feeders supplying Palestinian consumers, will be transferred to the Palestinian side.] [P: The Israeli side shall transfer to the Palestinian side all existing property related to this sphere and the grid, as defined in paragraph 4, in the West Bank.]

7. The PEA will be authorized to implement, in the grid [I: under the responsibility of the Palestinian side] [P: in the West Bank], the outcome of the technical studies currently being undertaken concerning the following:

   a. The rehabilitation of existing distribution systems.

   b. Upgrading of protection systems.

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 09/29/21    Page 95 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 94 of 156

Page 93

36 I.L.M. 551, *608

    c. Construction of control systems.

    d. Implementation of transmission and distribution schemes.

8. Both sides shall establish a Joint Electricity Subcommittee. The functions of the committee shall be to deal with the issues of mutual interest concerning electricity and to implement the provisions of this Article including, *inter alia:* finalization of the commercial agreement, cooperation in technical issues and arrangements concerning the transfer of agreed systems.

[P: 9. In light of the proposal that was submitted by President Arafat in the last round of negotiations which was later reassured by Mr. Perez, Israeli Foreign Minister, both sides shall agree on an international arbitration company to deal with the transfer of the electrical grid in the West Bank.]

    ARTICLE 11

    Employment

1. Powers and responsibilities of the Civil Administration in the sphere of Employment in the West Bank and the Gaza Strip will be transferred to the Palestinian side.

2. This sphere includes, inter alia, organizing and planning, from the Palestinian side, the employment of the Palestinians who work or intend to work in Israel and in the Settlements, as well as collecting information and building a data base.

3. The Palestinian side will provide the Israeli side with details of Palestinian workers seeking jobs in Israel and in the Settlements. When Israel makes positive decisions, Israel will issue the necessary permits.

4. The Israeli side will continue to provide the assistance currently granted to Palestinian workers who work in Israel or in the Settlements, regarding their social rights according to the prevailing laws.

5. A joint committee will be established after the signature of this Agreement to set the procedures and arrangements relating to this sphere and their implementation, including the matters of employment injuries.

6. Israel will provide the Palestinian side with lists of all Palestinian employees from whose wages Israel deducts health fees ("health stamp") and lists of retired Palestinian employees receiving pensions paid through the Payment Section of the Israeli Employment Service.

7. Israel will notify the Palestinian side of amendments made in the laws and regulations that relate to Palestinians employed in Israel or in the Settlements.

8. Issues relating to the placement and rights of the Palestinians employed in Israel are dealt with in Article VII of Annex V (Protocol on Economic Relations).

    ARTICLE 12

    Environmental Protection

A. Transfer of Authority

The Palestinian side and Israel, recognizing the need to protect the environment and to utilize natural resources on a sustainable basis, agreed upon the following:

1. This sphere includes, inter alia, licensing for crafts and industry, and environmental aspects of the following: sewage,

Case 1:18-cv-12255-MLW DCF Document 130-9 Filed 08/30/21 Page 96 of 157
Case 1:02-cv-02280-RJL Document 830-36 Filed 01/29/16 Page 95 of 156

Page 94

36 I.L.M. 551, *608

solid waste, water, pest control (including anti-malaria activities), pesticides and hazardous substances, planning and zoning, noise control, air pollution, public health, mining and quarrying, landscape preservation and food production.

2. The Israeli side shall transfer to the Palestinian side, and the Palestinian side shall assume, powers and responsibilities in this sphere, in the West Bank and the Gaza Strip that are presently held by the Israeli side, including powers and responsibilities in Area C which are not related to territory.

> In Area C, powers and responsibilities in this sphere related to territory (which only include environmental aspects of sewage, solid waste, pesticides and hazardous substances, planning and zoning, air pollution, mining and quarrying, and landscape preservation) will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

B. Cooperation and Understandings

3. Both sides will strive to utilize and exploit the natural resources, pursuant to their own environmental and developmental policies, in a manner which shall prevent damage to the environment, and shall take all necessary measures to  [*609]  ensure that activities in their respective areas do not cause damage to the environment of the other side.

4. Each side shall act for the protection of the environment and the prevention of environmental risks, hazards and nuisances including all kinds of soil, water and air pollution.

5. Both sides shall respectively adopt, apply and ensure compliance with internationally recognized standards concerning the following: levels of pollutants discharged through emissions and effluents; acceptable levels of treatment of solid and liquid wastes, and agreed ways and means for disposal of such wastes; the use, handling and transportation (in accordance with the provisions of Article 38 (Transportation)) and storage of hazardous substances and wastes (including pesticides, inseicides and herbiddes); and standards for the prevention and abatement of noise, odor, pests and other nuisances, which may affect the other side.

6. Each side shall take the necessary and appropriate measures to prevent the uncontrolled discharge of wastewater and/or effluents to water sources, water systems and water bodies, including groundwater, surface water and rivers, which may affect the other side, and to promote the proper treatment of domestic and industrial wastewater, as well as solid and hazardous wastes.

7. Both sides shall ensure that a comprehensive Environmental Impact Assessment (EIA) shall be conducted for major development programs, including those related to industrial parks and other programs detailed in Schedule 2.

8. Both sides recognize the importance of establishing new industrial plants in their respective areas within planned and approved industrial zones, subject to the preparation of comprehensive EIAs, and shall endeavor to ensure compliance with the above.

9. Both sides recognize the importance of taking all necessary precautions to prevent water and soil pollution, as well as other safety hazards in their respective areas, as a result of the storage and use of gas and petroleum products, and shall endeavor to ensure compliance with the above.

10. Pending the establishment of appropriate alternative sites by the Palestinian side, disposal of chemical and radioactive wastes will be only to the authorized sites in Israel, in compliance with existing procedures in these sites. The construction, operation and maintenance of the alternative facilities will follow internationally accepted guidelines, and will be implemented pursuant to the preparation of EIAs.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/30/21 Page 97 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 96 of 156

Page 95

36 I.L.M. 551, *609

11. Both sides shall cooperate in implementing the ways and means required to prevent noise, dust and other nuisances from quarries, which may affect the other side. To this end the Palestinian side shall take all necessary and appropriate measures, in accordance with the provisions of this Agreement, against any quarry that does not meet the relevant environmental standards.

12. Both sides recognize the importance of taking all necessary and appropriate measures in their respective areas for the monitoring and control of insect- transmitted diseases including sand flies, anopheles and all other mosquito species, and shall endeavor to ensure compliance with the above.

13. Both sides shall cooperate in implementing internationally accepted principles and standards relating to environmental issues of global concern, such as the protection of the ozone layer.

14. Israel and the Palestinian side shall cooperate in implementing principles and standards, which shall conform with internationally accepted principles and standards, concerning the protection of endangered species and of wild fauna and flora, including restriction of trade, conservation of migratory species of wildlife and preservation of existing forests and nature reserves.

15. Israel and the Palestinian side shall respectively operate an emergency warning system in order to respond to events or accidents which may generate environmental pollution, damage or hazards. A mechanism for mutual notification and coordination in cases of such events or accidents will be established.

16. Recognizing the unsatisfactory situation of the environment in the West Bank, and further recognizing the mutual interest in improving this situation, Israel shall actively assist the Palestinian side, on an ongoing basis, in attaining this goal.

17. Each side shall promote public awareness on environmental issues.

18. Both sides shall work on appropriate measures to combat desertification.

19. Each side shall control and monitor the transfer of pesticides and any internationally banned and restricted chemicals in their respective areas.

20. Each side shall reimburse the other for environmental services granted in the framework of mutually agreed programs.

21. Both sides shall cooperate in the carrying out of environmental studies, including a profile, in the West Bank.

22. For the mutual benefit of both sides, the relevant Israeli authorities and the Palestinian Environmental Protection Authority and/or other relevant Palestinian authorities shall cooperate in different fields in the future.

   Both sides will establish an Environmental Experts Committee for environmental cooperation and understandings.

   [*610]  ARTICLE 13

   Fisheries

1. This sphere includes, inter alia, licensing of fishermen, marine agriculture and vessels' permits, in the Gaza Strip.

2. Security restrictions are dealt with in Article XIV (Security along the Coastline to the Sea of Gaza) of Annex I.

   ARTICLE 14

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/29/21 Page 98 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 97 of 156

Page 96

36 I.L.M. 551, *610

Forests

1. Powers and responsibilities in the sphere of Forests in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the establishment, administration, supervision, protection, and preservation of all forests (planted and unplanted).

2. In Area C, powers and responsibilities related to the sphere of Forests will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall safeguard, protect and preserve all forests in the West Bank and the Gaza Strip. The Palestinian side shall take all necessary measures to ensure the protection and prevention of damage to said forests.

4. The Palestinian side shall have the right to plant new forests for, inter alia, protection of soil from erosion and desertification, and landscaping purposes, bearing in mind safety and security considerations concerning main roads and infrastructure.

5. Both sides shall cooperate in matters regarding the protection and preservation of forests, including fire extinguishing and pest control, and shall exchange information on issues relating to pests, diseases and scientific research.

6. The Israeli side shall coordinate with the Palestinian side activities in Area C, outside Settlements and military locations, which may change the existing status of this sphere.

ARTICLE 15

Gas, Fuel and Petroleum

1. a. This sphere includes, inter alia, the planning, formulation and implementation of policies, as well as the licensing and supervision of gas, fuel and petroleum facilities. For the purposes of this paragraph, "gas, fuel and petroleum facilities" shall include, inter alia, all gas and petrol stations, installations, terminals and infrastructure, as well as agencies for the marketing, distribution, transportation, storage, sale or supply of gas, fuel or petroleum products. This sphere also includes the licensing and supervision of the import, export, and transportation in addition to the exploration, production and distribution of gas, fuel and petroleum.

     b. In Area C, powers and responsibilities regarding exploration and production of oil and gas shall be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

2. In authorizing the establishment and operation of gas, fuel and petroleum facilities as defined in paragraph 1, the Palestinian side shall ensure that there is no detrimental impact on the environment or on the safety of Israel, the Settlements and military installations and that a safety distance from Israel, the Settlements and military installations is observed. Accordingly, the Palestinian side shall apply the American, British and/or Israeli safety and environmental standards.

3. The color of all gas cylinders in use by Palestinians in the West Bank and the Gaza Strip shall be different than that in use in Israel and by Israelis.

4. a. The Palestinian side will notify the Israeli side of any exploration and production of oil and gas carried out by the Palestinian side or with its permission.

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 08/30/21    Page 99 of 157
Case 1:02-cv-02280-RJL    Document 330-36    Filed 01/29/16    Page 98 of 156

Page 97

36 I.L.M. 551, *610

b. Israel and the Palestinian side agree to cooperate concerning production of oil and gas in cases of joint geological structures.

5. a. All transportation of gas or fuel products, in Israel and in the West Bank and the Gaza Strip, shall be in accordance with the respective laws applying which, in any event, shall not fall short of the international requirements and standards concerning safety and environmental protection as applied by Israel. The transportation of gas and fuel products into Israel, the Settlements and military installations shall further be subject to the requirements and modalities regarding entry into Israel.

b. In order to facilitate the movement of transportation of gas or fuel products in the West Bank and the Gaza Strip -

[*611]  (1) The Palestinian side will issue permits to Palestinian owners, drivers and escorts of vehicles transporting gas or fuel products. The issue of such permits shall be governed by the criteria regarding recruitment to the Palestinian police according to this Agreement. The issue of such permits is not contingent upon the approval of the Israeli side. The Palestinian side shall notify the Israeli side of the permits issued by it.

(2) The Palestinian side shall ensure that vehicles transporting gas or fuel products, as well as their parking lots, shall be guarded against any theft or unauthorized use.

The Palestinian side shall inform the Israeli side, at the earliest opportunity, of any suspected theft or unauthorized use of such vehicles.

6. The Israeli side shall cooperate with the Palestinian side with regard to the establishment by the Palestinian side of 3-4 storage facilities for gas and petroleum, including in facilitating, inter alia, location, land and technical assistance in order to secure the purchasing needs of the Palestinians from the Israeli market.

7. Matters regarding the environment and transportation are dealt with in Article 12 (Environmental Protection) and Article 38 (Transportation), respectively.

ARTICLE 16

Government and Absentee Land and Immovables

1. Powers and responsibilities of the Custodian of Government and Absentee Property (hereinafter "the Custodian") in the West Bank and the Gaza Strip with regard to Government and Absentee Land and immovables, shall be transferred from the military government and its Civil Administration to the Palestinian side.

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall respect the legal rights of Israelis (including corporations owned by Israelis) related to Government and Absentee land located in the areas under the territorial jurisdiction of the Council.

4. a. The Palestinian courts shall be empowered to deal with disputes regarding rights relating to land.

b. Notwithstanding the above, when an Israeli or a Palestinian considers that his or her rights may be affected by any enforcement, confirmation or registration proceedings, he or she may request, within 30

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/30/21 Page 100 of 157
Case 1:02-cv-02280-RJL Document 330-30 Filed 01/29/16 Page 99 of 156

Page 98

36 I.L.M. 551, *611

days from the receipt of the information by the CAC in accordance with subparagraph c. below, that the issue be brought before a Professional Joint Committee established by the two sides (hereinafter - "the Joint Committee"), prior to the carrying out of such proceedings. The Joint Committee shall convene within 14 days from the submission of the objection to deal with all the relevant aspects pertaining to the issue and decide whether to approve the carrying out of the proceedings regarding which the objection has been submitted.

Pending an approval by the Joint Committee, no enforcement, confirmation or registration, regarding which the objection has been put forward, may be carried out or registered in the Land Registry or in any other relevant registry.

c. For the purpose of this paragraph, the Palestinian side shall, at the earliest opportunity, provide the CAC with the information regarding any judgment or any request for enforcement, confirmation or registration (including First Registration of land), which may affect the rights of Israelis.

ARTICLE 17

Health

1. Powers and responsibilities in the sphere of Health in the West Bank and the Gaza Strip will be transferred to the Palestinian side, including the health insurance system.

2. The Palestinian side shall continue to apply the present standards of vaccination of Palestinians and shall improve them according to internationally accepted standards in the field, taking into account WHO recommendations.

In this regard, the Palestinian side shall continue the vaccination of the population with the vaccines listed in Schedule 3.

3. The Palestinian side shall inform Israel of any Israeli hospitalized in a Palestinian medical institution upon his or her admission. Arrangements for moving such hospitalized Israelis shall be agreed upon in the joint committee.

4. The Palestinian side, on the one hand, and the Israeli Ministry of Health or other Israeli health institutions, on the other, shall agree on arrangements regarding treatment and hospitalization of Palestinians in Israeli hospitals.

5. The Israeli authorities shall endeavor to facilitate the passage of Palestinian ambulances within and between the West Bank and the Gaza Strip and Israel, subject to the provisions of Annex I.

6. Israel and the Palestinian side shall exchange information regarding epidemics and contagious diseases, shall cooperate in combating them and shall develop methods for exchange of medical files and documents.

 [*612]  7. The health systems of Israel and of the Palestinian side will maintain good working relations in all matters, including mutual assistance in providing first aid in cases of emergency, medical instruction, professional training and exchange of information.

8. a. The Palestinian side shall act as guarantor for all payments for Palestinian patients admitted to Israeli medical institutions, on condition that they receive prior approval from the Palestinian health authorities.

b. Notwithstanding the above, in all cases of the emergency hospitalization in Israel of a sick or injured Palestinian not arranged in advance via the Ministry of Health of the Council, the Israeli hospital shall report to the Palestinian side directly and immediately, and in any case not more than 48 hours after the admission, the fact of the admission and the person's condition and diagnosis. The report shall be made

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 101 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 100 of 156

Page 99

36 I.L.M. 551, *612

by telephone and fax and the Israel Ministry of Health shall be informed at the same time.

> Within 24 hours of the receipt of the said report, the Palestinian side must either give an undertaking to cover all the costs of the hospitalization or remove the patient, by its own means, to a Palestinian hospital.

> Should the Palestinian side have done neither of these in the given time, the Israeli hospital shall remove the patient in an Israeli vehicle and charge all costs to the Palestinian side at the accepted Israeli rate.

