IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHABTAI SCOTT SHATSKY, *et al.*,

                    Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION and THE PALESTINIAN AUTHORITY,

                    Defendants.

Case No. 18-cv-12355 (MKV) (DCF)

---

**DEFENDANTS' STATEMENT OF FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

      Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendants Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively, "Defendants") respectfully submit the following Statement of Facts as to Which There Is No Genuine Issue in support of their Motion for Summary Judgment:

      1.      The PLO was founded in 1964 by Egypt and the Arab League and has been recognized as the international diplomatic representative of the Palestinian People. Declaration of Joseph S. Alonzo ("Alonzo Decl.") Ex. A ¶ 25; PLO U.N. Mission, *Diplomatic Relations*, The Permanent Observer Mission of the State of Palestine to the United Nations New York, http://www.palestineun.org/about-palestine/diplomatic-relations (last visited April 27, 2021), and G.A. Res. 67/19, U.N. Doc. A/RES/67/19 (Dec. 4, 2012), http://palestineun.org/wp-content/uploads/2013/08/67-19-Status-of-Palestine.pdf.

2. The 1993 Oslo Accords established the PA as a semi-autonomous domestic government responsible for managing Palestine's civil affairs and finances. Alonzo Decl. Ex. A ¶ 26; Alonzo Decl. Ex. B, Arts. I, VI-VII.

3. Neither Palestine itself, nor the PA and PLO as its government, is recognized by the U.S. as sovereign, but 139 U.N. Member States do so, and the U.N. has awarded Palestine Non-Member State status. PLO U.N. Mission, *Diplomatic Relations*, THE PERMANENT OBSERVER MISSION OF THE STATE OF PALESTINE TO THE UNITED NATIONS NEW YORK, http://www.palestineun.org/about-palestine/diplomatic-relations (last visited Apr. 27, 2021), and G.A. Res. 67/19, U.N. Doc. A/RES/67/19 (Dec. 4, 2012), http://palestineun.org/wp-content/uploads/2013/08/67-19-Status-of-Palestine.pdf.

4. With the signing of the Oslo Accords, all factions within the PLO umbrella organization were required to become non-violent political parties, and all military elements were outlawed. Alonzo Decl. Ex. C at 78:2-14, 79:10-22; Alonzo Decl. Ex. D at 32:14-33:13.

5. To facilitate this process, the PLO provided modest support—such as rent, transportation, and accommodations—to its constituent political factions. Alonzo Decl. Ex. D at 30:2-6; 33:11-23, 34:8-35:15; Alonzo Decl. Ex. E at 12:24-13:7, 25:11-26:1, 36:6-37:3, 37:20-25.

6. For similar policy reasons, the PA has paid stipends to the families of Palestinians detained or killed by Israel or the PA, which helped to ensure their basic standard of living and thus enhanced security by blunting the financial allure of terrorism. Alonzo Decl. Ex. F at 39:20-25, 40:7-12.

7. Palestinian families financially impacted by the loss of a wage-earner or the costs of providing food, clothing, and supplies to an imprisoned relative are thought to be more susceptible to that allure. Alonzo Decl. Ex. F at 39:20-25, 42:21-47:7.

8. Israel had a similar National Insurance program, supporting needy families of Arab-Israeli prisoners in Israeli prisons regardless of the reason for detention. Alonzo Decl. Ex. F at 39:20-40:24, 48:10-49:3.

9. Once released, ex-prisoners have received financial and employment support from the PLO or PA to ensure their welfare and to minimize recidivism. Alonzo Decl. Ex. C at 37:16-22, 80:18-25, 81:8-12; Alonzo Decl. Ex. G at 53:6-12; Alonzo Decl. Ex. J at No. 3.

10. PA law "prohibits. . . armed groups, regardless of their political affiliation." Alonzo Decl. Ex. C at 23:8-10.

11. The PA security forces have worked to combat militants and help Palestinians "comply with the peace process and Oslo Accords." Alonzo Decl. Ex. C at 37:10-15. In this regard, the PA security forces have coordinated with Israel on security issues. *Id.* at 45:17-22.

12. "[S]ecurity [apparatuses] within the PA, combated all armed groups. . . [including] from [the Popular Front for the Liberation of Palestine ('PFLP')]." Alonzo Decl. Ex. C at 23:10-12.

13. The Popular Front for the Liberation of Palestine ("PFLP"), a faction of the PLO, initially objected to the Oslo Accords and its PLO membership was suspended. *See* Alonzo Decl. Ex. E at 37:23-25. But in 1999, it returned to the political process and rejoined the PLO, accepting the military prohibitions of the Oslo Accords. *See id.*

14. On October 22, 2001, the Palestinian Supreme Council on National Security issued a decree outlawing the military wing of the PFLP. Alonzo Decl. Ex. H; *see also* Alonzo Decl. Ex. C at 72:12-19, 78:2-14.

