# Exhibit 68

S. Hrg. 106–340

# FOREIGN OPERATIONS, EXPORT FINANCING, AND RELATED PROGRAMS APPROPRIATIONS FOR FISCAL YEAR 2000

## HEARINGS

BEFORE A

SUBCOMMITTEE OF THE

COMMITTEE ON APPROPRIATIONS

UNITED STATES SENATE

ONE HUNDRED SIXTH CONGRESS

FIRST SESSION

ON

### H.R. 2606, 3196, 3422/S. 1234

AN ACT MAKING APPROPRIATIONS FOR FOREIGN OPERATIONS, EXPORT FINANCING, AND RELATED PROGRAMS FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 2000, AND FOR OTHER PURPOSES

Agency for International Development
Department of Justice
Department of State
Department of the Treasury
Nondepartmental Witnesses

Printed for the use of the Committee on Appropriations

(

Available via the World Wide Web: http://www.access.gpo.gov/congress/senate

U.S. GOVERNMENT PRINTING OFFICE

54–215 cc                WASHINGTON : 2000

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0–16–060169–X

COMMITTEE ON APPROPRIATIONS

TED STEVENS, Alaska, *Chairman*

| | |
|---|---|
| THAD COCHRAN, Mississippi | ROBERT C. BYRD, West Virginia |
| ARLEN SPECTER, Pennsylvania | DANIEL K. INOUYE, Hawaii |
| PETE V. DOMENICI, New Mexico | ERNEST F. HOLLINGS, South Carolina |
| CHRISTOPHER S. BOND, Missouri | PATRICK J. LEAHY, Vermont |
| SLADE GORTON, Washington | FRANK R. LAUTENBERG, New Jersey |
| MITCH McCONNELL, Kentucky | TOM HARKIN, Iowa |
| CONRAD BURNS, Montana | BARBARA A. MIKULSKI, Maryland |
| RICHARD C. SHELBY, Alabama | HARRY REID, Nevada |
| JUDD GREGG, New Hampshire | HERB KOHL, Wisconsin |
| ROBERT F. BENNETT, Utah | PATTY MURRAY, Washington |
| BEN NIGHTHORSE CAMPBELL, Colorado | BYRON DORGAN, North Dakota |
| LARRY CRAIG, Idaho | DIANNE FEINSTEIN, California |
| KAY BAILEY HUTCHISON, Texas | RICHARD J. DURBIN, Illinois |
| JON KYL, Arizona | |

STEVEN J. CORTESE, *Staff Director*
LISA SUTHERLAND, *Deputy Staff Director*
JAMES H. ENGLISH, *Minority Staff Director*

---

SUBCOMMITTEE ON FOREIGN OPERATIONS, EXPORT FINANCING, AND RELATED PROGRAMS

MITCH McCONNELL, Kentucky, *Chairman*

| | |
|---|---|
| ARLEN SPECTER, Pennsylvania | PATRICK J. LEAHY, Vermont |
| JUDD GREGG, New Hampshire | DANIEL K. INOUYE, Hawaii |
| RICHARD C. SHELBY, Alabama | FRANK R. LAUTENBERG, New Jersey |
| ROBERT F. BENNETT, Utah | TOM HARKIN, Iowa |
| BEN NIGHTHORSE CAMPBELL, Colorado | BARBARA A. MIKULSKI, Maryland |
| CHRISTOPHER S. BOND, Missouri | PATTY MURRAY, Washington |
| TED STEVENS, Alaska | ROBERT C. BYRD, West Virginia |
| (Ex officio) | (Ex officio) |

*Professional Staff*
ROBIN CLEVELAND
JENNIFER CHARTRAND
TIM RIESER *(Minority)*

(II)

# CONTENTS

TUESDAY, MARCH 9, 1999

| | Page |
|---|---|
| Department of State: Office of South Asian Affairs | 1 |
| Nondepartmental witnesses | 31 |

THURSDAY, MARCH 25, 1999

| | |
|---|---|
| Department of Justice | 51 |
| Department of State | 51 |
| Nondepartmental witnesses | 79 |

