UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

SHABTAI SCOTT SHATSKY, individually and as       :
personal representative of the Estate of Keren Shatsky, :
JO ANNE SHATSKY, individually and as personal    :
representative of the Estate of Keren Shatsky,       :      Case No. 1:18-cv-12355-MKV
TZIPPORA SHATSKY SCHWARZ, YOSEPH                :
SHATSKY, SARA SHATSKY TZIMMERMAN,               :
MIRIAM SHATSKY, DAVID RAPHAEL                   :      Honorable Mary Kay Vyskocil
SHATKSY, GINETTE LANDO THALER,                  :
individually and as personal representative of the     :
Estate of Rachel Thaler, MICHAEL THALER,            :
individually and as personal representative of the     :
Estate of Rachel Thaler, LEOR THALER, ZVI           :
THALER, ISAAC THALER, HILLEL TRATTNER,          :
RONIT TRATTNER, ARON S. TRATTNER,               :
SHELLEY TRATTNER, EFRAT TRATTNER,               :
HADASSA DINER, YAEL HILLMAN, STEVEN             :
BRAUN, CHANA FRIEDMAN, ILAN FRIEDMAN,           :
MIRIAM FRIEDMAN, YEHIEL FRIEDMAN, ZVI           :
FRIEDMAN and BELLA FRIEDMAN,                    :
                                               :
                        Plaintiffs,            :
                                               :
        v.                                     :
                                               :
THE PALESTINE LIBERATION ORGANIZATION, :
and THE PALESTINIAN AUTHORITY (a/k/a "THE :
PALESTINIAN INTERIM SELF-GOVERNMENT            :
AUTHORITY" and/or "THE PALESTINIAN             :
NATIONAL AUTHORITY"),                          :
                                               :
                        Defendants.            :
                                               :
                                               :
                                               :
                                               :
————————————————————————x

**REDACTED VERSION**

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**</u>
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

<u>**TABLE OF CONTENTS**</u>

**Page**

**PRELIMINARY STATEMENT** ................................................................. 1

**BACKGROUND** ..................................................................................... 3

    I.     Statement of Undisputed Facts ................................................. 3

           A.    Formation of the PLO and PA ................................... 3

           B.    The PLO and PA Sponsored Terrorism During the Second Intifada.......... 4

           C.    Nazal and the PFLP Bombing in Karnei Shomron .................... 4

    II.    Procedural History ................................................................... 5

           A.    *Shatsky I* ................................................................. 5

           B.    Proceedings In This Court ......................................... 6

**LEGAL STANDARD** ............................................................................ 7

**ARGUMENT** ......................................................................................... 8

    III.    *Shatsky I* Orders Are Not Binding On This Court. .................... 8

    IV.    Defendant PA Is Vicariously Liable For The Tortious Acts Of Captain Nazal. .. 11

           A.    Nazal Orchestrated The Bombing.............................. 12

           B.    The PA Is Liable For The Tortious Acts of Nazal. ................ 15

    V.    Defendants Are Directly Liable Under The ATA For Knowingly Providing Material Support To The PFLP.................... 16

    VI.    Defendants Are Secondarily Liable For Aiding-and-Abetting and Conspiracy Under JASTA.................... 20

           A.    Defendants Aided And Abetted The PFLP And Its Operatives, Who Were Responsible For Planning And Executing The Bombing That Injured Plaintiffs.................... 20

           B.    Defendants "*Knowingly*" Provided "*Substantial Assistance*" To The PFLP In Carrying Out The Bombing.................... 21

           C.    The Evidence Shows Defendants Were "Generally Aware" Of Their Role In PFLP's Illegal And Tortious Activities. ................ 23

           D.    The Evidence Also Supports a Finding of Liability Based on JASTA Conspiracy. .................... 24

    VII.    Plaintiffs' Non-Federal Claims. .................... 25

**CONCLUSION** ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adorno v. Corr. Servs. Corp.*,
    312 F. Supp. 2d 505 (S.D.N.Y. 2004) ........................................................................16

*Am. Cas. Co. of Reading, PA v. Nordic Leasing, Inc.*,
    42 F.3d 725 (2d Cir. 1994) .......................................................................................7

*Amnesty Am. v. Town of W. Hartford*,
    361 F.3d 113 (2d Cir. 2004) .....................................................................................7

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) .................................................................................................7

*Bruce v. Port Auth. of N.Y. & N.J.*,
    531 F. Supp. 2d 472 (E.D.N.Y. 2008) ...................................................................12

*Daniels v. Jacobs*,
    753 F. App'x 748 (11th Cir. 2018) .........................................................................10

*De Curtis v. Ferrandina*,
    529 F. App'x 85 (2d Cir. 2013) ...............................................................................8

*Debevoise v. Rutland Railway Corp.*,
    291 F.2d 379 (2d Cir. 1961) .....................................................................................8

*Doe v. New York Univ.*,
    2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021) ...................................................1, 10

*Enron Oil Corp. v. Diakuhara*,
    10 F.3d 90 (2d Cir. 1993) .......................................................................................11

*Every v. Makita U.S.A., Inc.*,
    2005 WL 2757952 (S.D.N.Y. Oct. 24, 2005) ........................................................10

*Fort Knox Music Inc. v. Baptiste*,
    257 F.3d 108 (2d Cir. 2001) .....................................................................................8

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ..............................................................11, 14

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
    53 F. Supp. 3d 191 (D.D.C. 2014) .........................................................................14

*Haas v. Del. Hudson Ry, Co.*,
    282 F. App'x 84 (2d Cir. 2008) .............................................................................10

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ................................................................21, 22, 24

*Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
   495 F. Supp. 3d 144 (E.D.N.Y. 2020) ...................................................................17

*Higazy v. Templeton*,
   505 F.3d 161 (2d Cir. 2007)...................................................................................20

*Kaplan v. Lebanese Canadian Bank, SAL*,
   405 F. Supp. 3d 525 (S.D.N.Y. 2019).....................................................................24

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021)....................................................................2, 20, 21, 23

*Keepers, Inc. v. City of Milford*,
   807 F.3d 24 (2d Cir. 2015).....................................................................................13

*Knox v. Palestine Liberation Org.*,
   306 F. Supp. 2d 424 (S.D.N.Y. 2004).......................................................................3

*Knox v. PLO*,
   442 F. Supp. 2d 62 (S.D.N.Y. 2006).......................................................................11

*Kwon v. Yun*,
   606 F. Supp. 2d 344 (S.D.N.Y. 2009).....................................................................12

*Lelchook v. Islamic Republic of Iran*,
   393 F. Supp. 3d 261 (E.D.N.Y. 2019) ....................................................................23

*Lewis v. Borg-Warner Corp.*,
   325 N.Y.S.2d 314 (1971)........................................................................................25

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)......................................................................... *passim*

*Linde v. Arab Bank, PLC*,
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) ......................................................................19

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) ......................................................................23

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D. Utah 2006) ......................................................................6

*Nabisco, Inc. v. Warner-Lambert Co.*,
   220 F.3d 43 (2d Cir. 2000)........................................................................................7

*Parker v. Freightliner Corp.*,
    940 F.2d 1019 (7th Cir. 1991) ..................................................................................10, 11

*Estate of Parsons v. Palestinian Auth.*,
    651 F.3d 118 (D.C. Cir. 2011) ...........................................................................................11

*Riviello v. Waldron*,
    47 N.Y.2d 297 (1979) .........................................................................................................12

*Schansman v. Sberbank of Russia PJSC*,
    2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021).....................................................................16

