UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

SHABTAI SCOTT SHATSKY, individually and as
personal representative of the Estate of Keren Shatsky,
JO ANNE SHATSKY, individually and as personal
representative of the Estate of Keren Shatsky,
TZIPPORA SHATSKY SCHWARZ, YOSEPH
SHATSKY, SARA SHATSKY TZIMMERMAN,
MIRIAM SHATSKY, DAVID RAPHAEL
SHATKSY, GINETTE LANDO THALER,
individually and as personal representative of the
Estate of Rachel Thaler, MICHAEL THALER,
individually and as personal representative of the
Estate of Rachel Thaler, LEOR THALER, ZVI
THALER, ISAAC THALER, HILLEL TRATTNER,
RONIT TRATTNER, ARON S. TRATTNER,
SHELLEY TRATTNER, EFRAT TRATTNER,
HADASSA DINER, YAEL HILLMAN, STEVEN
BRAUN, CHANA FRIEDMAN, ILAN FRIEDMAN,
MIRIAM FRIEDMAN, YEHIEL FRIEDMAN, ZVI
FRIEDMAN and BELLA FRIEDMAN,

              Plaintiffs,

      v.

THE PALESTINE LIBERATION ORGANIZATION,
and THE PALESTINIAN AUTHORITY (a/k/a "THE
PALESTINIAN INTERIM SELF-GOVERNMENT
AUTHORITY" and/or "THE PALESTINIAN
NATIONAL AUTHORITY"),

              Defendants.

———————————————————————x

:    Case No. 1:18-cv-12355-MKV

:    Hon. Mary Kay Vyskocil

**REDACTED VERSION**

**PLAINTIFFS' RESPONSES TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1 of this Court, Plaintiffs respectfully submit the following objections and responses to Defendants' Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA") (collectively, "Defendants") Statement of Facts ("Defendants' Statement").  In addition, in accordance with Local Civil Rule 56.1(b), Plaintiffs hereby submit a Statement of Additional Material Facts as to which Plaintiffs contend there exists genuine issues to be resolved.

### Plaintiffs' General Objection to Defendants' <u>Local Civil Rule 56.1 Statement of Material Facts</u>

Plaintiffs object to Defendants' attempts to avoid this Court's clear requirement that each statement of material fact asserted by Defendants in their Statement of Material Facts must be supported by a citation to admissible evidence, pursuant to Local Civil Rule 56.1(d).  Courts within this judicial district have steadily and dutifully enforced this principle, finding that "where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true." *RL 900 Park, LLC v. Ender*, 2021 WL 738705, at *1 (S.D.N.Y. Feb. 25, 2021).  Moreover, courts in this district have refused to consider statements in a Party's 56.1 Statement "that do not cite to any admissible evidence in the record" or where a party does not "provide a specific citation to admissible evidence as required by Local Rule 56.1(d)." *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 (S.D.N.Y. Jan. 2, 2018).

Here, Defendants have tried to side-step this requirement by failing to cite to admissible evidence in support of their myriad factual assertions. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").  Defendants' Statement cites virtually

no admissible evidence in support of its factual statements, relying primarily on the testimony of Defendants' own Rule 30(b)(6) witnesses, which is inadmissible hearsay.  *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016) (holding that relying on the testimony of defendant's own 30(b)(6) witness is inadmissible hearsay); *Williams Advanced Materials, Inc. v. Target Tech. Co.*, 2009 WL 3644357, at *10 (W.D.N.Y. Oct. 28, 2009) (preventing party from using 30(b)(6) testimony on its *own* behalf, unless the testimony is shown to be based upon the witness's  personal knowledge).  Moreover, the vacated decision from the District Court for the District of Columbia creates no binding precedent on this Court.  *See* ECF 46 at 24:18–23 (As this Court noted: "[T]he D.C. circuit vacated the Judge Leon summary judgment opinion.  So how can there possibly be any kind of preclusive effect?  They vacated it based on your argument that there was no jurisdiction in the first place, and so he couldn't properly grant summary judgment.").  The Court may also take judicial notice of the fact that *Shatsky I* was vacated, and its decisions are therefore null and void.  *See Vagaszki v. Consolidation Coal Co.*, 225 F. 913, 915 (2d Cir. 1915) (holding federal courts can take judicial notice of other judicial opinions); *Boruski v. U.S. Gov't*, 493 F.2d 301, 304 n.5 (2d Cir. 1974) (stating that where a decision vacates the judgment of another court, the judgment in the first instance is rendered "null and void").

### Responses to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1

Subject to and without waiver of Plaintiffs' General Objections, Plaintiffs respond to the specific statements in the Defendants' Statement as follows:

1.      The PLO was founded in 1964 by Egypt and the Arab League and has been recognized as the international diplomatic representative of the Palestinian People. Declaration of Joseph S. Alonzo ("Alonzo Decl.") Ex. A ¶ 25; PLO U.N. Mission, *Diplomatic Relations*, The Permanent Observer Mission of the State of Palestine to the United Nations New York, http://www.palestineun.org/about-palestine/diplomatic-relations (last visited April 27, 2021), and

G.A. Res. 67/19, U.N. Doc. A/RES/67/19 (Dec. 4, 2012), http://palestineun.org/wp-content/uploads/2013/08/67-19-Status-of-Palestine.pdf.

**RESPONSE:** Undisputed.

2.     The 1993 Oslo Accords established the PA as a semi-autonomous domestic government responsible for managing Palestine's civil affairs and finances.  Alonzo Decl. Ex. A ¶ 26; Alonzo Decl. Ex. B, Arts. I, VI-VII.

**RESPONSE:** Undisputed.

3.     Neither Palestine itself, nor the PA and PLO as its government, is recognized by the U.S. as sovereign, and the U.N. has awarded Palestine Non-Member State status. PLO U.N. Mission, Diplomatic Relations, THE PERMANENT OBSERVER MISSION OF THE STATE OF PALESTINE TO THE UNITED NATIONS NEW YORK, http://www.palestineun.org/about-palestine/diplomatic-relations (last visited Apr. 27, 2021), and G.A. Res. 67/19, U.N. Doc. A/RES/67/19 (Dec. 4, 2012), http://palestineun.org/wp-content/uploads/2013/08/67-19-Status-of-Palestine.pdf.

**RESPONSE:** Undisputed.

4.     With the signing of the Oslo Accords, all factions within the PLO umbrella organization were required to become non-violent political parties, and all military elements were outlawed.  Alonzo Decl. Ex. C at 78:2-14, 79:10-22; Alonzo Decl. Ex. D at 32:14-33:13.

**RESPONSE:** It is undisputed that all factions of the PLO were required to comply with the Oslo Accords, but Plaintiffs dispute any characterization or assertion that the PLO complied with those Accords.  In fact, the PLO had a duty under the Accords to ensure compliance regarding the transition to non-violent political parties and that all military elements were outlawed.  *See* Declaration of Abbe David Lowell ("Lowell Decl."), Ex. 1 at 1 (stating in a letter to Israeli Prime Minister Rabin that "the PLO renounces the use of terrorism and other acts of violence and will assume responsibility over all PLO elements and personnel in order to assure their compliance, prevent violations and discipline violators.").  Despite this pledge, during the Second Intifada, the PA and the PLO used the new level of autonomy obtained under the Oslo Accords to prepare and carry out violent attacks against Israel and its citizens.  *See* Lowell Decl., Ex. 2 at SHATSKY-006781 (¶ 51), SHATSKY-006784 (¶ 54); Ex. 3.  Further, Plaintiffs dispute Paragraph 4 on the basis that Defendants rely on 30(b)(6) testimony, which is inadmissible

4

hearsay.  *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

5.    To facilitate this process, the PLO provided modest support—such as rent, transportation, and accommodations—to its constituent political factions.  Alonzo Decl. Ex. D at 30:2-6; 33:11-23, 34:8-35:15; Alonzo Decl. Ex. E at 12:24-13:7, 25:11-26:1, 36:6-37:3, 37:20-25.

**RESPONSE:** Plaintiffs dispute Defendants' characterization that the PLO provided only

"modest" support to its constituent political factions, as evidence shows that this support was

quite extensive.  Specifically, the evidence shows that Defendants paid PFLP salaries, paid rent

payments for the PFLP's many headquarters and its office in Qalqilya, provided cars, and other

financial contributions, such as martyr payments.  *See* ECF 120-5, Ex. E ("Malouh Dep.") at

12:22-13:7, 25:19, 36:1-22 (showing the PA authorized payment of expenses for the car, driver,

and apartment of Malouh); 37:8-38:18 (showing payments were made for all years from 1991

through the date of the deposition, September 5, 2012, with the exception of the period 1993 to

1999); Lowell Decl., Ex. 4 at 07:000035-37, 07:000046-50 (showing PA rent payments for the

PFLP's headquarters for the period from June 1, 2001 to May 31, 2002); *id.* at 07:000040 (noting

that ███████████████████████████████████████████████

███████████████████); *id.* at 07:000041 (███████████████████████████

███████████████████████████); Ex. 5; Ex. 6 at 07:000202-

207 (showing the PA National Security apparatus began making payments to Nazal's wife, as

Nazal had been declared a martyr); Ex. 7 (showing the PLO and PA made martyr payments to

Hafez's father, Ahed Mahmoud Abdallah Abdel Hafez); *see also* Lowell Decl., Ex. 8 ("Spitzen

Decl.") ¶¶ 22–23, 28, 33–34; Ex. 9 ("Shaked Decl.") at 9–12.  Plaintiffs further dispute that such

payments were made to "facilitate this process" of converting all factions within the PLO

umbrella to "non-violent political parties."  *See* ¶ 4.  Specifically, the PLO continued unabated

making such payments to the PFLP, notwithstanding that the PFLP continued to engage in

violence during and after the Second Intifada.  *See* Lowell Decl., Ex. 6 at 07:000192-96 (finding

that certain operatives were involved in armed terrorist activities in the name of the PFLP in violation of the Accords); Ex. 10 at 110:7-22 (testimony by Dahbour that the PFLP engaged in terrorist activities and was involved in violence or terrorism in violation of the Accords). Additionally, Plaintiffs dispute Paragraph 5 on the basis that Defendants rely on 30(b)(6) testimony, which is inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

6.      For similar policy reasons, the PA has paid stipends to the families of Palestinians detained or killed by Israel or the PA, which helped to ensure their basic standard of living and thus enhanced security by blunting the financial allure of terrorism.  Alonzo Decl. Ex. F at 39:20-25, 40:7-12.

**RESPONSE:** It is undisputed that the PA has made payments to the families of Palestinians who died while committing acts of terrorism, and to the designees of Palestinians who were imprisoned after being convicted of committing such acts.  But, Plaintiffs dispute that payments by the PA to Palestinian families of terrorists killed or imprisoned by reason of the commission of terrorist attacks are made for the purpose of enhancing security or "blunting" the financial allure of terrorism.  Rather, Defendants' Rule 30(b)(6) witnesses have testified that Defendants have made such payments because the terrorists died or were imprisoned as a result of committing such terrorist attacks.  *See, e.g.*, Lowell Decl., Exs. 11–12 ("Ghannam Dep.") at 69-70, 72-73, 111-118, 122-128, 130-138, 145-154; Exs. 13–14 ("Salem Dep.") at 34-37, 46, 67-68, 85-88, 143, 146, 156-157, 166, 168-170, 174-175, 177-178, 182.  Furthermore, Defendants have provided no factual support for their statement that those stipends enhanced security by blunting the financial allure of terrorism, relying exclusively on 30(b)(6) testimony, which is inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

7.      Palestinian families financially impacted by the loss of a wage-earner or the costs of providing food, clothing, and supplies to an imprisoned relative are thought to be more susceptible to that allure.  Alonzo Decl. Ex. F at 39:20-25, 42:21-47:7.

