**LOWELL DECL. EX. 2a**

Exhibit 45

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

**Presiding:**   Hon. Judge Dalia Ganot

**The Plaintiffs 1.   Estate of the Deceased Mentin Amit   Amos**
**2.   Raines Nitz Mentin**
Represented by Adv. Anat Ginzburg

**versus**

The Defendants       **1.   Bezeq Israeli Telecommunications Company Ltd**
**2   Asher Ben-Naim**
**3   Yekutiel Lavi – Director of Department for Physical Security**
**4   Dror Overlander**
**5   Yehuda Aryeh**
**6   Lilit Security Ltd**
**7   The Palestinian Authority**
**8   The Palestinian Council**
**9   Harel Insurance Company Ltd**

**JUDGMENT**

1.   I have before me a statement of claim that was filed by the Estate of the Deceased, the late Mentin Amos (hereinafter: "**the Deceased**") and by Innes Nitza Mentin – the mother and the heiress of the Deceased (hereinafter: "**the Mother**") against Bezeq Israeli Telecommunications Company Ltd  against Asher Ben-Naim, against Yekutiel Lavi – Director of Department for Physical Security, against Dror Overlander, against Yehuda Aryeh, against Lilit Security Ltd, against The Palestinian Authority, against The Palestinian Council, and against Harel Insurance Company Ltd

**The Relevant Facts**

2.   On 26 June, 2003, Amit Amos Mentin was murdered, when while  working as a Bezeq technician in the Baqa al-Gharbiyya settlement he was shot by a terrorist

The Deceased was murdered in the course of a terrorist attack, carried out by the terrorist, a minor who on the date of the event was 15.5 years old. The terrorist was captured and tried, and is serving his sentence in a prison in Israel

SHATSKY – 006723-T
P1: 886

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 4 of 93
Case 1:02-cv-02280-RJL Document 253-36-8 Filed 10/05/21 Page 3 of 109

Tel-Aviv-Jaffa District Court

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

3. The Plaintiff claims that the Defendants are responsible for the murder of her son, and are therefore obligated to compensate her for her damages as a result of the murder of her son

4. It will be stated at the outset that Lilit Security Ltd is a company in liquidation and an order for stay of proceedings against it has been issued, but this does not prevent the determination of its liability, should there be such, for failure to prevent the murder.

5 For purposes of writing this judgment I have decided to view the defendants Bezeq Israeli Telecommunications Company Ltd (hereinafter – "**Bezeq**"), Yekutiel Lavi, Dror Overlander, and Yehuda Aryeh, as a single entity, and as such I will not adjudicate the personal responsibility of each one of the Defendants 3 – 5, meaning that their responsibility or lack thereof will be determined jointly and severally with Bezeq (hereinafter – "**the Bezeq Group**").

## **The Murder**

6. For purposes of determining responsibility in tort, we must determine the facts of the case, which terminated in the tragic death of the Deceased.

On 26 June 2003 a Bezeq technician – the Deceased – and a bodyguard, Asher Ben-Naim (hereinafter – "**Ben-Naim**") came to Baqa Al Gharbiyya, for the purpose of doing Bezeq related work, which included the repair of malfunctions in accordance with an order for repairs made by the local residents

The Deceased and Ben-Naim came to Baqa al-Gharbiyya in two cars. The Deceased drove a Citroen Berlingo, which bore the logo "Bezeq" (hereinafter: "**the Berlingo**") and Ben-Naim came in his private car, which was a Honda Civic.

Ben-Naim parked his car in the car appliances store, went over to the Deceased's car, and both of them began their work.

As will become clear below, Ben-Naim's car was left in the "Dana" car appliances store because Ben-Naim had agreed with the shop owner, Wail Kadaan (hereinafter: "**Wail**") for the latter to repair an amplifier in his car and as stated, after leaving his car, Ben-Naim joined the Deceased in his Berlingo car and together they began their work in Baqa al-Gharbiyya.

At a certain stage in the course of their work during the pre-noon hours, the Deceased and Ben-Naim returned to Wail's shop, and according to Ben-Naim they did this in order to give Wail the keys of the Honda for purposes of installing

SHATSKY - 006724-T
P1: 887

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF Document 253-8 Filed 10/05/21 Page 5 of 93
Case 1:02-cv-02280-RJL-DCF Document 253-6 Filed 10/05/21 Page 4 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

the amplifier, and so that the latter could take them to his house, because, according to Ben-Naim, Wail had contacted him the night before and asked to **hasten** the repair of a Bezeq pole that had fallen next to his house.

Ben-Naim left the Berlingo car and the Deceased remained seated in the car, with the windows closed and talked on the telephone while waiting for Ben-Naim to return to the Berlingo. When Ben-Naim was talking to Wail, at a distance of about 5 meters from the Berlingo, standing with his back towards the Berlingo, a youth aged about 16 years old approached the car, pulled out a pistol and fired five bullets into the head of the Deceased, through the closed windscreen. This shooting caused the death of the Deceased.

Upon hearing the shots Ben-Naim turned around, pulled out his pistol, that he carried with the license of a bodyguard, and fired in the direction of the terrorist, who began to escape, with Ben-Naim pursuing him.

As it became clear, during his flight the terrorist threw away his weapon, which was seized by Ben-Naim. It further emerged that the terrorist was injured as a result of Ben-Naim's shooting at him, which enabled his capture. He was hospitalized in the **"Hillel Yaffe"** hospital, in Hadera for purposes of medical treatment.

Upon hearing the shots, another Bezeq team came to the scene, also having been engaged in repairs in the Baqa al-Gharbiyya on the same day. The bodyguard, Oni Devir entered the Berlingo car, sat on the seat next to the driver's seat and attempted to speak to the Deceased, and even to resuscitate him, but his efforts failed because the Deceased had died from his injury.

To complete the picture it will be mentioned that a "VAN" ambulance (an ambulance company in the Palestinian Authority) arrived at the scene, and refused to treat the Deceased, and even removed him from the ambulance after he had already been placed inside it; finally a Magen David Adom ambulance came to the scene and its staff determined the death of the Deceased dead, and evacuated him from the scene.

### The Liability and the Tort of Negligence

7.    In this judgment I will be examining and determining the legal relations between the Deceased and each one of the Defendants, in order to establish liability or to negate it, and, should liability be determined, then to determine whether the duty of care to the Deceased was violated, and if there exists a legal causal connection between the violation of the duty and the harm that occurred.

8.    For purposes of proving responsibility for the tort of negligence, the existence of three foundations must be proved:

SHATSKY – 006725-T
P1: 888

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 135-3   Filed 10/05/21   Page 5 of 109
Case 8:02-cv-02280-RJC   Document 253   Filed 11/19/5/21   Page 6 of 93

# Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

a.   The existence of a duty of care that applies to the tortfeasor in relation to the victim, on both the plane of a conceptual duty of care and on the plane of a concrete duty of care.

b.   A breach of the said duty.

c.   Proof of the harm as a result of the breach of the duty.

(C.A. 145/80 **Vaknin v, Local Council of Beth Shemesh**, 37 (1) P.D. 113 ((hereinafter: *"Vaknin"*case).

9.   <u>Regarding the existence of a conceptual duty of care -</u>  question is whether there is a duty of care between a particular category of tortfeasors and a particular category of victims. This question is examined in view of the test of foreseeability, in other words, whether the tortfeasor could have foreseen the occurrence of the event, and whether he ought to have foreseen it in the normative sense. (C.A. 653/97 **Baruch and Tzippora Ltd v. Tel-Aviv Jaffe**,  (50(5) P.D. 817 (hereinafter: **"Baruch and Tzippora Center***"*case).

The final determination regarding the normative foreseeability, which constitutes the conceptual duty of care, is a matter of legal policy (see Baruch and Tzippor case, ibid. 825) and in  our comments below I will deliberate on this question as it relates to each of the Defendants.

**The Conceptual Duty of Care in the Relations between the Deceased  - Bezeq, Yekutiel, Lavi, Dror Overlander and Yehuda Aryeh (the Bezeq Group).**

10.   Bezeq was the Deceased's employer at the time of his murder, the murder having been committed in the course of a working day. It seems to me that there is no need to elaborate regarding the existence of a conceptual duty of care between an employer and his worker. This duty is well settled in the framework of the legal policy of the court, as it receives consistent expression in its case law. In principle, a reasonable employer must and can anticipate the occurrence of a physical injury to his worker (see for example, C.A. 684/76 **Ayal v. Fuxman,** P.D. 31 (3) 349, 359), as determined, for example, in C.A. 663/88 **Sharizan v. Labidi Ashkelon Ltd** (P.D. 47(3) 225, 229 (hereinafter: the "**Sharizan**"  case):

"It would seem that today it is no longer necessary to prove the conceptual duty of care of an employer to his worker. This is a well settled duty in widespread and consistent case law"

(and see also in the court's comment in CA 417/81 **Hotel Rammadah Shalom v. Amsalem** P.D. 38(1) 72, 76 (hereinafter: the "**Hotel Rammadah Shalom**" case):

SHATSKY – 006726-T
P1: 889

Symbol [    ]
Case 1:18-cv-12355-MKV-DCF   Document 136-3   Filed 10/05/21   Page 7 of 93
Case 8:02-cv-02280-RJL   Document 253-3   Filed 11/20/05/21   Page 6 of 70

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

> "an employer – as the employer of his workers, there can no
> doubt that this duty of care is imposed upon him"

11.  From all of the above it emerges that there is no dispute regarding the existence of a conceptual duty of care in the relations between the Deceased and the Bezeq Group.

**Conceptual Duty of Care of Asher Ben-Naim and Lilit Security Ltd to the Deceased**

12.  Asher Ben-Naim the bodyguard, was the worker of Lilit Security Ltd (hereinafter "**Lilit**") and was employed by Bezeq as a bodyguard, and at the time of the incident was guarding the Deceased, and so, by virtue of the definition of his role – the bodyguard of the Deceased – was duty bound to guard the welfare and the safety of the Deceased, a fact that establishes a conceptual duty of care in the relations between Ben-Naim Lilit, on the one hand, and the Deceased, on the other hand.

**Conceptual Duty of Care of the Palestinian Authority and the Palestinian Council to the Deceased**

13.  It will be clarified below in this judgment that in the relations between the Palestinian Authority and the Deceased, the Palestinian Authority had a clear and unequivocal concrete duty of care, which it violated.

By virtue of the existence of this duty, and its violation, it is doubtful whether it is appropriate to take the traditional path of considering the question of the existence of a conceptual duty of care.

This position has recently found expression in case law and in legal writing, as part of a position in accordance with which there is no need to prove a conceptual duty of care. The reason for this is as far as the question concerns whether there is impediment in principle to imposing responsibility upon a certain category of tortfeasors with respect to a certain category of victims, the test is considered to be overly broad, and as such preference should be given to the approach whereby given that the conceptual duty of care will only be negated in isolated cases, it is preferable to address the concrete circumstances of the case. In other words, to first examine the question of whether or not there was negligence, and if the answer to that question is positive, then to proceed to examine whether there was a concrete duty of care, while skipping over the question of the conceptual liability (C.A. 878/06 **Dr. Troyaft et al v. Attiah et al,** published in Nevo, hereinafter: Troyaft case); Y. Gilad, "**The Foundations of the Tort of Negligence,** *Dinei Mishpat* 14 (5749) 319; Y. Gilad "**Causality in the Israeli Law of Torts**" *Mishpatim* 14 (5744-5745).

SHATSKY – 006727-T
P1: 890

Symbol [　]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 2 of 9
Case 1:02-cv-02280-RJL   Document 253-36   Filed 11/12/15   Page 8 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Here it should be mentioned that in certain cases there is no difficulty in establishing the existence of a conceptual duty of care before determining the concrete duty of care. However, there are also cases, such as the case before me, in which it is problematic to initially adjudicate the question of a conceptual duty of care, although it becomes quite obvious after an initial clarification of the concrete duty of care

In view of the above, I hereby rule already now, and as clarified below – that there was a conceptual duty of care in the relations between the Palestinian Authority and the Deceased.

### Concrete Duty of Care and its Breach

14.   On this level the question to be examined is "**whether, in the relations between a specific tortfeasor and a specific victim, under the special circumstances of the case, there exists a concrete duty of care relating to specific damage that occurred**" (Vaknin case, *ibid* p. 125, CA 3510 **Wallace v. Egged – Cooperative Association for Transport in Israel,** P.D. 55 (5), 826, 840.

This question too, like its predecessor, is examined in accordance with the foreseeability test. That is to say: Would a reasonable person have been able to foresee the occurrence of the damage on a technical-factual plane, and should he have foreseen the occurrence of the damage in its specific circumstances, on a normative level.

The law is that the responsibility of a tortfeasor who owes a duty of care towards a victim does not extend to every case in which damage is caused to the victim as a result of the action or the omissions of the tortfeasor. The occurrence of the damage as such does not indicate that the duty of care was breached. The tortfeasor is responsible for taking reasonable precautions, and only if he failed to take them, and damage was caused as a result, will there be a crystallization of the tortfeasor's responsibility (see: CA 437/87 **Cohen v. Israel Electric Company Ltd,** P.D. 44 (1) 807, 809).

The reasonableness of the precautionary measures is determined in accordance with an objective criterion, which is summed up in the dictum that the tortfeasor must conduct himself in the manner in which a reasonable person would have conducted himself given the circumstances of the case.
This level of caution is determined in accordance with considerations of legal policy (Vaknin case, p. 131).

15. As I noted, the victim is obligated to prove the existence of a factual causal connection and a legal causal connection between the breach of the duty of care towards him, and the damage that was caused to him (section 64 of the  Civil Wrongs Ordinance [New Version]  (hereinafter "**The Civil Wrongs Ordinance**"); Vaknin case, p. 144; CA 576/81 **Ben Shimon v. Barda,** P.D. 38 (3) 1,7 (hereinafter: **"Barda case");** CA 610/94 **Bochbinder v. Official Assets Receiver acting  as the Liquidator of the North American Bank,**  P.D. 57(4) 289, 309, 311 (hereinafter: **"Bochbinder case"**)

SHATSKY -  006728-T
P1: 891

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 9 of 93
Case 8:02-cv-02280-RJL-DCF   Document 253   Filed 10/05/21   Page 8 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

The purpose of the rules of causation is to determine whether in terms of the law, there is a sufficient connection between the fault of the tortfeasor and the damage suffered by the victim. The existence of this connection establishes the responsibility of the tortfeasor, or tortfeasors for the damage, and the victim's right to sue for the measures stemming from that responsibility (see: Y. Gilad "**Causality in Israeli Law of Torts – a Renewed Examination,** 14*Mishpatim* 15 – 16 (hereinafter "**Causality in Israeli Law**")

16.   The Factual Causal Connection  - The basic requirement is that on a factual level the damage must be caused by the conduct of the tortfeasor (by act or omission). This conduct must be the necessary or sufficient cause for the occurrence of the damage (see Y.Gilad, **"The Foundations of the Tort of Negligence in Israeli Torts law",**14 *Tel Aviv Law Review*, 319, 326

The customary understanding is that this test means that the breach of the duty of care constitutes a *cause sine qua non*. In other words, that without the breach of the duty the damage would not have been caused (Vaknin case, 144); Causality in Israeli Law, p.18). In the current context this means that is must be examined whether the negligence of each one of the defendants before us, on a factual level, constitutes a *cause sine qua non* of the damage of the victim. (Bochbinder case, p. 311). And, as clarified below, the conduct of each one of the defendants is in my opinion a *cause sine qua non* for the damage to the Deceased, and if not for the incidents of negligence, to be specified below, the tragic event would not have occurred. Alternatively, even had there been an attempt to shoot the Deceased, he would not have died as a result of that attempt.

17.   The Legal Causal Connection -   Having established the existence of a factual causal connection, the question arises as to whether the causal connection is not negated by considerations of "**legal causation".**

It was held that the "**determinative cause**" for the occurrence of the damage   is established based on legal criteria, in the center of which are three alternate tests: the foreseeability test, the risk test and the common sense test (Barda case, p.7; Causality in Israeli Law, p. 24)

As I noted, these tests are alternative and not cumulative, however as we shall see below, I am of the view that all three of the tests were proved with respect to the Defendants.

As I noted above, according to another approach cited in the case law, no distinction should be made between the conceptual and concrete duty of care, and the question should be examined as a single unit (see e.g. CA 10084/04

SHATSKY - 006729-T
P1: 892

Symbol [ ]
Case 1:18-cv-12355-MKV-DCF Document 136-3 Filed 12/05/21 Page 10 of 93
Case 1:02-cv-02280-RJL Document 255 Filed 07/12/13 Page 935 of 109

# Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

**Noder v. Modi'in Local Council,** published in Nevo; CA 2625/02**Nachum v.Dorenbaum,** P.D. 58(3), 385, 408; CA 10078/03 **Shatil v. State of Israel,** published in Nevo). This approach receives expression in CA 915/91 **State of Israel v Levi (**P.D. 48 (3) 45) where it was held that the duty of care would be recognized if two foundations were satisfied: the first is the foundation of "neighborliness" or "proximity"; the second is the judicial conclusion according to which it is just, reasonable, and fair to determine a duty of care. In that case, as part of the first foundation, the connection between the tortfeasor and the victim is examined, and it may be a legal connection, physical connection, or by force of reliance etc, all of which create the duty of care. As part of the second foundation, the various considerations of judicial policy are considered (see <u>Levi Ltd</u> case, p. 66 – 70; the <u>Dorenbaum Ltd case p.408 – 409)</u> (Regarding the relationship between the various approaches, see the article of Yisrael Gilad,_ "**Working Assumptions, Judicial Intuition, and Rationality in determining the Boundaries of Responsibility in Negligence**_ 26 Mishpatim, 295, 304, 305 (5756)

Without going into detail about the difference between these approaches, it seems to me that both of them are based on similar considerations of judicial policy, in view of which the borders of the duty of care should be defined, and their aim is one – as very aptly expressed by Hon. Justice Rivlin, in the <u>Dornbaum case</u>, where he ruled:

> "**The application of the tort of negligence is, inter alia, a result of the determining the borders of the duty of care. These borders may separate the particular cases in which a person was negligent and when in view of policy considerations it is appropriate to impose responsibility upon him for his actions, and cases in which the tortfeasor was indeed negligent, but policy considerations bring the court to the conclusion that it would not be appropriate to impose responsibility upon him**" (<u>Dornbaum case, p</u>. 408)

This being so, I will do my best to combine the two approaches, in order to reach a correct and appropriate result

## <u>Concrete Duty of Care in the Relations between the Deceased and the Bezeq group</u>

18.     The conduct of the Bezeq group should be examined in accordance with the affidavits and the testimonies of the Defendants, and of additional, relevant witnesses.

I will say immediately that I do not attribute any evidential value to the testimonies of the Plaintiff and the brother of the Deceased, Mr. Roni Mentin, regarding the manner in which the event forming the subject of the statement of claim occurred; on this matter their testimonies constitute

SHATSKY – 006730-T
P1: 893

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 11 of 93
Case 9:02-cv-02280-RJC Document 253 Filed 10/5/21 Page 11 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

hearsay because they were not present at the scene of the event, at the time of the event, and in any case are not personally aware of the Bezeq work procedures.

Defendant 2 – Yekutiel Lavi, (hereinafter: "**Lavi**") submitted an affidavit of evidence in chief and also testified before the court.

From Lavi's statements it emerges that at the time of the event he was in charge of the Security, Safety and Emergency Branch of Bezeq (s. 2 of his affidavit).

Lavi claimed in his affidavit that at the time of the attack forming the subject of the statement of claim, the entire State was suffering from **"a harsh reality of acts of terror and maiming, which took the lives of many, innocent people** (s. 7 of the affidavit). These were the days of the Second Intifada, which without a doubt were extremely stormy and were characterized by numerous attacks and attempted attacks all over the country, and as such, according to Lavi – like all of the other Bezeq witnesses – in view of the difficult security situation all of the country, which Bezeq could neither have protected nor foreseen, no liability should be imposed upon it.

I do not accept this position. The specific fact that our concern is with a particularly grave security situation which was know to all those concerned, obligated Bezeq to make sure that it had updated its security apparatus and changed its procedures in order to make them suited for the reality described by its personnel. This did not happen.

Lavi claimed in his affidavit that by virtue of his position "**I know that the Bezeq company at the relevant times had introduced appropriate and reasonable safety procedures and rules, and even beyond that"** (sec. 17 of the affidavit). As such it would have been appropriate for them to have submitted these updated procedures which had prima facie been adjusted to the security reality in which Israel found itself at the relevant times, and especially in the seam zone settlements just next to the border, such as Baqa al-Gharbiyya. However, despite various statements which were occasionally supported by meaningless documents and sometimes not, Bezeq did not discharge the onus imposed on it to prove the existence of **updated** safety procedures, which were adjusted to the security reality prevailing during the Second Intifada.

Lavi referred the court to the procedure issued in January 1995 (!!) **"in the Security Division of the Bezeq company, of which, as said, I was the head – a procedure for conduct in the Territories and in sensitive areas, and we made sure to disseminate it and publicize it among the Company's workers, the bodyguards and the technicians and to supervise its execution and enforcement by them"** (sec. 19 of the affidavit). The problem was however that these grand statements remained a dead letter on the pages of the affidavit and were not proved. Quite the opposite. In my humble opinion it was positively proved that there was no publication of new procedures in as an updated response

9 of 90

SHATSKY 006731-T
P1: 894

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 12 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 12/3/11   Page 11 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

to the grave security situation that prevailed in Israel at the time of the attack, and naturally, there was no enforcement of procedures that, as stated, had not even been published.

In the course of Lavi's interrogation it emerged that he began to work for Bezeq in the year 2000 (p. 64 of the protocol line 25) and as such the declaration included in sec. 19 of his affidavit is strange, because it was clarified that at the time of the publication of the 1995 procedure he was not even a worker in Bezeq and hence was not partner to the drafting of those procedures (p. 87 lines 7 – 12). Moreover, these procedures, which were drafted in 1995, were drafted before the outbreak of the Second Intifada, which erupted in September 2000 and continued until October 2005, and naturally they were not adjusted to the security situation that prevailed in the State of Israel during those years.

In his examination, Lavi claimed that upon taking his position in Bezeq "**he reviewed**" the rules of 1995, and in response to the question of whether he had found reason to update them he replied "**occasionally we issued….. we issued instructions, occasionally we issued, I issued instructions … there were temporary instructions that I issued….**" (p. 88 lines 19 – 27), but when he was requested to present those temporary instructions, or new procedures, he answered "**they are in the Bezeq files**" (p. 89 line 4) but he did not "**remember**" whether there was a document that was more updated than Appendix A of his affidavit, which is nothing more than same irrelevant and non-updated procedure from 1995.

This conduct of Bezeq - as it finds expression in Lavi's testimony – is grave, because Lavi testified that before writing his affidavit he examined the security file of Bezeq, a file that was not submitted to the court, and according to Lavi "**it is not here**" (p. 86). He further affirmed that he determined the security policy of Bezeq (p. 140 lines 1 – 2). As such it is reasonable to presume that Lavi was highly involved in the security plans of Bezeq and capable of presenting them in detail to the court, but this hope turned into disappointment.

Lavi testified that he knew that Baqa al-Gharbiyya was located on the border of the seam between the Green Line and the territories located under Palestinian administration, and especially – that it was on the border of the adjacent settlement – Baqa al- Sharqiyya, and that he was even aware how easy it was to go from Baqa al-Sharqiyya to Baqa al-Gharbiyya during the period relevant to the attack (p. 71, lines 14 – 18), p. 72 (today there is a Separation Fence in that location).

Notwithstanding that Baqa al-Gharbiyya was adjacent to the border, and notwithstanding the execution of a number of attacks and attempted attacks, including events which ended up with the deaths of Israelis during the relevant years of the Second Intifada, Bezeq did not conduct an operations journal, in order to discern the foreseeable risk for its workers in the seam areas, and by extension it did not prove that it attempted to deal with this danger (p. 79, lines 18 – 25, p. 80). Lavi once again asserted the existence of security procedures in Bezeq p. 84, lines 15 – 20) and of a work plan (p. 106, lines 6 – 16). However, upon being requested to present them he answered " **they are**

SHATSKY – 006732-T
P1: 895

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 13 of 93
Case 1:02-cv-02280-RJC Document 253-3 Filed 2/5/... Page 12 of 109
# Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

**in the office"** (p. 137), and he went even further when he said that in accordance with that work plan, the existence of which was not even proved, there was even supervision of workers to ensure their compliance with them (p. 106, lines 6 – 16), p. 110).

In Lavi's testimony he spoke at length about the work procedures and the various guidelines that were given to the workers, but when he was asked to present them he said that these guidelines were given "**orally"** (p. 127, line 199).

Lavi claimed that in addition to the work procedures and guidelines given orally to the Bezeq workers, the existence of which was, as stated, not proved, the workers – technicians and bodyguards- also received security briefings.

When he was asked whether the briefings were conducted in accordance with an organized work plan, Lavi surprisingly  responded that the briefings were given inter alia **"based on intuition"** of the Bezeq personnel, who **"felt"** that they should assemble the workers for a briefing (p. 101, p 122).

Levi also claimed that the procedure – from 1995 – was disseminated among the bodyguards at the time that they received the briefing (??) (p. 139) but he had no answer to the fact that the 1995 procedure indicates that it relates to Areas A, B, and C. and not specifically to the areas of the State of Israel (p. 139), and what's more, that this procedure determines that **two** armed workers are to be sent (p. 111). As it transpired, in the case forming the subject of the statement of claim, it was only the worker Ben-Naim who was carrying a weapon. That is to say: Bezeq did not even comply with the inappropriate and outdated procedure, and did not send **two** armed workers to Baqa al-Gharbiyya.

In sec. 15 of his affidavit, Lavi claimed that "**At no stage did the Israel Police or any other authorized security instance given Bezeq any guidelines, prior to the event, regarding how to conduct itself when the company executes work in an Arab settlement...".**  However, contrary to this declaration, in the course of his testimony it emerged that there were ongoing and daily work connections between the Israel Police and Bezeq, even though most of them were not recorded.

From Appendix E of the Lavi affidavit it emerges that on the morning of the event, a Bezeq  telephone receptionist named Einat had a conversation with the Eiron Police (with Hadar), as she did every morning, as claimed by Bezeq, and she was told that "**there are no restrictions"** (p. 82 – 83)**.**  Further on in his testimony Lavi claimed that work meetings were conducted between Bezeq and the Israel Police and that the Israel Police had approved the security policy adopted by Bezeq and even gave Bezeq guidelines (p. 84 – 85) but no documentation of this was submitted.  To be more precise: This testimony totally and absolutely contradicts the claim appearing in sec. 15 of Lavi's affidavit, where he claimed that the Israel Police did not guide Bezeq, a claim that sounded like a complaint of Bezeq against the Israel Police.

SHATSKY – 006733-T

P1: 896

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 14 of 93
Case 9-02-cv-02280-KJC   Document 253-3   Filed 2/5/   Page 19 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

Lavi testified that ongoing meetings were conducted with the Israel Police (p. 95 – 96), in the wake of which, prima facie, the procedure of Bezeq was changed, but he did not produce any documentation to that effect (p. 112).

It would seem reasonable to presume that in confronting the grave security situation that prevailed in the State during the Second Intifada, a situation of which the Bezeq security personnel were undoubtedly aware, like every other citizen in the State of Israel at that time,   Bezeq would have established strict procedures, updated, and upgraded, in anticipation of updating and guidance sessions with the Israel Police. However, from Lavi's testimony it emerges that this did not happen (p. 128, 152), and it appears that Bezeq continued to be updated by the Israel Police on a random and unplanned basis, although this did not prevent Lavi from continuing to testify that Bezeq did not receive any guidelines from the Israel Police regarding its conduct in Arab settlements (p. 154).

