# LOWELL DECL. EX. 2b

Original



בית המשפט המחחי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

בפני   כב' השופטת דליה גנות

תובעים   1.עזבון המנוח מנטין עמית עמוס
         2.ראינס ניצה מנטין
         ב"כ עו"ד ענת גינזבורג

         נגד

נתבעים   1.בזק החברה הישראלית לתקשורת בע"מ
         2.אשר בן נעים
         3.יקותיאל לביא - מנהל המחלקה לאבטחת פיזית
         4.דרור אוברלנדר
         5.יהודה אריה
         6.לילית אבטחה בע"מ
         7.הרשות הפלשתינית
         8.המועצה הפלשתינית
         9.הראל חברה לביטוח בע"מ

## פסק דין

1

2

3    1.   בפני כתב תביעה, אשר הוגש על ידי עזבון המנוח מנטין עמוס ז"ל (להלן: "המנוח") וכן על

4         ידי אינס ניצה מנטין – אמו ויורשתו של המנוח (להלן: "האם") כנגד בזק – החברה

5         הישראלית לתקשורת בע"מ, כנגד אשר בן נעים, כנגד יקותיאל לביא, כנגד דרור אוברלנדר,

6         כנגד יהודה אריה, כנגד לילית אבטחה בע"מ – בפירוק, כנגד הרשות הפלשתינית, כנגד

7         המועצה הפלשתינית וכנגד הראל – חברה לביטוח בע"מ.

8

9         העובדות הצריכות לעניין

10

11   2.   בתאריך 26/6/036 נרצח עמית עמוס מנטין ז"ל, כאשר במהלך עבודתו כטכנאי בזק בישוב

12        בקעה אל גרבייה נורה על ידי מחבל.

13

14        המנוח נרצח במהלך ביצוע פיגוע חבלני, שביצע מחבל – קטין בן 15.5 במועד האירוע.

15        המחבל נתפס ונשפט, והוא מרצה את עונשו בבית כלא בישראל.

16

1 מתוך 90

SHATSKY-006723



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

3.   התובעת טוענת, כי הנתבעים אחראיים לרצח בנה, ועל כן עליהם לפצותה בגין נזקיה
     כתוצאה מרצח בנה.

4.   ייאמר מיד, כי לילית אבטחה בע״מ הינה חברה בפירוק, וקיים כנגדה צו עיכוב הליכים, דבר
     שאינו מונע את קביעת חבותה, ככל שקיימת, בגין אי מניעת רצח המנוח.

5.   לצורך כתיבת פסק הדין בחרתי לראות בנתבעים בזק – החברה הישראלית לתקשורת בע״מ
     (להלן : ״**בזק**״), יקותיאל לביא, דרור אוברלנדר ויהודה אריה כישות אחת, ומשכך לא אדון
     באחריותו האישית של כל אחד מהנתבעים 3-5, באופן שאחריותם, או חוסר אחריותם
     ייקבעו ביחד ולחוד עם בזק (להלן : ״**קבוצת בזק**״).

<u>**הרצח**</u>

6.   לצורך קביעת אחריות בנזיקין, יש לקבוע את עובדות המקרה, אשר הסתיים במותו הטראגי
     של המנוח.

     בתאריך 26.6.03 הגיעו טכנאי בזק – המנוח והמאבטח אשר בן נעים (להלן : ״**בן נעים**״)
     לבקעה אל גרבייה לצורך ביצוע עבודות בזק, שכללו תיקוני תקלות בהתאם להזמנות תיקון
     שנמסרו על ידי תושבים מקומיים.

     המנוח ובן נעים הגיעו לבקעה אל גרבייה בשתי מכוניות. המנוח נהג ברכב מסוג סיטרואן
     ברלינגו, אשר נשא את הלוגו של בזק (להלן : ״**הברלינגו**״) ואילו בן נעים הגיע עם רכבו
     הפרטי מסוג הונדה סיוויק.

     בן נעים החנה את רכבו בעסק לאביזרי רכב, עבר לרכב של המנוח, והשניים החלו בעבודתם.

     כפי שיובהר בהמשך, רכבו של בן נעים הושאר בחנות לאביזרי רכב ״דנה״ משום שבן נעים
     סיכם עם בעל החנות – וואיל קעדאן (להלן : ״**וואיל**״), כי הלה יתקין מגבר ברכבו, וכאמור,
     לאחר השארת הרכב הצטרף בן נעים למנוח ברכב הברלינגו והשניים החלו את עבודתם
     בבקעה אל גרבייה.

     בשלב מסויים במהלך השעות שלפני הצהריים, חזרו המנוח ובן נעים לחנותו של וואיל,
     כאשר לטענת בן נעים הם עשו כן, הן כדי לתת לוואיל את מפתח ההונדה לצורך התקנת

SHATSKY-006724



## בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

1    המגבר, והן על מנת שהלה יקח אותם לביתו, שכן לדברי בן נעים, ואיל יצר עימו קשר
2    טלפוני ערב קודם לכן וביקש ממנו **לזרז** תיקון עמוד בזק שנפל בסמוך לביתו.
3

4    בן נעים יצא מרכב הברליינגו ואילו המנוח נשאר יושב ברכב, עם חלונות סגורים ושוחח
5    בטלפון תוך כדי המתנה לשובו של בן נעים לברליינגו. בזמן שבן נעים שוחח עם ואיל,
6    במרחק של כ- 5 מ׳ מרכב הברליינגו, כשהוא עומד עם גבו לרכב הברליינגו, הגיע לרכב
7    הברליינגו נער כבן 16 שנים, שלף אקדח וירה בראשו של המנוח חמישה כדורים מבעד
8    לשמשה הסגורה. ירי זה גרם למותו של המנוח.
9

10    למשמע הירויות הסתובב בן נעים, שלף את האקדח, שנשא ברשיון כמאבטח וירה לכיוון
11    המחבל, שהחל נמלט, כאשר בן נעים רודף אחריו.
12

13    כפי שהתברר, במהלך מנוסתו, השליך המחבל את נשקו, אשר נתפס על ידי בן נעים. עוד
14    התברר, כי המחבל נפצע כתוצאה מהירי של בן נעים לעברו, דבר אשר איפשר את תפיסתו,
15    והוא אושפז בבית החולים ״**הלל יפה**״ בחדרה לצורך קבלת טיפול.
16

17    למשמע הירויות הגיע למקום צוות נוסף של בזק, שעסק גם הוא בתיקונים בבקעה אל
18    גרבייה באותו יום. המאבטח אוני דביר נכנס לרכב הברליינגו, התיישב במושב שליד הנהג
19    וניסה לדבר עם המנוח, ואף להניעים אותו, אולם מאמציו כשלו, שכן המנוח נפטר מפציעתו.
20

21    לצורך השלמת התמונה יצויין, כי למקום האירוע הגיע אמבולנס ״וואן״ (חברת אמבולנסים
22    ברשות הפלשתינית),אשר סירב לטפל במנוח, ואף הוציאו מהאמבולנס לאחר שהוא כבר
23    הוכנס אליו, ובסופו של דבר הגיע למקום אמבולנס של מד״א, אשר אנשיו קבעו את מותו
24    של המנוח ופינו אותו מהמקום.
25

26    <u>החבות ועוולת הרשלנות</u>
27

28    .7 בפסק הדין הנני מתעתדת לסקור ולקבוע את היחסים המשפטיים שבין המנוח לבין כל אחד
29    מהנתבעים, על מנת לקבוע קיומה או שלילתה של חבות, וכן – במידה שתקבע קיומה של
30    חבות, אדון, אדון בשאלה האם הופרה חובת הזהירות כלפי המנוח, והאם קיים קשר סיבתי
31    משפטי בין הפרת החובה לבין הנזק שאירע.
32

33    .8 לצורך הוכחת אחריות בעוולת הרשלנות, יש להוכיח קיומם של שלושה יסודות:
34

3 מתוך 90

SHATSKY-006725



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

|    |    |
|---|---|
| 1 | א.  קיומה של חובת זהירות החלה על המזיק כלפי ניזוק, הן במישור חובת הזהירות |
| 2 | המושגית והן במישור חובת הזהירות הקונקרטית. |
| 3 | ב.  הפרת החובה האמורה. |
| 4 | ג.  הוכחת הנזק כתוצאה מהפרת החובה. |
| 5 | (ע.א. 145/80 ועקנין נ' **המועצה המקומית בית שמש ואח'**, פ"ד לו(1) 113, (להלן : **"פרשת** |
| 6 | **ועקנין"**). |
| 7 |  |
| 8 | 9.  <u>באשר לחובת הזהירות המושגית</u> – השאלה היא האם קיימת חובת זהירות בין סוג מסויים |
| 9 | של מזיקים לבין סוג מסויים של ניזוקים, כאשר השאלה נבחנת לאור מבחן הציפיות, |
| 10 | כלומר, האם המזיק יכול היה לצפות את התרחשות האירוע והאם צריך היה לצפותו |
| 11 | מבחינה נורמטיבית. (ע"א 653/97 חב' **מרכז ברוך וצפורה בע"מ נ' עיריית תל אביב יפו,** |
| 12 | פ"ד נג (5) 817, (להלן : **"פרשת מרכז ברוך וצפורה"**). |
| 13 |  |
| 14 | ההכרעה הסופית בשאלת הצפיות הנורמטיבית, המרכיבה את חובת הזהירות המושגית |
| 15 | היא עניין של מדיניות משפטית (ראו : <u>פרשת מרכז ברוך וציפורה</u>, שם בעמ' 825) ובהמשך |
| 16 | אדון בשאלה זו בהתייחס לכל אחד מהנתבעים. |
| 17 |  |
| 18 | <u>**חובת זהירות מושגית ביחסים שבין המנוח לבין בזק, יקותיאל לביא, דרור אוברלנדר ויהודה אריה**</u> |
| 19 | <u>**(קבוצת בזק)**</u> |
| 20 |  |
| 21 | 10.  בזק הייתה מעבידתו של המנוח בעת הירצחו, כאשר הרצח אירע במהלך יום העבודה. |
| 22 | דומני, כי אין להכביר מילים באשר לקיומה של חובת זהירות מושגית בין מעביד לבין |
| 23 | עובדו. חובה זו מוכרת היטב במסגרת מדיניותו המשפטית של בית המשפט, כפי שבאה לידי |
| 24 | ביטוי באופן שיטתי בפסיקתו. בעקרון, מעביד סביר צריך ויכול לצפות התרחשות של נזק |
| 25 | גוף לעובדו (ראו למשל ע"א 684/76 **אייל נ' פוקסמן**, פ"ד לא(3) 349, 359), כפי שנקבע למשל |
| 26 | בע"א 663/88 **שריזיאן נ' לבידי אשקלון בע"מ** (פ"ד מז(3) 225, 229) (להלן : **"פרשת** |
| 27 | **שריזיאן"**) : |
| 28 |  |
| 29 | "נראה שהיום, אין עוד צורך לבחינת עצם קיומה של חובת זהירות |
| 30 | מושגית בין מעביד לעובדו. חובה זו מוכרת יפה בפסיקה ענ יפה |
| 31 | ועקבית". |
| 32 |  |
| 33 | וכן דברי בית המשפט בע"א 417/81 **מלון רמדה שלום נ' אמסלם** (פ"ד לח(1) 72, 76 (להלן : |
| 34 | **"פרשת מלון רמדה שלום"**) : |

4 מתוך 90

SHATSKY–006726



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | |
| 2 | **"מעביד – כמעביד כלפי עובדיו, לא יכולה להיות מחלוקת, כי מוטלת** |
| 3 | **עליו חובת זהירות זו".** |
| 4 | |
| 5 | .11 מהאמור עולה, כי אין כל מחלוקת באשר לקיומה של חובת זהירות מושגית בין המנוח לבין |
| 6 | קבוצת בזק. |
| 7 | |
| 8 | <u>חובת זהירות מושגית בין המנוח לבין אשר בן נעים וליילית אבטחה בע"מ.</u> |
| 9 | |
| 10 | .12 אשר בן נעים –המאבטח - היה עובד ליילית אבטחה בע"מ   (להלן: **"ליילית"**) והועסק |
| 11 | כמאבטח בבזק, כאשר במועד האירוע אבטח את המנוח, ועל כן, מתוקף הגדרת תפקידו – |
| 12 | מאבטחו של המנוח, היה עליו לשמור על שלומו ובטחונו של המנוח, עובדה המקימה חובת |
| 13 | זהירות מושגית ביחסים שבין בן נעים וליילית מחד גיסא וליילית לבין המנוח מאידך גיסא. |
| 14 | |
| 15 | <u>חובת זהירות מושגית בין המנוח לבין הרשות הפלשתינית והמועצה הפלשתינית</u> |
| 16 | |
| 17 | .13 כפי שיובהר בהמשך פסק הדין, ביחסים שבין הרשות הפלשתינית לבין המנוח קיימת חובת |
| 18 | זהירות קונקרטית ברורה וחד משמעית, אשר הופרה על ידה. |
| 19 | |
| 20 | מכח קיומה של חובה זו, והפרתה, ספק אם יש לדון בדרך המסורתית בשאלת קיומה של |
| 21 | חובת זהירות מושגית. |
| 22 | |
| 23 | עמדה זו מצאה לאחרונה, לא אחת, את ביטוייה בפסיקה ובספרות המשפטית, במסגרת |
| 24 | העמדה, על פיה אין צורך בקביעת חובת זהירות מושגית, שכן, ככל שעסקינן בשאלה האם |
| 25 | יש מניעה עקרונית להטיל אחריות על מזיקים מסוג פלוני כלפי ניזוקים מסוג אלמוני, |
| 26 | בחינה זו היא כללית מידי, ועל כן יש להעדיף את הגישה הגורסת, כי חובת הזהירות |
| 27 | המושגית ממילא תישלל במקרים בודדים בלבד, וכי מוטב להידרש לנסיבות המקרה |
| 28 | הספציפי, קרי: לבחון תחילה את שאלת קיומה של ההתרשלות, ואם התשובה לכך היא |
| 29 | חיובית, לעבור ולבחון האם קיימת חובת זהירות קונקרטית, תוך פסיחה על שאלת החובה |
| 30 | המושגית (ע"א 878/06 **דר' טרויהפט ואח' נ' עטיה וע"ח**', פורסם בנבו, להלן: **"פרשת** |
| 31 | **טרויהפט"** ; י. גלעד **"על יסודותיה של עוולת הרשלנות"**, דיני משפט, כרך יד (תשמ"ט) |
| 32 | 319 ; י' גלעד **"הסיבתיות במשפט הנזיקין הישראלי"**, משפטים יד', (תשמ"ד – תשמ"ה). |
| 33 | |

SHATSKY-006727



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   זה המקום לציין, כי קיימים מקרים שבהם אין כל קושי לקבוע קיומה של חובת זהירות
2   מושגית לפני בחינת שאלת חובת הזהירות הקונקרטית, אולם, קיימים מקרים – כמו
3   המקרה אשר בפני – בהם יש קושי לדון תחילה בשאלת חובת הזהירות המושגית, ההופכת
4   לברורה מאליית לאחר ליבון שאלת חובת הזהירות הקונקרטית.
5
6   נוכח האמור, הנני קובעת כבר עתה – כפי שיובהר בהמשך – כי ביחסים שבין המנוח לבין
7   הרשות הפלשתינית קיימת חובת זהירות מושגית.
8
9   <u>**חובת זהירות קונקרטית והפרתה**</u>
10
11   .14   במישור זה נבחנת השאלה **"האם בין המזיק הספציפי לבין הניזוק הספציפי, בנסיבותיו**
12   **המיוחדות של המקרה, קיימת חובת זהירות קונקרטית בגין הנזק הספציפי שהתרחש"**
13   (**פרשת עוקנין**, שם בעמ' 125 ; ע"א 3510/99 **ולעס נ' אגד – אגודה שיתופית לתחבורה**
14   **בישראל**, פ"ד נה(5) 826, 840).
15
16   גם שאלה זו, כקודמתה, נבחנת על פי מבחן הצפיות, קרי : האם האדם הסביר יכול היה
17   לצפות את התרחשות הנזק במישור הטכני – עובדתי, והאם   צריך היה לצפות את
18   התרחשות הנזק בנסיבותיו הספציפיות, במישור הנורמטיבי.
19
20   הלכה היא, כי אחריותו של מזיק החב חובת זהירות כלפי הניזוק איננה משתרעת על כל
21   מקרה בו נגרם נזק לניזוק בשל מעשיו, או מחדליו של המזיק. אין ללמוד מעצם קרות הנזק
22   שחובת הזהירות הופרה. אחריותו של המזיק כלפי הניזוק היא לנקוט אמצעי זהירות
23   סבירים, ורק אם לא נקט בהם, ובשל כך גרם הנזק, מתגבשת אחריותו של המזיק (ראו :
24   ע"א 437/87 **כהן נ' חברת חשמל לישראל בע"מ**, פ"ד מד(1) 807, 809).
25
26   סבירותם של אמצעי הזהירות נקבעת על פי אמות מידה אובייקטיביות, המגולמות
27   באמירה, כי על המזיק לנהוג כפי שאדם סביר היה נוהג בנסיבות העניין.
28   רמת זהירות זו נקבעת על פי שיקולים של מדיניות משפטית (פרשת עוקנין, עמ' 131) .
29
30   .15   כפי שציינתי, חובה על הניזוק, להוכיח קיומו של קשר סיבתי עובדתי וקשר סיבתי משפטי
31   בין הפרת חובת הזהירות כלפי, לבין הנזק שנגרם לו (סע' 64 <u>לפקודת הנזיקין</u> [נוסח חדש]
32   (להלן : **"פקודת הנזיקין"**) ; פרשת עוקנין, עמי 144 ; ע"א 576/81 **בן שמעון נ' ברדה**, פ"ד
33   לח(3) 1, 7 (להלן : **"פרשת ברדה"**), ע"א 610/94 **בוכבינדר נ' כונס הנכסים הרשמי**
34   **בתפקידו כמפרק בנק צפון אמריקה**, פ"ד נו (4) 289, 309, 311 (להלן : **"פרשת בוכבינדר"**).

6 מתוך 90

SHATSKY–006728



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

ייעודם של כללי הסיבתיות הוא לקבוע, אם קיימת מבחינת הדין זיקה מספקת בין אשמו
של המזיק לבין נזק שסבל הניזוק. קיומה של זיקה זו מקים את אחריותם של המזיק, או
של המזיקים לנזק, ואת זכותו של הניזוק לסעדים הנובעים מאחריות זו (ראו: י' גלעד
**"הסיבתיות המשפט המזיקין הישראלי – בחינה מחודשת**, משפטים ידי 15, 16 (להלן:
**"הסיבתיות במשפט הישראלי"**).

16.   הקשר הסיבתי העובדתי – הדרישה הבסיסית היא, שהנזק ייגרם עובדתית על ידי
ההתנהגות של המזיק (במעשה, או במחדל). התנהגות זו צריכה להיות גורם הכרחי, או גורם
מספיק לקרות הנזק (ראו : י. גלעד **"על יסודותיה של עוולת הרשלנות במשפט הנזיקין
הישראלי"**, עיון משפט יד 319, 326).

