# LOWELL DECL. EX. 2c



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   והבהיר, כי עשה כן ברשות הפלשתינית ביריחו. לדבריו, נמשך הקורס במשך 50 ימים,
2   והסתיים כשעשרה ימים לפני ביצוע הפיגוע (שם). המחבל תיאר בהודעתו כיצד החליט לרצוח
3   יהודי, וכיצד מימש את רצונו, ובמענה לשאלה ענה, כי אינו משתייך **"לשום ארגון"** (גליון 5
4   שורה 10).
5
6   דומה, כי לאחר הודאתו של המחבל על פיה התאמן ברשות הפלשתינית, אין עוד ספק
7   בשאלה זו. אלא מאי? בעת מתן עדותו בבית המשפט טען המחבל לראשונה, כי **"מה
8   שאמרתי במשטרה זה לא נכון"** (עמ' 11 שורה 29) ולדבריו בבית המשפט, האימונים שעבר
9   היו בגינין, וכן **"אני עברתי אימונים על נשק בגדודי אל אקצע"** (עמ' 14 שורה 28), אולם לא
10  היה בפיו כל הסבר לשינוי גרסתו דווקא בעת הזאת, בניגוד גמור לגירסתו הראשונית
11  והבתולית בעת חקירתו בסמוך לאחר ביצוע הרצח, ועל כן יש רגליים לסברה, שהועלתה על
12  ידי ב"כ התובעים, לפיה מאן דהוא בכלא הינחה את המחבל לשנות את עדותו, כל מנת שלא
13  לסבך את הרש"פ בתיק זה.
14
15  נוכח שינוי הגרסה הוכרז המחבל כעד עוין (עמ' 12) בלא שמי מהצדדים התנגד לכך, והוא
16  נחקר בחקירה נגדית על ידי הצדדים.
17
18  הרש"פ טוענת בסיכומיה, כי דברי המחבל בהודעתו במשטרה, על פיהם עבר אימוני גוף
19  ונשק **"ברשות הפלשתינית ביריחו"**, אין בהם כדי להצביע שהמחבל עבר את האימונים
20  ברשות הפלשתינית, אלא **"בתחומי"** הרשות הפלשתינית ביריחו, ולא מטעם הרשות
21  הפלשתינית ביריחו.
22
23  הנני דוחה טענה זו מכל וכל. ראש וראשונה, לו סבר ב"כ הרש"פ, כי האמור בהודעת המחבל
24  פורש, או תורגם בצורה שגויה, כי אז רשאי היה להביא מומחה לבלשנות, אשר יבהיר את
25  הטעון הבהרה. הימנעותו מלעשות כן פועלת לחובת הרש"פ.
26
27  זאת ועוד. מקריאת הודעת המחבל עולה, כי התכוון להבהיר שעבר אימוני גוף ונשק ברשות
28  הפלשתינית ביריחו ולא **"בתחומי"** הרשות הפלשתינית ביריחו. זאת ניתן ללמוד מהמשך
29  ההודעה, בה הסביר המחבל **"כי התאמנתי על נשק ביריחו..."** (גליון 2 שורה 14). קרי:
30  כאשר התכוון המחבל לציין מיקום גיאוגרפי בלבד, הוא השתמש במילה **"יריחו"** בלבד,
31  והמסקנה היא שכאשר טען שעבר אימוני גוף ונשק ברשות הפלשתינית ביריחו, התכוון
32  בדיוק למה שאמר, כלומר, הוא השתתף במחנה אימונים מטעם הרשות הפלשתינית ביריחו.
33

SHATSKY-006766



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1 כפי שציינתי, במועד ביצוע הפיגוע היה המחבל בן 15.5 שנים בלבד, ונראה, כי החליט לנצל
2 עובדה זו לצורך ביסוס שינוי גרסתו, שכן לראשונה טען במפתיע, כי "**הרשות הפלשתינית**
3 **היא לא נתנה לי לעבור אימונים, ואני כאשר יצאתי לאיזור יריחו, על מנת להתנדב למקום**
4 **צבאי, והם לא הסכימו, סרבו, בגלל סיבה אחת, בגלל הגיל שלי**" (עמ' 14 שורות 17-18).
5
6 כפי שנינו לראות, קיימת התפתחות בגירסת המחבל, התפתחות, אשר מטרתה להרחיק את
7 הרשות הפלשתינית מאחריות לרצח שביצע, שכן, בעוד שימים ספורים לאחר ביצוע הרצח
8 הבהיר המחבל, כי התאמן "**ברשות הפלשתינית ביריחו**", הרי שבבית המשפט, כעבור שש
9 שנים מהפיגוע, ידע לומר, כי יצא "**לאיזור יריחו**", והדברים מדברים בעד עצמם.
10
11 המחבל נשאל מדוע אמר לחוקר המשטרתי, שהתאמן ברשות הפלשתינית ביריחו, ועתה הוא
12 טוען שהתאמן בגינין בגדודי אל אקצה, ותשובתו הסתמית היתה "**זה היו דברים של לפני**
13 **6,7 שנים, אני לא זוכר מה דיברתי בכלל. כאשר אני ביצעתי את הביצוע הייתי שייך**
14 **לגדודי אל אקצה**" אלא מאי? כאשר נחקר המחבל בסמוך לאירוע, טען וזכור, כי אינו שייך
15 לארגון כלשהו, וכאשר עמת עם דבריו, טען "**הם חקרו אותי ואני הייתי פגוע, עייף**" –
16 אמירה שגם היא איננה אמת, שכן מקריאת ההודעה המשטרתית עולה, כי החוקר שאל
17 לשלומו של המחבל  לפני תחילת החקירה, ותשובתו היתה "**השבה לאל אני מרגיש טוב...**
18 **היחס טוב מאוד כאן, והרופאים  והאחים והאחיות מתייחסים אליי בצורה טובה מאוד**"
19 (גליון 1 שורות 14, 16).
20
21 הנה כי כן, אין ספק, כי דווקא התשובות שהשיב המחבל לחוקר המשטרה במסגרת ת/1, הן
22 הן תשובות האמת, וכאמור, שינוי גרסתו נובע מרצונו להרחיק את הרש"פ מהאירוע נשוא
23 כתב התביעה.
24
25 בהמשך עדותו של המחבל, ניכר היה שהולעט באינפורמציה, שמאן דהוא רצה להביאה בפני
26 בית המשפט. כך למשל טען, כי "**אלה שבג'נין הם לא הכניסו אותם לרשות. אלה הם**
27 **נלחמים עם ישראל. והרשות היא לא נלחמת. ג'נין לוקחים אנשים שרוצים לבצע פעולה...**
28 **הרשות היא רוצה בטחון ושלום, אבן בג'נין רוצים כל אחד שהוא יכול לבצע איזה פעולה,**
29 **שיתנו לו**" (עמ' 23 שורות 6-10).
30
31 במאמר מוסגר יצוין, כי המחבל טען בבית המשפט, שסיפר לחוקר המשטרה שאומן על ידי
32 גדודי אל אקצה, אולם לא ידע להסביר את העובדה שמהודעתו, הנושאת את חתימתו,
33 עולה, כי אומן ברשות הפלשתינית, ובבית המשפט הוא ניסה לתלות את אמירותיו בפני

SHATSKY-006767



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| 1 | החוקר במצבו הרפואי, אלא שהתיאור שנתן בבית המשפט (עמ' 16 שורות 14-25) אינו |
| 2 | תואם את הצהרתו בפני החוקר בדבר הרגשתו הטובה במועד גביית ההודעה. |
| 3 | |
| 4 | ב"כ התובעים טענה, כי שינוי גרסתו של המחבל בבית המשפט, לעומת דבריו בת/1 מהווים |
| 5 | "עדות כבושה"", והצדק עימם. |
| 6 | |
| 7 | **עדות כבושה** |
| 8 | |

42.  עדות כבושה הינה עדות, שהעד המוסר אותה בבית המשפט, "כבש" אותה בליבו על אף
שהיא רלוונטית וברת משקל לעניין וגילה אותה בשלב מאוחר. כבישת העדות  בהיעדר
הסבר נאות, מעוררת חששות באשר לאמיתותה. **"הכלל הוא: עדות כבושה, ערכה ומשקלה**
**מועטים ביותר, משום ש"הכובש עדותו" חשוד, מטבע הדברים, על אמיתותה. זאת, כל**
**עוד אין בפיו הסבר משכנע: על שום מה נבצרה העדות עת רבה; ומדוע החליט העד**
**לחשפה. ניתן הסבר מתקבל על הדעת ל"כבישת" העדות, רשאי בית המשפט ליתן בה**
**אמון ולהעניק לה את המשקל הראייתי המתחייב בנסיבות"** ( ר: י' קדמי **על הראיות** חלק
ראשון דין בראי הפסיקה, מהדורה משולבת מעודכנת תשס"ד- 2003, עי"מ 441).

וכך באו הדברים לכלל ביטוי בהלכה פסוקה:

> "הכלל החל לענ**יינ**ה של עדות כבושה הינו כי ערכה ומשקלה
> הראייתי של זו מועטים בשל החשד המתעורר באופן טבעי
> באשר לאמיתותה. זאת, כל עוד אין בפי העד הסבר משכנע
> ומניח את הדעת לטעמים שבעטיים כבש עדותו (ראו: <u>ע"פ</u>
> <u>5386/05</u> אלחורטי נ' מדינת ישראל ([פורסם בנבו], 18.5.06);
> <u>ע"פ 4297/98 הרשטיק נ' מדינת ישראל, פ"ד נד</u>(4) 673, 687 –
> 688 (2000); <u>ע"פ 3625/91</u> אור נ' מדינת ישראל ([פורסם בנבו],
> 9.6.93) פסקה 19 לפסק דינו של השופט לוין; <u>ע"פ 154/85</u>
> <u>אברושומי נ' מדינת ישראל, פ"ד מא</u>(1) 387, 399 (1987)). משך
> הזמן שלאחריו תיחשב עדות לכבושה אינו נקבע בהתאם לאמת
> מידה ברורה ונוקשה, אלא הוא נקבע בכל מקרה בהתאם
> לנסיבותיו (<u>ע"פ 4223/07</u> פלוני נ' מדינת ישראל ([פורסם
> בנבו], 29.11.07); <u>ע"פ 1543/06</u> פלוני נ' מדינת ישראל
> ([פורסם בנבו], 11.6.07); <u>ע"פ 10189/02</u> פלוני נ' מדינת
> ישראל ([פורסם בנבו], 19.9.05) בפסקה 13; <u>ע"פ 5612/92</u>

46 מתוך 90

SHATSKY-006768



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  מדינת ישראל נ' בארי, פ"ד מח(1) 302, 363 (1993) (להלן:
2  פרשת בארי). ... מרכז הכובד אינו מושם על משך השתיקה אלא
3  על הסיבה בגינה בחר העד לצפון המידע שברשותו, כמו-גם על
4  שינוי הנסיבות אשר הניעו לחשוף את המידע". ( ר: סעיף 10
5  לע"פ 1645/08 פלוני נ' מ"י, טרם פורסם)

6

7  וראה גם:
8
9  "במקרה שלפניי, מתבקש בית המשפט להתחשב בעדות
10  שנכבשה במשך תקופת זמן לא מבוטלת. לא בנקל יתחשב בית
11  המשפט בעדות שכזו, לא כל שכן כאשר מדובר בעדות עליה
12  נסמכת בקשה לעריכת משפט חוזר. ערכה הראייתי של עדות
13  כבושה הינו מועט, זאת בשל החשד הטבעי המתעורר לגבי
14  אמינותה. חשד זה כמובן יכול להיות מופרך, בהינתן סיבה
15  משכנעת לכבישת העדות. (לעניין זה, ראו והשוו: עניין כהן,
16  סעיף 11 לפסק דינה של השופטת ארבל; ע"פ 1645/08 פלוני נ'
17  מדינת ישראל, סעיף 10 לפסק הדין והאסמכתאות המובאות
18  בו, [פורסם בנבו], (3.9.2009).". (ר: מח ( משפט חוזר בימ"ש
19  עליון) 7803/11 האני חסון נ' מדינת ישראל, טרם פורסם, סעיף
20  11 לפסק הדין) (וכן ראו: ע"פ 94/2014 סאלח נ' מדינת ישראל,
21  פ"ד נ (2) 624, 629 ; ע"פ 5730/96 גרציאני נ' מדינת ישראל,
22  פורסם בנבו ; ע"פ 235/79 אוחנה נ' מדינת ישראל, פ"ד לד (1)
23  544, 546 ; ע"פ 6274/98 פלוני נ' מדינת ישראל, פ"ד נה (2) 293,
24  297 ; ע"פ 1258/03 פלוני נ' מדינת ישראל, פ"ד נח (6) 625,
25  638).

26

27  ויובהר, ההלכות לעניין עד שונה הן זהות הן במישור הפלילי והן במישור האזרחי.
28  אחת התוצאות הנובעות מהעלאת עדות כבושה, הינה הכרתום של העד כעד עויין, כפי
29  שנעשה בעניין אשר בפניי. ודוק: עד עויין הוא עד, אשר במהלך עדותו בבית המשפט מגלה
30  עויינות כלפי הצד שקרא לו לעדות, או שקיימת סתירה בין דברי העד בבית המשפט לבין
31  הרשום מפיו בהודעתו חוץ שלו, בתצאיר, או בחוות דעת, ולענייננו – סתירה ברורה ומוחלטת
32  בין אמירות, שאמר המחבל (ואישר על דוכן העדים את אמירתן) בהודעתו בפני המשטרה
33  (ת/1) לאמירותיו בבית המשפט. ויובהר – כפי שקבעתי, אין לי כל ספק, כי הסתירה בין

SHATSKY-006769



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1    דברי המחבל בת/1 לבין דבריו בבית המשפט נועדה להרחיק את הרש"פ מהאירוע נשוא כתב
2    התביעה, אלא שניסיון זה לא צלח.
3
4    למרות שינוי הגרסה – שאינני מקבלת אותה – ניתן לצייר בבהירות את השתלשלות
5    העניינים.
6    המחבל, קטין בן 15.5 רצה להיות חייל פלשתיני (עמ' 16 שורה 12), ובהתאם להודעתו
7    במשטרה, אומן ביריחו על ידי הרשות הפלשתינית, לשאת נשק. אימון זה ארך לדבריו 50
8    ימים, ומיד לאחר מכן, עשרה ימים מתום האימון, נראה שבער בעצמותיו של המחבל הצורך
9    להוציא לפועל את הידע שרכש במחנה האימונים של הרשות הפלשתינית, והשאר ידוע.
10
11   כפי שציינתי, הנני מעדיפה את הודעתו של המחבל במשטרה. מדובר בהודעה אותנטית,
12   אשר מאז נתינתה ועד לחקירתו של המחבל בבית המשפט, הוא לא מצא לנכון לשנותה ואין
13   לי כל ספק, כי האמור בהודעה זו הינו האמת לאמיתה.
14
15   גרסת האימונים במסגרת גדודי אל אקצא "נולדה" לראשונה בבית המשפט, וניכר היה
16   שהמחבל מדקלם גרסה, שאיננה גרסת אמת.
17
18   ב"כ הרש"פ טען, כי התביעה כולה כנגד הרש"פ מושתתת על הודעת המחבל, (ת/1) על פיה
19   אומן על ידי הרשות הפלשתינית ביריחו, ובלשונו "**ברשות הפלשתינית ביריחו**", אולם
20   לדבריו הודעה זו איננה קבילה ואיננה יכולה לשמש ראיה לאמיתות תוכנה, אלא שאינני
21   מקבלת את האמור.
22
23   ראש וראשונה יצויין, כי הודעת המחבל (ת/1) הוגשה בהסכמה וללא התנגדות, לאחר
24   שהמחבל אישר את חתימתו על ההודעה, ולמעשה אישר בבית המשפט גם את אמיתות
25   תוכנה, בהעידו על עצמו, שהוא "**פיקח ומבין**" (עמ' 24 שורה 13), ובתהותו "**בשביל מה**
26   **לשאול את כל השאלות, אני הודיתי מזמן**" (עמ' 24 שורות 13-14), קרי: המחבל עצמו מפנה
27   להודעתו ת/1, ומאשר למעשה את אמיתות תוכנה.
28
29   זאת, אף זאת. הודעת המחבל נגבתה ממנו סמוך מאוד לביצוע הפיגוע, ומקריאת החקירה
30   עולה, כי המחבל נשאל שאלות "פתוחות", כגון: "**האם אתה יכול לספר לי מה קרה בדיוק**
31   **איתך?**" (גליון 2 ת/1 שורה 3), כאשר במענה לשאלה זו החל המחבל מספר את קורותיו,
32   והוא עצמו בחר לספר מרצונו, ומבלי שהוצגה לו שאלה כלשהי בעניין אימונו קודם לביצוע
33   הרצח, על מחנה האימונים שעבר ברשות הפלשתינית ביריחו. אופן הצגת השאלה והתשובה
34   הספונטנית מקורה להודעה במשטרה ערך ראייתי רב, ערך אשר אף עולה נוכח התנהגותו

SHATSKY−006770



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

1   ושקריו  של המחבל בחקירתו בבית המשפט, כשש שנים לאחר מסירת הודעתו הראשונית
2   באופן וולונטרי (לגבי ערכה של ההודעה, ראו: י' קדמי "על הראיות, מהדורה מעודכנת
3   ומשלבת 2009, 1818). ודוק:  ב"כ הרש"פ לא התנגד להגשת הודעתו של המחבל כראייה,
4   הוא אף לא העלה כל הסתייגות בנוגע לתוכנה, ומשלא עשה כן במועד הגשתה, הוא לא
5   יורשה לעשות כן בשלב הסיכומים, שכן אילו היה מעלה התנגדות להגשת הראיה, הייתה
6   ההתנגדות נדונה ומוכרעת, אף בהתייחס לערכה הראייתי של ההודעה. דבר מאלו לא קרה.
7   לא זו אף זו. משהוכרז המחבל כעד עויין, רשאי היה ב"כ הרש"פ לחקור אותו בחקירה
8   נגדית, ולנסות להבהיר את שינוי הגרסאות המהותיו בין ההודעה ת/1 בשאלת מיהות הגוף
9   המאמן, לבין עדות המחבל בבית המשפט. ב"כ הרש"פ ויתר על חקירת המחבל ובחר שלא
10  לחקור אותו כלל. וויתור זה אומר דרשני.
11
12  שינוי גרסתו של המחבל לא בא לידי ביטוי רק בשאלת מיהות הגוף המאמן, אלא גם בשאלת
13  משך האימונים. בניגוד להודעתו ת/1 טען המחבל בבית המשפט, כי התאמן בגין – ולא
14  בירוח, כפי שהבהיר בהודעתו - במשך יומניים בלבד, כל יום שעה, כלומר, הוא התאמן בסך
15  הכל שעתיים לפני ביצוע הרצח. גם גירסה זו איננו מקובלת, וקובעת שהיא שקרית. המחבל
16  נשאל מדוע סיפר בת/1, כי התאמן במשך 50 ימים, אולם הוא בחר להתחמק ממתן תשובה,
17  באומרו "אני לא הלכתי לאימונים בכלל, אמרו לי שאין לי תעודת זהות" (עמ' 26 שורות
18  11-10), כלומר תשובה לשאלה –אין.
19
20  כדרכו של מי שאינו דובר אמת, הסתבך גם המחבל בדבריו. מחד גיסא חזר וטען, כי ענה
21  לחוקר המשטרה תשובות אמת, לרבות בשאלת השתייכותו הארגונית (בת/1 טען שאינו
22  שייך לשום ארגון), אולם מיד התחכם וטען, כי אמר לחוקר המשטרה שארגון אל אקצה
23  "עומד מאחורי הביצוע של הרצח שעשיתי" ומיד הוסיף ביוזמתו ומבלי שנשאל "החוקר
24  היה מרוכז אם הרגתי, או לא ולמי אני שייך" (עמ' 28 שורות 18-16), וכאמור, אין לי כל
25  ספר שאמירותיו של המחבל בת/1 הינן אמירות אמת שנאמרו ללא כל הדרכה, או הכוונה,
26  אמירות אמת של נער בן 15.5, שאינו מתוחכם, ומן הסתם אינו מעורה בתוצאות אמירותיו
27  בהתייחס לרשות הפלשתינית.
28
29  אין ספק שבמהלך שנות כליאתו "החכים" המחבל, הבין את הנזק שנגרם לרש"פ בגין
30  הודעתו בת/1, הודרך על ידי אסירים אחרים (עמ' 28), ועשה מאמץ גדול לתקן אמירותו אלו,
31  מאמץ שנדון לכשלון, שכן אין ספק כי מדובר בעדות שקר, והאמת היא שהמחבל אומן על
32  ידי הרש"פ במחנה אימונים בירוחו, ממש כפי שטען מלכתחילה.
33

