**LOWELL DECL. EX. 35**

Date: 28 Kislev 5768                                                     File Number: 2958/06
25 December 2008

## The Military Court in Judea

**Before the Honorable President: Lieutenant Colonel Zvi Lekah**
**Judge:  Major Menachem Lieberman**
**Judge:  Major Amir Dahan**

**The Military Prosecutor**

(<u>Represented </u>by Captain Meital Zrihan)

-v-

**The Defendant: Ahmed Sadat Yousef Abed Alrasoul, Identity No. 965056138/** Israel Prison
Service

(Represented by Counsel, Adv. Mahmoud Hassan)

---

# <u>Verdict</u>

**<u>Honorable Judge Major Amir Dahan</u>**

The Defendant, Ahmed Sadat Abed Alrasoul, a resident of Al-Bireh, was prosecuted pursuant to
the indictment that was filed with this Court on May 21, 2006.

**1.      The Indictment and the Course of the hearing.**

**1.1      <u>In the first count of the Indictment,</u>** the Defendant was accused of the offense of
membership and activity in an unlawful organization, insofar as from 1995 until his arrest on
March 14, 2006, he was a member and acted as a member in the organization "the Popular Front
for the Liberation of Palestine" (hereinafter the PFLP), which is an unlawful organization.

**1.2      <u>In the second count of the Indictment</u>**, the Defendant was accused of the offense of
holding a position in an unlawful organization, insofar as from 1995, he managed and was
responsible for the PFLP in Jericho.

**1.3      <u>In the third count of the Indictment</u>** the Defendant was accused of the offense of
holding a position in an unlawful organization insofar as he was responsible for the PFLP in
Ramallah during the years 1999-2001. In this position, the Defendant was responsible for both
the organizational and military activity in the PFLP.

-1-                          [Stamp] SHATSKY-006501

Date: 28 Kislev 5768                                              File Number: 2958/06
25 December 2008

**1.4     In the fourth, fifth and sixth counts of the indictment**, the Defendant was accused of two counts of conspiring to intentionally cause death and one count of conspiring to throw a Molotov cocktail. Under these charges, the Defendant is accused of being the person whom three PFLP military operatives approached to request the approval of the PFLP for the execution of the following attacks:

- The stabbing of a Jewish woman who was married to an Abu Dis resident.

- The throwing of a Molotov Cocktail at the automobile of a Christian priest who was suspected by them of sexually molesting teenage boys.

- The detonation of an explosive device at Café Rimon in Jerusalem – the assistance of the Defendant was requested for this attack too.

- The detonation of an explosive device at an entertainment establishment in Talpiot in Jerusalem.

Several days later, the Defendant allegedly made a telephone call to the cell members in which he told them that the PFLP had no objections in principle to carrying out the plans, but instructed them to wait until after the organization's conference that was scheduled for about a month and a half later.

Regarding the plan to attack the place of entertainment in Talpiot, the Defendant was accused of notifying one of the cell members – in response to the other cell member's question – that the attack was not approved.

According to the indictment, the three operatives, Haitham, Mohamed and Maher, were arrested during September 1999 and therefore the planned attacks were never actually executed.

**1.5     In the seventh count of the Indictment**, the Defendant was accused of trading in war materiel insofar as he allegedly requested and received a Mini-Uzi submachine gun from Haitham Abidat.

**1.6     In the eighth count of the Indictment**, The Defendant was accused of conspiring to commit armed robbery:

According to the indictment, the members of the cell described in the fourth count planned the robbery of a banking institution and the stolen money, which the cell estimated to be approximately $200,000, was to be transferred to the Popular Front for the Liberation of Palestine.

[Stamp] SHATSKY-006502

2

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

The members of the cell approached the Defendant, told him of their plan and requested the assistance of the Popular Front for the Liberation of Palestine in the execution of the robbery, in the form of supplying a vehicle and two pistols for the execution of the robbery.

The Defendant allegedly heard of the cell's plans, agreed to the commission of the robbery, and also agreed to assist them by supplying them with two pistols and a vehicle, which they would use for the commission of the robbery.

-2-

[Stamp] SHATSKY-006502 [continued]

Date: 28 Kislev 5768                                  File Number: 2958/06
25 December 2008

Several days later, the cell members traveled to meet the Defendant in Ramallah to take delivery of the weapons and the vehicle, and were arrested on their way to him.

**1.7   In the ninth count of the Indictment**, the Defendant was accused of the offense of performance of a service for an unlawful organization. According to the indictment, a number of persons arrived at the offices of the PFLP and requested that the Defendant perform "military" terrorist activity on behalf of the organization – the Defendant allegedly instructed those present not to talk about this subject in the offices of the PFLP; in addition, he told those present that a meeting would be set up in another location and at that meeting they would discuss the subject of the "military" terrorist activities of those present.

A week later, Mohamed Al-Ghoul and Khaled Halabi met with the Defendant and with other operatives and described to him their wish to become operatives engaging in "military" terrorist activity. The Defendant allegedly said that he would look into the matter and notify each one personally of his response regarding the "military" terrorist activity.

Some time later, one of the operatives who had been present at the meeting and had requested to perform "military" terrorist activity was invited to a meeting at which the planning of the attacks was to be explained. The operative met an anonymous person who told him that the Popular Front for the Liberation of Palestine was interested in carrying out military activity and kidnapping soldiers for bargaining purposes. The anonymous person dealt with training the cell members in the use of weapons, requested to attach a silencer to a submachine gun, supplied a pistol for the training and together with the cell, planned the kidnapping of soldiers and various other attacks – at the level of initial planning. Additionally, the anonymous person, together with the cell members, committed various other acts involving preparation, conspiracy and assistance, all with the intent of carrying out terrorist activity.

**1.8   In the tenth count of the Indictment**, the Defendant was accused of conspiring to intentionally cause death, under the following circumstances.

During August-September 2000, Mohamed Khalil Al-Ghoul arrived at the PFLP offices, met the Defendant, and requested that the Defendant recruit him into the organization for the purpose of "military activity." The Defendant allegedly rejected the request outright. The two met again, the subject was raised again and the Defendant refused to discuss it.

Following that, the Defendant allegedly approached Mohamed and told him that if he wanted to take part in "military activity" on behalf of the Popular Front for the Liberation of Palestine, he was to come to the Clock Square in Ramallah the next day at 2:00 p.m., where he would meet a man holding a string of red beads.

-3-                       [Stamp] SHATSKY-006503

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

Mohamed Al-Ghoul did as he was requested, and there was rejected for a third time by another person, and as a result, for a period of time, involved himself in terrorist activity that was not related to the Defendant.

The Defendant allegedly met again with Mohamed Al-Ghoul and discussed with him hostile terrorist activity. Following this conversation, Mohamed Al-Ghoul met an anonymous person who discussed with him the execution of hostile terrorist activity on behalf of the organization.

In accordance with this arrangement, Mohamed Al-Ghoul and his accomplices carried out planning and observation of various locations with the intention of committing attacks on them. During the period of his activity, Mohamed became the person responsible for Northeast Jerusalem on behalf of the Popular Front for the Liberation of Palestine.

**1.9      In the eleventh count of the Indictment**, the Defendant was accused of the performance of a service for an unlawful organization insofar as he was present at and supervised the Conference of the PFLP for the Jerusalem district

**1.10    In the twelfth count of the Indictment**, the Defendant was accused of the performance of a service for an unlawful organization based on the following facts:

The Defendant was allegedly approached by a PFLP operative who contended that his associates suspected him of cooperating with the Israeli authorities. This operative requested that he check for the existence of written records regarding this in the PFLP records. The Defendant allegedly looked into the matter and answered the person who had approached him that there indeed was negative material about him in the organization's records as he had asked about.

**1.11    In the thirteenth count of the Indictment**, the Defendant was accused of the offense of holding a position in an unlawful organization insofar as during the period from August 2001 until his arrest on March 14, 2006, he held the position of Secretary-General of the Popular Front for the Liberation of Palestine in the Area and elsewhere.

The Defendant allegedly continued to receive people and to fulfill all aspects of the position, even when he was imprisoned in the prison of the Palestinian Authority.

**1.12    In the fourteenth count of the Indictment**, the Defendant was accused of the offense of incitement, insofar as during the month of October 2001 he held a rally of the PFLP marking the 40th day of the death of Abu Ali Mustafa, his predecessor as Secretary-General of the PFLP.

In a speech at this rally, the Defendant allegedly called for the crowd to avenge Abu Ali Mustafa's death at the hands of the Israeli security services.

-4-                                    [Stamp] SHATSKY-006504

Date: 28 Kislev 5768                                              File Number: 2958/06
25 December 2008

**1.13    In the fifteenth count of the Indictment** the Defendant was accused of the offense of performance of a service for an unlawful organization insofar as he conversed with Mutzab Abdal Mahmoud, who at the time was head of the PFLP at the A-Najjah University, and with Aahed Ghulma, the head of the military branch of the PFLP, regarding activity within the organization's framework. During these conversations, Mutzab asked the Defendant and Aahed for money for the organization's activity.

After these requests were, Mussa Salameh, the senior PFLP operative in Nablus, would transfer the money to Mutzab.

**1.14    In the sixteenth count of the Indictment.** the Defendant was accused of the offense of performance of a service for an unlawful organization, insofar as in 2002, he approached Hassan Mohamed Ahmed Fetafeta, who had visited him in the Ramallah prison, and asked him to resume his activity in the PFLP organization and undertake the job of responsibility for the organization's activities in the Ramallah area, recruit people for PLFP operations and make contact with a PFLP operative engaging in terrorism named George Kurat.

The Defendant allegedly decided with Hassan regarding the transfer of funds for purposes of the desired activity and parallel activity in Nablus through a person named Kamil Abu-Hanish.

Hassan carried out the Defendant's instructions and served as a military commander for the PFLP in the area of Ramallah, was involved in extensive terrorist activity and was active in carrying out various attacks with the aim of causing the deaths of Israel Defense Forces officers and soldiers, various security personnel, senior officials and officers of the Israel Police and citizens of the State of Israel, including advanced planning of attacks at the Jerusalem Central Bus Station.

As agreed upon with the Defendant, Hassan later received various sums of money every two months in the said bank account, part of which he transferred to the organization in Nablus.

Kamil Abu Hanish received funds that he used for military activity of the PFLP, for assisting operatives, for expenses in actual attacks – including those that resulted in death.

Additionally, on numerous occasions, Hassan transferred sums of money to a person named Aahed Husia, a wanted PFLP operative.

Under the Defendant's orders, Hassan spoke to George Kurat, recruited him for military activity in the PFLP, and used him to gather information for carrying out attacks against Israel Defense Forces  and police officers as well as against the then Mayor of Jerusalem– Ehud Olmert.

[Stamp] SHATSKY-006505

Date: 28 Kislev 5768                                               File Number: 2958/06
25 December 2008

He also conspired and planned together with them to execute the attacks.

Hassan recruited additional people for activity and conspired with them to carry out serious offenses and cultivated relationships with members of other organizations and other areas in order to carry out joint attacks.

-5-

[Stamp] SHATSKY-006505 [continued]

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

**1.15   In the seventeenth count of the Indictment**, the Defendant was accused of the offense of performance of a service for an unlawful organization, insofar as he held discussions with three of his visitors at Jericho Prison, Ali Jamal Hassan Atallah, Mohamed Abidat and Hasin Neirat – PFLP operatives from Abu Dis – regarding activities of the PFLP. During the discussion, the three presented the Defendant with a report on the organization's activities in Abu Dis. In addition, the three asked the Defendant for paint canisters for spraying slogans for the organization and pictures of PFLP martyrs for purposes of continuing the organization's operations in Abu Dis.

**1.16   In the eighteenth count of the Indictment**, the Defendant was accused of the offense of performance of a service for an unlawful organization, insofar as he determined that the PFLP candidate in the future general elections would be Mustafa Barghouti.

**1.17   In the nineteenth count of the Indictment**, the Defendant was accused of the offense of performance of a service for an unlawful organization, insofar as in May 2004, he met Wisam Tzubahi Abdel Hamid al-Aza at Jericho Prison, and the latter asked the Defendant for assistance for a PFLP military operative by the name of Wa'el Khalil Atallah who was wanted by Israel.

During the discussion, the Defendant allegedly removed NIS 700 from his pocket and gave it to Wisam to assist the fugitive Wa'el Khalil Atallah. Afterwards, the Defendant suggested to Wisam to tell Khalil to contact PFLP operatives in Ramallah, for them to assist him in the future.

**2.     The evidence in the case and the manner in which it was managed**

**2.1**     At the outset of the trial, in a session on July 2, 2006, Adv. Mahmoud Hassan informed the Court that he was representing the Defendant. Adv. Hassan made a number of motions pertaining to investigation material, requested a copy of an agreement from the Prime Minister's Office and asked to defer the hearing until after receiving the material.

The prosecutor joined the request of Counsel for the Defendant and informed the Court that various legal questions were still being considered by the military prosecution, including questions that may lead to amendment of the indictment. The prosecutor also informed the Court that his receipt of additional investigation material was being also being considered, and if the said investigation material would be added, it would be transferred directly to defense counsel.

-6-

[Stamp] SHATSKY-006506

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

**2.2**    On June 4, 2006, a document was filed on behalf of the Defendant, bearing the title "Supplementary Arguments," in which it was claimed that there existed an agreement between the Government of Israel and the Palestinian Authority which voided the legality of the indictment against the Defendant.

**2.3**    On June 8, 2006, a certificate of confidentiality was filed in the case regarding certain pieces of information pertaining to the case.

**2.4**    On June 13, 2006, the prosecution requested an extension in order to carry out the Court's decision to transfer the additional investigation material to defense counsel.

**2.5**    On September 13, 2006, a defense motion was filed to postpone the hearing in order to give the parties an extension to deal with amendment of the indictment and the investigation material, and in light of the holiday period, a motion to defer the hearing to November 5, 2006, was made and accepted.

**2.6**    On November 5, 2006, the Defendant was not brought to the Court due to a fault on the part of the Israel Prison Service.

**2.7**    On November 9, 2006, a hearing took place. The Defendant requested not to respond to the indictment, and argued that there was an agreement between the State of Israel and the Palestinian Authority that prevents his prosecution in the Area and in Israel. The Defendant also contended that he had been in prison without trial for four years based on that same agreement.

The prosecution did not inform the Court that this version of the indictment was final as per the defense counsel's request. The defense counsel argued that the Court had no authority to try the Defendant's case, just as the commander of the Area has no legislative authority. Defense counsel also argued that his client did not view the offenses attributed to him in the indictment as a crime, argued that any powers that the regional commander had prior to the interim agreement had been transferred to the Palestinian Authority, and that there, if anywhere, was the court that was competent to try the Defendant. Defense counsel did not elaborate his arguments, but added that, as customary, he would file detailed preliminary arguments in writing with the Court; the Court determined dates for filing of arguments, the response to the arguments and a decision date.

**2.8**    On January 14, 2007, the Defendant filed his response to the indictment in writing. The response included denial of the legality of the powers of the Commander of the Judea and Samaria region, general arguments against Zionism and the occupation within the borders of the State of Israel and in the Area, and general refusal to stand trial before this Court and to stand before it as a defendant.

-7-                                          [Stamp] SHATSKY-006507

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

Regarding the accusations, the Defendant contended in the filed document that that which was set forth in the indictment was not within the realm of "security offenses", but rather of national duty, and that it made no difference whether or not that which was set forth in the indictment actually occurred or not. The Defendant contended that this national duty was within the framework of resistance to the occupation.

The Defendant elaborated in his confession that he had served as the Secretary-General of the PFLP and as such, he was fighting to end the Israeli occupation, achieve national independence and the return of his nation's refugees to their homes and their land.

The Defendant announced in writing that he was aware of the possibility that the Court would not want to hear his fundamental position and that – "it might perhaps reject it due to lack of jurisdiction – and that in the strict sense, is correct".

The Defendant noted that his right, his righteousness and logic were consistent with his actions that led to his being accused of resistance to the occupation on behalf of his people.

On this day the defense counsel informed the Court that in light of the response and the Defendant's lack of recognition of the Court, from now on his client was no longer interested in being represented, nor was he interested in the legal proceedings, and the defense counsel therefore requested to resign from this representation. Defense counsel stated that his client did not deny that he was the Secretary-General of the PFLP, and the Defendant stated that aside from his written response, he was not interested in answering anything to the Court on the matter of the indictment.

2.9     In its decision, the Court noted that it was not releasing defense counsel from his representation; and in any case, since the document filed by the Defendant did not contain a full confession regarding all the details of the indictment, he is considered as having denied the indictment. The Court announced that it was not expressing an opinion at this stage regarding the full evidential significance of the Defendant's response, including the question of whether or not this response may be considered as admission to the facts in the indictment. At the same time, the case was set to move forward to the trial stage.

2.10    From this point onward, the trial was conducted via the testimony of witnesses, while the defense abstained from cross examination of the witnesses, and after the Defendant was warned regarding the legal significance of this waiver.

[Stamp] SHATSKY-006508

Date: 28 Kislev 5768                                        File Number: 2958/06
25 December 2008

Witnesses were heard on: April 18, 2007, May 6, 2007, May 9, 2007, May 30, 2007, July 29, 2007, August 1, 2007, August 5, 2007, August 8, 2007, November 4, 2007, November 18, 2007, February 13, 2008, February 20, 2008, March 19, 2008, April 2, 2008, and May 11, 2008. The Defendant waived his defense in light of his position, after having been warned regarding the legal ramifications of this waiver.

-8-

[Stamp] SHATSKY-006508 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

**2.11**    The prosecution also took testimony from the witnesses' statement takers and their statements were filed according to Section 10a of the Evidence Ordinance (New Version) 5731-1971 after the giving of the statements was proved in the trial.

**2.12**    On May 11, 2008 the case was set to move forward to written summations and following several motions for extensions, the prosecution summations were filed in writing on August 4, 2008. The defense counsel declared that in accordance with the Defendant's position, he would not be filing summations.

**3.**    **Preliminary contentions**

**3.1**    The defense counsel chose not to assert his preliminary contentions after having announced their existence in the preliminary session and briefly informing the Court with respect of their cause.

**3.2**    The Defendant chose to make general contentions of an ideological character against the Court's jurisdiction to try any resident of the Area, or anyone at all, carrying out any act at all against Israeli rule in the Area or in the State of Israel. The Defendant, in fact, chose to deny, in principle, the Court's jurisdiction, even though he declared that he was not denying the existence of the jurisdiction in the "narrow sense". Understandably, after the Defendant took such a stand, defense counsel was also instructed not to take part in the trial, and among other things, he also relinquished his contentions of lack of jurisdiction and estoppel due to governmental promise based on the agreement between the Palestinian Authority and Israel.

**3.3**    Beyond necessity, I would say that after considering the Defendant's contentions, I have found within them allusions to arguments regarding the agreement that was supposed to be presented as evidence for the Court's consideration. **However, it was not filed as evidence in the proceeding before us**, and it is doubtful whether such an agreement even exists.

**3.4**    The result is that I have not found proof that any governmental promise, explicit or implicit, was given that the Defendant should not be tried in Israel in a civil Court or military Court, and it has not been proven to us that the Defendant has been tried in another competent Court and has served his sentence or was acquitted at his trial.

**3.5**    The preliminary arguments that were made in general terms were not set out in detail; and therefore the prosecution has not been given the right to bring or defend against evidence.

Therefore they should not be rejected by a [formal] decision, since we consider defense counsel to have agreed to the striking of the contentions, if he did not prove them with documents

-9-                                    [Stamp] SHATSKY-006509

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

that were supposed to have been filed, did not expand upon them in his summation, and did not detail them as he should have after he announced their existence in general terms.

**3.6** I recommend to my colleagues to determine that the Court has not found a legal cause to discontinue the Defendant's trial and to abstain from handing down his verdict.

**3.7** As stated, the Defendant chose to take an adversarial approach toward the Court, did not file a detailed response to the indictment, but contended rather in the filed document that he does not recognize the authority of the Court. In light of this approach, we have viewed the Defendant as having denied all the charges against him in the indictment. The prosecution has summoned all of its witnesses, conducted direct examination of all of the witnesses, however the Defendant instructed his defense counsel not to cross examine the witnesses and has not done so himself. After hearing all of the prosecution witnesses, the Defendant has chosen not to testify on behalf of the defense, and despite our warning that should he choose not to testify use could be made of his failure to testify as an addition to prosecution evidence, he has stood by this choice. The prosecution filed its summations while at the same time the Defendant chose not to sum up.

**3.8** Nonetheless, the Defendant occasionally intervened with comments to one witness or another or with "heckling" directed at either the defense counsel or the Court. We attributed the same evidentiary value to these utterances as to defendant's statements and to events taking place during a trial that are not by way of orderly testimony.

**3.9** Considering the Defendant's approach to the Court proceedings, we gave ourselves a stern warning that we must examine the prosecution's evidence, question the witnesses ourselves, all the time keeping in mind the Defendant's defense, and investigate whether the evidence could be interpreted in a way that is different from the prosecution's approach. In the event that we found that the evidence before us was insufficient to prove the offense attributed to the Defendant beyond any reasonable doubt, we would acquit him of this count, even if he did not contend that, as he did not file his summations.

**4.** <u>**First count of the indictment**</u> [Membership in the Popular Front Organization during the years 1995-2006].

<u>Key evidence</u>:

The words of the Defendant himself were the key evidence for this charge, including in his written response to the indictment, in the Defendant's statement and in his written response to the Court.

[Stamp] SHATSKY-006510

13

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

In all of this evidence, the Defendant explicitly confirms that he served as Secretary-General of the PFLP.

-10-

[Stamp] SHATSKY-006510 [continued]

Date: 28 Kislev 5768                                        File Number: 2958/06
25 December 2008

At the same time, since this count of the indictment relates to a specific timeframe, I have found it appropriate to request evidence regarding the period of membership in the PFLP.

<u>Testimony of Ahmed Hawira, his statement and the resolution between them:</u>

This is the direct quote from the witness in Court:

> **Q: In this statement on page 1 starting from line 11 you state that during the course of the first two months of 2001 you worked in the offices of the Popular Front in Ramallah.**
>
> **A: I did not work for the Front.**
>
> **Q: You further state at line 16 that Ahmed Sadat worked with you in the office. What do you have to say about that?**
>
> **A: Officially, I did not work in the office. This is a labor office for workers.**
>
> **Q: Explain what that means.**
>
> **A: It is part of the National Labor Bureau.**
>
> **Q: What do you have to say about what appears in the statement, that the Defendant also worked there?**
>
> **A: Which defendant?**
>
> **Q: There is one defendant in the courtroom. The one you spoke to earlier.**
>
> **A: I don't understand.**
>
> **Q: In the statement you say that together with you in the office, and in the statement it's written that it was that of the Popular Front, Ahmed Sadat worked with you. What do you have to say about that?**

[Stamp] SHATSKY-006511

15

> **A: I would go to the office and I am in the Popular Front. My being in the office is natural. Regarding what is written there, I don't know. It is an office for labor affairs.**
>
> **Q: What do you have to say about the fact that line 14 of the statement asserts that you were a clerk there?**
>
> **A: I was not.**
>
> **Q: What do you have to say about the fact that it is written in the statement that Ahmed Sadat worked in the office?**
>
> **A: I have no idea from where you got what is written here. It's only natural that I would go to the office.**
>
> **Q: Are you ready to answer the question? What do you have to say about the fact that the statement asserts that Ahmed Sadat worked in this office?**
>
> **A: I cannot determine whether Ahmed Sadat worked in the office, who told him to work in the office. As we said, it is a labor office. I don't know why he was there.**

And this is a quote from the witness's statement: Ahmed Mahmoud Taha Hawira's statement, page 1, lines 12-16.

> **"First and second months of 2001 I worked in the office of the Popular Front in Ramallah, every day I worked in the morning as a janitor ("*duam*"), I worked about 4 hours, I was a clerk. People come to the office, whose family had been arrested and they would want a lawyer. I write this and it's passed on to the Authority. Ahmed Sadat, also known as Abu Ghassan worked together with me in the office…"**

Ahmed Hawira's testimony in the Court was evasive and contradictory and made a negative impression. The witness did not attempt to or succeed in explaining the contradictions between his statement and his account given in Court. Ultimately, he confirmed that he was a PFLP member and that the Defendant had worked in the same office in which he had worked during the relevant period, thus supporting his statement.

[Stamp] SHATSKY-006511 [continued]

Date: 28 Kislev 5768                                              File Number: 2958/06
25 December 2008

I therefore recommend to my colleagues to prefer the witness's statement over his account in Court and to determine according to it that the Defendant had a member and active in the PFLP since 2001 at least.

In his testimony to the Court, Haitham Abidat said the following:

-11-

[Stamp] SHATSKY-006511 [continued]

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

**Q: What was the Defendant's job?**

**A: A member.**

**Q: What was he a member of?**

**A: It's known where he is, in what organization could he be? The Popular Front.**

**Q: What was his position in the organization?**

**A: I do not know.**

**Q: When did you meet him in Ramallah?**

**A: During 1999.**

**Q: What was his position then in the organization?**

**A: I do not know.**

The Defendant's membership in the PFLP and the period of his membership also came up during Abdel Rahim Mahmoud Abu Maluh's testimony **during which the Defendant interrupted the testimony of the witness and confirmed that he was Secretary-General of the PFLP**.

It may further be stated that most of the witnesses related to the Defendant, in their police statements, as holding a position in the Popular Front organization, and a good part of them referred to him in Court as "the comrade" – a nickname accepted in organizations with a communist orientation to one who is a member of the organization.

The Defendant made no assertion at all regarding the actual charge itself. As has been his approach during the course of this trial, the Defendant did not testify for his defense, and waived his defense, thus avoiding being cross-examined, further reinforcing the prosecution's evidence.

The logical conclusion to all this is that I recommend to my colleagues to convict the Defendant of the offense attributed to him in the first count of the Indictment, of membership and activity in the PFLP, but only since 1999.

[Stamp] SHATSKY-006512

Date: 28 Kislev 5768                                            File Number: 2958/06
25 December 2008

**5.** <u>**The second count**</u> **[holding the position of responsibility for the Jericho branch of the PFLP].**

The facts regarding this count have not been proved before us, and the prosecution itself moved that the Court acquit the Defendant of the offense described in this count of the Indictment.

Since the prosecution did not file evidence to prove the Defendant's guilt of committing this offense, I recommend to my colleagues to acquit the Defendant of this offense.

**6.** <u>**The third count of the Indictment**</u> **[holding the position of responsibility for the Ramallah branch of the PFLP and its activities].**

<u>Key evidence</u>:

**PW/16 Mohamed Salah Abed Mahsin's statement and testimony.**

-12-

[Stamp] SHATSKY-006512 [continued]

Date: 28 Kislev 5768            File Number: 2958/06
25 December 2008

The witness Mahmud Mahsin testified before the Court and was clearly and explicitly elusive, avoiding giving any details regarding the Defendant, and denied knowing him. At the same time, he did give details directly connecting himself to military activity connected with the PFLP Organization – activity that was specified in the indictment and is well supported by other evidence in the case. This activity points to the existence of the local organization of a military cell, planning of the attack at Café Rimon, and military activity with Maher Shakirat and Haitham Abidat.

Tokens of the truth that I noticed and took note of during the course of the testimony indicated an avoidance of giving any direct responses. The witness's facial expressions and body language vis-à-vis the Court reflected unwillingness to clarify the facts on the one hand and his acquaintance with the Defendant on the other.

The witness contended that in his statement he also denied any connection with the Defendant, and contended that the police officer who questioned him about this fabricated his acquaintance with the Defendant – at the same time asserting continuous pressure during his interrogation by both the Israel Security Agency and the police.

The witness summed it up in the following words:

> **Q: Did the officer tell you what you were suspected of before taking your testimony?**
>
> **A: There are things that he told me and I told him yes, I did it, and there were things I didn't. But what you asked me about the Defendant, these things never happened.**

These words carry a clear and obvious inclination to avoid incrimination of the Defendant.

The witness's statement is organized, includes numerous details that dovetail with other statements. It has not been proven to us that its contents contain any sort of logical contradictions such as direct contradictions to other evidence.

Therefore I recommend to my colleagues to prefer the witness's statement over his testimony before us.

In his statement dated September 24, 1999, beginning on page 13, Mohamed Salah Abed Mahsin describes the following:

[Stamp] SHATSKY-006513

20

Date: 28 Kislev 5768                                         File Number: 2958/06
25 December 2008

> *"A month before I became a wanted person due to things that*
> *Maher told me, we approached Ahmed Sadat, 45 years old from*
> *Ramallah, responsible for the PFLP, and told him that Maher*
> *and his cell were planning to carry out an attack…"*

This statement is supported by the testimony of the investigator who took it, without his having been cross examined. In the logical sequence of things, the witness mentioned the name of the Defendant and his position as stated in the third count of the Indictment.

<u>Corroborating evidence:</u>

**Ahmed Mahmud Taha Hawira's statement, page 1, lines 12-16,** which, as set forth in the discussion of the first count is preferred over his testimony for the reasons set forth there.

-13-

[Stamp] SHATSKY-006513 [continued]

Date: 28 Kislev 5768                                           File Number: 2958/06
25 December 2008

The Court discovered additional corroborating evidence in the admission of the Defendant himself, both in his statements to the police and also to the Court, that he holds the position of Secretary-General of the PFLP.

The Defendant did not contend anything regarding the merits of the charge. In his usual manner during this trial, he did not testify in his defense and waived his defense, thereby preventing cross examination and adding corroborating evidence to the assertion.

Therefore, I shall recommend to my colleagues to convict the Defendant of the offense that is attributed to him in the third count of the indictment.

7.    **Counts 4, 5, 6:** [**Conspiring to murder a Jewish woman who is a resident of Abu Dis, conspiring to throw a Molotov cocktail and conspiring to detonate a bomb in the Rimon Café in Jerusalem together with Haitham Abidat, Maher Shakirat and others].**

The basis of counts 4, 5, 6 is the planning of attacks carried out by one cell and that were brought to the attention of the Defendant in order to receive organizational approval and assistance.

The key evidence was presented to the Court in Haitham Abidat's testimony and his statements. Haitham Abidat gave testimony in Court that supports his statement in numerous points. It was evident that the longer the testimony continued, and the more severe the alleged conspiracies became in the prosecution's questions, the greater the tendency of the witness to minimize both the seriousness of the conspiracy as well as the Defendant's part in relation to the plans. After hearing the testimony, and examining the statement, I have concluded that the contradictions between the two are not significant. At any rate, in light of the witness's clear tendency in his testimony to minimize the Defendant's responsibility, in light of the evidence of the statement taker and the fact that nearly nine years had passed since the statement was given to the time that the testimony was given, I recommend to my colleagues to prefer the account given in the witness's statement. I shall quote below the passages relevant to each charge of the testimony and the statements:

From the testimony of Haitham Abidat in the Court:

> **Q: Do you remember planning to stab a Jewish woman who was married to a man in Abu Dis?**
>
> **A: Once again, I'm telling you. Ask me questions connected with Abu Ghassan.**

[Stamp] SHATSKY-006514

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

**Q: Do you remember that you and Mohamed told the other members who planned the attack with you that they were required to get approval from the organization, and therefore you traveled to Ramallah to meet the Defendant and requested his approval?**

**A: We went to Ahmed Sadat, told him about it and his response was that the matter was connected to our superior. That he has no connection with it and we should speak to the superior.**

**Q: You say in your statement that Abu Ghassan asked you to wait with the attack until the 10th month, and not that he sent you to someone else.**

-14-

[Stamp] SHATSKY-006514 [continued]

23

Date: 28 Kislev 5768                                                  File Number: 2958/06
25 December 2008

> A: I told you, after the conversation with Abu Ghassan, a while
> later he came and told us that he was not connected [with it],
> and that we should speak to our superior, and that he had no
> connection with these things.

Haitham Assad Ali Abidat's police statement dated September 22, 1999, page 4, lines 3-27
(regarding count 4):

> **"We did not request money from the Popular Front
> organization because we knew they would not give us any.
> Approximately 3 months ago we sat near Mohamed Mahsin's
> home, myself, Mohamed, Maher Shakirat and Saada, and we
> spoke among ourselves. Then Maher told us about a Jewish
> woman married to a man in Abu Dis called El-Am, and Maher
> asked us to join him in stabbing the Jewish woman. Mohamed
> and I said that we would not participate unless we would get
> approval from the organization, and Maher tried to convince
> us to agree to act with him, even without approval from the
> organization. A few days later, Mohamed and I spoke to a man
> known as a Popular Front operative. We traveled to Ramallah
> to meet Ahmed Sadat a.k.a. Abu Ghassan, a man of about 40
> years of age, and we told him what was happening. Abu
> Ghassan said that we should not do anything until the tenth
> month, because then there would be a meeting of the
> organization and they would decide how to proceed. Fares also
> felt the same as Maher about stabbing the Jewish woman
> without the organization's approval.**

Haitham Asaad Ali Abidat's police statement dated September 22, 1999, page 4, line 3-27:
(regarding count 5)

> *About two weeks later Maher Shakirat suggested to me,
> Mohamed and Shadi to join him in throwing Molotov cocktails at
> the car belonging to the priest ("Huri") named George, who has
> a Black Volvo, because he comes to Abu Dis and takes boys, and
> sleeps with them and this isn't good. Mohamed and I agreed to
> do this but said that we have to get the approval from
> Headquarters.*

[Stamp] SHATSKY-006515

24

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

> *Mohamed and I traveled to Ramallah again and met Abu Ghassan and told him all this, and again he told us that we should wait until after the tenth month. This time also, Shadi said that we have to do this without the organization's approval. He just thought like Maher that we have to do these attacks without approval.*

Haitham Asaad Ali Abidat's police statement dated September 22, 1999, page 4, line 3-27 (regarding count 6):

> *About a month ago, when Mohamed Mahsin and I were in Ramallah, Maher Shakirat came to us. Maher told us that he has 2 people and together with him that makes three, who are willing to carry out a suicide attack in Jerusalem in a certain café where he worked. He told us that the person willing to do these attacks is Ahmed Arikat, 24 years old and married, a painter of Jordanian descent who lives in Abu Dis, and the second person's name is Mohanad Arikat, 23 years old, single, a painter, of Jordanian descent who lives in Abu Dis. I think that he has already returned to Jordan. Maher said that he needs explosives for the attack and asked me and Mohamed Mahsin to obtain the explosives for him. He asked us because he wanted to speak some more with Mohamed Mahsin who was in charge of all of us. We told Maher that we would try to obtain explosives for him and spoke with Abu Ghassan who once again told us to wait until the tenth month…."*

<u>Corroborating evidence:</u>

Mohamed Salah Abed Mahsin's police statement dated September 24, 1999, page 13 and onward:

-15-

[Stamp] SHATSKY-006515 [continued]

Date: 28 Kislev 5768                                           File Number: 2958/06
25 December 2008

The considerations for preferring this statement over Mohamed Mahsin's testimony are detailed in this verdict in the discussion of the third count, and the witness said the following in his statement:

> *"A month before I became a wanted person due to things that Maher told me, we spoke with Ahmed Sadat, 45 years old from Ramallah who is a senior PFLP official, and I told him that Maher and his cell were planning to carry out an attack…."*

The testimony of prosecution witness no. 16 [witness no. 26 in the witness list], Mohamed Salaah Abed Mahsin.

