# LOWELL DECL. EX. 72

Exhibit 20

SHATSKY 002947-T

[in handwriting] [*Yaakov neg…illegible*]

1

Judea and Sumarea/Appeal 91 / 288,294

[Circular Stamp]
Court of Appeals in Judea and Samaria
Unit of Military Courts
Faithful Copy of Original

12-20-[*partly cut off*]98

## Judgment

Raed Mousa Ibrahim Nazal (hereinafter – the defendant) was convicted of manslaughter by the trial court, pursuant to Section 51A (a) of the Order Regarding Security Provisions, 5730-1970, and was sentenced to serve 13 years imprisonment.

The indictment filed against the defendant accused him of the offense of murder, pursuant to Section 51 of the Order Regarding Security Provisions, 5730-1970. The details of the offence for which he was charged were as follows:

> The aforementioned defendant, while being a resident of the Area, on the night between 22.8.90, in the Jenin Prison, murdered his cellmate in the course of interrogating him.
> During the interrogation, the defendant bound the victim – Jamal Mousa Manasra, to whom [sic] his mouth with socks and a sheet, and beat him on all parts of his body with his hands, his fists, elbows and feet, over a long period of time.
> The defendant continued that conduct even after the victim confessed that he was a collaborator. The victim died as a result of the beating.

The trial court decided not to convict the defendant of the offence imputed to him in the indictment, but rather of the offense of manslaughter, as aforesaid. We have before us an appeal by the Military Prosecution against the verdict of the trial court, as it is the view of the Prosecution that there were grounds for convicting the defendant of the offense of murder, and an appeal by the Defense against the claimed severity of the punishment imposed on the defendant.

It should be noted that the trial court's verdict was handed down on the basis of the written evidence in the possession of the Military Prosecution, which was submitted to the court by agreement. The evidence included, inter alia, the defendant's detailed statement to the Police, and an autopsy report. Before addressing the arguments of the parties, we will quote the defendant's own words in the aforementioned statement, which was given on the day following the night on which the victim was killed. As

**SHATSKY 002947-T (continued)**

mentioned, the statement is detailed, filling over 3 pages, and due to its importance, we will quote from it at length. At the beginning of his statement the defendant states that at about eleven o'clock at night he approached the victim and said to him that he "wants to interrogate him because he is a collaborator". He took him to his bed ("because he could not resist me") and while he was lying on his back, tied his hands and legs to the bedposts, and tied a rope around his waist to the bed. To prevent him from making noise, he inserted two socks in his mouth and used torn sheets to tie his mouth and face, such that his nose and his eyes were also covered. In addition, he also covered the victim with a blanket. He continues as follows:

> …and I began to beat him with my fists, elbows and legs, in the area of the stomach and chest. I kicked him mainly in the area of his stomach and chest and in the area of his face. I attacked him with my hands, fists, and elbows and I also choked him with my hands and hit him in his testicles and legs.

The defendant continued hitting the victim in this manner for between quarter to half an hour and then untied the torn sheets and took the socks out of his mouth. At this stage the victim confessed and said "I am a collaborator, I am a collaborator". At that stage the defendant did not let up, but again stuffed his mouth with socks, tied his face, covered him

SHATSKY 002948-T

2

[Circular Stamp]　　　　　　　　　　　　　　　　　　Judea and Samaria Area/Appeal 288,294/91
Court of Appeals in Judea and Samaria
Unit of Military Courts
Faithful Copy of Original

with a blanket, and continued the "interrogation". After about half an hour of "interrogation combined with blows" the defendant once again freed the victim's mouth and the latter told him that he had "worked against the Intifada". At this stage, too, the Defendant did not let up on the victim, and once again he placed the socks in his mouth and tied him up with torn sheets. He continues:

> ... I continued beating him with elbows and fists all over his body. I focused my blows on his balls, the area of his chest and neck…. while I was beating him, his body moved and shook, but when I gave him the last two blows and he didn't move I untied his face and removed the socks from his mouth, and I saw that he was not breathing. So I started to press on his chest as a heart massage and resuscitation, and it didn't help so I knew that he was dead.

When it became clear to the defendant that the victim was dead, he left him, took a shower and returned to his bed. At about four thirty he called a guard and told him that the victim had "died during interrogation" and the body of the deceased was removed from the cell.

An autopsy was performed on the body of the deceased by an expert from the Tel-Aviv Institute of Forensic Medicine, and in his summary he expressed his view that the death of the deceased "was caused by asphyxiation (choking) as a result of pressure on the lips and the neck, combined with internal hemorrhaging resulting from a rupture of the mesentery."

In a short verdict, the trial court found that the deceased had died as a result of the actions of the defendant, but did not find evidence that the defendant intended to cause his death, given that the defendant stated that his intention had been to "interrogate" the deceased, and he was not asked whether he had intended to cause his death. Accordingly, he was convicted for the offence of manslaughter.

