# LOWELL DECL. EX. 76

Exhibit 35

SHATSKY 007481-T

**ISRAEL DEFENCE FORCES**

In the Military Court
S A M A R I A
Before the Tribunal

Court File 6358 / 03
Prosecution file 699 / 03
File P.A. 2496/03
(Petah Tikva)

In the trial between:

**The Military Prosecutor**

**- The Prosecutor -**

**vs.**

**Nuraddin Said Daoud (Titan)**

(Detained since 4/23/03)

I.D. 913368981 Birth date 10/10/79 from Qalqilya

**- The Defendant -**

**Amended Indictment as of 08.08.04 (in the framework of a plea)**

The aforementioned defendant is charged with the following offenses:

**First Count:**

**Nature of the Offense:** Membership in an illegal organization, an offense according to regulation 85(1)(a) of the Defense (Emergency) Regulations, 1945

**Details of the Offense:**The aforementioned defendant, in the area, was a member of the Popular Front, which is an unlawful association.

That is, in 1998 the defendant approached the office of the Popular Front in Qalqilya, where he met with a activist of the organization, Shaher Rai. The defendant asked Shaher to recruit him into the organization, and Shaher agreed to his request.

During the month of October 2000 or thereabouts, Raed Nazal proposed to the defendant that he join the military activity in the framework of the Popular Front organization, and the defendant agreed to join the organization's military cell, in which Mohamed Jabber and Tahsin Yousef Daoud, who is nicknamed "Eladal" (hereinafter: "Tahsin") were also members.

The defendant's membership in the military squad continued until his arrest.

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 3 of 22

**Second Count:**

**Nature of the Offense:** Attempted intentional manslaughter, an offense according to Section 51(a) of the directive regarding security provisions (Judea & Samaria) (No. 378), 5730 – 1970 and Sections 14, 19, 20 of the directive regarding the rules of responsibility for a crime (No. 225), 5728 - 1968.

**Details of the Offense:** The aforementioned defendant was complicit in an attempt to intentionally cause the death of others.

That is, in or around the beginning of 2001, Maher Ali Ahmed Rai (hereinafter: "Maher"), a Popular Front activist, asked the defendant and Ahmed Ismail Awini to execute a shooting attack. The two agreed to do so and Maher gave a handgun to the defendant, and a Kalashnikov rifle to Ahmed .

Following that, the defendant and Ahmed travelled with Salim Jaidi, in the latter's vehicle, to an orchard adjacent to the Trans-Israel Highway, opposite Kfar Saba. The defendant and Ahmed approached the highway on foot, and positioned themselves near the road. After about a quarter of an hour, a white Magnum vehicle approached, and Ahmed opened automatic fire towards it [the vehicle]. The defendant shot five shots in the air, and afterwards he and his friends escaped from the area.

**Third Count:**

**Nature of the Offense:** Assistance in the placing of an explosive device, an offense according to regulation 58(b) of the defense (emergency) regulations, 1945, and according to section 2 and 14 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 - 1968.

**Details of the Offense:** The defendant assisted others in the placement of an explosive device, that is:

A. During or around June 2001, Maher met with the Popular Front activist Mohamed Fahmi Ahmed Jabber (hereinafter: "Mohamed") at the cemetery in Qalqilya. Maher told Mohamed that he wanted to booby-trap a motorbike and to smuggle it into Israel. Mohamed asked what would be his part in the terrorist attack, and Maher replied that Mohamed would have to bring the motorcycle into Israeli territory. In response Mohamed said that he does not know Israel nor does he know how to drive a motorcycle, and therefore Maher requested that he [Mohamed] locate someone appropriate for the task.

B. The following day, Mohamed approached Shaher Abdullah Div Aamar (hereinafter: "Shaher"), told him that he was active in the military arm of the Popular Front Organization and proposed that he be recruited to the organization. Shaher agreed. Later on, Mohamed met with Maher and reported to him about his recruitment of Shaher to the Popular Front organization. Mohamed told Maher that Shaher knows Israel and that he is appropriate for the task of smuggling the booby-trapped motorcycle into Israel. In response, Maher agreed to assign the task to Shaher.

C. Two days later, Mohamed again met with Shaher and informed him that he would be required to move car bombs to locations that would be determined. Shaher agreed, but only on the condition that he would choose the locations for planting the car bombs, since he trusted no one. Mohamed responded that the two of them would work together, and added that the Popular Front in Qalqilya has in its possession explosive devices ready for planting in Israel, as well as hand grenades and other weapons. In addition, Mohamed told Shaher that the two would meet again soon,

so as to give him a task for the coming Friday. Mohamed told Shaher that he would give the latter a cellular phone and code names, and would explain in detail the action planned for Friday.

D. On Friday, 6/15/01, Mohamed and Shaher met. Mohamed told Shaher that he has a booby-trapped motorcycle ready, and they sought to choose a place to plant the motorcycle. Shaher responded that he was interested in placing it in Haifa. Mohamed told Shaher that Netanya is closer, and the responsible ones prefer that the motorcycle be planted there. However, eventually the two agreed to plant the motorcycle bomb in Haifa. Mohamed told Shaher that he would give him the phone number of a person called "Halil", so that the latter would pick him up after planting the motorcycle bomb. Mohamed asked that Shaher tell "Halil" that his nickname [codename] was "J'asan".