> In all cases, the Palestinian side shall cover all hospitalization costs from admission to discharge to the territory of the Palestinian side.

> Should the Israeli hospital not report as required to the Palestinian side, the hospital itself shall bear all costs.

9. A committee established through the CAC shall facilitate coordination and cooperation on health and medical issues between the Palestinian side and Israel.

10. Imports of pharmaceutical products to the West Bank and the Gaza Strip shall be in accordance with general arrangements concerning imports and donations, as dealt with in Annex V (Protocol on Economic Relations).

ARTICLE 18

Indirect Taxation

1. This sphere includes, inter alia, VAT, purchase taxes on local production and import taxes, as well as any other indirect taxes, as formulated in Annex V (the Protocol on Economic Relations).

2. In order to foster regional trade between the Palestinian territories and external markets, various storage facilities can be established at the entry points at the Rafah and Allenby Bridge terminals, for temporary storage purposes (by Palestinian companies and the Palestinian Customs Department) before the customs clearance of goods. The specific locations and arrangements for the above will be agreed upon by the Joint Economic Committee. The administration of these storage facilities will be according to the provisions relating to freight shipments detailed in Article III of Annex V (the Protocol on Economic Relations). Detailed arrangements and procedures will be agreed upon between the two sides.

3. If there will be additional entry points in which paragraph 14.a of Article III of Annex V will be implemented, additional storage facilities as those detailed in paragraph 2 above can be established there too.

4. While ongoing permanent Israeli businesses situated in Area C outside the Settlements and military locations will be registered for VAT purposes with the Israeli side, the rules of Palestinian VAT legislation will apply to these businesses and the Israeli side will transfer to the Palestinian side the net VAT collected from these businesses after deduction of their refunds. The above will be coordinated with the Palestinian side.

> For this purpose, an Israeli includes a corporation in which the majority of shares which grant rights to distribution of profits are held by Israelis.

5. Tax enforcement in the West Bank and the Gaza Strip shall be in accordance with applicable laws and in accordance with this Agreement.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/26/21   Page 103 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 101 of 156

Page 100

36 I.L.M. 551, *612

ARTICLE 19

Insurance

1. This sphere includes, inter alia, the licensing of insurers and insurance agents, and the supervision of their activities, including supervision of insurers' deposits and funds and the road safety fund.

2. Arrangements regarding the compulsory insurance of motor vehicles and the compensation of road accident victims are dealt with in Article XI (Insurance Issues) of Annex V (Protocol on Economic Relations) (hereinafter: Article XI).

3. a. The Existing Fund, as defined in Article XI, shall be transferred to the Palestinian side. This transfer will include all the Existing Fund's assets and liabilities.

   b. The Palestinian side shall be responsible for all liabilities of the Existing Fund whether arising from accidents occurring prior or subsequent to the date of transfer.

   c. Accordingly, Israel will cease to bear any financial responsibility in this respect. If Israel is sued with regard to the aforesaid liabilities, the Palestinian side will reimburse Israel for the full amount awarded by any court or tribunal. The Israeli side shall notify the Palestinian side about any  [*613]  claim against it in this respect and shall enable the Palestinian side to participate in defending the claim.

4. With a view to assisting the Palestinian side to deal with claims against the Existing Fund, the following provisions shall apply:

   a. A joint experts committee shall be established to examine claims against the Existing Fund (hereinafter "the Joint Committee").

   b. Without prejudice to paragraph 3.c above, the Joint Committee shall examine and estimate whether the assets of the Existing Fund are sufficient to meet its liabilities as they stand on the day of the transfer (in the Gaza Strip and Jericho Area - the 4th of May 1994; in the West Bank - the 10th of September 1995). In the event that the Joint Committee concludes that the Existing Fund's assets are not sufficient to meet its liabilities, the Israeli side shall cover the agreed deficit, including claims incurred but not reported (IBNR).

      If the Joint Committee is unable to agree on the above amount, the matter shall be referred to the JEC (Joint Economic Committee).

   c. The Joint Committee shall submit recommendations to the Palestinian side concerning administrative or legal changes with a view to expediting settlement of the claims.

   d. The Joint Committee shall conclude its work within three months. The two sides may agree on a one time extension for another three months.

5. Additionally, the Israeli side will provide to the Palestinian side all the necessary assistance with regard to the Existing Fund, and advice and consultation when requested.

6. All claims, including pending claims, against the Existing Fund should not be brought before or heard by any Israeli court or tribunal and should only be brought before the Palestinian Courts. To this end, the two sides may take all necessary measures, including, if possible, the enactment of legislation.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/26/21   Page 103 of 157
Case 1:04-cv-00280-RJL   Document 330-36   Filed 01/29/16   Page 102 of 156

Page 101

36 I.L.M. 551, *613

ARTICLE 20

Interior Affairs

1. Powers and responsibilities in the sphere of Interior Affairs in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, licensing of newspapers and publications and censorship of films and plays.

2. Municipal affairs are dealt with in Article 24 (Local Government).

ARTICLE 21

Labor

1. The sphere of Labor includes, inter alia, rights of workers, labor relations, labor conciliation, safety and hygiene in work places, labor accidents and compensation, vocational and professional training courses, cooperative associations, professional work associations and trade unions, heavy machinery equipment.

2. The two sides shall establish agreed procedures for mutual recognition of professional certificates and diplomas.

3. The Palestinian side shall ensure the completion of vocational and professional training courses currently being conducted by the Civil Administration. In this regard, the Civil Administration shall transfer to the Palestinian side a proportionate amount of fees received on account of such courses, relating to the period following the date of transfer.

4. The Palestinian side shall continue to hold vocational training courses, at least to the same extent as has been undertaken by the Civil Administration, inter alia, in the following professions: heavy-vehicle and public transport drivers, garage managers, vehicle technicians, vehicle testers, driving teachers and driving school managers.

5. Cooperative Associations, Professional Work Associations and Trade Unions should act in a manner that does not violate the Cooperative Associations laws, the Professional Work Associations laws and the Trade Unions laws.

6. The Palestinian side shall inform the Israeli side of any work related accident resulting in the injury of an Israeli. The Israeli side may conduct an investigation of such an accident in coordination with the Palestinian side.

7. All matters regarding the production and use of explosives and gunpowder shall be dealt with in Article XIV of this Agreement and Annex I.

ARTICLE 22

Land Registration

1. Powers and responsibilities in the sphere of Land Registration in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, registration in the Land Registry of real estate transactions, First Registrations of land, registration of courts' decisions, registration of parcelations pursuant to the Towns, Villages and Buildings Planning Law, No. 79, of 1966, and the administration of Land Registry offices and processes.

 [*614] 2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall respect the legal rights of Israelis (including corporations owned by Israelis) related to

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/26/21   Page 104 of 157
Case 1:04-cv-00200-RJL   Document 330-36   Filed 01/29/16   Page 103 of 156

Page 102

36 I.L.M. 551, *614

lands located in the areas under the territorial jurisdiction of the Council.

4. a. The Palestinian courts shall be empowered to deal with disputes regarding ownership of or rights relating to land.

    b. Notwithstanding the above, when an Israeli or a Palestinian considers that his or her rights may be affected by any enforcement, confirmation or registration proceedings, he or she may request, within 30 days from the receipt of the information by the CAC in accordance with subparagraph c. below, that the issue be brought before a Professional Joint Committee established by the two sides (hereinafter - "the Joint Committee"), prior to the carrying out of such proceedings. The Joint Committee shall convene within 14 days from the submission of the objection to deal with all the relevant aspects pertaining to the issue and decide whether to approve the carrying out of the proceedings regarding which the objection has been submitted.

        Pending an approval by the Joint Committee, no enforcement, confirmation or registration, regarding which the objection has been put forward, may be carried out or registered in the Land Registry or in any other relevant registry.

    c. For the purpose of this paragraph, the Palestinian side shall, at the earliest opportunity, provide the CAC with the information regarding any judgment or any request for enforcement, confirmation or registration (including First Registration of land), which may affect the rights of Israelis.

ARTICLE 23

Legal Administration

1. Powers and responsibilities in the sphere of legal administration shall be transferred from the military government and its Civil Administration to the Palestinian Side.

2. This sphere includes, inter alia:

    a. administration, planning and management of the Palestinian Judicial system and its different organs;

    b. appointment of judges;

    c. licensing and supervision of lawyers;

    d. licensing and supervision of public notaries; and

    e. registration of companies and intellectual property rights, including, but not limited to, patents and trademarks.

3. Registration of Companies:

    a. The Israeli side shall transfer to the Palestinian side the Register of Companies in the West Bank.

    b. Each side shall allow persons or legal entities of the other side to register companies in its register.

    c. Each side shall ensure that its Register of Companies is open to the public for information.

    d. Each side will provide the other side, upon request, and on a case-by-case basis, with updated information regarding the registration of companies, share ownership, charges and other relevant information held by their respective registrars of companies.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 105 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 104 of 156

Page 103

36 I.L.M. 551, *614

The two sides shall agree on arrangements for the exchange of updated information regarding the registration of companies.

4. Intellectual Property Rights:

a. Intellectual property rights include, inter alia, patents, industrial designs, trademarks, copyright and related rights, geographical indications and undisclosed information.

b. (1) Each side shall use its best efforts to adopt in its legislation standards of protection of intellectual property compatible with those in the GATT Agreement on Trade Related Aspects of Intellectual Property (hereinafter "GATT-TRIPS").

(2) Each side will strive to establish an adequate system for the examination of applications for registration of intellectual property rights compatible with those in GATT-TRIPS.

c. Each side will recognize the copyright and related rights in original "literary and artistic works", including in particular, musical works, computer programs and audio and visual recordings, legally originating in the areas under the jurisdiction of the other side.

d. Each side will recognize the undisclosed information rights originating in the areas under the jurisdiction of the other side.

[*615] e. (1) In view of the free movement of industrial goods between Israel on the one hand and the West Bank and Gaza Strip on the other, each side when processing applications submitted by any resident or legal entity of the other side for the registration of patents, industrial designs, trade marks and geographic indications (hereinafter "Registered Rights"), shall expedite the examination process including publication for objections, for Registered Rights existing and in force in both areas, on the date of the transfer of powers and responsibilities in the sphere of legal administration.

(2) In the event of a dispute between the registration of Registered Rights in Israel and their registration in the West Bank and Gaza Strip the registration of each side will apply in the areas under its jurisdiction.

f. In the interest of promoting investment in the region, and in order to facilitate the protection by registration of intellectual property rights, the Palestinian side will, when processing applications for registration, take account of the fact that a particular right has been examined elsewhere.

g. Without prejudice to the provisions contained in Annex IV (Protocol concerning Legal Affairs), each side will extend its administrative and judicial protection to intellectual property right-holders of the other side. The purpose of this protection is to permit effective action against any act of infringement of intellectual property rights under this Agreement, including expeditious remedies to prevent infringements, and remedies which constitute a deterrent to future infringements.

h. The two sides will provide each other on a case-by-case basis with information regarding the registration of Registered Rights held by their respective Registrars of intellectual property rights.

i. Both sides shall ensure that their Registers are open to the public.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 106 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 105 of 156

Page 104

36 I.L.M. 551, *615

5. Legal issues regarding criminal and civil jurisdiction of the Palestinian courts are dealt with in Annex IV (Protocol concerning Legal Matters).

ARTICLE 24

Local Government

1. This sphere includes, inter alia, formulation and implementation of Local Government policies, appointment of Local Government officials, approval of Local Government budgets, tenders, acquisitions, fees and tariffs, alteration of Local Government boundaries, creation and dissolution of Local Government, Local Government election processes, Local Government inspections and the creation of joint service councils, city councils, in their capacity as local planning committees, and the operation and maintenance of the municipal water and electricity distribution systems and pricing of these services.

The term "Local Government" in this Article includes municipal councils, village councils and all other communities which lack municipal status.

2. The Palestinian side has the right to make any and all alterations to the Local Government boundaries in the West Bank, within areas A and B as defined in this Agreement.

3. Issues relating to the provision of Local Government services to Settlements and to installations serving the Israeli military forces, are dealt with in the relevant Articles of this Appendix.

4. The Palestinian side shall give notice to the Israeli side of any Local Government elections. With a view to avoiding friction in the context of such elections, special security arrangements will be agreed in the security liaison mechanism.

5. In addition to the existing powers and responsibilities of a city council, in its capacity as local planning committee, it shall also be authorized to issue building permits for various purposes, including factories, hospitals and schools, in accordance and subject to existing detailed planning schemes in force.

6. Municipal authorities shall continue to supply water and electricity from existing systems in accordance with existing quantities and practices.

7. Matters regarding planning and zoning, water and electricity are dealt with in Article 27 (Planning and Zoning), Article 40 (Water and Sewage) and Article 10 (Electricity), respectively.

ARTICLE 25

Nature Reserves

1. Powers and responsibilities in the sphere of Nature Reserves in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side and shall be assumed by it, including, inter alia, the establishment, declaration, administration, supervision, protection and preservation of Nature Reserves and of animal species, natural assets and plants.

2. In Area C, powers and responsibilities related to the sphere of Nature Reserves will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall safeguard and preserve the Nature Reserves in accordance with established scientific standards.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 107 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 106 of 156

Page 105

36 I.L.M. 551, *615

4. The two sides shall agree on methods of cooperation regarding the protection and preservation of Nature Reserves, through a Joint Committee of Experts from the two sides. This cooperation shall include exchange of information and data regarding issues such as animal and plant diseases, pests, and scientific research.

 [*616]  5. The two sides shall each take appropriate measures in order to protect Nature Reserves, Protected Natural Assets and species of animals, plants and flowers of special breeds, as well as to implement rules of behavior in Nature Reserves.

6. Each side shall enforce, within the areas under its responsibility, the regulations pertaining to hunting, and in particular the prohibition on hunting of protected and endangered species.

7. The Israeli side shall coordinate with the Palestinian side activities in Area C, outside Settlements and military locations, which may change the existing status of this sphere.

   ARTICLE 26

   Parks

1. Powers and responsibilities in the sphere of Parks in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side including, inter alia, the establishment, administration, supervision, protection, and development of Parks.

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. Each side, within the area under its responsibility, shall implement rules of behavior in Parks, and shall take necessary measures to avoid detrimental impacts on the scenery, and natural and cultural attractions.

4. The two sides shall make arrangements, including in matters relating to finance, for the mutual recognition of multi-site tickets issued by either side.

5. The above is without prejudice to the provisions of Article 32 (Religious Sites) and Article 2 (Archaeology).

6. The Israeli side shall coordinate with the Palestinian side activities in Area C, outside Settlements and military locations, which may change the existing status of this sphere.

   ARTICLE 27

   Planning and Zoning

1. Powers and responsibilities in the sphere of Planning and Zoning in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This includes initiating, preparing, amending and abrogating Planning Schemes, and other legislation pertaining to issues regulated by Planning Schemes (hereinafter: "Planning Schemes") issuing building permits and supervising and monitoring building activities.

2. In Area C, powers and responsibilities related to the sphere of Planning and Zoning will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. a. The Palestinian side shall ensure that no construction close to the Settlements and military locations will harm,

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 108 of 157
Case 1:04-cv-02280-RJL   Document 350-36   Filed 01/29/16   Page 107 of 156

Page 106

36 I.L.M. 551, *616

damage or adversely affect them or the infrastructure serving them.

> b. Accordingly, when the Palestinian side considers that a proposed Planning Scheme pertains to construction which may fall within subparagraph a. above (in particular: waste disposal sites; electric power stations and projects regarding sewage, hazardous materials or which may have a polluting impact), it shall provide the CAC with a copy of such a Planning Scheme prior to its entry into force.

> > A sub-committee established by the CAC shall, upon request by the Israeli side, discuss such Planning Scheme. Pending the decision of the committee, planning procedures shall not be concluded and no building activity shall be carried out pursuant to the said Planning Scheme.

ARTICLE 28

Population Registry and Documentation

1. Powers and responsibilities in the sphere of population registry and documentation in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side.