15. Karnei Shomron is an "Israeli town" in the West Bank. First Am. and Suppl. Compl. (ECF 50) ¶ 1.

16. On February 16, 2002, an individual detonated an explosive device at a pizza parlor located in an outdoor shopping mall in the West Bank, in the Israeli settlement known as Karnei Shomron (the "Karnei Shomron Bombing"). First Am. and Suppl. Compl. (ECF 50) ¶ 1; Alonzo Decl. Ex. A ¶ 1.

17. In 2002, Israel retained exclusive civil and security control in Area C, which included settlements. *See* Alonzo Decl. Ex. I Art. XVII.

18. The PFLP often publicly claimed responsibility for operations that they did not carry out. Alonzo Decl. Ex. C at 35:5-10.

19. For example, PA security forces investigated an explosion in Qalqilya that the PFLP publicly claimed to have conducted, but "it turned out later that somebody from Hamas perpetrated that operation." Alonzo Decl. Ex. C at 33:16-34:8.

20. PA security forces also investigated "a certain operation that had happened in Ashkelon [for which the PFLP claimed credit], and it turned out that they ha[d] nothing to do with it." Alonzo Decl. Ex. C at 34:9-11.

21. Following the Karnei Shomron Bombing, the PA's Preventive Security Services attempted to investigate the attack, and based on the PFLP's reported claim of responsibility, interrogated several individuals associated with the PFLP. Alonzo Decl. Ex. C at 53:20-54:8.

22. Repeated incursions by the Israeli military into the West Bank in 2001 and 2002 prevented the PA's security forces from conducting a proper investigation of the Karnei Shomron Bombing. Alonzo Decl. Ex. G at 92:1-20.

23. "[D]uring that period in 2002, the PA areas [of the West Bank]," including Qalqilya, which lies near Karnei Shomron, were "under siege." Alonzo Decl. Ex. C at 51:14-19.

24. Accordingly, during that time period, the PA "did not have any control over the area of [Qalqilya]," Alonzo Decl. Ex. C at 54:2-5, and the PA's Preventive Security Services headquarters in Ramallah could not coordinate with personnel in Qalqilya concerning the interrogations of individuals associated with the PFLP. *Id.* at 54:12-55:10.

25. There is no admissible evidence that either the PA or the PLO had advance knowledge of the Karnei Shomron Bombing. *See Shatsky v. PLO,* 2017 U.S. Dist. LEXIS 94946, at *23-32 (D.D.C. June 20, 2017) (Leon, J.) ("SJ Order") (no admissible evidence of advance knowledge).

26. There is no admissible evidence that funds, services, personnel, or other support provided by either the PA or the PLO were used to plan, facilitate, or carry out the Karnei Shomron Bombing. *See* SJ Order at *23-32 (no admissible evidencing linking Ra'ed Nazal ("Nazal")—or any other evidence linking Defendants' conduct—to the Karnei Shomron Bombing); *id.* at *30 ("[N]o reasonable jury could find that the PLO's payment of rent for the Qalqilya office 'caused' the bombing simply because that office is located in a place physically 'proximate' to the attack."); *id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing," and "[w]ithout such evidence, no reasonable jury could conclude that the PA proximately caused the bombing by paying Nazal a salary"); *id.* ("As plaintiffs have not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron

bombing, I have no trouble concluding that payments to the families of these individual could not have proximately caused the bombing."); *id.* at *32 (concluding that the "after-the-fact payments are not sufficient for a reasonable jury to conclude that defendants proximately caused the Karnei Shomron bombing").

27. There is no admissible evidence that any officers, employees, or agents of the PA or the PLO were involved in planning, facilitating, or carrying out the Karnei Shomron Bombing. *See* SJ Order at *23-32 (no admissible evidencing linking Nazal—or any other evidence linking Defendants' conduct—to the Karnei Shomron Bombing); *id.* at *28 ("no admissible evidence supporting [Plaintiffs'] theory that Nazal planned the bombing"); *id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing").

28. Sadek Abdel Hafez ("Hafez") was not an employee of the PA or PLO. *See* SJ Order at *23-32 (no evidence Hafez had any link to the PA or PLO with the exception of family payments made to Hafez's family after the bombing).

29. No evidence exists in this case to show that Hafez was employed by, paid by, or had any contact whatsoever with, the PA or PLO. *See* SJ Order at *23-32 (no evidence Hafez had any link to the PA or PLO with the exception of payments made to Hafez's family after the bombing).

30. There is no evidence in this case that Hafez acted as an agent of the PA or PLO, or that he acted with the support or authorization of the PA or PLO. *See* SJ Order at *23-32 (no evidence Hafez had any link to the PA or PLO with the exception of payments made to Hafez's family after the bombing).