THURSDAY, APRIL 29, 1999

| | |
|---|---|
| Agency for International Development | 101 |

WEDNESDAY, MAY 19, 1999

| | |
|---|---|
| Department of the Treasury: Office of the Secretary | 149 |

THURSDAY, MAY 20, 1999

| | |
|---|---|
| Department of State: Office of the Secretary | 181 |
| Nondepartmental witnesses | 221 |

# FOREIGN OPERATIONS, EXPORT FINANCING, AND RELATED PROGRAMS APPROPRIATIONS FOR FISCAL YEAR 2000

---

### THURSDAY, MARCH 25, 1999

U.S. SENATE,
SUBCOMMITTEE OF THE COMMITTEE ON APPROPRIATIONS,
*Washington, DC.*

The subcommittee met at 10 a.m., in room SD–192, Dirksen Senate Office Building, Hon. Mitch McConnell (chairman) presiding.

Present: Senators McConnell, Specter, Stevens, and Lautenberg.

### DEPARTMENT OF JUSTICE

**STATEMENT OF HON. MARK M. RICHARD, DEPUTY ASSISTANT ATTORNEY GENERAL OF THE CRIMINAL DIVISION**

### DEPARTMENT OF STATE

**STATEMENT OF HON. MARTIN S. INDYK, ASSISTANT SECRETARY OF STATE FOR NEAR EASTERN AFFAIRS**

OPENING STATEMENT OF SENATOR MITCH MC CONNELL

Senator MCCONNELL. This hearing today is being held at the request of Senator Arlen Specter. As the subcommittee proceeds with consideration of the administration's substantial request to meet commitments made at the Wye Plantation, congressional emphasis must be on how the assistance advances America's and our regional partners' interests in security and stability. Today we will focus on the Palestinian piece of the package.

The Oslo Accords and subsequent agreements negotiated by the administration spell out specific obligations undertaken by the Palestinian Authority. In reviewing the $400 million request for the Palestinians, we must consider whether they have met these key obligations, including developing and sharing a plan to collect illegal weapons, reducing the size of security forces, and cooperating with Israeli and U.S. authorities on cases involving terrorism, especially when Americans are the victims.

As I indicated, my colleague Senator Specter will be presiding over this hearing. I thank him for suggesting that we do this, and I now turn the chair over to Senator Specter.

52

OPENING STATEMENT OF SENATOR ARLEN SPECTER

Senator SPECTER. Thank you very much, Senator McConnell, for convening this hearing in your capacity as chairman of the Foreign Operations Subcommittee of Appropriations.

The issues outlined by Chairman McConnell are matters of great importance as they relate to the appropriations bill which will be coming out of this subcommittee. During my service on the subcommittee since I was elected to the Senate, I found the work enormously important. It is a very small share of the total Federal budget but a very, very important part, and the aspect of how responses are made to the issue of terrorism is one of enormous importance as we evaluate the allocations to the Palestinian Authority in the upcoming fiscal year.

This issue came into sharp focus for me in December when I accompanied President Clinton on his trip to Israel, and at that time a number of parents of victims of terrorist attacks, and terrorist murders asked that something be done in a very concrete way, and my response was that we would try to schedule a hearing on the subject and bring together people from the administration who are key participants.

We have a very distinguished panel here with the Honorable Martin Indyk, Assistant Secretary of State for Near Eastern Affairs, who has been an ambassador to Israel, has a very distinguished record, and knows this subject and many others related to it, and Deputy Assistant Attorney General Mark Richard, a man whom I have known for decades, who started his career in 1967 and is a real career professional, something that is unusual in Washington, D.C. Mark Richard brings a lot of information. I have worked with him since my days as district attorney in the City of Philadelphia.

And we have relatives of victims, and then we have the chief representative of the Palestinian Authority to the United States with us today, a man whom I have known over the years and met with as recently as Tuesday of this week; when Chairman Arafat was in town, we had a meeting. And also the head of the legal assistance between Israel and the Palestinian Authority from the Israeli Ministry of Justice. So we have people who are in a position to know this subject and move ahead to try to resolve it.

It is a matter of tremendous importance. Since the signing of the Oslo Accords, 12 American citizens have been killed in terrorist attacks. There is some dispute as to the number, depending on how you count an American citizen, but I think the accurate number is 12.