*Selzer v. Bank of Bermuda Ltd.*,
    385 F. Supp. 415 (S.D.N.Y. 1974) ......................................................................................25

*Shatsky v. Palestine Liberation Org.*,
    2017 WL 2666111 (D.D.C. June 20, 2017) ...........................................................................6

*Shatsky v. Palestine Liberation Org.*,
    955 F.3d 1016 (D.C. Cir. 2020) ............................................................................................6

*Shatsky v. Syrian Arab Republic*,
    312 F.R.D. 219 (D.D.C. 2015)...............................................................................................6

*Shatsky v. Syrian Arab Republic*,
    No. 08-cv-00496 (RJL) (D.D.C. 2008)..............................................................................9, 10

*Shatsky v. Syrian Arab Republic*,
    No. 02-cv-02280 (RJL) (D.D.C. 2002).......................................................................... *passim*

*Sokolow v. Palestine Liberation Org.*,
    60 F. Supp. 3d 509 (S.D.N.Y. 2014)..........................................................................2, 11, 18

*Strauss v. Credit Lyonnais, S.A.*,
    2017 WL 4481126 (E.D.N.Y. Sept. 30, 2017) .............................................................13, 19

*Strauss v. Credit Lyonnais, S.A.*,
    2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006).........................................................................19

*Sty-Lite Co. v. Eminent Sportswear Inc.*,
    2002 WL 15650 (S.D.N.Y. Jan. 7, 2002) ............................................................................10

*U.S. v. Gupta*,
    747 F.3d 111 (2d Cir. 2014)................................................................................................15

*United States v. Hamilton*,
    334 F.3d 170 (2d Cir. 2003)................................................................................................22

*United States v. Taleb-Jedi,*
    566 F. Supp. 2d. 157 (E.D.N.Y. 2008) ......................................................19

*Waldman v. Palestine Liberation Org.,*
    835 F.2d 317 (2d Cir. 2016)....................................................................25

*Weiss v. Nat'l Westminster Bank, PLC,*
    278 F. Supp. 3d 636 (E.D.N.Y. 2017) .............................................14, 22

*Weiss v. Nat'l Westminster Bank, PLC,*
    993 F.3d 144 (2d Cir. 2021)...................................................................17

**Statutes**

18 U.S.C. § 2331(1)(A)................................................................................17

18 U.S.C. § 2332(b)....................................................................................17

18 U.S.C. § 2333(a) ..............................................................................16, 20

18 U.S.C. § 2333(d) ....................................................................................24

18 U.S.C. § 2333(d)(2)................................................................................20

18 U.S.C. § 2339..........................................................................................18

18 U.S.C. § 2339B .......................................................................................17

Anti-Terrorism Act of 1991, 18 U.S.C. § 2331, *et seq.*............................2, 11

Pub. L. No. 114-222, 130 Stat. at 854 (Sept. 28, 2016)................................20

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................7

Fed. R. Civ. P. 56(d) .................................................................................7, 8

Fed. R. Civ. P. 59(e) ..................................................................................14

Fed. R. Civ. P. 803(8) ................................................................................18

Fed. R. Civ. P. 804(b)(3)............................................................................15

Fed. R. Evid. 801(d)(2)...............................................................................18

N.Y. C.P.L.R. § 207 ...................................................................................25

*Restatement (Third) of Agency* § 7.07 (2006)...........................................11

## PRELIMINARY STATEMENT

The evidence in this case demonstrates that the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively, "Defendants") provided substantial material support to the Popular Front for the Liberation of Palestine (the "PFLP"), a known terrorist organization that admitted to carrying out a terrorist attack in the Israeli town of Karnei Shomron in 2002 (the "Bombing").  Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1 ("SOF") ¶¶ 49, 53.  The attack killed two Americans, severely injuring five more.

Admissions by Defendants demonstrate that Defendants' material support of the PFLP took many forms, including: (i) paying rent for PFLP offices, including an office in Qalqilya (*Id.* ¶¶ 5, 26); (ii) hiring Ra'ed Nazal, one of the PFLP's most dangerous military leaders, into the PA's security apparatus, providing him with a salary but no formal assignment or uniform (*Id.* ¶ 43); (iii) continuing the employment of Nazal (*Id.* ¶ 39) despite knowledge that he was actively serving as the leader of the PFLP's militant wing; and (iv) providing detainee and martyr payments to families of PFLP operatives including the families of Nazal and Sadeq Hafez (*Id.* ¶¶ 35–36).  A 2007 report issued by the Israel Security Agency (the "ISA")—the Israeli government agency responsible for and tasked with carrying out counterterrorism, counter-espionage, and intelligence gathering in Israel—concluded the Bombing "was planned and executed by the PFLP military network in Qalqilya, under the direction of [Nazal], in collaboration with the PFLP network in Nablus, headed by Ahad Oulma."[1]  Declaration of Abbe David Lowell ("Lowell Decl."), Ex. 20 ("2007 ISA Report") at 59; Ex. 25 ("Guez Decl.") ¶¶ 11–13; Ex. 26 ("Ilan Decl.") ¶ 14.  This evidence, taken together, is sufficient to raise a genuine dispute of material fact for trial that the

---

[1] The 2007 ISA Report is incorporated by reference in the operative complaint.  FAC ¶ 129.  On summary judgment, courts can appropriately consider documents that are "integral to" the complaint as well as those that are outside of the pleadings.  *Doe v. New York Univ.*, 2021 WL 1226384, at *32 (S.D.N.Y. Mar. 31, 2021).

PA, as Nazal's employer, is vicariously liable under the Anti-Terrorism Act of 1991, 18 U.S.C. § 2331, *et seq*. (the "ATA").  *See, e.g.*, *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014).  The evidence is also sufficient to prove Plaintiffs' primary- and secondary-liability claims under the ATA.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 882 F.3d 314, 320 (2d Cir. 2018); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 847 (2d Cir. 2021).

Rather than litigate on the merits and confront the considerable amount of relevant admissible evidence proffered in this case, Defendants assert that they are entitled to summary judgment because the United States District Court for the District of Columbia ("D.D.C.") granted summary judgment in favor of Defendants in a related lawsuit (*Shatsky I*) and excluded certain evidence that Plaintiffs seek to rely on here.  Mot. at 2–3.  As an initial matter, that case took 15 years to litigate because Defendants defaulted twice, refusing to litigate on the merits until five years after the case had been filed (and, even then, stonewalling Plaintiffs at every turn).  *See infra* at 5.  Moreover, the *Shatsky I* summary judgment order has *no preclusive effect here*.  As this Court previously articulated, "the D.C. circuit vacated the Judge Leon summary judgment opinion. So how can there possibly be any kind of preclusive effect?  They vacated based on your argument[.]" ECF 46 (Nov. 6, 2020 Hr'g Tr.) at 24:18-23.  What's more, that decision was based on a *limited* record, not the full evidentiary record in play here.  *See infra* Part I.  Defendants feigned claim of prejudice of having to litigate based on previously excluded evidence (Mot. at 8) is rendered moot by the fact that they have long known—as they concede in their Motion—that Plaintiffs planned to rely here on the full *Shatsky I* record, including expert testimony and documents excluded from the *Shatsky I* summary judgment record (*see* Mot. at 2).

The applicable summary judgment standard requires that all evidence at this stage be considered in the light most favorable to Plaintiffs. When this standard is applied, there can be no question that this case should proceed to trial. Plaintiffs respectfully ask the Court to let it do so.