**RESPONSE:** Plaintiffs dispute Paragraph 7 and incorporate by reference Plaintiffs'

response to Paragraph 6. Plaintiffs further dispute Paragraph 7 on the basis that Defendants have

provided no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which

is inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

8.     Israel had a similar National Insurance program, supporting needy families of Arab-
Israeli prisoners in Israeli prisons regardless of the reason for detention. Alonzo Decl. Ex. F at 39:20-
40:24, 48:10-49:3.

**RESPONSE:** Plaintiffs dispute Paragraph 8 on the basis that Defendants have provided

no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is

inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

9.     Once released, ex-prisoners have received financial and employment support from
the PLO or PA to ensure their welfare and to minimize recidivism. Alonzo Decl. Ex. C at 37:16-22,
80:18-25, 81:8-12; Alonzo Decl. Ex. G at 53:6-12; Alonzo Decl. Ex. J at No. 3.

**RESPONSE:** Plaintiffs do not dispute ex-prisoners received financial and employment

support from Defendants. *See* Lowell Decl., Ex. 6 at 07:000192 (showing that after having been

released from prison, the PA hired Nazal as a Captain in its National Security Forces). However,

Plaintiffs dispute the characterization that such support was to ensure the "welfare and to

minimize recidivism" of ex-prisoners on the basis that Defendants have provided no factual

support for their assertion and rely on 30(b)(6) testimony, which is inadmissible hearsay. *See*

*Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016). To the contrary, Nazal was a known

PFLP operative who was likely to engage in recidivist activity. *See* Lowell Decl., Ex. 10

("Dahbour Dep.") at 35:11-13, 52:3-9, 53:3-12 (acknowledging when Nazal was released from

prison, it was well known "he was PFLP and head of Ali Abu Mustafa Brigade"); Ex. 15 at

SHATSKY-002814 (stating Nazal resumed his PFLP activities "since the first day of his release

[from prison]"). Moreover, Defendants' Rule 30(b)(6) witness further testified that payments are

made to prisoners and ex-prisoners because of their commission of terrorist attacks. *See* Salem

7

Dep. at 34-37, 46, 67-68, 85-88, 143, 146, 156-157, 166, 168-170, 174-175, 177-178, 182.

10.     PA law "prohibits. . . armed groups, regardless of their political affiliation."  Alonzo Decl. Ex. C at 23:8-10.

**RESPONSE:** Plaintiffs dispute Paragraph 10 on the basis that Defendants have provided no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

11.     The PA security forces have worked to combat militants and help Palestinians "comply with the peace process and Oslo Accords."  Alonzo Decl. Ex. C at 37:10-15. In this regard, the PA security forces have coordinated with Israel on security issues. *Id.* at 45:17-22.

**RESPONSE:** Plaintiffs dispute Paragraph 11 as evidence demonstrates that the PLO and the PA did not comply with the Oslo Accords and had a policy of supporting terrorism during the Second Intifada.  *See* Lowell Decl., Ex. 16; Ex. 17; Ex. 18; Dahbour Dep. at 35:11-13, 52:3-9, 53:3-12 (acknowledging that Nazal, a paid employee of the PA, "was PFLP and head of Ali Abu Mustafa Brigade" in Qalqilya).  Plaintiffs further dispute Paragraph 11 on the basis that Defendants have provided no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is inadmissible hearsay.  *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

12.     "[S]ecurity [apparatuses] within the PA, combated all armed groups. . . [including] from [the Popular Front for the Liberation of Palestine ('PFLP')]."  Alonzo Decl. Ex. C at 23:10-12.

**RESPONSE:** Plaintiffs dispute Paragraph 12 on the basis that Defendants have provided no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).  Plaintiffs further dispute 12 as evidence demonstrates that the PLO and the PA had a policy of supporting terrorism during the Second Intifada.  *See* Lowell Decl., Ex. 16; Ex. 17; Ex. 18; Dahbour Dep. at 35:11-13, 52:3-9, 53:3-12 (acknowledging that Nazal, a paid employee of the PA, "was PFLP

and head of Ali Abu Mustafa Brigade" in Qalqilya).

13.     The Popular Front for the Liberation of Palestine ("PFLP"), a faction of the PLO, initially objected to the Oslo Accords and its PLO membership was suspended.  *See* Alonzo Decl. Ex. E at 37:23-25.  But in 1999, it returned to the political process and rejoined the PLO, accepting the military prohibitions of the Oslo Accords.  *See id.*

**RESPONSE:** Plaintiffs do not dispute that the PFLP initially objected to the Oslo

Accords.  However, Plaintiffs dispute whether the PFLP indeed accepted the military prohibitions

stipulated by the Accords.  *See* Lowell Decl., Ex. 6 at 07:000192-96 (finding that certain

operatives were involved in armed terrorist activities in the name of the PFLP in violation of the

Accords); Dahbour Dep. at 110:7-22 (testimony by Dahbour that the PFLP engaged in terrorist

activities and was involved in violence or terrorism in violation of the Accords).

14.     On October 22, 2001, the Palestinian Supreme Council on National Security issued a decree outlawing the military wing of the PFLP.  Alonzo Decl. Ex. H; *see also* Alonzo Decl. Ex. C at 72:12-19, 78:2-14.

**RESPONSE:** Plaintiffs dispute Defendants' contention in Paragraph 14 that the military

wing of the PFLP was outlawed.  The PLO and the PA supported and gave free rein to terrorist

groups, including the PFLP, during the Second Intifada.  Lowell Decl., Ex. 19 ("Levitt Decl.") at

2, 49.  Plaintiffs further dispute Paragraph 14 on the basis that Defendants rely on 30(b)(6)

testimony, which is inadmissible hearsay.  *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575

(S.D.N.Y. 2016).  Plaintiffs also object to the admissibility of Alonzo Decl. Ex. H on the grounds

that Defendants have not demonstrated its authenticity.

15.     Karnei Shomron is an "Israeli town" in the West Bank.  First Am. and Suppl. Compl. (ECF 50) ¶ 1.

**RESPONSE:** Undisputed.

16.     On February 16, 2002, an individual detonated an explosive device at a pizza parlor located in an outdoor shopping mall in the West Bank, in the Israeli settlement known as Karnei Shomron (the "Karnei Shomron Bombing").  First Am. and Suppl. Compl. (ECF 50) ¶ 1; Alonzo Decl. Ex. A ¶ 1.

**RESPONSE:** Undisputed.

17.     In 2002, Israel retained exclusive civil and security control in Area C, which included settlements.  *See* Alonzo Decl. Ex. I Art. XVII.

**RESPONSE:** Undisputed.

18.     The PFLP often publicly claimed responsibility for operations that they did not carry out.  Alonzo Decl. Ex. C at 35:5-10.

**RESPONSE:** Plaintiffs dispute Paragraph 18 on the basis that the PFLP "often publicly claimed responsibility for operations that they did not carry out."  To the contrary, the PFLP does not often claim responsibility, and further, the PFLP is quite cautious not to take "credit" for terror attacks it did not carry out.  Spitzen Decl. ¶¶ 39, 41–43.  Plaintiffs point out that the PFLP did issue a statement explicitly claiming responsibility for the Karnei Shomron Bombing.  *See* ECF 120-3, Ex. C ("Amayra Dep.") at 36:5-20.

19.     For example, PA security forces investigated an explosion in Qalqilya that the PFLP publicly claimed to have conducted, but "it turned out later that somebody from Hamas perpetrated that operation."  Alonzo Decl. Ex. C at 33:16-34:8.

**RESPONSE:** Plaintiffs dispute Paragraph 19 on the basis that Defendants have provided no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is inadmissible hearsay.  *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

20.     PA security forces also investigated "a certain operation that had happened in Ashkelon [for which the PFLP claimed credit], and it turned out that they ha[d] nothing to do with it."  Alonzo Decl. Ex. C at 34:9-11.

**RESPONSE:** Plaintiffs dispute Paragraph 20 on the basis that Defendants have provided no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is inadmissible hearsay.  *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

21.     Following the Karnei Shomron Bombing, the PA's Preventive Security Services attempted to investigate the attack, and based on the PFLP's reported claim of responsibility, interrogated several individuals associated with the PFLP.  Alonzo Decl. Ex. C at 53:20-54:8.

**RESPONSE:** Plaintiffs dispute Paragraph 21 on the basis that Defendants have provided

no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is

inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

22.     Repeated incursions by the Israeli military into the West Bank in 2001 and 2002
prevented the PA's security forces from conducting a proper investigation of the Karnei Shomron
Bombing. Alonzo Decl. Ex. G at 92:1-20.

**RESPONSE:** Plaintiffs dispute Paragraph 22 on the basis that Defendants have provided

no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is

inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

23.     "[D]uring that period in 2002, the PA areas [of the West Bank]," including
Qalqilya, which lies near Karnei Shomron, were "under siege." Alonzo Decl. Ex. C at 51:14-19.

**RESPONSE:** Plaintiffs dispute Paragraph 23 on the basis that Defendants have provided

no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is

inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

24.     Accordingly, during that time period, the PA "did not have any control over the area
of [Qalqilya]," Alonzo Decl. Ex. C at 54:2-5, and the PA's Preventive Security Services headquarters
in Ramallah could not coordinate with personnel in Qalqilya concerning the interrogations of
individuals associated with the PFLP. *Id.* at 54:12-55:10.

**RESPONSE:** Plaintiffs dispute Paragraph 24 on the basis that Defendants have provided

no factual support for their assertion and rely exclusively on 30(b)(6) testimony, which is

inadmissible hearsay. *See Cruz v. Zucker*, 195 F. Supp. 3d 554, 575 (S.D.N.Y. 2016).

25.     There is no admissible evidence that either the PA or the PLO had advance
knowledge of the Karnei Shomron Bombing. *See Shatsky v. PLO*, 2017 U.S. Dist. LEXIS 94946,
at *23-32 (D.D.C. June 20, 2017) (Leon, J.) ("SJ Order") (no admissible evidence of advance
knowledge).

**RESPONSE:** Plaintiffs dispute Paragraph 25 on the basis that just nine days prior to the

Karnei Shomron Bombing, the PA was advised that Nazal had been participating in terrorist

activity and was armed, yet the PA did nothing. Lowell Decl., Ex. 6 at 07:000192-96. Moreover,

Defendants had been monitoring Nazal and knew in "real time" that Nazal was engaging in

terrorism as the head of the PFLP in Qalqilya.  *See* Spitzen Decl. ¶¶ 59–60.  Plaintiffs further

dispute Paragraph 25 on the grounds that Defendants have provided no factual support for their

assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court

decision.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Local Rule 56.1

statement is not itself a vehicle for making factual assertions that are otherwise unsupported in

the record."); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at

*1 n.4 (S.D.N.Y. Jan. 2, 2018) (holding that pursuant to Local Rule 56.1, "the Court will not

consider statements in [a Party's] 56.1 Statement that do not cite to any admissible evidence in

the record.").