Further on it emerged that in October 2002, a briefing was conducted in Bezeq for bodyguards and for technicians of the seam zone, in which Baqa al-Gharbiyya is located – and in that framework the technicians and the bodyguards were updated regarding an increase in the levels of warnings concerning attacks in this zone, warnings concerning attempts to steal weapons, etc) – all of these being warnings that indicate a specific aggravation of the security situation in the area. Lavi was asked where Bezeq received the information from concerning the said aggravation and he admitted that the information came from the Israel Police (p. 90 – 91), however there was no clarification regarding the manner in which Bezeq received this information and which person in Bezeq received the information and decided to conduct a briefing in the wake of the information that he received.

From all of the above it emerges that there was an ongoing connection between Bezeq and the Israel Police, but in the absence of any documentation, even as much as a single scrap of paper concerning the nature of that connection, it is impossible to determine whether this communication was  planned and initiated by Bezeq or perhaps it was just a chance inquiry to the Israel Police on the part of Bezeq workers.  At all events, it is clear that in the absence of a defined and detailed program regarding work connections with the Israel Police it cannot be determined that Bezeq discharged it duty towards its workers in guarding their personal security.

Lavi claimed that Bezeq conducted an evaluation of the situation (p. 95) but no documentation was produced attesting to the conduct of the alleged situation evaluation, or of conclusions drawn from the situation evaluations.  Accordingly there is no escaping the conclusion that it is highly doubtful whether the alleged situation evaluations were really conducted, for otherwise Bezeq would have produced some kind of documentation attesting that they had taken place.

As I mentioned, Lavi claimed that the workers, and primarily the bodyguards, were given guidance by the Bezeq people, a fact that was not proven. He also claimed that they were given a booklet of sorts that specified the security guidelines, and that the workers had confirmed, by way of their signatures, that they had received the booklet (p. 138-139). However no documentation whatsoever was attached

SHATSKY -006734-T
 P1: 897

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 15 of 93
Case 9:02-cv-02280-K-JCF   Document 253   Filed 10/5/13   Page 14 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

attesting that the booklet had been given to the Deceased, or to Ben-Naim, and hence no documentation was produced regarding their signature confirming the receipt of the booklet.

The testimonies indicate that until 4 May, 2003 about three and a half months before the murder of the Deceased, the Bezeq workers had been complaining about a sense of insecurity in Baqa al-Gharbiyya, and in the wake of these complaints a patrol was conducted in that location by senior personnel of the Bezeq Security Department.

Summing up the patrol, (t/15) it was recorded that it had been conducted in the wake of complaints on the part of workers, and that recommendations for implementation were written down, including a meeting with the Border Police Platoon that was stationed at the location.

Lavi related to this patrol in his examination, which was conducted at the request of the workers, and then it turned out that patrols such as this were actually intended **to calm the workers down** and as such they were not conducted for the sake of a renewed evaluation of the level of security that should be provided for the workers (p. 103). That is to say: The seniors of the Bezeq security network had no intention in the first place of implementing any lessons in the security realm as a result of the aforementioned trip – something which I view as particularly serious- because as it emerged the purpose of the trip was to serve as a relaxation pill for Bezeq workers, who had complained about feelings of lack of security – nothing more.

Lavi had no recollection at all of whether a meeting with the Border Police was conducted in the wake of the trip, even though Overlander claimed that such a meeting did take place and that he personally took part in it (p. 184). However, at all events, no document was presented to me which recorded such a meeting or its conclusions, and I fear that Lavi's statements are correct, and that as stated, the Bezeq administration did not have any intention of changing the security arrangements in the wake of this trip, and that the very conduct of the trip was only intended to put the workers at ease.

This is the place to mention that Bezeq shirks its responsibility for the murder of the Deceased with the claim that the Deceased and Ben-Naim broke the rules, given that they entered Baqa al-Gharbiyya in two cars, when according to the procedure they were supposed to enter in one car only; in the fact that they had contact with the local population, when such contact was prohibited etc.  However, as I have mentioned a number of times, the existence of procedures was not proven, and by extension it has not been proved what guidelines were included in those, prima facie procedures. As such there is no escaping the conclusion that it was not proved that it was forbidden for the technicians and the bodyguards to enter the locations of work in two cars, or that it was forbidden for them to have any contact with the local population. To be even more precise: Even were there proof of a prohibition to enter in two care, at all events, it was not proved that there was a causal connection between the act of entering with two cars and the said attack. Regarding the prohibition of contact with the local population – such a prohibition was not proved. And there was proof of quite the opposite.  The Bezeq bodyguards that testified in this file (Vaadim Simanovitz, Ben-Naim, Oni Dever) testified that they usually received assistance from the local residents in finding the addresses of Bezeq clients and

SHATSKY – 006735-T
P1: 898

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 16 of 93
Case 9:02-cv-02288-K-JCF   Document 253-3   Filed 2/13/12   Page 15 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

made a habit of eating in the local restaurants and even did business with the locals (p. 473-474, 497-498), just as Ben-Naim did with Wail at the time of the murder, and as clarified above, this was with the knowledge of Bezeq that saw no fault and naturally did nothing to prevent it.

The omission of non-submission of relevant documents to prove Bezeq's claims also continued in the testimony of Dror Overlander – a physical security officer in Bezeq (p. 165 – 166) who, like his predecessors, made numerous claims, laconically, without any basis, and obviously, without producing any documents to verify his statements.

Overlander admitted that despite the worsening of the security situation during the relevant period, the safety procedures of 1995 were not altered (p. 170-171), but he claimed that it was not his task to issue new procedures.

He said that it was the duty of the Israel Police (??) (p.171) to issue new procedures for Bezeq, but he admitted that he had not turned to Israel Police regarding this matter even though later on he claimed that he had turned to them but did not receive answers (p. 173)  and naturally, none of his statements were supported by any kind of documentation.

Overland admitted that Bezeq acted according to its own discretion (p. 178), but he did not specify what specific considerations underlay the prima facie discretion, the existence of which was not proved.

Overlander further claimed that Bezeq "**consulted**" with the Israel Police (p. 178) but he did not remember "**with whom**" (p. 179), even though he examined the Bezeq files before signing on his affidavit – the very same mysterious files that Bezeq did not submit to the court.  This indeed is the place to remind ourselves of first principles regarding the failure to bring proof, as elaborated by the writer Y. Kedmi in his book *On Evidence*, Vol. 3, p. 1649:

> "**In certain cases, the manner in which the litigant conducts his case in the court has evidential significance, as though it was circumstantial evidence.   Accordingly, one can ascribe evidential significance to the failure to bring a witness, to the failure to present a question to a witness, or to the failure to cross-examine someone whose testimony was given in a written certificate that he submitted. Conduct of this kind, in the absence of a believable and reasonable explanation, will be held against the party adopting it, given that prima facie, it compels the conclusion that had the evidence been produced or the witness heard, or questions presented, or a cross-examination conducted, they would have supported the version of the rival party.**

SHATSKY – 006736-T
P1: 899

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 17 of 93
Case 9:02-cv-02280-R-JCF   Document 251   Filed 1/03/10   Page 17 of 709

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

> **Failure to bring evidence – in the broader sense of the term as explained – establishes a factual presumption to be held against the avoiding party, rooted in logic and life experience, according to which: the rule applying to avoidance is the same as the rule applying to an admission in the sense that had the evidence been submitted it would have worked against the avoiding party. In this way, evidential significance is given to evidence that was not brought."**

Overlander admitted that briefing of the technicians (t/13) conducted on 28 October, 2010  did not give rise to any change in the security procedure (p. 180). His claim was that he had requested the approval of the Israel Police to change the security procedure that had been written by Bezeq in 1995, but he did not produce any written evidence to that effect (p.181), and he admitted that Bezeq had not found it necessary to change and update the outdated safety procedures from 1995 when confronted by the events of the Second Intifada and in view of the rise in the level of warnings and attacks (p. 181).

Beyond what is required in the current context I will note that no evidence at all was produced which compelled Bezeq to receive the approval of the Israel Police to change its security procedures, and by extension no evidence was produced that indicated involvement on the part of the Israel Police in the drafting of the security procedure of 1995.

The affidavit of the Deceased's brother – Ronen Mentin, was supplemented by Appendix J, carrying the title "**List of Settlements -  in Sensitive Areas and Security Measures Required for Movement and Work within Them".**  This document bears the date 7 November, 2002 and it appears that it was issued by Bezeq in the wake of the security situation as a result of the Second Intifada
The document is not signed, and it is not clear who wrote it.

From the document it emerges that someone in Bezeq  felt that Bezeq workers in Baqa al-Gharbiyya should be given a bodyguard and a car protected against stones. The problem was however that none of the Bezeq witnesses were able to explain exactly why the document was written. Was it preceded by a specific security related event? Who was in the thinking team in the Security Department of Bezeq who gave consideration to the security needs of the Bezeq workers in the settlements mentioned in the document?  Who did the Bezeq people consult with prior to the writing the document?  None of this is known, but it is clear as daylight that the security measures specified in this document were intended to protect the Bezeq workers exclusively from stone throwing and not from shooting attacks. And to be even more precise:  As I mentioned Baqa al-Gharbiyya is a settlement within the borders of Israel, populated by Israeli Arabs, and is situated adjacent to Baqa al-Sharqiyya,  which is an Arab settlement located in the Palestinian Authority, and the attendant risk stems from its close proximity to Baqa al- Sharqiyya, and not specifically from being in Baqa al-Gharbiyya, which is an Israeli settlement located within the Green line

SHATSKY – 006737-T
P1: 900

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 18 of 93
Case 1:02-cv-02280-RJC   Document 253-3   Filed 2/05/21   Page 1 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

From the testimonies presented to me it emerges that there is a useless barrier between the two settlements, which did not prevent the passage of people from Palestinian Baqa al- Sharqiyya to the Israeli Baqa al-Gharbiyya, just as the terrorist himself testified, when he testified about the unbearable facility easiness with which he made the move from  Baqa al-Sharqiyya to Baqa al-Gharbiyya.

 I was not presented with so much as a single document that was drawn up by Bezeq, which weighed up the security needs of the Bezeq workers in Baqa al-Gharbiyya, which was so close to the Palestinian Baqa al- Sharqiyya, and which specified the risk that stems from the simplicity of passing over from the Palestinian territory to the Israeli territory – a simplicity that **"invites"** a attacker such as the terrorist to equip himself with a weapon, to enter the territory of Israel and to carry out a murderous attack.

Did the Bezeq security personnel weigh up the danger involved in the adjacency of Israeli Baqa al-Gharbiyya and Palestinian Baqa al-Sharqiyya? Did they consider the possibility of the easy, and "convenient" passage from the Palestinian territory to the Israeli territory, and the immense danger that this posed for Bezeq workers? As mentioned we were not presented with any documents that attest to the exercise of any discretion at all in this matter, or any kind of attempt to consult with the Israel Police concerning the protection required for the Bezeq workers (see testimony of Aryeh Yehuda, p. 337), and the sad conclusion is that the Bezeq administration and the Security Division in Bezeq acted in an  unprofessional and grossly negligent manner – something which enabled the terrorist's difficulty free entry into Israeli territory and his murder of the Deceased.

It should be mentioned that in Appendix J (t/14) which is the list of the settlements in sensitive areas, which was drafted by Bezeq, there was an itemization of additional settlements in which for example, it was determined that Bezeq workers were to travel there by way of a bullet proof car with an armed bodyguard, or with a bullet proof vest and a helmet, as opposed to Baqa al-Gharbiyya regarding which the recommendation was for a car protected against stones and with the accompany of a bodyguard only.

I read the list of the settlements, but I did not understand why with respect to certain settlements it was decided to equip the workers with a bullet proof car and why specifically with respect to Baqa al-Gharbiyya, which is right on the seam line, it was decided not to equip the workers with a bullet proof car, and moreover, none of the Bezeq personnel were able to answer that question. To be even more precise, there is no doubt that had the Deceased been sitting in a bullet proof car at the time of being shot at, his life would have been saved and he would not have died.

Overland testified in his examination that he was **"among those"** who drafted t/14 (p. 182 line 8) but he had difficulty in explaining why it was decided to equip the Bezeq workers with bullet proof cars in certain settlements, but to only provide stone shielded cars to workers in Baqa al-Gharbiyya. He even went to the extent of **"reminding"** us that there was no difference between Baqa al-Gharbiyya and Hadera (!)where there had also been

SHATSKY – 006738-T

P1: 901

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF Document 253-8 Filed 10/05/21 Page 19 of 93
Case 1:02-cv-02280-RJC Document 136-8 Filed 2/05/21 Page 18 of 109

# Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

terrorist attacks, and hence we were left with the unanswered question – what was the difference between the settlements in which Bezeq workers **"merited"** bullet proof cars, and Baqa al-Gharbiyya, which was in the same category as Hadera?? (p. 182-183), even though, as distinct from Hadera, Baqa al-Gharbiyya is located right on the border.

The lack of professionalism that characterized the attitude of the personnel of the Bezeq Security Division to the security and protection needs of their workers also found expression in the fact that Overlander was not aware of document t/15 which is the summary of the patrol conducted in  Baqa al-Gharbiyya in the wake of the complaints of the Bezeq workers regarding their sense of insecurity in these places. This patrol was conducted quite close to the date of the murderous attack forming the subject of the statement of claim before me, on 4 March, 2003,  but Overlander was not aware of the document, nor did he participate in the patrol (p. 183), although this did not prevent him from claiming that the purpose of the visit was "**to examine what…. the workers were afraid of.  It was in the area of Baqa al-Gharbiyya, which is quite near to Baqa al-Sharqiyya**, where there were some kind of connection box works** …" (p. 184 lines 6-16).

Overlander's response was somewhat strange because he had clarified that he was not familiar with the document, did not remember the worker's complaints, and did not participate in the visit, and the document does not refer to works in the connection box, and when asked about this he admitted that "**it is not written,  I remember the case"** .  Is this really so?  Let us be precise: This complaint of the Bezeq workers, having been raised at a time so close to the date of the murder, attests to the workers' feeling of insecurity, and the feeling was not responded to in any form other than the conduct of the patrol, the sole purpose of which, as per Lavi's testimony, was to calm down the worried workers, and not to change any of the existence procedures, to the extent that they existed.

As I clarified, the procedures that were attached were the outdated ones of 1995, which do not address the actual security problems to which the State of Israel was exposed during the years of the Intifada,  and as proved, they were concerned with movement within the Palestinian territories and not specifically movement of Bezeq workers within the areas of the State of Israel in general , and in the settlements located just near the borders specifically.  The conclusion therefore is that on the date of the event there were no security procedures that were intended to protect Bezeq workers within the borders of the State of Israel in the settlements close to the seam line – a fact which is of particular gravity

Actually, the Bezeq witnesses attempted to present the procedures of 1995 as also being applicable to movement within Israeli territory, but this conclusion is not evidenced by the document itself and thus it has become clear that even Bezeq did not conduct itself in accordance with the guidelines of that document. For example, the 1995 procedures provide that Bezeq workers should move in pairs and be armed, and yet it was proven beyond all doubt that in the event under discussion a technician was teamed up with a bodyguard, but only the bodyguard was armed. When Overlander was required to address this point in his examination and asked by the Deceased was not

SHATSKY - 006739-T
P1: 902

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF Document 135-8 Filed 10/05/21 Page 20 of 93
Case 9:02-cv-02280-K-JCF Document 253 Filed 10/9/12 Page 12 of 109

## Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

armed, he replied laconically that "**we changed the movement guidelines**" (p. 190, line 9) and naturally the questions continued to flow: Who changed them? Which guidelines were changed? (because no guidelines at all had been presented which were intended for movement within the area of the State of Israel); Why were they changed; What were the considerations for changing the guidelines? Answers however were not forthcoming (p. 190).

Furthermore, Overland confirmed that after the events of 2000 (the beginning of the Second Intifada) two bodyguards were teamed up with each Bezeq technician (**"I believe that this was in Wadi Araa"** (p. 189, lines 7 – 10) (a fact that was confirmed by Erez Golan in his examination, p. 304-305), but in the year 2002 the number of bodyguards was reduced, because someone in Bezeq felt that one bodyguard for each technician would suffice (by the way, quite strangely Aryeh Yehuda "**does not remember**" that there were two bodyguards before the event, p. 358).

The matter of the reduction of the number of bodyguards raises numerous questions, because just as with other aspects of Bezeq's conduct, no evidence was produced, nor protocols from meetings, in which the professional level discussed the question of the number of bodyguards necessary for each technician, and naturally, there is no specification of the considerations for the reduction of the number of technicians(*sic*)[1], including the success in doing so.

I view this matter as being of particular importance in view of the contents of t/15 which speaks for itself, and mentions the fears of workers during 2003 regarding certain areas, including the area forming the subject of the statement of claim, and so it is quite natural that there was a need for a renewed examination of the safeguarding of technicians and the number of bodyguards required for each technician in particular locations, however, no such discussion took place, nor was there any change in the manner of protecting Bezeq workers in settlements in "**sensitive areas**".

Bezeq again claimed that the Deceased and Ben-Naim breached the procedure guidelines when they chose to enter into Baqa al-Gharbiyya, in two cars "**in defiance of the procedure**". However, as I ruled, the existence of procedures was not proved, and hence it cannot be concluded that the Deceased and Ben-Naim breached any kind of procedure by entering Baqa al-Gharbiyya in two cars, a fact that was confirmed by Overlander who affirmed in his examination that "**there is no procedure, no explicit, written procedure, that he travels in one car… no** (p. 192 lines 12 – 14).

At all events, there was no proof of a causal connection between the occurrence of the murder and the actual entry of two cars, and what's more, the attack did not occur at the time of the entry of the two cars, but rather a few hours later.

Bezeq further claims that the Deceased and Ben-Naim breached an additional procedure which prohibited them from having contact with the local population, but this is a claim that should never have been made.

18 of 90

SHATSKY – 006740-T

P1: 903

---

[1] Translator's Note: It seems that there is a mistake in the Hebrew text, which should have said "meavtechim (bodyguards) but instead used the word "technicians". I translated according to what is written.

Symbol [    ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 21 of 93
Case 9:02-cv-02280-RJC   Document 253   Filed 1/03/   Page 20 of 109

# Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

The reliance on this prohibition derives from the procedure of 1995, which, as mentioned, relates to the territories A, B, C, of the Palestinian Authority and not the territories of the State of Israel.  Is it even conceivable to prohibit Bezeq workers from conversing or being in contact with residents of Israel? Baqa al-Gharbiyya is an Israeli settlement populated by Israel-Arab citizens, and after all, according to Overlander, there is no difference between Baqa al-Gharbiyya and Hadera ?!

Moreover, the bodyguards testified that quite often they had difficulty in locating the houses of Bezeq clients for purposes of carrying out repairs, because in Baqa al-Gharbiyya there are no clear addresses (name of streets and numbers of houses) and because of the tremendous similarity between the residents' names. As such they regularly received assistance from the local residents who guided them to the required address.

The fact that Bezeq workers were assisted by local residents for purposes of identifying addresses was well known to the personnel of the Bezeq Security Division. This emerges from the testimony of Lavi (p.126) and also from the testimony of Overlander (p. 194), who for his own reasons chose to limit the prima facie prohibition by the claim that Bezeq workers were permitted to be in contact with the local population exclusively for purposes of fulfilling their duties (??) (p. 204) (lines 19 – 20), and once again  the question arises – where is all this written down? Where are the guidelines concerning the prohibition of contacting local residents (Israeli citizens !!!), other than for purposes of fulfilling their duties. Yehuda Aryeh too – the Director of Physical Security  in Bezeq, admitted in his examination that he was aware that Bezeq workers received the assistance of local residents in locating addresses and that he **"did not"**  remember a procedure that prohibited them from talking to the local residents  (p. 204)

Important testimony concerning the relations that were formed between the Bezeq workers and the local residents of Baqa al-Gharbiyya was given by the bodyguard, Oni Devir, who made a very reliable impression upon me.

In his testimony Devir related that the Bezeq workers did business with residents of Baqa al-Gharbiyya (p. 473-474), including with the owner of the car appliances store (Wail) , the murder having taken place at the entry into his business.  Devir testified that their supervisor from Bezeq – Eli Levinger – was aware of the private activities of the Bezeq workers  with the local residents (p. 497). Furthermore, he claimed that Bezeq workers, himself included, had a habit of travelling to Baqa al-Gharbiyya privately after work hours to execute business transactions with the locals (p. 503). To be precise:  Levinger was not brought to testify, and as such Devir's testimony was never contradicted and I accept it.

As opposed to the testimonies of the other witnesses, the bodyguard Vaadim Simanovitz claimed that the bodyguards received updated instructions from Bezeq once or twice a week, and they would sign upon having received them and return

SHATSKY – 006741-T
P1: 904

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 22 of 93
Case 1:02-cv-02280-RJD   Document 253-3   Filed 12/05/12   Page 200 of 709

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

them to Bezeq (p. 234-235). The point is however that documentations of the above was not attached, and this indeed was a new version that did not appear in Simanovitz's affidavit (p. 235). Further on, Simanovitz claimed that the bodyguards also received telephone warnings upon their entries into the settlements (p. 237-238), but there too the version is a new one which was not mentioned in the affidavit, and was not verified in any manner. And, he further surprised us with the claim that occasionally the technicians too were armed (p. 239), which was also a version that was not authenticated in his affidavit, and was not raised by any of the other witnesses. Needless to say, had they equipped the technicians with weapons, there would have been a document to that effect, and naturally such documentation was not produced.

In general Simanovitz's testimony was characterized by "innovations and surprises" that were not detailed in his affidavit, and which in certain cases totally contradicted other testimonies. For example, Simanovitz remembered that he had conducted a "yellow booklet" (p. 241-242) which to this very day is in his home but was not presented to the court, and what's more, it was never clarified whether the booklet was given to him by Lilit, who hired his services, or by Bezeq, for whom he worked as a bodyguard.

In section 6 of his affidavit Simanovitz claimed that "**I can state unequivocally that all of the workers were well aware of the procedures in the sensitive areas",** and in his examination he clarified that he made this claim based on meetings that were held with the security officers "**once every few months"** (p. 243, line 10), and surprisingly he testified that the workers (technicians and bodyguards) were given written procedures (p. 243, line 22), but these procedures were not presented in the course of the trial.

Needless to say, Simanovitz testified that Ben-Naim was in charge of the shift (p.262) and it was he who gave the weekly warnings to the workers (p. 263), a fact that did not find expression in a single affidavit or testimony, and in general, I do not accept Simanovitz' testimony, most of which was raised for the first time in court, was absent from his affidavit, and contradicts the other testimonies that were heard in the court.

Erez Golan as well, from the Security Division, relied in both his affidavit and his testimony on the existence of procedures but he too did not attach any procedures to his affidavit, and in his testimony he admitted that "**the procedures, once again I don't know if its written down"** (p. 272, line 9). In other words, once again our concern is with mysterious procedures the contents of which nobody knows, and even more seriously, which do not actually exist, and it would seem that the giving of instructions for security and guarding to the workers, took place, it at all, orally and as an independent initiative of various security officers, as a kind of "**Oral Law"** that was dependent upon the seriousness, the professionalism, and the work ethic of any particular security officer..

SHATSKY – 006742-T
P1: 905

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF Document 253-8 Filed 10/05/21 Page 23 of 93
Case 9-02-cv-02280-KJC Document 253 Filed 1/05/21 Page 22 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Erez Golan "proclaimed" in his testimony that he was not aware of their source (p. 271-272) and he claimed that the procedures were based on the procedure from 1995, which was changed and updated, but he did not produce any documentation of the evidence and updating of the outdated procedures (o. 271-272). And as mentioned, he admitted that there are no written procedures, as opposed to incidental guidelines given orally (p. 272).

Erez Golan claimed that he conducted briefs for the workers in accordance with written work plans, that were agreed upon with Overlander and which lasted for between half and hour to an hour, but these plans were not attached to his affidavit and nor were they presented in the course of the trial.
He said that he was not requested to present them (p. 275) and there is no escaping the conclusion that the very existence of the briefs, as well as their duration, contents and frequency was not proved.

Golan drew an exceedingly odd distinction between a briefing, which is specific and precedes departure to a mission, and guidance, which is actually training (p.275), but he admitted that there were no fixed systems of guidance for technicians or for bodyguards (p.276, and moreover, no documentation was submitted to prove the existence of briefings or trainings.

Golan admitted that he did not conduct a personal file which includes a professional opinion that evaluates the functioning of the various bodyguards (p. 277) even though, so he says, a complaint about the functioning of a bodyguard was liable to bring about the discontinuation of his employment.

Golan claimed in his examination that there are reports on the covert and overt review of the bodyguards but these reports too were not submitted (p. 278) and when eyebrows were raised upon hearing this, Golan claimed that occasionally the results of the reviews "**were not reflected in the report**" (p. 279 line 8). It has been proved that a report of this nature does not exist with regard to the activity of Ben-Naim as a bodyguard for a period of 3 years (p. 279) and the question must therefore be asked – were these reviews actually conducted?

Golan claimed that "**technically there was a barrier**" (line 282, line 31) between Baqa al-Gharbiyya, and Baqa al Shaarqiya, but he admitted that "**it was quite easy to cross them**" (ibid). Golan was asked why he did not initiate the issuing of new updated guidelines in view of the deterioration of the security situation, but he claimed that it not his job but rather the job of his superiors (p. 283).

Relating to the list of settlements in the sensitive areas and the security measures required for travelling to work therein (t/14) Golan claimed that this list was transferred to the Israel Police ,but no documentation was presented that could confirm this (p. 284-285), and moreover, it was not clarified who from Bezeq prima facie transferred

SHATSKY – 006743-T
P1: 906

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 133-8   Filed 10/05/21   Page 24 of 93
Case 1:02-cv-02280-RJD-CF   Document 253   Filed 12/05/06   Page 23 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

the list for the confirmation of Israel police; who at Israel Police prima facie received the list etc.

Golan gave surprising testimony when he claimed that he had warned his superiors of the possibility of a terrorist attacking upon a Bezeq worker, but when he was asked whether he put his warning into writing, he answered that he **"doesn't understand the question"** (p. 286 lines 12 – 17). To be more precise, Erez Golan was responsible for the security of Bezeq workers in the northern strip, which included Baqa al-Gharbiyya!!!.

Golan testified that the bullet proof car was **intended to safeguard movement, the travelling"** (p. 280 line 27) but he was not able to point to a single decision that was given in writing after someone exercised discretion, concerning who was entitled to transport in a bullet proof car (p. 288), and he admitted that he did not know how the reports were issued regarding the security activities for Bezeq workers (p. 288). These reports were not presented at all before the court, and prima facie they included the surveillance of the Bezeq workers for purposes of ascertaining compliance with the procedures ??(p.289), the very existence of was not proved, as stated.

Reports that were prima facie drawn up once a month were attached to the Bezeq affidavits, from which one can infer the existence of reviews and briefs that were conducted for the Bezeq bodyguards in the areas defined as sensitive.