מקובל לומר, כי משמעות מבחן זה היא, כי הפרתה של חובת הזהירות מהווה גורם, אשר
אין בלעדיו, כלומר, שללא הפרת החובה לא היה נגרם הנזק (פרשת ועקנין, 144 ; הסיבתיות
במשפט הישראלי, עמי 17). כל גורם, שדי היה בו לגרום לנזק ייחשב כגורם עובדתי לנזק
(הסיבתיות במשפט הישראלי, עמי 18). משמעות הדבר בהקשר דנן הינה, כי יש לבחון האם
התרשלותם של כל אחד מהנתבעים אשר בפני מהווה ברמה העובדתית **"הסיבה בלעדיה
אין"** לנזקו של התובע (פרשת בוכבינדר, עמי 311), וכפי שיובהר בהמשך, התנהלותם של כל
אחד מהנתבעים, הינה לעניית דעתי **"הסיבה בלעדיה אין"** לנזקו של המנוח, ולולא
ההתרשלויות שיפורטו, לא היה מתרחש כלל האירוע הטראגי, ולחילופין, אף אם היה נסיון
לירות במנוח, הוא לא היה מוצא את מותו כתוצאה מנסיון זה.

17.   הקשר הסיבתי המשפטי – משנקבע קיומו של קשר סיבתי עובדתי, קמה ועולה השאלה, אם
הקשר הסיבתי לא נשלל בשל שיקולים של **"סיבתיות משפטית"**.

נקבע, כי **"הסיבה המכרעת"** לקרות הנזק נקבעת על פי אמות מידה משפטיות, אשר
במרכזם עומדים שלושה מבחנים חלופיים : מבחן הצפיות, מבחן הסיכון ומבחן השכל הישר
(פרשת ברדה, בעמי 7 ; הסיבתיות במשפט הישראלי, עמי 24).

כפי שציינתי, מדובר במבחנים חלופיים – ולא מצטברים – אולם כפי שאראה בהמשך, הנני
בדיעה, כי כל שלושת המבחנים הוכחו לגבי כל הנתבעים.

כפי שציינתי קודם לכן, לפי גישה אחרת שהובאה בפסיקה, אין להבחין בין חובת זהירות
מושגית וקונקרטית, אלא יש לבחון את השאלה כמקשה אחת (ראו למשל ע"א 10084/04

SHATSKY-006729



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1    **גודר נ׳ המועצה המקומית מודיעין**, פורסם בנבו; ע״א 2625/02 **נחום נ׳ דורנבאום**, פ״ד
2    נח(3) 385,408; ע״א 10078/03 **שתיל נ׳ מדינת ישראל**, פורסם בנבו). גישה זו באה לידי
3    ביטוי בע״א 915/91 **מדינת ישראל נ׳ לוי** (פ״ד מח(3) 45), שם נקבע, כי חובת הזהירות תוכר
4    בהתקיים שני יסודות: האחד – יסוד של ״שכנות״ או ״קירבה״; השני – מסקנה שיפוטית
5    לפיה צודק, סביר והוגן שתיקבע חובת זהירות. במקרה זה, בגדרו של היסוד הראשון נבחנת
6    הזיקה בין המזיק לניזוק – אשר יכול שתהיה זיקה משפטית, או פיסית, או מכח הסתמכות
7    וכו׳, היוצרת את חובת הזהירות. בגדר היסוד השני נשקלים שיקולי מדיניות שיפוטית
8    שונים (ראה **עניין לוי** בע״מ 70-66; **עניין דורנבאום** בע״מ 408-409). (אודות היחס שבין
9    הגישות ראה מאמרו של ישראל גלעד ״**הנחות עבודה, אינטואיציה שיפוטית ורציונליות**
10    **בקביעת גדרי האחריות ברשלנות**״ משפטים כו׳, 304-305 ,295 (התשנ״ו).

12    מבלי לדון בפירוט בהבדלי הגישות האמורות, דומני, כי שתיהן משלבות שיקולי מדיניות
13    ושפיטה דומים, אשר לאורם יש לתחום את גבולותיה של חובת הזהירות, ומטרתן היא
14    אחת, כפי שהיטיב לנסח כב׳ השופט ריבלין **בפרשת דורנבאום** בקובעו:

16        ״תחולתה של עוולת הרשלנות היא, בין השאר, פועל יוצא של קביעת
17        גדריה של חובת הזהירות. גדרים אלה עשויים לבור את אותם
18        המקרים, בהם התרשל אדם, ואשר לאור שיקולי מדיניות ראוי
19        להטיל עליו אחריות בגין מעשיו, מבין המקרים בהם התרשל אמנם
20        המזיק, אלא ששיקולי המדיניות מביאים את בית המשפט למסקנה
21        **כי לא יהא זה ראוי להטיל עליו אחריות**״ (**עניין דורנבאום**, בע״מ
22        408).

24    ובהמשך אעשה כמיטב יכולתי לנסות ולשלב בין שתי הגישות האמורות, כדי להגיע לתוצאה
25    הנכונה והראויה.

27    <u>חובת זהירות קונקרטית ביחסים שבין המנוח לבין קבוצת בזק</u>

29    .18   יש להעריך את התנהלותה של קבוצת בזק בהתאם לתצהיריהם ועדויותיהם של הנתבעים
30       ושל עדים רלבנטיים נוספים.

32    אומר מיד, כי אינני מייחסת כל ערך ראייתי לעדויותיהם של התובעת ושל אחי המנוח – מר
33    רונן מנטין, בהתייחס לאופן התרחשות האירוע נשוא כתב התביעה, שכן בנושא זה מהווה

SHATSKY-006730



בית המשפט המחחי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

|   |   |
|---|---|
| 1 | עדויותיהם עדות שמועה, שהרי לא נכחו במקום האירוע בזמן האירוע, וממילא אינם |
| 2 | יודעים מידיעה אישית את נוהלי העבודה בבזק. |
| 3 | |
| 4 | הנתבע 2 – יקותיאל לביא (להלן: "**לביא**"), הגיש תצהיר עדות ראשית ואף העיד בפני בית |
| 5 | המשפט. |
| 6 | |
| 7 | מדברי לביא עולה, כי במועד האירוע הוא ניהל את אגף הבטחון, הבטיחות והחירום בבזק |
| 8 | (סעי' 2 לתצהירו). |
| 9 | |
| 10 | לביא טוען בתצהירו, כי במועד הפיגוע נשוא כתב התביעה סבלה המדינה כולה "**ממציאות** |
| 11 | **קשה של מעשי טרור ואירועי חבלה, הגובים קורבנות רבים בנפש, חפים מפשע**" (סעי' 7 |
| 12 | לתצהיר). הימים – ימי האינתיפאדה השניה, אשר ללא ספק היו סוערים מאוד והתאפיינו |
| 13 | בפיגועים ובנסיונות פיגוע רבים בכל רחבי הארץ, ועל כן לדעת לביא – כמו גם לדעת כל עדי |
| 14 | בזק – היות ומדובר היה במציאות בטחונית קשה כלל ארצית, אשר לא היה בידי בזק |
| 15 | למונעה, או לצפותה, אין להטיל עליה חבות. |
| 16 | |
| 17 | אינני מקבלת עמדה זו. דווקא משום שמדובר היה במציאות בטחונית קשה ביותר, וידועה |
| 18 | לכל הגורמים, היה על בזק לוודא, כי היא עדכנה את מערך הבטחון שלה ושינתה את נוהליה |
| 19 | כדי להתאימם למציאות המתוארת על ידי אנשיה. זאת לא קרה. |
| 20 | |
| 21 | לביא טען בתצהירו, כי בתוקף תפקידו "**אני יודע, כי חברת בזק במועדים הרלבנטיים** |
| 22 | **הנהיגה נוהלים וכללי בטחון ראויים וסבירים, ואף מעבר לכך**" (סעי' 17 לתצהיר), ועל כן, |
| 23 | מן הראוי היה להמצאא נוהלים מעודכנים אלו, שהותאמו לכאורה למציאות הבטחונית, |
| 24 | שהייתה מנת חלקה של מדינת ישראל במועדים הרלבנטיים, ובמיוחד בישובי התפר |
| 25 | הסמוכים לגבול, דוגמת בקעה אל גרבייה, אלא שלמעט אמירות, אשר לעיתים גובו |
| 26 | במסמכים סתמיים ולעיתים לא, לא הרימה בזק את הנטל הרובץ עליה להוכיח קיומם של |
| 27 | נוהלי בטחון **עדכניים**, המותאמים למציאות הבטחונית נשוא האינתיפאדה השניה. |
| 28 | |
| 29 | לביא הפנה את בית המשפט לנוהל שהוצא בינואר 1995(!!!),"**באגף הבטחון של חברת בזק,** |
| 30 | **שכאמור עמדתי בראשו, נוהל התנהגות בשטחים ובאיזורים רגישים ודאגנו להפיצו** |
| 31 | **ולפרסמו בקרב עובדי החברה, המאבטחים והטכנאים ולפקח על ביצועו ואכיפתו על ידם**" |
| 32 | (סעי' 19 לתצהיר). אלא מאי? אמירה יפה זו נותרה כאות מתה מעל דפי התצהיר, ולא |
| 33 | הוכחה. נהפוך הוא, לעניות דעתי הוכח באופן פוזיטיבי, כי לא פורסמו נהלים חדשים כמענה |

SHATSKY-006731



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1    מעודכן למצב הבטחוני הקשה ששרר במועד הפיגוע, וממילא לא נאכפו הנהלים – שכאמור
2    לא פורסמו כלל.

3

4    במהלך חקירתו של לביא התברר, כי הוא החל לעבוד בבזק בשנת 2000 (עמ׳ 64 לפרוטוקול
5    שורה 25), ועל כן לא ברורה התצהרות הכלולה בסע׳ 19 לתצהירו, שכן הוברר, כי במועד
6    פרסום הנוהל בשנת 1995, כלל לא עבד בבזק וממילא לא היה שותף לניסוח אותם נהלים
7    (עמ׳ 87 שורות 7-12). זאת ועוד. נהלים אלו אשר נוסחו בשנת 1995, נוסחו לפני פרוץ
8    האינתיפאדה השנייה, שפרצה בספטמבר 2000 ונמשכה עד 05/10, ומטבע הדברים לא
9    הותאמו למצב הבטחוני ששרר במדינת ישראל באותן שנים.

10

11    לביא טען בחקירתו, כי עם כניסתו לתפקידו בבזק, **״עבר״** על הכללים משנת 1995, ובמענה
12    לשאלה, האם לא סבר שיש לעדכנם, ענה **״אנחנו הוצאנו מידי פעם... הוצאנו הוראות, מידי**
13    **פעם הוצאנו, הוצאתי אני הוראות... היו הוראות שעה שהוצאתי...״** (עמ׳ 88 שורות 27-19),
14    אולם כאשר התבקש להציג את אותן הוראות שעה, או נהלים חדשים, ענה **״יש אותם**
15    **בתיקים של בזק״** (עמ׳ 89 שורה 4), אולם לא **״זכר״** האם יש מסמך מעודכן יותר מנספח א׳
16    לתצהירו, שאינו אלא נוהל בלתי רלבנטי ובלתי מעודכן משנת 1995.

17

18    התנהלות זו של בזק – כפי שבאה לידי ביטוי בעדותו של לביא – הינה חמורה, שכן לביא
19    העיד, כי לפני כתיבת תצהירו הוא עיין בתיק האבטחה של בזק, תיק אשר לא הוגש בפני בית
20    המשפט, ולדברי לביא **״זה לא כאן״** (עמ׳ 86), והוא אף אישר, כי הוא קבע את מדיניות
21    האבטחה של בזק (עמ׳ 140 שורות 1-2), אם כן – הדעת נותנת, שלבוא מעורה היטב
22    בתוכניות האבטחה של בזק, ומסוגל לפרט באוזני בית המשפט, אלא שתקוה זו נכזבה.

23

24    לביא העיד, כי ידע שבקעה אל גרבייה ממוקמת על גבול התפר בין הקו הירוק לבין שטחים
25    הנמצאים בניהול הרשות הפלשתינית, ובמיוחד היישוב הצמוד – בקעה אל שרקייה, ואף
26    היה מודע למעבר הקל מבקעה אל שרקייה לבקעה אל גרבייה בתקופה הרלבנטית לפיגוע
27    (עמ׳ 71 שורות 14-18, עמ׳ 72) (כיום קיימת במקום גדר הפרדה).

28

29    למרות צמידותה של בקעה אל גרבייה לגבול, ולמרות ביצועם של מספר פיגועים ונסיונות
30    פיגוע, לרבות אירועים שהסתיימו במות ישראלים בשנים הרלבנטיות לאינתיפאדה השניה,
31    לא ניהלה בזק יומן אירועים, על מנת להתחקות אחר מידת הסכנה הצפויה לעובדיה באיזור
32    קו התפר, וממילא לא הוכיחה, כי ניסתה להתמודד עם סכנה זו (עמ׳ 79 שורות 18-25, עמ׳
33    80). לביא חזר וטען לקיומם של נהלי בטחון ואבטחה בבזק (עמ׳ 84 שורות 15-20) וכן
34    תוכניות עבודה (עמ׳ 106 שורות 6-16), אולם כאשר התבקש להציגם, ענה **״יש אותם**

10 מתוך 90

SHATSKY-006732



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1   **במשרד"** (עמ' 137), והוא אף הגדיל לעשות כאשר טען, כי בהתאם לאותן תוכניות עבודה,
2   שקיומן לא הוכח כלל, אף נערכו מעקבים אחר העובדים כדי לוודא התנהלות על פיהן (עמ'
3   106 שורות 6-16, עמ' 110).
4
5   לביא הרבה להתייחס בעדותו לנוהלי עבודה ולהנחיות שניתנו לעובדים, אולם כאשר
6   התבקש להציגן טען, כי מדובר בהנחיות שניתנו **"בעל פה"** (עמ' 127 שורה 199).
7
8   לביא טען, כי בנוסף לנוהלי העבודה וההנחיות שניתנו בעל פה, שכאמור קיומם לא הוכח,
9   עברו העובדים – הטכנאים והמאבטחים – תדרוכי ביטחון.
10
11   כאשר נשאל האם נערכו התדרוכים בהתאם לתוכנית עבודה סדורה, ענה לביא במפתיע, כי
12   התדרוכים נעשו, בין היתר **"לפי תחושה"** של אנשי בזק, אשר **"חשו"** כי יש לכנס את
13   העובדים לתדרוך (עמ' 101, עמ' 122).
14
15   עוד טען לביא, כי הנוהל – משנת 1995 – הופק למאבטחים בזמן שעברו תדרוך (?!) (עמ'
16   139), אולם לא ידע להתייחס לעובדה, שמקריאת הנוהל משנת 1995 עולה, שהוא מתייחס
17   בכלל לשטחים A,B,C ולא דווקא לשטחי מדינת ישראל (עמ' 139), מה עוד שנוהל זה
18   קובע, שיש לשלוח **שני** עובדים חמושים (עמ' 111), כאשר הוברר, כי במקרה נשוא כתב
19   התביעה רק המאבטח בן נעים נשא נשק, קרי: בזק אף לא פעלה בהתאם לאותו נוהל לא
20   מעודכן ולא מתאים, ולא שלחה לבקעה אל גרבייה **שני** עובדים חמושים.
21
22   לביא טען בסע' 15 לתצהירו, **"כי משטרת ישראל ושום גורם ביטחוני מוסמך לא נתן לבזק**
23   **מעולם, לפני האירוע, הנחיות כיצד לנהוג כאשר החברה מבצעת עבודה בישוב ערבי..."**,
24   והנה, בניגוד למוצהר, התברר במהלך עדותו, כי על פי דבריו הוא התקיימו בין בזק לבין
25   משטרת ישראל קשרי עבודה הדוקים ויומיומיים, אם כי מרביתם לא תועדו.
26
27   מנספח ה' לתצהיר לביא עולה, כי בבוקר האירוע שוחחה מוקדנית מבזק בשם ענת עם
28   משטרת עירון (עם הדר) ונמסר לה ש**"אין הגבלות"**, כפי שעשתה , כנטען על ידי בזק, כל
29   בוקר (עמ' 82-83). בהמשך עדותו טען לביא, כי התקיימו ישיבות עבודה בין בזק לבין
30   משטרת ישראל וכי משטרת ישראל אישרה את מדיניות הבטחון שננקטה על ידי בזק ואף
31   הנחתה את בזק (עמ' 84-85) אולם לא המציא כל אסמכתא לאמור, ודוק: עדות זו הינה
32   בניגוד גמור ומוחלט לנטען בסע' 15 לתצהירו של לביא, שטען כי משטרת ישראל לא הנחתה
33   את בזק, טענה שנשמעה כטרוניה של בזק כלפי משטרת ישראל.
34

SHATSKY-006733



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1   לביא העיד על קיומן של פגישות שוטפות עם משטרת ישראל (עמ׳ 95-96), אשר בעקבותיהן
2   שונה לכאורה הנוהל של בזק, אולם לא המציא כל אסמכתא לאמור (עמ׳ 112).
3
4   הדעת נותנת, שבעת התמודדות עם המצב הבטחוני הקשה ששרר במדינה בתקופת
5   האינתיפאדה השניה, מצב, אשר ללא ספק היה בידיעת אנשי האבטחה של בזק, כפי שהיה
6   בידיעת כל אזרח במדינת ישראל בתקופה ההיא, תקבע בזק נהלים מוקפדים, מעודכנים
7   ומשודרגים לפגישותיה עדכון והכוונון עם משטרת ישראל, אולם מעדות לביא התברר שהדבר
8   לא נעשה (עמ׳ 128, 152), ונראה, כי בזק המשיכה להתעדכן על ידי משטרת ישראל באופן
9   רודומלי ולא מתוכנן, דבר שלא מנע מלביא להמשיך ולטעון, כי בזק לא קיבלה הנחיות
10  ממשטרת ישראל לגבי התנהלות בישובים ערביים (עמ׳ 154).
11
12  בהמשך התברר, כי באוקטובר 2002 נערך בבזק תדרוך למאבטחים ולטכנאים במרחב חפר
13  – אשר בקעה אל גרבייה נמצאת בתחומו – ובמסגרתו עודכנו הטכנאים והמאבטחים בדבר
14  עלייה ברמת ההתרעות לפיגועים בגזרה זו, התרעות על נסיונות לחטיפת נשק וכד׳, עובדות
15  המצביעות על החמרה ספציפית במצב הבטחוני באיזור זה. לביא נשאל מהיכן קיבלה בזק
16  את המידע בדבר ההחמרה האמורה, והודה, כי המידע הגיע ממשטרת ישראל (עמ׳ 90-91),
17  אולם לא הוברר באיזו דרך הגיע המידע האמור לבזק, ומי האישיות בבזק שקיבלה אותו
18  והחליטה על קיום התדריך האמור בעקבות המידע שהתקבל.
19
20  מהאמור עולה, כי היה קשר רציף בין בזק לבין משטרת ישראל, אולם בהיעדר אסמכתא
21  כלשהי, ולו בדל נייר בהתייחס לאופיו של קשר זה, לא ניתן לקבוע האם מדובר בהדברות
22  מתוכננת שנעשתה על דעת בזק, ביוזמת בזק, או שמא מדובר בהתעניינות אקראית של מי
23  מאנשי בזק אצל משטרת ישראל. מכל מקום, ברור כי בהיעדר תוכנית מוגדרת ומפורטת של
24  קשרי עבודה עם משטרת ישראל,  לא ניתן לקבוע, כי בזק יצאה ידי חובתה כלפי עובדיה
25  בשמירה על בטחונם האישי.
26
27  לביא טען, כי בזק קיימה הערכות מצב (עמ׳ 95) אולם לא הומצאה כל אסמכתא המעידה על
28  קיומן של הערכות המצב הנטענות, או מסקנותיהן של הערכות המצב, ועל כן, אין מנוס
29  מהמסקנה, כי ספק גדול מאד האם באמת נערכו הערכות המצב הנטענות, שאם לא כן,
30  הייתה בזק ממציאה אסמכתא כלשהי, המעידה על ביצוען.
31
32  כפי שציינתי, לביא טען, כי העובדים – ובעיקר המאבטחים תודרכו על ידי אנשי בזק, עובדה
33  שלא הוכחה, וכן טען כי נמסר להם איושהו פנקס המפרט את הנחיות הבטחון, והעובדים
34  אף אישרו את קבלת הפנקס בחתימתם (עמ׳ 138-139),  אולם לא צורפה אסמכתא כלשהיא