49 מתוך 90

SHATSKY-006771



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

43. הרש"פ ניסתה להוכיח באמצעות עדים מטעמה, כי המחבל לא עבר קורס מטעמה במועד 1
הרלבנטי, אלא שנסיון זה כשל. 2

3

ראשון העדים מטעם הרש"פ היה נעמן נעים פאנון (להלן: "**פאנון**"), המשמש כיועץ משפטי 4
במודיעין הצבאי הפלשתיני (עמ' 64 שורה 7) מאז שנת 2009 (שם). מדבריו עלה, כי משנת 5
2000 עד שנת 2006 שימש כתובע בבתי דין של הרש"פ (עמ' 64 שורה 20) ומשנת 2006 עד 6
שנת 2008 שימש כשופט בבית דין צבאי של הרש"פ (שם). עוד התברר כי בשנים שבהן שימש 7
כתובע צבאי, הוא התגורר "**בין חברון לבית לחם**" (עמ' 65 שורה 2) ומאליה נשאלת השאלה 8
מדוע הובא עד זה לעדות, כאשר בשים הרלבנטיות לא היה לו כל קשר למחנות האימונים 9
של הרש"פ, וממילא אינו מסוגל ליתן כל אינפורמציה לגביהם מידיעה אישית. התמיהה 10
שהובאתו לעדות גברה, כאשר התבררה זהותו של מפקד מנגנון הבטחון הפלשתיני, וכן 11
התברר שמדובר באדם שהוא חי וקיים, והוא זה אשר יכול היה ליתן את העדות המוסמכת 12
ביותר בנוגע לקיומם, או אי קיומם של מחנות אימונים של הרש"פ בירחו בשנת 2003, וכן 13
פרטים לגבי המתאמנים בהם (עמ' 65). 14

15

במאמר מוסגר יצויין, כי תמיהה זו "**הוסברה**" על ידי ב"כ הרש"פ בסיכומיו (סע' 73) 16
ומפאת כבודו לא אתייחס "**להסבר**" זה, המופיע בסיכומים. 17

18

העד פאנון, שהינו עורך דין במקצועו, ניסה לתרץ את הבאתו לעדות בתיק זה, למרות שאין 19
לו כל ידע בנושא השנוי במחלוקת, בהסבירו כי "**קשה למצוא בן אדם שיתן אינפורמציה על** 20
**כל המקומות האלה**" (מחנות האימונים שקיבלה הרש"פ – ד.ג.) **ושמות ממש מדוייקים**" (של 21
מתאמנים – ד.ג.) (עמ' 65 שורה 25). ודוק: בית המשפט נתן מספר צווים המחייבים את 22
הרש"פ לגלות פרטים בהתייחס למחנה האימונים בירחו ולשמות המתאמנים במועד 23
הרלבנטי, אולם הרש"פ לא המציאה את האינפורמציה האמורה, מבלי להעלות טעם של 24
ממש להימנעותה מהיענות להוראות הצו, וכך נמנע מבית המשפט ללמוד מכלי ראשון, האם 25
השתתף המחבל במחנה אימונים בירחו מטעם הרש"פ בשנת 2003 – כפי שהודה בת/1, או 26
שלא השתתף במחנות אלו, בהתאם לגירסתו המאוחרת, שהינה שקרית על פי קביעתי. 27
מיותר לציין, כי הימנעות זו פועלת לחובת הרש"פ, וקרוב לוואי שאילו היתה היתה מומצאת 28
האינפורמציה המבוקשת, היינו מגלים בין שמות המתאמנים גם את שמו של המחבל, ממש 29
כפי שתיאר בת/1. 30

31

עו"ד פאנון אף הודה, כי אינו יודע מי היה אחראי על מחנות האימונים בירחו בין השנים 32
2000-2006 (עמ' 66 שורות 1-2), והתברר, כי טענתו על פיה המחבל לא נטל חלק במחנה 33

SHATSKY-006772



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    אימונים מטעם הרש"פ הסתמכה על **"שאלנו... בררנו..."** והוא הודה, כי אינו יודע מידיעה
2    אישית האם המחבל התאמן במחנה של הרש"פ בריחו אם לאו (עמ' 66 שורות 17-18).
3
4    עוד אישר עו"ד פאנון, כי הוא לא הגיע באופן אישי למחנה האימונים בריחו ולא בדק את
5    רישומי המחנה באופן אישי (עמ' 67 שורות 12-13), ולדבריו **"אני לא יכול לבדוק וללכת**
6    **ולעבור על כל הרשימות"** (עמ' 68 שורה 14).
7
8    באשר לטענות המחבל בחקירתו בבית המשפט, על פיה לא התקבל למחנה האימונים בריחו
9    בשל גילו הצעיר, הודה עו"ד פאנון, כי אין ברשותו אישור של מנגנוני הבטחון הפלשתיניים,
10   על פיו הם אינם מקבלים לשורותיהם אנשים שגילם פחות מגיל 18 (עמ' 69 שורות 6-8),
11   ובמענה לשאלת בית המשפט היכן ניתן לראות את רשימת המשתתפים במחנות אימונים של
12   הרש"פ בריחו מאפריל עד יוני 2003, הפתיע העד, באומרו **"על מנת שאת תוכלי להגיע**
13   **לרשימה הזו, אנחנו צריכים לדעת איפה איפה הוא התאמן, באיזה מקום בריחו"** (עמ' 70 שורות
14   28-29) ואז התחוור, כי הרש"פ קיימה בריחו מספר מחנות אימונים (עמ' 71 שורות 1-2).
15
16   44.   נוכח חוסר התמצאותו הטוטאלי בנושאים העומדים על הפרק, הגישה הרש"פ תצהיר נוסף
17        מטעמו של ג'ומעה חסין פריג' חמדאללה (להלן : **"חמדאללה"**), שהינו ראש רשות האימונים
18        ברש"פ.
19
20   ניתן היה לסבור, כי חמדאללה הוא העד הוא שיוכל ליתן סוף סוף מענה לשאלת אימוניו של
21   המחבל, אלא שפעם נוספת נכונה לנו אכזובה. התברר, כי חמדאללה התגורר בעזה
22   מספטמבר 96 **"עד 2007 אחרי המהפכה של החמאס"** (עמ' 520 שורה 6), כלומר, במועד
23   הרלבנטי, בשנת 2003, לא רק שלא היה ראש רשות האימונים, אלא ששהה בעזה, וממילא
24   לא יכול היה להגיע לאיזור יריחו.
25
26   עוד עולה מדברי חמדאללה, כי עד שנת 2007 היה **"אלוף סמיה נאסר"** (עמ' 520 שורה 23)
27   ראש רשות האימונים ברש"פ ועל כן, כבר עתה אין מנוס מהמסקנה, שהימנעותה של הרש"פ
28   מהבאתו לעדות של האדם הרלבנטי, הינה הימנעות הפועלת לחובתה, ומקורה ברצונה של
29   הרש"פ להסתיר את האמת מידיעת בית המשפט, אמת אשר כפי הנראה אינה נוחה לרש"פ.
30
31   במאמר מוסגר יצויין, כי חקירתו של חמדאללה נתקלה בקשיים עקב הימנעותו השיטתית
32   ממתן תשובות ישירות לשאלות ברורות, ונסיון להתחמקותו ממתן מענה (עמ' 522, שורות
33   31-32).
34

SHATSKY-006773



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1     בחקירתו הודה חמדאללה, כי בין השנים 2000-2005 היו לרש"פ מחנות אימונים **"רק**
2     **ביריחו"** (עמ' 525 שורה 30), אולם לדבריו בין השנים 2002 ו- 2004 לא פעלו מחנות
3     האימונים עקב ההתקפות הישראליות, לרבות במסגרת מבצע חומת מגן (עמ' 526 שורות
4     22-25, עמ' 527 שורות 16-19), אלא שהוא נאלץ להודות באי רצון גלוי, כי צה"ל לא נכנס
5     למחנות האימונים במסגרת מבצע חומת מגן, **"אבל הוא היה בקירבת מקום, במחסום"**
6     (עמ' 527).
7
8     בהמשך חקירתו של חמדאללה התברר, כי בין השנים 2002-2004 הוא לא היה כלל באיו"ש,
9     אלא בעזה, ומעדותו עלה, כי בשנים אלו שהן השנים הרלבנטיות לעניינו – הוא היה בקשר
10    טלפוני עם מנגנוני הבטחון ביריחו (עמ' 529 שורות 11-12) ולטענתו הוא יודע שבשנים
11    הרלבנטיות לא התקיימו קורסים, שכן הוא נהג לתת אישור טלפוני לקיומו של הקורס,
12    ובשנים אלו הוא לא התבקש לאשר קיומו של קורס. (עמ' 530).
13
14    45.    לסיכום עדויותיהם של פאנו וחמדאללה, אין מנוס מהמסקנה, כי מדובר בעדויות שמרביתן
15    המכריע הינו עדות שמועה, בבחינת חוסר ידיעה אישית. וליתר דיוק : איני יכולה לקבל את
16    טענתו של חמדאללה, לפיה לא התקיימו מחנות אימונים ביריחו בין השנים 2002-2004.
17    ראש וראשונה, חמדאללה הודה, כי הוא לא נכח פיסית ביריחו בשנים האמורות, ועל כן כל
18    מידע שבידו, אינו אלא עדות שמועה, שכן בהיעדרו מיריחו, אינו יכול לדעת באמת ובתמים
19    האם התקיימו מחנות אימונים, אם לאו. לא זאת אף זאת. באם אכן הייתה החלטה שלא
20    לקיים מחנות אימונים, או קורסים בין השנים 2002-2004, מחמת הפחד מתקיפה
21    ישראלית, קרוב לוודאי שהיו מסמכים המאשרים זאת, אלא שמסמכים כאלו לא הומצאו
22    וחשוב מכל, מבצע חומת מגן התקיים בין החודשים 3/02-5/02, (עובדה לה מסכים ב"כ
23    הרש"פ בסע' 71 לסיכומיו) ועל כן דברי חמדאללה, לפיהם היה חשש לנוע בכבישים בשנים
24    האמורות, לכאורה בשל מבצע חומת מגן אינם אמת, והם חסרי כל ערך.
25
26    אם אצרף לכך את עדותו האותנטית של המחבל בת/1, הרי שאין כל ספק, שהמחבל השתתף
27    במחנה אימונים ביריחו מטעם הרשות הפלשתינית, וכל מאמציה של הרש"פ להסתיר את
28    עובדת קיומו של מחנה האימונים ביריחו בעת הזאת והשתתפותו של המחבל במחנה, כשלו,
29    **ועל כן הנני קובעת, כי המחבל אומן ברשות הפלשתינית במחנה אימונים ביריחו במשך 50**
30    **ימים, וכן הנני קובעת כי הוא סיים את אימוניו כעשרה ימים לפני ביצוע הרצח.**
31
32    46.    זה המקום לציין, כי ב"כ הרש"פ עשה מאמץ לכל אורך הסיכומים שהוגשו על ידו
33    **"להסביר"** אמירות כאלו ואחרות של עדיו, אלא ש**"הסברים"** אלו אינם, אלא עדות,

SHATSKY-006774



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    שמקומם היה בתצהירים, או במהלך שמיעת הראיות, ולא בסיכומים מפי ב"כ הרש"פ (ראו
2    למשל סע' 71, 73 לסיכומים ועוד).
3

4    47.    ב"כ הרש"פ יצא חוצץ כנגד טענתה של ב"כ התובעת, לפיה הרש"פ "**גייסה ואימנה את**
5    **המחבל אשר רצח את המנוח**" (סע' 53 א' לכתב התביעה המתוקן), וכן כנגד האמור בסע'
6    53ב' לכתב התביעה המתוקן, לפיו "**הנתבעת אימנה והדריכה את המחבל לרצוח יהודים,**
7    **באשר הם, בדם קר, ולדבריו, התובעים לא הרימו את הנטל המוטל עליהם להוכיח, כי**
8    **המחבל אומן לרצוח יהודים בקורסים, או מחנות אימונים מטעם הרשות הפלשתינית**".
9

10   אין ספק, כי האמירות הללו בכתב התביעה ובסיכומים הן בוטות משהו, אולם אם נבור את
11   המוץ מהתבן ונציג את העובדות כפשוטן, ללא כל פלפולים, הרי שלא יתכן ספק באשר
12   לקיומו של קשר סיבתי עובדתי ומשפטי בין האימונים שניתנו למחבל על ידי הרשות
13   הפלשתינית, לבין הרצח שביצע זמן קצר לאחר מכן, מיד בתום "**לימודיו**".
14

15   48.    תיק זה הינו תיק סבוך ויוצא דופן מבחינה משפטית, והדיון בשאלת קיומו או אי קיומו של
16   קשר סיבתי – עובדתי ומשפטי – בין מעשיו, או מחדלי הרש"פ, לבין ביצוע הפיגוע, אינו בגדר
17   דיון משפטי רגיל. מדובר במארג סבוך של עובדות, אשר חיבורם לכלל יצירה שלמה, יסייע
18   בידי לפתור את שאלת הקשר הסיבתי.
19

20   49.    על מנת לקבוע מסמרות בעניין קיומו, או אי קיומו של קשר סיבתי, יש לסקור ראש
21   וראשונה את הלך הרוח הציבורי בקרב הציבור הפלשתיני בתקופה שקדמה לרצח המנוח.
22   הלך הרוח הזה יסייע בידינו לנסות ולהבין, מה גורם לנער בן 15.5 לרצוח יהודי, רק בשל
23   היותו יהודי (ראה ת/19, וכן יבהיר, כי דברי ב"כ התובעים בכתב התביעה, על פיהם הרש"פ
24   "**גייסה ואימנה את המחבל, אשר רצח את המנוח**", לא רק שאינם מופרכים, אלא שהוכחו
25   ברמת ההסתברות המקובלת במשפט האזרחי.
26

27   באשר לאמירה הנוספת של ב"כ התובעים, על פיה הרש"פ אימנה את המחבל לרצוח יהודים
28   – מדובר במסקנה הסתברותית, אשר לעניות דעתי הוכחה גם ברמת ההסתברות
29   הנדרשת במשפט האזרחי, ואבהיר.
30

31   את המסקנות בדבר הלך הרוח ברחוב הפלשתיני עובר לביצוע הרצח ניתן ללמוד
32   מעדויותיהם של תת אלוף קופרווסר במיל קופרווסר (להלן : "**קופרווסר**") ודר' מנחם קליין.
33

SHATSKY-006775



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  בטרם אדון בעדויות אלו, יש להבהיר את מעמדה של תעודת עובד ציבור שהוגש על ידי
2  קופרווסר.
3
4  ב"כ הרש"פ טוען, ובצדק, כי המסמך אשר הוגש על ידי קופרווסר אינו מהווה **"תעודת עובד**
5  **ציבור"** כהגדרתה בסע' 23 לפקודת הראיות, הקובעת: **"תעודת עובד הציבור  תהא חתומה**
6  **בידי עובד הציבור שעשה את הרישום, או את המעשה, או קיבל את הידיעה שנרשמה,**
7  **ואם אין הוא עוד באותו שירות – בידי האחראי על היחידה שבה עבד".**
8
9  מדברי קופרווסר עולה, כי מיולי 2001 ועד יוני 2006 שימש כראש חטיבת המחקר באמ"ן,
10  ובמסגרת תפקידו זה הכיר וקרא באופן אישי את כל מסמכי השלל שנתפסו על ידי צה"ל
11  במסגרת מבצע חומת מגן, ואף היה מעורה בכתיבת הסקירות שצורפו לתעודת עובד
12  הציבור, ופיקח על כתיבתן. אלא מאי? כיום אין הוא משמש עוד כראש חטיבת המחקר
13  באמ"ן. אמנם, גם כיום הוא משמש בתפקיד ציבורי כמנהל הכללי של המשרד לנושאים
14  אסטרטגיים (עמ' 312 שורה 21), אולם אין ספק, כי תעודת עובד הציבור (ת/9) לא ניתנה
15  במעמדו כמנכ"ל המשרד לנושאים אסטרטוגיים, ועל כן, ובהתאם לסע' 23 לפקודת הראיות,
16  הוא אינו בגדר **"עובד ציבור"** שרשאי היה להגיש את **"תעודת עובד ציבור"** שהוגשה
17  באמצעותו.
18
19  נוכח האמור, הבהרתי במהלך הדיון, כי ההתייחסות לת/9 תהיה כאל חוות דעת ולא כאל
20  תעודת עובד ציבור (עמ' 325 שורה 25), ואף אפשרתי לרש"פ להמציא חוות דעת נגדית, והיא
21  עשתה כן, והגישה חוות דעת נגדית כתובה בידי דר' מנחם קליין, כמענה לחוות דעתו של
22  קופרווסר.
23
24  מהאמור עולה, כי המסמך אשר הוגש על ידי קופרווסר הינו חוות דעת, עובדה שאף
25  התקבלה כאמור על דעת הרש"פ, אשר הגישה חוות דעת נגדית.
26
27  היות וקבעתי כי ההתייחסות לת/9 תהיה כאל חוות דעת, שהוגשה מטעם התובעים, הרי
28  שכל הכללים הראייתיים לבחינת חוות דעת יחולו על ת/9 ועל עדותו של קופרווסר, שהינו
29  מומחה מטעם התובעים, ממש כפי שדר' קליין הינו המומחה הנגדי מטעם הנתבעים 7 ו- 8.
30
31  זאת ועוד, ב"כ הרש"פ טוען, כי ארבע הסקירות שצורפו לת/9 אינן אלא עדות מפי השמועה,
32  ואין בהן כדי להעיד על אמיתות תוכנם, להבדיל מעצם קיומן, אלא שאינני מקבלת עמדה
33  זו, ואבהיר עמדתי בהמשך.
34