**Q: To whom did you speak about the idea?**

**A: I didn't speak to anyone. They spoke to me.**

**Q: Who spoke to you?**

**A: One of the members.**

**Q: What's his name?**

**A: Haitham and it stopped with me, I didn't take it further.**

**Q: I would like you to relate to what was said, the idea, about the attack at Café Rimon and the Mashbir in Jerusalem. Who spoke to you about it and what was the idea?**

**A: These talks were approximately 9 years ago. I would ask that you ask specific questions.**

**Q: With whom were these talks?**

**A: With me.**

**Q: Who did you speak with?**

**A: It wasn't anyone specific.**

**Q: You talked to yourself?**

**A: No, with the group I worked with.**

[Stamp] SHATSKY-006516

26

Date: 28 Kislev 5768                                           File Number: 2958/06
25 December 2008

**Q: Who were the people in the group?**

**A: Maher, Shakirat, Haitham Abidat and me.**

**Q: What did you do with this idea?**

**A: We rejected the idea.**

**Q: Who rejected it?**

**A: I did.**

**Q: What organization do you belong to?**

**A: To the Popular Front.**

After hearing the witness in the Court, it was evident that he testified in an elusive manner that revealed some of the details, but attempted as much as possible to cover up the connection between the Defendant and the plans, which connection the witness Haitham Abidat had already revealed in his testimony.

Therefore, I recommend to my colleagues to make the following factual determinations:

- The cell in which Haitham Abidat, Maher Shakirat, and Mohamed Mahsin were members initiated and planned the attacks set forth in counts 4, 5, and 6 of the indictment.

- Afterwards, the members of the cell brought the plans to the Defendant for his approval on behalf of the PFLP.

-16-

[Stamp] SHATSKY-006516 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

- The Defendant notified them that this approval was not within his jurisdiction and that this type of activity must be brought before the PFLP Conference, and that it may not be executed without the said approval.

- Since some of the cell members agreed that PFLP approval was vital and the attacks should not be executed without it, the attacks were postponed, and ultimately were never carried out.

The facts of the indictment raise difficulty regarding the foundations of the offense of conspiracy. Therefore, I will discuss the normative framework of this offense and after this framework is established, I will consider whether the foundations for the offenses which are the subject of counts 4, 5 and 6 of the indictment are established in the facts that were proven.

## 7.1    Conspiracy – the normative framework

The offense of conspiring to commit another offense is defined by law as follows:

> **"Anyone who conspires with another person to commit a crime or offense punishable by the death penalty or imprisonment for a period longer than three years, shall be charged with an offense – and if no other sentence is prescribed for this, and the most severe sentence for a person convicted of the offense is seven years imprisonment or more, the conspirator shall be liable to seven years imprisonment; while if the most severe punishment to which a person convicted of the offense is liable is less than seven years – he shall be liable to the same punishment of less than seven years imprisonment."**

For the purposes of orientation, I will quote the definition of the offense of "attempting" that is the next stage after the offense of conspiring. Since the lower bound of the definition of "attempting" is the upper bound of conspiring, there is great importance to the correct analysis of this boundary.

> **A person is considered as having attempted to commit an offense when he begins to put his intent to commit the offense into action, by means appropriate for commission of the his intent,**

[Stamp] SHATSKY-006517

28

Date: 28 Kislev 5768                                                                File Number: 2958/06
25 December 2008

> **carrying out his intention with an overt action, but not carrying out his intent to the point of commission of the offense.**

And the Supreme Court has defined it as follows:

Criminal Appeals 3338/99 **Damian Pekovich** v. **State of Israel** *Piskei Din* 54(5) 667, 715):

> *"The justification for the legal system's intervention at the stage of a conspiracy is extremely important regarding serious offenses, where it is not reasonable to assert that society should wait and do nothing until the joint criminal plan that was been devised reaches practical stages. Nipping the joint criminal plan in the bud in cases such as these, by way of imposing criminal prohibitions on the conspiracy to commit an offense, and by punishing it, is a clear and well founded societal interest."*

-17-

[Stamp] SHATSKY-006517 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

In Criminal Appeals 129/54 **Goldstein v. State of Israel** stated:

> *"When a single person contemplates the future commission of a criminal mission, while he may actually pose a potential danger to the state, there is no justification for the immediate intervention for the purpose of his punishment, as long as he has taken no action to realize his criminal plot. The same would be the case when more than one person plans to carry out a criminal plot. In this situation the danger to the state, due to the number of persons contemplating the commission of an offense will be even greater, but nonetheless, the time is not yet ripe for intervention, as long as no contact has been made between them. <u>However, as soon as contact is made, and mutual agreement is reached to realize the joint evil objective, the danger to the state has become closer, such that the immediate punishment of those involved in the conspiracy is justified.</u>"*

In Criminal Appeals 330/85 **David v. State of Israel**, *Piskei Din* 40(2) 30 it is stated:

> **Agreement regarding the details of the execution is probably not needed: however it is minimally required to prove a common will to execute together a specific type of offense (for example, the offense of robbery), although not necessarily a concrete criminal offense at a defined time.**

In Criminal Appeals 269/58 **Amuri v. State Attorney-General** (*Piskei Din* 13 276) the Honorable Justice Dr. Zilberg determined (on page 278) that:

> **"The scale against which criminal agreement under Section 35 is measured is only "slightly lacking", and possibly even identical, to the scale that applies to a civil agreement as found in contracts".**

Criminal Appeals 461/92, **Zakai et al. v. State of Israel** (*Piskei Din* 47(2) 580, 588) it was determined that the specificity required does not have to stand up to the requirements in civil contract law, for example regarding the target of the offense, and it stated there:

[Stamp] SHATSKY-006518

Date: 28 Kislev 5768                                                File Number: 2958/06
25 December 2008

> **"Thus, for example, if the conspirators agreed among**
> **themselves that on a given night they would go out to break**
> **into a store, the two may be accused of a conspiracy even if**
> **they did not agree which store they would break into, and even**
> **if civil law were to instruct us – due to lack of specificity – that**
> **we no binding agreement was made between them."**

It follows that in a manner exceptional to criminal law, the legislator punishes the conspirator for actions of expressing criminal ideas in the presence of another party and receiving agreement to them. This offense of creating agreement for a criminal act leads to the punishment of the defendant for a contractual agreement made with another party for the purpose of committing an offense.

Specifically, because of this exceptionality, it seems to me that the test for the conviction of a conspiracy must be sharp and clear, and very similar to the accepted requirements in contract law. With all due respect, I think that the Court has to be stringent with itself by coming to a decision in accordance with the opinion expressed in the **Amuri** case by the Honorable Justice

**-18-**

[Stamp] SHATSKY-006518 [continued]

31

Date: 28 Kislev 5768                                               File Number: 2958/06
25 December 2008

Dr. Zilberg, otherwise the boundaries of the offense of conspiracy might be expanded too far and the principle of legality might be infringed.

I think that when two persons come to an agreement between themselves to commit an offense, a contract is formed between them, even if the object of the crime has only been determined in accordance with some coordinating rule, and even if the commission is dependent on various preconditions and/or terminating conditions. In contract law too, the foundations of the agreement are determined in accordance with its content. The same applies, *mutatis mutandis*, to a contract for the commission of an offense.

Therefore I recommend examining the offense of a conspiracy in accordance with the following foundations:

1.      The expression of a specific proposal for the commission of an offense on the part of one of the conspirators.

2.      Verbal or behavioral acceptance of the proposal on the part of the second conspirator.

### 7.2      The factual framework in light of the normative framework

Regarding the Defendant, have these conditions been met?

It may be stated, in the terminology of contract law, that the Defendant can been viewed as a third party whose approval is essential for its existence – as an undoubted precondition that, for the terrorists, PFLP approval was essential and may be considered a *sine qua non*.

Following is the factual course of events:

- The members of the cell planned an attack without the Defendant's knowledge.

- The cell members approach the Defendant in order to receive PFLP approval that some of them consider a condition for the execution of the attack.

- The cell members receive a negative answer (the Talpiot attack), or an answer subject to approval.

[Stamp] SHATSKY-006519

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

- The Defendant checks, for the cell, the question of approval with other people and returns with an answer that the organization has no objection in principle to carrying out attacks, however at the same time, he **instructs them not to do anything** until the organization's conference.

- Nothing actually happens until the organization's conference, and before that takes place, the conspirators are arrested (according to the indictment, they were on their way to receive various resources from the Defendant that were to be used for the armed robbery).

-19-

[Stamp] SHATSKY-006519 [continued]

Date: 28 Kislev 5768                                      File Number: 2958/06
25 December 2008

There is no argument about the fact that the Defendant did not take part in the plan. Examination of the indictment shows that there were plans for an attack that the Defendant completely rejected and there were plans that he did not approve and instructed them to wait, asserting that he himself was not the "approving authority", rather it was to be the organization's conference and he would be the one to bring up the issue before the conference, and would also bring them their answer.

Actually, the Defendant was the one who delayed the execution of the attacks with his instruction. It was never proven that the Defendant undertook to represent the cell members or to recommend the approval of the attack at the conference.

At this point we must ask the following questions:

- Can the Court complete the Defendant's response to the cell members following the conference?

- Can the Court make any finding regarding the Defendant's future stance [on the issue] during the conference?

- Perhaps the Defendant would have opposed execution of the attacks at the conference, for operational or policy reasons, and would have notified the cell of the rejection of their plan?

We have no proof before us of what the Defendant's will was regarding the above conspiracy. It has not been proven that the Defendant agreed to fill the part of an active, supporting messenger, and therefore, since we are involved in criminal law, we must assume that the Defendant was a "neutral" envoy between the attackers and the conference and between the conference and the attackers regarding their "approval" on behalf of the PFLP.

Does the Defendant's willingness to act as an envoy between the conference and the conspirators mean that he was party to the conspiracy? Does it mean, as in the words of the decision quoted earlier, that **"contact was made and mutual agreement was reached for the realization of the criminal intent"**?

I do not think that the answer to that is positive, at least for one of the cell members the organization's approval was an absolute precondition for carrying out the attack. The problem is that the foundations of the offense of conspiracy have not been established as there was no basis of agreement or meeting of minds, although the specificity requirement has been met.

[Stamp] SHATSKY-006520

34

Date: 28 Kislev 5768                                                        File Number: 2958/06
25 December 2008

I think we have here something that may be determined from its end result: were the Defendant to return with an answer from the conference rejecting the attack plan, would we still say that the conditions of a conspiracy were fulfilled regarding him? The answer to that question, in my opinion, is negative.

-20-

[Stamp] SHATSKY-006520 [continued]

35

Date: 28 Kislev 5768                                                     File Number: 2958/06
25 December 2008

Nonetheless, since all the Defendant's actions in these charges were performed for and in the service of the PFLP, I think that the foundations for the offense of performing a service for an unlawful organization were fulfilled completely; that is, the Defendant was to clarify with the heads of the PFLP conference whether to approve a given operation on behalf of this cell of the PFLP. Furthermore, it may be said that I have found that an adequate opportunity has been given for defense against this count of the Indictment.

Therefore, I recommend to my colleagues to acquit the Defendant of the charges appearing in counts 4, 5 and 6 of the indictment and to convict him of three counts of performance of a service for an unlawful organization.

**8.    Seventh count** [bartering of a mini Uzi submachine gun for a pistol]

The testimony of Haitham Abidat in Court:

> **Q: In the statement dated September 23, 1999, you state that you possessed a weapon of mini Uzi type, what is your response?**
>
> **A: Correct, I did not have it with me in Ramallah, but it was at my place in the village of Abu Dis.**
>
> **Q: Try to remember again, what other weapons did you have?**
>
> **A: Regarding the weapons in my possession, that's listed in the file. I told you, if you want to ask me [questions] ask me only about the Ahmed Sadat matter.**
>
> **Q: In your statement you say that you gave the mini Uzi to Ahmed Sadat.**
>
> **A: I said that because Ahmed was in area A and because of that, nobody could arrest him. I said that I transferred the weapon to him but I didn't really do that, I gave it to somebody else.**

Haitham Asaad Ali Abidat's statement dated September 23, 1999, page 2, lines 1-12.

[Stamp] SHATSKY-006521

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

> *"About a week later I spoke to Montaz and asked him to purchase another weapon. Montaz told me that he has a mini Uzi (in Hebrew) rifle* [sic] *and was asking 1500 dinar for it, and I bought this weapon with a magazine with 12 cartridges in it. I hid the mini Uzi rifle at the same stone fence where I had previously hidden the M16. I didn't tell anyone about the weapon this time. Approximately a month ago, when I fled to Ramallah with Mohamed Mahsin, when I met Abu Ghassan there, who is Ahmed Sadat, a senior operative in the Ramallah Popular Front, I told him that I have a mini Uzi rifle. He asked me to bring him the weapon because he wanted it for Popular Front activities. Abu Ghassan told me that instead of the mini Uzi, he would give me a D.M. pistol and he would assist us when we would stay in Ramallah. I agreed and gave him the rifle after traveling to Abu Dis to bring it and gave the mini Uzi to Abu Ghassan. I did not get a pistol from him at all. In a previous statement I said that Abu Ghassan said that he would give us 2 pistols so that we could rob the moneychanger in Jerusalem. I had given him the mini Uzi earlier, before we asked him for the pistols. Nobody knew about this mini Uzi that I gave to Abu Ghassan, I didn't even tell Mohamed about it."*

-21-

[Stamp] SHATSKY-006521 [continued]

Date: 28 Kislev 5768                                                              File Number: 2958/06
25 December 2008

After considering the testimony and the statement, I find that the witness confirmed that he had said these things in his statement but explained things that he said so that in fact, the weapon was given to somebody else, whereas in the interrogation he said the Defendant's name because he was in area A and is therefore "immune from arrest". This explanation did not raise doubts about the truthfulness of the witness's account in his statement or in delivering the weapon, and it seems from a logical standpoint, as it looked at the time that testimony was given in Court from the aspect of personal impression – like casual evasion.

There is no logic to an account that attributes immunity to a person simply because he is located in area A, where making arrests is routine. If the Defendant wanted to attribute the matter of the weapon to a protected figure, he could have done so to a dead person or a convict. It is difficult to believe, in the absence of a substantiating or well-founded story, that the witness would choose to frame the PFLP Secretary-General for the weapons incident, which is actually not one of the more serious ones, in order to cover up for someone else.

There is much logic in delivering the weapon to the Defendant due to his status and his ability to provide a weapon that would be more appropriate for robbing the moneychanger, such as pistols that, according to the statement, the Defendant promised to supply in exchange. A mini Uzi is a small submachine gun, but it is not as concealable or maneuverable as a pistol, for purposes of carrying out the type of operations planned by the witness's cell. It can be understood from other portions of the statement that the witness sought to obtain a pistol from other sources as well, such as Montaz Abu Rumi. The witness's need for pistols to carry out his operations supports the story regarding delivery of the weapon to the Defendant in exchange for the promise of receiving pistols.

The ties between the Defendant and the witness and his cell comes up in numerous testimonies of cell members and they corroborate and reinforce the story of delivering the weapon and the Defendant's standing as someone who could have asked for the weapon and made use of it.

My impression of the witness on the witness stand, as recorded at the time that the testimony was given, was that the witness was trying to sidestep the questions with weak excuses, to avoid incriminating the Defendant or going into detail about the other person to whom he gave the weapon. My impression from the witness's body language and his glances at the Court and at the Defendant are that his testimony before us was not the truth.

[Stamp] SHATSKY-006522

Date: 28 Kislev 5768                                      File Number: 2958/06
25 December 2008

The Court has another substantiating piece of evidence in the admission of the Defendant himself, both in his statement to the police and in Court, that he holds the position of Secretary-General of the PFLP.

The Defendant did not make any arguments at all as to the charge itself. As was his habit in this trial, he did not testify in his defense and waived his defense, thereby avoiding his cross examination, and additionally substantiating the evidence of the prosecution.

-22-

[Stamp] SHATSKY-006522 [continued]

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

I have warned myself, as required by the legislator, that I have a single piece of testimony before me, and I have examined whether or not it would have been possible, through examination, to corroborate the witness's story in his statement from other sources. I have found that the matter was something done in secret between the two of them, and would naturally not have been reflected in material evidence or additional witnesses.

The conclusion from all of the above is that no factual doubt was found and I recommend to my colleagues to convict the Defendant of the offense attributed to him in the seventh count.

**9.** **Eighth count** **[conspiring to commit the armed robbery of a moneychanger]**

**9.1** **The statement in relation to the testimony**

The sole, key evidence to this conviction was the statement of Haitham Abidat, which we are to consider against his testimony in Court. The problem is that, amazingly enough, during his examination in Court, Haitham Abidat was not asked about the robbery and neither were his fellow cell members.

This situation makes the requisite comparison, pursuant to Section 10a of the Evidence Ordinance, more difficult; for it is difficult to prefer a statement over testimony when no testimony has been given.

This is the text of that section of the law:

**10a. (a) A statement in writing given by a witness outside of the Court shall be admissible as evidence in a criminal proceeding if the following have been fulfilled:**

> **(1) The giving of the statement was proven in the trial;**

> **(2) The giver of the statement is a witness in the trial and the parties have been given an opportunity to examine him;**

> **(3) The testimony, in the view of the Court, differs from the statement in a significant detail, or the witness denies the content of the statement or claims that he does not remember its content.**

**(b) The Court may accept a statement as stated in sub-section (a) even if the giver of the statement is not a witness, whether because he refuses to testify or is not capable of testifying, or because it is not possible to bring him to the Court since he is no longer alive or cannot be located, provided that the Court is**

[Stamp] SHATSKY-006523

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

convinced that the circumstances of the matter show that improper means were used to dissuade or prevent the statement giver from giving the testimony.

© **The Court may support its findings based on a statement accepted according to this section, or on a part thereof, and is permitted to prefer the statement over the witness's testimony, this if it saw fit to do so in light of the circumstances, including the circumstances of giving the statement, the evidence brought in Court, the witness's behavior**

**-23-**

[Stamp] SHATSKY-006523 [continued]

Date: 28 Kislev 5768                                                     File Number: 2958/06
25 December 2008

at the trial and tokens of truth that were revealed during the trial, and the reasons shall be noted.

(d) **A person shall not be convicted on the basis of a statement that was accepted according to this section unless there is evidence to substantiate it.**

The wording of the paragraph shows that a condition for admissibility of the evidence is a difference between the testimony and the statement, and in any case, except for the case of a silent witness, the witness is required to be confronted with the statement in order for it to be admissible as evidence to indict.

## 9.2    Interrogation shortcomings

When the Court asked for additional evidence for the indictment, it discovered, strangely enough, that Haitham's accomplice, who was, according to the statements, responsible for the cell, **was not questioned at all regarding the robbery, neither by the police nor by the Court**, and did not mention the event in his statement, although allegedly it was directly connected to his arrest, and considering the fact that in the same statement he incriminated his fellow cell members and himself with other serious, severe criminal offenses.

Regarding Maher Shakirat, who according to the indictment also participated in the robbery, he was never brought as a witness in this indictment – not to mention that the Court was never exposed to his police statement.

We will therefore consider Haitham's statement, in order to determine whether, despite the prosecution's and the police's investigation failures, it is possible to base a conviction on the Defendant's statement, or not.

Haitham Asaad Ali Abidat's statement dated September 22, 1999, page 4, line 27 through page 5 line 14.

> *"Maher told us that he had previously worked for a moneychanger in Musrara. He worked for him doing repairs, so he worked in repairs and renovations, and one of his jobs was at the office of this moneychanger. Maher said that he saw the moneychanger coming and going with a lot of money and recommended that we join him and rob him of his money. Mohamed and I agreed. We spoke about it amongst ourselves and said that we needed pistols for this.*

[Stamp] SHATSKY-006524

Date: 28 Kislev 5768                                      File Number: 2958/06
25 December 2008

*We said that we would take pistols with us from the Popular Front and said that we would need Montaz Abu Rumi to bring his pistol as well. We suggested to Montaz that he join us and bring his pistol and he agreed. And because he has a driver's license, we suggested that Montaz drive the getaway car for us that we would obtain from the Popular Front. Montaz agreed to join us and be the driver and said that he would bring his pistol. We drove from Ramallah to Montaz's house; when we wanted to talk to him, for that we drove to Azariya. We spoke to him there and after he agreed, Maher, Mohamed and I went to Abu Ghassan and told him what we wanted to do and asked him for a car and two pistols. Abu Ghassan said that he would get us two pistols and a car. Then, on the day that Maher, Ahmed and I were arrested, we had been on the way to Abu Ghassan to get the pistols*

-24-

[Stamp] SHATSKY-006524 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

> *that he said he would get for us. We were in the passenger*
> *transport vehicle from Abu Dis to Ramallah, to Abu Ghassan,*
> *and then the Border Guard caught us. Maher said that he had*
> *seen this moneychanger with perhaps $200,000 and that we*
> *wanted to steal the money from him and give it to the Popular*
> *Front."*

My colleagues and I had a disagreement regarding the significance of the fact that the witness had not been questioned at all about the facts of this count and was not asked to relate to it in Court.

I was of the opinion that Section 10a **of the Evidence Ordinance [New Version] 5731-1971** attributes great importance to the statement giver being a witness at the trial and his examination for the purpose of comparison, and even views it as a condition for admissibility. How would the Court compare the accounts if the witness did not testify at all in the matter – but was not quiet about other issues. Moreover the prosecution should have questioned both Mahsin and Abidat, but did not do so; what is the significance of this fact?

My colleagues, the Honorable Judges Lekah and Lieberman, were of the opinion that, from the outset, the witness's testimony throughout had been intentionally evasive of any incrimination connected to the Defendant, and since it generally evoked a lack of trustworthiness, the statement was to be believed regarding all counts of the indictment including that which the Defendant was not even questioned about.

My colleagues are also of this opinion in the matter of the testimony of Mohamed Mahsin and I will bring support for what they said from his testimony in the Court:

> **Q: Did the police officer translate for you prior to signing on that which you had been questioned about?**
>
> **A: I told them 10 times and now I am saying it here, if you brought me here to frame him, to leave him (pointing to the Defendant) here in prison, I will not tell you.**
>
> **Q: In other words, you told the police officer that you don't know Ahmed Sadat at all?**
>
> **A: I did not have any discussion with the police officer regarding Ahmed Sadat.**

[Stamp] SHATSKY-006525

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

I did not find it necessary to resolve this dispute because, irrespective of the fact that the witness was not questioned on the witness stand before the Court, I am of the opinion that the Defendant's guilt has not been proven beyond reasonable doubt.

I believe that that stated in Haitham Abidat's statement, together with the evidential gap that was created as a result of what Mohamed Mahsin was not questioned about in his detailed statement, due to investigative failures – does raise an element of doubt.

Ultimately, the entire story rests upon the single statement of a co-offender, where it could have been based on at least two additional sources, in order to dispel the doubt.

-25-

[Stamp] SHATSKY-006525 [continued]

Date: 28 Kislev 5768                                                File Number: 2958/06
25 December 2008

Moreover, through many episodes in the indictment, the Defendant presented a totally different position, according to which he himself, from an organizational standpoint, was not authorized to support any attack without the authorization of the PFLP Conference; following that Conference, the Defendant was careful not to support the terrorist activity himself, but rather to direct it and fund it through other means. Why in this specific instance would the Defendant consider himself authorized to support the attack and even offer him material assistance including supplying weapons?

Therefore, I recommend to my colleagues to acquit the Defendant, due to reasonable doubt, of the offense that is the subject of the eighth count.

**10.   The ninth and tenth counts** [arranging a meeting with persons who expressed interest in carrying out military activity] [conspiracy to carry out attacks with Mohamed Khalil Al-Ghoul]

Key evidence:

The prosecution points to the testimony and statement of Mohamed Khalil Al-Ghoul as key evidence to these convictions. The Court will below consider the testimony against the statement. The witness stated the following on the witness stand:

> **Q: Tell me briefly why you are being tried.**
>
> **A: Membership in the PFLP and planning and attempted planning of a shooting attack.**
>
> **Q: I would like you to tell me about planning the attack, which attack did you plan to carry out.**
>
> **A: There was no attempt, there was an idea.**
>
> **Q: I would like you to tell me about this idea.**
>
> **A: It is written in the indictment and 7 years have passed since then.**
>
> **Q: The Court does not know, I know that it's written down, tell the Court briefly what the idea was.**
>
> **A: There was an idea about a shooting attack and it didn't take place.**

[Stamp] SHATSKY-006526

Date: 28 Kislev 5768                                                          File Number: 2958/06
25 December 2008

**Q: To which organization do you belong?**

**A: The Popular Front.**

**Q: For which organization did you want to carry out the planned attack?**

**A: For the Popular Resistance Forces.**

**Q: To whom do they belong?**

**A: Politically I belong to the Popular Front, however for military activity I belonged to the Popular Resistance Forces (this is said in Hebrew).**

**Q: Who is Ahmed Sadat?**

**A: He is well known, he's known to the media.**

**Q: Where is he now?**

**A: In prison.**

**Q: Do you see him now?**

**A: Yes, he's sitting opposite me.**

**Q: When was the last time you saw him before your arrest?**

**A: I saw him once.**

**Q: Under what circumstances was that time?**

-26-

[Stamp] SHATSKY-006526 [continued]

47

Date: 28 Kislev 5768                                        File Number: 2958/06
25 December 2008

**A: I wanted to return to the Popular Front and he told me he had nothing to do with the matter.**

**Q: What does that mean?**

**A: That's the answer he gave me, a person whom I don't know, I can't communicate with him anymore.**

……………..

**Q: When you went to Ahmed Sadat, what was the purpose of the meeting?**

**A: I met him in the office, I asked him to return to the Front, he answered me that he had nothing to do with the matter.**

The witness claimed that he was threatened and tortured during both his interrogation by the Israel Security Agency and at the police by Israel Security Agency personnel in the presence of a police officer; however he did not deny that these things were in fact stated.

The witness named Israel Security Agency interrogators who forced him to incriminate the Defendant as follows: Israel Security Agency interrogators "Omri", "Arbel", the "Major" and the "Colonel". These people were not summoned to testify at the trial as a result of defense counsel's stance. Regarding the type of torture, the witness detailed as follows:

**Q: Can you tell me what kind of torture you underwent at the Israel Security Agency? What did they do to you?**

**A: They beat me. And they tied me to a chair in the *shabah* position [position where a prisoner is tied to a low chair in a painful position], sleep deprivation.**

**Q: Where did they hit you?**

**A: In the face and abdomen.**

**Q: When you were opposite the policemen who interrogated you, even then you were tied up in a *shabah* position?**

**A: I was tied to the chair on which they had tortured me a few minutes prior to that. When the police came in, the Israel Security Agency man would remove the restraints.**

[Stamp] SHATSKY-006527

48

Date: 28 Kislev 5768                                                 File Number: 2958/06
25 December 2008

> **Q: I imagine that the blows to your face were so strong that they left marks on you.**
>
> **A: I think they are skilled enough in their work that they don't leave marks.**

When the witness was asked whether he had incriminated other people at the command of the Israel Security Agency people, he said:

> **A: The Israel Security Agency brought me a picture album while questioning me. They wanted me to talk about anyone they felt like. It's possible that I know him and he has no connection to me, just so that I point them out.**
>
> **Q: From the entire album, whom else did you make things up about who had no connection to you?**
>
> **A: Luckily there wasn't anyone like that.**

Later on in the examination, the witness gave an additional or other motive to implicate Sadat:

> **Q: At the police.**
>
> **A: I don't remember. I just remember that it was Ahmed Sadat, the investigator whom they call Arbel asked me to talk about Sadat, that we're not taking this person to prison, we're taking him down with a bullet to the head. He would tell me that all the time and pressure me on the name Sadat.**

In contrast to this, the witness supported his statement with the following details:

> **Q: You asked him for a silencer, correct?**
>
> **A: Yes.**
>
> **Q: There was also a plan to carry out an attack with hand grenades but in the end he didn't bring you any, correct?**
>
> **A: Yes. And it didn't happen.**
>
> **Q: But there was an idea?**
>
> **A: Yes, but there were no hand grenades.**

                                   **-27-**     [Stamp] SHATSKY-006527 [continued]

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

**Q: He also actually taught you how to use weapons, correct?**

**A: He is the same person whom we saw with weapons in his possession.**

According to the witness, the weapons training was done not because of the Defendant's referral, rather due to a chance meeting in the street. At a certain point in the testimony, the witness distanced the Popular Front from the activity and afterwards reconnected them:

**Q: To whom do they in fact belong?**

**A: They are called the Popular Resistance Forces.**

**Q: Do they belong to the Popular Front?**

**A: As this person answered me, no.**

**Q: If I were to tell you that in your police statement you say exactly the opposite?**

**A: If their first suspicions about a person are that they are a member of the Popular Front and he admits to carrying out military activity, then what do you expect the policeman to write? He would surely write that he belongs to the Popular Front.**

**Q: So the police added that, not you?**

**A: He hears Popular Resistance Forces and writes down Popular Front.**

**Q: When you confessed to your indictment, did you confess to your experience, to your military activity in the framework of the Popular Front or in the framework of the Popular Resistance Forces?**

**A: I don't remember.**

**Q: Could you have admitted to being active in the Popular Front?**

**A: I think that the primary accusation was for the Popular Front.**

[Stamp] SHATSKY-006528

50

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

Q: But your activity, did you admit that it was in the framework of the Popular Front?

A: Yes, my activity was in the framework of the Popular Front.

Q: Did you participate, in late 1999, early 2000, in the conference of the Popular Front of the Jerusalem area leadership, at a hall in Ramallah?

A: Yes. It happened …….

…………………

Q: Was Ahmed Sadat there?

A: Yes.

Q: Did he supervise the conference?

A: Maybe, it's within the framework of the political activity of the Popular Front.

Q: Did he supervise that conference?

A: I think so, because nobody asked him what he was doing there and he didn't say.

Q: I'm asking the question again. Did he supervise the conference?

A: It's possible.

Q: You said earlier that a year later when you met him in order to return to the Popular Front, he told you that he has no connection to it, so how is it that you say that he was at the conference of the Popular Front and even you thought that he was connected to it from the media?

A: At the time of the conference, as I said before, he did not say that he supervised the conference. We thought that perhaps he was the supervisor. Afterwards, when I asked him about it myself, he answered me that he has no connection with the matter.

[Stamp] SHATSKY-006528 [continued]

51

Date: 28 Kislev 5768                                                                                File Number: 2958/06
25 December 2008

In his police statement, which was filed according to section 10a of the Evidence Ordinance (new version) 5731-1971, Mohamed Al-Ghoul said the following:

Statement of Mohamed Khalil Hasin Al-Ghoul dated April 24, 2001, page 5, line 1 to page 10 line 7, and page 5 line 1 until 16:

> **At the beginning of 1999, I don't remember exactly when, Ahmed Musulmani called my cell phone and told me to come to a meeting in Ramallah, and I went by myself to the office of the Popular Front in Ramallah in al-Manara Street and there I saw 1) Ahmed**

-28-

[Stamp] SHATSKY-006528 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

> Sadat, who is over 40 years old, I don't know where he lives 2)
> Khaled Halabi, approximately 23 years old from Beit Hanina,
> who has a hair salon for women, I don't know his father or
> brother, 3) Majid Barber, 4) Shadi Sharfa approximately 23
> years old from Shuafat who is a school teacher, I don't know
> which school, and at the meeting we asked Mohamed Sadat,
> who is in charge at the Popular Front, I don't know on what, to
> transfer to military activity, and Ahmed Sadat told us not to
> discuss this matter in the office and said that another meeting
> would be arranged somewhere else. About a week later I saw
> Khaled Halabi on Salah a-Din [Street] and he told me that he
> and I have to go to Ramallah to a place that Khaled knew the
> address, but I didn't know, and Khaled Halabi and I went
> together and went inside a house and there we saw 1) Shadi
> Sharfa, 2) Majid Barber and 3) Ahmed Sadat and we told
> Ahmed Sadat that we wanted to transfer to military activity,
> and Ahmed told us that he would check it out and let us know,
> each one of us individually."

Regarding the tenth count, the prosecution indicated Mohamed Khalil Hasin Al-Ghoul's statement dated April 7, 2001 and Mohamed Khalil Hasin Al-Ghoul's statement dated April 24, 2001, page 12, line 14 to page 14, line 2.

According to that stated in those statements, the witness Mohamed Al-Ghoul went to the Defendant and asked him to work, according to him, in "hostile military activity against Israel". The Defendant, for his own considerations, at first rejected the witness's request. It seems that the reason for that was the presence of others there.

And indeed, when the witness was on his way outside, the Defendant spoke with him privately and told him to come to a meeting place where he would meet someone regarding this activity. Although at a certain point the connection between Mohamed Al-Ghoul and the Defendant's contact was severed, however a short time later contact was reestablished, and reached the point of planning an attack against Israeli targets in the name of the organization, attacks which were intended, according to the plan, to result in loss of life.