This brings us to the pleadings of the parties. In his appeal, the Military Prosecutor claims that the lower court erred in determining that there were no grounds for convicting the defendant of intentionally causing death, under Section 51 of the Order Regarding Security Provisions, but for manslaughter only. He maintains that the Defendant's actions, in continuing his violent attack upon the deceased for a long time after he had already confessed to cooperating with the authorities, demonstrates his intention to cause his death, which is what actually happened, in accordance with the forensic report.

Regarding this, the Military Prosecutor finds support in a series of decisions, including Criminal Appeal 176/81 *Alfasi v. Attorney General* (P.D. 16, 493, at p. 497), Criminal Appeal 299/81 *Tetrashvilli v. State of Israel* (P.D. 36 (1) 141) and Criminal Appeal 392/91 *Shatz v. State of Israel* (P.D. 47 (2) 299), and others.

On the other hand, the defendant's attorney, Adv. Leah Tzemel, claimed that the lower court was correct in determining that there are no grounds for convicting the defendant for the offense of intentionally causing death. She claims that the defendant did not intend to cause the victim's death, nor was that his desire. All that he wanted was to interrogate the defendant given that he suspected him, as related in his statement; and the fact that he attempted to revive him, upon discovering that he was dead, attests to the fact that he did not desire his death. The defense attorney finds support for her claim in the forensic expert's opinion, which relates to the combination of asphyxiation and internal hemorrhaging as the reason for death, whereas the defendant, so she claims, did not strangle the deceased. The learned defense attorney supported her claims with various decisions, including Criminal Appeal 394, 426/75, *Dilki et al v. The Attorney General* (P.D. 45 (3) 705), from which she seeks to show that the Military Prosecution did not discharge its burden of proving the foundations of the offense of intentionally causing death.

Based on the evidence that was before the trial court, which was submitted consensually by both parties, we can already determine that the defendant caused the death of the deceased. The defendant's detailed statement, parts of which were cited above, indicates that the defendant vigorously beat the deceased, having taken measures to prevent interference with his actions, stating that his aim was to "interrogate" the deceased and to extract his confession that he was collaborating with the authorities. The core of the dispute between the parties concerns the mental element that crystallized in the defendant's mind at the time that he caused the death of the deceased – did it satisfy the requirements for a conviction under Section 51 of the Order Regarding Security Provisions in regard to the intentional causing of death, or were the required foundations perhaps not satisfied, and hence the defendant should be convicted of a lesser offense?

SHATSKY 002949-T

3

[Circular Stamp]　　　　　　　　　　　　　　　　　Judea and Samaria Area/Appeal  288,294/91
Court of Appeals in Judea and Samaria
Unit of Military Courts
Faithful Copy of Original

Before addressing this question in accordance with the security legislation applicable in the Area, we will briefly examine the law in Israel.  As is well known, the foundations required for a conviction for premeditated murder under the Criminal Code in Israel are a decision, preparation and an absence of provocation, in other words a real intention to kill based on calculated consideration , its foreseeability and the desire of the result. As for the offense of manslaughter, our concern here is with a mental element of recklessness regarding the result, and it is not necessary that the foreseen result be specifically fatal. As stated in the *Deutch* decision (Criminal Appeal 1/52 P.D. 8, 456) the conviction of a person of the offense of manslaughter…. is only possible if it was proved …that he acted recklessly, in other words, with the awareness that his conduct was liable to endanger the life or the bodily integrity of another".

A summary of the law regarding the mental element required to substantiate a conviction for manslaughter appears in Judge Kedmi's book On the Criminal Law (Part 2, p.451):

> 1. The mental element that suffices to base a conviction for the offense of manslaughter – whether by 'act' or 'omission' – is the state of mind of recklessness, which reflects an actual awareness of the existence of a real danger of injuring a person's body; 'actual' – means in accordance with a subjective test of the defendant himself, and the objective test of a reasonable person in the defendant's shoes does not suffice.
> 2. The aforementioned real danger is the danger of bodily injury, and not necessarily death specifically. However, there must be a tangible danger of a substantive injury to a person's body, and an abstract danger or a trivial injury is not sufficient.

For our purposes, and at this stage, without relating to the fact that under Section 51 of the Order Regarding Security Provisions there is no requirement for intentionally causing death following premeditation, but rather the causing of death "intentionally", as per the wording of the section, the question is whether the trial court should have given consideration to the defendant's statement to the Police to the effect that his sole intention was to "interrogate" the deceased, and that as such it cannot be said that he intended to cause his death, or perhaps it should be inferred from his acts that his intention was to cause the death of the decedent.