E. Shaher returned to his home, showered and shaved off his beard. Meanwhile, Mohamed approached the **defendant** and asked him to move the motorcycle from place to place for him. The **defendant** agreed and collected a grey motorcycle [bearing] license plate number 54-525-58, equipped with a black storage box in the rear, and also a white helmet (the motorcycle was stolen in Israel on 5/31/01). The

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 5 of 22

**defendant** understood that the heavy motorcycle was booby-trapped, and that Mohamed seeks to execute a terrorist attack with it in Israel.

F. In the afternoon, Mohamed called Shaher's cellphone, whose number was 050-351332, and came to pick him up. Mohamed let Shaher off in his garage, where the latter waited for some time. Mohamed gave Shaher a battery for an explosive and told him that he had to mount in on the explosive device in the motorcycle. Mohamed added that there would be another cellular phone device in the motorcycle, and that he would explain to him how to operate the explosive device when he brings the motorcycle. Additionally, Mohamed warned Shaher not to discuss the operation he was going to execute on the cellular phone. After that, Mohamed gave Shaher 400 NIS, for travel expenses.

G. During the evening, the two travelled to the old sabotage route. The **defendant** arrived there, bringing with him the aforementioned motorcycle. Mohamed presented the motorcycle to Shaher, who observed the black bag laying in the storage box with protruding wires that were connected to two cellular phone devices (one with a battery and the other one without), as well as an operation switch. The explosive device itself was covered with waffle crackers and biscuits.

H. Mohamed explained to Shaher that in order to operate the explosive device, he would have to connect the missing battery to the appropriate cellular phone and to operate the switch. Additionally, Mohamed explained to Shaher how to drive the motorcycle, as Shaher had never driven this kind of motorbike before. Mohamed asked Shaher where he would like to leave from, and told him that he would arrange observers from the Popular Front for him, in order to verify that the road is clear. Shaher responded that it did not matter to him, and Mohamed said that the Popular Front activists would show him from where to leave.

I. Accordingly, the **defendant**, who was together with Mohamed and Shaher all that time, left and checked the road until Alfei Menashe. A short time later, the **defendant** returned and reported that the road was "clean". Shaher left with the motorcycle, with the explosive inside, in the direction of the Jaljulya checkpoint. Following him, in a separate vehicle, he was accompanied by the **defendant** and Mohamed. Shaher arrived at the PA checkpoint, where he saw

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 6 of 22

Yousef al-Rai, who was known to him as a member of the Popular Front, standing on the side talking into a cellular phone. He [Yousef al-Rai] signaled to Shaher to pass though the checkpoint. The **defendant** and his friends passed through the checkpoint without delay. After having progressed about 200 meters, Shaher arrived at a pile of dirt which blocked the way. Shaher did not succeed in bypassing the obstacle, and therefore the **defendant** assisted him.

J. Following that, Shaher continued by himself, and a short while later arrived at “Paris” Square in Haifa near the "Sallah Brothers" restaurant on Maginim Street. Shaher parked the motorcycle bomb. Following that, Shaher entered a nearby refreshment store where he observed a number of people, who seemed to him to look like Russians. Shaher parked the motorcycle bomb several meters from them, bought cigarettes and a drink and returned to the motorcycle bomb. Shaher then opened the motorcycle, and made it look like he was removing a package of waffles. Actually, Shaher removed the battery from his pocket and placed it in the box [of the motorcycle]. Shaher, who was afraid to operate the explosive device for fear that it would explode, placed the helmet on the motorcycle and entered a nearby restaurant. From there, Shaher called Mohamed and told him that the explosive device was planted as planned. Mohamed told him that he himself would activate the device after Shaher's return to Qalqilya. Shaher then called "Halil" and asked him to come pick him up.

K. A short time later, Ahmed Ismail Awini a.k.a., "Halil" picked up Shaher and drove him to Qalqiliya. In Qalqiliya Mohamed approached Shaher and told him that he was not succeeding in operating the explosive. Shaher told him that he was prepared to return to Haifa to check the device. Mohamed responded that he would consider the matter. After about an hour, Mohamed called Shaher and said that those responsible were against the idea of his returning to Haifa, for fear of his life.

L. The motorcycle bomb was discovered by Civil Guard volunteers during the night between 6/17/01 and 6/18/01

**<u>Fourth Count:</u>**

**<u>Nature of the Offense:</u>** Shooting at a person or in the direction of a place where people may be found, an offense according to regulation 58(a) of the defense (emergency) regulations 1945 and according to section 14 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 - 1968.

**SHATSKY 007484-T (continued)**

**Details of the Offense:** The aforementioned defendant, in the area, fired in the direction of a person or a place where people may be found.

That is, during the course of 2002, it became known to the defendant and to Askar that Mustafa Shatiwi was arrested by Special Forces in Qalqilya. The two travelled to the "Alsaha" region, where the defendant remained by himself, carrying an M-16 rifle which he took from Askar.

When he noticed a military jeep, he aimed his weapon at it, and attempted to fire at it. However, a jam in the rifle prevented his firing it. The defendant then pointed the rifle in the air and succeeded in getting off three shots. He then tried again to aim and fire at the jeep, however, again, he did not succeed in firing at it. The defendant then left the area.