2. The Palestinian side shall maintain and administer a population registry and issue certificates and documents of all types, in accordance with and subject to the provisions of this Agreement. To this end, the Palestinian side shall receive from Israel the population registry for the residents of the West Bank and the Gaza Strip in addition to files and records concerning them, as follows:

> - Notices of births.

> - Old handwritten records of births and deaths and the indexes from 1918 till 1981.

> - Photographs file with all its equipment.

> - All computer devices and equipment with all accessories (screens, printers and communications equipment).

3. A Joint Committee will be established to solve the reissuance of identity cards to those residents who have lost their identity cards.

 [*617]  4. The existing identity card of the present residents, as well as of new residents, shall be substituted by a new identity card with a new I.D. number. Such substituted identity cards shall be issued by the Palestinian side and shall bear its symbols. New identification numbers may be issued by the Palestinian side a year after the signing of this Agreement. The new identification numbers and the numbering system will be transferred to the Israeli side. All titles and values in such identity cards will be in Arabic and Hebrew, and the number of such identity cards will be in Arabic numerals (i.e. 0-9).

5. Possession of the aforementioned identity card, whether it was issued by the military government and its Civil Administration or substituted or issued by the Palestinian side, and any other necessary documents, notification of which will be given to the Palestinian side through the CAC, shall be required for entry into Israel by residents.

6. Safe passage between the Gaza Strip and the West Bank, as provided for in Annex I, shall require the possession of the aforementioned identity card, whether it was issued by the military government and its Civil Administration or substituted or issued by the Palestinian side, and any other necessary documents, notification of which will be given to the Palestinian side through the CAC.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 109 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 108 of 156

Page 107

36 I.L.M. 551, *617

7. Israel recognizes the validity of the Palestinian passports/travel documents issued by the Palestinian side to Palestinian residents of the West Bank and the Gaza Strip in accordance with the Gaza-Jericho Agreement and this Agreement. Such passports/travel documents shall entitle their holders to exit abroad through the passages or through Israeli points of exit.

8. The holder of a VIP Palestinian passport/travel document will pass the international passages free of the fees and will enjoy VIP treatment in the Israeli international exit points.

9. Special VIP certificates may be issued as concluded in the Protocol regarding Arrangements with respect to Passages of October 31, 1994, and in this Agreement.

10. In order to ensure efficient passage procedures and to avoid discrepancies and with a view to enabling Israel to maintain an updated and current registry, the Palestinian side shall provide Israel, on a regular basis through the CAC, with the following information regarding passports/travel documents and identity cards:

   a. With respect to passports/travel documents: full name, mother's name, ID number, date of birth, place of birth, sex, profession, passport/travel document number and date of issue and a current photograph of the person concerned.

   b. With respect to identity cards: identity card number, full name, mother's name, date of birth, sex and religion and a current photograph of the person concerned.

   The Palestinian side shall inform Israel of every change in its population registry, including, inter alia, any change in the place of residence of any resident.

11. To reflect the spirit of the peace process, the Palestinian side has the right, with the prior approval of Israel, to grant permanent residency in the West Bank and the Gaza Strip to:

   a. investors, for the purpose of encouraging investment;

   b. spouses and children of Palestinian residents; and

   c. other persons, for humanitarian reasons, in order to promote and upgrade family reunification.

12. The Palestinian side shall have the right to register in the population registry all persons who were born abroad or in the Gaza Strip and West Bank, if under the age of sixteen years and either of their parents is a resident of the Gaza Strip and West Bank.

13. a. Persons from countries not having diplomatic relations with Israel who visit the Gaza Strip and the West Bank shall be required to obtain a special visitor's permit to be issued by the Palestinian side and cleared by Israel. Requests for such permits shall be filed by any relative or acquaintance of the visitor, who is a resident, through the Palestinian side, or by the Palestinian side itself. All titles and values in such permits will be in English.

   b. Visitors to the Gaza Strip and the West Bank shall be permitted to remain in these areas for a period of up to three months granted by the Palestinian side and cleared by Israel. Such visitors can enter Israel during the validity of their visit permit, without any need for another permit.

      The Palestinian side may extend this three months period for an additional period of up to four months. The Palestinian side will notify Israel of this extension. Any further extensions require the approval of Israel.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 110 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 109 of 156
Page 108
36 I.L.M. 551, *617

The Palestinian side may, upon clearance by Israel, issue visitors' permits for the purpose of study or work, for a period of one year which may be extended by agreement with Israel. In any event, the duration of such visitors' permits shall not exceed the period of validity of the said visitors' passports or travel documents. The Palestinian side may grant permanent residency to the employees upon agreement with Israel.

14. Persons from countries having diplomatic relations with Israel who visit the Gaza Strip and the West Bank shall either be required to obtain the aforementioned visitor's permit or to hold a valid passport and an Israeli visa, when required. Such visitors can enter Israel during the validity of their visit permit, without any need for another permit.

15. The Palestinian side shall ensure that visitors referred to above shall not overstay the duration of their entry permit and authorized extensions.

16. The Palestinian side shall use, in the West Bank and the Gaza Strip, Palestinian revenue stamps and shall determine their required fees.

 [*618]  17. The CAC will establish a subcommittee to supervise the implementation of this Article.

ARTICLE 29

Postal Services

1. This sphere includes, inter alia, the planning, formulation and implementation of policies, as well as the management and supervision of post offices, postal services and all monetary transactions and activities in postal units (publicly known as "the Postal Bank").

2. The Palestinian side shall issue postage stamps and postal stationery (hereinafter "stamps"), date stamps and all other related materials, subject to the following provisions:

a. Stamps shall include only the terms "the Palestinian Council" or "the Palestinian Authority", the face value and the subject. Should date stamps include the name of the issuing authority, only the above-mentioned terms may be used.

b. The face value shall be stated only in one of the agreed legal currencies circulating in the West Bank and the Gaza Strip as detailed in Annex V (Protocol on Economic Relations).

c. The design, symbols, wording and subjects of stamps and date stamps issued by the Palestinian side will be in the spirit of the peace.

3. In setting postal rates for international postal services, both sides shall coordinate in such a way as to prevent mutual economic harm.

4. Both sides shall ensure the efficient transmission and delivery of postal items, including parcels, destined for or originating from the other side. Similarly, they shall ensure the efficient transmission and delivery of such postal items arriving from, or destined for, foreign countries.

5. The modalities and arrangements for sending and receiving all postal items, including parcels, between the two sides will be arranged by means of a commercial agreement between the Israel Postal Authority and the Palestinian side.

6. a. The modalities and arrangements for sending and receiving postal items, including parcels, between the Palestinian side and foreign countries, will be arranged by means of commercial agreements between the PLO, for the benefit of the

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 111 of 157
Case 1:04-cv-00280-RJL Document 330-36 Filed 01/29/16 Page 110 of 156

Page 109

36 I.L.M. 551, *618

Palestinian side, and the Postal Authorities of Jordan and Egypt, and a commercial agreement between the Palestinian side and the Israel Postal Authority.

> b. Without derogating from the generality of paragraph 5 of Article IX of this Agreement (Foreign Relations), the status of the Palestinian side to this Agreement in the Universal Postal Union will remain as it is at present, and the Palestinian side will not be party to any action to alter or change its status.

7. The relevant customs principles detailed in Annex V (Protocol on Economic Relations) shall also apply to postal items, including parcels, transmitted to the West Bank and the Gaza Strip.

ARTICLE 30

Public Works and Housing

1. Powers and responsibilities in the sphere of Public Works and Housing in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the maintenance and repair of roads and Housing Department affairs.

2. a. In Area C, powers and responsibilities related to the sphere of Public Works and Housing will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

> b. In exercising its powers and responsibilities in Area C, the Israeli side shall, as far as possible, employ Palestinians in carrying out road works.

3. a. The Palestinian side shall maintain the roads and be guided by international standards for road maintenance and construction, and shall ensure compatibility in said standards with neighboring countries. Additionally, the Palestinian side shall carry out any necessary works in order to ensure the proper condition of road infrastructure, including the cleaning of culverts and ditches, and shall keep the roads clear and free of all physical obstacles.

> b. Upon the request of the Israeli side, any necessary work stipulated in subparagraph a above may be carried out by either one side or the two sides together, after full coordination between them.

4. a. The Palestinian side shall notify the Israeli side and road users, in a reasonable time and prior to having significant activities which may disturb the regular flow of traffic on roads or which may affect infrastructure located in proximity to roads.

> b. Whenever both sides consider that the above activities affect the movement on roads or the infrastructure located in proximity to such roads, these activities shall be carried out in coordination between the Israeli and Palestinian sides.

5. A professional joint committee shall be established by the CAC to deal with issues requiring coordination and cooperation in this sphere, including the  [*619]  coordination of road works on roads in the West Bank serving both Palestinians and Israelis.

ARTICLE 31

Quarries and Mines

Case 1:18-cv-12855-MKV-DCF  Document 130-9  Filed 08/20/21  Page 113 of 157
Case 1:02-cv-02280-RJL  Document 350-36  Filed 01/29/16  Page 111 of 156

Page 110

36 I.L.M. 551, *619

1. Powers and responsibilities in the sphere of Quarries and Mines in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side including, inter alia, the licensing and supervision of the establishment, enlargement, and operation of quarries, crushing facilities and mines (hereinafter "quarries").

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. a. Rights of Israelis (including corporations owned by Israelis) regarding quarries situated within the areas under the territorial jurisdiction of the Palestinian side, which are not operative, may be purchased by the Palestinian side, with the consent of the Israeli concerned, through a joint committee which shall be established by the CAC for this purpose. The sum to be paid to each Israeli with regard to his rights in the said quarries shall be based upon the investments made by him in the site. The Israeli side shall freeze licenses to such quarries. Pursuant to the date of the signing of this Agreement, such quarries shall not become operative.

b. The above joint committee shall also discuss the issue of quarries operated or used by Israelis. The two sides shall respect the recommendations of this committee. Until the decision of the Committee, the Palestinian side shall not take any measures which may adversely affect these quarries.

c. The provisions of subparagraphs a. and b. will apply to quarries presently situated in Area C, as they come under the territorial jurisdiction of the Palestinian side, commensurate with the gradual transfer of powers and responsibilities in accordance with paragraph 2 above.

4. The Israeli side shall consider any request by Palestinian entrepreneurs to operate quarries in Area C on its merits.

ARTICLE 32

Religious Sites

1. Responsibility over sites of religious significance in the West Bank and the Gaza Strip (hereinafter - "Holy Sites") will be transferred to the Palestinian side. In Area C, this responsibility will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

2. Both sides shall respect and protect the listed below religious rights of Jews, Christians, Moslems and Samaritans:

a. protection of the Holy Sites;

b. free access to the Holy Sites; and

c. freedom of worship and practice.

3. a. The Palestinian side shall ensure free access to, respect the ways of worship in and not make any changes to, the Jewish Holy Sites listed in List No. 1 of Schedule 4.

b. The Palestinian side shall ensure free access to, and respect the ways of worship in, the Jewish Holy Sites listed in List No. 2 of Schedule 4.

c. Schedule 4 shall be updated commensurate with the gradual transfer of responsibility in accordance

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 113 of 157
Case 1:04-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 112 of 156

Page 111

36 I.L.M. 551, *619

with paragraph 1.

4. The holy site of Nebi Musa shall be under the auspices of the Palestinian side for religious purposes.

5. During religious events that take place three times a year and other special occasions that shall be coordinated with the Israeli authorities, Palestinians shall have the right to religious pilgrimage to the Al-Maghtas under the Palestinian flag. Safe passage will be provided from the Jericho Area to Al-Maghtas for this purpose.

ARTICLE 33

Social Welfare

1. Powers and responsibilities in the sphere of Social Welfare in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, all social services and the registration and supervision of local and international charitable societies.

2. Charitable, voluntary and non-profit organizations and institutions, whether local or international, should act in a manner that does not violate the laws in force.

3. Israeli and Palestinian social welfare systems shall cooperate with regard to the following:

 [*620]  a. Probation officers and preparation of briefs in connection with juvenile offenses.

 b. Exchanging social reports needed for juvenile offenders upon request.

 c. Arrangements to protect confidentiality and individual privacy in the exchange of information.

4. Both sides will maintain a positive working relationship in the field of professional training.

ARTICLE 34

Statistics

1. This sphere includes, inter alia, all phases of planning, producing and disseminating and archiving statistics from censuses and surveys in all areas of statistics including, but not limited to, demographic, social, economic, area, and environmental matters.

2. Israel shall transfer from the Civil Administration to the Palestinian side all the necessary material for maintaining and running the statistical system, such as:

 a. The estimation procedures, forms of questionnaires, manuals, coding manuals, procedures for and results of quality control measures and analysis of surveys.

 b. The statistical maps.

 c. The sampling frames, including the household listings.

 d. The basket of consumer goods and all related material, including the weights used for the CPI.

 e. Any other professional statistical materials whenever requested.

  Any other professional statistical means and methods used by the military government,

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/2021 Page 114 of 157
Case 1:04-cv-00200-RJL Document 330-36 Filed 01/29/16 Page 113 of 156

Page 112

36 I.L.M. 551, *620

Civil Administration, or on their behalf, shall also be transferred to the Palestinian side.

3. a. The Israeli side shall, through a Joint Committee to be established, transfer to the Palestinian side, if requested, any primary data from censuses and surveys, carried out by the military government, Civil Administration, or on their behalf, and archived administrative records used by the military government, Civil Administration, or on their behalf.

b. The Joint Committee shall decide upon the modalities and arrangements concerning the transfer of the above-mentioned materials.

4. Issues relating to the right to be included in the Population Registry are dealt with in Article 28 (Population Registry and Documentation).

5. The Israeli Central Bureau of Statistics and the Palestinian Central Bureau of Statistics will maintain good working relations and will cooperate in statistical matters.

ARTICLE 35

Surveying

1. Powers and responsibilities in the sphere of surveying in the West Bank and in the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, licensing of surveyors, carrying out of surveys and confirmation of survey maps.

2. In Area C, powers and responsibilities relating to the sphere of surveying will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. Each side shall preserve and ensure the location and adequate condition of triangulation points, traverse points and bench marks, located in the West Bank and in the Gaza Strip. The Israeli side shall provide the Palestinian side with all the necessary information regarding these points and marks.

4. The two sides shall establish a Joint Committee of Experts to deal with any needs that may arise.

ARTICLE 36

Telecommunications

A. General

1. This sphere includes, inter alia, the management and monitoring of the use of the radio frequency spectrum, the use of the geostationary satellite orbit, the planning, formulation and implementation of telecommunications policies, regulations and legal frameworks. The above shall be in accordance with, and subject to, the following provisions:

2. a. In Area C, although powers and responsibilities are transferred to the Palestinian side, any digging or building regarding telecommunications and any installation of telecommunication equipment, will be subject to prior confirmation of the Israeli side, through the CAC.

b. Notwithstanding paragraph a. above, the supply of telecommunications services in Area C to the Settlements and military locations, and the activities regarding the supply of such

Case 1:18-cv-12355-MKV-DCF  Document 130-9  Filed 08/20/21  Page 115 of 157
Case 1:02-cv-02280-RJL  Document 350-36  Filed 01/29/16  Page 114 of 156

Page 113

36 I.L.M. 551, *620

services, shall be under the powers and responsibilities of the Israeli side.

[*621]  B. Principles

1. Israel recognizes that the Palestinian side has the right to build and operate separate and independent communication systems and infrastructures including telecommunication networks, a television network and a radio network.

2. Without prejudice to subparagraph D.5.c. of this section, the Palestinian side has the right to establish satellite networks for various services, excluding international services.

3. The Palestinian side has the right to establish its own telecommunications policies, systems and infrastructures. The Palestinian side also has the right to choose any and all kinds of communication systems (including broadcasting systems) and technologies, suitable for its future in, inter alia, basic and value added services (including cellular telephony).

4. Operators and providers of services, presently and in the future, in the West Bank and the Gaza Strip shall be required to obtain the necessary approvals from the Palestinian side. In addition, all those operating and/or providing services, presently and in the future, in the West Bank and the Gaza Strip who wish to operate and/or provide services in Israel, are required to obtain the necessary approvals from the Israeli Ministry of Communications.