31. No admissible evidence exists in this case to show that the PA or PLO provided material support to Hafez. *See* SJ Order at *23-32 (no admissible evidence Hafez had any link to

or received any support from the PA or PLO); *Shatsky v. PLO,* 292 F. Supp. 3d 188, 189 (D.D.C. 2017) (Leon, J.) ("[T]he cornerstone of my ruling was the determination that plaintiffs lacked sufficient admissible evidence to prove the essential elements of their claims" against the PA and PLO.).

32. There is no evidence that the PA or the PLO ever agreed with Hafez to commit a terrorist act. *See* SJ Order at *23-32 (no evidence of any connection between Hafez and PA or PLO).

33. There is no evidence that the PA or PLO ever made any agreement with Hafez. *See* SJ Order at *23-32 (no evidence of any connection between Hafez and PA or PLO).

34. There is no evidence that the PA or the PLO ever agreed with the PFLP to commit a terrorist act, or any unlawful act. *See* SJ Order at *23-32 (rent and other incidental support unconnected to any wrongdoing).

35. There is no evidence that Hafez was aware of the possibility that his family might receive welfare support after his death in the Karnei Shomron Bombing. SJ Order at *32 ("[P]laintiffs have pointed to no evidence suggesting that Hafez knew his family would receive martyrdom payments.").

36. There is no evidence that Hafez was motivated to undertake the Karnei Shomron Bombing by the prospect of welfare support for his family. SJ Order at *32 ("[P]laintiffs have pointed to no evidence suggesting . . . that Hafez was motivated by the prospect of [martyrdom] payments.").

37. No admissible evidence exists in this case to show that Nazal had advance knowledge of the Karnei Shomron Bombing. *See* SJ Order at *24-31 (no admissible evidence that connects Nazal to the Karnei Shomron Bombing); *id.* at *28 (finding "no admissible evidence

supporting [Plaintiffs'] theory that Nazal planned the bombing"); *id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing.").

38. No admissible evidence exists in this case to show that Nazal was involved in planning, facilitating, or carrying out the Karnei Shomron Bombing. *See* SJ Order at *24-31 (no admissible evidence that connects Nazal to the Karnei Shomron Bombing); *id.* at *28 (finding "no admissible evidence supporting [Plaintiffs'] theory that Nazal planned the bombing"); *id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing.").

39. From 1999 through approximately April 27, 2002, Nazal was listed as an employee of the PA's National Security Forces ("NSF") in Qalqilya. Alonzo Decl. Ex. J at No. 3.

40. Nazal came into the employment of the NSF after he was released from an Israeli prison in 1999 pursuant to a process by which he could be rehabilitated. Alonzo Decl. Ex. J at No. 3.

41. Accordingly, he was given an entry-level officer position. Alonzo Decl. Ex. J at No. 3.

42. After his date of hire, Nazal never reported to work, never received a uniform, and never was available to receive any assignment. Alonzo Decl. Ex. J at No. 3.

43. There is no admissible evidence in this case of any relationship, or any contact or communications, between Nazal and Hafez. *See* SJ Order at *24-31 (no admissible evidence that connects Nazal to the Karnei Shomron Bombing).

44. There is no admissible evidence that Mohammad Wasef was involved in the Karnei Shomron Bombing. *See* SJ Order at *31 ("As plaintiffs have not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron bombing, I have no trouble

concluding that payments to the families of these individuals could not have proximately caused the bombing.").

45. There is no admissible evidence that Jamal Hindi was involved in the Karnei Shomron Bombing. SJ Order at *31 ("As plaintiffs have not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron bombing, I have no trouble concluding that payments to the families of these individuals could not have proximately caused the bombing.").

46. There is no evidence that the Israelis prosecuted anyone, including any PA or PLO officials, for involvement in the Karnei Shomron Bombing.

47. No evidence exists to show that the PFLP office in Qalqilya, or anyone working in that office, was involved in planning, facilitating, or carrying out the Karnei Shomron Bombing. *See* SJ Order at *28-30 (noting the lack of any evidence relating to the PFLP's Qalqilya office other than it purportedly "is nearby to Karnei Shomron.").

48. The PA and the PLO are unincorporated associations. *See* SJ Order at *33 (noting that the parties "acknowledge that the PA and PLO 'both are unincorporated associations'").

August 20, 2021

Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

Respectfully Submitted,

**SQUIRE PATTON BOGGS (US) LLP**

/s/ *Gassan A. Baloul*
Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Joseph S. Alonzo (JA-1378)
joseph.alonzo@squirepb.com
1211 Avenue of the Americas
26th Floor
New York, NY 10036
Telephone: (212) 872-9800
Facsimile:  (212) 872-9815

*Attorneys for Defendants*