There have been efforts to investigate the matter. There is a real question as to whether the administration is doing what should be done. We note that rewards of up to $5 million have been offered for information or other assistance to lead to the arrest or conviction in many, many other terrorist attacks, but according to the information provided to me, that is not present with the issues of the murder of U.S. citizens.

There have been requests to the Palestinian Authority for the transfer to Israel of seven individuals who were suspected of murdering American citizens. There are specific factual matters which

53

have to be determined to activate that, and they have not been turned over, and we are going to be asking very pointed questions on that subject.

There is a question as to whether there has been adequate Israeli cooperation. I wrote on the subject back last May and received a response in July from the Acting Assistant Attorney General Sutin, complaining that the Israelis had delayed in complying with the October 1996 Department of Justice request for information. So there are many open questions.

We are joined by our distinguished colleague, Senator Lautenberg, who has been a member of this subcommittee almost as long as I have. He was elected in 1982 and has been a very active participant on this subject and many subjects related to this matter. He has taken a leave from his duties as ranking member of the Budget Committee, which has its bill on the Floor today, to emphasize the importance of this for this hearing. Senator Lautenberg.

PREPARED STATEMENTS OF SENATOR LEAHY AND SENATOR BOND

At this point in the record, I would like to include a prepared statement from Senator Leahy and Senator Bond.

[The statements follow:]

PREPARED STATEMENT OF SENATOR PATRICK LEAHY

Mr. Chairman, I welcome this hearing and am grateful to Senator Specter for taking the initiative.

We are here to listen to testimony on a tragic and difficult matter. I am as outraged as anyone about the terrorist attacks that have killed and injured Americans in Israel. We are all concerned about our ability to protect Americans abroad and to bring the perpetrators to justice. It should not matter whether a person is Israeli, Palestinian, or American—if there is credible evidence that a crime has been committed, justice should be served.

There is confusion about the facts in these cases and what efforts the Palestinian Authority, Israel and the United States have made to investigate and prosecute the people responsible for these crimes.

Rumor, speculation and longstanding mistrust between Israelis and Palestinians have only added to the confusion. Press reports contain widely varying accounts of the number of suspected Palestinian terrorists, including those implicated in the killings of Americans, who have been sentenced, released or who remain at large.

Both sides accuse the other of failing to live up to their obligations under the Wye Memorandum.

I have asked the State Department and the Justice Department for their views. It is my understanding that investigations of the terrorist attacks are ongoing, but that to date the administration does not believe there is enough evidence to issue indictments. I hope that this hearing will provide the answers that we and the victims' families are seeking.

I look forward to learning what the administration is doing to pursue these cases, what the evidence is, and what cooperation they are receiving.

It is somewhat ironic that the organizations most vocal about the need to extradite Palestinians suspected of killing Americans have not also raised their voices to protest the decision by the Israeli Supreme Court to deny extradition requests for Samuel Sheinbein, a fugitive who has flagrantly sought to avoid justice in this country.

This hearing is not only about American victims of the longstanding conflict between Israel and the Palestinian Authority. Suicide bombings and other attacks have claimed the lives of many innocent Israelis. Palestinians have died needlessly in indiscriminate killings. The violence continues and it claims lives on all sides.

Mr. Chairman, this hearing goes to the heart of the Oslo Accords and the Wye Memorandum, and whether the officials who signed those agreements are making good faith efforts to fulfill their security obligations and cooperate in the interest of ending the senseless bloodshed that has done nothing but prolong the suffering of innocent people.

54

PREPARED STATEMENT OF SENATOR CHRISTOPHER S. BOND

Ladies and gentlemen, thank you for coming before us to discuss the current situation facing all parties involved in the painful and painfully slow search for a lasting and fruitful peace in the Middle East.

This nation is blessed in that we have determined amongst ourselves that we can live together—and live together with our neighbors, in a state of peace. We come from varied backgrounds, some came here voluntarily, some not. Some came in search of a haven from oppression, some came in search of opportunity and prosperity. We are a nation of very different peoples forged in a crucible of democracy based on the tenet that each one of us is entitled to live peacefully alongside our neighbor. It has not been easy. It has required an intensive and long learning process and we have experienced severe pain, sometimes self inflleted, to arrive at our own peace. I raise this because I am afraid that until children are taught that they can coexist, the cycle will not be broken for the reasons we are discussing today. I am afraid that inciting the children to sacrifice themselves to kill other innocents through terrorist attacks on buses and in coffee houses and restaurants, and on busy streets, does nothing to further the cause of peace. I am afraid that turning a blind eye to inciteful rhetoric, empty promises, and cow towing to threats of violence unless one group or another gets their way, is no way for this nation to conduct a successful foreign policy. It distresses me when individuals are praised and worshiped for killing innocents. It distresses me greatly, when national leaders speak of driving people into the sea, of forcing people to "drink from the waters of the Dead Sea."