## BACKGROUND

### I.   Statement of Undisputed Facts

On the evening of February 16, 2002, American teenagers Keren Shatsky and Rachel Thaler were murdered when a suicide bomber detonated himself in a pizzeria located in the Israeli town of Karnei Shomron, just 14 miles from Qalqilya, a town in the West Bank governed by the PA. SOF ¶¶ 14, 69. Plaintiffs Leor Thaler, Hillel Trattner, Ronit Trattner, Steven Braun, and Chana Friedman were also severely injured in the Bombing. *Id.* ¶ 69. The PFLP, a terrorist organization which is the second largest faction in the PLO, carried out the attack using resources provided by the PA and PLO. *Id.* ¶¶ 53, 57. The mastermind behind the attack was a Captain in the PA's security forces and known PFLP military leader named Ra'ed Musa Ibrahim Nazal (a/k/a "Ra'ed Madi") ("Nazal").[2] *Id.* ¶¶ 56. That is the event that led to this litigation.

### A.   Formation of the PLO and PA

Since its inception in 1964, the PLO's purpose has been to "fight for Palestinian rights and independence." *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 432 (S.D.N.Y. 2004). The PFLP, which the United States designated a foreign terrorist organization ("FTO") in 1997, falls under the PLO umbrella.[3] SOF ¶ 49. Until his death, Yasser Arafat was the chairman of the PLO and president of the PA. *Id.* ¶ 130.

---

[2] Some of Defendant PA's files or other payment records use the name Ra'ed Madi instead of Ra'ed Nazal. For the avoidance of doubt, it is undisputed that Ra'ed Madi and Ra'ed Nazal are the same individual.

[3] The PFLP's militant wing is known as the Abu Ali Mustafa Brigades.

### B.      The PLO and PA Sponsored Terrorism During the Second Intifada

After peace talks failed between Israel and the Palestinians in July 2000, Arafat led a violent resistance against Israel known as the Second Intifada (2000 to 2005).  *Id.* ¶ 125.  The PA and the PLO supported and sponsored the PFLP as it carried out violent attacks against Israel and Israeli citizens during this period, including the Bombing in 2002.  *Id.* ¶ 131.

A crucial component of the PA and PLO plan to encourage terrorism involved a rewards system devised to compensate terrorists and their families for terrorist acts undertaken.  *Id.* ¶¶ 117–123.  The Palestinian Ministry of Detainees and Ex-Detainees Affairs made detainee payments to families of PFLP operatives held in Israeli prisons.  *Id.* ¶¶ 117–123.  The PA's Martyrs and Wounded Affairs Establishment made posthumous payments, known as "martyr payments," to families of PFLP operatives killed in terrorist attacks.  *Id.* ¶ 123.

### C.      Nazal and the PFLP Bombing in Karnei Shomron

Nazal was an active member of the PFLP when he was imprisoned by Israel for his PFLP-related activities in 1985.  *Id*. ¶ 89.  The PA negotiated Nazal's release in September 1999.  *Id*. ¶ 91.  Upon his release, Nazal was hired by the PA as a Captain in the PA's National Security apparatus in Qalqilya and assumed a leadership role in the PFLP's cell in Qalqilya.  *Id*. ¶ 93.  Defendants concede that the PA paid Nazal a salary, despite Nazal having no official duties or responsibilities, and also paid the rent for the PFLP office in Qalqilya.  ECF 121 ¶¶ 26, 34.  While employed by the PA, Nazal perpetrated terrorist acts on behalf of the PFLP, and recruited Palestinian youths to the PFLP.  SOF ¶¶ 94, 97.  Nazal was actively involved with terrorism for the entire two year period of his employment, until his death in April 2002.  *Id.*

The PFLP admitted carrying out the Bombing, which was planned and executed by the PFLP military network in Qalqilya, under the direction of Nazal, in coordination with the PFLP network in Nablus, headed by Ahad Oulma.  SOF ¶ 59.  The PA was advised nine days before the

Bombing that Nazal had been engaging in terrorist activity. *Id.* ¶ 25 (Plaintiffs' Response). The PFLP operative who carried out the bombing was Sadeq Hafez. *Id.* ¶ 53; *see* Defs.' Stmt. of Facts as to Which There is No Genuine Issue (ECF 121) ¶¶ 28–36 (discussing Hafez and the Bombing); SOF ¶ 55 (noting "Defendants have conceded . . . that Hafez was the bomber.").

The Bombing would not have been possible without the aid and material support of the PLO and PA. Specifically, Defendants permitted the PFLP to maintain and operate headquarters and offices in the West Bank cities of Qalqilya, Nablus, Jenin, Ramallah and Tulkarem, as well as various locations in the Gaza Strip. *Id.* ¶ 106. The PLO paid the annual rent for many, if not all, of the PFLP headquarters in the West Bank (*Id.* ¶¶ 108–112), including the PFLP office in Qalqilya. ECF 121 ¶¶ 26, 34. The PA also paid "salaries" and other financial benefits to hundreds of PFLP operatives, including Nazal. SOF ¶¶ 94, 99, 115; *see also* ECF 121 ¶ 42.

Nazal died in April 2002 during a stand-off with Israeli forces who were pursuing him in connection with his role in the Bombing. SOF ¶ 58. After his death, the PA posthumously promoted Nazal from Captain to the rank of Major and started making "martyr" payments to his family. *Id.* ¶¶ 102–104. Hafez's father also received "martyr" payments as compensation for Hafez's role in the Bombing. *Id.* ¶ 101. Nearly 20 years later, the victims of that Bombing and their families have received nothing.

## II.      Procedural History

### A.      *Shatsky I*

In 2002, Plaintiffs filed a suit in the D.D.C. based on the same facts at issue here. Complaint, *Shatsky, et al. v. Syrian Arab Republic, et al.*, No. 02-cv-02280 (RJL) (D.D.C. 2002) ("*Shatsky I*") (*Shatsky I*, DE3). The D.D.C. entered two defaults against Defendants: in 2003 for failing to answer (*Shatsky I*, DE18) and in 2005 for refusing to litigate after their motion to dismiss was denied (*Shatsky I*, DE52). Five years after the suit was filed, in 2007, Defendants moved to

vacate their willful default, committing to "litigating the case on the merits." *See Shatsky I*, DE77 at 11 (Memorandum in Support of Defs.' Mot. to Vacate Clerk's Entry of Default).

The Defendants moved for summary judgment on the merits in August 2013 (*Shatsky I*, DE247),[4] which Plaintiffs opposed on November 12, 2013 (*Shatsky I*, DE252). Defendants subsequently moved to strike certain of Plaintiffs' experts and exhibits as having been untimely disclosed and thus prejudicial (which the court granted in part). *Shatsky v. Syrian Arab Republic*, 312 F.R.D. 219, 229 (D.D.C. 2015). In response, Plaintiffs filed a reconstituted opposition to summary judgment on the stripped record. *Shatsky I*, DE331. The district court ruled that it had personal jurisdiction over Defendants but granted them summary judgment on the ground that the evidence that was allowed to be submitted did not show that Defendants had proximately caused the terrorist attack. *Shatsky v. Palestine Liberation Org.*, 2017 WL 2666111, at *6–10 (D.D.C. June 20, 2017). On appeal, Defendants cross-challenged, among other things, the lower court's finding of personal jurisdiction. *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016 (D.C. Cir. 2020). The D.C. Circuit reversed and vacated, holding that the D.D.C. should have dismissed for lack of personal jurisdiction (*id.* at 1022), thereby rendering all *Shatsky I* rulings legal nullities.