26.     There is no admissible evidence that funds, services, personnel, or other support
provided by either the PA or the PLO were used to plan, facilitate, or carry out the Karnei Shomron
Bombing.  *See* SJ Order at *23-32 (no admissible evidencing linking Ra'ed Nazal ("Nazal")—or
any other evidence linking Defendants' conduct—to the Karnei Shomron Bombing); *id.* at *30
("[N]o reasonable jury could find that the PLO's payment of rent for the Qalqilya office 'caused'
the bombing simply because that office is located in a place physically 'proximate' to the attack.");
*id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to
the Karnei Shomron bombing," and "[w]ithout such evidence, no reasonable jury could conclude
that the PA proximately caused the bombing by paying Nazal a salary"); *id.* ("As plaintiffs have
not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron
bombing, I have no trouble concluding that payments to the families of these individual could not
have proximately caused the bombing."); *id.* at *32 (concluding that the "after-the-fact payments
are not sufficient for a reasonable jury to conclude that defendants proximately caused the Karnei
Shomron bombing").

**RESPONSE:** Plaintiffs dispute Defendants' contention that no funds, services,

personnel, or other support were provided by either the PA or the PLO to plan, facilitate, or carry

out the Karnei Shomron Bombing, as the evidence shows that material support and provisions

were provided by Defendants to the PFLP.  *See* Shaked Decl. at 9–12.  Moreover, evidence shows

that Nazal was employed and paid by the PA and PLO, had no official duties or responsibilities,

and orchestrated the Bombing.  *See* Lowell Decl., Ex. 5 at 07:000055-57 (showing Nazal was a

salaried employee of the PA); Ex. 6 at 07:000192 (Nazal was given the rank of "Captain" upon

joining the PA's National Security apparatus); Ex. 20 ("2007 ISA Report") at 59 (stating the

Bombing was planned and executed under the direction of Nazal);[1] Dahbour Dep. at 35:11-13,

52:3-9, 53:3-12 (acknowledging when Nazal was released from prison, it was well known "he

was PFLP and head of Ali Abu Mustafa Brigade"); *id.* at 50:24 – 52:19 (stating Nazal was the

elected head of the PFLP in Qalqilya, a fact known to the PA's General Intelligence Service,

which kept a thick file on Nazal); ECF 120-10, Ex. J at 15 ("Defs.' Objections and Answers to

Pls.' Second Set of Interrogatories, Interrog. No. 3") (stating Nazal did not report to work or

receive any assignments from his employer, the PA).  Plaintiffs further dispute Paragraph 26 on

the grounds that Defendants have provided no factual support for their assertion as required by

Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered

without jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick*

*Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2,

2018).

      27.    There is no admissible evidence that any officers, employees, or agents of the PA
or the PLO were involved in planning, facilitating, or carrying out the Karnei Shomron Bombing.
*See* SJ Order at *23-32 (no admissible evidencing linking Nazal—or any other evidence linking
Defendants' conduct—to the Karnei Shomron Bombing); *id.* at *28 ("no admissible evidence
supporting [Plaintiffs'] theory that Nazal planned the bombing"); *id.* at *31 (finding that "plaintiffs
have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing").

      **RESPONSE:** Plaintiffs dispute that no "officers, employees, or agents" of Defendants

were involved in planning, facilitating, or carrying out the Bombing when, in fact, Nazal was a

salaried employee of the PA despite having no defined duties or official responsibilities within

the PA.  *See* Lowell Decl., Ex. 5 at 07:000055-57 (showing Nazal was a salaried employee of the

PA); Ex. 15 at SHATSKY-002814 (stating Nazal resumed his PFLP activities "since the first day

of his release [from prison]"); Defs.' Objections and Answers to Pls.' Second Set of

---

[1] *See also* Lowell Decl., Ex. 25 ("Guez Decl.") ¶¶ 11–13; Ex. 26 ("Ilan Decl.") ¶ 14.

Interrogatories, Interrog. No. 3 at 15 (stating Nazal did not report to work or receive any official

assignments from the PA).  Plaintiffs further dispute Paragraph 27 on the grounds that Defendants

have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely

exclusively on a now vacated district court decision that was entered without jurisdiction.  *See*

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller,*

*Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

28.     Sadek Abdel Hafez ("Hafez") was not an employee of the PA or PLO.  *See* SJ Order
at *23-32 (no evidence Hafez had any link to the PA or PLO with the exception of family payments
made to Hafez's family after the bombing).

**RESPONSE:**  Undisputed.

29.     No evidence exists in this case to show that Hafez was employed by, paid by, or
had any contact whatsoever with, the PA or PLO.  *See* SJ Order at *23-32 (no evidence Hafez had
any link to the PA or PLO with the exception of payments made to Hafez's family after the
bombing).

**RESPONSE:** Plaintiffs dispute that Hafez was not paid by or did not have any contact

with Defendants, when in fact after the Bombing, the PLO and PA made martyr payments to

Hafez's father, Ahed Mahmoud Abdallah Abdel Hafez.  *See* Lowell Decl., Ex. 4 at 07:000048-

50; Ex. 7.  Plaintiffs further dispute Paragraph 29 on the grounds that Defendants have provided

no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a

now vacated district court decision that was entered without jurisdiction.  *See Holtz v. Rockefeller*

*& Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois,*

*LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

30.     There is no evidence in this case that Hafez acted as an agent of the PA or PLO, or
that he acted with the support or authorization of the PA or PLO.  *See* SJ Order at *23-32 (no
evidence Hafez had any link to the PA or PLO with the exception of payments made to Hafez's
family after the bombing).

**RESPONSE:** Plaintiffs dispute Paragraph 30 on the grounds that Defendants have

provided no factual support for their assertion as required by Local Rule 56.1(d) and rely

exclusively on a now vacated district court decision. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018). Moreover, Plaintiffs aver that the PA and PLO made martyr payments to Hafez's father after the attack. *See* Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.

31. No admissible evidence exists in this case to show that the PA or PLO provided material support to Hafez. *See* SJ Order at *23-32 (no admissible evidence Hafez had any link to or received any support from the PA or PLO); *Shatsky v. PLO*, 292 F. Supp. 3d 188, 189 (D.D.C. 2017) (Leon, J.) ("[T]he cornerstone of my ruling was the determination that plaintiffs lacked sufficient admissible evidence to prove the essential elements of their claims" against the PA and PLO.).

**RESPONSE:** Plaintiffs dispute Paragraph 31 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered without jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018). Moreover, Plaintiffs aver that the PA and PLO made martyr payments to Hafez's father after the attack. *See* Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.

32. There is no evidence that the PA or the PLO ever agreed with Hafez to commit a terrorist act. *See* SJ Order at *23-32 (no evidence of any connection between Hafez and PA or PLO).

**RESPONSE:** Plaintiffs dispute Paragraph 32 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered without jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018). Plaintiffs aver that, after carrying out Karnei Shomron attack, Defendants made martyr payments to Hafez's father.

*See* Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.

33.    There is no evidence that the PA or PLO ever made any agreement with Hafez.  *See* SJ Order at *23-32 (no evidence of any connection between Hafez and PA or PLO).

**RESPONSE:** Plaintiffs dispute Paragraph 33 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered without jurisdiction.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).  Plaintiffs aver that, after carrying out Karnei Shomron attack, Defendants made martyr payments to Hafez's father. *See* Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.

34.    There is no evidence that the PA or the PLO ever agreed with the PFLP to commit a terrorist act, or any unlawful act.  *See* SJ Order at *23-32 (rent and other incidental support unconnected to any wrongdoing).

**RESPONSE:** Plaintiffs dispute Paragraph 34 on the grounds that Defendants provided material support to the PFLP, which is a designated terrorist organization. That itself constitutes unlawful support for terrorism.  Moreover, the Defendants did so knowing that the PFLP would use such support in preparation for, or to carry out, acts of terrorist violence.  *See* Lowell Decl., Ex. 21 at SHATSKY-009438 (U.S. Department of State statement that the payments "were likely made with the knowledge that the intended recipients had been involved in violence and terrorism."); Ex. 22 at SHATSKY-005539 (Arafat and his men used the funds donated to them by other countries, including the European Union, to finance terrorist activity); *id.* at SHATSKY-005538, SHATSKY-005547-52 (showing Arafat personally authorized funding for terrorists and execution of terror attacks); Ex. 23 (providing evidence that international financial aid given to the PA was redirected to terrorist elements); Shaked Decl. at 10, 12.  Plaintiffs further dispute Paragraph 34 in that Defendants have provided no factual support for their assertion as required

by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was

entered without jurisdiction.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001);

*Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y.

Jan. 2, 2018).

35.     There is no evidence that Hafez was aware of the possibility that his family might
receive welfare support after his death in the Karnei Shomron Bombing. SJ Order at *32
("[P]laintiffs have pointed to no evidence suggesting that Hafez knew his family would receive
martyrdom payments.").

**RESPONSE:**  Plaintiffs dispute Paragraph 35 that Hafez was not aware of the possibility

that his family might receive support after his death.  After a perpetrator is killed in a suicide

bombing, it is customary for family members of the terrorist to receive "martyr" payments.

Lowell Decl., Ex. 24.  In fact, Defendant PA's Martyrs and Wounded Affairs Establishment is an

establishment of the PA funded from taxes collected from the Palestinian population, and

payments made to families of those individuals designated as "martyrs" are made from funds

under the control of the PA's Ministry of Finance.  *See* Ghannam Dep. at 28, 42, 49, 59-60, 146.

Hafez was declared a "Shahid" (one who met his death as a martyr) after the Karnei Shomron

Bombing.  Lowell Decl., Ex. 24 at 07:000015.  Accordingly, after the Bombing occurred, the

PLO and PA made martyr payments to Hafez's father, Ahed Mahmoud Abdallah Abdel Hafez.

*See* Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.  Defendants' Rule 30(b)(6) witness also testified

that Defendants relied on the fact that Hafez committed the Bombing in order to designate him a

"martyr" under the applicable laws and issue payments to his father.  *See* Ghannam Dep. at 65,

69-70, 72-73, 80-84, 90, 95-96, 108, 110.  Plaintiffs further dispute Paragraph 35 on the grounds

that Defendants have provided no factual support for their assertion as required by Local Rule

56.1(d) and rely exclusively on a now vacated district court decision that was entered without

jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search,*

*Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

36.    There is no evidence that Hafez was motivated to undertake the Karnei Shomron Bombing by the prospect of welfare support for his family.  SJ Order at *32 ("[P]laintiffs have pointed to no evidence suggesting . . . that Hafez was motivated by the prospect of [martyrdom] payments.").