For example, in the report (t/13) that was signed by Erez Golan it was recorded that on 28 October, 2002, a briefing was conducted for the bodyguards and the technicians in the Hefer District, where the settlement of Baqa al-Gharbiyya is located and it states that "**in the course of the briefing the following emphases emerged: an increase in the degrees of warnings of attacks, warnings of attempting stealing of arms, bodyguards were instructed to increase their level of alertness"** (p. 291). Hence it emerges that despite the grave warnings, which specify risks that might cost human life, the bodyguards were instructed to **"increase alertness"**, without conducting any discussion with them regarding how the bodyguards were supposed to **"increase alertness**" and accordingly they did not increase the guarding ability in the form of supplying bullet proof cars, or by arming the technicians. Furthermore, Golan was asked how he enforced the guideline of increasing alertness, and then it became clear that this guideline was actually not enforced at all, and there was no surveillance to verify the mysterious "increased alertness" (p.291). It also emerged that despite the complaints of the workers, who feared for their security in the area of Baqa al-Gharbiyya, Golan did not deem it appropriate to turn the Israel Police, or to the Border Police, in order to consult with them concerning the methods for guarding the Bezeq workers (p. 294), and in fact the conclusion is that despite the clear increase of warnings, there was no improving or sharpening up of the procedures (the existence of which was not proved, as stated) and the Security Department of Bezeq felt that it had discharged its obligation to protect the personal security of the Bezeq workers in sensitive areas during the Second Intifada by assembling the workers and calling for increased alertness. Was this sufficient? Most certainly not, And yet all of the above did not prevent Erez Golan from asserting the existence of a plan

SHATSKY - 006744-T
P1: 907

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF Document 253-8 Filed 10/05/21 Page 25 of 93
Case 1:02-cv-02280-RJC Document 136-8 Filed 2/13 Page 24 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

for conducting reviews, but such a plan was never presented to the court (p. 297), even though Golan admitted that before preparing his affidavit and giving testimony in court he went over all of the relevant material located in the folder and in the computer. However, as stated, this material was not submitted to court and one cannot know whether important materials were hidden from the knowledge of the parties and from the court (p. 298) or whether they simply do not exist.

Golan claimed that the briefs for the Bezeq workers  were conducted once every month or month and a half, in a morning meeting before the workers left for their daily work (p. 300, lines 8 – 10), however, he did not produce the reports on these meetings. Golan further claimed that there was a **"short"** period before the murder during which two bodyguards escorted every technician (p. 304, line 31) due to the existence of a **"specific warning during that period, the abduction of a technician, and so we increased the security, but we subsequently reduced it again"** (p. 305, lines 2- 3) and needless to say,  the warning itself was not submitted,  just like the deliberations concerning the expansion of the security network by reason thereof, and hence there was no submission of the professional considerations that were at the basis of the decision to downgrade the bodyguarding network and to reduce the number of bodyguards

An example of the faulty, unprofessional conduct of Bezeq in safeguarding its workers, is the appointment of Aryeh Yehuda as the director of the physical security in Bezeq.

From the testimony of Aryeh Yehuda it emerges that he was appointed to his position without any prior training on matters of security, and only after his appointment did he undergo specially designed courses in the Police and in the GCC.  (p. 328 – 329), that included a course of three-four weeks in the Police and a six week course in the GCC (no documentation of the above was submitted).

In parenthesis I will note that it could have been expected from a large and broadly based body such as Bezeq, which has so many workers travelling over the territories of Israel, to appoint to this sensitive job a person who has a security background and knowledge of security matters. Moreover, as per his own claim he was responsible for the security of hundreds of people (p. 391) and the choice of a person lacking any knowledge of security and guarding matters is astonishing and certainly does not attest to professionalism.

Aryeh confirmed in his testimony that there was no orderly procedure for questions and consultations with the Israel Police (p. 337).   He said that he was a partner to the drafting of the 1995 procedures (p.337) but he had not deemed it appropriate to change them or to draft revised procedures upon the outbreak of the Second Intifada in 2002.  Upon his own testimony everything that he did could be summed up in the category of meeting with workers and informing them of the existence of warnings (p. 338). Aryeh testified that despite the workers' fears, as they found expression in t/13 he did not deem it necessary to

SHATSKY – 006745-T
P1: 908

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 26 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 10/05/21   Page 25 of 109

**Tel-Aviv-Jaffa District Court**
**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

change the level of security (p. 338 – 339). From his comments it emerges that there is no written explanation, or written system of considerations, from which one can learn what were the considerations that guided Bezeq on the subject of security for workers in general and specifically in the settlements of the seam line  (p. 339 – 340)

Despite his position – Director of Physical Security , Aryeh did not remember the administration's patrol in the area as a result of the workers' fears (p.340) and my impression of the manner in which matters were conducted received expression in the protocol, where I said "**If I have correctly understood what you are saying, then everything took place verbally, there were no organized procedures. If someone felt that the Police should be talked to – they talked to them, if someone felt that they must    speak to the Border Police , they spoke, everything was discretion and nothing was in accordance with procedure and nothing was written:** (p. 340, lines 28 – 31), and this conclusion was actually confirmed by the witness.   From what has been said it is clear that there were no permanent and clear procedures and by extension there were no enforceable procedures, and the security of the workers was dependent upon the professional talents, diligence, and initiative of any particular worker.

Aryeh did not remember that he had requested  guidelines from the Israel Police, even though later on he claimed that he had requested "**many times**" (p. 350 line 14) but he could not remember "**where it was written**" (ibid.).

Aryeh very surprisingly claimed that the Police "**did not give answers, but in oral conversations they were prepared to say do this, or otherwise, they were not prepared**"  (p. 350 lines 29 – 30), which is a strange fact, in and of itself. The question therefore presents itself: Did the Israel Police refuse to give guidelines to Bezeq, or perhaps it was never requested to supply guidelines. It is reasonable to presume that the Police was not requested to give guidelines to Bezeq, and at all events no documentation was produced which could enable a different conclusion to be reached. Being more precise:   The Israel Police is not a litigant in this file,  and none of the litigants, Bezeq included, requested its joining__The impression created is that its absence from the statement of claim created a relatively comfortable platform for Bezeq to attempt to saddle it with the responsibility for Bezeq's omissions, even without hearing the actual voice of the Israel Police being heard. However, all this took place along with the intentional failure to summon the relevant Police people for giving testimony in an attempt to prove  Bezeq's claims regarding the Israel Police. This conduct is reprehensible and I do not accept it.

Aryeh admitted that there is no written documentation for the existence of a procedure and that he almost did not participate in any briefings (p. 357), and surprisingly, despite his position" **he did not remember**" that there was a period in which teams consisted of two bodyguards and a technician (p. 358)
Oni Devir defined the procedures as "**Oral Law**" (p. 470, 472) which consisted primarily of prohibitions such as: the prohibition for the bodyguard to drive etc. "….**this is prohibited and this is prohibited, clothing…**

SHATSKY – 006746-T
P1: 909

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 253-6   Filed 10/05/21   Page 27 of 93
Case 1:02-cv-02280-RJD   Document 136-8   Filed 12/05/12   Page 26 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

**They dealt with us extensively concerning clothing, appropriate clothing, inappropriate clothing, no emphasis, no relating to the extent of professionalism of the bodyguard…"** (p. 470, lines 19 – 23).

It will be recalled that Bezeq claimed that each worker was equipped with a booklet that contained security provisions, a photocopy of which was even attached to the exhibits file, but its delivery to the workers in general, and specifically to Ben-Naim, was not proved.

According to Devir he received the aforementioned booklet as a free handout on the firing range from Bezeq, or from Lilit (p. 472), and from his testimony it emerges that in fact there was no supervision of the work of the bodyguards, neither by Bezeq, nor by Lilit (p. 479).

Devir complained bitterly about what he saw as the insufficient training, and the failure to give authorities to the bodyguards. He said that the bodyguards in Bezeq are nothing more than armed civilians, and that they have no authorities of arrest or any other authorities, the type of which the bodyguards of the court have, and as such they have no real ability to protect the technicians.

I am unable to rely on these statements in the framework of the considerations underlying the judgment. Had the Plaintiffs felt that the training given to the Bezeq bodyguards or those in their position, was insufficient then they should have produced an opinion of an expert in the field. An opinion of this kind was not submitted, and in its absence I have no tools with which to evaluate the professional value of the training given to the bodyguards, or their stature as such. Over and above what is required, it will be noted that from the testimonies it emerges that all of the bodyguards already have appropriate training from the period of their military service, and it is clear that the Bezeq or Lilit person did not rely exclusively on the five day course that was given to bodyguards in their work for Bezeq or Lilit.

As stated, regarding status of bodyguards as security guards and not specifically as bodyguards, on this topic too I am taking no position, because no opinion was presented to me in accordance with which the status of the bodyguards in Bezeq was not sufficient and there was a need to upgrade their status to equate it with the of the court bodyguards.

I assume that there is a legal mechanism for regulating the status of the bodyguards, but it is clear that there was no-one in Bezeq who considered changing the status of the bodyguards and no one took any measures to change that status and to equate it, for example, with the status of the bodyguards of the court, and this claim was not even made.

Summing up, I will say that the absolute absence of any updated and detailed procedures, created a situation in which every guard acted in accordance with his own assessment of the situation on the ground, without any clarity on whether the personal assessment of each guard was suited to the conditions on the ground, and as such our concern is with a very grave failure.

SHATSKY – 006747-T
P1: 910

**Symbol [   ]**

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 28 of 93
Case 1:02-cv-02280-RJL   Document 136-8   Filed 10/05/21   Page 28 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

19. From all of the above it emerges that Bezeq had no clear, written and detailed security policy and the Bezeq's systematic failure to submit documents to verify its claims concerning the prima facie existence of procedures, or the summonsing of witnesses to prove its claims – against the Police for example – will be held against it.

Even more gravely, there was no review network regarding the enforcement of the guidelines that were occasionally given orally, and it seems to be that I would not be mistaken if I were to determine that the absence of procedures created a situation in which the technicians and the bodyguards were left to their own devices in the form of "every person will do as he pleases" a situation which is intolerable, especially during the period concerned.

As a result of these failures, Bezeq overlooked the fact that its workers were engaged in private activities during the work day – work which in the case before us caused the Deceased to be abandoned by his bodyguard who, as to be explained below, was engaged in his own private matters, and in doing so refrained from the guarding of the technician – the Deceased, and this too was something the enabled, inter alia, the commission of the murder in the sense of a *causa sine qua non*.

Needless to say, had Bezeq drafted clear and sharp security procedures, and had it maintained a permanent system of briefings, and had it enforced those procedures on its workers, it is almost certain that Ben-Naim would never have dared to engage in his own private affairs during work hours, and he would never have abandoned his post as the bodyguard of the Deceased. Similarly, it is almost certain that had Bezeq provided the Deceased with a bullet proof car, due to the physical proximity of Baqa al-Gharbiyya to Baqa al-Shaarqiya, it is conceivable that the tragic murder would have been prevented.   In other words it has been proved that there was a factual causal connection between the omissions of the Bezeq group and the occurrence of the murder, and it has been proved that there was a legal causal connection insofar as the foreseeability test, the risk test, and the common sense test all required Bezeq to foresee the occurrence of a tragedy as a result of the serious security failures as these were proved before me.   Being even more precise, there can be no doubt regarding the existence of a risk in the settlement on the seam line during the Second Intifada, given that it has been proved that the workers themselves were fearful of working in that location. In my humble opinion, and in view of the grave security situation in which the State of Israel found itself during the relevant period, common sense demanded that Bezeq draft clear procedures, in cooperation with other security bodies, such as the Israel Police, or the Border Police, in order to guard the security and lives of its workers, as well as to enforce and ascertain the compliance the procedures.

SHATSKY - 006748-T
P1: 911

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 29 of 93
Case 9:02-cv-02280-KJC   Document 253-3   Filed 10/5/ Page 28 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

Bezeq also failed in the test of common sense, and as stated – the consequence is clear.

20. Prior to completing this chapter, of the breach of the concrete duty of care by Bezeq, I will address a number of points raised in the Bezeq summation.

   In its summation Bezeq claimed that Baqa al-Gharbiyya is actually an Israel settlement located within the borders of the Green Line, and as such the rule applying do not differ from those that apply to any other Israeli settlement.

   There is no doubt that Baqa al-Gharbiyya is an Israeli settlement inside the Green Line. Nonetheless it is a border settlement located on the seam line, on the other side of which hostile Palestinian settlements are located. During a particularly severe security situation, the special treatment of Baqa al-Gharbiyya does not flow from the characterization of its residents as Arab residents, but rather from its adjacent proximity to Palestinian settlements that are under the control of the Palestinian Authority and the clear risk stemming from that proximity. The fact is that Bezeq too felt that in certain settlements within the Green Line there is a need to provide its workers with bullet proof cars, but unfortunately Baqa al-Gharbiyya was not included among those settlements, despite it being adjacent to the Palestinian Baqa al-Shaarqiya and despite the facility of passage between the two settlements.

21. In its summation Bezeq made every effort to drag the court into a determination the implication of which would be that imposition of responsibility on Bezeq would mean that the Arab population of Israel in its totality should be treated as a population with terrorist potential.  But this is not so.

   I hereby emphatically protest against this idiotic attempt. To be very precise: The court does not make political declarations and it is distressing that attempts are made to dragging it into doing so.

   **Given that this miserable statement was made in the summation of the Bezeq Group, I wish to make it crystal clear: The court does not make any distinction between Israel's Jewish citizens and its citizens who are Muslim, Christian or otherwise.**

SHATSKY - 006739-T
P1: 912

Symbol [    ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 30 of 93
Case 1:02-cv-02280-RJC-F   Document 253   Filed 2/13/12   Page 22 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

This suit was filed, inter alia, against Bezeq by reason of its grave security failures, which received expression in this file.

As I clarified with the utmost clarity, the request for increased security in area of Baqa al-Gharbiyya was not in any way because of its residents being characterized as Arabs, but solely because of its closeness and proximity to the Palestinian Baqa al-Shaarqiya, and the danger – that materialized – of the passage of a murderous terrorist from Baqa al-Shaarqiya to Baqa al-Gharbiyya, due to the absence of a serious obstacle which would prevent such passage.

As stated, to our great distress, in the case before us the danger materialized, and the Deceased was murdered by a terrorist who exploited the proximity and the easy passage between the settlements. To be more precise: It was not claimed, and hence not proven, that the terrorist was assisted by local residents for carrying out his plot. On the other hand, it was proven beyond all doubt that excellent relations prevailed between the local residents and the Bezeq workers, that found expression in the daily assistance that the Bezeq workers received from the local residents, and in the commercial relations between the Bezeq workers and the local residents. As stated, this judgment does not contain so much as the slightest hint of a characterization of the residents of Baqa al-Gharbiyya, as hinted by the Bezeq group in its summation – a hint that should never have been made.

22. In its summation the Bezeq group compared the presence of the Bezeq workers in Baqa al-Gharbiyya to the presence of advocates from the offices of the Bezeq attorneys in the court in Jerusalem, located in the heart of eastern part of the city. And it wonders: Is it required to attach a body guard to advocates on its behalf during their visits to the court in Jerusalem?

Obviously this query is nothing more than a provocative and superfluous query.

The security authorities of the State of Israel are charged with the security of the citizens and residents of the State, in all of its territory. Naturally, it is not possible to attach a bodyguard to each and every person, and large bodies – such as Bezeq - are expected to assist the security forces in posting appropriate security for its workers who are working in places carrying a security risk.

It would seem that Bezeq was aware of its duty, and as such it equipped the Deceased with an armed bodyguard and with a stone-shielded car. However, in view of the grave security situation during the relevant period, in view of the proximity of Baqa al-Gharbiyya to the border, in view of the anticipated fear of an attack being perpetrated by an attacker coming from the Palestinian Authority, there is no escaping the conclusion that Bezeq did not do enough, and in fact there was no proof of all of a security policy and the existence of procedures that attest to real measures being taken in the field of the security of Bezeq workers in sensitive areas.

SHATSKY – 006750-T
P1: 913

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 31 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 10/5/21   Page 30 of 109

# Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

23.      The Bezeq group further claims in its summation that the attack was not foreseeable, and as proof it presented the document that attests to the ascertaining of the security situation conducted by Israel Police on the morning of the event.

     The fact that the State security authorities did not discover in advance the intention to carry out an attack does not lead to the conclusion that this was a surprising and unforeseeable event. On the contrary. The daily conversation of the Bezeq telephone receptionist with the Israel Police provide more than ample testimony of the delicate security situation that prevailed in the areas of Baqa al-Gharbiyya. In other words, Bezeq had had the ability to foresee and did actually foresee the possibility of an attack, but for its own reasons it decided that it had discharged its duty by way of its daily conversation with the Israel Police, but this is not so.

24.      Bezeq devoted a chapter of its summation to the absence of statutory provisions, or guidelines, or procedures, under the auspices of the State of the I.D.F., concerning the subject of security in sensitive areas. However, I do not see the absence of guidelines and procedures under State auspices as releasing Bezeq from the protection of its workers. If Bezeq was of the view that it did not know how to protect its workers in areas that it defined as "sensitive" then it ought to have initiated an application to the Israel Police in order to receive guidelines. Such an application was not made, and by extension not proved, and hence there are grounds for complaining against the State authorities of the Israel Police regarding this matter.

25.      The Bezeq group refers to the decision in CA 491/73 **Gedudei HaHuleh Ltd v. Ezra Mahruz** (P.M. 29(2) 32, (hereinafter: **"Gedudei HaHuleh case"),** however there facts of the Gedudei HaHuleh case bear no resemblance to the matter before me.

     In the Gedudei HaHuleh case, the plaintiff was injured in 1967 – on the eve of the outbreak of the Six-Day War, when driving a combine in the course of the harvesting work in an area close to the Syrian border. In that case, the claim that the employer was obligated to provide the plaintiff with an armed car was rejected, because this was not practical in the context of a combine. In that case a custom was proven in the relations between the I.D.F authorities and the employer, in accordance with which the employer would report to the I.D.F when he workers were leaving for work, and doing a specific coordination between the employer and the Army authorities regarding the worker's departure for the field, and in which it was the Army that worried about the security of the workers.

     In the case before me, there was no similar arrangement with the I.D.F. authorities, or the Border Police, or the Israel Police, and the only connection proven between Bezeq and the Israel Police consisted of a daily conversation in order to receive information concerning expected warnings.

SHATSKY – 006751-T
P1: 914

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 32 of 93
Case 9:02-cv-02280-KJD   Document 253   Filed 2/03/ra   Page 30 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

It was positively proved that Bezeq did not request security advice for its workers from the Israel Police, and as such the Bezeq workers were not guarded specifically by the Israel Police. And, there is no doubt that the duty to protect the security and the life of the Deceased rested first and foremost on his employer – Bezeq, not on any other instance, that is not a litigant in the case before me, and was not brought by Bezeq to testify.

26.     Bezeq refers to the decision in C.A. 559/77 **Haim Lampert v. State of Israel** (published in Nevo), where the court heard the claim of a worker of the Ministry of Defense, who was injured on his way to work by the fire of terrorists who infiltrated into Israel. In that matter the court ruled that **"One cannot compare the degree of caution required from an employer with the respect to the level of safety in his factory and premises which are in his control, and the degree of caution that he can adopt with respect to the dangers posed to his worker, like any other person located in the public domain."**

In all modesty, I concur with this statement. However, it was proved that Bezeq workers were sent to certain settlements in bullet proof cars and no clarification was given concerning the difference between those settlements, and Baqa al-Gharbiyya. In other words, the employer – Bezeq provided more advanced means of protection, but did not provide them to the Deceased, even though it was clear that had he been in a bullet proof car, he would not have been killed.

Given that no explanations were given for this failure of not providing the Deceased with a bullet proof car, notwithstanding that he worked on seam line, which abutted a Palestinian settlement, the result is that the explicit ruling in Lampert case cannot be of assistance to Bezeq in the case before me.

27.     Bezeq further referred to the decision in C.A. 686/77 **Mekorot Israel Water Company v. Moshe Margi et al** (published in Nevo) which held that in the circumstances of a terrorist event, the regular principles of negligence cannot be applied to an employer.

I likewise concur with this holding, in all humility. But the case before me concerns a <u>foreseeable</u> terrorist attack, against which it was possible to prepare, for example, by equipping the Deceased with a bullet proof car.  This failure to prepare and the failure to equip the Deceased with a bullet proof car, in addition to the many additional security defects detailed up to now, can only lead to one conclusion – that Bezeq was negligent and that as a result of that negligence, the tragedy forming the subject of the suit was made possible.

My conclusion stands even in view of the facts of the decision in C.F (T.A. 1051/92 **Abraham Shapir v. Pardess Syndicate** (published in Nevo). Moreover, I am of the opinion that to the extent that acts of terror directed  against the Israeli citizens continue and increase, the employer is obligated to improve the security measures

SHATSKY – 006752-T

P1: 915

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 33 of 93
Case 1:02-cv-02280-RJL   Document 253-3   Filed 2/05/12   Page 32 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

that he provides for his worker. It does not suffice to determine that this is the harsh reality that we live in. Will this difficulty provide an employer with a permit not to protect his worker? Most certainly not, and particularly since it was proved that at that time Bezeq owned bullet proof cars, which, for reasons that were not clarified, were not used for the benefit and the security of the Deceased.

28. Attorney for Bezeq continues, and claimed that considerations of legal policy **"compel the conclusion that negates attributing foreseeabilty to the employer with respect to terrorist events, which are an integral part of the regular dangers of life in the State of Israel** (sec. 53 of the Bezeq summation). However, I do not accept this proposition. On the contrary. In the framework of legal policy there is a duty to entrench and strengthen the holding concerning the employer's obligation to worry about the security of his workers, specially when there is an anticipation and basis for the fear regarding occurrence of an attack.  Even more precisely: Obviously, the employer is not capable of foreseeing the occurrence of a specific attack but he is certainly capable and obligated to foresee a security event, in the general sense, and to do all that he can in order to minimize the danger to which he worker is exposed.

29. I cannot complete this chapter without addressing the debriefings conducted by Bezeq and the Israel Police in relation to the attack forming the subject of the statement of claim.

The Bezeq Debriefing-  The  Bezeq debriefing was defective because it lacks specification concerning the identity of the interviewees, who gave the information forming the subject of the debriefing, as well as the identity of the interviewers who conducting the debriefing and as such there is a real difficulty in evaluating the seriousness  of the debriefing.

From reading the debriefing it emerges that it is not signed, but at the bottom it is written **"written by: Yehuda Aryeh",** and the question that naturally presents itself is whether it was the same writer who edited the debriefing or perhaps **"he wrote"** the determinations and conclusions of others.

Yehuda Aryeh was the Director of Physical Security in Bezeq, and related to this issue in his examination, and said that that he was asked by the director of the division, Yekutiel Lavi, to write the debriefing.

Aryeh made it clear in his testimony that he did not edit the debriefing by himself, and that he was assisted by Overlander and Erez Golan and by Gal, and **"the workers"** (p. 341), but he was unable to explain why the involvement of others in preparation of the debriefing was not mentioned in the body of the debriefing (p 342).  Later in his testimony Aryeh again related that "**I was not the only one doing the debriefing, as I stated, other additional workers also participated, there were conversations with Bezeq workers and with bodyguards from Bezeq and from the Israel Police** (p. 344  lines 13- 14) and he admitted that he did not participate in all of the alleged debriefings, but rather in "**most of them"** (p. 344 line 229) and **"in those in which I didn't, they transferred the**

SHATSKY - 006753-T
P1: 916

Symbol [    ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 34 of 93
Case 9:02-cv-02280-R-JCF   Document 253   Filed 1/05/21   Page 39 of 109
## Tel-Aviv-Jaffa District Court
#### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

**material to me"** (p. 344 line 24). Aryeh was asked to present the court with the basic raw material that was prima facie presented to him, - so he claimed – by others involved in the investigation of the event on behalf of Bezeq, but he did not remember where the material was "**it may have been filed. I don't know. I don't remember** (p. 345 line 4). In his own words, "**I summed it up in the debriefing"** (p. 344 line 319).

Given that Aryeh claimed that the Bezeq debriefing was inter alia based upon meeting with police personnel, he was asked which particular police personnel he had met with, and he answered "**there was one meeting in the Eiron station, the intelligence officer of the Eiron station and another functionary whose name I don't remember, in the position at that time, and they met with them, yes** (p. 345 lines 15 – 16). However he did not remember whether there were written records of the meeting (p. 345 line 18) and at all events, he was unable to explain why a meeting that prima facie took place with the Police did not find expression in the Bezeq debriefing.

Aryeh further claimed in his testimony that for purposes of writing the debriefing "**we sat"** (p. 346 line 119) "**with the workers that worked in the area of Baqa al-Gharbiyya**…" (ibid.).

He claimed that he and others – whose identity remained a mystery – debriefed the Bezeq workers in Baqa al-Gharbiyya, each one of them separately. and that their statements were recorded (p. 346 line 17) and when he was asked why these statements do not find expression in the debriefing  he answered "**Listen, in this Report there does not appear, we did not write down everything in the wake of each statement by this or another worker. The report is general"** (p. 346 lines 19 – 20), and it would seem that in view of the "generality" of the debriefing, the witness was unable to explain the involvement of "**the media and the Company spokesperson"** who were specified in the debriefing as having been involved in its preparation. He said that "**the truth is that I did not meet with them, Kuti** (Lavi – D.G) **met them and that was at their request**…" (p. 347 line 6)**,** and the actual specification of the meeting with them was a "**mistake"** *(sic)*  (p. 347 line 15). Hearing these words, there is no escaping the conclusion that this debriefing is of no value at al all, and its results may well be biased.  Otherwise it is unclear why it was necessary to have a meeting of Lavi – who is not signed upon the debriefing – with the media and the company spokesperson, in order to reach true conclusions regarding the manner in which the event had taken place and those responsible for it, if at all in the Bezeq company. Unless the purpose of the meeting was to give guidelines regarding the conclusions of the debriefing regardless of the facts?!

Yekutiel Lavi who during the relevant period served as the Director of the Physical Security Department, confirmed that he had conducted a debriefing of the event (p. 100 lines 1 -3), but , as opposed to the majority of his testimony that was characterized by lack an absolute lack of memory regarding the questions he was asked, he claimed that he was "**involved"** (p. 123 line 24) in the execution of the debriefing.  However, the problem was that he was unable to say where, physically, the debriefings of the various workers had taken place (p. 123 line 20), he was not able tell the whereabouts of the statements supposedly taken from the workers who were questioned,

SHATSKY – 006754-T
P1: 917

Symbol [  ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 35 of 93
Case 1:02-cv-02280-RJC   Document 253   Filed 2/03   Page 34 of 109

## Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

(p. 1259) and he did not know where the statements were, even though he assumed that **"everything was located in the Security, the Security Division"** (p. 125, line 19).  He did however have a definite memory of the taking of statements from Ben-Naim and from Oni Devir (p.125), a fact that was emphatically denied both by Oni Devir (p. 488 – 489) and by Ben-Naim (p. 443 line 30, p. 444 line 1).

From the testimony of Overland too – the Physical Security Officer Bezeq, a similar picture emerges regarding the manner in which the Bezeq debriefing was conducted. Overland insisted that Bezeq had not '**investigated"** the event, but rather conducted a **"debriefing"** thereof, stressing that **there is a difference between investigation to** …" (p.199 lines 25- 29. Overland was questioned a number of times regarding the identity of the people who were "**debriefed"** but in the course of many long minutes he avoided giving an answer, and was finally forced to answer that he did not take the testimony or a statement of any of those involved, **"because the Police interrogated them**….."(p. 201 line 22), and he claimed that the conclusions stipulated in the debriefing are "**our joint conclusions, yes"**(p. 201 line 31), in other words, of Overland and of Aryeh Yehuda

From all of the above it emerges that it is highly doubtful whether the document bearing the title "**Bezeq Debriefing"** is worthy of that title. It seems that this is a document that was written on the initiative of the Bezeq administration, based on the demands of its media consultants, and it lacks any evidentiary value, and it certainly cannot serve as a source for learning about Bezeq's part in the mistakes that enabled the occurrence of the tragedy.