12 מתוך 90

SHATSKY-006734



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1    המעידה שפנקס כזה נמסר למנוח, או לבן נעים, וממילא לא הומצאה אסמכתא המעידה על
2    חתימתם המאשרת את קבלת הפנקס.
3
4    מהעדויות עולה, כי עובר לתאריך 4.3.03 – כשלושה וחצי חודשים לפני רצח המנוח –
5    התלוננו עובדי בזק על תחושת חוסר בטחון בבקעה אל גרבייה, ובעקבות תלונתם נערך
6    במקום סיור של בכירי מחלקת האבטחה בבזק.
7
8    בסיכום הביקור (ת/15) נרשמה העובדה שהסיור נערך בעקבות תלונות העובדים, וכן נרשמו
9    המלצות ליישום, ובהן פגישה עם פלוגת מג״ב המוצבת במקום.
10
11    לביא נדרש בחקירתו לסיור זה, שנערך כאמור לבקשת העובדים, או אז התברר, שהסיורים
12    דוגמת הסיור האמור, נעדרו בעצם **להרגעת העובדים**, וממילא, לא נעשו לצורך הערכה
13    מחודשת של רמת האבטחה שיש לספק לעובדים (עמ׳ 103). קרי : בכירי מערך האבטחה של
14    בזק לא התכוונו מלכתחילה ליישם לקחים כלשהם בתחום הבטחוני כתוצאה מהסיור
15    האמור, עובדה הנתפסת בעיני כחמורה במיוחד, שכן התברר, שמטרת הסיור הייתה לשמש
16    גלולת הרגעה לעובדי בזק, שהתלוננו על תחושת חוסר הבטחון, ותו לא.
17
18    לביא לא זכר כלל אם נערכה פגישה עם מג״ב בעקבות הסיור האמור – אם כי אוברלנדר טען
19    כי פגישה כזאת התקיימה והוא השתתף בה באופן אישי (עמ׳ 184), אולם, מכל מקום לא
20    הוצג לעיני מסמך המתעד פגישה מעין זו, או את מסקנותיה, והנני חוששת, שדברי לביא
21    נכונים, וכאמור, מראש לא הייתה להנהלת בזק כל כוונה לשנות את הסדרי האבטחה
22    בעקבות הסיור האמור, ועצם קיומו של הסיור לא נועד, אלא כדי להרגיע את העובדים.
23
24    זה המקום לציין, כי בזק מתנערת מאחריותה לרצח המנוח בטענה שהמנוח ובן נעים הפרו
25    את הנוהלים, בכך שנכנסו לבקעה אל גרבייה בשני רכבים, כאשר הנוהל חייב כניסה של רכב
26    אחד, רכב בזק בלבד ; בכך שקיימו מגעים עם האוכלוסיה המקומית, מקום שמגע כזה נאסר
27    עליהם וכד׳, אלא מאי? כפי שציינתי מספר רב של פעמים, קיומם של הנוהלים לא הוכח,
28    וממילא לא הוכח מה היו ההנחיות הכלליות באותם נוהלים לכאוריים, ועל כן, אין מנוס
29    מהמסקנה, כי לא הוכח שנאסר על הטכנאים והמאבטחים להיכנס לשטחי העבודה בשני
30    רכבים, או שנאסר עליהם לקיים מגע עם האוכלוסיה המקומית. ודוק : גם אם היה מוכח
31    איסור כניסה בשני רכבים, הרי ממילא לא הוכח קשר סיבתי בין עצם הכניסה בשני רכבים
32    לבין הפגיעה האמור. באשר לאיסור מגע עם האוכלוסיה המקומית – איסור זה לא רק שלא
33    הוכח, אלא ההפך הוכח. מאבטחי בזק שהעידו בתיק זה (וואדים סימנוביץ, בן נעים, אוני
34    דביר) העידו, כי נהגו להיעזר בתושבים המקומיים במציאת כתובות של לקוחות בזק, וכן

13 מתוך 90

SHATSKY-006735



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

| | |
|---:|---:|
| 1 | נהגו לאכול במסעדות במקום ואף עשו עסקים עם המקומיים (עמ׳ 474-473, 498-497),ממש |
| 2 | כפי שעשה בן נעים עם ואיל בעת ביצוע הרצח, וכפי שהוזהר, התנהלות זו הייתה בידיעת |
| 3 | בזק, שלא מצאה בה כל פסול וממילא לא הוכח איסורה. |
| 4 | |
| 5 | המחדל שבאי המצאת מסמכים רלבנטיים להוכחת טענות בזק נמשך גם בעדותו של דרור |
| 6 | אוברלנדר – קצין אבטחה פיסית בבזק (עמ׳ 166-165), אשר כמו קודמו הירבה לטעון |
| 7 | טענות, שנטענו על דרך הסתם, ללא כל ביסוס ומבלי להמציא מסמכים לאימות דבריו. |
| 8 | |
| 9 | אוברלנדר הודה, כי למרות החרפת המצב הבטחוני בתקופה הרלבנטית לא שונו נוהלי |
| 10 | הבטחון משנת 1995 ( עמ׳ 171-170), אולם טען, שלא היה זה מתפקידו להוציא נהלים |
| 11 | חדשים. |
| 12 | |
| 13 | לדבריו, החובה להוצאת נהלים חדשים לבזק חלה על משטרת ישראל (?!)(עמ׳ 171) אולם |
| 14 | הוא הודה, כי לא פנה בעניין זה למשטרת ישראל, אם כי בהמשך טען שגם, אולם לא קיבל |
| 15 | תשובות (עמ׳ 173) וכמובן שאף אחת מאמירותיו לא לוותה באסמכתא כלשהי. |
| 16 | |
| 17 | אוברלנדר הודה, כי בזק פעלה על פי שיקול דעתה (עמ׳ 178), אולם לא פירט מה השיקולים |
| 18 | שעמדו בבסיס אותו שיקול דעת לכאורי, שקיומו כלל לא הוכח. |
| 19 | |
| 20 | אוברלנדר טען עוד, כי בזק ״**התייעצה**״ עם משטרת ישראל (עמ׳ 178), אולם הוא לא זכר |
| 21 | ״**עם מי**״ (עמ׳ 179), למרות שעיין בתיקי בזק לפני שחתם על תצהירו, אותם תיקים עלומים |
| 22 | שבזק לא המציאה לבית המשפט, וזה המקום להזכיר מושכלות ראשונים בדבר הימנעות |
| 23 | מהמצאת ראיה, כפי שפורט על ידי המחבר י. קדמי בספרו ״**על הראיות**״ חלק שלישי, עמ׳ |
| 24 | 1649: |
| 25 | |
| 26 | ״ יש והדרך שבה מנהל בעל דין את עניונו בבית המשפט הינה בעלת |
| 27 | משמעות ראייתית, כאילו הייתה זו ראיה נסיבתית. כך ניתן |
| 28 | להעניק משמעות ראייתית״ לאי הבאת ראיה, לאי השמעת עד, לאי |
| 29 | הצגת שאלות לעד או להימנעות מחקירה נגדית של מי שעדותו |
| 30 | הוגשה בתעודה בכתב שהוגשה על ידו. התנהגות כזו, בהיעדר |
| 31 | הסבר אמין וסביר, פועלת לחובתו של הנוקט בה; באשר על פניה, |
| 32 | מתחייבת ממנה המסקנה שאילו הובאה הראיה או הושמע העד, או |
| 33 | הוצגו השאלות או קויימה החקירה הנגדית-היה בכך כדי לתמוך |
| 34 | בגירסת היריב. |

14 מתוך 90

SHATSKY-006736



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | **הימנעות מהבאת ראיה – במשמעות הרחבה של המושג כמוסבר** |
| 2 | **לעיל – מקימה למעשה לחובתו של הנמנע חזקה שבעובדה, הנעוצה** |
| 3 | **בהגיון ובנסיון החיים, לפיה: דין ההימנעות כדין הודאה בכך** |
| 4 | **שאילו הובאה אותה ראיה, הייתה פועלת לחובת הנמנע. בדרך זו** |
| 5 | **ניתן למעשה משקל ראייתי לראיית שלא הובאה".** |
| 6 | |
| 7 | אובלנדר הודה, כי בעקבות תדרוך הטכנאים (ת/13) בתאריך 28.10.02 לא שונה נוהל |
| 8 | האבטחה (עמ' 180). לדבריו, הוא ביקש את אישור משטרת ישראל לשנות את נוהל |
| 9 | האבטחה שנכתב על ידי בוק בשנת 1995, אולם לא המציא אסמכתא לכך (עמ' 181), והוא |
| 10 | הודה, כי בוק לא מצאה לנכון לשנות ולעדכן את נוהלי האבטחה המיושנים משנת 1995, |
| 11 | נוכח אירועי האינתיפאדה השנייה ונוכח העלייה ברמת ההתרעות והפיגועים (עמ' 181). |
| 12 | |
| 13 | מעבר לצורך אציין, כי לא הובאה ראייה כלשהי המחייבת את בוק לקבל את אישור |
| 14 | משטרת ישראל לשינוי נוהלי הבטחון, וממילא לא הובאה ראייה כלשהי על פיה הייתה |
| 15 | משטרת ישראל מעורבת בניסוח הנוהלים בשנת 1995. |
| 16 | |
| 17 | לתצהירו של אחי המנוח – רונן מנטין צורף נספח י' הנושא כותרת "**רשימת הישובים –** |
| 18 | **באיזורים הרגישים ואמצעי האבטחה הדרושים לתנאים ועובדה בהם**". מסמך זה נושא |
| 19 | תאריך 7.11.02 ונראה, כי הופק בבוק עקב המצב הבטחוני הקשה כתוצאה מאירועי |
| 20 | האינתיפאדה השנייה. |
| 21 | המסמך אינו חתום ולא ברור מי כתב אותו. |
| 22 | |
| 23 | מהמסמך עולה, כי מאן דהוא בבוק סבר, שבבקעה אל גרבייה יש לספק לעובדי בוק מאבטח |
| 24 | וכן רכב ממוגן אבנים. אלא מאי? איש מעדי בוק לא ידע לומר מדוע נכתב המסמך? האם |
| 25 | קדם לו אירוע בטחוני מסויים? מי היה צוות החשיבה באגף האבטחה בבוק ששקל את |
| 26 | הצרכים הבטחוניים של עובדי בוק בישובים המוזכרים במסמך? עם מי נועצו אנשי בוק |
| 27 | עובר לכתיבת המסמך? דבר מכל אלה לא ידוע, אולם ברור כשמש, כי אמצעי האבטחה |
| 28 | המפורטים במסמך זה, נועדו להגן על עובדי בוק מידוי אבנים בלבד, ולא מפיגוע ירי. ודוק? |
| 29 | כפי שציינתי, בקעה אל גרבייה הינה ישוב בתחום ישראל, המאוכלס באזרחים ערבים |
| 30 | ישראליים, והוא שוכן ממש על הגבול בצמידות לבקעה אל שרקייה, שהינה ישוב ערבי |
| 31 | בשליטת הרשות הפלשתינית, והסיכון בעבודה בו נובע מהשכנות הצמודה שלו לבקעה אל |
| 32 | שרקייה, ולא דווקא משהייה בבקעה אל גרבייה, שהינו ישוב ישראלי, המצוי בתוך תחומי |
| 33 | הקו הירוק. |
| 34 | |

SHATSKY-006737



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   מהעדויות שהובאו בפני עלה, כי בין שני הישובים היה איזושהו מכשול חסר ערך, אשר לא
2   מנע מעבר אנשים מבקעה אל שרקייה הפלשתינית אל בקעה אל גרבייה הישראלית, ממש
3   כפי שהעיד המחבל, שסיפר על הקלות הבלתי נסבלת שבה עבר מבקעה אל שרקייה אל
4   בקעה אל גרבייה.
5
6   לא הוצג בפני ולו מסמך אחד  שנערך בבזק, השוקל את צרכי הבטחון של עובדי בזק
7   בבקעה אל גרבייה, הסמוכה כל כך לבקעה אל שרקייה הפלשתינית והמפרט את הסיכון
8   הנובע מהמעבר הפשוט והקל מהשטח הפלשתיני לשטח הישראלי, פשטות "**המזמינה**"
9   מפגע כמו המחבל להצטייד בנשק, להגיע לשטח ישראל ולבצע פיגוע רצחני.
10
11   האם שקלו אנשי האבטחה בבזק את הסיכון הגלום בצמידות של בקעה אל גרבייה
12   הישראלית אל בקעה אל שרקייה הפלשתינית? האם שקלו את אפשרות המעבר הקלה
13   "והנוחה" מהשטח הפלשתיני לשטח הישראלי, ואת הסיכון העצום העצום הגלום בכך לעובדי בזק?
14   כאמור, לא הוצגו מסמכים כלשהם המעידים על העלאת איזשהו שיקול דעת כזה, ואת פנייה
15   למשטרת ישראל על מנת להיוועץ בה  לגבי המינגון הנדרש לעובדי בזק, (ראו עדות אריה
16   יהודה, עמ' 337), והמסקנה המעציבה הינה, שהנהלת בזק ואגף האבטחה בבזק פעלו בחוסר
17   מקצועיות וברשלנות רבתי – דבר אשר אפשר את כניסתו של המחבל לשטח ישראל ללא כל
18   קשיים, ורציחתו של המנוח.
19
20   יצויין, כי בנספח י' (ת/14), שהינו רשימת הישובים באיזורים הרגישים שנוסח על ידי בזק
21   פורטו ישובים נוספים, שבהם למשל נקבע, כי עובדי בזק ינועו בהם ברכב ממוגן ירי
22   ומאבטח חמוש, או עם אפוד מגן וקסדה, להבדיל מבקעה אל גרבייה, שבה הומלץ על שימוש
23   ברכב ממוגן אבנים וליווי מאבטח בלבד.
24
25   קראתי את רשימת הישובים, אולם לא השכלתי להבין מדוע בישובים מסויימים הוחלט
26   לצייד את העובדים ברכב ממוגן ירי, ודווקא בבקעה אל גרבייה – השוכנת ממש על קו
27   התפר, הוחלט שלא לצייד את העובדים ברכב ממוגן ירי, מה עוד שאיש מאנשי בזק לא ידע
28   ליתן מענה לתהייה זו. ודוק: אין כל ספק, שאילו היה המנוח יושב ברכב ממוגן ירי בעת
29   ביצוע הירי לעברו, היו חייו ניצלים והוא לא היה מוצא את מותו.
30
31   אוברלנדר העיד בחקירתו, כי הוא "**בין אלו**" שערכו את ת/14 (עמ' 182 שורה 8), אולם
32   התקשה להסביר, מדוע הוחלט לצייד את עובדי בזק בישובים מסויימים ברכב ממוגן ירי,
33   ואת העובדים בבקעה אל גרבייה הוחלט לצייד רק ברכב ממוגן אבנים, והוא הגדיל לעשות
34   כאשר "**הזכיר**" לכולנו, שאין הבדל בין בקעה אל גרבייה לבין חדרה(!!!), שגם בה אירעו

SHATSKY-006738



**בית המשפט המחוזי בתל אביב - יפו**

**ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳**

1     פיגועים חבלניים, ומשכך נותרנו עם השאלה הבלתי פתורה – מה ההבדל בין הישובים,
2     שבהם **״זכו״** עובדי בזק לרכבים ממוגני ירי, לבין בקעה אל גרבייה, שדינה כדין חדרה?! 
3     (עמ׳ 182-183), למרות שבשונה מחדרה, ממוקמת בקעה אל גרבייה ממש על קו הגבול.
4

5     חוסר המקצועיות שבה התייחסו אנשי אגף האבטחה בבזק לצרכי האבטחה והמיגון של 
6     עובדיהם בא לידי ביטוי גם בעובדה, שאוברלנדר אינו מכיר את המסמך ת/15 – שהינו 
7     סיכום סיור שנערך בבקעה אל גרבייה ובברתעה עקב תלונותיהם של עובדי בזק לגבי 
8     תחושת חוסר הבטחון שלהם במקומות אלו. סיור זה נערך מאוד לפיגוע הרצח נשוא 
9     התובענה אשר בפניי, בתאריך 4.3.03, אולם אוברלנדר לא הכיר את המסמך ואף לא 
10     השתתף בסיור (עמ׳ 183), דבר שלא מנע מבעדו לטעון, כי מטרת הביקור הייתה ״... **על מנת** 
11     **לבחון את מה ש... ממה שהעובדים חוששים. מדובר שם באיזור של בקעה אל גרבייה** 
12     **בקרבת בקעה אל שרקייה, היה שם איזה עבודות של ארגון סעף...״** (עמ׳ 184 שורות 6-16).
13

14     תשובתו של אוברלנדר הייתה תמוהה משהו, שכן הוא הבהיר, כי אינו מכיר את המסמך, 
15     אינו זוכר את תלונות העובדים ואף לא השתתף בביקור, ובמסמך לא מוזכרות עבודות 
16     בארגון סעף של בזק, וכאשר נדרש לכך הודה, כי ״**לא כתוב, אני זוכר את המקרה״**. האם 
17     אכן?! ודוק: תלונה זו של עובדי בזק, שהועלתה במועד כה סמוך לביצוע הרצח מצביעה על 
18     תחושת חוסר הבטחון של העובדים, תחושה שלא זכתה לכל מענה, לבד מעצם ביצוע הסיור, 
19     שכך שהעיד לביא – מטרתו הייתה להרגיע את העובדים המודאגים, ולא לשנות את 
20     נוהלים קיימים שהיו, ככל שהיו.
21