SHATSKY-006776



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1   ת/9 ועדותו של קופרווסר מבוססים על מסמכי שלל שנתפסו על ידי צה״ל במסגרת מבצע
2   חומת מגן, ואשר אין כל ספק לגבי האותנטיות שלהם, כפי שאף הודה דר׳ קליין בחקירתו
3   (עמי 702) (למרות שב״כ הרש״פ ניסה לחלוק על כך, עמי 322). הסקירות שצורפו לת/9, הן
4   סקירות שנעשו בידי אנשי חטיבת המחקר באמ״ן בשנים הרלבנטיות, והן מבוססות על
5   תוכנם של מסמכי השלל שנתפסו ותורגמו לעברית.
6
7   אין חולק, כי בתקופת תפיסת מסמכי השלל, תרגומם וכתיבת הסקירות על סמכם, היה
8   קופרווסר ראש חטיבת מחקר באמ״ן, והיה ממונה על לימוד מסמכי השלל והסקת מסקנות
9   העולות מהן, הן לצרכים צבאיים והן לצרכים מדיניים. ודוק: קופרווסר הבהיר בחקירתו,
10  כי הסקירות שצורפו לת/9 מבוססות הן על מסמכי השלל שנתפסו במהלך מבצע חומת מגן,
11  והן על מסמכים **״שנתפסו גם הם בהזדמנויות אחרות״** (עמי 313 שורות 26-27), ואשר כפי
12  שציין, אין כל מחלוקת באשר לאותנטיות שלהם.
13
14  קופרווסר העיד, כי הוא מכיר את המסמכים באופן אישי (עמי 313 שורות 28-30), שכן
15  לאחר תפיסת המסמכים הם הובאו אליו פיסית והוא קרא אותם (עמי 314 שורות 2-4). עוד
16  העיד קופרווסר, כי היה מעורב בכתיבת הסקירות המצורפות לת/9 **״לא ברמת כותב״**, אלא
17  **״ברמת פיקוח״** (עמי 314 שורות 16-21), וכן אישר, כי **״כן. כל דבר שיוצא מחטיבת המחקר**
18  **מאושר על ידי ראש חטיבת המחקר״** (עמי 314 שורה 27), וחזר והבהיר, כי הוא מכיר באופן
19  אישי את מסמכי השלל (עמי 316 שורה 14).
20
21  קופרווסר נחקר בשאלת תפקידה של חטיבת המחקר באמ״ן והבהיר **״תפקידי המרכזי,**
22  **תפקידה המרכזי של חטיבת המחקר הוא להתריע ולמנוע מעשים הפוגעים בבטחונה של**
23  **מדינת ישראל ואזרחיה...״** (עמי 317 שורות 26-28).
24
25  בחקירתו הנגדית של קופרווסר על ידי ב״כ הרש״פ, נעשה מאמץ גדול להוכיח קיומה של
26  עמדה אישית מגמתית של קופרווסר בשאלת פרשנות מסמכי השלל, כפי גם נטען בסיכומי
27  הרש״פ.
28
29  קופרווסר העיד, כי על סמך מסמכי השלל נכתבו **״הרבה סקירות נוספות״** (עמי 321 שורה
30  9) בנוסף לארבע הסקירות שצורפו לת/9, והבהיר, כי לא היה שותף להחלטה אילו סקירות
31  לצרף לת/9 ואילו לא.
32
33  קופרווסר אישר בחקירתו, שאף אחד ממסמכי השלל שנתפסו אינו נוגע ספציפית לפגיעו
34  נשוא כתב התביעה (עמי 322 שורות 5-6), וכן אישר, כי לא תרגם את המסמכים לעברית

55 מתוך 90

SHATSKY-006777



**בית המשפט המחוזי בתל אביב - יפו**

**ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת**
**בע״מ ואח׳**

1   באופן אישי, ומעורבותו בכתיבת הסקירות הייתה ברמת הפיקוח (עמ׳ 323), דבר שהינו
2   ברור, שכן הוא שימש במועדים הרלבנטיים כראש חטיבת המחקר באמ״ן והוא נעזר
3   בעבודתו בצוות של אנשים נוספים.
4
5   ב״כ הרש״פ ניסה בכל מאודו להוכיח באמצעות חקירתו של קופרווסר, קיומם של חילוקי
6   דעות בין האנשים השונים ששרתו בחטיבת המחקר באמ״ן, לגבי הפרשנות שיש ליתן
7   למסמכים אלו, וכי העמדה המוצגת בסקירות שצורפו לת/9 אינה עמדה רשמית של אמ״ן,
8   אלא שהוא כשל בכך, ועל פי התרשמותי, בהתבסס על עדותו האמינה של קופרווסר,
9   מייצגות הסקירות שצורפו את עמדתה הרשמית של חטיבת המחקר באמ״ן, מה עוד
10  שקופרווסר אישר באופן חד משמעי, כי העמדה המוצגת בסקירות, אינה עמדת המיעוט
11  **״שהתקבלה״** (עמ׳ 325, שורות 1-2).
12
13  בעניין זה יובהר, כי לא הוכח קיומן של דעות סותרות באשר למשמעות שיש ליתן למסמכי
14  השלל, אולם מובנה בהחלט לקבל את העובדה שהיו דעות שונות, וטוב שכך, שכן עצם
15  העלאת הדעות השונות מצביע על חופש מחשבתי וסיעור מוחות של האנשים, שזהו בדיוק
16  תפקידם. גם אם העמדה המוצגת בסקירות הינה **״עמדת מיעוט שהתקבלה״** (דברי ב״כ
17  הרש״פ, עמ׳ 325 שורה 1), הרי שהמסקנה הינה, כי זו הפרשנות הסופית שניתנה למסמכי
18  השלל, וכך התייחסו אליהם בעלי התפקידים, שהיו אמורים להגיע להכרעות והחלטות על
19  סמכם.
20
21  בחוות דעתו הנגדית של דר׳ קליין, התרעם דר׳ קליין על אמירותיו של קופרווסר בחקירתו,
22  וטען כי הסקירות שצורפו לת/9 אינן אלא **״פרשנות סובייקטיבית, אך מגמתית ומכוונת**
23  **מלמעלה, או כלפי מעלה, והדבר משול לאותו אדם היורה את החץ ולאחר מכן מסמן את**
24  **המטרה״** (סע׳ 18 לחוות הדעת).
25
26  דר׳ קליין הסכים, כי העמדה המובאת בסקירות שצורפו לת/9 הינה העמדה הרשמית של
27  אמ״ן, אולם לדבריו, עמדה זו לא התבססה בלעדית על חומר הגלם שעמד בפני חטיבת
28  המחקר (מסמכי השלל), ומכל מקום, אינה מבוססת על **״מלוא חומר הגלם המודיעיני,**
29  **שהיה בידי החטיבה באותה עת״** (סע׳ 19 לחוות הדעת).
30
31  דר׳ קליין הרחיק לכת, בקובעו כי **״חטיבת המחקר כשלה בעת שהוציאה סקירות אלו...**
32  **כפי שעולה ממסמכי השלל, מדובר במסמכים נקודתיים, המתייחסים לפעולות ספציפיות**
33  **במקום ובזמן נתון והם אינם מעידים על המכלול האסטרטגי. הסקירות בחרו להתייחס**
34  **למסמכי שלל מסוויימים בלבד ולא ליתר המסמכים, דבר המעלה את השאלה, האם יתר**

SHATSKY-006778



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת**
**בע"מ ואח'**

1  **מסמכי השלל תאמו את המסקנה אליה ביקשו כותבי הסקירות להגיע....''** (סע' 21 לחוות
2  הדעת).
3
4  לכאורה, דברים כדורבנות, אולם אין בהם כל ממש, ואבאר.
5
6  מחקירתו של דר' קליין עלה, כי הוא שירת בחטיבת מחקר באמ"ן בשנות ה- 90 (עמ' 690)
7  תחת פיקודו של המפקד דאז דר' אפריים לביא, אשר על פי חוות דעתו הינו מורו ורבו של דר'
8  קליין, שכן מקריאת חוות דעתו של דר' קליין עולה, כי כל כולה מבוססת על מאמרים
9  שנכתבו בידי דר' לביא ואח', ונשאלת השאלה, מדוע הוגשה חוות דעתו של דר' קליין דווקא,
10 ולא חוות דעתו של דר' לביא, אשר כתביו ואמירותיו הן היסוד לאמירות והקביעות בחוות
11 דעתו של דר' קליין, שאינה אלא סיכום שיחות שערך דר' קליין עם דר' לביא (סע' 2 לחוות
12 הדעת) וסיכום מאמרים שפורסמו בנושא. ודוק: ספק בעיני האם ניתן להתייחס לחוות
13 דעתו של דר' קליין כאל **''חוות דעת''**, שכן היא איננה כוללת קביעות עניניות, הנובעות
14 ממומחיותו בנושא, אלא מהווה צֶבֶר סיכומים של אמירות ודעות של אחרים, וכזו, הינה
15 חסרת כל ערך ראייתי.
16
17 לגופה של **''חוות הדעת''**, דר' קליין הודה בחקירתו, כי אינו מומחה לטרור, כי אם מומחה
18 לתחום הפלשתיני, **''לא לטרור במובן המבצעי שלי''** (עמ' 691 שורה 31).
19
20 דר' קליין הסביר, כי חוות דעתו כוללת שני חלקים. החלק הראשון הינו כל כולו **''עדות**
21 **שמועה''**, **''מה ששמעתי מאל'מ דר' אפריים לביא, והחלק השני אילו הן המסקנות**
22 **שאליהן הגעתי במחקרים האקדמיים שלי''** (עמ' 696 שורות 28-30), ובהמשך אישר פעם
23 נוספת, כי חוות דעתו כולה מבוססת על דברי דר' לביא (עמ' 700 שורות 7-13), והמסקנה
24 היא, שהדעות המובאות בחוות דעת זו, הן למעשה דעותיו של דר' לביא (שלא הובא לעדות)
25 שאומצו במלואן על ידי דר' קליין.
26
27 דר' קליין אישר, כי קביעתו בחוות דעתו ממנה עולה, כי חטיבת המחקר באמ"ן נרתמה
28 למסע הסברה, שבמסגרתו נכתבו הסקירות האמורות במטרה להתאמין ליעדי ההסברה של
29 ממשלת ישראל, מבוססת **''על הדברים של דר' לביא''** (עמ' 703 שורה 5).
30
31 עוד טען דר' קליין בחוות דעתו, כי הדעות הבאות לידי ביטוי בסקירות שצורפו לת/9 אינן
32 מבוססות על כלל מסמכי השלל, אלא על חלקם בלבד, אולם בהמשך התברר, כי מדובר
33 באמירות חסרות כל בסיס, בבחינת השמצות שלא הוכחו, שכן דר' קליין אישר שדבריו

SHATSKY-006779



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1     מבוססים על דברי דר׳ לביא וכלשונו, **״את זה אומר אפריים לביא ואני מצטט מתוך**
2     **הדברים שהוא כתב בבטאון חיל המודיעין, בבטאון מל״״** (עמ׳ 704 שורות 26-27).
3
4     הדעת נותנת, שאם סבר דר׳ קליין, כי הסקירות מבוססות על אותם מסמכי שלל, אשר
5     **״נוח״** היה לחטיבת המחקר באמ״ן להשען עליהם, הרי שהיה טורח ומאמת את סברתו –
6     או סברתו של דר׳ לביא – בדבר קיומם של מסמכי שלל נוספים, שלא הוזכרו בסקירות,
7     ואשר תוכנם עשוי היה לשנות את המסקנות המובאות בסקירות שצורפו לת/9, אלא
8     שבמהלך חקירתו של דר׳ קליין התברר, כי הוא עצמו לא ראה את אותם מסמכים
9     מודיעיניים (עמ׳ 704 שורות 28-29), והבהיר פעם נוספת, כי הוא מסתמך על דעותיו של דר׳
10     לביא (עמ׳ 704 שורות 30-31), וכי **״יכול להיות״** (עמ׳ 705 שורות 16-18) שבסקירות, אשר
11     צורפו בת/9 לא כתוב שהיו מסמכי שלל נוספים.
12
13     נוכח המחלוקת, שניסה דר׳ קליין לעורר בדבר קיומם, או אי קיומם של מסמכי שלל נוספים
14     **״שהוסתרו״** בזמן כתיבת הסקירות הרלבנטיות, אך טבעי היה, שדר׳ קליין יבקש לראות
15     בעצמו את מסמכי השלל, ויווכח בעצמו האם היו מסמכים נוספים אלא, שמחקירתו עלה,
16     כי הוא לא ביקש כלל לראות את מסמכי השלל **״מפני שאני לא חוקר את הפעולות**
17     **המבצעיות והשתלשלות האינתיפאדה ברמה הפרטנית מאוד של המבצעים״** (עמ׳ 705
18     שורות 24-29), והוא הבהיר, כי לא ראה לנכון לעיין במסמכים בעצמו, שכן **״הסתמכתי על**
19     **דבריו, נסיונו של דר׳ לביא״** (עמ׳ 706 שורות 4-6), ובהמשך הוברר, כי הוא לא שוחח גם עם
20     הכותבים הנוספים המצוטטים בחוות דעתו, והסתפק בציטוט הכתוב (עמ׳ 708), וכפי
21     שציינתי, חוות דעתו של דר׳ קליין, אינה אלא עדות שמועה המתבססת על דעותיהם של
22     אחרים, שלא הובאו לעדות, והינה חסרת כל ערך ראייתי.
23
24     במאמר מוסגר אציין, כי נוכח דברי דר׳ קליין בחוות דעתו, בדבר הקונספציה, שעמדה
25     בבסיס הסקירות שצורפו לת/9 וכן סברתו, כי מדובר בפרשנות סובייקטיבית של כותבי
26     הסקירות (סע׳ 17, 18 לחוות הדעת), אך טבעי היה, שדר׳ קליין יעניק למסמכים האמורים
27     את הפרשנות הנכונה לפי דעתו, אלא שלמעט פסילת הפרשנות שניתנה למסמכי השלל
28     במסגרת הסקירות האמורות, נמנע דר׳ קליין מלהאיר את עינינו באשר לפרשנות הנכונה
29     לדעתו, שיש ליתן לאותם מסמכים, אולי משום שלא טרח לקרוא אותם מעולם, ואולי
30     משום שלא ניתן ליתן להם פרשנות אחרת, או מכל סיבה אחרת.
31
32     כאשר נשאל דר׳ קליין בחקירתו מדוע לא מצא לנכון לפרש את המסמכים האמורים בצורה
33     שונה, אם סבר שזוהי הדרך הנכונה לפרשם, השיב דר׳ קליין **״אני לא כותב עכשיו פרשנות**
34     **אחרת, או חוות דעת, אני מתייחס למסמכים הללו כפי שהם. אני לא כותב את התיזה**

58 מתוך 90

SHATSKY-006780



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1     **הנגדית שלי כאן**" (עמ' 713 שורות 25-26), ודומני, כי הדברים מדברים בעד עצמם, ואינם
2     זקוקים לפרשנות נוספים.
3
4     50.    נוכח כל האמור, הנני קובעת, כי אין לייחס ערך ראייתי – משפטי כלשהו לחוות דעתו של
5     דר' קליין, והנני מאמצת את חוות דעתו ועדותו של קופרווסר, אשר הרשים אותי בידענותו
6     ובמקצועיותו.
7
8     51.    ייחודה של חוות הדעת, שהוגשה על ידי קופרווסר, הינה התבססותה על מסמכים שצורפו
9     אליה, מסמכי השלל, אשר אין כל מחלוקת באשר לאמיתותם והאותנטיות שלהם.
10
11     נסיונה של הרש"פ למזער את המסקנות העולות ממסמכי השלל, כשל. ממסמכי השלל
12     עולה, כי במהלך האינתיפאדה השנייה שילבו הארגונים השונים ידיים במאמציהם לבצע
13     פיגועים בישראל וכנגד ישראלים, וכן הוכח למעלה מכל ספק, כי הם עשו כן תחת פיקודו
14     ופיקוחו הישיר של ראש הרש"פ – יאסר ערפאת, אשר הנחה אותם – ודאג למימן את
15     פעולותיהם, לרבות אישור כספים למפגעים ולמשפחותיהם, ונקיבה בסכומים שיש ליתן
16     להם.
17
18     עומק מעורבותו של ערפאת בפעילות הארגונים עולה בבירור מהמסמכים שצורפו, ויעידו
19     המסמכים הרבים של הפניות של ה"**האח הנשיא אבו עמאר ישמרהו האל**", פניות הנוגעות
20     לגיוס פעילים ומימונם, לרבות הבעת תודות על תשלום כספים על פי פניות הארגונים, וראו
21     למשל את מסמך מס' 1 (עמ' 17 לת/8), שבו מתבקש ערפאת להקצות סיוע כספי למפקד
22     התנזים בטול כרם וכן "לאח" המחבל זיאד מוחמד דעאס, שתכנן, בהתאם למסמך זה, את
23     "פעולת ההרג בטקס בת המצווה בחדרה".
24
25     הנה כי כן, ועל מנת שלא אאריך יתר על המידה, עיון במסמכים שצורפו לסקירות, כמו גם
26     בסקירות עצמם, מביא למסקנה אחת ויחידה, על פיה פעולותיהם של הארגונים השונים,
27     לרבות התנזים וגדודי חללי אל אקצע, נעשו תחת ניצוחה ובמימונה של הרש"פ, ואשר על כן,
28     גם אם הייתי מקבלת את גרסתו העכשווית של המחבל, על פיה ביצע את הפיגוע מטעם
29     ארגון חללי אל אקצע, הרי שאין בכך כדי לשנות את חבותה הבסיסית של הרש"פ, בהיותה
30     שותפה מלאה למתרחש בגדודי חללי אל אקצע, כפי שעולה ממסמכי השלל. ודוק: אינני
31     מקבלת גרסה זו, והנני קובעת באופן שאינו משתמע לשתי פנים, כי המחבל הרוצח אומן
32     בנשק על ידי הרשות הפלשתינית.
33

SHATSKY-006781



**בית המשפט המחוזי בתל אביב - יפו**

**ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳**

52.     מחלוקת נוספת אשר נפלה בין התובעים לבין הרש״פ הינה בדבר ערכו הראייתי של דו״ח
        השר לשעבר דני נווה (להלן: **״דו״ח נווה״**).

        התובעים ביקשו להביא את מר דני נווה לעדות, על מנת להגיש באמצעותו את הדו״ח (ת/8),
        אלא שסברתי, שהיות וגם דו״ח זה מבוסס על אותם מסמכי שלל אוטנטיים, שצורפו לת/9,
        אין מקום להטריחו, וכך, בהסכמת ב״כ הרש״פ הוגש הדו״ח וסומן ת/8, כאשר הובהר, כי
        הצדדים יהיו רשאים לטעון לגבי ערכו הראייתי – להבדיל מקבילותו – בסיכומיהם.

        דברי ב״כ הרש״פ בסיכומיו, על פיהם נותר דו״ח נווה בתיק בית המשפט **״כמוצג״** (סע׳ 130
        לסיכומיה) אינם נכונים, ומטעים. עיון בפרוטוקול הדיון (עמ׳ 47) מלמד, כי ב״כ הרש״פ לא
        התנגד להגשתו וסימונו של הדו״ח כראייה, ואכן הדו״ח הוגש כאמור כראייה וסומן ת/8.