[Stamp] SHATSKY-006529

53

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

The witness claimed in his examination that he had been forced by the Israel Security Agency men to incriminate the Defendant; however his claims rang hollow, since he did not provide the Court or the parties with any tools to prove or to contradict them. The witness did not give any names or nicknames of the investigators, and the Defendant did not wish to call them and interrogate them regarding the witness's claims or to interrogate the witness himself regarding these claims.

Claims of undue pressure or violent interrogation toward witnesses on the part of Israel Security Agency personnel come up in this Court from time to time, and are thoroughly investigated at the request of the parties. It is the Court's experience that Israel Security Agency people are always identified by the interrogation subjects with their permanent nicknames. Their interrogations are documented under these permanent nicknames, and they can be brought to Court and this frequently happens. The witness's claim – had it been raised in a serious and detailed manner, would have been investigated; however the Defendant chose not to clarify it, nor did he argue against the weight of the statements or the testimony.

Under these circumstances, we cannot confirm the witness's claim that he was tortured by Israel Security Agency personnel or the police and we will not attribute any weight to it. It must be added here that my impression of the testimony

-29-

[Stamp] SHATSKY-006529 [continued]

54

Date: 28 Kislev 5768                                     File Number: 2958/06
25 December 2008

and the way things were stated, that this claim rang hollow, and had been made as a matter of form made by a witness who had given an incriminating statement and found himself confused when testifying before the Defendant whom he had incriminated in his statement to the police.

After examining the testimony against the statement, and in light of my impression of the witness, I prefer the account presented in the statement. It is obvious, on the surface, that the witness contradicted himself in Court numerous times. The witness could not explain why he, after admitting to being active in the Popular Front and seeking to return to work in military activity under its framework, requested doing so through the Defendant, was refused, and afterwards through "a miracle", met a person in the street who resumed his activity and trained him in the use of weapons. The trainer and operative remains unknown and so do his motives, however the proximity and the causal relationship between the witness's meeting with the Defendant and the resumption of the witness's activity were not at all explained in the testimony, while they were explained quite well in the statement.

The requisite amplified support necessary for an accomplice's statement is found in the evidence pointing to the standing, position and location of the Defendant's activity, which correspond to the witness's statement.

The Court found additional substantiating evidence in the admission of the Defendant himself, both in his police statement as well as in Court, that he holds the position of Secretary-General of the PFLP.

The Defendant did not assert anything regarding the charge itself. In line with his approach to this trial, he did not testify in his defense and waived his defense, thereby avoiding cross examination and adding additional reinforcement to prosecutorial evidence.

The facts proven establish the foundations for the offense of performing a service for an unlawful organization. It is certainly the case that someone who sees to a person who comes to his organization and integrates him into hostile terrorist activity under the auspices of the organization, is committing the said offense.

In the matter of the conspiracy attributed to the Defendant in the tenth count, the question is whether this same "match" or "mediation" set up by the Defendant, according to the evidence, between Al-Ghoul and others, who among themselves plotted to commit murder, without the Defendant being involved in the details, is sufficient to establish the alleged offense.

[Stamp] SHATSKY-006530

Date: 28 Kislev 5768                                              File Number: 2958/06
25 December 2008

The answer seems to me to be positive. Even one who mediates a criminal act is party to the contract and promotes the conspiracy through the essential service of mediation between the conspirators and bringing them together. The Defendant did this after he was asked to assist Al-Ghoul to resume "military action", the significance of this request being – unequivocally – integrating him into a cycle of attacks and attempted murder, as it in fact was. When the Defendant knowingly mediated between the witness and the unknown person who trained him and conspired with him to carry out

-30-

[Stamp] SHATSKY-006530 [continued]

56

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

attacks, making the requisite contact, if the offense was not causing intentional death, then at least it was committing a felony offense. At the same time, he cannot be convicted of the offense of conspiring to cause intentional death, due to the lack of specificity required for an action of this type, although the specificity required for a conviction of promoting some sort of military activity does exist.

Therefore, I recommend to my colleagues to convict the Defendant:

Of the ninth count: the offense of performance of a service for an unlawful organization

Of the tenth count: the offense of conspiring to commit an offense punishable by more than three years imprisonment.

## 11.    Eleventh count of the Indictment [Supervision of and participation in the PFLP Conference]

Under this count, the Defendant was accused of organizing and supervising the PFLP Conference. Evidence for this count of the Indictment was provided to the Court in the testimony of persons who saw him at the conference, and as part of the evidence to counts 4, 5 and 6 from which the conference and its importance to the PFLP's continued hostile terrorist activity was clearly evident.

Key evidence:

In his testimony in the Court, Mohamed Al-Ghoul said the following:

> **Q: Did you participate in the Popular Front Conference of the Jerusalem area in a hall in Ramallah during late 1999 early 2000?**
>
> **A: Yes, it happened.**
>
> **Q: Is it true that Dr. Ahmed Mesalameh was present at the conference?**
>
> **A: Yes, he was.**
>
> **Q: What about Nasser Abu Hadir?**
>
> **A: He was present.**
>
> **Q: Khaled Halabi?**

Stamp] SHATSKY-006531

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

**A: Yes.**

**Q: Said Salameh?**

**A: He might have been.**

**Q: Was Ahmed Sadat there?**

**A: Yes.**

**Q: Did he supervise the conference?**

**A: Maybe, this was in the framework of the political activity of the Popular Front.**

**Q: He supervised the Conference?**

**A: I think so, because no one asked him what he was doing there and he did not say.**

**Q: I am asking the question again. Was he running the conference?**

**A: Possibly.**

**Q: You said earlier that when you met him a year later in order to return to the Popular Front he told you that he has no connection with it, so how can you say that he was at the Popular Front Conference and you thought that he was connected through the media.**

**-31-**

[Stamp] SHATSKY-006531 [continued]

Date: 28 Kislev 5768                                         File Number: 2958/06
25 December 2008

> **A: At the time of the conference, as I stated earlier, he did not say that he was supervising the conference we thought that it could be that he was the supervisor. Later on, after I requested from him, and he responded to me that he had nothing to do with it.**

In his statement dated April 24, 2001, page 15, lines 17-20 Mohamed Khalil Hasin al-Ghoul strongly supported his testimony.

> **"I want to tell you that a year and a half earlier, there was a conference of the PFLP Jerusalem district leadership, which took place in a hall in Ramallah and who was at the conference was 1) Ahmed Sadat who supervised the Conference…"**

The facts regarding this charge have been proven clearly, but additional corroborating evidence was provided to the Court in the admission of the Defendant himself, both in his statements to the police and in the Court, [stating] that he filled the position of Secretary-General of the Popular Front.

The Defendant made no arguments regarding the merits of this charge. As was his manner during the course of this trial, he did not testify in his own defense, and waived the defense, thus avoiding his being cross-examined, further corroborating the prosecution's evidence.

The foundations of the offense were clearly established insofar as the organization of a conference of this scope and size definitely constitutes the performance of a service for the Popular Front organization.

Therefore, I recommend to my colleagues to find the Defendant guilty of the offense that he is accused of in count 11 of the indictment.

## 12.    Twelfth count of the Indictment [Examining the PFLP records and notification of Ramy Jebil that the records contain negative information against him].

The facts regarding this charge have not been proven before us, and the prosecution itself moved that the Court acquit the Defendant of the charges he is accused of under this count. I am doubtful whether the facts of this count reveal an offense; however, the Court is exempt from discussing this matter as no evidence has been found proving the facts that appear in this count of the indictment.

As such, I recommend to my colleagues to acquit the Defendant of the charges in count 12 of the indictment.

[Stamp] SHATSKY-006532

Date: 28 Kislev 5768                                        File Number: 2958/06
25 December 2008

## 13.    Thirteenth count of the Indictment [Holding the position of Secretary-General of the Popular Front]

This charge is central in its importance and as proof of the facts included in it, a significant amount of evidence has been found, including the Defendant's admission on various occasions, and the Court will recall part of them.

Key evidence:

-32-

[Stamp] SHATSKY-006532 [continued]

60

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

In his written statement to the Court, the Defendant stated that he acted as Secretary-General of the Popular Front organization. After I examined the transcripts documenting the occurrences regarding the statement filed by the Defendant at the start of his trial – as a response to the indictment, I found that the facts stated in it – and that are known to the Defendant regarding his activities – should be accepted as evidence of the veracity of their contents. The Defendant wrote to the Court as follows:

> *For what you refer to in the indictment as "security offenses" are none other than a national duty, and it does not matter whether or not it actually occurred, and it comes as part of the framework of the resistance to the occupation. At the same time, I, as Secretary-General of the Popular Front for the Liberation of Palestine emphasize my pride in my membership in a Palestinian revolutionary movement, and the continuity of this movement at the <u>regional, national and global</u> levels. And of its being part of the global revolutionary movement opposed to imperialistic globalization …*

It should be noted that defense counsel also informed the Court that he does not deny this fact and stated the following in the Court:

**"Defense counsel: My client has never denied that he is Secretary-General of the Popular Front, this is written in the response."** (Court session dated January 14, 2007)

The Defendant also admitted to this fact in his statement dated March 19, 2006 (page 2 line 5).

> **Question: Is it true that you are the Secretary-General of the Popular Front?**
>
> **Answer: Yes, it is correct, I am the Secretary-General of the Popular Front.**

In Abdel Rahim Maluh's testimony in Court, the witness was asked and responded as follows:

> **Q: Is it true that you acted as Sadat's deputy?**
>
> **A: I was the Deputy Secretary-General of the Popular Front.**
>
> **Q: Who is the Secretary General of the PFLP?**

Then the Defendant himself intervened and said:

[Stamp] SHATSKY-006533

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

**Defendant: (Speaking from the dock) Ahmed Sadat.**

And Abdel Rahim Mahmud Abu Maluh's statement dated July 2, 2002, page 1, line 26 stated:

> **"Abu Ali Mustafa was the Chairman of the Popular Front**
> **until the day of his death after which Ahmed Sadat was**
> **appointed Chairman of the Popular Front and I was appointed**
> **Deputy Chairman…."**

During Basel Abdel Rahman Ismar's testimony in Court the witness was questioned and responded as follows:

**Q: What is the Defendant's position in the Popular Front?**

**A: The comrade is the Secretary-General of the Popular Front.**

This also was the testimony of Prosecution Witness number 18 in the witness list, Lawei Hani Arar Babit dated July 18, 2007, page 1, lines 44 through 47:

**-33-**

[Stamp] SHATSKY-006533 [continued]

Date: 28 Kislev 5768                                         File Number: 2958/06
25 December 2008

> **Q: In which organization are you a member?**
>
> **A: The Popular Front.**
>
> **Q: And who is this man?**
>
> **A: Ahmed Sadat, the Secretary-General of the Popular Front
> for the Liberation of Palestine.**

Hence the Defendant admitted, from the start of his trial, the facts regarding this count of the indictment, in writing and orally, and the testimony of the witnesses supports and corroborates this admission.

The facts that were proven establish the foundations of the charge of holding a position in an unlawful organization, that being the senior position of Secretary-General of the PFLP, which we have proved was filled by the Defendant.

The result of this is that I recommend to my colleagues to convict the Defendant of the offense attributed to him in the thirteenth count of the indictment.

## 14.    Fourteenth count of the Indictment [Speech inciting revenge following the death of Abu Ali Mustafa]

### 14.1    The Evidential Picture

Key evidence:

The Court was provided with key evidence in the testimony of George Kurat, which is supported by his statement and is based upon his personal knowledge, as someone who was present at the rally:

Testimony of Prosecution Witness no. 7 (Witness no. 10 in the witness list), George Mansur Kurat.

> **Q: Let's go back to the rally at Syria Square, do you remember
> who spoke at that rally?**
>
> **A: Many people.**
>
> **Q: Do you remember that the Defendant spoke at that rally?**
>
> **A: Which defendant?**
>
> **Q: There is only one defendant in this courtroom.**

[Stamp] SHATSKY-006534

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

**A: Yes, he spoke.**

**Q: At how many rallies did you see him speaking?**

**A: I don't remember, perhaps once, I think.**

**Q: Do you remember what he said?**

**A: No.**

**Q: In your statement you say that he called for revenge, to take revenge for the death of Abu Ali Mustafa.**

**A: Everybody said he would take revenge for the death of Abu Ali Mustafa.**

In his statement dated November 4, 2002, page 1, lines 8-10 George Mansur Kurat goes into detail and directly attributes the call for revenge to the Defendant.

> **"A few days prior to the murder of Minister Ze'evi, I was at Syria Square in Ramallah at the PFLP rally. The person who spoke there was Ahmed Sadat who called for revenge for the death of Abu Ali Mustafa…"**

-34-

[Stamp] SHATSKY-006534 [continued]

Date: 28 Kislev 5768                                      File Number: 2958/06
25 December 2008

In Court the witness remembered the general atmosphere at a rally that took place more than six years prior to his testimony, and remembered that speeches were made that spoke of revenge. The witness also said that he did not remember what the Defendant said. The testimony supports the statement and presumably because it was so many years ago, the witness did not accurately remember (or perhaps preferred not to remember) what was said by the Defendant – in any case he did not deny the incitement content, and even added in his way that a speech of that sort under those circumstances was reasonable. My conclusion is that the statement is to be preferred, since it is closer to the place and time of the rally, as a complementary source to the testimony, and for determining that the Defendant said the things attributed to him.

## 14.2    The normative framework

The foundations of the offense of incitement as set out in the law are as follows:

Section 7(a) + 10 of the Prohibition of Incitement and Hostile Propaganda Order (Judea and Samaria) (No. 101), 5727-1967.

**7.      Any person who: -**

**a. Attempts, whether orally or in another manner, to influence public opinion in the Area in a manner that is liable to undermine public safety or the public order, or…**

**10.      a. Anyone who organizes a procession, gathering or vigil without a permit, calls for or incites to organize them or encourages them or takes part in them in any manner; or**

The foundations of this offense are similar to the foundations of the corresponding offense in the Penal Law [New Version] 5737-1977.

**144d2. (a) Any person who publishes a call to carry out an act of violence or terror, or praise, sympathy or encouragement of an act of violence or terror, support of it or identification with it (in this section – inciting publication), and based on the content of the inciting publication and the circumstances under which it was published, there is a real possibility that it will lead to the commission of an act of violence or terror, shall be liable for five years imprisonment.**

In my opinion, it would be appropriate for this Court to adopt a similar examination of "real possibility" that the announcement would cause an infringement of public safety or public order. This is how the expression "in a manner that is liable to undermine" that appears in the law, should be interpreted.

-35-                              [Stamp] SHATSKY-006535

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

This is not how the Supreme Court chose to interpret the offense of sedition [Section 134-138 of the Penal Law (New Version 5737-1977] in its verdict in Criminal Appeals 6696/96 **Kahane vs. State of Israel** *Piskei Din* 52 (1) 535, by majority opinion the Supreme Court accepted the "*close certainty*" test insofar as things that are stated orally will result in actual harm, and thus preferred this test over the "*likelihood*" test. The Supreme Court, therefore, acquitted the Defendant who publicly expressed the need to drop bombs from the air over certain populations of the country.

The Israeli legislature itself distinguished between the offense of sedition and an offense of incitement, and established the stricter test of "*likelihood*" on the Defendant.

In the present matter, my impression of the evidence brought before us is that it referred to a mass rally. The Defendant spoke at this rally as the successor leader of an established, experienced and equipped terror organization. The leader of that same organization had recently been killed, with the participants being in agreement that it had been done by the Israeli security forces, and there was a general atmosphere calling for a revenge attack.

This type of call from a man of the Defendant's stature, in this sort of forum, and under these circumstances, establishes the "*likelihood*" and even a "*close certainty*" of someone hearing this being persuaded or moved to get up and carry out acts of revenge that are liable to endanger lives, not to mention harm public order and public safety.

Therefore I recommend to my colleagues to convict the Defendant of the offense attributed to him in the fourteenth count.

## 15.    Fifteenth count of the Indictment [coordination meetings with the head of the organization at A-Najjah University]

Key evidence was produced for the Court in the testimony of Mutzab Mahmoud:

> **A Hebrew translation of statement number 1 of Mutzab Abdel Mahmoud, page 24 lines 13-21:**
>
> **"First, I was chairman of the Popular Front at A-Najjah University. I was in contact with Musa Alguma who was responsible for the Popular Front in Nablus and I received funding from him for activities at the University. I was also in contact with Ahmed Sadat and Abed Abu Gulmar Ibrahim at the Popular Front,**

[Stamp] SHATSKY-006536

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

> **Ahmed from Ramallah and Abed from Beit Furik. I would
> request financial assistance from them and they would speak to
> the senior director Musa Tuama so that he should provide us
> with the funding".**

In order to compare the statement with the testimony, pursuant to section 10a, we will below
bring relevant portions from the testimony.

Testimony of Prosecution Witness no. 20, Mutzab Abdel Mahmoud, dated [date omitted] page 3
line 2 to line 31:

-36-

[Stamp] SHATSKY-006536 [continued]

Date: 28 Kislev 5768                                   File Number: 2958/06
25 December 2008

"**Q: How do you know Ahmed Sadat?**

**A: I don't know him.**

**Q: How many times have you met him?**

**A: Today on the bus.**

**Q: How did you know this morning that he was Ahmed Sadat?**

**A: Everyone recognizes the people here, like you recognize the prison guard that you have here.**

**Q: Which organization did you belong to before you were arrested?**

**A: No organization.**

**Q: At which university did you study?**

**A: An-Najjah University.**

**Q: Where?**

**A: In Nablus**

**Q: What did you study?**

**A: Social Sciences and I am still studying.**

**Q: I present to you a statement in Arabic dated December 13, 2004. Whose signature is on this statement?**

**A: That is not my signature.**

**Q: What is your identity number?**

**A: I don't know.**

**Q: Birth date?**

**A: February 12, 1978.**

**Q: Your full name?**

[Stamp] SHATSKY-006537

68

Date: 28 Kislev 5768                                            File Number: 2958/06
25 December 2008

A: Mutzab Abdel Ahmed Mahmoud.

Q: In your statement, you state that you were chairman of the Popular Front at the University, what is your response?

A: That's incorrect, I wasn't.

Q: You further state that you were in contact with Musa Salameh, what do you have to say?

A: Incorrect.

Q: You also state that you were in contact with Aahed Gulma and Ahmed Sadat.

A: I don't know them."

"Q: Do you know that Musa Salameh was responsible for the Popular Front in Nablus?

A: No.

Q: How do you suppose that got into your statement?

A: I don't know.

Q: Do you remember being questioned by the police?

A: I don't remember.

Q: Do you remember being arrested?

A: Of course I remember.

Q: How many times did you sit with an officer who wrote down your statement?

A: Never.

Q: Were you questioned by the Israel Security Agency.?

A: I was questioned in Petach Tikva.

Q: Do you remember an officer by the name of Jamal Shakur?

[Stamp] SHATSKY-006537 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

**A: No.**

**Q: Do you remember asking Ahmed Sadat and Aahed Gulma for financial assistance?**

**A: No.**

-37-

[Stamp] SHATSKY-006537 [continued]

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

> **Q: Do you remember stating in your statement that Ahmed and Aahed Gulma are responsible for the Popular Front?**
>
> **A: No.**
>
> **Q: You also explained that Ahmed is from Ramallah and Aahed is from Bet Furik.**
>
> **A: No, I don't know that place.**
>
> **Q: Is it true that you were a member of the Popular Front?**
>
> **A: No."**

In his testimony the witness took a stance of absolute hostility bordering on silence. He contended that he did not know any of those involved, had never had any connection with the PFLP, that he had never given any statement at all in writing to a police officer, and that the writing was not his handwriting. I felt based on the witness's body language and glances exchanged between him and the Defendant while giving his testimony, that the opposite was true – they are acquainted and there is even a relationship of respect between the witness and the Defendant.

The giving of the statement was proven in Court by the testimony of Officer Jamal Shakur who testified, from the statement and from his memory, regarding the circumstances of his taking it, in a reliable and direct manner, but nothing was asked about taking the statement by the defense. Officer Shakur testified that he took the statement in Arabic and showed how the witness's handwriting and his differed from one another on the same document.

The lengthy and detailed statement (24 pages), includes numerous details of the witness's life story, from the beginning of his membership in the PFLP at the age of 14 (page 2), through names of operatives who worked with him at various stages of his life, coordination with other organizations, places, names, times and telephone numbers, which the witness could not explain how they got into the statement, or how it was possible, or from which sources, the investigator could have fabricated them. Actually, the witness broadened his assertion when he contended that he never gave this statement.

In his statement the witness also went into detail regarding the matter of the suicide bombing associated with Amjad Melitat and Samr Hannani.

[Stamp] SHATSKY-006538

Date: 28 Kislev 5768                                     File Number: 2958/06
25 December 2008

This episode was supported by various pieces of additional evidence presented in this Court regarding the witnesses Abu Hanish and Hassan Fetafeta, who gave corresponding details, just as Mutzab Mahmoud himself had done in the matter of planning the same suicide bombing of the PFLP branch in Nablus.

Consequently, I prefer the witness's account given to the police, the taking of which was testified to by Officer Shakur, and which was supported by other sources, over the witness's testimony in Court, which was evasive and showed negative tokens of truth.

-38-

[Stamp] SHATSKY-006538 [continued]

72

Date: 28 Kislev 5768                                                         File Number: 2958/06
25 December 2008

Further substantiating evidence was provided to the Court in the statement of the Defendant himself, both in his statements to the police and also in Court, that he held at the relevant times the position of Secretary-General of the PFLP. Therefore, I determine that the facts of this count have been proven beyond all reasonable doubt.

The Defendant did not assert anything regarding the merits of the charge. As was his manner during this trial, he did not testify in his defense and waived his defense, thereby avoiding his cross examination and adding substantiating evidence to the assertion.

The foundations of the offense were obviously fulfilled because support of a branch of the PFLP at a large university is certainly performing a service for the Popular Front organization.

Therefore I recommend to my colleagues to convict the Defendant of the offense attributed to him in count no. 15.

**16.    Sixteenth count of the Indictment [Administering military operations of the PFLP from the prison of the "Palestinian Authority" in Ramallah]**

Key evidence:

**Prosecution Witness No. 14 (Witness No. 23 in the witness list), Mohamed Fawzi Mohamed Hanafsa.**

The witness confirmed his meeting with the Defendant in the Palestinian Authority prison in Ramallah, but contended that it dealt with legal matters, and gave testimony as follows:

> **Q: I would like to refresh your memory. Tell me whether or not you remember, based on what is written in the statement. You say that you in fact requested the assistance of the Defendant to open the community center and he told you that it was a good idea, but that he had no money to support you and sent you to other responsible bodies, do you remember?**
>
> **A: It was a community club, there was no problem with it.**
>
> **Q: Do you remember?**
>
> **A: Yes.**
>
> **Q: Is that what was the conversation was about?**

[Stamp] SHATSKY-006539

73

Date: 28 Kislev 5768                                         File Number: 2958/06
25 December 2008

      **A: Yes, but he did not support me.**

      **Q: What do you mean he did not support you?**

      **A: He did not give me the money.**

Prosecution Witness No. 11 (Witness No. 16 in the witness list), Hassan Mohamed Fetafeta testified the following in the Court:

      **Q: To which organization do you belong?**

      **A: The Popular Front for the Liberation of Palestine.**

<div align="center">-39-</div>

[Stamp] SHATSKY-006539 [continued]

Date: 28 Kislev 5768                                   File Number: 2958/06
25 December 2008

**Q: What was your position in the organization?**

**A: I worked in the military branch.**

**Q: Elaborate.**

**A: I was responsible for the group in Ramallah.**

**Q: What does that mean?**

**A: It was a group made up of people who did things against the occupation.**

**Q: What kind of things?**

**A: Military.**

**Q: Please elaborate.**

**A: Any military action against the occupation.**

**Q: Military parades?**

**A: Against military targets.**

**Q: In the statement that purports to be your police statement, you say that Ahmed Sadat asked you to resume your activity in the Popular Front in 2002. What is your response?**

**A: I have a lot to say about that. Khaled Batir was in the Israeli prison, he was ill, his daughter had just died and I didn't want him to be interrogated, the Israel Security Agency after a very difficult interrogation, after they used the worst instruments on me because they wanted the name of who was responsible. And the most appropriate name was Sadat because he was detained in the [Palestinian] Authority.**

**Q: That was why you stated that Sadat asked you to recruit operatives?**

[Stamp] SHATSKY-006540

75

Date: 28 Kislev 5768                                File Number: 2958/06
25 December 2008

A: He didn't ask me.

Q: Did you tell the officer that?

A: I told you, everything that should have been Khaled Batir, instead there was the name Ahmed Sadat.

…………………

Q: You say in the statement that Sadat asked for the number of your bank account.

A: Not true.

Q: Did Khaled Batir ask for it?

A: No.

Q: Then who did?

A: Nobody.

Q: You state that you gave it to him in order to transfer money to you.

A: I don't have a dollar bank account, I have a shekel bank account as a government clerk.

Q: I did not mention the word "dollars".

A: I know what's written in the indictment, it states dollars, they wanted the answer so I gave it to them.

Q: Do you remember the amount in dollars being discussed?

A: 28 thousand dollars in a few installments.

Q: What is your connection with Kamil Abu Hanish?

A: He is the one who called me, not Amjad Melitat, so that I should send the suicide bomber.

Q: What was in the conversation?

[Stamp] SHATSKY-006540 [continued]

Date: 28 Kislev 5768                                                                                   File Number: 2958/06
25 December 2008

**A: There was no conversation, it was a closed letter.**

**Q: You say that the money that was intended to be deposited in your bank account, you were supposed to transfer part of it to Kamil Abu Hanish?**

**A: Yes, for spending money and for food.**

**Q: Does the Popular Front have enough money to give out 28 thousand dollars for spending money?**

-40-

[Stamp] SHATSKY-006540 [continued]

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

> **A: 28 thousand dollars is a lot? (It's nothing) The Popular Front has no money. Hamas and Fatah spend more than that in one day.**
>
> **Q: Does the Popular Front spend amounts like that?**
>
> **A: That amount would last for 5 months.**

At this point the Defendant intervened and objected to the prosecution's criticism of the financial management of the organization headed by him and said as follows:

> **Defendant: What are you talking about, spending, this is the organization's money. The corruption is in your government, not in the Popular Front.**

The prosecution continued with its cross examination:

> **Q: Did you hear what the Defendant said, aren't you ashamed to stand before him and say that you transferred the Popular Front's money for spending money?**
>
> **A: What is the money for? For saving? Isn't it there so that people can eat and rent apartments? There were wanted people and they wanted apartments.**
>
> **Q: That money was actually for military activity, correct?**
>
> **A: No.**
>
> **Q: Over which area was Kamil Abu Hanish responsible?**
>
> **A: I don't know.**
>
> **Q: You transferred such a large sum of money to someone and you don't know what he does?**
>
> **A: At the instructions of Khaled Batir.**
>
> **Q: You stated earlier that it wasn't Khaled Batir.**
>
> **A: Today I said that?**

[Stamp] SHATSKY-006541

Date: 28 Kislev 5768                                           File Number: 2958/06
25 December 2008

> Q: Yes, a few minutes ago.
>
> A: I am the one who transferred them, but the instructions came from Khaled Batir, not the Defendant."

In his statement dated January 15, 2003, page 1 line 13 through 25, Hassan Mohamed Ahmed Fetafeta said the following:

> "I resumed my activity in the Popular Front in February 2002. It was when I visited the Secretary-General (*Amin Al-Am*) of the PFLP Ahmed Sadat, in the Palestinian Authority prison in Ramallah. Ahmed Sadat asked me to resume my activity in the PFLP and be responsible for PFLP activity in the Ramallah area and I agreed.
>
> Question: Did Ahmed Sadat tell you what he wanted you to do?
>
> Answer: He told me to recruit people for military activity and also told me to speak to George Kurat, approximately 32 years old, resident of Jerusalem and active in the PFLP military. At that same meeting I gave Ahmed Sadat my bank account number in the Arab Bank in Ramallah so that he could transfer money to my bank account for military activity. Ahmed Sadat told me that I have to transfer part of the money that he's putting into my bank account to Kamil Abu Hanish, resident of Nablus and active in the PFLP military…"

After examining the testimony and the statement, and taking into consideration my impressions of the witness during the trial, I saw fit to note the following considerations:

- It is quite evident that the witness does not distance himself at all from incrimination, however he makes a significant effort to distance the Defendant from incrimination.

-41-

[Stamp] SHATSKY-006541 [continued]

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

- The witness contradicted himself during the testimony with embarrassing contradictions, in that he first used dollar amounts, before the prosecution mentioned that currency in his questioning, and afterwards the witness continued naturally to the numbers and amounts themselves.

- The witness did not deny naming the Defendant as the one who ordered the transferring of the money, but said that he did this to protect the other one, Khaled Batir. Later in his testimony, he had another slip of the tongue (while surprising himself) when he avoided attributing certain organizational administrative instructions to Khaled Batir, and afterwards attributed those exact same administrative instructions to Khaled Batir.

- The witness did not explain why he specifically chose to sacrifice the Defendant, a senior person holding the position of Secretary-General of the organization, on the altar of Khaled Batir's defense.

- From the aspect of division of powers, the Defendant's status compared with that of the witness, and the relative attention to discipline and hierarchy within the organization, as shown by the evidence during the trial, the statement fits in well with the Defendant's position and control of the umbrella organization's money, more than the scenario in which he would leave control of it to another.

- The scenario where once every few months, in a relatively small organization, sums of money are transferred to operatives in the amounts of tens of thousands of dollars without the Defendant's instructions, is extremely unlikely.

- The relevant period corresponds exactly to the period of the Defendant's imprisonment in Ramallah, and to the manner in which contact was maintained between him and the operatives who continued the organization's activity.

- The interruption by the Defendant, who had followed the testimony with great interest, and who felt called upon to protect the integrity of the division of money, was made out of emotional involvement and participation in a debate with the prosecution. This statement seemed to me to be honest, and confirms the fact that the Defendant saw himself as someone responsible for the flow of funds, and personally protested the prosecution's "accusations" of financial corruption in his organization.

[Stamp] SHATSKY-006542

80

Date: 28 Kislev 5768                                    File Number: 2958/06
25 December 2008

I have attributed substantial evidential value to this reaction due to its content and timing and it constitutes an additional and considerable factor in preferring the witness's account in his statement over that in his testimony.

- In his statement the witness expanded upon the details in the matter of Amjad Melitat, who was mentioned in the statement of his partner, Kamil Abu Hanish, and thereby found additional substantiation to the statement.

For these reasons I preferred the witness's account in his police statement over his testimony in Court.

Additional key evidence was produced to the Court in the testimony of the witness Kamil Hanish:

-42-

[Stamp] SHATSKY-006542 [continued]

Date: 28 Kislev 5768                                            File Number: 2958/06
25 December 2008

In his statement, the witness Kamil Hanish went into detail, connecting the money transferred at the Defendant's command to "military" terrorist activity. The witness refused with great hostility to answer the questions he was asked and is considered. For all intents and purposes, a silent witness. The witness said as follows:

Testimony of Prosecution Witness No. 17 in the witness list, Kamil Sa'id Abu Hanish, dated August 8, 2007, page 1 line 31 through page 2 line 32:

> **Q: How long were you sentenced to?**
>
> **A: Don't know, 8 or 9 life sentences.**
>
> **Q: For what?**
>
> **A: I have finished my trial. If I have finished it, why are you asking?**
>
> **The Court explains to the witness that he is required to answer the questions he is asked by the prosecution.**
>
> **Q: I will repeat the question, what were you tried for?**
>
> **A: I told you, my matter is closed. I have finished my trial and I don't care about any other case.**
>
> **Q: Isn't it true that you were in contact with Gahed Gulma?**
>
> **A: I repeat, I told you that I finished my trial. If I am finished, I won't talk.**
>
> **Q: Isn't it true that you were responsible for the military wing of the Popular Front in Samaria?**
>
> **A: Am I presently being interrogated?**
>
> **Q: Isn't it true that your case ended with a plea bargain?**
>
> **A: No comment.**
>
> **Q: Isn't it true that in your trial you confessed?**

[Stamp] SHATSKY-006543

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

> **A: The fact that I am not in the Magistrate's Court, I will not speak. This is not my trial, I am not speaking. You ask me about people who are not in my indictment and are not involved in my case and this is degrading to me."**

In his statement dated April 16, 2003, page 13, line 25 through page 14, line 5, the witness Kamil Said Abu Hanish said the following:

> **In October 2002 I received a call from the same unnamed person who had always contacted me and funded my military operations, and asked me to bring him a young man for a suicide mission from Nablus to Ramallah. I asked Amjad Melitat to find me someone like that and he told me that there is a young man whose name is Samr Hanani whom I don't know, and haven't seen. He's 18 years old from Beit Furik and is prepared to carry out a suicide bombing. I asked Amjad Melitat to send Samr Hanani to Ramallah in order to carry out a suicide attack. The same day that Samr Hanani was sent to carry out a suicide bombing he was caught by the army in Ramallah ..."**

- This statement is supported by the statements of Mutzab Mahmoud and Hasan Fetafeta and completes, from a standpoint of time (the second half of 2002) and place (Nablus) the connection between the Defendant's instructions and his management of the organization and the maintenance and management of the Nablus branch of the PFLP organization headed by the Defendant.

- Due to the severity of the outcome of this count, it would have also been appropriate for Samr Hanani to have testified on this issue. No reason has been given to us as to why nothing was done about this complex episode,

-43-

[Stamp] SHATSKY-006543 [continued]

Date: 28 Kislev 5768                                               File Number: 2958/06
25 December 2008

but the defense has not denied the fact of Hanani's capture and the prevention of the attack spoken of by the witness.

- In light of the testimony that neither explained nor contradicted anything in the statement, and in light of the fact that the statement is well supported and in detail by Fetafeta's and Mutzab Mahmoud's statements, I prefer the statement over the testimony and determine the facts according to the evidence arising from it.

The provision of the statements has been proven to the satisfaction of the Court in the testimonies of those taking the statements, Metans Hadad and Yitzhak Yaakoboff, and it has not been contradicted in any way that can reduce the weight of the statements.

The facts of this count have proven in a satisfactory manner, additional substantiating evidence has been provided to the Court in the confession of the Defendant himself, both in his statements to the police as well as in Court, that he holds, and held, at the relevant times, the position of Secretary-General of the Popular Front organization.