As mentioned, the parties elaborated on this point, and each of them cited judgments supporting their respective positions. According to the defense attorney, from the evidence one cannot derive anything beyond what was actually said by the defendant himself and hence it cannot be said that he had the mental element required for a conviction of the offense of intentionally causing death.  The prosecutor, on the other hand, addressed the acts of the defendant as they were expressed in detail in the

Case 1:18-cv-12355-MKV-DCF Document 136-85 Filed 10/05/21 Page 8 of 17
Case 1:02-cv-02280-RJL Document 254-1 Filed 11/12/13 Page 7 of 10

SHATSKY 002949-T (continued)

defendant's statement, from which he derives the defendant's intention to cause the death of the deceased, even according to the criteria determined for a conviction under Israeli law. One of the decisions referred to by the prosecutor was Criminal Appeal 2577/90 *Zariki v. State of Israel* (P.D. 47 (1) 214), especially to page 218:

> It is clear from the evidence that even before the defendant left the apartment, leaving his friend there, both of them had viciously assaulted the deceased. As such, if the appellant's friend had choked the deceased in the course of the joint assault, there would be no doubt that the appellant's guilt for murder would have been proved, pursuant to Section 300 (a)(2), even if it was not clear that it was exclusively the injuries caused by the appellant caused the death. The reason for this is that the actions of both of them, having been performed jointly, attest to their intention to kill the deceased, [*sic*][1] would have been inferred primarily from the fact that he strangled her. But the actions of the appellant too likewise attest to the very same intention, when he mercilessly attacked a helpless and sickly old woman… pressed her chest, kicked her and even trod on her chest, while she was lying helplessly on the floor, and caused breaks in her ribs and severe damage to her internal organs (lungs and liver). [*sic*][2] of the decedent. Under these circumstances, the mental element of the decision to kill, on the appellant's part

---

[1] Translator's Note: It appears that some words from the quote are missing.
[2] Translator's Note: It appears that some words from the quote are missing.

SHATSKY 002950-T

4

[Circular Stamp]                                          Judea and Samaria Area/Appeal 288,294/91
Court of Appeals in Judea and Samaria
Unit of Military Courts

Faithful Copy of Original

> would have been deduced from the nature of his actions and the manner in which they were carried out, in respect of which one could apply the assumption that he too, and not only the party that choked, intended the natural result of such an assault…"

In the case before us, do the things described in the appellant's statement, and the evidence that was before the trial court, attest to the defendant's intention? Can we accept his claim that his sole intention was "to interrogate" the deceased, or do his actions attest to his intention to cause his death?

Here we should return to the beginning of this judgment and the defendant's description of his actions, as he detailed them. The defendant "interrogated" the deceased, using measures that ensured that his actions would not be revealed, and in a manner that would enable him to carry out his plan without interruption. He turned to the deceased, tied him to the bed, sealed his mouth, covered his face and beat him mercilessly on all parts of his body. He beat the deceased with his fists and elbows, strangled him with his hands, and even after the deceased had confessed that he was cooperating with the authorities, he did not stop and continued to hit him. This happened once, and then again, until the deceased stopped moving and the defendant concluded that he was dead. Indeed, he claims that he attempted to resuscitate him, but having failed to do so, he took a shower and then returned to his bed. It was only at four thirty in the morning that he called the guard and told him that the deceased was dead.

Doesn't this appalling series of acts indicate the defendant's intention to cause the death of the deceased? For if his intention had been solely to "interrogate" the deceased concerning his suspicions regarding him, why didn't he discontinue those actions once the deceased had confessed that he was collaborating with the authorities and working against "the Intifada"?

Instructive comments regarding this matter were made by Justice Cohn in Criminal Appeal 176/01 *Alfasi v. Attorney General* (P.D. 17, 493, at p. 498)

> "But what ever the case, I think that the final outcome of the act is only indicative of its beginning if there is was a doubt regarding what his initial intention was, and in my mind there can be no reasonable doubt on that count. Even according to the defendant, both in his statement to the police and in his testimony in court, the incident occurred after the discussion between himself and the decedent regarding the causing of death by burning in gasoline, and from that perspective it is immaterial whether the death had to be caused by her own hands, or at his hands.

**SHATSKY 002950-T (continued)**

> The main thing is that the gasoline was spilt and the fire ignited while they were speaking of the death, and for purposes of causing death. Once the court had ruled that the act was committed by the appellant and not by the deceased, it held – and it was obligated to hold – that the act was committed by the defendant with the purpose of causing death."

We will further cite from the comments of Justice Levin in Criminal Appeal 299/81 *Tetroshevilli v. State of Israel* (P.D. 36 (1) 141, at p. 148:

> "…[T]he issue of intention and the attendant decision belong to the realm of the perpetrator's innermost thoughts. Usually it is not possible to investigate a person's inner thoughts, other than by examination of the totality of the circumstances attendant to the act (as apart from cases in which the defendant discloses his intention and his decision in an explicit confession). Accordingly, the court has more than once ruled that the elements of the decision and the preparation are bound up with each other, and one of them can be deduced from the other. The intention to kill can be learnt from the totality of the circumstances of the case, including the act of preparation. And this indeed is the path that the court will take, and the court will examine each case according to its circumstances, and if the reasonable and unequivocal conclusion is that the decision to kill

SHATSKY 002951-T

TO 09970635 p. 01

5

[Circular Stamp]  Judea and Samaria Area/Appeal 288,294/91
Court of Appeals in Judea and Samaria
Unit of Military Courts

Faithful Copy of Original

> crystallized in the perpetrator's heart just before the act of killing, then in the event that the other elements are present, then it may be concluded that the causing of the death was premeditated."