**5**

**SHATSKY 007485-T**

**Fifth Count:**

**Nature of the Offense:** Shooting at a person or in the direction of a place where people may be found, an offense according to regulation 58(a) of the defense (emergency) regulations 1945 and according to section 14 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 - 1968.

**Details of the Offense:** The aforementioned defendant, in the area, fired in the direction of people or a place where people may be found.

That is, during or around December 2002, the defendant, Tahsin, Ahmed Atia Hamis (hereinafter: "Ahmed") and Anas Samih Yousef Shanti (hereinafter: "Anas") set out to plant an explosive device on the Tulkarm- Qalqilya Road. The explosive device, which the members of the cell carried with them, was assembled from a large blue gas balloon, which was operated by an electric mechanism, and weighed tens of kilos.

On their way to the aforementioned road, the defendant and his friends encountered a military force that opened fire upon them. Anas and Tahsin shot towards the army, and then escaped together with the defendant and Ahmed back to Qalqilya.

**Sixth Count:**

**Nature of the Offense:** Conspiracy to shoot at a person or in the direction of a place where people may be found, an offense according to regulation 58(a) of the defense (emergency) regulations 1945 and according to section 22 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 - 1968.

**Details of the Offense:** The aforementioned defendant, in the area, conspired with another [party] to fire in the direction of people or a place where people may be found.

**SHATSKY 007485-T (continued)**

That is, during or around February 2003, the defendant planned, together with Wael Abu Qamer, Anas and Ahmed, to execute a shooting attack at an Israeli vehicle or a military patrol near Alfei Menashe. The next day, Anas learned that Ahmed, and another person carried out the plans and executed the attack.

**6**

**SHATSKY 007486-T**

**Eighth Count:**

**Nature of the Offense:** Conspiracy to shoot at a person or in the direction of a place where people may be found, an offense according to regulation 58(a) of the defense (emergency) regulations 1945 and according to section 22 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 - 1968.

**Details of the Offense:** The aforementioned defendant, in the area, conspired with another [party] to fire in the direction of people or a place where people may be found.

That is, during or around March 2003, the defendant planned, together with Wael, Ahmed and Anas, to plant an explosive device against guards who were securing roadwork in the area of North Qalqilya. Ahmed offset up a look out in the area, and as a result of his findings, the defendant and his friends decided that the attack would be a shooting attack and not planting an explosive device. In accordance with the plan concocted, Wael would drive Ahmed and an additional attacker, who would carry out the shooting together.

[signature]
Liron Averbach, Legal Officer
Military Prosecutor

**Prosecution Witnesses:**

1. 972384 Master Sergeant Metanas Hadad (took witnesses confession 28.4.03)
2. 995052 Master Sergeant Amir Abu Saad (took witnesses confession 8.5.03)
3. 904121282 Mohamed Fahamu Ahmed Jabber (arrested – T"T 92/03)
4. 906461785 Shaher Abdallah Dib Aamar (arrested – T"T 386/01)
5. 941563249 Jamal Amin Moustafa Hindi-Zeid (arrested – T'T 1014/02)
6. 903685428 Ahmed Ismail Ahmed awini (arrested – T"T 448/01)
7. 907802391 Anas Samih Yousef Shanti (arrested – T"T 532/30)

**SHATSKY 007486-T (continued)**

**Detailed Incident File 8085/01 (Haifa)**

8. 92447 Sagi Matza (Northern Explosives Laboratory – prepares accompanying forms for exhibits, 18/6/01).
9. Expert opinion in the name of Yehuda Noboselsky.
10. Queries for location and display of vehicle information.
11. 51131555 Second Sergeant Haim Geva (Civil Guard volunteer – wrote up action report, 17/6/01 + אמרה).
12. Leah Forer (Civil Guard volunteer – details with the prosecution).
13. Alon Balmas (Civilian – complainant – details with the prosecution).
14. Moran Naftali (Civilian – complainant – details with the prosecution).
15. Siham Mahmed Intabawi (Civilian – complainant – details with the prosecution).
16. 921859807 Ibrahim Assad Daoud (arrested T"T 1270/03).

17. Date: 08/08/04 1 File Number: 6358/03

**Military Tribunal**

**S A M A R I A**

**- TRANSCRIPT -**

---

Court Hearing from: 08/08/04 Before Panel: Lt. Col. Erez Hason – Court President

Lt. Col. Anat Ziso – Judge

Major Tali Fried – Judge

Prosecutor: Judicial Officer Ihab Halabi

Defense counsel: Adv. Aardeh + Adv. Agabrieh

**Defendant: Nur a-Din Adnan Said Daoud I.D. No. 913368981**

Stenographer: Corporal Lena

Interpreter: Sergeant Bahaa

---

**The President of the Court identified the defendant -**

Defendant: I am also represented by Adv. Agabrieh

Prosecutor and Defense Counsel: We have reached a plea bargain by which the indictment will be amended (the prosecutor submits an amended indictment). The parties request to impose the following sentence upon the defendant:

22 years of actual imprisonment and suspended imprisonment at the court's discretion.

**The Court clarifies for the parties that it is not bound by the plea bargain between them.**

Defense Counsel: The defendant understands the amended indictment and admits [to the charges in] it.

Defendant: I certify the words of my defense counsel and admit to the amended indictment.