5. Both sides shall refrain from any action that interferes with the communication and broadcasting systems and infrastructures of the other side.

> Specifically, the Palestinian side shall ensure that only those frequencies and channels specified in Schedule 5: List of Approved Frequencies (herein - "Schedule 5") and Schedule 6: List of Approved TV Channels and the Location of Transmitters (herein - "Schedule 6") shall be used and that it shall not disturb or interfere with Israeli radio communication activity, and Israel shall ensure that there shall be no disturbance of or interference with the said frequencies and channels.

6. A joint committee of technical experts representing both sides shall be established to address any issue arising out of this section including the growing future needs of the Palestinian side (hereinafter referred to as "the Joint Technical Committee" or "JTC"). The JTC shall meet on a regular basis for the purpose of solving all relevant problems, and as necessary in order to solve urgent problems.

C. The Electromagnetic Sphere

1. The Palestinian side has the right to use the radio frequency spectrum, in accordance with principles acceptable to both sides, for present and future needs, and frequencies assigned or reassigned within the West Bank and the Gaza Strip covering all its required services within the bands L.F., M.F., H.F., V.H.F., U.H.F., S.H.F. and E.H.F. In order to satisfy the present needs of the Palestinian side, the frequencies detailed in Schedule 5 are assigned for the use of the Palestinian side in the West Bank and the Gaza Strip.

2. Future needs for frequencies shall be agreed upon by the two sides. To that end, the Palestinian side shall present its requirements through the JTC which must fulfill these requirements within a period not exceeding one month.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 116 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 115 of 156

Page 114

36 I.L.M. 551, *621

Frequencies or sections of frequencies shall be assigned, or an alternative thereto
providing the required service within the same band, or the best alternative thereto
acceptable by the Palestinian side, and agreed upon by Israel in the JTC.

3. a. The frequencies specified in Schedule 5 shall serve, inter alia, for the transmission of a television
network and a radio network.

b. The television channels and locations of transmitters to be used by the Palestinian side
are specified in Schedule 6. The production studios and related broadcasting equipment
shall be located in the West Bank and the Gaza Strip.

c. The radio transmitter shall be located in the area of Ramallah and Al-Bireh Cities, at the
presently agreed site.

d. The Palestinian side has the right to change the location(s) of radio transmitters
according to an agreement between the two sides through the JTC, to serve the Palestinian
plans in achieving the best coverage.

D. Telecommunications

1. Pending the establishment of an independent Palestinian telephone network, the Palestinian side shall
enter into a commercial agreement with Bezeq - The Israel Telecommunications Corp. Ltd. (herein,
"Bezeq"), regarding supply of certain services in the West Bank and the Gaza Strip. In the area of
international telephony, commercial agreement(s) shall be concluded with Bezeq or other duly-licensed
Israeli companies.

The above shall be without prejudice to subparagraph 5.c below.

2. As long as the Palestinian network is integrated with the Israeli network, the Palestinian side shall use
such telephonic equipment as is compatible with the standards adopted and applied in Israel by the
Ministry of Communications, and will coordinate with the Israeli side any changes to the structure and
form of telephone exchanges and transmission equipment. The Palestinian side shall be permitted to
import and use any and all kinds of telephones, fax machines, answering machines, modems and data
terminals, without having to comply with the above-mentioned standards (accordingly, lists A1 and A2
of Annex V (Protocol on Economic Relations) will be updated). Israel recognizes and understands that
for the  [*622]  purpose of building a separate network, the Palestinian side has the right to adopt its own
standards and to import equipment which meets these standards (accordingly, lists A1 and A2 of Annex
V (Protocol on Economic Relations) will be updated). The equipment will be used only when the
independent Palestinian network is operational.

3. a. The Palestinian side shall enable the supply of telecommunications services to the Settlements and
the military installations by Bezeq, as well as the maintenance by Bezeq of the telecommunications
infrastructure serving them and the infrastructure crossing the areas under the territorial jurisdiction of
the Palestinian side.

b. The Israeli side shall enable the supply of telecommunications services to the
geographically-dispersed areas within the West Bank and the Gaza Strip. This shall
include provision, subject to the approval of the proper Israeli authorities, free of charge,
of rights of way or sites in the West Bank for microwave repeater stations and cables to
interlink the West Bank and to connect the West Bank with the Gaza Strip.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 117 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 116 of 156

Page 115

36 I.L.M. 551, *622

c. Israel recognizes the right of the Palestinian side to establish telecommunications links (microwave and physical) to connect the West Bank and the Gaza Strip through Israel. The modalities of establishing such telecommunications connections, and their maintenance, shall be agreed upon by the two sides. The protection of the said connections shall be under the responsibility of Israel.

4. Without prejudice to paragraph 3 above:

a. The Palestinian side shall take the necessary measures to ensure the protection of the telecommunications infrastructures serving Israel, the Settlements and the military installations, which are located in the areas under the territorial jurisdiction of the Palestinian side.

b. The Israeli side shall take the necessary measures to ensure the protection of the telecommunications infrastructures serving the West Bank and the Gaza Strip and which are located in areas under Israel's responsibility.

5. a. The Palestinian side has the right to collect revenue for all internal and international telecommunications services originating and terminating in the West Bank and the Gaza Strip (except Settlements and military locations).

b. Details regarding payment by the Palestinian side to Bezeq or other duly-licensed Israeli companies, and compensation by Bezeq or the said companies to the Palestinian side, referred to in subparagraph a. above, shall be agreed upon in the commercial agreement(s) between them.

c. The provisions of subparagraphs a. and b. above will be applied between the sides until such time as the two sides agree upon installation and operation of an "international gateway", as well as the international code, for the Palestinian side and the actual commencement of operation of the said gateway.

d. The Palestinian side shall enter into a discussion with Bezeq for the purpose of coming to an agreement for the use of a separate area code and numbering plan, pending the establishment of a separate Palestinian network.

6. The Palestinian side has the right to collect taxes on all telecommunications services billed in the West Bank and the Gaza Strip, subject to the provisions of Annex V (Protocol on Economic Relations).

7. a. The Israeli side shall provide the Palestinian side with all operating, maintenance and system manuals, information regarding billing systems and all operating and computer programming protocols of all the equipment that will be transferred to the Palestinian side, subject to protection of rights of commercial confidentiality.

b. The Israeli side shall also supply the Palestinian side with all contractual agreements between the Civil Administration and all domestic and international entities in the area of telecommunications. The timing of the provision of the above mentioned materials will be as provided for in this Annex.

c. Bezeq, in accordance with the commercial agreement, will supply the Palestinian side with all legal verification of its purported ownership of any and all movable or immovable

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 118 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 117 of 156

Page 116

36 I.L.M. 551, *622

assets in the West Bank and the Gaza Strip, that are not part of the Civil Administration's present network.

ARTICLE 37

Tourism

1. Powers and responsibilities in the sphere of Tourism in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side.

This sphere includes, inter alia, regulating, licensing, classifying, and supervising tourist services, sites and industries. It also includes promoting foreign and domestic tourism and developing the Palestinian tourist sources and sites. It includes, as well, supervising the marketing, promotion and information activities related to foreign and domestic tourism.

2. In Area C, while powers and responsibilities regarding the development of visitors' interest in tourist sites and the encouragement of the development of tourist services around them, in coordination with the Israeli side, will be transferred during the first phase of redeployment, other powers and responsibilities regarding those sites will be transferred gradually to Palestinian [*623] jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. Tourism issues are dealt with in Article X of Annex V (Protocol on Economic Relations).

4. Without derogating from the provisions of paragraph 9 of Article X of Annex V (Protocol on Economic Relations), a Joint Committee, established through the CAC, shall facilitate coordination and cooperation on day to day tourism issues.

ARTICLE 38

Transportation

General

Powers and responsibilities relating to transportation in the West Bank and the Gaza Strip will be transferred from the Israeli military government and its Civil administration to the Palestinian side subject to the following:

1. This sphere includes, inter alia, the licensing and supervision of drivers and vehicles, freight transportation, public transportation, traffic supervision, setting appropriate standards for transportation, meteorology, and others.

2. High and appropriate transportation safety standards and environmental quality shall serve as the basis for cooperation and agreement in this sphere.

3. The Palestinian side in this sphere shall follow international standards such as the European Standard, as applied in the area. Such standards and regulations shall be continuously adapted to reflect technological developments and advances as well as safety and environmental considerations.

4. The arrangements regarding the transfer of powers and responsibilities concerning maritime activity and aviation are dealt with according to the provisions of this Agreement.

Drivers' and Vehicle Licensing

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/26/21   Page 119 of 157
Case 1:02-cv-02280-RJL   Document 350-36   Filed 01/29/16   Page 118 of 156

Page 117

36 I.L.M. 551, *623

5. Instruction, training and licensing in all fields relating to transportation, including drivers' testing, training and licensing will be conducted at a minimum, in accordance with existing standards.

6. The Palestinian side shall issue drivers' and vehicle licenses as well as license plates according to the format and standards currently in use and as set out in Schedule 7 to be attached to this Appendix as agreed upon between the sides.

7. To facilitate the entry of vehicles registered by the Palestinian side into Israel, the Palestinian side will periodically forward to the Israeli side through the CAC, updated information regarding drivers and vehicles registered by it.

Traffic Supervision

8. Signalization and Traffic Arrangements

    a. The Palestinian side shall have powers and responsibilities regarding traffic signalization and traffic arrangements in the areas under its territorial jurisdiction and shall cooperate with the Israeli side concerning related activities that may disturb traffic arrangements.

    b. All traffic signalization, including the posting of road signs, markings and traffic arrangements, shall be in accordance with international standards as applied in the area and where a written warning or message on a sign is required, such a warning or message shall be written in the Arabic, Hebrew and English languages.

9. Public Transportation Permits

    a. Powers and responsibilities regarding Israeli public transportation to and between Israel and the Settlements and military locations shall be exercised by Israel.

    b. Powers and responsibilities regarding Palestinian public transportation to, between and within the West Bank and the Gaza Strip shall be exercised by the Palestinian side. Arrangements for the use of safe passage for this purpose are set out in Annex I.

10. Public Transportation Routes

    a. Palestinian public transportation routes in the West Bank and Gaza Strip, except into Settlements and military locations, shall be determined by the Palestinian side.

    b. Israeli public transportation routes from Israel to and between Settlements and military locations, and/or to other places in Israel, shall be determined by Israel.

    c. Public transportation routes will be as short and safe as possible.

11. Bus Stops

    a. Bus stops designated for the boarding and alighting of passengers in the areas under Palestinian territorial jurisdiction shall be determined by the Palestinian side.

    b. Bus stops at the main junctions leading to Settlements and military locations or Palestinian villages in the West Bank will be determined in cooperation between Israeli and Palestinian traffic controllers.

    c. Existing bus stops will be kept at Jewish Holy Sites.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/26/21 Page 120 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 119 of 156

Page 118

36 I.L.M. 551, *624

[*624] Vehicles and Vehicle Maintenance

12. Israel and the Palestinian side shall cooperate for the purpose of maintaining safety standards, technical know how and professional training, and shall exchange information regarding the maintenance, repair and servicing of vehicles, based on international standards as applied in the area.

13. Without derogating from other provisions of this Agreement, any vehicle prototype imported by the Palestinian side which has not been tested and approved by Israel, will be permitted to enter Israel and the West Bank and the Gaza Strip provided that such vehicle prototype is tested and approved by an authorized laboratory facility recognized by both sides, applying standards used in the European Union as applied in the area.

14. All types of vehicles and automotive products manufactured by the Palestinian side shall be tested and approved for use by an authorized laboratory recognized by both sides, prior to their entry into Israel and the West Bank or the Gaza Strip.

15. The import of vehicles by the Palestinian side shall be according to Annex V, Article III, paragraphs 10 and 11.

16. The issue of the transfer of car ownership will be discussed between the Ministries of Transportation of the two sides immediately after the signing of this Agreement.

Freight Transportation

17. Vehicles for transporting freight that are registered by the Palestinian side shall be permitted to enter Israel subject to the provisions regarding entry into Israel, the applicable Israeli laws and regulations governing the transportation of freight by motor vehicle, and the provisions set out in Schedule 7.

Transportation of Dangerous Substances

18. a. The provisions of Article 15, paragraph 5.a. and b. on transportation of gas, fuel and petroleum shall be applicable to the transportation of all dangerous substances.

    b. The above provisions shall be applicable with respect to the transportation of dangerous substances, except household gas and fuel and petroleum products for vehicles, on roads in the West Bank and Gaza Strip directly leading to Settlements and military locations.

    c. In addition to the provisions of sub-paragraph a. above, the transportation within Israel and on roads in the West Bank and Gaza Strip, of dangerous substances classified as "most dangerous substances" as listed in current U.N. publications, will require a permit signed by both traffic controllers.

Public Transportation from the West Bank and the Gaza Strip to and from Jordan and Egypt

19. Both sides agree in principle to the operation of public transportation from the West Bank and the Gaza Strip to and from Jordan and Egypt. Procedures and arrangements, including lines, will be detailed in Schedule 7.

Meteorology

20. Both sides agree on a wide range of cooperation in the sphere of meteorology and, in particular, regarding the updating of weather forecasts, data processing, and the transfer of information. The Israeli side shall provide meteorological services to the Palestinian side in the following fields: aviation, maritime, synoptic stations, weather forecasting, vocational training, etc.

Subcommittee for Transportation

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 121 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 120 of 156

Page 119

36 I.L.M. 551, *624

21. Details regarding the implementation of the provisions of this Section, as well as all other matters regarding transportation between the two sides shall be formulated by the Subcommittee of the CAC for Transportation.

ARTICLE 39

Treasury

1. The transfer of the powers and responsibilities from the Civil Administration to the Council in this sphere shall include providing the available details concerning the Civil Administration's budgets, revenues, expenses and accounts.

> Israel will provide the Council with all the necessary information, manuals, forms, operating procedures, etc., of the Civil Administration's financial system, which are relevant for the smooth and orderly transfer of powers and responsibilities in this sphere and for their operation by the Council.

2. The Israeli side shall transfer to the Council, as soon as possible but not later than nine months after the date of the transfer of the powers and responsibilities, the remaining surplus of the Civil Administration's budget.

3. a. Israel shall provide the Council with a list of the Civil Administration departments and their immovable offices, storerooms, warehouses, etc., located in the areas under the territorial jurisdiction of the Council.

> b. Where such immovables are situated on private property, including property owned by absentees, Israel shall provide the Council with the contracts made between the Civil Administration and the owners of such property.

 [*625]  4. a. The Civil Administration shall bring to an end all its services and development contracts, and will bear the liability directly arising from such termination.

> b. Civil Administration lease or rental contracts with the Waqf, the Custodian of Absentee Property or private property owners in the areas under the territorial jurisdiction of the Council, will be transferred to the Council.

> c. All land and property lease and rental contracts entered into by the Custodian of Absentee and Governmental Property relating to the areas under the territorial jurisdiction of the Council will be transferred to the Council. Israel shall give notice of such transfer to the tenants and lessees.

5. Without derogating from the above provisions, upon the transfer of powers and responsibilities. Israel will cease to bear any financial responsibility regarding contracts of the Civil Administration and the Council will bear all financial responsibility for them, in accordance with Article XX of the Agreement (Rights, Liabilities and Obligations).

ARTICLE 40

Water and Sewage

On the basis of good-will, both sides have reached the following agreement in the sphere of Water and Sewage:

Principles

1. Israel recognizes the Palestinian water rights in the West Bank. These will be negotiated in the permanent status negotiations and settled in the Permanent Status Agreement relating to the various water resources.