I look forward to your comments and the lively discussion I anticipate during this herring.

OPENING STATEMENT OF SENATOR FRANK R. LAUTENBERG

Senator LAUTENBERG. Thanks very much, Senator Specter, for scheduling this hearing on two important subjects, the Wye aid package and terrorist attacks on U.S. citizens in Israel.

I must say that few here have taken the active interest that Senator Specter has in these matters, Senator Specter has traveled to what I would consider some risky places to see if he could bring people to the table, bring heads of government to the table to engage in sensible dialog to achieve peaceful resolution of the dispute. I am sure, though those efforts do not turn out the kinds of effects we would like to see immediately, it does have an impact, and we thank you, Senator Specter, for your hard work.

I am delighted to see Ambassador Martin Indyk. He served with distinction as our Ambassador to Israel before assuming his present important post as Assistant Secretary for Near Eastern Affairs. And Mr. Richard, we do not know each other directly, but I know of your reputation. We are pleased to have you here.

Mr. RICHARD. Thank you.

Senator LAUTENBERG. I hope that we will hear how we can best support the peace process. In my view, one step we have got to take is the United States must fulfill President Clinton's commitment at Wye River to additional aid to support redeployment of Israeli forces, and to improve conditions in the West Bank and Gaza.

I visited there a few months ago, and I am persuaded that unless we start to see some improvement in the living standard of the inhabitants of Gaza and the West Bank, that you can never really rely on stability to take over. You cannot have that kind of disparity between one community and another and expect the people to sit back and settle for the deplorable conditions. So I support fully what we are committed to do.

  Our emergency supplemental which we now have in front of us includes $100 million also in aid to Jordan, to demonstrate our support during the transition following the passing of a great and dear friend of peace, King Hussein.

  I am disappointed, however, that we have not included the Wye aid package for Israel and the Palestinians in this supplemental bill. I do not know what kind of recourse we have there. But we will watch with interest and try to seize any opportunity that we can to make sure that we fulfill a commitment that we have to both parties, even as we hope that both parties will fulfill their commitment to the agreement.

  In my view we should implement fully the Wye River memorandum as soon as that process is back on track. Meanwhile, we must not let violence divert us from the road to peace. We must continue to pursue justice against those who have committed terrorist acts, particularly those who have injured or killed American citizens. The Palestinian Authority must fully investigate any leads in these cases and arrest and prosecute every individual responsible for terrorism, and we must stand with the American victims and the families in their quest for some measure of justice.

  I want to welcome a friend and constituent, Steve Flatow. Steve is going to be testifying today. Since a suicide bomber took the life of Steve's daughter Alisa in 1995—it was a day also that I arrived in Israel on a trip and placed a call to the Flatow family; Steve was already on his way to Israel; he had been notified—we have worked together to try to undermine the sources of support for terrorism.

  I have great respect for the efforts of Steve Flatow to try to deter that pain and that anguish from any other family. His daughter was in Israel as an innocent traveler. She wasn't in uniform. She was a student, she wasn't pursuing a course in conflict. It was a disastrous attack that was leveled against her and her friends.

  Well, on the basis of legislation that I introduced, Mr. Flatow won a $247 million judgment against Iran as a state sponsor of the terrorist act which killed his daughter. I was in the courtroom when the decisions were handed down, first to judge that terrorists were Iran state-supported and, second, when the damage award was made. I continue to work with Steve Flatow to help him collect on his judgment against Iran. I only wish the administration would be helping us more rather than obstructing this effort.

  I also want to welcome Vicki Eisenfeld. Her son Matt was killed at the same time as Sara Duker, from another constituent family from New Jersey, in another terrorist attack. I look forward to working with Mrs. Eisenfeld to identify and hold responsible those who financed, planned, and carried out these heinous crimes.