### B.    Proceedings In This Court

Plaintiffs filed this action on December 31, 2018. ECF 1. Contrary to Defendants' assertion (Mot. at 3), this action is *not* "duplicative of *Shatsky I*" – it involves new Plaintiffs (Efrat Trattner, Hadassa Diner and Yael Hillman, ECF 50 ¶ 18) and new factual allegations (*see, e.g.*, ECF 50 ¶¶ 109, 113–14, 129, 140).[5] Among other things, the First Amended Complaint ("FAC")

---

[4] The Palestinian Defendants' 2013 summary judgment motion did not include a challenge to personal jurisdiction. *See* Memorandum Order, ( *Shatsky I*, DE300).

[5] Defendants have previously asserted that the claims of the new Plaintiffs are derivative of the claims of Plaintiff Hillel Trattner. That is incorrect. ATA claims are not derivative and must be prosecuted individually. *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1338–39 (D. Utah 2006) ("[S]ince Mr. Morris survived the attack, his family members

incorporates certain evidence that was not considered in *Shatsky I* – most notably, a 2007 Report by the Israel Security Agency, which made certain investigative findings about who planned and executed the Bombing (the "2007 ISA Report"). *Id.* at ¶¶ 128–29.

Although this Court previously noted that it "sees no need for other discovery" (ECF 60 at 2), it never limited the evidentiary record in this case to just the *Shatsky I* summary judgment record. And the Court left open the possibility of seeking additional discovery pursuant to Federal Rule of Civil Procedure 56(d). *See* ECF 80 at 2 (noting any new merits discovery under Rule 56(d) is "premature"); ECF 81 at 10:9–13 (same).

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When faced with a summary judgment motion, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in the nonmovant's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986); *Am. Cas. Co. of Reading, PA v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). If material facts are genuinely in dispute, or if a "reasonable jury" could decide in the non-moving party's favor, summary judgment is inappropriate. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

---

cannot recover for those injuries derivatively through him; they must do so as individual plaintiffs who allege personal injury in a complaint.").

## ARGUMENT

**III.    *Shatsky I* Orders Are Not Binding On This Court.**

Rather than litigating on the merits on a *full* record, Defendants argue that Plaintiffs should be limited to the summary judgment record in *Shatsky I*.  Mot. at 7.  Specifically, they claim that this Court's February 8 order "protect[s]" them from materials outside of "the *Shatsky I* discovery record, which encompass … the D.D.C's discovery sanctions orders[.]"  Mot. at 7.  Not so.

While this Court did note that no further discovery was warranted *before* summary judgment motions were filed (ECF 81 at 10:9–13), that ruling was based on Defendants' representation that the "'*full* [merits-based] discovery' conducted in *Shatsky I*" would be in play here (ECF 60 at 2)—not the limited summary judgment record from *Shatsky I* (ECF 54 at 2 (noting that, in *Shatsky I*, the D.D.C. did not consider documents disclosed after September 2012 or expert testimony)).  Also, this Court specifically left open the possibility of seeking additional discovery in this case pursuant to Federal Rule of Civil Procedure 56(d) after "the motions get made."  ECF 81 at 10:10–13.

Defendants insist that the prior discovery orders should apply here as they would purportedly suffer "the <u>same</u> prejudice here if Plaintiffs can oppose summary judgment with materials excluded by the D.D.C."  Mot. at 8.  That is disingenuous and without any merit.  As an initial matter, Defendants *themselves* elected to nullify the summary judgment decision in *Shatsky I* (and all other orders in that case) by pressing their personal jurisdiction argument on appeal.  *See* Mot. at 1, n.1.  Defendants cannot now claim the benefit of that vacated decision, or any other rulings rendered along the way.  *See*, *e.g.*, *De Curtis v. Ferrandina*, 529 F. App'x 85, 85 (2d Cir. 2013) ("A judgment is void where the court lacks personal jurisdiction over the defendant."); *Fort Knox Music Inc. v. Baptiste*, 257 F.3d 108, 110 (2d Cir. 2001) ("A vacated judgment has no effect."); *Debevoise v. Rutland Railway Corp.*, 291 F.2d 379, 381 (2d Cir. 1961) ("Since the district

court had no jurisdiction all proceedings taken in it were a nullity[.]"); *see also* ECF 42 at 2-3.  As this Court previously articulated, "the D.C. circuit vacated the Judge Leon summary judgment opinion. So how can there possibly be any kind of preclusive effect?  They vacated based on your argument[.]"  ECF 46 (Nov. 6, 2020 Hr'g Tr.) at 24:18-23.

Moreover, the situation here is nothing like *Shatsky I*.  In that case, the D.D.C. excluded certain evidence produced *for the first time* in Plaintiffs' opposition to summary judgment because the judge concluded that such "late-breaking disclosures . . . materially altered the evidentiary landscape after defendants filed for summary judgment relief" and were thus "highly prejudicial." *Shatsky*, 312 F.R.D. at 226–27.  Putting aside the merits of those findings, any such concerns do not exist here.  Defendants cannot seriously dispute that for years, or at the very least months, they have had access to the *Shatsky I* record and other evidence relied on in this opposition—giving them ample opportunity to take depositions, hire experts, or further investigate any previously-disclosed evidence.  *See* Index of Evidence In Support Of Plaintiffs' Opposition To Defendants' Motion For Summary Judgment, filed concurrently herewith (indicating where and when evidence was previously introduced).  Over the past year, Plaintiffs have *repeatedly* informed Defendants that they "anticipate using in this case evidence that was not considered in *Shatsky I*" including "a report by the Israel Security Agency."  ECF 54 at 2–3.  Plaintiffs also notified Defendants that they intended to rely on expert testimony from Messrs. Arieh Dan Spitzen, Matthew Levitt and Ronni Shaked that falls squarely within the scope of their reports submitted in *Shatsky I* and in *Shatsky v. Syrian Arab Republic*, No. 08-cv-00496 (RJL) (D.D.C. 2008) ("*Shatsky v. Syria*") and that they intended to submit a new, purely foundational declaration by Mr. Nimrod Guez that would be substantively similar to the foundational declaration provided by the late Itzhak Ilan in *Shatsky v. Syria*.  *See* Lowell Decl., Ex. 117; Ex. 118.  Plaintiffs provided Defendants with copies

of the relevant declarations from the *Shatsky v. Syria* matter and a copy of the new Guez declaration in April 2021 (which is identical to the Guez declaration filed in support of this opposition), and offered to re-produce the expert reports from *Shatsky I*.  *See* Lowell Decl., Ex. 118; Ex. 119.  None of the declarations submitted in support of this opposition offer any *new* testimony or expert theories.  And any claim of being "blindsided by the[] eleventh hour production" (Mot. at 8) of documents is risible.

Defendants' reliance on *Sty-Lite Co*, *Haas*, and *Every* (Mot. at 7-8) is misplaced.  Unlike *Sty-Lite Co.*, where plaintiffs were requesting additional discovery they had failed to obtain in prior litigation, Plaintiffs are merely seeking to rely on previously obtained (and disclosed) evidence. *Cf. Sty-Lite Co. v. Eminent Sportswear Inc.*, 2002 WL 15650, at *6 (S.D.N.Y. Jan. 7, 2002) (denying plaintiff's request for *additional* discovery when plaintiff "nowhere state[d] what efforts it has made to obtain the discovery it now seeks, much less why it never sought to obtain such discovery in the prior litigation.").  *Haas* and *Every* (cited in Mot. at 8–9) are also inapposite, as those cases involve *new* evidence or theories advanced *for the first time on summary judgment*. *Cf. Haas v. Del. Hudson Ry, Co.*, 282 F. App'x 84, 85–86 (2d Cir. 2008) (excluding late-disclosed witness affidavit as "new testimony" that constituted plaintiff's "final attempt to uncover" information that "would significantly prejudice [the defendant]"); *Every v. Makita U.S.A., Inc.*, 2005 WL 2757952, at *5 (S.D.N.Y. Oct. 24, 2005) (plaintiff sought "to add new expert testimony based on a new theory of liability … to present a completely new theory of the case").