**RESPONSE:** Plaintiffs dispute Paragraph 36 on the grounds that Defendants have

provided no factual support for their assertion as required by Local Rule 56.1(d) and rely

exclusively on a now vacated district court decision that was entered without jurisdiction.  *See*

*Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller,*

*Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).  And, in any event,

after the Karnei Shomron bombing occurred, the PLO and PA made martyr payments to Hafez's

father.  *See* Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.

37.    No admissible evidence exists in this case to show that Nazal had advance knowledge of the Karnei Shomron Bombing. *See* SJ Order at *24-31 (no admissible evidence that connects Nazal to the Karnei Shomron Bombing); *id.* at *28 (finding "no admissible evidence supporting [Plaintiffs'] theory that Nazal planned the bombing"); *id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing.").

**RESPONSE:** Plaintiffs dispute that Nazal lacked advanced knowledge of the Bombing

because, as established by the 2007 ISA Report, "[t]he attack was planned and executed . . . under

the direction of Raad Madi" (a/k/a Ra'ed Nazal).  *See* 2007 ISA Report at 59; *see also* Lowell

Decl., Ex. 25 ("Guez Decl.") ¶¶ 11–13; Ex. 26 ("Ilan Decl.") ¶ 14.   Additional evidence

demonstrates Nazal's intimate knowledge of and involvement with the attack, and that Nazal had

previously agreed to Hafez's request to carry out the attack.   *See* Lowell Decl., Ex. 27 at

SHATSKY-007493; Ex. 28 at SHATSKY-002829-30.  Plaintiffs further dispute Paragraph 38 on

the grounds that Defendants have provided no factual support for their assertion as required by

Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered

without jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick*

*Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

38.     No admissible evidence exists in this case to show that Nazal was involved in planning, facilitating, or carrying out the Karnei Shomron Bombing.  *See* SJ Order at *24-31 (no admissible evidence that connects Nazal to the Karnei Shomron Bombing); *id.* at *28 (finding "no admissible evidence supporting [Plaintiffs'] theory that Nazal planned the bombing"); *id.* at *31 (finding that "plaintiffs have not identified any admissible evidence linking Nazal . . . to the Karnei Shomron bombing.").

**RESPONSE:** Plaintiffs dispute that Nazal was not involved in planning, facilitating, or carrying out the Karnei Shomron Bombing, as the 2007 ISA Report determined that "[t]he attack was planned and executed . . . under the direction of Raad Madi" (a/k/a Ra'ed Nazal).  *See* 2007 ISA Report at 59; *see also* Guez Decl. ¶¶ 11–13; Ilan Decl. ¶ 14.  Plaintiffs further dispute Paragraph 39 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered without jurisdiction.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

39.     From 1999 through approximately April 27, 2002, Nazal was listed as an employee of the PA's National Security Forces ("NSF") in Qalqilya.  Alonzo Decl. Ex. J at No. 3.

**RESPONSE:** Plaintiffs dispute Paragraph 39 to the extent Nazal was merely an "employee" of the PA's National Security Forces, when in fact he was given the rank of "Captain" upon his release from prison and joining the PA National Security apparatus.  *See* Lowell Decl., Ex. 6 at 07:000192 (Nazal was given the rank of "Captain" upon joining the PA's National Security apparatus); Ex. 5 at 07:000055-57 (showing Nazal was a salaried employee of the PA); Ex. 15 at SHATSKY-002814 (stating Nazal resumed his PFLP activities "since the first day of his release [from prison]").

40.     Nazal came into the employment of the NSF after he was released from an Israeli prison in 1999 pursuant to a process by which he could be rehabilitated.  Alonzo Decl. Ex. J at No. 3.

**RESPONSE**: Plaintiffs dispute Defendants' characterization in Paragraph 40 that Nazal was released from prison pursuant to a process by which he could be rehabilitated.  In fact, evidence shows that Nazal was released due to the lobbying efforts of Defendants.  *See* Lowell Decl., Ex. 29 at SHATSKY-007763 (statement by the PA Minister of Detainees and Ex-Detainees Affairs that his goal was the release of 700 military prisoners); Ex. 30 at SHATSKY-007965 (PA Minister states that the Palestinian prisoners are "not criminals as the Israeli politicians and media describe them. . . . [T]hey are national warriors and . . . they have a [just] cause according to the laws of the United Nations."); Ex. 31 (the PA Minister of Detainees and Ex-Detainees Affairs "called on the Palestinian leadership to give the issue of the prisoners a special care and priority so that we can liberate them from the Israeli prisons"); Ex. 32 (arguing for the release of prisoners who had been sentenced to life imprisonment).

41.     Accordingly, he was given an entry-level officer position.  Alonzo Decl. Ex. J at No. 3.

**RESPONSE**: Plaintiffs dispute Defendants' characterization that Nazal was given an entry level position, as Nazal was given the rank of "Captain" upon his release from prison. Lowell Decl., Ex. 6 at 07:000192; *see also* Shaked Decl. at 11.

42.     After his date of hire, Nazal never reported to work, never received a uniform, and never was available to receive any assignment.  Alonzo Decl. Ex. J at No. 3.

**RESPONSE**: Undisputed.

43.     There is no admissible evidence in this case of any relationship, or any contact or communications, between Nazal and Hafez.  *See* SJ Order at *24-31 (no admissible evidence that connects Nazal to the Karnei Shomron Bombing).

**RESPONSE**: Plaintiffs dispute Paragraph 43 because the evidence shows that there was contact and communications between Nazal and Hafez prior to the attack.  For instance, the

evidence indicates that Hafez was accompanied by Nazal and another PFLP leader, Jamal Al-Hindi, prior to Hafez carrying out the attack. Dahbour Dep. at 140:22-142:1. Plaintiffs further dispute Paragraph 44 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered without jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

44. There is no admissible evidence that Mohammad Wasef was involved in the Karnei Shomron Bombing. *See* SJ Order at *31 ("As plaintiffs have not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron bombing, I have no trouble concluding that payments to the families of these individuals could not have proximately caused the bombing.").

**RESPONSE:** Plaintiffs dispute that Wasef was not involved in the Karnei Shomron Bombing, as testimony demonstrates that the PA and PLO paid detainee benefits to Wasef, who helped recruit Hafez to the PFLP. Dahbour Dep. at 140:22-142:1. Plaintiffs further dispute Paragraph 44 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule 56.1(d) and rely exclusively on a now vacated district court decision that was entered without jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

45. There is no admissible evidence that Jamal Hindi was involved in the Karnei Shomron Bombing. SJ Order at *31 ("As plaintiffs have not identified any admissible evidence linking Nazal, Wasef, or Hindi to the Karnei Shomron bombing, I have no trouble concluding that payments to the families of these individuals could not have proximately caused the bombing.").

**RESPONSE:** Plaintiffs dispute that Hindi was not involved in the Karnei Shomron Bombing, as testimony supports that Hindi was with Hafez just prior to Hafez carrying out the attack. Dahbour Dep. at 140:22-142:1. Plaintiffs further dispute Paragraph 46 on the grounds that Defendants have provided no factual support for their assertion as required by Local Rule

56.1(d) and rely exclusively on a now vacated district court decision that was entered without

jurisdiction. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search,*

*Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

46.     There is no evidence that the Israelis prosecuted anyone, including any PA or PLO officials, for involvement in the Karnei Shomron Bombing.

**RESPONSE:**  Plaintiffs admit Paragraph 46 but dispute that it is material given that Nazal

and Hafez, the perpetrators of the Bombing, died during or shortly after the bombing.

47.     No evidence exists to show that the PFLP office in Qalqilya, or anyone working in that office, was involved in planning, facilitating, or carrying out the Karnei Shomron Bombing. *See* SJ Order at *28-30 (noting the lack of any evidence relating to the PFLP's Qalqilya office other than it purportedly "is nearby to Karnei Shomron.").

**RESPONSE:**  Plaintiffs dispute Defendants' assertion that the PFLP office in Qalqilya

was not involved in planning, facilitating, or carrying out the Bombing, given that the 2007 ISA

Report concluded that "[t]he attack was planned and executed by the PFLP military network in

Qalqilya, under the direction of Raad Madi" (a/k/a Ra'ed Nazal).  *See* 2007 ISA Report at 59; *see*

*also* Guez Decl. ¶¶ 11–13; Ilan Decl. ¶ 14.  Plaintiffs further dispute Paragraph 48 on the grounds

that Defendants have provided no factual support for their assertion as required by Local Rule

56.1(d) and rely exclusively on a now vacated district court decision that was entered without

jurisdiction.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001); *Indus. Quick Search,*

*Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *1 n.4 (S.D.N.Y. Jan. 2, 2018).

48.     The PA and the PLO are unincorporated associations.  *See* SJ Order at *33 (noting that the parties "acknowledge that the PA and PLO 'both are unincorporated associations'").

**RESPONSE:** Given the Second Circuit's holding in *Waldman v. Palestine Liberation*

*Org.*, 835 F.3d 317, 332 (2d Cir. 2016), which concluded that both the PA and the PLO are

unincorporated associations, Plaintiffs do not dispute Paragraph 48.

## PLAINTIFFS' COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS FOR WHICH THERE IS A GENUINE ISSUE TO BE TRIED

**A.  The Popular Front for the Liberation of Palestine (the "PFLP") Carried Out the 2002 Bombing That Caused Plaintiffs' Injuries.**

49.  The Popular Front for the Liberation of Palestine ("PFLP") is a known foreign terrorist organization ("FTO") that is opposed to negotiations with Israel.  Lowell Decl., Ex. 33 at SHATSKY-006177-78; Ex. 34 at SHATSKY-002913 (according to the PFLP, "the conflict with the Zionist enemy is a fatal conflict that cannot be solved through the ongoing negotiations. It can only be solved through a struggle . . . ."); *id.* at SHATSKY-002918 (emphasizing that "the Front opposes the Camp David Summit and any agreements that might be reached"); Levitt Decl. at 9 (stating the U.S. State Department designated the PFLP a foreign terrorist organization in 1997).

50.  The PFLP uses terrorist attacks against Israelis, including suicide bombings, to carry out its objectives.  Indeed, in its official magazine, Al-Hadaf, the PFLP boasted about the number of successful attacks it had carried out against Israel and Israelis. *See* ECF 120-5, Ex. E ("Malouh Dep.") at 116:21-23 (Al-Hadaf is "the magazine that speaks in the name of the PFLP."); Lowell Decl., Ex. 34 at SHATSKY-002913 (paying tribute to those who "sacrificed themselves"); *id.* at SHATSKY-002918 (stating that PFLP members will "pursue shahada [martyrdom]" until Palestinians achieve their goals).

51.  The PFLP officially endorses the use of terrorism to achieve its goals. For example, its leader in Ramallah, Ahmed Saadat, was convicted for his terrorist activities as a PFLP member. *See* Lowell Decl., Ex. 35; Ex. 36 (Layla Khaled – a member of the Palestinian National Counsel and a member of the PFLP's Central Committee who was convicted of multiple airplane hijackings – stating in an interview 31 years after her "self-sacrificing operations" that "the importance of the confrontation, the armed struggle and the popular Intifada has been clearly proved.").