The Debriefing of the Police – The Police debriefing is based on conversations conducted with Bezeq personnel, whose names are specified in the debriefing, but in a particularly conspicuous manner it omits the name of the bodyguard Ben-Naim, who was an eye witness to the attack. Also missing is the name of Oni Devir, who arrived on the scene immediately after the attack occurred. The absence of these two from the debriefing casts a heavy shadow over the Police Debriefing, which is based in its entirety on the hearsay of the Bezeq personnel, and who were not witness to the event and as such, as transpired in their testimony, they were interested parties. Their interest was to prevent the established of Bezeq's responsibility for the severe event – responsibility which has been clearly established in judgment and which received expression in both the acts and the omissions of Bezeq.

The Israel Police notes with praise the conduct of Ben-Naim, **for the matter in which he began pursuing, the striving for contact, the stubbornness, and the wounding of the terrorist"** and I wholeheartedly concur with the praises showered upon Ben-Naim in relation to his conduct after the perpetration of the attack on the Deceased. However, this does not suffice to reduce his share in the responsibility for the actual occurrence of the effect, as I detailed in this judgment in relation to his conduct before the firing.

At all events, I hereby determine that the Police debriefing was superficial and unsubstantiated, and it cannot aid in the determination of the responsibilities of various instances for the occurrence of the event forming the subject of the statement of claim.

SHATSKY – 006755-T
P1: 918

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 253   Filed 10/05/21   Page 36 of 93
Case 9:02-cv-02280-K-JCF   Document 136-8   Filed 10/05/13   Page 35 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

30.  <u>To summarize this chapter, I hold that the Bezeq group (Defendants 1,3,4 and 5)
     breached the duty of care to which it was subject in its relations with the Deceased,
     and there is no doubt that the omissions set forth in this judgment constitute the
     "causa sine qua non" for the occurrence of the tragedy, in addition to other causes
     that will be set forth further on in this judgment.</u>

**<u>Concrete Duty of Care, and its Breach in the Relationship between the
Deceased and Defendant 2 – Asher Ben-Naim</u>**

31.  At the time of the incident, Ben-Naim served as the Deceased's bodyguard, and
     worked at Bezeq through Lilit.

     In his affidavit, Ben-Naim repeated his claim that he protected the Deceased in
     accordance with the procedures followed at the time at Lilit, however, it was not
     proved that there were any procedures at Lilit at the relevant time, and in any case,
     they were not submitted to the court file.

     In his affidavit, Ben-Naim completely ignored the reason for which the Deceased
     arrived at Wail's store, where the Deceased was murdered, and reading the affidavit,
     one might mistakenly think that the two arrived at Wail's store, and that Ben-Naim
     left the car, in accordance with some rules and for work-related purposes, which is
     not the case.
     We should note here that Ben-Naim's omission in protecting the Deceased was very
     severe, although his conduct after the murder was very professional, and he was
     even awarded a commendation for his pursuit of the terrorist following the murder,
     which pursuit that led to his capture.

32.  In the course of his interrogation, Ben-Naim raised claims in regard to the level of
     his training as a bodyguard, but as I have explained, I do not intend to evaluate the
     level of his training, inasmuch as no expert opinion was submitted in that regard,
     and in any case, as will be explained further on, not only is there no causal
     relationship between the prospect of perpetrating the attack and the level of Ben-
     Naim's training as a bodyguard, but his excellent performance following the murder
     attests to his being a professional bodyguard who was fit to serve as a bodyguard.

33.  The central question in regard to Ben-Naim's involvement is what was the purpose
     of the Deceased's visit to Wail's store.
     Ben-Naim was interrogated by the Israel Police on the day of the incident, on 26
     June, 2003, and he claimed that Wail serviced his car from time to time, **"and that
     morning he had to install an amplifier for me in the car"**, and also noted that
     **"Wail called me**

SHATSKY – 006756-T
P1: 919

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 37 of 93
Case 9:02-cv-02280-RJC   Document 136-8   Filed 11/5/13   Page 36 of 709

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

**yesterday evening ... and said that a Bezeq pole had fallen beside his home, and he asked that I speed up the service in his matter ...."** (folio 1 lines 7-11).

From Ben-Naim's court testimony it arose that, on the morning of the incident, he parked his car under an awning at Wail's store (para. 382 line 29), and left it there, as Wail had not yet opened his business and was not present when Ben-Naim's car was brought to the site for the purpose of installing the amplifier.

After leaving the car by Wail, Ben-Naim transferred to the Bezeq Berlingo, which was driven by the Deceased, and the two began their workday.

According to him, at about 11:00 o'clock they returned to Wail's store – where Ben-Naim's car was parked. Ben-Naim testified that when they arrived at the store, he got out of the Berlingo, surveyed the area around the Berlingo (p. 385), and began to walk towards the store, but then spotted Wail, who was in a car parked **"before the car that we had left"** (p. 386 line 6). In his testimony, Ben-Naim claimed that the purpose of going to Wail's store at this stage was so that he would take them to the site of the problem with the Bezeq pole beside Wail's house so that they could repair it. In any case, in his interrogation Ben-Naim admitted that while he was talking with Wail, he actually had his back to the Berlingo in which the Deceased was sitting and talking on the phone (p. 392), although, according to him, **"I would take a look from time to time, to look right, to look left..."** (p. 392 line 14). At this point, the assailant approached the Berlingo and shot the Deceased in the head through the closed window.

I will immediately state that I do not accept Ben-Naim's version, and in my humble opinion, it is my impression that we are concerned with a fabricated version that was only created to justify why Ben-Naim and the Deceased went to Wail's store, as I shall explain.

As I noted, from reading Ben-Naim's affidavit it appears that, on the morning of the incident, Ben-Naim left his car at Wail's store, but in his affidavit he does not supply any explanation for leaving the car at the store, nor for the return of the two to the store in the course of the morning.

Reading Ben-Naim's testimony to the police, and his testimony in court,  give rise to an utterly different picture from the innocent, and apparently naive version that appears in Ben-Naim's affidavit.

From Ben-Naim's testimony, it appears that the purpose of leaving his car with Wail on the morning of the incident was to install an amplifier in his car.

SHATSKY – 006757-T
P1: 920

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 133-8   Filed 10/05/21   Page 38 of 93
Case 9-02-cv-02280-KJC   Document 253   Filed 2/03/12   Page 32 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Ben-Naim claimed that on the previous evening, Wail called him and asked that he expedite the repair of the pole that had fallen beside his house.

For reasons known only to Ben-Naim, he did not find it necessary to mention those facts in his affidavit, which seriously detracts from his reliability and the accuracy of his version.

Ben-Naim resorted to the alleged phone call on the previous night between him and Wail, who asked him to expedite the repair of the pole that had fallen beside his house, but this version is a sole, uncorroborated version of a litigant, and in light of Ben-Naim's unreliability, I am of the opinion that, as I noted earlier, is a fabrication.

Beyond what is necessary, I would further note that Ben-Naim could have submitted a phone record to prove the existence of the said conversation, but he did not do so. No one denies that Bezeq did not receive any complaint in regard to a fallen pole beside Wail's house, and in fact, no one knows where Wail's house is located. And note: if a pole indeed fell beside Wail's house, it may be assumed that, at some point after the murder, Bezeq would have fixed that pole, but no verification of the repair of the pole was submitted, and Ben-Naim refrained from bringing Wail to testify, claiming that Wail demanded money for his testimony, and we should now refer, yet again, to the established law in regard to the failure to bring a witness, not to mention that Ben-Naim could have asked that Wail be summoned by the court, which he did not do.

Moreover, no one denies that Ben-Naim served as a bodyguard, and he did not provide an intelligent explanation for why Wail chose to turn to a bodyguard, of all people, in order to request the expediting of the repair of a Bezeq pole, which is not his job, as he confirmed in his testimony (p. 384). And note: as I stated, it was not proven that Wail reported the alleged fallen pole to Bezeq, and in any case, the existence of such a referral to Bezeq was never proved.

This is a matter of substance, inasmuch as according to Ben-Naim's testimony to the police and in court, he was asked by Wail to "speed up" and "expedite" the repair of the pole, a request that would appear to attest to the existence of a report to Bezeq about the falling of the said pole – a report whose existence was not proved.

Ben-Naim admitted in his interrogation that the purpose of his going with the Deceased to Wail's store was to install an amplifier, but he insisted that they also went in order to repair the pole (p. 383). But having found that the entire matter of the repair of the pole was a complete fabrication, it becomes clear that the purpose for which the two went to Wail's store on the said date was exclusively in order to arrange the installation of the amplifier in Ben-Naim's car, and for reasons known only to him, he decided to arrange his personal affairs during

SHATSKY - 006758-T
P1: 921

Symbol [  ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 39 of 93
Case 9:02-cv-022280 K-JDC   Document 253   Filed 1/05/13   Page 38 of 109

**Tel-Aviv-Jaffa District Court**
**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

and in the course of the workday, and not thereafter, despite the fact that, according to Oni Devir (p. 506), Ben-Naim was accustomed to going to Baqa Al Gharbiya on personal matters even after work hours.

In the course of his testimony, Ben-Naim described the manner in which he exited the Berlingo and the survey that he allegedly conducted following his exit, but in light of my lack of faith in Ben-Naim's testimony, I do not accept his version of the conducting of a survey, which was apparently intended to show that despite the fact that he was seeing to personal matters at the time, he was not derelict in his duties as a bodyguard, which, moreover, finds no mention in his affidavit. And note: no one denies that while Ben-Naim was talking to Wail, he stood with his back to the Berlingo and to the Deceased who sat in it (p. 392). Is it plausible that a bodyguard who exits a car and conducts a survey would stand with his back to the person he is protecting and talk to someone else?!

This is the place to note that in the course of his testimony, Ben-Naim submitted a sketch of Wail's establishment, including a sketch of the location of the cars that were there (D/3), but it turns out that this sketch differs in material details from the sketch that Ben-Naim made in the course of his police interrogation (P/5), where from the sketch found in the police file it is clear that Ben-Naim's testimony describing the path he took from the moment he left exited the Berlingo until reaching Wail, who was bent over servicing another car, is untruthful testimony and impossible (p. 460-461), and I am of the opinion that the purpose for which the two went to Wail's store in the course of the workday was for no reason other than arranging the installation of the amplifier in Ben-Naim's car, and giving Wail the car keys for the purpose of the said installation (436-437), and as stated, the entire story about the fallen pole is a fabrication that never was.

Ben-Naim claimed in his testimony that he saw the terrorist before he reached Wail's store, and even saw him approach the store. I do not know if Ben-Naim indeed saw the terrorist at those early stages, but in light of the terrorist's young age (15.5), and the fact that a group of children was also walking nearby, he did not deem him important, and certainly did not suspect that he was a terrorist, which is a fact that I accept.

34.   In summary, in regard to the question of Ben-Naim's involvement in the incident that is the subject of the suit, there is no avoiding the conclusion that Ben-Naim's conduct was also a **"causa sine qua non"** that contributed to the possibility of perpetrating the attack.

Ben-Naim led the Deceased to Wail's store for his personal affairs, left the Deceased's car and spoke with Wail while his back was to the Deceased, and therefore was unable to prevent the fatal shots that led to the death of the Deceased.

SHATSKY - 006759-T
P1: 922

As for the question of whether Ben-Naim was able and required to foresee what was about to occur, the answer is yes, and it is, in fact, necessary and was actually proven in light of the description of the survey that Ben-Naim allegedly performed upon exiting the Berlingo, in other words: Ben-Naim proved by his conduct, as he described it, that he could have and should have foreseen the incident that occurred very shortly after he exited the Berlingo.

As stated, I do not accept the said description, but the very fact that it was raised points to Ben-Naim's understanding of the situation, and of the need to protect the technician from any event that might harm him. In that description, Ben-Naim demonstrated awareness of his role as a bodyguard, and attempted to minimize his part in the sad occurrence that followed.

35.  I cannot avoid addressing the question of what would have happened had Ben-Naim and the Deceased not visited Wail's store, and what would have happened had Ben-Naim not exited the car and conversed while standing with his back to the Deceased.

We are concerned with hypotheticals that I cannot answer. The facts are that the Deceased and Ben-Naim arrived at Wail's store at Ben-Naim's initiative, and Ben-Naim was dealing with his own private matters in the store, while turning his back to the Deceased.
This conduct leads to the conclusion that there is a concrete duty of care between Ben-Naim and the Deceased, and that it was breached by Ben-Naim.

### The Concrete Duty of Care and its Breach in the Relationship between Lilit and the Deceased

36.  Lilit is a company in liquidation, and there is a stay of proceedings in its regard, but my task will not be complete without an estimate of Lilit's share in the incident, and moreover, there is a policy that covers Lilit's liability at the time of the incident.

It has been explained that Ben-Naim was employed as a bodyguard for Bezeq through Lilit, and according to him, he was trained for his job by Lilit.

I am of the opinion that Lilit's role was concluded upon transferring the bodyguard, who trained by it to work at Bezeq.

SHATSKY – 006760-T
P1: 923

Symbol [ ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 41 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 10/05/12   Page 40 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

It was proven that from the moment that the bodyguard was transferred to Bezeq, the guard operated in accordance with the instructions of Bezeq, and I do not see how the existence of a concrete duty of care can be established in the relationship between the Deceased and Lilit. An note: had it been shown that Lilit had not properly trained Ben-Naim, and that his training was deficient, and that as a result he did not know how to defend the protectee upon the occurrence of the incident, then it would be possible to establish the existence of a concrete duty of care and its breach. However, there was no flaw in the training of Ben-Naim, who was even awarded a commendation for his quick response upon hearing the shots, and therefore Lilit has no direct or indirect involvement in the incident, and in any case, there is no concrete duty of care between it and the Deceased.

### Concrete Duty of Care and its Breach in the Relations Between the Palestinian Authority and the Palestinian Council, and the Deceased

37. On May 4, 1994 the **Agreement on the Gaza Strip and Jericho Area was signed between the Government of the State of Israel and the Palestine Liberation Organization** (hereinafter: "**P.L.O**",) **the Representative of the Palestinian People** (hereinafter: "**Gaza – Jericho Agreement**") (attached as Appendix B of the notification of the Plaintiff's attorney regarding the submission of conventions.)

The agreement was published in *Kitvei Amana* [Treaties – trans.]1067, Vol.32 and includes Article VI, which is titled *Powers and Responsibilities of the Palestinian Authority,* which clarifies in section c. that the Palestinian Authority "**will have, inter alia, power to formulate policies, supervise their implementation, employ staff, establish departments, authorities and institutions, sue and be sued and conclude contracts".** In other words, before us is the admission of a litigant regarding the legal capacity of the Palestinian Authority (hereinafter – "**the Authority**") and of the fact of it being a legal entity which can be sued and against which a judgment can be given. To be more precise, it is not for me to define the nature of the legal entity referred to as the "**Palestinian Authority**" and I can suffice with the certificate of a public servant that was submitted and according to which the Authority does not enjoy legal immunity.

Attorney for the Authority invested tremendous efforts in an attempt to drag the Court into the political controversy concerning the nature of the legal entity referred to as **"the Palestinian Authority***"*, and which he defined as **"a foreign political entity"** which is not subject to Israel law in general, and specifically not to the laws of torts. According to the attorney for the Authority, "**One cannot ignore the international aspect of the fact that the P.L.O is not just a foreign, non-Israeli body, which is not subject to Israeli law or norms, nor to the status of the foreign law**..." He deduces this inter alia from the Oslo Agreements, which, according to his interpretation determined the P.L.O, as the sovereign in the Territories. For otherwise, so he claims "**What is the source for the Plaintiff's attribution of negligence to Defendant 8** (the P.L.O – D.G), **for their failure to prevent terrorist acts against the citizens of the State of Israel, if not by force of their being the sovereign in the territory?** (section 3 of the opening part of the Authority's summation)

39 out of 90

SHATSKY – 006761-T
P1: 924

Symbol [  ]

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 42 of 93
Case 9:02-cv-02280-KJD   Document 151   Filed 10/5/21   Page 40 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

Regarding the event forming the subject of the statement of claim it was claimed that no direct connection was proved between the Palestinian Authority and event forming the subject of the statement of claim, and claims were made regarding the illegality of the certificate of the Foreign Minister, and there were also claims concerning lack of justiciability and *forum non-conveniens*, and in all of these claims the Court was requested not to give a ruling in the framework of this file, in the summation of the Palestinian Authority.

38.  In the statement of claim and in the summation, the Plaintiffs attribute responsibility for the attack to the Palestinian Authority and base the grounds of claim in the Palestinian Authority's undertaking in the framework of the Gaza-Jericho Agreement and in the Interim Agreement as well as in the provisions of the Torts Ordinance [New Version] and it would seem that first and foremost we should address these agreements and clarify their significance for the claim before us.

39.  <u>The Gaza – Jericho agreement and the Interim Agreement –</u> as I mentioned, was signed on May 4, 1994 in Cairo, between **"The Government of Israel"** and the Palestinian Liberation Organization.

After the signing of the agreement, the <u>Implementation of the Agreement Regarding the Gaza Strip and Jericho (Jurisdictional Powers and other Provisions) (Legislative Amendments) 5754-1994</u> was enacted (hereinafter: "**The Implementation of the Gaza-Jericho Agreement Law"**)

On September 28, 1995 the Israel-Palestine Interim Agreement Regarding the West Bank (hereinafter – "**The Interim Agreement**") was signed in Washington in the framework of which the Palestinian Council was established and founded, as the body that was supposed to receive the powers conferred to the Palestinian Authority in accordance with the Gaza-Jericho agreement (Chapter 1, Article 2 of the Interim Agreement.

The Interim Agreement was published in *Kitvei Amana* 1071, Vol. 33 and was followed by the enactment of <u>Implementation of the Interim Agreement on the West Bank and the Gaza Strip (Jurisdiction and Other. Provisions) (Statutory Amendments) Law**,** 5756-1996, and the Law Amending and Extending the validity of Emergency Regulations (Judea and Samaria – Jurisdiction over Offences and Legal Assistance) (Amendment and Extension of Validity), 5766-2007, while some of the legislative amendments were directly inserted in the Law Amending and Extending the validity of Emergency Regulations (Judea and Samaria and Gaza Strip – Jurisdiction over Offences and Legal Assistance (Extension of Validity) 5727-1967 Law</u>, It was also published in the Proclamation Regarding Implementation **of the** Interim Agreement (**Judea** and Samaria) ( Proclamation No. 7). In the framework of the Interim Agreement Israel transferred to the council the powers and responsibilities as specified in the agreement itself.

SHATSKY – 006762-T

P1: 92**5**

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 42 of 109
Case 1:02-cv-02280-RJC   Document 251-3   Filed 12/05/21   Page 42 of 109

### Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

"The Agreement Regarding the Preparatory Transfer of Powers and Responsibilities" was signed in Erez on August 29, 1994 and published in *Kitvei Amana* 1068, Vol. 32 and was followed by the enactment of the <u>Implementation of the Preparatory Transfer of Powers to the Palestinian Authority (Legislative Amendments and Miscellaneous Provisions), 5755-1995</u>   (hereinafter:  **"The Transfer Agreement").**

40.   In Article 18 (XVIII) of the Gaza – Jericho agreement both parties (both the State of Israel and the Palestinian Authority) undertook to " **[T]ake all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property, and shall take legal measures against offenders. In addition, the Palestinian side shall take all measures necessary to prevent such hostile acts directed against the Settlements, the infrastructure serving them and the Military Installation Area, and the Israeli side shall take all measures necessary to prevent such hostile acts emanating from the Settlements and directed against Palestinians."**

This undertaking is repeated in Article 15 of the Interim Agreement, under the heading "**Prevention of Hostile Activity**".
Hence, there can be no doubt that contrary to the claims of the Palestinian Authority, the aforementioned agreements between the State of Israel and the Palestinian authority became part of the Israeli domestic law, by force of the enactment of those laws, and as such there is no impediment, legal or otherwise, to the filing of civil-torts claims based on the undertakings of the Palestinian Authority in those agreements.

Attorney for the Palestinian Authority claims that the purpose of the aforementioned implementation laws was to adjust the Israeli legislation to the undertakings assumed by the State of Israel in the aforementioned agreements, because it is quite clear that Israeli legislation cannot anchor undertakings of the Palestinian Authority. However, the Palestinian Authority is only partially correct in this claim.

There can be no doubt that the purpose of the implementation laws is to anchor Israel's undertakings to the Palestinian Authority in the framework of Israeli law; however, these undertakings did not originate in a vacuum. They are based on the agreements which the Palestinian Authority is signed upon. In other words, the Palestinian Authority as an independent legal entity gave a contractual undertaking to the State of Israel and its citizens to prevent terrorist acts. This undertaking, which receives expression both in Gaza-Jericho agreement and in the Interim Agreement constitutes a direct undertaking to the citizens of the State of Israel; alternatively, it constitutes a contract for the benefit of a third party – the citizens of the State of Israel. That is to say:  The reliance on the undertakings of P.A. in various agreements is by force of  the Israeli and Palestinian contractual agreement, to the effect that these are binding agreements and that in accordance with the laws of contracts the party directly harmed by the violation of these agreements,

SHATSKY - 006763-T
P1: 92**6**

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 44 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 2/03/12   Page 43 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

may submit claims for his damages. To be precise, section 34 of the Contracts (General Part) Law, recognizes the right of a third party to the contract to sue thereunder, in the capacity of a person who is a third party under that contract (See G. Shalev:*Contracts Law,* 2nd ed, 5755, p.4319.

The P.A attorney claimed that in the framework of summation filed in CA 4060/93, **Palestinian Authority et al v. Eliyahu Dayaan,** the attorney for the Attorney General agreed that the aforementioned agreements do not provide a grounds for claims other than to the parties signed thereon **"and there are no people, or private bodies, who are not party to them, who are authorized to sue by force thereof, unless it specially states otherwise in the political agreements themselves.** However, the P.A. attorney did not attach the aforementioned position of the Attorney General to his summation, and examination of the ruling of the Supreme Court reveals that the Supreme Court did not even address the claim, because it was not even raised in the trial forum (section 7 of the decision).

On the merits of the matter we should clarify that the Supreme Court is not bound by any particular position submitted by the Attorney General, and even more so given that the Attorney General's statement was not brought to my knowledge and I do not know what his position is.

My view is that having read the agreements, and by virtue of that which arises from them, it may be concluded that the intention of its drafters was to confer on the beneficiaries the right to demand the fulfillment of the obligation in accordance with the contents of the agreement. I derive this inter alia from the preface to the Gaza- Jericho agreement which confirms that right of the parties to the agreement **"to live in peaceful co-existence, mutual dignity, and security…"** Dignity includes the right not to be harmed by acts of terror and the right to sue in torts for such harm. To be precise, the right of the State of Israel to live in peaceful co-existence, mutual dignity, and security, is none other than the right of the residents and citizens of the State of Israel, and at all events, it has not been proved otherwise.

I am aware of the fact that the construction of the agreements between the State of Israel and the P.A. was not even mentioned in the deliberations of the court, but given that the Plaintiff's attorney relied upon the existence of the agreements, they are entitled to interpret them at their own discretion. If the P.A. is of the view that the agreements cannot be relied on, or that they should be constructed in a different manner, it was entitled to make such a claim accordingly, and to bring evidence in support of its claim – but it did not do this.

Furthermore, in Article C. of section 6 of the Gaza – Jericho agreement the P.A. declares its right to sue and to be sued. The P.A. did not see fit to limit the right of a suit against it, or the type of matter regarding which it could be sued; rather, it proclaimed the existence of a right to sue it. From all of this it emerges that the right to sue the P.A. is given both to the State of Israel and to its individuals who are harmed as a result of the actions of the P.A., especially since the goal of the agreements it to institutionalize **"peaceful co-existence".** This concept includes

SHATSKY - 006764-T
P1: 927

Symbol [    ]

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 45 of 93
Case 9:02-cv-02280-RJS   Document 253   Filed 2/05/12   Page 44 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

both the right of individuals to live in peace and their right to file a suit in the event of a violation of their right to live in peace – for if one does not say this – what then is the meaning of **"co-existence"** ?.

In view of all the above, my view is that the agreements confer the right to sue for their violation both to the State and to its individuals, and if any of the parties had desired to prevent individuals of the State [from having] that right to sue it would have specified the same in the agreements, and this was not done.

In addition to the above it should be remembered that the Plaintiff's ground for claim against the P.A. was in torts, and reliance on the agreements is legitimate reliance in the framework of their attempt to prove the liability of the P.A. to compensate them for the incident forming the subject of the suit.

As I mentioned, the P.A. defined itself as a legal entity competent to sue and to be sued.  Regardless of the fact that the admission of this litigant to the effect that the P.A. is a legal entity, one cannot ignore the fact that it is a legal entity whose conduct, according to the Plaintiffs, caused the damage forming the subject of the claim through its conduct. My view is that regarding responsibility in torts, the law applying to the P.A. is identical to the law applying to any legal entity that is sued on the grounds of a civil wrong in the realm of torts. As such it is clarified that the grounds of claim invoked by the Plaintiff does not stem from the P.A.'s undertakings as specified in the framework of the Agreements, but rather from the very fact of it being a legal entity, which committed a wrong in the realm of torts, and this being the case, is called upon to compensate the victims.

41.     The Plaintiff claims that the P.A and the Palestinian Council "**not only did they fail to frustrate terror, but they actually initiated, activated, and financed terror, in defiance of the relevant treaties** (section 4 of the Plaintiff's summation) and the P.A. and the Council claim that they do not bear responsibility for the acts of a terrorist and that they do not fall into the category of the  "**principal**" of the terrorist for the commission of the attack forming the subject of the Statement of Claim , page 8 of the summation of Defendant 8,9).

I do not accept the position of the P.A., and I will clarify my position.

The terrorist, Shadi Muhamad Hassain Gauda – gave preliminary testimony in the court on July 12, 2009.

In his testimony in the Police and in the deliberations before me the terrorist admitted that he had murdered the Deceased.

In his statement the terrorist (taken from him in the hospital on July 2, 2003, t/19) he related that about two and a half months before the attack he had began to train in a **"course for physical training and training with arms"**  (folder 2 lines 7-8),

SHATSKY- 006765-T
P1: 92**8**

Symbol [ ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 46 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 12/03/12   Page 45 of 109
## Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

and he clarified that he did this in the Palestinian Authority in Jericho. He claimed that the course had lasted 50 days, and terminated about ten days before the commission of the attack (ibid.).  In his statement he described how he had decided to kill a Jew, and how he realized his will and in answer to a question he answered that he does not belong "**to any organization**" (folder 5 line 10).

Evidently, after the terrorist's admission that he trained in the Palestinian Authority, there can no longer be any question regarding the matter. However, when testifying in Court the terrorist raised the claim for the first time that "**what I said in the Police was not correct**" (page 11 line 29), and according to his testimony in Court, his training took place in Jenin and that "**I went through training in arms in the *Al-Aqsa Brigades*** ( p. 14 line 28).  But, he had no explanation for the change in his version precisely at this time, which totally contradicted his original, untainted version when he was under interrogation just after committing the murder. As such it seems reasonable to assume, as suggested by the Plaintiff's attorney, that someone in the prison instructed him to change his testimony so as not to implicate the P.A in this file.

In view of the change in the version, the terrorist was declared to be a hostile witness without any of the parties objecting, and he was cross examined by the parties.

In its summation the P.A. claimed that the terrorist's statement in the Police that he underwent training "**in the Palestinian Authority**" does not mean that he did the training in the Palestinian Authority, but rather "**within the territory**" of the Palestinian Authority in Jericho and not on under the auspices  of the Palestinian Authority in Jericho.

I reject this claim out of hand. First of all, had the P.A. attorney felt that what was said in the terrorist's statement was misunderstood or interpreted in a mistaken fashion, then he could have brought an expert in linguistics who would make the necessary clarification. His failure to do so will be held against the P.A.