22     כפי שהובהרתי, הנוהלים שצורפו הינם נוהלים מיושנים משנת 1995, שאינם מתמודדים עם 
23     הבעיות הבטחוניות האקטואליות שאליהן נחשפה מדינת ישראל במהלך שנות 
24     האינתיפאדה, וכפי שהוכח, הם כוונו לתנועה בשטחים הפלשתינים, ולא דווקא לתנועת 
25     עובדי בזק בתוך שטחי מדינת ישראל בכלל, ובישובים הממוקמים על קו הגבול בפרט. 
26     היוצא מכך הוא, שבמועד האירוע לא היו קיימים בבזק נוהלי אבטחה המיועדים לשמירה 
27     על עובדי בזק בתוך תחומי מדינת ישראל, בישובים הסמוכים לקו התפר, עובדה שהינה 
28     חמורה ביותר.
29

30     אמנם, עדי בזק ניסו להציג את הנוהלים משנת 1995, כחלים גם על תנועה בתוך שטח 
31     ישראל, אולם מסקנה זו אינה עולה מהמסמך עצמו, וממילא התברר, שבזק אף לא נהגה על 
32     פי ההנחיות באותו מסמך. כך למשל נקבע בנוהלים משנת 1995, כי עובדי בזק ינועו בצמדים 
33     ויהיו חמושים, והנה הוכח מעבר לכל ספק, כי באירוע הנדון צוות טכנאי למאבטח, כאשר 
34     רק המאבטח היה חמוש. כאשר נדרש לכך אוברלנדר בחקירתו, ונשאל מדוע המנוח לא היה

SHATSKY-006739



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1      חמוש, ענה על דרך הסתם **"כי שיניני את הנחיות התנועה"** (עמ' 190 שורה 9), ומטבע
2      הדברים צפו ועלו השאלות: מי שינה? איזה הנחיות שונו (שכן לא הוצגו נוהלים כלשהם
3      המיועדים לתנועה בתוך שטח מדינת ישראל), מדוע שונו? מה היו השיקולים לשינוי
4      ההנחיות? אולם תשובות אין. (עמ' 190).
5

6      זאת ועוד. אוברלנדר אישר, כי לאחר אירועי 2000 (תחילת האינתיפאדה השנייה) הוצמדו
7      לכל טכנאי בזק **"נדמה לי בוואדי ערה"** (עמ' 189 שורות 10-7) שני מאבטחים (עובדה
8      שאושרה על ידי ארז גולן בחקירתו, עמ' 304-305), אולם בשנת 2002 הופחתו מספר
9      המאבטחים, שכן מאן דהוא בבזק סבר שדי במאבטח אחד לכל טכנאי. (אגב, באופן תמוה,
10      אריה יהודה **"לא זוכר"** – שהיו שני מאבטחים לפני האירוע, עמ' 358).
11

12      עניין הפחתת מספר המאבטחים מעורר סימני שאלה רבים, שכן, בדומה לכלל ההתנהלות
13      של בזק לא הומצאו ראיות, או פרוטוקולי ישיבות, שבהם דן הדרג המקצועי בשאלת מספר
14      המאבטחים הנדרש לכל טכנאי, וממילא לא פורטו השיקולים להפחתת מספר הטכנאים,
15      לרבות עצם ההחלטה לעשות כן.
16

17      עניין זה נתפס בעיני בחומרה מיוחדת דווקא נוכח תוכנו של ת/15 המדבר בעד עצמו, ומציין
18      את חשש של העובדים בשנת 2003 באיזורים מסויימים, ובהם האיינו נשוא כתב התביעה,
19      ועל כן אך טבעי הוא שנדרש, לפחות בשנת 2003, דיון מחודש בנוהלי אבטחת הטכנאים,
20      לרבות מספר המאבטחים הנדרשים לכל טכנאי במקומות מסויימים, אלא שדיון כזה לא
21      נערך, ואף לא נעשה כל שינוי באופן אבטחת עובדי בזק בישובים **"באיזורים רגישים"**.
22

23      בזק חזרה וטענה, כי המנוח ובן נעים הפרו את הוראות הנוהל, כאשר בחרו להיכנס לבקעה
24      אל גרבייה בשני רכבים **"בניגוד לנוהל"**. אלא מאי? כפי שקבעתי, לא הוכח קיומם של
25      נוהלים, ועל כן, לא ניתן להגיע למסקנה, כי המנוח ובן נעים הפרו איזשהו נוהל בכניסתם
26      לבקעה אל גרבייה בשני רכבים, עובדה שאושרה על ידי אוברלנדר, אשר אישר בחקירתו
27      **"אין נוהל. אין נוהל שכתוב בפירוש, שהוא נוסע ברכב אחד... לא"** (עמ' 192 שורות 14-12).
28

29      מכל מקום, לא הוכח קשר סיבתי בין אירוע הרצח לבין עצם הכניסה בשני רכבים, מה עוד
30      שהפגיעו לא אירע בעת הכניסה בשני הרכבים, אלא מספר שעות לאחר מכן.
31

32      עוד טוענת בזק, כי המנוח ובן נעים הפרו נוהל נוסף האוסר עליהם להיות במגע עם
33      האוכלוסיה המקומית, אלא שטענה זו מוטב היה לו לא הייתה נטענת, משנטענה.
34

SHATSKY-006740



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1     ההסתמכות על איסור זה מצויה בנוהל משנת 1995, אשר כזכור מתייחס לשטחי הרשות
2     הפלשתינית, A,B,C ולא לשטחי מדינת ישראל. היעלה על הדעת לאסור על עובדי בזק
3     לשוחח או להיות במגע עם תושבי ישראלי?! והרי בקעה אל גרבייה הינה ישוב ישראלי
4     המאוכלס באזרחים ישראליים ערביים, והלא לדעת אוברלנדר, אין כל הבדל בין בקעה אל
5     גרבייה לבין חדרה למשל?!
6
7     לא זאת אף זאת. המאבטחים העידו, כי לעיתים מזומנות התקשו לאתר את בתי לקוחות
8     בזק לצורך ביצוע תיקונים, וזאת משום שבבקעה אל גרבייה אין כתובות ברורות (שמות
9     רחובות ומספרי בתים) ובשל הדמיון הרב בין שמות התושבים, ועל כן, נעזרו באופן קבוע
10    בתושבים מקומיים כדי שינחו אותם להגיע לכתובת הנדרשת.
11
12    עובדת הסתייעותם של עובדי בזק בתושבים מקומיים לצורך איתור כתובות הייתה ידועה
13    היטב לאנשי אגף האבטחה בבזק. כך עולה מדברי לביא (עמ' 126 לפרוטוקול) ואף מדברי
14    אוברלנדר (עמ' 194), אשר מטעמיו הוא בחר לסייג את האיסור הלכאורי בטענה, שמותר
15    לעובדי בזק ליצור מגע עם האוכלוסיה המקומית לצורך ביצוע תפקידם בלבד (?!)(עמ' 204
16    שורות 19-20), ופעם נוספת נשאלת השאלה, היכן כתובים הדברים? היכן ההנחיות בדבר
17    איסור יצירת מגע עם תושבים מקומיים (אזרחים ישראליים!!!), אלא לצורך ביצוע
18    תפקידם?! גם יהודה אריה – מנהל אבטחה פיסית בבזק הודה בחקירתו, כי היה מודע לכך
19    שעובדי בזק נעזרו במקומיים לצורך איתור כתובות, והוא **"לא זוכר"** נוהל, שאסר עליהם
20    לשוחח עם התושבים המקומיים (עמ' 204).
21
22    עדות חשובה לעניין היחסים שנרקמו בין עובדי בזק לבין התושבים המקומיים בבקעה אל
23    גרבייה ניתנה על ידי המאבטח אוני דביר, שהותיר עליי רושם אמין מאד.
24
25    דביר סיפר בעדותו, כי עובדי בזק עשו עסקים עם תושבי בקעה אל גרביה (עמ' 473-474)
26    לרבות עם בעל החנות לאביזורי רכב – ואאיל – שבפתח עסקו התרחש הפיגוע הרצחני. דביר
27    העיד, כי הממונה עליהם מטעם בזק – אלי לוינגר – היה מודע לפעילויות הפרטיות של
28    עובדי בזק עם תושבים מקומיים (עמ' 497), מה עוד, שלדבריו נהגו עובדי בזק – ובהם הוא
29    עצמו – לנסוע לבקעה אל גרבייה באופן פרטי לאחר שעות העבודה ולבצע שם עסקאות עם
30    המקומיים (עמ' 503). ודוק: לוינגר לא הובא לעדות, ועל כן עדותו של דביר לא נסתרה, והיא
31    מקובלת עלי.
32
33    בניגוד לעדויות העדים האחרים, טען המאבטח ואדים סימונוביץ', כי המאבטחים קיבלו
34    התראות עדכניות מבזק פעם ,או פעמיים בשבוע, והם היו חותמים על קבלתן ומחזירים

19 מתוך 90

SHATSKY-006741



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

1    לבזק (עמ׳ 234-235), אלא שאסמכתאות לאמור לא צורפו, מה עוד שמדובר בגרסה חדשה
2    שזכרה לא בא בתצהירו של סימונוביץ׳ (עמ׳ 235). בהמשך טען סימונוביץ, כי המאבטחים
3    קיבלו גם התראות טלפוניות בכניסה לכפרים (עמ׳ 237-238), אלא שגם כאן מדובר בגרסה
4    חדשה, אשר לא הועלתה בתצהיר, ולא אומתה בכל דרך שהיא, והוא הפתיע בטענה, כי
5    לעיתים גם הטכנאים היו חמושים (עמ׳ 239), גרסה שלא עלתה בתצהירו, ולא הועלתה על
6    ידי אף אחד מהעדים. למותר לציין, כי אילו היו מציידים את הטכנאים בנשק, כי אז הייתה
7    אסמכתא על כך, וכמובן שאסמכתא כזו לא צורפה.
8

9    באופן כללי התאפיינה עדותו של סימונוביץ ״בחידושים והפתעות״, שלא פורטו בתצהירו,
10    ובחלק מהמקרים אף עמדו בניגוד גמור ומוחלט לעדויות אחרות. כך למשל, סימונוביץ זכר
11    שניהל ״**פנקס צהוב**״ (עמ׳ 241-242) שנמצא עד היום בביתו, אולם לא הוצג בפני בית
12    המשפט, מה עוד שלא הוברר האם הפנקס ניתן לו על ידי לילית, ששכרה את שירותיו, או על
13    ידי בזק – שם עבד כמאבטח.
14

15    סימונוביץ טען בסע׳ 6 לתצהירו, כי ״**אני מציין באופן חד משמעי, כי כל העובדים ידעו**
16    **היטב מהם הנוהלים באיזורים הרגישים**״, ובחקירתו הבהיר, כי הוא טוען זאת על סמך
17    ישיבות שנערכו עם קב״טים ״**פעם בכמה חודשים**״ (עמ׳ 243 שורה 10), והפתיע בהעידו, כי
18    נמסרו לעובדים (טכנאים ומאבטחים) נוהלים כתובים (עמ׳ 243 שורה 22), אלא שנוהלים
19    כאלה לא הוצגו במהלך המשפט.
20

21    למותר לציין, כי סימונוביץ העיד, שבן נעים היה אחראי משמרת (עמ׳ 262) והוא זה שמסר
22    לעובדים את ההתרעות השבועיות (עמ׳ 263), עובדה שלא מצאה את ביטויה באף תצהיר
23    ובשום עדות, ובאופן כללי, אינני מקבלת את עדותו של סימונוביץ, שמרביתה הועלתה
24    לראשונה בבית המשפט, היא נעדרת מתצהירו ועומדת בניגוד לעדויות האחרות שנשמעו
25    בבית המשפט.
26

27    גם ארז גולן מאגף האבטחה בבזק, הסתמך בתצהירו ובעדותו על קיומם של נוהלים, אולם
28    גם הוא לא צירף נוהלים כלשהם לתצהירו, ובעדותו הודה ״**הנוהלים, עוד פעם, אני לא יודע**
29    **אם זה רשום**״ (עמ׳ 272, שורה 9), קרי : פעם נוספת מדובר בנוהלים עלומים, שאיש אינו
30    יודע את תוכנם, וחמור מכך, למעשה הם אינם קיימים באמת, ונראה, כי מתן הוראות
31    אבטחה ובטחון לעובדים, נעשתה, אם בכלל, בעל פה וביוזמה עצמאית של קצין בטחון כזה,
32    או אחר, בבחינת ״**תורה שבעל פה**״ התלויה ברצינותו, מקצועיותו ומוסר העבודה של קצין
33    בטחון כזה, או אחר.
34

SHATSKY-006742



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    ארז גולן "דיקלמ" בעדותו נוהלים, שאינו יודע את מקורם (עמ' 271-272), וטען, כי הנוהלים
2    התבססו על הנוהל משנת 1995, ששונה ועודכן, אולם לא המציא אסמכתא כלשהיא לשינוי
3    ועדכון הנוהלים המיושנים (עמ' 271-272), וכאמור הודה, כי אין בנמצא נוהלים כתובים,
4    להבדיל מהנחיות אקראיות הניתנות בעל פה (עמ' 272).
5

6    ארז גולן טען, כי ערך לעובדים תדריכים על פי תוכניות עבודה כתובות, שסוכמו עם
7    אוברלנדר וארכו בין חצי שעה לשעה, אולם תוכניות כאלו לא צורפו לתצהירו ואף לא הוצגו
8    במהלך המשפט.
9    לדבריו, הוא לא התבקש להציגן (עמ' 275), ואין מנוס מהמסקנה, כי עצם קיומם של
10    התדריכים כמו גם משכם, תוכנם ותדירותם כלל לא הוכח.
11

12    גולן ערך הבחנה תמוהה בין תדרוך – שהוא ספציפי ולפני יציאה לשטח, לבין הדרכה –
13    המהווה הכשרה (עמ' 275) אולם הודה, כי לא היו מערכים קבועים של הדרכות לטכנאים,
14    או למאבטחים (עמ' 276), מה עוד שלא הוצגה כל אסמכתא להוכחת קיומם של התדריכים,
15    או ההכשרות.
16

17    גולן הודה, כי לא ניהל תיק אישי הכולל חוות דעת מקצועית המעריכה את תפקודם של
18    המאבטחים השונים (עמ' 277), למרות שלדבריו, תלונה על תפקודו של מאבטח, הייתה
19    עלולה לגרום להפסקת העסקתו.
20

21    גולן טען בחקירתו, כי קיימים דו"חות על ביקורות גלויות וחסויות שנעשו למאבטחים,
22    אולם גם דוחות אלו לא צורפו (עמ' 278), וכאשר הורמה גבה למשמע הדברים, טען גולן, כי
23    לפעמים תוצאות הביקורות **"לא עלו בדו"ח"** (עמ' 279 שורה 8), והוכח, כי אין בנמצא דו"ח
24    כזה לגבי פעילותו של בן נעים כמאבטח במשך 3 שנים (עמ' 279), ונשאלת השאלה, האם אכן
25    נערכו ביקורות?!
26

27    גולן טען, כי **"תכנית היה מחסום"** (עמ' 282 שורה 31) בין בקעה אל גרביה לבין בקעה אל
28    שרקייה, אולם הודה, **"אבל אפשר היה לעבור בקלות"** (שם). גולן נשאל מדוע לא יום
29    הוצאת הנחיות חדשות ומעודכנות נוכח ההחמרה במצב הבטחוני, אולם טען, כי אין זה
30    מתפקידו, אלא מתפקידם של הממונים עליו (עמ' 283).
31

32    בהתייחס לרשימת הישובים באיזורים הרגישים ואמצעי האבטחה הדרושים לתנועה
33    לעבודה בהם (ת/14), טען גולן, כי רשימה זו הועברה למשטרת ישראל, אולם לא הוצג כל
34    תיעוד לאישור האמור (עמ' 284-285), מה עוד שלא הובהר מי בבזק העביר לכאורה את

21 מתוך 90

SHATSKY-006743



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   הרשימה לאישורה של משטרת ישראל; מי במשטרת ישראל קיבל לכאורה את הרשימה
2   וכד'.
3
4   גולן הפתיע בעדותו, כאשר טען, כי התריע בפני הממונים עליו על אפשרות של פגיעת מחבל
5   בעובדי בזק, אולם כאשר נשאל האם העלה את התרעתו על הכתב, ענה, כי הוא "**לא מבין**
6   **את השאלה**" (עמ' 286 שורות 12-17), ודוק: ארז גולן היה האחראי על הבטחון של עובדי
7   בזק בגזרת הצפון, בה נכללה גם בקעה אל גרבייה!!!
8
9   גולן העיד, כי הרכב ממוגן הירי "**נועד לאבטח את התנועה, את הנסיעה**" (עמ' 280 שורה
10  27), אולם לא ידע להגביע על החלטה שניתנה בכתב לאחר הפעלת שיקול דעת של מישהו,
11  לגבי מי זכאי להתניייע ברכב ממוגן ירי (עמ' 288), והוא הודה, כי איננו יודע איך הופקו
12  הדו"חות באשר לפעולות האבטחתיות של עובדי בזק (עמ' 288), דו"חות שלא הוצגו כלל
13  בפני בית המשפט, וכללו לכאורה מעקב אחר עובדי בזק לצורך וידוא שמירה על נוהלים?!
14  (עמ' 289), שגן קיומם לא הוכח כאמור.
15
16  לתצהירי בזק צורפו דו"חות, שנערכו לכאורה אחת לחודש, ומהם ניתן להסיק קיומן של
17  ביקורות ותדרוכים שנערכו למאבטחי בזק באיזורים שהוגדרו רגישים.
18
19  כך למשל, בדו"ח (ת/13) החתום על ידי ארז גולן נרשם, שבתאריך 28.10.02 נערך תדרוך
20  למאבטחים ולטכנאים במחוז חפר בו מצוי הישוב בקעה אל גרבייה – וכי "**במהלך התדרוך**
21  **עלו הדגשים הבאים: עלייה ברמות התרעה לפיגועים, התרעות לנסיונות חטיפה של**
22  **נשק, מאבטחים הונחו להגביר עירנות**" (עמ' 291), והנה התברר, כי למרות ההתרעות
23  החמורות, המפרטות סיכונים העלולים לעלות בחיי אדם, הונחו המאבטחים באופן כללי
24  "**להגביר עירנות**", מבלי שדנו עימם בפרטני פרטים, כיצד על המאבטחים "**להגביר עירנות**",
25  וממילא לא שיכללו את יכולת האבטחה על ידי אספקת רכבים ממוגני ירי, למשל, או ציוד
26  הטכנאים בנשק.  לא זו אף זו. גולן נשאל כיצד אכף את ההנחיה להגביר עירנות, או אז
27  התברר שהנחייה זו לא נאכפה כלל, ולא נעשה כל מעקב לוודא את אותה "**הגברת עירנות**"
28  עלומה (עמ' 291). עוד הוברר, כי למרות תלונות העובדים, אשר חששו לבטחונם באיזור
29  בקעה אל גרבייה, לא מצא גולן לנכון לפנות למשטרת ישראל, או למ"ב על מנת להיוועץ
30  עימם בנושא דרכי אבטחתם של עובדי בזק (עמ' 294), ולמעשה המסקנה הינה, כי למרות
31  העלייה הברורה בהתרעות, לא שונו, או חודדו הנוהלים (שקיומם לא הוכח כאמור),
32  ומחלקת האבטחה של בזק סברה, שיצאה כדי חובתה בשמירת בטחונם האישי של העובדים
33  באיזורים רגישים בזמן האינתיפאדה השניה, בדרך של כינוס העובדים וקריאה להגברת
34  עירנות. האם די בכך?!! ודאי שלא. כל האמור, לא מנע מארז גולן לטעון לקיומה של תוכנית