        לגבי ערכו הראייתי של הדו״ח – קופרווסר העיד, כי דו״ח זה נכתב על ידי **״הצוות של דני
        נווה״** (עמ׳ 316 שורה 3), אולם הוא אישר, כי קרא אותו ומסכים לתוכנו, באשר הוא מבוסס
        על אותם מסמכי שלל, אשר אליהם התייחס קופרווסר עצמו, ועל כן, למרות שדני נווה לא
        העיד בפניי, הנני קובעת, כי נוכח הסתמכות דו״ח נווה על מסמכי השלל, הרי שמדובר
        בראייה כשרה ובעלת ערך גבוה, ולענייננו – בעלת משמעות מיוחדת, כפי שיבואר בהמשך,
        מה עוד שב״כ הרש״פ לא הצביע על סתירות הקיימות בין האמור בדו״ח לבין הכתוב
        במסמכי השלל.

53.     ועתה, נחזור לשאלת הקשר הסיבתי, ונבחן אותה בראי התקופה בה נעשה הפיגוע.

        מדובר במחבל, קטין בן 15.5 שנים, אשר רצה להיות חייל פלשתיני (עמ׳ 16 שורה 129.
        נשאלת השאלה, מה גורם לנער בן 15.5 לרצות להיות חייל, וחמור מכך, הכיצד הסכימה
        הרש״פ לאמנו, למרות גילו הצעיר.

        מהודעת המחבל (ת/8) עולה, כי הוא התגורר ב״**כפר קטן נקרא ביר אלמקסור״** (גליון 1
        שורה 19). עוד עולה מת/1, כי כפי הנראה הוא נפלט ממערכת החינוך, שכן במענה לשאלה
        **״מה אתה עושה״**, ענה **״עובד בחקלאות עם אבי ונוטע ירקות עם אבא שלי בדיר
        אלמקסור״** (גליון 1 שורות 19-20). עוד עולה מת/1, כי המחבל הינו בן בכור למשפחה המונה
        עוד שבעה ילדים (גליון 1 שורה 25).

SHATSKY-006782



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1   אין לי אינפורמציה לגבי מצבה הכלכלי של המשפחה, שהיינה משפחה גדולה המונה עשר
2   נפשות, אולם ברור, כי ההכנסות מהעבודה בחקלאות בדיר אל מקסור לא הספיקו לפרנסת
3   המשפחה, שכן "**אבא שלי עובד בקטיף פירות בקיבוץ עוגן**" (גליון 1 שורות 25-26).
4
5   התמונה המצטיירת מדברי המחבל הינה, כי מדובר בנער שנפלט ממסגרת חינוכית, בן בכור
6   למשפחה מרובת ילדים, אשר מצבה הכלכלי אינו מזהיר מן הסתם, ועל רקע זה, נקל להבין
7   את הפנטזיה שלו, להיות חייל ובמילים אחרות, הוא רצה מן הסתם לעזוב את משפחתו
8   ומצוקותיה.
9
10   כאמור, התקופה היא תקופת האינתיפאדה השנייה, כאשר קברניטי הרש"פ, לא רק שלא
11   עשו כל מאמץ לסכל פיגועים, אלא עודדו את ביצועם, כפי שעולה בבירור ממסמכי השלל
12   והסקירות שנכתבו בעקבותיהם (ת/9), ולתוך הואקום הזה נשאב הנער, אשר נוכח גילו
13   הצעיר, לא ברורה מידת שיקול הדעת שהפעיל, אם בכלל, ויתכן, כי הפעיל שיקול דעת ובחר
14   באופציה המפתה של השתייכות לשורות מגננון הבטחון של הרש"פ.
15
16   כפי שציינתי, בשל נסיונה של הרש"פ להרחיק עצמה מהסכמתה לאמן את המחבל הקטין
17   במחנה אימונים שקיימה בריחו, ובהמשך לקביעתי החד משמעית, על פיה השתתף המחבל
18   במחנה אימונים בן 50 ימים בריחו, מטעם הרשות הפלשתינית, ממש כפי שהודה בהודעתו
19   ת/1, הוסתרו מידיעת בית המשפט הפרטים הנוגעים לאימון המחבל, עובר לביצוע הרצח על
20   ידו.
21
22   הסכמתה של הרש"פ לאמן קטינים ב"**אימוני גוף ונשק**" (ת/19) אף עולה בבירור ממסמכי
23   השלל, שהרי בעבר עשתה כבר הרש"פ שימוש בקטינים לצורך הוצאת פיגועים כנגד מטרות
24   ישראליות מהכח אל הפועל, ולאחר מכן, כפי שעולה ממסמכי השלל, היא מימנה אותם, או
25   את משפחותיהם, הן במקרים בהם מצאו המגוייסים הקטינים את מותם כתוצאה
26   ממעשיהם והן במקרים שהם נתפסו ונכלאו בבתי כלא בישראל.
27
28   כך למשל מקרהו של ג'מיל חמיד, נער בן 16 מבית לחם, אשר גוייס על ידי הפת"ח, למרות
29   גילו הצעיר, ואולי בשל גילו הצעיר, ופוצץ עצמו בתאריך 31.3.02 בישוב אפרת. בפיגוע זה
30   נפצעו שישה ישראליים.
31
32   כך למשל, עניינה של הנערה שירין רבוע, בת 15 שנים, אשר נעצרה לתחקור עם כניסת צה"ל
33   לבית לחם, והודתה, כי גוייסה על ידי דודה, שהיה פעיל תנזים באזור, לצורך ביצוע פיגוע
34   התאבדות בשטח ישראל. (ודוק: ממסמכי השלל עלה באופן חד משמעי קיומו של שיתוף

SHATSKY-006783



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1    פעולה מלא בין הרש״פ, בראשותו של ערפאת, לבין ארגונים נוספים לרבות התנזים, גדודי
2    חללי אל אקצא ועוד. (סקירה מס׳ 688/0032, העוסקת במיסוד המיליציות המקומיות על ידי
3    הנהגת אש״פ, על סמך מסמכי השלל, וכן דו״ח דני נווה ת/8, עמ׳ 4, המבוסס גם הוא על
4    מסמכי השלל).
5
6    כך למשל מקרהו של הנער אנואר חמאד, בן 17 שנים מרפיח, אשר נשלח לבצע פיגוע
7    התאבדות כנגד שיירת כלי רכב, אשר הסיעה חיילי צה״ל ברצועת עזה. התברר, כי הנער
8    חסר השכלה ואינו יודע קרוא וכתוב, וטרם גיוסו לפת״ח עסק בשימוש וסחר בסמים. (ראו
9    עמ׳ 42 לת/89).
10
11    משכך, נקל להבין את מסקנתו של דני נווה, על פיה **״יצוין, כי הרשות הפלשתינית אינה**
12    **נאבקת בתופעה זו וממשיכה בעקביות להעלים עין מכך שהנערים והנערות הפלשתינים**
13    **היו ״לקורבן עצמו״ של החברה הפלשתינית כולה״**, (עמ׳ 42 לת/8) ואף להצטרף אליה.
14
15    54.   במקרה אשר בפניי לא הוכח, כי המחבל נשלח לביצוע הפיגוע הספציפי על ידי הרש״פ, בין
16    היתר בשל הקושי לעשות כן נוכח התחמקותה השיטתית של הרש״פ מהמצאת מסמכים
17    רלבנטיים. אלא מאי? משהביעה הרש״פ את נכונותה לאמן נער בן 15.5 בשימוש בנשק
18    במשך 50 ימים (!!), הרי שברור שעודדה אותו, ליישם את המידע שצבר במשך לימודיו,
19    וונכח האווירה ששררה באותם ימים, ליבוי השנאה וההסתה כלפי ישראל וכלפי היהודים
20    (ראו ת/8 עמ׳ 9), אך טבעי היה בעיני המחבל כי עליו לממש את הידיעות שצבר במחנה
21    האימונים של הרש״פ בהפעלת נשק ברוח התקופה, קרי: בדרך של רצח יהודי. ודוק:
22    ממסמכי השלל עולה, כי אין ספק באשר לעיסוקה המתמיד של הרש״פ בהטמעת
23    האידיאולוגיה שעמדה מאחורי התפיסה האסטרטגית שלה, כי הטרור הוא לגיטימי להשגת
24    היעד הלאומי הפלשתיני, ואין ספק, כי אידיאולוגיה זו חלחלה והוטמעה בקרב הצעירים,
25    אשר ראו במימוש האידיאולוגיה משום מעשה נאצל ורצוי, מה עוד שהרשות טרחה להקנות
26    להם את הידע המעשי בשימוש בנשק, כצעד ישיר כתוצאה מאותה אידיאולוגיה.
27
28    מסקנה זו הינה מסקנה מתבקשת, אף בראי מבחן השכל הישר. וכי מדוע הסכימה הרשות
29    הפלשתינית לאמן נער בן 15.5 ולהקנות לו ידע בהפעלת כלי נשק, אם לא כדי לעודדו
30    להשתמש בו? והרי ברור, כי הרשות לא עשתה כן כדי שישתמש בנשק כנגד בני עמו, ואם כך,
31    מי היה מטרת היעד של הקניית הידע בשימוש בנשק לנער בן 15.5? דומה, שהתשובה ברורה
32    מאליה.
33

SHATSKY-006784



בית המשפט המחוזי בתל אביב - יפו

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

55.    למען הסר ספק יובהר, כי לא הוכחו התכנים שהועברו לחניכים במחנה האימונים של
הרש"פ בירחון, ועל כן איננו יכולה לקבוע בוודאות, כי המחבל אומן על ידי הרש"פ **לרצוח**
**בכלל ויהודים בפרט"** (סע' 91 לסיכומי הרש"פ), אולם, משהחליטה הרש"פ לאמן קטין בן
15.5 וללמדו את רזי השימוש בנשק, באווירה ששררה ברש"פ באותה עת, בהתחשב
באינתיפאדה מחד גיסא ובמבצע חומת מגן מאידך גיסא, הרי שברור, שגם אם הדברים לא
נאמרו **"ברחל בתך הקטנה"**, הרי שהאווירה הכללית עודדה את חניכי המחנה לעשות
שימוש בידע שרכשו בתפעול כלי נשק, והיות וברור, כי איש לא ציפה ששימוש זה ייעשה
כנגד הפלשתינים, הרי שנותר מעט מאד דמיון באשר למסקנה המתבקשת – שימוש בנשק
כנגד יהודים.

וזאת ועוד. סמיכות הזמנים שבין סיום **"לימודיו"** של המחבל במחנה האימונים לבין ביצוע
הרצוח ( עשרה ימים), אך מחזקת את המסקנה, שנכוונתה של הרש"פ לאמן בנשק קטין בן
15.5 הייתה לצורך מטרה מסויימת, מטרה שמומשה על ידי המחבל מיד עם סיום הכשרתו,
קרי: הוכח קיומו של קשר סיבתי עובדתי ומשפטי בין האימונים שעבר המחבל במחנה
האימונים של הרש"פ בירחון, לבין רצח המנוח. ודוק: אין לשכוח, כי הרש"פ – מטעמים
מובנים – נמצעה ממתן אינפורמציה כלשהי בהתייחס למחנה האימונים האמור, לרבות לא
לגבי עצם קיומו, או תכניו, והסתפקה בהכחשת קיומו. אלא מאי? הרש"פ לא סיפקה הסבר
כלשהו למניעיו של המחבל לומר בהודעתו במשטרה (1/ת) אמירות שלכאורה אינן אמת
מחד גיסא, ומאידך גיסא – הימנעותה השיטתית מהבאת עדים רלבנטיים לעדות ומהמצאת
מסמכים, אשר יכולים היו לתמוך בעמדתה הנטענת, מובילה למסקנה, כי דברי המחבל
בהתייחס לאימונים שעבר מטעם הרשות הפלשתינית במחנה האימונים בירחון הינם אמת,
ובהמשך ישיר לאימונים אלו – בוצע הרצוח נשוא כתב התביעה.

56.    ב"כ הרש"פ טען בסיכומיו, כי התובעים **"לא הוכיחו"** את טענותיהם בדבר אימונו של
המחבל במסגרת הרש"פ והסתתו לרצוח יהודים.

כפי שהבהרתי, הנני בדעה, כי התובעים הרימו את הנטל המוטל עליהם, ועל מנת להבהיר
עמדתי, אחזור למושכלות ראשונים בדבר הטיית מאזן ההסתברות במשפט האזרחי, ויפים
לכך דברי המחבר י' קדמי **"על הראיות"** עמ' **1548, בהבהירו:**

> **"הטיית מאזן ההסתברות מאי משמע? הלכה למעשה, משמעותה**
> **של מידת ההוכחה האמורה היא: שלדעת בית המשפט – על בסיס**
> **העמדה שהוא נוקט באשר למהימנותן של הראיות שבאו בפניו,**
> **כמותן, דיותן והמשקל הראיתי, שיש להעניק להן – <u>גירסה אחת</u>**

SHATSKY-006785



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | (באשר לעניין השנוי במחלוקת) <u>מסתברת יותר ומתקבלת יותר על</u> |
| 2 | <u>הדעת מן הגרסה שכנגד.</u> |
| 3 | |
| 4 | באורח ציורי, נוהגים לומר 'שדרושה רק הרמת נטל ההוכחה על |
| 5 | למעלה   מ- 50%' לשון אחר די לנושא בנטל השכנוע, שגרסתו |
| 6 | תשכנע את בית המשפט ב- 51%, מתוך ה- 100% המבטאים ודאות |
| 7 | מוחלטת, על מנת לצאת ידי חובתו; ואין נפקא מינה שנותרים 49% |
| 8 | של "אי ודאות". (ראו ע"א 6283/97 יאניקה אלכסנדרוב נ' מדינת |
| 9 | ישראל, פ"ד נב(3) 254; ע"א 1892/95 מוחמד קאסם אבו סעדה נ' |
| 10 | שירות בתי הסוהר – משטרת ישאל, פ"ד נא(2) 704). |
| 11 | |
| 12 | ובאשר להבחנה בין נטל השכנוע לבין נטל הבאת הראיות, נקבע: |
| 13 | |
| 14 | "'נטל השכנוע' הוא נטל ראייתי מהותי שהוא חלק מדיני הראיות. |
| 15 | נטל זה הוא הנטל העיקרי המוטל על בעל-דין הנדרש להוכיח את |
| 16 | העובדות העומדות ביסוד טענותיו. אי-עמידה בנטל זה משמעותה |
| 17 | דחיית תביעתו של מי שהנטל מוטל עליו. 'נטל הבאת הראיות' הוא |
| 18 | נטל דיוני, הוא חלק מסדרי הדין. נטל זה הוא הנטל המוטל על בעל- |
| 19 | דין להביא את ראיותיו כדי לעמוד ב'נטל השכנוע' אם נטל זה מוטל |
| 20 | עליו, או כדי לשמוט את הבסיס מתחת לכוחן של טענות יריבו |
| 21 | וראיותיו. נטל זה הוא נטל משני, ועיקר קיומו הוא לצורכי הנטל |
| 22 | העיקרי. |
| 23 | רע"א 98 / 3646 כ.ו.ע. לבנין בע"מ נ' מנהל מס ערך מוסף, נו (4) 891, |
| 24 | בעמ' 897. (ראה גם: י. קדמי "על הראיות" (תשס"ד-2003) בעמ' |
| 25 | 1508-1505). |
| 26 | |
| 27 | "הקביעה מי מבעלי הדין נושא בנטל השכנוע נעשית על בסיסם של |
| 28 | שני כללים יסודיים: האחד – 'המוציא מחברו עליו הראיה'; ויכול |
| 29 | שיהא זה התובע ויכול שיהא זה הנתבע, הכל לפי העניין. והשני – |
| 30 | 'דיני הראיות הולכים אחרי הדין המהותי'; הן לעניין הוכחת יסודות |
| 31 | העילה/ההגנה והן לעניין הפרכתן של חזקות." |
| 32 | י. קדמי "על הראיות" (תשס"ד-2003) בעמ' 1508. |
| 33 | |

SHATSKY-006786



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  באשר לכלל "המוציא מחברו עליו הראייה", נקבע בע"א 72/357, שנסי עזיז נ' סוראיה בצלציוני,
2
3  (פ"מ כז(1), 741) בעמ' 744 :
4
5
6  "חובה שכנוע זו נובעת מהעקרון היסודי בדיני ראיות, לפיו בעל-דין
7  במשפט אזרחי, הטוען טענה חשובה לעמדתו המשפטית, נושא בנטל
8  השכנוע להוכחת העובדות הנחוצות לביסוס טענתו"
9
10  (ראה גם : י. קדמי על הראיות (תשס"ד-2003) בעמ' 1515 - 1508 ; א.
11  הרנון, דיני ראיות (הדפוס האקדמי, כרך א, תש"ל) 200 ; ע"א 88 /
12  210 החברה להפצת פרי הארץ בע"מ נ' הוועדה המקומית לתכנון
13  ולבנייה, כפר-סבא מו (4) 627).
14
15  ובע"א 642/61 טפר נ' מכלה, (פ"ד טז 1000) הובהר מפי השופט זוסמן :
16
17  "תובע המביא דברו לפני בית-המשפט מבקש לזכות ביתרון או
18  בהנאה שנקבעו - לטובתו - בהלכה פלונית מהלכות המשפט
19  המהותי. תוצאה זו, הזכות שהתובע טוען לה, מותנית בכך שנתקיימו
20  העובדות המולידות את הזכות האמורה ('עילת התביעה').
21  כיוצא בזה הנתבע המבקש לנקות את עצמו ומסתמך לשם כך על
22  הלכה אחרת הפוטרת אותו מחבות שנולדה. אם תוספת הלכת-
23  הטפו לטובת הנתבע, תלוי בכך אם נתקיימו עובדות אחרות ('עילת
24  ההגנה')".
25
26  באשר לכלל על פיו "דיני הראיות הולכים אחרי הדין המהותי" נקבע:
27
28  "הכל תלוי במשפט המהותי, כי דיני הראיות הולכים אחריו. פעמים
29  יש והמשפט המהותי תולה את הזכות שהתובע טוען לה בכך שלא
30  אירעה עובדה מפקיעה, ואם עשה כן - נטל השכנוע על התובע, ועליו
31  להוכיח שלא אירעה העובדה האמורה, אף על-פי - שלענין זכות
32  אחרת - עובדת מפקעת היא".
33  ע"א 88 / 210 החברה להפצת פרי הארץ בע"מ נ' הוועדה המקומית
34  לתכנון ולבנייה, כפר-סבא מו (4), בעמ' 643. (ראה גם : י. קדמי על
35  הראיות (תשס"ד-2003) בעמ' 1516 - 1537).