The Defendant did not assert anything regarding the merits of the charge. As was his manner during this trial, he did not testify in his defense and waived his defense, thereby avoiding cross examination and adding corroborating evidence to the assertion.

The foundations of the offense have been proven (and perhaps also the foundations of even more severe offenses) for in fact the finance and organization of operations of the military branch of the organization are certainly performance of a service for the PFLP.

Nothing except for hearsay has been brought in the matter of the suicide attack itself, and therefore the murderous deeds of the cell whose organization and financing the Defendant assisted in have not been proven, nor has it been proven that these deeds were with the Defendant's knowledge, and he has not been convicted of these deeds.

Therefore I recommend to my colleagues to convict the Defendant of the offense attributed to him in count no. 16.

## 17.   Seventeenth and eighteenth counts of the indictment [Management of military operations of the PFLP from the "Palestinian Authority" prison in Jericho in conjunction with Ali Atallah Mohamed Abidat and Hassan Neirat] [Coordination and choosing a PFLP representative for the Palestinian National Authority elections]

-44-

[Stamp] SHATSKY-006544

Date: 28 Kislev 5768                                          File Number: 2958/06
25 December 2008

The facts of these counts have not been proven to us and the prosecution itself has moved that the Court acquit the Defendant of the offenses described in these counts.

That being the situation, I recommend to my colleagues to acquit the Defendant of counts seventeen and eighteen.

## 18.   Nineteenth count [Financial assistance and making contact for the wanted person Wa'el Atallah]

Key evidence:

Testimony of prosecution witness no. 12, Wisam Subahi Abed Hamid al-Gaza, page 5 line 14 through page 6 line 4:

> **Q: In this statement, on page 4, lines 17 and onward, you state that you were in Jericho, in May 2004. What is your response?**
>
> **A: I lied.**
>
> **Q: Why?**
>
> **A: I don't know.**
>
> **Q: So the fact that you stated that you visited the Jericho prison was a lie?**
>
> **A: Yes.**
>
> **Q: Let's try again, why did you lie?**
>
> **A: I wanted to present myself as someone who knows an important person.**
>
> **Q: Wa'el Atallah is also an important person?**
>
> **A: I don't know him.**
>
> **Q: Do you remember that you mentioned his name in the statement?**
>
> **A: No.**
>
> **Q: Have you ever assisted a wanted person?**

[Stamp] SHATSKY-006545

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

A: No.

Q: You state in the statement that you asked the Defendant for money.

A: That's not true.

Q: You say that he gave you NIS 700 from his pocket.

A: Not true.

Q: You also state that he asked you not to come back again.

A: Not true.

Q: What is "marjayah"?

A: I don't know.

Q: When you lied to the officer, did you make up a word in Arabic?

A: Yes. It's all a lie."

Q: To what organization does the Defendant belong?

A: Who?

Q: As I've already said, there is one defendant in the courtroom.

A: I don't know.

Q: What do you know about him?

A: I don't know anything about him.

-45-

[Stamp] SHATSKY-006545 [continued]

Date: 28 Kislev 5768                                                File Number: 2958/06
25 December 2008

In Wisam Subahi Abdel Hamid al-Aza's statement dated November 21, 2004, page 4, lines 17-21 the following words were recorded.

> **Question: You met Ahmed Sadat, what was his position?**
>
> **Answer: During May 2004 I met Ahmed Sadat "Abu Ghassan" the Secretary-General (*Amin Am*) of the PFLP in Jericho in the prison, and requested that he provide assistance to Wa'el Khalil Atallah. I told him that Wa'el was wanted and a military operative and he gave me 700 shekel from his pocket and said not to return even though he is not the "marjayah" and that the Ramallah people will take care of the PFLP operative Wa'el there."**

- So, this witness stated that he does not know the Defendant at all, and never met him. When asked how this is consistent with his statement to the police, he contended that he lied because he wanted to present himself as someone who knows someone important. The witness denied that he asked for money or received money from the Defendant, however he did confirm that he planned to carry out attacks, and that he was a member of the Popular Front.

- At a certain stage, he claimed that he did not remember certain things. At the end of his questioning, he was asked to which organization the Defendant belongs, he answered that he does not know, and that he doesn't know anything at all about him. When he was asked how did he know that he [the Defendant] was an important person, he stated that he was seen on television.

- It is unlikely that the witness, who according to his own testimony was himself a member of the PFLP, did not know who he was and who the Secretary-General of the PFLP was. This is totally inconsistent with his contentions regarding his wish to brag about his connections with the Defendant, and what would he brag about if he didn't know who he was?

- The witness's reply at this point shows that he was ready to make unreasonable statements in order for him not to say anything that might even somewhat incriminate the Defendant.

- The witness could not explain why he connected himself to Wa'el Atallah, and what there was to brag about; also what was the explanation of the expression "marjayah". One may wonder about all the detail included in the witness's statement, including the precise

[Stamp] SHATSKY-006546

Date: 28 Kislev 5768
25 December 2008

File Number: 2958/06

month of the visit, the amount of money given by the Defendant – a sum that does not point to much in the way of greatness.

-46-

[Stamp] SHATSKY-006546 [continued]

Date: 28 Kislev 5768                                                    File Number: 2958/06
25 December 2008

- The Defendant's reaction, according to the witness's story in his statement, is inconsistent with boasting and greatness; on the contrary, it presents the Defendant as someone who was not willing or able to offer serious assistance to a wanted person, and as someone unwilling to take responsibility.

- It is unclear why the witness would have wanted to brag specifically to a police officer, and if so, what happened to his desire to boast when giving testimony in public – in a forum better suited to bragging.

- Therefore this witness is found by the Court to be unreliable, has clearly tried to cover up for the Defendant and has done so in a manner that makes the contradictions and lies in his testimony self-evident. Therefore we have decided not to accept his testimony to the Court and to instead give preference to his statement to the police.

- The giving of the statement was proven in the Court in the testimony of Police Officer Yaakov Barazani; I found no defect in the taking of the statement, nor did I find in its details any indication that the witness wanted to boast of his connections with the Defendant, specifically before a police officer.

The facts regarding this count of the indictment have been proven well beyond any reasonable doubt. Additional corroborating evidence was provided to the Court in the admission of the Defendant himself, both in his statements to the police and in the Court, that he holds, and held, during the relevant time periods, the position of Secretary-General of the Popular Front organization.

The Defendant did not make any assertions at all regarding the actual charge itself. In line with his behavior during this trial, he did not testify in his defense and waived any defense, thus avoiding his cross-examination and providing additional reinforcement to the prosecution's evidence.

Given the facts, I determine that the foundations of the charges have been proven, since financing and support for a wanted person on behalf of the PFLP is in itself an offense, even if it was not proven that the wanted person was a PFLP member.

It has also been proven that the Defendant gave this support an organizational and not personal nuance when he stated that continued assistance would be provided by the regional organizational personnel. Making the assistance dependent on the organization is definitely performing a service for the Popular Front organization.

-47-

[Stamp] SHATSKY-006547

Date: 28 Kislev 5768                                 File Number: 2958/06
25 December 2008

Therefore, I recommend to my colleagues to find the Defendant guilty of the offenses he is charged with under in count 19 of the indictment.

### Honorable President Lieutenant Colonel Zvi Lekah

I agree with my colleague Justice Dahan's detailed verdict, except with respect to the eighth count of the Indictment. My colleague believes that Haitham Abidat's statement cannot be relied upon regarding this charge, since the witness was not questioned regarding this charge in Court, and since it is a sole testimony, it should not be relied upon.

When my colleague relates to Haitham's testimony in Court he says the following:

> "My impression of the witness on the witness stand, as recorded at the time that the testimony was given, was that the witness was trying to sidestep the questions with weak excuses, to avoid incriminating the Defendant or going into detail about the other person to whom he gave the weapon. My impression from the witness's body language and his glances at the Court and at the Defendant are that his testimony before us was not the truth."

I myself share the same impression. Since this was my impression, I have no doubt that even had the witness been asked any question regarding the conspiracy to commit a robbery, he would have responded evasively and avoid incriminating the Defendant, as he did with the other offenses about which he was questioned.

When our overall impression from the testimony of the witness before us is negative with regards to the degree of his credibility, and we are not prepared to rely on his testimony before us, the only alternative we have is to examine whether or not to prefer his statement to the police. My colleague wishes to separate the part of the statement about which the witness was questioned in Court from the part of the statement about which he was not questioned. In this case, as stated, there is no justification for this distinction, and it is similar in this context to a witness who remains silent on the stand, about which my colleagues also agree that it is not necessary for him to be asked all the questions, from the moment that it is clear that he is not willing to testify. This is about a witness who was absolutely consistent in his evasive maneuvers and his refusal to incriminate the Defendant in Court, as opposed to his clear, orderly account in his police statement. Separation of the parts of the statement is artificial and unnecessary, in light of our direct impression from Haitham Abidat's testimony before us.

**-48-**

[Stamp] SHATSKY-006548

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

The non-exhaustive investigation in this case cannot be ignored, and without significant and appropriate substantiation, a single statement given to the police certainly cannot be relied upon in this case. Nevertheless, in the case before us, there is significant corroboration. Haitham's statement is corroborated in the testimony given by his fellow cell members regarding other acts that they carried out together. The Defendant himself did not testify at all as part of the defense, something that may be considered a serious evidentiary factor, and it may be said that in his questioning by the police also, he refused to answer questions or to cooperate with his investigators, apart from the fact that he confirmed his being the Secretary-General of the PFLP.

Under the circumstances, I do not believe that there is any doubt regarding Haitham Abidat's statement in relation to the conspiracy to carry out a robbery, just as we did not believe there was any doubt regarding the other conspiracies carried out by the cell members.

Therefore, in my opinion, the Defendant should also be convicted of the charges he stands accused of in the eighth count of the indictment.

**Honorable Judge Captain Menachem Lieberman**

I concur with the verdict of my colleagues, the Honorable Justice Dahan, and also with the comments of the Honorable President Lekah. In light of this, I also believe that the Defendant should be found guilty of the charges he stands accused of in the eighth count of the indictment.

**Conclusion:**

We find the Defendant guilty of the charge of membership and activity in an unlawful organization pursuant to Regulation 85(1) (a) of the Defense (Emergency) Regulations, 1945, attributed to him in the first count of the Indictment, however only from the beginning of 1999 **[Membership in the Popular Front].**

We acquit the Defendant of the charge of holding a position in an unlawful organization, an offense pursuant to Regulation 85(1) (b) of the Defense (Emergency) Regulations, 1945, attributed to him in the second count of the indictment **[Holding the position of being responsible for the branch of the Popular Front in Jericho].**

We find the Defendant guilty of the charge of holding a position in an unlawful organization, an offense pursuant to Regulation 85(1) (b) of the Defense (Emergency) Regulations, 1945, attributed to him in the third count of the indictment **[Holding the position of directing the branch of the Popular Front in Ramallah and his activities].**

In lieu of the charge of conspiracy to intentionally cause death, which the Defendant was charged with in the fourth count of the indictment, we find him guilty of the offense of performing a service for an unlawful organization,

-49-

[Stamp] SHATSKY-006549

Date: 28 Kislev 5768 File Number: 2958/06
25 December 2008

an offense pursuant to Regulation 85(1)© of the Defense (Emergency) Regulations, 1945 **[Requesting approval from the Defendant for the murder of a Jewish woman, resident of Abu Dis].**

In lieu of the charge of conspiracy to throw a Molotov cocktail, which the Defendant was charged with in the fifth count of the indictment, we find him guilty of the offense of performing a service for an unlawful organization, an offense pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945 **[Requesting approval from the Defendant for the carrying out of a Molotov cocktail attack].**

In lieu of the charge of conspiracy to intentionally cause death, which the Defendant was charged with in the sixth count of the indictment, we find him guilty of the offense of performing a service for an unlawful organization, an offense pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945 **[Requesting approval from the Defendant for the setting off of an explosive device at Café Rimon in Jerusalem].**

We convict the Defendant of the charge of trading in war materiel, pursuant to Section 2 of the Prohibition Against Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968, attributed to him in the seventh count of the indictment. **[Trading an Uzi mini-submachine gun for a pistol].**

By a majority we convict the Defendant of the offense of conspiring to commit armed robbery, an offense pursuant to Section 22 of the Criminal Liability (Judea and Samaria) Order (N©225), 5728-1968, pursuant to Section 402(2) of the Jordanian Criminal Law (No. 16) of 1960, and Section 14(a) (2) of the Criminal Liability (Judea and Samaria) Order (N©225), 5728-1968, attributed to him in the eighth count of the indictment **[conspiring to commit armed robbery of a money-changer].**

We convict the Defendant of the offense of performing a service for an unlawful organization, an offense pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the ninth count of the indictment **[Arranging a meeting with persons who expressed interest in carrying out military activity]**.

In lieu of the offense of conspiracy to intentionally cause death, attributed to him in the tenth count of the Indictment, we convict the Defendant of the offense of conspiring to commit a crime, conduct of military activity, pursuant to Section 22 of the Criminal Liability (Judea and Samaria) Order (N©225), 5728-1968 **[Conspiracy to carry out attacks together with Mahmoud Khalil al-Ghoul].**

[Stamp] SHATSKY-00650

Date: 28 Kislev 5768                                                      File Number: 2958/06
25 December 2008

We convict the Defendant of the charge of performing a service for an unlawful organization, an offense pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the eleventh count of the indictment **[Supervision of and participating in the PFLP Conference in the Jerusalem area]**.

We acquit the Defendant of the charge of performing a service for an unlawful organization, an offense pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the twelfth count of the indictment **[Checking the PFLP records and notification of Raami Jabil that there is negative material regarding him]**.

We convict Defendant of the charge of holding a position in an unlawful an offense pursuant to Regulation 85(1) (b) of the Defense (Emergency) Regulations, 1945, attributed to him in the thirteenth count of the indictment **[Holding the position of the Secretary General of the Popular Front]**.

We convict the Defendant of the charge of the offense of incitement in accordance with Sections 7 + 10 of the Prohibition of Incitement and Hostile Propaganda Order (Judea and Samaria) (No. 101), 5727-1967,

-50-

[Stamp] SHATSKY-00650 [continued]

Date: 28 Kislev 5768                                       File Number: 2958/06
25 December 2008

attributed to him in the fourteenth count of the indictment **[Incitement speech calling for revenge after the death of Abu Ali Mustafa]**.

We convict the Defendant of the charge of performing a service for an unlawful organization, pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the fifteenth count of the indictment **[Coordination of meetings with the association head at An-Najjah University]**.

We convict the Defendant of the charge of performing a service for an unlawful organization, pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the sixteenth count of the indictment **[Directing the military activities of the PFLP from a Palestinian Authority jail cell in Ramallah]**.

We acquit the Defendant of the charge of performing a service for an unlawful organization, pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the seventeenth count of the indictment **[Directing military activities of the PFLP from a Palestinian Authority jail cell in Jericho through Ali Atallah, Mohamed Abidat and Hassan Neirat]**.

We acquit the Defendant of the charge of performing a service for an unlawful organization, pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the eighteenth count of the indictment **[Coordination and choosing a PFLP representative in the Palestinian Authority elections]**.

We convict the Defendant of the charge of performing a service for an unlawful organization, pursuant to Regulation 85(1) (c) of the Defense (Emergency) Regulations, 1945, attributed to him in the nineteenth count of the indictment **[Financial assistance and making contacts on behalf of Waal Atallah, wanted person]**.

**Given and notified today, December 25, 2008, in public and in the presence of the parties.**

|  |  | [Signature] |
| :---: | :---: | :---: |
| [Signature] | [Signature] | [Stamp] Amir Dahan, Judge |
|  |  | December 25, 2008 |
| **Judge** | **President** | **Judge** |

**-51-**

[Stamp] SHATSKY-00651

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

# בית המשפט הצבאי יהודה

בפני כב׳ הנשיא: סא״ל צבי לקח
השופט: רס״ן מנחם ליברמן
השופט: רס״ן אמיר דהאן

התביעה הצבאית
(באמצעות סרן מיטל זריהן)

נגד

הנאשם:אחמד סעדאת יוסף עבד אלרסול ת.ז 965056138/שב״ס
(באמצעות ב״כ עו״ד מחמוד חסאן)

---

## הכרעת דין

### כב׳ השופט רס״ן אמיר דהאן:

הנאשם אחמד סעדאת עבד אלרסול, תושב אלבירה, הועמד לדין בכתב אישום
שהוגש ביום 21/05/06 לבית משפט זה.

## 1 .כתב האישום ומהלך הדיון.

**1.1 בפרט האישום הראשון** הואשם הנאשם בעבירה של חברות ופעילות בהתאחדות
בלתי מותרת בכך משנת 1995 ועד למעצרו ביום 14/03/06 היה חבר ופעל כחבר
בארגון ״החזית העממית לשחרור פלסטין״ ( להלן החז״ע ) שהוא התאחדות בלתי
מותרת.

**1.2 בפרט האישום השני** הואשם הנאשם בעבירה של נשיאת משרה בהתאחדות
בלתי מותרת, בכך משנת 1995 ניהל והיה אחראי על ארגון החז״ע ביריחו.

**1.3 בפרט האישום השלישי** הואשם הנאשם בעבירה של נשיאת משרה בהתאחדות
בלתי מותרת, בכך שהיה אחראי ארגון החז״ע ברמאללה בשנים 2001-1999.
במסגרת תפקיד זה היה הנאשם אחראי גם על הפעילות הארגונית וגם על הפעילות
הצבאית בחז״ע.

-1-

תאריך : כ"ח בכסלו תשס"ח
25 בדצמבר 2008

1.4 **בפרטי האישום הרביעי החמישי והשישי** האשם הנאשם בשתי עבירות של
קשירת קשר לגרימת מוות בכוונה, ובעבירה אחת של קשירת קשר לזריקת בקבוק
תבערה. בגדרם של אישומים אלה מואשם הנאשם כמי שאליו פנו שלושה פעילים
צבאיים של ארגון החז"יע וביקשו מהנאשם את אישור ארגון החז"יע לבצע את
הפיגועים הבאים :

- דקירתה של אישה יהודייה הנשואה לתושב אבו-דיס.
- יידוי בקבוק תבערה לעבר רכבו של כומר נוצרי אשר נחשד על ידם כמי
  שמבצע מעשים מיניים בנערים.
- פיצוץ מטען חבלה בקפה "רימון" בעיר ירושלים – לפיגוע זה התבקש גם
  סיועו של הנאשם.
- פיצוץ מטען חבלה במקום בילוי בתלפיות – ירושלים.

כעבור מספר ימים, יוחסה לנאשם שיחה עם חברי החוליה, במהלכה אמר להם
שארגון החז"יע אינו מתנגד עקרונית לביצוע תוכניות הפיגוע אך הורה להם להמתין
עד לאחר ועידת הארגון אשר יועדה להיות כחודש וחצי לאחר מכן .
לעניין התוכנית לפגע במקום הבילוי בתלפיות יוחס לנאשם כי הודיע לאחד מחברי
החוליה - במענה לפניית החבר האחר שפנה אליו - כי פיגוע זה אינו מאושר .
על פי כתב האישום, שלושת הפעילים, הייתם, מחמד ומאהר נעצרו בחודש ספטמבר
1999, על כן לא יצאו הפיגועים המתוכננים אל הפועל.

1.5 **בפרט האישום השביעי** האשם הנאשם בסחר באמל"ח בכך שייוחס לו כי ביקש
וקיבל מאת הייתים עבידאת תת מקלע מיני עוזי .

1.6 **בפרט האישום השמיני** האשם הנאשם בקשירת קשר לשוד מזויין :
על פי כתב האישום תכננו אנשי אותה חוליה המתוארת בפרט האישום הרביעי שוד
של מוסד בנקאי ואת כספי השלל, אשר אותם העריכו בני החבורה בכ-$200,000,
תכננו בני החבורה להעביר לארגון החזית העממית לשחרור פלסטין.
אנשי החוליה הנ"ל פנו לנאשם, סיפרו לו על תוכניתם, וביקשו ממנו את סיוע ארגון
החזית העממית לשחרור פלסטין בביצוע השוד, באופן של אספקת רכב ו-2 אקדחים
לשם ביצוע השוד.
יוחס לנאשם כי שמע את תוכניתם של בני החבורה והסכים לביצוע השוד, וכן
הסכים לסייע לבני החבורה בדרך של אספקת 2 אקדחים ורכב, אשר ישמשו את בני
החבורה בעת ביצוע השוד.

תאריך : כ״ח בכסלו תשס״ח        תיק מס׳ : 2958/06
25 בדצמבר 2008

1   לאחר מספר ימים, נסעו אנשי החוליה  להיפגש עם הנאשם ברמאללה ולקבל ממנו

2   את הנשקים והרכב, ונעצרו בדרכם אליו.

3

4   **1.7 בפרט האישום התשיעי** הואשם הנאשם בעבירה של ביצוע שירות עבור

5   התאחדות בלתי מותרת. על פי כתב האישום הגיעו מספר אנשים למשרדי החז״ע

6   ובקשו מן הנאשם לבצע פעילות חבלנית ״צבאית״ מטעם הארגון – יוחס לנאשם כי

7   הורה לנוכחים שלא לשוחח על נושא זה במשרדי ארגון החז״ע, וכי הוסיף ואמר

8   לנוכחים כי תיקבע פגישה במקום אחר, ובאותה פגישה יידון נושא הפעילות

9   החבלנית ה- ״צבאית״ של הנוכחים.

10   כעבור שבוע, נפגשו מחמד אלעיול וחאלד חלבי עם הנאשם ועם פעילים נוספים,

11   ושטחו בפניו את רצונם לעבור לפעול פעילות חבלנית ״צבאית״. יוחס לנאשם כי

12   אמר שיבדוק את העניין ויודיע לכל אחד באופן פרטי את תשובתו בנוגע לעניין

13   הפעילות החבלנית ה״צבאית״.

14   לאחר זמן מה  אחד מן הפעילים שנכחו בפגישה עם הנאשם ושביקשו לבצע ״פעילות

15   צבאית״ הוזמן לפגישה שבה יוסבר תכנון הפיגועים. אותו פעיל נפגש עם אדם

16   אלמוני אשר סיפר לו כי ארגון החזית העממית לשחרור פלסטין מעוניין לבצע

17   פעילת צבאית ולחטוף חיילים לצרכי מיקוח, האלמוני  דאג לאמן את חברי החוליה

18   בנשק, ביקש להתקין משתיק קול לתת מקלע, סיפק אקדח לאימונים ותכנן עם

19   החוליה חטיפות חיילים ופיגועים שונים – ברמה של תכנון ראשוני. כמו כן ביצע

20   האלמוני עם חברי החוליה מעשים שונים של הכנה קשר וסיוע, הכול על מנת

21   להוציא פעילות חבלנית.

22

23   **1.8 בפרט האישום העשירי** הואשם הנאשם בקשירת קשר לגרימת מוות בכוונה לפי

24   הנסיבות הבאות :

25   במהלך החודשים אוגוסט-ספטמבר 2000, הגיע מחמד חליל אלעיול למשרדי החז״ע,

26   נפגש עם הנאשם, וביקש מהנאשם כי יגייסו לארגון למטרות ״פעילות צבאית״.

27   יוחס לנאשם כי דחה את בקשתו על הסף. השניים נפגשו שוב, הנושא עלה שוב

28   והנאשם סירב לדון בו .

29   לאחר מכן יוחס לנאשם כי פנה אל מחמד ואמר לו כי אם ברצונו לפעול ״פעילות

30   צבאית״ בשם ארגון החזית העממית לשחרור פלסטין, כי אז עליו להגיע לכיכר

31   השעון ברמאללה בשעה 14:00, שם יפגוש אדם המחזיק שרשרת חרוזים בצבע

32   אדום.

-3-

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1   מחמד אל עיול עשה כמיצות הנאשם, ושם סורב בשלישית על ידי אדם אחר ולפיכך
2   פנה לתקופת מה לעסוק בפעילות חבלנית עוינת שאינה קשורה לנאשם.
3   יוחס לנאשם כי נפגש פעם נוספת עם מחמד אל עיול ושוחח עימו על פעילותו
4   החבלנית העוינת. לאחר שיחה זו פגש מחמד אל עיול באדם פלוני אשר דן איתו
5   בקשר לביצוע פעילות חבלנית עוינת בשם הארגון.
6   מחמד אל עיול וחבריו ביצעו בהתאם לתיאום זה תכנונים ותצפיות על מקומות
7   שונים בכוונה לבצע בהם פיגועים. במהלך תקופת הפעילות, הפך מחמד לאחראי על
8   צפון מזרח ירושלים מטעם ארגון החזית העממית לשחרור פלסטין.

9

10   **1.9 בפרט האישום האחד עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור
11   התאחדות בלתי מותרת בכך שנכח בועידת החז״ע באזור ירושלים ופיקח עליה.

12

13   **1.10 בפרט האישום השנים עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור
14   התאחדות בלתי מותרת לפי העובדות הבאות :
15   יוחס לנאשם כי קיבל את פניותו של פעיל חז״ע אשר טען כי חבריו חושדים בו
16   בשיתוף פעולה עם שלטונות ישראל. פעיל זה ביקש לבדוק האם קיים רישום בנושא
17   זה ברישומי החז״ע. יוחס לנאשם כי בדק את העניין, והשיב לפונה כי אכן קיים
18   חומר שלילי במסמכי הארגון כפי שביקש לדעת.

19

20   **1.11 בפרט האישום השלושה עשר** הואשם הנאשם בעבירה של נשיאת משרה
21   בהתאחדות בלתי מותרת בכך שבמהלך התקופה מחודש אוגוסט 2001 ועד למעצרו
22   ביום 14/03/06 נשא את משרת המזכיר הכללי של ארגון החזית העממית לשחרור
23   פלסטין באזור ומחוצה לו.
24   יוחס לנאשם כי המשיך לקבל פונים ולקיים את רכיבי התפקיד גם בהיותו כלוא
25   בכלא של ה״רשות הפלסטינית ״.

26

27   **1.12 בפרט האישום וה:ארבעה עשר** הואשם הנאשם בעבירה של  הסתה, בכך
28   שבחודש  אוקטובר 2001 קיים עצרת של ארגון החז״ע, לציון 40 יום למותו של אבו
29   עלי מוצטפא אשר היה קודמו של הנאשם בתפקיד מזכ״ל החז״ע.
30   בעצרת זו יוחס לנאשם כי קרא בנאום בפני קהל רב לנקום את מותו של אבו עלי
31   מוצטפא בידי כוחות הביטחון הישראליים.

32

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1.13 **בפרט האישום החמישה עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור
התאחדות בלתי מותרת, בכך שקיים שיחות עם מס״עב עאדל מחמוד, אשר היה
אותה עת ראש ארגון החז״ע באוניברסיטת א-נג׳אח, ועם עאהד עיולמה, ראש
הזרוע הצבאית של ארגון החז״ע, הכול בנוגע לפעילות במסגרת הארגון. במהלך
שיחות אלו בקש מס״עב מהנאשם ומעאהד כספים לטובת פעילות הארגון.
לאחר שהתבקשו בקשות אלו, נהג מוסא סלאמה, אחראי ״ארגון החזית העממית
לשחרור פלסטין בשכם, להעביר את הכספים למס״עב.

1.14 **בפרט האישום הששה עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור
התאחדות בלתי מותרת בכך שבשנת 2002 פנה אל חסן מחמד אחמד פטאפטה אשר
ביקר אותו בכלא ברמאללה, וביקש ממנו לחדש את פעילותו בארגון החז״ע, כדי
שישא את משרת  אחראי על פעילות הארגון באזור רמאללה, יגייס אנשים לפעילות
החז״ע, וייצור קשר עם פעיל חז״ע העוסק בפח״ע ושמו ג׳ורג׳ קורט.
יוחס לנאשם כי סיכם עם חסן על העברת כספים .לצורך הפעילות המבוקשת
ולפעילות מקבילה בשכם דרך אחד ושמו כמיל אבו-חניש.
חסן ביצע את הוראות הנאשם ושימש כמפקד הצבאי של ארגון החז״ע באזור
רמאללה, עסק בפעילות חבלנית ענפה ופעל לביצוע פיגועי טרור שונים במטרה
לגרום למותם של קציני וחיילי צה״ל, אנשי בטחון שונים, בכירים ושוטרים
ממשטרת ישראל ואזרחי מדינת ישראל לרבות תכנון מתקדם של פיגוע תופת
בתחנה המרכזית בירושלים.
כמסוכם עם הנאשם, קיבל חסן בהמשך, לחשבון הבנק האמור, אחת לחודשיים,
סכומי כסף שונים והעביר חלק מהם לארגון בשכם.
כמיל אבו-חניש קיבל לידיו כספים, בהם השתמש לפעילות הצבאית של ארגון
החז״ע, בסיוע לפעילים, בהוצאת פיגועים לפועל - לרבות כאלה שהסתיימו במוות.
בנוסף, העביר חסן, במספר הזדמנויות שונות, סכומי כסף לאחד בשם עאהד חושיה,
מבוקש ופעיל חז״ע.
חסן פנה לג׳ורג׳ קורט כמצוותו של הנאשם, גייס אותו לפעילות צבאית בארגון
החזית העממית לשחרור פלסטין, והפעילו באיסוף מידע לשם ביצוע פיגועים כנגד
קציני צבא ומשטרה וכנגד ראש עיריית ירושלים דאז – אהוד אולמרט. כמו כן קשר
ותכנן עימם להוציא את הפיגועים לפועל.
חסן גייס אנשים נוספים לפעילות וקשר עימם לבצע עבירות חמורות וכן רקם
קשרים עם חברי ארגונים אחרים ואזורים אחרים לשם ביצוע משותף של פיגועים.

תיק מס׳: 2958/06.

תאריך: כ״ח בכסלו תשס״ח
25 בדצמבר 2008

**1.15 בפרט האישום השבעה עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור

התאחדות בלתי מותרת, בכך שדן עם שלושה ממבקריו בכלא יריחו, עלי ג׳מאל חסן

עטאללה, מחמוד עבידאת וחסין נעיראת – פעילי חז״ע מאבו דיס – בפעילות ארגון

החז״ע. במהלך השיחה, הציגו השלושה בפני הנאשם דין וחשבון על פעילות הארגון

באבו-דיס. בנוסף, ביקשו השלושה מהנאשם בקבוקי צבע לכתיבת סיסמאות

הארגון וכן תמונות של חללי ארגון החזית העממית לשחרור פלסטין לשם המשך

פעילות הארגון באבו-דיס.

**1.16 בפרט האישום השמונה עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור

התאחדות בלתי מותרת, בכך שקבע כי מועמד החז״ע בבחירות הכלליות העתידיות

יהיה מוצטפא ברעיותי.

**1.17 בפרט האישום התשעה עשר** הואשם הנאשם בעבירה של ביצוע שירות עבור

התאחדות בלתי מותרת בכך שבחודש מאי 2004, נפגש בכלא יריחו עם ויסאם צובחי

ע/חמיד אלעזה, וזה האחרון ביקש מהנאשם סיוע לפעיל צבאי של ארגון החזית

העממית לשחרור פלסטין המבוקש לישראל, בשם ואאל חליל עטאללה.

יוחס לנאשם כי במעמד השיחה הוציא סכום של 700 ₪ ונתנם לויסאם עבור

סיוע למבוקש, ואאל חליל עטאללה. לאחר מכן הציע הנאשם לויסאם, כי יאמר

לחליל לפנות לפעילי ארגון החז״ע ברמאללה, על-מנת שאלו יסייעו בידו בעתיד.

## 2. מערך הראיות בתיק ואופן ניהולו

**2.1** בפתח המשפט בישיבה מיום 02/07/06, הודיע עו״ד מחמוד חסאן כי הוא מייצג

את הנאשם. עו״ד חסאן ביקש מספר בקשות הקשורות לחומר החקירה ולעותק של

הסכם מאת משרד ראש הממשלה, וביקש לדחות את הדיון להמשך לאחר שיתקבל

החומר.

התובע הצטרף לבקשתו של ב״כ הנאשם והודיע כי שאלות משפטיות שונות נבחנות

עדיין בתביעה הצבאית, לרבות שאלות העשויות להוביל לתיקונו של כתב האישום.

כמו כן, הודיע התובע כי קבלתו של חומר חקירה נוסף נבחנת גם היא, ואם יתוסף

חומר חקירה כזה, הוא יועבר ישירות לסנגור.

תיק מס׳ : 2958/06                    תאריך : כ״ח בכסלו תשס״ח
                                      25 בדצמבר 2008

2.2 ביום 04/06/06 הוגש מטעם הנאשם מסמך הנושא את הכותרת: "השלמת
טיעונים" ובו טען כי קיים הסכם בין ממשלת ישראל ובין הרשות הפלסטינית
השולל את חוקיות כתב האישום כנגד הנאשם.

2.3 ביום 08/06/06 הוגשה לתיק תעודת חיסיון בדבר פרטי מידע שונים הקשורים
בתיק.

2.4 ביום 13/06/06 ביקשה התביעה אורכה כדי לבצע את החלטת ביהמ״ש להעברת
חומר החקירה הנוסף לסנגור.

2.5 ביום 13/09/06 הוגשה בקשה מוסכמת לדחיית הדיון על מנת ליתן אורכה
לצדדים להסדיר את ענייני תיקון כתב האישום וחומר החקירה, ולאור תקופת
החגים, התבקשה והתקבלה החלטה על דחייה של הדיון ליום 05/11/06.

2.6 ביום 05/11/06, לא הובא הנאשם לביהמ״ש עקב תקלה של שב״ס.