Based on all the material before us, we find that we must dismiss the defense attorney's claim, and determine that the decision to kill the deceased crystallized in the defendant's heart and that his actions were intended to kill the deceased. In our opinion, in the case before us there is no need to address the question of the significance of the absence of the word "premeditated" in Section 51 of the Order Regarding Security Provisions, because the defendant's actions, as he described in detail and in accordance with the evidence before the court, attest unequivocally to the defendant's intention to cause the death of the deceased, be it from the very outset, or after he had confessed to being in collaboration with the authorities. The defendant continued to beat the deceased mercilessly, using different means, until the causing of his death. Accordingly we have reached the conclusion that the appeal should be allowed. We overturn the verdict of the trial court and we convict the defendant of the offense of intentionally causing death, under Section 51 of the Order Regarding Security Provisions, 5730-1970.

This brings us to the appropriate punishment for the defendant. Having accepted the Military Prosecution's appeal, and having convicted the defendant of the offense of intentionally causing death, the defense's appeal must be dismissed.

It is settled law in this court that when a defendant has been convicted of the offense of intentionally causing death, it is proper that he be sentenced to life imprisonment, as a rule, and only in exceptional cases, upon finding exceptional circumstances, will the court refrain from imposing that sentence. In the defendant's case, we have not found any reason for deviating from the settled law, and we see no reason for not imposing the regular sentence upon him. Accordingly, we overturn the sentence that was imposed on the defendant by the trial court, and we sentence him to life imprisonment.

Handed down and given in public and in the presence of

Today    in Ramallah

[signature]           [signature]                  _____

Judge                 President                    Judge

Original




אי"ש/ ע'/ 91 /288,294

## פסק דין

ראיד מוסא אברהים נזאל ( להלן:הנאשם ) הורשע בבית המשפט קמא בביצוע עבירת הריגה, לפי סעיף 51א (א) לצו בדבר הוראות בטחון , התש"ל- 1970 , ונגזרו עליו 13 שנות מאסר לריצוי בפועל .

בכתב האישום שהוגש נגד הנאשם יוחסה לו עבירה של גרימת מוות בכוונה , לפי סעיף 51(א) לצו בדבר הוראות בטחון , התש"ל - 1970 ופרטי העבירה בה הואשם היו כדלקמן:

" הנאשם הנ"ל , בהיותו תושב האזור , בלילה שבין 23.8.90 , בכלא ג'נין , רצח את חברו לתא תוך כדי חקירתו .
במהלך החקירה קשר הנאשם את הקורבן , ג'מל מוסא מנאצרה , למי את פיו בגרביים ובסדין , והכה אותו בידיו , באגרופיו , במרפקיו וברגליו בכל חלקי גופו , משך זמן רב .
הנאשם המשיך במעשיו גם לאחר שהקורבן הודה כי הינו משתף פעולה . כתוצאה מהמכות נפטר הקורבן ".

בית המשפט קמא מצא שלא להרשיע את הנאשם בעבירה שיוחסה לו בכתב האישום , אלא בעבירה של הריגה, כאמור. בפנינו ערעור מטעם התביעה הצבאית על הכרעת דינו של בית המשפט קמא , שלדעת התביעה היה מקום להרשיע את הנאשם בעבירה של גרימת מוות בכוונה , וערעור מטעם הסניגוריה כנגד חומרת העונש - כך לפי הטענה - שהוטל על הנאשם.

ראוי לציין , כי הכרעת דינו של בית המשפט קמא ניתנה לאחר שהוגשו לבית המשפט הראיות שבכתב ע"י התביעה הצבאית - וזאת על פי הסכמת הצדדים - ראיות שכללו , בין היתר , הודעה מפורטת שנמסרה ע"י הנאשם במשטרה וחוות דעת פתולוגית . קודם שנפנה לטענות הצדדים , נביא להלן מדבריו של הנאשם בהודעתו האמורה , הודעה שניתנה למחרת הלילה בה , כאמור , זוהי הודעה מפורטת המשתרעת על פני שלושה עמודים , ובשל חשיבות הדברים נביא ממנה בהרחבה . בראשית דבריו אומר הנאשם , כי בסמוך לשעה אחת עשרה בלילה ניגש לקורבן ואמר לו , כי הוא " רוצה לחקור אותו כי הוא משת"פ". הוא נטלו עימו למיטתו ("כי הוא לא יכול להתנגד לי") וקשר אותו בידיו וברגליו, כשהוא שוכב על גבו, לעמודי המיטה וכן בחבל סביב מותניו אל המיטה . על מנת שלא יקים רעש , הכניס לפיו של הקורבן שתי גרביים ובקרעי סדין קשר את פיו ואת פניו , כך שכיסו גם אפו ועיניו . על אלה הוסיף והניח שמיכה על פני הקורבן . וכך ממשיך הוא :