**SHATSKY 007487-T (continued)**

**<u>VERDICT</u>**

In light of his admission we hereby find the defendant guilty of the crimes attributed to him in the amended indictment:

**Membership** – an offense according to regulation 85(1)(a) of the Defense (Emergency) Regulations, 1945.

**Attempted intentional manslaughter** - an offense according to Section 51(a) of the directive regarding security provisions (Judea & Samaria) (No. 378), 5730 – 1970 and according to Section 19, 20 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 - 1968.

**Assistance in the placement of an explosive device**, an offense according to regulation 58(b) of the defense (emergency) regulations, 1945, and according to section 2 and 14 of the directive regarding the rules of responsibility for a crime.

**Shooting at a person**, an offense according to regulation 58(a) of the defense (emergency) regulations 1945 (2 counts).

**Conspiracy to shoot at a person**, an offense according to regulation 58(a) of the defense (emergency) regulations 1945 and according to sections 21, 22 of the directive regarding the rules of responsibility for a crime (Judea & Samaria) (No. 225), 5728 – 1968 (2 counts).

Submitted and notified today 08/08/04, publicly and in the presence of the parties.

| [stamp-illegible] | [signature] | ______________________ |
|---|---|---|
| **Judge** | **President** | **Judge** |

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 12 of 22

**SHATSKY 007488-T**

**Evidence for Sentencing**

Prosecutor: There is no evidence for sentencing

Defense Counsel: There is no evidence for sentencing

**Prosecutor Summation:**

I request that the [plea] bargain be honored. We have primarily taken into consideration the fate of the defendant's co-conspirator from Court file number 5240/03, who was convicted, among other things, of the more serious crime of placement of an explosive device, and the court sentenced him to 15 years of actual in prison, while here, the defendant was convicted of aiding and abetting the serious crime. I would note that no damage was caused from the actions of the defendant and he chose to conclude his matter via a confession without witness testimony.

In light of the above, and the clean past record of the defendant, I hereby request to honor the agreement.

**Defense Counsel Summation:**

Thank G-d no harm came as a result of the defendant's activities, aside from him being injured himself during the course of his activities. The defendant became entangled with a group of military activists, all of whom that are still alive, have stood trial before this court, and all of whom are more senior than him, which they will attest, the amendments made to the indictment.

With regards to Count 3, which is aiding and abetting the planting of an explosive device, where the defendant became aware of the explosive device during the course of the operation. With regards to the attempt, the defendant was present and fired only in the air, and on other occasions no harm was caused, and he chose to confess, to save the court's time, he avoided the testimony of 16 witnesses.

22 years incarceration is a punishment which carries both retribution and deterrence for both the defendant and others, I hereby request the adoption of the agreement.

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 13 of 22

**SHATSKY 007487-T (continued)**

**SENTENCE**

In these circumstances, despite the fact that the defendant was involved in the very serious activity of smuggling a booby-trapped motorcycle into the boundaries of a civilian city, in light of the punishment agreed on by the parties, which in itself is not light, in consideration of the fact that ultimately, no one was injured, the fact the shooting done by the defendant was in the air, and as a result of that there were no injuries sustained by anyone, we have decided that it is appropriate to accept the [plea] bargain reached by the parties.

Therefore, we hereby sentence the defendant to the following sentences:

A. 22 years of actual impriosnment, to run from the day of his arrest.

B. An additional 3 years suspended imprisonment for a period of 5 years from the date of his release from prison, and the condition being that he shall not commit any of the above offenses for which he was convicted, or any offenses similar to them.

**Right of Appeal as Determined by Law**

Submitted and notified today 08/08/04, in public and in the presence of the parties.

| [signature – illegible] | [signature – illegible] | [signature-illegible] |
|---|---|---|
| **Judge** | **President** | **Judge** |

# Original

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 15 of 22

**צבא הגנה לישראל**

בבית המשפט הצבאי
ש ו מ ר ו ן
בפני הרכב

תיק בימ"ש 03 / 6358
תיק תביעה 03 / 699
תיק פ.א. 03 / 2496
(פתח תקווה)

במשפט שבין:

**התובע הצבאי**

**- המאשים -**

**- נ ג ד -**

**נור אלדין עדנאן סעיד דאוד (טיטאן)**

(עצור מיום 23/4/03)

ת.ז. 913368981 יליד 10/10/79 מקלקיליה

**- הנאשם -**

**כתב אישום מתוקן ליום 08.08.04 (במסגרת הסדר)**

הנאשם הנ"ל מואשם בזה בעבירות הבאות:

**פרט ראשון:**

**מהות העבירה:** חברות בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באזור, היה חבר בארגון החזית העממית, שהוא התאחדות בלתי מותרת.

דהיינו, בשנת 1998 פנה הנאשם למשרד החזית העממית בקלקיליה, שם נפגש עם פעיל הארגון שאהר ראעי. הנאשם ביקש משאהר לגייסו לארגון, ושאהר נעתר בחיוב.

בחודש אוקטובר 2000 או בסמוך לכך, הציע ראיד נזאל לנאשם להצטרף לפעילות צבאית במסגרת ארגון החזית העממית, והנאשם הסכים והצטרף לחוליה צבאית של הארגון, בה היו חברים גם מוחמד ג'בר ותחסין יוסף דאוד המכונה "אלעדלי" (להלן: "תחסין").