2. Both sides recognize the necessity to develop additional water for various uses.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 122 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 121 of 156

Page 120

36 I.L.M. 551, *625

3. While respecting each side's powers and responsibilities in the sphere of water and sewage in their respective areas, both sides agree to coordinate the management of water and sewage resources and systems in the West Bank during the interim period, in accordance with the following principles:

a. Maintaining existing quantities of utilization from the resources, taking into consideration the quantities of additional water for the Palestinians from the Eastern Aquifer and other agreed sources in the West Bank as detailed in this Article.

b. Preventing the deterioration of water quality in water resources.

c. Using the water resources in a manner which will ensure sustainable use in the future, in quantity and quality.

d. Adjusting the utilization of the resources according to variable climatological and hydrological conditions.

e. Taking all necessary measures to prevent any harm to water resources, including those utilized by the other side.

f. Treating, reusing or properly disposing of all domestic, urban, industrial, and agricultural sewage.

g. Existing water and sewage systems shall be operated, maintained and developed in a coordinated manner, as set out in this Article.

h. Each side shall take all necessary measures to prevent any harm to the water and sewage systems in their respective areas.

i. Each side shall ensure that the provisions of this Article are applied to all resources and systems, including those privately owned or operated, in their respective areas.

Transfer of Authority

4. The Israeli side shall transfer to the Palestinian side, and the Palestinian side shall assume, powers and responsibilities in the sphere of water and sewage in the West Bank related solely to Palestinians, that are currently held by the military government and its Civil Administration, except for the issues that will be negotiated in the permanent status negotiations, in accordance with the provisions of this Article.

5. The issue of ownership of water and sewage related infrastructure in the West Bank will be addressed in the permanent status negotiations.

Additional Water

6. Both sides have agreed that the future needs of the Palestinians in the West Bank are estimated to be between 70 - 80 mcm/year.

7. In this framework, and in order to meet the immediate needs of the Palestinians in fresh water for domestic use, both sides recognize the necessity to make available to the Palestinians during the interim period a total quantity of 28.6 mcm/year, as detailed below:

a. Israeli Commitment:

(1) Additional supply to Hebron and the Bethlehem area, including the construction of the required

Case 1:18-cv-12355-MKV-DCF  Document 130-9  Filed 08/26/21  Page 123 of 157
Case 1:02-cv-02280-RJL  Document 350-36  Filed 01/29/16  Page 122 of 156

Page 121

36 I.L.M. 551, *625

pipeline - 1 mcm/year.

(2) Additional supply to Ramallah area - 0.5 mcm/year.

(3) Additional supply to an agreed take-off point in the Salfit area - 0.6 mcm/year.

(4) Additional supply to the Nablus area - 1 mcm/year.

(5) The drilling of an additional well in the Jenin area - 1.4 mcm/year.

 [*626]  (6) Additional supply to the Gaza Strip - 5 mcm/year.

(7) The capital cost of items (1) and (5) above shall be borne by Israel.

b. Palestinian Responsibility:

(1) An additional well in the Nablus area - 2.1 mcm/year.

(2) Additional supply to the Hebron, Bethlehem and Ramallah areas from the Eastern Aquifer or other agreed sources in the West Bank - 17 mcm/year.

(3) A new pipeline to convey the 5 mcm/year from the existing Israeli water system to the Gaza Strip. In the future, this quantity will come from desalination in Israel.

(4) The connecting pipeline from the Salfit take-off point to Salfit.

(5) The connection of the additional well in the Jenin area to the consumers.

(6) The remainder of the estimated quantity of the Palestinian needs mentioned in paragraph 6 above, over the quantities mentioned in this paragraph (41.4 - 51.4 mcm/year), shall be developed by the Palestinians from the Eastern Aquifer and other agreed sources in the West Bank. The Palestinians will have the right to utilize this amount for their needs (domestic and agricultural).

8. The provisions of paragraphs 6-7 above shall not prejudice the provisions of paragraph 1 to this Article.

9. Israel shall assist the Council in the implementation of the provisions of paragraph 7 above, including the following:

a. Making available all relevant data.

b. Determining the appropriate locations for drilling of wells.

10. In order to enable the implementation of paragraph 7 above, both sides shall negotiate and finalize as soon as possible a Protocol concerning the above projects, in accordance with paragraphs 18-19 below.

The Joint Water Committee

11. In order to implement their undertakings under this Article, the two sides will establish, upon the signing of this Agreement, a permanent Joint Water Committee (JWC) for the interim period, under the auspices of the CAC.

12. The function of the JWC shall be to deal with all water and sewage related issues in the West Bank including, inter alia:

a. Coordinated management of water resources.

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 124 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 124 of 156

Page 122

36 I.L.M. 551, *626

b. Coordinated management of water and sewage systems.

c. Protection of water resources and water and sewage systems.

d. Exchange of information relating to water and sewage laws and regulations.

e. Overseeing the operation of the joint supervision and enforcement mechanism.

f. Resolution of water and sewage related disputes.

g. Cooperation in the field of water and sewage, as detailed in this Article.

h. Arrangements for water supply from one side to the other.

i. Monitoring systems. The existing regulations concerning measurement and monitoring shall remain in force until the JWC decides otherwise.

j. Other issues of mutual interest in the sphere of water and sewage.

13. The JWC shall be comprised of an equal number of representatives from each side.

14. All decisions of the JWC shall be reached by consensus, including the agenda, its procedures and other matters.

15. Detailed responsibilities and obligations of the JWC for the implementation of its functions are set out in Schedule 8.

Supervision and Enforcement Mechanism

16. Both sides recognize the necessity to establish a joint mechanism for supervision over and enforcement of their agreements in the field of water and sewage, in the West Bank.

17. For this purpose, both sides shall establish, upon the signing of this Agreement, Joint Supervision and Enforcement Teams (JSET), whose structure, role, and mode of operation is detailed in Schedule 9.

Water Purchases

18. Both sides have agreed that in the case of purchase of water by one side from the other, the purchaser shall pay the full real cost incurred by the supplier, including the cost of production at the source and the conveyance all the way to the point of delivery. Relevant provisions will be included in the Protocol referred to in paragraph 19 below.

19. The JWC will develop a Protocol relating to all aspects of the supply of water from one side to the other, including, inter alia, reliability of supply, quality of supplied water, schedule of delivery and off-set of debts.

[*627] Mutual Cooperation

20. Both sides will cooperate in the field of water and sewage, including, inter alia:

a. Cooperation in the framework of the Israeli-Palestinian Continuing Committee for Economic Cooperation, in accordance with the provisions of Article XI and Annex III of the Declaration of Principles.

b. Cooperation concerning regional development programs, in accordance with the provisions of Article XI and Annex IV of the Declaration of Principles.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 125 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 124 of 156

Page 123

36 I.L.M. 551, *627

c. Cooperation, within the framework of the joint Israeli-Palestinian-American Committee, on water production and development related projects agreed upon by the JWC.

d. Cooperation in the promotion and development of other agreed water-related and sewage-related joint projects, in existing or future multilateral forums.

e. Cooperation in water-related technology transfer, research and development, training, and setting of standards.

f. Cooperation in the development of mechanisms for dealing with water-related and sewage related natural and man-made emergencies and extreme conditions.

g. Cooperation in the exchange of available relevant water and sewage data, including:

(1) Measurements and maps related to water resources and uses.

(2) Reports, plans, studies, researches and project documents related to water and sewage.

(3) Data concerning the existing extractions, utilization and estimated potential of the Eastern, North-Eastern and Western Aquifers (attached as Schedule 10).

Protection of Water Resources and Water and Sewage Systems

21. Each side shall take all necessary measures to prevent any harm, pollution, or deterioration of water quality of the water resources.

22. Each side shall take all necessary measures for the physical protection of the water and sewage systems in their respective areas.

23. Each side shall take all necessary measures to prevent any pollution or contamination of the water and sewage systems, including those of the other side.

24. Each side shall reimburse the other for any unauthorized use of or sabotage to water, and sewage systems situated in the areas under its responsibility which serve the other side.

The Gaza Strip

25. The existing agreements and arrangements between the sides concerning water resources and water and sewage systems in the Gaza Strip shall remain unchanged, as detailed in Schedule 11.

SCHEDULE 1

Archaeological Sites of Importance to the Israeli Side

Pursuant to Article 2, paragraph 9 of this Appendix:

1. The Samoa/Synogog/Ashtamaa
2. The Maon Synagogue/Ma'in
3. The Synagogue in Yata
4. Tel Rumeida (Tomb of Yishai and Ruth in Biblical Hebron)
5. Betar/Batir
6. The Hasmonean Palaces
7. Sebastia/Samaria

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 126 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 125 of 156

Page 124

36 I.L.M. 551, *627

8. Elonei Mamre/Haram Er-Rameh
9. The Naaran Synagogue - Ein Diuk
10. The Jewish Cemetry in Tel Sammarat
11. The "Shalom Al Israel" Synagogue in Jericho
12. The Jewish Synagogue in Gaza City.

   SCHEDULE 2

Pursuant to Article 12, paragraph 7 of this Appendix:

1. Power plants (including gas turbines, substations and super tension lines).

2. Quarries and mines (including expansion of existing quarries and mines).

3. Waste water treatment plants including main sewers.

4. Solid waste disposal sites.

5. Hazardous waste disposal sites.

6. Plants producing, storing, or using hazardous substances.

 [*628]  7. Airports and landing strips.

8. Seaports, jetties and harbors.

9. Refineries.

10. Industrial parks.

11. Major dams and reservoirs.

12. Major roads.

   SCHEDULE 3

Pursuant to Article 17, paragraph 2 of this Appendix:

Vaccinations

The routine vaccination system carried out in the West Bank and the Gaza Strip including:

A) Vaccinations for infants:
1. Vaccination against Hepatitis B:

       I To an infant born in a hospital or in a maternity home: at the ages of 0, 1, 6, months.

       II To an infant born at home: at the ages of 1, 2, 6 months.


2. Triple vaccination against Diptheria, Pertussis and Tetanus (DPT):

     Given at the ages of 2, 4, 6, 12 months.

3. Vaccination against Poliomyelitis (Polio):

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 127 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 126 of 156

Page 125

36 I.L.M. 551, *628

Sabin vaccine (OPV) given at the ages of 4, 6, 12 months.

Salk vaccine (IPV) given at the ages of 2, 4, 12 months.

Note: If, in the future, we will revert to the quadruplex vaccination method which combines DPT with the Salk vaccine against Polio, the method will be: Quadruplex (IPV + DPT): at the ages of 2, 4, 12 months.

DPT: at the age of 6 months.

4. Triple vaccination against Measles, Mumps, Rubella (MMR):

Given at the age of 15 months.

(Note: It is necessary to point out that UNRWA gives an additional dose of the Measles vaccine, at the age of 9 months - within the boundaries of the refugee camps).

B) Vaccinations for children and youth:

1. Against Poliomyelitis (OPV = SABIN) at the age of 6 years.

2. Against Measles - at the age of 6 years.

3. Against Tuberculosis - given BCG (after a Tuberculin test = Mantoux test) at the age of 6 years.

(Note: It is necessary to note that UNRWA gives an additional dose of the BCG vaccine immediately after birth).

4. Vaccination against Diptheria and Tetanus - DT (at special concentration suitable for children) is given as a booster vaccination at the age of 6 years.

An additional booster vaccination - dT (at a special concentration suitable for adults) is given at the age of 15 years.

5. Against Rubella, for girls only, at the age of 12 years.

C) Vaccination against Tetanus for pregnant women:

Tetanus Toxoid vaccination is given in order to avoid Tetanus Neonatorum.

First dose is given at the beginning of the second third of the pregnancy (in the fourth or fifth month) and a second dose before the birth (during the eighth month of pregnancy).

D) Vaccination against Hepatitis B for specific members of the population:

1. A newborn whose mother was found to be suffering with Hepatitis B during her pregnancy or is a carrier of the disease (discovered after a routine test for this disease in pregnant women) - receives vaccination against Hepatitis B. The vaccination is given a number of days after the birth and includes an active and passive vaccine: HBV and HBIG.

2. The husband of a pregnant woman who is sick or is a carrier of the disease (who was checked for Hepatitis B and found healthy) - receives an active vaccination - HBV.

3. Hospital workers, including nurses, technicians and others, who come into contact with blood intensively: in laboratories, haemodialysis units, intensive care units, operating theaters, delivery rooms and emergency rooms, as well

Case 1:18-cv-12355-MKV-DCF  Document 130-9  Filed 08/20/21  Page 128 of 157
Case 1:04-cv-00280-RJL  Document 330-36  Filed 01/29/16  Page 127 of 156

Page 126

36 I.L.M. 551, *628

as dentists - receive the active vaccination HBV.

E) Vaccination against Meningococcal Meningitis type A:

Given to pilgrims to Saudi Arabia, 10 days before their departure via the Jordan River bridges.

[*629]  SCHEDULE 4

Pursuant to Article 32, paragraph 3 of this Appendix:

List No. 1

1. Elazar's Tomb, Ittamar's Tomb, and the Tomb of the 70 Elders in Awarta
2. Joshua's Tomb in Kifel-Hares
3. The Cave of Othniel ben Knaz in Hebron
4. The Eshtamoa Synagogue in Samoa
5. The Yata Synagogue
6. Batir
7. Sebastia/Samaria

List No. 2

1. Nun's Tomb and Caleb's Tomb in Kifel-Hares
2. The Tombs of Natan the Prophet and Gad the Seer in Halhul
3. The Naran Synagogue - Ein Duk
4. The Jewish Cemetery in Sammerat
5. The Synagogue in Gaza City

SCHEDULE 5

List of Approved Frequencies

Pursuant to Article 36, paragraph B.5 of this Appendix:

1. L.F.

As soon as any need arises.

2. M.F.

Broadcast network.

Ramallah - 675khz

3. H.F.

To use it freely.

4. V.H.F.

41. V.H.F. - F.M. broadcast

V.H.F. - F.M. broadcast network composed of 8 locations. The specific 8 frequencies will be assigned not later than six months from the date of signing this Agreement.

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/30/21   Page 129 of 157
Case 1:04-cv-00280-RJL   Document 330-36   Filed 01/29/16   Page 128 of 156

Page 127

36 I.L.M. 551, *629

4.2 V.H.F. - maritime local services

Assignment of frequencies for vessels and fixed stations is subject to the provisions of Annex I and of Article 38 (Transportation).

4.3 V.H.F. - aeronautical local services

Assignment of frequencies for airplanes and fixed stations is subject to the provisions of Annex I and of Article 38 (Transportation).