  I look forward to hearing from all of our witnesses, Mr. Chairman, this morning to see how we can sustain and revitalize the peace process and how we can work together to combat the scourge of terrorism in the Middle East and all around the world. I thank you very much for holding this hearing.

                SUMMARY STATEMENT OF MARK M. RICHARD

  Senator SPECTER. Thank you very much, Senator Lautenberg. We have listed Deputy Assistant Attorney General Richard No. 1 and Secretary Indyk as No. 2, so we will proceed in that order.

Welcome, Mr. Richard. I know that you have served in the Justice Department since 1979, a trial attorney in the Fraud Section, chief of the Major Violations Unit, director of the Attorney General's White Collar Crime Committee.

I thank you for joining us, and the floor is yours. We would like to limit the opening statements, if we might, to 5 minutes, leaving the maximum amount of time for dialogue, questions and answers. All statements will be made a part of the record in their entirety.

Mr. RICHARD. Thank you, Mr. Chairman. Let me begin by apologizing for the lateness of the delivery of my statement. We will endeavor to be more timely in the future. I do want to apologize.

### INVESTIGATION OF TERRORIST ATTACKS

I will summarize just key portions of the statement. The Department of Justice, and more particularly the FBI, initiates an inquiry into each and every terrorist attack that causes the death of a U.S. citizen abroad. The terrorist attacks that killed American citizens in Israel, the West Bank, and Gaza over the last several years are no exception.

Moreover, U.S. nationals who suffer injuries but who survive terrorist attacks, such as Diane Campesano, these incidents are also investigated by the FBI.

With regard to the particular facts of the cases here, I would say that the attacks that killed David Boim and Yaron Ungar were drive-by shootings. Sara Duker, Matthew Eisenfeld, Ira Weinstein, Alisa Flatow, Joanne Davenny, Leah Stern and Yael Botwin were killed in suicide bombing attacks that occurred in public places. Nachon Wachsman, a dual United States-Israeli citizen and an Israeli soldier, was kidnapped and held for ransom before being killed by his captors during an Israeli rescue attempt.

In each of these cases responsibility was claimed either by HAMAS or the Palestinian Islamic Jihad. The State of Israel or the Palestinian Authority have already arrested and convicted many of the surviving terrorists they claim were involved in these attacks, and those persons are now serving sentences in Israeli and Palestinian prisons.

### INFORMATION SOURCES

As much of the information that we have regarding these incidents is derived from Israeli and Palestinian authorities, it would be inappropriate to go into, in great detail, the information that we have available regarding these incidents. Moreover, public revelation at this point of such information could very well prejudice our ongoing inquiries.

Let me describe, though, briefly our efforts to secure cooperation from both the Israelis and Palestinian authorities. These efforts involve both formal diplomatic correspondence and more informal exchanges of information.

In each of the eight attacks I have listed, the FBI deployed investigators to the region after the incident. Thereafter, the FBI, through the Department of Justice, submitted through diplomatic channels two formal requests in which we sought from Israel such things as investigative and forensic reports, witness statements, and confessions.

57

Although Israel's response to these requests are not as timely or forthcoming as we had hoped—our first request was denied in part because of Israeli concerns that disclosure of some information could compromise their national security—we have nevertheless been able to obtain material information and additional assistance through more direct in-person meetings with our Israeli counterparts.

In March 1998 I led a Department of Justice and FBI delegation to Israel, where we were able to secure significant commitments from the Israelis to provide us with all of their law enforcement materials pertinent to these cases, subject to national security considerations. During this visit we also received assurances from Chairman Arafat that the Palestinian Authority would similarly cooperate in our efforts to bring killers of American citizens to justice.

### JOINT INVESTIGATIONS

I would note that both with respect to the Israelis and the Palestinians that their commitment does not necessarily include a willingness to allow American investigators to conduct on-the-ground investigations about these incidents. They are willing to give the FBI access to nonclassified information generated by their law enforcement and intelligence apparatus, but at present they are not prepared to allow joint United States-Israeli or United States-Palestinian investigations.

Senator SPECTER. Who was that?