Defendants' references to outside circuit cases are also inapt.  In both *Daniels* and *Parker*, the court granted plaintiff's voluntary dismissal of the initial case *on the explicit condition* that any refiled case be bound by the discovery and procedural history of the dismissed case.  *Daniels v. Jacobs*, 753 F. App'x 748, 752–53 (11th Cir. 2018) (dismissing case on the condition that "any

newly-filed case be deemed to incorporate the procedural history of this case," and ordering that the refiled action "resume where the previous case left off, with the discovery period having closed."); *Parker v. Freightliner Corp.*, 940 F.2d 1019, 1022 (7th Cir. 1991) (dismissing initial action on the condition that an "order barring expert testimony would remain in effect in any refiled action"). There are no such orders or conditions here. In fact, any decisions rendered in *Shatsky I* are legal nullities since they were vacated based on Defendants' own insistence that the D.D.C. lacked jurisdiction.

Courts have an "oft-stated preference for resolving disputes on the merits" and "all doubts must be resolved in favor of trial on the merits." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95, 98 (2d Cir. 1993). None of Defendants' arguments justify departing from this important mandate.

## IV.   Defendant PA Is Vicariously Liable For The Tortious Acts Of Captain Nazal.

Congress, when enacting the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq., "intended to incorporate general principles of tort law," including *respondeat superior*, into the civil cause of action under the ATA. *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014); *see also Linde v. Arab Bank*, No. 4-cv-2799 (BMC), Hr'g Tr. (DE 943) at 71–72 (E.D.N.Y. Apr. 24, 2013); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012); *Knox v. PLO*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006); *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, J., concurring).

Under traditional tort principles, a principal is vicariously liable for acts of its employee when the employee's conduct of the employee is "within the scope of his employment; *i.e.*, if the conduct is of the kind he is employed to perform," "if it occurs substantially within the authorized time and space limits," "if it is actuated, at least in part, by a purpose to serve the master," and "if force is intentionally used by the servant against another, the use of force is not unexpected by the master." *Restatement (Third) of Agency* § 7.07 (2006). The issue of whether an intentional tort

11

occurred within the scope of employment presents a jury question, and is not appropriate for summary judgment, unless there is no evidence to support the claim. *Bruce v. Port Auth. of N.Y. & N.J.*, 531 F. Supp. 2d 472, 476 (E.D.N.Y. 2008). An employer may be vicariously liable even where the employee's conduct is intentional or at odds with his employer's stated policy. *See Kwon v. Yun*, 606 F. Supp. 2d 344, 363 (S.D.N.Y. 2009) ("for purposes of *respondeat superior* liability, even an employee who commits an intentional tort may be found to have acted within the scope of his employment"); *Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979) (same).

Here, Plaintiffs have set forth ample evidence upon which a jury could reasonably conclude that (i) Nazal was the mastermind behind the Bombing and (ii) the PA is liable for his tortious acts.

### A.    Nazal Orchestrated The Bombing

The single strongest piece of evidence tying Nazal to the Bombing is a 2007 report issued by the ISA—the Israeli government agency responsible for and tasked with carrying out counterterrorism, counter-espionage, and intelligence gathering in Israel—that concluded "[t]he attack was planned and executed by the PFLP military network in Qalqilya, under the direction of Raad Madi [a/k/a/ "Ra'ed Nazal"], in collaboration with the PFLP network in Nablus, headed by Ahad Oulma." 2007 ISA Report at 59; Guez Decl. ¶¶ 11–13; Ilan Decl. ¶ 14.

Further evidence corroborates these findings. Specifically, in a 2016 video interview posted by the PFLP on its Facebook page, Allam Kaabi, a member of the PFLP Central Committee and head of the PFLP's Prisoner Committee, recounted three suicide attacks carried out by the PFLP's military wing, including the Bombing. *See* Lowell Decl., Ex. 41. According to Kaabi, "the Karnei Shomron operation was executed by comrade Ra'ed Nazal from Qalqilya in coordination with the comrades in the [Abu Ali Mustafa] Brigades in Nablus" as "a joint, distinguished effort." *Id.* at 8–9. Notably, Ibrahim Dahbour, one of Defendants' 30(b)(6) witnesses and a former Deputy Director of the Qalqilya Governate Office of the PA's General

Intelligence Service ("GIS"), testified that when Nazal was released from prison, it was well known that "he was PFLP and head of Ali Abu Mustafa Brigade."  *See* Lowell Decl., Ex. 10 ("Dahbour Dep.") at 35:11-13, 52:3-9, 53:3-12.  Dahbour also acknowledged that at the time of Bombing, Nazal was the elected head of the PFLP in Qalqilya, a fact known to the PA's General Intelligence Service.  *Id.* at 50:24-52:19.[6]

Defendants take issue with the ISA Report.  They argue (i) that the 2007 ISA Report is not part of the *Shatsky I* discovery record and was not timely disclosed; and (ii) that in any event the report's conclusions are inadmissible hearsay.  Mot. at 13–15.  Defendants are wrong on both points.  As to timeliness, Defendants concede that Plaintiffs' counsel provided Defendants with an advance copy of the 2007 ISA Report and the draft Guez declaration (identical to the final filed version) on April 29, 2021—*more than five months ago*.  Mot. at 14; Lowell Decl., Ex. 119.  What's more, Plaintiffs also incorporated it by reference in this case's operative complaint (the FAC) filed nearly a year ago, such that Defendants can hardly call the 2007 ISA Report a "surprise."  *See* ECF 50 ¶ 129.

Defendants' challenges to the Report's admissibility fare no better.  Notably, myriad of judges in the Second Circuit have found the 2007 ISA Report to be "plainly admissible."  *See Linde v. Arab Bank, PLC*, No. 4-cv-2799 (BMC), Trial Tr. at 947:3-9 (E.D.N.Y. Aug. 25, 2015) (finding the 2007 ISA Report "to be a plainly admissible government report of the factual findings of an ISA investigation. Assuming authentication, it will be admissible."); *see also Strauss v. Credit Lyonnais, S.A.*, 2017 WL 4481126, at *4 (E.D.N.Y. Sept. 30, 2017) ("Plaintiffs here rely on the 2007 ISA Report . . . [Judge] Cogan . . . ruled the 2007 ISA Report admissible in *Linde v.*

---

[6] As a 30(b)(6) witness on behalf of Defendant PA, Dahbour's testimony is binding against his employer, the PA, and accordingly, binds Defendants in this case.  *See Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015) ("[A]n organization's deposition testimony is 'binding' in the sense that whatever its deponent says can be used against the organization.").

*Arab Bank*); *Weiss v. Nat'l Westminster Bank, PLC*, 278 F. Supp. 3d 636, 647 (E.D.N.Y. 2017) (finding the 2007 ISA Report admissible).

Defendants' suggestion that the 2007 ISA Report is "substantially identical" to Israeli government reports submitted and found inadmissible in *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191 (D.D.C. 2014) and *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 570–71 (E.D.N.Y. 2012) (*see* Mot. at 15), is simply not true. The *Gilmore* court made clear that the materials at issue there were not "reports" at all, but merely press releases "appearing on the [Israeli Ministry of Foreign Affairs] webpage that purport to transmit information from an unidentified 'IDF Spokesman.'" *Gilmore*, 53 F. Supp. 3d at 203. And the two reports in *Gill* were based solely on the confession of a single suspect. *Gill*, 893 F. Supp. 2d at 570–71.[7] The 2007 ISA Report, on the other hand, is an 83-page report (as written in Hebrew) containing detailed factual findings made by the ISA in the course of its investigations into numerous terrorist attacks occurring between 2000 and 2007. *See* Ilan Decl. ¶¶ 10–12.