52.     The PFLP carried out car bombings in 2001 and, on October 17, 2001, assassinated Israeli cabinet minister Rehav'am Ze'evi.  *See* Lowell Decl., Ex. 37 at SHATSKY-008263; *see also* Ex. 38 at SHATSKY-007584 (describing the assassination).

53.     On February 16, 2002, the PFLP continued its plan and pattern of terror and carried out the Karnei Shomron Bombing, causing injury to Plaintiffs in this action.  *See* Spitzen Decl. at ¶¶ 24–28 (stating "[t]he PFLP immediately and repeatedly confirmed that it executed the Bombing").  Sadeq Ahed Mahmoud Abdel Hafez ("Hafez"), a PFLP operative, was responsible for detonating the explosive device in the attack.  *See* Lowell Decl., Ex. 24 at 07:000013 (stating Hafez was affiliated with "The Popular Front"); Ex. 39 at 07:000017 (stating Hafez died on February 16, 2002); Ex. 24 at 07:000012-13 (stating that on February 16, 2002, Hafez carried out a ███████████████████████████████████████████████████████); *id.* at 07:000015 (stating Hafez "shall be considered a Shahid [one who met his death as a martyr] (of the Al-Aqsa Martyrs)"); Spitzen Decl. at ¶¶ 17–23 (stating that "[t]he suicide bomber was Sadeq Ahed Abdel Hafez, identity number 922361217").

54.     The PFLP's announcement claiming responsibility for the attack, published on al-Jazeera, identified Sadeq Hafez and stated that he was affiliated with the PFLP.  Lowell Decl., Ex. 40 at SHATSKY-008012-13.

55.     Defendants conceded in *Shatsky I* that Hafez was the bomber who carried out the attack.  *See Shatsky v. Palestine Liberation Org.*, 2017 WL 2666111, at *10 (D.D.C. June 20, 2017) ("*Shatsky I*") ("Defendants have conceded . . . that Hafez was the bomber.").

56.     The mastermind behind the attack was Ra'ed Nazal ("Nazal"), a known PFLP military leader.  Ilan Decl. ¶ 14; Guez Decl. ¶¶ 11–13; Lowell Decl. Ex. 41 at 8–9 (interview with Allam Kaabi); Dahbour Dep. at 50:24-52:19.

57.     Israel's investigation into the Karnei Shomron Bombing culminated with a determination that Ra'ed Nazal planned the Bombing and that the PFLP carried it out.  *See* 2007 ISA Report at 59; Ilan Decl. ¶ 14; Guez Decl. ¶¶ 11–13; Spitzen Decl. at ¶¶ 24–28.

58.     Nazal was killed on April 26, 2002 during an Israeli military raid in connection with his role in the Karnei Shomron Bombing.  Lowell Decl., Ex. 6 at 07:000203, 07:000205.

59.     A 2007 Report by the Israel Security Agency (a/k/a "Shin Bet" or "Shabak") investigated the suicide bombing in Karnei Shomron and concluded "[t]he attack was planned and executed by the PFLP military network in Qalqilya, under the direction of Raad Madi, in collaboration with the PFLP network in Nablus, headed by Ahad Oulma."  Ilan Decl. ¶ 14; Guez Decl. ¶¶ 11–13.

60.     Allam Kaabi, a member of the PFLP Central Committee and head of the PFLP's Prisoner Committee in Gaza, and in 2002 a senior leader of the PFLP's military wing, the Abu Ali Mustafa Brigades in Nablus, confirmed Ra'ed Nazal's involvement in the Bombing.  Lowell Decl., Ex. 41 at 8–9; *see also* Spitzen Decl. ¶¶ 36–37 (discussing Kaabi's titles and his statement confirming Nazal's involvement in the attack).

61.     In a video interview posted by the PFLP on its Facebook page on December 17, 2016, Kaabi stated "the Karnei Shomron operation was executed by comrade Ra'ed Nazal from Qalqilya in coordination with the comrades in the [Abu Ali Mustafa] Brigades in Nablus."  *Id.*

62.     Kaabi termed this attack "a joint, distinguished effort" between the PFLP's Abu Ali Mustafa Brigades in Nablus, of which Kaabi was a leader at the time, and Nazal in Qalqilya.  *Id.*

63.     Kaabi currently resides in the Gaza Strip and cannot be located.  *See* Spitzen Decl. ¶ 43, n.23 ("I attempted several times to obtain contact information for Kaabi in the Gaza Strip, such as a phone number or email address. To that end I called several PFLP offices and officials

(without of course revealing my identity or the purpose of the inquiry), but I was unable to obtain contact information for Kaabi.").

64.     Defendants knew in real time that between 1999 and the time of the Bombing, Nazal was  the leader and commander of the PFLP's militant wing, the Abu Ali Mustafa Brigades, in Qalqilya.  Dahbour Dep. at 35:11-13, 52:3-9, 53:3-12 (acknowledging that at the time Nazal was released from prison, it was well known "he was PFLP and head of Abu Ali Mustafa Brigade").

65.     At the time of and prior to the Bombing, Nazal was the elected head of the PFLP in Qalqilya, a fact known to the Defendants.  Dahbour Dep. at 50:24-52:19; *see also* Lowell Decl., Ex. 15 at SHATSKY-002814 (Nazal was "elected as a member of the leadership of the Qalqilya region, and participated as an active member in the Sixth National Conference of the Popular Front.").

66.     The PA's GIS maintained a thick file on Ra'ed Nazal.  *See* Dahbour Dep. at 50–51 (estimating that the GIS file was "three and a half to four centimeters" thick).

67.     There is significant additional admissible evidence showing that the PFLP carried out the Karnei Shomron bombing.  *See, e.g.*, *Shatsky I*, DE 77 at 35 ("[i]n fact, it is likely that a radical militant wing (Abu Ali Mustafa Brigades) of the Popular Front for the Liberation of Palestine ("PFLP") committed the [Karnei Shomron] attack."); Lowell Decl., Ex. 42 at SHATSKY-000902-03 (PFLP publication referring to Hafez as its comrade and hero who carried out an act of martyrdom on February 16, 2002); Ex. 43 at SHATSKY-000908 (same); Ex. 44 at SHATSKY-000913 (same); SHATSKY-003271 (same); Ex. 40 at SHATSKY-008012-14 (report from Al-Jazeera that the PFLP claimed responsibility for the bombing); Ex. 33 at SHATSKY-006061 (report from the U.S. Department of State that the PFLP claimed responsibility for

the bombing); Spitzen Decl. at ¶¶ 24–28 (discussing the communiqué published by the PFLP shortly after the attack on its official website).

68.     No other organization claimed responsibility for the Karnei Shomron attack that injured the Plaintiffs in this action.  *See* Lowell Decl., Ex. 33 at SHATSKY-006061 (report from the U.S. Department of State that the PFLP claimed responsibility for the bombing); Ex. 40 at SHATSKY-008012-14 (report from Al-Jazeera that the PFLP claimed responsibility for the bombing); Ex. 42 at SHATSKY-000902-03 (PFLP publication referring to Sadeq Hafez as its comrade and hero who carried out an act of martyrdom); Ex. 43 at SHATSKY-000908 (same); Ex. 44 at SHATSKY-000913 (same); *see also* Spitzen Decl. at ¶¶ 24–28.

69.     American teenagers Keren Shatsky and Rachel Thaler were killed as a result of the Bombing, and Plaintiffs Leor Thaler, Hillel Trattner, Ronit Trattner, Steven Braun, and Chana Friedman were injured in the Bombing.  *See* Lowell Decl., Ex. 51; Ex. 49 at 21:17–20; Ex. 68 at 20:4–12; Ex. 69 at 38:21–40:11; Ex. 48 at 13:11–13.

70.     Plaintiffs Shabtai Scott Shatsky and Jo Anne Shatsky are citizens of the United States and are the personal representatives of the Estate of Keren Shatsky, a United States citizen killed in the Bombing.  Lowell Decl., Ex. 46 at 1; Ex. 63.

71.     Plaintiffs Tzippora Shatsky Schwarz, Yoseph Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky, and David Raphael Shatsky are citizens of the United States and are the siblings of decedent Keren Shatsky, a United States citizen killed in the bombing.  Lowell Decl., Ex. 53; Ex. 57; Ex. 58; Ex. 61.

72.     Plaintiffs Ginette Lando Thaler and Michael Thaler are the personal representatives of the Estate of Rachel Thaler, a United States citizen killed in the bombing. Michael Thaler is a citizen of the United States.  Ex. 45 at 1.

73.     Plaintiffs Leor Thaler, Zvi Thaler, and Isaac Thaler are citizens of the United States and are the siblings of decedent Rachel Thaler, a United States citizen killed in the bombing. Lowell Decl., Ex. 62; Ex. 67; Ex. 50 at 13:4–8, 13:13–15.

74.     Plaintiff Leor Thaler suffered injuries as a result of the explosion.  Lowell Decl., Ex. 51.

75.     Plaintiff Hillel Trattner is a citizen of the United States and suffered injuries as a result of the explosion.  Lowell Decl., Ex. 56.

76.     Plaintiff Ronit Trattner is the spouse of Plaintiff Hillel Trattner, and she suffered injuries as a result of the explosion.  Lowell Decl., Ex, 68 at 20:4–12.

77.     Plaintiffs Aron S. Trattner and Shelley Trattner are citizens of the United States and are the parents of Plaintiff Hillel Trattner.  Lowell Decl., Ex. 54; Ex. 59.

78.     Plaintiffs Efrat Trattner, Hadassa Diner, and Yael Hillman are citizens of the United States are the sisters of Plaintiff Hillel Trattner.  Lowell Decl., Ex. 46.

79.     Plaintiff Steven Braun is a citizen of the United States and suffered injuries as a result of the explosion.  Lowell Decl., Ex. 60.

80.     Plaintiff Chana Friedman is a citizen of the United States and suffered injuries as a result of the explosion.  Lowell Decl., Ex. 55.

81.     Plaintiffs Ilan Friedman, Yehiel Friedman, Zvi Friedman, and Miriam Friedman are citizens of the United States and are the siblings of Plaintiff Chana Friedman.  Lowell Decl., Ex. 57; Ex. 64; Ex. 65; Ex. 66.

82.     Plaintiff Bella Friedman is a citizen of the United States and is the mother of Plaintiff Chana Friedman.  Lowell Decl., Ex. 65.

**B.     Defendants Knowingly Provided Material Support to the PFLP, a Foreign Terrorist Organization, that Caused Injury to the Plaintiffs.**

**1.     The PLO and the PA in many respects share a unity of identity with the PLO controlling the PA.**

83.     Defendant PLO was founded in 1964 by Egypt and the Arab League.  *Shatsky I*, DE 77-10 at ¶ 25.   Defendant PA is an administrative organization established by the Oslo Accords to serve as a governing authority for Palestinians.  *Id.* at ¶ 26.

84.     The Interim Agreement on the West Bank and the Gaza Strip (Sept. 28, 1995) ("Oslo II Accords" or "Interim Agreement") created three distinct administrative divisions in the West Bank: Areas A, B and C.  *See* ECF 120-9, Ex. I ("Oslo II Accords").   The PA had full civil and security control over Area A.  Interim Agreement at Art. XIII.1.  It had civil control over Area B, but shared security control in that area with Israel.  *Id.* at Art. XIII.2.  Israel had full civil and security control over Area C, with planned transfer of that area to the PA.  *Id.*; *id.* at Art. XVII.