Furthermore, from a reading of the terrorist's statement it emerges that his intention was to clarify that he underwent physical and weapon training as part of the Palestinian Authority in Jericho and not **"within the territory"** of the Palestinian Authority in Jericho.  This can be inferred from the continuation of the statement where the terrorist explained **"that I trained with weapons"** in Jericho…" (folder 2 line 14). In other words: When the terrorist intended to indicate a geographic location only, he used the word "**Jericho**" only, and the conclusion is that when he claimed that he underwent physical and weapon training in the Palestinian Authority in Jericho, he was saying exactly what he meant, namely that he participated in the training camp under the auspices of the Palestinian Authority in Jericho,

SHATSKY – 006766-T
P1: 929

Symbol [ ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 47 of 93
Case 1:02-cv-02280-RJL   Document 251-3   Filed 12/05/03   Page 46 of 109
**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

As I mentioned, on the date of attack the terrorist was only 15.5 years old and it seems that he chose to exploit that fact in support of his change in version, because initially he rather surprisingly claimed that **"the Palestinian Authority permitted me to undergo training, and when I went to the Jericho area to volunteer for a military location, and they didn't agree, for one reason only – because of my age (**p. 14, lines 17-18).

As evident, there is a development in the terrorist's version, the aim of which is to distance the Palestinian Authority from responsibility for the murder that he committed. The reason is that whereas just a few days after the murder the terrorist clarified that he **trained in the Palestinian Authority in Jericho,** in the Court on the other hand, six years after the attack, he knew to say that he left to [go to] the **"area of Jericho."** The matter speaks for itself.

The terrorist was asked why he told the police interrogator that he had trained in the Palestinian Authority, and now he was claiming that he trained in Jenin with the *Al-Aqsa* Brigades, and his laconic answer was that "**these were things of 6, 7 years ago. I can't even remember what I said at all. When I carried out the attack I belonged to the Al-Aqsa brigades.** The point is however that when the terrorist was interrogated right after the event**,** he claimed, it will be recalled, that he did not belong to any organization at all, and when he was confronted with his statements he said "**they interrogated me, and I was injured, tired" -** This statement too is not true, because when the interrogator asked him how he felt before the beginning of the interrogation, his reply was "**praise the Lord, I feel good… the treatment here is very good, the doctors and the nurses all treat me very well"** (folder 1, lines 14, 16).

Accordingly, there is no doubt that it was specifically in the answers of the terrorist to the Police interrogator in the framework of t/1 that he gave true answers, and as stated, the change in his version stemmed from his attempt to distance the P.A. from the event forming the subject of the statement of claim.

In the continuation of the terrorist's testimony, it was clear that he had been fed information that somebody wanted to be placed before the court. For example, he claimed that "**Those in Jenin were not brought into the Authority. They are fighting against Israel, and the Authority is not fighting. Jenin takes people who want to do actions. The Authority wants security and peace, - but in Jenin each one wants to carry out some kind of action that they will allocate to him (**p. 23, lines 6 – 10).

In parenthesis it will be mentioned that the terrorist claimed in Court that he had told the Police investigator that he had been trained by the Al-Aqsa Brigades, but he had no explanation for the fact that in his statement, which bears his signature, it emerges that he was trained in the Palestinian Territory and in the Court he attempted to justify his statements to the

45 of 90

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 48 of 93
Case 9-02-cv-02280 K-JCF   Document 136-8   Filed 10/5/12   Page 47 of 109
**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

interrogator based on his medical condition,  but the description he gave in the Court (p. 16, lines 14-25) is not consistent with his declaration to the interrogator regarding his good feeling at the time the statement was taken.

The Plaintiff's attorney claimed that the change in the terrorist's version in the Court, contrasted with his statements in t/1 constitutes **"repressed testimony"** and she is correct.

**Repressed Testimony**

42.     **"Repressed testimony" is testimony given by a witness in court which he had previously 'repressed" in his heart, despite its relevance, and significance for the matter at hand, and which he only revealed at a later stage.  Repressed testimony in the absence of an explanation, triggers grave doubt regarding its truthfulness: "the rule is: Repressed testimony is of particularly low value and weight, because a person who "represses his testimony" is naturally suspect with respect to its truth. This is the case for as long as he has no convincing explanation, for why his testimony was repressed for a long time; and why the witness decided to disclose it; If the witness gave a satisfactory explanation for the "repression" of the testimony the court may view it as  reliable and give it the evidentiary significance dictated by the circumstances (see Y. Kedmi _On Evidence, - the Law in the View of the Case Law,_  Part 1, combined, revised version, 5563-2003, p. 441.**

The subject was summarized in the settled case law as follows:

> The rule applying to repressed testimony is that its evidentiary **value and weight are low by reason of the natural suspicion that arises concerning its truthfulness, for as long as the witness has not provided a convincing explanation of the reasons behind the repressing of his testimony (see:  CrApp 5396/05 Alhorati v. State of Israel [published by Nevo] 18.5.06;** CrApp 4297/98 **Hershtik v. State of Israel  50(4) P.D. 673, 687- 688 (2000);** Cr.App 3625/91 **Or v. State of Israel [ published in Nevo] 9.6.93) paragraph 19 of Justice Levin's judgment;** Cr App 154/85 **Avrushmi v, State of Israel, 41 (1) P.D. 387, 399 (1987)). The duration of time after which testimony will be considered as repressed is not determined according to a fixed and rigid criterion, and is determined in each case according to the circumstances (CrApp 4223/07 Anon v. State of Israel   [ published in Nevo] 11.6.07) ;** CrApp. 10189/02 Anon v. State of Israel [published Nevo] 19.9.05, in par. 13; CrApp 5612/92

46 of 90

SHATSKY – 006768-T
P1: 931

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 49 of 93
Case 1:02-cv-02280-RJL-DCF   Document 253-3   Filed 12/05/12   Page 48 of 109

**Tel-Aviv-Jaffa District Court**
C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

> **State of Israel v. Beeri, 48(1) P.D. 302, 363 (1993) (hereinafter – the *Beeri* case)…. the focus is not on the duration of the silence, but rather on the reason that motivated the witness to suppress the knowledge that he had, as well as the change in circumstances that prompted him to disclose the information (see: section 10 of CrApp 1645/08 Anon v. State of Israel, not yet published).**

See also:

> **"in the case before us the court is requested to have consideration for the fact that the evidence was repressed for a considerable period; the court will only reluctantly attribute weight to such testimony; and this is especially the case when the testimony is presented as grounds for the conduct of a retrial. The evidentiary value of repressed testimony is negligible, due to the natural suspicion pertaining to its truthfulness. These fears may naturally be dispelled, where a good reason is presented for the repressing of the testimony (regarding this matter see and compare: the *Cohen* matter, section 11 of the judgment of Justice Arbel; CrApp 1645/08 Anon v.State of Israel, section 10 of the judgment and references cited [published by Nevo], 3.9.2008)" (see RT (Retrial – Supreme Court)** 1178/03 **Haani Hason v. State of Israel** (not yet published, section 11 of the decision) (and see also: CrApp 2014/94 **Salah v. State of Israel**, 50 (2) P.D. 624, 629; CrApp 5730/96 **Ohana v. State of Israel**, (published Nevo); CrApp 235/79 **Ohana v. State of Israel**, 34 (1) P.D. 544, 546; CrApp 6274/98 **Anon v. State of Israel**, 55 (2) P.D 293,297; CrApp 1258/03 **Anon v. State of Israel**, 58 (6) 625,638).

It will be clarified that the law concerning a different [*sic.*][2] witness  is identical both in the criminal and the civil planes.  One of the results of the raising of the repressed testimony is the proclamation of the witness as a hostile witness, as in the case before me.  To be more precise, a hostile witness is a witness who in the course of giving testimony demonstrates hostility towards the party who called upon him to give testimony, or where there is a contradiction between the witness's testimony in court and his recorded statements out of court, or in affidavit, or in expert opinions, and for our purpose there is a  clear and absolute contradiction between statements made by the terrorist (and which he confirmed on the witness stand) in his statement to the Police (t/1) and his statements in court. It should be clarified – as I already determined - I have no doubt that the contradiction between

SHATSKY – 006769-T
P1: 93**2**

---

[2] Translator's Note: It appears from the context that there was a typo in the Hebrew text and the Court intended to write "hostile" witness instead of "different" witness.

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

the statements of the terrorist in t/1 and his statements in court, were intended to distance the P.A. from the event forming the subject of the statement of claim. However, this attempt was unsuccessful

Despite the change in his version, which I have rejected, it is possible to give a clear outline of the unfolding of events.

The terrorist – a minor who was fifteen years old – wanted to be a Palestinian soldier (page 16, line 12), and in accordance with his statement in the Police, he was trained in Jericho by the Palestinian Authority, in carrying arms. He stated that the training lasted 50 days and immediately after that, about 10 days after the end of the training session, he had a burning desire to implement the knowledge that he had acquired in the training camp of the Palestinian Authority. The rest is history.

As I mentioned, I prefer the terrorist's statement in the Police. This was an authentic statement which, as of the time he gave it and until his cross examination in court, he did not seek to change it, and I have no doubt that what appears in the statement is the truth

The P.A. attorney claimed that the entire claim against the P.A. is based on the terrorist's statement (t/1) in accordance with which he was trained by the P.A. in Jericho, and in his own words "**in the Palestinian Authority in Jericho**". However, he claims that this statement is not admissible and cannot serve as evidence of the truth of its contents, but I do not accept this claim.

First of all it will be noted that the terrorist's statement t/1 was filed in consent, and without objection, after the terrorist confirmed his signature on the confession, and in fact, having confirmed the truth of its contents in court, he testified about himself that he was "**shrewd and understanding**" (page 24, line 13) and he even asked "**why is it necessary to ask all the questions, I confessed a long time ago**" (p. 24, lines 13- 14). In other words, the terrorist himself referred to his statement t/1 and actually confirms the veracity of its content.

Furthermore, the terrorist's statement was taken from him just after the attack, and from a reading of the interrogation it is clear that he was asked "**open questions**" such as "**can you tell us what exactly happened to you?**" (folder 2 t/1, line 3), and in answering this question the terrorist started telling his story, and of his own free will, and without having been presented with any question concerning his training before the commission of the murder, he chose to tell about the training camp that he had undergone in the Palestinian Authority in Jericho. The manner in which the question was presented and the detailed answer confer extensive evidentiary value to the statement in the Police, and its value increases in view of the terrorist's conduct

48 of 90

SHATSKY – 006770-T
P1: 933

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 51 of 93
Case 1:02-cv-02280-RJL   Document 253-3   Filed 12/3/12   Page 50 of 109

## Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

and lies when he was examined in court, six years after he had given his voluntary statement (regarding the value of the statement, see Y. Kedmi, **On Evidence, Revised and Combined Edition, 2009, 1818**). Let us be precise, the P.A. attorney did not object to the submission of the terrorist's statement as evidence nor did he have any reservations regarding its content, and what he didn't do at the time of its submission, he certainly cannot be permitted to do at the time of the summation, because had he raised any objection to its submission as evidence, the objection would have been heard, and ruled on, even with respect to the evidentiary value of the statement. But none of this happened. Furthermore, when the terrorist was declared to be a hostile witness, the P.A. was entitled to interrogate him by way of cross examination, and thereby attempt to explain the substantive contradiction between the statement in t/1 regarding the identity of the body that trained him, and the terrorist's testimony on that matter in court. The P.A attorney waived the interrogation of the terrorist and chose not to examine him at all. The waiving of the examination demands an explanation.

The terrorist's change of version did not only find expression in the question of the identity of the body that trained him, but also regarding the duration of the training. As opposed to the statement t/1, when he was in court, the terrorist claimed that he had trained in Jenin and not in Jericho, as clarified in his statement – but for only two days, for an hour each day. He trained for a total of two hours before the murder. I likewise find this version unacceptable, and I hold that it is untrue. The terrorist was asked why he stated in t/1 that he had trained for 50 hours, but he chose to avoid giving an answer, saying only that "**I didn't go to training at all, they told me that I didn't have an identity certificate** (page 26 lines 10 – 11). In the other words, there was no answer to the question.

As is the habit of those who do not speak the truth, the terrorist also became entangled in his statements. On the one hand, he claimed that he had spoken truthfully to the police interrogators, including with the respect to the question of his organizational belonging (in t/1 he claimed that he did not belong to any organization) but he immediately began to play it smart and said that he had told the police investigator that the *Al-Aqsa* organization **"was behind the perpetration of the murder that I committed"** and immediately added on his initiative and without having been asked "**the investigator was focused on whether I had murdered or not and to who I belonged** (p.28, lines 16- 18). And as mentioned, I have no doubt that the terrorist's statement in t/1 are true statements that were made without any leading, or guiding; they were the truthful statements of a 15.5 year old youth, who is not sophisticated, and most probably is not aware of the consequences of his statements with respect to the Palestinian Authority.

There is no doubt that in the course of his years in prison, the terrorist **"became smart",** and understood the damage caused to the P.A by his statement in t/1, and was guided by other prisoners (p. 28) and made a tremendous effort to rectify these statements, an effort that was doomed to failure because there is no doubt that this is a case of false testimony, and the truth is that the terrorist was trained by the P.A. in the training camp in Jericho, just as he claimed at the very beginning.

SHATSKY – 006771-T
P1: 93**4**

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 52 of 93
Case 9:02-cv-02280-K-JCF   Document 136-8   Filed 10/05/12   Page 51 of 107

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

43.  The P.A. attempted to prove by way of witnesses on its behalf that the terrorist had not undergone a course under its auspices in the relevant period, but this attempt failed.

The first witness on behalf of the P.A. was Naaman Naim Panon (hereinafter: **"Panon"),** who has served as the legal advisor in the Palestinian military intelligence (page.64, line 7) since 2009 (ibid.). From his statements it emerges that between the years 2000 – 2006 he served as a prosecutor in the courts of the P.A. (p. 64 line 20) and from 2006 until 2008 he served as a judge in the military court of the P.A (ibid). It further transpired that during the years in which he served as a military prosecutor, he lived **"between Hebron and Bethlehem"** (p. 65 line 2). The question that naturally arises is why this witness was brought to testify, given that during the relevant years he had no connection to the training camps of the P.A. and by extension was not capable of giving any information regarding them based on his own personal knowledge. The oddity of his testimony only increases when the identity of the Commander of the Palestinian Security Apparatus became clear, together with the fact that this person was alive, and capable of giving the most authoritative evidence regarding the existence or non-existence of training camps in Jericho in the year of 2003, and details regarding those who had trained there (p. 65).

In parenthesis it will be noted that this "oddity" was **"explained"** by the P.A. attorney in his summation (sec. 73), and in deference to his dignity I will not address this **"explanation" as** it appears in his summation.

The witness Panon, who is an advocate by profession, attempted to explain the fact that he was brought to testify in this file, notwithstanding the fact that he had no personal knowledge of the disputed subject. He explained that "**[I]t is difficult to find a person who can give information about all of these places (**the training camps that the P.A. received – D.N.) **and really accurate names** (of the people who had trained –D.N.) (p. 65 line 25). To be precise: The Court issued a number of orders compelling the P.A to disclose details regarding the training camp in Jericho and the names of those who had trained there at the relevant time, but the P.A. did not turn over the relevant information, without giving any reason for its failure to respond to the provisions of the order. Thus the Court was prevented from finding out, first hand, whether the terrorist had participated in these training camps, in Jericho, under the auspices of the P.A,. in the year 2003 – as he had indeed confessed in t/1, or not. Needless to say, this avoidance works against the P.A., and it is almost certain that had the required information been produced, we would have found the terrorists name among the names of those who were training there, just as he described in t/1.

Adv. Panon even admitted that he did not know who had been responsible for the training camps in Jericho between the years 2000 – 2006 (p. 66 lines 1- 2), and it transpired that his claim to the effect that the terrorist had not participated in the training camp

SHATSKY – 006772-T
P1: 93**5**

Symbol [  ]

Case 1:18-cv-12355-MKV-DCF  Document 136-8  Filed 10/05/21  Page 52 of 93
Case 1:02-cv-02280-RJL  Document 253-3  Filed 12/05/13  Page 52 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

of the P.A. relied on **"we asked…. we clarified…."**, and he admitted that he had no personal knowledge of whether the terrorist had trained in the camp of the P.A. in Jericho or not (p. 66 lines 17 – 18).

Adv. Panon further confirmed that he had not personally visited the training camp in Jericho and had not personally examined the lists of the camp (p. 67 lines 12 – 13). In his own words "**I cannot go over and examine all of the lists**" (p, 68, line 14).

As to the terrorist's claim in his interrogation in Court according to which he was not accepted to the training camp in Jericho because of his young age, Adv. Panon confessed that he was not in possession of any confirmation from the Palestinian Security Apparatus in accordance with which people whose age was under 18 were not accepted into their ranks (p.69, lines 6- 8), and in answer to the question of the Court, where it would have been possible to see a list of the participants in a P.A. training camp in Jericho from April until June 2003, the witness surprisingly stated that "**in order for you to find this list, we would have to know where he trained, in which place in Jericho**" (p. 70 lines 28 – 29) and so it became clear that the P.A. ran a number of training camps in Jericho (p. 71, lines 1 – 2).

44.    In view of his total unfamiliarity with the subjects under discussion, the P.A. submitted an additional affidavit, of Juma'a Hassin Freg Hamdallah (hereinafter: **"Hamdallah"**) who is the Head of the Training Authority in the P.A.

One could have expected that Hamdallah would be the witness who could finally answer the question regarding the terrorist's training, but once again we were disappointed. It transpired that Hamdallah had lived in Gaza from September 96 and **until 2007 after the Hamas revolution**" (p. 520, line 6). In other words, on the relevant date – in 2003 – not only was he not the Head of the Training Authority, but he was staying in Gaza and ipso facto could not have reached the Jericho area.

It further emerged form Hamdallah's statements that until 2007 the Head of the Training Authority in the P.A. was **"Aluf Samia Nasser"** (p. 520 line 23), and hence, already now the inevitable conclusion is that the P.A,'s failure to bring the relevant person as a witness is a failure to be will he held against it, and originates in the P.As' desire to conceal the truth from the Court – the truth apparently not being convenient for the P.A.

In parenthesis it will be mentioned that the examination of the Hamdallah encountered difficulties due to his systematic refusal to give direct answers to clear questions, and his attempt to avoid giving an answer (p. 522, lines 31 – 32)

SHATSKY – 006773-T
P1: 93**6**

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 54 of 93
Case 9:02-cv-02280-R-JC   Document 136-8   Filed 12/5/   Page 59 of 109
## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

In his examination Hamdallah admitted that between the years 2000 – 2005 the P.A's training camps **"were only in Jericho"** (p. 525 line 30), however, he claimed that the training camps did not operate between the years 2002 – 2004 due to the Israeli attacks, including within the framework of the Defensive Shield Operation (p. 526, lines 22- 25, p. 527, lines 16- 19), but he was forced to admit, with obvious reluctance, that the I.D.F. did not enter the training camps in the framework of Defensive Shield, **"but it was in close proximity, at the road block"** (p. 527).

Later on in Hamdallah's examination it transpired that between the years 2002-2004 he was not even in the Judea- Samaria area, but rather in Gaza and from his testimony it emerged that during these  years, which are relevant for our purposes, he did have a telephone connection to the security apparatuses in Jericho (p. 529 lines 11-12) and his claim was that he knew that during the relevant years the courses were not conducted, because he did not give the telephone approval for the conduct of a course, and during these years he was not asked to confirm the conduct of such a course (p. 530).

45.     Summing up the testimonies of Panon and Hamdallah, there is no escaping the conclusion that both of them are testimonies the vast majority of which is hearsay, in terms of absence of personal knowledge.  To be more precise: I cannot accept the testimony of Hamdallah, according to which no training camps were operated in Jericho between the years 2002 – 2004.

First and foremost, Hamdallah admitted that he was not physically present in Jericho during those years, and as such all of the information he had is nothing other than hearsay because being absent from Jericho he had no way of really knowing whether or not the training camps took place.  Furthermore, if indeed a decision was taken not to conduct training camps or courses between the years 2002 – 2004, because of the fear of an Israeli attack, then it is almost certain that there would be documentation to that effect, but documents of this kind were not produced and most importantly, the Defensive Shield Operation took place between the months 3/02 – 5/02 (a fact to which the P.A. attorney agreed, see section 71 of his summation). Accordingly, no weight at all attaches to Hamdallah's claim to the effect that there was fear of moving around in the roads during those years, ostensibly because of the Defensive Shield operation.

If I supplement this with the authentic testimony of the terrorist in t/1, then there can be no doubt that the terrorist participated in a training camp in Jericho on behalf of the Palestinian Authority, and all of the P.A's efforts to conceal the existence of the training camp in Jericho at that time, and the terrorist's participation in them – have failed. **I therefore determine that the terrorist was trained in the Palestinian Authority in a training camp in Jericho, for 50 days and I also determine that he completed his training about ten days before the commission of the murder.**

46.     This is the place to point out that the P.A attorney made an effort, in all of the summation that he submitted, to "explain" various statements made by his witnesses.  However, these **"explanations"** are not  actually testimony,

SHATSKY – 006774-T

P1: 93**7**

Symbol [    ]

Case 1:18-cv-12355-MKV-DCF    Document 253-6    Filed 10/05/21    Page 55 of 93
Case 1:02-cv-02280-RJL    Document 251-36-8    Filed 10/05/21    Page 54 of 109

## Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

the proper place for which is in affidavits, or during the course of hearing the evidence, and not as part of the summation of the P.A. attorney (see for example, sections 71 and 73 of the summation and others).

47.  The P.A. attorney emphatically rejected the claim of the Plaintiff's attorney according to which the P.A. "**enlisted and trained the terrorist who murdered the Deceased**" (section 53A of the Amended Statement of Claim) and likewise the contents of section 53B of the Amended Statement of Claim, according to which "**the Defendant trained and guided the terrorist to kill Jews, as such, in cold blood and he claimed that the Plaintiff had not discharged the burden of proving that the terrorist was trained to kill Jews in courses or in training camps under the auspices of the Palestinian Authority**"

There can be no doubt that these statements in the statement of claim and the summation are somewhat blunt, but separating the wheat from the chaff, and presenting the facts as they are, without casuistry, there can be no doubt that there was a causal factual connection between the training of the terrorist by the Palestinian Authority and the murder committed shortly thereafter, immediately upon the completion of his "**studies**".

48.  This file is complex and exceptional from a legal standpoint, and the discussion of whether or not there was a factual and legal causal connection between the acts or omissions of the P.A and the commission of the murder is not a regular legal deliberation. It involves a complex fabric of facts, which when combined together creates a complete creation which assists me in resolving the question of the causal connection.

49.  In order to establish iron clad findings regarding the existence or absence of a causal connection, one must first review the general public atmosphere among the Palestinian populace during the period that preceded the murder of the Deceased. An understanding of the atmosphere will assist us in out attempt to understand what caused a youth of 15.5 to kill a Jew, just because he was a Jew (see t/19, and will also clarify that the words of the Plaintiff's attorney in the statement of claim, according to which the P.L.O "**enlisted and trained the terrorist, who murdered the Deceased**" are not only not without basis, but were actually proved at the level of probability required in a civil trial.

Regarding the additional statement of the Plaintiff's attorney, according to which the P.A. trained the terrorist to kill Jews – this is conclusion based on probability, which in my humble opinion was proven at the level of probability required in a civil trial, and I will clarify myself.

The conclusions regarding the atmosphere in the Palestinian streets just before the murder can be derived from the testimonies of Brigadier General (Res) Kuperwasser (hereinafter "**Kuperwasser**" and Dr. Menachem Klein

SHATSKY – 006775-T
P1: 93**8**

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 56 of 93
Case 1:02-cv-02280-RJL   Document 253-3   Filed 10/5/12   Page 55 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Before I discuss these testimonies, the standing of the civil servant certificate, filed by Kuperwasser, must be clarified.

The P.A. attorney correctly claimed that the document filed by Kuperwasser does not constitute a **"certificate by public servant"** as defined in section 23 of the Evidence Ordinance, which states". **The certificate  by the public servant shall be signed by the public servant who made the record or did the act or received the information recorded, and if he is no longer in the service in question, by the person in charge of the unit in which he was employed".**

 From Kuperwasser's testimony we learn that from July 2001 and until June 2006 he served as the Head of Research in Army Intelligence, and that in that capacity he was familiar with and actually read all of the documents captured by the I.D.F. in the framework of Defensive Shield, and was even involved in writing the surveys that were attached to the certificate of the public servant and supervised their drafting.  On the other hand, he no longer served as the head of Research in Army Intelligence, but today too he serves in the public position of the Director General of the Office for Strategic Matters (p. 312, line 21). On the other hand, there can be no doubt that the certificate of a public servant (t/9) was not filed by him in his capacity as the Director General of the Office for Strategic Matters, and as such, in accordance with section 23 of the Evidence Ordinance, he is not a **"public servant"** by way of whom a **"certificate of a public servant",** can be filed.

In view of the above, in the course of the hearing I made it clear that t/9 would be treated as an expert opinion and not as a certificate of a public servant (p. 325, line 25) and I also allowed the P.A. to submit an opposing opinion, and it submitted an opposing opinion, written by Dr. Menachem Klein, in response to the opinion of Kuperwasser.

It emerges from the above that the document submitted by Kuperwasser is an expert opinion, a fact that was also accepted, as stated by the P.A, who submitted an opposing expert opinion.

In view of my ruling that t/9 will be treated as an expert opinion, that was submitted on behalf of the Plaintiffs, all of the evidential rules for examining an expert opinion will apply to t/9 and to the testimony of Kuperwasser, who is an expert on the Plaintiff's behalf, just as Dr. Klein is the opposing expert on behalf of Defendants 7 and 8.

Furthermore, the P.A. attorney claims that the 4 surveys that were attached to t/9 are nothing other than hearsay, and that they cannot verify the truth of their contents, as opposed to their existence per se.  However, I do not accept this position, and I will clarify my position below.

SHATSKY – 006776-T
P1: 939

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 57 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 12/05/12   Page 56 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

T/9 and the testimony of Kuperwasser are based on the documents captured by the I.D.F. in the framework of the Defensive Shield operation, and the authenticity of which is beyond doubt, as also admitted by Dr. Klein in his examination (p. 702) (and despite the attempt of the P.A. attorney to dispute the same, p. 332). The surveys that were attached to t/9 are surveys that were conducted by people of the Research Unit of the Intelligence Branch during the relevant years, and they are based on the contents of the documents seized, and which were translated into Hebrew.

It is not disputed that during the period in which the documents were seized, translated, and in reliance on which surveys were written, that Kuperwasser was the Head of Research in the Intelligence Branch and was in charge of studying the documents and deriving the conclusions from them, both for military and political purposes. To be precise: Kuperwasser made it clear in his testimony that the surveys attached to t/9 were based both on the documents seized in the course of the Defensive Shield operation, and the **"documents that were also seized in other occasions"** (p. 313 lines 26- 27) and in respect of which, as mentioned, there is no dispute as to their authenticity.

Kuperwasser testified that he is personally familiar with the documents (p. 313, lines 28 – 30) because after the capture of the documents, they were physically brought to him, and he read them (p. 314, lines 2 -4). Kuperwasser further testified that he was involved in the writing of the surveys attached to t/9 **"not on the level of writing"** but rather **"on the level of supervision"** (p. 314, lines 16-21). He also confirmed that **""Yes. Everything that goes out of the Research Division is confirmed by me as the Head of the Research Division"** (p. 314 line 27) and that he was personally familiar with the documents (p. 316 line 14).

Kuperwasser was questioned regarding the issue of the role of the Research Division in the Intelligence Branch and he made it clear that **[M]y central role, and the central role of the Research Division was to warn about and to prevent acts that harm the security of the State of Israel and its citizens….** (p. 317 lines 26 – 28)

In the cross examination of Kuperwasser by the P.A. Attorney, a great effort was made to prove the existence of a personal, biased position of Kuperwasser regarding the interpretation of the documents seized, a point that was also raised in the P.A. summaries.