SHATSKY-006744



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  לעריכת ביקורות, אלא שתוכנית כזו לא הומצאה לבית המשפט (עמ' 297), למרות שגולן
2  הודה שלקראת עריכת התצהיר ומתן העדות בבית המשפט עבר על החומר הרלבנטי בקלסר
3  ובמחשב, אלא שכאמור, חומר זה לא הוגש לבית המשפט, ואין לדעת האם חומרים
4  רלבנטיים הוסתרו מידיעת הצדדים ומידיעת בית המשפט (עמ' 298), או שמא אינם כלל
5  בנמצא.
6
7  גולן טען שהתדרוכים לעובדי בזק נערכו אחת לחודש, או חודש וחצי במפגש הבוקר לפני
8  יציאתם לעבודת יומם (עמ' 300 שורות 8-10), אולם לא המציא דיווחים על קיומם. עוד
9  אישר גולן, כי הייתה תקופה "**קצרה**" לפני הרצאה, שבמהלכה היו מתלווים שני מאבטחים
10 לכל טכנאי (עמ' 304 שורה 31), וזאת בשל קיומה של "**התרעה נקודתית באותה תקופה,**
11 **חטיפה של טכנאי, הגברנו את האבטחה ואז צמצמנו אותה בחזרה**" (עמ' 305 שורות 2-3)
12 ולמותר לציין, כי ההתרעה עצמה לא הומצאה, כמו גם דיונים לגבי תגבור מערך האבטחה
13 בגינה, וממילא לא הומצאו השיקולים המקצועיים שעמדו בבסיס ההחלטה לצמצם את
14 מערך האבטחה ולהפחית את מספר המאבטחים.
15
16 דוגמא להתנהלותה הכושלת והבלתי מקצועית של בזק באבטחת עובדיה, הינה מינויו של
17 אריה יהודה למנהל אבטחה פיסית בבזק.
18
19 מעדותו של אריה עולה, כי הוא מונה לתפקידו ללא כל הכשרה מוקדמת בנושאי אבטחה,
20 ורק לאחר מינויו עבר, לדבריו, קורסים ייעודיים במשטרה ובשב"כ (עמ' 328-329), שכללו
21 קורס בן שלושה – ארבעה שבועות במשטרה, וקורס בן שישה שבועות בשב"כ. (לא הומצאו
22 אסמכתאות לאמור).
23
24 במאמר מוסגר אציין, כי מצופה מגוף גדול ורחב היקף כמו בזק, הכולל עובדים רבים
25 המתניידים בכל שטח מדינת ישראל, למנות לתפקיד רגיש זה אדם בעל עבר בטחוני וידע
26 בנושאי אבטחה, מה עוד, שלדבריו הוא היה אחראי על בטחונם של מאות אנשים (עמ' 391)
27 ובחירה באדם חסר כל ידע בנושאי בטחון ואבטחה הינה תמוהה, בלשון המעטה ובוודאי
28 שאינה מעידה על מקצועיות.
29
30 אריה אישר בעדותו, כי לא היה נוהל מסודר של פניות והיוועצויות עם משטרת ישראל (עמ'
31 337). לדבריו, הוא היה שותף לניסיון הנוהלים משנת 1995 (עמ' 337), אולם הוא לא מצא
32 לנכון לשמרם, או לנסח נהלים עדכניים עם פרוץ האינתיפאדה השנייה בשנת 2002. כל
33 שנעשה הסתכם לדבריו, בפגישות עם העובדים וידיעום בדבר קיומן של התרעות (עמ' 338).
34 אריה העיד כי למרות חשושת העובדים, כפי שבאו לידי ביטוי בת/13, הוא לא מצא לנכון

SHATSKY-006745



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

1   לשנות את רמת האבטחה (עמ׳ 338-339), ומדבריו עלה, כי אין בנמצא כל הסבר כתוב, או
2   מערך שיקולים כתוב, שמהם ניתן ללמוד מה היו השיקולים שהינחו את בזק בנושא אבטחת
3   העובדים בכלל, ובישובים על קו התפר בפרט (עמ׳ 339-340).
4
5   למרות תפקידו – מנהל אבטחה פיסית, לא זכר אריה את סיור ההנהלה בשטח עקב חשש
6   העובדים (עמ׳ 340), והתרשמותי לגבי אופן התנהלות העניינים באה לידי ביטוי בפרוטוקול,
7   באומרי: ״**אם אני מבינה נכון את מה שאתה אומר, אז הכל התנהל בעל פה, לא היו נוהלים**
8   **מסודרים. אם מישהו חשב שצריך לדבר עם המשטרה – דיברו, אם מישהו חשב שצריך...**
9   **לדבר עם מג״ב – דיברו, הכל היה שיקול דעת אישי ושום דבר לא על פי נוהל ולא כתוב**״
10  (עמ׳ 340 שורות 28-31), מסקנה שאושרה למעשה על ידי העד. מהאמור ברור, כי לא היו
11  נוהלים קבועים וברורים וממילא לא היו נוהלים ברי אכיפה, ואבטחת העובדים הייתה
12  תלוייה בכשריו המקצועיים, חריצותו ויוזמתו של עובד כזה, או אחר.
13
14  אריה לא זכר שביקש הנחיות מממשטרת ישראל, למרות שלאחר מכן טען שביקש ״**הרבה**
15  **פעמים**״ (עמ׳ 350 שורה 14), אולם לא זכר ״**איפה זה כתוב**״ (שם).
16
17  אריה הפתיע מאוד בטענה, כי המשטרה ״**הם לא נתנו תשובות, אבל בשיחות בעל פה הם**
18  **היו מוכנים לומר, תעשו כך, או אחרת, הם לא היו מוכנים**״ (עמ׳ 350 שורות 29-30), עובדה
19  תמוהה כשלעצמה. ונשאלת השאלה: האם משטרת ישראל סרבה להנחות את בזק, או שמא
20  לא התבקשה כלל להנחותה. סביר להניח, כי המשטרה כן התבקשה להנחות את בזק, ומכל
21  מקום לא הומצאה אסמכתא שיש בה כדי להגיע למסקנה שונה. ודוק: משטרת ישראל
22  איננה בעלת דין בתיק זה, ואיש מבעלי הדין, לרבות לא בזק לא ביקש את צירופה, ונוצר
23  הרושם שהיעדרה מכתב התביעה יצר לבזק פלטפורמה נוחה לנסות ולהטיל עליה אחריות
24  בגין מחדלי בזק, כפי שהוכחו, וזאת לא רק מבלי שקולה של משטרת ישראל יישמע, אלא
25  שהדבר נעשה תוך הימנעות יזומה מזימון אנשי המשטרה הרלבנטיים למתן עדות בנסיון
26  להוכיח את טענותיו של בזק כלפי משטרת ישראל. התנהלות זו הינה פסולה ואיננה
27  מקובלת עלי.
28
29  אריה הודה, כי אין אסמכתאות לקיומו של נוהל, וכי כמעט שלא השתתף בתדרוכים (עמ׳
30  357), ובאופן מפתיע, ולמרות תפקידו, ״**לא זכר**״ שהייתה תקופה בה צוותו שני מאבטחים
31  וטכנאי (עמ׳ 358).
32
33  אוני דביר, הגדיר את הנוהלים כ״**תורה שבעל פה**״ (עמ׳ 470, 472), שכללה בעיקר איסורים
34  כגון: איסור על המאבטח לנהוג, וכו׳. לדבריו ״**... זה אסור וזה אסור, הביגוד מאוד**

24 מתוך 90

SHATSKY-006746



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  **התעסקו איתנו עם הביגוד, ביגוד כן מתאים, לא מתאים, שום דגש, שום התייחסות לכמה**
2  **המקצועיות של המאבטח...״** (עמ' 470 שורות 23-19).
3
4  כזכור, בוק טענה, כי כל עובד צוייד בפנקס שכלל הוראות בטחון, אשר צילומו אף צורף
5  לתיק המוצגים, אולם מסירתו לעובדים לא הוכחה בכלל, ולמנוח ולבן נעים בפרט.
6
7  והנה, לדברי דביר, הוא קיבל את הפנקס האמור כמוצר חינמי במטווח מבזק, או מליליית
8  (עמ' 472), ומעדותו עולה, כי למעשה לא היה כל פיקוח על עבודת המאבטחים, לא מטעם
9  בזק ולא מטעם ליליית (עמ' 479).
10
11  דביר הלין קשות הן על הליכי ההכשרה הבלתי מספיקים לדבריו, והן על אי מתן סמכויות
12  למאבטחים. לדבריו, המאבטחים בבזק אינם אלא אזרחים נושאי נשק, ואין להם סמכויות
13  מעצר או סמכויות אחרות, כפי שיש למשל למאבטחי בתי המשפט, ועל כן, אין באפשרותם
14  באמת ובתמים להגן על הטכנאים.
15
16  אינני יכולה להסתמך על אמירות אלה במסגרת השיקולים העומדים בבסיס פסק הדין. לו
17  סברו התובעים, כי אין די בהדרכה הניתנת למאבטחי בזק, או במעמדם, כי אז היה עליהם
18  להמציא חוות דעת של מומחה בתחום. חוות דעת כזו לא הומצאה, ובהיעדרה אין לי כלים
19  לחעריך את ערכה המקצועי של ההדרכה שניתנה למאבטחים, או את מעמדם ככאלה. מעבר
20  לצורך יצויין, כי מהעדויות עולה, כי כל המאבטחים היו בעלי הכשרה מתאימה עוד
21  מתקופת שירותם הצבאי, וברור שאיש בבזק, או בליליית לא הסתמך על הידע הנרכש
22  בחמשת ימי הקורס שניתנו למאבטחים בעבודתם בבזק, או בליליית.
23
24  כאמור, באשר למעמדם של המאבטחים כשומרים ולאו דווקא כמאבטחים – גם בנושא זה
25  אינני מביעה כל דעה, שכן לא הוצגה בפני כל חוות דעת, אשר על פיה לא היה די במעמדם
26  של המאבטחים בבזק, והיה צורך לשדרג את מעמדם ולהשוותו למעמד מאבטחי בתי
27  המשפט.
28  הנני מניחה, כי קיימת דרך חוקית להסדיר את מעמד המאבטחים, אולם ברור, כי איש
29  בבזק לא שקל לשנות את מעמדם של המאבטחים ואף לא פעל כדי לשנות מעמד זה,
30  ולהשוותו, למשל, למעמדם של מאבטחי בתי המשפט, והדבר אף לא נטען.
31
32  לסיכום אציין, כי היעדרם המוחלט של נהלים מעודכנים ומפורטים, הביאו לכך, שכל
33  מאבטח התנהג בהתאם לאומד דעתו, כאשר לא ברור אם אומד דעתו האישי של כל מאבטח
34  ומאבטח תאם את התנאים בשטח, ועל כן מדובר במחדל חמור מאוד.

25 מתוך 90

SHATSKY-006747



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

19.   מכל האמור עולה, כי לא הייתה בבזק מדיניות אבטחה ברורה, כתובה ומפורטת,
והימנעותה השיטתית של בזק מהמצאת מסמכים לאימות טענותיה בדבר קיומה הלכאורי
של נוהלים, או מזימון עדים להוכחת טענותיה – כלפי המשטרה למשל – פועלת לחובתה.

חמור מכך, לא היה כל מנגנון ביקורת של אכיפת הנחיות שניתנו מידי פעם בעל פה, ודומני
כי לא אטעה אם אקבע, כי היעדר הנוהלים גרם למצב בו הושארו הטכנאים והמאבטחים
לנפשם בבחינת "איש הישר בעיניו יעשה", מצב שהינו בלתי נסבל, במיוחד בתקופה בה
מדובר.

כתוצאה מהמחדלים אלו, חמקה מעיני בזק העובדה, שעובדיה מבצעים פעילות פרטית
במהלך יום העובדה, פעילות, אשר במקרה אשר בפני גרמה לנטישת הממונה על ידי מאבטחו,
אשר כפי שיבואר בהמשך, עסק בענייניו הפרטיים, ונמנע תוך כדי כך מאבטחת הטכנאי –
הממונה, דבר שגם הוא איפשר, בין היתר את ביצוע הרצח, בבחינת הגורם שאין בלתו.

רוצה לומר, שרשלנותה של בזק במקרה זה, הינה  במחדליה האבטחתיים הרבים, אשר
בסופו של דבר אפשרו את היממצאותו של הממונה ללא מאבטח שיגן עליו, ברכב שאינו ממוגן
ירי.

למותר לציין, כי אילו הייתה בזק מנסחת נוהלי אבטחה ברורים וחדים, ואילו הייתה
מקיימת מערך קבוע של תדריכים, ואילו הייתה אוכפת את אותם נוהלים על עובדיה, קרוב
לוודאי שבן נעים לא היה מעז לעסוק בענייניו הפרטיים במהלך שעות העבודה, ולא היה
נוטש את משמרתו כמאבטחו של הממונה, וכן קרוב לוודאי, שאילו הייתה בזק מספקת
למנוח רכב ממוגן ירי, עקב קרבתה הפיסית של בקעה אל בקעה אל שרקייה יתכן
שהיה נמנע הרצח הטראגי, קרי הוכח קיומו של קשר סיבתי עובדתי בין מחדליה של קבוצת
בזק לבין אירוע הרצח, וכן הוכח קשר סיבתי משפטי, שכן הן מבחן הצפיות, הן מבחן
הסיכון והן מבחן השכל הישר חייבו שקבוצת בזק תצפה אירוע של אסון עקב מחדלי
האבטחה החמורים, כפי שהוכח בפני; ודוק: אין כל ספק לגבי קיומו של הסיכון בישוב על
קו התפר בימי האינתיפאדה השנייה, כאשר הוכח שהעובדים עצמם חששו לעבוד במקום;
ולענוות דעתי ולנוכח המציאות הבטחונית הקשה שהייתה מנת חלקה של מדינת ישראל
בתקופה הרלבנטית, חייב השכל הישר את הנהלת בזק לנסח נוהלים ברורים, בשיתוף עם
גופי בטחון אחרים, כגון משטרת ישראל, או משמר הגבול, על מנת לשמור על בטחונם
וחייהם של עובדיה, כמו גם לאכוף ולוודא ביצוע הנוהלים.

SHATSKY-006748



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

| | |
|---|---|
| 1 | בזק נכשלה גם במבחן השכל הישר, וכאמור – התוצאה ידועה. |
| 2 | |
| 3 | 20. בטרם אסיים פרק זה של הפרת חובת הזהירות הקונקרטית על ידי בזק, אתייחס למספר |
| 4 | נקודות בסיכומי קבוצת בזק. |
| 5 | |
| 6 | בזק טענה בסיכומיה, כי בקעה אל גרבייה הינה למעשה ישראלי המצוי בתוך גבולות |
| 7 | הקו הירוק, ועל כן דינו אינו שונה מדינו של כל ישוב ישראלי אחר. |
| 8 | |
| 9 | אין כל ספק, שבקעה אל גרבייה הינה ישוב ישראלי בתוך תחומי הקו הירוק. אלא מאי? |
| 10 | מדובר בישוב ספר המצוי על קו התפר, אשר מעברו השני ישובים פלשתינים עויינים., כאשר |
| 11 | המציאות הבטחונית קשה במיוחד. ההתייחסות המיוחדת לבקעה אל גרבייה איננה נובעת |
| 12 | מאפיון תושביה כתושבים ערביים, אלא מקירבתה הצמודה לישובים פלשתינים בשליטת |
| 13 | הרשות הפלשתיניכון והסיכון הברור הנובע מקירבה זו. עובדה היא, שגם בזק סברה, כי |
| 14 | בישובים מסויימים בתוך תחומי הקו הירוק, יש צורך לצייד את עובדיה ברכבים ממוגני |
| 15 | ירי, אלא שלרוע המזל – בקעה אל גרבייה לא נכללה בין אותם ישובים, למרות צמידותה |
| 16 | לבקעה אל שרקייה הפלשתינית, ולמרות קלות המעבר בין שני הישובים. |
| 17 | |
| 18 | נסיבות אלו יוצרות את השוני בין בקעה אל גרבייה לבין ישובים אחרים בתוך תחומי הקו |
| 19 | הירוק, מה עוד שסיבותיה של בזק לצייד עובדים אחרים בישובים אחרים הסמוכים לגבול |
| 20 | באמצעי אבטחה טובים יותר, כגון שימוש ברכבים ממוגני ירי – נותרו עלומות, ולפיכך לא |
| 21 | ניתן לבקרן שיפוטית, להבדיל מעצם ההבחנה שנעשתה בין הישובים השונים. |
| 22 | |
| 23 | 21. בזק ניסתה בסיכומיה בכל מאודה, לגרור את בית המשפט לקביעה על פיה באם אטיל |
| 24 | אחריות על בזק, הרי שהתוצאה של הטלת אחריות זו הינה, כי ההתייחסות לאוכלוסיה |
| 25 | הערבית בישראל בכללותה, ככוו, צריכה להיות כאל פוטנציאל טרוריסטי, ולא היא. |
| 26 | |
| 27 | הנני מוחה נמרצות על נסיון נואל זה. ודוק: בית המשפט אינו נותן הצהרות פוליטיות, ויש |
| 28 | להזהר על הנסיון לגוררתו לעשות כן. |
| 29 | |
| 30 | **היות ואמירה אומללה זו עלתה בסיכומי קבוצת בזק, הנני להבהיר הבהר היטב: בית** |
| 31 | **המשפט אינו עושה כל אבחנה בין אזרחיה היהודיים של מדינת ישראל לבין אזרחיה** |
| 32 | **המוסלמים, או הנוצרים, או אחרים.** |
| 33 | |