65 מתוך 90

SHATSKY-006787



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

1
2      ובאשר לעמידה, או אי עמידה בנטל השכנוע נקבע:
3
4          ״השאלה אם הרים בעל דין את נטל השכנוע המוטל עליו נבחנת
5          בתום הדיון כולו; ובית המשפט משיב לשאלה זו, על פי כלל הראיות
6          שבאו בפניו – ואין נפקא מינה מיהו בעל הדין שהביאן – ועל בסיס
7          הערכת מהימנותן של ראיות אלו וקביעת משקלן הראייתי.״
8          (י. קדמי על הראיות (תשס״ד-2003) בעמ׳ 1537).
9
10         ״ואין צריך לומר, שחשיבותה המיוחדת של קביעת נטל השכנוע היא
11         בכך: שאם בסוף המשפט העריך השופט שההוכחות של הצדדים הן
12         שקולות ומאוזנות, כי אז יכריע את הדין לרעת הצד הנושא בנטל
13         השכנוע״.
14
15         ד״נ 4/69 נוימן ואח׳ נ׳ כהן ואח׳ פ״ד כד(2) 229, ע״א 8383/09
16         המועצה המקומית סאג׳ור נ׳ סונול ישראל בע״מ (פורסם בנבו
17         בתאריך 24.1.11).
18
19   57.   ולענייננו – התובעים הביאו די והותר ראיות להוכחת הקשר הסיבתי הנסיבתי, העובדתי
20         והמשפטי בין התנהלות הרש״פ, הן במעשה והן במחדל, לבין ביצוע הפיגוע על ידי המחבל.
21         ודוק: איננו קובעת כעניין שבעובדה, כי הוכח שהרש״פ יזמה את הפיגוע הספציפי באופן
22         מעשי. הקביעה היא שנכונותה של הרש״פ ללמד נער בן 15.5 להשתמש בכלי נשק, על רקע
23         התקופה בה עשתה כן, יצרה אצל המחבל הצעיר הבנה, כי מצופה ממנו לעשות מעשה
24         ולממש את ידיעותיו בתחום תפעול כלי נשק. המחבל תרגם הבנה זו למעשה, וביצע את
25         המצופה ממנו, כפי שלמד במחנה האימונים של הרש״פ. כלומר: גם אם לא הוכח באופן
26         פוזיטיבי, כי הרשות כללה במסגרת הידע שהנחילה למתאמנים במחנותיה, הנחיות ברורות
27         לביצוע פיגועים כנגד מטרות ישראליות, הרי שעצם קיום המחנות ושיתוף נערים בלימוד
28         תיפעול כלי הנשק, כמוה כמתן הנחיות בפועל לביצוע פיגועים כאלו.
29
30         ודוק: הרש״פ לא הרימה את הנטל המשני המונח על כתפיה, ולא המציאה תיעוד, או עדויות
31         לגבי המתרחש במחנות האימונים שלה, ולייתר דיוק, לא המציאה ראיות, שיש בהן כדי
32         להוביל למסקנות שונות.
33

66 מתוך 90

SHATSKY-006788



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    בנוסף, הרש"פ "עצמה עיניה" אל מול האפשרות שהחניך, שאותו אימנה, למרות גילו הצעיר

2    יממש את הידע, שהרשות טרחה לצייד אותו בו, ויבצע פיגוע טרור כנגד יהודי, וככלל,

3    הרש"פ לא הוכיחה, ואף לא ניסתה להוכיח מה עמד ביסוד הסכמתה להעניק לנער בן 15.5

4    אימוני נשק, לרבות המטרה שניסתה להשיג בהקניית ידע זה לנער בן 15.5.

5

6    התנהלות זו של הרש"פ מובילה למסקנה, כי בהחלטתה לאמן נער בן 15.5 וללמדו לאחוז

7    בנשק, היא מבינה את הסיכון הגלום בכך, וכפועל יוצא – היא מסכימה למימוש הסיכון,

8    ממש כפי שקרה בפועל.

9

10    הרש"פ לא עמדה בנטל המשני המוטל עליה לשמוט את הבסיס מתחת לראיות התובעים,

11    ובמאזן ההסתברות שוכנעתי, כי גרסת התובעים **"מסתברת יותר ומתקבלת יותר על הדעת**

12    **מהגרסה שכנגד"** (קדמי, שם).

13

14    ויובהר, כבר נקבע (בע"א 10078/03 **אורי שתיל ואח' נ' מדינת ישראל ואח'**, פורסם בנבו),

15    כי אין בנמצא בדיני הראיות כלל עקרוני השולל, או מקים אחריות, והקביעה בדבר קיומו

16    או אי קיומו של חובת זהירות קונקרטית נעשית על יסוד הנסיבות הקונקרטיות של כל

17    מקרה ומקרה, וכפי שהבהרתי, במקרה אשר בפני, בנסיבותיו הקונקרטיות הוכחה

18    אחריותה של הרש"פ לביצוע הפיגוע, וכן הוכחו עידודה ותמיכתה בביצוע פעולות  טרור  הן

19    במעשה והן במחדל. **ודוק: אין מנוס מהמסקנה, כי ביצוע הרצח בידי המחבל, אינו אלא**

20    **התממשותו של סיכון שיצרה הרש"פ באמנה נער בן 15.5 לירות בנשק,** וכי אחריותה של

21    הרש"פ לאירוע הנזיקי ולתוצאותו הינה אחריות עיקרית ומכרעת, שכן אילו הייתה נמנעת

22    מללמד את המחבל להשתמש בנשק, קרוב לוודאי שהאירוע היה נמנע.

23

24    אין כל ספק, כי כאשר בחרה הרש"פ ללמד את הנער להשתמש בנזק, היא יכולה הייתה

25    וצריכה הייתה לצפות את אירוע הנזק, קרי: השימוש שיבחר הנער לעשות בכישוריו

26    החדשים.

27

28    כפי שציינתי, ב"כ הרש"פ ניסה ללא לאות לגרור את בית המשפט, לאמירות פוליטיות,    .58

29    ולהסיט את מרכז הכובד של הדיון בהתייחס לקיומה, או אי קיומה של רשלנות במעשי

30    הרש"פ לשאלות של ריבון זר ויישות משפטית זרה, והמשיך לעשות כן אף בסיכומיו, בהגיעו

31    למסקנה מרחיקת הלכת, לפיה, אם **"תוטל על הנתבעת אחריות גורפת למעשי האלימות**

32    **שאירעו במהלך האינתיפאדה – תתלווה לכך בהכרח אמירה מדינית המייחסת למדינת**

33    **ישראל, לאמירה זו תהיה מצידה השלכה ישירה ומיידית על עתידו של התהליך המדיני**

34    **בפרט ועל היחסים בין העמים בפרט"** (סעי' 147 לסיכומי הנתבעת).

67 מתוך 90

SHATSKY-006789



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1
2   עוד טוען ב"כ ברש"פ במשתמע, כי מקורו של הפיגוע הינו "**בסכסוך בין עמים...**" (סע' 27
3   לסיכומים), אמירה אומללה, שיש להער עליה. האם הכשרת נער בן 15.5 לשימוש בנשק
4   הינה תוצאה של סכסוך בין עמים? האם הפיגוע ורצח המנוח הינם תוצאה צפויה של סכסוך
5   בין עמים? האם קיומו של סכסוך בין העמים מכשיר ביצוע רצח כנון זה? האם זו עמדתה
6   של הרש"פ? ואם כן – לשם מה נדרש בית המשפט לשמוע ראיות באשר לאחריותה של
7   הרש"פ לביצוע הרצח??
8
9   ב"כ הרש"פ חוזר על הדברים בסע' 148 לסיכומי, באומרו, כי "**העובדה, כי הארוע נשוא**
10  **כתב התביעה הינו חלק בלתי נפרד מהסכסוך בין שני העמים הישראלי והפלשתיני,**
11  **מהווה שיקול מדיניות ראשון במעלה, שיש בו כדי למנוע קביעה בדבר קיומו של חובת**
12  **זהירות במקרה זה**". קראתי ונדהמתי. אם זו איננה הודאת בעל דין בדבר אחריות הרש"פ
13  לרצח, לא ברור לי מהי הודאת בעל דין.
14
15  ויובהר הבהר היטב. פסק דין זה ניתן על ידי כשופטת בבית המשפט המחוזי בתל אביב. פסק
16  הדין ניתן לאחר שמיעת ראיות, ומבוסס כל כולו על הדין הנוהג במדינת ישראל.
17
18  כשופטת אין לי כל עניין להתערב בעניינים מדיניים, ואיני עושה כן. פסק הדין הינו תוצאה
19  משפטית של הליך משפטי שנוהל בפני כדין, לא יותר ולא פחות, ונסיונו של ב"כ הרש"פ
20  לייחס לקביעותי פגיעה "**ישירה ומיידית על עתידיו של התהליך המדיני בפרט ועל היחסים**
21  **שבין העמים בפרט**" אינה, אלא נסיון להלך אימים על בית המשפט, ונסיון להניאני מליתן
22  פסק דין לחובת הרשות הפלשתינית, והנני מצרה מאוד על נסיון זה ועל התבטאויות אלו.
23
24  .59   בטרם סיום פרק זה בפסק הדין, הקובע הלכה למעשה את הקשר הסיבתי הנדרש בדין בין
25  התנהלות הרש"פ, במעשה ובמחדל, לבין ביצוע הרצח נשוא כתב התביעה, אדרש למספר
26  נושאים נוספים, אשר הועלו על ידי ב"כ הרש"פ בסיכומיו.
27
28  באשר לטענות אי השפיטות, שכן מדובר לכאורה בעניינים מדיניים – אינני רואה בטענה זו
29  כל ממש, וכל עניינה הוא לגרור את בית המשפט לדיונים לעניינים מדיניים, דבר שאינו
30  מתפקידו, או מסמכותו של בית המשפט.
31
32  למעלה מן הצורך אציין, כי כפי שקבעתי, עילת התביעה כנגד הרש"פ הינה מכח פקודת
33  הנזיקין, בהיותה ישות משפטית, שניתן לתובעה, בהתאם להצהרותיה היא.
34

SHATSKY-006790



**בית המשפט המחוזי בתל אביב - יפו**

**ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳**

1    בהתייחס למעמדם של פסקי הדין הצבאיים – אינני נדרשת להכרעה בעניין זה שכן ממילא
2    לא הסתמכתי בפסק דין זה על אותם פסקי דין.
3
4    בהתייחס לטענה, כי אין בסקירות (ת/9) התייחסות לאירוע נשוא כתב התביעה – אין כל
5    ספק שהצדק עם ב״כ הרש״פ. אלא מאי? הסקירות נועדו לתאר את הרקע, האווירה והלך
6    הרוח ברש״פ וברחוב הפלשתיני, רקע, שהינו הכרחי להבנת הסיטואציה, שהובילה לפיגוע
7    נשוא תיק זה.
8
9    הטענה בדבר אי חקיקת חוקים ברש״פ עקב ההסכמים שנחתמו עם ישראל – גם היא טענה
10   מוצדקת של הרש״פ, אלא שהיות ולא ייחסתי בפסק הדין כל ערך לשאלת חקיקתם, או אי
11   חקיקתם של החוקים, אינני מוצאת לנכון להתייחס אליה כלל.
12
13   הטענה, כי לא הובאו ראיות להפצת כרוזים, שידורי תעמולה והפצת ספרים – טענה זו
14   נכונה בחלקה, שכן במסגרת מסמכי השלל שהוצגו בפני בית המשפט קיימים כרוזים.
15
16   באשר לשידורי תעמולה – בתיק זה לא נעשה נסיון להוכיח את קיומם.
17
18   באשר להפצת ספרים אין לי כל מידע, וטענה זו לא הוכחה.
19
20   באשר להפרת חובה חקוקה בהתייחס <u>לחוק בדבר מניעתו ועונשתו של הפשע השמדת עם,</u>
21   <u>תשי״י – 1950</u> – חוק זה מגדיר בסע׳ 1 מה פירוש ״**השמדת עם**״ על פי חוק זה, והוא כולל
22   חמש אפשרויות חלופיות להחלתו, כאשר לצורך החלתו, יש להוכיח, כי מאן דהוא עשה
23   מעשה מסוים ״**בכוונה להשמיד, השמדה גמורה או חלקית, קיבוץ לאומי, אתני, גזעי, או**
24   **דתי...**״ (סע׳ 1 לחוק) – כוונה זו יש צורך להוכיח באמצעות ראיות, דבר שלא היה בעניין
25   אשר בפני.
26
27   לא זו אף זו, אינני סבורה, כי חוק זה נועד לשימוש במסגרת המשפט האזרחי, אלא במסגרת
28   המשפט הפלילי, וזאת למדה אני משימושו במונח ״**פשע**״ – הגדרת הלקוחה מהמשפט
29   הפלילי, ממחרתו המוצהרת של החוק – ענישת הפושע. המשפט האזרחי אינו עוסק בעונשה
30   ודיני הנזיקין – מטרתם לפצות לפצות בשל נזקים שנגרמו בעוולה, ובשום פנים ואופן אין מטרתם
31   להעניש את המעוול.
32
33   אחריות שילוחית – ההתייחסות לאחריות שילוחית עלתה לראשונה בסיכומי התובעים ולא
34   נדונה במסגרת שמיעת הראיות.

SHATSKY-006791



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

| | |
|---|---|
| 1 | |
| 2 | מעבר לצורך אציין, כי גם אילו הייתה מועלית הטענה בדבר קיומה של אחריות שילוחית |
| 3 | לרש״פ, הרי שטענה זו הייתה נדחית, באשר נקבע קיומה של אחריות ישירה, בהתאם |
| 4 | למפורט בפסק דין זה. |
| 5 | |
| 6 | עניין נוסף הדורש התייחסות הינו בקשת הנתבעים למחוק את סיכומי התשובה שהוגשו על |
| 7 | ידי ב״כ התובעים וזאת על סמך הנימוקים שפורטו בבקשות שהוגשו על ידם. |
| 8 | |
| 9 | לא מצאתי לנכון להיעתר למבוקש, למרות שחלק מטענות הנתבעים נכונות. כך בהתייחס |
| 10 | לאורכם של סיכומי התשובה וכך בהתייחס לטענות בדבר הרחבת חזית אסורה. |
| 11 | |
| 12 | יובהר, כי התובעים הונחו באשר לאורכם של סיכומי התשובה, וללא ספק התעלמו במופגן |
| 13 | מהנחייה זו, מבלי שהיה בפיהם הסבר משכנע, או מניח את הדעת להתנהלותם. אלא מאי? |
| 14 | מחיקת סיכומי התשובה היה גורם להארכת משך ניהול התובענה, שהוגשה בשנת |
| 15 | 2004, וזאת לא יכולתי להתיר. |
| 16 | |
| 17 | באשר להרחבת החזית הנטענת – גם טענה זו מוצדקת, אולם הקורא את פסק הדין לא |
| 18 | יתקשה להבחין בהתעלמותי מהטענות שהועלו בסיכומי התשובה בבחינת הרחבת חזית. |
| 19 | |
| 20 | 60.   טענה נוספת הדורשת התייחסות הינה טענת התובעים, לפיה יש להעביר את נטל הראיה |
| 21 | לרש״פ, מכח סע׳ 41 לפקודת הנזיקין. |
| 22 | |
| 23 | סע׳ 41 לפקודת הנזיקין מונה שלושה תנאים מצטברים להחלתו: |
| 24 | |
| 25 | <u>האחד</u> – לתובע לא הייתה ידיעה, או לא הייתה לו יכולת לדעת מה הן הנסיבות שהביאו |
| 26 | לאירוע הנזק. |
| 27 | |
| 28 | <u>השניה</u> – הנזק נגרם על ידי נכס, שהיה בשליטתו המלאה של הנתבע. |
| 29 | |
| 30 | <u>השלישי</u> – אירוע המקרה מתיישב יותר עם המסקנה, שהנתבע התרשל, מאשר עם המסקנה |
| 31 | שנקט זהירות סבירה. |
| 32 | |
| 33 | כאמור, מדובר בתנאים מצטברים, ולעניות דעתי, לא כולם התקיימו במקרה אשר בפני. |
| 34 | במה דברים אמורים? |

SHATSKY-006792



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

<br>

1
2  כמפורט בפסק הדין, אין ספק שהתנאי הראשון והתנאי השלישי התקיימו, אולם אין
3  באפשרותי לקבוע, כי במועד ביצוע הפיגוע היה המחבל בשליטתה המלאה של הרש"פ, אלא
4  אם כן כוללת "שליטה" זו גם הלך רוח שבו היה נתון המחבל במועד ביצוע הפיגוע, אלא
5  שאינני סבורה שכוונת המחוקק הייתה לכלול במבחן השליטה גם הלך רוח, אלא הכוונה
6  היא לשליטה ממשית ואקטיבית, ואשר על כן הנני דוחה את הטענה בדבר חלותו של סע' 41
7  לפקודת הראיות במקרה אשר בפניי.
8
9  61.  כפי שציינתי ופרטתי היטב בפסק הדין, הנני בדעה, כי התובעים הרימו את נטל ההוכחה
10  המוטל עליהם ברמת ההסתברות הנדרשת במשפט האזרחי, בשיעור של למעלה מ- 51%,
11  אולם הנני סבורה, כי מקרה זה מלמד, שיש ליתן את הדעת על הקושי המובנה שבהוכחת
12  חבות במקרים כגון דא, וביתר דיוק, להוכחת החבות של הרשות הפלשתינית והמועצה
13  הפלשתינית. במה דברים אמורים? מטבע ה הדברים, האינפורמציה הרלבנטית, אשר יש בה
14  כדי לסייע בהגעה למסקנות בדבר קיומה, או אי קיומה של חובת זהירות, והפרתה, מצויה
15  בידיעת הרש"פ, אשר נמענה באופן שיטתי וגורף מהמצאת מסמכים, או אינפורמציה.
16  ההלכה היא, שהימנעות מהמצאת האמור פועלת לחובתו של הנמנע – הרשות הפלשתינית,
17  שכן חזקה היא שאילו הייתה ממציאה את כל הנדרש ממנה, היו המסמכים והראיות
18  פועלים לחובתה.
19
20  ב"כ הרש"פ חזר הרבה מאוד פעמים בסיכומיו על הטענה, כי התובעים לא הוכיחו את
21  הטענה, על פיה הרש"פ אימנה את המחבל כדי להרוג יהודים, וכפי שביארתי בפסק דין זה,
22  עצם האימון על נער בן 15.5 להשתמש בנשק, בתקופה הרלבנטית, אינה אלא, לצורך הכנתו
23  של הנער לשימוש בנשק בפועל בהתאם "להשכלה" שרכש במחנה של הרשות הפלשתינית.
24  אין צורך באמירה ברורה ומפורשת מה אמור הנער לעשות עם "ההשכלה" שרכש במחנה
25  האימונים ברש"פ. בהתחשב בכל הרקע שפורט בפסק דין זה, ובמיוחד בהתחשב בעובדה
26  שהימים הם ימי האינתיפאדה השניה, ופיגועים קשים שבוצעו כנגד תושבי ישראל ואף גבו
27  קורבנות רבים בנפש, אין צורך צורך באמירה ברורה, אם כי, אין לדעת האם לא נאמרו אמירות
28  ברורות במסגרת אותו  מחנה אימונים, מקום שהרש"פ הכחישה  הן את עצם קיומו והן את
29  השתתפותו של המחבל במחנה מטעמה, וממילא לא צירפה את "תוכנית הלימודים", לה
30  נחשף המחבל במסגרת לימודיו במחנה האימונים מטעם הרש"פ.
31
32  הוכחת טענת התובעים אינה מלאכה קלה נוכח הימנעותה השיטתית של הרש"פ מהיענות
33  לצווי בית המשפט, והסתרת כל החומר הרלבנטי שיכול היה להטיל אור על המתרחש