2.7. ביום 09/11/06 התקיים דיון. הנאשם ביקש שלא להשיב לכתב האישום, וטען
את הטענה בדבר הסכם בין מדינת ישראל ובין הרשות הפלסטינית המונע את
העמדתו לדין באזור או בישראל. הנאשם הוסיף וטען כי ישב בכלא ללא משפט
בעקבות אותו הסכם למשך 4 שנים.
התביעה לא הודיעה כי נוסח כתב האישום הוא סופי כבקשת הסנגור. הסנגור טען כי
לביהמ״ש אין סמכות לדון בעניינו של הנאשם כשם שלמפקד האזור אין סמכויות
חקיקה. כן טען הסנגור כי מרשו אינו רואה במעשים המיוחסים בכתב האישום
משום עבירה וטען שכל הסמכויות שהיו למפקד האזור, ערב הסכמי הביניים,
הועברו לרשות הפלסטינית ושם, אם בכלל, מצוי בית המשפט המוסמך לדון
בנאשם. הסנגור לא פרט את טענותיו אך הוסיף כי יגיש כנהוג את טענותיו
המקדמיות המפורטות בכתב לביהמ״ש, וביהמ״ש קבע תאריכים להגשת הטענות,
התגובה לטענות, ומועד להחלטה.

2.8 ביום 14/01/07 הגיש הנאשם את תגובתו בכתב לכתב האישום. התגובה כללה
כפירה בחוקיותן של סנכויות מפקד האזור באיו״ש, טענות כלליות כנגד הציונות
והכיבוש בתחומי מדינת ישראל ובאזור, וסירוב כללי להישפט בפני ביהמ״ש זה
ולעמוד בפניו במעמד של נאשם.

-7-

לעניין ההאשמות טען הנאשם במסמך שהוגש כי האמור בכתב האישום אינו בגדר   1
"עבירות ביטחון" אלא חובה לאומית, ואין נפקא מינא אם האמור בכתב האישום   2
קרה בפועל, או שאינו אמת. הנאשם טען כי חובה לאומית זו באה במסגרת   3
ההתנגדות לכיבוש.   4

הנאשם פירט בהודאתו כי הוא משמש כמזכיר הכללי של החזית העממית לשחרור   5
פלסטין ובתור שכזה הוא לוחם למען סיום הכיבוש הישראלי, השגת העצמאות   6
הלאומית והחזרת פליטי עמו לבתיהם ולאדמתם.   7

הנאשם הודיע בכתב כי הוא ער לאפשרות שביהמ״ש לא ירצה לשמוע את עמדתו   8
העקרונית ו - "אולי ידחה אותה מחוסר סמכות - וזה במובן הצר, נכון".   9

הנאשם ציין כי זכותו, צדקתו וההיגיון מתייישבים עם פעולותיו שהובילו להאשמתו   10
בהתנגדות לכיבוש מצד בני עמו.   11

                                                                          12

ביום זה הודיע הסנגור לבית המשפט כי לאור התגובה ואי הכרתו של הנאשם   13
בביהמ״ש, אין  מרשו מעוניין מעתה לא  בייצוג ולא בהליך המשפטי, ולפיכך ביקש   14
הסנגור להתפטר מהייצוג. הסנגור ציין כי מרשו לא הכחיש כי הוא המזכ״ל של   15
החזית העממית, והנאשם ציין כי לבד מתגובתו בכתב איננו מעוניין לענות דבר   16
לביהמ״ש בעניין כתב האישום.   17

                                                                          18

**2.9** בהחלטתו ציין ביהמ״ש כי הוא איננו משחרר את הסנגור מייצוג, ומכל מקום,   19
כיוון שאין במסמך שהגיש הנאשם הודאה מלאה בכל פרטי כתב האישום, רואים   20
אותו כאילו כפר בכתב האישום. ביהמ״ש הודיע כי אינו מחווה דעה בשלב זה לגבי   21
המשמעות הראייתית המלאה של תגובת הנאשם, לרבות בשאלה אם ניתן לראות   22
בתגובה זו הודאה בעובדות כתב האישום. באותו מעמד נקבע התיק להוכחות.   23

                                                                          24

**2.10** מכאן ואילך, התנהל המשפט בדרך של שמיעת עדים, כאשר ההגנה נמנעת   25
מחקירת העדים בחקירה נגדית ולאחר שהנאשם הוזהר לגבי המשמעות המשפטית   26
של ויתור זה. העדים נשמעו בתאריכים 18/04/07, 06/05/07, 09/05/07, 30/05/07,   27
29/07/07, 01/08/07, 05/08/07, 08/08/07, 04/11/07, 18/11/07, 13/02/08,   28
20/02/08, 19/03/08, 02/04/08, 11/05/08. הנאשם ויתר על פרשת ההגנה במסגרת   29
עמדתו, וזאת לאחר שהוזהר לגבי המשמעות המשפטית של ויתור זה.   30

                                                                          31

תיק מס׳: 2958/06

תאריך: כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1     2.11 התביעה העידה גם את גובי אמרותיהם של העדים והאמרות הוגשו ע״פ סעיף
2     10א לפקודת הראיות (נוסח חדש) התשל״א – 1971 לאחר שמתן האמרות הוכח
3     במשפט.

4

5     2.12 ביום 11/05/08 נקבע התיק לסיכומים בכתב ולאחר מספר בקשות להארכת
6     מועד, הוגשו סיכומי התביעה בכתב ביום 04/08/08. הסנגור הודיע כי בהתאם
7     לעמדתו של הנאשם הרי שלא יגיש סיכומים.

8

9     ## 3. טענות מקדמיות

10

11     3.1 הסנגור בחר שלא לעמוד על טענותיו המקדמיות לאחר שהודיע על קיומן
12     בישיבה המקדמית ויידע את בית המשפט בתמציתיות בדבר עילתן.

13

14     3.2 הנאשם בחר לטעון טענות כלליות הנושאות אופי אידיאולוגי כנגד סמכות בית
15     המשפט לשפוט כל תושב של האזור, או כל אדם שהוא, המבצע פעילות כלשהי כנגד
16     שלטון ישראל באזור או במדינת ישראל. הנאשם בחר למעשה לכפור באופן עקרוני
17     בסמכות בית המשפט אף שהודיע שאינו כופר בקיומה של סמכות משפטית ב״מובן
18     הצר״ . מובן שלאחר שנקט הנאשם עמדה שכזו, הוננחה גם הסנגור שלא ליטול חלק
19     במשפט ובין השאר זנח גם את טענותיו לחוסר סמכות ולהשתק מחמת הבטחה
20     שלטונית שיסודן היה בהסכם בין הרשות הפלסטינית לבין ישראל .

21

22     3.3 למעלה מן הצורך אומר כי לאחר שעיינתי בטענותיו של הנאשם מצאתי בהן
23     רמזים לטענות בדבר הסכם אשר אמור היה להיות מוגש כראייה לעיונו של בית
24     המשפט. **אך הוא לא הוגש כראייה בהליך שלפנינו**, וספק אם כלל קיים הסכם כזה.

25

26     3.4 התוצאה היא כי לא מצאתי שהוכח כי ניתנה הבטחה שלטונית כלשהי, מפורשת
27     או משתמעת כי הנאשם לא יישפט בישראל בבית משפט אזרחי או בבית משפט
28     צבאי ולא הוכח בפנינו כי הנאשם נשפט בבית משפט מוסמך אחר וריצה את עונשו
29     או שזוכה במשפטו. .

30

31     3.5 הטענות המקדמיות שנטענו בכלליות לא פורטו, ולפיכך לא ניתנה לתביעה
32     הזכות להביא ראיות או להתגונן מפניהן. מכאן שאין מקום לדחותן בהחלטה שכן
33     רואים את הסנגור כמי שהסכים למחיקת הטענות אם לא הוכיח אותם במסמכים

1   שהיו אמורים להיות מוגשים, לא עמד עליהן בסיכומיו,  ולא פירט אותן כפי שצריך

2   היה לעשות לאחר שהודיע על קיומן בכלליות.

3

4   **3.6** אני מציע לחבריי לקבוע כי בית המשפט לא מצא עילה משפטית להפסיק את

5   משפטו של הנאשם ולהימנע מלהכריע את דינו.

6

7   **3.7** כאמור, הנאשם בחר לנקוט בגישה לעומתית כלפי ביהמ"ש, לא מסר תגובה

8   מפורטת לכתב האישום אלא טען במסמך שהוגש כי אינו מכיר בסמכותו של

9   ביהמ"ש. לנוכח גישה זו, ראינו את הנאשם כמי כופר בכל המיוחס לו בכתב האישום.

10   התביעה הזמינה את כל עדיה, התקיימו חקירות ראשיות על ידי התביעה של כל

11   העדים, אולם הנאשם הורה לסנגורו שלא לחקור את העדים בחקירה נגדית ולא

12   עשה כן בעצמו. לאחר שנשמעו כל עדי התביעה בחר הנאשם שלא להעיד במסגרת

13   פרשת ההגנה וחרף אזהרתנו כי אם יבחר שלא להעיד, ניתן יהיה לעשות שימוש באי

14   העדתו כתוספת לראיות התביעה, עמד בבחירתו זו. התביעה הגישה את סיכומיה

15   בעוד שהנאשם בחר שלא לסכם.

16

17   **3.8** יחד עם זאת התערב הנאשם מדי פעם בהערות לעד זה או אחר או ב"קריאות

18   ביניים" אשר הפנה אל התביעה או אל בית המשפט, לאמירות אלה ייחסנו את הערך

19   הראייתי הרגיל הניתן לאמרות נאשם ולאירועים במשפט המתרחשים שלא על דרך

20   עדות מסודרת.

21

22   **3.9** לנוכח גישתו של הנאשם בניהול המשפט, הזהרנו את עצמנו הזהר היטב כי עלינו

23   לבחון את ראיות התביעה, לשאול את העדים שאלות בעצמנו, והכול גם מתוך

24   ראייה של הגנת הנאשם ולבדוק האם ניתן לפרש את הראיות באופן שאיננו רק

25   כגישת התביעה. במידה שמצאנו כי הראיות שבפנינו אין בהן כדי להוכיח מעל לכל

26   ספק סביר את העבירה שיוחסה לנאשם, זיכינו אותו מעבירה זו אף אם לא טען לכך

27   משלא הגיש את סיכומיו.

28

29   **4. פרט האישום הראשון** [חברות בארגון החזית העממית בשנים 2006-1995 ].

30   <u>ראיות מרכזיות:</u>

31   דברי הנאשם עצמו היו לראיה מרכזית לאישום זה, לרבות בתגובתו בכתב לכתב

32   האישום, באמרתו של הנאשם ובתשובתו בכתב לבית המשפט. בכל הראיות האלה

33   מאשר הנאשם מפורשות כי הוא שימש כמזכ"ל החז"ע.

תיק מס׳: 2958/06                          תאריך: כ״ח בכסלו תשס״ח
                                          25 בדצמבר 2008

1   יחד עם זאת, והואיל ופרט האישום התייחס לתקופה מסוימת מצאתי לנכון לבקש
2   ראיות לתקופת החברות בארגון החז״ע .
3   <u>עדות אחמד חווירה, אמרתו וההכרעה ביניהן :</u>
4   וזהו ציטוט מגרסת העד בבית המשפט :
5   ש: באמרה זו, בע״מ 1 החל משורה 11 אתה מספר  כי במהלך חודשים 2-1 שנת
6   2001 עבדת במשרד=החזית העממית ברמאללה.
7   ת: אני לא עבדתי בחזית.
8   ש: אתה ממשיך ומספר בשורה 16 כי ביחד איתך עבדו במשרד אחמד סעדאת, מה
9   יש לך לומר על כך?
10  ת: עבודה רשמית לא עבדתי במשרד. זה משרד עבודה לעובדים.
11  ש: תסביר למה כוונתך.
12  ת: זה חלק מלשכת העבודה הלאומית.
13  ש: מה יש לך לומר לגבי המופיע באמרה, שהנאשם גם עבד שם ?
14  ת: איזה נאשם?
15  ש: יש נאשם אחד באולם. זה שדיברת אליו מקודם.
16  ת: אני לא מבין.
17  ש: באמרה אתה אומר שיחד איתך במשרד , שבאמרה כתוב שהוא של החזית
18  העממית, עבד איתך אחמד סעדאת. מה יש לך לומר על זה?
19  ת: אני הייתי הולך למשרד ואני בחזית העממית. הימצאותי במשרד זה טבעי.
20  בנוגע למה שרשום שם אני לא יודע. זה משרד לעניייני עובדים.
21  ש: מה יש לך לומר על כך שבשורה 14 באמרה אתה אומר שהיית שם פקיד?
22  ת: לא הייתי.
23  ש: מה יש לך לומר שבאמרה כתוב שאחמד סעדאת עבד במשרד?
24  ת: אני לא יודע מאיפה הבאתם את מה שכתוב פה. זה עניין טבעי שאני אלך
25  למשרד.
26  ש: אתה מוכן לענות לשאלה.מה יש לך לומר על כך שבאמרה מופיע שאחמד סעדאת
27  עבד במשרד הזה.
28  ת: אני לא יכול לקבוע  אם אחמד סעדאת עובד במשרד, מי אמר לו לעבוד במשרד.
29  כפי שאמרנו זה לשכת עובדים. אני לא יודע למה הוא מצוי שם.
30
31  וזהו ציטוט מאמרתו של העד :אמרתו של אחמד מחמוד טהא חווירה, עמי 1, שי -12
32  16. ״חודשים ראשון שני שנת 2001 עבדתי במשרד החזית העממית ברמאללה בכל
33  יום את עבודתי בבוקר כשרף (דואם), עבדתי כ-4 שעות, הייתי פקיד, באים אנשים
34  למשרד שהמשפחה שלהם נעצרו והם רוצים עורך דין אני כותב את זה ומעבירים
35  לרשות. ביחד איתי במשרד עבדו : אחמד סעדאת המכונה אבו ע׳סאן..״
36
37  עדותו של אחמד חווירה בבית המשפט הייתה מתחמקת וסותרת ועוררה רושם
38  שלילי. העד לא ניסה ולא הצליח להסביר את הסתירות בין אמרתו לבין גרסתו
39  בבית המשפט. בסופו של דבר אישר כי הוא חבר חז״ע וכי הנאשם עבד במשרד שבו
40  הוא עבד בתקופה הרלוונטית ובכך תמך את אמרתו. לפיכך אני מציע לחבריי
41  להעדיף את אמרתו של העד על גרסתו בבית המשפט ולקבוע לפיה כי הנאשם היה
42  חבר ופעל בחז״ע למן שנת 2001 לפחות .
43
44  בעדותו בבית המשפט אמר היותם עבידיתע את הדברים הבאים:
45

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

ש: מה תפקידו של הנאשם?   1
ת: חבר.   2
ש: במה הוא חבר?   3
ת: ידוע איפה הוא, באיזה ארגון הוא יכול להיות, החזית העממית   4
ש: מה תפקידו בארגון?   5
ת: לא יודע.   6
ש: מתי פגשת אותו ברמאללה?   7
ת: בשנת 99.   8
ש: מה היה תפקידו אז בארגון?   9
ת: אני לא יודע.   10
   11
דבר חברותו של הנאשם  בחז״ע ותקופת החברות עלו גם במהלך עדותו של עבד אל   12
רחים מחמוד אבו מלוח **שם התפרץ הנאשם לדברי העד ואישר כי הוא מזכ״ל**   13
**החז״ע.**   14

   15
עוד יש לומר כי מרבית העדים התייחסו לנאשם הן באמרותיהם המשטרתיות כבעל   16
משרה בארגון החזית העממית, וחלקם הגדול כינה אותו בבית המשפט "החבר" –   17
כינוי מקובל בקרב ארגונים בעלי אוריינטציה קומוניסטית למי שהינו חבר בארגון.   18

   19
הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד הנאשם  להגנתו   20
וויתר על פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות   21
התביעה.   22

   23
העולה מן המקובץ הוא כי אני מציע לחבריי להרשיע את הנאשם בעבירה המיוחסת   24
לו בפרט האישום הראשון בעובדות של חברות ופעילות בחז״ע אך רק מאז שנת   25
1999 .   26

   27
**5 .פרט האישום השני**    [נשיאת משרה של אחראי על סניף החז״ע ביריחו ].   28
עובדות פרט אישום זה לא הוכחו בפנינו והתביעה עצמה ביקשה כי ביהמ״ש יזכה   29
את הנאשם מהעבירה המתוארת בפרט אישום זה .   30
לאחר שהתביעה לא העמידה ראיות להוכחת אשמתו של הנאשם בביצוע עבירה זו   31
אני מציע לחבריי לזכות את הנאשם מעבירה זו .   32

   33
**6 .פרט האישום השלישי** [נשיאת משרה של אחראי על סניף החז״ע ברמאללה ועל   34
פעילותו]   35
ראייה מרכזית:   36
**אמרתו ועדותו של עת/16 מוחמד סאלח עבד מחסין.**   37

תאריך: כ"ח בכסלו תשס"ח                    תיק מס': 2958/06
25 בדצמבר 2008

1   העד מחמד מחסין העיד בפני בית המשפט והתחמק בבירור ובמפורש מלמסור
2   פרטים הקשורים בנאשם, והכחיש את ההיכרות איתו.  יחד עם זאת, מסר פרטים
3   הקושרים אותו עצמו באופן ישיר בפעילות צבאית הקשורה בארגון החז"ע – פעילות
4   אשר בא זכרה בכתב האישום ונתמכת היטב בראיות אחרות בתיק. פעילות זו
5   מצביעה על קיומן של התארגנות מקומית בחוליה צבאית, תכנון הפיגוע בקפה
6   רימון, ופעילות צבאית עם מאהר שקיראת והיית'ם עבידאת.

7   סימני האמת כפי שהתרשמתי מהם ורשמתים במהלך העדות העידו על התחמקות
8   ממתן כל תשובה ישירה. מבטי העד ושפת הגוף שלו כלפי בית המשפט ביטאו חוסר
9   רצון להבהיר את העובדות מוחד גיסא, והיכרות עם הנאשם מאידך גיסא.

10  העד טען כי הכחיש גם באמרתו קשר עם הנאשם וטען כי השוטר ששאל אותו לגבי
11  עניין זה בדה את דבר היכרותו של העד עם הנאשם - מנגד טען העד ללחץ מתמשך
12  בחקירה ע"י השב"כ והמשטרה.

13  העד סיכם את דבריו במילים הבאות :

14  **" ש: האם השוטר ידע אותך במה חשוד לפני שגבה ממך את העדות?**
15  **ת: יש דברים שהוא אמר לי ואמרתי לו כן, עשיתי ויש דברים שלא. אך מה**
16  **ששאלת אותי בקשר לנאשם, הדברים האלה לא קרו."**
17
18  בדברים אלה ניכרת מגמה בוטה וישירה להרחיק את הנאשם מהפללה.
19
20  אמרתו של העד סדורה, מכילה פרטים מרובים המצטלבים באמרות אחרות. לא
21  הוכח בפנינו כי הנאמר בה מקיים סתירות לוגיות כלשהן כמו גם סתירות ישירות
22  לראיות אחרות .

23  אשר על כן אני מציע לחבריי להעדיף את אמרתו של העד על עדותו בפנינו.

24  באמרתו מיום 24.9.99, החל מעמ' 13 מתאר מחמד צאלח עבד מחסין את הדברים
25  הבאים :

26  **'תודש לפני שהפכתי למבוקש בגלל הדברים שאמר לי מאהר, פנינו לאחמד**
27  **סעדאת בן 45 מרמאללה אחראי החז"ע וסיפרנו לו שמאהר וחולייתו מתכוננים**
28  **לבצע פיגוע....'**
29
30  אמרה זו נתמכה על ידי עדות החוקר שגבה אותה, ללא שנחקר חקירה נגדית. העד
31  משיח בה בתוך כדי רצף הדברים ההגיוני את שמו של הנאשם ומשרתו כאמור בפרט
32  השלישי בכתב האישום.

33
34  <u>ראייה מחזקת :</u>
35
36  **אמרתו של אחמד מחמוד טהא חוירה, עמ' 1, ש' 12-16.** אשר כאמור בדיון בפרט
37  האישום הראשון הועדפה על פני  עדותו מן הטעמים שפורטו שם.
38

1 ראייה מחזקת נוספת נמצאה לבית המשפט בהודאתו של הנאשם עצמו הן

2 באמרותיו במשטרה והן בבית המשפט כי הוא נושא את משרת המזכיר הכללי של

3 ארגון החזית העממית.

4

5 הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגינתו וויתר על

6 פרשת הגנה וכך נמנעה חקירתו הנגדית והתוספת חיזוק נוסף לראיות התביעה .

7 אשר על כן, אציע לחבריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט האישום

8 השלישי.

9

10 **7 פרטי האישום 4,5,6: [קשירת קשר לרצח אשה יהודיה תושבת אבו דיס ,**

11 **קשירת קשר לזריקת בקבוק תבערה וקשירת קשר לפיצוץ מטען בבית קפה רימון**

12 **בירושלים עם היית׳ם עבידאת, מאהר שקיראת, ואחרים].**

13 אישומים 4,5,6 יסודם בתכנון פיגועים שבוצע על ידי חוליה אחת והובאו לידיעת

14 הנאשם על מנת לקבל אישור ארגוני וסיוע ארגוני .

15 ראיות מרכזיות נמצאו לבית המשפט בעדותו של היית׳ם עבידאת בבית המשפט

16 ובאמרותיו. היית׳ם עבידאת נתן בבית המשפט עדות התומכת את אמרתו בנקודות

17 רבות. ניכר היה שככל שהתמשכה העדות, ומעשי הקשר המיוחסים לו בשאלות

18 התביעה החמירו, כך נטה העד למעט הן ברצינות הקשר והן בחלקו של הנאשם

19 בעניין התוכניות. לאחר ששמעתי את העדות, ועיינתי באמרה, מצאתי לנכון כי

20 הסתירות בין השתיים אינן מהותיות. מכל מקום לאור המגמה הברורה של העד

21 בעדותו לצמצם את אחריות הנאשם, לנוכח עדות גובה האמרה והעובדה שחלפו

22 כמעט תשע שנים בין מתן האמרה למתן העדות, אני מציע לחבריי להעדיף את

23 הגרסה האמורה באמרתו של העד – אצטט להלן את הקטעים הרלוונטיים לכל

24 אישום בעדות ובאמרה :

25

26 מתוך עדות היית׳ם עבידאת בבית המשפט :

27 **ש : אתה זוכר שתכננתם לדקור יהודיה אשר נשואה לאדם מאבו דיס ?**

28 **ת : שוב אני אומר לך, שאל אותי שאלות הקשורות לאבו ע׳סאן**

29 **ש : אתה זוכר שאתה ומוחמד אמרתם לחברים האחרים אשר תכננו איתכם את**

30 **הפיגוע שחייבים לקבל אישור מהארגון ולכן נסעתם לרמאללה לפגוש את הנאשם**

31 **וביקשתם ממנו אישור.**

32 **ת : הלכנו לאחמד סעדאת, סיפרנו לו על זה, התגובה שלו הייתה שהנושא הזה**

33 **קשור לאדם האחראי עלינו. שלו אין קשר ושנפנה לאחראי.**

34 **ש : אתה אומר באמרה שאבו ע׳סאן ביקש ממכם לחכות עם הפיגוע לחודש ה-10**

35 **ולא שהוא שלח אתכם למישהו אחר.**

-14-

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1   ת: אמרתי לך, לאחר השיחה עם אבו ע׳סאן אחרי תקופה הוא בא ואמר לנו שאין
2   לו קשר, ושנפנה לאחראי עלינו, ושאין לו כל קשר לדברים אלו.
3

4   אמרתו המשטרתית של הייתם אסעד עלי עבידאת מיום 22.9.99, עמ׳ 4, ש׳ 27-3

5   (לעניין פרט אישום 4 ) :

6

7   ״אנחנו לא ביקשנו את הכסף מהארגון חזית עממית כי ידענו שלא יתנו לנו. לפני
8   כ-3 חודשים לערך ישבנו ליד ביתו של מחמד מחסין אני, מחמד, מאהר שקיראת
9   ופראס סעאדה ודיברנו בינינו. ואז מאהר סיפר על אישה יהודיה שנשואה לאדם
10   מאבו דיס שמכונה אל-עם ומאהר הציע לנו שנשתתף איתו בדקירה של היהודיה.
11   אני ומחמד אמרנו שלא נשתתף עד שלא נקבל אישור מהארגון ומאהר ניסה לשכנע
12   אותנו להסכים ולפעול איתו גם בלי אישור הארגון. לאחר כמה ימים פנינו אני
13   ומחמד לאדם המוכר כאיש חזית עממית אנחנו נסענו לרמאללה לפגוש את אחמד
14   סעדאת שנקרא אבו עסאן והוא בן 40 לערך וסיפרנו לו מה שהיה. אבו עסאן אמר
15   שלא נעשה כלום עד לחודש העשירי שאז צריכה להיות ישיבה של הארגון ויחליטו
16   איך לפעול, גם פראס חש כמו מאהר על דקירת היהודיה בלי אישור הארגון.
17

18   אמרתו המשטרתית של הייתם אסעד עלי עבידאת מיום 22.9.99, עמ׳ 4, ש׳ 27-3 :

19   (לעניין פרט אישום 5 )

20

21   *לאחר כשבועיים לערך הציע מאהר שקיראת לי למחמד ולשאדי להשתתף איתו*
22   *בידדי בקבוק תבערה לעבר מכוניתו של כומר (חורי) ששמו ג׳ורג׳ שיש לו מכונית*
23   *וולו שחזרה כי הוא מגיע לאבו דיס ולוקח בחורים ושוכב איתם זה לא טוב אני*
24   *ומחמד הסכמנו לעשות זאת אך אמרנו שצריך לבקש אישור מהמפקדה אני ומחמד*
25   *נסענו שוב לרמאללה ונפגשנו עם אבו עסאן וסיפרנו לו כל זאת ושוב הוא אמר*
26   *שצריך לחכות לאחר החודש העשירי. גם הפעם שאדי אמר שצריך לעשות זאת בלי*
27   *אישור הארגון הוא חשב רק כמו שמאהר חשב שצריך לעשות את הפיגועים האלה*
28   *בלי אישורים.*
29

30   אמרתו המשטרתית של הייתם אסעד עלי עבידאת מיום 22.9.99, עמ׳ 4, ש׳ 27-3

31   (לעניין פרט אישום 6) :

32

33   *בערך לפני חודש כשהיינו אני ומחמד מחסין ברמאללה הגיע אלינו מאהר*
34   *שקיראת. מאהר סיפר לנו שיש לו 2 אנשים ויחד איתו הם שלושה המוכנים*
35   *לעשות פיגוע התאבדות בירושלים באיזה בית קפה שבו עבד. הוא אמר לנו שמי*
36   *שמוכן לעשות פיגועים אלו הם אחמד עריקאת בן 24 נשוי, פועל צבע מוצאו*
37   *מירדן גר באבו דיס והשני שמו מהנד עריקאת בן 23 רווק פועל בצבע מוצאו*
38   *מירדן גר באבו דיס. אני חושב שהוא כבר חזר לירדן. מאהר אמר שצריך חומר*
39   *נפץ בשביל הפיגוע וביקש ממני ומממחמד מחסין שנשיג לו חומר נפץ הוא פנה*
40   *אלינו כי רצה לדבר יותר עם מחמד מחסין שהיה אחראי על כולנו. אנחנו אמרנו*
41   *למאהר שננסה להשיג לו חומר נפץ ודיברנו עם אבו עסאן שוב אמר שצריך*
42   *לחכות לאחר חודש עשירי....*.״
43

44   <u>ראיות מחזקות :</u>

45

46   אמרתו המשטרתית של מחמד צאלח עבד מחסין מיום 24.9.99, עמ׳ 13 ואילך.

תיק מס׳: 2958/06

תאריך: כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1     השיקולים להעדפתה של אמרה זו על פני עדותו של מחמד מחסין מפורטים בהכרעת

2     דין זו בדיון באישום השלישי וכך אמר העד באמרתו :

3     *"חודש לפני שהפכתי למבוקש בגלל הדברים שאמר לי מאהר, פנינו לאחמד*

4     *סעדאת בן 45 מרמאללה אחראי החז״ע וסיפרתו לו שמאהר וחוליתו מתכוננים*

5     *לבצע פיגוע...."*

6
7     עדות עד תביעה מס׳ 16 (עד מס׳ 26 ברשימת העדים), מחמד סאלח עבד מחסין.
8

9     **ש : עם מי דיברת על הרעיון?**
10     **ת : אני לא דיברתי עם אף אחד. הם דיברו איתי.**
11     **ש : מי דיבר איתך ?**
12     **ת : אחד החברים.**
13     **ש : מה שמו!**
14     **ת : היתם וזה נעצר אצלי, לא הוצאתי את זה הלאה.**
15     **ש : אני רוצה שתתייחס לדיבורים שהיו, לרעיון, על פיגוע בקפה רימון והמשביר**
16     **בירושלים. מי דיבר איתך על כך ומה היה הרעיון.**
17     **ת : הדיבורים האלה היו לפני 9 שנים בערך אבקש להתמקד בשאלות.**
18     **ש : עם מי היו הדיבורים ?**
19     **ת : איתי.**
20     **ש : עם מי אתה דיברת?**
21     **ת : זה לא היה מישהו מסויים.**
22     **ש : דיברת עם עצמך?**
23     **ת : לא, עם החבורה שאיתה עבדתי.**
24     **ש : מי האנשים בחבורה?**
25     **ת : מאהר שקיראת, היתם עבידאת ואני.**
26     **ש : מה עשית עם הרעיון הזה?**
27     **ת : דחינו את הרעיון.**
28     **ש : מי דחה?**
29     **ת : אני.**
30     **ש : לאיזה ארגון אתה שייך ?**
31     **ת : לחזית העממית.**

32
33     לאחר ששמעתי את העד בבית המשפט, ניכר היה כי העיד  באופן מתחמק שחשף
34     חלק מהפרטים אך ניסה לטשטש ככל האפשר את הקשר של הנאשם עם התכנונים,
35     קשר אותו חשף כבר העד הייתים עבידאת בעדותו .

36
37     לפיכך אני מציע לחברריי לקבוע את הקביעות העובדתיות הבאות :
38
39     • החוליה בה היו חברים הייתים עבידאת מאהר שקיראת ומחסין יזמה
40     ותכננה את הפיגועים האמורים בפרטי אישום 4,5,6 .

41     • לאחר מכן הביאו אנשי החוליה את הפיגועים לאישור הנאשם בשם ארגון
42     החז״ע.

תאריך: כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1 • הנאשם הודיע כי אין אישור זה בסמכותו וכי על סוג כזה של פעילות צריך

2 לבוא אישורה של ועידת החז״ע וללא אישור זה אין לבצעה.

3 • משסברו חלק מחברי החוליה כי אישור ארגון החז״ע חיוני ואין לצאת

4 לפיגועים בלעדיו, נדחו הפיגועים ובסופו של דבר לא בוצעו בפועל.

5
6

7 עובדות פרטי האישום מעוררות קושי לעניין יסודות העבירה של קשירת הקשר.

8 לפיכך אדון במסגרת הנורמטיבית של עבירה זו ולאחר שתקבע מסגרת זו אבחן אם

9 יסודות העבירות נשוא פרטי אישום 4,5,6 מתקיימים בעובדות שהוכחו.

10

## 11 7.1 קשירת קשר – המסגרת הנורמטיבית:

12

13 העבירה של קשירת קשר לביצוע עבירה אחרת מוגדרת בחוק כך:

14 ״כל הקושר קשר עם אדם אחר לעשות פשע או לעבור עבירה שדינה עונש
15 מיתה או מאסר לתקופה העולה על שלוש שנים, ייאשם בעבירה - ואם לא
16 נקבע לכך עונש אחר, והעונש הגדול ביותר הצפוי לו לאדם שנתחייב בעבירה
17 הוא מאסר לשבע שנים או ליותר מכך, יהא הקושר קשר צפוי לשבע שנות מאסר;
18 ואילו אם העונש הגדול ביותר הצפוי לאדם שנתחייב בעבירה הנידונה הוא
19 פחות משבע שנות מאסר - יהא צפוי לאותו העונש הפחות משבע שנות
20 מאסר.״

21 לצורך ההתמצאות אביא גם את הגדרת עבירת הניסיון שהיא השלב הבא לאחר

22 עבירת הקשר. כיוון שהחסם התחתון של הגדרת הניסיון הינו החסם העליון של

23 הגדרת הקשר יש חשיבות לניתוח נכון של חסם זה:

24 אדם נחשב כאילו הוא מנסה לעבור עבירה כשהוא מתחיל להוציא מן הכוח
25 אל הפועל את כוונתו לעשות את העבירה באמצעים מתאימים לביצוע כוונתו
26 וכשהוא מביא לידי ביטוי את כוונתו על ידי מעשה גלוי, אך אין הוא מבצע את
27 כוונתו עד כדי עשיית העבירה.

28 וכך הגדיר את הדברים בית המשפט העליון:

29 ע״פ 3338/99, <u>דמיאן פקוביץ ני מדינת ישראל</u>, פ״ד נד(5) 667, 715):

30 ״ההצדקה להתערבות המשפט הפלילי בשלב קשירת הקשר, הינה חזקה
31 במיוחד בעבירות חמורות, כאשר אין זה סביר לגרוס כי על החברה להמתין
32 באפס מעשה עד שתגיע התכנית העבריינית המשותפת שגובשה, לשלבי
33 ביצוע ממשיים. קטיעת התכנית העבריינית המשותפת באיבה במקרים מסוג
34 זה, באמצעות הטלת איסור פלילי על קשירת קשר לביצוע עבירה והענשתו,
35 הינה אינטרס חברתי מובהק ומובוסס.״

36

-17-

תאריך : כ"ח בכסלו תשס"ח
25 בדצמבר 2008

1    בע"פ 129/54 **גולדשטיין נגד מדינת ישראל** נאמר :

2    'כשאדם יחיד הוגה בלבו את הביצוע בעתיד של משימה פלילית, הרי מהווה
3    הוא אומנם סכנה בכוח למדינה, אך לא קיים ציווק להתערבותה המיידית
4    לשם העונשתו, כל עוד לא עשה דבר לשם הוצאת מזימתו מהכוח אל הפועל.
5    הוא הדין כאשר יותר מאדם אחד זוממים לבצע מזימה פלילית. במקרה זה
6    הסכנה למדינה, בגלל ריבוי הזוממים, תגדל עוד יותר, ואף-על-פי-כן גם כאן
7    עדיין לא הגיע הזמן להתערבותה, כל עוד לא נוצר מגע ביניהם. **אולם ברגע**
8    **שנוצר מגע זה והושגה ההסכמה ההדדית להגשמת המטרה הנפסדת**
9    **המשותפת, הפכה הסכנה למדינה להיות קרובה ביותר, עד כדי שתהיה**
10    **מוצדקת העונשתם המיידית של הקושרים.**' ......