"... והתחלתי לתת לו מכות באגרופים , במרפק וברגליים באזור הבטן והחזה שלו . את הבעיטות בעיקר נתתי לו באזור הבטן והחזה ובאזור הפנים שלו . תקפתי אותו במכות בידיים אגרופים ומרפקים כמו כן הייתי חונק אותו בידיים שלי וגם נתתי לו מכות באשכים שלו וברגליים".

כך הכה הנאשם את הקורבן כרבע שעה עד חצי שעה ולאחר מכן התיר את קרעי הסדין והוציא את הגרביים מפיו . בשלב זה הודה הקורבן ואמר "אני משת"פ אני משת"פ". בשלב זה לא הרפה הנאשם ממנו , אלא חזר וסתם את פיו בגרביים , קשר את פניו והניח עליהן

איר"ש/ ע 91 / 288,294

את השמיכה והמשיך ב"חקירה". אחרי כחצי שעה של "חקירה מלווה במכות", התיר הנאשם פעם נוספת את פיו של הקרבן וזה מסר לו כי "עבד נגד האינתיפדה". גם בשלב זה לא הניח הנאשם לקרבן ושוב חזר והכניס את הגרביים לפיו וקשרו בקרעי הסדין , והוא ממשיך :

"... והמשכתי להכות אותו במרפקים ואגרופים בכל חלקי גופו . אני ריכזתי את המכות שלי על הביצים שלו , על אזור החזה ועל הצוואר ... בזמן שהייתי תוקף אותו הוא היה זז בגופו ומתנועע אולם כאשר תקפתי אותו את שתי המכות האחרונות ולא הורדתי לו את הקשר מהפנים שלו והוצאתי את הגרביים מהפה שלו וראיתי שהוא לא נושם אז התחלתי ללחוץ לו על החזה כעיסוי לב ופעולת החייאה וזה לא עזר אז ידעתי שהוא מת."

משנסתבר לנאשם שהקרבן מת, עזב אותו ניגש להתקלח וחזר למיטתו . בשעה ארבע וחצי קרא לסוהר ומסר לו כי הקרבן "מת בזמן החקירה" , וגופתו של המנוח נלקחה מן התא . נתיחה שלאחר המוות בוצעה בגופו של המנוח ע"י מומחה מן המכון לרפואה משפטית בת"א , ובסיכומה חווה דעתו , כי מותו של המנוח " נגרם בגלל תשניק (חנק) בעקבות לחץ על שפתי הפה וצוואר בשילוב של דימום תוך בטני בעקבות קרע במזנטריום."

בהכרעת דין קצרה קבע בית המשפט קמא כי מותו של המנוח נגרם כתוצאה ממעשיו של הנאשם , אך לא מצא ראיה לכך שהנאשם התכוון לגרום למותו , וזאת לאחר שהנאשם מסר כי ביקש "לחקור" את המנוח ולא נשאל כלל האם נתכוון לגרום למותו . על כן הרשיעו בעבירה של הריגה .

ומכאן לטענות הצדדים . בערעורו טוען התובע הצבאי כי שגה בית המשפט קמא במצאו כי אין מקום להרשיע את הנאשם בעבירה של גרימת מוות בכוונה , לפי סעיף 51 לצו בדבר הוראות בטחון , אלא בעבירת הריגה בלבד . לדעתו מגלים מעשיו של הנאשם , שהמשיך בתקיפתו האלימה של המנוח זמן רב לאחר שזה הודה בשיתוף פעולה עם השלטונות , את כוונתו לגרום למותו של המנוח , כפי שהכן אירע - כאמור בסיכום חוות הדעת הפתולוגית . לעניין זה תמך התובע הצבאי יתדותיו בשורה של פסקי דין , ובהם ע"פ 176/81 אלפסי נ' היועץ המשפטי לממשלה (פ"ד ט"ז , 493 , בעמ' 497) ע"פ 299/81 טטרואשוילי נ' מ"י (פ"ד ל"ו (1) 141) , ע"פ 392/91 שץ נ' מ"י (פ"ד מ"ז (2) 299 , ) ועוד .