חברותו של הנאשם בחוליה הצבאית נמשכה עד למעצרו.

SHATSKY-007481

**פרט שני:**

**מהות העבירה**: ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יו"ש) (מס' 378), התש"ל - 1970 וסעיפים 14, 19, 20 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשם הנ"ל היה שותף לניסיון לגרום למותם של אחרים בכוונה.

דהיינו, בתחילת שנת 2001 או בסמוך לכך, ביקש פעיל חז"ע מאהר עלי אחמד ראעי (להלן: "מאהר") מהנאשם ומאחמד אסמעיל עוויני לבצע פיגוע ירי. השניים הסכימו, ומאהר נתן לנאשם אקדח ולאחמד רובה קלצ'ניקוב.

בהמשך, נסעו הנאשם ואחמד עם סלים ג'עידי, ברכבו של האחרון לפרדס הסמוך לכביש חוצה ישראל, מול כפר סבא. הנאשם ואחמד התקדמו רגלית לעבר הכביש והתמקמו בסמוך לו. כעבור כרבע שעה, עבר במקום רכב "מאגנום" לבן, ואז פתח אחמד בירי אוטומאטי לעברו. הנאשם ירה חמישה כדורים באויר, ולאחר מכן נמלטו הוא וחבריו מהמקום.

**פרט שלישי:**

**מהות העבירה**: סיוע להנחת פצצה, עבירה, עבירה לפי תקנה 58(ב) לתקנות ההגנה (שעת חירום), 1945, ולפי סע' 2, ו- 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשם הנ"ל סייע לאחרים בהנחת פצצה, דהיינו:

א. בחודש יוני 2001 או בסמוך לכך, נפגש מאהר עם פעיל החז"ע מוחמד פהמי אחמד ג'בר (להלן: "מוחמד") בבית הקברות בקלקיליה. מאהר אמר למוחמד כי ברצונו למלכד קטנוע ולהחדירו לישראל. מוחמד שאל מה יהיה תפקידו בביצוע הפיגוע, ומאהר ענה כי על מוחמד יהיה להכניס את הקטנוע לתחומי ישראל. בתגובה, אמר מוחמד כי אינו מכיר את ישראל וכי אינו יודע כיצד לנהוג בקטנוע, ולכן ביקש ממנו מאהר לאתר אדם מתאים לביצוע המשימה.

ב. למחרת, פנה מוחמד לשהיר עבדאללה דיב עאמר (להלן: "שהיר"), אמר לו כי הוא פעיל בזרוע הצבאית של ארגון החז"ע, והציע לו להתגייס לארגון. שהיר הסכים. מאוחר יותר, נפגש מוחמד עם מאהר ודיווח לו על גיוסו של שהיר לארגון החז"ע. מוחמד אמר למאהר כי שהיר מכיר את ישראל וכי הוא מתאים לביצוע משימת החדרת קטנוע התופת לישראל. בתגובה, הסכים מאהר להטיל את המשימה על שהיר.

ג. כעבור כיומיים, נפגש מוחמד בשנית עם שהיר והודיע לו כי נדרש ממנו להעביר מכוניות תופת למקומות שייקבעו. שהיר הסכים לכך, אך רק בתנאי שהוא יבחר את המקומות להנחת מכוניות התופת, מאחר ואינו סומך על איש. מוחמד השיב כי השניים יעבדו יחדיו, והוסיף כי יש ברשות החז"ע בקלקיליה מטעני חבלה מוכנים להנחתם בישראל, וכן רימוני יד וכלי נשק נוספים. כמו כן אמר מוחמד לשהיר כי תוך זמן קצר ייפגשו השניים שוב, על

מנת שיטיל עליו משימה לביצוע ביום ו' הקרוב. מוחמד אמר לשהיר כי ייתן לאחרון מכשיר טלפון סלולרי וכינויים, ויסביר לו בהרחבה על הפעולה אותה יבצע ביום ו'.

ד. ביום ו' ה- 15/6/01 או בסמוך לכך, נפגשו מוחמד ושהיר. מוחמד סיפר לשהיר כי מצוי ברשותו קטנוע תופת מוכן, וביקשו לבחור מקום בו יניח את הקטנוע. שהיר השיב ואמר כי הוא מעוניין להניחו בחיפה. מוחמד אמר לשהיר כי נתניה קרובה יותר, והאחראים מבכרים כי הקטנוע יונח בה. ברם, בסופו של דבר סיכמו השניים להניח את הקטנוע בחיפה. מוחמד אמר לשהיר כי ימסור לו מספר טלפון של אדם המכונה "חלילי", כדי שהלה יאספו לאחר הנחת הקטנוע. מוחמד ביקש משהיר לומר ל"חלילי" כי כינויו הוא "ג'סאן".

ה. שהיר שב לביתו, התקלח וגילח את זקנו. בינתיים, פנה מוחמד אל **הנאשם** וביקש ממנו להעביר עבורו קטנוע ממקום למקום. **הנאשם** הסכים ואסף קטנוע אפור מ"ר 54-525-58, בעל ארגז שחור מאחור, וכן קסדה לבנה (הקטנוע נגנב בישראל ביום 31/5/01). **הנאשם** הבין כי הקטנוע הכבד ממולכד, וכי מוחמד מבקש לבצע באמצעותו פיגוע בישראל.