4.4 V.H.F. - mobile services

Assignment of frequencies for use for mobile and fixed services of Police, Civil and Official networks and other users, in the West Bank and the Gaza Strip is as follows:

4.4.1 Qalqilya

* 1) 150.250

* 2) 155.6625

3) 150.3875

4) 150.425

5) 155.5625

6) 162.500

7) 162.525

8) 162.5625

9) 162.6125

10) 162.6625

11) 162.6875

12) 167.5375

13) 167.575

14) 167.6125

15) 167.650

16) 167.6875

4.4.2 Tulkarm

* 1) 150.2375

* 2) 155.650

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 130 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 129 of 156

Page 128

36 I.L.M. 551, *629

3) 150.3125

4) 150.3375

5) 150.3625

6) 155.575

7) 155.750

8) 162.5125

9) 162.575

10) 162.625

11) 162.650

12) 162.675

13) 167.475

14) 167.525

15) 167.5875

16) 167.6625

4.4.3 Jenin

* 1) 150.2125

* 2) 155.625

3) 150.2625

4) 150.400

5) 150.4375

6) 155.5375

7) 155.600

8) 155.675

9) 155.725

10) 155.7625

11) 162.475

12) 162.550

13) 162.600

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 131 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 130 of 156

Page 129

36 I.L.M. 551, *629

14) 167.500

15) 167.550

16) 167.625

4.4.4 Nablus

* 1) 150.225

* 2) 150.350

* 3) 155.6375

4) 150.2875

5) 150.300

6) 150.325

7) 150.375

8) 150.4125

9) 150.450

10) 155.550

11) 155.5875

12) 155.6215

13) 155.700

14) 155.7125

15) 155.7375

16) 155.775

17) 162.4875

18) 162.5375

19) 162.5875

20) 162.6375

21) 167.4875

22) 167.5125

23) 167.5625

24) 167.600

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 132 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 131 of 156

Page 130

36 I.L.M. 551, *629

25) 167.6375

26) 167.675

 [*630]  4.4.5 Ramallah

* 1) 150.2625

* 2) 150.3625

* 3) 155.675

4) 150.2125

5) 150.2375

6) 150.3125

7) 150.400

8) 150.4375

9) 155.5375

10) 155.575

11) 155.600

12) 155.625

13) 155.650

14) 155.725

15) 155.7625

16) 162.475

17) 162.5125

18) 162.550

19) 162.575

20) 162.600

21) 162.625

22) 162.650

23) 162.675

24) 167.475

25) 167.500

Case 1:18-cv-12855-MKV-DCF  Document 130-9  Filed 08/20/21  Page 133 of 157
Case 1:02-cv-02280-RJL  Document 330-36  Filed 01/29/16  Page 132 of 156

Page 131

36 I.L.M. 551, *630

26) 167.525

27) 167.550

28) 167.5875

29) 167.625

30) 167.6625

4.4.6 Bethlehem

* 1) 150.2875

* 2) 155.700

3) 150.325

4) 150.375

5) 150.4125

6) 150.450

7) 155.550

8) 155.5875

9) 155.6215

10) 155.7375

11) 162.4875

12) 162.5375

13) 162.5875

14) 162.6375

15) 167.4875

16) 167.5125

17) 167.5625

18) 167.600

19) 167.6375

20) 167.675

4.4.7 Gaza

* 1) 150.3125

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 134 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 133 of 156

Page 132

36 I.L.M. 551, *630

\* 2) 155.725

\* 3) 155.7625

4) 150.2125

5) 150.2375

6) 150.2625

7) 150.3625

8) 150.400

9) 150.4375

10) 155.5375

11) 155.575

12) 155.600

13) 155.625

14) 155.650

15) 155.675

16) 162.475

17) 162.5125

18) 162.550

19) 162.575

20) 162.600

21) 162.625

22) 162.650

23) 162.675

24) 167.475

25) 167.500

26) 167.525

27) 167.550

28) 167.5875

29) 167.625

Case 1:18-cv-12855-MKV-DCF  Document 130-9  Filed 08/20/21  Page 135 of 157
Case 1:02-cv-02280-RJL  Document 350-36  Filed 01/29/16  Page 134 of 156

Page 133

36 I.L.M. 551, *630

30) 167.6625

4.4.8 Khan Yunis

* 1) 150.325

* 2) 155.7375

3) 150.375

4) 150.4125

5) 150.450

6) 155.550

7) 155.5875

8) 155.6215

9) 162.4875

10) 162.5375

11) 162.5875

12) 162.6375

13) 167.4875

14) 167.5625

15) 167.6375

16) 167.675

4.4.9 Rafah

* 1) 150.3375

* 2) 155.750

3) 150.3875

4) 150.425

5) 155.5625

6) 162.500

7) 162.525

8) 162.5625

9) 162.6125

Case 1:18-cv-12855-MKV-DCF   Document 136-9   Filed 08/20/21   Page 136 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 135 of 156

Page 134

36 I.L.M. 551, *630

10) 162.6625

11) 162.6875

12) 167.5375

13) 167.575

14) 167.6125

15) 167.650

16) 167.6875

4.4.10 Jericho

* 1) 150.275

* 2) 155.6875

3) 150.3875

4) 150.425

5) 155.5625

6) 162.500

7) 162.525

8) 162.5625

9) 162.6125

10) 162.6625

11) 162.6875

12) 167.5375

13) 167.575

14) 167.6125

15) 167.650

16) 167.6875

4.4.11 Hebron

* 1) 150.300

* 2) 155.7125

* 3) 155.775

Case 1:18-cv-12655-MKV-DCF Document 130-9 Filed 08/20/21 Page 137 of 157
Case 1:02-cv-02280-RJL Document 350-36 Filed 01/29/16 Page 136 of 156

Page 135

36 I.L.M. 551, *630

4) 150.225

5) 150.250

6) 150.275

7) 150.3375

8) 150.350

9) 150.3875

10) 150.425

11) 155.5625

12) 155.6375

13) 155.6625

14) 155.6875

15) 155.750

16) 162.500

17) 162.525

18) 162.5625

19) 162.6125

20) 162.6625

21) 162.6875

22) 167.5375

23) 167.575

24) 167.6125

25) 167.650

26) 167.6875

Notice: (1) The frequencies marked with (*) are assigned for exclusive use by the Palestinian side and can serve for multi-areas networks and for trunking systems.

[*631] (2) All other frequencies are for use only at the specific area since some of the frequencies are duplicated at various areas in Israel.

(3) All frequencies are assigned to be used with BW=2.5KHz and Power=up to 25 watts; all values are in MHz. The frequencies marked with (*) can be used with unlimited power.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 138 of 157
Case 1:04-cv-05282-RJL Document 330-36 Filed 01/29/16 Page 137 of 156

Page 136

36 I.L.M. 551, *631

5. S.H.F.

5.1 Microwave Links

5.1.1 TV Specific Links

For long distance use at specific locations for TV transmission as detailed below:

| Location A | Tx Freq (MHz) | Location B | Tx Freq (MHz) | Pol | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|---|---|
| 1. Ramallah 1 | 7519 | Ramallah 2 | 7680 | II | 34TV | 27 |
| 2. Ramallah 2 | 7624 | Talita | 7463 | V | 34TV | 27 |
| 3. Talita | 7519 | Hebron | 7680 | H | 34TV | 27 |
| 4. Hebron | 7624 | Gaza | 7463 | H | 34TV | 27 |
| 5. Gaza | 7519 | Khan Yunis | 7680 | V | 34TV | 27 |
| 6. Ramallah 2 | 7680 | Nablus | 7519 | V | 34TV | 27 |
| 7. Nablus | 7463 | Jenin | 7624 | H | 34TV | 27 |
| 8. Ramallah 1 | 23G | Ramallah | 23G | V | 34TV | 27 |

The Palestinian side is requested to confirm the above microwave links topology for the TV network.

5.1.2 7GHz Additional Links

The links are for long distance use at any location in the West Bank and the Gaza Strip for radio, civil networks, Police networks, official networks and other uses. These links can be duplicated in these areas; however, frequency assignment for specific locations should be coordinated through the JTC.

The list of these links at 7GHz band, is:-

| | Freq A (MHz) | Freq B (MHz) | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|
| 1. | 6640 | 6820 | 10 | 27 |
| 2. | 6720 | 7060 | 10 | 27 |

5.1.3 23 GHz Microwave Links

For short distance exclusive use at any location in the West Bank and the Gaza Strip for any service, the following frequencies are assigned:-

| | Freq A (MHz) | Freq B (MHz) | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|
| 1. | 21255 | 22455 | 28 | 27 |
| 2. | 21295 | 22495 | 28 | 27 |
| 3. | 21495 | 22695 | 28 | 27 |
| 4. | 21610 | 22810 | 28 | 27 |
| 5. | 22310 | 23510 | 28 | 27 |

Case 1:18-cv-12855-MKV-DCF  Document 130-9  Filed 08/20/21  Page 139 of 157
Case 1:04-cv-02280-RJL  Document 330-36  Filed 01/29/16  Page 138 of 156

Page 137

36 I.L.M. 551, *631

## 6. U.H.F. Trunking

### 6.1 Police and Official Networks

The following sub-bands are assigned at 410 to 450 MHz, for exclusive use for mobile service of Police and official trunking networks, in the West Bank and the Gaza Strip.

1. 414 to 415.5 MHz

2. 424 to 425.5 MHz

### 6.2 Civil and Commercial Networks

The following sub-bands are assigned at 410 to 450 MHz, for exclusive use for mobile services of civil and commercial trunking networks in the West Bank and the Gaza Strip.

1. 412.5 to 414 MHz

2. 422.5 to 424 MHz

3. 428.5 to 430 MHz

4. 438.5 to 440 MHz

## 7. Satellite Services

Frequencies will be assigned upon specific requests, for each station, through the JTC.

## 8. GSM

Mutual participation will be agreed in the JTC according to the planning of each side, and the division of this section of frequencies will take into account the users ratio of each side.

## 9. E.H.F.

As soon as any need arises.

SCHEDULE 6

List of Approved TV Channels and the Locations of Transmitters

Pursuant to Article 36, paragraph B.5 of this Appendix:

| | |
|---|---|
| Jericho | Channel 24 |
| Nablus (Mt. Gerizim) | Channel 5 |
| Jenin | Channel 31 |
| Ramallah | Channel 25 |
| Hebron | Channel 30 |
| Gaza | Channel 31 |

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 140 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 139 of 156

Page 138

36 I.L.M. 551, *631

[*632]  SCHEDULE 7

Transportation Arrangements

Pursuant to Article 38, paragraphs 6, 17 and 19 of this Appendix:

Note: To be attached.

SCHEDULE 8

Joint Water Committee

Pursuant to Article 40, paragraph 15 of this Appendix, the obligations and responsibilities of the JWC shall include:

1. Coordinated management of the water resources as detailed hereunder, while maintaining the existing utilization from the aquifers as detailed in Schedule 10, and taking into consideration the quantities of additional water for the Palestinians as detailed in Article 40.

It is understood that the above-mentioned Schedule 10 contains average annual quantities, which shall constitute the basis and guidelines for the operation and decisions of the JWC.

a. All licensing and drilling of new wells and the increase of extraction from any water source, by either side, shall require the prior approval of the JWC.

b. All development of water resources and systems, by either side, shall require the prior approval of the JWC.

c. Notwithstanding the provisions of a. and b. above, it is understood that the projects for additional water detailed in paragraph 7 of Article 40, are agreed in principle between the two sides. Accordingly, only the geohydrological and technical details and specifications of these projects shall be brought before the JWC for approval prior to the commencement of the final design and implementation process.

d. When conditions, such as climatological or hydrological variability, dictate a reduction or enable an increase in the extraction from a resource, the JWC shall determine the changes in the extractions and in the resultant supply. These changes will be allocated between the two sides by the JWC in accordance with methods and procedures determined by it.

e. The JWC shall prepare, within three months of the signing of this Agreement, a Schedule to be attached to this Agreement, of extraction quotas from the water resources, based on the existing licenses and permits. The JWC shall update this Schedule on a yearly basis and as otherwise required.

2. Coordinated management of water and sewage systems in the West Bank, as follows:

a. Existing water and sewage systems, which serve the Palestinian population solely, shall be operated and maintained by the Palestinian side solely, without interference or obstructions, in accordance with the provisions of Article 40.

b. Existing water and sewage systems serving Israelis, shall continue to be operated and maintained by the Israeli side solely, without interference or obstructions, in accordance with the provisions of Article 40.

c. The systems referred to in a and b above shall be defined on Maps to be agreed upon by the JWC

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 141 of 157
Case 1:02-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 140 of 156

Page 139

36 I.L.M. 551, *632

within three months from the signing of this Agreement.

d. Plans for construction of new water and sewage systems or modification of existing systems require the prior approval of the JWC.

SCHEDULE 9

Supervision and Enforcement Mechanism

Pursuant to Article 40, Paragraph 17 of this Appendix:

1. Both sides shall establish, upon the signing of this Agreement, no less than five Joint Supervision and Enforcement Teams (JSETs) for the West Bank, under the control and supervision of the JWC, which shall commence operation immediately.

 [*633] 2. Each JSET shall be comprised of no less than two representatives from each side, each side in its own vehicle, unless otherwise agreed. The JWC may agree on changes in the number of JSETs and their structure.

3. Each side will pay its own costs, as required to carry out all tasks detailed in this Schedule. Common costs will be shared equally.

4. The JSETs shall operate, in the field, to monitor, supervise and enforce the implementation of Article 40 and this Schedule, and to rectify the situation whenever an infringement has been detected, concerning the following:

a. Extraction from water resources in accordance with the decisions of the JWC, and the Schedule to be prepared by it in accordance with subparagraph 1.e of Schedule 8.

b. Unauthorized connections to the supply systems and unauthorized water uses;

c. Drilling of wells and development of new projects for water supply from all sources;

d. Prevention of contamination and pollution of water resources and systems;

e. Ensuring the execution of the instructions of the JWC on the operation of monitoring and measurement systems;

f. Operation and maintenance of systems for collection, treatment, disposal and reuse, of domestic and industrial sewage, of urban and agricultural runoff, and of urban and agricultural drainage systems;

g. The electric and energy systems which provide power to all the above systems;

h. The Supervisory Control and Data Acquisition (SCADA) systems for all the above systems;

i. Water and sewage quality analyses carried out in approved laboratories, to ascertain that these laboratories operate according to accepted standards and practices, as agreed by the JWC. A list of the approved laboratories will be developed by the JWC;

j. Any other task, as instructed by the JWC.

5. Activities of the JSETs shall be in accordance with the following:

a. The JSETs shall be entitled, upon coordination with the relevant DCO, to free, unrestricted and secure access to all water and sewage facilities and systems, including those privately owned or operated, as

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 143 of 157
Case 1:04-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 141 of 156

Page 140

36 I.L.M. 551, *633

required for the fulfillment of their function.

b. All members of the JSET shall be issued identification cards, in Arabic, Hebrew and English containing their full names and a photograph.

c. Each JSET will operate in accordance with a regular schedule of site visits, to wells, springs and other water sources, water works, and sewage systems, as developed by the JWC.

d. In addition, either side may require that a JSET visit a particular water or sewage facility or system, in order to ensure that no infringements have occurred. When such a requirement has been issued, the JSET shall visit the site in question as soon as possible, and no later than within 24 hours.

e. Upon arrival at a water or sewage facility or system, the JSET shall collect and record all relevant data, including photographs as required, and ascertain whether an infringement has occurred. In such cases, the JSET shall take all necessary measures to rectify it, and reinstate the status quo ante, in accordance with the provisions of this Agreement. If the JSET cannot agree on the actions to be taken, the matter will be referred immediately to the two Chairmen of the JWC for decision.

f. The JSET shall be assisted by the DCOs and other security mechanisms established under this Agreement, to enable the JSET to implement its functions.

g. The JSET shall report its findings and operations to the JWC, using forms which will be developed by the JWC.

SCHEDULE 10

Data Concerning Aquifers

Pursuant to Article 40, paragraph 20 and Schedule 8 paragraph 1 of this Appendix:

The existing extractions, utilization and estimated potential of the Eastern, North-Eastern, and Western Aquifers are as follows:

Eastern Aquifer:

- In the Jordan Valley, 40 mcm to Israeli users, from wells;

- 24 mcm to Palestinians, from wells;

- 30 mcm to Palestinians, from springs;

- 78 mcm remaining quantities to be developed from the Eastern Aquifer;

- Total = 172 mcm.

North-Eastern Aquifer:

- 103 mcm to Israeli users, from the Gilboa and Beisan springs, including from wells;

- 25 mcm to Palestinian users around Jenin;

- 17 mcm to Palestinian users from East Nablus springs;

- Total = 145 mcm.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 143 of 157
Case 1:04-cv-00280-RJL Document 330-36 Filed 01/29/16 Page 142 of 156

Page 141

36 I.L.M. 551, *634

[*634]  Western Aquifer:

- 340 mcm used within Israel;

- 20 mcm to Palestinians;

- 2 mcm to Palestinians, from springs near Nablus;

- Total = 362 mcm.

All figures are average annual estimates.

The total annual recharge is 679 mcm.

SCHEDULE 11

The Gaza Strip

Pursuant to Article 40, Paragraph 25:

1. All water and sewage (hereinafter referred to as "water") systems and resources in the Gaza Strip shall be operated, managed and developed (including drilling) by the Council, in a manner that shall prevent any harm to the water resources.

2. As an exception to paragraph 1., the existing water systems supplying water to the Settlements and the Military Installation Area, and the water systems and resources inside them shall continue to be operated and managed by Mekoroth Water Co.

3. All pumping from water resources in the Settlements and the Military Installation Area shall be in accordance with existing quantities of drinking water and agricultural water.

Without derogating from the powers and responsibilities of the Council, the Council shall not adversely affect these quantities.

Israel shall provide the Council with all data concerning the number of wells in the Settlements and the quantities and quality of the water pumped from each well, on a monthly basis.

4. Without derogating from the powers and responsibilities of the Council, the Council shall enable the supply of water to the Gush Katif settlement area and Kfar Darom settlement by Mekoroth, as well as the maintenance by Mekoroth of the water systems supplying these locations.