Mr. RICHARD. Both the Palestinians and the Israelis. They do not conduct joint investigations. I would add, though, I am not sure that if the tables were reversed that we would allow independent foreign investigators to conduct inquiries in our territory under similar circumstances.

Documentary evidence provided by the Israelis and the Palestinians has enhanced our understanding of these incidents. In October 1998 another Department of Justice team, consisting of two prosecutors and several FBI agents, traveled to Jerusalem, remaining there for a 2-week period to engage in face-to-face meetings and interviews with Israeli police officers and prosecutors who handle these cases, from the crime scene through the investigation and prosecution. These meetings were very fruitful.

Since October the FBI has been in periodic contact with the Israeli Ministry of Justice, and they will be returning to the region in the near future.

### PREPARED STATEMENT

Let me just add in closing that these extraterritorial investigations are complex, but they are nevertheless guided by the same standards that apply to prosecutions of Federal crimes in the United States, and that is only when we have sufficient admissible evidence available for use at trial that can obtain and support a conviction will we seek an indictment. Until that point is reached in these cases, there is no basis for us seeking transfer of suspects being held in either Israeli or Palestinian custody.

58

Mr. Chairman, that completes my summary of the statement. I will be glad to answer any questions you may have.

Senator SPECTER. Thank you very much, Mr. Richard.

[The statement follows:]

PREPARED STATEMENT OF MARK M. RICHARD

Mr. Chairman and Members of the Subcommittee, I am pleased to be here today to discuss the Department of Justice's current investigations into terrorist attacks that killed American citizens in Israel, the West Bank, and Gaza.

The Department, and more particularly the Federal Bureau of Investigation, initiates an inquiry into each and every terrorist attack that causes the death of a U.S. citizen abroad. The terrorist attacks that killed American citizens in Israel, the West Bank, and Gaza over the last several years are no exception. Among the incidents that the FBI is currently investigating are the terrorist attacks that killed:

—Nachon Wachsman (October 9, 1994),
—Alisa Flatow (April 9, 1995),
—Joanne Davenny (August 21, 1995),
—Sara Duker, Matthew Eisenfeld and Ira Weinstein (February 25, 1996),
—David Boim (May 13, 1996),
—Yaron Ungar (June 9, 1996),
—Leah Stern (July 30, 1997), and
—Yael Botwin (September 4, 1997).

I should note that this list does not include U.S. nationals who suffered injuries but who survived terrorist attacks, although the FBI investigates those cases as well.

With regard to the particular facts of these eight cases, two of them—the attacks that killed David Boim and Yaron Ungar—were drive-by shootings. Sara Duker, Matthew Eisenfeld, Ira Weinstein, Alisa Flatow, Joanne Davenny, Leah Stern and Yael Botwin were killed in suicide bombing attacks that occurred in public places. Nachon Wachsman, a dual U.S.-Israeli citizen and Israeli soldier, was kidnaped and held for ransom before being killed by his captors during an Israeli rescue attempt.

In each of these cases, responsibility was claimed either by HAMAS or the Palestinian Islamic Jihad (PIJ). The State of Israel or the Palestinian Authority has arrested and convicted many of the surviving terrorists they claim were involved in these attacks, and those persons are now serving sentences in Israeli and Palestinian prisons.

The Department's investigation into these attacks is multi-faceted, and involves both formal, diplomatic correspondence and more informal exchanges of information between Israeli and American law enforcement. In each of the eight attacks I have listed, the FBI deployed investigators to the region after the incident. Thereafter, the FBI, through the Department of Justice, submitted through diplomatic channels two formal requests—known as "Judicial Assistance Requests" or "Letters of Request"—in which we sought from Israel such things as investigative and forensic reports, witness statements and confessions. Although Israel's response to these requests was not as timely or forthcoming as we had hoped—our first request was denied in part because of Israeli concerns that disclosure of some information could compromise their national security—we have been able to obtain material information and additional assistance through more direct, in-person meetings with our Israeli counterparts.

In March 1998, I led a Department of Justice and FBI delegation to Israel, where we were able to secure a commitment from the Israelis to provide us with all of their law enforcement materials pertinent to these cases, subject to national security considerations. During this visit, we also received assurances from Chairman Arafat that the Palestinian Authority would similarly cooperate in our efforts to bring killers of American citizens to justice.