Defendants' challenges to Kaabi's statement (Mot. at 12) fare no better. The interview was recorded and posted on December 17, 2016, long after discovery concluded in *Shatsky I* (2012) and after Plaintiffs filed their reconstituted opposition to summary judgment (January 29, 2016). The statement was thus never part of the *Shatsky I* summary judgment record. But Defendants admit Plaintiffs raised Kaabi's statement in a Rule 59(e) motion in *Shatsky I* in December 2017 (Mot. at 12), such that they have been aware of this piece of evidence for almost five years. *See* *Shatsky I*, DE354. Defendants' contention that Kaabi's statement cannot be treated as a statement

---

[7] Judge Weinstein even took care to note on the record that "[a] public record such as the ISA report[] *is admissible* if 'neither the source of information nor other circumstances indicate a lack of trustworthiness.'" *Gill*, 893 F. Supp. 2d at 571 (citation omitted) (emphasis added). The ISA takes extreme care to guarantee the accuracy of its investigative findings contained in its reports, which are produced by highly trained experts. *See* Ilan Decl. ¶¶ 9–16. And Defendants do not raise any basis for challenging the 2007 ISA Report's trustworthiness.

against penal interest because the rule does not allow for admission of non-self inculpatory statement (Mot. at 11) is also misguided. Kaabi's statement qualifies under the rule as he is "unavailable" as Rule 804(b)(3) requires (he resides in the Gaza Strip, *see* Lowell Decl., Ex. 8 ("Spitzen Decl.") at ¶ 43, n.23) and the statement could reasonably expose him to civil or criminal liability. *See U.S. v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014) (a statement "[need] not have been sufficient, standing alone, to convict [the declarant] of any crime, so long as it would have been 'probative' in a criminal case against him.").

Defendants point to the D.D.C.'s finding that Kaabi's statement is inadmissible hearsay. Mot. at 11. But as noted *supra* at Part I, that finding is not binding on this Court. And, in any event, it is incorrect. Contrary to Defendants' claim (Mot. at 11), Kaabi's statement about Nazal's role in the Bombing was *not* a non-self-inculpatory statement made "within a broader narrative that is generally self-inculpatory" under Rule 804(b)(3). Rather, by finding that Nazal directed and was responsible for the Bombing in coordination with the Abu Ali Mustafa Brigades in Nablus (*see* Lowell Decl., Ex. 41 at 8–9), it necessarily implicates the Brigades in the attack, of which Kaabi was also a member. Accordingly, Kaabi's entire statement should be found admissible.

### B.    The PA Is Liable For The Tortious Acts of Nazal.

Defendants have admitted that Nazal was "an employee of the PA's National Security Forces [] in Qalqilya" (ECF 121 ¶ 39), despite Defendants' knowledge that Nazal was a known leader of the PFLP's militant wing, the Ali Abu Mustafa Brigades, and the Qalqilya cell. *See* Spitzen Decl. ¶¶ 37, 51; Dahbour Dep. at 35:11-13, 52:3-9, 53:3-12 (acknowledging that when Nazal was released from prison, it was well known "he was PFLP and head of Ali Abu Mustafa Brigade"); *id.* at 50:24-52:19 (acknowledging that at the time of Bombing, Nazal was the elected head of the PFLP in Qalqilya, a fact known to the PA's General Intelligence Service); Lowell Decl., Ex. 5 (showing Nazal received the rank of Captain upon joining the PA's National Security

Forces, and was promoted posthumously to the rank of Major).  Furthermore, nine days prior to the Bombing, the PA was advised that Nazal was participating in terrorist activity and was armed; yet, the PA did nothing.  Lowell Decl., Ex. 6 at 07:000192-96.

On these facts, a reasonable juror could find that the tortious conduct committed by Nazal was within the scope of his employment with the PA, or that his conduct was at least not unexpected.  *See Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (holding that to prove vicarious liability, an "employer need not have foreseen the precise act . . . as long as the general type of [tortious] conduct may have been reasonably expected.") (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979)).  Particularly since Defendants ratified Nazal's acts by posthumously promoting him from Captain to Major and continuing to pay his salary to his family until the PA began making martyr payments.  *See supra* Part I.B n.3.

At a minimum, Plaintiffs present sufficient evidence to allow the issue of *respondeat superior* to be presented to a jury.

## V.    Defendants Are Directly Liable Under The ATA For Knowingly Providing Material Support To The PFLP.

In addition to vicarious liability, the ATA authorizes "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs" to sue in "any appropriate district court of the United States and . . . recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."  18 U.S.C. § 2333(a).  A claim for primary liability requires a plaintiff to prove: (1) injury to a U.S. national; (2) causation; and (3) an act of international terrorism.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 882 F.3d 314, 320 (2d Cir. 2018); *Schansman v. Sberbank of Russia PJSC*, 2021 WL 4482172, at *8–9 (S.D.N.Y. Sept. 30, 2021) (stating a "lack of direct [money]

transfers" to a FTO "is not dispositive of proximate cause" and, therefore, plaintiffs adequately plead facts showing the necessary elements of ATA primary liability).

The statute defines international terrorism as activities that (i) "involve violent acts . . . that are a violation of the criminal laws of the United States or of any State;" (ii) appear to be intended to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping;" and (iii) occur primarily outside the territory of the United States. 18 U.S.C. § 2331(1)(A). To prevail, Plaintiffs must show Defendants would have violated *any* federal or state criminal law had Defendants acted within the jurisdiction of the United States. *Linde*, 882 F.3d at 326. The actions of Defendants in this case constitute a violation of two federal criminal statutes: 18 U.S.C. § 2339B, which makes it a crime to "knowingly provide[] material support or resources to a foreign terrorist organization, or [to] attempt[] or conspire[] to do so," and 18 U.S.C. § 2332(b), which makes it a crime to conspire to kill a United States national outside the United States.

Defendants do not dispute, nor could they, that this case involves injury to U.S. nationals. SOF ¶¶ 69–82.[8] As noted above, Plaintiffs can also point to clear admissible evidence that they were injured by an act of international terrorism (i.e., the Bombing), which was orchestrated and supervised by Nazal, who worked for the PA and was a known leader and key operative of the PFLP in Qalqilya. *See supra* Part II.B (demonstrating Nazal's employment with the PA and his central role in planning and directing the Bombing); *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 162 (2d Cir. 2021) (holding that a suicide bombing counts as an act of international

---

[8] Non-American family members of a U.S. national killed in an international terrorist attack may also bring claims under the ATA. *See Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 153 (E.D.N.Y. 2020) (holding that despite the surviving children being foreign nationals, they could still bring claims based on deceased husband's U.S. nationality).

terrorism because it "is an act that inherently involves violence and objectively would appear intended to intimidate a population or government.").