85.     In many respects, the PLO and the PA have a unity of identity. The PLO, which negotiated the PA into existence, controls the PA.  Lowell Decl., Ex. 70 at SHATSKY-007133 (testimony of PA witness in a civil case brought against the PA agreeing that the PA "answer[s] to" the PLO).  The letterhead of many official documents consists of the names of both the PLO and the PA, with the latter name in the line below the former.  *Id.*  Indeed, Defendant PA produced documents appearing on the PLO's letterhead.  *See, e.g.*, Lowell Decl., Ex. 4 at 07:000048; Ex. 21.

86.     "[S]hortly after [June 15, 2002, the PA] condemned an EU decision to designate the PFLP a terrorist organization, saying the PFLP was 'committed to the principles of the PLO.'" Lowell Decl., Ex. 21 at SHATSKY-009439.

2. **The PLO and the PA Provided Material Support to and Aided and Abetted the Mastermind of the Karnei Shomron Bombing.**

a. **The PLO and the PA Supported the Terrorist Activities of Ra'ed Nazal, A Known PFLP Military Leader and the Mastermind of the Karnei Shomron Bombing.**

87. Raed Musa Ibrahim Nazal (Mahdi) was ███████████████████ ████████ Lowell Decl., Ex. 6 at 07:000192.

88. He was arrested for 25 days when he was thirteen years-old, and for thirteen months when he was fourteen years old. Lowell Decl., Ex. 15 at SHATSKY-002814.

89. During the first Intifada, Nazal was imprisoned by Israel for his PFLP activities. *Id.* ███████████████████████████████████ ███████████████████████████████████ ████████████████████ ); *see also* Ex. 6 at 07:000194.

90. While in prison, he brutally murdered a fellow prisoner whom he suspected was a spy for the Israelis and was sentenced to life imprisonment. *See* Lowell Decl., Ex. 72 at SHATSKY-002947-48 (describing the heinous murder in Nazal's own words); Ex. 73 (describing the attack); Ex. 74 (showing photographs of the victim's injuries); Ex. 75 (same); Ex. 15 at SHATSKY-002814 (detailing Nazal's "struggle record").

91. On September 9, 1999, Nazal was released from Israeli prison pursuant to a deal negotiated by the PA with Israel. Lowell Decl., Ex. 6 at 07:000192; Ex. 15 at SHATSKY-002814 (PFLP article noting that Nazal ███████████████████ )

92. Prior to his release, Nazal spent approximately 13 years in Israeli prisons. Lowell Decl., Ex. 6 at 07:000178.

93. Upon his release from prison, Nazal was hired by the PA into its National Security apparatus, resumed his PFLP terrorist activities and was given the rank of Captain. *Id.* at

30

07:000192; Lowell Decl., Ex. 5 at 07:000055-57 (showing Nazal was paid a salary as an employee of the PA); Ex. 15 at SHATSKY-002814 (stating Nazal resumed his PFLP activities "since the first day of his release [from prison]").

94.     At the time the PA hired Nazal into this security post, it knew of his violent background and PFLP activities.  *See* Lowell Decl., Ex. 6 at 07:000192-98 (GIS report stating that Nazal was involved in armed terrorist activities on behalf of the PFLP).  The PA also knew well before 2002 that while Nazal was in prison he actively recruited young people into the PFLP and murdered a fellow prison mate whom he suspected of being a spy for the Israelis.  *Id.* at 07:000200-01.

95.     Despite the PA's knowledge of Nazal's dangerous nature, it provided him with a handsome salary and gave him no job responsibilities.  While he was employed by the PA, Nazal did not report to work or receive any assignments.  ECF 120-10, Ex. J at 15.

96.     Prior to the Bombing, Nazal had become the leader of the PFLP's military wing in Qalqilya.  Dahbour Dep. at 35:11-13; *see also* Lowell Decl., Ex. 15 at SHATSKY-002814 ([Ra'ed Nazal] was "elected as amember of the leadership of the Qalqilya region, and participated as an active member in the Sixth National Conference of the Popular Front."  He was also "elected as a member of a central committee in a [PFLP] branch.").

97.     Nazal actively recruited people to join the PFLP and carry out terrorist activities on behalf of the PFLP.  *See* Lowell Decl., Ex. 76 at SHATSKY-007481 (Nazal recruited Nuraddin Said Daoud (Titan) to join the military cell of the PFLP); Shaked Decl. at 12 (discussing Nazal "spend[ing] his time planning[,] recruiting and training terrorists").

98.     The following was published on the PFLP's official website:

> We will not be exaggerating if we say that the comrade, leader,
> *shahid* [martyr, Raed Nazal], is one of the most prominent PFLP

> leaders and warriors, who have returned to it its prestige, its presence, its role, and its popularity in the region of Qalqilya andin the northern [West Bank]. He also broadened the scope of its struggle and military activities during the Second Intifada. He became a symbol and model in the leadership of the Shahid AbuAli Mustafa Brigades and cells, while at the same time the occupation and its intelligence agencies included him in their most-wanted list.

Lowell Decl., Ex. 77 at SHATSKY-002809.

99.     During the years prior to the Bombing, while Nazal was a salaried PA employee, the PA knew, among other things, that:



a.                                    Lowell Decl., Ex. 6 at 07:000178, 07:000192.

b.                                    *Id.* at 07:000189-93.

c.                                    *Id.*

d.                                    *Id.* at 07:000192.

e.                                    *Id.* at 07:000193.

f.                                    *Id.*

g.                                    . *Id.* at 07:000190.

h.                                    *Id.* at 07:000194.

100.    Despite its knowledge of Nazal's ongoing activities in the military wing of the PFLP (which the PA claims to have outlawed months earlier), the PA continued to pay Nazal a

salary and allow him to operate freely within its jurisdiction.  Lowell Decl., Ex. 5 at 07:000055-57 (showing that Nazal was a salaried employee of the PA).

> **b.      The PLO and PA Affirmatively Endorsed the PFLP's Execution of the Karnei Shomron Bombing.**

101.    After the Karnei Shomron bombing occurred, the PLO and PA endorsed its execution, and even made martyr payments to Hafez's father, Ahed Mahmoud Abdallah Abdel Hafez, after the Bombing.  Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7.

102.    Upon Nazal's death on April 26, 2002, the PA continued to disburse his National Security salary to his family.  Lowell Decl.,  Ex. 6 at 07:000202–207 (showing the PA National Security apparatus began making payments to Nazal's wife, after he had been declared a martyr).

103.    In May 2002, the PA posthumously promoted Nazal to the rank of Major.  Lowell Decl., Ex. 5 at 07:000057.

104.    In 2004, the PA converted its payments to Nazal's family to Martyr payments.  *Id.* at 07:000057-62, 07:001083.

105.    Over a decade after Nazal's death, the PFLP and its members continue to glorify their terrorist leader, Raed Nazal.  *See, e.g.*, Lowell Decl., Ex. 77; Ex. 78;  Ex. 79.

> **3.      The PLO and PA Provided Additional Material Support For and Aided and Abetted the Terrorist Activities of the PFLP.**

> **a.      PFLP Office Locations and PA Rent Assistance.**

106.    During the relevant period, the PFLP maintained and operated headquarters and offices in the West Bank cities of Jenin, Nablus, Qalqilya, Ramallah and Tulkarem, and in various locations throughout the Gaza Strip, which were all within the PA's jurisdiction, with the PA's knowledge.  *See* Shaked Decl. at 9.

107.    The PFLP regularly utilized its offices in the West Bank and Gaza Strip (territory governed by Defendant PA) for terrorist purposes and to carry out terrorism-related activities.  *See*

Shaked Decl. at 9–10; Lowell Decl., Ex. 76 at SHATSKY-007481 (showing convicted violent terrorist, Nuraddin Said Daoud, was recruited to the PFLP's military wing in the PFLP's Qalqilya office); Ex. 38 at SHATSKY-007605 (witness in criminal case testifying that the PFLP office in Ramallah was used to recruit people into "the military wing of the Organization, for the purpose of carrying out terror attacks").

108.    All or some of the offices were financed by the PA. *See* ECF 120-4, Ex. D ("Barahme Dep.") at 28, 48, Sept. 11, 2012 (admitting that the PA funded several PFLP offices).

109.    From at least June 1, 2000 through May 30, 2002, the PFLP rented office space for its headquarters in Qalqilya.  Lowell Decl., Ex. 4 at 07:000042 (lease agreement for June 1, 2000 to May 30, 2001).

110.    On January 30, 2000, the Deputy Head of the Palestine National Council asked PA head Yasser Arafat to approve the PA's payment of the PFLP's rent ███████████████████ *Id.* at 07:000041.  The evidence suggests that Arafat indeed approved the payment.  *See id.* (showing ████████ ███████████████████████████████████████████████████████████ ████████ ).

111.    The PA's financial support for the PFLP's Qalqilya headquarters continued at least through 2001 and 2002.  *See id.* (████████████████████████████████ ████████████████████████████████ ); *id.* at 07:000040 (noting that ████████████████████████████████████████████ ████████████████ ).

112.    Pursuant to Arafat's orders, the PA paid the annual rent for the PFLP's offices in the Gaza Strip and in the West Bank, including in Qalqilya, Nablus, and Ramallah.  *See id.* at

07:000035-37, 07:000046-47 (showing PA rent payments for the PFLP's headquarters for the period from June 1, 2001 to May 31, 2002); ECF 120-4, Ex. D ("Barahme Dep.") at 28, 48 (admitting that the PA funded several PFLP offices).

113.    The PA also granted the landlord who rented office space to the PFLP certain income tax benefits in connection with his transactions with the PFLP.  Ex. 154 at 07:000038-39.

114.    Indeed, the PA knew that the PFLP office in Qalqilya housed M16s, Uzis and Kalashnikovs.  Ex. 158 at 07:000193.

115.    Other PFLP offices within the PA's jurisdiction were used to recruit terrorists. Lowell Decl., Ex. 38 at SHATSKY-007605 (witness in a criminal case testified that "he met with the Defendant in the PFLP offices in Ramallah, where the Defendant recruited him for the military wing of the Organization, for the purpose of carrying out terror attacks."); Shaked Decl. at 9–12.

### b.    Other Financial and Material Support Provided to the PFLP.

116.    The PA provided a car, driver, and apartment to the Deputy Secretary General of the PFLP, Abdel Rahim Malouh, who served as the PFLP representative on the PLO's Executive Committee.  *See* ECF 120-5, Ex. E ("Malouh Dep.") at 12:22-13:7, 36:1-22; 37:8-38:18 (showing the PA authorized payment of the expenses related to the car, driver, and apartment of Malouh).