Kuperwasser testified that based on the documents captured **"many additional surveys were written"** (p. 321 line 9) in addition to the four surveys that were added to t/9 and he clarified that he was not a partner to the decision of which surveys to attach to t/9 and which ones not.

In his examination Kuperwasser confirmed that none of the documents captured refers specifically to the event forming the subject of the statement of claim (p.322 lines 5-6). He also confirmed that he did not personally translate the documents into Hebrew,

SHATSKY – 006777-T
P1: 940

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 58 of 93
Case 1:02-cv-02280-RJD   Document 253   Filed 2/03/12   Page 32 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

and his involvement in the writing of the surveys was at the supervisory level (p. 323), which is clear, because at the relevant times he served as the head of the Research Division, in the Intelligence Branch, and in doing his work he was assisted by a team of additional people.

The P.A. attorney made his very best attempt to prove via the examination of Kuperwasser that there were disputes between the various personnel serving in the Research Division of the Intelligence Branch, with respect to the interpretation of these documents, and that the position presented in the surveys that were attached to t/9 is not the official position of the Intelligence Branch. He failed in these efforts; my impression, based on the reliable testimony of Kuperwasser, is that the attached surveys represent the official position of the Research Division of the Intelligence Branch, and what's more, Kuperwasser testified unequivocally that the position presented in the surveys was not minority position that was "**adopted**" (p. 325 lines1-2).

Regarding this matter it is clarified that it was not proved that there were conflicting views over the meaning that should be given to the documents seized, but I am certainly prepared to accept the view that there were different views. This is as it should be, because the very raising of different views indicates freedom of thought and the brain storming processes and this is precisely their job.  Indeed, even if the position presented in the surveys was a **"minority opinion that was adopted"** (in the words of the P.A attorney (p.325 line 1), the conclusion is that this is the final interpretation that was given to the documents captured and this is how they were treated by the position holders, who were required to reach decisions on the basis thereof.

In the opposing expert opinion of Dr. Klein, he strongly disputed these statements of Kuperwasser in his examination, and claimed that the surveys attached to t/9 were "**a subjective, biased interpretation, directed by higher authorities or for the higher authorities, and they are comparable to a person who shoots an arrow and then circles the goal"** (section 18 of expert opinion).     Dr. Klein agrees that the position expressed in the surveys attached to t/9 is the official position of the Intelligence Branch, but he claims that this position was not based exclusively on the raw material that was placed before the Research Division (the documents captured), and at all events is not based on "**the intelligence material in its entirety that was in the hands of the Division at that time**"  (section 19 of expert opinion).

Dr. Klein actually went far further, in his determination that "**[T]he Research Division failed when issuing these surveys…. as indicated by the documents captured, these were specific documents that relate to specific acts in a particular time and place, and do not attest to the overall strategic network. The surveys chose to relate to a few captured documents only and not to the other documents, which raises the question of whether the other**

SHATSKY – 006778-T
P1: 941

Symbol [    ]
Case 1:18-cv-12355-MKV-DCF  Document 135-8  Filed 10/05/21  Page 59 of 93
Case 1:02-cv-02280-RJC  Document 253  Filed 12/05/13  Page 58 of 109

### Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

captured documents were consistent with the conclusion that the writers of the surveys wished to reach …."(section 21 of expert opinion).

On the face of it, these comments are resoundingly correct, but actually they have no basis, and I will explain.

From Dr. Klein's comments we learn that he served in the Research Division of the Intelligence Branch during the 90's (p. 690), under the command of the commander at that time Dr. Ephraim Levi, who according to the expert opinion was Dr. Klein's teacher and mentor, because from reading Dr. Klein's opinion, it emerges that in its entirety it is based on articles written by Dr. Lavi and others. The question which therefore arises is why the expert opinion filed was that of Dr. Klein and not of Dr. Lavi, whose writings and statements are the basis of the statements and the determinations of Dr Klein in his expert opinion, which is nothing more than a summary of the conversations conducted by Dr. Klein with Dr. Lavi (section 2 of the expert opinion) and a summary of the articles published on that subject. To be precise: I am skeptical as to whether one can treat Dr. Klein's expert opinion as an "**expert opinion**" because it does not contain pertinent determinations that stem from his expertise in the subject, but is rather a collection of statements and opinions of others, and as such lacks any evidential value.

In terms of the substance of the **"expert opinion"**, in his examination Dr. Klein admitted that he was not an expert on terror, but rather on the Palestinian issue **"not terror in its operative sense"** (p. 691 line  31).

Dr. Klein explained that his expert opinion contains two sections. The first section is entirely **"hearsay", "what I heard from Colonel (Res) Dr. Ephraim Lavi and the second part, which is the conclusions that I arrived at based on my academic research** (p. 696  lines 28 – 30) and further on he again confirmed that his entire expert opinion is based on things said by Dr. Lavi  (p. 700 lines 7- 13), and the conclusion is that the opinions brought in this expert opinion, are actually the opinions of Dr. Lavi (who was not brought to testify) which were endorsed in full by Dr. Klein.

Dr. Klein confirmed that his determination in the expert opinion from which it emerges that that the Research Division in the Intelligence Branch engaged in a public relations campaign, as part of which these surveys were written with the purpose of making them suited to the public relations campaign of the Israeli government, was based **"on the statements of Dr. Lavi"** (p. 703  line 5).

Dr. Klein further claimed in his expert opinion that the opinions that received expression in the surveys attached to t/9 were not based on all of the documents that were captured, but on a part of them only, however it subsequently transpired that these statements were totally without foundations, being smears that were never proved, because Dr. Klein confirmed that his statements

SHATSKY – 006779-T
P1: 942

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 60 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 12/05/12   Page 59 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

were based on the statements of Dr. Lavi and in his own words **"this was said by Ephraim Lavi and I am quoting from the things he wrote in the journal of the Intelligence Corps, in** the Israeli Military Intelligence Heritage **Journal** (p. 704 lines 26-27).

It may be reasonably concluded that if Dr. Klein had thought that the surveys were based on those documents that were captured upon which it was **"convenient"** for the Research Division in the Intelligence Branch to rely, then he would have taken the trouble to verify his view, or the view of Dr. Lavi regarding the existence of additional captured documents, that were not mentioned in the surveys, and the contents of which could have changed the conclusions cited in the surveys attached to t/9. However, in the course of Dr. Klein's examination it emerged that he did not see those intelligence documents himself (p. 704 lines 28-29), and once again he clarified that he was relying on the opinions of Dr. Lavi (p. 704 lines 30-31), and that **"it could be"** (p. 705 lines 16-18) that in the surveys that were attached to t/9 it does not say that there were additional captured documents.

In view of the dispute that Dr. Klein attempted to provoke concerning the existence or non-existence of additional captured documents "**that were concealed"** at the time of writing the relevant surveys, it would have been only natural for Dr. Klein to attempt to see the captured documents himself, and to see for himself whether there were additional documents. However, from his examination it emerges that he made no request to see the captured documents **"because I do not investigate the operative acts and the history of the Intifada on the very specific level of campaigns"** (p. 705 lines 24-29), and he clarified that he had not found it necessary to personally examine documents because **"I relied on the statements and the experience of Dr. Lavi"** (p. 706 lines 4 - 6), and in the continuation it emerged that neither had he talked to any of the other writers mentioned in his expert opinion, and that he sufficed with quoting what was said (p. 708), and as I mentioned, the expert opinion of Dr. Klein is no more than hearsay based on the opinions of others, who were not brought to testify, and it therefore lacks any evidentiary value.

In parenthesis I will note that in view of Dr. Klein's comments in his expert opinion regarding the underlying conception of the surveys that were attached to t/9, and that they reflected the subjective interpretation of the authors of the surveys (ss. 17, 18 of the expert opinion), it would have been only natural for Dr. Klein to interpret the documents in the manner that he felt was correct. Nonetheless, apart from ruling out the interpretation given to the captured documents in the framework of those surveys, Dr. Klein did not enlighten us regarding what he viewed as being the correct interpretation of those documents. Perhaps this was because he never actually bothered to read them, and perhaps because they do not admit of any other interpretation, or for any other reason.

When Dr. Klein was asked in his examination why he did not see fit to give another interpretation to the said documents, if he felt that this was the correct way of interpreting them, he replied "**At this stage I am not writing another interpretation or expert opinion. I am relating to the documents as they are. I am not writing my**

SHATSKY – 006780-T
P1: 943

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 61 of 93
Case 1:02-cv-02280-RJC-F   Document 13-5   Filed 2/13   Page 60 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

**my opposing-thesis here"** (p. 713   lines 25-26).   It seems to me that these comments speak for themselves and do not require any further interpretation.

50.    In view of all the above, I determine that no evidentiary – legal value is to be attached to the expert opinion of Dr. Klein, and I hereby endorse the expert opinion and the testimony of Kuperwasser, who impressed me with his knowledge and his professionalism.

51.    The uniqueness of the expert opinion filed submitted by Kuperwasser is due to its being founded upon the documents attached to it, the captured documents, the authenticity of which is not disputed.

The P.A failed in its attempt to minimize the conclusions stemming from the documents captured. From the documents captured it emerges that in the course of the Second Intifada, the various organizations joined hands in their efforts to perpetrate attacks against Israel and against Israelis, and it was proven beyond all doubt that they did this under the direct command and supervision of the head of the P.A. - Yasser Arafat. – who guided them and ensured the funding for their activities, including the approval of money for the attackers and their families, and specifying the sums to be given to them.

The depth of Arafat's involvement in the activity of the organizations is clearly evidenced in the documents that were attached and this is clearly attested to by the numerous requests to "**the brother, the President Abu Amar, May God Preserve him"** , letters concerning the enlisting and funding of activists, including the expression of thanks for the payments of money following the requests of organizations, and see, e.g. Document No. 1 (p. 17 of t/8) in which Arafat is requested to allot financial assistance to the commander of the Tanzim in Tul – Karem, as well as to the "brother" – the terrorist Ziad Muhamad Daas, who, according to this document planned the "acts of killing in the Bat Mitzvah ceremony in Hadera"

The conclusion, and without being too elaborate on this matter,  is that examination of the documents attached to the surveys, as well as the surveys themselves, lead to one, single conclusion, which is that the activities of the various organizations – including the Tanzim and the Al-Aqsa Brigades were all conducted under the orchestration and the funding of the P.A. and in view of which, even were I to accept the current version of the terrorist, that he had carried out the attack on behalf of the Al-Aqsa Brigades, it would not alter the basic liability of the P.A, given its being a full partner to what went on in the Al-Aqsa Brigades, as evidenced by the documents captured.  To be even more precise: I do not accept that version, and I hereby determine unequivocally that the murderous terrorist was trained in weaponry by the Palestinian Authority

SHATSKY – 006781-T
P1: 944

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 62 of 93
Case 9-02-cv-02280-KJD-CF   Document 253-3   Filed 10/9/12   Page 61 of 109

### Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

52.  Another dispute between the Plaintiffs and the P.A. concerned the evidentiary value of the report of the former Minister Danny Naveh (hereinafter – "**Naveh Report"**).

The Plaintiffs requested to bring Mr. Danny Naveh to testify, and as a means for the submission of the Report (t/8), but I thought that inasmuch as this report too was based on the same authentic captured documents, that were attached to t/9 there was no need to put him to the trouble. And so, with the agreement of the P.A. attorney, the report was submitted and marked as t/8, and it was made clear that the parties would be entitled to plead in their summation regarding its evidentiary value, as opposed to its admissibility.

The claims of the P.A. attorney in his summation, according to which the Naveh Report was left in the court file as an "exhibit" (section 130 of the summation) are not correct. Examination of the protocol of the proceedings indicates that the P.A. attorney did not object to its submission and the marking of the Report as evidence, and indeed the Report was submitted as evidence and marked t/8.

As to the evidentiary value of the Report, - Kuperwasser testifies that this Report was written by the **"team of Danny Naveh"** (p. 316 line 3). But he confirmed that he had read it and concurred with its contents, which were based on the same captured documents which Kuperwasser himself had related to.  As such, notwithstanding that Danny Naveh did not testify before me, I determine that in view of the Naveh Report's reliance on  the captured documents, it is valid evidence and of high probative value. And for our purposes, it is of special significance, as clarified below.  Moreover, the P.A. attorney did not indicate any contradictions between the contents of the Report and the contents of the captured documents.

53.  We will now return to the question of the causal connection, and we will examine it from the perspective of the period during which the attack was committed.

Our concern is with a terrorist, 15.5 years old, who wanted to be a Palestinian soldier (p. 16 line 129). The question arises: What prompts a 15.5 year old youth to want to be a soldier, and even more gravely – how did the P.A agree to train him, despite his youth.

From the statement of the terrorist (t/19) it emerges that he lived in a **"small villager called Almaksor** (folder 1 line 19). It further emerges from t/1 that apparently he dropped out of the education system, because in answer to the question "**what do you do?"** he answered "**work in agriculture  with my father and plant vegetables with my father in Dir Almaksor"** (folder 1 lines 19 – 20). It further emerges from t/1 that the terrorist is a first born son to a family with another seven children (folder 1 line 25).

SHATSKY – 006782-T
P1: 945

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 63 of 93
Case 9:02-cv-02280-K-JCF   Document 253   Filed 2/03/12   Page 62 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

I have no information concerning the economic position of the family, which was a large family of ten people. It is clear however that the income from agricultural work in Dir Almaksor was not sufficient to support the family because **"my father works in the harvesting of fruit in Kibbutz Ogen"** ( folder 1 lines 25- 26)

The picture emerging from the terrorist's statement is one of a young lad who dropped out of the educational framework, a first born son of a family with many children, the financial position of which was probably not good. Against this background one can easily understand his fantasies of being a solider. In other words, he probably wanted to leave his family and its travails.

As stated, this was the period of the Second Intifada, a time at which the leaders of the P.A. not only refrained from making every effort to prevent attacks, but actually encouraged them, as is clearly indicated by the documents captured and the surveys written in reliance on them (t/9).  The youth was sucked into this vacuum and in view of his young age, it is not clear how much discretion he exercised, if at all, and quite possibly he exercised discretion and chose the tempting option of joining the ranks of the security apparatus of the P.A.

As I noted, due to the P.A.'s effort to distance itself from its consent to train a terrorist who is a minor, in the training camp that it ran in Jericho, and further to my unequivocal determination that the terrorist participated in the training camp in Jericho for a period of 50 days, under the tutelage of the P.A. just as he admitted in his statement t/1 - the details pertaining to the training of the terrorist just before he committed the murder were hidden from the Court.

The P.A's agreement to train minors **"in physical and weapon training"** (t/19) also emerges clearly from the captured documents, for in the past too the P.A had already used minors for purposes of carrying out attacks against Israeli targets, and after then, as indicated by the captured documents – it financed them, or their families, both in cases in which the minors enlisted died as a result of their actions, and in cases in which they were captured and imprisoned in Israeli prisons.

By way of example, the incident of Jamal Hamid, a youth aged 16 from Bethlehem, who was recruited by Fatah, despite his young age, and perhaps due to his young age, and who blew himself up on March 31, 2002 in the settlement of Efrat. In this attack, 6 Israelis were injured.

By way of example, in the case of the young girl, Shirin Rabua, - 15 years old – who was detained for investigation upon the I.D.F's entry into Bethlehem, and she confessed that her uncle, a local Tanzim activist, had recruited her to carry out a suicide attack in the area of Israel (to be precise: from the documents captured it emerges unequivocally that there was full cooperation

SHATSKY – 006783-T
P1: 946

Symbol [    ]

Case 1:18-cv-12355-MKV-DCF  Document 136-8  Filed 10/05/21  Page 64 of 93
Case 1:02-cv-02280-RJL  Document 253  Filed 12/03/13  Page 63 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

between the P.A. headed by Yasser Arafat, and other organizations, including the Tanzim, the Al-Aqsa Brigades and others (Survey No. 688/0032, which deals with the institutionalization of the local militias by the P.L.O leadership, based on the captured documents, and the Danny Naveh Report t/8 p.4, which is likewise based on the captured documents).

Hence, for example, there was the case of the lad Anuar Hamad, 17 years old, from Rafiah, who was sent to carry out a suicide attack against a convoy of vehicles, which was conveying I.D.F. soldiers in the Gaza Strip. It transpired that the youth lacked any education, being totally illiterate, and before his recruitment into Fatah, was engaged in use and trade of drugs (see p. 42 of t/89).

This being the case it is easy to understand and to endorse Danny Naveh's conclusion that "**[I]t should be noted that the Palestinian Authority did not struggle against this phenomenon and consistently continues to ignore the fact that young Palestinian male and female teenagers have become a "self sacrifice" of the entire Palestinian society** (p. 42 of t/8).

54.    In the case before me it was not proved that the terrorist was sent to carry out the specific attack by the P.A. inter alia because of the difficulty in doing so in view of the systematic avoidance on the part of the P.A. in submitting relevant documents. Nevertheless, when the P.A. expressed its willingness to train a 15.5 years old adolescent in the use of weapons for a period of 50 days (!!), then it is clear that it encouraged him to apply the knowledge that he had acquired during his studies, and in view of the prevailing atmosphere at that time of fomenting hatred and incitement against Israel and against Jews (see t/8 p.9), it was natural in the eyes of the terrorist that he should implement the knowledge that he acquired in the training camp of the P.A. in the operation of weapons in the spirit of the period, in other words,  by way of murdering a Jew. To be precise, the captured documents indicate that there is no doubt regarding the ongoing activity of the P.A in the inculcation of the ideology that formed the basis of its strategic conception -  that terror is a legitimate means of achieving the Palestinian national objective. And there is no doubt that this ideology was gradually internalized by the youth, who viewed the realization of the ideology as a noble and desirable act, and what's more – the Authority made the effort to give them the practical knowledge in the use of weapons as a direct step resulting from that ideology.

This conclusion is a necessary conclusion, even from the perspective of common sense.  For why would the Palestinian Authority agree to train a youth of 15.5 years old, to impart knowledge to him in the using of weapons, if not to encourage him to use it? It is clear that the Authority did not do this so that the weapons would be used against his own people. And if this is the case, what as the purpose of giving the knowledge of using weapons to a youth of 15.5?  It would seem that the answer is obvious.

SHATSKY – 006784-T
P1: 947

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 65 of 93
Case 1:02-cv-02280-RJC Document 253 Filed 10/05/21 Page 64 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

55. In order to remove all doubt it is clarified that no proof was brought of the content that was imparted to the trainees in the P.A training camp in Jericho. As such I cannot determine with certainty that the terrorist was trained by the P.A. **"to generally murder and specifically Jews"** (s, 91 of the P.A. summation). However, when the P.A decided to train a 15.5 year old minor and to teach him the secrets of using weapons, in the atmosphere that prevailed in the P.A. at that time, having consideration for the Intifada on one hand and the Defensive Shield Operation on the other hand, then it is clear that even if the things were not said in so many words, that the general atmosphere encouraged the trainees of the camp to use the knowledge that they had acquired in the operation of arms, and given that it was clear that no one expected this use to be against Palestinians, then it doesn't require much imagination to reach the necessary conclusion  - the use of the weapons against Jews.

Furthermore, the time proximity between the terrorist's completion of "**his studies**" in the training camp and the commission of the murder (ten days) only fortifies the conclusion that the P.A.'s willingness to train a15.5 year old minor in the use of arms was for the purpose of a particular goal, a goal that was realized by the terrorist immediately after the completion of his training. That is to say: It was proven that there was a causal and legal connection between the training of the terrorist in the training camp of the P.A. in Jericho and the murder of the Deceased. To be precise, it cannot be forgotten that for obvious reasons the P.A. avoided giving any kind of information pertaining to the aforementioned training camp, including regarding its very existence, or the contents, and sufficed with a denial of its existence. On the other hand, the P.A. did not supply any explanation for the terrorist's motivation for his claims in his statement (t/1) in the Police, - statements which are supposedly not true, but on the other hand, the P.A.'s systematic failure to bring relevant witness for the testimony and the presentation of documents, which could have supported the alleged claim, lead to the conclusion that the terrorist's statements regarding his training by the Palestinian Authority in the training camp in Jericho are the truth, and as direct result of this training the murder forming the subject of this statement of claim was committed.

56. The P.A. attorney claimed in his summation that the Plaintiffs **"did not prove"** their claims regarding the training of the terrorist in the P.A framework and that he was incited to kill Jews.

As I clarified, in my view the Plaintiffs discharged the onus that they carried and in order to clarify my position, I will return to first principles regarding the proof of the balance of probabilities in a civil trial, and the comments of the author **Y.Kedmi** *On Evidence*, **p. 1548,** are appropriate, **where he clarifies**:

> **"What does "tilting the balance of probabilities mean? In terms of settled law this degree of proof means that in the view of the court, based on its position regarding the reliability of the evidence presented to it, their quantity, their sufficiency and their evidentiary weight to be attributed to them – <u>one version</u>**

SHATSKY – 006785-T
P1: 948

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 131-8   Filed 10/05/21   Page 66 of 93
Case 9:02-cv-02280-KJD   Document 253-3   Filed 12/05/12   Page 65 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

(regarding a matter which is disputed) **is more probable and more reasonable than the opposing version.**

**In a graphic manner, it is usually said that "there is only a need to discharge the burden of proof above 50%. This means that for the party bearing the burden of proof, it suffices if his version convinces the court to the degree of 51% out of 100%, which expresses absolute certainty, in order to fulfill his obligation. It is irrelevant if there is another 49% of "uncertainty" (see CA 6283/97 Alexandrov v. State of Israel, 52 (3) P.D. 254; C.A. 1892/95 Muhamad Kassam Abu Saada v. Prison Service – State of Israel, 51 (2) 704.**

Regarding the distinction between the burden of persuasion and the burden of bringing evidence, it was held:

**"The onus of persuasion is a substantive, evidentiary onus which is part of the law of evidence. This onus is the central onus imposed on the litigant required to proof the facts upon which his claims are based. Failure to discharge this onus means the dismissal of the claim of the person bearing the onus. "The onus of bringing proof" is a procedural onus, which is part of the laws of procedure. This is the onus imposed on a litigant to bring evidence that enables him to discharge the "onus of persuasion" if he bears this onus, or in order to remove the basis and evidence for his rival's claims. This onus is a secondary one and it exists primarily in service of the principal onus**
LCA 3646/98 C.**I.A. Construction Ltd v. Director of Value Added Tax**, 57 (4) 891, p. 897 (see also Y.Kedmi *On Evidence* (5760-2003, pp. 1505- 1508)**.**

**The determination of which of the litigants bears the onus of persuasion is made on the basis of two basic rules: The first is that "he who takes from his friend bears the burden of proof"; it may be plaintiff or the defendant, as the case may be. The second one is that "the laws of evidence follow the substantive law" – both regarding the proof of the foundations of the torts/the defense and the refutation of presumptions"**
(Y.Kedmi *On Evidence* (5760-2003, p 1508)**.**

SHATSKY – 006786-T
P1: 949

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Regarding the principle "he who takes from his friend bears the burden of proof", it was held in CA 357/72 **Shansi Aziz v. Surioa Batzlzioni,** P.M 27(1) 741 , p. 744"

> **"This burden of persuasion stems from the basic principle in the law of evidence, which is that the litigant in a civil suit, making a claim that is important for his legal position, bears the burden of persuasion to prove the facts that are required to substantiate his claim**
>
> (see also Y.Kedmi *On Evidence* (5760-2003, p 1508);  E. Harnon, *Law of Evidence,* Academic Print, Vol. 1, 5730, 200; C.A. 210/88 **The Company for Distribution of Local Produce Ltd v. Local Committee for Planning and Building, Kfar Saba,** 46 (4) P.D. 627).

(In CA 642/61 **Tefer v. Mackla** (16 P.D. 1000) Justice Sussman clarified:

> **"A plaintiff bringing his case to court seeks to gain an advantage or benefit that is prescribed in his favor in a particular law, which is part of the substantive law. This result, the right to which the plaintiff claims that he is entitled, is conditional upon the existence of the facts that give rise to the said right ('the grounds of claim").**
> **By the same token, the defendant seeking to exempt himself, and to do so relies on another law that releases him from the liability that arose. Whether or not the exempting law applies in the defendant's favor will be conditional upon whether other facts were proven (the grounds of defense).**

Regarding the rule according to which **"the laws of evidence follow the substantive law",** it was held:

> **"Everything depends upon the substantive law, for the laws of evidence follow in its steps.  Occasionally the substantive law makes the right claimed by the plaintiff dependent upon  the non-occurrence of a abrogating act, and if such an act occurred, then the plaintiff bears the burden of proving that the event did not take place, even if it is an abrogating fact with respect to another right**
>
> C.A. 210/88 **The Company for Distribution of Local Produce Ltd v. Local Committee for Planning and Building, Kfar Saba,** 46 (4) P.D. 643).see also Y.Kedmi  *On Evidence* (5760-2003, pp 1516-1537).

SHATSKY – 006787-T

P1: 950

Symbol [  ]
Case 1:18-cv-12355-MKV-DCF Document 253-8 Filed 10/05/21 Page 68 of 93
Case 1:02-cv-02280-RJL Document 136-8 Filed 10/05/21 Page 67 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

And regarding the discharging or failure to discharge onus of persuasion:

> **"The question of whether a litigant discharged the burden of persuasion that he bears is examined at the end of the hearing. The courts gives its answer to this question in accordance with the entirety of evidence presented to it, and it makes no difference which litigant brought, and based on the reliability of this evidence and the determination of their evidentiary weight"**
> (Y.Kedmi *On Evidence* (5760-2003) p.1537.

> **"And needless to say, the particular importance of determining the onus of persuasion lies in this: if at the end of the trial the court considers that the proofs of both parties are identical, then the court will rule against the party that bears the onus of persuasion"**

> F.H. **4/69 Newman et al v. Cohen et al** 24 (2) P.D. 229; CA **8383/09 Local Council Sagiour v. Sonul Israel Ltd** (published in Nevo, on 24.1.11)
> '

57. And for our purposes, the Plaintiffs presented more than enough evidence to prove the causal and circumstantial, factual and legal connection between the conduct of the P.A. both in act and omission and the carrying out of the attack by the terrorist. To be precise: I am not making a factual determination that it was proved that the P.A. initiated the specific attack on a practical level. My determination is that the willingness of the P.A. to teach a 15.5 year old youth how to use weapons, against the background of the period during which it did so, gave rise to the understanding on the part of the terrorist youth that he was expected to perform an act and to realize his knowledge in the area of operating weapons. The terrorist translated this understanding into action, and carried out what was expected of him, just as he had learned in the P.A. training camp. In other words, even if it was not positively proved that the P.A. information imparted to the trainees in its camps included clear instructions to carry out attacks against Israeli targets, the very existence of the camps and the involvement of young adolescents in studying the operation of weapons, is tantamount to giving actual instructions to carry out attacks of this kind.

To be precise, the P.A. did not discharge the secondary burden imposed upon it, and did not produce documentation or testimonies regarding what went on in its training camps, and more precisely, it did not produce evidence that would lead to different conclusions.

SHATSKY – 006788-T
P1: 951

Symbol [ ]
Case 1:18-cv-12355-MKV-DCF Document 135-8 Filed 10/05/21 Page 69 of 93
Case 1:02-cv-02280-RJL Document 253 Filed 2/05/21 Page 68 of 09

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

In addition, the P.A. "closed its eyes" to the possibility that the trainee, which it had trained, despite his young age, would apply the knowledge that the Authority had troubled to supply him with and would carry out a terrorist attack against a Jew. And, in general, the P.A. did not prove, nor did it attempt to prove what lay behind its agreement to give weapons training to a 15.5 year old youth, including its intended goal in imparting this knowledge to a 15.5 year old youth.