SHATSKY-006749



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

| | |
|---|---|
| 1 | תביעה זו הוגשה, בין היתר, כנגד בזק בגין מחדלי האבטחה החמורים שלה, שבאו לידי |
| 2 | ביטוי בתיק זה. |
| 3 | |
| 4 | כפי שהבהרתי הבהר היטב, האבטחה המוגברת בתחומי בקעה אל גרבייה לא נדרשה בשום |
| 5 | פנים ואופן מחמת אפיונם של תושביה כערבים, אלא אך ורק בשל קירבתה וצמידותה |
| 6 | לבקעה אל שרקייה הפלשתינית, והסיכון – שהתממש- במעבר מפגע רצחני מבקעה אל |
| 7 | שרקייה אל בקעה אל גרבייה, נוכח אי קיומו של מכשול רציני, אשר ימנע מעבר זה. |
| 8 | |
| 9 | כאמור, לצערנו הרב, במקרה אשר בפני התממש הסיכון, והמנוח נרצח בידי מחבל שניצל |
| 10 | את הקירבה והעבירות הקלה בין הישובים. ודוק: לא נטען, וממילא לא הוכח, כי המחבל |
| 11 | עבר בתושבים מקומיים לצורך ביצוע מזימתו. לעומת זאת, הוכח מעבר לכל ספק, כי בין |
| 12 | התושבים המקומיים לבין עובדי בזק שררו יחסים מצויינים, שבאו לידי ביטוי בסיוע |
| 13 | יומיומי שקיבלו עובדי בזק מהתושבים המקומיים וביחסי מסחר בין עובדי בזק לבין |
| 14 | התושבים המקומיים, וכאמור, אין בפסק דין זה, ו/או רמיזה לאפיון תושבי בקעה אל גרבייה |
| 15 | כמרומז על ידי קבוצת בזק בסיכומיה, רמיזה אשר מוטב היה שלא להעלותה כלל. |
| 16 | |
| 17 | 22. קבוצת בזק משוויח בסיכומיה את נוכחות עובדי בזק  בבקעה אל גרבייה, לנוכחות עורכי דין |
| 18 | ממשרד ב״כ בזק בבית המשפט בירושלים, השוכן בלב ליבה של מזרח העיר, והיא תוהה, |
| 19 | האם עליה להצמיד מאבטח לעורכי הדין מטעמם בעת ביקורם בבית המשפט בירושלים. |
| 20 | |
| 21 | כמובן שתהייה זו אינה אלא תהייה פרובוקטיבית ומיותרת. |
| 22 | |
| 23 | רשויות הבטחון במדינת ישראל אמונות על בטחונם של אזרחיה ותושביה של המדינה בכל |
| 24 | שטחה. מטבע הדברים, לא ניתן להצמיד מאבטח לכל אדם ואדם, ועל כך מצופה מגופים |
| 25 | גדולים – כגון בזק, לסייע לכוחות הבטחון בהצבת אבטחה מתאימה לעובדיה העובדים |
| 26 | במקומות שיש בהם סיכון בטחוני. |
| 27 | |
| 28 | נראה, כי בזק הייתה מודעת לחובתה, ועל כן, ציידה את המנוח במאבטח חמוש וברכב |
| 29 | ממוגן אבנים, אולם, נוכח המצב הבטחוני החמור בתקופה הרלבנטית, נוכח קירבת בקעה |
| 30 | אל גרבייה לגבול, נוכח החשש הצפוי לביצוע פיגוע באמצעות מפגע שיגיע מהרשות |
| 31 | הפלשתינית, אין ניתן ליקבל את בזק לא עשתה די, ולמעשה לא הוכחה כלל מדיניות |
| 32 | בטחון וקיומם של נוהלים, שיש בהם כדי להעיד על עשייה אמיתית בתחום בטחון עובדי |
| 33 | בזק באיזורים רגישים. |
| 34 | |

SHATSKY-006750



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

23.     עוד טוענת קבוצת בוק בסיכומיה, כי הפיגוע לא היה צפוי, ולראיה הציגה את המסמך
המעיד על וידוא המצב הבטחוני עם משטרת ישראל בבוקר האירוע.

אין בעובדה שרשויות הבטחון  במדינה לא גילו את הכוונה לבצע פיגוע מבעוד מועד, כדי
להביא למסקנה שמדובר באירוע מפתיע ובלתי צפוי. נהפוך הוא, דוקא השיחה היומית
מידי בוקר של מוקדנית בוק עם משטרת ישראל מעידה יותר מכל על המצב הבטחוני העדין
באיזור בקעה אל גרבייה, קרי: בוק יכולה הייתה וצפתה בפועל אפשרות של פיגוע, אולם
מטעמים השמורים עימה סברה, כי היא תצא ידי חובתה, בשיחה יומית עם משטרת ישראל,
ולא היא.

24.     בוק ייחדה בסיכומיה פרק בדבר היעדר הוראות שבדין, או הנחיות, או נוהלים בנושא
בטחון באיזורים רגישים – מטעם המדינה/צה"ל, אלא שאינני רואה בהיעדר ההנחיות
והנוהלים מטעם המדינה, מתן פטור לבזק מהגנה על עובדיה. אם סברה בוק, כי איננה
יודעת איך להגן על עובדיה באיזורים שהוגדרו על ידה "כרגישים", היה עליה ליזום פניה
למשטרת ישראל לצורך קבלת הנחיות. פנייה כזו לא נעשתה, וממילא לא הוכחה, ואין לבוא
בטרוניה לרשויות המדינה, או למשטרת ישראל בעניין זה.

25.     קבוצת בוק מפנה לפסק הדין בע"א 491/73 **גדודי החולה בע"מ נ' עזרא מחרוז** (פ"מ כט(2)
32) (להלן: "**פרשת גדודי החולה**") אלא, שאין דמיון בין עובדות פרשת גדודי החולה לבין
העניין אשר בפניי.

בפרשת גדודי החולה, נפגע התובע בשנת 1967 – ערב פרוץ מלחמת ששת הימים – בעת שנהג
בקומביין במהלך עבודתו קציר בשטח סמוך לגבול הסורי. באותו מקרה, נדחתה הטענה, כי
היה על המעביד לספק לתובע רכב משוריין, שכן הדבר אינו מעשי כאשר מדובר בקומביין.
באותו מקרה הוכח, כי בין המעביד לבין שלטונות צה"ל קיים היה נוהג, על פיו דיווח
המעביד לשלטונות צה"ל על צאת עובדיו לעבודתו, תוך ביצוע תיאום פרטני בין המעביד לבין
שלטונות הצבא לגבי יציאת העובדים לשטח, כאשר הצבא הוא זה שדאג לאבטחת
העובדים.

במקרה אשר בפניי, לא היה כל הסדר דומה עם שלטונות צה"ל, או מג"ב, או משטרת
ישראל, והקשר המוכח היחיד בין בוק לבין משטרת ישראל, היה בשיחה יומית על מנת
לקבל אינפורמציה לגבי התרעות צפויות.

29 מתוך 90

SHATSKY-006751



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    הוכח באופן פוזיטיבי, כי בזק לא ביקשה ייעוץ אבטחתי מעובדיה מאת משטרת ישראל,
2    וממילא לא אובטחו עובדי בזק באופן פרטני על ידי משטרת ישראל, ואין כל ספק, כי חובת
3    השמירה על בטחונו וחייו של המנוח הייתה מוטלת בראש ובראשונה על מעבידתו בזק, ולאו
4    דווקא על גוף אחר, שאינו בעל דין בתיק שבפני, ואף לא הובא לעדות על ידי בזק.
5

6    26.    בזק מפנה אף לפסק הדין בע"א 559/77 **חיים למפרט נ' מדינת ישראל** (פורסם בנבו), שם
7    עסק בית המשפט בתביעה על עובד משרד הבטחון, שנפגע בדרכו לעבודה מאש מחבלים
8    שחדרו לישראל. באותו עניין קבע בית המשפט, כי **"אין להשוות את מידת הזהירות**
9    **הנדרשת ממעביד לגבי מצב הבטיחות בתוך מפעלו ובחצרו הנתונים לשליטתו ומידת**
10    **הזהירות שהוא יכול לנהוג כלפי סכנות הנשקפות לעובדי כלכל אדם הנמצא ברשות**
11    **הרבים".**
12

13    במלוא הענווה, הנני מסכימה עם אמירה זו. אלא מאי? בעניננו הוכח, כי בישובים
14    מסוויימים נשלחו עובדי בזק ברכב ממוגן ירי, כאשר לא הובהר השונו בין אותם ישובים
15    לבין בקעה אל גרביה. קרי: המעבידה – בזק סיפקה אמצעי מיגון מתקדמים יותר, אולם
16    לא סיפקה אותם דווקא למנוח, כאשר ברור, שאילו היה ברכב ממוגן ירי, לא היה נהרג.
17

18    היות ולא הומצאו כל הסברים למחדל שבאי ציוד המנוח ברכב ממוגן ירי, למרות שעבד על
19    קו התפר בצמידות לישוב פלשתיני, הרי שאין בקביעות בפרשת למפרט כדי לסייע לבזק
20    במקרה אשר בפניי.
21

22    27.    עוד הפנתה בזק לפסק הדין בע"א 686/77 **מקורות חב' מים לישראל נ' משה מרג'י ואח'**
23    (פורסם בנבו), שם נקבע, כי בנסיבות של אירוע חבלני, לא ניתן להחיל על מעביד את
24    עקרונות הרשלנות הרגילים.
25

26    גם לקביעה זו הנני מסכימה, עם כל הצניעות. אלא מאי? במקרה אשר בפניי מדובר באירוע
27    חבלני <u>צפוי</u>, אשר ניתן היה להיערך כנגדו, למשל בצוידו של המנוח ברכב ממוגן ירי. אי
28    היערכות זו, והימנעות מציוד המנוח ברכב ממוגן ירי, בנוסף לכשלי האבטחה הרבים
29    והנוספים שפורטו עד כה, אינם יכולה להביא, אלא למסקנה אחת – בזק התרשלה,
30    וכתוצאה מהתרשלות זו התאפשר האסון נשוא התובענה.
31

32    מסקנתי זו עומדת בעינה גם נוכח עובדות פסק הדין בת.א. (ת"א 1051/92 **אברהם שפיר נ'**
33    **פרדס סינדיקט** (פורסם בנבו). לא זאת אף זאת. הנני בדיעה, כי ככל שנמשכים ומתרבים
34    מעשי הטרור המכוונים כלפי אזרחי ישראל, חובה על המעביד לשפר את אמצעי האבטחה

SHATSKY–006752



בית המשפט המחוזי בתל אביב - יפו

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

| | |
|---|---|
| 1 | והבטחון שהוא מספק לעובדו. אין די בקביעה, כי מדובר במציאות קשה שאנו חיים בה. |
| 2 | האם בשל הקושי האמור ניתן היתר למעביד שלא להגן על עובדו?? לא ולא, מה עוד שהוכח, |
| 3 | כי בבעלות בזק היו בתקופה הרלבנטית רכבים ממוגני ירי, אשר מסיבות שלא הובהרו, לא |
| 4 | נעשה בהם שימוש לטובת המנוח ולבטחונו. |
| 5 | |
| 6 | 28.  ממשיך וטוען ב״כ בזק, כי גם שיקולי מדיניות משפטית **מחייבים הגעה אל המסקנה,** |
| 7 | **אשר שוללת צפיית של המעביד בגין אירועי טרור, אשר הינם חלק בלתי נפרד מהסיכון** |
| 8 | **הרגיל של החיים במדינת ישראל״** (סעי׳ 53 לסיכומי בזק), אולם אינני מקבלת אמירה זו. |
| 9 | נהפוך הוא – במסגרת שיקולי מדיניות משפטית, חובה לשרש ולחזק את הקביעה בדבר |
| 10 | חובתו של מעביד לדאוג לשלום עובדיו, במיוחד כאשר יש צפי ובסיס לחשש בדבר |
| 11 | התרחשות פיגוע. ודוק: כמובן שאין המעביד מסוגל לצפות קיומו של פיגוע ספציפי, אולם |
| 12 | הוא בהחלט יכול וצריך לצפות אירוע בטחוני, באופן כללי, ולעשות כל שביכולתו על מנת |
| 13 | לחשוף את עובדו למינימום סיכון. |
| 14 | |
| 15 | 29.  לא אוכל לסיים פרק זה בלא להתייחס לתתחקירי בזק ומשטרת ישראל בהתייחס לפגיעה |
| 16 | בנשוא כתב התביעה. |
| 17 | |
| 18 | <u>תחקיר בזק</u> – תחקיר  בזק לוקה בחסר, שכן אין כל פירוט לגבי זהות המרואיינים שמסרו |
| 19 | את האינפורמציה נשוא התחקיר, כמו גם זהות המראיינים שעשו את התחקיר, ועל כן, יש |
| 20 | קושי אמיתי בהערכת רציונותו של התחקיר. |
| 21 | |
| 22 | מקריאת התתחקיר עולה, כי אינו חתום, אולם בתחתיתו נרשם ״**כתב: יהודה אריה**״, |
| 23 | ומאליה עולה השאלה, האם אותו כותב ערך את התחקיר, או שמא ״**כתב**״ קביעות |
| 24 | ומסקנות של אחרים. |
| 25 | |
| 26 | יהודה אריה, שהינו מנהל אבטחה פיסית בבזק נדרש לנושא זה בחקירתו, וסיפר כי התבקש |
| 27 | על ידי מנהל האגף, יקותיאל לביא, לכתוב את התחקיר. |
| 28 | |
| 29 | אריה הבהיר בעדותו, כי לא ערך את התחקיר לבדו, וכי סייעו לו אוברלנדר וארז גולן וכן גל |
| 30 | ״**והעובדים**״ (עמי 341), אולם לא ידע להסביר מדוע עובדת מעורבותם של אחרים בהכנת |
| 31 | התחקיר לא צויינה בגוף התחקיר (עמי 342). בהמשך חקירתו חזר אריה וסיפר, כי ״**זה לא** |
| 32 | **רק אני תחקרתי, כמו שאמרתי השתתפו בו עובדים נוספים והיו, היו שיחות עם עובדי בזק** |
| 33 | **ועם מאבטחים מבזק ומשטרת ישראל**״ (עמי 344 שורות 13-14), והודה, כי לא השתתף בכל |
| 34 | התחקירים הנטענים, אלא ״**ברובם**״ (עמי 344 שורה 229) ו״**באלה שלא, העבירו לי את** |

SHATSKY–006753



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04** עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   **החומר"** (עמ' 344 שורה 24). אריה התבקש להציג בפני בית המשפט את אותו חומר גולמי
2   שהועבר אליו לכאורה, לדבריו, על ידי אחרים שעסקו בחקירת האירוע מטעם בזק, אולם
3   הוא לא זכר היכן החומר **"יכול להיות שתוייק. אני לא יודע. אני לא זוכר"** (עמ' 345 שורה
4   4), ולדבריו **"אני סיכמתי אותו בתחקיר"** (עמ' 344 שורה 319).
5
6   היות ואריה טען, כי תחקיר בזק מבוסס, בין השאר על פגישות עם אנשי משטרה, הוא נשאל
7   עם מי מאנשי המשטרה נפגש, וענה **"הייתה פגישה עם מפקד תחנת עירון, קצין המודיעין**
8   **של תחנת עירון, ועוד איזושהי פונקציה שאני לא זוכר את שמה, את התפקיד שהיה אז**
9   **ואיתם ישבו, כן"** (עמ' 345 שורות 15-16), אולם הוא לא זכר אם היו רישומים בכתב של
10  הפגישה (עמ' 345 שורה 18), ומכל מקום, הוא לא ידע להסביר מדוע הפגישה שהתקיימה
11  לכאורה עם אנשי משטרה לא מוצאת ביטוייה בתחקיר בזק.
12
13  עוד טען אריה בעדותו, כי לצורך כתיבת התחקיר **"ישבנו"** (עמ' 346 שורה 119) **"עם עובדים**
14  **שעבדו באיזור בקעה אל גרביה..."** (שם).
15
16  לדבריו הוא ואחרים – שזהותם נותרה עלומה – תחקרו את עובדי בזק בבקעה אל גרבייה,
17  כל אחד מהם בנפרד, ואמירותיהם נרשמו (עמ' 346 שורה 17), וכאשר נשאל מדוע אמירות
18  העובדים אינם באים לידי ביטוי בתחקיר, ענה **"תשמעי, בדו"ח הזה לא מופיע, לא רשמנו**
19  **בכל דבר בעקבות אמירה כזאת של עובד כזה, או אחר, הדו"ח הוא כללי"** (עמ' 346 שורות
20  19-20), ונראה, כי נוכח **"כלליותו"** של התחקיר, לא ידע העד להסביר את מעורבותם של
21  **"התקשורת ודובר החברה"** שצויינו בתחקיר כמעורבים בעריכתו. לדבריו **"האמת, שאני**
22  **לא נפגשתי איתם, קותי** (לביא – ד.ג.) **נפגש איתם זה זה היה לבקשתם..."** (עמ' 347 שורה 6),
23  ועצם ציון הפגישה עימם הייתה **"בטעות"** (עמ' 347 שורה 15), ולמשמע הדברים, אין מנוס
24  מהמסקנה, כי בתחקיר זה הינו חסר כל ערך ויתכן שתוצאותיו מוטות, שאם לא כן לא ברור
25  מדוע נדרשה פגישה של לביא – שאינו חתום בתחקיר – עם התקשורת ודובר החברה, על
26  מנת להגיע למסקנות אמת באשר לאופן התרחשות האירוע, והאחראים לו, אם בכלל,
27  בחברת בזק, אלא אם כן מטרת הפגישה הייתה מתן הנחיות באשר למסקנות התחקיר
28  במנותק מהעובדות?!
29
30  יקותיאל לביא, ששימש בתקופה הרלבנטית כמנהל המחלקה לאבטחה פיסית אישר, כי
31  תיחקר את האירוע (עמ' 100 שורות 1-3), אולם בניגוד למרבית עדותו אשר התאפיינה
32  בחוסר זכרון מוחלט באשר לשאלות שנשאל, הוא טען, כי היה **"מעורב"** (עמ' 123 שורה 24
33  בביצוע התחקיר. אלא מאי? הוא לא ידע לומר היכן פיסית נערכו התחקורים של העובדים
34  השונים (עמ' 123 שורה 20), לא ידע לומר היכן ההודעות שנגבו כביכול מהעובדים שתושאלו