SHATSKY-006793



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1　באותם מחנות אימונים במועד הרלבנטי, הימנעות, אשר כפי שקבעתי, אין כל ספק שיש
2　לזוקפה לחובת הרש"פ.
3
4　ולמה הדבר דומה? לא אחת נקבע בפסקי דין בתחום הפלילי, כי חזקה על מי שנושא סכין,
5　שהוא מתכוון להשתמש בו, קרי: עצם נשיאת הסכין הוא סיכון, והשימוש בו הוא
6　התממשות הסיכון. כך במקרה אשר בפני. כוונת הרש"פ ללמד נער בן 15.5 את רזי הנזק
7　והשימוש בו הינה בגדר סיכון עצום שלקחה הרש"פ על עצמה, ועל כן לא ייפלא, שאותו נער
8　מימש את הסיכון והשתמש בנשק לרצח יהודי.
9
10　למה מכוונים דברי? יתכן, שבמקרים כאלו בהם קיים קושי ראייתי מובנה להוכיח את
11　הקשר הסיבתי בין התנהלות של צד א' – במקרה שלנו, הרש"פ - לבין התנהגותו של צד ב' –
12　במקרה שלנו, המחבל, יש מקום לחשוב על הפעלת הדוקטרינה של סיבתיות עמומה  (או
13　עמימות סיבתית) בדומה ובשונה – בשינויים המתבקשים, לדוקטרינה שנקבעה בדנ"א
14　4693/05 **בית החולים "כרמל" חיפה נ' עדן מלול** (פורסם בנבו). במה דברים אמורים?
15　בפרשת עדן מלול הראשונה (ע"א 7375/02) פסק בית המשפט, כי יש להכיר בחריג האחריות
16　היחסית במקרים של סיבתיות עמומה. אמנם פרשת עדן מלול הינה פרשה, אשר עובדותיה
17　שונות בתכלית מעובדות המקרה אשר בפני, שכן היא עוסקת בשאלת קיומו של קשר סיבתי
18　בין התנהלות רפואית לבין נזק שנגרם, כאשר קיים קושי להוכיח ברמת ההסתברות של
19　51% קיומו של קשר כזה.
20
21　במסגרת הדיון הנוסף (דנ"א 4693/05) בוטל פסק הדין שניתן בע"א 7375/02, והתקבלה
22　עמדתו של המשנה לנשיאה (כתוארו דאז) כב' השופט א' ריבלין, והנני בדיעה, כי יתכן
23　שעמדה זו אף נכונה לבחינת המקרה אשר בפני, ואבאר.
24
25　במסגרת הדיון הנוסף בפרשת עדן מלול סבר כב' השופט ריבלין, כי עד לאותו מועד
26　התמודדה הפסיקה עם העמימות הסיבתית, תוך קביעת העובדות במקרה הבודד המובא
27　בפני בית המשפט, ותוך חתירה להשגת צדק פרטני, ולשיטתו של השופט ריבלין, מן ראוי
28　להכיר את מבחן החריגה מכלל מאזן ההסתברויות לכלל של פיצוי לפי הסתברות בדרך
29　שאינה מצוה במישור של המקרה הבודד, כי אם במישור רחב יותר על ידי איתור הטייה
30　נשנית. לדעתו, תוצאה זו הינה הרע במיעוטו, בשל הסטייה ממבחן מאזן ההסתברויות.
31
32　השופט ריבלין דורש התקיימותם של ארבעה יסודות לצורך הפעלת הסטייה ממבחן מאזן
33　ההסתברויות:
34

SHATSKY-006794



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---|---|
| 1 | א. קיומו של מזיק. |
| 2 | ב. קיומה של קבוצת ניזוקים. |
| 3 | ג. סיכון חוזר ומשותף. |
| 4 | ד. הטייה עקבית בהחלט כלל מאזן ההסתברויות. |
| 5 | |
| 6 | לדברי השופט ריבלין, במקרים אלו, ובהם בלבד, ניתן יהיה לשיטתו לחרוג מן הכלל הרגיל |
| 7 | של מאזן ההסתברויות ולחייב בפיצוי גם את מי שהסיכוי לכך שגרם לנזק בהתרשלותו – |
| 8 | במעשה, או במחדל – נמוך למדי. |
| 9 | |
| 10 | אם אבחן את המקרה אשר בפני לאור המבחנים האמורים, אמצא, כי כל המרכיבים |
| 11 | האמורים מתקיימים במקרה אשר בפני. קרי: קיים מזיק – הרשות הפלשתינית, אשר |
| 12 | אימנה במשך 50 ימים נער בן 15.5 להשתמש בנשק. |
| 13 | |
| 14 | קיימת קבוצה של ניזוקים – כפי שפירטתי, הימים ימי האינתיפאדה השניה רווית |
| 15 | הפיגועים והקורבנות בקרב אזרחי ישראל, כאשר ממסמכי השלל שהוצגו בפני עולה באופן |
| 16 | ברור ומפורש מעורבותה של הרש"פ במימון והוצאה לפועל של הפיגועים. |
| 17 | |
| 18 | סיכון חוזר ומשותף – מדובר בסיכון מובנה כתוצאה מהתנהלות הרש"פ, כפי שעולה |
| 19 | ממסמכי השלל, אשר אינם מותירים ספק באשר לאחריותה של הרש"פ לביצוע הפיגועים, |
| 20 | או חלקם. |
| 21 | |
| 22 | הטייה עקבית בהחלט מאזן ההסתברויות – לעניינו דעתי מדובר בתופעה – פיגועים כלפי |
| 23 | אזרחי ישראל – היוצרת "**הטייה נשנית**" בשל הקושי המובנה להוכיח בכל אחד מהמקרים |
| 24 | את אחריותו של הארגון, או של הגוף שאחראי לפיגועים ולתוצאתו. |
| 25 | |
| 26 | 62. דברי באשר להתכנות הפעלת דוקטרינה זו גם במקרים כגון המקרה נשוא פסק הדין, הינם |
| 27 | הגינים שעלו על דעתי, לא נטענו על ידי בעלי הדין, וממילא אינני מכריעה בהם, אולם |
| 28 | סברתי, כי מן הראוי לשקול דוקטרינה זו במקרים כגון המקרה נשוא פסק הדין. ודוק: |
| 29 | הפעלת הדוקטרינה במקרה כזה עשויה לשרת הן את האינטרסים של התובעים, המוצאים |
| 30 | עצמם לעיתים מתקשים לעמוד ברף מאזן ההסתברויות, והן את האינטרסים של הנתבעים, |
| 31 | שיוכלו לטעון להפחתת הפיצויים  כאשר אין ודאות מלאה בהתייחס להוכחת חבותם, כמו |
| 32 | גם היעדר קביעה מפורשת בדבר אחריותם למעשה הנזיקי, אשר בגינו נתבעים פיצויים. |
| 33 | |

SHATSKY-006795



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1   אמנם בפרשת עדן מלול נקבע, כי היתכנות ההזקקות למבחן ההטייה הנשנית הינו חריג
2   לכלל בדבר החובה להוכיח את התביעה על פי כלל מאזן ההסתברות, ומכל מקום, הוא
3   מופעל רק במקרים של טענה לקיומו של נזק במישור הרפואי, אולם כפי שהבהרתי, יש
4   לשקול הפעלת מבחן זה גם במקרים נוספים, כגון המקרה אשר בפני, מה עוד שמבחן
5   ההטייה הנשנית הינו חדש יחסית וטרם נבחן הלכה למעשה באופן שיטתי בפסיקת בתי
6   המשפט. (לדיון נרחב בקשיים המתעוררים בישום גורף של פתרונות יחסים, ראו י' גלעד
7   **"דוקטרינת הנזק הראייתי: האם הורם נטל השכנוע?** משפטים ל 317; **י' גלעד "תגובה:**
8   **הסדר חדש לדין ההתיישנות?**, משפטים לו (3) 855).
9
10  כפי שציינתי, מדובר ברעיון, אשר מן הראוי לעבדו ולשקול אותו, ומכל מקום, אינני מוצאת
11  לנכון להכריע בו, או ליישמו במסגרת המקרה אשר בפניי, שכן כפי שקבעתי, במקרה אשר
12  בפני הוכחה התובענה בהתאם לכלל מאזן ההסתברות.
13
14  <u>התביעה כנגד הראל חברה לביטוח בע"מ</u>
15
16  63.  הראל חברה לביטוח בע"מ (להלן: **"הראל"**) הוציאה פוליסת ביטוח לחברות **"בזק"**
17  ו**"לילית"** (נספחים א', ו' לתצהיר גרמיזה).
18
19  באשר לפוליסה, שהוצאה ללילית – משקבעתי, כי לא קמה חובת  אחריות קונקרטית
20  ללילית בגין האירוע נשוא כתב התביעה, הרי שיש לדחות את התובענה כנגד הראל בגין
21  הטענות שהועלו כנגד **"לילית"**, מה עוד שהפוליסה איננה רלבנטית למקרה אשר בפני,
22  באשר היא כוללת חריג ביחס לאירועי טרור.
23
24  ביחס לפוליסה שהוצאה לחברת בזק – מדובר בפוליסת חבות מעבידים שמספרה
25  61000043/02, אשר צורפה כנספח א' לתצהירו של גרמיזה  (להלן: **"הפוליסה"**).
26
27  עיון בתנאי הפוליסה מגלה, כי היא כוללת **"חריג מלחמה, מלחמת אזרחים וטרור"** הקובע,
28  בין היתר: **"בניגוד לאמור בכל מקום אחר בפוליסה, או בכל תוספת לפוליסה, מוסכם**
29  **ומוצהר בזאת, כי הפוליסה לא תכסה את המבוטח בגין:**
30  **... 2. כל מעשה טרור"**
31
32  **"מעשה טרור"** מוגדר בפוליסה: **"מעשה הכולל, אך לא מוגבל לשימוש בכח, אלימות...**
33  **חבלה, או כל שימוש באמצעי אחר על מנת לגרום במכוון, או שלא במכוון לנזק מכל סוג**

74 מתוך 90

SHATSKY-006796



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1      שהוא... על ידי אדם, קבוצה/ות בין אם הם פועלים לבדם, או בשם, או בקשר עם כל ארגון
2      שנוצר למטרות פוליטיות, דתיות, אידיאולוגיות, או מטרות דומות...״
3
4      גם בג׳יקטים של הפוליסות מוחרג באופן מפורש אירוע טרור (נספח א׳ – עמ׳ 2 ו- 3 לרשימה,
5      וסע׳ 3.4 לג׳יקט; נספח ד׳ – עמ׳ 9 לרשימה, וסע׳ 1.3 לג׳יקט; נספח ו׳ – עמ׳ 3 לרשימה, וסע׳
6      51.2 לג׳יקט.
7
8      מהאמור עולה, כי הפוליסה מחריגה במפורש ובאופן ברור את האירוע נשוא כתב התביעה,
9      שהינו ללא כל ספק אירוע טרור.
10
11     ב״כ התובעים ניסתה להוכיח במהלך שמיעת הראיות ואף טענה בסיכומיה, כי אין לקבל את
12     החרגת הטרור בפוליסה, ואין לפטור את הראל מכיסוי בגין הארוע נשוא כתב התביעה, שכן
13     חבותה של הראל נובעת מאחריותה הנזיקית של בזק בגין התנהלותה ומחדליה, ולא בשל
14     אירוע הטרור, אלא שאיני יכולה לקבל פרשנות זו. הפוליסה קובעת בלשון שאיננה
15     משתמעת לשתי פנים שהיא מכסה כל אירוע רשלני של בזק, אשר כתוצאה ממנו תחוייב
16     בזק בתשלום פיצוי לנפגעים, אלא מאי? התחייבות חוזית זו של הראל, כפי שבאה לידי
17     ביטוי בפוליסה איננה מוחלטת, אלא מסוייגת, ונקבע במפורש, כי היא לא תחול במקרה
18     שהאירוע נשוא החיוב הוא אירוע טרור.
19
20     אין להבין מהאמור, כפי שמבקשת ב״כ התובעים לטעון, כי באם מתברר שאירוע הטרור
21     התאפשר, בין היתר, כתוצאה ממחדלי בזק, כי אז אין להפעיל את החריג. נהפוך הוא –
22     הפוליסה קובעת בבירור ובחדות, כי אם מדובר באירוע טרור, יחול החריג והראל לא
23     תחוייב לשלם בהתאם להתחייבויותיה בפוליסה.
24
25     בעניין זה יצויין, כי העד מר יורם זילברמן, שהינו סוכן ביטוח, נחקר בעיקר לגבי פוליסת
26     לילית, ולאו דווקא בהתייחס לפוליסת בזק, ולא בכדי.
27
28     לילית הינה חברה בפירוק, ואיש מטעמה לא התייצב לדיון, ועל כן נוצר הרושם שיקל על
29     התובעים להוכיח מחדלים של הראל עובר להוצאת פוליסת הביטוח לילילית, באופן שיחייב
30     את הראל לשאת בחלקה של לילית לארוע נשוא כתב התביעה, אלא שנוכח קביעתי באשר
31     לדחיית התובענה כנגד לילית, אין בדעתי להידרש לנסיבות הוצאת פוליסת לילית, ואומר
32     רק, שלא הוכח בשום פנים ואופן שהכללת חריג הטרור בפוליסת לילית היה בניגוד לרצונה,
33     ו/או מתוך חוסר הבנתה של לילית למשמעות חריג זה.
34

SHATSKY-006797



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1   באשר לפוליסות בזק - הראל הביאה לעדות מטעמה את מר אילן גרמיזה (להלן: **"גרמיזה"**)
2   שהינו מנהל מחלקת תביעות בהראל, והותיר עלי רושם מצויין. גרמיזה הגיש לבית המשפט
3   שני תצהירים, האחד – מתאריך 11.11.09, והשני - מתאריך 23.3.11.
4
5   ב״כ התובעים ניסתה ללא לאות להוכיח, כי הפוליסה לא שיקפה את ההסכמות בין בזק
6   והראל בנושא תוכן הפוליסה בכלל, וקיומו של חריג הטרור בפרט, זאת תוך הצגת שאלות
7   רבות באשר למשא ומתן שנערך בין בזק להראל עובר להפקת הפוליסה, אלא שמודובר היה
8   בחקירה מיותרת לחלוטין. במה דברים אמורים? פוליסת ביטוח הינה חוזה ככל חוזה
9   הנכרת בין הצדדים לו, והיא משקפת את כל ההסכמות אליהן הגיעו הצדדים לחוזה (ראו:
10  ע״א 4688/02 **חזי כהן נ׳ מגדל חברה לביטוח בע״מ**, פורסם בנבו), דהיינו – אם הפוליסה
11  כוללת חריג טרור, הרי שזו הייתה הסכמת הצדדים. ודוק: במקרה נשוא כתב התביעה אין
12  מדובר בפוליסה שהוצאה לאדם פרטי, הדיוט בעניינים משפטיים, אשר יתכן שלא הבין את
13  הכלול בה, או את המשמעות של חריג טרור. מיותר לציין, כי בזק הינה חברה גדולה הנעזרת
14  ביועצים משפטיים, ועל כן, אין מדובר "בהגנבת" חריג, שהיה הנעלם מעיני יועציה
15  המשפטיים של בזק.
16
17  מסקנה זו אף מחוייבת המציאות נוכח דבריו של גרמיזה בעדותו, כאשר הבהיר **"בפוליסות**
18  **של בזק, שנכתבו וצורפו לפה... זה פוליסות שנכתבו על ידי בזק/היועצים שלהם ולא על**
19  **ידי הראל. זה פוליסה שהם חלק ממכרז"** (עמ׳ 641 שורות 18-19). אמירה זו, אשר לא
20  נסתרה, משמיטה את הקרקע מתחת לטענות התובעים בשאלת ידיעת בדבר החלת
21  חריג הטרור.
22
23  מעבר לצורך אציין, כי בהתאם להלכה הפסוקה, בעת פרשנות של חוזה   ביטוח, או חוזה
24  בכלל ניתן להיעזר בבכלל בדבר העדפת פרשנות שהינה כנגד המנסח (ראו למשל ע״א 5175/06
25  **כלל חברה לביטוח בע״מ נ׳ שמעון אסרף**, פורסם בנבו ; ע״א 5775/02 נווה גן (א.כ.) בנייה
26  **פיתוח והשקעות בע״מ נ׳ הפניקס הישראלי בע״מ**, פ״ד נח(2) 307 ; ע״א 779/89 שלו נ׳
27  **סלע חברה לביטוח בע״מ**, פ״ד מח(1) 221). והנה, משהתברר, כי המנסחת היא למעשה בזק,
28  הרי שיש להפעיל את כלל הפרשנות הנ״ל כנגדה, ולקבוע, כי חריג הטרור הוכנס לפוליסה על
29  דעתה ועל פי רצונה.
30
31  מסקנה זו מקבלת משנה תוקף מהתנהלות בזק לאחר הארוע.   בהתאם לעדות גרמיזה,
32  פנתה בזק להראל עם הגשת התובענה כנגדה לבית המשפט (עמ׳ 632 שורה 11) וטענתה
33  במכתב דחיה על סמך חריג הטרור, ולדברי גרמיזה ״... **בזק, אחרי שקיבלו את מכתב**
34  **התביעה** (צריך להיות : מכתב הדחיה – ד.ג.) **לא באו בהשגות כלשהם לגבי הדחיה, למרות**

76 מתוך 90

SHATSKY-006798



**בית המשפט המחזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  שבמקרים שיש לנו איתם חילוקי דעות בעניינים אחרים, הם יודעים לבוא. יש להם יועץ
2  ביטוח אורי אורלנד שמייצג אותם והוא זה, שגם היה אחראי על כל המכרז וכל הניסוח של
3  **הפוליסות...**" (עמ' 634 שורות 27-23). עדות זו לא נסתרה ואמירות אלו רק מחזקות את
4  המסקנה, שחריג הטרור הוכנס לפוליסה על דעתה ועל פי רצונה של בזק.
5
6  ב"כ התובעים מפנה בסיכומיה לעובדה, שבתקופה שלאחר קרות הארוע נשוא כתב התביעה,
7  הוציאה הראל לבזק פוליסה הכוללת הרחבה המתייחסת לטרור (ת/20), ומכאן ניתן ללמוד,
8  לדבריה, ששינוי הפוליסה על דרך הרחבתה והכללת אירועי טרור מלמדת, כי זו הייתה
9  כוונת בזק גם בתקופת הפוליסה הרלבנטית.
10
11  איננו יכולה לקבל טענה זו, שאינה אלא ספקולציה, שלא רק שלא הוכחה, אלא שהוכח
12  ההפך. העובדה שלאחר האירוע בחרה בזק להרחיב את הפוליסה ולבטל את חריג הטרור
13  מלמדת שבזק הפנימה את הלקח העולה מהאירוע נשוא כתב התביעה, והסכימה להרחבת
14  הפוליסה וביטול חריג הטרור, מן הסתם כנגד הגדלת תשלומי הפרמיה, ובכל מקרה, אין
15  לראות בהתנהלות זו הוכחה לנטען על ידי ב"כ התובעים.
16
17  עוד טוענת ב"כ התובעים בסיכומיה (עמ' 24), כי בזק והראל עשו יד אחת כנגד התובעים
18  "**כאשר יותר מסביר הוא, כי השתיים סיכמו ביניהן, כי הראל תשפה את בזק בגין**
19  **הפיצויים שיושתו עליה בתביעה זו**", טענה שערורה תרעומת אצל ב"כ הראל (פסקה
20  אחרונה בפתיח לסיכומיו). פעם נוספת, מדובר בספקולציה שלא הוכחה, ואיני יכולה
21  להתייחס אליה.
22
23  ב"כ התובעים טוענת עוד, כי הפעלת חריג הטרור במקרה זה, מרוקנת למעשה את הפוליסה
24  מכל תוכן, אלא שמדובר בטענה תמוהה. ממקרא הפוליסה עולה, כי היא מכסה את כל
25  המקרים בהם תחוייב בזק לפצות צדדי ג' בשל התרשלותה, למעט מקרים הנובעים, בין
26  היתר, מאירועי טרור, כפי שארע במקרה זה. חריג זה אינו מרוקן את הפוליסה מתוכנה,
27  ואינו אלא ביטוי להסכמות הצדדים, מה עוד שלא הוכח אחרת.
28
29  נוכח האמור, נדחית בזאת התובענה כנגד הראל חברה לביטוח בע"מ.
30
31  <u>**חלוקת החבות**</u>
32
33  64.  כפי שקבעתי, הופרה חובת הזהירות הקונקרטית בין הנתבעים 1, 2, 3, 4, 5, 7 ו-8 לבין
34  המנוח.