11    בע"פ 330/85, **דוד נ' מדינת ישראל**, פ"ד מ(2) 30 נאמר :

12    'אולם יש לפחות להוכיח
13    הסכמה לענין פרטי הביצוע כנראה אינה דרושה: אולם יש לפחות להוכיח
14    רצון משותף לבצע בצוותא עבירה מסוג מסוים (כגון, עבירת שוד), אם כי לאו
15    דווקא עבירה קונקרטית במועד מוגדר.

16    בע"פ 269/58, **עמורי נ' היועץ המשפטי לממשלה**, פ"ד יג 276) קבע כב' השופט ד"ר
17    זילברג (בעמ' 278) כי :

18    'קנה המידה לגבי ההסכם הפלילי של סעיף 35, הוא רק "חסר מעט" ואולי
19    אף זהה לגמרי עם קנה-המידה החל על הסכם אזרחי המצוי אצל חוזים"

20    ע"פ 461/92, **זכאי ואח' נ' מדינת ישראל** (פ"ד מז(2) 580, 588) נקבע כי המסוימות
21    הנדרשת אינה צריכה לעמוד בדרישות דיני החוזים במשפט האזרחי למשל לגבי יעד
22    העבירה ושם נאמר :

23    'כך, למשל, אם הסכימו קושרי-קשר ביניהם כי בלילה פלוני יצאו לפריצתה
24    של חנות, יואשמו השניים בקשר גם אם לא הסכימו איזו חנות יפרצו, וגם
25    אם המשפט האזרחי יורנו - מפאת היעדר ספציפיות - כי לא נכרת ביניהם
26    חוזה מחייב."

27    הנה כי כן באופן חריג למשפט הפלילי, מעניש המחוקק את הקושר על מעשים של
28    הבעת רעיונות עברייניים במעמד אדם אחר וקבלת הסכמה עליהם. עבירה זו של
29    יצירת הסכמה למעשה פלילי, מביאה לענישת הנאשם בגין הסכמה חוזית שערך עם
30    אחר לשם ביצוע עבירה.

31    דווקא בגלל חריגות זו, נראה לי כי המבחן להרשעה בקשירת קשר צריך להיות ברור
32    וחד, ודומה מאוד למבחנים המקובלים בדיני החוזים. בכל הכבוד נראה לי שעל בית
33    המשפט להחמיר עם עצמו, ולפסוק כפי הדעה שהובאה בפרשת **עמורי** ע"י כב' השופט

תיק מס׳ : 2958/06

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1   ד״ר זילברג, אחרת יורחבו גבולותיה של עבירת הקשר מעל ומעבר ועקרון החוקיות

2   ייפגע.

3   אני סבור כי כאשר שני אנשים מסכימים ביניהם לבצע עבירה מתגבש ביניהם חוזה

4   גם אם יעד העבירה לא נקבע אלא לפי כלל התאמה מסוים, וגם אם הביצוע הותנה

5   בתנאים מתלים או מפסיקים. גם בדיני החוזים נקבעים יסודות החוזה בהתאם

6   לתוכנו . כך, בשינויים המחויבים, גם חוזה לביצוע עבירה.

7   לפיכך אני מציע לבחון את עבירת הקשר לפי היסודות הבאים :

8   1. הבעת הצעה מסוימת לביצועה של עבירה מצד קושר אחד.

9   2. קיבול מילולי או בהתנהגות של ההצעה מצד קושר שני.

10   ### 7.2 המסגרת העובדתית לאור המסגרת הנורמטיבית

11   האם תנאים אלה התקיימו בעניינו של הנאשם ?

12   ניתן לומר בטרמינולוגיה של דיני החוזים כי הנאשם הינו בגדר צד שלישי שאישורו

13   לקשר חיוני לקיומו - בגדר תנאי מתלה ללא ספק כי עבור המפגעים היה אישור

14   החז״ע חיוני ובגדר תנאי בלעדיו אין.

15   וזו ההשתלשלות העובדתית :

16   ● בני החבורה מתכננים פיגוע ללא קשר עם הנאשם.

17   ● בני החבורה פונים לנאשם כדי לקבל את אישור ארגון החז״ע אשר חלקם

18   רואים אותו כתנאי לביצוע הפיגוע.

19   ● בני החבורה מקבלים תשובה שלילית (הפיגוע בתלפיות), או תשובה מותנית

20   באישור.

21   ● הנאשם מברר עבור בני החבורה את נושא האישור מול אנשים אחרים

22   ומחזיר להם תשובה כי אין לארגון התנגדות עקרונית לביצוע פיגועים אך יחד

23   עם זאת **מורה להם לא לבצע דבר** עד לועידת הארגון .

24   ● בפועל לא מתבצע דבר עד לועידת הארגון ולפני קיומה נעצרים הקושרים

25   (ע״פ כתב האישום בדרכם לקבל אמצעים לביצוע שוד מזוין מן הנאשם).

1    אין מחלוקת שהנאשם לא נטל חלק בתוכניות. עיון בכתב האישום מראה כי ישנן

2    תוכניות לפיגוע אותן פסל הנאשם על הסף וישנן תוכניות אשר לא אישר והורה

3    להמתין איתן בטענה שהוא איננו ה״סמכות המאשרת״ בעצמו אלא שתהיה זו ועידה

4    של הארגון והוא אשר יביא את העניין בפני הוועדה  והוא יחזיר גם את התשובה.

5    למעשה הנאשם הוא שעיכב את ביצוע הפיגועים בהוראתו, לא הוכח כי הנאשם

6    התחייב לייצג את חברי החוליה או להמליץ על אישור הפיגוע בוועידה.

7    מכאן יש לשאול את השאלות הבאות :

8    •  היוכל בית המשפט להשלים את תשובתו של הנאשם לחברי החוליה לאחר

9       הוועידה ?

10   •  היוכל בית המשפט לקבוע ממצא בדבר עמדתו העתידית של הנאשם במהלך

11      הוועידה ?

12   •  אולי היה הנאשם מתנגד לביצוע הפיגועים במהלך הוועידה מטעמים

13      מבצעיים או מדיניים ונושא עימו סירוב עבור חברי החוליה ?

14   אין בפנינו כל הוכחה מה היה רצונו של הנאשם בכל הנוגע לקשר האמור. לא הוכח

15   כי הנאשם הסכים לשמש שליח אקטיבי ותומך, ולכן, ומכיוון שבמשפט פלילי

16   עסקינן, עלינו לצאת מנקודת ההנחה שהנאשם היה שליח ״נייטרלי״ בין המפגעים

17   לוועידה ומהוועידה למפגעים בעניין ״הסכמתם״ של המפגעים מטעם החז״ע.

18   האם עצם נכונותו של הנאשם לשמש שליח בין ועידת הארגון ובין הקושרים משמעה

19   הצטרפות לקשר? האם משמעותה כדברי הפסיקה שצוטטה לעיל כי **״נוצר מגע זה**

20   **והושגה ההסכמה ההדדית להגשמת המטרה הנפסדת״** ?

21   איני סבור שהתשובה לכך היא חיובית, לפחות למבצע אחד היה אישור הארגון

22   ״תנאי בלעדיו אין״ לשם הוצאה לפועל של הפיגוע עצמו. דא עקא, יסודות עבירת

23   הקשר לא התקיימו שכן לא היה יסוד של הסכמה או גמירת דעת אף שדרישת

24   המסויימות נתמלאה.

25

26   אני סבור כי לפנינו דבר הלמד מסופו: אילו היה הנאשם מחזיר תשובה מהוועידה

27   ולפיה אין לבצע את הפיגוע האם עדיין היינו אומרים כי התמלאו ביחס אליו יסודות

28   קשירת הקשר? התשובה על כך היא, לעניות דעתי, שלילית .

1

עם זאת, הואיל וכל מעשי הנאשם באישומים אלה נעשו עבור ארגון החז"ע          2

ובשירותו, אני סבור כי נתקיימו במלואן יסודות העבירה של ביצוע שירות עבור          3

התאחדות בלתי מותרת היינו, בשם חוליה זו של ארגון החז"ע הנאשם היה אמור          4

לברר מול ראשי הארגון האם לאשר ביצוע מעשים מסוימים. עוד יש לומר כי          5

מצאתי שניתנה אפשרות ראויה להתגונן מפני סעיף עבירה זה.          6

7

אשר על כן אציע לחבריי לזכות את הנאשם מן העבירות האמורות בסעיפי העבירה          8

4,5,6 ולהרשיעו תחת זאת בשלוש עבירות של ביצוע שירות עבור התאחדות בלתי          9

מותרת.          10

11

**8. פרט האישום השביעי** [חילופי תמ"ק מיני עוזי תמורת אקדח]          12

עדות הייתים עבידאת בבית המשפט :          13

14

ש: באמרה מיום 23/9/99 אתה אומר שהיה עליך נשק מסוג מיני עוזי, מהי          15
תגובתך ?          16

ת: נכון, הוא לא היה איתי ברמאללה הוא היה אצלי בכפר אבו דיס.          17

ש: נסה להיזכר שוב, אילו נשקים נוספים היו לך?          18

ת: לגבי הנשקים שהיו ברשותי, זה רשום לך בתיק. אמרתי לך אתה רוצה לשאול          19
אותי תשאל אותי רק בעניינו של אחמד סעדאת.          20

ש: אתה מסכר באמרה שנתת את המיני עוזי לאחמד סעדאת.          21

ת: אני אמרתי את זה כי אחמד היה באזור A ואף אחד לא יכול לעצור אותו בגלל זה          22
אמרתי שהעברתי לו את הנשק אך לא עשיתי את זה באמת, נתתי את זה למישהו          23
אחר.          24

25

26

אמרתו של הייתים אסעד עלי עבידאת מיום 23.9.99, עמ' 2, ש' 12-1.          27

28

"אחרי שבוע לערך אני פניתי למונתז וביקשתי ממנו לקנות נשק אחר. מונתז          29
אמר לי שיש לו רובה מיני עוזי (בעברית) הוא ביקש עליו 1500 דינר ואני קניתי          30
את הנשק הזה עם מחסנית ובתוכה 12 כדורים. את הרובה מיני עוזי אני          31
הסתרתי באותה גדר אבנים שבה הסתרתי לפני כן את ה- M16. אני לא          32
סיפרתי על הנשק בפעם זו לאף אחד. לפני כחודש לערך כשברחתי עם מחמד          33
מחסין לרמאללה כשפגשתי שם את אבו עסאן שהוא אחמד סעדאת אחראי          34
חזית עממית ברמאללה אני סיפרתי לו שיש לי רובה מיני עוזי הוא ביקש ממני          35
שאני אביא לו את הנשק כי הוא רוצה אותו לפעילות של חזית עממית. אבו          36
עסאן אמר לי שבמקום המיני עוזי יתן לי אקדח ד.מ. והוא יעזור לנו כשנשאר          37
ברמאללה ואני הסכמתי נתתי לו את הרובה אחרי שנסעתי לאבו דיס להביא          38
אותו ומסרתי את המיני עוזי לאבו עסאן. אני לא קיבלתי ממנו שום אקדח. אני          39
בעדות הקודמת סיפרתי שאבו עסאן אמר שיתן לנו 2 אקדחים בשביל שנשדוד          40
את כספו של חלפן הכספים בירושלים. אני הבאתי לו את המיני עוזי לפני כן          41
לפני שביקשנו ממנו את האקדחים. אף אחד לא ידע על המיני עוזי הזה שאני          42
נתתי לאבו עסאן גם למחמד לא סיפרתי על כך.".          43

44

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1 לאחר שבחנתי את העדות והאמרה, מצאתי כי העד אישר כי אמר את הדברים
2 באמרתו אך נימק את הדברים שאמר בכך  שלמעשה נמסר הנשק לאדם אחר, ואילו
3 בחקירה אמר את שמו של הנאשם כי הוא היה באזור A ולפיכך "חסין ממעצר".
4 הנמקה  זו לא עוררה ספק בנכונות גרסתו של העד באמרתו או במסירת הנשק, והיא
5 נראית מבחינת ההיגיון כפי שנראתה בזמן מסירת העדות בבית המשפט מבחינת
6 ההתרשמות האישית – התחמקות כלאחר יד.

7

8 אין היגיון בגרסה המיוחסת חסינות לאדם רק בשל כך שהוא נמצא באזור A שבו
9 התבצעו מעצרים דבר יום ביומו. אם רצה הנאשם לייחס את עניין הנשק לדמות
10 מוגנת יכול היה לעשות זאת כלפי אדם מת או אסיר, קשה להאמין בהעדר סיפור
11 תומך או מבוסס כי העד יבחר לטפול את פרשיית נשק שאינה מן החמורות דווקא
12 על ראשו של מזכ״ל החז״ע כדי לחפות על אדם אחר.

13

14 יש היגיון רב במסירת הנשק לנאשם עקב מעמדו ויכולותיו, לספק נשק המתאים
15 יותר לביצוע שוד החלפן כגון האקדחים שאותם, לפי האמרה, התחייב הנאשם
16 לספק בתמורה. מיני עוזי הינו תת מקלע קטן אך עדיין אינו יעיל בהסתרתו ובשימוש
17 כמו אקדח, לצורך ביצוע הפעולות שאותן הגו חברי חולייתו של העד. מחלקים
18 אחרים באמרה ניתן להבין כי העד חיפש אקדח גם ממקורות אחרים, כמו מונתז
19 אבו רומי. צרכו של העד באקדחים לביצוע פעילותו תומך את סיפורו לגבי מסירת
20 הנשק לנאשם כנגד הבטחה לקבל אקדחים.

21 הקשרים שהיו בין הנאשם לבין העד וחולייתו עולים במספר עדויות אנשי החוליה
22 ומבססים ומחזקים את סיפור מסירת הנשק ומעמדו של הנאשם כמי שיכול היה
23 לבקש את הנשק ולעשות בו שימוש.

24 התרשמותי מן העד על דוכן העדים כפי שנרשמה בעת מתן העדות הייתה כי העד
25 מנסה לפטור את השאלות בתירוץ דחוק, להימנע מלהפליל את הנאשם או להיכנס
26 לפרטים בדבר אותו אדם אחר שלו מסר את הנשק, התרשמתי משפת הגוף של העד
27 וממבטיו אל בית המשפט ואל הנאשם כי דבריו בעדותו בפנינו אינם אמת.
28 ראייה מחזקת נוספת נמצאה לבית המשפט בהודאתו של הנאשם עצמו הן
29 באמרותיו במשטרה והן בבית המשפט כי הוא נושא את משרת המזכיר הכללי של
30 ארגון החזית העממית.

31

32 הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגנתו וויתר על
33 פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות התביעה.

תאריך : כ"ח בכסלו תשס"ח          תיק מס' : 2958/06
25 בדצמבר 2008

הזהרתי את עצמי, כמצוות המחוקק כי לפני עדות יחידה, ובדקתי אם ניתן היה     1
באמצעות החקירה לאשש את גרסתו של העד באמרתו ממקורות אחרים, מצאתי כי     2
המדובר היה במעשה שנעשה בחשאיות בתחומם של השניים ומטבע הדברים לא     3
קיבל ביטוי בראיות חפציות ובעדים נוספים .     4

5

העולה מן המקובץ, הוא כי לא נמצא ספק עובדתי ואני מציע לחברייי להרשיע את     6
הנאשם בעבירה המיוחסת לו בפרט האישום השביעי .     7

8

## 9. פרט האישום השמיני [קשירת קשר לשוד מזויין של חלפן כספים]     9

10

### 9.1 האמרה ביחס לעדות     11

12

הראייה המרכזית והיחידה לאישום זה היתה אמרתו של הייתים עבידאת אשר     13
אותה היינו אמורים לבחון מול עדותו בבית המשפט. דא עקא, למרבה הפלא לא     14
נשאל הייתם עבידאת בחקירתו בבית המשפט על השוד כשם שלא נשאלו חבריו     15
לחוליה.     16

17

מצב דברים זה מקשה על ההשוואה הנדרשת לפי סעיף 10א לפקודת הראיות     18
שכן קשה להעדיף את האמרה על העדות מקום בו לא נמסרה כלל עדות.     19

20

וזהו נוסח הסעיף בחוק :     21

22

10א. (א) אמרה בכתב שנתן עד מחוץ לבית המשפט תהיה קבילה     23
כראיה בהליך פלילי אם נתקיימו אלה:     24

(1) מתן האמרה הוכח במשפט;     25

(2) נותן האמרה הוא עד במשפט וניתנה לצדדים     26
הזדמנות לחקרו;     27

(3) העדות שונה, לדעת בית המשפט, מן האמרה בפרט     28
מהותי, או העד מכחיש את תוכן האמרה או טוען כי אינו     29
זוכר את תכנה.     30

(ב) בית-המשפט רשאי לקבל אמרה כאמור בסעיף קטן (א)     31
אף אם נותן האמרה איננו עד, בין משום שהוא מסרב להעיד או     32
אינו מסוגל להעיד, ובין שלא ניתן להביאו לבית-המשפט משום     33
שאינו בחיים או לא ניתן למצאו, ובלבד שבית-המשפט שוכנע     34
שמנסיבות הענין עולה, כי אמצעי פסול שימש להניא או למנוע את     35
נותן האמרה מלתת את העדות.     36

(ג) בית המשפט רשאי לסמוך ממצאיו על אמרה שנתקבלה     37
לפי סעיף זה, או על חלקה, והוא רשאי להעדיף את האמרה על     38
עדותו של העד, והכל אם ראה לעשות כן לנוכח נסיבות הענין,     39
לרבות נסיבות מתן האמרה, הראיות שהובאו במשפט, התנהגות     40

1    **העד במשפט ואותות האמת שנתגלו במהלך המשפט, והטעמים**
2    **יירשמו.**

3    **(ד) לא יורשע אדם על סמך אמרה שנתקבלה לפי סעיף זה**
4    **אלא אם יש בחומר הראיות דבר לחיזוקה.**

5

6 מנוסח הסעיף עולה כי תנאי לקבילות הראיה הוא שוני בין העדות לאמרה ומכל

7 מקום, למעט במקרה של עד שותק, חייב העד להיות מעומת עם האמרה על מנת

8 שתהא קבילה כראייה לאישום .

9

10 **9.2 מחדלי חקירה**

11

12 כאשר פנה בית המשפט לבקש ראיות נוספות לאישום מצא כי באופן תמוה חברו

13 של הייתם, אשר היה על פי האמרות האחראי עליו בחוליה **לא נחקר כלל על**

14 **נושא השוד גם במשטרה וגם בבית המשפט** ולא ציין את הארוע באמרתו הגם

15 שהיה לכאורה קשור ישירות למעצרו, ובהתחשב בעובדה שבאותה אמרה הפליל

16 את חבריו לחוליה ואת עצמו בעבירות קשות וחמורות אחרות.

17

18 באשר למאהר שקיראת, אשר על פי כתב האישום היה גם הוא שותף לשוד הרי

19 שאדם זה לא הובא כלל כעד בכתב אישום זה – לא כל שכן שבית המשפט לא

20 נחשף לגרסתו במשטרה .

21

22 נעיין אם כן, באמרתו של הייתם, על מנת לקבוע האם למרות מחדלי החקירה

23 של התביעה ושל המשטרה ניתן לבסס הרשעה על אמרתו של הנאשם .

24

25 אמרתו של הייתם אסעד עלי עבידאת מיום 22.9.99, עמ׳ 4 ש׳ 27 עד עמ׳ 5 ש׳ 14.

26

27 *"מאהר סיפר לנו שעבד קודם לכן אצל חלפן כספים במוסררה. הוא עבד אצלו*
28 *בתיקונים אז הוא עבד בתיקונים וישיפוצים ואחת מעבודותיו הייתה במשרדו*
29 *של החלפן הזה. מאהר סיפר שראה של חלפן זה נכנס ויוצא הרבה כסף והציע*
30 *לנו שנשתתף איתו ונשדוד את כספו ממנו. אני ומחמד הסכמנו אנחנו דיברנו*
31 *בינינו ואמרנו שצריך אקדחים בשביל זה ואמרנו שניקח איתנו אקדחים*
32 *מהחזית עממית ואמרנו שצריך גם את מונתז אבו רומי שיביא את אקדחו.*
33 *אנחנו הצענו למונתז להשתתף איתנו ולהביא את אקדחו והוא הסכים. ובגלל*
34 *שיש לו רשיון נהיגה הצענו למונתז שהוא ינהג באוטו לאחר שנברח משם ברכב*
35 *שנשיג. מהחזית עממית מונתז הסכים להשתתף ולהיות נהג ואמר שיביא את*
36 *אקדחו. אנחנו נסענו מרמאללה לביתו של מונתז כשרצינו לדבר איתו נסענו*
37 *בשביל זה לעזריה. שם דיברנו איתו לאחר שהוא הסכים הלכנו אני מאהר*
38 *ומחמד לאבו עסאן וסיפרנו לו מה אנחנו רוצים לעשות וביקשנו ממנו מכונית*
39 *ושני אקדחים אבו עסאן אמר שישיג לנו 2 אקדחים ומכונית. ואז ביום שנעצרנו*
40 *אני מאהר ומחמד אנחנו הינו בדרכנו לאבו עסאן להביא ממנו את האקדחים*

תאריך: כ"ח בכסלו תשס"ח
25 בדצמבר 2008

*שאמר שישיג לנו. אנחנו הינו ברכב הסעות מאבו דיס לרמאללה לאבו עסאן ואז* 1
*תפסו אותנו שוטרי מג"ב. מאהר סיפר שראה אצל אותו חלפן אולי 200,000* 2
*דולר ואת זה רצינו לגנוב לו את הכסף שרצינו לגנוב לו חשבנו לו שניתן לארגון* 3
*החזית עממית. "* 4
5
מחלוקת נפלה ביני לבין חבריי באשר למשמעות העובדה שהעד לא נחקר כלל על 6
עובדות פרט אישום זה ולא נתבקש להתייחס אליו בבית המשפט. 7

אני כסבור הייתי כי סעיף 10א **לפקודת הראיות [נוסח חדש] התשל"א - 1971** 8
מייחס חשיבות מרובה להיותו של נותן האמרה עד במשפט ולחקירתו לצורך 9
השוואה ואף רואה בה תנאי לקבילות, כיצד ישווה בית המשפט בין הגרסאות אם 10
העד כלל לא העיד בנושא – אך לא שתק בנושאים אחרים? זאת ועוד היה לה 11
לתביעה לשאול גם את מחסין וגם את עבידאת ולא עשתה כן, מהי משמעותה של 12
עובדה זו? 13

14

חבריי, כב' השופטים לקח וליברמן כסבורים היו שעדותו של העד לכל אורכה הייתה 15
מתחמקת באופן יזום מכל הפללה הקשורה בנאשם ומשום שעוררה חוסר אמון 16
באופן כללי יש להאמין לאמרה בעניין כל פרטי האישום כולל זה שהנאשם כלל לא 17
נשאל בגינו. 18

19

כך סוברים חבריי גם בעניין עדותו של מחמד מחסין וחיזוק לדבריהם אביא מעדותו 20
בבית המשפט: 21

**ש: האם השוטר תרגם לך לפני שחתמת את מה שנחקרת עליו?** 22
**ת: אני סיפרתי לו 10 פעמים ועכשיו אמרתי את זה פה, אם הבאת אותי כדי** 23
**להלביש עליו תיק, כדי להשאיר אותו (מצביע על הנאשם) בכלא אני לא אספר.** 24
**ש: כלומר אמרת לשוטר שאתה לא מכיר כלל את אחמד סעדאת?** 25
**ת: לא היה דו שיח לגבי אחמד סעדאת עם השוטר.** 26
27
לא מצאתי מקום להכריע במחלוקת זו מפני שבלי קשר לעובדת אי חקירתו של העד 28
על דוכן העדים בפני בית המשפט אני סבור כי אשמת הנאשם לא הוכחה מעל לכל 29
ספק סביר. 30

אני סבור כי האמור באמרתו של הייתים עבידאת יחד עם החלל הראייתי שנוצר 31
בעקבות מה שלא נשאל באמרתו המפורטת של מחמד מחסין עקב מחדלי החקירה - 32
יש בהם לעורר את הספק . 33

בסופו של יום נמצא הסיפור כולו נשען על אמרה יחידה של שותף לעבירה מקום 34
שניתן היה להשעינו על שני מקורות נוספים לפחות כדי לפזר את הספק. 35

36

תאריך: כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1. זאת ועוד, הנאשם הציג לאורך פרשיות רבות בכתב אישום זה עמדה אחרת לחלוטין

2. לפיה הוא עצמו איננו מוסמך לגבות מבחינה ארגונית כל פיגוע ללא אישור וועידת

3. החמ״יע, לאחר אותה וועידה נזהר הנאשם לא לתמוך את הפח״יע בעצמו ממש אלא

4. לנווטו ולמלמנו באמצעות אחרים, מדוע דווקא במקרה יחיד זה יראה הנאשם עצמו

5. מוסמך לגבות את הפיגוע ואף יציע לו סיוע בגופו לרבות אספקת נשק?

6.

7. אשר על כן אני מציע לחבריי לזכות את הנאשם מחמת הספק מהעבירה נשוא פרט

8. האישום השמיני.

9.

10. **.10 פרטי האישום התשיעי והעשירי** [תאום פגישה עם אנשים שהביעו עניין

11. לבצע פעילות צבאית] [קשירת קשר לביצוע פיגועים עם מחמד חליל אלע׳ול]

12.

13. ראייה מרכזית:

14. התביעה מצביעה על עדותו ואמרתו של מחמד אל עיול כראיות המרכזיות

15. לאישומים אלה. בית המשפט יבחן להלן את האמור בעדות אל מול האמרה. על דוכן

16. העדים מסר העד כך:

17. ש: ספר לי בקצרה על מה אתה שפוט.

18. ת: חברות בחזית העממית ותכנון וניסיון לתכנון פיגוע ירי.

19. ש: אני רוצה שתספר לי על תכנון הפיגוע, איזה פיגוע תכננת לבצע.

20. ת: לא היה ניסיון, היתה מחשבה.

21. ש: אני רוצה שתספר לי על המחשבה הזאת.

22. ת: זה רשום בכתב האישום ועברו מאז 7 שנים.

23. ש: ביהמ״ש לא יודע, אני יודע שזה רשום, ספר לביהמ״ש בקצרה מה היה

24. הרעיון.

25. ת: היה רעיון לפיגוע ירי והוא לא בוצע.

26. ש: לאיזה ארגון אתה שייך?

27. ת: החזית העממית.

28. ש: בשביל איזה ארגון רצית לעשות את הפיגוע המתוכנן?

29. ת: בכוחות ההתנגדות העממית.

30. ש: למי הם שייכים?

31. ת: אני מבחינה פוליטית שייך לחזית העממית אבל בפעילות צבאית הייתי שייך

32. לכוחות ההתנגדות העממית (הדברים נאמרים בעברית).

33. ש: מיהו אחמד סעדאת?

34. ת: מכירים אותו, הוא ידוע בתקשורת.

35. ש: איפה הוא עכשיו?

36. ת: בכלא.

37. ש: אתה רואה אותו עכשיו?

38. ת: כן, הוא יושב מולי.

39. ש: מתי ראית אותו בפעם האחרונה בטרם מעצרך?

40. ת: ראיתי אותו פעם אחת.

41. ש: באילו נסיבות הייתה אותה פעם?

תאריך : כ"ח בכסלו תשס"ח
25 בדצמבר 2008

ת: רציתי לחזור לחזית העממית והוא אמר לי שאין לו קשר בענ"יין.    1
ש: מה ז"א?    2
ת: זו התשובה שהוא ענה לי, בנאדם שאני לא מכיר אני לא יכול לתקשר איתו    3
יותר.    4
............    5
ש: כשניגשת לאחמד סעדאת, מה הייתה מטרת הפגישה?    6
ת: פגשתי אותו במשרד, ביקשתי ממנו לחזור לחזית, הוא השיב לי כי אין לו שום    7
קשר לעניין.    8
   9
העד טען כי אויים ועונה הן בחקירתו בשב"כ והן במשטרה ע"י אנשי שב"כ בנוכחות    10
שוטר אך לא הכחיש כי הדברים אכן נאמרו.    11
   12
העד נקב בשמות חוקרי השב"כ אשר הכריחו אותו להפליל את הנאשם והם : חוקרי    13
השב"כ, "עומרי", "ארבלי", "המיניגיורי" ו"הקולונל" אנשים אלה לא הוזמנו לעדות    14
במשפט עקב עמדתו של הסניגור. בהתייחסו לסוג העניניים פירט העד כדיכתיב :    15
   16
ש: אתה יכול לומר לי אילו עינויים עברת בשב"כ? מה עשו לך?    17
ת: היו מכות. והייתה קשירה על הכיסא בתנוחת שבח, מניעת שינה.    18
ש: איפה הרגיצו לך?    19
ת: בפנים ובבטן.    20
ש: כשהיית מול השוטרים אשר חקרו אותך, גם אז היית אזוק בתנוחת שבח?    21
ת: הייתי כבול על הכיסא שעינו אותי עליו לפני דקות מאז. כשהיה מגיע השוטר,    22
היה איש השב"כ מוריד לי את האזיקים.    23
ש: אני מניח כי המכות היו כל כך חזקות בפנים שהשאירו לך סימנים.    24
ת: אני חושב שהם מיומנים בביצוע עבודתם כך שלא יישארו סימנים.    25
   26
משנשאל העד האם הפליל במצוות אנשי השב"כ אנשים נוספים אמר :    27
   28
ת: השב"כ הביא לי אלבום תמונות תוך כדי החקירה, הם רצו להגיד על כל מי    29
שבא להם. יכול להיות שאני מכיר אותו ואין לו שום קשר איתי, רק בשביל    30
להצביע עליו.    31
ש: מכל האלבום הזה, על מי עוד המצאת דברים שאין לו שום קשר אליך?    32
ת: לרוב המזל לא היה אחד כזה.    33
   34
בהמשך חקירתו פרש העד מניע נוסף או אחר להפללת סעדאת :    35
   36
ש: במשטרה.    37
ת: אני לא זוכר. אני רק זוכר שזה אחמד סעדאת, החוקר שקוראים לו ארבל והוא    38
ביקש שאני ידבר על סעדאת, שאנו לא מביאים את האדם הזה לכלא, אנו מורידים    39
אותו עם כדור בראש. כל הזמן הוא היה אומר לי ככה ולוחץ על שמו של סעדאת.    40
   41
לעומת זאת תמך העד את אמרתו בפרטים הבאים :    42
   43
ש: אתה ביקשת ממנו משתיק קול נכון?    44
ת: כן.    45
ש: הייתה גם תכנית לעשות לעשות פיגוע עם רימוני יד אבל בסוף הוא לא הביא לך, נכון?    46
ת: כן. וזה לא היה.    47
ש: אבל היה רעיון?    48
ת: כן, אבל לא היו רימוני יד.    49

תאריך : כ"ח בכסלו תשס"ח             תיק מס' : 2958/06
25 בדצמבר 2008

1     ש : הוא גם בעצם לימד אותך להשתמש בנשק, נכון?
2     ת : הוא אותו אדם שראינו את הנשק אצלו.
3
4     לדברי העד בוצע האימון בנשק לא עקב הפניית הנאשם אלא בעקבות פגישה מקרית
5     ברחוב. בשלב מסוים בעדות הרחיק העד את החזית העממית מהפעילות ולאחר מכן
6     קשר אותה בחזרה:
7
8     ש : למי הם כן שייכים?
9     ת : קוראים להם כוחות ההתנגדות העממית.
10     ש : הם שייכים לחזית העממית?
11     ת : כפי שהאדם הזה ענה לי, לא.
12     ש : אם אומר לך כי באמרתך המשטרתית אתה אומר בדיוק ההפך?
13     ת : אדם שהחשדות הראשונים הם שהוא חבר בחזית העממית והוא הודה בביצוע פעילות
14     צבאית, אז מה יכתוב השוטר? בטח יכתוב שהוא שייך לחזית העממית.
15     ש : אז השוטר הוסיף את זה, לא אתה?
16     ת : הוא שומע כוחות ההתנגדות העממית ורושם חזית עממית.
17     ש : כשהודית בכתב האישום שלך האם הודיע על הניסיון שלך, על הפעילות הצבאית
18     במסגרת החזית העממית או במסגרת כוחות ההתנגדות העממית?
19     ת : לא זוכר.
20     ש : יתכן כי הודית בפעילות החזית העממית?
21     ת : אני חושב שההאשמה הראשית הייתה החזית העממית.
22     ש : אבל הפעילות שלך, האם הודית כי הייתה במסגרת החזית העממית?
23     ת : כן, הפעילות שלי הייתה במסגרת החזית העממית.
24     ש : האם השתתפת בסוף 99 תחילת שנת 2000 בוועידה של החזית העממית של הנהגת
25     אזור ירושלים, באולם ברמאללה?
26     ת : כן. זה קרה. ..........
27     ..........
28     ש : אחמד סעדאת היה?
29     ת : כן.
30     ש : הוא פיקח על הוועידה?
31     ת : אולי, זה במסגרת הפעילות הפוליטית של החזית העממית.
32     ש : הוא פיקח על אותה וועידה?
33     ת : אני חושב שכן, כי אף אחד לא שאל אותו מה הוא עושה שם והוא לא אמר.
34     ש : אני שואל את השאלה שוב. הוא ניהל את הוועידה?
35     ת : יכול להיות.
36     ש : אתה אמרת קודם ששנה לאחר מכן כשפגשת אותו על מנת לחזור לחזית העממית הוא
37     אמר לך שאין לו שום קשר לזה, אז איך אתה אומר שהוא היה בוועידה של החזית
38     העממית ואתה בכל חשבת מהתקשרות שהוא קשור.
39     ת : באותו זמן של הוועידה, כמו שאמרתי לפני כן, הוא לא אמר שהוא מפקח על הוועידה,
40     אנו חשבנו שיכול להיות שהוא היה המפקח. לאחר מכן, אחרי שביקשתי ממנו אני והוא
41     השיב לי שאין לי קשר לעניין.
42
43     באמרתו במשטרה אשר הוגשה על פי סעיף 10א לפקודת הראיות (נוסח חדש)
44     התשל"א – 1971 אמר מחמד אל עיול את הדברים הבאים :
45
46     אמרתו של מחמד חליל חסין אלעיול מיום 24.4.01, עמ' 5, ש' 1 עד עמ' 10 ש' 7.
47     ועמ' 5 ש' 1 עד 16 : "בתחילת שנת 1999 לא זוכר בדיוק מתי התקשר אחמד
48     מסלמאני לפלאפון שלי ואמר לי לבוא לפגישה ברמאללה, ואני הלכתי לבדי
49     למשרד החזית העממית ברמאללה ברחוב אלמנארה ושם ראיתי את 1) אחמד