מנגד טענה באת - כחו של הנאשם , עו"ד לאה צמל , כי כדין קבע בית המשפט קמא כי אין מקום להרשעת הנאשם בעבירה של גרימת מוות בכוונה . לטענתה לא נתכוון הנאשם לגרום למותו של המנוח וכן לא חפץ בכך ; כל שביקש הוא לחקור את המנוח בשל החשדות שחשד בו , כפי שמסר בהודעתו , וניסיונו להחיות אותו , כשגילה שמת , מעיד על כך שלא חפץ במותו . חיזוק לדבריה מוצאת הסניגורית בחוות הדעת הפתולוגית , המדברת בשילוב של חנק עם דימום תוך בטני כסיבת המוות , בעוד הנאשם - כך לדבריה - לא חנק את המנוח . כתימוכין לדבריה מפנה הסניגורית המלומדת לפסקי דין שונים ובהם ע"פ 394,426/75 דילקי ואח' נ' היועץ המשפטי לממשלה (פ"ד מ"ה(3),705), מהם מבקשת היא ללמוד כי התביעה הצבאית לא יצאה ידי חובתה להוכיח כי נתמלאו יסודות העבירה של גרימת מוות בכוונה .

דומה כי כבר בשלב זה ניתן לקבוע , וזאת על פי חומר הראיות אשר היה בפני בית משפט קמא ואשר הוגש לו בהסכמה ע"י הצדדים , כי הנאשם הוא זה אשר גרם למותו של המנוח . מהודעתו המפורטת של הנאשם , שחלקים ממנה הובאו לעיל עולה כי הנאשם הכה את המנוח מכות נמרצות , לאחר שנקט אמצעים שימנעו התערבות במעשיו , כשלדבריו נעשה הדבר מתן מטרה "לחקור" את המנוח ולהוציא מפיו הודאה כי הינו משתף פעולה עם השלטונות . עיקר המחלוקת שבין הצדדים עניינה היסוד הנפשי שהתגבש אצל הנאשם שעה שגרם למותו של המנוח , האם זה מגיע כדי הנדרש להרשעה עפ"י סעיף 51 לצו בדבר

SHATSKY-002948

Case 1:18-cv-12355-MKV-DCF Document 136-85 Filed 10/05/21 Page 15 of 17
Case 1:02-cv-02280-RJL Document 254-8 Filed 11/12/15 Page 14 of 17

3

איו"ש/ ע' 91 /288,294

הוראות בטחון המדבר בגרימת מוות בכוונה או שמא לא נתמלאו התנאים הנדרשים לכך ואין להרשיע את הנאשם אלא בעבירה פחותה מזו.

קודם שנדון בשאלה זו עפ"י תחיקת הביטחון החלה באזור, נפנה בקצרה לדין בישראל. כידוע, היסודות הנדרשים להרשעה בעבירה של רצח בכוונה תחילה עפ"י חוק העונשין בישראל הנם כוונת קטילה ממשית שבאה מתוך שיקול הדעת וישוב הדעת, החלטה, הכנה והעדר קינטור, דהיינו כוונת קטילה ממשית שבאה מתוך שיקול הדעת וישוב הדעת, חזותה מראש וחפץ בה. אשר לעבירת ההריגה, כאן מתייחסים הדברים ליסוד נפשי שעניינו פזיזות לגבי התוצאה ואין הכרח כי התוצאה החזויה תהיה קטלנית דווקא, כפי שנאמר בפסק הדין בעניין דויטש (ע"פ 1/52 פ"ד ח', 456) כי "הרשעת אדם בעבירת הריגה... תיתכן רק אם הוכח של שנהג... מתוך 'פזיזות', כלומר מתוך ראיה כי התנהגותו עשויה לסכן את חייו או שלמות גופו של אחר."

סיכומה של ההלכה לעניין היסוד הנפשי הנדרש לביסוס הרשעה של הריגה מובא בדבריו של כב' השופט קדמי בספרו על הדין בפלילים (חלק ב', עמ' 451):

"1. היסוד הנפשי המספיק לביסוס הרשעה בעבירה של הריגה - אם ב'מעשה' ואם ב'מחדל' - הינו הלך נפש של פזיזות, המבטא ערנות בפועל לקיומו של סיכון ממשי של פגיעה בגופו של אדם; ו'בפועל' - משמעו עפ"י מבחן סובייקטיבי של הנאשם עצמו ואין די במבחן אובייקטיבי של האדם הסביר בנעליו של הנאשם.

2. הסיכון הממשי האמור הינו סיכון של פגיעה גופנית, ולא של הריגה דווקא. ברם, צריך שיהא זה סיכון מוחשי של פגיעה ממשית בגופו של אדם ואין די בסיכון ערטילאי או בפגיעה קלת ערך."

לענייננו, ובלא שנתייחס בשלב זה לעובדה שעל פי סעיף 51 לצו בדבר הוראות בטחון אין מדובר בגרימת מוות בכוונה "תחילה" אלא בגרימת מוות "בכוונה" כלשון הסעיף, האם היה על בית המשפט קמא להתייחס לאשר נאמר ע"י הנאשם בהודעתו במשטרה, לפיה כל שביקש הוא "לחקור" את המנוח וכי על כן אין לדבר בכוונתו לגרום למותו, או שמא יש ללמוד ממעשיו על כוונתו לגרום לקטילתו של המנוח.