ו. בשעת צוהריים, התקשר מוחמד למכשיר הטלפון הסלולרי של שהיר, שמספרו 050-351332, ובא לאוספו. מוחמד הוריד את שהיר במוסכו, שם המתין האחרון זמן מה. מוחמד מסר לשהיר סוללה של מטען, ואמר לו כי עליו להרכיבה על מטען החבלה שבקטנוע. מוחמד הוסיף כי בקטנוע ישנו מכשיר טלפון סלולרי נוסף, וכי יסביר לו על אופן הפעלת המטען עת יביא את הקטנוע. כמו כן, הזהיר מוחמד את שהיר לבל ישוחח בטלפון הנייד על הפעולה אותה הוא עומד לבצע. לאחר מכן, מסר מוחמד לשהיר 400 ש"ח, דמי נסיעות.

ז. בשעות הערב, נסעו השניים לדרך חבלה הישנה. אל המקום הגיע **הנאשם**, ועימו הקטנוע האמור. מוחמד הציג את הקטנוע בפני שהיר, אשר הבחין בתיק שחור קטן שהונח בארגז, ממנו יצאו חוטים המחוברים לשני מכשירי טלפון ניידים (האחד עם סוללה והאחר ללא סוללה), וכן מתג להפעלה. המטען היה מכוסה בוופלים וביסקוויטים.

ז. מוחמד הסביר לשהיר כי על מנת להפעיל את המטען, עליו לחבר את הסוללה החסרה למכשיר הטלפון הנייד המתאים, ולהפעיל את המתג. כמו כן, הסביר מוחמד לשהיר כיצד לנהוג בקטנוע, כיוון ששהיר לא נהג בקטנוע כזה מעולם. מוחמד שאל את שהיר מהיכן הוא מעונין לצאת, ואמר לו כי יסדר עבורו משקיפים מהחז"ע, על מנת לוודא כי הדרך פנויה. שהיר השיב כי אין זה חשוב לו, ומוחמד אמר כי פעילי החז"ע יראו לו מהיכן לצאת.

ח. לפיכך, יצא **הנאשם**, שהיה יחד עם מוחמד ושהיר כל אותה עת, ובדק את הדרך עד לאלפי מנשה. כעבור זמן קצר, שב **הנאשם** ואמר כי הדרך "נקייה". שהיר יצא עם הקטנוע ובו המטען לכיוון מחסום ג'לג'וליה. מאחוריו, ברכב נפרד, ליווהו **הנאשם** ומוחמד. שהיר הגיע למחסום של הרש"פ, שם ראה את

יוסף אלראעי, המוכר לו כחבר בחז"ע, עומד בצד ומשוחח בטלפון נייד. הלה אותת לשהיר לעבור את המחסום. **הנאשם** וחבריו עברו את המחסום ללא דיחוי. לאחר כמאתיים מטר, הגיע שהיר לערמת עפר שחסמה את הציר. שהיר לא הצליח לצלוח את הערמה, ולפיכך יצא **הנאשם** וסייע לו בכך.

ט. לאחר מכן, המשיך שהיר לבדו. כעבור זמן קצר, הגיע לחיפה, לכיכר "פריז". בסמוך למסעדת "אחים סאלח", ברחוב המגינים, החנה שהיר את קטנוע התופת. לאחר מכן, נכנס שהיר לחנות משקאות סמוכה, בה הבחין במספר אנשים, שנראו לו כבעלי חזות רוסית. שהיר החנה את קטנוע התופת במרחק מטרים ספורים מהם, קנה סיגריות ומשקה ושב לקטנוע התופת. אז, פתח שהיר את הקטנוע, ועשה עצמו מוציא חבילת וופלים. למעשה, הוציא שהיר את הסוללה שהייתה בכיסו, והניחה בארגז. שהיר, שחשש להפעיל את המטען פן יתפוצץ, הניח את הקסדה על האופנוע ופנה למסעדה סמוכה. משם, התקשר שהיר למוחמד ומסר לו כי המטען הונח ע"פ התכנון. מוחמד אמר לו כי יפעיל בעצמו את המטען עם שובו של שהיר לקלקיליה. אז, התקשר שהיר ל"חליל" וביקש כי יבוא לאוספו.

י. כעבור זמן קצר, אסף אחמד אסמעיל עוויני, הוא המכונה "חליל", את שהיר, והסיעו לקלקיליה. בקלקיליה, פנה מוחמד אל שהיר ואמר לו כי אין הוא מצליח להפעיל את המטען. שהיר אמר לו כי הוא מוכן לשוב לחיפה ולבדוק את המטען. מוחמד השיב כי יבחן את הנושא. לאחר שעה קלה, מסר מוחמד לשהיר כי האחראים מתנגדים לרעיון שובו לחיפה, מחשש לחייו.

יא. קטנוע התופת נתגלה ע"י מתנדבי המשמר האזרחי בלילה שבין 17/6/01 לבין 18/6/01.

**פרט רביעי:**

**מהות העבירה:** ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום) 1945 ולפי סעיף 14 לצו בדבר כללי האחריות לעבירה (י"וש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור, ביצע ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו.