5. The Council shall pay Mekoroth for the cost of water supplied from Israel and for the real expenses incurred in supplying water to the Council.

6. All relations between the Council and Mekoroth shall be dealt with in a commercial agreement.

7. The Council shall take the necessary measures to ensure the protection of all water systems in the Gaza Strip.

8. The two sides shall establish a subcommittee to deal with all issues of mutual interest including the exchange of all relevant data to the management and operation of the water resources and systems and mutual prevention of harm to water resources.

9. The subcommittee shall agree upon its agenda and upon the procedures and manner of its meetings, and may invite

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 144 of 157
Case 1:04-cv-00280-RJL   Document 350-36   Filed 01/29/16   Page 143 of 156

Page 142

36 I.L.M. 551, *634

experts or advisers as it sees fit.

TO: Major General Oren Shachor, Head of the Israeli side of the Civil Affairs Committee

September 22, 1995

Re: The Signing of a Commercial Agreement with Bezeq, Israel Telecommunications Corp. Ltd.

1. I hereby inform you that the Palestinian side commits itself to enter into negotiations with Bezeq immediately upon the signing of the Interim Agreement for the purpose of reaching a commercial agreement.

2. The commercial agreement between the Palestinian side and Bezeq will be signed within three months of the signing of the Interim Agreement.

Sincerely,

Jamil Tariff, Head of the Palestinian side of the Civil Affairs Committee

Note: This letter will be attached as a side letter to the Interim Agreement.

 [*635]  ANNEX IV

PROTOCOL CONCERNING LEGAL MATTERS

[Index not reproduced]

ARTICLE I

Criminal Jurisdiction

1. a. The criminal jurisdiction of the Council covers all offenses committed by Palestinians and/or non-Israelis in the Territory, subject to the provisions of this Article.

> For the purposes of this Annex, "Territory" means West Bank territory except for Area C which, except for the Settlements and the military locations, will be gradually transferred to the Palestinian side in accordance with this Agreement, and Gaza Strip territory except for the Settlements and the Military Installation Area.

b. In addition, the Council has criminal jurisdiction over Palestinians and their visitors who have committed offenses against Palestinians or their visitors in the West Bank and the Gaza Strip in areas outside the Territory, provided that the offense is not related to Israel's security interests.

c. Notwithstanding the provisions of subparagraph a. above, the criminal jurisdiction of each side over offenses committed in Area B shall be in accordance with the provisions of paragraph 2.a of Article XIII of this Agreement.

d. Individuals arrested by the Palestinian Police in Area B for public order and other reasons shall be tried before the Palestinian courts, provided that these courts have criminal jurisdiction.

2. Israel has sole criminal jurisdiction over the following offenses:

a. offenses committed outside the Territory, except for the offenses detailed in subparagraph I. b above;

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 145 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 144 of 156

Page 143

36 I.L.M. 551, *635

and

 b. offenses committed in the Territory by Israelis.


3. a. In exercising the criminal jurisdiction of their courts, each side shall have the power, inter alia, to investigate, arrest, bring to trial and punish offenders.

 b. Activities of the Palestinian Police and the Israeli military forces for the implementation of subparagraph a. above shall be as set out in the Agreement and Annex I thereto.


4. In addition, and without derogating from the territorial jurisdiction of the Council, Israel has the power to arrest and to keep in custody individuals suspected of having committed offenses which fall within Israeli criminal jurisdiction as noted in paragraphs 1.c, 2 and 7 of this Article, who are present in the areas under the security responsibility of the Council, where:

 a. The individual is an Israeli, in accordance with Article II of this Annex; or

 b. (1) The individual is a non-Israeli suspected of having just committed an offense in a place where Israeli authorities exercise their security functions in accordance with Annex I, and is arrested in the vicinity in which the offense was committed. The arrest shall be with a view to transferring the suspect, together with all evidence, to the Palestinian Police at the earliest opportunity.

  (2) In the event that such an individual is suspected of having committed an offense against Israel or Israelis, and there is a need for further legal proceedings with respect to that individual, Israel may retain him or her in custody, and the question of the appropriate forum for prosecuting such a suspect shall be dealt with by the Legal Committee on a case by case basis.


5. In the case of an offense committed in the areas under the security responsibility of the Council by a non-Israeli against Israel or an Israeli, the Council shall take measures to investigate and prosecute the case, and shall notify Israel of the result of the investigation and any legal proceedings.

6. When a suspicion arises against a tourist in transit to or from Israel through the Territory in the West Bank and the Gaza Strip, that the tourist has committed an offense in the Territory and that tourist is present on roads or in Jewish holy sites specified in Article V, paragraph 7, Article VII, paragraph 9 and Appendix 4 of Annex I, the Palestinian Police may detain him in place and immediately notify the Israeli military forces which shall be authorized to arrest and question him. Where an offense has been committed by a tourist in violation of the prevailing law and further legal proceeding in respect of the tourists are required, such proceedings shall be taken by the Council.

 Where such a tourist present outside these areas is detained or arrested by the Council, it shall notify the Israeli authorities within a reasonable time, not exceeding 24 hours, and shall enable them at the earliest opportunity to meet the detainee and to provide any necessary assistance, including consular notification, requested by the detainee.


7. a. Without prejudice to the criminal jurisdiction of the Council, and with due regard to the principle that no person can be tried twice for the same  [*636]  offense, Israel has, in addition to the above provisions of this Article, criminal jurisdiction in accordance with its domestic laws over offenses committed in the Territory against Israel or an Israeli.

 b. In exercising its criminal jurisdiction in accordance with subparagraph a. above, activities of the Israeli

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 146 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 145 of 156

Page 144

36 I.L.M. 551, *636

military forces related to subparagraph a. above shall be as set out in the Agreement and Annex I thereto.

ARTICLE II

Legal Assistance in Criminal Matters

1. General

a. Israel and the Council shall cooperate and provide each other with legal assistance in criminal matters. Such cooperation shall include the arrangements detailed in this Article.

b. Documents served by one side in the territory under the responsibility of the other, shall be accompanied by a translation into the official language of the other side.

2. Cooperation in Criminal Matters

a. The Israeli Police and the Palestinian Police shall cooperate in the conduct of investigations. Subject to detailed arrangements to be agreed upon, such cooperation shall include the exchange of information, records and fingerprints of criminal suspects, vehicle ownership registration records, etc.

b. Where an offense is committed in the Territory by an Israeli acting jointly with an individual under Palestinian personal jurisdiction, the Israeli military forces and the Palestinian Police will cooperate in conducting an investigation.

c. The Palestinian authorities shall not arrest Israelis or place them in custody. Israelis can identify themselves by presenting Israeli documentation.

However, when an Israeli commits a crime against a person or property in the Territory, the Palestinian Police, upon arrival at the scene of the offense shall, if necessary, until the arrival of the Israeli military forces, detain the suspect in place while ensuring his protection and the protection of those involved, prevent interference with the scene of the offense, collect the necessary evidence and conduct preliminary questioning, and in any case shall immediately notify the Israeli authorities through the relevant DCO.

d. Without derogating from the jurisdiction of the Council over property located or transported within the Territory, where the property is being transported or carried by an Israeli, the following procedure shall apply: The Palestinian authorities have the power to take any measures necessary in relation to Israeli vehicles or property where such vehicle or property has been used in the commission of a crime and present an immediate danger to public safety or health. When such measures are taken, the Palestinian authorities shall immediately notify the Israeli authorities through the relevant DCO, and shall continue to take the necessary measures until their arrival.

3. When an Israeli is suspected of committing an offense and is present in the Territory, the Israeli military forces shall be able to arrest, search and detain the suspect as required; in areas where the Palestinian Police exercise powers and responsibilities for internal security and public order, such activities shall take place in coordination with the Palestinian Police, in its presence and with its assistance.

4. Israel shall hand over to the Palestinian Police the Palestinian offenders to whom Article I, paragraph 1.b applies, together with any collected evidence.

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 147 of 157
Case 1:04-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 146 of 156

Page 145

36 I.L.M. 551, *636

5. Restraining Orders

Each side shall execute orders issued by the competent organs of the other side restraining a person under the jurisdiction of that side from traveling abroad.

6. Summons and Questioning of Witnesses

    a. Where the statement of a witness who is an Israeli or other person present in Israel is required for a Palestinian investigation, the statement shall be taken by the Israeli Police in the presence of a Palestinian Police officer in an Israeli facility at an agreed location.

    b. Where the statement of a non-Israeli witness present in the Territory is required for an Israeli investigation, the statement shall be taken by the Palestinian Police in the presence of an Israeli Police officer in a Palestinian facility at an agreed location.

    c. In exceptional cases, each side may take a statement requested by the other side itself, without the presence of the requesting side.

7. Transfer of Suspects and Defendants

    a. Where a non-Israeli suspected of, charged with, or convicted of, an offense that falls within Palestinian criminal jurisdiction is present in Israel, the Council may request Israel to arrest and transfer the individual to the Council.

    b. Where an individual suspected of, charged with, or convicted of, an offense that falls within Israeli criminal jurisdiction, is present in the Territory, Israel may request the Council to arrest and transfer the individual to Israel.

    c. Requests under subparagraph a. and b. above shall specify the grounds for the request and shall be supported by an arrest warrant issued by a competent court.

    [*637] d. Where the request is for the transfer of a suspect who is not a Palestinian requested by the Council:

        (1) the arrest warrant shall only be issued pursuant to an application made by or on behalf of the Attorney-General, confirming that there is a reasonable evidentiary basis that the offense was committed by the suspect;

        (2) the offense must be punishable by not less than 7 years imprisonment under the law of the requesting side.

    e. (1) Individuals suspected of offenses punishable by less than 7 years' imprisonment shall be interrogated by the investigating side in a facility of the other side or at an agreed location.

        (2) Interrogation shall take place in the presence of a police officer of the other side.

        (3) Upon the request of the investigating side the other side may detain the suspect in custody pending and during questioning.

        (4) Where the presence of the suspect is required for an objective reason, such as confronting witnesses and identification of site, the suspect shall be transferred for that

Case 1:18-cv-12855-MKV-DCF Document 130-9 Filed 08/20/21 Page 148 of 157
Case 1:04-cv-00280-RJL Document 330-36 Filed 01/29/16 Page 147 of 156

Page 146

36 I.L.M. 551, *637

purpose only.

f. (1) Both sides, upon receipt of a request in accordance with this Article, shall effect the arrest and transfer requested.

> (2) If the individual requested is detained in custody or is serving a prison sentence, the side receiving the request may delay the transfer to the requesting side for the duration of the detention or imprisonment.

g. No person shall be transferred in respect of an offense punishable by capital punishment unless the requesting side undertakes that capital punishment shall not be imposed in the case.

h. (1) Both sides shall take all necessary measures to ensure that the treatment of the individuals transferred under this article complies with the applicable legal arrangements in Israel and in the Territory and with internationally-accepted norms of human rights regarding criminal investigations.

> (2) suspects transferred under this paragraph shall have the right to be assisted during the investigation period by an advocate of their own choice.

i. Each side may, upon the request of the other side, detain, for no more than seven days, an individual in respect of whom a request for arrest and transfer is to be made, pending the submission of such a request.

j. The transfer of foreigners by Israel to the Council under this Article shall be subject to the applicable conventions to which Israel is a party and in coordination with the foreigner's state of origin.

k. Both sides may agree that an individual convicted in the courts of one side shall serve his sentence in a prison of the other side, subject to arrangements and conditions to be agreed between the sides.

8. Assistance in the Execution of Court Orders for the Purposes of Investigation

a. Israel and the Council shall execute orders issued by each other's courts for the purposes of investigations (e.g., search warrants, orders for the production of documents and seizure orders), subject to the provisions of local law.

b. Where, for the purposes of an investigation, Israel or the Council requires that tests or examinations (such as fingerprinting or blood analysis) be effected in relation to an item situated in territory under the responsibility of the other side, that side shall effect the tests or examinations required and transfer the results to the side conducting the investigation, where feasible.

> Where these results are not sufficient for the purposes of the investigation, arrangements shall be made for the transfer of the item to the side conducting the investigation.

9. Legal Assistance in the Conduct of Judicial Proceedings

a. (1) Summons and subpoenas issued by an Israeli court in respect of defendants and witnesses present in the Territory, shall be effected through the Council, which shall be responsible for the service of summons, and the execution of subpoenas by the Palestinian Police.

> (2) Subpoenas issued in respect of an Israeli defendant or witness present in the Territory

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 149 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 148 of 156

Page 147

36 I.L.M. 551, *637

shall be executed by the Israeli military forces. In areas where the Palestinian Police exercise powers and responsibilities for internal security and public order, such activities shall take place in the presence and with the assistance of, the Palestinian Police.

b. Summons and subpoenas issued by a Palestinian court in respect of defendants and witnesses in Israel shall be effected through the Israeli Police who shall be responsible for the service of summons and the execution of subpoenas.

c. Where the evidence of an Israeli witness is required in connection with proceedings conducted by a Palestinian court, the witness shall testify at a Palestinian court sitting at an agreed venue, and the witness shall be accompanied by representatives of the Israeli military forces together with the Palestinian Police.

[*638] d. Where the evidence of a witness is required in connection with proceedings conducted by a court of one side, a notice of such a request will be given to the authorities of the other side to summon the witness.

10. Nothing in this Annex shall derogate from each side's powers and responsibilities as detailed in Annex I.

ARTICLE III

Civil Jurisdiction

1. The Palestinian courts and judicial authorities have jurisdiction in all civil matters, subject to this Agreement.

2. In cases where an Israeli is a party, the Palestinian courts and judicial authorities have jurisdiction over civil actions in the following cases:

a. the subject matter of the action is an ongoing Israeli business situated in the Territory (the registration of an Israeli company as a foreign company in the Territory being evidence of the fact that it has an ongoing business situated in the Territory);

b. the subject matter of the action is real property located in the Territory;

c. the Israeli party is a defendant in an action and has consented to such jurisdiction by notice in writing to the Palestinian court or judicial authority;

d. the Israeli party is a defendant in an action, the subject matter of the action is a written agreement, and the Israeli party has consented to such jurisdiction by a specific provision in that agreement;

e. the Israeli party is a plaintiff who has filed an action in a Palestinian court. If the defendant in the action is an Israeli, his consent to such jurisdiction in accordance with subparagraphs c. or d. above shall be required; or

f. actions concerning other matters as agreed between the sides.

3. The jurisdiction of the Palestinian courts and judicial authorities does not cover actions against the State of Israel including its statutory entities, organs and agents.

4. Israelis, including registered companies of Israelis, conducting commercial activity in the Territory are subject to the prevailing civil law in the Territory relating to that activity. Enforcement of judicial and administrative judgments and

Case 1:18-cv-12355-MKV-DCF   Document 130-9   Filed 08/20/21   Page 150 of 157
Case 1:02-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 149 of 156

Page 148

36 I.L.M. 551, *638

orders issued against Israelis and their property shall be effected by Israel, within a reasonable time, in coordination and cooperation with the Council.

ARTICLE IV

Legal Assistance in Civil Matters

1. Service of Documents

   a. Israel and the Council will be responsible for the service of legal documents, including subpoenas, issued by the judicial organs under the responsibility of the other side.

   b. Documents served by one side in the territory under the responsibility of the other, shall be accompanied by a translation into the official language of the other side.


2. Taking of Evidence

Israel and the Council will make arrangements for taking evidence from witnesses, when necessary, when such evidence is sought in connection with proceedings conducted by the judicial organs under the responsibility of the other side.

3. Enforcement of Judgments

   a. Israel and the Council will enforce judgments rendered by the judicial organs under the responsibility of the other side, provided that the judicial organ concerned has the jurisdiction to render the judgment and further provided that the enforcement is not contrary to public policy. The execution offices under the responsibility of each side shall execute such judgments as if rendered by their own judicial organs.

   b. In executing any judgment against Israelis, the Palestinian execution offices may issue orders (e.g., attachments, receivership, eviction) against Israeli property within the Territory. The Palestinian Police shall effect the execution of such orders jointly with the Israeli Police, which undertakes to respect the said orders.