With regard to the Israelis, I should note that their commitment does not include a willingness to allow American investigators to join the Israeli police in developing evidence immediately after the occurrence of an incident. They are willing to give the FBI access to non-classified information generated by their law enforcement and intelligence apparatus, but at present they are not prepared to allow joint U.S.-Israeli investigations into terrorist attacks that occur in the region. To place this position in context, I should note that, in the majority of terrorist attacks of this sort, the Israeli victims outnumber the Americans. In the blast that killed Americans SaraDuker, Matthew Eisenfeld and Ira Weinstein, for example, 22 Israelis died. In this light, it is understandable that the Israeli government would be in-

59

clined to pursue these investigations, at least initially, without our assistance or direct participation.

Documentary evidence provided by the Israelis and the Palestinians as a result of the March visit has enhanced our understanding of these incidents and has provided us with the means of following up with requests for additional information. In October, 1998, a Department of Justice team consisting of two prosecutors and several FBI agents traveled to Jerusalem over a two-week period to engage in face-to-face meetings with the Israeli police officers and prosecutors who handled these cases, from the crime scene through the investigation and prosecution. In our view, these meetings were fruitful; in addition to receiving thousands of pages of additional investigative material and interviewing several Israeli police officers, the Department established a channel of communication that we believe will facilitate not only these cases but future investigations as well. Since October, the FBI has been in periodic contact with the Israeli Ministry of Justice personnel, and they will be returning to the region in the near future. Our current efforts place priority on those terrorists who remain at large or who have yet to be brought to trial.

In pursuing these extraterritorial investigations, the Department is guided by the same standards that apply to prosecutions of federal crimes in the United States: only when sufficient admissible evidence is developed and available for use at trial, such that we could obtain a conviction in a U.S. court, do we seek an indictment. Until that point is reached in these cases, there is not a basis for our seeking the transfer of suspects being held in Israeli or Palestinian custody.

The extraterritorial nature of these investigations adds a complicating—though not insurmountable—factor to the Department's pursuit of them. In addition to the fact that the evidentiary material is largely in Hebrew and must be run through an extensive translation process, it is collected in accordance with a legal system and evidentiary standards that are different from our own. Moreover, in putting together an American prosecution, the Department must go beyond the evidence itself and determine how that evidence could be presented in a form that would be admissible in a U.S. proceeding and how it would be received in the context of a jury trial. Thus, in each of these cases, our prosecutors must determine whether additional investigative steps are necessary to meet evidentiary or procedural standards that may be different from or even more onerous than what is required in Israel. This determination must necessarily start with the translated Israeli evidence we are still in the process of receiving as a result of the March and October, 1998 visits.

These factors should not be read to imply that American criminal laws cannot reach terrorists who harm U.S. interests abroad. In fact, recent experience shows that the contrary is true. In June, 1998, for example, the FBI arrested Mohammed Rashed, who had been indicted by the United States in 1987 for the 1982 bombing or a Pan Am flight originating in Tokyo. He is currently awaiting trial in Washington. In addition to this case, over the last decade the Department has successfully prosecuted several cases in which defendants had to be arrested abroad and brought back to stand trial in the United States for acts of international terrorism committed overseas. In many of these cases, the Department pursued the investigations through evidence provided by other countries.

The Department remains committed to the pursuit of these terrorism investigations, and we will continue our efforts to bring the investigations to a successful conclusion.

Mr. Chairman, this concludes my statement. I would be happy to answer questions from you and the members of the Subcommittee. I should stress that, as these cases remain under active criminal investigation, we would prefer to limit discussion of their particular details.

SUMMARY STATEMENT OF MARTIN S. INDYK

Senator SPECTER. We now turn to Mr. Martin Indyk, Assistant Secretary of State for Near Eastern Affairs. He served as U.S. Ambassador to Israel from 1995 to 1997 and prior to that was Special Assistant to the President and Senior Director for Near East and South Asian Affairs at the National Security Council. Welcome, Mr. Indyk, and the floor is yours.

Mr. INDYK. Thank you very much, Senator Specter. I am very grateful for this opportunity to address the Senate Appropriations Subcommittee on Foreign Operations, and in particular to address you, sir, and Senator Lautenberg, whom I also know. I have had