Defendants contend that Plaintiffs lack "admissible evidence that connects Defendants to the 'act of international terrorism' for which they sue—much less any evidence Defendants substantially contributed to that act." Mot. at 1, 10. But as noted below, the *full* evidentiary record from *Shatsky I* and the evidence proffered in this case demonstrate that Defendants knowingly provided material support to the PFLP (a known FTO) and its operatives by:

- Paying a salary to senior PFLP leader Nazal (ECF 121 ¶ 39; *see supra* Part II.B);

- Disregarding information that Nazal was a supervisor and recruiter of armed members of the PFLP and was engaging in violent activities in the name of the PFLP (SOF ¶¶ 94, 99 (February 7, 2002 GIS investigative report notifying the PA that Nazal was involved in armed terrorist activities in the name of the PFLP); *id.* at ¶ 99 (February 8, 2002 GIS investigative report noting, among other things, that ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████; Spitzen Decl. at ¶¶ 59–60);[9]

- Paying rent for PLFP offices, including the office in Qalqilya from June 1, 2000 through May 30, 2002 (*see, e.g.*, SOF ¶ 109 (lease agreement for PFLP rented office space in Qalqilya);[10] SOF ¶¶ 110–111 (requesting funds for rent payment from Arafat);

- Covering other PFLP expenses, including paying for the car, driver, and apartment of Abdel Rahim Malouh, the Deputy Secretary-General of the PFLP and the PFLP representative to the PLO Executive Committee (SOF ¶ 116);

- Providing a crucial safe-haven and base of operations for the PFLP to incite, facilitate and execute acts of terrorism by allowing the PLFP to maintain offices and operate in Palestinian territory[11] (Lowell Decl., Ex. 9 ("Shaked Decl.") at 9; Spitzen Decl. ¶ 54); and

---

[9] The PA GIS investigative reports referenced herein are admissible as both party admissions under Fed. R. Evid. 801(d)(2) as well as admissions of public records or reports under Rule 803(8), which allows for records or reports containing "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8). The authenticity of these GIS documents is satisfied by the fact that Defendants produced them in response to discovery requests in *Shatsky I*.

[10] *See* Lowell Decl., Ex. 4 at 07:000035-37, 07:000046-47 (showing line-by-line rent payments by the PA for the PFLP's headquarters from June 1, 2001 to May 31, 2002).

[11] Courts within this circuit have held that when a foreign government permits a terrorist organization to operate in its territory, it thereby provides a "safehouse" to that organization within the meaning of 18 U.S.C. § 2339. *Sokolow v. PLO*, 60 F. Supp. 3d 509, 523 (S.D.N.Y. 2014) (finding triable issue of fact for the jury as to whether the PA and PLO

- Providing detainee payments, in the form of monthly stipends from the Palestinian Ministry of Detainees and Ex-Detainees Affairs, to the families of PFLP operatives held in Israeli prisons. *See* SOF ¶¶ 117–121.[12]

Notably, Defendants provided the aforementioned material support while the PFLP was actively engaged in carrying out terrorist attacks and advocating for terrorism. *See* Shaked Decl. at 9–12.

To raise a genuine issue of material fact as to the causation element of a civil ATA claim, Plaintiffs must show that their injuries were "reasonably foreseeable or anticipated as a natural consequence" of Defendants' acts. *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704, at *18 (E.D.N.Y. Oct. 5, 2006). Proximate cause may be established by showing only that a "defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries." *Id.* Thus, "plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because money is fungible." *Strauss*, 925 F. Supp. 2d at 433 (quotation marks omitted). Here, the Bombing was a foreseeable consequence of Defendants' provision of material support to the PFLP. *See Strauss*, 925 F. Supp. 2d at 432 (holding that "a reasonable juror could conclude that the sizable amount of money sent from Defendant to Hamas front organizations was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable consequence of sending millions of dollars to groups controlled by Hamas."). Moreover, because causation is often a question of fact for the jury, any dispute as to whether Defendants' conduct is sufficiently causally connected to Plaintiffs' injuries should be resolved at

---

provided a safehouse to a Hamas operative); *see also Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 331–33 (E.D.N.Y. 2015); *United States v. Taleb-Jedi*, 566 F. Supp. 2d. 157, 163 (E.D.N.Y. 2008).

[12] Defendants further facilitate terrorist activities by perpetuating a policy of proving "martyr payments" to families of terrorists who died while carrying out a terrorist bombing, including to Hafez (who Defendants do not dispute was the bomber) and Nazal. *See supra* Part I.B, n.2.

trial. *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) ("foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication").

Defendants do not grapple with this evidence and instead try to hide behind the D.D.C. dismissal for lack of proximate cause. *See* Mot. at 9–10. But as noted *supra* at Part I.A, that decision was vacated and is thus null and void. *See* ECF 46 (Nov. 6, 2020 Hr'g Tr.) at 24:18-23. More importantly, that decision was based on a limited summary judgment record. The D.D.C. acknowledged that had Plaintiffs had admissible evidence linking Nazal to the Bombing—as they do now—"a reasonable jury could conclude that the PA proximately caused the Bombing by paying Nazal a salary." *See Shatsky I*, DE351 at 22, 24 (Memorandum Opinion).

## VI.     Defendants Are Secondarily Liable For Aiding-and-Abetting and Conspiracy Under JASTA.

Congress amended the ATA in 2016 by enacting JASTA, which added secondary liability provisions to expand the relief available to litigants under § 2333(a). *See* Pub. L. No. 114-222, 130 Stat. at 854 (Sept. 28, 2016); *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 847 (2d Cir. 2021); *Linde*, 882 F.3d at 328. JASTA established that plaintiffs may assert secondary liability under the ATA for acts of terrorism committed, planned, or authorized by a FTO against "*any person who aids and abets, by knowingly providing substantial assistance*, or who conspires with the *person who committed* such an act of international terrorism." 18 U.S.C. § 2333(d)(2) (emphases added).

### A.     Defendants Aided And Abetted The PFLP And Its Operatives, Who Were Responsible For Planning And Executing The Bombing That Injured Plaintiffs.

To demonstrate a JASTA aiding and abetting claim, Plaintiffs must show Defendant "knowingly and substantially" assisted the principal violation—here, the Bombing—and that Defendants "were generally aware of [their] role as part of an overall illegal or tortious activity at

the time [they] provide[d] the assistance." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see also Linde*, 882 F.3d at 329.   JASTA does not limit aiding-and-abetting liability only to "those circumstances in which a defendant actually 'aided and abetted . . . the person who committed' the relevant 'act of international terrorism.'"   *Id.* at 495.   The Second Circuit has emphasized that giving "substantial assistance" to an intermediary is sufficient to establish aiding and abetting liability.  *Kaplan*, 999 F.3d at 856.

**B.     Defendants "*Knowingly*" Provided "*Substantial Assistance*" To The PFLP In Carrying Out The Bombing.**

The knowledge component of a JASTA aiding and abetting claim requires that a defendant "know[]" that it is providing assistance—"whether directly to [a] FTO or indirectly through an intermediary."   *Kaplan*, 999 F.3d at 864 (finding allegations of indirect support provided to five Hezbollah customers sufficient to satisfy the knowledge requirement).  Here, Defendants are not "innocent, incidental participants" as they purport to be (Mot. at 19, quoting *Kaplan*); rather, Defendants are vitally important figures in this terrorist equation, who had "actual knowledge" they were providing much needed assistance, safe haven, and financial support to a *known* FTO.

*Halberstam* identified six factors to assess substantiality with respect to the assistance provided: (1) the nature of the act encouraged; (2) the amount of assistance given by defendant; (3) defendant's presence or absence at the time of the tort; (4) defendant's relation to the principal; (5) defendant's state of mind; and (6) the period of defendant's assistance.  *Halberstam*, 705 F.2d at 483–84.  These factors are "variable" and the absence of some is not dispositive.  *Kaplan*, 999 F.3d at 856.  The Second Circuit has explained that "[d]isputed facts pertinent to these factors and the weight to assign such factors" are factual issues for the trier of fact and not matters that can be determined as a matter of law.  *Linde*, 882 F.3d at 330.