### c.    Monthly Stipends and Martyr Payments.

117.    The Palestinian Ministry of Detainees and Ex-Detainees Affairs "pays a monthly stipend from the Palestinian National Authority to the families of all prisoners held in Israeli prisons."  Lowell Decl., Ex. 81 at SHATSKY-007968; *see also* Ex. 69 (PA witness in an Israeli civil case testified that the PA makes prisoner payments); Ex. 15 at SHATSKY-002814 (monthly stipend from the Palestinian National Authority to the families of prisoners held in Israeli prisons).

118.     These stipends "are paid to all prisoners without exception and with no discrimination, as all of them are considered soldiers of the homeland."  Lowell Decl., Ex. 81 at SHATSKY-007968.

119.     Single prisoners receive 1000 Shekels. *Id.*  The wives of the married prisoners receive 300 Shekels, plus 50 Shekels for every child under 18 years of age. *Id.*

120.     The stipend is paid "according to a special salary scale and according to the period of time spent in prison," not according to financial need. *Id.*

121.     PFLP members Mohammed W. Nazal (Lowell Decl., Ex. 82), Jamal Hindi (Lowell Decl., Ex. 83), Yusef Ra'i (Lowell Decl., Ex. 84) and Mahjer Ra'i (Lowell Decl., Exs. 85, 86, 87) received these payments.

122.     In addition to making payments to terrorists, the Palestinian Ministry of Detainees and Ex-Detainees Affairs also has lobbied for their release from prison. *See, e.g.*, Lowell Decl., Ex. 29 at SHATSKY-007763 (statement by the Minister of Detainees and Ex-Detainees Affairs that his goal was the release of 700 military prisoners); Ex. 30 at SHATSKY-007965 (the PA Minister of Detainees and Ex-Detainees Affairs states that the Palestinian prisoners are "not criminals as the Israeli politicians and media describe them . . . [T]hey are national warriors and they have a [just] cause according to the laws of the United Nations."); Ex. 31 (PA Minister "called on the Palestinian leadership to give the issue of the prisoners a special care andpriority so that we can liberate them from the Israeli prisons"); Ex. 32 (arguing for the release of prisoners who had been sentenced to life imprisonment).

123.     The PLO and PA also made "martyr payments" to families of individual suicide terrorists who were designated as "martyrs," which were paid from funds under the control of the PA Ministry of Finance.  *See* Ghannam Dep. at 28, 42, 49, 59-60, 146 (stating that Defendant PA's

Martyrs and Wounded Affairs Establishment is an establishment of the PA that makes martyr payments to families, and is funded from the taxes collected from the Palestinian population); Spitzen Decl. ¶ 22 (stating that "defendants operate an 'Institution for Families of the Martyrs and the Injured,' which makes payments to families of suicide terrorists).

124.    After the Karnei Shomron bombing, the PLO and PA made martyr payments to Hafez's father, Ahed Mahmoud Abdallah Abdel Hafez.  Lowell Decl., Ex. 4 at 07:000048-50; Ex. 7; Ex. 24 (showing Hafez was affiliated with the PFLP and that his family was entitled to receive martyrdom payments as a result of Hafez dying in a ███████████████████████ ████████ on February 16, 2002).

### 4.    The PLO and PA Pattern and Policy of Supporting Terrorism During the Second Intifada Provides Further Evidence, if Needed, of Defendants' Knowledge and Intent in Supporting the PFLP.

#### a.    The PA made Little or No Effort to Combat Terrorism During the Second Intifada.

125.    In July 2000, Arafat, Israeli Prime Minister Ehud Barak and United States President Bill Clinton met at Camp David in an effort to negotiate an end to the Israeli-Palestinian conflict. The Camp David Summit ended without an agreement. Upon his return to the Palestinian territories after the failed Camp David talks, Arafat decided to start a violent resistance known as the Second Intifada or Al-Aqsa Intifada. PA Minister of Communications explained:

> Whoever thinks that the Intifada started because of the hated Sharon's visit to Al-Aqsa Mosque is mistaken. That was only the straw breaking the Palestinian people's patience. This Intifada was already planned since [Arafat] the President returned from the recent talks at Camp David.

Lowell Decl., Ex. 17.

126.    Arafat's wife, Suha, explained why she left Palestine during the Second Intifada, stating:

> [Arafat] said: "You have to leave Palestine, because I want to carry
> out an Intifada, and I'm not prepared to shield myself behind my
> wife and little girl." Everyone said: "Suha abandoned him," but I
> didn't abandon him. **He ordered me to leave him because he had
> already decided to carry out an Intifada after the Oslo Accords
> and after the failure of Camp David**.

Lowell Decl., Ex. 18 (emphasis added).

127.    In the period from 2001 to 2002, "the [PA's] efforts to thwart terrorist operations
were minimal."  Lowell Decl., Ex. 33 at SHATSKY-006116; *see also* Lowell Decl., Ex. 37 at
SHATSKY-008263-64.

128.    According to the State Department, "Arafat did not take sufficient sustained action
to end the violence," and the PA arrested few terrorists, most of whom were quickly released or
not kept under credible conditions of arrest.  Lowell Decl., Ex. 49 at SHATSKY-008517; Ex. 89
at SHATSKY-008441, SHATSKY-008445.

129.    Indeed, militants were often under "house arrest" pursuant to which "the detained
person was kept in comfortable surroundings and allowed to stay in touch with associates."
Lowell Decl., Ex. 90 at SHATSKY-005040; *see also* Lowell Decl., Ex. 91 at SHATSKY-009452,
SHATSKY-009454 (it was "clear" that PLO elements involved in violence against Israelis were
not "disciplined"); Ex. 21 at SHATSKY-009437 (same); Ex. 90 at SHATSKY-005039 (the
"weight of the evidence" would indicate that the PLO and PA knew of various organizations'
"involvement in the violence and did little to rein them in").

130.    During the Second Intifada, which began in September 2000 and ended in February
2005, the PLO and the PA used the new level of autonomy it obtained under the Oslo Agreement
to prepare and execute violent attacks against Israel and its citizens.  Lowell Decl., Ex. 3.

131.    In his capacity as Chairman of the PLO and President of the PA, Arafat rallied the
PA security forces, various organizations, including terrorist organizations, and ordinary

Palestinians, including women and children, to carry out the violent attacks against Israel and its citizens that occurred during the Second Intifada.  Lowell Decl., Ex. 2 at SHATSKY-006781 (¶ 51), SHATSKY- 006784 (¶ 54); Ex. 92 (Deputy Director of the PA's Political and National Education Authority stated in a May 2002 interview that the Intifada and "all its directives belong to the President and Supreme Commander Yasser Arafat."); Ex. 93 at SHATSKY-008102-03 (former Palestinian Authority MP, Secretary General of the Fatah in the West Bank and Palestinian military leader during the Second Intifada who is currently serving five consecutive life sentences in Israeli prison for planning terrorist operations explained the violent nature of the Intifada during an interview).

132.    Under Arafat's direct leadership as Chairman of the PLO and President of the PA, the period during which the Karnei Shomron bombing occurred was characterized by significant terrorist activity.  Lowell Decl., Ex. 21 at SHATSKY-009435.

133.    "Terrorist groups including Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP) and the Al Aqsa Martyrs Brigades (AAMB) continued to be very active" in the period from December 2001 to June 2002. *Id.*

134.    These terrorist groups "utilized a variety of terrorist tactics, including suicide bombers, pipe bombs, mortar attacks, roadside bombings and ambushes, drive-by shootings, and shooting at Israeli homes and military and civilian vehicles." *Id.*; *see also* Lowell Decl., Ex. 90 at SHATSKY- 005036-39.

135.    Arafat himself was directly involved in terrorist activities.  *See* Lowell Decl., Ex. 94 (July 2009 statement by Muhammad Dahlan, head of the Palestinian Preventive Security Services from 1999 until 2002 and Palestinian Minister of State Security from April until

September 2003, that:"I lived with Chairman Yasser Arafat for years.  Arafat would condemn [terror] operations by day while at night he would do honorable things.").

136.   The U.S. Department of State confirmed that the period between December 16, 2001 and June 15, 2002, which includes the date of the Karnei Shomron Bombing, saw numerous incidents of terrorism in the region.  Lowell Decl., Ex. 81 at SHATSKY-007968.

137.   During the Second Intifada, the Israel Defense Forces ("IDF") conducted a large-scale military operation in the West Bank known as Operation Defensive Shield. The IDF recovered numerous documents and obtained information by questioning captured terrorists. Lowell Decl., Ex. 22 at SHATSKY-005540.  The captured documents show among other things that:

> a.   Arafat was personally involved in the planning and execution of terror attacks.  *Id.* at SHATSKY-005538.
>
> b.   Arafat personally authorized funding for terrorists and terrorist activities. *Id.* at SHATSKY-005538, SHATSKY-005547-52; *see also* Lowell Decl., Ex. 2 at SHATSKY-006781 (¶ 51) (where an Israeli court concluded Arafat "approv[ed] . . . money for the attackers and their families, and specif[ied] the sums to be given to them."); Ex. 21 at SHATSKY-009438 (where the U.S. Department of State stated that the payments "were likely made with the knowledge that the intended recipients had been involved in violence and terrorism.").
>
> c.   Head of the PA's General Intelligence Service Tawfik Tirawi and PA financial officer Fouad Shubaki, two of Arafat's closest aides,

operated the ongoing logistics of ensuring financial aid and support of terrorism.  Lowell Decl., Ex. 22 at SHATSKY- 005538.

d.  Arafat and his men used the funds donated to them by other countries, including the European Union, to finance terrorist activity.  *Id.* at SHATSKY-005539; *see also* Lowell Decl., Ex. 23 (providing evidence that international financial aid to the PA was redirected to terrorist elements).

138.  Additional evidence linking Arafat to terrorism was discovered in January 2002, when "Israeli forces boarded the vessel *Karine-A* in the Red Sea and uncovered nearly 50 tons of Iranian arms, including Katyusha missiles, apparently bound for militants in the West Bank and Gaza Strip."  Lowell Decl., Ex. 37 at SHATSKY-008264.

139.  Fouad Shubaki, a PA financial official and one of Arafat's close aides, was involved in the smuggling operation. According to the U.S. Department of State, "Shubaki and other PA officials involved [in the smuggling incident] work very closely with PA Chairman Arafat, raising serious questions of his involvement and foreknowledge."  Lowell Decl., Ex. 21 at SHATSKY- 009437; *see also* Lowell Decl., Ex. 95 at SHATSKY-008149 (statement of Hon. Benjamin A. Gilman, Chairman, House International Relations Subcommittee on the Middle East and South Asia, that credible evidence uncovered by the Israelis "links Arafat and many of his associates directly to the planning and financing of specific terrorist acts as well as the illegal importation of 50 tons of heavy weaponry into the Palestinian-controlled territories.").

### b.  During the Second Intifada, the PLO and PA Participated in Terrorist Attacks and Protected Terrorists.

140.  The U.S. Department of State has stated that "[i]t was clear that some members of the PA security forces and Chairman Arafat's Fatah faction within the PLO were deeply involved

in the violence."  Lowell Decl., Ex. 90 at SHATSKY-005039; Ex. 91 at SHATSKY-009454; Ex. 21 at SHATSKY-009440.