This conduct on the part of the P.A. leads to the conclusion that in its decision to train a 15.5 year old youth and to teach him how to use arms, understanding the danger involved therein, and as a result, that it agreed to the realization of the danger, just as it actually transpired.

The P.A. did not discharge the secondary onus imposed upon it to remove the basis of the Plaintiffs' evidence and in terms of the balance of probability, I am convinced that the Plaintiffs' version **is more probable and more reasonable than the opposing version. (**Kedmi, ibid.)

Here it will be clarified that it was already held (**CA 10078/03**) **Uri Shatil et al v. State of Israel,** (published in Nevo) that there is no rule in principle in evidentiary law that establishes or negates responsibility, and the determination regarding the existence or absence of a concrete duty of care is based on the basis of the concrete circumstances of each case. And, as I have clarified, in the case before me, in the concrete circumstances, the P.A.'s responsibility for the attack has been proved, and its encouragement and support for acts of terror has also been proved, by action and by omission. **To be precise: There is no escaping the conclusion that the commission of the murder by the terrorist, is nothing other than the materialization of the danger created by the P.A. when it trained a 15.5 year old youth to fire a weapon,** and the P.A.s' responsibility for the tortuous event and its consequences is principal and determinative because had it refrained from training the terrorist in the use of weapons it is almost certain that the event would have been avoided.

There can be no doubt that when the P.A. chose to train the youth in the use of weapons, it could and should have expected the occurrence of the damage, in other words, the use that the youth would make of his new talents.

58. As I noted, the P.A. attorney made unrelenting efforts to drag the Court into political statements and to divert the focus of the hearing concerning the existence or absence of negligence on the part of the P.A. to questions of a foreign sovereign and a foreign legal entity, and it continued this in the framework of its summation, when it reached the far-reaching conclusion that if "**sweeping responsibility is imposed on the Defendant for acts of violence that occurred in the course of the Intifada…. it will necessarily be accompanied by a political statement on the part of the State of Israel; such a statement will have a direct and immediate affect on the future of the political process specifically and specifically on the relations between the nations**" (s. 147 of the Defendant's summation)

SHATSKY – 006789-T
P1: 952

Symbol [    ]

Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 70 of 93
Case 9:02-cv-02280-KJD-CF Document 253 Filed 2/3/12 Page 69 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

By implication, the P.A further claims that the attack has its origin in **"a dispute between nations…"**(s. 27 of the terrorists) – a  miserable statement, which is particularly disturbing. Is the training of a 15.5 year old youth to use weapons a result of the dispute between nations? Is the attack and murder of the Deceased an anticipated result of the dispute between nations? Does the existence of a dispute between nations legitimate the commission of this kind of murder?  Is that position of the P.A?. And if so, for what purpose is this court required to hear evidence regarding the P.A's responsibility for the commission of murder??

The P.A. attorney repeated this claim in s. 148 of his summation, where he said: "**the fact that the event forming the subject of the claim is an inseparable part of the dispute between the two nations Israeli and Palestinian, constitutes a policy consideration on the highest level which should prevent the determination of a duty of care in this case".** I read, and I was astonished.  If this is not a litigant's admission of the P.A.'s responsibility for the murder, then it is not clear what constitutes the admission of a litigant.

This matter will be made entirely clear. I am giving this decision as a judge in the Tel-Aviv District Court. My decision is given after hearing evidence and is based in its entirety on the settled law as practiced in the State of Israel

As a judge I have no interest in interfering in political matters and I am not doing so. This decision is the legal result of a legal proceeding that was conducted by law before me, no more and no less. The attempt of the P.A. attorney to characterize my determinations as an "**immediate and direct"** blow to **"the future of the political process specifically and specifically on the relations between the nations"** is nothing more than attempt to intimidate the Court, an attempt to dissuade it from giving a decision against the Palestinian Authority, and I am greatly distressed by this attempt and by these utterances.

59.    Before I complete this part of the judgment, which establishes the legally required causal connection between the conduct of the P.A. in action and omission, to the commission of the murder forming the subject of the statement of claim, I will address a number of additional subjects which were raised by the P.A. attorney in his summation.
Regarding the claim of non-justiciability, given that the matter *a priori* concerns political matter, I do not  attribute any significance to this claim, and its entire purpose is to drag the court into discussions of political matters, which neither the role,  nor within the competence of the Court.

Over and above what is required, I will note, that as I determined, the grounds of the claim against the P.A. is the Torts Ordinance, by virtue of its being a legal entity, which can be sued, in accordance with its own declarations.

68 of 90

SHATSKY – 006790-T
P1: 953

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 536-8   Filed 10/05/21   Page 71 of 93
Case 1:02-cv-02280-RJCF   Document 253   Filed 2/13/12   Page 70 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Regarding the standing of military judgments, I am not required to rule on this matter because at all events, in this judgment I have not relied on those judgments.

Regarding the claim that the surveys (t/9) do not relate to the event forming the subject of the statement of claim – the P.A. attorney is without a doubt correct on this point. However, the surveys were intended to describe the background, and atmosphere and feelings in the P.A. and in the Palestinian street. This background is essential for an understanding of the situation that lead to the attack forming the subject of this file.

The claim regarding the non-enactment of laws in the P.A. following the agreements signed with Israel – this claim too is justified on the part of the P.A. However, given that in this judgment I did not attribute any value to the question of their enactment or non-enactment, I will not address the claim at all.

The claim that no proof was brought for the dissemination of flyers, propaganda broadcasts, and the distribution of books – this claim is partially correct, because in the framework of the documents captured that were presented before this court, there were flyers.

Regarding the propaganda broadcasts - no attempt was made in this file to prove them.

I have no information regarding the distribution of books and the claim was not proved.

Regarding the breach of a statutory duty with reference to the  Crime of Genocide (Prevention and Punishment) Law, 5710-1950 -  s. 1 of the law defines the term "**genocide**" for purposes of the law, and it includes five alternatives for its application, and for purposes of its application there is a need to prove that someone did a particular act "**with intent to destroy, in whole or in part, a national, ethnical, racial or religious group…**" (s. 1 of the law). Intent must be proven by way of evidence, which did not occur in the case before me.

Furthermore, I do not think that this law was intended for use in the framework of the civil law, but rather, in the criminal law. I learn this from the use of the term "**crime**" – a definition taken from the criminal law, and from the declared purpose of the law – punishment of the criminal. The civil law is not concerned with punishment and the laws of torts are intended to compensate for damages caused by a wrong, and under no circumstance are they intended to punish the wrongdoer.

Vicarious liability – reference was made to vicarious liability for the first time in the Plaintiff's summation and was not discussed in the framework of hearing the evidence.

SHATSKY – 006791-T
P1: 954

**Symbol [   ]**
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 72 of 93
Case 1:02-cv-02280-RJD   Document 253   Filed 12/9/5/12   Page 71 of 109
## Tel-Aviv-Jaffa District Court
**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Beyond what is required, I will note that even had a claim been made concerning the vicarious liability of the P.A., the claim would have been rejected, because direct liability was established in accordance with this decision.

Another matter requiring attention is the Defendant's motion to delete the responding summation that were filed by Plaintiffs' attorney, based on the reasons that they specified in their applications.

I have not deemed it proper to grant the motion, even though some of the Defendant's claims are correct, both with regard to the length of the responding summation and with regard to the prohibited expansion of the scope of the dispute.

It should be clarified, that the Plaintiffs received guidelines concerning the length of the responding summation, and there is no doubt that they patently ignored this guideline, without having any convincing or satisfactory explanation for doing so. However, the deletion of the responding summation would have necessarily lead to an extension of the duration of the suit, which was filed in 2004 and I could not permit this.

Another claim requiring attention is the Plaintiff's claim to the effect that the onus of bringing proof should be transferred to the P.A. by force of section 41 of the Torts Ordinance.

Section 41 of the Torts Ordinance enumerates three cumulative conditions for its application

<u>The First -</u>    the plaintiff had no knowledge or means of knowledge of the actual circumstances which caused the occurrence which led to the damage,

<u>The Second -</u>the damage was caused by some property of which the defendant had full control.

<u>The Third -</u> the happening of the occurrence causing the damage is more consistent with the defendant having failed to exercise reasonable care than with his having exercised such care.

As stated, these are cumulative conditions, and in my opinion not all of them were present in the case before me.  What do I mean by this?

SHATSKY – 006792-T
P1: 955

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 73 of 93
Case 1:02-cv-02280-RJC   Document 253   Filed 12/05/13   Page 72 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

As stipulated in the judgment, there is no doubt the first and third conditions were fulfilled, however I am not able to determine that at the time of the attack, the terrorist was under the full control of the P.A. unless the "control" also includes the terrorist's state of mind  when the act was carried out, but I do not think that the legislature intended to include the state of mind in the test of control, the intention having been rather to the real and effective control, and as such I reject the claim regarding the application of section 41 of the Torts Ordinance to the case before me.

61. As I mentioned, and detailed at length in this judgment, my view is that the Plaintiffs discharged the onus of proof imposed upon them at the level of probability required in a civil trial, at a rate of over 51%. However, I think that this case is indicative of the structural difficulty of proving liability in case such as this, and more precisely, proving the liability of the Palestinian Authority and the Palestinian Council.  My intention is to the fact that naturally, the information relevant for reaching a conclusion concerning the presence or absence of a duty of care, and its violation, is in the knowledge of the P.A., and the P.A. systematically and sweepingly avoids the submission of any documents or information. The law is that this kind of avoidance is held against the avoiding party – the Palestinian Authority, because the presumption is that had it produced all that was required of it, the documents and evidence would have operated to its detriment.

The P.A attorney repeatedly claimed in his summation that the Plaintiffs did not prove the claim that the P.A had trained the terrorist to kill Jews, and as I demonstrated in this judgment, the very act of training a 15.5 year old youth in the use of weapons during the relevant period was for  no other purpose than to prepare him to use the weapons in accordance with the "**education"** that he received in the training camp in the Palestinian Authority. Having consideration for all of the background specified in this judgment, and especially the fact that this was the time of the second Intifada and of grave attacks committed against the residents of Israel, and even resulted in numerous deaths, there was no need for explicit statements, although one cannot know whether such clear statements were not actually made in the framework of those training camps, given that the P.A. actually denied that they even took place and that the terrorist had participated in them, and obviously did not attach "**the syllabus**" to which the terrorist had been exposed in the framework of the training camp under P.A. auspices.

Proving the claim of the Plaintiffs is not an easy task in view of the P.A.'s systematic failure to respond to the orders of the court orders, and the concealing of all of the relevant material that could shed light on what was going on

SHATSKY – 006793-T
P1: 956

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF  Document 253  Filed 10/05/21  Page 74 of 93
Case 1:02-cv-02280-RJL  Document 136-8  Filed 10/05/21  Page 75 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

in those training camps at the relevant period, a failure which, as I stated, must undoubtedly be held against the P.A.

To what can this be compared?  In criminal cases it is often ruled that when a person carries a knife the presumption is that he intends to use it. In other words the act of carrying a knife is a danger, and the use made thereof is the materialization of the danger. The same is true in the case before us. The P.A's intention to teach a 15.5 year old youth the secrets of weapons and their use is a tremendous risk that the P.A assumed, and hence it should come as no surprise that the youth gave concrete expression to the danger and used the weapon to murder a Jew.

What is the focus of these comments? Conceivably in cases of this kind where there is an innate evidentiary difficulty of proving the causal connection between the conduct of party A. – in our case – the P.A. and the conduct of party B – in our case – the terrorist, there are grounds for applying the doctrine of vague causation (or circumstantial causation), which is both similar to and different from, *mutatis mutandi* the doctrine established in FCH 4693/05 **"Carmel" Hospital Haifa v. Edan Malul** (published in Nevo). What was the context? In the first *Edan Malul* case, (CA 7375/02) the court ruled that an exception to liability should be recognized in the cases of vague causation. Concededly, the facts of the *Edan Malul* case were decidedly different from the facts of the case before me, because it was concerned with the existence of a causal connection between the medical conduct and the damage caused, where there was a difficulty of proving the existence of such a connection at the probability level of 51%

In the framework of the Further Hearing (FCH 4693/05) the decision given in CA 7375/02 was cancelled and the position of the (former) Vice – President Justice E. Rivlin was accepted. In my opinion, this position is also the correct one for examining the case before us. Let me explain.

In the framework of the further hearing in the *Malul* case, Justice Rivlin felt that until that time the case law had confronted the issue of vague causation by establishing the facts in the particular case coming before the court, and in an attempt to do individual justice. In Justice Rivlin's view the rule for deviation from the balance of probabilities test should be replaced by a rule of compensation in accordance with probability not measurable on the plane of the individual case, but rather on a broader plane of identifying a recurrent tendency. In his opinion this result represents the lesser evil when deviating from the test of balance of probability.

Justice Rivlin requires the fulfillment of four foundations in order to deviate from the balance of probabilities test.

SHATSKY – 006794-T
P1: 957

Symbol [    ]

Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 75 of 93
Case 1:02-cv-02280-RJL Document 253 Filed 1/03/12 Page 74 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

a.  The existence of a tortfeasor.
b.  The existence of a group of victims.
c.  A recurrent and shared danger.
d.  Consistent tendency in the application of the balance of probabilities rule.

According to Justice Rivlin, in these cases, and in these cases only, there is justification for deviating from the regular rule of the balance of probabilities and to obligate a party to pay compensation even if the chance of the damage having been caused as a result of his negligence by act or omission is rather low.

If I examine the case before me in view of these tests, I find that each of the aforementioned foundations exists in the case before me. In other words: the existence of the tortfeasor – the Palestinian Authority, who for a period of 50 days trained a 15.5 year old adolescent in the use of weaponry.
There is a group of victims. As I set forth in detail- the period was that of the Second Intifada which abounded with attacks and victims among the Israeli citizenry, and where the documents captured that were presented to me clearly and explicitly indicate the P.A.'s involvement in the financing and carrying out of the attacks.
Recurrent and shared danger – this was a structural danger as a result of the conduct of the P.A. as indicated by the captured documents, which leave no doubt regarding the P.A.'s responsibility for the commission of the attacks or some of them.

Consistent tendency in the application of the balance of probabilities rule - In my humble opinion our concern is with a phenomenon – of attacks against Israeli citizens, which create a **"recurrent tendency"** due to the structural difficulty of proving the responsibility of the organization in each and every case, or of the particular body responsible for the attack and its consequences.

62.  My comments concerning the possibility of also applying this doctrine to cases such as the case forming the subject of this judgment, are thoughts that occurred to me and which were not claimed by the litigants, and hence I will obviously not rule on them, but I think that it would be appropriate to consider the application of this doctrine to cases such as the case forming the subject of this judgment. More precisely, the application of the doctrine in this case is also liable to  serve the interests of the plaintiffs who occasionally find it difficult to meet the requirements of the balance of probability, and the needs of the defendants who can make a claim for the reduction of compensation, when there is no full certainty regarding the proof of their liability, as well as the absence of a clear determination regarding their responsibility for the tortuous act, for which they are being sued for compensation.

SHATSKY – 006795-T
P1: 958

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 76 of 93
Case 1:02-cv-02280-RJL   Document 253-3   Filed 10/13/09   Page 75 of 109
Tel-Aviv-Jaffa District Court
C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

Concededly, in the *Malul* case it was held that the possibility of relying on the recurrent tendency test is an exception to the rule concerning the duty to prove the claim in accordance with the rule of the balance of probabilities, and at all events, it is only applied in cases of a claim regarding damage in the medical realm. However, as I clarified the application of this test should also be considered in additional cases, such as the one before me. Moreover, the test of the recurrent tendency is relatively new and has yet to be examined in a systematic manner in

the case law of the court.  (For an extensive discussion of the difficulties in the implementation of relative solutions, see Y. Gilad "**The Doctrine of Evidentiary Damage: Does it Contribute to the Onus of Persuasion?** 30 *Mishpatim* 317; Y. Gilad; **Response: A New Arrangement for the Law of Prescription?**  36 (3) *Mishpatim*).

As I noted, this is an idea which it would be appropriate to develop and consider, and at all events I have not deemed it proper to rule on it, or to apply it in the case before me, because as I determined, in the case before me the suit has been proved in accordance with the rule of the balance of probabilities.

### The Suit against Harel Insurance Company Ltd.

63.    Harel Insurance Company Ltd. (hereinafter: **"Harel"**) issued an insurance policy to the **"Bezeq"** and **"Lilit"** companies (appendices A, F of the Garmeiza affidavit).

As for the policy issued to Lilit – having found that Lilit bears no concrete duty of care in regard to the incident that is the subject of the complaint, the suit against Harel in regard to the claims raised against **"Lilit"** must be dismissed. Moreover, the policy is not relevant to the case before me, inasmuch as it comprises an exception in regard to terrorist incidents.

As for the policy issued to the Bezeq company – we are concerned with employers' liability policy number 61000043/02, which was appended as Appendix A to Garmeiza's affidavit (hereinafter: **"the policy"**).

Examination of the policy reveals that it comprises a **"war, civil war and terror exception"** that states, inter alia: **"Notwithstanding what is stated anywhere else in the policy, or in any addendum to the policy, it is hereby agreed and declared that the policy will not cover the insured for: ...2. Any act of terror"**

**"Act of terror"** is defined by the policy as: **"an act, including, but not limited to use of force, violence...sabotage, or any use of another means in order to intentionally or unintentionally cause harm of any kind.**

SHATSKY – 006796-T
P1: 959

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 77 of 93
Case 9:02-cv-02280-KJD-  Document 253   Filed 2/13/  Page 76 of 709

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

..by a person, group/s whether acting alone, or in the name of, or in connection with any organization created for political, religious, ideological or similar purposes...”

Terrorist incidents are also explicitly excepted on the jackets of the policies (Appendix A – p. 2 and 3 of the list, and sec. 3.4 of the jacket; Appendix D – p. 9 of the list, and sec. 1.3 of the jacket; Appendix F – p. 3 of the list, and sec. 51.2 of the jacket.

It arises from the aforesaid that the policy explicitly and clearly excepts the incident that is the subject of the complaint, which is, without any doubt, a terrorist incident.

The attorney for the Plaintiffs tried to show in the course of hearing the evidence, and even argued in her summation, that the terror exception in the policy should not be accepted, and Harel should not be exempted from coverage for the incident that is the subject of the complaint, inasmuch as Harel's liability derives from the tortious responsibility of Bezeq for its conduct and omissions, and not from the terrorist incident, but I cannot accept that interpretation. The policy unambiguously states that it covers any negligent act of Bezeq owing to which Bezeq will be required to pay damages to the victims. However, that contractual obligation of Harel, as expressed in the policy, is not absolute but restricted, and it clearly stated that it will not apply in a case where the event that is the subject of the liability is a terrorist incident.

The aforesaid cannot be understood to mean, as the Plaintiff's attorney argues, that if it turns out that the terrorist incident was made possible, inter alia, as a consequence of Bezeq's omissions, then  the exception does not apply. Quite the opposite – the policy clearly and precisely establishes that if a terrorist incident is involved, the exception will apply and Harel will not be liable to pay in accordance with its obligations under the policy.

In this regard, it should be noted that the witness Mr. Yoram Zilberman, who is an insurance agent, was primarily questioned in regard to the Lilit policy, and not specifically in regard to the Bezeq policy, and for good reason.

Lilit is a company in liquidation, and no one appeared on its behalf. This, therefore, created the impression that it would be easier for the Plaintiffs to prove omissions on the part of Harel in issuing the insurance policy to Lilit, in a manner that would obligate Harel to bear Lilit's share in the incident that is the subject of the complaint. However, in light of my decision dismissing the suit against Lilit, I do not intend to examine the circumstances of the issuance of the policy to Lilit, and I will only say that it was in no way proven that the terror exception was included in the policy against Lilit's will, or as a result of Lilit's misunderstanding the meaning of that exception.

SHATSKY – 006797-T
P1: 960

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 253-8   Filed 10/05/21   Page 78 of 93
Case 1:02-cv-02280-RJD    Document 253-6   Filed 10/05/21   Page 72 of 109

**Tel-Aviv-Jaffa District Court**

C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

As for Bezeq's policy – Harel called Mr. Ilan Garmeiza (hereinafter: **"Garmeiza"**), who is the head of Harel's claims department, to testify on its behalf, and he made an excellent impression upon me. Garmeiza submitted two affidavits, one – from 11 March, 2009, and the second – from 23 March, 2011 .

The Plaintiff's attorney tirelessly tried to prove that the policy did not reflect the agreements between Bezeq and Harel in regard to the content of the policy in general, and the existence of the terror exception in particular, while presenting numerous questions in regard to the negotiations between Bezeq and Harel leading up to the issuance of the policy, but that examination was entirely superfluous. That is to say that an insurance policy is a contract like any contract executed by the parties thereto, and it reflects all of the agreements arrived at by the parties to the contract (see: CA 4688/02 **Hezi Cohen v. Migdal Insurance Company Ltd**., published in Nevo), that is – if the policy comprises a terror exception, then that was the intention of the parties. And note: in the case that is the subject of the complaint, we are not concerned with a policy issued to a private individual, untutored in matters of law, who might not understand what is included in it, or the significance of a terror exception. It is superfluous to state that Bezeq is a large company that is aided by legal advisors, and therefore, we are not concerned with "sneaking in" an exception that went unnoticed by Bezeq's legal advisors.

This is also the necessary conclusion in view of Grameiza's testimony, in which he explained that **"in the Bezeq policies that were appended here... these are policies that were written by Bezeq/its advisors and not by Harel. It is a policy that is part of a tender"** (p. 641 lines 18-19). This statement, which was not rebutted, undermines the claims of the Plaintiffs as to the question of Bezeq's knowledge regarding the application of the terror exception.

Beyond what is necessary, I will note that in accordance with settled precedent, in interpreting an insurance contract, or any contract, one may resort to the rule preferring the construction that is against the drafter (see for example, CA 5167/06 **Clal Insurance Company Ltd. v. Shimon Asraf**, published in Nevo; CA 5775/02 **Neve Gan (A.C.) Construction, Development and Investments Ltd.**, P.D. 58(2) 307; CA 779/89 **Shalev v. Sela Insurance Company Ltd**., P.D. 48(1) 221). Therefore, now that it has become clear that the drafter was, in fact, Bezeq, the said rule of construction should be applied against it to determine that the terror exception was inserted into the policy with its consent and in accordance with its desire.

This conclusion is reinforced by Bezeq's conduct after the event. According to Garmeiza's testimony, upon the filing of the complaint against it in court, Bezeq turned to Harel (p. 632 line 11), and in reply, was sent a rejection letter on the basis of the terror exception, and according to Garmeiza **"... Bezeq, after receiving the complaint letter** (should be: rejection letter – D.G.) **did not raise any objections, although**

SHATSKY – 006798-T
P1: 961

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 79 of 93
Case 9:02-cv-02280-KJD-CF   Document 253-3   Filed 1/3/5   Page 78 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

**in cases in which we disagree with them in other matters, they know how to raise them. They have an insurance consultant Uri Orland who represents them, and he is the one who was also responsible for the entire tender and the all the drafting of the policies...”** (p. 634 lines 23-27). This testimony was not rebutted, and these statements only serve to strengthen the conclusion that the terror exception was inserted into the policy with Bezeq's consent and in accordance with its desire.

In her summation, the attorney for the Plaintiffs refers to the fact that in the period following the occurrence of the event that is the subject of the complaint, Harel issued a policy to Bezeq that included a rider for terror (P/20), and we can learn from this, according to her, that the change in the policy by way of a rider to cover terrorist events shows that this was Bezeq's intention even at the time of the relevant policy.

I cannot accept this purely speculative argument, which not only was not proved, but the contrary was proved. The fact that, following the incident, Bezeq chose to expand its policy and cancel the terror exception shows that Bezeq internalized the lesson learned from the incident that is the subject of the complaint, and agreed to expanding the policy and cancelling the terror exception, no doubt against payment of higher premiums. In any case, this conduct cannot be viewed as proof of the claim made by the Plaintiffs' attorney.

The Plaintiffs' attorney further argues in her summation (p. 24) that Bezeq and Harel colluded against the Plaintiffs **"and it is more than likely that the two reached an agreement that Harel would compensate Bezeq for the damages that would be assessed against it in this suit"**, a claim that met with the indignation of Harel's attorney (last paragraph of the introduction to his summation). Once again, we are concerned with unproved speculation that I cannot address.

The Plaintiffs' attorney further argues that applying the terror exception in this case effectively eviscerates the policy, which is a strange claim. Reading the policy shows that it covers all cases in which Bezeq will be required to pay damages to a third party for its negligence, with the exception of cases deriving from, inter alia, terrorist incidents, as in this case. This exception does not eviscerate the policy, but merely expresses the agreement of the parties, and this, moreover, was not shown to be otherwise.

In light of the above, the suit against Harel Insurance Company Ltd. is hereby dismissed.

## Division of the Liability

64.    As I found, the concrete duty of care was breached between Defendants 1,2,3,4,5,7 and 8 and the Deceased.

SHATSKY – 006799-T
P1: 962

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF    Document 253-8    Filed 10/05/21    Page 80 of 93
Case 1:02-cv-02280-RJD-DCF    Document 43-6    Filed 10/05/21    Page 72 of 109

### Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

In accordance with my findings as to the acts and omissions of the various tortfeasors, whose acts, silence or omission enabled the occurrence of the terrible incident in the course of which the Deceased was shot and killed, I divide the liability as follows:

Defendants 7 and 8 (The Palestinian Authority and The Palestinian Council) bear 70% of the responsibility, jointly and severally, for the occurrence of the incident.

Defendants 1,2,3,4,5 bear 30% of the responsibility, jointly and severally, for the occurrence of the incident.

### The Damage

65.  The Plaintiffs seek damages for the Deceased's losses **"in the lost years"**, including loss of pension, loss of old-age stipend, loss of professional development fund, car, benefits, pain and suffering and shortened life expectancy, loss of the services of a son, third-party help, increased travel, the Plaintiff's loss of income, cost of a monument and the seven-day mourning period, and punitive damages against Defendants 7 and 8.

66.  The Deceased's losses **"in the lost years"** – According to the pay slips submitted to the court (Appendix M to the affidavit of Ronen Mentin), the Deceased's average gross salary came to NIS 5,474, and with the addition of the linkage differential to today's date – the amount of NIS 6,605.

In her summation, the Plaintiffs' attorney laid out a speculative path for the Deceased's advancement in Bezeq, had he not been murdered, but I cannot accept her arguments in this regard, as I shall explain.

67.  The Deceased, 31 at the time of his death, worked as a technician for Bezeq for 7 years. He worked at Bezeq for 6 of those years through a manpower placement company – Lilit – and during the last year of his employment, he was accepted into Bezeq as a Bezeq employee, and at the time of his murder, he had worked at Bezeq as a Bezeq employee for 11 months.
In an attempt to prove the Deceased's advancement path in Bezeq, the Plaintiff's attorney presented a number of witnesses.

The first witness – Ms. Mali Yosef – head of the human resources staff at Bezeq, explained that the Deceased was employed by Bezeq in the framework of the collective agreement called "Dor 2000", and explained that he was not signed on a personal contract.

SHATSKY – 006800-T
P1: 963

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF  Document 135-8  Filed 10/05/21  Page 81 of 93
Case 1:02-cv-02280-RJL  Document 253-3  Filed 12/3/12  Page 80 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

Ms. Yosef explained under examination that this was a personal collective agreement, and further explained that **"it is important for me to say that the Bezeq company recently underwent privatization, cutbacks and streamlining, and even good workers were sent home. I cannot guarantee that he would have continued to have been employed, not to mention that he had been employed for less than a year** (at the time of his murder – D.G.) **..."** (p. 73 lines 3-5) – a fact that was verified by the Deceased's mother, who testified that her husband, who was a Bezeq employee, was fired due to cutbacks, although **"he was an excellent worker"** (p. 33 line 21). We should here note that according to the testimony presented, the Deceased's personal file at Bezeq was not found, and therefore we have no way of knowing if there were assessments as to the Deceased's professional performance.