32 מתוך 90

SHATSKY-006754



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

1    (עמ׳ 1259, ולא ידע לומר היכן מצויות ההודעות, אם כי הניח **שהשכל נמצא בבטחון, באגף**
2    **הבטחון״** (עמ׳ 125 שורה 19), אולם ״זכר״ בודדאות שנגבו הודעות מבן נעים ומאוני דביר
3    (עמ׳ 125), עובדה שהוכחשה נמרצות הן על ידי אוני דביר (עמוד 488 – 489) והן על ידי בן
4    נעים (עמ׳ 443 שורה 30, עמ׳ 444 שורה 1).
5
6    גם מעדותו של אוברלנדר – קצין אבטחה פיסית בבזק  - עלתה תמונה דומה באשר לאופן
7    ניהול תחקיר בזק. אוברלנדר התעקש, כי בזק לא ״**חקרה**״ את האירוע, אלא ״**תחקרה**״
8    אותו, בהדגישו ״**שיש הבדל בין חקירה ל...**״ (עמ׳ 199 שורות 25-29). אוברלנדר נשאל
9    מספר פעמים לגבי זהות האנשים ״**שתוחקרו**״ על ידו, אולם התחמק במשך דקות ארוכות
10   ממתן תשובה, ולבסוף נאלץ להודות, כי לא גבה עדות או הודעה מאיש מהמעורבים ״**כי**
11   **המשטרה חקרה אותם...**״ (עמ׳ 201 שורה 22), וטען, כי המסקנות המפורטות בתחקיר בזק
12   הן ״**המסקנות שלנו ביחד, כן**״ (עמ׳ 201 שורה 31), דהיינו, של אוברלנדר  ושל אריה יהודה.
13
14   מכל האמור עולה, כי ספק רב האם המסמך הנושא כותרת ״**תחקיר בזק**״ ראוי לכותרת זו.
15   נראה, כי מדובר במסמך אשר נכתב ביוזמת הנהלת בזק, על סמך דרישות יועצי התקשורת
16   שלה, והוא חסר כל ערך ראייתי, ובוודאי שלא ניתן ללמוד ממנו על חלקה של בזק במחדלים
17   שאפשרו את התרחשות האסון.
18
19   תחקיר המשטרה – תחקיר המשטרה מבוסס על שיחות שנערכו עם אנשי בזק, ששמותיהם
20   מפורטים בתחקיר, אולם באופן בולט ביותר נעדר שמו של המאבטח – בן נעים, שהיה עד
21   ראייה לפיגוע, וכן שמו של אוני דביר, שהגיע למקום מיד לאחר התרחשות הפיגוע, והיעדר
22   תחקירים של שניים אלה, מטיל צל מעיב על תחקיר המשטרה, המבוסס על כולו על עדות
23   שמיעה של אנשי בזק, שלא היו עדי ראיה להתרחשות וממילא – כפי שהוברר בעדותם, הם
24   אינטרסנטיים ומטרתם  למנוע קביעת אחריות של בזק לאירוע החמור, אחריות שנקבעה
25   באופן ברור בפסק דין זה ובאה לידי ביטוי הן במעשים והן במחדלים של בזק.
26
27   משטרת ישראל מציינת לשבח את התנהלותו של בן נעים ״**על אופן ביצוע המרדף, החתירה**
28   **למגע, הנחישות והפגיעה במחבל**״, והנני מצטרפת מכל לב לשבחים שהורעפו על בן נעים
29   בהתייחס להתנהלותו לאַחַר ביצוע הירי על המנוח, אלא, שאין בכך כדי להמעיט מחלקו
30   באחריות לעצם התרחשות האירוע, כפי שפירטתי בפסק דין זה בנוגע להתנהלותו לפני הירי.
31
32   מכל מקום, הנני קובעת, כי תחקיר המשטרה היה שטחי ובלתי מבוסס, ואין בו כדי לסייע
33   בקביעת אחריותם של הגורמים השונים להתרחשות האירוע נשוא כתב התביעה.
34

SHATSKY-006755



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

30.    <u>לסיכום פרק זה הנני קובעת, כי קבוצת בזק (נתבעים 1, 3, 4 ו-1-5 הפרה את חובת הזהירות</u>
<u>החלה עליה ביחסיה עם המנוח ואין כל ספק, כי המחדלים המפורטים בפסק דין זה מהווים</u>
<u>את ״הגורם בלתו אין״ להתרחשות האסון, בנוסף לגורמים אחרים שיפורטו בהמשך פסק</u>
<u>הדין.</u>

<u>**חובת זהירות קונקרטית, והפרתה ביחסים שבין המנוח לבין הנתבע 2 – אשר בן נעים**</u>

31.    במועד האירוע שימש בן נעים כמאבטחו של המנוח, ועבד בבזק מטעם לילית.

תצהירו חזר בן נעים וטען, כי אבטח את המנוח בהתאם לנוהלים שהיו נהוגים באותה עת
בלילית, אולם כלל לא הוכח, שבמועד הרלבנטי היו איזשהם נוהלים בלילית, וממילא לא
הומצאו לתיק בית המשפט.

בתצהירו התעלם בן נעים לחלוטין מהסיבה, אשר בגינה הגיע  עם המנוח לחנותו של וואיל,
שם נרצח המנוח, ולמקרא התצהיר ניתן לחשוב בטעות שהגעתם של השניים לחנותו של
וואיל ויציאתו של בן נעים מהרכב, נעשתה בהתאם לכללים כלשהם ולצרכי עבודה, ולא
היא.

זה המקום לציין, כי מחדלו של בן נעים באבטחת המנוח הינו חמור ביותר, למרות
שהתנהלותו לאחר הרצח הייתה מקצועית מאוד, והוא אף זכה לציון לשבח על המרדף
שניהל אחרי המחבל לאחר הרצח, מרדף שהביא לתפיסתו.

32.    בחקירתו העלה בן נעים טענות לגבי רמת הכשרתו כמאבטח, אלא שכפי שהבהרתי, אין
בדעתי לנסות ולהעריך את רמת הכשרתו, שכן לא הומצאה חוות דעת מומחה בעניין, ומכל
מקום, כפי שיובהר בהמשך, לא רק שאין כל קשר סיבתי בין התאפשרות ביצוע הפיגוע לבין
רמת הכשרתו של בן נעים כמאבטח, אלא שהתנהלותו המצויינת לאחר הרצח מעידה על
היותו מאבטח מקצועי, שהיה כשיר לשמש כמאבטח.

33.    השאלה המרכזית הנוגעת למעורבותו של בן נעים, הינה מה הייתה מטרת הגעתו עם המנוח
לחנותו של וואיל.

בן נעים נחקר במשטרת ישראל ביום האירוע, בתאריך 26.6.03, וטען, כי וואיל מטפל ברכבו
מידי פעם ״**והבוקר היה צריך להרכיב לי מגבר באוטו**״ וכן ציין, כי ״**וואיל התקשר אליי**

SHATSKY-006756



**בית המשפט המחוזי בתל אביב - יפו**

**ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳**

1   **אתמול בשעות הערב... ואמר לי שנפל עמוד בזק על יד ביתו ומבקש שאקדים את הטיפול**
2   **בעניינו....״** (גליון 1 שורות 11-7).
3
4   מעדותו של בן נעים בבית המשפט עלה, כי בבוקר האירוע הוא התנה את רכבו מתחת
5   לסככה בחנותו של וואיל (סע׳ 382 שורה 29) והותירו שם, שכן וואיל לא פתח עדיין את
6   עסקו ולא נכח במקום בעת הבאת רכבו של בן נעים למקום, לצורך התקנת המגבר.
7
8   לאחר השארת הרכב אצל וואיל, עבר בן נעים לרכב הברלינגו של בזק, שהיה נהוג בידי
9   המנוח, והשניים החלו את יום עבודתם.
10
11   לדבריו, בערך בשעה 11:00 חזרו לחנותו של וואיל – שם חנה רכבו של בן נעים. בן נעים
12   העיד, כי כשהגיעו לחנות, הוא ירד מרכב הברלינגו, עשה סריקה סביב רכב הברלינגו (עמ׳
13   385) והחל ללכת לעבר החנות, אלא שאז הבחין בוואיל שהיה ברכב שחנה **״לפני הרכב**
14   **שעמדנו״** (עמ׳ 386 שורה 6). בעדותו טען בן נעים, כי מטרת הגעתם לחנותו של וואיל בשלב
15   זה הייתה כדי שיקח אותם למקום התקלה בעמוד בזק הסמוכה לביתו של וואיל על מנת
16   שיתקנו אותה. מכל מקום, בן נעים הודה בחקירתו, כי בזמן שדיבר עם וואיל היה למעשה
17   עם גבו לרכב הברלינגו, בו ישב המנוח ושוחח בטלפון (עמ׳ 392), למרות שלדבריו **״עשיתי**
18   **מבט מידי פעם, להסתכל ימינה, להסתכל שמאלה...״** (עמ׳ 392 שורה 14). בשלב זה
19   התקרב המפגע אל רכב הברלינגו וירה בראשו של המנוח  מבעד לשמשת הרכב שהייתה
20   סגורה.
21
22   אומר מיד, כי אינני מקבלת את גרסתו של בן נעים, וכי לעניות דעתי ולהתרשמותי מדובר
23   בגרסת בדים, שלא באה לעולם, אלא כדי להצדיק את הגעת בן נעים והמנוח לחנותו של
24   וואיל, ואבהיר.
25
26   כפי שציינתי, ממקרא תצהירו של בן נעים עולה, כי בבוקר האירוע השאיר בן נעים את רכבו
27   בחנות של וואיל, אולם הוא אינו מספק בתצהיר כל הסבר לסיבת השארת הרכב בחנות, כמו
28   גם לסיבת חזרת השניים לחנות במהלך הבוקר.
29
30   ממקרא עדות של בן נעים במשטרה ומעדותו בבית המשפט, עולה תמונה שונה בתכלית
31   השינוי מהמצב התמים והסתמי לכאורה המופיע בתצהיר בן נעים.
32
33   מעדותו של בן נעים עולה, כי מטרת השארת מכוניתו אצל וואיל בבוקר האירוע הייתה
34   לצורך התקנת מגבר ברכבו.

SHATSKY-006757



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | |
| 2 | בן נעים טען, שערב לפני כן טלפן אליו ואיל ובקשו לזרז תיקון עמוד שנפל ליד ביתו. |
| 3 | |
| 4 | מטעמים השמורים עם בן נעים, הוא לא מצא לנכון לציין עובדות אלו בתצהירו, דבר הפוגם |
| 5 | קשות באמינותו ובנכונות גרסתו. |
| 6 | |
| 7 | בן נעים נדרש לשיחת הטלפון הלכאורית שנערכה ערב קודם לכן בינו לבין ואיל, אשר ביקש |
| 8 | ממנו לזרז תיקון העמוד שליד ביתו, אלא שגירסה זו הינה גירסה יחידה של בעל דין, ואין |
| 9 | לה אימות, ונוכח חוסר מהימנותו של בן נעים, הנני בדיעה, כי כפי שציינתי מדובר בגרסת |
| 10 | בדים. |
| 11 | |
| 12 | מעבר לצורך יצויין, כי בן נעים יכול היה להמציא את פלט שיחות של הטלפון להוכחת קיומה |
| 13 | של השיחה האמורה, אולם הוא לא עשה כן. אין חולק, כי בבוק לא התקבלה תלונה על |
| 14 | נפילת העמוד בסמוך לביתו של ואיל, ולמעשה, כלל לא ידוע היכן ממוקם ביתו של ואיל. |
| 15 | ודוק: אם אכן נפל עמוד ליד ביתו של ואיל, יש להניח שבשלב כלשהו, לאחר הרצח, הייתה |
| 16 | בוק מתקנת את אותו עמוד, אלא שלא הובאה כל אסמכתא לתיקונו של העמוד, ובן נעים |
| 17 | אף נמנע מהבאת ואיל לעדות, לטעמתו, משום שדרש כסף עבור עדותו, וזה הרגע להפנות |
| 18 | פעם נוספת להלכות הידועות בדבר אי הבאת עד, מה עוד שבן נעים רשאי היה לבקש את |
| 19 | זימונו של ואיל על ידי בית המשפט, דבר שלא עשה. |
| 20 | |
| 21 | זאת ועוד. אין חולק, כי בן נעים שימש כמאבטח, והוא לא המציא הסבר מושכל, הכיצד פנה |
| 22 | לכאורה ואיל  דוקא למאבטח בבקשה לזרז תיקון עמוד בוק, והלא אין זה מתפקידו, כפי |
| 23 | שאישר בעדותו (עמ' 384), ודוק: כפי שציינתי, לא הוכח, כי ואיל דיווח לבוק על נפילתו |
| 24 | הלכאורית של העמוד, וממילא לא הוכחה קיומה של פנייה כזו לבוק. |
| 25 | |
| 26 | עניין זה הינו מהותי, שכן לדברי בן נעים במשטרה ובעדותו, הוא התבקש על ידי ואיל |
| 27 | "לזרז" "ולהקדים" את תיקון העמוד, בקשה המעידה לכאורה על קיומו של דיווח בבוק על |
| 28 | נפילתו של העמוד האמור, דיווח שקיומו לא הוכח. |
| 29 | |
| 30 | בן נעים הודה בחקירתו, כי מטרת הגעתו עם המנוח לחנותו של ואיל הייתה גם לצורך |
| 31 | התקנת המגבר, אולם התעקש, כי ההגעה הייתה גם לצורך תיקון העמוד (עמ' 383), אלא |
| 32 | משתבעינתי שכל עניין תיקון העמוד לא היה ולא נברא, הרי שברור, שמטרת הגעת השניים |
| 33 | לחנותו של ואיל במועד האמור, הייתה אך ורק לצורך הסדרת התקנת המגבר ברכבו של בן |
| 34 | נעים, אשר מטעמים השמורים עימו מצא לנכון להסדיר את ענייניו הפרטיים תוך כדי |

36 מתוך 90

SHATSKY-006758



בית המשפט המחזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   ובמהלך יום העבודה, ולא לאחריו, למרות שלפי דברי אוני דביר (עמ' 506), נהג בן נעים
2   להגיע לבקשה אל גרבייה לצורך ענייניו הפרטיים גם לאחר שעות העבודה.
3
4   במהלך עדותו, תיאר בן נעים את אופן ירידתו מרכב הברלינגו ואת הסריקה שעשה לכאורה
5   לאחר ירידתו, אולם, נוכח חוסר האמון שלי בעדותו של בן נעים, אינני מקבלת את גרסת
6   ביצוע הסריקה, שמטרתה, כפי הנראה להוכיח, כי למרות שעסק באותה עת בענייניו
7   הפרטיים, לא הזניח את חובותיו כמאבטח, מה עוד שלא בא זכרה בתצהירו. ודוק: אין
8   חולק, כי כאשר שוחח בן נעים עם וואיל, הוא עמד עם גב לרכב הברלינגו ולמנוח שישב בו.
9   (עמ' 392), והרי הדעת נותנת שמאבטח היורד מהרכב ועושה סריקה, לא יעמוד בגבו אל
10  המאבטח, וישוחח עם אחר!!
11
12  זה המקום לציין, כי במהלך עדותו של בן נעים הגיש בן נעים שרטוט של עסקו של וואיל,
13  לרבות ציור מיקום הרכבים שהיו שם (3/נ), אולם התברר, כי שרטוט זה שונה בפרטים
14  מהותיים משרטוט שעשה בן נעים במסגרת חקירתו במשטרה (5/ת), כאשר מהשרטוט
15  המפצר בתיק המשטרה ברור, כי עדותו של בן נעים בתארו את מסלול הליכתו מרגע ירידתו
16  מהברלינגו ועד הגיעו לוואיל שטיפל ברכינה ברכב אחר, היא עדות שאיננה איננה ואיננה
17  אפשרית (עמ' 460 – 461), והנני בדעה ,כי מטרת הגעת השניים לחנותו של וואיל במהלך יום
18  העבודה לא הייתה אלא לצורך הסדרת התקנת המעבר ברכבו של בן נעים ומסירת מפתחות
19  הרכב לוואיל לצורך ביצוע ההתקנה האמורה (437-436), וכאמור, כל סיפור העמוד שופל
20  הוא סיפור בדים, שלא היה ולא נברא.
21
22  בן נעים טען בחקירתו, כי ראה את המחבל המפגע קודם להגעתו לחנותו של וואיל, ואף ראה
23  אותו מתקרב לעבר החנות. אינני יודעת אם אכן ראה בן נעים את המחבל בשלבים
24  מוקדמים אלו, אולם נוכח גילו הצעיר של המחבל (15.5) והעובדה שבקרבת מקום פצעה גם
25  חבורת ילדים, הוא לא ייחס לו חשיבות ובוודאי שלא חשד בו שהוא מחבל, עובדה
26  המקובלת עליי.
27
28  .34   לסיכום, בשאלת מעורבותו של בן נעים באירוע נשוא כתב התביעה, אין מנוס מהמסקנה, כי
29        התנהלותו של בן נעים הייתה גם היא **"הגורם בלתו אין"**, אשר תרמה לאפשרות ביצוע
30        הפיגוע.
31
32        בן נעים הוביל את המנוח לחנותו של וואיל לצרכיו הפרטיים, יצא מרכבו של המנוח ושוחח
33        עם וואיל כשהוא בגבו אל המנוח, ועל כן לא יכול היה למנוע את היריות הקטלניות שגרמו
34        למותו של המנוח.