SHATSKY-006799



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'

| | |
|---:|---:|
| 1 | בהתאם לקביעותי בדבר מעשיהם ומחדליהם של המעורבים השונים, אשר אפשרו במעשה, |
| 2 | בשתיקה, או במחדל את התרחשות הארוע הקשה, אשר במהלכו נורה ונהרג המנוח, הנני |
| 3 | מחלקת את החבות כדלקמן: |
| 4 | |
| 5 | נתבעות 7 ו - 8 (הרשות הפלשתינית והמועצה הפלשתינית) נושאות באחריות בשיעור של |
| 6 | 70% ביחד  ולחוד להתרחשות האירוע. |
| 7 | |
| 8 | נתבעים 1,2,3,4,5 נושאים באחריות בשיעור של 30% ביחד ולחוד להתרחשות האירוע. |
| 9 | |
| 10 | <u>הנזק</u> |
| 11 | |
| 12 | 65.   התובעים עותרים לפיצוי בגין הפסדי המנוח **בשנים האבודות**", לרבות אובדן פנסיה, |
| 13 | אובדן קצבת זקנה, הפסד קרן השתלמות, רכב, הטבות, כאב וסבל וקיצור תוחלת חיים, |
| 14 | אובדן שירותי בן, עורת צד ג', נסיעות מוגברות, אובדן השתכרות התובעת, הוצאות מצבה |
| 15 | ושבעה ופיצויים עונשיים כנגד נתבעים 7 ו – 8. |
| 16 | |
| 17 | 66.   <u>אובדן הכנסות המנוח **בשנים אבודות"**</u> – בהתאם לתלושי המשכורת שהוגשו לבית |
| 18 | המשפט (נספח יג' לתצהירו של רונן מנטין) עמד שכרו הממוצע ברוטו של המנוח על סך של |
| 19 | 5,474 ₪ ובתוספת הפרשי הצמדה לתאריך היום – סך של 6,605 ₪. |
| 20 | |
| 21 | ב"כ התובעים שירטטה בסיכומיה מסלול התקדמות ספקולטיבי של המנוח בבזק, אילו לא |
| 22 | היה נרצח, אולם איני יכולה לקבל את טענותיה בעניין זה ואבאר. |
| 23 | |
| 24 | 67.   המנוח, בן 31 במותו, עבד בבזק 7 שנים כטכנאי, מתוכם עבד בבזק במשך 6 שנים מטעם |
| 25 | חברת השמת כח אדם – לילית – ובשנה האחרונה, השנה השביעית להעסקתו, התקבל לבזק |
| 26 | כעובד בזק ועובר להירצחו עבד בבזק כעובד בזק במשך 11 חודשים. |
| 27 | |
| 28 | בנסיון להוכיח את מסלול קידומו של המנוח בבזק הביאה ב"כ התובעים לעדות מספר |
| 29 | עדים. |
| 30 | |
| 31 | העדה הראשונה – גב' מלי יוסף – ראש צוות משאבי אנוש בבזק, הבהירה כי המנוח הועסק |
| 32 | בבזק במסגרת הסכם קיבוצי שנקרא "דור 2000" והיא הבהירה כי הוא לא היה חתום על |
| 33 | חוזה אישי. |
| 34 | |

SHATSKY-006800



בית המשפט המחוזי בתל אביב - יפו

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1     גב׳ יוסף הבהירה בחקירתה, כי מדובר בהסכם קיבוצי אישי, וכן הבהירה, כי **״חשוב לי**
2     **לומר, שחברת בזק עברה הפרטה לאחרונה, צמצומים והתייעלות וגם עובדים טובים**
3     **נשלחו הביתה. אני לא יכולה להבטיח שהוא היה ממשיך להיות מועסק, מה גם שהיה**
4     **מועסק פחות משנה** (במועד הרצחו – ד.ג.)...״ (עמ׳ 73 שורות 3-5) – עובדה שאושרה על ידי
5     אם המנוח שהעידה כי בעלה, שהיה ועבד בזק פוטר עקב צמצומים, למרות ש״**הוא היה**
6     **עובד מצויין**״ (עמ׳ 33 שורה 21). זה המקום להבהיר, כי בהתאם לעדויות שנשמעו, לא נמצא
7     תיקו האישי של המנוח בבזק, ועל כן לא ניתן לדעת האם היו בנמצא הערכות לגבי תפקודו
8     המקצועי של המנוח.
9

10     אין ספק שיש לזקוף לחובת בזק את העלמו של התיק, מה עוד שהודעה נותנת, שהמנוח
11     נחשב לעובד מקצועי, שאם לא כן, לא הייתה בזק קולטת אותו ביולי 2002 כעובד בזק לאחר
12     שהועסק בבזק כשש שנים באמצעות חברת להשמת כח אדם (לילית) (עמ׳ 75 שורות 3-4).
13

14     העדה הסבירה, כי בהתאם להסכם הקיבוצי דור 2000, אליו השתייך המנוח, ניתן היה
15     לעבוד בבזק כעובד ארעי במשך 8 שנים, והיות שהמנוח החל את עבודתו בבזק כעובד ארעי
16     ביולי 2002, הוא אמור היה להישאר במעמד זה למשך 8 שנים, קרי : עד שנת 2010 – ממש
17     כפי שעולה מתלושי המשכורת שצורפו, שם נרשם, כי מועד סיום העסקתו אמור היה להיות
18     בתאריך 30.6.10.
19

20     באשר לשאלה, האם היה המנוח מקבל קביעות בבזק, בתום תקופת העסקתו כעובד ארעי,
21     השיבה העדה כי ״**ממש לא מבטיח שעובד יקבל קביעות. ממש לא. גם אם הוא עובד טוב**״
22     (עמ׳ 76 שורה 23), אם כי הוברר, כי המנוח לא היה בתחום טיפולה ולא הייתה לה כל ידיעה
23     אישית לגביו (עמ׳ 80 שורות 25-26, עמ׳ 81 שורות 2-3).
24

25     אחרי גב׳ יוסף העידה גב׳ איוֹוט רון, שהינה מנהלת משאבי אנוש של החטיבה הפרטית
26     בבזק.
27

28     גב׳ רון העידה, כי במסגרת תפקידה היא אחראית על הטכנאים (עמ׳ 6). היא אישרה, כי
29     המנוח עבד בבזק במסגרת ההסכם הקיבוצי דור 2000, וכן העידה, כי כל העובדים שעבדו
30     בבזק במסגרת הסכם דור 2000 עברו בשנת 2006 להסכם קיבוצי חדש, שנקרא דור 2006
31     (עמ׳ 8). מדברי העדה עלה, כי ״**אין מסלול** (קידום – ד.ג.) **לטכנאים. אין מסלול מובנה...**
32     (עמ׳ 13) בניגוד למקצועות אחרים בבזק. עוד הבהירה העדה, כי קיימת אפשרות שידרוג
33     בעבודות הטכנאים, בהתאם לכישוריהם, בהתאם לכישוריהם, בהתאם ל**אבל שדרושות הסמכה...**״ (עמ׳ 13), ולעניין זה
34     אבהיר, כי לא הובאה עדות כלשהי, שהיה בה כדי לרמז על כך שהמנוח היה עובר הסמכות

SHATSKY–006801



**בית המשפט המחוזי בתל אביב - יפו**

**ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳**

1   ומשפר את כישוריו, ובאותה מידה שניתן לצאת מתוך הנחה שהיה עושה כן, ניתן גם לצאת
2   מתוך הנחה, שנוכח כישוריו הנטענים היה פורש מעובדתו בבזק ועובד במסגרת חברה
3   פרטית למשל (ראו הערתי בעמ׳ 15 לפרוטוקול).
4
5   בהמשך עדותה של העדה הוברר, שבהמשך הוחלף ההסכם הקיבוצי דור 2006 בהסכם
6   קיבוצי חדש מדצמבר 2010, וסביר להניח, שאילו המנוח היה בחיים היה מועסק במסגרת
7   הסכם חדש זה ״**ועובר למעמד שנקרא – עובד קבוע חדש**״, זאת בתנאי ש״**הוא היה נשאר,**
8   **והוא היה ראוי... החברה הייתה מוצאת אותו ראוי להישאר, הוא היה עובר כנראה**
9   **לסטטוס הזה היום**״ (עמ׳ 17), ואילו עובדים שלא הועברו להסכם החדש החדש – עבודתם
10  הופסקה (שם).
11
12  גב׳ רון נשאלה, האם היא יודעת אילו שינויים חלו משנת 2004 בשאלת השעות הנוספות,
13  והיא הבהירה שחלה ״**ירידה דרסטית**״ (עמ׳ 18) בנושא השעות הנוספות, למעט בתקופות
14  לחוצות.
15
16  עד התבדיעה, מר רונן לוי, המשמש כמנהל מחלקת שכר והטבות בבזק העיד, כי בדרך כלל
17  עובד ארעי – הוא המעמד של המנוח במועד הרצאון, מקבל קביעות כעבור 96 חודשים (7
18  שנים) (עמ׳ 30,31), כאשר קיים מעמד ביניים בין עובד ארעי לבין עובד קבוע, הנקרא - עובד
19  קבוע חדש (עמ׳ 319).
20
21  בשלב מסויים במהלך שמיעת הראיות הוחזרה גב׳ איבט רון לעדות.
22  ב״כ התובעים ניסתה לדלות לדלות מגב׳ רון אישור לקיומן של העדפות שונות שניתנו לבנים
23  ממשיכים בבזק (אבי המנוח היה בזמנו עובד בזק), אולם היא הבהירה, כי אין עדיפות במתן
24  קביעות לבנים ממשיכים (עמ׳ 579 שורות 26-28), כפי שאף העידה גב׳ אירית גר מור –
25  מנהלת מחלקת יחסי עבודה, שהסבירה שיתכן קיצור זמנים מסויים לבן ממשיך, אולם לא
26  ניתנה לו כל עדיפות בקבלת תפקיד מסויים (עמ׳ 598).
27
28  מעדותה של גב׳ רון עלה, כי הנסיון להעריך את שאלת קביעותו העתידית של התובע הינו
29  מאוד מאוד תיאורטי, שכן הוברר, כי רק בשנת 2011 החלה בזק להעביר עובדים זמניים
30  למעמד של עובדי קבע, ודוק: מדובר בעובדים שהחלו עבודתם בבזק לפני המנוח, בפברואר
31  2001 (עמ׳ 584).
32
33  מעדותה של גב׳ רון וכן מעדותו של גב׳ נגר מור עלה בבירור, כי אין כל אפשרות, אפילו
34  תיאורטית, לנסות ולשרטט את מסלול קידומו של המנוח בבזק, ונסיונה של ב״כ התובעים

SHATSKY-006802



בית המשפט המחוזי בתל אביב - יפו

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1  לנסות ולהוכיח את הפסדי המנוח, לרבות את ערכן של המתנות לחג שניתנו לעובדי בזק,
2  הינה ירידה לרזולוציות בלתי אפשריות. ודוק: במועד הרצאון עבד המנוח כעובד ארעי בבזק
3  במשך 11 חודשים בלבד, ונסיונה של ב"כ התובעים להוכיח מסלול קידום וואי ובטוח נדון
4  לכשלון, מה עוד, שמדבריה של גב' נגר מור עלה שביק מפטרת עובדים אשר מפרים את
5  הוראותיה , או נתפסים באי אמירת אמת (עמ' 614), ובעניין אשר לפניי, אין כל חולק, כי
6  המנוח העביר לבזק בעקרו של יום הרצח דיווח בלתי מדוייק, כאשר דיווח למוקד בזק על
7  כניסתו לבקעה אל גרבייה עם המאבטח, בהסתירו את העובדה שהמאבטח נכנס לבקעה אל
8  גרבייה ברכבו הפרטי ולא ברכב בזק. על דברים כגון דא העידה גב' נגר מור **"על דיווחים**
9  **כוזבים אנשים הולכים הביתה".**
10
11  נוכח כל האמור, ובשל חוסר האפשרות לקבוע שהמנוח היה נשאר עובד בזק עד הגיעו לגיל
12  67, או שהיה מתקדם בתפקידו מעבר לתפקיד של טכנאי, בעיקר בהתחשב בעובדה שבמועד
13  הרצחו היה המנוח עובד בזק במשך 11 חודשים בלבד, הנני בדעה, כי יש לחשב את הפסדי
14  הכנסתו מיום הרצחו ועד מועד מתן פסק הדין על פי הכנסתו המוכחת בסך של 6,605 ₪,
15  כערכה לתאריך היום.
16
17  עם זאת, נוכח כישוריו והשכלתו של המנוח, כפי שמפורט בתצהירו של אחיו – רונן מנטין,
18  אין לי כל ספק, שבשלב מסויים היה המנוח משתכר לפחות בגובה השכר הממוצע במשק,
19  (אם בבזק, או מחוצה לה) ואשר על כן, יש לחשב את הפסדיו מתאריך פסק הדין ועד הגיעו
20  לגיל 67, על פי השכר הממוצע במשק, בסך של 8,837 ₪.
21
22  במאמר מוסגר אציין, כי במרבית התביעות המוגשות בעילה נזיקית עוסק בית המשפט
23  בניחוש ובנבואה בהתייחס לעתידו המקצועי ורמת הכנסתו של הנפגע. ישנם מקרים, בהם
24  קל יותר להעריך את קידומו של הנפגע לולא פגיעתו, וישנם מקרים בהם קשה הדבר, ואף
25  בלתי אפשרי למעשה, כמו המקרה אשר לפניי. ודוק: המנוח עבד בבזק מטעם לילית במשך
26  שש שנים עד שהתקבל כעובד בזק. לא הובהר, וממילא לא הוכח מדוע לא הפך המנוח לעובד
27  בזק בתאריך מוקדם יותר, אולם אין ספק שלא ניתן לבנות מגדלים באוויר בהתייחס
28  לעתידו המקצועי של המנוח בבזק, ומן הראוי להשתמש בנתונים אובייקטיביים ומקובלים,
29  אשר קרוב לוודאי שהינם קרובים למציאות, וממילא אינם מקפחים איש מבעלי הדין.
30
31  אשר על כן, יש לחשב את הפסדי ההכנסה של המנוח באופן כדלקמן:
32
33  א.   6,605 ₪ (הכנסתו המשוערכת של המנוח לתאריך היום) X 117 חודשים ) (ממועד
34  הרצח ועד לתאריך פסק הדין) = 772,785 ₪, בצירוף ריבית מאמצע התקופה בסך

81 מתוך 90

SHATSKY-006803



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

1    של <u>66,905</u> ש"ח, ובסה"כ <u>839,690</u> ש"ח.

2

3

4    ב.   מתאריך היום עד הגיע המנוח לגיל 67, <u>8,837</u> ש"ח (השכר הממוצע במשק) X

5    <u>210.8765</u> (מקדם היוון למשך <u>25</u> שנים) =סך של <u>1,863,516</u> ש"ח.

6

7    נוכח האמור, הפסדי ההשתכרות של המנוח הינם בשיעור <u>2,703,206</u> ש"ח.

8

9    68.   <u>אובדן פנסיה</u> – התובעת ערכה חישוב בראש נזק זה, על פי כפל השכר הממוצע במשק, אלא

10   שכפי שפרטתי, אינני מקבלת את חישוב השכר שפורט בסיכומיה של ב"כ התובעים.

11

12   הנתבעים לא התייחסו לראש נזק זה בסיכומיהם, ואשר על כן, על פי עקרון החישוב המופיע

13   בסיכומי התובעים, יש לקחת בחשבון 70% משכרו הצפוי של המנוח עובר לפרישתו, ועל כן

14   ייערך החשבון באופן הבא:

15

16   70% <u>8,837</u>X ש"ח (שכרו של המנוח) =<u>6186</u> X <u>0.47</u> כפול היוון (מקדם) <u>129.0454</u>X) =

17   <u>375,183</u> ש"ח.

18

19   69.   <u>אובדן קיצבת זיקנה</u> – אלמלא האירוע המצער, היה המנוח זכאי לקצבת זקנה החל מהגיעו

20   לגיל 70 ועד תום תוחלת חייו, בגיל 80 לפי נתוני הלשכה המרכזית לסטטיסטיקה, קרי:

21   למשך 11 שנים.

22

23   הנתבעים לא התייחסו בסיכומיהם לחישוב התובעים, ומשכך, אינם מתנגדים לחישוב

24   המוצע, ואשר על כן, הנני מקבלת אותו ומעמידה את ההפסד בגין ראש נזק זה על סך של

25   <u>62,201</u> ש"ח.

26

27   70.   מהאמור עולה, כי שווי סך כל הפסדי ההכנסה של המנוח הינו בסך של <u>3,140,590</u> ש"ח,

28   ובהתאם לעקרונות שהותוו בע"א 1400/00 **עזבון המנוח מיכאל אטינגר ז"ל נ' החברה**

29   **לשיקום ופיתוח הרובע היהודי,** פורסם בנבו, (להלן: **"הלכת אטינגר"**), זכאי העזבון לפיצוי

30   בשיעור החסכון שהיה צובר המנוח במהלך חייו בשיעור של 30%, ואשר על כן זכאי העזבון

31   לפיצוי בסך של <u>942,177</u> ש"ח.