תאריך : כ"ח בכסלו תשס"ח          תיק מס׳ : 2958/06
25 בדצמבר 2008

סעדאת הגיל שלו יותר מארבעים שנים אני לא יודע איפה הוא גר 2) חאלד חלבי    1
כבן 23 מבית חנינא ויש לו מספרה לנשים לא יודע אביו או אחיו 3) מג׳ד ברבר 4)    2
שאדי שרפאא כבן 23 משועפט והוא מורה בבית ספר, לא יודע איזה בית ספר,    3
ובפגישה אנחנו ביקשנו מאחמד סעדאת שהוא אחראי בחזית העממית אני לא יודע    4
על מה לעבור לפעילות צבאית, ואחמד סעדאת אמר לנו לא לדבר על הנושא הזה    5
במשרד ואמר שיקבעו פגישה נוספת במקום אחר, אחרי כשבוע ראיתי את חאלד    6
חלבי בצלאח אדין והוא אמר לי שאני והוא צריכים להגיע לרמאללה למקום    7
שחאלד ידע את הכתובת אבל אני לא ידעתי ואני וחאלד חלבי הלכנו ביחד ונכנסנו    8
לבית ושם ראינו את 1) שאדי שרפאא׳ 2) ומג׳ד ברבר 3) ואחמד סעדאת ואנחנו    9
אמרנו לאחמד סעדאת שאנחנו רוצים לעבור לפעילות צבאית ואחמד אמר לנו    10
שיבדוק את זה ויודיע לכל אחד באופן פרטי."    11
12

לעניין האישום העשירי, הצביעה התביעה על אמרתו של מחמד חליל חסין אלעיול    13
מיום 7.4.01 ואמרתו של מחמד חליל חסין אלעיול מיום 24.4.01, עמ׳ 12, ש׳ 14 עד    14
עמ׳ 14, ש׳ 2.    15

עפ"י האמור באמרות אלו, העד מחמד אלעיול פנה לנאשם וביקש ממנו לפעול,    16
כדבריו, "פעילות צבאית עונית נגד ישראלי". הנאשם, משיקוליו שלו, דחה תחילה    17
את בקשת העד. נדמה כי הסיבה לכך הייתה נוכחותם של נוספים במעמד זה.    18
ואכן, כאשר העד היה בדרכו החוצה, שוחח הנאשם עמו ביחידות, ואמר לו להגיע    19
לנקודת מפגש, שם ייפגש עם פלוני בעניין פעילות זו. אמנם בשלב כלשהו נותק    20
הקשר בין מחמד אלעיול לבין איש הקשר של הנאשם, אולם לאחר תקופה קצרה    21
חודש הקשר, והגיע עד כדי תכנון פיגועים נגד מטרות ישראליות בשם הארגון,    22
פיגועים אשר היו אמורים על פי התכנון להביא לאבידות בנפש.    23
24

העד טען בחקירתו כי הוכרח על ידי אנשי השב"כ להפליל את הנאשם, אך טענותיו    25
נותרו מן הפה ולחוץ, באשר לא מסר לבית המשפט או לצדדים  כל כלים להוכיחם    26
או לסתור אותם. העד לא נקב בשמות החוקרים או בכינוייהם והנאשם לא חפץ    27
להזמינם ולחוקרם על טענות העד או לחקור את העד עצמו בגין טענות אלה.    28
טענות על לחץ בלתי הוגן, או חקירות אלימות של אנשי שירות הביטחון הכללי כלפי    29
עדים, עולות בבית משפט זה מפעם לפעם, ומתבררות בו ביסודיות עי"פ בקשות    30
הצדדים. מניסיונו של בית המשפט אנשי השב"כ מזוהים תמיד על ידי הנחקרים    31
בכינוייהם הקבועים, חקירותיהם מתועדות תחת אותו כינוי קבוע, וניתן להביאם    32
לבית המשפט והדבר אף נעשה חדשות לבקרים. טענתו של העד - לו הייתה מועלית    33
באופן רציני ומפורט, הייתה נבדקת, אך הנאשם בחר שלא לברר, ואף לא טען כנגד    34
משקלן של האמרות או העדות.    35
בנסיבות אלה לא נוכל לבסס את טענת העד כי עונה על ידי אנשי השב"כ או    36
השוטרים ולא נייחס לה כל משקל. כאן המקום להוסיף כי התרשמתי מן העדות    37

1   ומדרך אמירת הדברים כי טענה זו נטענה מן הפה ולחוץ וכדי לצאת ידי חובה של עד

2   אשר מסר אמרה מפלילה, ועומד במבוכה ביום מתן עדותו בפני הנאשם אשר הפליל

3   באמרתו במשטרה.

4

5   לאחר בחינת העדות מול האמרה, ולאור התרשמותי מן העד, אני מעדיף את הגרסה

6   האמורה באמרה. גלוי על פני הדברים שהעד סתר את עצמו בבית המשפט מספר

7   פעמים, העד לא ידע להסביר מדוע הוא, אשר הודה ומודה בפעילות בחזית העממית

8   וביקש לשוב ולפעול פעילות צבאית במסגרתה, ביקש לעשות זאת באמצעות

9   הנאשם, סורב, ולאחר מכן ב"דרך נס" פגש אדם ברחוב אשר חידש את פעילותו

10  ואימן אותו בנשק. האיש המאמן והפעיל נשאר אלמוני כמו גם מניעיו, אך סמיכות

11  הזמנים, והקשר סיבה- מסובב שבין פגישת העד עם הנאשם לבין חידוש פעילותו של

12  העד  לא הוסברה בעדות כלל בעוד שהוסברה היטב באמרה.

13

14  חיזוק מוגבר הנדרש לאמרת שותף מצוי בחומר הראיות המצביע על מעמדו תפקידו

15  ומקום פעילותו של הנאשם התואמים את אמרת העד .

16  ראייה מחזקת נוספת נמצאה לבית המשפט בהודאתו של הנאשם עצמו הן

17  באמרותיו במשטרה והן בבית המשפט כי הוא נושא את משרת המזכיר הכללי של

18  ארגון החזית העממית.

19  הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגנתו וויתר על

20  פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות התביעה .

21

22  העובדות אשר הוכחו מקיימות את יסודות עבירת ביצוע שירות עבור התאחדות

23  בלתי מותרת, ודאי הוא כי אדם הדואג לפונה אל ארגונו ומשלב אותו בפח"ע בשם

24  הארגון מבצע את העבירה האמורה.

25  לעניין קשירת הקשר המיוחסת לנאשם בפרט האישום העשירי נשאלת השאלה אם

26  אותו "שידוך" או "תיווך" שיצר הנאשם ע"פ הראיות בין אל ריול לאחרים, אשר

27  רקמו בינם לבין עצמם מזימות רצח, בלי שהנאשם היה מעורב בפרטיהן, די בו כדי

28  לבסס את העבירה המיוחסת.

29  התשובה נראית לי חיובית, גם המתווך לדבר עבירה הינו צד לחוזה ומקדם את

30  הקשר על ידי שירות חיוני של תיווך בין הצדדים הקושרים והפגשתם. הנאשם עשה

31  זאת לאחר שנתבקש לסייע לאל ריול , לשוב ל"פעילות צבאית", בקשה זו משמעותה

32  – באופן חד משמעי - שילובו במעגל של פיגועים וניסיונות רצח כפי שאכן היה.

33  משתיווך הנאשם ביודעין בין העד לבין האלמוני שחנך אותו וקשר איתו לביצוע

תאריך : כ"ח בכסלו תשס"ח      תיק מס': 2958/06
25 בדצמבר 2008

1   פיגועים, קשר את הקשר הנדרש, אם לא לעבירה של גרימת מוות בכוונה בוודאי

2   לעבירה מסוג פשע. יחד עם זאת, לא ניתן להרשיע בעבירה של קשר לגרימת מוות

3   בכוונה בשל העדר מסוויימות נדרשת למעשה מסוג זה, הגם שישנה מסוויימות לצורך

4   הרשעה בקשר לקידום פעילות צבאית כלשהי.

5   אשר על כן אני מציע לחבריי להרשיע את הנאשם :

6   בפרט האישום התשיעי : בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת

7   בפרט האישום העשירי : בעבירה של קשירת קשר לביצוע עבירה שעונשה עולה על

8   שלוש שנות מאסר.

9

10   **11 .פרט האישום האחד עשר** [פיקוח והשתתפות בוועידת החז"ע באזור ירושלים]

11   בפרט אישום זה, הואשם הנאשם בכך שארגן ופיקח על ועידת החז"ע. ראיות לפרט

12   אישום זה נמצאו לבית המשפט בעדות אישים שראוהו בוועידה, וכן במערך הראיות

13   לאישומים 4,5,6 אשר בהם עלה במפורש נושא הוועידה וחשיבותה להמשך פעילות

14   הפח"ע של ארגון החז"ע .

15   <u>ראייה מרכזית :</u>

16   בעדותו בבית המשפט אמר מחמד אל עיול את הדברים הבאים :

17   **ש: האם השתתפת בסוף 99 תחילת שנת 2000 בוועידה של החזית העממית של**

18   **הנהגת אזור ירושלים, באולם ברמאללה?**

19   **ת: כן. זה קרה.**

20   **ש: האם נכון כי דר' אחמד מסאלמה היה בוועידה?**

21   **ת: כן, הוא היה.**

22   **ש: מה לגבי נאצר אבו חדיר?**

23   **ת: היה נוכח.**

24   **ש:חאלד חלבי?**

25   **ת: כן.**

26   **ש: סעיד סלאמה?**

27   **ת: יכול להיות שהיה.**

28   **ש: מג'ד ברבר ושאדי?**

29   **ת: כן, יכול להיות.**

30   **ש: אחמד סעדאת היה?**

31   **ת: כן.**

32   **ש: הוא פיקח על הוועידה?**

33   **ת: אולי, זה במסגרת הפעילות הפוליטית של החזית העממית.**

34   **ש: הוא פיקח על אותה וועידה?**

35   **ת: אני חושב שכן, כי אף אחד לא שאל אותו מה הוא עושה שם והוא לא אמר.**

36   **ש: אני שואל את השאלה שוב. הוא ניהל את הוועידה?**

37   **ת: יכול להיות.**

38   **ש: אתה אמרת קודם ששנה לאחר מכן כשפגשת אותו על מנת לחזור לחזית**

39   **העממית הוא אמר לך שאין לו שום קשר לזה, אז איך אתה אומר שהוא היה**

40   **בוועדיה של החזית העממית ואתה בכלל חשבת מהתקשורת שהוא קשור.**

ת: באותו זמן של הוועידה, כמו שאמרתי לפני כן, הוא לא אמר שהוא מפקח על                    1
הוועידה, אנו חשבנו שיכול להיות שהוא היה המפקח. לאחר מכן, אחרי שביקשתי                     2
ממנו אני והוא השיב לי שאין לו קשר לעניין.                                                3
                                                                                        4
באמרתו מיום 24.4.01, עמ' 15, ש' 17-20   תמך מחמד חליל חסין אלעיול את עדותו                5
היטב                                                                                     6
                                                                                        7
"אני רוצה לספר לך שלפני כשנה וחצי הייתה ועידה של החזית העממית הנהגת                      8
אזור ירושלים והועידה הייתה באולם ברמאללה ומי היה בוועידה זה 1) אחמד                     9
סעדאת שפיקח על הוועידה..."                                                              10
                                                                                        11
עובדות פרט אישום זה הוכחו בבירור אך ראייה מחזקת נוספת נמצאה לבית                          12
המשפט בהודאתו של הנאשם עצמו הן באמרותיו במשטרה והן בבית המשפט כי                          13
הוא נושא את משרת המזכיר הכללי של ארגון החזית העממית.                                      14
הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגנתו וויתר על                   15
פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות התביעה.                        16
                                                                                        17
יסודות העבירה נתקיימו בעליל שכן ארגון ועידה בהיקף ובסדר גודל שכזה הם                     18
בוודאי ביצוע שירות עבור ארגון החזית העממית .                                             19
אשר על כן אני מציע לחברריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט אישום                   20
מס' 11.                                                                                  21
                                                                                        22

## 12 .פרט האישום השניים עשר [בדיקה ברישומי החז"ע והודעה לראמי ג'ביל כי          23
קיים בהם חומר שלילי כנגדו]                                                               24

עובדות פרט אישום זה לא הוכחו והתביעה עצמה ביקשה כי ביהמ"ש יזכה                            25
את הנאשם מהעבירה המתוארת בפרט אישום זה . ספק בעיני אף אם עובדות פרט                       26
אישום זה מגלות  עבירה אך בית המשפט פטור מלדון בכך מלא נמצאו ראיות                         27
להוכחת העובדות המופיעות בפרט אישום זה .                                                  28
                                                                                        29
משכך אציע לחברריי לזכות את הנאשם מפרט האישום השניים עשר .                                 30
                                                                                        31

## 13 .פרט האישום השלושה עשר [נשיאת משרה של המזכיר הכללי של החזית              32
העממית]                                                                                  33

פרט אישום זה הינו מרכזי בחשיבותו ולהוכחת העובדות האמורות בו נמצאו ראיות                   34
מרובות לרבות הודאה במספר הזדמנויות ובית המשפט יזכיר את חלקן.                              35
ראיות מרכזיות :                                                                          36

1   בהודעתו בכתב לבית המשפט, הודיע הנאשם כי הוא משמש כמזכיר הכללי של

2   ארגון החזית העממית. לאחר שעיינתי בפרוטוקולים אשר תיעדו את ההתרחשות

3   סביב ההודעה אשר הגיש הנאשם בתחילת משפטו – כתשובה לכתב האישום מצאתי

4   כי יש לקבל את העובדות האמורות בה והנמצאות בידיעת הנאשם לגבי מעשיו שלו

5   – כראייה לאמיתות תוכן . וכך כתב הנאשם לבית המשפט :

6   *כי מה שאתם מכנים בכתב האישום "עבירות ביטחון" אינה אלא חובה לאומית,*

7   *ולא משנה באם זה קרה או לא קרה בפועל, והיא באה במסגרת ההתנגדות לכיבוש .*

8   *בעת ובעונה אחת, אני כמזכיר הכללי של החזית העממית לשחרור פלסטין מדגיש*

9   *את גאוותי בהשתייכותי לתנועה המהפכנית הפלסטינית והמשכיות תנועה זו*

10  *במישור האיזורי, הלאומי והעולמי. והיותה ממרכיבי התנועה המהפכנית העולמית*

11  *אשר מתנגדת להליך הגלובליזציה האימפריאליסטי .......*

12  יצויין כי אף הסניגור הודיע לבית  המשפט כי אינו כופר בעובדה זו וכך אמר לבית

13  המשפט :

14

15  "**סנגור: מרשי אף פעם לא הכחיש שהוא המזכ"ל של החזית העממית, זה כתוב**

16  **בתגובה.** " (ישיבת בית המשפט מיום 14/1/07 )

17

18  הנאשם הודה בעובדה זו גם באמרתו מיום 19/3/06 ( עמ' 2 שורה 5 ) .

19  **שאלה : זה נכון שאתה המזכיר הכללי של החזית העממית**

20  **תשובה : כן זה נכון אני המזכ"ל של החזית העממית**

21

22  בעדותו של עבד אל  רחים מלוח בבית המשפט נשאל העד וענה כך :

23

24  **ש : האם נכון שאתה שמשת כסגנו של סעדאת?**

25  **ת: אני הייתי סגן למזכ"ל החזית העממית.**

26  **ש : מי מזכ"ל החז"ע?**

27

28  או אז התערב הנאשם בעצמו ואמר :

29

30  **נאשם: (אומר מתוך תא הנאשמים) אחמד סעדאת.**

31

32  וכך נאמר גם באמרתו של ע"א רחים מחמוד אבו מלוח מיום 2.7.02. עמ' 1, ש' -26

33  .27

34

35  "**אבו עלי מוצטפא היה יו"ר החזית העממית עד מותו ואחרי מותו מונה אחמד**

36  **סעדאת כיו"ר החזית העממית ואני כסגן ליו"ר...**"

37

38

39  כך גם בעדותו של באסל עבד אל רחמאן אסמר בבית המשפט נשאל העד וענה כך :

40

41  **ש : מה תפקידו של הנאשם בחזית העממית?**

42  **ת: החבר הוא המזכיר הכללי של החזית העממית.**

43

44  כך עלה גם עדותו של עד תביעה מס' 18 ברשימת העדים, לואי האני עראר בבית

45  מיום 18.11.07, עמ' 1, ש' 44 עד 47 :

1

"ש: באיזה ארגון אתה חבר?

ת: חזית העממית.

ש: ומי האדם הזה?

ת: אחמד סעדאת, המזכיר הכללי של החזית העממית לשחרור פלסטין."

הנה כי כן הודה הנאשם מתחילת משפטו בעובדות פרט אישום זה בכתב ובעל פה

ועדויות העדים האחרים תמכו ואישרו הודאה זו .

העובדות שהוכחו מקיימות את יסודות העבירה של נשיאת משרה בהתאחדות בלתי

מותרת היא המשרה הבכירה של מזכ"ל החזי"ע אשר הוכח כי בה נשא הנאשם.

התוצאה היא שאני מציע לחבריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט

האישום השלושה עשר.

## 14. פרט האישום הארבעה עשר [נאום הסתה לנקמה לאחר מותו של אבו עלי מוצטפא]

### 14.1 התמונה הראייתית

ראיה מרכזית :

ראייה מרכזית נמצאה לבית המשפט בעדותו של ג'ורג' קורט הנתמכת באמרתו

ונשענת על ידיעתו האישית כמי שנכח בעצרת :

עדות עד תביעה מס' 7 (עד מס' 10 ברשימת העדים), ג'ורג' מנסור קורט.

ש: בוא נחזור לעצרת בכיכר סירייה, אתה זוכר מי נאם בעצרת זו?

ת: הרבה אנשים.

ש: אתה זוכר שהנאשם נאם בעצרת זו?

ת: איזה נאשם?

ש: יש רק נאשם אחד באולם.

ת: כן, הוא נאם.

ש: בכמה עצרות ראית אותו נואם?

ת: לא זוכר אולי פעם אחת, נראה לי.

ש: אתה זוכר מה הוא אמר?

ת: לא.

ש: באמרתך אתה אומר שהוא קרא לנקמה, לקחת נקמה בשל הריגתו של אבו עלי מוצטפא.

ת: כל העולם דיבר שהוא הולך לנקום על מותו של אבו עלי מוצטפא.

באמרתו מיום 4.11.02. עמ' 1, שורה 10-8. מפרט ג'ורג' מנסור קורט את דבריו

ומייחס את הקריאה לנקמה ישירות לנאשם .

"כמה ימים לפני רצח השר זאבי הייתי בעצרת בכיכר סיריה ברמאללה של ארגון

החזי"ע מי שנאם שם זה אחמד סעדאת אשר קרא לקחת נקמה בגלל הריגתו של

אבו עלי מוצטפא.."

העד בבית המשפט זכר את האווירה הכללית בעצרת אשר התקיימה יותר משש
שנים לפני עדותו, וזכר כי נישאו נאומים בנוסח הנקמה. יחד עם זאת העד אמר כי
לא זכר מה אמר הנאשם. העדות תומכת את האמרה ויש להניח כי ממרחק השנים
העד לא זכר (או אולי העדיף לא לזכור) את הנאמר על ידי הנאשם בוודאות – מכל
מקום לא הכחיש את תוכן ההסתה אלא אף הוסיף בדרכו כי נאום מסוג זה בנסיבות
אלה היה סביר. מסקנתי היא כי יש להעדיף את האמרה בהיותה קרובה יותר
למקום ולזמן של העצרת כמקור משלים לעדות ולקבוע כי הנאשם אמר את הדברים
המיוחסים לו.

## 14.2 המסגרת הנורמטיבית

יסודות עבירת ההסתה כפי שנקבעו בחוק הם : .

סעיף 7(א) + 10 לצו בדבר איסור פעולות הסתה ותעמולה עויינת (יהודה והשומרון)
(מס׳ 101), תשכ״ז – 1967.

### 7 . כל אדם אשר : -

> א. מנסה, בין בעל פה ובין באופן אחר, להשפיע על דעת הקהל
> באזור באופן העלול לפגוע בשלום הציבור או בסדר הציבורי,
> או .........

### 10 .

> א. המארגן תהלוכה, אסיפה או משמרת ללא רשיון, קורא או
> מסית לקיימן או מעודד אותן או נוטל בהן חלק בצורה כל
> שהיא; או

יסודותיה של עבירה זו דומים ליסודותיה של העבירה המקבילה בחוק העונשין
(נוסח חדש ) התשל״ז 1977

> 144ד2.(א) המפרסם קריאה לעשיית מעשה אלימות או טרור, או דברי
> שבח, אהדה או עידוד למעשה אלימות או טרור, תמיכה בו או הזדהות
> עמו (בסעיף זה – פרסום מסית), ועל פי תוכנו של הפרסום המסית
> והנסיבות שבהן פורסם, יש אפשרות ממשית שיביא לעשיית מעשה
> אלימות או טרור, דינו – מאסר חמש שנים.

לדעתי, ראוי הדבר שנאמץ בבית משפט זה מבחן דומה של ״אפשרות ממשית״ לכך
שהפרסום יגרום לפגיעה בשלום הציבור או בסדר הציבורי. כך יש לפרש את הביטוי
״באופן העלול לפגוע״ המופיע בחוק.

1   לא כך בחר בית המשפט העליון לפרש את עבירת ההמרדה [סעיף 134-138 לחוק

2   העונשין (נוסח חדש) התשל״ז - 1977] .בפסק דינו בע״פ 6696/96 **כהנא נגד מדינת**

3   **ישראל** פ״ד נב (1) 535, בדעת רוב קיבל בית המשפט העליון את מבחן *הוודאות*

4   *הקרובה״* לכך שהדברים הנאמרים בפה יביאו לנזק ממשי, ובכך העדיפו מבחן זה על

5   פני מבחן *׳האפשרות הסבירה״* . בית המשפט העליון זיכה לפיכך את הנאשם אשר

6   התבטא ברוב עם בדבר הצורך להפציץ מן האוויר אוכלוסין מסוימים של המדינה.

7

8   המחוקק הישראלי עצמו הבדיל בין עבירת ההמרדה לעבירת ההסתה וקבע מבחן

9   מחמיר יותר על הנאשם של *׳אפשרות סבירה״*.

10   בעניינינו התרשמתי מן הראיות שהובאו בפנינו שמדובר היה בעצרת מרובת

11   משתתפים. הנאשם דיבר בעצרת זו כמנהיג יורש של ארגון טרור מבוסס, מנוסה

12   ומצויד. זה מקרוב הומת מנהיגו של אותו ארגון, כאשר המשתתפים תמימי דעים כי

13   הדבר נעשה על ידי כוחות הביטחון הישראליים, ובאווירה כללית של קריאה לפיגוע

14   נקמה.

15

16   קריאה שכזו מפי אדם במעמדו של הנאשם, בפורום שכזה, ובנסיבות שכאלה,

17   מעמידה *״אפשרות סבירה״* ואף *׳וודאות קרובה״* לכך שאדם השומע את הדברים

18   ישודל ויונע לקום ולבצע מעשי נקמה העלולים לסכן חיי אדם, לא כל שכן לפגוע

19   בסדר הציבורי ובשלום הציבור.

20

21   אשר על כן אני מציע לחבריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט

22   האישום הארבעה עשר .

23

24   **15 פרט האישום החמישה עשר** [ישיבות תאום עם ראש הארגון באוניברסיטת א-

25   נג׳אח]

26   ראיה מרכזית נמצאה לבית המשפט בעדותו ובאמרתו של מס׳עב מחמוד :

27   **תרגום לעברית של הודעה מס׳ 1 של מס׳עב עאדל מחמוד, עמ׳ 24 ש/ 13-21:**

28

29   **״ראשית הייתי יושב ראש לחזית העממית באוניברסיטת א-נג׳אח הייתי בקשר**

30   **עם מוסא אלגומה האחראי על החזית העממית בשכם וממנו קיבלתי כספים**

31   **לפעילות באוניברסיטה וגם הייתי בקשר עם אחמד סעאדת ועאבד אבו גולמר**

32   **אבראהים בחזית העממית, אחמד מרמאללה ועבד מבית פוריק ומהם ביקשתי**

33   **סיוע כספי והם היו מדברים עם האחראי הבכיר מוסא טועמה בכדי שיספק לנו**

34   **את הכספים״.**

35

36   על מנת לבחון את האמרה מול העדות על פי סעיף 10א נביא להלן קטעים רלוונטיים

37   מן העדות.

38   עדותו של עד תביעה מס׳ 20, מס׳עב עאדל מחמוד, מיום עמ׳ 3 ש/ 2 עד ש/ 31 :

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

```
 1
 2   ש : "מה היכרותך עם אחמד סעדאת?
 3   ת: אני לא מכיר.
 4   ש: כמה פעמים פגשת אותו?
 5   ת: היום באוטובוס.
 6   ש: איך ידעת הבוקר שזה אחמד סעדאת?
 7   ת: כל אחד מכיר את האנשים שנמצאים, כמו שאתה מכיר את הסוהר שיש לך
 8      פה.
 9   ש: באיזה ארגון היית חבר לפני המעצר שלך?
10   ת: בשום ארגון.
11   ש: באיזה אוניברסיטה למדת?
12   ת: אוניברסיטת אל נג׳אח.
13   ש: איפה?
14   ת: בשכם.
15   ש: מה למדת?
16   ת: מדעי החברה ואני עדיין לומד.
17   ש: אני מציג לך אמרה בערבית מתאריכים 13/12/04 של מי החתימה על גבי
18      האמרה ?
19   ת: זה לא חתימתי.
20   ש: מה ת.ז שלך ?
21   ת: לא יודע.
22   ש: ת. לידה?
23   ת: 12.2.78.
24   ש: שמך המלא?
25   ת: מוצעב עאדל אחמד מחמוד.
26   ש: באמרתך אתה אומר שאתה היית יו״ר החזית העממית באוניברסיטה, מהי
27      תגובתך ?
28   ת: זה לא נכון, לא הייתי.
29   ש: אתה מוסיף ואומר שהיית בקשר עם מוסא סלאמה, מה יש לך לומר ?
30   ת: לא נכון.
31   ש: אתה אומר גם שהיית בקשר עם עאהד ע׳ולמה ואחמד סעדאת.
32   ת: לא מכיר אותם.״
33
34   ש : "אתה יודע שמוסא סאלמה היה אחראי על החזית העממית בשכם ?
35   ת: לא.
36   ש: איך זה הגיע לאמרתך לדעתך ?
37   ת: לא יודע.
38   ש: אתה זוכר שנחקרת במשטרה?
39   ת: לא זוכר.
40   ש: אתה זוכר שנעצרת?
41   ת: בטח שאני זוכר.
42   ש: כמה פעמים ישבת עם שוטר שכתב את אמרתך?
43   ת: אף פעם.
44   ש: נחקרת בשב״כ?
45   ת: נחקרתי בפתח תקווה.
46   ש: אתה זוכר שוטר בשם ג׳מאל שכור ?
47   ת: לא.
48   ש: אתה זוכר שביקשת מאחמד סעדאת ומעאהד ע׳ולמה סיוע כספי?
49   ת: לא.
```

תאריך : כ״ח בכסלו תשס״ח          תיק מס׳ : 2958/06
25 בדצמבר 2008

ש : אתה זוכר שאמרת באמרתך שאחמד ועאהד ע׳ולמה אחראים על החזית          1
העממית?          2
ת : לא.          3
ש : הסברת גם כי אחמד הוא מרמאללה ועאהד מבית פוריק.          4
ת : לא, לא מכיר את המקום הזה.          5
ש : נכון שהיית חבר בחזית העממית?          6
ת : לא.״          7
8
העד בעדותו נקט קו של עוינות מוחלטת הגובלת בשתיקה, הוא טען כי אינו מכיר          9
איש מהמעורבים, ומעולם לא היה לו קשר לחז״ע, וכן כי מעולם לא מסר אמרה          10
כלשהי לשוטר בכתב ובע״פ וכי הכתב אינו כתב ידו. התרשמתי משפת הגוף של העד          11
וחילופי המבטים עם הנאשם תוך כדי מסירת העדות כי ההיפך הוא הנכון - ישנה          12
היכרות ואף קשר של הערכה בין העד לנאשם.          13
14
מתן האמרה הוכח במשפט בעדותו של השוטר ג׳מאל שכור אשר העיד מן האמרה          15
ומזיכרונו על נסיבות גבייתה באופן מהימן וישיר, ולא נשאל דבר בעניין גביית          16
העדות על ידי ההגנה. השוטר שכור העיד כי גבה את האמרה בשפה הערבית והראה          17
את כתב ידו של העד ואת כתב ידו שלו הנבדלים זה מזה על אותו המסמך.          18
19
האמרה הארוכה ( 24 עמוד ) והמפורטת, מכילה פרטים רבים מקורות חייו של העד          20
החל מתחילת חברותו בחז״ע בגיל 14 (עמ׳ 2), דרך שמות הפעילים איתו בשלבים          21
השונים של חייו, תאום עם ארגונים אחרים, מקומות, שמות, זמנים ומספרי טלפון,          22
אשר העד לא הסביר כיצד הגיעו לאמרה, ואיך יכול, או מאילו מקורות יכול היה          23
החוקר לבדותם. למעשה הרחיב העד את החזית של טיעונו וטען כי מעולם לא מסר          24
אמרה זו.          25
26
העד הרחיב באמרתו גם בעניין פרשת פיגוע התאבדות הקשור באמג׳ד מליטאת          27
וסאמר חנני. פרשה זו נתמכה בראיות נוספות ושונות שהוגשו במשפט זה בעניין          28
העדים אבו חניש וחסן פטאפטה אשר מסרו פרטים תואמים, כפי שעשה זאת מסיעב          29
מחמוד עצמו בעניין תכנון אותו פיגוע ההתאבדות של פלג החז״ע בשכם.          30
31
העולה מן המקובץ הוא כי אני מעדיף את גרסתו של העד במשטרה אשר על גבייתה          32
העיד השוטר שכור, ואשר נתמכה ממקורות נוספים, על פני עדותו של העד בבית          33
המשפט אשר הייתה מתחמקת ובעלת סימני אמת שליליים.          34
35

תאריך : כ״ח בכסלו תשס״ח
25 בדצמבר 2008

1   ראייה מחזקת נוספת נמצאה לבית המשפט בהודאתו של הנאשם עצמו הן

2   באמרותיו במשטרה והן בבית המשפט כי הוא נושא ונשא בזמנים הרלוונטיים את

3   משרת המזכיר הכללי של ארגון החזית העממית. לפיכך, יש לקבוע כי עובדות פרט

4   אישום זה הוכחו מעל לכל ספק סביר.

5

6   הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגנתו וויתר על

7   פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות התביעה .

8

9   יסודות העבירה נתקיימו בעליל שכן תמיכה בסניף החז״ע באוניברסיטה גדולה הינו

10   בוודאי ביצוע שירות עבור ארגון החזית העממית .

11

12   אשר על כן אני מציע לחברריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט אישום

13   מס׳ 15 .