בעניין זה כאמור הרחיבו הצדדים וכל אחד מהם הפנה לשורה של פסקי דין התומכים בעמדתו. לדעת הסניגוריה אין ללמוד מחומר הראיות יותר מאשר נאמר ע"י הנאשם עצמו ועל כן אין לומר כי נתגבש אצלו היסוד הנפשי הנדרש להרשעה בעבירה של גרימת מוות בכוונה. לעומת זאת הפנה התובע למעשיו של הנאשם, כפי שהם באים לידי ביטוי מפורט בהודעתו ומהם למד הוא על כוונה לגרום למותו של המנוח, אף לפי המבחנים שנקבעו לעניין הרשעה ע"פ הדין בישראל. אחד מפסקי הדין אליהם הפנה התובע הוא ע"פ 2577/90 זריקי נ' מדינת ישראל (פ"ד מ"ז (1), 214), ובמיוחד לאמור בעמוד 218:

"ברור מן הראיות, כי עוד טרם שעזב המערער את הדירה והשאיר את חברו בה, תקפו שניהם את המנוחה באכזריות. לפיכך, אם היה חברו של המערער חונק את המנוחה במהלך התקיפה המשותפת, כי אז לא יכול היה להיות ספק כי הייתה מוכחת אשמתו של המערער ברצח, לפי סעיף 300 (א)(2), גם אם לא היה ברור אם חבלותיו של המערער הן לבדן גרמו למוות. זאת משום שאז היה מקום לראות את מעשי השניים, שנעשו בצוותא חדא, כמבטאים כוונה להמית את המנוחה הייתה נלמדת בעיקר מחניקתו אותה. אולם גם מעשיו של המערער מעידים על אותה כוונה, כשתקף אף הוא ללא רחם אשה זקנה וחולנית... לחץ על חזה, בעט ואף דרך על חזה, כשהיא מוטלת חסרת אונים על הרצפה, וכך גרם לשברים בצלעותיה ולנזקים קשים לחלקיה הפנימיים (בריאות ובכבד). כאדם בר דעת הבין המערער, אל נכון, כי התוצאה של המנוחה. היסוד הנפשי של ההחלטה להרוג, מצד המערער,

SHATSKY-002949

איו"ש/ ע'/ 91 /288,294

היה נלמד , על כן , בנסיבות אלה , מאופי מעשיו וממצורת הביצוע , שלגביהם ניתן היה ליישם את ההנחה כי גם הוא , ולא רק החונק , התכוון לתוצאה הטבעית של תקיפה שכזאת ..."

ולעניינו , האם מן הדברים שתוארו בהודעתו של המערער ובראיות שהיו בפני בית משפט קמא היה כדי ללמוד על כוונתו של הנאשם ? האם יש לקבל את דבריו כי כל שביקש הוא "לחקור" את המנוח או שמא מלמדים מעשיו על כוונה לגרום למותו ?

כאן ראוי הוא שנחזור לדברים שהובאו בתחילת פסק דין זה ולתיאור מעשיו של הנאשם , כפי שפורטו על ידו . הנאשם פנה "לחקור" את המנוח כשהוא נוקט אמצעים שיבטיחו כי מעשיו לא יתגלו , ובאופן שיאפשר לו לבצע את זממו ללא הפרעה . הוא פנה אל המנוח , קשרו למיטה , סתם את פיו , כיסה את פניו והכהו ללא רחם בכל חלקי גופו . הוא הכה את המנוח באגרופיו ומרפקיו , חנק אותו בידיו , וגם לאחר שהמנוח הודה כי הינו משתף פעולה עם השלטונות , לא חדל ממעשיו והמשיך להכותו . כך פעם ופעמיים , עד אשר חדל המנוח לנוע והנאשם הגיע למסקנה כי מת . הוא אמנם ניסה לדבריו להחייתו , אך כשלא עלה הדבר בידו פנה להתקלח ואח"כ חזר למיטתו . רק בשעה ארבע וחצי בבוקר קרא לסוהר ומסר לו כי המנוח מת .

האם אין במסכת מחרידה זו של מעשים כדי ללמד על כוונתו של הנאשם לגרום למותו של המנוח ? שהרי אילו כל שביקש היה "לחקור" את המנוח בדבר חשדותיו כלפיו , מדוע לא חדל ממעשיו כאשר הודה המנוח כי הינו משתף פעולה עם השלטונות ועובד נגד "האינתיפדה" .