דהיינו, במהלך שנת 2002, נודע לנאשם ולעסכר כי מוצטפא שתיוי נעצר ע"י כוחות מיוחדים בקלקיליה. השניים נסעו לאזור "אלסחה", שם נשאר הנאשם לבדו כשהוא נושא רובה M-16 שלקח מעסכר.

כאשר הבחין בג'יפ צבאי, כיוון לעברו הנאשם את רובהו, וניסה לבצע ירי לעברו. ברם, מעצור ברובה מנע את הירי. הנאשם כיוון את הרובה לאוויר ואז הצליח לירות 3 כדורים. על כן, שב הנאשם וכיוון את הרובה לעבר הג'יפ, אולם גם הפעם לא הצליח לבצע ירי לעברו. על כן, עזב הנאשם את המקום.

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 19 of 22

**פרט חמישי**:

**מהות העבירה**: ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום) 1945 ולפי סעיף 14 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור, ביצע ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו.

דהיינו, בחודש דצמבר 2002 או בסמוך לכך, יצאו הנאשם, תחסין, אחמד עטיה חמיס (להלן: "אחמד") ואנס סמיח יוסף שנטי (להלן: "אנס") להניח מטען חבלה על כביש טולכרם - קלקיליה. מטען החבלה, אותו נשאו עימם חברי החוליה, הורכב מבלון גז כחול גדול, המופעל באמצעות מנגנון חשמלי, ואשר משקלו עשרות ק"ג.

בדרכם אל הכביש האמור, נתקלו הנאשם וחבריו בכוח צבאי, אשר פתח לעברם באש. אנס ותחסין ירו לעבר הצבא, ונמלטו ביחד עם הנאשם ואחמד בחזרה לקלקיליה.

**פרט שישי**:

**מהות העבירה**: קשירת קשר לירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום) 1945 ולפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשם הנ"ל, באזור, קשר עם אחר קשר לבצע ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו.

דהיינו, בחודש פברואר 2003 או בסמוך לכך, תכנן הנאשם עם ואיל אבו קמר, אנס ואחמד לבצע פיגוע ירי לעבר רכב ישראלי או סיור צבאי בסמוך לאלפי מנשה. למחרת, נודע לאנס כי אחמד ואדם נוסף הוציאו אל הפועל את התכנון וביצעו את הפיגוע.

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 20 of 22

**פרט שמיני**:

**מהות העבירה**: קשירת קשר לירי לעבר אדם או מקום שבני אדם עשויים להימצא בו, עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום) 1945 ולפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יו"ש) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה**: הנאשם הנ"ל, באזור, קשר עם אחר קשר לבצע ירי לעבר אדם או מקום שבני אדם עשויים להימצא בו.

דהיינו, בתחילת חודש מרץ 2003 או בסמוך לכך, תכנן הנאשם עם ואיל, אחמד ואנס לבצע פיגוע הנחת מטען כנגד שומרים המאבטחים עבודות-דרך באזור צפון קלקיליה. אחמד ערך תצפית במקום, ובעקבות ממצאיו, החליטו הנאשם וחבריו כי הפיגוע שיבוצע יהיה פיגוע ירי ולא הנחת מטען חבלה. בהתאם לתוכנית שנרקמה, יסיע ואיל את אחמד ומפגע נוסף, אשר יבצעו יחדיו את הירי.

**לירון אברבך, קמ"ש**
**תובע צבאי**

**עדי התביעה:**

1. 927384 רס"מ מטאנס חדאד (גובה הודאת הנאשם 28/4/03).
2. 995052 רס"ל אמיר אבו סעד (גובה הודאת הנאשם 8/5/03).
3. 904121282 מוחמד פהמי אחמד ג'בר (עצור - ת"ת 92/03).
4. 906461785 שהיר עבדאללה דיב עאמר (עצור - ת"ת 386/01).
5. 941563249 ג'מאל אמין מוצטפא הינדי-זיד (עצור - ת"ת 1014/02).
6. 903685428 אחמד אסמעיל אחמד עוויני (עצור - ת"ת 448/01).
7. 907802391 אנס סמיח יוסף שנטי (עצור - ת"ת 532/03).

**מפ"א 8085/01 (חיפה)**

8. 92447 שגיא מצא (מעבדת חבלה צפון - עורך טופס לוואי למוצגים, 18/6/01).
9. חוות דעת מומחה ע"ש יהודה נובוסלסקי.
10. שאילתות לאיתור והקרנת פרטי כלי רכב.
11. 51131555 סמ"ש חיים גבע (מתנדב משא"ז - עורך דוח פעולה, 17/6/01 + אמרה).
12. לאה פורר (מתנדבת משא"ז - פרטים בתביעה).
13. אלון בלמס (אזרח - מתלונן - פרטים בתביעה).
14. מורן נפתלי (אזרחית - מתלוננת - פרטים בתביעה).
15. סיהאם מחמד עינבתאווי (אזרחית - מתלוננת - פרטים בתביעה).
16. 921859807 אברהים אסעד דאוד (עצור - ת"ת 1270/03).