      This subparagraph does not relate to attachments effected by the service of documents without requiring any physical actions, such as attachments of bank accounts.


   c. Without derogating from the civil jurisdiction of the Palestinian courts and judicial authorities in accordance with Article III, imprisonment orders against Israelis, and orders restraining Israelis from traveling abroad (excluding interim orders before a judgment was given), shall only be issued by Israeli execution offices and effected by the Israeli police.

   [*639]  ANNEX V

PROTOCOL ON ECONOMIC RELATIONS

   [Index not reproduced]

[The Protocol on Economic Relations Between Israel and the P.L.O., done at Paris, April 29, 1994, appears at 33 I.L.M. 696 (1994). It was carried with the Israel-P.L.O. Agreement on the Gaza Strip and the Jericho Area, done at Cairo, May 4, 1994, which appears at 33 I.L.M. 622 (1994). The following were reproduced as part of the Protocol: the Preamble, at 33 I.L.M. 696 (1994); Article I, Framework and Scope, at 33 I.L.M. 697 (1994); Article II, the Joint Economic

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/2021 Page 151 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 150 of 156

Page 149

36 I.L.M. 551, *639

Committee, at 33 I.L.M. 697 (1994); Article III, Import Taxes and Import Policy, at 33 I.L.M. 698 (1994); Article IV, Monetary and Financial Issues, at 33 I.L.M. 703 (1994); Article V, Direct Taxation, at 33 I.L.M. 707 (1994); Article VI, Indirect Taxes on Local Production, at 33 I.L.M. 707 (1994); Article VII, Labor, at 33 I.L.M. 709 (1994); Article VIII, Agriculture, at 33 I.L.M. 711 (1994); Article IX, Industry, at 33 I.L.M. 715 (1994); Article X, Tourism, at 33 I.L.M. 716 (1994); Article XI, Insurance Issues, at 33 I.L.M. 717 (1994); and the Side Letters to the Protocol at 33 I.L.M. 720 (1994).

[Appendices I, II, III and IV were not reproduced with the Protocol, and Appendix IV was not available. Appendix I contains List A1 which is a list of goods locally-produced in Jordan and in Egypt particularly and in the other Arab countries, which the Palestinians will be able to import in quantities agreed upon by the two sides up to the Palestinian market needs. Appendix II contains list A2 which is a list of goods from the Arab, Islamic and other countries, which the Palestinians will be able to import in quantities agreed upon by the two sides up to the Palestinian market needs. Appendix III contains List B which is a list of basic food items and other goods for the Palestinian economic development program, imported by the Palestinians to the Gaza Strip and the Jericho Area. Appendix IV is about the Jordanian Petroleum Standards.

[The Supplement to the Protocol on Economic Relations below is new, and did not appear with the original Protocol. It replaces Articles V on Direct Taxation and Article VI on Indirect Taxes on Local Production.]

Supplement to the Protocol on Economic Relations

1. The clearance of revenues from all import taxes and levies and from excise on fuel products between Israel and the Council, according to this Agreement, will come into full force on the date of completion of the first phase of the redeployment of the Israeli military forces prior to the elections, i.e., 22 days before the day of elections (hereinafter "the said date").

However, in view of the special needs of the Palestinian Authority and in order to assist it in covering current expenses, Israel has agreed to transfer to the Palestinian Authority:

a. One month after the signing of this Agreement - 50% of the revenues collected during this month from import taxes on goods, the final destination of which is the West Bank, and from excise on petroleum purchased by the Palestinian side for the West Bank.

b. Two months after the signing of this Agreement - 50% of the revenues collected during the previous month from import taxes and petroleum excise as aforesaid.

c. On the said date - 100% of the revenues collected during the period since the previous payment according to subparagraph b. above, from import taxes and petroleum excise as aforesaid.

2. In addition, on the said date Israel will transfer to the Palestinian Authority 15 million NIS as an advance payment in respect of the remaining surplus of the Civil Administration's budget as mentioned in paragraph 2 of Article 39 (Treasury) of Annex III.

3. Israel will transfer immediately 12 million NIS to cover the recurrent costs of the eight spheres transferred to the Palestinian Authority starting from September 1, 1995.

4. For the purposes of the implementation of the Protocol on Economic Relations, Israel will deduct 3% from each transfer to the Palestinian side of import taxes and other indirect taxes, in order to cover Israel's administrative costs in collecting these taxes and in handling matters related to them.

5. The two sides will continue discussion through the Joint Economic Committee on the procedures for the set-off of

Case 1:18-cv-12255-MKV-DCF Document 130-9 Filed 08/20/21 Page 153 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 151 of 156

Page 150

36 I.L.M. 551, *639

financial obligations between the two sides, including legal entities under their control or management.

6. a. Cigarettes, alcohol, iron and cement will be added to list A2 attached to the Protocol on Economic Relations in accordance with subparagraphs 2.a.(2) and 2.b of Article III of the Protocol, in quantities according to the Palestinian market needs, taking into account the quantities of these goods included in list A1.

    [*640] However, with regard to these goods, the Israeli rates of customs, purchase tax, levies, excises and other charges, prevailing at the date of signing of the Agreement, as changed from time to time, shall serve as the minimum basis for the Council.

    b. The quantities of electrical equipment in lists A1 and A2 will be revised and increased by the JEC to cover all the needs of the Palestinian market.

7. Articles V (Direct Taxation) and VI (Indirect Taxes on Local Production) of the Protocol on Economic Relations shall be replaced by the Articles attached as Appendices 1 and 2 to this Supplement.

    APPENDIX 1

    (Replacing Article V of the Protocol on Economic Relations)

    ARTICLE V

    Direct Taxation

1. Israel and the Palestinian side will each determine and regulate independently its own tax policy in matters of direct taxation, including income tax on individuals and corporations, property taxes, municipal taxes and fees.

2. Each tax administration will have the right to levy the direct taxes generated by economic activities within the area under its tax responsibility.

3. Each tax administration may impose additional taxes on its residents (individuals and corporations) who conduct economic activities in areas under the tax responsibility of the other side.

4. Israel will transfer to the Palestinian side a sum equal to:

    a. 75% of the income taxes collected from Palestinians from the West Bank and the Gaza Strip employed in Israel.

    b. The full amount of the income taxes collected from Palestinians from the West Bank and the Gaza Strip employed in the Settlements.

5. When a Palestinian remits payment to an Israeli the following rules regarding deduction at source shall apply:

    a. No tax shall be deducted at source on income from the sales of goods from the areas under Israeli tax responsibility, which are not supplied by means of a permanent establishment in the areas under Palestinian tax responsibility. Where income from the sales of goods is attributable to a permanent establishment in the areas under Palestinian tax responsibility, tax may be deducted at source, but only on such income as is attributable to such permanent establishment.

    b. No tax shall be deducted at source on income derived by an Israeli from transportation activities, if the point of departure or the point of final destination is in the areas under Israeli tax responsibility.

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 153 of 157
Case 1:02-cv-02280-RJL Document 350-36 Filed 01/29/16 Page 152 of 156

Page 151

36 I.L.M. 551, *640

6. When an Israeli remits payment to a Palestinian which is income accruing in or deriving in the West Bank and the Gaza Strip, the following rules regarding deduction at source shall apply:

> a. No tax shall be deducted at source on income from the sales of goods from the areas under Palestinian tax responsibility which are not supplied by means of a permanent establishment in the areas under Israeli tax responsibility. Where income from the sales of goods is attributable to a permanent establishment in the areas under Israeli tax responsibility, tax may be deducted at source, but only on such income as is attributable to such permanent establishment.

> b. No tax shall be deducted at source on income derived by a Palestinian from transportation activities, if the point of departure or the point of final destination is in the areas under Palestinian tax responsibility.

7. Non-deduction at source in accordance with the provisions of paragraphs 5 and 6 above, shall be carried out through the use of certificates in the form set out in Schedule 1. Such certificates shall be issued on special paper in order to assure that the certificates are authentic. The certificates will be worded in both Hebrew and Arabic and will be filled out in the language of the other side or in English, and the figures will be written in "Arabic" (not Hindi) numerals.

8. a. In any case, where the appropriate certificate referred to in paragraph 7 has not been presented to the payer prior to the payment of income referred to in paragraphs 5 and 6 above, tax will be deducted at source by the payer according to the applicable law.

> b. With regard to income not referred to in paragraphs 5 and 6 above, tax may be imposed by the tax administration responsible for the areas in which the income was accrued or derived.

9. Each side will grant its residents a tax relief for income tax paid by them on income accrued in or derived in the areas under the tax responsibility of the other side.

10. Both sides agree that a special subcommittee will be established to finalize the arrangements and procedures regarding taxation issues (including issues concerning double taxation).

[*641] APPENDIX 2

(Replacing Article VI of the Protocol on Economic Relations)

ARTICLE VI

Indirect Taxes on Local Production

1. The Israel and the Palestinian tax administrations will levy and collect VAT and purchase taxes on local production, as well as any other indirect taxes, in their respective areas.

2. The purchase tax rates within the jurisdiction of each tax administration will be identical as regards locally produced and imported goods.

3. While the prevailing concepts and principles of VAT will continue to be applied by both sides in a compatible way, the Palestinian VAT rate shall not be lower than 2% below the Israeli VAT rate (the present Israeli VAT rate is 17%).

4. The Palestinian side will decide on the maximum annual turnover for businesses under its jurisdiction to be exempt from VAT, within an upper limit of 12,000 US $ .

5. a. Ongoing permanent businesses will register for VAT purposes with the VAT administration of the side exercising

Case 1:18-cv-12855-MKV-DCF   Document 130-9   Filed 08/20/21   Page 154 of 157
Case 1:04-cv-02280-RJL   Document 330-36   Filed 01/29/16   Page 153 of 156

Page 152

36 I.L.M. 551, *641

responsibility in the place in which they are situated.

b. When subparagraph a does not apply, dealers will register for VAT purposes with the VAT administration of the side of their residence, notwithstanding the place of their activity. A corporation will register for VAT purposes according to the residency of the individual holding the majority of its shares which grant rights to distribution of profits.

c. Special cases of dealers having ongoing operations in the other side without having a permanent place of business there, will be dealt with by the joint committee established according to paragraph 11 below, upon a request of either side.

d. Each side will provide the other side, upon request, information concerning sales of specific dealers from one side to specific dealers from the other side. Israel will provide the Palestinian tax administration assistance in collecting information concerning the activities in Israel of Palestinian dealers registered for VAT purposes with the Palestinian VAT administration having ongoing operations in Israel, and will enable Palestinian inspectors to follow their activities in Israel, as necessary for tax enforcement purposes and allowed by law.

6. The VAT on purchases by dealers registered for VAT purposes will accrue to the VAT administration with which the dealer is registered.

7. The principles set out in paragraphs 1-6 of this Article shall also apply to wage- and profit tax on financial institutions.

8. There will be clearance of VAT revenues between the Israeli side and the Palestinian side according to the following conditions:

a. The VAT clearance will apply to VAT on transactions between dealers registered with different VAT administrations.

b. The following procedures will apply to clearance of VAT revenues accruing from transactions by dealers registered for VAT purposes:

(1) For transactions between dealers registered with the different VAT administrations special invoices, clearly marked for this purpose, must be used, and they will be accepted for clearance purposes.

(2) These invoices will be worded in both Hebrew and Arabic and will be filled out in any of these two languages or in English, provided that the figures are written in "Arabic" (not Hindi) numerals and that the amounts filled out in the invoice are stated also in NIS. The amount of VAT will be specified both numerically and in words.

(3) For the purposes of tax rebates, such invoices will be valid for six months from their date of issue.

(4) Representatives of the two sides will meet once a month, on the twenty-fifth day of the month, to present each other with a list of invoices submitted to them for tax rebate, for VAT clearance. This list will include the following details regarding each invoice:

(a) the number of the registered dealer issuing it;

(b) the name of the registered dealer issuing it;

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 155 of 157
Case 1:04-cv-02280-RJL Document 350-36 Filed 01/29/16 Page 154 of 156

Page 153

36 I.L.M. 551, *641

(c) the number of the invoice;

(d) the date of issue;

(e) the amount of the invoice - with a separate reference to the amount of VAT; and

(f) the name and the registration number of the recipient of the invoice.

(5) The clearance claims will be settled within six days from the meeting, through a payment by the side with the net balance of claims against it, to the other side.

$-P642 (6) Each side will provide the other side, upon request, with invoices for verification purposes. Each tax administration will be responsible for providing invoices for verification purposes for two years after receiving them.

(7) Each side will take the necessary measures to verify the authenticity of the invoices presented to it for clearance by the other side.

(8) Claims for VAT clearance which will not be found valid will be deducted from the next clearance payment.

(9) Once an interconnected computer system for tax rebates to dealers and for VAT clearance between the two sides is operational, it will replace the clearance procedures specified in subparagraph (4) above.

(10) The two tax administrations will exchange lists of the dealers registered with them and will provide each other with the necessary documentation, if requested, for the verification of transactions.

(11) The joint subcommittee established under paragraph 11 will deal with the implementation of the provisions of this paragraph.

9. VAT paid on transactions made with dealers registered with the Israeli side by not-for-profit Palestinian organizations and institutions, or by financial institutions, which are registered with the Palestinian side, or by the Palestinian local authorities, or by the Palestinian side itself, will be remitted to the Palestinian side in accordance with the clearance system set out in paragraph 8 above.

10. VAT paid on transactions made with dealers registered with the Palestinian side by not-for-profit Israeli organizations and institutions, or by financial institutions, which are registered with the Israeli side, or by the Israeli local authorities, or by the Israeli side itself, will be remitted to the Israeli side in accordance with the clearance system set out in paragraph 8 above.

11. The two sides will establish a joint committee composed of representatives of both VAT administrations. This committee will deal with all issues requiring coordination and cooperation with regard to this Article.

SCHEDULE 1

Pursuant to Article V (Direct Taxation):

Serial No.

Certificate of Non-Deduction of Income Tax at Source by the Palestinian Tax Administration

Case 1:18-cv-12355-MKV-DCF Document 130-9 Filed 08/20/21 Page 156 of 157
Case 1:04-cv-02280-RJL Document 330-36 Filed 01/29/16 Page 155 of 156

Page 154

36 I.L.M. 551, *641

To: (name of payer)

1. We hereby certify that: (name of recipient)

   I.D. Number and/or dealer number

   home address

   business address

      is entitled to receive the full amount of NIS     for the sale of goods/transportation activities without
      deduction of tax at source.


2. This certification shall apply only to income accruing in or deriving in the West Bank or Gaza Strip, and shall be
valid from (date)     until (date)     and/or for invoice(s) No.

3. This certification is valid only on presentation of the original certificate.

   This certificate was issued by

   Date of issue

 [*643]  Serial No.

   Certificate of Non-Deduction of Income Tax at Source by the Israeli Tax Administration

To: (name of payer)

1. We hereby certify that: (name of recipient)

   I.D. Number and/or dealer number

   home address

   business address

      is entitled to receive the full amount of NIS     for the sale of goods/transportation activities without
      deduction of tax at source.


2. This certification shall apply only to income accruing in or deriving in Israel, the Settlements and military locations,
and shall be valid from (date)     until (date)     and/or for invoice(s) No.

3. This certification is valid only on presentation of the original certificate.

   This certificate was issued by

   Date of issue

 [*644]  [SEE Map No. 2 Security Arrangements in the Gaza Strip IN ORIGINAL]

 [*645]  [SEE Map No. 5 The Deployment of the Palestinian Police in the Gaza Strip IN ORIGINAL]

 [*646]  [SEE Map No. 6 SAFE PASSAGE ROUTES IN ORIGINAL]

Case 1:18-cv-12355-MKV-DCF    Document 130-9    Filed 08/20/21    Page 157 of 157
Case 1:02-cv-02280-RJL    Document 350-36    Filed 01/29/16    Page 156 of 156

Page 155

36 I.L.M. 551, *646

[*647]   [SEE Map No. 8 Maritime Activity Zones IN ORIGINAL]

[*648]   [SEE Map No. 9 IN ORIGINAL]