Here, it is undisputed that the PFLP was a terrorist organization.  SOF ¶ 49. Defendants' provision of salaries, rent payments, martyr payments, individual expenses, a geographic base of operations and other material assistance were crucial to the PFLP's ability to plan, organize and carry out terrorist activities.  *See supra* Parts II and III.  It is undisputed that Defendants provided such support and assistance to the PFLP for several years leading up to the attack.  *See* ECF 120-5, Ex. E (Malouh Deposition) at 37:8-38:18 (stating the PLO made rent payments and covered other expenses for all years from 1991 through the date of the deposition (September 5, 2012), except between 1993 to 1999); Shaked Decl. at 9–12.  It is irrelevant that the PA and PLO were not "present at the scene" of the Bombing (Mot. at 20), as the success of the PFLP's "tortious enterprise" was still substantially depended on funds and other material contributions provided by Defendants.  *See Halberstam*, 705 F.2d at 488 ("Hamilton was admittedly not *present at the time of the murder*," but his role in "the success of the tortious enterprise" was still substantial).

Defendants assert that substantial assistance cannot be proven on the basis of martyr payments alone.  Mot. at 20 (citing *Sokolow*, 60 F. Supp. 3d at 517 n.11; *United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir. 2003)).[13]  True, but Plaintiffs offer much more here.  Notably, Defendants concede that the PA's rent payments for the Qalqilya office and payment of Nazal's salary could be enough if there were admissible evidence that the PFLP's Qalqilya office and Nazal were involved in the Bombing.  *See* Mot. at 20.   As discussed above, the 2007 ISA Report provides such evidence, in admissible form.  *See supra* Part II.[14]

---

[13] *Hamilton* is also inapposite, as that case involved aiding and abetting a second crime after the defendant had already been charged with a first crime.  *See Hamilton*, 334 F.3d at 180.  That is not the situation in this case.

[14] Defendants rely on *Weiss v. Nat'l Westminster Bank* to argue that no JASTA liability can be found where, "based on a completed discovery record," plaintiffs cannot show substantial assistance provided to a FTO.  Mot. at 2, 21.  However, as discussed *supra* Part III at 18, Plaintiffs have proffered considerable admissible evidence establishing the substantial assistance provided to the PFLP and its operatives, including through the provision of funds, employment, rent payments and other material services.

**C.     The Evidence Shows Defendants Were "Generally Aware" Of Their Role In PFLP's Illegal And Tortious Activities.**

The "general awareness" element does not require proof of "specific intent" or "knowledge of the particular attacks at issue." *Linde*, 882 F.3d at 329 (distinguishing *activities* from *attacks*, and not requiring defendant Bank have knowledge of any specific terrorist *attacks* by Hamas). The Second Circuit has held that providing financial support to a designated FTO, where the individual or entity is "so closely intertwined with [the FTO]'s violent terrorist activities," satisfies the "general awareness" prong. *See Kaplan*, 999 F.3d at 860 (noting that given Hezbollah's violent terrorist activities, "one can reasonably infer that LCB was generally aware while it was providing banking services to those entities that [LCB] was playing a role in unlawful activities from which the rocket attacks were foreseeable.").

Here, Defendants' admissions demonstrate that they have provided more than just "incidental support" (Mot. at 22) to a FTO: Defendants admit they provided funds, personnel, and other material support to the PFLP and operatives like Nazal, including paying Nazal's salary. SOF ¶¶ 5, 26, 39.  Numerous courts within the Second Circuit have found terrorist attacks are a "natural and foreseeable consequence" of soliciting and transferring funds to FTOs, as Defendants have done here.  *See, e.g.*, *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 266 (E.D.N.Y. 2019) (finding bank's conduct was a "substantial factor" in Hezbollah planning and carrying out attack, and that "it was reasonably foreseeable" that the attack would cause injury); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 46 (E.D.N.Y. 2019) (evidence "that a defendant provided money to terrorist organizations . . . strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA.") (internal citations and quotations omitted).

Defendants note that the D.D.C. found this evidence insufficient to support an aiding and abetting claim.  Mot. at 22.  But as Defendants concede, that was because Judge Leon did not consider any of the evidence linking Nazal to the Bombing.  *Id.*  Here, by contrast, Plaintiffs have proffered admissible evidence (*e.g.*, the 2007 ISA Report) sufficient to establish that link and Nazal's involvement.  *See supra* Part II.B.

> ### D.   The Evidence Also Supports a Finding of Liability Based on JASTA Conspiracy.

In addition to liability based on material support, a jury could reasonably conclude that Defendants and the PFLP engaged in conspiracy under 18 U.S.C. § 2333(d).  To prove conspiracy, Plaintiffs must show: (1) an agreement between two or more persons; (2) to participate in an unlawful act (or a lawful act in an unlawful manner); (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which was done pursuant to and in furtherance of the common scheme.  *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019).  The party seeking to prove the conspiracy need not present evidence of an explicit agreement; rather, proof of a tacit understanding will suffice.  *Halberstam*, 705 F.2d at 477–78.  Moreover, to satisfy participation in the conspiracy, a conspirator need not "participate actively in or benefit from the wrongful action," or even have planned or known about the injury-causing action, so long as the tortious conduct was intended to advance the overall object of the conspiracy.  *Id.* at 482.

Plaintiffs have satisfied each of the above elements here.  A reasonable jury could conclude that the PA negotiated the release of Nazal, a senior and notorious leader of the PFLP, and consequently hired him into the PA National Security apparatus, to give him a cloak of "legitimacy" while Nazal went about the business of recruiting suicide bombers and orchestrating

terrorist attacks, the very job that a jury might conclude Defendants and the PFLP at least tacitly agreed Nazal would perform.[15]

## VII.   Plaintiffs' Non-Federal Claims.

Defendants contend that they are entitled to summary judgment on Plaintiffs' non-federal claims because they (i) lack the capacity to be sued and (ii) the claims are time-barred.  Mot. at 22–23.  Pursuant to the tolling provision in N.Y. C.P.L.R. § 207, Plaintiffs' non-federal claims were tolled until the enactment of the PSJVTA in 2019 and are thus timely.  *See Lewis v. Borg-Warner Corp.*, 325 N.Y.S.2d 314, 315 (1971); *Selzer v. Bank of Bermuda Ltd.*, 385 F. Supp. 415 (S.D.N.Y. 1974).  However, Plaintiffs recognize they are bound by the Second Circuit's finding in *Waldman v. Palestine Liberation Org.*, 835 F.2d 317, 332 (2d Cir. 2016), that Defendants are unincorporated associations, but preserve the right to appeal the dismissal of any non-federal claims.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask this Court to deny Defendants' Motion for Summary Judgment.

Dated:  New York, New York
        October 4, 2021

Respectfully submitted,
WINSTON & STRAWN LLP

s/  *Abbe David Lowell*
Abbe David Lowell
Sofia Arguello
200 Park Avenue
New York, New York 10166
Tel.: (202) 282-5875
Fax: (202) 282-5100
Email: adlowell@winston.com
Email: sarguello@winston.com
*Attorneys for Plaintiffs*

---

[15] Defendants' claim that they had no "contact at all" with Hafez (Mot. at 18) is irrelevant given that Plaintiffs have proffered considerable admissible evidence that Defendants had, at the very least, a tacit agreement with Nazal, who planned and orchestrated the Bombing.  *See supra* Part II.A–B.