141.    "[E]lements within the PLO, specifically Tanzim, Force 17 and members of other security forces, were involved in acts of violence against Israelis" during the Second Intifada. Lowell Decl., Ex. 91 at SHATSKY-009452; *see also* Lowell Decl., Ex. 21 at SHATSKY-009436. "Some personnel in the [PA] security services, including several senior officers, . . . assist[ed] terrorist operations."  Lowell Decl., Ex. 33 at SHATSKY-006116; *see also* Lowell Decl., Ex. 21 at SHATSKY-008441 ("Many members of Palestinian security services and the Fatah faction of the PLO participated with civilians and terrorist groups in violent attacks against Israeli settlers, other civilians, and soldiers.").

142.    Members of Presidential Security/Force 17, a unit of the PA's national security apparatus, also executed terrorist attacks alongside other PA and Fatah officers. *See* Lowell Decl., Ex. 96 at ¶¶ 2, 42–45 (detailing Presidential Security/Force 17 employee Mohannad Sa'id Munib Abu Halawah's terrorist activities with Marwan Barghouti between 2000-2002); Ex. 97 at SHATSKY-009126 (showing that Halawah was a Presidential Security/Force 17 employee in the period from September 2000 to March 2002).

143.    Muhammad Dahlan, head of the Palestinian Preventive Security Services from 1999 until 2002 and Palestinian Minister of State Security from April until September 2003, has repeatedly stated that the PSS protected terrorists before and during the Second Intifada.  *See* Lowell Decl., Ex. 98 (stating during a June 16, 2007 broadcast on Al-Arabiya TV, that: "Forty percent of the Martyrs in this Intifada belonged to the Palestinian security forces. The Palestinian security forces were those who protected and hid half of the Hamas [military] leadership and of the Hamas military force during the Intifada."); *id.* at SHATSKY-009448 ("We, in the Gaza Strip,

a whole year before the Intifada, all the staff of the Hamas Movement and the Islamic Jihad were under the protection of the Preventive Security Force and the Palestinian security apparatus . . . when this Intifada began we did not constitute a barrier in face of any Palestinian faction that wished to express its warrior position and protect the Palestinian people and the interests of the Palestinian Authority."); *id.* at SHATSKY-009447 ("All the important leaders of Hamas were protected by us. We did not make them a favor, this was a national duty and a Palestinian political decision. After that they proved to be ungrateful and the first thing that they did was to kill the security officers who provided protection for the wanted Hamas staff. This caused me a greater pain that[sic] all other disputes.").

144.    On June 29, 2009, Ashraf Al-Ajrami, former PA Minister of Prisoners, stated on PA TV (Fatah):

> The master of resistance is, without doubt and without question, the *Shahid (*Martyr) Yasser Arafat. Even this Intifada, whose flag Hamas has tried to wave unjustly, forcibly, falsely and fraudulently – that [Intifada] flag belongs to Yasser Arafat alone . . . These [Palestinian Authority security] forces paid the heavy price in the second Intifada, both as (martyrs) Shahids and as prisoners. The largest number of prisoners are from the security forces. They are the ones who bore arms and carried out the greatest and most important operations (i.e., terror attacks) against the Israeli occupation – and especially against soldiers, and some of the most famous operations (i.e., terror attacks) in the West Bank – Ein-Arik, Wadi Al-Haramiyeh, Sorda, and others. These were carried out by the heroes of the Palestinian security forces, who protected the homeland and the national interest, while Hamas merely looked on for many months before starting [on operations].

Lowell Decl., Ex. 99.

145.    On May 11, 2011, Adli Sadeq, PLO Ambassador to India, wrote in Al-Hayat Al-Jadida:

> Palestinian experience has taught us that when the moment of resistance arrives, whether the calculations are mistaken or accurate, it is the legitimate leadership that will be on the frontlines,

and constitute who will push society into the confrontation. This is what happened in the lengthy second Intifada, when the [PA] security services and Hamas fought together.

Lowell Decl., Ex. 16.

### c.   PLO and PA Officials Made Statements Encouraging Terrorism.

146.   "Some PA officials made public statements justifying Palestinian attacks on Israelis, stating that such attacks were in response to the occupation. Additionally, Fatah leaders made public statements urging Palestinians to continue all aspects of the Intifada, including violent attacks."  Lowell Decl., Ex. 89 at SHATSKY-008445.  For example:

> a.   Lowell Decl., Ex. 100 (October 2000 broadcast on Palestinian Authority Television (PATV), during which Dr. Ahmed Yousuf Abu Halabiah, a member of the Palestinian Shari'ah (Islamic religious law) Rulings Council, and Rector of Advanced Studies at the Islamic University stated, *inter alia*: "The Jews…do not have any moderates or any advocates of peace. They are all liars. They must be butchered and must be killed, as Allah the Almighty said [in the Quran]: 'Fight them, Allah will punish them by your hands. He will humiliate them, and grant you victory over them.'… Have no mercy on the Jews anywhere in any country…Wherever you are - kill those Jews and those Americans who are like them and those who stand with them. They are all together in one trench against the Arabs and the Muslims."); Ex. 101 (September 27, 2013, speech

by PLO representative and PA ambassador to Libya praising terrorists and celebrating the Second Intifada).

b.   On August 3, 2001, during the official Friday sermon broadcast on officialPA TV, PA cleric Dr. Muhammad Ibrahim Madi stated:

> I was delighted when a youth said to me: "Oh, Sheikh, I am 14 years old, I have 4 more years, and then I will blow myself up among Allah's enemies. I will blow myself up among the Jews." I said: "My little son, I'll ask Allah [to grant] you Martyrdom." We are blowing them up in Hadera, we are blowing them up in Tel- Aviv and in Netanya in fulfillment of the mastery that Allah gave us over this riff-raff. If there is no way out of death, it is shamefulfor us to die as cowards…Blessings upon anyone who has charged at a soldier for the sake of Allah. Blessings upon anyone who has acted for the sake of Allah and has gone on raids for His sake. Blessings upon anyone who has brought up his sons with the education of Jihad and Martyrdom-seeking. Blessings upon anyone who has saved a single bullet in order to put it through a Jew's head. We shall enter Jerusalem as conquerors and Jaffa as conquerors, and Haifa as conquerors and Ashkelon as conquerors. Lowell Decl., Ex. 102.

c.   On May 18, 2001, Sheikh Muhammad Abd Al Hadi La'afi, the senior PAreligious official, made statements in Al-Hayat Al-Jadida, the PA's official daily publication inciting anti-Jewish sentiment. Lowell Decl., Ex. 103.

d.   Marwan Barghouti – former Palestinian Authority MP and Secretary General of Fatah in the West Bank stated during an interview: "I think that the occupation army and all its elements and components, including the settlers and the settlements, are targets

for the attacks of the Intifada and the resistance, including the Al-Aqsa Martyrs Brigades."  Lowell Decl., Ex. 104.

e.  The PA's official newspaper, Al-Hayat Al-Jadida, also published articles glorifying terrorists and terrorist activities.  *See* Lowell Decl., Ex. 105 (May 19, 2001, Al-Hayat Al-Jadida publication glorifying the acts of a suicide bomber); Ex. 106 (March 11, 2002, Al- Hayat Al-Jadida report glorifying female bombers); Ex. 107 (June 23, 2002, article published in Al-Hayat Al-Jadida glorifying and stating effectiveness of martyrdom); Ex. 108 (Al-Hayat Al-Jadida reporting on PFLP's rally to celebrate the second anniversary of Nazal's martyrdom); Ex. 109 (Al-Hayat Al-Jadida reporting on a sporting tournament named after Nazal).

**d.  The PLO and PA Issued Propaganda to Keep the Second Intifada Going.**

147.  During the Second Intifada, official PA publications, such as Al-Shurta Magazine, a monthly publication of the Palestinian Police; Al-Shuhada, a monthly bulletin published by the Political Guidance for the Border-Region Forces; Watani, a General Security Forces magazine; Humat-Al-Areen, whose Editor in Chief is Director General of Political Guidance and General Inspection for Presidential Security Force 17, issued propaganda to incite hatred of Jews and encouraged Palestinians to carry out terrorist attacks. *See, e.g.*, Lowell Decl., Ex. 110 at SHATSKY-006844 (suggesting Palestinians should devise ways to kill more Israelis and fewer Palestinians); *id.* at SHATSKY-006845 (saluting "devoted martyrs"); Ex. 111 at SHATSKY-006881 (Palestinians engaging in the Intifada are not terrorists, but the "dirty [international] alliance" purporting to combat terrorism are hypocrites); Ex. 112 at SHATSKY-007702-03 ("[Our

46

leadership's position must also be] that all efforts by Palestinian forces should be turned towards inflaming the popular Intifada until the image of the infamous child who challenges Israeli tanks with stones appears…"); Ex. 113 at SHATSKY-006978 ("From the Land of Palestine, we say to our mothers: 'The mother that ululates in her sons' martyrdom procession will ululate at the eternal gates of Heaven.'").

### e. The PLO and PA Permitted the Use of PLO/PA-Controlled Media to Incite Terrorism.

148. The U.S. Department of State has reported that "senior PLO and PA leaders did little to prevent – and may even have encouraged – an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials." Lowell Decl., Ex. 90 at SHATSKY-005038; *see also* Ex. 90 at SHATSKY-005039 (The PA "tolerated an atmosphere that promoted or supported the use of violence."); Ex. 91 at SHATSKY-009452 (Senior PLO and PA leaders "did little to prevent – and may even have encouraged – an atmosphere of incitement to violence in the Palestinian media and through public statements of Palestinian officials.").

149. The U.S. Department of State has observed: "Some programs broadcast on the PA and PLO controlled or influenced mass media had the effect of inciting Palestinians to violence" by "glorifying martyrdom and legitimizing the use of violence." Lowell Decl., Ex. 90 at SHATSKY-005039; *see also* Lowell Decl., Ex. 114 (poem published on February 27, 2003, in Al-Hayat Al-Jadida, the PA's official daily publication, written from the point of view of martyr son to his mother glorifying martyrdom).

     **5.**     **The PLO and the PA Pattern and Policy of Supporting Terrorism Demonstrates That It Knew The Support Would Be Used In the Killing Of a U.S. National.**

150.    The PLO and the PA recklessly disregarded the likelihood that the support it provided to the PFLP would be used to further terrorist activity.  *See* ECF 120-3, Ex. C ("Amayra Dep.") at 42:1-13 (testimony of Raed Taha Mahmud Amayra acknowledging that members of the PA National Security apparatus were known to carry out terrorist operations while employed by the PA).

151.    A 2007 televised broadcast by a key PA security official, Mohammed Dahlan, admitted that the PA explicitly understood that the men hired into its own security forces were conducting a significant number of terrorist operations.  Lowell Decl., Ex. 98.

 

Respectfully submitted,

Dated:  New York, New York           WINSTON & STRAWN LLP
       October 4, 2021

                                     s/  *Abbe David Lowell*
                                     Abbe David Lowell
                                     Sofia Arguello
                                     200 Park Avenue
                                     New York, New York 10166
                                     Tel.: (202) 282-5875
                                     Fax: (202) 282-5100
                                     Email: adlowell@winston.com
                                     Email: sarguello@winston.com

                                     *Attorneys for Plaintiffs*