There can be no doubt that the loss of the file should be held against Bezeq, and moreover, it seems reasonable to assume that the Deceased was deemed a competent worker, for if not, Bezeq would not have taken him on as a Bezeq employee in July 2002 after he had worked at Bezeq for some six years through a manpower placement company (Lilit) (p. 75 lines 3-4).

The witness explained that in accordance with the Dor 2000 collective agreement, to which the Deceased was party, it was possible to work for Bezeq as a temporary worker for 8 years, and since the Deceased began working at Bezeq as a temporary employee in July 2002, he was meant to remain in that status for 8 years, that is, until 2010 – just as we find in the pay slips that were attached, where it is written that the date for the termination of his employment was meant to be 30.6.10.

As for the question of whether the Deceased would have been granted permanent employment status at Bezeq, following the period of his temporary employment, the witness replied that **"it really does not guarantee that an employee will get permanent status. Really not. Even if he is a good worker"** (p. 76 line 23). However, it was clarified that she did not handle the Deceased within the scope of her job, and she had no personal knowledge of him (p. 80 lines 25-26, p. 81 lines 2-3).

Following Ms. Yosef, Ms. Yvette Ron, who is the director of human resources for the private division of Bezeq, testified.

Ms. Ron testified that in the framework of her job, she is responsible for technicians (p. 6). She confirmed that the Deceased worked at Bezeq in the framework of the Dor 2000 collective agreement, and further testified that, in 2006, all of the employees who worked at Bezeq in the framework of Dor 2000 were transferred to a new collective agreement, called Dor 2006 (p. 8). It arose from the witnesses statement that **"there is no path** (of advancement – D.N.[sic]) **for technicians. There is no structured path...** (p. 13) as opposed to other professions in Bezeq. She further explained that there is a possibility for upgrading in the work of technicians, in accordance with their skills **"but that requires certification..."** (p. 13), and in this regard I would make clear that no testimony was brought that even hinted that the Deceased was obtaining certifications.

SHATSKY – 006801-T
P1: 964

Symbol [  ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 82 of 93
Case 1:02-cv-02280-RJC   Document 253   Filed 12/03/12   Page 81 of 109

# Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

and improving his abilities, and just as one may assume that he would have done so, one may also assume that, in view of his claimed abilities, he would have left his work at Bezeq to work for a private company, for example (see my comment at p. 15 of the protocol).

Further on in the witness' testimony it was made clear that the Dor 2006 collective agreement was later replaced by a new collective agreement in December 2010, and it is reasonable to assume that had the Deceased been alive, he would have been employed in the framework of the new agreement **"and transferred to the status termed – new permanent employee"**, upon the condition that **"he would remain, and that he was appropriate... the Company would find him appropriate to remain, he probably would have transferred to that status today"** (p. 17), whereas employees who were not transferred to the new, new agreement – were terminated (ibid.).

Ms. Ron was asked if she knew what changes had occurred from 2004 in regard to overtime, and she explained that there had been **"a drastic reduction"** (p. 18) in regard to overtime, except during periods of pressure.

Plaintiff's witness Mr. Ronen Levi, who is director of the salary and benefits department in Bezeq, testified that, as a rule, a temporary employee – which is the status of the Deceased at the time of his murder, receives permanent status after 96 months (7 years [sic]) (p. 30,31), while there is an interim status between temporary employee and permanent employee that is called – new permanent employee (p.319.

At a certain point in the presenting of testimony, Ms. Yvette Ron was returned to testify.

The Plaintiff's attorney tried to obtain confirmation from Ms. Ron as to the existence of various preferences granted to continuing children (the Deceased's father had been a Bezeq employee), but she explained that there is no preference in granting permanent status to continuing children (p. 579 lines 26-28), as also was the testimony of Ms. Irit Nagar Mor – director of the employee relations department, who explained that it is possible that a certain shortening of the time period may be granted to a continuing child, but one was given no preference in receiving a particular job (p. 598).

From Ms. Ron's testimony, it appears that the attempt to estimate the question of the Plaintiff's future permanent status is very, very theoretical, as it was made clear that Bezeq began transferring temporary employees to the status of permanent employees only in 2011. And note: we are speaking of employees who began working at Bezeq before the Deceased, in February 2001 (p. 584).

It is clear from the testimony of Ms. Ron and the testimony of Ms. Nagar Mor that it is not even theoretically possible to attempt to lay out the Deceased's path of advancement in Bezeq, and the attempt by the Plaintiffs' attorney

SHATSKY – 006802-T
P1: 965

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 83 of 93
Case 1:02-cv-02280-RJL   Document 253-3   Filed 2/3/9   Page 82 of 109

## Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

to try to prove the Deceased's losses, including the value of the holiday gifts given to Bezeq employees, descends to impossible degrees of resolution. And note: at the time of his murder, the Deceased had worked for 11 months as a temporary employee of Bezeq, and the attempt of the Plaintiffs' attorney to prove a certain, sure advancement path is doomed to failure. Moreover, we learned from Ms. Nagar Mor's statement that Bezeq fires workers who break its rules, or who are caught not telling the truth (p. 614), and in the matter before me, there is no denying that on the morning of the murder, the Deceased submitted an inaccurate report when he reported to the Bezeq call center that he was entering Baqa Al Gharbiya with the bodyguard, while hiding the fact that the bodyguard had entered Baqa Al Gharbiya in his own car, and not in the Bezeq car. On such matters, Ms. Nagar Mor testified **"for false reports, people are sent home"**.

In light of all of the above, and in the absence of the possibility to determine that the Deceased would have remained a Bezeq employee until reaching the age of 67, or that he would have advanced in his job beyond the job of a technician, primarily in consideration of the fact that at the time of his murder the Deceased had been a Bezeq employee for only 11 months, I am of the opinion that his loss of income from the day of his murder to the date of the handing down of the judgment should be calculated according to his proven income in the amount of NIS 6,605, at today's value.

However, in view of the Deceased's abilities and education, as detailed in the affidavit of his brother – Ronen Mentin, I have no doubt that at some point the deceased would have earned at least the average labor-market wage (whether at Bezeq or elsewhere), and therefore, his losses from the date of the judgment until reaching the age of 67, according to the average labor-market wage should be calculated at the amount of NIS 8,837.

Parenthetically, I would note that in most suits submitted for tort claims, the court is involved in guesswork and prophecy in regard to the professional future and income level of the injured party. There are cases in which it is easier to estimate the injured party's advancement had he not been injured, and there are cases where it is difficult, or even practically impossible, as in the case before us. And note: the Deceased had worked for Bezeq through Lilit for six years until he was accepted as a Bezeq employee. It was not made clear, and in any case not proven, why he did not become a Bezeq employee at an earlier date, but there is no doubt that we cannot build castles in the sky in regard to the Deceased's professional advancement in Bezeq, and it is appropriate to employ objective, accepted data, which are, no doubt, close to reality, and in any case do not oppress any of the litigants.

Therefore, the Deceased's lost income should be calculated as follows:

A. NIS 6,605 (the Deceased's estimated income as of this date) x 117 months (from the date of the murder until the date of the judgment) = NIS 772,785, with the addition of interest from the middle of the period in the amount

SHATSKY – 006803-T
P1: 966

Symbol [　]

Case 1:18-cv-12355-MKV-DCF   Document 253-6   Filed 10/05/21   Page 84 of 93
Case 9:02-cv-02280-K-JCF   Document 45-36   Filed 12/15/03   Page 83 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

of NIS 66,905, totalling NIS 839,690.

B.  From today until the Deceased reaching the age of 67, NIS 8,837 (the average labor-market wage) x 210.8765 (the capitalization coefficient for a period of 25 years) = NIS 1,863,516.

In light of the above, the Deceased's loss of income is a total of NIS 2,703,206.

68.  Loss of pension – the Plaintiff made a calculation of this head based upon twice the average labor-market wage, but as I explained, I do not accept the wage calculation set forth in the summation of the Plaintiffs' attorney.

The Defendants did not respond to this head in their summation, and therefore, in accordance with the calculation principles presented in the Plaintiffs' summation, we should take into account 70% of the expected salary of the Deceased prior to his retirement, and therefore the calculation is to be made as follows:

70% x NIS 8,837 (the Deceased's salary) = 6186 x (capitalization coefficient times 0.47 x 129.0454) =  NIS 375,183.

69.  Loss of old-age stipend – were it not for the unfortunate incident, the Deceased would have been entitled to an old-age stipend from the time he reached the age of 70 and until the end of his life expectancy, at the age of 80 according to the Central Bureau of Statistics, viz: for 11 years.

The Defendants did not respond to the Plaintiffs' calculation, and therefore do not object to the proposed calculation, and I therefore accept it and set the loss for this head of damages at the amount of NIS 62,201.

70.  What arises from the above is that the value of all of the Deceased's loss of income comes to an amount of NIS 3,140,590, and in accordance with the principles set forth in CA 1400/00 **Estate of the Late Michael Ettinger v. The Company for the Restoration and Development of the Jewish Quarter**, published in Nevo (hereinafter: **"the Ettinger rule"**), the Estate is entitled to damages at the rate of 30% of the savings that the Deceased would have accumulated in the course of his life, and the Estate is therefore entitled to damages in the amount of NIS 942,177.

82 of 90

SHATSKY – 006804-T
P1: 967

Symbol [ ]

Case 1:18-cv-12355-MKV-DCF   Document 253-3   Filed 10/05/21   Page 85 of 93
Case 1:02-cv-02280-RJL   Document 253-8   Filed 10/05/21   Page 84 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

71. <u>Pain and suffering and loss of life expectancy</u> – according to Ben-Naim's testimony, the Deceased did not die immediately as a result of the shooting. In his statement to the police, Ben-Naim reported that following the – successful – chase after the terrorist, he returned to the car in which the Deceased sat, and according to him **"I heard that Amos was gurgling."** (statement no. 2 folio no. 8 line 13 P/17), although according to the testimony of Oni Devir (p. 481), it would appear that the Deceased died just a few minutes after he was shot.

Parenthetically I would note that the conduct of the ambulance crew of VAN, as expressed in the testimony of Oni Devir (p. 482) amounts to desecration of the Deceased, but VAN is not a defendant in this case, and cannot be brought to account for its treatment of the Deceased.

The Deceased, 31 at his death, died at a young age and in tragic circumstances, and I am therefore of the opinion that the Estate is entitled to damages in the amount of <u>NIS 1,000,000</u> for the pain and suffering and the loss of life expectancy of the Deceased.

72. <u>Loss of the services of a son</u> – I admit that I am unfamiliar with a head of damages known in case law as loss of services of a son, and it would appear that this section was intended to justify the Plaintiff's suit as a dependant, but this suit was not proved. And note: I have no doubt that upon receiving word of the murder of the Deceased and the circumstances of his death, his mother's world was destroyed. We are concerned with a great, unfathomable tragedy that leaves behind it a wake of pain that will never cease, but there is nothing at all to tie this terrible pain of a mother at the loss of her son to a conclusion regarding her being his dependant.

Moreover, I am deeply saddened that I have to evaluate the testimony of the mother – Ms. Inez Nitza Mentin, as, sadly, her testimony was very tendentious.

In her affidavit (sec. 15), Ms. Mentin claimed that she lives with her husband **"but we have not gotten along for years, and my late son was my savior and confidant"**. Ms. Mentin further claimed in her affidavit that the Deceased used to drive her to her errands in the car that Bezeq had provided him (sec. 13), and that he supported her **"financially and saw to all my needs, as my husband did not give me money to live and/or for anything else throughout the years. My late son even supported the little brother Talor"** (sec. 23).
As to her income, Ms. Mentin claimed in her affidavit that from 1990 until 2000 she worked as a cleaning lady in the Mizrahi Bank as an employee of a manpower company, and earned a sum of NIS 1,700 a month, and that after she was fired due to the liquidation of the company, she worked as a housekeeper three times a week for five hours each

SHATSKY – 006805-T
P1: 968

**Symbol [  ]**
Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 86 of 93
Case 9:02-cv-02280-KJD Document 253 Filed 2/03/12 Page 85 of 109
## Tel-Aviv-Jaffa District Court
### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

time, and earned NIS 140 a day. Ms. Mentin further affied that, since the murder, she does not work (sec. 22 of the affidavit).

From the affidavit and the inheritance decree, it appears that Ms. Mentin is the sole heir of the Deceased, and that his father renounced any claim to inheriting the Deceased, but no satisfactory explanation was given for this fact.

From the affidavit and testimony of Ms. Mentin, it appears that she and her husband are the parents of four additional children, born in 1973, 1975, 1978 and 1986, but in her testimony, the witness claimed that her husband never supported her and her children **"since we were married"** (p. 33 line 7).

According to her **"he did not participate in all the expenses of the children, for all kinds of things, he only participated in marginal things like giving them bread and milk"** (ibid.).

The witness confirmed that she lives with her husband under one roof to this very day, and that she has been retired for 12 years.
Further on in her testimony it turned out that the couple have a joint bank account to which are deposited both the mother's pension and the National Insurance allocation by the National Insurance Institute, in accordance with the Compensation for Victims of Hostile Acts Law 5730-1970, and she confirmed that she uses the money from this account to support the members of her family (p. 33 lines 17-21).

It further became clear that the couple jointly owns an apartment, which was purchased with the help of a mortgage that was taken and repaid by both spouses (p. 34 lines 1-12).

Ms. Mentin further confirmed that when her husband worked for Bezeq, his salary was deposited **"to the joint account"** (p. 34 line 28), although she then recanted and claimed that only the pension monies are deposited to the joint account, while the money from his wages went into a separate account, but **"he made me checks that I could sign..."** (p. 35 line 4). In view of the above, it is but natural that Ms. Mentin confirmed that in the course of all the years of their marriage, the family was supported both form her husband's income and from her own income (p. 35 line 7), although, according to her, **"he did not support me"** (p. 35 line 7), which forced her to work hard and take loans, because her husband only participated in the household expenses **"in insignificant expenses that he paid, electricity..."** (p. 35 lines 7-10), although she confirmed that the family was maintained both from her husband's income and her own income (p. 35 lines 11-12).

84 of 90

SHATSKY – 006806-T
P1: 969

Further on, the witness admitted that even today **"he gives me money to put in my account..."** (p. 35 lines 16-19), and admitted that her husband pays the bills for water, property taxes and electricity (p. 37 lines 29-30).

It appears from this testimony that the attempt to portray the father of the family as someone who does not support it, failed, and there can be no doubt that the couple live on their joint incomes both in the period prior to the murder and in the period following it. Parenthetically, it should be noted that the father of the family was not brought to testify, and it would seem for good reason.

As for the Deceased's alleged support of his mother – this claim was not proved.

The Plaintiff did not append a printout from a bank account from which the existence of such support of her might be learned, and in fact, did not append any document that would support her claim.
Moreover, it appears from Ms. Mentin's statement, that the Deceased rented an apartment for himself an apartment [sic], and even financed its costs, such as rent and ongoing expenses, and it is thus clear that in light of the proven level of his salary, he could not have supported his mother even if he had wanted to.

While, according to the mother, the Deceased rented the apartment shortly before his murder, and until then lived in the family home, but for reasons that she kept to herself, she did not append any document to verify her claim as to the date of the rental of the apartment, etc., which acts to her detriment.

Ms. Mentin asks the court to deduce the fact of the support of her late son from the fact that after his death it was found that he had only NIS 1500 in his account. According to her, the reason there was such a paltry sum remaining in the account was because most of his income served to support his mother. According to her **"if he wouldn't have helped me he would have had a wad of money..."** (p. 38 line 27). But not only was no document appended testifying to the balance in the Deceased's account at the time of his death, but nothing about the said amount can serve as evidence for Ms. Mentin's claim, and as stated, Ms. Mentin's claim in regard to her being dependant upon her son was not proved.

Beyond what is necessary, I will note – that the Deceased's brother – Ronen Mentin – testified, inter alia, in regard to the financial management of his parents' home, but his testimony absolutely contradicted the main parts of his mother's testimony, and the effort and tendency to artificially prove the mother's dependence upon her late son was apparent. Moreover, from the mother's testimony it appears that her son Ronen has been married since '99 (p. 46) and does not live with or near his parents, such that he cannot have any personal knowledge of whether the mother was supported by his late brother.

SHATSKY – 006807-T
P1: 970

Symbol [   ]
Case 1:18-cv-12355-MKV-DCF   Document 135-8   Filed 10/05/21   Page 88 of 93
Case 9:02-cv-02280-KJD   Document 253   Filed 1/13/5   Page 87 of 109

# Tel-Aviv-Jaffa District Court

### C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al

It should be clearly stated: there is no doubt that the Deceased was a good son, and was very devoted to his mother, and no doubt helped her in transport and other matters, and I am even willing to assume that he occasionally helped her financially – even though such support was not proved – but there is also no doubt, and in any case the opposite was not proved, that the Deceased's support for his mother did not deviate from the framework of the normal help that children occasionally provide for their parents, and I therefore dismiss the claim in regard to the Plaintiff being dependent upon the Deceased.

73. <u>Third-party help</u> – This petition is odd. It was not claimed, and in any case not proved, that the Deceased performed the housework in his mother's home, and therefore it is unclear why this claim was raised.

Moreover, it should be recalled that the father of the family did not testify, which acts to the detriment of the Plaintiffs, for if his testimony had been presented, it is possible that it might have been proven that he helps his wife with the housework. In any case, since it was not claimed, and as stated, in any event not proved, that the Deceased helped with the housework in his mother's home, no causative relationship was proved between the Deceased's death and her demand from the Defendants for third-party help.

74. <u>Increased travel</u> – It was not proved that the Plaintiff required increased travel as a result of the death of the Deceased. And note: I accept as a fact the claim that the Deceased occasionally transported his mother, however, it should not be forgotten that the Deceased worked most of the day, and in any case was not present in his mother's home, and thus could not help his mother in the course of the day, and I therefore dismiss this petition.

Moreover, the brother – Ronen Mentin confirmed in his testimony that, after the murder, his parents received a loan from the National Insurance Institute for the purpose of purchasing a car, and that they even purchased a car with that money **"and the one who takes them in that car is my little brother"** (p. 115 lines 9-13). In other words, the family owns a car that is used by the younger son, who transports his parents as needed. And note: before the murder, the family did not own a car.

75. <u>Loss of income of Plaintiff 2</u> – The Plaintiff claims that prior to the death of her son, she did housekeeping three times a week, and since the death she has stopped working, but she did not prove either her income during the period prior to the murder, and in any case did not raise her burden of proving the reason that she stopped working.

Moreover, in accordance with the decision in LCA 444/87 **Alsuha v. Estate of the Late David Dahan** (P.D. 44 (3) 397) (hereinafter: **"the Alsuha rule"**) and the ensuing decisions, the Plaintiff has no independent cause of action for claiming damages for loss of income, moreover, there was no claim, and in any case no proof of the existence of any psychological handicap.

SHATSKY – 006808-T
P1: 971

And note: as I explained, I have no doubt as to the deep, terrible suffering of the Plaintiff as the result of her son's death and the circumstances attending his death, but such suffering, as severe as it may be, does not entitle the Plaintiff to damages in the framework of an independent cause of action unless it be shown that she suffers significant psychological damage as a result of her son's death, which was not proven in the case before me.

76. <u>Expenses for a monument and the seven day mourning period</u> – The attorney for Bezeq is correct in arguing that it were better not to repeat the claim for damages for the expenses of the seven days of mourning in the summation, when the Plaintiff admitted under examination that Bezeq paid all of the expenses in the course of the seven days of mourning and for marking the 30th day since the death of the Deceased, including **"catering the seven days of mourning, of the month, for renting chairs and tables... they brought and did everything themselves..."** (p. 41 lines 23-26). And note: no receipts were presented attesting to additional expenses, and there is therefore no avoiding the conclusion that the claim in para. 78 of the affidavit of the brother – Ronen Mentin was raised just like that, and without any foundation.

As for the monument, the Plaintiff testified that the monument was paid for **"partly by Bezeq, partly by the National Insurance, and the rest by us"** (p. 42 line 3).

From the documents submitted by the Plaintiffs, it appears that the cost of the monument was NIS 12,000, but what part of that sum was paid by the Plaintiff herself was not clarified.
Nevertheless, and for the sake of caution, I find it appropriate to award the Plaintiffs damages in the amount of <u>NIS 2,000</u>.

77. <u>Punitive damages in regard to Defendants 7 and 8</u> – The Plaintiffs are correct in their claim that **"the Deceased was murdered due to a heinous, malicious, murderous act of terror"** (para. 52 of the Plaintiffs' summation, however the act itself was committed by a terrorist – who is not a party to this suit – and it was not held that the acts of the terrorist were the acts of the P.A., although it was held that the Plaintiffs proved the causative connection between the conduct of the P.A. and the heinous act of the terrorist to the required degree of probability, and therefore I am of the opinion that the P.A. should not be charged punitive damages.

SHATSKY – 006809-T
P1: 972

Symbol [  ]
Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 90 of 93
Case 1:02-cv-02280-RJL   Document 253   Filed 10/05/21   Page 89 of 109

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

### Stipends from the National Insurance Institute

78. Sec. 17(b) of the <u>Compensation for Victims of Hostile Acts Law 5730-1970</u> (hereinafter: **"the Compensation Law"**) establishes:

> **"(b) a person entitled by a single event to compensation under this Law, and to damages under the Civil Wrongs Ordinance [New Version], or under the Compensation for Victims of Road Accidents Law, 5735-1975, will be subject, mutatis mutandis, to the provisions of sec. 36 of the Invalids Law, or sec. 21 of the Families of Soldiers Law, as the case may be".**

The purpose of this arrangement, to which the Compensation Law refers, is to prevent "double compensation", and it arranges the route that a plaintiff is to follow if he is entitled to compensation under the Compensation Law and under **"another law"**, and in our case – the Civil Wrongs Ordinance.

The principles of the arrangement are as follows:

A. A person who is entitled to compensation may institute parallel legal proceedings against the National Insurance Institute and against the tortfeasor, in the framework of a legal suit under the Civil Wrongs Ord., but he may not collect compensation from both.

B. If the entitled person chose to accept compensation from the state, under the Compensation Law, the state is entitled to initiate a subrogation action against the tortfeasor for the sums paid by it to the injured party.

C. If the injured party was paid damages by the tortfeasor, he is no longer entitled to benefits from the state (in our case – under the Compensation for Victims of Hostile Acts Law), and if he received compensation from the state, he must return to it all the compensation he received.

79. The attorney for the Bezeq group argues that the suit should be dismissed in limine, inasmuch as the Plaintiff receives monthly stipends from the state in accordance with the Compensation Law, the capitalized value of which, in the past and future, comes to an amount of NIS 2,200,000, but he is mistaken, as I shall explain.

The attorney for the Bezeq group basis his arguments upon the judgment in <u>CA 399/81</u> **Yaffa Timsod v. Levis Catering Meals Industries Ltd.** (P.D. 36 (3) 686) (hereinafter: **"the Timsod case"**) from which it arises that the consent

SHATSKY – 006810-T
P1: 973

Symbol [ ]
Case 1:18-cv-12355-MKV-DCF Document 136-8 Filed 10/05/21 Page 91 of 93
Case 9:02-cv-02280-K-JCF Document 253-3 Filed 10/5/21 Page 90 of 109

## Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

of the state (in that case – the consent of the Claims Officer) to the return of the payments, stipends and benefits that the injured party received from the state is a precondition to the renewed crystallization of the right to sue in tort, and since no such consent was submitted to the court file in the case before me, the Plaintiff does not have the right to sue in tort.

That was indeed the rule for a number of years, but it was changed in the framework of a decision handed down by an expanded bench of seven judges in <u>CA 1162/96</u> **Hila Weiss et al. v. Aviad Yosef Mack et al.** P.D. 53 (2) 79 (hereinafter: **"the Weiss case"**).
In the Weiss case, the Supreme Court addressed the intrinsic difficulty inherent in the demand to return payments that the injured party received from the state as a condition for the crystallization of his right to sue in tort.

This difficulty derives from the fact that upon the National Insurance Institute's agreeing to the return of the compensation by the injured party, the payment of compensation to the injured party stops, and in such a case, the injured party is **"without resources to benefit his injury for the duration of the tort proceeding"**, and this in addition to the loss of his future right to receive compensation from the state. That being the case, the injured party's alternative to choose between compensation by the state or damages from the tortfeasor **"usually remains a theoretical matter, not to mention that he lacks the possibility to return the amounts he received, whether in money or in real benefits"**.

In view of the said problems, it was decided, against the background of section 36(a)(1) of the <u>Invalids (Compensation and Rehabilitation) Law [Consolidated Version], 5719-1959</u>, which expressly distinguishes between conducting suits and collecting compensation, that the end of the provision of sec. 36(a)(5) of the Law, which establishes when an invalid may **"sue under another law"**, should be interpreted as referring to the realization of the suit, which concerns the collecting of the damages and not the conducting of the proceedings.

The legal result is that the initial standing of the entitled injured invalid to institute the two suits – does not change upon receiving compensation. In other words, the injured party may conduct both suits in parallel, both against the state and against the tortfeasor, and if he first applied for compensation – as in the case before me, he may still institute a suit against the tortfeasor and conduct it to completion. If, in the end, he prefers to collect damages from the tortfeasor, he will have to meet the condition of sec. 36(a)(5) of the Invalids Law, viz: to return all the amounts he received from the state, as a condition to receiving the damages from the tortfeasor.

SHATSKY – 006811-T
P1: 974

Symbol [   ]

Case 1:18-cv-12355-MKV-DCF   Document 136-8   Filed 10/05/21   Page 92 of 93
Case 9:02-cv-02280-RJC   Document 253   Filed 12/5/12   Page 91 of 109

# Tel-Aviv-Jaffa District Court

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**

This solution changes the alternative available to the injured party, who may choose between compensation and damages, from a theoretical alternative to a real alternative, and is consistent with the provisions of Basic Law: Human Dignity and Liberty.

80. In view of the aforesaid, there is no flaw in instituting a suit in court despite receiving compensation from the state, such that at the end of the day the injured party will have the option of choosing which of the possibilities is preferable from her point of view, whether continuing to receive the compensation from the state, or returning it and receiving damages from the tortfeasors. Therefore, the Bezeq group's claim is hereby dismissed, including the claim in regard to the lack of good faith attributed to the Plaintiffs (in para. 11 of Bezeq's summation).

81. In conclusion, we hereby grant a judgment in the amount of <u>NIS 1,944,177</u>, with the addition of legal fees at the rate of 20%, experts' fees, and a return of filing fees.
In accordance with what was detailed in the decision, Defendants 7 and 8 will jointly and severally bear 70% of the amount of the judgment, while Defendants 1-5 will jointly and severally bear 30% of the amount of the judgment.

The suit against Defendant 9 – is dismissed.

In view of the tragedy that is the subject of the suit, and despite the fact that it was recommended that the Plaintiffs agree to the dismissal of the suit against this Defendant in the early stages of the proceeding, I make no order for costs.

Given this day, 17 Adar 5773, 26 February 2013, in the absence of the parties.

( - )
Dalia Ganot, Judge

SHATSKY – 006812-T
P1: 975

Symbol [   ]

**Tel-Aviv-Jaffa District Court**

**C.F. 1047-04 Estate of Late Mentin Amit Amos et al. v. Bezeq Israel Telecommunications Ltd et al**