37 מתוך 90

SHATSKY-006759



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1
2 באשר לשאלה האם יכול היה וצריך היה בן נעים לצפות את העומד להתרחש, התשובה היא
3 חיובית ולמעשה היא מתבקשת והוכחה בפועל, נוכח תיאור הסריקה שביצע לכאורה בן
4 נעים ברדתו מרכב הברלינגו, קרי: בן נעים הוכיח בהתנהגותו, כפי שתיאר, שהוא יכול היה
5 וצריך היה לצפות את האירוע, שהתרחש זמן קצר מאד לאחר רדתו מרכב הברלינגו.
6
7 כאמור, אינני מקבלת את התיאור האמור, אולם עצם העלאתו מצביע על הבנתו של בן נעים
8 את המצב ואת הצורך להגן על הטכנאי מפני כל אירוע, אשר עלול לפגוע בו. בתיאור זה
9 הפגין בן נעים מודעות לתפקידו כמאבטח, וניסה למזער את חלקו בהתרחשות האומללה
10 שאראה לאחר מכן.
11
12 .35 אינני יכולה שלא להתייחס לשאלה, מה היה קורה אילו לא היה בן נעים והמנוח  מגיעים
13 לחנותו של וואיל, ומה היה קורה אילו לא היה בן נעים יורד מהרכב, ומשוחח בעומדו בגבו
14 למנוח.
15
16 מדובר בהיפותיזות, שאינני יכולה להשיב עליהן. העובדות הן שהממונה ובן נעים הגיעו
17 לחנותו של וואיל ביוזמתו של בן נעים, ובן נעים עסק בחנות בענייניו הפרטיים, תוך הפניית
18 גבו למנוח.
19
20 התנהלות זו מביאה למסקנה, כי בין בן נעים למנוח קיימת חובת זהירות קונקרטית, וכי זו
21 הופרה על ידי בן נעים.
22
23 <u>**חובת הזהירות הקונקרטית והפרתה, ביחסים שבין לילית לבין המנוח**</u>
24
25 .36 לילית הינה חברה בפירוק, וקיים לגביה צו עיכוב הליכים, אולם לא אעשה מלאכתי שלמה
26 ללא הערכת חלקה של לילית באירוע, מה עוד שקיימת פוליסה המכסה את חבותה של
27 לילית במועד האירוע.
28
29 הובהר, כי בן נעים הועסק כמאבטח בבזק מטעם לילית, ולדבריו הוכשר לתפקידו על ידי
30 לילית.
31
32 הנני בדיעה, כי תפקידה של לילית מוצה עם העברת המאבטח, שעבר אצלה הכשרה, לעבודה
33 בבזק.
34

SHATSKY-006760



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1   הוכח, כי מרגע העברת המאבטח לבזק, פעל המאבטח בהתאם להוראות בזק, ואינני רואה
2   איך ניתן לקבוע קיומה של חובת זהירות קונקרטית ביחסים שבין המנוח לבין ליליית. ודוק:
3   אילו היה מוכח, כי ליליית לא הכשירה את בן נעים כיאות וכי הכשרתו הייתה לקויה
4   וכתוצאה מכך הוא לא ידע להגן על המאובטח בעת קרות האירוע, כי אז ניתן היה לקבוע
5   קיומה של חובת זהירות קונקרטית והפרתה. אלא מאי? לא נפל כל דופי בהכשרתו של בן
6   נעים, אשר אף זכה לציון לשבח על תגובתו המהירה עם הישמע הירייה, ואשר על כן אין
7   לליליית כל מעורבות ישירה, או עקיפה לאירוע, וממילא לא קמה חובת זהירות קונקרטית
8   בינה לבין המנוח.
9
10  **חובת זהירות קונקרטית והפרתה ביחסים שבין הרשות הפלשתינית והמועצה הפלשתינית לבין**
11  **המנוח.**
12
13  37.   בתאריך 4.5.94, נחתם ״**הסכם בדבר רצועת עזה ואיזור יריחו בין ממשלת מדינת ישראל**
14       **לבין ארגון השחרור הפלשתיני**״ (להלן: ״אש״ף״), **הנציג של העם הפלשתיני** (להלן:
15       ״**הסכם עזה-יריחו**״) (נספח ב׳ להתיידע ב״כ התובעים בדבר הגשת כתבי אמנה).
16
17       ההסכם פורסם בכתבי אמנה 1067, כרך 32 והוא כולל את סעיף VI, שכותרתו ״**הכוחות**
18       **והאחריות של הרשות הפלשתינית**״ המבהיר בסעי׳ ג׳, כי הרשות הפלשתינית ״**תהיה, בין**
19       **היתר, בעלת כח לנסח קווי מדיניות, לפקח על יישומם, להעסיק סגל עובדים, להקים**
20       **מחלקות, רשויות ומוסדות, לתבוע ולהיתבע ולכרות חוזים...**״, קרי: בפנינו הודאת בעל דין
21       בדבר כשרותה המשפטית של הרשות הפלשתינית (להלן: ״**הרשות**״) ובדבר היותה ישות
22       משפטית, שניתן לתובעה ולקבל כנגדה פסק דין. ודוק: לא לי להגדיר את טיבה של הישות
23       המשפטית המכונה ״**הרשות הפלשתינית**״, ודי לי בתעודת עובד ציבור שהוגשה, ועל פיה
24       אין הרשות נהנית מחסיינות משפטית.
25
26       ב״כ הרשות, עשה מאמצים גדולים מאוד לנסות ולגרור את בית המשפט לפולמוס פוליטי
27       בדבר טיבה של הישות המשפטית, המכונה ״**הרשות הפלשתינית**״, בהגדירו אותה ״**ישות**
28       **מדינית זרה**״ וככזו אינה כפופה לדין הישראלי בכלל, ולדיני הנזיקין בפרט. לדברי ב״כ
29       הרשות ״**אי אפשר להתעלם מהיסוד הבינלאומי של עובדת היותה של הרש״פ לא רק גוף**
30       **זר ולא ישראלי, שלא חלים עליו הדין, או הנורמות הישראליים, אלא גם במעמד של הדין**
31       **זר...**״ וזאת הוא מסיק, בין היתר מהסכמי אוסלו, אשר על פי פרשנותו קבע, כי הרש״פ
32       הינה הריבון בשטחים, שאם לא כן, לדבריו ״**מכח מה מייחסים התובעים רשלנות לנתבעת**
33       **8** (הרש״פ – ד.ג.) **כאשר לא מנעו פעולות טרור נגד אזרחי מדינת ישראל, אם לא מכח**
34       **היותה ריבון בשטח?**״ (סעי׳ 3 לפתיח לסיכומי הרשות).

SHATSKY-006761



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1
2  לגופו של האירוע נשוא כתב התביעה נטען, כי לא הוכח קשר ישיר בין הרש"פ לבין האירוע
3  נשוא כתב התביעה וכן הועלו טענות בדבר אי חוקיות תעודת שר החוץ, וכן טענות לגבי אי
4  שפיטות ופורום בלתי נאות – טענות בהן התבקש בית המשפט שלא להכריע במסגרת תיק
5  זה במסגרת סיכומי הרשות הפלשתינית.
6
7  38.   בכתב התביעה ובסיכומים מייחסים התובעים לרש"פ את האחריות לביצוע הפיגוע, והם
8        מבססים את עילת התביעה על ההתחייבויות שנטלה הרש"פ על עצמה במסגרת הסכם עזה-
9        יריחו והסכם הביניים וכן על הוראות פקודת הנזיקין [נוסח חדש]. ודומני, כי ראש וראשונה
10       מן הראוי להתייחס להסכמים אלו ולהבהירם באיצטלת התביעה דנן.
11
12  39.   <u>הסכם עזה-יריחו והסכם הביניים</u> – כפי שציינתי, נחתם הסכם זה בתאריך 4.5.94 בקהיר,
13        בין <b>"ממשלת ישראל"</b> לבין הארגון לשחרור פלשתין.
14
15  <u>לאחר החתימה על ההסכם, נחקק <b>חוק</b> יישום ההסכם <b>בדבר רצועת עזה</b> ויריחו (סמכויות</u>
16  <u>שיפוט והוראות אחרות) (תיקוני חקיקה), התשנ"ה – 1944</u> [להלן: <b>"חוק יישום הסכם עזה-</b>
17  <b>יריחו"</b>].
18
19  בתאריך 28.9.95 נחתם בוושינגטון הסכם ביניים ישראלי – פלשתיני בדבר הגדה המערבית
20  ורצועת עזה [להלן: <b>"הסכם הביניים"</b>], ובמסגרתו הוקמה ונוסדה המועצה הפלשתינית,
21  אשר אליה אמורות היו להיות מועברות הסמכויות אשר הוקנו לרשות הפלשתינית בהתאם
22  להסכם עזה-יריחו (פרק 1 סעיף 2 להסכם הביניים).
23
24  הסכם הביניים פורסם בכתבי אמנה 1071, כרך 33, ובעקבותיו חוקק <u>חוק יישום הסכם</u>
25  <u>הביניים בדבר הגדה המערבית ורצועת עזה (סמכויות שיפוט והוראות שונות (תיקוני</u>
26  <u>חקיקה) התשנ"ו – 1996   וחוק לתיקון ולהארכת תוקפו של תקנות שעת חירום (יהודה</u>
27  <u>ושומרון – שיפוט בעבירות ועזרה משפטית), התשס"ז – 2007</u>, כאשר חלק מתיקוני
28  החקיקה הוכנסו ישירות <u>לחוק הארכת תוקפו של תקנות שעת חירום (יהודה ושומרון וחבל</u>
29  <u>עזה – שיפוט בעבירות ועזרה משפטית) תשכ"ז – 1967,</u> וכן פורסם מנשר מס' 7 בדבר יישום
30  הסכם הביניים (יהודה ושומרון). במסגרת הסכם   הביניים, העבירה ישראל למועצה את
31  הסמכות והאחריות כמפורט בהסכם עצמו.
32

SHATSKY-006762



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1    ״הסכם בדבר העברה מכינה של סמכויות ואחריות״ נחתם בארו בתאריך 29.8.94 ופורסם
2    בכתבי אמנה 1068 כרך 32, ובעקבותיו נחקק חוק יישום הסכם העברה מכינה של סמכויות
3    לרש״פ (תיקוני חקיקה והוראות שונות), התשנ״ה – 1995 (להלן : **הסכם ההעברה**״).
4

40.   5    בסע׳ 18 (XVIII) להסכם עזה ירוחו התחייבו שני הצדדים (הן מדינת ישראל והן הרשות
6    הפלשתינית) לנקוט ״**בכל האמצעים הנחוצים כדי למנוע מעשי טרור, פשע ועוינות**
7    **המכוונים כנגד כל אחד מהם, נגד יחידים המצויים בסמכות הצד האחר ונגד רכושם**
8    **וינקטו באמצעים משפטיים כנגד עבריינים. נוסף על כך, הצד הפלשתיני ינקוט בכל**
9    **האמצעים הנחוצים כדי למנוע פעולות עוינות כאלה המכוונות כנגד ישובים, נגד התשתית**
10   **המשרתת אותם ונגד איזור המתקנים הצבאיים, והצד הישראלי ינקוט בכל האמצעים**
11   **הנחוצים כדי למנוע פעולות עוינות כאלה, אשר מקורן בישובים והמכוונות כנגד**
12   **פלשתינים״.**
13
14   התחייבות זו חוזרת על עצמה בסע׳ 15 להסכם הביניים, שכותרתו ״**מניעת פעולות עוינות**״.
15
16   הנה כי כן, אין ספק, כי בניגוד לטענת הרש״פ הפכו ההסכמים האמורים בין מדינת ישראל
17   לבין הרש״פ לחלק מהמשפט הפנימי הישראלי, זאת בעקבות חקיקת החוקים האמורים,
18   ואשר על כן אין כל מניעה משפטית, או אחרת להגיש תביעות אזרחיות – נזיקיות על סמך
19   התחייבויותיה של הרש״פ באותם הסכמים.
20
21   ב״כ הרש״פ טוען, כי מטרתם של חוקי היישום האמורים הינם להתאים את החקיקה
22   הישראלית להתחייבויות שנטלה על עצמה מדינת ישראל בהסכמים האמורים, והרי לא
23   תתכן חקיקה ישראלית המעגנת את ההתחייבויות הרש״פ, אלא שבטענה זו צודקת הרש״פ
24   באופן חלקי בלבד.
25
26   אין ספק, שמטרת חוקי היישום הינה לעגן בחוק הישראלי את ההתחייבויות את ההתחייבויות שנטלה על
27   עצמה מדינת ישראל כלפי הרשות הפלשתינית, אלא מאיי התחייבויות אלו לא באו לעולם
28   בחלל ריק, אלא הן שאובות מהסכמים שהרש״פ חתומה עליהם, קרי: הרש״פ – כישות
29   משפטית עצמאית התחייבה בחוזה כלפי מדינת ישראל ותושביה למנוע פעולות טרור.
30   התחייבות זו, הבאה לידי ביטוי הן בהסכם עזה-יריחו והן בהסכם הביניים מהווה
31   התחייבות ישירה כלפי אזרחי מדינת ישראל, ולחילופין מהווה חוזה לטובת צד ג׳ – הם
32   אזרחי מדינת ישראל. רוצה לומר: ההסתמכות על ההתחייבות של הרש״פ בהסכמים
33   השונים, הינה מכח ההסכמה החוזית הישראלית והפלשתינית, כי מדובר בהסכמים
34   מחייבים, וכי בהתאם לדיני החוזים, ראשי מי שנפגע כתוצאה מהפרת ההסכמים אלו,

41 מתוך 90

SHATSKY-006763



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  להגיש תביעת ולתבוע את נזקו. ודוק: סע' 34 לחוק החוזים (חלק כללי) מכיר בזכותו של
2  צד א', זר לחוזה , לתבוע על פיו, כמי שהינו מוטב על פי אותו חוזה (ראו: ג' שלו "**דיני**
3  **חוזים**", מהדורה שנייה, התשנ"ה, 4319.
4
5  ב"כ הרש"פ טוען, כי במסגרת הסיכומים שהוגשו ברע"א 4060/03 **הרשות הפלשתינית**
6  **ואח' נ' אליהו דיין ואח'** הסכים ב"כ היועץ המשפטי לממשלה, כי ההסכמים האמורים
7  אינם מקימים עילות תביעה, אלא לצדדים החתומים עליהם, "**ואין אנשים, או גופים**
8  **פרטיים, אשר אינם צד להם, זכאים לתבוע בגינם, אלא אם נאמר במפורש אחרת**
9  **בהסכמים המדיניים עצמם**" אלא מאי? ב"כ הרש"פ לא צירף את עמדתו האמורה של
10 היועץ המשפטי לממשלה לסיכומיו, ועיון בפסק דינו של בית המשפט העליון מגלה, כי בית
11 המשפט העליון לא דן כלל בטענה, משום שלא הועלתה כלל בפני בית הערכאה המבררת
12 (סע' 7 לפסק הדין).
13
14 לגופם של דברים יובהר, כי בית המשפט אינו כפוף לעמדה כזו, או אחרת של היועץ המשפטי
15 לממשלה, מה עוד שהאמירות לא הובאו לידיעתי, ואינני יודעת מהי עמדתו של היועץ
16 המשפטי.
17
18 הנני בדיעה, כי מקריאת ההסכמים, ומכח הדברים העולה מהם, ניתן להגיע למסקנה, כי
19 כוונת מנסחיו הייתה להקנות למוטבים על פיהם את הזכות לדרוש את קיום החיוב בהתאם
20 לאמור בהסכמים וזאת הנני למדה, בין היתר מהמבוא להסכם עזה-יריחו, המאשר את
21 זכותם של הצדדים להסכם "**לחיות בדו קיום של שלום, כבוד הדדי ובטחון...**". כבוד כולל
22 את הזכות שלא להיפגע על ידי מעשי טרור, ואת הזכות לתבוע את בנזיקין בגין פגיעה כזו.
23 ודוק: זכותה של מדינת ישראל לחיות בדו קיום של שלום, כבוד הדדי ובטחון, אינה אלא
24 זכותם של תושביה ואזרחיה של מדינת ישראל, ומכל מקום לא הוכח אחרת.
25 הנני ערה לעובדה, שפרשנות ההסכמים בין מדינת ישראל לרש"פ לא עלתה כלל בדיוני בית
26 המשפט, אלא משהסתמכה ב"כ התובעים על קיומם של ההסכמים, זכותה לפרשם על פי
27 ראותה, ואם סברה הרש"פ, כי אין להסתמך על ההסכמים, או שיש לפרשם בדרך מסויימת,
28 רשאית הייתה לטעון זאת ולהביא עדויות לאימות טענותיה, וזאת לא עשתה.
29
30 זאת ועוד. בסע' ג' לסע' 6 להסכם עזה-יריחו, מכריזה הרש"פ על זכותה לתבוע ולהיתבע.
31 הרש"פ לא מצאה לנכון להגביל את זכות התביעה כנגדה, או את סוג העניין שבגינו ניתן
32 לתבוע אותה, אלא הכריזה על קיומה של זכות לתבוע אותה. מהאמור עולה, כי הזכות
33 לתבוע את הרש"פ נתונה הן למדינת ישראל והן ליחידיה המוצאים עצמם נפגעים כתוצאה
34 מפעולת הרשות, מה עוד שמטרת ההסכמים הינה למסד "**דו קיום בשלום**". מושג זה כולל

SHATSKY-006764



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

| | |
|---:|---:|
| 1 | בחובו הן את זכותם של היחידים לחיות בשלום, והן את זכותם להגיש תביעות אם הופרה |
| 2 | זכותם לחיות בשלום, שאם לא תאמר כן, מה משמעו של **״דו הקיום?״**. |
| 3 | |
| 4 | לנוכח כל האמור, הנני בדיעה, כי ההסכמים מקנים זכות תביעה בגין הפרתם הן למדינה והן |
| 5 | ליחידיה, ואילו רצה מי מהצדדים למנוע את זכות התביעה ליחידי המדינה, היה מפרט זאת |
| 6 | בהסכמים, דבר שלא נעשה כאמור. |
| 7 | |
| 8 | מעבר לאמור, יש לזכור, כי עילת התביעה של התובעים כנגד הרש״פ הינה עילה נזיקית |
| 9 | והסתמכותם על ההסכמים הינה הסתמכות לגיטימית במסגרת ניסיונם להוכיח את חבותה |
| 10 | של הרש״פ לפצותם בגין האירוע נשוא התובענה. |
| 11 | |
| 12 | כפי שציינתי, הרש״פ הגדירה את עצמה בהסכמים כישות משפטית הרשאית לתבוע |
| 13 | ולהיתבע. ללא קשר לעובדה, שהודאת בעל דין זו בדבר היות הרשות הפלשתינית ישות |
| 14 | משפטית, לא ניתן להתעלם מהעובדה, שמדובר בישות משפטית, אשר לטענת התובעים |
| 15 | גרמה בהתנהלותה לנזק נשוא כתב התביעה, והנני סבורה, שלעניין האחריות הנזיקית, דינה |
| 16 | של הרש״פ זהה לדינה של כל ישות משפטית הנתבעת בגין עוולה אזרחית בתחום הנזיקי, |
| 17 | ועל כן יוברר, כי עילת התביעה המצויה בידי התובעים אינה נובעת מהתחייבויות הרש״פ |
| 18 | כפי שפורטו במסגרת ההסכמים, כי אם מעצם היותה ישות משפטית, אשר ביצעה עוולה |
| 19 | בתחום הנזיקין ומשכך היא נתבעת לפצות את הנפגעים. |
| 20 | |
| 21 | התובעת טוענת, כי הרשות הפלשתינית והמועצה הפלשתינית **״לא רק שלא סיכלו טרור,** |
| 22 | **אלא יזמו, הפעילו ומימנו טרור, בניגוד לאמנות הרלבנטיות״** (סע׳ 4 לסיכומי התובעים), |
| 23 | ואילו הרש״פ והמועצה טוענות שאינן נושאות באחריות למעשיו של המחבל ואינן בגדר |
| 24 | **״שולחת״** המחבל לביצוע הפיגוע נשוא כתב התביעה (עמ׳ 8 לסיכומי נתבעים 7,8 ). |
| 25 | |
| 26 | אינני מקבלת את עמדת הרש״פ ואבהר. |
| 27 | |
| 28 | המחבל – שאדי מוחמד חסאין ג׳וואדה – העיד בפני בית המשפט עדות מוקדמת בתאריך |
| 29 | 12.7.09. |
| 30 | |
| 31 | המחבל הודה כן בחקירתו במשטרה, והן בדיון שבפני, כי רצח את המנוח. |
| 32 | |
| 33 | המחבל סיפר בהודעתו (שנלקחה ממנו בבית החולים בתאריך 2.7.03, ת/19), כי כחודשיים |
| 34 | וחצי לפני הפיגוע החל ללמוד **״בקורס אימוני גוף ואימונים על נשק״** (גליון 2 שורות 7-8), |

41.

SHATSKY-006765