32

82 מתוך 90

SHATSKY-006804



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

<table>
<tr><td>71.</td><td>

<u>כאב וסבל וקיצור תוחלת חיים</u> – מעדותו של בן נעים עולה, כי המנוח לא נפטר באופן מיידי   1
כתוצאה מהירי שספג. בהודעתו במשטרה  מסר בן  נעים, שבתום המרדף – המוצלח –   2
לאחר המחבל, הוא חזר לרכב  בו  ישב המנוח, ולדבריו ״**שמעתי שעמוס היה מחרחר**״.   3
(הודעה מס׳ 2 גליון מס׳ 8 שורה 13, ת/17), אם כי על פי עדותו של אוני דביר (עמ׳ 481) נראה   4
כי המנוח נפטר דקות ספורות מאד לאחר שנורה.   5

  6

במאמר מוסגר אציין, כי התנהגות צוות האמבולנס של וואן, כפי שבאה לידי ביטוי בעדותו   7
של אוני דביר (עמ׳ 482) מגעת לכדי חילול כבודו של המנוח, אולם וואן אינה נתבעת בתיק   8
זה ולא ניתן לבוא עימה  חשבון על התייחסותה למנוח.   9

  10

המנוח, בן 31 במותו מצא את מותו בגיל צעיר ובנסיבות טראגיות, ואשר על כן הנני בדעה,   11
כי העזבון זכאי לפיצוי בסך <u>1,000,000</u> ₪ בגין הכאב והסבל ובגין קיצור תוחלת חייו של   12
המנוח.   13

  14
</td></tr>
</table>

<table>
<tr><td>72.</td><td>

<u>אובדן שירותי בן</u> – אודה, כי אינני מכירה ראש נזק הידוע  בפסיקה כאובדן  שירותי בן,   15
ונראה, כי סעיף זה בא להצדיק את תביעת התובעת כתלויה, אלא שתביעה זו לא הוכחה.   16
ודוק: אין לי כל ספק, שעם קבלת ההודעה על הרצחו של המנוח ונסיבות מותו, חרב על אמו   17
עולמה. מדובר באסון כבד ובלתי נתפס, המותיר אחריו שובל של כאב שלעולם לא יפוג, אלא   18
שאין בין כאב נוראי זה של אם על מות בנה, לבין המסקנה בדבר היותה תלויה בו, דבר וחצי   19
דבר.   20

  21

זאת ועוד. הנני מצרה מאוד על שהנני נדרשת להעריך את עדותה של האם – גב׳ אינג ניצה   22
מנטין, שכן עדותה הייתה מגמתית מאוד, וחבל.   23

  24

בתצהירה (סע׳ 15) טענה גב׳ מנטין, כי היא מתגוררת עם בעלה ״**אך מזה שנים לא הסתדרנו   25
ובני ז״ל היה המושיע שלי, איש סודי**״. גב׳ מנטין אף טענה בתצהירה, כי המנוח נהג   26
להסייע לסידורירה ברכב שבוק העמידה לרשותו (סע׳ 13) וכי תמך בה ״**כספית ודאג לכל   27
מחסורי, היית ובעלי לא נתן כסף למחייה ו/או לכל דבר אחר משך כל השנים. בני המנוח   28
אף תמך באה הקטן טלאור**״ (סע׳ 23).   29

  30

כאשר להכנסתה, טענה גב׳ מנטין בתצהירה, כי משנת 1990 ועד שנת 2000 עבדה כמנקה   31
בבנק מזרחי כעובדת חברת כח אדם והשתכרה סך של 1,700 ₪ לחודש, ולאחר שפוטרה   32
עקב פרוקה של החברה, עבדה בעבודות משק בית שלוש פעמים בשבוע במשך חמש שעות כל   33
</td></tr>
</table>

SHATSKY-006805



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 1047-04 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת בע״מ ואח׳

|    |    |
|---|---|
| 1 | פעם, והשתכרה סך 140 ₪ ליום. עוד הצהירה גב׳ מנטין, כי מאז הרצח איננה עובדת (סע׳ 22 |
| 2 | לתצהיר). |
| 3 | |
| 4 | מהתצהיר ומצו הירושה עלה, כי גב׳ מנטין הינה יורשתו היחידה של המנוח, וכי אביו |
| 5 | הסתלק מירושת המנוח, אולם לא ניתן לעובדה זו כל הסבר המניח את הדעת. |
| 6 | |
| 7 | מהתצהיר ומעדותה של גב׳ מנטין עלה, כי היא ובעלה הינם הורים לארבעה ילדים נוספים |
| 8 | ילידי 1973, 1975, 1978 ו- 1986, אולם העדה טענה בחקירתה, כי בעלה מעולם לא תמך בה |
| 9 | ובילדיה **״מאז שהתחתנו״** (עמ׳ 33 שורה 7). |
| 10 | |
| 11 | לדבריה **״הוא לא השתתף בכל ההוצאות של הילדים, של כל מיני דברים, הוא השתתף** |
| 12 | **בדברים שוליים כמו לתת לחם וחלב״** (שם). |
| 13 | |
| 14 | העדה אישרה, כי היא חיה עם בעלה תחת קורת גג אחת עד עצם היום הזה, וכי היא |
| 15 | בגמלאות מזה 12 שנים. |
| 16 | |
| 17 | בהמשך העדות התברר, כי לבני הזוג חשבון בנק משותף, אליו מועברים גם כספי הפנסיה |
| 18 | של האם והן קצבת הביטוח הלאומי מהמוסד לביטוח לאומי, בהתאם <u>לחוק התגמולים</u> |
| 19 | <u>לנפגעי פעולות איבה תשל״ו -1970</u> וכן היא אישרה כי היא משתמשת בכספים מחשבון זה |
| 20 | לצורך מחיית בני המשפחה (עמ׳ 33 שורות 21-17). |
| 21 | |
| 22 | עוד התברר, כי לבני הזוג דירה משותפת בבעלותם, אשר נרכשה בסיוע כספי משכנתא |
| 23 | שנלקחה ושולמה על ידי שני בני הזוג (עמ׳ 34 שורות 12-1). |
| 24 | |
| 25 | גב׳ מנטין אישרה, כי גם כאשר בעלה עבד בבזק, נכנסה משכורתו **״לחשבון משותף״** (עמ׳ |
| 26 | 34 שורה 28), אם כי חזרה בה וטענה, כי רק כספי הפנסיה נכנסים לחשבון משותף, ואילו |
| 27 | כספי משכורתו נכנסו לחשבון נפרד, אולם **״הוא עשה לי שיקים שיכולתי לחתום** |
| 28 | **עליהם...״** (עמ׳ 35 שורה 4). נוכח האמור, אך טבעי הוא שגב׳ מנטין אישרה שבמהלך כל |
| 29 | שנות נישואיהם התקיימה התקיימה המשפחה הן מהכנסת בעלה והן מכנסתה היא (עמ׳ 35 שורה 7), |
| 30 | אם כי לדבריה **״הוא לא תמך בי״** (עמ׳ 35 שורה 7), דבר שאילץ אותה לעבוד קשה ולקחת |
| 31 | הלוואות, וזאת משום שבעלה השתתף בהוצאות משק הבית **״בדברים שוליים שישלם,** |
| 32 | **חשמל...״** (עמ׳ 35 שורות 10-7), למרות שהיא אישרה כי המשפחה התקיימה הן מהכנסת |
| 33 | בעלה והן מהכנסתה היא (עמ׳ 35 שורות 12-11). |
| 34 | |

SHATSKY-006806



**בית המשפט המחזי בתל אביב - יפו**

ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

1    בהמשך הודתה העדה, כי גם כיום "**הוא נותן לי כסף שאכניס לחשבון שלי...**" (עמ' 35
2    שורות 16-19) וכן הודתה, כי בעלה משלם את חשבונות המים, הארנונה והחשמל, (עמ' 37
3    שורות 29-30).
4
5    מעדות זו עולה, כי הנסיון לצייר את אבי המשפחה כמי שאינו תומך בה, כשל, ואין כל ספק
6    שבני הזוג מתקיימים מהכנסתם המשותפת הן בתקופה שלפני הרצח והן בתקופה שלאחריו.
7    במאמר מוסגר יצויין, כי אבי המשפחה לא הובא לעדות, ונראה כי לא בכדי.
8
9    באשר לתמיכתו הנטענת של המנוח באמו – טענה זו לא הוכחה.
10
11    התובעת לא צרפה תדפיס מחשבון בנק, אשר ממנו היה ניתן ללמוד על קיומה של תמיכה
12    בה, ולמעשה לא צרפה כל מסמך התומך בטענתה.
13
14    זאת ועוד. מדברי גב' מנטין עלה, שהמנוח שכר דירה לעצמו ודירה, ואף מימן את הוצאותיה,
15    כגון שכר דירה וחשבונות שוטפים, ועל כן ברור, כי נוכח גובה משכורתו המוכח, לא יכול
16    היה לתמוך באמו, אף לו רצה לעשות כן.
17
18    אמנם לדברי האם, שכר המנוח את הדירה זמן קצר קודם להרצחו, ועד אז התגורר בבית
19    המשפחה, אלא שמטעמים השמורים עמה, היא לא צרפה מסמך כלשהו לאימות דבריה לגבי
20    מועד שכירת הדירה, וכי', דבר הפועל לחובתה.
21
22    גב' מנטין מבקשת מבית המשפט להסיק את עובדת תמיכתו של בנה המנוח בה מכך שלאחר
23    מותו התגלה, כי בחשבון המנוח היו רק 1,500 ₪. לדבריה נשארו בחשבון סכום כה זעום,
24    שכן מרבית הכנסתו שימשה לעזור לאמו. לדבריה "**אם לא היה עוזר לי הייתה לו בוחטה**
25    **של כסף...**" (עמ' 38 שורה 27), אלא שלא רק שלא צורף מסמך המעיד על היתרה בחשבונו
26    של המנוח בעת פטירתו, אלא שאין בסכום האמור כדי לשמש ראיה לטענותיה של גב'
27    מנטין, וכאמור, טענתה של גב' מנטין בדבר היותה תלויה בבנה לא הוכחה.
28
29    מעבר לצורך אציין – כ גם אחי המנוח – רונן מנטין – העיד, בין היתר לגבי ההתנהלות
30    הכספית בבית הוריו, אולם עדותו עמדה בסתירה מוחלטת לעיקרי עדותה של אמו, וניכרו
31    המאמץ והמגמה להוכיח באופן מלאכותי את תלותה של האם בבנה המנוח, מה עוד,
32    שמעדות האם עלה שבנה רונן נשוי מאז שנת 99 (עמ' 46) ואינו מתגורר עם ההורים, או
33    בקרבתם, כך שאינו יכול לדעת מידיעה אישית האם נתמכה אמו על ידי אחיו המנוח.
34

SHATSKY–006807



**בית המשפט המחוזי בתל אביב - יפו**

**ת"א 04-1047 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת בע"מ ואח'**

| | |
|---|---|
| 1 | ויובהר: אין לי ספק שהמנוח היה בן טוב וקשור מאוד לאמו, ומן הסתם סייע לה בהסעות |
| 2 | או בעניינים אחרים, ואני מוכנה אף לצאת מהנחה שלעיתים אף סייע לה כספית – למרות |
| 3 | שסיוע זה לא הוכח – אולם אין גם ספק, וממילא לא הוכח אחרת, שסיועו של המנוח לאמו |
| 4 | לא חרג ממסגרת של סיוע רגיל שניתן לעיתים להורים על ידי ילדיהם, ואשר על כן הנני |
| 5 | דוחה את הטענה בדבר היות התובעת תלויה במנוח. |
| 6 | |
| 7 | 73.   **עזרת צד ג'** - עתירה זו תמוהה. לא נטען, וממילא לא הוכח, כי המנוח ביצע את עבודות |
| 8 | הבית בבית אמו, ואשר על כן, לא ברור על סמך  מה הועלתה תביעה זו. |
| 9 | |
| 10 | זאת ועוד. יוזכר, כי אבי המשפחה זה העיד, דבר הפועל לחובת התובעים, שכן אילו היה |
| 11 | מובא לעדות, יתכן והיה מוכח, כי הוא מסייע לרעייתו בעבודות הבית. מכל מקום, משלא |
| 12 | נטען, וכאמור ממילא לא הוכח, כי המנוח סייע בעבודות הבית בבית אמו, הרי שלא הוכח |
| 13 | קשר סיבתי  בין מות המנוח לבין דרישתה למימון עזרת צד ג' מהנתבעים. |
| 14 | |
| 15 | 74.   **נסיעות מוגברות** – לא הוכח, כי התובעת נזקקה לנסיעות מוגברות עקב מות המנוח. ודוק: |
| 16 | הנני מקבלת כעובדה את הטענה שלעיתים הסיע המנוח את אמו, אלא מאי? אין לשכוח, כי |
| 17 | המנוח עבד במשך מרבית שעות היום וממילא לא היה נוכח בבית אמו, ועל כן לא יכול היה |
| 18 | לסייע לאמו במהלך שעות היום, ומשכך הנני דוחה עתירה זו. |
| 19 | |
| 20 | זאת ועוד. האח – רונן מנטין אישר בחקירתו, כי לאחר הרצח קיבלו הוריו הלוואה מהמוסד |
| 21 | לביטוח לאומי לצורך רכישת רכב, ואף רכשו בכסף זה רכב **"ומי שלוקח אותם ברכב זה** |
| 22 | **אחי הקטן"** (עמ' 115 שורות 9-13). קרי: המשפחה הינה בעלת רכב הנמצא בשימוש הבן |
| 23 | הצעיר, אשר מסיע את הוריו על פי הצורך. ודוק: לפני הרצח לא היה בבעלות המשפחה רכב. |
| 24 | |
| 25 | 75.   **אובדן השתכרות התובעת 2** – התובעת טוענת, כי עובר למות בנה עבדה במשק בית שלוש |
| 26 | פעמים בשבוע, ומאז מותו חדלה לעבוד, אלא שהיא לא הוכיחה הן את הכנסתה בתקופה |
| 27 | שלפני הרצח, וממילא לא הרימה את הנטל המוטל עליה להוכחת הסיבה להפסקת עבודתה. |
| 28 | |
| 29 | לא זו אף זו. בהתאם לפסק הדין ברע"א 444/87 **אלסוחה נ' עזבון המנוח דוד דהאן ז"ל,** |
| 30 | (פ"ד מד (3) 397) (להלן: **"הילכת אלסוחה"**) ופסקי הדין שבאו בעקבותיו, אין לתובעת עילה |
| 31 | עצמאית לתביעת פיצוי בגין אובדן השתכרות, מה עוד שלא נטען, וממילא לא הוכחה קיומה |
| 32 | של נכות כלשהי בתחום הנפשי. |
| 33 | |

SHATSKY—006808



**בית המשפט המחוזי בתל אביב - יפו**

ת״א 04-1047 עזבון המנוח מנטין עמית עמוס ואח׳ נ׳ בזק החברה הישראלית לתקשורת
בע״מ ואח׳

1  ודוק: כפי שהבהרתי, אין לי כל ספק בדבר צערה העמוק והקשה של התובעת בגין מות בנה,
2  והנסיבות הכרוכות במותו, אלא שאין בצער זה, קשה ככל שיהיה כדי לזכות את התובעת
3  בפיצוי במסגרת עילת תביעה עצמאית, אלא אם הוכח, כי היא סובלת מנזק נפשי משמעותי
4  כתוצאה ממות בנה, דבר שלא הוכח כאמור במקרה אשר בפני.
5

76.  **הוצאות בגין מצבה ושבעה** – צודק ב״כ בזק בטענה, כי מן הראוי היה שלא לחזור במסגרת
7  הסיכומים על העתירה לפיצוי בגין הוצאות השבעה, שעה שהתובעת הודתה בחקירתה, כי
8  בזק מימנה את כל ההוצאות במהלך השבעה ולרגל ציון 30 למותו של המנוח, לרבות
9  **״קייטרינג של השבעה, של החודש, לגבי השכרת כסאות ושולחנות... הביאו ועשו הכל**
10  **בעצמם...״** (עמ׳ 41 שורות 23-26). ודוק: לא הוצגו קבלות המעידות על הוצאות נוספות,
11  ומשכך אין מנוס מהמסקנה, כי והטענה בסע׳ 78 לתצהירו של האח – רונן מנטין הועלתה על
12  דרך הסתם וללא כל ביסוס.
13

14  באשר למצבה, העידה התובעת כי המצבה מומנה ״**חלק בזק וחלק ביטוח לאומי והשאר**
15  **אנחנו״** (עמ׳ 42 שורה 3).
16

17  מהמסמכים שהוגשו על ידי התובעים עולה, כי עלות המצבה הייתה בסך של 12,000 ₪,
18  כאשר לא הוברר כמה מסכום זה שולם על ידי התובעת עצמה.
19

20  עם זאת, ולמען הזהירות, הנני מוצאת לנכון להעניק לתובעים פיצוי בסך <u>2,000 ₪</u>.
21

77.  <u>פיצויים עונשיים בהתייחס לנתבעים 7 ו- 8</u> – צודקים התובעים בטענתם, כי ״**המנוח נרצח**
23  **עקב מעשה טרור נפשע, זדוני ורצחני״** (סע׳ 52 לסיכומי התובעים, אולם המעשה עצמו
24  בוצע על ידי המחבל – שאינו בעל דין בתובענה זו – ולא נקבע כי מעשי המחבל הינם מעשי
25  הרש״פ, אם כי נקבע, כי התובעים הוכיחו ברמת ההסתברות הנדרשת את הקשר  הסיבתי
26  בין התנהלות הרש״פ לבין מעשהו הנפשע של המחבל, ומשכך, איננו סבורה, כי יש להטיל על
27  הרש״פ פיצויים עונשיים.
28
29
30
31
32
33
34

SHATSKY-006809



**בית המשפט המחוזי בתל אביב - יפו**

ת"א 1047-04 עזבון המנוח מנטין עמית עמוס ואח' נ' בזק החברה הישראלית לתקשורת
בע"מ ואח'

| | |
|---|---|
| **קצבאות המוסד לביטוח לאומי** | 1 |
| | 2 |
| 78. סע' 17(ב) לחוק התגמולים לנפגעי פעולות איבה, תש"ל -1970 (להלן: "חוק התגמולים") | 3 |
| קובע: | 4 |
| | 5 |
| "(ב) זכאי עקב מאורע אחד לתגמול לפי חוק זה ולפיצויים לפי פקודת | 6 |
| הנזיקין [ נוסח חדש], או לפי חוק פיצויים לנפגעי תאונות דרכים, | 7 |
| התשל"ה – 1975, יחולו עליו בשינויים המחוייבים הוראות סע' 36 | 8 |
| לחוק הנכים, או סעיף 21 לחוק משפחות חיילים, לפי העניין". | 9 |
| | 10 |
| מטרתו של הסדר זה, אשר אליו מפנה חוק התגמולים היא למנוע "כפל פיצוי", והוא מסדיר | 11 |
| את הדרך בה על התובע לילך במקרה בו הוא זכאי לפיצוי הן לפי חוק התגמולים והן לפי | 12 |
| "חוק אחר", ובענייננו – פקודת הנזיקין. | 13 |
| | 14 |
| עיקריו של ההסדר הם כדלקמן: | 15 |
| | 16 |
| א. הזכאי לפיצוי רשאי לנקוט בהליכים משפטיים במקביל הן כנגד המוסד לביטוח | 17 |
| לאומי והן כנגד המזיק, במסגרת תביעה משפטית אחת לפי פק' הנזיקין, אולם הוא אינו | 18 |
| רשאי לגבות את הפיצוי משניהם. | 19 |
| | 20 |
| ב. אם בחר הזכאי במסלול של קבלת תגמולים מהמדינה, בהתאם לחוק התגמולים, | 21 |
| זכאית המדינה להגיש תביעת שיבוב כנגד המזיק בגין הסכומים המשולמים על ידה | 22 |
| לניזוק. | 23 |
| | 24 |
| ג. אם שולמו לניזוק פיצויים מהמזיק, הוא אינו זכאי עוד להטבות מהמדינה (במקרה | 25 |
| שלנו – על פי חוק התגמולים לנפגעי פעולות איבה), ואם קיבל תגמולים מהמדינה, | 26 |
| עליו להחזיר לה את כל התגמולים שקיבל. | 27 |
| | 28 |
| 79. ב"כ קבוצת בוק טוען, כי יש לדחות את התביעה על הסף, שכן התובענה מקבלת מהמדינה | 29 |
| תגמולים חודשיים על פי חוק התגמולים, אשר ערכם המהוון לעבר ולעתיד הינו בסך של כ- | 30 |
| 2,200,000 ₪, אלא שהוא נתפס לכלל טעות, ואבאר. | 31 |
| | 32 |
| ב"כ קבוצת בוק מסתמך בטיעוניו על פסק הדין בע"א 399/81 יפה טימסוד נ' לויס קטרינג | 33 |
| **תעשיית ארוחות בע"מ** (פ"ד לו (3) 686) (להלן: "**פרשת טימסוד**") ממנו עולה, כי הסכמתה | 34 |

88 מתוך 90