14

15   **16 .פרט האישום הששה עשר** [ניהול פעולות צבאיות של החז״ע מתוך הכלא של

16   **ה״רשות הפלסטינית״ ברמאללה]**

17   ראיות מרכזיות :

18   **עד תביעה מס׳ 14 (עד מס׳ 23 ברשימת העדים), מוחמד פאוזי מוחמד חנאפסה.**

19   העד אישר את פגישתו עם הנאשם בכלא רש״פ ברמאללה אך טען כי היא עסקה

20   בעניינים חוקיים, וכך אמר בעדותו :

21

22   **ש : אני רוצה לרענן את זיכרונך, תגיד לי אם אתה זוכר או לא לפי הכתוב באמרה,**

23   **אתה מס/פר שביקשת בעצם את העזרה של הנאשם לפתוח את המוסד הקהילתי**

24   **והוא אמר לך שזה רעיון טוב, אך אין לו כסף על מנת לתמוך בך והפנה אותך**

25   **לגורמים אחרים אתה זוכר?**

26   **ת: זה היה מועדון קהילתי, לא הייתה עם זה שום בעיה.**

27   **ש : אתה זוכר?**

28   **ת: כן**

29   **ש : זה מה שהיה בשיחת?**

30   **ת: כן, אבל הוא לא תמך בי.**

31   **ש : מה ז״א לא תמך בך?**

32   **ת: הוא לא נתן לי כסף.**

33

34

35   עד תביעה מס׳ 11 (עד מס׳ 16 ברשימת העדים), חסן מוחמד אחמד פטאפטה העיד

36   בבית המשפט את הדברים הבאים :

37

38   **ש : באיזה ארגון אתה חבר?**

39   **ת: החזית העממית לשחרור פלשתין.**

תאריך : כ"ח בכסלו תשס"ח
25 בדצמבר 2008

1   ש : מה היה תפקידך בארגון?
2   ת : עבדתי בפלג הצבאי.
3   ש : פרט.
4   ת : הייתי אחראי על הקבוצה ברמאללה.
5   ש : מה הכוונה?
6   ת : הייתה קבוצה המורכבת מאנשים שמבצעים דברים נגד הכיבוש.
7   ש : איזה סוג של דברים?
8   ת : צבאיים.
9   ש : פרט בבקשה.
10  ת : כל דבר צבאי כנגד הכיבוש.
11  ש : מצעדים צבאיים?
12  ת : נגד מטרות צבאיות.
13
14  ש : באמרה שנחזית להיות אמרתך במשטרה, אתה אומר שאחמד סעדאת ביקש
15     ממך לחדש את הפעילות שלך בחזית העממית בשנת 2002, מהי תגובתך?
16  ת : יש לי הרבה מה לומר על כך, חאלד בטיר היה בכלא הישראלי, הוא היה חולה,
17     בתו נפטרה בדיוק ולא רציתי שילך לחקירות, השב"כ אחרי חקירה מאוד קשה
18     אחרי שהשתמשו איתי בכלים הכי קשים רצו שם של מי אחראי. והשם הכי
19     מתאים היה של סעדאת כי הוא היה עצור ברשות.
20  ש : בגלל זה גם אמרת שסעדאת ביקש ממך לגייס פעילים?
21  ת : הוא לא ביקש ממני.
22  ש : אמרת את זה לשוטר?
23  ת : אמרתי לך, כל דבר שהיה צריך להיות חאלד בטיר, היה במקום שמו של אחמד
24     סעדאת.
25
26            ..............
27
28  ש : אתה אומר באמרה שסעדאת ביקש ממך את מסי חשבון הבנק שלך.
29  ת : לא נכון.
30  ש : חאלד בטיר ביקש?
31  ת : לא
32  ש : אז מי כן?
33  ת : אף אחד.
34  ש : אתה אומר שנתת לו על מנת שיעברו אליך כספים.
35  ת : אין לי חשבון בנק דולרי, יש לי חשבון בנק שקלי כפקיד בממשלה.
36  ש : אני לא הזכרתי את המילה "דולרים".
37  ת : אני יודע מה כתוב בכתב האישום, כתוב דולרים, הם רצו את התשובה לכן
38     נתתי להם אותה.
39  ש : אתה זוכר על איזה סכום של דולרים מדובר?
40  ת : 28 אלף דולר בכמה פעמים.
41  ש : מה הקשר שלך לכמיל אבו חניש?
42  ת : הוא זה שהתקשר אליי, לא אמג'ד מליטאת כדי שאשלח את המתאבד.
43  ש : מה היה בשיחה?
44  ת : לא הייתה שיחה, זה היה מכתב סגור.
45  ש : אתה אומר שאת הכספים שהיה תכנון להכניס לחשבון הבנק שלך היית אמור
46     להעביר את חלקם לכמיל אבו חניש
47  ת : כן, כדי לבזבז ולאכול.
48  ש : יש לחזית העממית מספיק כסף בשביל לחלק 28 אלף דולר לבזבוזים?

<div dir="rtl">

תאריך : כ"ח בכסלו תשס"ח                                     תיק מס' : 2958/06
25 בדצמבר 2008

ת: 28 אלף דולר זה מספר? (זה לא כסף) לחזית העממית אין כסף. החמאס   1
והפתח מבזבזים את זה ביום אחד.   2
ש: בחזית העממית מבזבזים סכומים כאלה?   3
ת: סכום כזה מספיק ל-5 חודשים.   4
  5
בשלב זה התערב הנאשם ומחה על ביקורתו של התובע על ניהול הכספים בארגון   6
שהוא עומד בראשו וכך אמר :   7
  8
נאשם: מה זה מבזבזים, זה הכסף של הארגון. השחיתות היא בממשלה שלכם  לא   9
בארגון החזית העממית.   10
  11
והתביעה המשיכה בחקירתה הנגדית :   12
ש: שמעת מה אמר הנאשם, אתה לא מתבייש לעמוד מולו ולומר שהעברת כסף   13
של החזית העממית לבזבוזים?   14
ת: למה משתמשים בכסף? לחסוך? זה לא כדי שאנשים יאכלו וישכרו דירות? היו   15
מבוקשים ורצו דירות.   16
ש: הכסף הזה היה בעצם בשביל פעילות צבאית נכון?   17
ת: לא   18
ש: על איזה אזור היה אחראי כמיל אבו חניש?   19
ת: לא יודע.   20
ש: העברת סכום כסף כ"כ גדול למישהו שאתה לא יודע מה הוא עושה?   21
ת: על פי הוראותיו של חאלד בטיר.   22
ש: אמרת קודם שזה לא היה חאלד בטיר.   23
ת: היום אמרתי?   24
ש: כן, לפני כמה דקות.   25
ת: אני זה שהעברתי אותם, אך ההוראה באה מחאלד בטיר ולא מהנאשם."   26
  27
באמרתו  מיום  15.1.03. עמ' 1 ש' 13 עד 25 אמר חסן מחמד אחמד פטפטה את   28
הדברים הבאים :   29
  30
"חידשתי את הפעילות שלי בחזית העממית בחודש פברואר 2002 זה היה כאשר   31
ביקרתי את מזכ"ל (אמין אל  עם) החז"ע אחמד סעדאת בכלא הרש"פ ברמאללה.   32
אחמד סעדאת ביקש ממני לחדש את הפעילות שלי בחז"ע  ולהיות אחראי על   33
פעילות החז"ע באזור רמאללה ואני הסכמתי.   34
שאלה: האם אחמד סעדאת אמר לך מה עליך לעשות?   35
תשובה: הוא אמר לי לגייס אנשים לפעילות צבאית וגם אמר לי לדבר עם ג'ורג'   36
קורט כבן 32 תושב ירושלים פעיל חז"ע צבאי באותה פגישה נתתי לאחמד סעדאת   37
את מספר חשבון הבנק שלי בבנק הערבי ברמאללה כדי  שהוא יעביר לי כספים   38
לחשבון הבנק שלי עבור הפעילות הצבאית.  אחמד סעדאת אמר לי שחלק   39
מהכספים  שהוא יכניס לחשבון הבנק שלי אני צריך להעביר לכמיל אבו חניש   40
תושב שכם פעיל חז"ע צבאי.."   41
  42
לאחר שבחנתי את העדות ואת האמרה ובהתחשב עם התרשמותי מן העד במהלך   43
המשפט, ראיתי לציין את השיקולים הבאים :   44
  45
● ניכר היה הניסיון שהעד אינו מרחיק את עצמו מהפללה כלל אך עושה מאמץ   45
ניכר להרחיק את הנאשם מהפללה.   46

-41-

</div>

1  • העד סתר עצמו במהלך העדות בסתירות מביכות, כך הקדים והשתמש
2  בסכומים דולריים, בטרם צוינה התביעה בשאלותיה מטבע זה, אח"כ המשיך
3  העד באופן טבעי למספרים ולסכומים עצמם.

4  • העד לא התכחש לכך שנקב בשמו של הנאשם כמי שהורה על העברת
5  הכספים, אך אמר כי עשה זאת כדי להגן על אחד, חאלד בטיר. בהמשך
6  העדות כשל בלשונו פעם נוספת (כשהוא מתפלא על עצמו) כאשר נמנע
7  מלייחס הוראות ניהוליות מסוימות של הארגון לחאלד בטיר ואח"כ ייחס
8  אותן הוראות ניהוליות ממש לחאלד בטיר .

9  • העד לא פירט מדוע בחר דווקא להעלות את הנאשם שהוא אדם בכיר הנושא
10 בתפקיד מזכ"ל ארגונו כקורבן על מזבח הגנתו של חאלד בטיר .

11 • מבחינת חלוקת הסמכויות, מעמדו של הנאשם לעומת מעמדו של העד,
12 וההקפדה היחסית על משמעת והיררכיה בתוך הארגון, כפי שעלתה בראיות
13 במהלך המשפט, משתלבת האמרה עם תפקידו ושליטתו של הנאשם בכספי
14 ארגון הגג שלו, יותר מתסריט בו הוא מותיר לאחר את השליטה.

15 • התרחיש שבו פעם במספר חודשים, בארגון קטן יחסית, מועברים סכומי
16 כסף לפעילים בשיעור עשרות אלפי דולרים ללא הוראת הנאשם, הוא
17 בסבירות נמוכה ביותר.

18 • התקופה הרלוונטית מתאימה בדיוק לתקופת כליאתו של הנאשם ברמאללה
19 ולאופן קיום הקשר בינו לבין הפעילים אשר המשיכו את פעילות הארגון.

20 • קריאת הביניים של הנאשם אשר עקב בעניין רב אחרי העדות ונזעק להגן על
21 טוהר המידות בחלוקת הכספים נאמרה מתוך מעורבות רגשית ושותפות
22 בפולמוס עם התובע. אמירה זו נראתה לי כנה, ומאוששת את העובדה
23 שהנאשם ראה עצמו כמי שאחראי על זרימתם של הכספים, ומחה אישית על
24 "האשמות" התובע בשחיתות כספית בארגונו. לתגובה זו ייחסתי ערך
25 ראייתי נכבד בשל תוכנה ותזמונה והיא מהווה נדבך נוסף ולא מבוטל
26 בהעדפת גרסתו של העד באמרה על פני גרסתו בעדות.

27 • העד הרחיב באמרתו על פרטים בעניין אמ"יד מליטאת הנזכר באמרת שותפו
28 כמיל אבו חניש ובכך נמצא חיזוק נוסף לאמרה.

29

30 מסיבות אלה העדפתי את גרסתו של העד באמרתו במשטרה על פני עדותו בבית
31 המשפט .

32  • ראייה מרכזית נוספת נמצאה לבית המשפט בעדותו של העד כמיל חניש :

תאריך : כ״ח בכסלו תשס״ח                                              תיק מסי : 2958/06
25 בדצמבר 2008

1   העד כמיל חניש מרחיב באמרתו את הרייעה וקושר את הכספים שהועברו במצוות

2   הנאשם לפעילות חבלנית ״צבאיתי״, העד סרב בעניינות מרובה  לענות על השאלות

3   אשר נשאל ודינו כעד שותק לכל דבר . וכך אמר העד :

4

5   עדותו של עד תביעה מסי 17 ברשימת העדים, כמיל סעיד אבו חניש, מיום 05/08/07

6   עמי 1 ש׳ 31 עד עמי 2 ש׳ 32 :

7

8   ש: לכמה זמן נשפטת?

9   ת: לא יודע, 8 או 9 מאסרי עולם.

10   ש: על מה?

11   ת: אני סיימתי את המשפט שלי, אם סיימתי אותו למה אתם שואלים?

12   ביהמ״ש מסביר לעד כי הוא חייב לענות על השאלות עליהן הוא נשאל על ידי

13   התביעה.

14   ש: אני חוזר על השאלה, על מה נשפטת?

15   ת: אמרתי לך, העניין שלי נסגר, סיימתי את המשפט שלי ולא אכפת לי משום

16   תיק אחר.

17   ש: נכון שהיית בקשר עם עאהד ע׳ולמה?

18   ת: אני חוזר, סיפרתי שסיימתי את המשפט שלי, אם כבר סיימתי אני לא מדבר.

19   ש: נכון שהיית אחראי על הפלג הצבאי של החזית העממית בשומרון?

20   ת: אני נמצא כרגע בחקירה?

21   ש: נכון שהתיק שלך נגמר בהסדר טיעון?

22   ת: אין תשובה.

23   ש: נכון ובמשפט שלך הודית?

24   ת: זה שאני לא נמצא בביהמ״ש סאלם, אני לא אדבר, זה לא המשפט שלי, אני לא

25   מדבר, אתה  שואל אותי על  אנשים שלא נמצאים בכתב האישום שלי ואינם

26   מעורבים בתיק שלי וזה ביזיון נגדי.״

27

28   באמרתו מיום 16.4.03, עמי 13, ש׳ 25 ועד עמי 14, ש׳ 5 אמר העד כמיל סעיד אבו

29   חניש את הדברים הבאים :

30

31   ״בחודש 10/02 התקשר אלי אותו אדם אלמוני שכל הזמן היה בקשר איתי ומימן

32   את הפעילות הצבאית שלי וביקש ממני להגיב לו בחור מתאבד משכם לרמאללה

33   ואני ביקשתי מאמג׳ד מליטאת שימצא לי אחד כזה והוא אמר לי כי ישנו בחור

34   שמו סאמר חנני שאני לא מכיר אותו ולא ראיתי אותו כבן 18 מבית פוריק שמוכן

35   לבצע פיגוע התאבדות ואני ביקשתי מאמג׳ד מליטאת שישלח את סאמר חנני

36   לרמאללה לשם ביצוע פיגוע התאבדות שם לאחר באותו יום שנשלח בו סאמר חנני

37   לביצוע הפיגוע נתפס על ידי הצבא ברמאללה..״

38

39   •   אמרה זו נתמכת באמרות מסיע מחמוד וחסן פטאפטה ומשלימה מבחינת

40   הזמן (מחצית שניה של 2002) והמקום (שכם) את הקשר בין הוראות הנאשם

41   וניהולו את ארגונו לבין תחזוקה וניהול של הסניף בשכם של ארגון החז״ע

42   שבראשו עמד הנאשם.

43   •   משום חומרת תוצאות פרט אישום זה ראוי היה להעיד בשאלה זו גם את

44   סאמר חנני. לא הובאה בפנינו סיבה מדוע לא נעשה הדבר בפרשיה מורכבת

-43-

תאריך: כ"ח בכסלו תשס"ח          תיק מס': 2958/06
25 בדצמבר 2008

זו, אך ההגנה לא כפרה בעובדת תפיסתו של חנני וסיכול הפיגוע, עליהם   1
מספר העד.   2

● לאור העדות שלא הסבירה או סתרה דבר מן האמרה, ולאור העובדה   3
שהאמרה נתמכת היטב ובפרטים מאמרותיהם של פטאפטה ומס'עב מחמוד   4
אני מעדיף את האמרה על פני העדות וקובע את העובדות על פי הראיות   5
העולות ממנה.   6

7

מתן האמרות הוכח להנחת דעת בית המשפט בעדויותיהם של גובי האמרות מטאנס   8
חדד ויצחק יעקובוף ולא נסתר בשום צורה שיש בה כדי להפחית את משקל   9
האמרות.   10

11
עובדות פרט אישום זה הוכחו באורח המניח את הדעת, ראייה מחזקת נוספת   12
נמצאה לבית המשפט בהודאתו של הנאשם עצמו, הן באמרותיו במשטרה והן בבית   13
המשפט כי הוא נושא ונשא בזמנים הרלוונטיים את משרת המזכיר הכללי של ארגון   14
החזית העממית.   15

16
הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגנתו וויתר על   17
פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות התביעה.   18

19
יסודות העבירה הוכחו (ואולי גם יסודותיהן של עבירות חמורות הימנה) שכן מימון   20
וארגון פעילותה של חוליה צבאית של הארגון הינו  בוודאי ביצוע שירות עבור ארגון   21
החזית העממית.   22

23
לא הובאו בשאלת פיגוע ההתאבדות עצמו אלא עדויות שמיעה, ולפיכך  לא הוכחו   24
מעשיה הרצחניים של החוליה אשר הנאשם סייע בארגונה ובמימונה ולא הוכח כי   25
מעשים אלה היו בידיעת הנאשם, ולא במעשים אלה הורשע.   26
אשר על כן אני מציע לחבריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט אישום   27
מס' 16.   28

29
**17 .פרטי האישום השבעה עשר והשמונה עשר  [ניהול פעולות צבאיות של החז"ע**   30
**מתוך הכלא של ה"רשות הפלסטינית" ביריחו מול עלי עטאללה מחמד עבידאת**   31
**וחסן נעיראת]  [ תאום ובחירת נציג החז"ע בבחירות לרש"פ ]**   32

תאריך : כ״ח בכסלו תשס״ח         תיק מס׳ : 2958/06
25 בדצמבר 2008

1    עובדות פרטי אישום אלה לא הוכחו בפנינו והתביעה ביקשה כי ביהמ״ש יזכה

2    את הנאשם מהעבירות המתוארות בפרטי אישום אלה.

3    משכך אציע לחבריי לזכות את הנאשם מפרטי האישום השבעה עשר והשמונה עשר.

4

5    **18 .פרט האישום התשעה עשר** [סיוע כספי ויצירת קשר עבור המבוקש ואאל

6    עטאללה]

7    <u>ראיות מרכזיות :</u>

8    עדותו של עד תביעה מס׳ 12, ויסאם צובחי ע/חמיד אלעזה, עמ׳ 5 ש׳ 14 עד עמ׳ 6 ש׳

9    4 :

10

11    ״ש : באמרה זו, בעמ׳ 4, שורות 17 ואילך, אתה מספר שהיית ביריחו, בחודש מאי

12    04,

13    מהי תגובתך ?

14    ת : שיקרתי.

15    ש : למה ?

16    ת : לא יודע.

17    ש : אז גם זה שאמרת שביקרת בכלא יריחו שיקרת ?

18    ת : כן.

19    ש : ננסה שוב, למה שיקרת ?

20    ת : רציתי להציג עצמי כמי שמכיר אדם גדול.

21    ש : וואאל עטאללה הוא גם אדם גדול ?

22    ת : לא מכיר אותו.

23    ש : אתה זוכר שהזכרת את שמו באמרה ?

24    ת : לא.

25    ש : עזרת אי פעם למבוקש ?

26    ת : לא.

27    ש : אתה אומר באמרה שביקשת כסף מהנאשם.

28    ת : זה לא נכון.

29    ש : אתה אומר שהוא נתן לך מכיסו 700 ₪.

30    ת : לא נכון.

31    ש : אתה גם אומר שהוא ביקש ממך לא לחזור יותר.

32    ת : לא נכון.

33    ש : מה זה מרג׳עיה ?

34    ת : לא יודע.

35    ש : כאשר שיקרת לשוטר, המצאת מילה בערבית ?

36    ת : כן. הכל שקר.״

37

38    ש : באיזה ארגון חבר הנאשם ?

39    ת : מי ?

40    ש : כמו שכבר אמרתי, יש נאשם אחד באולם.

41    ת : לא יודע.

42    ש : מה אתה יודע עליו ?

43    ת : לא יודע עליו כלום.

44

<div dir="rtl">

תיק מס׳ : 2958/06                                     תאריך : כ״ח בכסלו תשס״ח
                                                         25 בדצמבר 2008

באמרתו של ויסאם צובחי ע״א חמיד אלעזה מיום 21.11.04 עמ׳ 4, ש׳ 17-21 תועדו    1
הדברים הבאים :                                                              2
                                                                            3
"שאלה: נפגשת עם אחמד סעדאת מה תפקידו?                                        4
תשובה: בחודש מאי 2004 נפגשתי בירחו בכלא עם אחמד סעדאת ״אבו ע׳סאן״           5
המזכ״ל (אמין עם) של  החז״ע וביקשתי שיתן לי מכיסו 700 ₪ ואמר שלא יחזור אף כי   6
לו שואאל מבוקש ופעיל צבאי והוא נתן לי מכיסו  700 ₪ ואמר שלא יחזור אף כי      7
הוא לא ה״מרגעייה״ וכי אנשי רמאללה ידאגו לואאל פעיל החז״ע שם."                8
                                                                            9
                                                                            10

•  הנה כי כן, עד זה מסר כי כלל אינו מכיר את הנאשם, ולא פגש בו מעולם.         11
   כשנשאל כיצד הדבר מתיישב עם אמרתו המשטרתית, טען כי שיקר כיוון             12
   שביקש להציג עצמו כמי שמכיר אדם גדול. העד הכחיש שביקש כסף               13
   מהנאשם ושקיבל ממנו כסף, אולם אישר כי תכנן לבצע פיגועים, וכי הוא         14
   חבר בחזית העממית.                                                       15
                                                                            16

•  בשלב מסויים, טען כי אינו זוכר חלק מהדברים. בסוף חקירתו, נשאל באיזה        17
   ארגון חבר הנאשם, והוא ענה כי אינו יודע וכי אינו יודע עליו כלום. כשנשאל    18
   כיצד ידע שהוא אדם גדול, מסר כי רואים אותו בטלוויזיה.                      19
                                                                            20

•  קשה להניח כי העד אשר העיד על פי עדותו חבר בעצמו בחז״ע לא ידע מיהו         21
   ומי היה מזכ״ל החז״ע. דבר זה שאינו מתיישב לחלוטין עם טענותו בדבר          22
   רצונו להתרברב בקשריו עם הנאשם וכי באיזו גדולה יתרברב אם אינו יודע        23
   מהי?!                                                                    24
                                                                            25

•  תשובתו של העד בנקודה זו מראה כי מוכן היה לומר גם דברים בלתי               26
   סבירים לחלוטין על מנת שלא להגיד דבר מה העלול להפליל במשהו את            27
   הנאשם.                                                                   28
                                                                            29

•  העד לא ידע להסביר מדוע קשר את עצמו גם לואאל עטאללה ומה התפארות          30
   יש בכך, וכן מה פירוש המונח ״מרגעייה״. יש לתמוה גם על הפירוט אשר           31
   באמרת העד לרבות החודש המדויק של הביקור, הסכום שמסר הנאשם –              32
   סכום שאינו מעיד על גדולה יתרה.                                           33
                                                                            34

</div>

- תגובת הנאשם על פי סיפורו של העד באמרתו אינה תואמת התפארות 1
  וגדולה אלא להיפך, מציגה את הנאשם כמי שלא מוכן או לא יכול לסייע 2
  סיוע רציני למבוקש ומי שאינו נוטל אחריות. 3
  4

- לא ברור למה יחפוץ העד להתברבר בעיני השוטר דווקא, ואם כן מה אירע 5
  לחפץ ההתברברות דווקא בעת מתן העדות בפומבי - בפורום הנאה יותר 6
  להתברברות. 7
  8

- הנה כי כן עד זה נמצא ע"י בית המשפט לא אמין, ביקש בעליל לחפות על 9
  הנאשם, ועשה זאת באופן כזה שהסתירות והשקרים בעדותו עלו מאליהם. 10
  על כן, החלטנו שלא לקבל את עדותו בביהמ"ש ולהעדיף עליה את אמרתו 11
  במשטרה. 12
  13

- מתן האמרה הוכח במשפט בעדות השוטר יעקב ברזני ולא מצאתי פגם 14
  כלשהו במתן האמרה ולא מצאתי בפרטיה אינדיקציה כי העד רצה להתברבר 15
  דווקא בעיני השוטר בקשרים עם הנאשם. 16
  17

עובדות פרט אישום זה הוכחו מעל לכל ספק סביר. ראייה מחזקת נוספת נמצאה 18
לבית המשפט בהודאתו של הנאשם עצמו הן באמרותיו במשטרה והן בבית המשפט 19
כי הוא נושא ונשא בזמנים הרלוונטיים את משרת המזכיר הכללי של ארגון החזית 20
העממית. 21
22

הנאשם לא טען דבר לגופו של האישום. כדרכו במשפט זה לא העיד להגנתו וויתר על 23
פרשת הגנה וכך נמנעה חקירתו הנגדית והתוסף חיזוק נוסף לראיות התביעה. 24
25

בהינתן העובדות – אני קובע כי יסודות העבירה הוכחו שכן מימון ותמיכה במבוקש 26
מטעם החז"ע הינו בוודאי עבירה,  גם אם לא הוכח כי המבוקש היה איש חז"ע. 27
28

הוכח גם כי לתמיכה זו נתן הנאשם גוון ארגוני ולא אישי כאשר הודיע שהמשך 29
הטיפול יהיה בידי אנשי הארגון האזוריים – תליית הסיוע בארגון הינו בוודאי ביצוע 30
שירות עבור ארגון החזית העממית. 31
32

1  אשר על כן אני מציע לחבריי להרשיע את הנאשם בעבירה המיוחסת לו בפרט אישום

2  מס׳ 19.

3

4  **כב׳ הנשיא סא״ל צבי לקח**

5

6  אני מסכים לפסק דינו המפורט של חברי, השופט דהאן, למעט בכל הנוגע לפרט

7  האישום השמיני. חברי סבור כי אין להסתמך על אמרתו של היית׳ם עבידאת בכל

8  הנוגע לפרט זה, שכן העד לא נחקר בנקודה זו בבית המשפט, ומכיוון שמדובר בעדות

9  יחידה, אין להסתמך עליה.

10

11  כאשר חברי מתייחס לעדותו של היית׳ם עבידאת בבית המשפט הוא אומר את

12  הדברים הבאים :

13  ״התרשמותי מן העד על דוכן העדים כפי שנרשמה בעת מתן העדות

14  הייתה כי העד מנסה לפטור את השאלות בתירוץ דחוק, להימנע

15  מלהפליל את הנאשם או להיכנס לפרטים בדבר אותו אדם אחר שלו

16  מסר את הנשק, התרשמתי משפת הגוף של העד וממבטיו אל בית

17  המשפט ואל הנאשם כי דבריו בעדותו בפנינו אינם אמת״

18

19  להתרשמות זו שותף גם אני. מאחר וזוהי התרשמותי, אין לי ספק כי גם לו היה

20  נשאל העד שאלה כלשהי בנוגע לקשירת הקשר לביצוע השוד, היה מעיד באופן

21  מתחמק ונמנע מלהפליל את הנאשם, כפי שעשה ביחס לעבירות האחרות לגביהן

22  נשאל.

23

24  כאשר ההתרשמות הכוללת שלנו מעדותו של העד בפנינו הינה שלילית בכל הנוגע

25  למידת אמינותו, ואיננו מוכנים להסתמך על עדותו בפנינו, נותר לנו לבחון אם עלינו

26  להעדיף את אמרתו המשטרתית. חברי מבקש להפריד בין החלקים באמרה לגביהם

27  נשאל העד בבית המשפט, לבין החלק באמרה לגביו לא נשאל. במקרה זה, כאמור,

28  אין הצדקה לערוך הפרדה זו, ודומה הוא בהקשר זה לעד ששתק על דוכן העדים,

29  לגביו מסכים גם חברי שאין צורך כי יישאל את כל השאלות ברגע בו ברור כי אין

30  הוא מוכן להעיד. המדובר בעד שהיה עקבי לחלוטין בהתחמקו׳יותיו ובסירובו׳

31  להפליל את הנאשם בבית המשפט, לעומת גרסתו הסדורה והברורה באמרתו

32  המשטרתית. יצירת הפרדה בין החלקים באמרה הינה מלאכותית ואינה נדרשת,

33  לאור ההתרשמות הבלתי אמצעית שלנו מעדותו של היית׳ם עבידאת בפנינו.

אין להתעלם מהחקירה הלא ממצה שהייתה במקרה זה, וללא חיזוקים מתאימים

ומשמעותיים ודאי שלא ניתן היה להסתמך על אמרה יחידה זו שנמסרה במשטרה.

יחד עם זאת, במקרה שלפנינו קיימים חיזוקים חיזוקים רבים. לאמרתו של היית׳ם ישנם

חיזוקים בעדויות שותפיו לחולייה ביחס למעשים אחרים אותם ביצעו יחדיו.

הנאשם עצמו לא העיד כלל במסגרת פרשת ההגנה, דבר מהווה תוספת ראייתית

כבדת משקל, ויש לומר כי גם בחקירתו במשטרה סרב לענות על שאלות ולשתף

פעולה עם חוקריו, למעט העובדה שאישר את היותו מזכ״ל החז״יע.

בנסיבות אלה, אינני סבור שיש ספק בכל הנוגע לאמרתו של היית׳ם עבידאת ככל

שהיא מתייחסת לקשירת הקשר לביצוע השוד, כשם שלא סברנו שיש ספק

בקשירות הקשר האחרות שביצעו חברי החולייה.

לפיכך, יש לדעתי להרשיע את הנאשם אף במיוחס לו בפרט האישום השמיני.

### כב׳ השופט רס״ן מנחם ליברמן

אני מסכים להכרעת הדין של חברי, כבוד השופט דהאן, ואף להערות של כבוד

הנשיא לקח. לאור זאת, אף אני סבור שיש להרשיע את הנאשם בעבירה המיוחסת

לו בפרט האישום השמיני.

### סוף דבר :

אנו מרשיעים את הנאשם בעבירה של חברות ופעילות בהתאחדות בלתי מותרת לפי
תקנה 85(1)(א) לתקנות ההגנה (שעת חירום), 1945  המיוחסת לו בפרט האישום
הראשון, אולם רק החל משנת 1999 [**חברות בארגון החזית העממית**].

אנו מזכים את הנאשם מהעבירה של נשיאת משרה בהתאחדות בלתי מותרת, עבירה
לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום
השני [**נשיאת משרה של אחראי על סניף החז״ע בריחון**].

אנו מרשיעים את הנאשם בעבירה של נשיאת משרה בהתאחדות בלתי מותרת,
עבירה לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט
האישום השלישי [**נשיאת משרה של אחראי על סניף החז״ע ברמאללה ועל
פעילותו**].

חלף העבירה של קשירת קשר לגרימת מוות בכוונה, שיוחסה לנאשם בפרט האישום
הרביעי, אנו מרשיעים אותו בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת,

עבירה לפי תקנה 85 (1)(ג) לתקנות ההגנה (שעת חירום), 1945 **[בקשת אישור**   1
**מהנאשם לרצח אשה יהודיה תושבת אבו דיס].**   2

  3

חלף העבירה של קשירת קשר ליידוי בקבוק תבערה, שיוחסה לנאשם בפרט האישום   4
החמישי, אנו מרשיעים אותו בעבירה של ביצוע שירות עבור התאחדות בלתי   5
מותרת, עבירה לפי תקנה 85 (1)(ג) לתקנות ההגנה (שעת חירום), 1945 **[בקשת**   6
**אישור מהנאשם לזריקת בקבוק תבערה].**   7

  8

חלף העבירה של קשירת קשר לגרימת מוות בכוונה, שיוחסה לנאשם בפרט האישום   9
השישי, אנו מרשיעים אותו בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת,   10
עבירה לפי תקנה 85 (1)(ג) לתקנות ההגנה (שעת חירום), 1945 **[בקשת אישור**   11
**מהנאשם לפיצוץ מטען בבית קפה רימון בירושלים]**   12

  13

אנו מרשיעים את הנאשם בעבירה של סחר בציוד מלחמתי לפי סעיף 2 לצו בדבר   14
איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס׳ 243), תשכ״ח 1968, המיוחסת   15
לו בפרט האישום השביעי **[חילופי תמ״ק מיני עוזי תמורת אקדח].**   16

  17

ברוב דעות אנו מרשיעים את הנאשם בעבירה של קשירת קשר לשוד מזויין, עבירה   18
לפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח   19
1968, ולפי סעיף 402(2) לחוק הפלילי הירדני (מספר 16) לשנת 1960 וסעיף14(א)(2)   20
לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח-1968,   21
המיוחסת לו בפרט האישום השמיני **[קשירת קשר לשוד מזויין של חלפן כספים].**   22

  23

אנו מרשיעים את הנאשם בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת,   24
עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט   25
האישום התשיעי **[תאום פגישה עם אנשים שהביעו עניין לבצע פעילות צבאית].**   26

  27

חלף העבירה של קשירת קשר לגרימת מוות בכוונה שיוחסה לו בפרט האישום העשירי אנו   28
מרשיעים את הנאשם בעבירה של קשירת קשר לבצע פשע, הוא עריכת פעילות צבאית, לפי   29
סעיף 22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח –   30
1968 **[קשירת קשר לביצוע פיגועים עם מחמד חליל אלע׳ול].**   31

  32

אנו מרשיעים את הנאשם בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת,   33
עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט   34
האישום האחד עשר **[פיקוח והשתתפות בועידת החז״ע באזור ירושלים].**   35

  36

אנו מזכים את הנאשם מעבירה ביצוע שירות עבור התאחדות בלתי מותרת, לפי תקנה   37
85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום השנים   38
עשר **[בדיקה ברישומי החז״ע והודעה לראמי ג׳ביל כי קיים בהם חומר שלילי**   39
**כנגדו].**   40

  41

  42

אנו מרשיעים את הנאשם בעבירה של נשיאת משרה בהתאחדות בלתי מותרת,   43
עבירה לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט   44
האישום השלושה עשר **[נשיאת משרה של המזכיר הכללי של החזית העממית]**   45

  46

  47

אנו מרשיעים את הנאשם בעבירה של הסתה לפי סעיפים 7 + 10 לצו בדבר איסור   48
פעולות הסתה ותעמולה עוינת (יהודה והשומרון) (מס׳ 101), תשכ״ז – 1967,   49

<div dir="rtl">

תאריך : כ"ח בכסלו תשס"ח     תיק מס' : 2958/06
25 בדצמבר 2008

המיוחסת לו בפרט האישום הארבעה עשר **[נאום הסתה לנקמה לאחר מותו של אבו**    1
**עלי מוצטפא].**    2
   3
אנו מרשיעים את הנאשם בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת, לפי    4
תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום    5
החמישה עשר **[ישיבות תאום עם ראש הארגון באוניברסיטת א- נג'אח].**    6
   7
   8
אנו מרשיעים את הנאשם בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת, לפי    9
תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום    10
הששה עשר **[ניהול פעולות צבאיות של החז"ע מתוך הכלא של ה"רשות**    11
**הפלסטינית" ברמאללה].**    12
   13
   14
אנו מזכים את הנאשם מעבירה ביצוע שירות עבור התאחדות בלתי מותרת, לפי תקנה    15
85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום השבעה    16
עשר **[ניהול פעולות צבאיות של החז"ע מתוך הכלא של ה"רשות הפלסטינית"**    17
**ביריחו מול עלי עטאללה, מחמד עבידאת וחסן נעיראת].**    18
   19
   20
אנו מזכים את הנאשם מעבירה ביצוע שירות עבור התאחדות בלתי מותרת, לפי תקנה    21
85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום השמונה    22
עשר **[תאום ובחירות נציג החז"ע בבחירות לרש"פ].**    23
   24
   25
אנו מרשיעים את הנאשם בעבירה של ביצוע שירות עבור התאחדות בלתי מותרת, לפי    26
תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945, המיוחסת לו בפרט האישום    27
התשעה עשר **[סיוע כספי ויצירת קשר עבור המבוקש ואאל עטאללה].**    28
   29
   30
**ניתן והודע ביום 25/12/08 בפומבי ובמעמד הצדדים.**    31
   32
אמיר דהאן, שופט    33
2 5 -12- 2008    34
שופט     נשיא     שופט    35
   36

</div>