יפים לעניין זה הדברים שנאמרו ע"י כב' השופט כהן בע"פ 176/01 אלפסי נ' היועץ המשפטי לממשלה (פ"ד ט"ז , 493 , בעמ' 498) :

"אבל יהא דבר זה אשר יהא , נראה לי שסופו של המעשה יכול להעיד על תחילתו רק אילו היה קיים ספק במה שהייתה כוונתו , תחילה , ולדעתי , לא יכול להיות קיים ספק סביר בכך . לפי גרסת הנאשם עצמו , הן בעדותו במשטרה והן בעדותו בבית המשפט , הרי קרה מה שקרה אחרי דין ודבריו בינו לבין המנוחה על גרימת מוות בשרפה בנפט , ולעניין זה אין נפקא מינה אם המוות היה צריך להיגרם על ידיה עצמה , או על ידי שלו ; העיקר הוא שהנפט נשפך והאש נדלקה תוך כדי דיבור על מוות ולמטרת המתה ; ומשקבע בית המשפט שהמעשה נעשה ע"י המערער ולא על ידיה של המנוחה , ממילא קבע - והיה צריך לקבוע - שהמעשה נעשה ע"י הנאשם במטרת גרם המוות."

ועוד נביא מדבריו של כב' השופט לווין בע"פ 299/81 טטרואשוילי נ' מדינת ישראל (פ"ד ל"ו (1) 141, בעמ' 148) :

"... עניין הכוונה וההחלטה המתלווה לכך , הם בתחום צפונות לבו של עושה המעשה . בדרך כלל לא ניתן להגיע אל חקר ליבו ואל סוד מחשבותיו של עושה המעשה , אלא על פי מכלול הנסיבות המתלוות למעשה ( להוציא מקרים בהם חושף הנאשם עצמו ומגלה את כוונתיו ואת החלטתו בהודאה מפורשת). לפיכך , פסק בית המשפט לא אחת לאמור , כי יסודות ההחלטה וההכנה משתלבים ואחוזים זה בזה , וניתן ללמוד על האחד מהשני . את כוונת הקטילה ניתן ללמוד ממכלול נסיבות המקרה , לרבות פעולת ההכנה , ואם אמנם יעשה בבתי המשפט וכל מקרה ומקרה יבחן על פי נסיבותיו , כי המסקנה הסבירה והחד משמעית מכלל הנסיבות היא , כי החלטת הקטילה

SHATSKY-002950



TO 0997082S P.01

5

איר"ש / ע' 91 / 288,294

התבשה בלב מבצע המעשה ולו גם סמוך למעשה ההריגה , הרי בהתקיים
יתר היסחות יש להסיק כי גרמת המוות בוצעה בכוונה תחילה".

מכלל הדברים שלפנינו , מוצאים אנו שיש לדחות את טענת הסניגוריה ולקבוע כי בלבו על
הנאשם גמלה ההחלטה להמית את המנוח וכי במעשיו נתכוון הוא לגרום למותו . לדעתנו אף אין
מקום לדון במקרה זה בשאלה בדבר משמעות הייעוד התיבה "תחילה" בסעיף זה לצו בדבר
הוראות בטחון , הדן בגרימת מוות בכוונה , שכן מעשיו של הנאשם , כפי שתואר על ידו
בפרוטרט והראיות שעמדו בפני בית המשפט מלמדת באופן חד משמעי על כוונתו של הנאשם
לגרום למותו של המנוח , בין אם בראשית הדברים ובין אם לאחר שהוחדה כי הינו משתף פעולה
עם השלטונות . הנאשם הכה את זה הכנות ללא רחם , תוך שהוא נוקט אמצעים שונים , עד שגרם
למותו . על כן הגענו למסקנה כי דינו של ערעור התביעה להתקבל . אנו מבטלים את פסק דינו
של בית המשפט קמא ומרשיעים את הנאשם בעבירה של גרימת מוות בכוונה , לפי סעיף 51 (א)
לצו בדבר הוראות הביטחון , התשל"ל - 1970 .

ומכאן לעונש לו ראוי הנאשם . משקיבלנו את ערעור התביעה הצבאית והרשענו את הנאשם
בעבירה של גרימת מוות בכוונה , הרי דינו של ערעור הסניגוריה להדחות .

הלכה היא בבית משפט זה , כי מקום שהורשע נאשם בעבירה של גרימת מוות בכוונה , ראוי הוא
שיוטל עליו עונש של מאסר עולם , בדרך כלל , וכי רק במקרים חריגים ובהימצא נסיבות מיוחדות
ויוצאות דופן ימנע בית המשפט מלהטיל עונש זה . בעניינו של הנאשם זה לא מצאנו כל סיבה
לסטות מן ההלכה שנקבעה ולא מצאנו כל טעם שלא להטיל עליו את העונש המקובל . על כן הננו
מבטלים את העונש שהוטל על הנאשם ע"י בית המשפט קמא וגוזרים עליו והננו עונש של מאסר
עולם .

ניתן והודע בפומבי ובמעמד

היום                           ברמאללה .

שופט                אב"ד              שופט

SHATSKY-002951