Case 1:02-cv-02280-RJL Document 254-4 Filed 11/12/13 Page 21 of 22

תאריך: 08/08/04

תיק מס': 6358/03

1

**בית המשפט הצבאי**
**ש ו מ ר ו ן**
**-פ ר ו ט ו ק ו ל-**

דיון בית משפט מיום: 08/08/04

בפני ההרכב: סא"ל ארז חסון - אב"ד
סא"ל ענת זיסו- שופטת
רס"ן טלי פריד- שופטת

תובע: קמ"ש איהאב חלבי
סניגור: עו"ד עארדה + עו"ד אגברייה

**נאשם: נור אלדין עדנאן סעיד דאוד ת.ז.: 913368981**

רשמת: רב"ט לנה
מתורגמן: סמל בהאא

**- אב"ד זיהה את הנאשם -**

נ: מייצג אותי גם עו"ד אגברייה.

ת+ס: הגענו להסדר טיעון לפיו יתוקן כת"א (תובע מגיש כת"א מתוקן). הצדדים מבקשים לגזור על הנאשם את העונשים הבאים:
22 שנות מאסר לריצוי בפועל ומאסר על תנאי לשיקול דעת ביהמ"ש.

**ביהמ"ש מבהיר לצדדים כי אינו כבול בהסדר הטיעון ביניהם.**

ס: הנאשם מבין את כת"א המתוקן ומודה בו.
נ: אני מאשר את דברי סניגורי ומודה בכת"א המתוקן.

**<u>הכרעת דין</u>**

לאור הודאתו הרינו מרשיעים את הנאשם בעבירות המיוחסות לו בכת"א המתוקן:

**חברות** – עבירה לפי תקנה 85 (1)(א) לתקנות ההגנה (שעת חירום), 1945.
**ניסיון גרימת מוות בכוונה** – עבירה לפי סע' 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס' 378), התש"ל – 1970 ולפי סע' 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח – 1968.
**סיוע להנחת פצצה**– עבירה לפי תקנה 58(ב) לתקנות ההגנה (שעת חירום), 1945 ולפי סע' 2 ו-14 לצו בדבר כללי האחריות לעבירה.
**ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 (2 פרטי אישום).
**קשירת קשר לירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ולפי סע' 21,22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח – 1968 (2 פרטי אישום).

ניתן והודע היום 08/08/04, בפומבי ובמעמד הצדדים.

רס"ן טלי פריד 4525799
שופטת בית משפט צבאי שומרון

| שופטת | נשיא | שופטת |
|---|---|---|

SHATSKY-007487

**ראיות לעונש**

ת: אין ראיות לעונש.

ס: אין ראיות לעונש.

**תובע מסכם:**

אבקש לכבד את ההסדר. התחשבנו בעיקר בגורל שותפו של הנאשם מתיק ביהמ"ש 5240/03, אשר הורשע בין היתר בעבירה החמורה ביותר של הנחת פצצה, וביהמ"ש גזר דינו ל-15 שנות מאסר בפועל, בעוד שכאן הנאשם הורשע בסיוע לעבירה החמורה. אציין כי ממעשיו של הנאשם לא נגרם כל נזק והוא בחר לסיים את עניינו בדרך של הודאה ללא שמיעת עדים.

לאור האמור ולאור עברו הנקי של הנאשם אבקש לכבד את ההסדר.

**סניגור מסכם:**

נודה לאל שלא נגרמו נזקים ממעשי הנאשם, חוץ מאשר שהוא בעצמו נפצע במהלך פעילותו. הנאשם השתרבב לקבוצה של פעילים צבאיים שכולם, אלה מהם שעוד בחיים, עמדו לדין בפני בית משפט זה, וכולם בכירים ממנו ויעידו על כך התיקונים שבוצעו בכת"א.

באשר לפ"א 3, שהוא סיוע להנחת פצצה, כאשר לנאשם נודע על הפצצה תוך כדי הפעולה.

באשר לפרט הניסיון, הנאשם היה נוכח וירה רק באוויר, ובהזדמנויות אחרות לא נגרם נזק, והוא בחר להודות, לחסוך מזמן ביהמ"ש, הוא חסך שמיעת 16 עדים.

22 שנות מאסר הינו עונש שיש בו גמול והרתעה לנאשם ולאחרים. אבקש לאמץ את ההסדר.

**גזר דין**

בנסיבות העניין, על אף העובדה כי הנאשם היה מעורב במעשה חמור ביותר של החדרת קטנוע תופת לתחומי עיר אזרחית, לאור העונש אליו הגיעו הצדדים, אשר גם הוא איננו קל, לאור העובדה כי בסופם של דברים, לא נגרמו נפגעים בנפש, העובדה כי מעשי הירי שבוצעו ע"י הנאשם בוצעו באוויר, וכתוצאה מהם גם לא נגרמו נפגעים, מצאנו לנכון לכבד את ההסדר אליו הגיעו הצדדים.

אשר על כן, הרינו גוזרים על הנאשם את העונשים הבאים:

א. 22 שנות מאסר לריצוי בפועל, מניינן החל מיום מעצרו.

ב. 3 שנות מאסר על תנאי למשך 5 שנים מיום שחרור הנאשם מכלאו, והתנאי הוא שלא יעבור עבירה מן העבירות בהן הורשע או דומה לאחת מהן.

**זכות ערעור כחוק**

ניתן והודע היום 08/08/04, בפומבי ובמעמד הצדדים.

שופטת　　　נשיא　　　שופטת