**LOWELL DECL. EX. 89**

Exhibit 57

| 108th Congress<br>1st Session | JOINT COMMITTEE PRINT | S. Prt.<br>108–30 |
|---|---|---|

# COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2002

## VOLUME II

R E P O R T

SUBMITTED TO THE

## COMMITTEE ON FOREIGN RELATIONS
## U.S. SENATE

AND THE

## COMMITTEE ON INTERNATIONAL RELATIONS
## U.S. HOUSE OF REPRESENTATIVES

BY THE

## DEPARTMENT OF STATE

IN ACCORDANCE WITH SECTIONS 116(d) AND 502B(b) OF THE
FOREIGN ASSISTANCE ACT OF 1961, AS AMENDED



JULY 2003

Printed for the use of the Committees on Foreign Relations of the U.S.
Senate and International Relations of the U.S. House of Representatives
respectively

SHATSKY-008390

SHATSKY-008391

# COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2002—VOLUME II

SHATSKY-008392

SHATSKY-008393

| 108th Congress 1st Session | JOINT COMMITTEE PRINT | S. Prt. 108–30 |
|---|---|---|

# COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2002

## VOLUME II

———

R E P O R T

SUBMITTED TO THE

## COMMITTEE ON FOREIGN RELATIONS U.S. SENATE

AND THE

## COMMITTEE ON INTERNATIONAL RELATIONS U.S. HOUSE OF REPRESENTATIVES

BY THE

## DEPARTMENT OF STATE

IN ACCORDANCE WITH SECTIONS 116(d) AND 502B(b) OF THE FOREIGN ASSISTANCE ACT OF 1961, AS AMENDED



JULY 2003

Printed for the use of the Committees on Foreign Relations of the U.S. Senate and International Relations of the U.S. House of Representatives respectively ———

U.S. GOVERNMENT PRINTING OFFICE

88–454 PDF       WASHINGTON : 2003

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

SHATSKY-008394

## COMMITTEE ON FOREIGN RELATIONS

RICHARD G. LUGAR, Indiana, *Chairman*

CHUCK HAGEL, Nebraska
LINCOLN D. CHAFEE, Rhode Island
GEORGE ALLEN, Virginia
SAM BROWNBACK, Kansas
MICHAEL B. ENZI, Wyoming
GEORGE E. VOINOVICH, Ohio
LAMAR ALEXANDER, Tennessee
NORM COLEMAN, Minnesota
JOHN E. SUNUNU, New Hampshire

JOSEPH R. BIDEN, JR., Delaware
PAUL S. SARBANES, Maryland
CHRISTOPHER J. DODD, Connecticut
JOHN F. KERRY, Massachusetts
RUSSELL D. FEINGOLD, Wisconsin
BARBARA BOXER, California
BILL NELSON, Florida
JOHN D. ROCKEFELLER IV, West Virginia
JON S. CORZINE, New Jersey

KENNETH A. MYERS, JR., *Staff Director*
ANTONY J. BLINKEN, *Democratic Staff Director*

————

## COMMITTEE ON INTERNATIONAL RELATIONS

HENRY J. HYDE, Illinois, *Chairman*

JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
CHRISTOPHER H. SMITH, New Jersey,
  *Vice Chairman*
DAN BURTON, Indiana
ELTON GALLEGLY, California
ILEANA ROS-LEHTINEN, Florida
CASS BALLENGER, North Carolina
DANA ROHRABACHER, California
EDWARD R. ROYCE, California
PETER T. KING, New York
STEVE CHABOT, Ohio
AMO HOUGHTON, New York
JOHN M. McHUGH, New York
THOMAS G. TANCREDO, Colorado
RON PAUL, Texas
NICK SMITH, Michigan
JOSEPH R. PITTS, Pennsylvania
JEFF FLAKE, Arizona
JO ANN DAVIS, Virginia
MARK GREEN, Wisconsin
JERRY WELLER, Illinois
MIKE PENCE, Indiana
THADDEUS G. McCOTTER, Michigan
WILLIAM J. JANKLOW, South Dakota
KATHERINE HARRIS, Florida

TOM LANTOS, California
HOWARD L. BERMAN, California
GARY L. ACKERMAN, New York
ENI F.H. FALEOMAVAEGA, American
  Samoa
DONALD M. PAYNE, New Jersey
ROBERT MENENDEZ, New Jersey
SHERROD BROWN, Ohio
BRAD SHERMAN, California
ROBERT WEXLER, Florida
ELIOT L. ENGEL, New York
WILLIAM D. DELAHUNT, Massachusetts
GREGORY W. MEEKS, New York
BARBARA LEE, California
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
EARL BLUMENAUER, Oregon
SHELLEY BERKLEY, Nevada
GRACE F. NAPOLITANO, California
ADAM B. SCHIFF, California
DIANE E. WATSON, California
ADAM SMITH, Washington
BETTY McCOLLUM, Minnesota
CHRIS BELL, Texas

THOMAS E. MOONEY, SR., *Staff Director/General Counsel*
ROBERT R. KING, *Democratic Staff Director*

(ii)

# CONTENTS

| | Page |
|---|---|
| Foreword | vii |
| Letter of Transmittal | ix |
| Preface | xi |
| Overview and Acknowledgments | xiii |
| Introduction | xvii |

VOLUME I

AFRICA:

| | |
|---|---|
| Angola | 1 |
| Benin | 20 |
| Botswana | 30 |
| Burkina Faso | 40 |
| Burundi | 50 |
| Cameroon | 65 |
| Cape Verde | 85 |
| Central African Republic | 91 |
| Chad | 105 |
| Comoros | 119 |
| Congo, Democratic Republic of the | 124 |
| Congo, Republic of | 150 |
| Cote d'Ivoire | 160 |
| Djibouti | 188 |
| Equatorial Guinea | 197 |
| Eritrea | 208 |
| Ethiopia | 219 |
| Gabon | 246 |
| Gambia, The | 255 |
| Ghana | 265 |
| Guinea | 284 |
| Guinea-Bissau | 297 |
| Kenya | 305 |
| Lesotho | 333 |
| Liberia | 341 |
| Madagascar | 356 |
| Malawi | 367 |
| Mali | 379 |
| Mauritania | 387 |
| Mauritius | 400 |
| Mozambique | 406 |
| Namibia | 423 |
| Niger | 436 |
| Nigeria | 447 |
| Rwanda | 473 |
| Sao Tome and Principe | 486 |
| Senegal | 490 |
| Seychelles | 502 |
| Sierra Leone | 508 |
| Somalia | 521 |
| South Africa | 532 |
| Sudan | 557 |
| Swaziland | 575 |
| Tanzania | 586 |

(iii)

SHATSKY-008396

iv

Page

AFRICA—CONTINUED

Togo ............................................................................................ 603
Uganda ....................................................................................... 615
Zambia ....................................................................................... 640
Zimbabwe ................................................................................... 654

EAST ASIA AND THE PACIFIC:

Australia ..................................................................................... 689
Brunei ......................................................................................... 704
Burma ......................................................................................... 712
Cambodia .................................................................................... 732
China (includes Hong Kong and Macau) ................................. 749
China (Taiwan only) .................................................................. 820
East Timor .................................................................................. 832
Fiji .............................................................................................. 841
Indonesia .................................................................................... 852
Japan .......................................................................................... 883
Kiribati ....................................................................................... 899
Korea, Democratic People's Republic of .................................. 903
Korea, Republic of ..................................................................... 915
Laos ............................................................................................ 929
Malaysia ..................................................................................... 941
Marshall Islands ........................................................................ 972
Micronesia, Federated States of .............................................. 977
Mongolia ..................................................................................... 981
Nauru ......................................................................................... 990
New Zealand ............................................................................... 994
Palau ........................................................................................... 1001
Papua New Guinea ..................................................................... 1006
Philippines ................................................................................. 1012
Samoa ......................................................................................... 1030
Singapore .................................................................................... 1035
Solomon Islands ......................................................................... 1052
Thailand ..................................................................................... 1059
Tonga .......................................................................................... 1079
Tuvalu ......................................................................................... 1083
Vanuatu ...................................................................................... 1087
Vietnam ...................................................................................... 1091

EUROPE AND EURASIA:

Albania ....................................................................................... 1115
Andorra ...................................................................................... 1127
Armenia ...................................................................................... 1131
Austria ........................................................................................ 1148
Azerbaijan .................................................................................. 1159
Belarus ....................................................................................... 1173
Belgium ...................................................................................... 1196
Bosnia and Herzegovina ........................................................... 1204
Bulgaria ...................................................................................... 1229
Croatia ........................................................................................ 1249
Cyprus ........................................................................................ 1266
Czech Republic .......................................................................... 1278
Denmark ..................................................................................... 1291
Estonia ....................................................................................... 1296
Finland ....................................................................................... 1304
France ......................................................................................... 1308
Georgia ....................................................................................... 1318
Germany ..................................................................................... 1338
Greece ......................................................................................... 1352
Hungary ...................................................................................... 1365
Iceland ........................................................................................ 1379
Ireland ........................................................................................ 1387
Italy ............................................................................................ 1395
Kazakhstan ................................................................................ 1407
Kyrgyz Republic ........................................................................ 1432
Latvia ......................................................................................... 1450
Liechtenstein ............................................................................. 1459
Lithuania .................................................................................... 1464

SHATSKY-008397

v

| | Page |
|---|---|
| EUROPE AND EURASIA—CONTINUED | |
| Luxembourg | 1476 |
| Macedonia, Former Yugoslav Republic of | 1480 |
| Malta | 1500 |
| Moldova | 1504 |
| Monaco | 1523 |
| Netherlands, The | 1526 |
| Norway | 1534 |
| Poland | 1539 |
| Portugal | 1555 |
| Romania | 1564 |
| Russia | 1581 |
| San Marino | 1623 |
| Slovak Republic | 1626 |
| Slovenia | 1639 |
| Spain | 1645 |
| Sweden | 1654 |
| Switzerland | 1661 |
| Tajikistan | 1676 |
| Turkey | 1691 |
| Turkmenistan | 1721 |
| Ukraine | 1735 |
| United Kingdom | 1764 |
| Uzbekistan | 1777 |
| Yugoslavia, Federal Republic of | 1800 |

VOLUME II

| | |
|---|---|
| NEAR EAST AND NORTH AFRICA: | |
| Algeria | 1853 |
| Bahrain | 1871 |
| Egypt | 1884 |
| Iran | 1904 |
| Iraq | 1927 |
| Israel and the occupied territories | 1947 |
| Jordan | 1994 |
| Kuwait | 2012 |
| Lebanon | 2030 |
| Libya | 2045 |
| Morocco | 2054 |
| Western Sahara | 2069 |
| Oman | 2073 |
| Qatar | 2082 |
| Saudi Arabia | 2090 |
| Syria | 2108 |
| Tunisia | 2122 |
| United Arab Emirates | 2141 |
| Yemen | 2155 |
| SOUTH ASIA: | |
| Afghanistan | 2175 |
| Bangladesh | 2187 |
| Bhutan | 2217 |
| India | 2227 |
| Maldives | 2266 |
| Nepal | 2274 |
| Pakistan | 2295 |
| Sri Lanka | 2331 |
| WESTERN HEMISPHERE: | |
| Antigua and Barbuda | 2351 |
| Argentina | 2357 |
| Bahamas | 2372 |
| Barbados | 2378 |
| Belize | 2384 |
| Bolivia | 2395 |
| Brazil | 2409 |

SHATSKY-008398

vi

| | Page |
|---|---|
| WESTERN HEMISPHERE—Continued | |
| Canada | 2436 |
| Chile | 2444 |
| Colombia | 2457 |
| Costa Rica | 2500 |
| Cuba | 2510 |
| Dominica | 2530 |
| Dominican Republic | 2535 |
| Ecuador | 2554 |
| El Salvador | 2567 |
| Grenada | 2587 |
| Guatemala | 2592 |
| Guyana | 2623 |
| Haiti | 2635 |
| Honduras | 2652 |
| Jamaica | 2671 |
| Mexico | 2680 |
| Nicaragua | 2714 |
| Panama | 2732 |
| Paraguay | 2747 |
| Peru | 2759 |
| St. Kitts and Nevis | 2781 |
| Saint Lucia | 2786 |
| Saint Vincent and the Grenadines | 2791 |
| Suriname | 2797 |
| Trinidad and Tobago | 2805 |
| Uruguay | 2812 |
| Venezuela | 2820 |
| APPENDIXES: | |
| A. Notes on Preparation of the Reports | 2841 |
| B. Reporting on Worker Rights | 2845 |
| C. Selected International Human Rights Conventions | 2847 |
| D. Description of Conventions in Appendix C | 2855 |
| E. FYs 2002–2004 Selected U.S. Assistance Programs—Actual Obligations | 2856 |
| F. 58th Session of the U.N. Human Rights Commission Voting Record | 2884 |
| G. 58th Session of the U.N. Human Rights Commission Voting Table | 2890 |
| H. United Nations Universal Declaration of Human Rights | 2905 |

SHATSKY-008399

# FOREWORD

———————

The country reports on human rights practices contained herein were prepared by the Department of State in accordance with sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961, as amended. They also fulfill the legislative requirements of section 505(c) of the Trade Act of 1974, as amended.

The reports cover the human rights practices of all nations that are members of the United Nations and a few that are not. They are printed to assist Members of Congress in the consideration of legislation, particularly foreign assistance legislation.

RICHARD G. LUGAR,
*Chairman, Committee on Foreign Relations.*

HENRY J. HYDE,
*Chairman, Committee on International Relations.*

(vii)

SHATSKY-008400

Case 1:02-cv-02280-RJL Document 257-5 Filed 11/13/13 Page 18 of 79

SHATSKY-008401

# LETTER OF TRANSMITTAL

————

DEPARTMENT OF STATE,
*Washington, DC, March 31, 2003*

Hon. RICHARD LUGAR,
*Chairman, Committee on Foreign Relations.*

DEAR MR. CHAIRMAN: On behalf of the Secretary of State, I am transmitting to you the *Country Reports on Human Rights Practices for 2002,* prepared in compliance with sections 116(d)(1) and 502B(b) of the Foreign Assistance Act of 1961, as amended, and section 505(c) of the Trade Act of 1974, as amended.

We hope this report is helpful. Please let us know if we can provide any further information.

Sincerely,

PAUL V. KELLY,
*Assistant Secretary, Legislative Affairs.*

Enclosure.

(ix)

SHATSKY-008402

SHATSKY-008403

# PREFACE

———

### HUMAN RIGHTS REPORTS

The year 2002 offered a stern test for the advancement of human rights by the United States of America. This is not necessarily because human rights violations grew in number or severity—although there is no lack of challenge in that area—but because we have been given greater opportunity to make good on our commitment to uphold standards of human dignity and liberty.

The year began with American forces in combat in Afghanistan, and we continue to act there—with military, political and economic resources—to reverse the ill effects of the Taliban regime and the conditions that left unchecked its cruel disregard for human rights. Elsewhere in the world, we set our sights on further extending the blessings of liberty and security, and demonstrating not only that they are compatible, but also interdependent. We advanced these goals not as exclusively American aspirations, but rather as the birthright of all persons.

The Country Reports on Human Rights Practices for 2002 are grounded in the conviction that we must recognize the problem and describe it with full objectivity if we are to proceed to solving it. We gain little by ignoring human rights abuses or flinching from reporting them. This year's report covers 196 countries, ranging from defenders of human rights and democracy to the worst violators of human dignity. But in truth, no country is exempt from scrutiny, and all countries benefit from constant striving to identify their weaknesses and improve their performance in this less-than-perfect world. Furthermore, the Reports serve as a gauge for our international human rights efforts, pointing to areas of progress and drawing our attention to new and continuing challenges.

In a world marching toward democracy and respect for human rights; the United States is a leader, a partner and a contributor. We have taken this responsibility with a deep and abiding belief that human rights are universal. They are not grounded exclusively in American or Western values. But their protection worldwide serves a core U.S. national interest. It is with this responsibility firmly in mind that we have prepared, and now transmit, the Department of State's Country Reports on Human Rights Practices for 2002 to the U.S. Congress.

COLIN L. POWELL, *Secretary of State.*

SHATSKY-008404

SHATSKY-008405

# OVERVIEW AND ACKNOWLEDGMENTS

---

## HUMAN RIGHTS REPORTS

### WHY THE REPORTS ARE PREPARED

This report is submitted to the Congress by the Department of State in compliance with Sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961 (FAA), as amended, and Section 504 of the Trade Assistance Act of 1974, as amended. The law provides that the Secretary of State shall transmit to the Speaker of the House of Representatives and the Committee on Foreign Relations of the Senate, by February 25 "a full and complete report regarding the status of internationally recognized human rights, within the meaning of subsection (A) in countries that receive assistance under this part, and (B) in all other foreign countries which are members of the United Nations and which are not otherwise the subject of a human rights report under this Act." We have also included reports on several countries that do not fall into the categories established by these statutes and that thus are not covered by the congressional requirement.

The responsibility of the United States to speak out on behalf of international human rights standards was formalized in the early 1970s. In 1976 Congress enacted legislation creating a Coordinator of Human Rights in the Department of State, a position later upgraded to Assistant Secretary. In 1994 the Congress created a position of Senior Advisor for Women's Rights. Congress has also written into law formal requirements that U.S. foreign and trade policy take into account countries' human rights and worker rights performance and that country reports be submitted to the Congress on an annual basis. The first reports, in 1977, covered only the 82 countries receiving U.S. aid; this year 196 reports are submitted.

### HOW THE REPORTS ARE PREPARED

In August 1993, the Secretary of State moved to strengthen further the human rights efforts of our embassies. All sections in each embassy were asked to contribute information and to corroborate reports of human rights violations, and new efforts were made to link mission programming to the advancement of human rights and democracy. In 1994 the Bureau of Human Rights and Humanitarian Affairs was reorganized and renamed as the Bureau of Democracy, Human Rights and Labor, reflecting both a broader sweep and a more focused approach to the interlocking issues of human rights, worker rights and democracy. The 2002 human rights reports reflect a year of dedicated effort by hundreds of State Department, Foreign Service and other U.S. Government employees.

SHATSKY-008406

xiv

Our embassies, which prepared the initial drafts of the reports, gathered information throughout the year from a variety of sources across the political spectrum, including government officials, jurists, armed forces sources, journalists, human rights monitors, academics, and labor activists. This information-gathering can be hazardous, and U.S. Foreign Service Officers regularly go to great lengths, under trying and sometimes dangerous conditions, to investigate reports of human rights abuse, monitor elections and come to the aid of individuals at risk, such as political dissidents and human rights defenders whose rights are threatened by their governments.

After the embassies completed their drafts, the texts were sent to Washington for careful review by the Bureau of Democracy, Human Rights and Labor, in cooperation with other State Department offices. As they worked to corroborate, analyze and edit the reports, the Department officers drew on their own sources of information. These included reports provided by U.S. and other human rights groups, foreign government officials, representatives from the United Nations and other international and regional organizations and institutions, experts from academia, and the media. Officers also consulted with experts on worker rights issues, refugee issues, military and police topics, women's issues and legal matters. The guiding principle was to ensure that all relevant information was assessed as objectively, thoroughly and fairly as possible.

The reports in this volume will be used as a resource for shaping policy, conducting diplomacy and making assistance, training and other resource allocations. They also will serve as a basis for the U.S. Government's cooperation with private groups to promote the observance of internationally recognized human rights.

The Country Reports on Human Rights Practices cover internationally recognized individual, civil, political and worker rights, as set forth in the Universal Declaration of Human Rights. There rights include freedom from torture or other cruel, inhuman or degrading treatment or punishment; from prolonged detention without charges; from disappearance or clandestine detention; and from other flagrant violations of the right to life, liberty and the security of the person.

Universal human rights seek to incorporate respect for human dignity into the processes of government and law. All persons have the inalienable right to change their government by peaceful means and to enjoy basic freedoms, such as freedom of expression, association, assembly, movement and religion, without discrimination on the basis of race, religion, national origin or sex. The right to join a free trade union is a necessary condition of a free society and economy. Thus the reports assess key internationally recognized worker rights, including the right of association; the right to organize and bargain collectively; prohibition of forced or compulsory labor; the status of child labor practices and the minimum age for employment of children; and acceptable work conditions.

Within the Bureau of Democracy, Human Rights and Labor, the editorial staff of the Country Reports Team consists of: *Editor in Chief:* Cynthia R. Bunton; *Senior Advisors:* E. Michael Southwick, Michael E. Parmly, J. Scott Carpenter, Monica Vegas Kladakis, Elizabeth Dugan; *Senior Editors:* Dan Dolan, Stan Ifshin, Jennifer

SHATSKY-008407

M. Pekkinen, Kimber Shearer; *Editors:* Amanda K. Allen, Sandra
Archer, Jonathan Bemis, Christopher R. Bornhorst, Frank B.
Crump, Kathleen Daly, Jeanette Davis, Julie Eadeh, Sarah Finch,
Joan Garner, Saba Ghori, Heather Glick, Judith Greenspan, Je-
rome Hoganson, Gabrielle Hotung-Davidsen, Ann Marie Jackson,
Kari Johnstone, Jehan S. Jones, Sandra J. Murphy, Peter Neisuler,
Kathryn Northrop, Sarah Fox Ozkan, Donald E. Parker, Gary V.
Price, Ereni Roess, Lange Schermerhorn, Rebecca A. Schwalbach,
John Sheerin, James C. Todd; *Assistant Editors:* Ken Audroue,
David Abramson, Ralph D. Anske, Kelly W. Bryant, Deborah J.
Cahalen, Patricia A. Davis, Douglas B. Dearborn, Thomas F. Farr,
Carol G. Finerty, Amy E. Gadsden, Jean M. Geran, Thomas J.
Grubisha, Patrick Harvey, Nancy M. Hewett, Sandra Hodgkinson,
Victor Huser, Robert P. Jackson, Jeffrey M. Jamison, Janet L.
Mayland, Peter Mulrean, Michael Orona, Susan O'Sullivan, Rich-
ard J. Patard, Gianni F. Paz, Maria B. Pica, LeRoy G. Potts, Lynn
M. Sicade, Wendy B. Silverman, Mary T. Sullivan, Danika Walters,
George M. White; *Editorial Assistants:* Lena Auerbach, Judith R.
Baroody, Jarrett Basedow, Marianne Biron, Sally I. Buikema,
Melanne Civic, Tatiana C. Gfoeller-Volkoff, Sondra Govatski, Jessie
M. Harpole, Gabrielle Hoosein, Amy McKee, Ryan McMillan, Derek
Teeter; *Technical Support:* Daniel J. Bowens, Mitchell R. Brown,
Anthony Felder, Linda C. Hayes, Celine A. Neves, Tanika N. Wil-
lis.

SHATSKY-008408

SHATSKY-008409

# INTRODUCTION TO THE COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR THE YEAR 2002

————

Spreading democratic values and respect for human rights around the world is one of the primary ways we have of advancing the national security interests of the United States. The defense of liberty is both an expression of our ideals and a source of strength that we have drawn on throughout our history. Democratic values have also been at the heart of America's most enduring and effective alliances, partnerships which continue to help us meet the challenges of tyranny and deprivation.

The U.S. Constitution aims to "secure the blessings of liberty to ourselves and our posterity." We realize that liberty is not a finished product, and that the course set out for us by our Constitution requires vigilance. Our history is a narrative of a nation confronting and overcoming obstacles to freedom, and generations to come will also undoubtedly face the question of how to fulfill the promise of our founding documents.

The Country Reports on Human Rights Practices reflect America's diligence in the struggle to expand freedom abroad. Together with past reports, and reports to come, this compendium is a snapshot of the global state of human rights that depicts work in progress and points the way to future tasks. It is a statement of our fundamental belief that human rights are universal; they are indigenous to every corner of the world, in every culture and in every religious tradition.

## HUMAN RIGHTS AND NATIONAL SECURITY

Governments that rule by force and use violence against their own people often threaten and intimidate their neighbors. Driven by shaky legitimacy, these regimes rule by iron fist, putting their people and neighbors at the mercy of the cruel logic of repression. In an age when the destructive capacities of brutal regimes exceed national and even regional boundaries, addressing human rights violations—whether episodic or systemic—becomes imperative to the assurance of security throughout the international community. On a smaller scale, governments that breach their constitutional obligations and the rule of law place their societies' well-being at risk in their pursuit of stability.

The Country Reports on Human Rights Practices call attention to patterns and instances of violations of basic human rights as recognized in such fundamental documents as the Universal Declaration of Human Rights, adopted by the United Nations in 1948. They serve as the starting point—not the end—of U.S. policy to ad-

(xvii)

SHATSKY-008410

vance human rights around the world. The Reports are one of the most significant tools available to the U.S. Government to help determine foreign policy strategies that promote the development of democratic systems and principles, and remedy abuse and disregard for human rights. As President Bush declared in his January 2003 State of the Union address, "We will not permit the triumph of violence in the affairs of men—free people will set the course of history."

Governments can violate rights and punish people for exercising freedoms, but they cannot extinguish the inherent rights of all human beings. People who dare to dream of freedom are setting the course of history not only in democratic societies, but also in the repressive regimes under which many live.

- Cuba is a place where human rights are violated every day, but the Varela Project, organized by Oswaldo Paya, has proven a powerful tool for Cubans to express their yearning for fundamental freedoms. Marta Beatriz Roque's Assembly to Promote Civil Society is providing another avenue for Cubans to express their desires for change. These and other efforts by the opposition movement are incrementally eroding the Cuban regime's grip on power and oppression.

- In Burma, even after years of on-and-off political arrest, harassment and constant surveillance, Aung San Suu Kyi is still wholly committed to bringing democracy and a humane rule of law to the Burmese people. Her tremendous strength of character stands boldly in the face of the military regime's disregard for human rights and democracy, a disregard that extends to abuses such as extrajudicial killings, rapes, disappearances, forced labor and forced relocations.

Their courage points the way to improving human rights—on paths that are as diverse as the countries where they live. U.S. policy is based on supporting individuals and groups committed to following universally accepted paths to freedom, equal protection, due process and the rule of law.

Promoting democratic governance is and will remain the best way to ensure protection of human rights. The United States recognizes that a world composed of democracies will better protect our long-term national security than a world of authoritarian or chaotic regimes. A democratic form of government fosters the rule of law, open markets, more prosperous economies and better-educated citizens and ultimately a more humane, peaceful and predictable world.

THE YEAR IN REVIEW: HUMAN RIGHTS, DEMOCRACY AND LABOR

*Institutional changes:* In Asia, democratic politics continued to develop in East Timor, with the ratification of a constitution, election of a president, and efforts to establish governance based on the rule of law and human rights protections. Taiwan's strides were also notable, with consolidation and improvement of civil liberties catching up to its free and open electoral system.

The push to meet European Union entry requirements resulted in positive human rights developments in aspirant countries. Turkey passed extensive human rights reform packages that covered

SHATSKY-008411

xix

a broadening of laws on freedom of speech, political activity and association, and fair trial. At the same time torture, although illegal, was still a serious problem and restrictions on freedom of the press remained.

Other positive developments in Europe included the first general elections in Europe included the first general elections in Bosnia and Herzegovina to be conducted by local (not international) authorities since the Dayton Peace Accords. Macedonia also reaffirmed the strength of its democracy through peaceful elections while its parliament laid the legal groundwork for improving civil and minority rights by completing nearly all of the constitutional and legislative actions related to the Framework Agreement.

In the Middle East, several positive steps were taken. In May, the first open municipal council elections were held in Bahrain, and in October women joined men in exercising their right to vote for the first time in nearly 30 years to elect a national parliament. Morocco saw its first open elections in September, and in Qatar, a new constitution has been drafted and municipal elections are scheduled for April 2003. Female candidates will participate for the second time.

In Russia, a new Criminal Procedure Code that took effect in July permitted for the first time the application of existing Constitutional provisions that only upon a judicial decision could individuals be arrested, taken into custody or detained. The changes appeared to be having an effect on police, prosecutorial behavior and the judicial system, although there were reports of non-compliance in some regions.

The Chinese also continued to carry out some structural reforms in the areas of the rule of law and democracy. Direct elections at the village level took place in several provinces and pressure to move them to higher levels grew. Economic reform has led to legal reform, and legislatures continued experimenting with public hearings to incorporate public opinion into policy.

*Political rights:* In 2002 six nations in the western hemisphere— The Bahamas, Bolivia, Brazil, Colombia, Costa Rica and Jamaica— held elections for their chief of state or government. The Organization of American States, which adopted a democracy charter in 2001, put its collective commitment into action in 2002 with vigorous efforts to resolve the political crisis in Venezuela.

In Africa, Kenya's free election and peaceful transfer of power in December signaled hope for the consolidation of democratic politics there. A political crisis during the first half of 2002 in Madagascar was eventually resolved, and legislative elections were held. In Swaziland, respect for rights and rule of law took steps backward with a government declaration that it would not abide by court decisions.

In 2002 China continued to commit serious human rights abuses in violation of international human rights instruments and at year's end, a spate of arrests of political dissidents and the imposition of the death sentence on two Tibetans, the continued detentions of Rebiya Kadeer, Wang Youcai, Qin Yongmin and others, and restrictions on religious freedom and repression of some ethnic minorities were particularly troubling.

SHATSKY-008412

xx

Zimbabwe's government has used a systematic campaign of violence and intimidation against stated and perceived supporters of the opposition, even to the extent of routinely and publicly denying food to these individuals. The Government manipulated the composition of the courts and repeatedly refused to abide by judicial decisions, which undermined the judiciary.

In Eurasia, several republics of the former Soviet Union resisted positive change. In Turkmenistan the human rights situation deteriorated markedly after an attack on President Niyazov's motorcade in November, leading to serious violations of due process under the law including widespread arrests and forced evictions of suspects' families, use of torture, threats of rape and summary trials. In Kazakhstan the Government's poor human rights record worsened, including selective prosecution of opposition leaders and a pattern of media harassment suggesting an attempt to silence media critics. While there were positive steps in the first half of 2002, such as registration of the first human rights NGO and abolition of prior censorship of the media in Uzbekistan, there were also setbacks that are a cause of concern, including at least four deaths in detention due to torture. The Kyrgyz Republic held a regional by-election in October, judged by independent monitoring groups to be marred by irregularities such as multiple voting and lax standards of voting eligibility. Harassment of media and civil society continued and police killed six unarmed protesters.

Pakistan's military regime began the process of restoring elected civilian governance at the national and provincial level in October. Observers deemed the elections to be flawed, but the new government seems reasonably representative.

*Internal and other conflicts:* Throughout 2002, Sri Lanka made progress in implementing a cease-fire agreement between the Government and the Liberation Tigers of Tamil-Eelam (LTTE). Prisoners have been exchanged, roadblocks reduced, internally displaced persons returned, and investigations into abuses by security forces have increased. There were unconfirmed reports that LTTE continued to commit extrajudicial killings, but observers believe the number decreased in 2002. There were also reports that LTTE continued to conscript children.

In Nepal, the Maoist campaign included killings, bombing, torture, forced conscription of children and other violent tactics. Government forces were accused of killing civilians and abusing others suspected of Maoist sympathies.

The war in Sierra Leone was officially declared over in January, and the Revolutionary United Front was disarmed. Remarkably peaceful presidential elections were held in May although there were reports of election irregularities.

Elsewhere in Africa, conflicts continued to fuel human rights abuses. In Cote d'Ivoire, a coup attempt and ensuing civil unrest sparked violations by government and rebel forces. In the Democratic Republic of the Congo, major abuses continued. Rwanda withdrew its troops by October, and Uganda only had 1,000 troops left in the country at year's end.

After 27 years, peace came to Angola in February. The former UNITA rebel movement has disarmed and is transitioning into an unarmed political party, and the Government—working with the

SHATSKY-008413

xxi

opposition—is beginning to move the country toward new elections. The massive human rights violations of the civil war have come to an end, although an increase of abuses in Cabinda Province is worrisome. The primary focus will now be on the civil and political rights necessary for the conduct of free and fair elections as well as the establishment of the rule of law throughout the country.

Eritrea's record worsened through 2002. However, all recorded Ethiopian prisoners of war (POWs) from the former conflict were released. Ethiopia also released the last of the Eritrean POWs during 2002.

In the Chechnya conflict, Russian forces and Chechen rebels continued to commit serious human rights violations. Government forces committed extrajudicial killings and at times used indiscriminate force, which resulted in civilian casualties. A number of government "cleansing" operations involved extensive abuses of civilians. Chechen rebels increased their killings of civilian officials and militia associated with the Russian-appointed Chechen administration. On October 23, approximately 41 members of Chechen terrorist groups took more than 750 persons hostage in a Moscow theater. The terrorists killed one hostage; another 128 hostages died in the rescue effort.

*Integrity of the person:* Colombia showed signs of progress, with generally good elections and a declaration by paramilitary forces that they would negotiate peace in 2003. But problems remain serious, particularly extrajudicial killings. The Dominican Republic made strides in reducing the number of extrajudicial killings. The police chief was replaced and prosecutions—in civilian courts—of human rights offenders increased.

Not surprisingly, many human rights abuses occurred in nations that have non-democratic forms of government. Testimony to the U.S. Congress in mid-2002 revealed systematic and egregious violations of human rights in North Korea, including torture, summary executions and the use of prison labor under incredibly inhumane conditions.

Iraq's Republican Guard and other members of the security apparatus committed widespread and systematic human rights abuses including killings, torture, disappearances, rapes and imprisonment of Iraqi political opposition and ethnic and religious minorities.

In Cambodia, incidents of extrajudicial killings began to increase as the country prepares for 2003 elections amidst a culture of impunity and with serious shortcomings in the Government's investigations.

*Freedom of the press:* Harassment and vandalism were common tools used to threaten press freedom in 2002. Legal harassment was also common: In the Kyrgyz Republic, opposition newspapers were periodically refused printing services by the Government-owned press and journalists faced libel suits filed by government officials. Similar bureaucratic tactics were used to pressure NGOs and opposition political organizations. On the other hand, the Kyrgyz government registered the Media Support Center, which is intended to provide an independent printing facility and training for journalists. In Kazakhstan, violence and harassment of journal-

SHATSKY-008414

xxii

ists continued, and selective prosecutions of opposition figures chilled the climate of free speech. In Russia, direct and indirect government actions further weakened the autonomy of the electronic media, which is the public's primary source of information. Controls on reporting of the conflict in Chechnya and terrorist incidents elsewhere in Russia raised concerns about the ability of the press and public to have adequate access to information about government actions. In Ukraine, the killing of prominent journalist Heorhiy Gongadze remained unsolved. Although an investigation officially continued, there was a lack of transparency and the authorities refused to cooperate with foreign investigators whom they had invited to assist with the investigation.

The closing down of pro-reform publications and jailing of journalists, editors and publishers in Iran continued. A dissident academic was sentenced to death for questioning the Islamic system, a decision that sparked widespread student demonstrations and finally resulted in the Government granting a retrial. When a poll found that the overwhelming majority of Iranians supported dialogue with the United States and almost half agreed with U.S. policy vis-a-vis Iran, the regime closed the polling institutes and arrested the pollsters.

*Religious freedom:* These issues are discussed in depth in the annual Report on International Religious Freedom, published in October 2002, but the Country Reports also highlight important developments.

In Afghanistan there was dramatic improvement over the past year, but respect for human rights varied widely in different parts of the country. The reappearance of the Taliban's Department of Vice and Virtue, in the form of the new authority's Department of Accountability and Religious Affairs, bears monitoring. Likewise, reprisals against ethnic Pashtuns—albeit with a limited religious dimension—occurred in areas controlled by some local Northern Alliance commanders.

Other internal conflicts have a more pronounced religious dimension. Saudi Arabia continued to deny religious freedom to non-Muslims by prohibiting them from engaging in public worship. In some cases, non-Muslim individuals and private gatherings of worshippers were subject to harassment, leading to arrest, detainment, torture and deportation. Shi'a Muslims faced widespread discrimination, including imprisonment and torture.

Sectarian violence erupted in India's Gujarat Province in February, where as many as 2,000 people—mostly Muslims—died. Elections in Jammu and Kashmir, and in Gujarat, were held successfully despite widespread terrorist violence and the new state government has proposed steps to ease repression and reduce alienation. Throughout India however, light punishment for instigators of violence and perpetrators of abuse remained a stumbling block to further improvement.

In Vietnam, religious (primarily Protestant) and ethnic minorities in the Central Highlands and northwest provinces, which have often been brought to heel by government authorities in Hanoi, reportedly faced intensified repression, including closing of churches and forced renunciations of faith.

SHATSKY-008415

xxiii

*Women/Children:* In Afghanistan, human rights improvements included women and ethnic minorities serving in the Government and an estimated one million girls back in school. In Burma on the other hand, the State Department documented stories of rape of ethnic minority women by the Burmese military that were similar to NGO reports on the issue suggesting that rape continued to be a widespread practice. Also, the conscription of child soldiers in Burma remained a serious problem.

Child labor in the informal sector, especially children forced into the commercial sex industry, continued to be a serious problem in Cambodia, along with trafficking in women and children. In Cote d'Ivoire, child labor remained an issue of concern, and the recruitment of child soldiers in the armed civil conflict was cause for concern. Rebel groups in particular used child soldiers.

Child soldiers were used in other conflicts, including in Colombia, where both paramilitaries and guerrillas recruited children, and there is evidence that guerrillas forcibly pressed children into their forces. In Burundi, the Government stated that it would not recruit child soldiers in its war against rebel forces. However, there are unconfirmed reports that children continue to serve in armed forces performing occasional tasks such as carrying weapons and supplies.

*Trafficking:* In the Middle East, the United Arab Emirates, Bahrain, Saudi Arabia and Lebanon acknowledged trafficking in persons as problems in their countries and are taking steps to address it by curbing abuses of foreign workers, regulating camel jockeys as applicable, and combating commercial sexual exploitation.

Awareness about trafficking in persons throughout Africa grew. More African countries participated in time-bound programs designed to eliminate the worst forms of child labor. In addition, many of these cash-strapped governments are increasingly working on creative programs to prevent trafficking and protect trafficking victims. Public awareness was raised at local government levels in many African countries, particularly in West Africa, about traditional practices that are being exploited by traffickers. In Tanzania, children were mobilized to help identify traffickers and other children particularly vulnerable to being trafficked. In Southern Africa, some governments began devoting more attention to the differences between trafficking, smuggling and seasonal labor migration.

In East Asia and Pacific countries, governments in general paid more attention to the problem of trafficking in persons. Indonesia passed two national plans aimed at reducing trafficking in women and children, and police action against traffickers increased. Thailand increased its cooperation with neighboring countries in addressing cross-border trafficking in persons.

In South Asia, governments continued to demonstrate serious collaboration with NGOs to provide protection, legal and medical services, and skills training to trafficking victims. This cooperative effort also extends to law enforcement, with police jointly conducting raids with NGOs.

The push for stronger anti-Trafficking in Persons (TIP) legislation was enhanced in the past year in many European countries. For example, the Governments of Turkey, Greece and Bulgaria all passed specific articles on trafficking in their criminal codes. Rus-

SHATSKY-008416

xxiv

sia, the Kyrgyz Republic and Kazakhstan continued work on comprehensive drafts that should be finalized and forwarded to their respective parliaments soon. Localized referral systems between NGOs and police and other officials were improved and strengthened in Ukraine and UN-administered Kosovo. Serbia and Montenegro, in addition to their multi-agency national anti-trafficking teams, provided a mobile trafficking unit that brought assistance to victims throughout the country. Croatia began implementation of their National Action Plan, establishing shelters and a hotline, and drafting a law making trafficking in persons a crime.

International cooperation on investigations occurred only sporadically, with Italy and Albania showing concrete results in their joint operations.

Ratification of the UN Protocol on Trafficking was also a focus throughout the world, with several countries depositing their ratification and preparing domestic implementation.

Corruption continued to be a major impediment to successful anti-trafficking efforts. Open police corruption, harassment of returning victims and inertia on reported cases showed the public and civil society that many governments still are not serious about combating trafficking.

*Worker rights:* In Venezuela, the conflict between the Government and labor unions intensified throughout the year. The International Labor Organization censured the Government's refusal to recognize the election of Carlos Ortega as the president of the Confederation of Venezuelan Workers, citing government interference in independent trade union elections.

Progress was made in Bahrain, where legal protections for the right to organize and collectively bargain were established in new legislation. The Government resolved the problem of more than 1,000 "bidoon," long-term residents of the country who were formerly stateless, by issuing them appropriate documents.

*Corporate social responsibility:* Partnerships among governments, business, labor unions and civil society to promote human rights and sustainable development flourished. The UN Global Compact and the Organization for Economic Cooperation and Development (OECD) worked to promote voluntary principles and guidelines that advance corporate responsibility. During the year, positive examples of partnerships and dialogues between the public and private sectors emerged.

Responding to conditions in the agricultural sector, an innovative framework agreement was drafted between a multinational corporation and regional labor unions to address worker rights and corporate responsibility. A June 2002 Roundtable dialogue on the management of supply chains was featured in a report on the annual meeting of National Contact Points for the OECD Guidelines for Multinational Enterprises. The Voluntary Principles on Security and Human Rights gained new participants. ExxonMobil, Occidental Petroleum and the Government of Norway joined the multistakeholder dialogue.

Secretary of State Colin Powell presented the Secretary of State's 2002 annual Award for Corporate Excellence at a ceremony that recognized two U.S. firms for their outstanding corporate citizen-

SHATSKY-008417

ship and exemplary international business practices by promoting healthcare in China and poverty alleviation programs in Egypt.

**NOTE:** In many cases, the Country Reports on Human Rights Practices state that a country "generally respects" the rights of its citizens. The phrase "generally respects" is used because the protection and promotion of human rights is a dynamic endeavor; it cannot accurately be stated that any government fully respects these rights all the time without qualification, in even the best of circumstances. Accordingly, "generally respects" is the standard phrase used to describe all countries that attempt to protect human rights in the fullest sense, and is thus the highest level of respect for human rights assigned by this report.

In some instances, this year's Country Reports use the word "Islamist," which should be interpreted by readers as a Muslim who supports Islamic values and beliefs as the basis for political and social life.

SHATSKY-008418

SHATSKY-008419

1947

have been prevented from terminating their employment and returning to their native countries because of regime-imposed penal sanctions on persons who do so. There was no information available regarding forced and bonded labor by children.

*d. Status of Child Labor Practices and Minimum Age for Employment.*—The employment of children under the age of 14 is prohibited, except in small-scale family enterprises. However, children reportedly were encouraged increasingly to work in order to help support their families because of the country's harsh economic conditions. The law stipulates that employees between the ages of 14 and 18 work fewer hours per week than adults. Each year the regime enrolls children as young as 10 years of age in a paramilitary training program (*see* Section 5).

*e. Acceptable Conditions of Work.*—There was no information available regarding minimum wages.

Most workers in urban areas worked a 6-day, 48-hour workweek. The head of each ministry sets hours for regime employees. Working hours for agricultural workers varied according to individual employer-employee agreements.

Occupational safety programs were in effect in state-run enterprises. Inspectors ostensibly inspected private establishments, but enforcement varied widely. There was no information regarding workers' ability to remove themselves from work situations that endanger their health or safety.

*f. Trafficking in Persons.*—There was no information available regarding whether the law prohibits trafficking in persons. There were reports of persons trafficked within the country.

------

# ISRAEL AND THE OCCUPIED TERRITORIES

Israel is a parliamentary democracy with a multiparty system and free elections. There is no constitution; a series of "basic laws" provide for fundamental rights. The legislature, or Knesset, has the power to dissolve the Government and limit the authority of the executive branch. In February 2001, Likud Party leader Ariel Sharon was elected Prime Minister and in March 2001 took office as the head of a broad "unity" government that included the Labor Party, the largest bloc in the Knesset. On November 5, after Labor withdrew from the Government, Prime Minister Sharon announced he was unable to form a coalition and asked the President to dissolve the Knesset and call for new elections. New elections for the Knesset are scheduled for January 28, 2003. The judiciary is independent.

Since its founding in 1948, Israel has been in a state of war with most of its Arab neighbors. Throughout its existence, Israel also has experienced numerous terrorist attacks by a number of terrorist organizations that had as their stated objective the elimination of the Israeli State. With the onset of the "Al-Aqsa Intifada" in September 2000, there was a dramatic escalation in the level of violence directed against Israelis. Since 2000 the number of terrorist incidents, and Israeli casualties due to such attacks, rose sharply.

Israel concluded peace treaties with Egypt in 1979 and with Jordan in 1994, and a series of agreements with the Palestinians beginning in 1993. As a result of the 1967 war, Israel occupied the West Bank, the Gaza Strip, East Jerusalem, and the Golan Heights (the human rights situation in the occupied territories is discussed in the annex appended to this report). The international community does not recognize Israel's sovereignty over any part of the occupied territories.

Since 1991, the Israelis and the Palestinians made repeated attempts at negotiating peace. The most recent Tenet Agreement and the Mitchell Plan established a working framework for both parties to reduce the violence and negotiate peace. During 2000 and early 2001, the parties held intensive talks concerning final status issues, including water rights, refugees, settlers, the status of Jerusalem, and border and security issues. They did not reach an agreement. Despite meetings between high-level Israel and Palestinian officials, and repeated declarations of cease-fires on both sides, efforts to end the violence yielded few results. However, during the year the United States, the Russian Federation, the European Union, and the United Nations, (or the Quartet), conducted a series of ministerial-level meetings to develop a roadmap to reach their vision of two democratic states—Israel and Palestine—living side by side in peace and security.

Internal security was the responsibility of the Israel Security Agency (the ISA— formerly the General Security Service (GSS) and also known as Shin Bet, or Shabak), which was under the authority of the Prime Minister's office. The police were under the authority of the Minister of Internal Security. The Israel Defense Forces (IDF) were under the authority of a civilian Minister of Defense. The IDF included a significant portion of the adult population on active duty or reserve sta-

SHATSKY-008420

1948

tus and played a role in maintaining security. The Foreign Affairs and Defense Committee in the Knesset reviewed the activities of the IDF and the ISA. Members of the security forces committed serious human rights abuses in the occupied territories and regarding Palestinian detainees.

The country's population was approximately 6.4 million (including Israeli settlers who lived in the occupied territories). The country had an advanced industrial economy with a relatively high standard of living. During the year, unemployment was approximately 10 percent, but was substantially higher in the country's peripheral regions and among lower-skilled workers. These facts disproportionately affected the country's non-Jewish citizens. The country's economic growth was accompanied by an increase in income inequality. The longstanding gap in levels of income within the Jewish population and between Jewish and Arab citizens increased. Arab citizens populated most of the 17 towns in Israel with the highest unemployment rates. During the year, the country relied heavily on foreign workers, principally from Asia and Eastern Europe, who were employed in agriculture and construction and constituted approximately 10 percent of the labor force.

The Government generally respected the human rights of its citizens; however, there continued to be problems with respect to its treatment of Arab citizens. During the year, terrorist organizations such as the Islamic Resistance Movement (Hamas), Hizballah, Islamic Jihad in Palestine, and the Popular Front for the Liberation of Palestine (PLFP), among others, committed acts of terrorism in Israel. Nearly 226 terror attacks, including suicide bombings, drive-by shootings, mortar and grenade attacks, and stabbings occurred in the West Bank, Gaza, and Israel proper. Also during the year, more than 469 Israelis were killed and over 2,498 injured, a sharp increase from the previous year. In November 2000, a Legal Commission of Inquiry was established to investigate the demonstrations and riots of October 2000, during which police used excessive force and killed 13 Arab citizens. The Commission completed its investigation but had not released a report of its findings at year's end.

Israeli and international human rights organizations continued to report an increase in the number of allegations that security forces tortured detainees, including using abusive methods prohibited in a September 1999 High Court decision. There also were numerous allegations that police officers beat detainees. Detention and prison conditions for Palestinian security detainees held in Israel were poor and did not meet international standards regarding the provision of sufficient living space, food, and access to medical care. During the year, the Government detained without charge thousands of persons in Israel, the West Bank, and Gaza. Some security prisoners were sentenced on the basis of coerced confessions by both themselves and others. According to human rights organizations, the legal system often imposed more severe punishments on Arab citizens than on Jewish citizens, although such discrepancies were not provided by law.

The Government interfered with individual privacy in some instances. The Government imposed severe restrictions on the movement of persons and some restrictions on the movement of goods between Israel and the West Bank and Gaza as well as between cities in the West Bank and Gaza. Also known as "closure," this practice has been in effect to varying extents since 1993 (see Section 2.d. of the annex). The Government claimed that the closures were necessary to prevent terrorism. Discrimination and societal violence against women persisted, although the Government continued to take steps to address these problems. Discrimination against persons with disabilities persisted. The Government did little to reduce institutional, legal, and societal discrimination against the country's Arab citizens, who constituted approximately 20 percent of the population but did not share fully the rights and benefits provided to, and obligations imposed on, the country's Jewish citizens. Trafficking in women for the purpose of forced prostitution was a continuing problem. Israel was invited by the Community of Democracies' (CD) Convening Group to attend the November 2002 second CD Ministerial Meeting in Seoul, Republic of Korea, as a participant.

RESPECT FOR HUMAN RIGHTS

*Section 1. Respect for the Integrity of the Person, Including Freedom From:*

*a. Arbitrary or Unlawful Deprivation of Life.*—There were no reports of political killings during the year.

In October 2000, police used excessive force to disperse demonstrations in the north of the country, killing 13 Arab citizens and injuring 300. In response the Government of Ehud Barak established a Legal Commission of Inquiry, chaired by Justice Theodore Or, to investigate the cause of the riots and the police response. In 2001 numerous police officers testified that the police, including snipers, fired live

SHATSKY-008421

1949

ammunition into crowds of demonstrators. Doctors testified that rubber-coated steel bullets being fired from close range apparently caused several of the 13 deaths. Some police described a few of their colleagues as having engaged in overly aggressive actions. Testimony during the year corroborated previous testimony and also explored alleged inflammatory rhetoric by Israeli Arab politicians during the demonstrations.

In February the Commission warned 14 individuals that it planned to investigate responsibility for the violence and deaths. Among the 14 warned individuals were former Prime Minister Ehud Barak, former Minister of Internal Security Shlomo Ben Ami, former Northern Police Commander Alik Ron, several other police officials, Knesset members Abdulmalik Dehamshe and Azmi Bisharah, and former Mayor of Um al-Fahm Sheikh Ra'ed Salah. All 14 individuals had a right to legal counsel and to call and cross-examine witnesses. In his testimony to the Commission, Ben Ami denied ever having seen a document prepared by his ministry's legal department in 2000 outlining ways he should cover himself if he were investigated over the actions of that month. Ben Ami did not deny that Arab leaders, including members of the Knesset, had warned him prior to the 2000 event of increasing violence and racism in the police force and of incidents of brutality against Arab citizens. In September Barak testified that he had never ordered the police "to use every means necessary to keep roads open" during demonstrations. He said that statements he had made during a radio interview on October 2, 2000, that seemed to support claims that he had ordered the police to take "any action necessary to bring about the rule of law and freedom of movement within the State" were "not relevant," since he had made those statements to calm public concerns. The Commission had not issued its findings by year's end.

During the year, there were no violent demonstrations on the scale of those that occurred in 2000.

There was a sharp increase in the number of suicide bombings, shootings, and other acts of terrorism by Palestinian groups or individuals in the country and the occupied territories, which resulted in the deaths of at least 469 Israelis (also see Sections 1.a. and 1.c. of the annex).

On January 17, a terrorist with an assault rifle opened fire on a Bat Mitzvah celebration in Hadera killing 6 persons and injuring 35. On March 27, a suicide bombing killed 29 persons and injured 140 during a Passover Seder at the Park Hotel in Netanya. On April 12, a suicide bombing killed 6 persons, including 2 foreign workers from China, and injured 104 near Jerusalem's Mehane Yehuda Market.

On May 15 and 31, suicide bombings killed 30 persons and injured 95 in attacks in Rishon Lezion and Haifa. On June 5, a car packed with explosives struck a bus traveling from Tel Aviv to Tiberias, killing 17 persons and injuring 38. On July 31, a bomb exploded at Hebrew University in Jerusalem and killed 9 persons, 4 citizens and 5 Americans. On August 4, a suicide bombing of a bus traveling from Haifa to Safed killed 9 persons and injured 50.

On September 19, a bomb on a bus in Tel Aviv killed 6 persons and injured 70. On October 21, a car packed with explosives crashed into a bus traveling from Kiryat Shmonah to Tel Aviv and killed 14 persons and injured 50.

Attacks by Hizballah in the Sheba Farms/Har Dov area in the northern part of the country resulted in the death of one soldier. On March 12, infiltrators from Lebanon killed five civilians, one soldier, and wounded seven others. It was believed that the attackers acted with the assistance of Hizballah.

*b. Disappearance.*—At year's end, Elhannan Tannenbaum, who was kidnaped in either Europe or Lebanon in 2000, was believed to still be in Hizballah custody. The International Committee of the Red Cross (ICRC) attempted to pass medication and messages to Tannenbaum but was unable to ascertain whether he received the packages. Tannenbaum's family believed he may be seriously ill.

*c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.*— Laws and administrative regulations prohibit the physical abuse of detainees. During the year there were credible reports that there was an increase in the number of allegations that security forces tortured detainees, including using methods prohibited by a 1999 High Court decision. The Attorney General has the authority to accept a "necessity defense" in deciding whether or not to prosecute. There also were numerous allegations that police officers beat detainees. Although it was not clear if any formal complaints of torture were filed, human rights groups maintained that no GSS agent has been criminally charged with torture or other ill treatment for the past several years. Human rights groups further complained that the investigators who did field work for the Attorney General's office on such claims were GSS agents.

SHATSKY-008422

1950

The 1997 Arrest and Detention Law provides for the right to live in conditions that would not harm the health or dignity of the detainee, access to adequate health care, the right to a bed for each detainee, and access to exercise and fresh air daily. Conditions varied in incarceration facilities in the country and the occupied territories, which were administered by the Israeli Prison Service (IPS), the IDF, or the national police. IPS prisons, which generally housed citizens convicted of common crimes, generally met international standards.

Since the 1995 closure of the main IDF detention camps in the occupied territories, all security detainees from the occupied territories who were held for more than a few days were transferred to facilities within Israel. During the year, security detainees usually were held in the IDF's Megiddo prison, in IPS facilities, and in special sections of police detention facilities. Prisoners incarcerated for security reasons were subject to a different regimen, even in IPS facilities, and conditions for them were poor. According to the Government, security detainees may receive financial assistance from the Palestinian Authority (PA); food, including food required for observing religious holidays from their families and other persons or organizations; and medical supplies from the ICRC and other aid organizations. Security detainees include some minors. Detention facilities administered by the IDF were limited to male Palestinian detainees. The total number of Palestinian prisoners held by Israel, which was 1,854 at the beginning of the year, reached 4,672 by year's end. The Government stated that it held 1,007 persons from Gaza and the West Bank, and no Israeli Arabs in administrative detention (without charge or trial) at year's end. The Government detained approximately 10,000 prisoners at some point during the year (*see* Section 1.d.).

Conditions at the Russian Compound remained extremely poor; however, conditions in other IDF facilities improved in some respects. For example, inmates were provided more time to exercise outside their cells. Nevertheless, recreational facilities remained minimal, and there were strict limitations on family visits to detainees.

Male family members of Palestinian prisoners who were between 16 and 40 years of age and any family members with security records generally were barred from visiting relatives in facilities in Israel. Following the outbreak of violence in 2000, the Government banned all family visits for Palestinian prisoners in jails. However, during the year, the Government intermittently allowed the ICRC to arrange for family members to visit Palestinian prisoners in government facilities (*see* Section 1.c. of the annex).

Since the Intifada began, only Israeli lawyers or Palestinian lawyers with Jerusalem identification cards were permitted to visit Palestinian prisoners in jails as advocates or monitors, which reduced significantly the availability and timeliness of legal aid for such prisoners.

Conditions at some national police detention facilities remained poor. Such facilities were intended to hold criminal detainees prior to trial but often became de facto prisons. Those held included some security detainees and some persons who were convicted and sentenced. Inmates in the national police detention facilities often were not accorded the same rights as prisoners in the IPS system. Moreover, conditions were worse in the separate facilities for security detainees maintained both in police facilities and in IPS prisons. There were no programs to improve prison conditions by year's end.

Children's rights groups expressed particular concern over the separate sections of holding facilities for the detention of children. Overcrowding, poor physical conditions, lack of social workers, and denial of visits by parents remained problems. In addition to some Israeli minors held in criminal cases, there were Palestinian juveniles among the detainees. There were separate prison facilities for Arab and Jewish children separate from the adult prison population. Men, women, and children were held in separate facilities.

All incarceration facilities were monitored regularly by various institutions including branches of the Government, members of the Knesset, the ICRC, and human rights groups (*see* Section 1.d. of the annex).

*d. Arbitrary Arrest, Detention, or Exile.*—The law prohibits arbitrary arrest; however, the Government did not always observe this prohibition. Defendants are considered innocent until proven guilty and have the right to writs of habeas corpus and other procedural safeguards. However, a 1979 law permits, subject to judicial review, administrative, or preventive detention (i.e., without charge or trial), which was used in a small percentage of security cases. In such cases, the Minister of Defense may issue a detention order for a maximum of 1 year, which could be extended every 3 months. Within 24 hours of issuance, detainees must appear before a district judge who could confirm, shorten, or overturn the order. If the order was confirmed, an automatic review took place after 3 months. Detainees had the right to

SHATSKY-008423

1951

be represented by counsel and to appeal detention orders to the High Court of Justice; however, the security forces could delay notification of counsel with the consent of a judge, which was usually granted. According to human rights groups and legal experts, there were some cases in which a judge denied the Government's request to delay notification of counsel. At detention hearings, the security forces may withhold evidence from defense lawyers on security grounds. The Government also may seek to renew administrative detention orders. However, the security services must "show cause" for continued detention, and, in some instances, individuals were released because the standard could not be met. No information was available concerning an approximate percentage of those released because the standard for continued detention could not be met.

On March 4, the Knesset passed the Imprisonment of Illegal Combatants Law, which allows the IDF to detain anyone if there is a basis to assume that he or she "takes part in hostile activity against Israel, directly or indirectly" or "belongs to a force engaged in hostile activity against the State of Israel."

In felony cases and in ordinary security arrests, a district court judge could postpone notifying the detainee's attorney for 48 hours. The Minister of Defense could extend the postponement to 7 days on national security grounds. Moreover, a judge could postpone notification for up to 15 days in national security cases.

The 1997 Arrest and Detention Law more narrowly defined the grounds for pretrial detention in criminal and security cases and reduced to 24 hours the length of time a person may be held without charge; however, this law does not extend to administrative detention cases. Human rights groups alleged abuse of detention orders in cases in which the accused did not pose a clear danger to society.

Since the beginning of the Intifada, children's rights activists have recommended separate legislation to define when and how a child may be arrested and how long children may be detained. However, no action had been taken by year's end.

Some protections afforded to citizens were not extended to Palestinian detainees, who fell under the jurisdiction of military law even if they were detained in Israel. Following IDF redeployment in the West Bank, detention centers there were closed in 1995. As a result, all Palestinian detainees held for longer than 1 or 2 days were incarcerated in Israel (*see* Section 1.d. of the annex).

At year's end, the Government held approximately 6,700 Palestinians in custody, 3 times as many during the previous year. Those held were a combination of common criminal prisoners (approximately 1,500), administrative detainees (approximately 850), and ordinary security detainees (approximately 4200, nearly 5 times more than the previous year). In April 2000, a High Court ruling declared illegal the holding of Lebanese detainees in Israeli prisons as "bargaining chips" to extract concessions or the release of Israeli prisoners held in Lebanon. The Government has held, without explicit charges, both Sheikh Obeid, a Lebanese Hizballah leader, since 1989 and Mustafa Dirani, a head of security for the Amal militia, since 1994. The Government claimed both were security threats. In 2001 the Government did not comply with a High Court decision mandating that the ICRC have access to Obeid. However, in June ICRC was able to make its first visit to both Obeid and Durani. There was another visit in October. At year's end, Obeid, Durani, and 27 other Lebanese prisoners (20 on security grounds, 7 on criminal grounds) remained in custody.

The law prohibits forced exile of citizens, and the Government generally respected this prohibition in practice.

*e. Denial of Fair Public Trial.*—The law provides for an independent judiciary, and the Government generally respected this provision. The judiciary generally provided citizens with a fair and efficient judicial process. However, in practice, according to some human rights organizations, Arab citizens often received stiffer punishments than Jewish citizens. The judicial system is composed of civil, military, religious, labor relations, and administrative courts, with the High Court of Justice as the ultimate judicial authority. The High Court of Justice is both a court of first instance (in cases involving government action) and an appellate court (when it sits as the Supreme Court). All courts in the judicial system, including the High Court of Justice, have appellate courts or jurisdictions.

The law provides for the right to a hearing with representation by counsel, and authorities generally observed this right in practice. A regional and national system of public defenders operated by the Ministry of Justice employed approximately 700 attorneys through 5 regional offices. Under the system, economically disadvantaged persons who faced sentences of 5 years or longer, and all persons who were accused of crimes with sentences of 10 years or longer, received mandatory legal representation. Judges also had discretionary power to appoint an attorney in all cases. Approximately 70 percent of defendants were represented by counsel. All nonsecurity

SHATSKY-008424

1952

trials were public except those in which the interests of the parties were deemed best served by privacy.

Cases involving national security may be tried in either military or civil courts and may be partly or wholly closed to the public. The prosecution must justify closing the proceedings to the public in such cases, and the Attorney General determines the venue. Adult defendants had the right to be represented by counsel even in closed proceedings but may be denied access to some evidence on security grounds. Under the law, convictions may not be based on any evidence denied to the defense, although it may influence a judge's decision.

The 1970 regulations governing military trials were the same as evidentiary rules in criminal cases. Convictions may not be based solely on confessions, although in practice some security prisoners have been sentenced on the basis of the coerced confessions by both themselves and others. Counsel may assist the accused, and a judge may assign counsel to those defendants when the judge deems it necessary. Charges were made available to the defendant and the public in Hebrew, and the court could order that the charges be translated into Arabic if necessary. Sentencing in military courts was consistent with that in criminal courts. Defendants in military trials had the right to appeal through the Military High Court. Defendants in military trials also could petition the civilian High Court of Justice (sitting as a court of first instance) in cases in which they believed there were procedural or evidentiary irregularities.

According to human rights organizations, the legal system in practice often imposed stiffer punishments on Israeli Arab citizens than on Israeli Jewish citizens. For example, human rights advocates claimed that Arab citizens were more likely to be convicted of murder (which carries a mandatory life sentence) than Jewish citizens. The courts reportedly also were more likely to detain Arab citizens until the conclusion of proceedings. For example, in the first month after the October 2000 riots in Arab and Jewish locales, police arrested approximately 1,000 persons, including 660 Arabs and 340 Jews. Of the Arabs arrested, 79 percent reportedly were indicted, compared to 21 percent of the Jews; 72 percent of the Arabs were detained without bond, compared to 11 percent of the Jews. A number of Arabs accused of crimes such as stone-throwing during the year received sentences of more than 3 years. In contrast in October 2001, a Jewish man who was convicted of being part of a mob that severely beat a Palestinian man in Netanya in March was sentenced to 18 months in prison (*see* Section 1.c.). The Government has stated that allegations of systematic discrimination of non-Jews in the courts were unfounded.

There were no reports of political prisoners.

*f. Arbitrary Interference with Privacy, Family, Home, or Correspondence.*—The law generally protected privacy of the individual and the home; however, there also were laws that provide that authorities may interfere with mail and monitor telephone conversations in certain circumstances. In criminal cases, the law permits wiretapping under court order; in security cases, the order must be issued by the Ministry of Defense. Under emergency regulations, authorities may open and destroy mail based on security considerations.

*Section 2. Respect for Civil Liberties, Including:*

*a. Freedom of Speech and Press.*—The law provides for freedom of the press, and the Government generally respected this right in practice. The law authorizes the Government to censor any material reported from Israel or the occupied territories that it regarded as sensitive on national security grounds; however, authorities rarely applied the law in practice. However, during the year, the Ministry of Interior closed an Arab newspaper, Sawt al-Haqq Wal-Hurriya. The newspaper was affiliated with the northern branch of the Islamic movement in the country, and had previously published articles the Government believed supported terrorism in the country. A censorship agreement between the Government and media representatives applied to all media organizations in the country and provided that military censorship was to be applied only in cases involving national security issues that had a near certainty of harming the country's defense interests. All media organizations may appeal the censor's decision to the High Court of Justice. Moreover, a clause prohibits the military censor from closing a newspaper for censorship violations and from appealing a court judgement against it. News printed or broadcast abroad may be reported without the censor's review, which permits the media to run previously censored stories that have appeared in foreign sources. Emergency regulations made it illegal for persons to express support for illegal organizations. On occasion the Government prosecuted persons for speaking or writing on behalf of terrorist groups. In August 2001, the Attorney General announced that he would file an indictment against Knesset Member Azmi Bisharah for making statements perceived by some as supportive of Hizballah during Bisharah's June visit to Syria (a country

SHATSKY-008425

1953

still in a state of war with Israel). In November 2001, the Knesset voted to lift Bisharah's immunity so that he could face prosecution. At year's end, the case was still in discovery.

One Palestinian-owned newspaper, Al-Quds, was required to submit its entire contents, including advertising, to the military censor by 4 p.m. each day. The editor claimed that this process caused his journalists to practice self-censorship. During the year, journalists and professional journalist groups claimed that the Government placed limitations on their freedom of movement within the occupied territories, between the West Bank and Gaza, and between the occupied territories and Israel during violent unrest. The Government and security forces have stated that they did not target journalists due to their profession; however, three journalists were killed and at least five were injured while covering events in the occupied territories during the year (see Section 2.a. of the annex).

The Government Press Office, due to security concerns, required foreign journalists to sign an agreement stating that they will submit certain news stories and photographs for censorship; however, they rarely were challenged for not doing so.

Individuals, groups, and the press freely addressed within the limits of the law public issues and criticized government policies and officials without reprisal. Laws prohibit hate speech and incitement to violence. The Government investigated a significantly higher number of Arab Members of the Knesset (MKs) than Jewish MKs for the use of hate speech and incitement to violence.

All newspapers were privately owned and managed. Newspaper licenses were valid only for Israel; separate licenses were required to distribute publications in areas in the occupied territories still under the Government's authority. There were 16 daily newspapers, 90 weekly local newspapers, and more than 250 periodical publications.

Directed by a government appointee, the quasi-independent Israel Broadcast Authority controlled television Channel 1 and Kol Israel (Voice of Israel) radio, both major sources of news and information. The privately operated Channel 2, the country's first commercial television station, was operated by 3 franchise companies and supervised by the Second Television and Radio Authority, a public body that also supervised 14 private radio stations. There were five cable television companies that carried both domestic and international networks and produced shows specifically for the Israeli audience.

The Government generally respected academic freedom; however, in December 2001 the human rights organization Adalah claimed that the Government interfered with the education of Israeli Arab students because a member of the GSS monitored and approved the appointment of teachers and administrators in Arab schools. Adalah claimed that the GSS discriminates against candidates for education positions based on political affiliations, although there have been no credible reports since the mid-1980s of the Government denying a teachers certificate on security grounds (see Section 5). However, a teaching certificate does not ensure job placement. For example, during the year, Minister of Education Limor Livnat supported an unsuccessful attempt to prosecute university professors who supported conscientious objectors to Israeli practices. In addition, there was an abortive attempt to dismiss a historian, Ilan Pappe, at Haifa University who criticized the prevailing interpretation of the 1948 conflict between Israelis and Palestinians. However, at year's end, he continued to teach there.

*b. Freedom of Peaceful Assembly and Association.*—The law provides for the right of assembly, and the Government generally respected this provision in practice.

During the year, there were a number of peaceful demonstrations for and against peace negotiations with the Palestinians.

The law provides for the right of association, and the Government generally respected this provision in practice. However, during the year, the Government continued to deny registration of a new Palestinian NGO in Israel, Tawasul. The organization works to establish connections between Arab citizens and other cultures around the world (see Section 4). The Government stated that it merely wanted the organization to change its name, due to its similarity to those of other registered NGOs.

*c. Freedom of Religion.*—The law provides for freedom of religion, and the Government generally respected this right; however, it imposed some restrictions. Approximately 80 percent of citizens are Jewish, although some persons in that group are not considered Jewish under Orthodox Jewish law or are related by marriage to a Jewish citizen. Muslims, Christians, and Druze make up the remaining 20 percent of the population. The Government recognized 5 religions: Judaism, Islam, Christianity, Druzism, and Samaritanism. The status of some Christian organizations with representation in the country heretofore has been defined by a collection of ad hoc arrangements with various government agencies. Several of these organizations

SHATSKY-008426

1954

sought to negotiate with the Government in an attempt to formalize their status. Each recognized religious community has legal authority over its members in matters of marriage and divorce. Secular courts have primacy over questions of inheritance, but parties, by mutual agreement, may bring cases to religious courts. Jewish and Druze families may ask for some family status matters, such as alimony and child custody in divorces, to be adjudicated in civil courts as an alternative to religious courts. Christians only may ask that child custody and child support be adjudicated in civil courts as an alternative to religious courts. Muslims have no recourse to civil courts in family-status matters.

Under the Law of Return, the Government grants automatic citizenship and residence rights to Jewish immigrants and their families; the Law of Return does not apply to non-Jews or to persons of Jewish descent who have converted to another faith (see Section 2.d.). Members of unrecognized religious groups (particularly evangelical Christians, but also Russian immigrants and others who considered themselves Jewish but were not recognized as such), at times faced problems obtaining marriage certificates or burial services. However, informal arrangements provided relief in some cases.

Many Israeli Jews who wish to marry in secular or non-Orthodox religious ceremonies do so abroad, and the Ministry of Interior recognizes such marriages. However, many Jewish citizens object to such exclusive control, and it has been at times a source of serious controversy in society, particularly in recent years, as thousands of immigrants from the former Soviet Union have not been recognized as Jewish by Orthodox authorities. For example, questions have been raised about according Russian immigrants full Jewish burial rights if their Jewish heritage was not certified by the Orthodox Rabbinate.

Under the Jewish religious courts' interpretation of personal status law, a Jewish woman may not receive a final writ of divorce without her husband's consent. Consequently, there were thousands of so-called "agunot" in the country who were unable to remarry or have legitimate children because their husbands either disappeared or refused to grant a divorce.

Some Islamic law courts have held that Muslim women may not request a divorce but that women may be forced to consent if a divorce is granted to a man.

The Government provided proportionally greater financial support to institutions in the Orthodox Jewish sector compared with those in the non-Orthodox or non-Jewish sector, i.e., Muslim, Christian, and Druze. For example, the budget for the Ministry of Religious Affairs for 2000 only allocated 2.9 percent of its resources to the non-Jewish sector, although Muslims, Christians, and Druze constituted approximately 20 percent of the population. In 1998 the High Court of Justice ruled that the Ministry of Religion budget allocation constituted "prima facie discrimination" but that the plaintiff's petition did not provide adequate information about the religious needs of the various communities. The Court refused to intervene in the budgetary process on the grounds that such action would invade the proper sphere of the legislature. However, in 2000 the Court ordered the Government to allocate resources equitably to cemeteries of the Jewish and Arab communities. The Government began implementing to some degree the decision during the year. For example, some non-Jewish cemeteries reported enhanced financing and some money to complete long-standing infrastructure and improvement projects.

For security reasons, the Government imposed restrictions on citizens who perform the Hajj, including requiring that they be over the age of 30 (see Section 2.d.). The Government justified these restrictions on the grounds that Saudi Arabia remained officially at war with Israel and that travel to Saudi Arabia therefore was considered subject to security considerations.

Missionaries were allowed to proselytize, although the Church of Jesus Christ of Latter-day Saints voluntarily refrained from doing so under an agreement with the Government. The law prohibits anyone from offering or receiving material benefits as an inducement to conversion; however, there have been no reports of the enforcement of this law.

The Government has recognized only Jewish holy places under the 1967 Protection of Holy Sites Law. However, the Government stated that it also protects the holy sites of other faiths. It also stated that is has provided funds for some holy sites of other faiths. Muslim groups claimed that the Government has been reluctant to renovate mosques in areas where there no longer was a Muslim population. In May the High Court sustained a demolition order for a mosque in the unrecognized village of Husseinya, which was built without a permit in 1996.

During the year, the Government continued to refuse recognition to the duly-elected Greek Orthodox Patriarch, Eirinaios I. Many local Greek Orthodox Christians perceived the Government's actions as interference with the internal workings of their church.

SHATSKY-008427

1955

For a more detailed discussion see the *2002 International Religious Freedom Report.*

d. *Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation.*—The law provides for these rights, and the Government generally respected them in practice for citizens, except with regard to military or security zones or in instances in which citizens may be confined by administrative order to their neighborhoods or villages. Since the outbreak of violence in 2000, the Government has imposed some restrictions on the movement of persons between Israel and the West Bank and Gaza, and between cities inside the West Bank and Gaza (*see* Section 2.d. of the annex).

Citizens generally were free to travel abroad and to emigrate, provided they had no outstanding military obligations and were not restricted by administrative order. During the year, the Government issued an order restricting the right of Sheik Raed Salah, leader of the oppositionist Northern Branch of Israel's Islamic Movement, to travel abroad. The Government claimed to have confidential security reasons for banning the foreign travel of Sheik Salah. For security reasons, the Government imposed some restrictions on its Muslim citizens who performed the Hajj (*see* Section 2.c.). The Government did not allow persons to return from the Hajj if they left the country without formal permission. The Government justified these restrictions on the grounds that Saudi Arabia remained officially at war with Israel and that travel to Saudi Arabia therefore was considered subject to security considerations.

The Government stated that non-Jewish female citizens who marry noncitizen men, including men from the occupied territories, could retain their citizenship. The law includes provisions that allow a male spouse of a non-Jewish citizen to acquire citizenship and enter the country after the spouse passes a 4 ½ year, multistage period of adaptation, except in cases in which the man has a criminal record or is suspected of posing a threat to security. A small number of Christian, Muslim, and Druze women who have married men from Arab states or the West Bank and Gaza have made unsubstantiated claims that the Government revoked their citizenship and their right to reenter Israel; particularly after marrying men who are citizens of countries officially at war with Israel. A much larger number of Israeli Arabs, both men and women, were waiting for the Ministry of Interior to admit their spouses into Israel as residents. One NGO, Adalah, claimed to have a list of dozens of couples who were denied the right to unite in Israel, despite laws guaranteeing this right.

During the year, journalists claimed that the Government placed limits on their freedom of movement within the occupied territories, between the West Bank and Gaza, and between Israel and the occupied territories, during violent unrest (*see* Section 2.a.).

Citizens are required to enter and leave the country on their Israeli passports only. In addition, no citizen or passport-holder was permitted to travel to countries officially at war with Israel without special permission from the Government. During the year, there were credible reports that the Government confiscated both the Israeli and Vatican passports of Archimandrite Theodosios Hanna, an Israeli citizen of the Greek Orthodox Church in Jerusalem. Hanna was held and interrogated by police at the Russian Compound. He was questioned regarding visits he made to Syria and Lebanon, relations with PA President Yasser Arafat, and his position on the Intifada. When summoned to collect his passports, Hanna was informed that he would have to sign a statement promising not to incite violence against the state, make statements in support of terrorist activity, and to visit states hostile to the country without Ministry of Interior permission. Hanna refused to sign and was denied his passports.

The Government welcomes Jewish immigrants and their Jewish or non-Jewish family members, refugees and immigrants, on whom it confers automatic citizenship and residence rights under the Law of Return. Children of female converts to Judaism are eligible to immigrate only if the children were born after the woman's conversion. The Law of Return does not apply to non-Jews or to persons of Jewish descent who have converted to another faith. During the year, several Israeli citizens from the former Soviet Union told diplomats that the Ministry of Interior was attempting to strip their citizenship and return them to their home countries because they had divorced their Jewish spouses. At least one of those potential deportees had served a full term in the IDF.

Other than the Law of Return and the family reunification statutes, there is no immigration law that provides for immigration to the country or for political asylum or refugee status. The law does allow individuals to live in the country as permanent residents. The Government cooperated with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting Jewish refugees. The Government did not provide asylum to refugees from states

SHATSKY-008428

1956

with which the country remains in a state of war. Individuals present in the country on tourist or work visas, or those in the country illegally, sometimes filed petitions with the local UNHCR representative as the first step in seeking refugee status. During the year, the Government removed the right to adjudicate status from UNHCR headquarters in Geneva and granted it to an interministerial committee, which reviewed pending cases to determine if the facts merited designation of refugee status. The interministerial committee makes a recommendation to the Minister of the Interior, who has the final authority to determine status. If a person is granted such status, it is government policy to grant renewable temporary visas, provided that the person is not from a state with which the country is at war. In those cases, the Government attempts to find a third country in which the individuals can live. The Government provides refugees all the protections under refugee conventions, although in some instances individual ministries have not complied in an expeditious manner. Some NGOs alleged that the process has been politicized and that decisions of the committee have been disregarded.

The issue of first asylum did not arise during the year.

*Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government*

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage for adult citizens. National elections were held on February 6, 2001, when Ariel Sharon was elected Prime Minister and the governing coalition changed party affiliation. The country is a parliamentary democracy with an active multiparty system in which political views are wide-ranging. Relatively small parties, including those whose primary support is among Israeli Arabs, regularly win seats in the Knesset. Elections are by secret ballot.

There were no legal impediments to the participation of women and minorities in government. Women held 17 of 120 Knesset seats. Of the Knesset's 20 committees, 6 (including the Committee on the Status of Women) were chaired by women. At year's end, there were 2 women in the Cabinet; 4 women served on the 14-member High Court of Justice. There were 11 Arabs and 2 Druze in the 120-member Knesset; most represented parties that derived their support largely or entirely from the Arab community. No Arab or Druze citizens served on the 14-member High Court of Justice.

In May the Knesset amended the Basic Law, which prohibits the candidacy of any party or individual who denies the Jewish and democratic existence of the State of Israel or incites racism, to also prohibit parties and individuals who "support (in action or speech) the armed struggle of enemy states or terror organizations." This amendment opened a door to challenges which were made by the Attorney General to one Israeli-Arab party and one Jewish candidate.

*Section 4. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights*

A wide variety of local and international human rights groups operated without government restriction, investigating and publishing their findings on human rights cases. Government officials generally cooperated with investigations. However, Human Rights Watch reported increased harassment by IDF soldiers and increased difficulty in gaining permission for expatriate staff to enter the country.

In March the Ministry of Interior issued an order to border officials to bar the entry to all foreign nationals who were affiliated with Palestinian NGOs and solidarity organizations. For example, in April the Ministry of Interior attempted to ban entry into the country of three representatives of international human rights organizations and threatened to deport them within hours. Sidiki Kaba and Driss El Yazami, President and Secretary General of the International Federation of Human Rights Leagues, and Henri LeClerck, former President of the Ligue des Droits de l'Homme, were told they would not be allowed to enter the country. The three had traveled to participate in a press conference regarding human rights violations resulting from Israeli incursions into Palestinian-controlled areas of the occupied territories. All three had proper travel documentation, including visas. The Government stated that it barred these individuals because they were interested in making political statements.

On August 11, Adalah claimed that the Government would investigate the group on the grounds of undertaking activities beyond the scope of its mandate, association with a political party, and financial mismanagement. The group raised concerns and stated that the investigation appeared to be government efforts to hinder or prevent its functioning.

SHATSKY-008429

1957

During the year, the Government continued to deny registration to a new Palestinian NGO in Israel, Tawasul. The Government said that it merely wanted the organization to change its name, due to its similarity to those of other registered NGOs (*see* Section 2.b.).

*Section 5. Discrimination Based on Race, Sex, Disability, Language, or Social Status*

The law prohibits discrimination on the basis of sex or marital status. The law also prohibits discrimination by both government and nongovernmental entities on the basis of race, political beliefs, and age. Local human rights groups were concerned that these laws often were not enforced, either as a result of institutionalized discrimination, or because resources for implementing those laws, or mechanisms for their enforcement, were lacking. According to a report submitted to the U.N. by the Government in February, allocation of resources to different population groups was not consistent with the law's prohibition on discrimination.

The Government owns and manages 77 percent of the country's land area, and as a matter of policy it does not sell land. The Jewish National Fund (JNF), an organization established in 1897 for the purchase and management of land for the Jewish people, owned 8 percent of the country's land area, including a considerable amount transferred directly from the Government, and managed another 8 percent on behalf of the Government. The JNF's statute prohibits the sale or lease of land to non-Jews. Foreigners and citizens of all religions were allowed freely to purchase or lease the 7 percent of land not controlled by the Government or the JNF. In March 2000, the High Court of Justice ruled that the Government's use of the JNF to develop public land was discriminatory. At year's end, there were no new developments in this case.

*Women.*—In March 2000, the Knesset passed the Equality of Women Law, which provides for equal rights for women in the workplace, the military, education, health, housing, and social welfare, and entitles women to protection from violence, sexual harassment, sexual exploitation, and trafficking. The law prohibits domestic violence; however, violence against women was a problem, despite the steps taken by the Government and other organizations to reduce such violence.

During the year, approximately 20 women were killed by their husbands or other male relatives. According to a prominent women's group, between 150,000 and 200,000 (4 and 6 percent) of women and girls were victims of domestic violence each year; an estimated 12,000 to 14,000 (7 percent) of them were abused on a regular basis. According to women's organizations, approximately 3,000 women and girls were assaulted sexually and approximately 1,000 were victims of incest during the year; an estimated 45 percent of them were girls under the age of 18. Only a small percentage of the victims complained to the police. According to the Domestic Violence Law, a district or magistrate court may prohibit access by violent family members to their property.

Rape is illegal.

Arab human rights advocates formed a coalition to raise public awareness of so-called honor crimes. There were an unknown number of Arab women killed during the year by male relatives in family "honor" cases, a violent assault with intent to commit murder against a woman or girl by a relative for her perceived immodest behavior or alleged sexual misconduct. Families often attempted to cover up the cause of such deaths. NGOs and press accounts reported that the Government investigated and tried the perpetrators of so-called honor crimes.

Prostitution is not illegal; however, the operation of brothels and organized sex enterprises is outlawed. Prostitution was a problem. NGOs reported that an unknown number, possibly between 100 and 200, of the nation's prostitutes were under the age of 18.

Trafficking in women became a significant problem in recent years. According to recent studies, every year hundreds of women from the former Soviet Union were trafficked to the country by well-organized criminal networks to work as prostitutes (*see* Section 6.f.).

In 1998 the country adopted a comprehensive sexual harassment prevention law; since that time, several prominent cases have increased public awareness of the issue.

In 1996 legislation was adopted that provides for class action suits and requires employers to provide equal pay for equal work, including important side benefits and allowances; however, women's rights advocates claimed that deep gaps remained. Women's advocacy groups reported that women routinely received lower wages for comparable work, were promoted less often, and had fewer career opportunities than their male counterparts. For example, the wage gap between men and women for year-round, full-time employment was approximately 30 percent, and

SHATSKY-008430

1958

only 2 percent of women served in positions of senior management in large companies.

The adjudication of personal status law in the areas of marriage and divorce is left to religious courts, in which Jewish and Muslim women are subject to restrictive interpretations of their rights. Under personal status law, Jewish women are not allowed to initiate divorce proceedings without their husbands' consent; consequently there were estimated to be thousands of "agunot" who may not remarry or have legitimate children because their husbands either disappeared or refused to grant a divorce.

In accordance with Orthodox Jewish law, the 1995 Rabbinical Courts Law allows rabbinical tribunals to impose sanctions on husbands who refuse to divorce wives who have ample grounds for divorce, such as abuse. Since 1999 a foreign citizen has been in prison for refusing to grant his wife a divorce. However, in some cases, rabbinical courts failed to invoke these sanctions. In addition, there were cases in which a wife failed to agree to a divorce, but rabbinical authorities allowed the man to "take a second wife"; this remedy was not available to wives. Such restrictive practices have been used by husbands to extort concessions from their wives in return for agreeing to a divorce. Rabbinical courts also may exercise jurisdiction over and issue sanctions against non-citizen Jews present in the country.

Some Islamic law courts in the country have held that Muslim women may not request a divorce, but that women may be forced to consent if a divorce is granted to a man.

*Children.*—The Government has stated its commitment to the rights and welfare of children; however, in practice resources at times were insufficient, particularly with respect to low-income families. Government spending was proportionally lower in predominantly Arab areas than in Jewish areas, which adversely affected children in Arab villages and cities. In June the Government passed an emergency economic plan that reduced the child allowance. Children whose parents have served in the army had a cut of 4 percent and children whose parents have not served in the army had a cut of 24 percent. Most Israeli Arabs are exempt from compulsory military service. In addition to the 12 percent cut in February, the decision makes child allowances 37 percent lower for Arab children compared to Jewish children. However, children of Druze or Circassians who are drafted or Christian/Muslims who volunteer for the IDF receive the higher figure. Children from religious Jewish families who do not serve in the IDF receive the lower figure. Ultra orthodox Jews who did not serve in the military faced the same child welfare cuts. However, they were eligible for extra subsidies, including educational supplements not available to others.

Education was compulsory up to the age of 15 or until the child reaches the 10th grade, whichever comes first. Arab children made up approximately one-quarter of the public school population, but historically government resources allocated for them were proportionately less than for Jewish children. Many schools in Arab communities were dilapidated and overcrowded, lacked special education services and counselors, had poor libraries, and had no sports facilities. The Government allocated 26 percent of the school budget for the year for the construction of new classrooms for schools in Arab communities (not including Druze communities). According to the Government's report to the U.N. in February, government investment per Arab pupil was approximately 60 percent of investment per Jewish pupil.

High school graduation rates for Arabs were significantly lower than for Jews. According to 1998 statistics, 58 percent of the teachers in Jewish schools had university degrees compared with 39 percent of the teachers in Arab schools. Preschool attendance for Bedouin children was the lowest in the country, and the dropout rate for Bedouin high school students was the highest.

Arab groups noted that the public school curriculum stressed Israel's Jewish culture and heritage. Israeli Arab students were not eligible to participate in a special education program to provide academic assistance to students from disadvantaged backgrounds. A petition was filed with the High Court of Justice in 1997 charging that the Ministry of Education's refusal to provide this program to Israeli Arab students was discriminatory. The Attorney General's office agreed that the policy constituted impermissible discrimination but asked for 5 years to expand the program to Israeli Arab students. The petitioners rejected this proposal as being too slow. The court held hearings on the case twice in 1999; during the hearings, the Government promised to equalize special education resources by 2004. In July 2000, the Commission to Examine the Implementation of the Special Education Law (the Margalit Commission) published its detailed recommendations on how to improve special education in the Arab sector. At year's end, the Government still had not implemented those recommendations, and the budget for the year did not contain provisions to equalize spending on Arab and Jewish special education.

SHATSKY-008431

1959

The Government operated a number of school systems: one for secular Jews, at least two for religious Jews, and one for Israeli Arabs. Most Jewish children attended schools where the language of instruction was Hebrew and the curriculum included Jewish history. Although Israeli Arab children were free to attend "Jewish schools," most chose schools where the language of instruction was Arabic and the curriculum had less of a "Jewish" focus. Israeli Arab children overall received an education inferior to that of Jewish children in the secular system. The Education Ministry allocated money per class, and due to the larger classes of Arab students, acknowledged that it allocated less money per student in the Arab system than in the Jewish systems. In addition, Jewish schools received additional state and state-sponsored funding for school construction and special programs through other government agencies. In its report to the U.N. in February, the Government stated that the discrepancies between the two sectors were reflected in various aspects in the Arab sector; including physical infrastructure, the average number of students per class, the number of enrichment hours, the extent of support services, and the level of education of professional staff. In 1999 the Government decided to implement a plan that would place the budgetary and educational standards of the Arab sector on par with those of the Jewish sector from the period 1999 to 2003. The plan proposed a unified criteria for allocating resources to the Arab sector, relative to the Jewish sector, and proposed integrating the Arab and Druze sectors equally in all new Ministry programs. However, the Follow-Up Committee on Arab Education claimed that the Ministry's implementation was only partial and did not encompass all of the recommendations presented in the original 5-year plan.

In December 2001, Adalah requested that the Government discontinue GSS monitoring and approval of teachers and administrators in Arab schools and claimed that in its role at the Ministry of Education, the GSS discriminated against persons on the basis of their political affiliation (*see* Section 2.a.).

There has been concern regarding the thousands of children of the country's growing population of foreign workers, many of whom resided in the country illegally. Technically, foreign workers may not enter the country with their spouses or bring their spouses into the country on tourist or work status. Those who did were subject to deportation. Foreign workers who married while in country lost their status and were subject to deportation. These restrictions, however, did not preclude the possibility of children being born to foreign workers while in the country. Those children were entitled to remain with their parent and to receive limited health and education benefits until the age of 18. Children of parents who were in the country illegally live in social limbo, occasionally without access to adequate education and medical care.

The Government has legislated against sexual, physical, and psychological abuse of children and has mandated comprehensive reporting requirements regarding these problems. Although there was a sharp increase in reported cases of child abuse in recent years, activists believed that this largely was due to increased awareness of the issue rather than a growing pattern of abuse. There were five shelters for children at risk of abuse.

Activists estimated that there may be several hundred prostitutes among the nation's children (*see* Section 6.f.).

*Persons with Disabilities.*—The Government provided a range of benefits, including income maintenance, housing subsidies, and transportation support for persons with disabilities, who constituted approximately 10 percent of the population. Existing anti-discrimination laws do not prohibit discrimination based on disability, and persons with disabilities continued to encounter difficulties in areas such as employment and housing. A law requiring access for persons with disabilities to public buildings was not widely enforced. There was no law providing for access to public transportation for persons with disabilities. Extended protests by organizations for persons with disabilities during the year led to a small increase in government spending in support of persons with disabilities.

*National/Racial/Ethnic Minorities.*—The Government did not allocate sufficient resources or take adequate measures to provide Israeli Arabs, who constitute approximately 20 percent of the population, with the same quality of government services, as well as the same opportunities for government employment, as Jews. In addition, government spending was proportionally far lower in predominantly Arab areas than in Jewish areas; on a per capita basis, the Government spent two-thirds as much for Arabs as for Jews. In February the Government noted in a report to the U.N. that "the Arab population is typified by larger families, lower levels of education, and lower income than the total Israeli population."

Municipalities, including Arab municipalities, were responsible for issuing building permits within the municipal boundaries. Some Arab NGOs claimed that outside

SHATSKY-008432

1960

of Arab-governed municipalities, the Government was more restrictive in issuing
building permits to Arabs than to Jews.

The Bedouin sector was the weakest of all the population groups in the country.
Bedouin living in unrecognized villages had no way to obtain building permits. In
May the Government destroyed 52 Bedouin homes, eliminating all the tents and
temporary structures in the unrecognized village of al-'Araqib in the Negev, in
which two Bedouin tribes were living. Many ministers publicly acknowledged the
continuing disparities in government funding for the country's non-Jewish citizens.
Following the demonstrations and disturbances in September and October 2000, the
Government approved a $975 million (4 billion NIS) economic assistance plan for
the country's Arab citizens to be phased in over 4 years. Most of the money included
in the plan was allocated for education and new infrastructure development. Israeli
Arab leaders and human rights groups criticized the plan because it was not based
on a comprehensive survey of the economic and development needs of the country's
Arab population and was considered inadequate to meet that population's needs.
Critics also pointed out that only half of the total sum represented newly allocated
money. The Government had still not implemented the plan by year's end.

By law, the Israel Land Authority has 18–24 members; half of which represent
organizations forbidden by statute to transfer land to non-Jews. In 1999 the Govern-
ment appointed the first Arab citizen to the board, and in 2001 the High Court of
Justice ruled that the Government must appoint an additional Arab to the board.
However, during the year, this had not been done. In March 2000, the High Court
ruled on a 1995 petition brought by an Arab citizen couple who were barred from
buying a home in Katzir, a Jewish municipality that was built on state-owned land.
The High Court ruled that the Government's use of the Jewish National Fund to
develop public land was discriminatory, since the fund's bylaws prohibit the sale or
lease of land to non-Jews. The High Court determined that its ruling in the case
would not affect previous land allocations and that differentiating between Jews and
non-Jews in land allocation might be acceptable under unspecified "special cir-
cumstances." The municipality was instructed to develop and publish criteria for its
decisions and a plan for implementation. By year's end, Israel Lands Authority had
not fully implemented the ruling, and the Arab couple still had not been able to pur-
chase a home in Katzir.

Israeli Arab organizations have challenged publicly the 1996 "Master Plan for the
Northern Areas of Israel," which listed as priority goals increasing the Galilee's
Jewish population and blocking the territorial contiguity of Arab villages and towns,
on the grounds that it discriminates against Arab citizens; the Government contin-
ued to use this document for planning in the Galilee. At year's end, there were no
discernible changes.

Israeli Arabs were underrepresented in the student bodies and faculties of most
universities and in higher level professional and business ranks. In 1999 Arabs con-
stituted 8.7 percent of the students at major universities in the country. Well-edu-
cated Arabs often were unable to find jobs commensurate with their level of edu-
cation. Arab citizens held fewer than 60 of the country's 5,000 university faculty po-
sitions. The Government stated that it was committed to granting equal and fair
conditions to Israeli Arabs, particularly in the areas of education, housing, and em-
ployment. A small number of Israeli Arabs have risen to responsible positions in the
civil service, generally in the Arab departments of government ministries. In 1994
a civil service commission began a 3-year affirmative action program to expand that
number, but it has achieved only modest results. In 2000 only the Ministry of
Health and Ministry of Religious Affairs had representation of more that 5 percent
of Arabs in their workforce. The Ministries of Housing, Transportation, and Trade
and Industry, all had representation of less than 1 percent of Arabs in their work-
force. Arab composition in the remaining 15 ministries was approximately 5 percent.
In October 2000, the Knesset passed a bill requiring that minorities and underrep-
resented populations be granted "appropriate representation" in the civil service and
on the boards of government corporations. The Government took steps toward im-
plementing the law during the year, including setting aside civil service positions
for Arab candidates and appointing more Israeli Arabs to corporate boards. For ex-
ample, during the year, an Arab citizen was appointed to the board of Ben Gurion
Airport.

In practice few Israeli Arabs served in the military or worked in companies with
defense contracts or in security-related fields. The Israeli Druze and Circassian com-
munities were subject to the military draft and the overwhelming majority accepted
service willingly. Some Bedouin and other Arab citizens who were not subject to the
draft served voluntarily. Those who did not serve in the army had less access than
other citizens to those social and economic benefits for which military service was
a prerequisite or an advantage, such as housing, new-household subsidies, and gov-

SHATSKY-008433

1961

ernment or security-related industrial employment. NGOs challenged in court a government plan to pay less social security child allowance benefits to families in which at least one parent did not serve in the IDF than to families in which at least one parent did. Until the court decides the case, the child benefits remain equal for all families, regardless of parents' IDF service.

Israeli Arab groups alleged that many employers used the prerequisite of military service to avoid hiring non-Jews. For instance, in August 2001 the municipality of Tel Aviv advertised for parking lot attendants; "military service" was a prerequisite.

There were approximately 130,000 Bedouin in the Negev; of this number approximately half lived in 7 state planned communities and the other half lived in 45 settlements that were not recognized by the Government. The recognized Bedouin villages receive basic services from the Government; however, they are among the poorest communities in the country. The unrecognized villages were declared illegal by the National Planning and Building Law of 1965 when the lands on which they sit were rezoned as nonresidential, and the Government claimed ownership of the land. According to the Government, recognizing these villages would conflict with its attempts to establish new villages in "an orderly manner, and would leave disputes over the land unresolved." Residents of the unrecognized villages paid taxes to the Government; however, their villages were not eligible for government services. Consequently, such villages were denied basic health, education, water, electricity, employment opportunities, and other services. In 34 villages, there was no school at all; under these circumstances, there was little incentive to stay in school. New building in the unrecognized villages was considered illegal and subject to demolition. Private efforts have supplied some unrecognized villages with water, and the courts have ordered the provision of limited health and education services. The Government has yet to fulfill its commitment to resolve the legal status of unrecognized Arab villages. Since 1994, 8 villages have been recognized officially, but nearly 100 more, of varying size and with a total population of nearly 70,000 persons, remained illegal. Following a 1999 High Court decision, the Government agreed to begin a study to determine the infrastructure needed in each village, and that the implementation of plans made by a professional team of researchers would be discussed with villagers. A planning committee was required to submit a report regarding the progress of these plans to the Court in October. No projects related to the planning committee had begun by year's end.

In February the Israel Lands Administration sprayed from the air chemical defoliant over 12,000 dunams (12 sq. km) of Bedouin wheat fields on the Negev that had been planted on unrecognized land. The Minister for National Infrastructure explained that the crops had been illegally planted on state-owned land and that he was acting to return the power of the Land Authority. The Ministry's action was widely criticized, both inside and outside the Government.

There continued to be claims by Arab groups that land expropriation for public use affected the Arab community disproportionately; that Arabs have been allowed too little input in planning decisions that affect their schools and municipalities; that mosques and cemeteries belonging to the Islamic Waqf (religious endowment) have been neglected or expropriated unjustly for public use; and that successive governments have blocked the return to their homes of citizens displaced in the early years of the country's history. The Government has yet to agree with the pre-1948 residents of the northern villages of Bir Am and Ikrit, and their descendants, regarding their long-term demand to be allowed to rebuild their houses. In 1997 a special interministerial panel recommended that the Government allow the villagers to return to Bir Am and Ikrit. The High Court granted the Government several extensions for implementing the recommendation. In October 2001, after the expiration of the most recent extension, under instructions from the Sharon government, the State Prosecutor's Office submitted an affidavit to the High Court asking it to reject the villagers' appeal, stating that the Government had legally appropriated the land and that the precedent of returning displaced persons to their villages would be used for propaganda and political purposes by the Palestinian Authority. The Court's decision was pending at year's end.

*Section 6. Worker Rights*

*a. The Right of Association.*—Citizen workers may join and establish labor organizations freely. Most unions belong to Histadrut (the General Federation of Labor in Israel) or to a much smaller rival federation, the Histadrut Haovdim Haleumit (National Federation of Labor). These organizations were independent of the Government. Histadrut members elected national and local officers and officials of its affiliated women's organization, Na'amat, from political party lists of those already in the union. Plant or enterprise committee members were elected individually. Ap-

SHATSKY-008434

1962

proximately 650,000 workers were members of Histadrut, and much of the non-Histadrut work force was covered by Histadrut's collective bargaining agreements.

Palestinians from the West Bank and Gaza Strip who worked in Israel were not able to join Israeli trade unions or organize their own unions in Israel. Palestinian trade unions in the occupied territories were not permitted to conduct activities in Israel (*see* Section 6.a. of the annex). However, nonresident workers in the organized sector were entitled to the protection of Histadrut work contracts and grievance procedures. They may join, vote for, and be elected to shop-level workers' committees if their numbers in individual establishments exceed a minimum threshold. Palestinian participation in such committees was minimal.

Labor laws apply to Palestinians in East Jerusalem and to the Syrian Druze living on the Golan Heights.

Unions were free to affiliate with international organizations.

*b. The Right to Organize and Bargain Collectively.*—Citizen workers exercised their legal rights to organize and bargain collectively. While there was no law specifically prohibiting antiunion discrimination, the law against discrimination could be cited to contest discrimination based on union membership. No antiunion discrimination was reported.

Nonresident workers could not organize their own unions or engage in collective bargaining, but they were entitled to be represented by the bargaining agent and protected by collective bargaining agreements. It was estimated that there were approximately 300,000 foreign workers in the country. They did not pay union dues, but were required to pay a 1 percent agency fee in lieu of dues, which entitled them to union protection by Histadrut's collective bargaining agreements. The Ministry of Labor could extend collective bargaining agreements to nonunionized workplaces in the same industrial sector. The Ministry of Labor also oversaw personal contracts in the unorganized sectors of the economy.

The right to strike was exercised regularly. Unions must provide 15 days' notice prior to a strike unless otherwise specified in the collective bargaining agreement. However, unauthorized strikes occurred. Strike leaders—even those organizing illegal strikes—are protected by law. If essential public services are affected, the Government may appeal to labor courts for back-to-work orders while the parties continue negotiations. There were a number of strikes in both the public and private sectors during the year by employees protesting the effects of privatization. Worker dismissals and the terms of severance arrangements often were the central issues of dispute. During the year, there were major strikes of municipal workers on several occasions. The workers were protesting wage and benefit issues.

There were no export processing zones.

*c. Prohibition of Forced or Bonded Labor.*—The law prohibits forced or bonded labor, specifically including forced and bonded labor by children, and neither citizens nor nonresident Palestinians working in Israel generally were subject to this practice; however, civil rights groups charged that unscrupulous employers often took advantage of illegal workers' lack of status to hold them in conditions amounting to involuntary servitude (*see* Section 6.e.). The problem was notable concerning non-Palestinian illegal workers.

Women were trafficked for the purpose of prostitution (*see* Section 6.f.).

*d. Status of Child Labor Practices and Minimum Age for Employment.*—Children who have attained the age of 15 years, and who fall under the compulsory education law (which applies to all children except those who have completed grade 10), may not be employed unless they work as apprentices under the Apprenticeship Law. Children who are 14-years-old may be employed during official school holidays. Employment of those 16 to 18 years of age is restricted to ensure time for rest and education; and the Government enforced these restrictions in practice.

There were no reliable data regarding illegal child workers. The small number of child workers reportedly was concentrated among the country's Arab population and its most recent Jewish immigrants. Illegal employment was found primarily in urban, light industry.

Children's rights groups have called for more vigorous enforcement of child labor laws, combined with a parallel effort to deal with the causes of illegal child labor.

*e. Acceptable Conditions of Work.*—In 2001 the minimum wage was raised to 47.5 percent of the average wage. The minimum wage was calculated periodically and adjusted for cost of living increases. At year's end, the minimum wage was approximately $760 (3,266 NIS) per month. The minimum wage often was supplemented by special allowances and generally was sufficient to provide a worker and family with a decent standard of living. Union officials expressed concern over enforcement of minimum wage regulations, particularly with respect to employers of illegal nonresident workers, who sometimes paid less than the minimum wage.

SHATSKY-008435

1963

By law the maximum hours of work at regular pay are 47 hours a week, 8 hours per day, and 7 hours on the day before the weekly rest, which must be at least 36 consecutive hours and include the Sabbath.

Employers must receive a government permit to hire nonresident workers from the occupied territories, certifying that no citizen is available for the job. All Palestinians from the occupied territories were employed on a daily basis and, unless they were employed on shift work, were not authorized to spend the night in Israel. Palestinians without valid work permits were subject to arrest. Due to security concerns, the Government stopped issuing almost all permits for Palestinian workers following the outbreak of violence in 2000.

Nonresident workers were paid through the employment service of the Ministry of Labor, which disbursed wages and benefits collected from employers. The Ministry deducted a 1 percent union fee and the workers' required contributions to the National Insurance Institute (NII), the agency that administered the Israeli social security system, unemployment benefits, and other benefits. Despite these deductions, Palestinian workers were not eligible for all NII benefits. They continued to be insured for injuries suffered while working in the country, maternity leave, as well as the bankruptcy of a worker's employer. However, they did not have access to unemployment insurance, general disability payments, or low-income supplements. Since 1993 the Government has agreed to transfer the NII fees collected from Palestinian workers to the Palestinian Authority, which is to assume responsibility for all the pensions and social benefits of Palestinians working in Israel. Mechanisms for providing these services in the PA controlled territories, as well as mechanisms for transferring the funds, have not been established. At year's end, the funds were not transferred and were held in a trust.

Following the outbreak of violence in 2000, the Government implemented a closure policy, which prevented nearly all Palestinians from getting to their places of employment in Israel (see Section 2.d.).

Along with union representatives, the Labor Inspection Service enforced labor, health, and safety standards in the workplace, although resource constraints, such as adequate staffing, affected overall enforcement. Legislation protects the employment rights of safety delegates elected or appointed by the workers. In cooperation with management, these delegates were responsible for safety and health in the workplace.

Workers did not have the legal right to remove themselves from dangerous work situations without jeopardy to continued employment. However, collective bargaining agreements provided some workers with recourse through the work site labor committee. Any worker may challenge unsafe work practices through government oversight and legal agencies.

Public debate continued regarding the role in the workplace and society of non-Palestinian foreign workers, who were estimated to number at least 300,000, about half of whom were undocumented and employed illegally. The majority of such workers came from Eastern Europe and Southeast Asia, and worked in the construction and agricultural sectors. The law does not allow foreign workers the ability to obtain citizenship or permanent residence status, unless they are Jewish, in which case they would qualify under the laws which allow for Jewish persons to immigrate. As a result, foreign workers and their families, especially those who entered the country illegally, experienced uncertainty in addressing legal and social problems, including exploitation or abuse in the workplace.

There have been growing allegations that foreign workers were being lured to Israel with the promise of jobs that in fact did not exist. Many foreign workers paid up to $10,000 to work in Israel. Work visas were tied to specific jobs, and quotas to bring in foreign workers were assigned by the Government to employers. Technically, it is illegal for manpower companies who provide the workers to the employers, to receive payments from the worker, but NGOs and news articles alleged that the companies made thousands of dollars from each worker brought into the country, usually as a payment from the foreign partner. According to NGOs, there have been a significant number of cases where workers have been dismissed shortly after arriving in Israel. These NGOs alleged that the manpower companies worked with deportation authorities to deport the newly arrived workers, who were then replaced with new workers, earning the manpower companies more fees. NGOs argued that most workers expected to work for some time in Israel to recoup their initial payments; often they sought illegal employment for fear of returning home with large debts. According to NGOs, there have been cases where workers have killed themselves rather than face this prospect.

Illegal foreign workers facing deportation were brought before a special court established to deal with issues related to deportation, and workers may contest the deportations. Many workers lacked fluency in Hebrew, which hindered the process.

SHATSKY-008436

1964

NGOs existed to aid workers facing deportations, and there have been cases in which the worker's status was reinstated. The court also provided a forum where deportable workers can claim that they were not paid or given benefits according to the law. In some cases, the court delayed deportation until all claims, including severance, were paid. However, some NGOs suggested that illegal workers often lived in situations amounting to involuntary servitude, due primarily to their tenuous legal status. NGOs noted several cases in which foreign workers were injured by the police during arrest. In some cases, these NGOs claimed, the workers were so seriously injured that they were not ultimately detained, due to the potential cost of care for their injuries. At least one foreign worker killed himself while in detention, and NGOs claimed that detention facilities did not meet minimum standards.

During the year there were attempts to include foreign workers within the national trade union Histadrut. News articles and some advocates stated that the union was interested only in collecting dues and had not acted to protect key union members who were singled out for deportation. The editor of the foreign worker newspaper Manila-Tel Aviv Times was deported shortly after giving interviews to other publications on the subject of foreign worker rights under the law; foreign worker advocates claimed the deportation was politically motivated. Human rights groups claimed that since foreign worker residency permits were tied to specific employment, even legal foreign workers had little leverage to influence their work conditions.

*f. Trafficking in Persons.*—The law prohibits trafficking in women for the purpose of prostitution; however, it remained a serious problem. The penal code stipulates that it is a criminal offense, punishable to between 5 and 7 years imprisonment, to force or coerce a person to engage in prostitution. The penal code also makes it a criminal offense to induce a woman to leave the country with the intent to "practice prostitution abroad." In 2000 the Knesset passed the Equality of Women Law (*see* Section 5), which stipulates that every woman is entitled to protection from violence, sexual harassment, sexual exploitation, and trafficking. In June 2000, the Government enacted a law that prohibits the trafficking of persons for the purpose of prostitution. The operation of brothels and "organized sex enterprises" is outlawed, as are many of the abuses committed by traffickers and pimps, such as assault, rape, abduction, and false imprisonment. During the year, the Government reported that it increasingly pursued legal action against traffickers.

Women were trafficked primarily from the former Soviet Union, including Moldova, Russia, and Ukraine. According to Amnesty International (AI), every year hundreds of women from the former Soviet Union were brought to the country by well-organized criminal networks and forced, often through violence and threats, to work illegally as prostitutes. According to some local NGOs, several hundred women were trafficked into the country annually. NGOs reported that the number of trafficked women entering the country fell from previous years because of increased security at Ben Gurion airport, but women still were being trafficked across the Egyptian border.

Activists estimated that there may be several hundred prostitutes among the nation's children (*see* Section 5).

Traffickers reportedly often lured women into traveling to the country by offering them jobs in the service industry. In many cases, traffickers met women at the border and confiscated all their official documents. Many trafficked women were forced to live and work under extremely harsh conditions and to give most of the money they earned to their traffickers. The women reportedly often were raped and beaten, then auctioned to pimps who repeated the procedure. If the women escaped from their traffickers, they were often afraid to report their situations to the police because the traffickers threatened to hunt them down and hurt them. According to press reports, it was common for trafficked women to be told that they must repay the costs of their travel to the country through servicing up to 25 clients a day. They were paid little or no money for this work and once the debt had been repaid, they were auctioned again.

In previous years, some victims accused individual police officers of complicity with brothel owners and traffickers and the Government worked to review these cases. However, during the year, the Government stated that although there were no specific allegations of police involvement in trafficking, there were several allegations that some police officers were involved in "trafficking-related activity," such as warning brothel owners before police raids.

During the year, the Government opened 67 files for trafficking and related crimes; most files dealt with multiple victims and suspects; the files specifically included trafficking as a charge. A total of 138 persons were detained for trafficking related crimes during the year; 92 persons were arrested and 55 detained until the beginning of legal proceedings. The Government convicted 33 persons and delivered

SHATSKY-008437

1965

sentences. In 28 cases, the Government settled by plea bargaining with the defendants.

Police often detained trafficked women following raids on brothels; the number of such raids increased during the year. The Ministry of Interior has broad powers to deport illegal aliens and to hold them in detention pending deportation. According to the Ministry of Public Security, through September, the Government deported 264 victims of trafficking, not all of whom were prostitutes who had been living illegally in the country.

Authorities generally kept trafficked women who were arrested in a special section of a women's prison and then deported them. Trafficked women often did not challenge a deportation order because they did not speak the language or were unaware of the appeals procedure. The Government transferred women who testified against their traffickers to a hotel or hostel and provided them funds on which to live. Many women were reluctant or afraid to testify in trials due to threats and intimidation by their traffickers. The country has no witness protection program or close and effective links with primary supply countries, such as Moldova. Trafficked women could not apply for legal status to remain as refugees or protected persons unless they were Jewish and filed under the Law of Return. NGO reports and witness testimony indicated that the Government did not attempt to determine whether or not a trafficked woman or girl would be at risk of abuse if she were deported to her country of origin, even in cases in which the woman or girl had testified in criminal proceedings.

The Government provided limited funding to NGOs for assistance to victims. In November the Government finalized a plan to make a shelter available for trafficked women. The Government provided legal representation to some trafficked women. The Government acknowledged the need to educate trafficked women regarding where to go for help and was developing such programs, but had not finalized any plans for or begun such education programs by year's end.

## THE OCCUPIED TERRITORIES (INCLUDING AREAS SUBJECT TO THE JURISDICTION OF THE PALESTINIAN AUTHORITY)

Israel occupied the West Bank, Gaza Strip, Golan Heights, and East Jerusalem during the 1967 War. Following the Madrid peace conference in 1992, Israel and the Palestinians entered into negotiations and in 1993, signed the Oslo Accords which established a framework for negotiating transitional and final status arrangements. Pursuant to the May 1994 Gaza-Jericho Agreement and the September 1995 Interim Agreement, Israel transferred most responsibilities for civil government in the Gaza Strip and parts of the West Bank to the newly created Palestinian Authority (PA). Israel retained responsibility for external security; foreign relations; the overall security of Israelis, including public order in the Israeli settlements; and certain other matters. (This annex on the occupied territories should be read in conjunction with the report on Israel).

The 1995 Interim Agreement divided the territories into Areas A, B, and C, denoting differing levels of Palestinian and Israeli control. Israel was assigned control of certain civil functions and was responsible for all security in portions of the occupied territories categorized as Area C. Israel and the PA were assigned varying degrees of control and jurisdiction over the Gaza Strip and the West Bank. Since then, Israel and the PA have administered the West Bank and Gaza Strip to varying extents. However, the distinctions made under the Interim Agreements were no longer in force following Israel's military incursions into most PA-controlled areas, which Israel carried out citing the Authority's failure to abide by its security responsibilities.

The "Intifada," or Palestinian uprising, began in September 2000. Its causes are complex and remain highly controversial between the parties. Since 2000 the security situation has deteriorated both within Israel and within the Occupied Territories. Israeli and Palestinian violence associated with the Intifada has claimed 1,782 Palestinian lives, 649 Israeli lives, and the lives of 41 foreign nationals. During the past year, the scale and nature of the violence changed and clashes have continued daily. The conflict was marked by increased Israeli military operations and armed attacks and terrorism by Palestinians against Israeli targets—including civilians within Israel, settlers, and soldiers in the occupied territories and Israel. The attacks also included suicide bombings, roadside bombings, shooting at Israeli vehicles and military installations, firing of antitank missiles and mortars, and use of hand grenades. Israel Defense Forces (IDF) military actions against Palestinians included violence and abuse at checkpoints, incursions into Palestinian-controlled towns and villages, targeted killings, firing toward civilian areas with tanks and fighter aircraft, and intense gun battles with Palestinian shooters. Many observers

SHATSKY-008438

1966

characterized such actions as punitive. By year's end, Israel reasserted military control, which placed all major West Bank cities except Jericho under IDF control, demolished the homes of suicide bombers and wanted men, conducted mass arrests, and transferred some suspects.

In the West Bank, Area C included the Israeli settlements, constituted more than 61 percent of the land, and approximately 4 percent of the total West Bank Palestinian population. In Gaza more than 12 percent of the land was designated as Area C equivalent, and included the Israeli settlements. In areas designated as Area B, the PA was assigned jurisdiction over civil affairs and shared security responsibilities with Israel. Approximately 21 percent of West Bank land was Area B, and approximately 41 percent of the West Bank Palestinian population resided there. The Area B equivalent in Gaza constituted almost 19 percent of the land. The PA had control over civil affairs and security in Area A. The West Bank Area A constituted nearly 18 percent of the land, and included roughly 55 percent of the West Bank Palestinian population. The Gaza Area A equivalent constituted approximately 69 percent of the land.

In parts of the West Bank and Gaza, Israel exercised civil authority through the Israeli Ministry of Defense's Office of Coordination and Liaison, known by the Hebrew acronym MATAK. The approximately 208,000 Israeli settlers (an increase of 33,000 since 2001) living in Area C of the West Bank and in the Gaza Strip were subject to Israeli law and, as citizens, received preferential treatment from Israeli authorities compared to Palestinians in the protection of their personal and property rights. The body of law governing Palestinians in the occupied territories derived from Ottoman, British Mandate, Jordanian, and Egyptian law, and Israeli military orders. Certain laws and regulations promulgated by the PA also were in force. The international community considered Israel's authority in the occupied territories to be subject to the Hague Regulations of 1907 and the 1949 Geneva Convention relating to the Protection of Civilians in Time of War. The Israeli government considered the Hague Regulations applicable and maintained that it largely observed the Geneva Convention's humanitarian provisions.

In January 1996, Palestinians chose their first popularly elected government in democratic elections that generally were free and fair; the 88-member Palestinian Legislative Council (PLC) and the Chairman of the Executive Authority were then elected. The PA has a cabinet of 19 ministers; however, Chairman Yasir Arafat controls the affairs of government and makes all major decisions. Most senior government positions in the PA are held by individuals who are members of, or loyal to, Arafat's Fatah faction of the Palestinian Liberation Organization (PLO). Prior to the Intifada, the PLC met regularly to discuss issues significant to the Palestinians; however, it did not have significant influence on policy or the behavior of the executive. In late 2001, Arafat invoked a state of emergency that granted him broader powers to make arrests, prohibit demonstrations, and take action against political opponents.

On May 14, Arafat signed the long-pending Independence of the Judiciary Law and on May 29 the PA Basic Law, which defined the authorities of the three governmental branches and prescribed direct election of a president accountable to a cabinet and to the elected PLC. Neither law was implemented fully, and at year's end the respective roles of the Ministry of Justice and the High Judicial Council in court operations were still unclear (*see* Section 1.e.). West Bank courts applied laws passed by the Legislative Council and pre-1967 Jordanian law. In recent years, the PA made little progress in efforts to unify the Gaza and West Bank legal codes. Gaza law for subjects not covered by unified legislation included elements from Ottoman law, British Mandate law, Egyptian law, and Israeli military orders. The PA courts were perceived as inefficient, and the PA executive and security services frequently ignored or failed to carry out court decisions.

Israeli security forces in the West Bank and Gaza Strip consisted of the IDF, the Israel Security Agency (the ISA-formerly the General Security Service, or GSS, and also known as Shin Bet, or Shabak), the Israeli National Police (INP), and the paramilitary border police. Israeli military courts tried Palestinians accused of committing acts of violence and terror in Israeli-controlled areas. Members of the Israeli security forces committed numerous, serious human rights abuses.

The Palestinian Police Force (PPF) was established in May 1994 and included the Palestinian Public Security Force, the Palestinian Civil Police, the Preventive Security Force (PSF), the General Intelligence Service, or Mukhabarat, the Palestinian Presidential Security Force, and the Palestinian Coastal Police. Other quasi-military security organizations, such as the Military Intelligence organization, also exercised de facto law enforcement powers. Palestinian police were responsible for security and law enforcement for Palestinians and other non-Israelis in PA-controlled areas of the West Bank and Gaza Strip. Israeli settlers in the occupied territories were

SHATSKY-008439

1967

not subject to PA security force jurisdiction. Members of the PA security forces committed numerous, serious human rights abuses.

The occupied territories were composed of the Gaza Strip, the West Bank, and East Jerusalem. The population of the Gaza Strip was approximately 1,225,911, not including some 7,000 Israeli settlers. The population of the West Bank (excluding East Jerusalem) was approximately 2,163,667 not including some 182,000 Israeli settlers. The population of East Jerusalem, within the municipal boundaries established by Israel in 1967 was approximately 385,600, including 174,000 Israeli settlers.

The economy of the West Bank and Gaza Strip is small, poorly developed, highly dependent on Israel, and was impacted severely by Israeli curfews and closures, as well as the continuing conflict. The economy relied primarily on agriculture, services, and, to a lesser extent, small manufacturing. Before the beginning of the Intifada, approximately 125,000 workers from the West Bank and Gaza (approximately 22 percent of the Palestinian work force) were employed in Israel. During heightened terrorist activity in Israel or periods of unrest in the West Bank or Gaza, Israeli-imposed closures on Palestinian cities, curfews, and strict limitations on movement within the West Bank and Gaza impeded Palestinians from reaching jobs or markets and disrupted internal and external trade. In addition the IDF and settlers destroyed sections of Palestinian-owned agricultural land and economic infrastructure. The Government of Israel stated that some of these actions, such as the destruction of groves alongside roadways and security fences by the IDF, were necessary for security reasons. Some human rights groups stated that these actions exceeded what was required for security. Unemployment in the West Bank and Gaza was estimated at 44 percent by year's end, up from 23 percent the previous year. Approximately 66.5 percent of Palestinian households were living below the poverty line (57.8 percent of families in the West Bank and 84.6 percent of families in Gaza), which was significantly higher than in previous years.

Israel requires Palestinians to obtain Israeli permits for themselves and their vehicles to cross from the West Bank or Gaza into Israel and Jerusalem. Citing security concerns, Israel applied partial "external closure," or enhanced restrictions, on the movement of persons and products, often for lengthy periods. During times of violent protest in the West Bank or Gaza, or when it believed that there was an increased likelihood of such unrest or of terrorist attacks in Israel, Israel imposes a tightened, comprehensive version of external closure, generally referred to as total external closure. Total external closures also are instituted regularly during major Israeli holidays and during some Muslim holidays. During such closures, Israel prevents Palestinians from entering Israel or Jerusalem. Israel imposed total external closure on the West Bank for the entire year, compared with 210 days of total external closure in 2001 and 88 days in 2000.

Israel also placed Palestinians in the West Bank under strict "internal closure" for the entire year, allowing only Palestinians with special permits for work or health services to leave cities and pass through checkpoints on main roads. Most Palestinians were unable to leave their towns or forced to travel without authorization on secondary roads.

Israeli forces further restricted freedom of movement of Palestinians by imposing extended curfews on Palestinian towns or neighborhoods. These curfews did not apply to Israeli settlers in the same areas.

Israel's overall human rights record in the occupied territories remained poor and worsened in several areas as it continued to commit serious human rights abuses. Security forces killed at least 990 Palestinians and 2 foreign nationals and injured 4,382 Palestinians and other persons during the year, some of whom were innocent bystanders. Israeli security forces targeted and killed at least 37 Palestinian terror suspects. Israeli forces undertook some of these targeted killings in areas where civilian casualties were likely, killing 25 bystanders, including 13 children. The Israeli government said that it made every effort to reduce civilian casualties during these operations.

Israeli security units used excessive force during Palestinian demonstrations, while on patrol, pursuing suspects, and enforcing checkpoints and curfews, which resulted in many deaths. IDF forces also shelled, bombed, and raided Palestinian civilian areas in response to Palestinian attacks on Israeli targets. Israeli soldiers placed Palestinian civilians in danger by ordering them to facilitate military operations, which exposed them to live fire between armed Palestinians and Israeli soldiers. The Israeli government said that it has reiterated to its forces that this practice is absolutely prohibited unless the civilian gives his voluntary consent. Israeli forces sometimes arbitrarily destroyed or looted Palestinian property during these operations. Israeli security forces often impeded the provision of medical assistance to Palestinian civilians by strict enforcement of internal closures, alleging in some

SHATSKY-008440

1968

cases that emergency vehicles have been used to facilitate terrorist transit and operations. Israeli security forces harassed and abused Palestinian pedestrians and drivers who attempted to pass through the approximately 430 Israeli-controlled checkpoints in the occupied territories. Israel conducted mass, arbitrary arrests in the West Bank during military operations, summoning and detaining males between the ages of 15 to 45. Israel provided poor conditions for Palestinians in its prisons. Facilities were overcrowded, sanitation was poor, and food and clothing at times were insufficient. Israeli security forces tortured detainees, including using methods prohibited in a 1999 High Court decision; police officers also beat detainees. During the year, two Palestinian prisoners died under ambiguous circumstances after Israeli forces took them into custody. Prolonged detention, limits on due process, and infringements on privacy rights remained problems.

Israel carried out policies of demolitions, strict curfews, and closures that directly punished innocent civilians. Israel intentionally punished innocent Palestinians by demolishing the homes of families and relatives of suspected terrorists. Israel's demolitions left hundreds of Palestinians not involved in terror attacks homeless. Some of the suspects had already been killed or arrested. The IDF destroyed numerous orchards, olive and date groves, and irrigation systems on Palestinian-controlled agricultural land. Israel censored Palestinian publications in East Jerusalem, attacked and closed media outlets in the territories, blocked publications and broadcasts, and periodically detained or harassed members of the media. Three journalists covering clashes between Palestinians and Israeli security forces, including some who clearly were identified as non-combatants, were killed by IDF fire and at least five others were injured. The Israeli authorities placed strict limits on freedom of assembly, and severely restricted freedom of movement for Palestinians. Israeli security forces failed to prevent Israelis from entering Palestinian-controlled areas in the West Bank who injured or killed several Palestinians. In some cases, Israeli soldiers escorted Israeli civilians who beat Palestinians and damaged Palestinian property.

The PA's overall human rights record remained poor, and it continued to commit numerous, serious abuses. Many members of Palestinian security services and the Fatah faction of the PLO participated with civilians and terrorist groups in violent attacks against Israeli settlers, other civilians, and soldiers. The PLO and PA have not complied with most of their commitments to Israel, notably those relating to the renunciation of violence and terrorism, taking responsibility for all PLO elements, and disciplining violators. Although there was no conclusive evidence that the most senior PLO or PA leadership gave prior approval for these acts, some leaders endorsed such acts in principle in speeches and interviews. For example, PA Minister of Interior Hani al-Hassan several months ago made comments affirming the legitimacy of attacks on soldiers and settlers in the territories. On a number of occasions, Arafat called on Palestinians not to attack civilians and ordered a complete cease-fire, but he took no action to that effect. PA and PLO officials often condemned attacks against Israeli civilians, but failed consistently to condemn attacks on settlers and soldiers in the occupied territories. PA security forces arrested some of those implicated in the violence, but most were quickly released or not kept under credible conditions of arrest.

Palestinian security forces used excessive force against Palestinians during demonstrations. The PA was responsible for the death of seven Palestinians who were in its custody. The PA had arrested six of the victims on charges of collaboration with Israel, and vigilantes subsequently killed them. The PA security services either failed to protect the prisoners from attack or actively turned them over to their killers. PA security officials tortured and abused prisoners. Such torture and abuse reportedly was widespread. PA security forces arbitrarily arrested and detained persons, and prolonged detention remained a problem. The PA provided poor conditions for prisoners. PA courts—particularly PA security courts—were inefficient and failed to ensure fair and expeditious trials. The imposition by Israel of internal closure in the occupied territories during the year obstructed courts from holding sessions or issuing rulings during most of the year. The PA executive and security services frequently ignored or failed to enforce court decisions. PA security forces infringed on citizens' rights to privacy and restricted freedom of speech and the press. Palestinian groups harassed and abused journalists. Such restrictions and harassment contributed to the practice of self-censorship by many Palestinian commentators, reporters, and critics. During the year, informal reports of domestic abuse of women increased, and "honor crimes" persisted. Societal discrimination against women and persons with disabilities and child labor remained problems.

Israeli civilians, especially settlers, harassed, attacked, and occasionally killed Palestinians in the occupied territories. During the year, settlers attacked and killed at least five Palestinians. Settlers also caused significant economic damage to Pal-

SHATSKY-008441

1969

estinians by attacking and damaging greenhouses and agricultural equipment, up-
rooting olive trees, and damaging other valuable crops. The settlers did not act
under government directive in the attacks, and Israeli soldiers sometimes restrained
them, but in several cases Israeli soldiers accompanied them or stood by without
acting. The Government of Israel stated that 80 Israeli settlers were indicted for
acts of violence against Palestinians. However, in general, settlers rarely served
prison sentences if convicted of a crime against a Palestinian.

Palestinian civilians were responsible for the deaths of 154 Israelis killed in the
occupied territories. Palestinians targeted Israelis in drive-by shootings and am-
bushes, suicide and other bombings, mortar attacks, and armed attacks on settle-
ments and military bases. Palestinian militant groups used minors to prepare at-
tacks or carry them out, exploitation that amounted to forced conscription. During
the year, Palestinians acting individually or in groups, including off-duty members
of the PA security services, killed 74 Israeli civilians, 82 Israeli security personnel,
and 3 foreign nationals in the occupied territories. Most of the attacks were orga-
nized by a number of Palestinian terrorist groups, including the militant Islamic Re-
sistance Movement (HAMAS), the Palestine Islamic Jihad (PIJ), the Popular Front
for the Liberation of Palestine (PFLP), and the al-Aqsa Martyrs' Brigades. The
Democratic Front for the Liberation of Palestine (DFLP) and Fatah affiliated groups
also participated in the attacks. Palestinian civilians also killed at least 35 Palestin-
ians in the occupied territories who allegedly had collaborated with Israel. Most of
the deaths were shootings perpetrated by small groups of unidentified Palestinian
gunmen. The PA conducted no investigations and made no arrests in any of these
killings.

RESPECT FOR HUMAN RIGHTS

*Section 1. Respect for the Integrity of the Person, Including Freedom From:*

*a. Arbitrary or Unlawful Deprivation of Life.*—During the year, the number of
deaths due to political violence associated with the Intifada remained extremely
high in the occupied territories. Israeli security forces killed at least 990 Palestin-
ians in the West Bank and Gaza, of whom 132 were members of PA security forces
and 2 were foreign nationals. Israeli civilians, mostly settlers, as well as extremist
groups believed to be associated with settlers, killed at least five Palestinians. Pal-
estinian militants and civilians killed an estimated 189 Israeli civilians and security
personnel in the occupied territories. Palestinian civilians killed at least 35 Palestin-
ians suspected of spying for the Israeli government (*see* Sections 1.c. and 1.g.).

Most Palestinians killed by Israeli security forces were killed during armed clash-
es, targeted killings, incursions into Palestinian-controlled areas, at checkpoints, or
as a result of sometimes excessive or indiscriminate fire toward Palestinian civilian
areas. During these incidents, Palestinian protesters frequently threw stones and
Molotov cocktails, and in some cases, also fired weapons at IDF soldiers (*see* Sec-
tions 1.c. and 1.d.). Israeli security forces used a variety of means to disperse pro-
testers, including tear gas, rubber-coated metal bullets, and live ammunition. The
IDF generally did not investigate the actions of security force members who killed
and injured Palestinians under suspicious circumstances. Since the start of the
Intifada, the IDF has opened only 30 investigations into the improper use of deadly
force despite the fact that human rights organizations have raised numerous allega-
tions.

Israeli security forces used excessive force against protesters, in response to per-
ceived threats while on patrols, in pursuing fleeing suspects, and in responding to
trespassers in restricted areas, at times resulting in death. For example, on Sep-
tember 30, IDF soldiers shot and killed a 10-year old Palestinian boy in the Balata
Refugee Camp in Nablus. The boy was among a group of youths who were throwing
rocks at Israeli soldiers. The use of lethal force against a rock-thrower, in this in-
stance and in many others like it, was excessive. IDF statistics state that no Israeli
soldier has ever been killed by rock throwing.

On May 5, the IDF killed a mother and her two young children in Jenin, while
they were picking grape leaves in the area. Soldiers in an approaching tank heard
a loud sound and opened fire, killing the woman and her children. The IDF initially
claimed the tank had run over a mine, but later acknowledged that the tank's track
had simply disconnected. While the IDF expressed regret for the deaths, it main-
tained that the soldiers acted according to regulations.

IDF soldiers shot and killed suspects who were avoiding arrest but not threat-
ening their lives. For example, on November 27, the IDF undertook a military incur-
sion into the Askar Refugee Camp in Nablus in the early morning and shot and
killed a fleeing man, who walked the streets of the camp in the morning to awaken

SHATSKY-008442

1970

people for prayers. He was discovered later to have been a frightened civilian not wanted by the IDF.

IDF soldiers fired without warning on trespassers in restricted areas, on several occasions killing Palestinians who posed no threat. For example, on the night of December 12, Israeli soldiers in a tank fired on and killed five men spotted near the fence dividing Israel and the Gaza Strip. When an IDF patrol went to investigate the scene the following day, it discovered that the five men were unarmed Palestinian workers from a single family who apparently were seeking to enter Israel to find jobs.

The IDF rules of engagement authorize soldiers to use deadly fire in cases of self defense, in defense of others facing an imminent threat to life, during procedures for apprehending suspected terrorists, and in extreme cases when dispersing rioters. The IDF stated that its rules of engagement on the use of live fire are fully consistent with international laws of armed conflict.

During the year the IDF targeted for killing at least 37 Palestinians. In the process, IDF forces killed at least 25 bystanders, relatives, or associates of those targeted and injured a number of others, although the Israeli security forces state that in planning operations, they make every effort to reduce civilian casualties. According to the IDF, the targeted persons were individuals whom the IDF believed were terrorists and had recently attacked or had been planning future attacks against Israeli civilians, settlements, or military targets. The IDF stated that it targeted persons only with the authorization of senior political leaders. The Government of Israel stated that such actions were exceptional self-defense measures taken only against those engaged in hostilities against Israeli citizens and were justified by its obligation to protect its citizens against terrorism and consistent with its right to self defense.

Israeli security forces put large numbers of civilian lives in jeopardy by undertaking targeted killings in crowded areas where civilian casualties were likely. This occurred despite statements that it had aborted operations against known terrorists when it became clear that they might endanger innocent civilians. For example, on July 23, Israel fired a missile at a civilian apartment building in a densely populated area of Gaza City in order to kill HAMAS military wing leader Salah Shahada. Israeli forces killed 14 other Palestinians in the effort, including 9 children. The Government of Israel publicly apologized for the incident.

Israeli security personnel used excessive force while manning checkpoints, killing a number of Palestinians (*see* Section 1.g.). On December 3, an IDF soldier shot and killed a 95-year-old Palestinian woman riding in a taxi on a Ramallah road that the army claimed was forbidden to Palestinian vehicles. An IDF inquiry into the case established that the shots were fired without justification, because the taxi did not pose a lethal threat to the soldiers. The soldier faced possible criminal charges.

Israel put civilian lives in jeopardy by using imprecise, heavy weaponry in operations against terrorist infrastructure conducted in civilian areas, in contravention of their own rules of engagement. Frequently, and often following shooting attacks, many of which were nonlethal, in the direction of Israeli settlements and military positions, the IDF retaliated against Palestinian towns and cities in the West Bank and Gaza. Israeli forces fired tank shells, heavy machine-gun rounds, and rockets from helicopters and F-16s at targets in residential and business neighborhoods located near the sites from which the Palestinian gunfire was believed to have originated. For example, on October 17 an unidentified Palestinian located in the Rafah refugee camp area fired an antitank shell at an IDF construction crew. Israeli forces responded by firing tank shells into the refugee camp, killing seven Palestinians including two women and two children. The shells also injured 35 other Palestinians.

Numerous civilians were killed by Israeli security forces during military incursions into Palestinian-controlled (Area A) cities and towns. Such incursions usually were conducted in response to Palestinian suicide bombings, shooting attacks that had killed Israeli civilians, settlers, or soldiers, or to make arrests. Israeli security forces also conducted military incursions on the basis of intelligence information about possible future attacks. Palestinians often resisted with gunfire and by boobytrapping civilian homes and apartment buildings. The military incursions into these areas varied in length from a few hours to several months. As part of such actions, the IDF usually leveled and raided buildings, including homes. The Government of Israel stated that such actions were intended to widen a security strip area adjacent to Israeli-controlled territory to or clear access for Israeli forces.

On April 3, Israeli security forces launched an incursion into the Jenin refugee camp, home to approximately 14,000 Palestinian civilians. The Government of Israel stated that the incursion was intended to attack Palestinian terrorists who had taken refuge in the camp and were responsible for suicide bombings and other attacks that had killed more than 70 Israelis since March. Israeli forces destroyed ap-

SHATSKY-008443

1971

proximately 140 homes and made 200 others structurally unsound during the operation, leaving approximately 4,000 camp residents homeless. Israeli forces killed 52 Palestinians in the operation, including 22 unarmed civilians who were killed inadvertently during the operation. The Israeli government stated that it made every effort to reduce civilian casualties, including by not using heavy weaponry or airpower. Palestinian gunmen killed 14 Israeli soldiers during the operation.

Israeli forces used excessive force to enforce curfews in reoccupied Palestinian areas, resulting in the deaths of at least 15 civilians, 12 of them children under the age of 16. For example, on October 11 Israeli border police enforcing a curfew in Nablus fired on a family sitting on its balcony, killing the mother and injuring her husband and son. Israel said it was investigating the killing, but no results were forthcoming at year's end.

Israeli security forces manning checkpoints often impeded the provision of medical assistance to sick and injured Palestinians, contributing to the deaths of at least 14 Palestinians (see Section 1.g.).

During the year, Israeli forces were responsible for the death in custody of at least one Palestinian. On March 31, IDF soldiers detained Murad 'Awaisa, a 17-year-old Palestinian, and several other Palestinians in an apartment building in Ramallah. IDF soldiers beat 'Awaisa and forcibly removed him from the room where he was imprisoned. Other detainees reported intense gunfire inside and outside the building and that the soldiers later told them that 'Awaisa had died. Inspection by the Palestinian physician who took 'Awaisa's body to the hospital and quick burial revealed two bullet wounds. The IDF said it would investigate the death. No results were forthcoming by year's end.

Israel forces may have beaten and killed one other Palestinian prisoner. On December 30, Israeli Border Police in Hebron arrested 'Imran Abu Hamdiyeh, a 17 year old Palestinian. Palestinians found Hamdiyeh dead in Hebron's industrial area later that day. He had been beaten to death. Israel said it was investigating the death but no results of the investigation were forthcoming by year's end.

Palestinian security forces used excessive force against Palestinians during demonstrations. For example, on January 22 PA police in Nablus violently dispersed a crowd demonstrating against the PA and demanding the release of HAMAS and Palestinian Islamic Jihad prisoners. The police shot and killed a Palestinian man while dispersing the crowd.

Palestinian security officers and members of Arafat's Fatah faction attacked and killed Israeli settlers, civilians, and soldiers. They often fired at Israelis from within or close to the homes of Palestinian civilians or in other locations in which civilians were present, drawing Israeli return fire and increasing the potential for the noncombatants to be injured. Arafat issued several ceasefire orders and denounced attacks on civilians without lasting effect, but took no action to arrest or try violators.

During the year, there were no reports that Palestinian security forces impeded the provision of medical assistance to injured Israelis in the occupied territories.

The PA was responsible for the deaths of seven Palestinians in custody. The PA arrested six of the victims on charges of collaboration with Israel, and vigilantes subsequently killed them. The PA security services either failed to protect the prisoners from attack or actively turned them over to their killers. For example, in 2001 PA security services arrested Mahmoud Nimer Sabateen, a 27-year-old Palestinian from the village of Housan, on suspicion that he collaborated with Israel and provided information that led to the killing of Fatah activists. In 2001, Sabateen was sentenced to death by firing squad. On March 14, when the execution still had not been carried out, armed Fatah members dragged Sabateen from his prison and killed him in Bethlehem.

Palestinian police may have tortured and killed one prisoner. On April 24, Ayman Ghayad Hilles, a 36-year-old Palestinian from al-Shajaeya in Gaza, died while in the custody of PA police in Gaza City. On April 23, PA police arrested Hilles allegedly on criminal charges and informed his family 1-day later that he had died in custody after being transferred to al-Shifa Hospital in Gaza City. PA police said that an investigation would be conducted to determine the circumstances of his death. At the request of the family, an autopsy was carried out at al-Shifa hospital. A preliminary examination revealed large bruises on his legs and hands, as well as signs of blunt trauma to the head, suggesting that Hilles had been tortured. The autopsy concluded that it was a suspicious death.

Palestinian civilians harassed, attacked, and killed Israelis, especially settlers and soldiers. During the year, Palestinians, acting as individuals or in unorganized or small groups, including some members of PA security services, killed 88 Israeli civilians, 101 Israeli soldiers, and injured hundreds of others in acts of violence and terrorism in the occupied territories (see Section 1.c.). The Palestinian attacks consisted

SHATSKY-008444

1972

of shootings, bombings involving improvised explosive devices, suicide bombings, and stone-throwing at Israeli drivers.

For example, on June 5, 2001, a five-month-old Israeli boy was hit in the head and critically injured when Palestinians threw stones at the car he was riding in near Shilo Junction in the West Bank. He was transported to the Hadassah intensive care unit, where he died on June 10.

On February 16, a Palestinian suicide bomber strapped with nail studded explosives blew himself up in a pizzeria at the Israeli Karnei Shomron settlement in the West Bank, killing three Israeli children.

On September 5, Palestinian militants detonated explosives that they had concealed near the Kissufim Crossing in Gaza and blew up an Israeli tank, killing an Israeli soldier.

Israeli settlers, acting individually or in small, at times unstructured, groups harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (see Section 1.c.). During the year, settlers killed at least five Palestinians by shooting them or stoning their vehicles and causing accidents. For example, on October 6 armed settlers fired on Palestinians harvesting olives. They injured two Palestinian men and killed a Palestinian who rushed to the scene. The Israeli government did not generally prosecute the settlers for their acts of violence (see Section 1.g.). According to Israeli government statistics, 80 settlers were indicted for violence against Palestinians. However, in general settlers rarely were detained or even investigated for crimes they committed against Palestinians.

HAMAS, PIJ, the PFLP, DLFP, and Fatah-affiliated groups such as the al-Aqsa Martyrs' Brigades and the Brigades of Return continued to kill and injure Israelis. By year's end, the PA made few arrests in these killings and made no effective efforts to control the violence. Many of those arrested were released a short time later or held under conditions not commensurate with normal conditions of arrest.

Some PA officials made public statements justifying Palestinian attacks on Israelis, stating that such attacks were in response to the occupation. Additionally, Fatah leaders made public statements urging Palestinians to continue all aspects of the Intifada, including violent attacks.

Palestinian civilians also killed at least 35 Palestinians in the occupied territories who allegedly collaborated with Israel. Most of the deaths were shootings perpetrated by small groups of unidentified Palestinian gunmen. In March alone, Palestinian extremists killed 10 alleged collaborators in the streets of the West Bank. The PA made no arrests in any of these killings. An example of such a case was the March 14 death of Mahmoud Nimer Sabateen, in which no one was held accountable.

*b. Disappearance.*—There were no reports of politically motivated disappearances during the year.

In 2001 one man disappeared in the West Bank and remained missing. Some have suggested that his disappearance was probably criminally motivated and not carried out by Israel.

*c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.*—In a landmark September 1999 decision, the Israeli High Court of Justice prohibited the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures; however, during the year, human rights organizations, including B'tselem, Human Rights Watch, LAW, and the Mandela Institute for Political Prisoners reported that there was an increase in the number of allegations that Israeli security forces tortured and abused detainees, and used methods prohibited in the 1999 High Court decision. Israeli security forces could obtain special permission to use "moderate physical pressure" against detainees considered to possess information about an imminent attack. The GSS has used court-approved "extraordinary interrogation methods"—some of which included physical pressure—in 90 cases since the law was passed in 1999. The Attorney General's office investigated allegations of mistreatment, but few cases were opened and no GSS agent has been criminally charged with torture or other abuse for the past several years. Israeli and Palestinian human rights groups noted that jailers made it difficult to visit prisoners during the interrogation period and that some detainees were reluctant to report abuse out of fear of retribution.

Several human rights groups stated that the case of Abdel Rahman al-Ahmar was representative of the allegations of physical abuse they received. In May 2001, Israeli authorities arrested al-Ahmar, a well-known Palestinian human rights activist and field researcher, for entering Jerusalem without a permit. The authorities first detained al-Ahmar at Etzion prison, then transferred him 6 days later to the Russian Compound in Jerusalem. According to testimony he gave his lawyer, au-

SHATSKY-008445

1973

thorities beat al-Ahmar when they arrested him, subjected him to shabeh (shackling in painful positions for prolonged periods), and held him in a dirty, cold cell. According to a press release from the Public Committee Against Torture in Israel, authorities denied al-Ahmar adequate medical care. In June 2001, an Israeli military judge denied al-Ahmar's legal complaint of torture—despite bruises on his arms and visible difficulty walking—and extended his detention without charging him. In July 2001, al-Ahmar was remanded for 6 months of administrative detention, and in November 2001 the order was renewed for an additional 6 months. International, Israeli, and Palestinian human rights groups continued to petition for his release. Al-Ahmar was released early this year.

Most convictions in security cases before Israeli courts were based on confessions. The law prohibits the admission of forced confessions as evidence. A detainee may not have contact with a lawyer until after interrogation, a process that may last days or weeks. The Israel government did not allow representatives of the International Committee of the Red Cross (ICRC) access to detainees until the 14th day of detention. Detainees sometimes stated in court that their confessions were coerced, but judges rarely excluded such confessions. During the year, there were no known cases in which an Israeli court excluded a Palestinian confession because of a finding of improper means of investigation or interrogation.

During the year, Israeli security forces injured approximately 4,382 Palestinians during armed clashes, violent demonstrations, retaliatory strikes, and other military actions (see Sections 1.a., 1.g., and 2.b.).

The IDF injured a number of bystanders, including journalists, at demonstrations, clashes, during retaliatory strikes, and during targeted killings. During the year, Israeli gunfire killed three journalists and injured at least one other during Israeli military actions (see Sections 1.a. and 2.a.).

Israeli authorities abused Palestinians at checkpoints, subjecting them to verbal and physical harassment. Each day, tens of thousands of Palestinians who traveled between Palestinian towns and villages had to pass through 1 or more of the approximately 430 Israeli checkpoints across the occupied territories; significantly more than the 130 checkpoints in 2001. Abuse was common, and as many as several thousand Palestinians encountered some form of abuse from soldiers at checkpoints. Palestinians were subjected to excessive delays in passing through checkpoints. Israeli soldiers forced Palestinian civilians to wait in the rain or inclement weather for excessive periods of time. For example, in November Israeli soldiers made a group of Palestinian schoolteachers in Asira ash-Shamaliya wait in a ditch in the rain for several hours before allowing them to pass through a military checkpoint.

Palestinians in the West Bank and Gaza were subjected to beatings, tire slashings, and gunfire directed against them or their vehicles because they were traveling on, or trying to circumvent, roads on which the IDF blocked passage to Palestinians as it attempted to enforce internal closures between Palestinian cities and towns in the West Bank and Gaza (see Section 2.d.).

Israeli security personnel on patrol abused and in some cases tortured Palestinian civilians. On several occasions during the year, Israeli border policemen in Hebron detained Palestinian civilians and beat them without provocation. For example, in early December, Israeli Border Police in Hebron halted Badr Abu Sneineh, a Palestinian taxi driver, handcuffed him, and beat him for 10 minutes. On December 3, IDF soldiers in Hebron raided a barbershop in the city for no stated security purpose, shaved the heads of two Palestinians sitting in the shop, and beat them. The IDF had opened an investigation into the latter incident, but no results were forthcoming at year's end.

Israeli fire killed 4 on-duty Palestinian medical personnel during retaliatory attacks on civilian areas or PA institutions, compared to 67 attacks against Palestinian Red Crescent Society (PRCS) ambulances and 121 injuries caused by IDF soldiers (see Sections 1.a and 1.g.).

Article 13 of the PA Basic Law signed this year prohibits the use of torture or force against detainees; however, PA security forces tortured and abused Palestinian detainees. Such abuse generally took place after arrest and during interrogation, and reportedly was widespread. Palestinian security officers were not issued formal guidelines regarding the proper conduct of interrogations. The PA lacked adequate equipment to collect and use evidence, and convictions were based largely on confessions.

PA security officials tortured and abused prisoners by threatening, hooding, beating, and tying detainees in painful positions, forcing them to stand for long periods of time, depriving them of sleep and food, and burning detainees with cigarettes and hot instruments. Palestinians also alleged that PA authorities have shaken them violently while in PA custody. International human rights groups have documented widespread arbitrary and abusive conduct by the PA. The organizations stated that

SHATSKY-008446

1974

the use of torture was widespread and not restricted to those persons detained on security charges. Human rights groups stated that Palestinians who were suspected of belonging to radical Islamic groups were more likely to be treated poorly, as were the 250 alleged collaborators with Israel who were arrested since the start of the Intifada. Observers noted that documentation of abuses was very limited, due partly to the hesitancy of alleged victims to file or make public claims of torture and abuse against the PA authorities.

During the year, one Palestinian died under PA custody, allegedly due to abuse (*see* Section 1.a.).

Palestinian security officers and Fatah Tanzim members with firearms attacked and injured Israelis. In some cases, they fired at Israeli civilians or soldiers from within or close to the homes of Palestinian civilians, drawing Israeli return fire (*see* Section 1.a.). Palestinian security forces often failed to prevent armed Palestinians in areas under PA control from opening fire on Israeli settlers or other civilians, soldiers, or military targets.

Extremist Israeli settlers harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (*see* Section 1.a.).

Some settlers attacked Palestinian homes and damaged crops, olive trees, greenhouses, and agricultural equipment, usually in areas located near settlements, causing extensive economic damage to Palestinian-owned agricultural land. In October settlers disrupted the Palestinian olive harvest by firing on Palestinians picking olives, beating harvesters returning home and stealing the harvest, and invading Palestinian property and picking the olives themselves. The settlers admitted to these activities but cited past Palestinian attacks on their settlement and claimed that the Palestinians must be deterred. Many settlers also claimed that Palestinians had no right to live on the land of "greater Israel" and that Palestinian attempts to cultivate their land was a form of theft. The settlers acted in an area in which the IDF was responsible for security. Settlers acted independent of government direction in such attacks. There have been some instances in which IDF forces protected Palestinians from settlers; however, the Government of Israel generally did not prosecute settlers for their acts of violence against Palestinians, and settlers rarely served prison sentences if convicted of a crime against a Palestinian. However, during the year, the Government stated that it indicted 80 Israelis for violence against Palestinians. In 20 of the cases, the perpetrators were indicted during their detention. Israel often enforced security by applying curfews and closures only to Palestinians, which on occasion prevented Palestinians from defending themselves and their property from attacks by settlers.

For example, from July 26 to 28, settlers in Hebron killed Nivin Jamjum, age 14, stabbed Ahmad a-Natsheh, age 8, beat Ahmad's brother Falah, age 9; injured more than 10 other Palestinians; took control of a house and damaged property in 20 other houses. Settlers also verbally and physically abused Israeli security forces in the city, but some committed their violence while accompanied by Israeli soldiers. Settlers claimed they were avenging a Palestinian shooting attack on July 26 that killed Elazar Leibowitz, a 21-year-old Israeli soldier and Hebron settler, and three residents of the P'sagot settlement, Hana and Yosef Dickstein and their 9-year-old son, Shuva'el. The couple's two other children were injured in the attack. A curfew on the city remained in effect for Palestinians during the duration of the events described.

During the year, Israeli settlers in Hebron continued their longstanding harassment of members of the Temporary International Presence in Hebron (TIPH), which monitored relations between Israeli and Palestinian security forces, Palestinian civilians, and settlers in the city, and damaged a number of their vehicles.

Palestinians harassed, attacked, and occasionally killed Israelis, especially settlers (*see* Section 1.a.).

Conditions for Palestinians in Israeli prisons were poor. Facilities were overcrowded, sanitation was poor, and at times food and clothing were insufficient. Israel set up tents at the Ofer Camp and crowded 60 Palestinian prisoners under each tent. Israel was unprepared to accommodate properly the thousands of Palestinians that were arrested in sweeps that accompanied Israeli operations this year. During April and May, Israel shut down the Ketziot prison to reorganize the facilities after discovering that it was not suited to handling the large number of detainees. In August 40 female Palestinian prisoners at the Ramlah prison conducted a 5 day hunger strike protesting conditions at the facility.

The IDF prevented families from the West Bank from visiting prisoners, citing the security situation as the reason. Visits for families of prisoners from Gaza took place at a fairly normal level. During the year, one Palestinian prisoner died in Israeli custody under suspicious circumstances and another Palestinian who had been taken into custody was later found dead (*see* Section 1.a.).

SHATSKY-008447

1975

Israel permitted independent monitoring of prison conditions by the ICRC and other groups, although human rights groups sometimes encountered difficulties gaining access to specific detainees.

The PA provided poor conditions for its prisoners. In many cases, facilities were old, dilapidated, and neglected. There are separate facilities to hold juvenile prisoners. Most Palestinian prison facilities and detention centers were destroyed during the current conflict, and prisoners were kept informally in houses or other buildings. One Palestinian died under suspicious circumstances after having been taken into custody by the PA (see Section 1.a.).

The PA permitted independent monitoring of its prisons, although human rights groups, humanitarian organizations, and lawyers reported difficulties arranging visits or gaining access to specific detainees. Human rights organizations stated that their ability to visit PA prisons and detention centers varied depending on which security organization controlled the facility. Human rights organizations stated that the police, the Preventive Security Force, and Mukhabarat generally allowed them to inspect facilities and visit prisoners and detainees. However, they stated that the Military Intelligence Organization usually did not grant them access to facilities that they controlled. Human rights monitors stated that prison authorities did not consistently permit them to have access to PA detention facilities, and that they rarely were permitted to see inmates while they were under interrogation.

The ICRC operated in the West Bank and Gaza under the terms of a memorandum of understanding signed in September 1996 between the ICRC and the PLO. The memorandum accorded the ICRC access to all detainees held by the PA and allowed regular inspections of prison conditions. In accordance with the agreement, the ICRC conducted visits of facilities run by the PA. The PA may deny a group access to a detainee for 14 days immediately following his or her arrest. When abuses occurred, they frequently happened during that 2 week period.

*d. Arbitrary Arrest, Detention, or Exile.*—Israeli security personnel may arrest without warrant or hold for questioning a person suspected of having committed a criminal or security offense. During the year, Israel conducted mass, arbitrary arrests in the West Bank. Most of those arrested were released several days or weeks thereafter. On April 5, Israel issued Military Order 1500, allowing the Israeli army to detain people for 18 days during which detainees were barred from seeing a lawyer or appearing before court. In March and April, during Operation Defensive Shield, Israel conducted mass arrests under this order's authority. Israeli forces began the operation on March 28, one day after a Palestinian suicide bomber blew himself up in the Park Hotel in Netanya, killing 30 Israelis. Israel entered cities and ordered all male civilians between the ages of 15 and 50 to assemble in main squares, blindfolded and handcuffed them, and led them to detention centers for processing. In such a way Israel arbitrarily detained approximately 7,000 Palestinians and later released 5,600 of them after a few days or weeks without taking legal action against them. Several Palestinians and human rights groups challenged the legality of these arbitrary arrests and delays of legal representation in court, and Israel announced that it would allow access to an attorney within 4 days and an appearance before a judge after 12 days. Human rights group did not consider these changes sufficient and their legal challenge had not been adjudicated by year's end.

Israel used administrative detention to hold hundreds of Palestinians without trial or charge. Prisoners who were not charged and tried in time were administratively detained after their arrest to put off their trial. At year's end, Israel held 1,007 Palestinians in administrative detention. Individual administrative detention orders could be issued for up to 6-month periods and could be renewed indefinitely. Israel conducted de facto detentions at checkpoints by confiscating Palestinian identification cards and keys. Israel conducted these detentions as a form of harassment at checkpoints and Palestinians were unable to leave the scene until IDF soldiers returned the items.

Israeli authorities intermittently issued special summonses for those suspected of involvement in or knowledge of security offenses. There were reports that some such summonses were issued immediately before and during the Intifada. Israeli military order 1369 provided for a 7-year prison term for anyone who did not respond to a special summons delivered to a family member or posted in the MATAK office nearest the suspect's home address. During the year, there were no reports that any person was convicted of failing to respond to a summons. Bail rarely was available to those arrested for security offenses.

Israel applied a different age standard in prosecuting Palestinian youth than when prosecuting Israeli youth. Israeli youth under the age of 18 cannot be tried as adults; however, Palestinian youth who are 17 years of age can be tried as adults.

SHATSKY-008448

1976

Authorities must inform detainees of their right to an attorney and whether there are any orders prohibiting such contact. Higher-ranking officials or judges may extend the period during which a detainee is denied access to counsel. For example, access to counsel was denied routinely while a suspect was being interrogated, which may last up to several weeks.

Israel hampered or prevented contacts between Palestinians in Israeli prisons and detention facilities and their lawyers, families, and human rights organizations. Legislation regarding the occupied territories requires the Israeli authorities to inform the family of a person's arrest and place of detention "without delay." Israeli authorities stated that they attempted to post notification of arrest within 48 hours, but that senior officers may delay notification for up to 12 days. In fact a military commander may appeal to a judge to extend this period in security cases for an unlimited period of time. Such notification rarely was given, and Palestinian suspects often were kept incommunicado for much longer than 48 hours. Even if family members or others became aware of a person's arrest, it often was difficult for them to obtain information regarding where a detainee was being held or whether the detainee had access to an attorney. Palestinians generally located detained family members through their own efforts. Palestinians may check with a local ICRC office or the Israeli human rights organization HaMoked to determine whether it has information regarding the whereabouts of a family member.

The Israeli government routinely transferred Palestinians arrested in the occupied territories to facilities in Israel, especially the prison in Ashkelon and the military detention centers in Megiddo and the Negev Desert. Israeli authorities in some instances scheduled appointments between attorneys and their detained clients, only to move the clients to another prison prior to the meetings. Authorities reportedly used such tactics to delay lawyer-client meetings for as long as 90 days. Palestinian prisoners had difficulty obtaining legal representation because of restrictions in place on Palestinian lawyers. Since the Intifada began, only Israeli citizens or Palestinian lawyers with Jerusalem identification cards were permitted to visit Palestinian prisoners in Israeli prisons as advocates or monitors. This significantly reduced the availability and timeliness of legal aid for such prisoners due to a reduction from 1,300 to approximately 100 available lawyers to handle such cases. Lawyers with Jerusalem identification cards reported frequent, repeated, and lengthy delays in meeting with prisoners. Israeli lawyers did not take steps to fill the void, which had grown even more severe with the greatly increased numbers of Palestinian detainees during the past year.

Human rights groups stated that Palestinian lawyers from the Gaza Strip had a more difficult time obtaining permission to meet their clients than their West Bank counterparts, and that they were denied entry into Israel more frequently than West Bank lawyers.

Male family members between 16 and 40 years of age, and any family members with security records, generally were barred from visiting relatives in Israeli facilities. Relatives of Palestinian prisoners also stated that in some instances they learned that visitation rights were canceled only when they arrived at the prison after having traveled for many hours from the occupied territories. Following the outbreak of violence in September 2000, the Israeli government banned all family visits for Palestinian prisoners in Israeli prisons, although some visitation rights were restored intermittently after ICRC intervention (*see* Section 1.c.).

Evidence used at hearings for administrative detentions in security cases was secret and unavailable to the detainee or his attorney during the hearings; the detainee and defense lawyer were required to leave the courtroom when secret evidence was presented. Israeli authorities maintained that they were unable to present evidence in open court because doing so would compromise the method of acquiring the evidence. In 1998 the High Court of Justice ruled that only judges, rather than military officials, may renew administrative detention orders beyond a 6-month period. Detainees may appeal detention orders, or the renewal of a detention order, before a military judge, but their chances for success were very limited. No information was available regarding whether any detainees were successful in such appeals.

During the year, the total number of Palestinian prisoners and administrative detainees in Israeli prisons more than doubled due to arrests associated with terrorist acts and the violence of the ongoing Intifada. According to the IDF, there were 4,672 Palestinian security prisoners held in IDF and Israeli Prisons Service jails, compared to 1,854 at the end of 2001. The IDF also held an unspecified number of Palestinian detainees in waiting facilities in the occupied territories. Approximately 1,400 had been detained before the Intifada began (most of them were pre-Oslo prisoners serving long terms), and approximately 3,000 of those in custody had been ar-

SHATSKY-008449

1977

rested during the year. During the year, approximately 10,000 Palestinians were detained, of whom an estimated 7,000 were released or had completed their sentences.

At year's end, Israel held 1,007 Palestinians in administrative detention. Most had been detained for less than 1 year. A number of Palestinians under administrative detention during the previous several years have had their detention orders renewed repeatedly and few, if any, appeals were successful.

Israel forcibly transferred persons suspected of terror from the West Bank to Gaza. In July the Government of Israel announced its intention to forcibly transfer from the West Bank to the Gaza Strip relatives of persons known or suspected of having organized or participated in attacks against Israelis. On August 1, the IDF West Bank Commander signed an amendment to Military Order 378 allowing for the forcible transfer of Palestinians from the West Bank to the Gaza Strip. On September 3, the Israeli High Court of Justice issued a ruling allowing the forcible transfer of two Palestinians from Nablus to the Gaza Strip on the grounds that they were not being transferred out of the occupied territories and had allegedly assisted their brother to commit attacks against Israelis. The two Palestinians, Intisar and Kifah 'Ajuri, were in detention since June 4 and July 18, respectively, but never were charged nor brought to trial. The Israeli government claimed that it could not try them because this would expose the source of the evidence against them.

The 2001 PA Criminal Procedures Law contains unified procedures that allow police to hold detainees without charges for 24 hours. Prosecutors can authorize detention for another 15 days. Court approval is necessary for detention without charges for a maximum of 30 more days. The Attorney General can ask any court of first instance to authorize up to another 45 days of detention. After the first 90 days of incarceration, the detainee must be brought before the court having jurisdiction in the case for any other extension of detention. A trial must start within 6 months of arrest, or the detainee must be released.

On May 14, Chairman Arafat signed the Independence of the Judiciary Law and on May 29 he signed the PA Basic Law, which defines the authorities of the three governmental branches and prescribes direct election of a president accountable to his cabinet and to the elected PLC. Neither law has yet been fully implemented; hence the safeguards they offer are not fully in place. The lack of safeguards has contributed to the tendency of PA security forces to refuse to carry out High Court of Justice orders to release detainees.

PA security forces arbitrarily arrested and detained persons, and security officials often ignored laws that restrict their actions. The PA ignored court decisions calling for the release of alleged security criminals. On November 24, the PA High Court of Justice ordered Eid Atya Abu Anseer released from detention for lack of evidence. The PA Military Intelligence Service in Gaza had arrested Anseer on charges of collaborating with Israel. Despite this ruling, Anseer remained imprisoned at year's end. Lawyers and PA judicial officials acknowledged that, in contravention of the law, PA security services sometimes arrested and detained persons without informing judicial officials.

At year's end, approximately 250 suspected collaborators and at least 20 political prisoners were in custody in PA prisons (*see* Section 1.e.). These alleged collaborators often were held without sufficient evidence, and denied access to lawyers, their families, or doctors.

PA authorities generally permitted prisoners—except those held for security offenses—to receive visits from family members and human rights monitors. PA security officials did not always permit lawyers to see their clients. In principle detainees may notify their families of their arrest, but this was not always permitted.

PA security services had overlapping or unclear mandates that often complicated the protection of human rights. Leadership changes and Israeli strikes against security posts have seriously crippled the PA security apparatus. Under existing law in the West Bank, only the PA's civil police force is authorized to make arrests. In practice all security forces detained persons at various times. The operating procedures and regulations for the conduct of PA security personnel in the various services still were not well developed and have not been made fully available to the public.

There were many detention facilities in the West Bank and Gaza Strip administered by the overlapping PA security services, a situation that complicated the ability of families, lawyers, and even the Ministry of Justice to track detainees' whereabouts and to determine their numbers. During the year, most PA prisons were destroyed during Israeli operations, and the use of informal detention centers in homes and apartment buildings spread. Security services, including Preventive Security, General Intelligence, Military Intelligence, and the Coast Guard have their own interrogation and detention facilities. In general these services did not inform families of a relative's arrest, or did so only sporadically. Most PA security officers

SHATSKY-008450

remained unaware of proper arrest, detention, and interrogation procedures, as well as basic human rights standards.

PA security forces continued to harass journalists, political activists, and human rights advocates who criticized the PA and its policies (*see* Section 2.a.).

Neither the Israeli government nor the PA used forced exile, or forcibly deported anyone from the occupied territories, during the year. However, Israel and the PA sanctioned the voluntary agreement of 13 Palestinian gunmen to go into exile in Europe and another 35 to Gaza in a negotiated resolution of the standoff at the Church of the Nativity in Bethlehem in the spring.

*e. Denial of Fair Public Trial.*—Israeli law provides for an independent judiciary, and the Government generally respected this provision. Palestinians accused by Israel of security offenses in the occupied territories usually were tried in Israeli military courts. Security offenses are defined broadly and may include charges as varied as stone throwing or membership in outlawed organizations, such as HAMAS or the PFLP. Military prosecutors brought charges. Serious charges were tried before three-judge panels; lesser offenses were tried before one judge. The Israeli military courts rarely acquitted Palestinians of security offenses, but sentences in some cases were reduced on appeal.

The 1970 regulations governing Israeli military trials allowed for evidentiary rules that were the same in criminal cases. Convictions may not be based solely on confessions, although in practice some security prisoners were sentenced on the basis of the alleged coerced confessions of both themselves and others. The prosecution must justify closing the proceedings to the public in such cases, and the Attorney General determines the venue. Counsel may assist the accused, and a judge may assign counsel to those defendants when it is deemed necessary. Charges are made available to the defendant and the public in Hebrew, and the court may order that the charges be translated into Arabic if necessary. Sentencing in military courts was consistent with that in civilian criminal courts. Defendants in military trials had the right to appeal through the Military High Court. Defendants in military trials also may petition to the civilian High Court of Justice (as a court of first instance) in cases in which they believe there are procedural or evidentiary irregularities. The court may hear secret evidence in security cases that is not available to the defendant or his attorney; however, while a conviction may not be based solely on such evidence, it reportedly may influence the judge's decision.

Trials sometimes were delayed because witnesses, including Israeli military or police officers, did not appear, the defendant was not brought to court, files were lost, or attorneys failed to appear, sometimes because they were not informed of the trial date or travel restrictions prevented Palestinian lawyers from reaching the court (*see* Section 2.d.). These delays pressured some defendants to plead guilty to minor offenses so that an expedited trial could be held; in expedited trials a charge sheet was drawn up within 48 hours and a court hearing was scheduled within days. There frequently was no testimony provided by Palestinian witnesses either for or against Palestinians on trial. Israeli authorities maintained that this was due to the refusal of Palestinians to cooperate with the authorities. However, Palestinian authorities maintained that the absence of Palestinian witnesses was due to strict travel restrictions. Tension resulting from the security situation, and the closures imposed on the West Bank and Gaza, posed additional barriers to cooperation. Physical and psychological pressures and reduced sentences for those who confessed induced security detainees to sign confessions. Confessions usually were given in Arabic but translated into Hebrew for the record because, authorities maintained, many Israeli court personnel could speak Arabic but few could read it. As a result, many Palestinian prisoners signed confessions written in Hebrew, which many could not read or understand.

Crowded facilities and poor arrangements for attorney-client consultations in prisons hindered legal defense efforts. Appointments to see clients were difficult to arrange, and prison authorities often failed to produce clients for scheduled appointments.

Israeli settlers in the West Bank and Gaza Strip accused of security and ordinary criminal offenses were tried under Israeli law in the nearest Israeli district court. Civilian judges presided, and the standards of due process and admissibility of evidence were governed by the laws of Israel, not military orders. Settlers rarely were prosecuted in Israeli courts of crimes against Palestinians, and, in the rare instances in which they were convicted, regularly received lighter punishment than Palestinians convicted in Israeli courts of similar crimes against either Israelis or other Palestinians (*see* Section 1.a.). The Government of Israel stated that it established a special department within the police force to investigate violence by settlers; the establishment of such a unit has not noticeably diminished the problem. During the year, 42 settlers were indicted for violence in the occupied territories;

SHATSKY-008451

1979

however, most of these indictments were for crimes against Israeli security forces rather than against Palestinians.

The Israeli government maintained that it held no political prisoners, but Palestinians claimed that many of the 1,007 Palestinian administrative detainees being held without charge were political prisoners.

The Government of Israel held thousands of persons for security related offenses (see Section 1.d.).

The PA courts were inefficient, lacked staff and resources, and often did not ensure fair and expeditious trials. The PA executive and security services frequently failed to carry out court decisions and otherwise inhibited judicial independence. The lack of judicial independence and the lack of rule of law in the PA lead to continuing problems of torture, extrajudicial killings, and arbitrary detention (see Sections 1.a., 1.c., and 1.d.).

The PA inherited a court system largely based on structures and legal codes that predate the 1967 Israeli occupation and Israeli military orders. Legislation implemented in the past 2 years clarified the court structure and changed the types or sizes of cases that some of the civil courts can conduct. A High Judicial Council (HJC) maintained authority over most court operations. In each governorate there must be at least one conciliation court and a court of first instance that hears appeals from that conciliation court, and that has original jurisdiction of more serious cases. Legislation dictates that three courts of appeal sit in Gaza, Ramallah, and Jerusalem to review decisions of the first instance courts. In practice, there was no Jerusalem appeals court and the Ramallah court handles its responsibilities. There was also a High Court, officially designated as sitting in Jerusalem, but it meets in Ramallah and Gaza City. The High Court also served as the Constitutional Court until additional legislation establishes it as a separate court. The High Court also serves as the Court of Cassation and as an administrative court until administrative courts are established by legislation. Most of the changes required by the legislation started to take effect during the last year, and very limited resources and restriction of movement have hampered the transition.

The PA executive at times did not respect decisions of the courts, and the Palestinian security agencies did not always enforce their rulings (see Section 1.d.). In 1995 the PA established state security courts in Gaza and the West Bank to try cases involving security issues, but in recent years only the High State Security Court has functioned. A civilian judge who also sits on the Court of Appeals headed the High State Security Court. In most cases, three military judges presided over each case. Most of the judges were military officers but a civilian judge usually headed each panel of the High State Security Court. There was no right of appeal, but the PA president reviewed the court's findings, and he could confirm or reject its decisions. The PA Ministry of Justice had no jurisdiction over the state security courts, which were subordinate only to the Chairman. There was a separate Attorney General appointed by the Chairman to work with the state security courts. There were military courts to handle charges against members of the security forces, but during the year, they saw little if any activity.

The Gaza legal code is derived from Ottoman law, British Mandate law, Egyptian law, and PA directives and laws. Pre-1967 Jordanian law, together with PA directives and laws, applied in the West Bank. Both sets of laws were modified substantially by Israeli military orders. According to the Declaration of Principles and the Interim Agreement, Israeli military decrees issued during the occupation remained valid in both areas and were subject to review by the parties pursuant to specific procedure. The PA had passed many pieces of fundamental legislation that unify the Gaza and West Bank legal codes, but there was still a lack of unified legislation and regulations on many subjects. Human rights advocates stated that the PA's judiciary did not operate consistently. Judges stated they were hampered by their lack of information about decisions issued by other courts.

The court system in general was struggling to recover from years of neglect; most of the problems predated PA jurisdiction and were aggravated by lack of resources and attention since the PA assumed control of the courts. Judges and staff lacked sufficient resources and suffered from a lack of skills and training. In addition, closures, curfews, and the inability of PLC members to travel seriously impeded administrative functions and implementation of reform. Court procedures and record keeping were antiquated, although donor-funded activities started to improve some of the systems. The delivery of justice often was perceived as slow and uneven. The ability of the courts to obtain enforcement of their decisions was extremely weak. A heavy caseload even before the Intifada exacerbated these systemic problems. During the past 2 years, the revolving caseload reportedly increased by 50 to 60 percent (see Section 2.d.).

SHATSKY-008452

1980

The High Judicial Council (HJC) slowly was gaining authority over judicial matters that formerly were administered by the PA Ministry of Justice. The 1998 Independence of the Judiciary Law created the HJC to enhance the judicial system and its independence. Arafat appointed an HJC by a decree issued in 2000 and published in 2001, giving it the powers it would have had if he had signed the judicial independence law. Arafat signed that particular law as well as the PA Basic Law on May 14, both of which pertained to the powers of the HJC. However, instead of appointing an HJC with the 9 members required by the judicial independence law, Arafat reappointed the same 11 members he appointed in 2000. Three of the HJC members were older than 70 years, the age limit contained in the law for HJC members, including its president. During the year, discussions continued within the PA about the membership of the HJC and the extent of control the laws give the Ministry over court operations, even as the HJC planned the budget for the judicial branch, supervised judicial operations in the West Bank and Gaza, and nominated more than 30 new judges for the Chairman's confirmation. Prior to this year, the Ministry of Justice appointed all civil judges for 10-year terms and supervised judicial operations.

The PA's state security courts failed to afford defendants due process. In theory these courts can apply procedures from the criminal procedures law or those specified in the Revolutionary Code. The PA usually ignored the legal limits on the length of prearraignment detention of detainees suspected of security offenses. Defendants often were brought to court without knowledge of the charges against them or sufficient time to prepare a defense. They typically were represented by court-appointed lawyers, who generally were members of the security services with valid law degrees, but who had not practiced trial law, or in some cases, any law, as part of their career. However, during the year there were more cases in which defendants chose their own lawyers. Court sessions often took place on short notice in the middle of the night, and the advocates were not always present. In some instances, security courts tried cases, issued verdicts, and imposed sentences in a single session lasting a few hours.

During the year, the state security courts sentenced 12 persons to death for collaboration with Israel in the killing of Palestinians. Defendants often were unable to obtain competent legal counsel or bring forward witnesses in their defense. All executions required approval from PA Chairman Arafat before they could be carried out, and he has not granted such permission since the execution of two Palestinians in 2001.

The state security courts adjudicated cases that fell far outside the scope of the courts' original mandate. In addition to cases in which violations of state security allegedly occurred, the courts have on occasion dealt with tax cases and economic crimes, such as smuggling. In 2000 Chairman Arafat decreed that "serious" crimes, including homicide, rape, and drug trafficking, be referred to state security courts. The decision prompted human rights organizations to issue statements requesting the abolition of state security courts and the referral of all cases to the regular civil courts.

There were no reports during the year that persons were convicted for their political beliefs. However, at year's end, a credible Palestinian prisoner rights organization estimated that the PA held at least 20 political prisoners, as well as approximately 250 Palestinians on charges of collaboration (*see* Section 1.d.).

*f. Arbitrary Interference with Privacy, Family, Home, or Correspondence.*—Israeli military authorities on many occasions entered private Palestinian homes and institutions without a warrant, citing security concerns. An officer of the rank of lieutenant colonel or above could authorize such action. In conducting searches, both in areas under Israeli control and during incursions into areas ostensibly under PA control, IDF personnel forcibly entered and in some cases, beat occupants and destroyed property.

Israeli forces arbitrarily destroyed or looted Palestinian property during military operations. During Operation Defensive Shield, which lasted from March 29 through April 21, numerous Palestinian Authority, NGO, and private offices were vandalized, damaged, and looted. Six Israeli soldiers were indicted for looting, of whom five were convicted and demoted and given prison sentences of up to five months. 20 other Israeli military police investigations were underway for violence, looting, and vandalism. Israeli authorities stated that forced entry may occur lawfully only when incident to an arrest and when entry was resisted. Authorities stated that beatings and arbitrary destruction of property during searches were punishable violations of military regulations and that compensation was due to victims in such cases. The Israeli government stated that it did not keep consolidated information regarding the claims against the Ministry of Defense for damages resulting from IDF actions.

SHATSKY-008453

1981

Israeli security forces demolished and sealed the homes (owned or rented) of Palestinians suspected of terrorism or the relatives of such suspects, without any judicial review (*see* Section 1.g.). During the year, according to Israeli human rights organization B'tselem, Israeli forces demolished 112 homes as punishment for terror activity.

The IDF destroyed numerous citrus orchards, olive and date groves, and irrigation systems on Palestinian-owned agricultural land in both the West Bank and Gaza. The IDF destroyed these groves or orchards for security reasons, stating that Palestinians had been shooting from those areas. Israel claimed that since the beginning of the Intifada it destroyed 5,500 dunams (1,223 acres) of orchards in Gaza and 4,500 dunams (1,000 acres) of cultivated and uncultivated land. However, the Palestinian Centre for Human Rights estimated that Israel razed 16,000 dunams (3,558 acres) of land in that period. The separation wall that Israel began to build this year in the West Bank was expected to divide 6,000 dunams of land from its Palestinian owners. Israel claimed that Regulation 119 of the Defence Emergency Regulations passed under the British mandate allows military commanders to destroy homes and property without judicial review if they suspect that they have been used for violent purposes.

The PA required the Attorney General to issue warrants for entry and searches of private property; however, Palestinian security services frequently ignored these requirements. Police searched homes without the consent of their owners. In some cases, police forcibly entered premises and destroyed property.

PA security forces at times detained or placed under house arrest the relatives of alleged security criminals. For example, in 2001 the PA arrested and detained two brothers of the suspects in the killing of the Israeli Tourism Minister. The PA released them during the year (*see* Section 1.d.).

*g. Use of Excessive Force and Violations of Humanitarian Law in Internal Conflicts.*—Israeli security forces often used excessive force against Palestinians and others, in contravention of their official rules of engagement (*see* Section 1.a.). In 2001 the IDF stated that its actions and its rules of engagement were based on a legal framework, that it followed a policy of restraint and proportionality, and that to the extent possible, it avoided harming civilians.

IDF regulations permitted the use of rubber-coated metal bullets and live ammunition only when the life of the soldier or another person imminently was threatened, and no other means of defense is available, to apprehend a fleeing person suspected of having committed a dangerous offense who did not respond to warning calls and shots, and to disperse a violent demonstration or riot. A response to a violent demonstration must be in clear escalatory stages—first tear gas—then warning shots in the air, then rubber-coated steel bullets. IDF Open-Fire Regulations stated that, in apprehending a fleeing suspect, soldiers were to direct fire at the suspect's legs only. Soldiers were not permitted to fire at persons suspected of having committed only minor offenses, such as refusal to identify themselves or fleeing from security forces. Regulations prohibited security force members from opening fire in the direction of children or women, even in the case of severe public disorder, unless there is an immediate and obvious danger to a soldier's life. Firing on a suspicious vehicle at a checkpoint was permitted only when the soldiers at the site are in a clearly life-threatening situation.

The IDF killed or injured Palestinians or others in non life-threatening situations. IDF forces used lethal force against Palestinians throwing stones, even though IDF data indicated that there were no known cases in which an Israeli soldier on duty had ever been killed by stone-throwing during the Intifada (*see* Section 1.a.).

IDF fire killed or injured a number of innocent bystanders, including journalists and Palestinian civilians, when they fired into crowds at demonstrations (*see* Sections 1.a. and 2.a.). Palestinian medical groups estimated that approximately 10 percent of the injuries will result in permanent disabilities, and another 10 percent will require medical rehabilitation (*see* Section 5).

Israel obstructed the movement of and occasionally fired upon medical personal and ambulances. During the year, the PRCS stated that IDF soldiers and settlers committed 44 attacks against PRCS ambulances. The PRCS also reported that IDF soldiers and Israeli settlers injured 63 PRCS emergency personnel in attacks. The Government of Israel stated that it has ordered soldiers to refrain from interfering with the provision of medical services, and to allow ambulances and medical personnel to pass through checkpoints, and had provided this information to soldiers. The Government of Israel further stated that Palestinians had used ambulances to transport arms, and that soldiers must balance these security considerations with humanitarian concerns.

On January 27, a female Palestinian paramedic employed by the PRCS carried out a suicide bombing in central Jerusalem, killing herself and 1 Israeli while injur-

SHATSKY-008454

1982

ing more than 100 others. It was not known whether she used her credentials as a paramedic to aid her access into Israel.

On March 4, an Israeli tank fired on a PCRS Ambulance in Jenin, killing the local head of the Emergency Medical Service.

On March 27, IDF soldiers stopped a PRCS Ambulance south of Ramallah and reported finding a wanted man and an explosive belt inside the vehicle. PRCS officials claimed the belt was planted in the ambulance.

During the Intifada, the IDF also used excessive force in responding to a number of incidents at checkpoints (*see* Section 1.a.).

Israeli soldiers placed Palestinian civilians in danger by ordering them to facilitate military operations, which exposed them to live fire between armed Palestinians and Israeli soldiers. Since the beginning of the Intifada, IDF soldiers have ordered Palestinian civilians to enter buildings to check whether they were booby-trapped; to expel their occupants; to remove suspicious objects from the road; and to walk in front of soldiers to protect them from gunfire. For example, IDF officials acknowledged that on August 14, IDF soldiers in the West Bank village of Tubas forced 17-year-old Palestinian Nidal Abu M'khisan at gunpoint to approach a house containing a suspected terrorist and demand him to surrender. The Palestinian, Nasser Jarrar, subsequently shot and killed M'khisan, apparently thinking he was an IDF soldier. In August seven human rights organizations, including B'tselem, petitioned the Israeli High Court of Justice and obtained an injunction against the use of Palestinians as "shields" for Israeli forces. Israel admitted the use of such practices, in violation of existing procedures, and reiterated that IDF forces "are absolutely forbidden to use civilians of any kind as a means of 'living shield' against gunfire or attack by the Palestinian side, or as 'hostages.'" However, B'tselem reported that IDF soldiers instead could employ the "neighbor procedure," using consenting civilians to enter homes and buildings ahead of soldiers. Israel claimed that Palestinians who agreed without coercion to enter homes for the IDF were not being exploited. Human rights groups asserted that Palestinians who agreed to assist such operations often did so out of fear of the soldiers even if they are not directly coerced. Palestinians who took part in such operations without being harmed still faced the risk of being branded as collaborators and risked being attacked by other Palestinians.

Israel also placed civilians in danger by occupying Palestinian homes and using them as military bases, including at times, during operations designed to eliminate terrorist infrastructure. The occupation of the home turns it into a military target, and forcing residents to remain inside puts them in unnecessary danger. For example, on January 21 IDF forces raiding Tulkarm took over the house of Ali Tawfiq al-Shurati, made it a military position, and locked Ali's wife and five children in a ground floor apartment for 24 hours.

The IDF fired tank rounds, as well as rockets from helicopters and military aircraft, on targets in cities and towns in the West Bank and Gaza during operations undertaken in response to attacks on Israeli soldiers, settlers and other civilians (*see* Section 1.a.).

Israeli forces demolished the homes of the families and relatives of those convicted of or suspected of committing terror attacks, effectively punishing innocent Palestinians not implicated in the attacks. Israel's demolitions left hundreds of Palestinians not directly implicated in the attacks homeless. During the year, Israel demolished 114 Palestinian homes, compared to 8 in 2001. The numbers of such demolitions increased as Israel re-occupied areas previously under exclusive PA control and gained access to such homes.

Israel's extensive curfews on Palestinian towns punished entire innocent populations. During the year, Israel demolished 114 Palestinian homes, compared to 8 in 2001. Israel's demolitions left hundreds of Palestinians not involved in terror attacks homeless. The curfews affected every aspect of life for Palestinians, damaging livelihood and causing food shortages. During Operation Defensive Shield in March and April, 800,000 Palestinians were prevented from leaving their homes for 2 weeks. The village of al-Walaja remained under constant curfew from April 2 to May 10. During the start of Operation Determined Path, which was ongoing at the end of the year, extensive curfews were still in place. For example, the city of Nablus was under curfew for 96.5 percent of time from June 18 to September, according to a report by the World Bank. All major Palestinian cities were also under curfew at varying times during this period. Qalqilya, which experienced the least curfew hours of major Palestinian cities during this period, was under curfew for 40.2 percent of the time. The Israeli government's sustained imposition of internal and external closures and curfews in the West Bank and Gaza during the year severely impacted Palestinian society and economy, contributing to shortages of basic food, water, and the provision of medical care and supplies.

SHATSKY-008455

1983

The external and internal closures contributed to increased unemployment and poverty in the occupied territories. Approximately 125,000 West Bank and Gaza workers, representing roughly 20 percent of the Palestinian work force, depended on day jobs in Israel, Israeli settlements, and Jerusalem. The closures on Palestinian cities and towns also impeded Palestinians from reaching jobs or markets in the occupied territories and disrupted internal and external trade. Closures and the destruction of large swathes of Palestinian-owned agricultural land and economic infrastructure by the IDF and settlers, contributed to an adjusted unemployment rate of approximately 44 percent. Closures particularly isolated and hurt the roughly 200,000 Palestinians who lived in rural villages. Rural villages rarely were self-sustaining communities and did not have the full range of services—such as medical care, education, or municipal provision of water—that larger urban areas had, increasing their isolation when community members were not able to travel outside the area to obtain access to services and provisions. Other rural villages under full Israeli control were further isolated from major Palestinian population centers.

The ICRC and various medical organizations stated that the prolonged closure of Palestinian cities significantly obstructed the delivery of medical care and prevented patients from passing through checkpoints, in some cases even when urgent treatment was critical to life and death. Since the beginning of the Intifada at least 34 persons died as a result of delays in, or prohibition from, crossing checkpoints to reach medical care. During the year, 12 died because of such delays. The closures made it impossible for most patients living outside large cities who need repeated medical treatment, such as dialysis or physical therapy, to reach medical centers on a regular basis. The PRCS stated that more than one-third of Palestinians who were injured in the Intifada required some type of physical rehabilitation and at least ten percent have permanent disabilities. Medical professionals noted that many Palestinians delayed all but emergency medical care because of the restrictions and economic conditions. Preventative treatment, such as vaccinations, antenatal and postnatal care, and family planning in most cases were postponed; and the number of births at home, in ambulances, and at checkpoints increased significantly. Medical observers noted that as the Intifada continued, the negative consequences would continue to have a significant impact on public health.

On January 21, Ra'ed Sabri Ibrahim Sruji, a 46-year-old Palestinian from the Tulkarm refugee camp and a diabetes patient suffering from kidney failure, was on his way to the hospital in Nablus when the ambulance he was in was detained at the Deir Sharaf checkpoint for 3 hours. He died due to lack of prompt treatment.

Closures and curfews also have affected the provision of emergency medical care. Israeli security services stopped and searched all ambulances at each checkpoint, which frequently added life-threatening delays in reaching hospitals, due to the fact that some had to use substandard local roads when denied access through any of the checkpoints. Israeli security forces often impeded the provision of medical assistance to Palestinian civilians by strict enforcement of internal closures, which contributed to at least 14 deaths. The PCRS reported that its average response time to emergency calls in "outer city" areas is 40 to 50 minutes, compared to a past average of 10–15 minutes. The PRCS also reported that Israel denied it access to outer city areas altogether 70 percent of the time.

Israeli soldiers frequently harassed and abused Palestinian emergency services staff at the checkpoints (see Section 1.c.). The closures also significantly impeded the ability of medical staff to reach work.

Israel regularly transferred Palestinians arrested in the occupied territories to prisons and detention facilities in Israel (see Section 1.d.).

Palestinian terrorist groups used minors to prepare attacks or carry them out. These youths were recruited to throw pipe bombs, plant explosives, and carry out suicide attacks.

*Section 2. Respect for Civil Liberties, Including:*

*a. Freedom of Speech and Press.*—The Israeli government generally respected freedom of speech in some areas in the occupied territories; however, it imposed censorship and prohibited public expressions of anti-Israeli sentiment and of support for Islamic extremist groups. Three journalists covering clashes between Palestinians and Israeli security forces, including some who were clearly identified as noncombatants, were killed by IDF fire and at least five others were injured. IDF soldiers routinely harassed and occasionally detained Palestinian and other journalists covering stories in the West Bank and Gaza. Israel frequently denied journalists travel permits and revoked or delayed issuing press credentials, all of which amounted to de facto censorship. The IDF moderately to extensively damaged radio and television stations and newspaper offices in Ramallah during the Israeli incursion in March and April. During the year, Israel raided a newspaper's premises.

SHATSKY-008456

1984

During the year, the Israeli government continued to enforce selectively its standing prohibition on the display in Jerusalem of Palestinian political symbols, such as flags, national colors, and graffiti. Such displays were punishable by fines or imprisonment. Israeli enforcement of existing censorship regulations remained stringent regarding press coverage of the Intifada. Israeli authorities monitored Arabic newspapers based in East Jerusalem for security-related issues, and newspapers sometimes were ordered to halt publication of stories about the security situation until the information first appeared in the Israeli media. Military censors reviewed Arabic publications for material related to the public order and security of Israel. Reports by foreign journalists were subject to review by Israeli military censors for security issues, and the satellite feed used by many foreign journalists was monitored. In periods of heightened security, the Israeli government often closed areas to journalists when it imposed a curfew or closure. Israeli authorities denied entry permits to Palestinian journalists traveling to their place of employment in Jerusalem during closures of the territories, and the journalists had difficulty renewing their Israeli issued press credentials (*see* Section 2.d.).

The IDF required a permit for Palestinian publications sold in areas of the occupied territories under its control. Publications may be censored or banned for content considered anti-Semitic or anti-Israeli. Possession of banned materials was punishable by a fine and imprisonment. The Israeli government prohibited the delivery and distribution of publications, including newspapers, in the Gaza Strip on the Jewish holiday of Yom Kippur (when import of any item is prohibited) and on numerous other occasions when the closure of the Gaza Strip was particularly tight. On several occasions during the year, usually following terrorist incidents, the Israelis banned Palestinian daily newspapers from entering Gaza. However, during such periods, Israeli newspapers were allowed into Gaza. During internal closures, the Israeli government also occasionally blocked the delivery of Palestinian daily newspapers to Palestinian cities in the West Bank.

Israeli soldiers sought out and destroyed Palestinian media outlets during operations in the West Bank. Most local Palestinian radio and television stations went off the air or scaled back their broadcasts because of damage done by the Israeli army. On January 19, the IDF detonated explosives in the main building of the Palestinian Broadcasting Corporation (PBC) in Ramallah, severely damaging the building and destroying equipment. The Israeli government singled out PBC for broadcasting material deemed to be anti-Semitic or that incited violence. On April 2, Israeli soldiers took over the building housing al-Quds Educational Television in Ramallah and occupied it for 20 days, during which they destroyed a studio, cameras, computers, videos and satellite receivers, and sprayed graffiti on the walls.

Israel also harassed Palestinian media organizations. In April IDF soldiers occupied the broadcasting station of a Palestinian cable outlet in Ramallah, interrupted its broadcasting, and transmitted pornography to area residents. On October 6, Israeli forces raided the facilities of al-Ayyam newspaper in Ramallah. The newspaper reported that Israeli forces stormed the building after midnight, forced all employees into one room and searched the premises for 2 hours.

During the year, three journalists were killed. On March 13, Israeli gunfire killed Raffaele Ciriello, special correspondent in Ramallah of the Italian daily Corriere della Sera. On July 12, in Jenin, Israeli gunfire killed Palestinian photographer Imad Abu Zarha. On August 23, the Israeli army denied all responsibility, stating that there was no proof of any firing at the journalists. Journalist and press groups rejected Israeli claims. On September 21, Voice of Palestine journalist Issam Hamza Tillawi was shot in the back of the head as he was reporting on a Palestinian demonstration in Ramallah.

On September 25, the Paris-based organization Reporters Sans Frontieres (RSF) released a statement expressing concern over journalists injured by Israeli forces. The organization noted 46 cases of journalists who had been injured by gunfire, nearly all from Israeli sources since the beginning of the Intifada. Several of those shot, mostly Palestinians, were seriously injured, even though some were clearly identifiable as journalists and standing apart from clashes when hit (*see* Section 1.g.).

Israel confiscated journalists' press cards and equipment on several occasions. On April 6, Israeli authorities deported Jasim Azzawi of Abu Dhabi Television, who was on a special assignment. Azzawi, who is an American citizen, filed an affidavit on April 4 at the U.S. Consulate in Jerusalem stating that he was summoned to the Israeli government Press Office and was told that the Prime Minister's office decided to revoke his press credentials and expel him for alleged inflammatory reporting. On April 9, Israeli troops in Bethlehem threatened TV Tokyo reporter Yuzuru Saito and confiscated a tape from his cameraman and from French cameraman Vincent Benhamou.

SHATSKY-008457

1985

On several occasions, Israel detained and questioned journalists. On April 24, Israeli troops in the West Bank detained Reuters cameraman Mazen Da'na and Hussam Abu Allan, a photographer for Agence-France Presse.

The PA restricted freedom of speech and freedom of the press. During the year, the PA limited free expression, particularly regarding human rights and alleged security issues. Press freedom is subject to a 1995 press law that does not protect the press adequately. PA security services closed media outlets, banned publications or broadcasts, and periodically harassed or detained members of the media (*see* Section 1.d.). Palestinian commentators and human rights groups stated that, as a result, journalists practiced self-censorship.

On August 27, the PA supported the Palestinian Journalists' Syndicate in the Gaza Strip to bar journalists from photographing Palestinian children wearing military uniforms and carrying weapons.

On April 1, Palestinians threatened journalists working for the Associated Press, Reuters, and Palestine TV in Bethlehem and forced them to hand over footage, shot the night before, of the body of an alleged Palestinian collaborator who had been shot in a parking lot.

There were three Palestinian dailies and several Palestinian weekly newspapers. There also were several monthly magazines and three tabloids.

In addition to the official Palestinian Broadcast Corporation television and radio, also known as Voice of Palestine, there were approximately 20 independently owned televisions stations and 9 radio stations in the West Bank.

The Internet was available widely.

Israeli-imposed closures, curfews, and military actions severely restricted academic freedom by disrupting the operations of West Bank and Gaza schools, colleges, and universities during the year. Students and staff at all educational levels had difficulty traveling to and from educational facilities because most areas were under some form of internal closure for the entire year. In addition, Israeli forces imposed curfews on many Palestinian areas, some for 24 hours a day, for extended periods (*see* Sections 2.d. and 5). Students from Gaza were unable to reach West Bank universities since early October 2000, when Israel closed the safe passage route between Gaza and the West Bank. Both Bir Zeit University in Ramallah and An-Najah University in Nablus were unable to open for the fall semester: Bir Zeit due in large part to a roadblock preventing access to the school, and An-Najah due to an almost continuous curfew in Nablus since midsummer. Israeli shelling and gunfire during military operations consequently damaged a number of schools in the West Bank and Gaza.

In March, the IDF relocated a roadblock in al-Khader village blocking access to the Hope Flowers School. Hope Flowers was the only Palestinian school in the West Bank that employed a curriculum emphasizing democracy and coexistence. After repeated requests by foreign governments and other interested parties, Israel repositioned the roadblock to facilitate access to the school. The sniper position that overlooked the roadblock remained in place at year's end.

The PA generally had authority over all levels of education in the West Bank and Gaza Strip, and it controlled the budgets of all public colleges. During the year, the PA did not interfere with education in the West Bank and Gaza Strip.

*b. Freedom of Peaceful Assembly and Association.*—The Israeli government placed severe limits on freedom of assembly for Palestinians in the occupied territories, largely through the imposition of internal closures and curfews (*see* Section 2.d.). Israeli military orders banned public gatherings of 10 or more persons without a permit. After the 1993 signing of the Declaration of Principles, Israel relaxed enforcement of this rule, except in cases of Palestinian demonstrations against land seizures or settlement expansions. However, extensive curfews during the year made assembly of any kind impossible in most major Palestinian cities. Those Palestinians who chose to take part in even peaceful demonstrations often did so only by breaking curfew restrictions and IDF prohibitions against demonstrations.

Israeli security forces killed scores of Palestinians and injured several thousand during demonstrations and other often violent clashes (*see* Sections 1.a. and 1.c.). The Israeli and Palestinian authorities regularly disputed whether Palestinians fired at security forces during such demonstrations. The PA and individual Palestinians stated that Israeli security forces often resorted to live fire even when Palestinian did not shoot at them first. In 2001 the IDF changed its definition of "life-threatening" situations to include stone-throwing in some cases.

The PA imposed some formal limits on freedom of assembly; however, while it required permits for rallies, demonstrations, and large cultural events, these permits rarely were denied. In Gaza police approval was required for political meetings at several specific large meeting halls. Written permission also was required for buses to transport passengers to attend political meetings. In West Bank cities, the PA

SHATSKY-008458

1986

required permits for outdoor rallies and demonstrations and prohibited calls for violence, displays of arms, and racist slogans, although this rarely was enforced.

The Israeli government placed severe restrictions on freedom of association in East Jerusalem. In 2001 Israeli forces closed Orient House, the preeminent Palestinian political institution in Jerusalem, and consequently other East Jerusalem institutions located in Orient House, including: The Chamber of Commerce, the Land Research Center, the Higher Council for Tourism, a women's center, a prisoner's rights society, and a historical preservation group. The Israeli police arrested a number of Palestinians and foreign nationals during protests calling for the reopening of Orient House. The closings were part of the Government's response to a suicide bombing in Jerusalem; the Government stated that it closed Orient House because it was engaged in political activity in violation of the Interim Agreement. At year's end, Orient House remained closed.

On February 6, the Israeli police closed the Multi-Sectoral Review Project, an EU-funded project dedicated to surveying development needs in East Jerusalem. Israel claimed that the project was linked to the PA, which was not permitted a presence in East Jerusalem under the terms of the Oslo Agreement. The same day, police closed the Land Research Center. On June 5, the police closed the East Jerusalem offices of the Federation of Palestinian Chambers of Commerce. On July 9, police closed the office of Al-Quds University President Sari Nusseibeh; Nusseibeh was able to reopen his office a few days later after signing a pledge to not use his office for activities relating to his separate role as PLO Political Commissioner for Jerusalem Affairs. On September 20, the Israeli police closed the offices of the Jerusalem Cultural Association and the Union of Sports Clubs.

The PA placed some limits on freedom of association; however, the PA permitted Palestinian charitable, community, professional, and self-help organizations to operate.

The armed wings of HAMAS, PIJ, and other Palestinian opposition groups remained outlawed. While it was not illegal to belong to other components of these groups, during times of heightened security, the PA detained members of these other components (*see* Section 1.d.).

*c. Freedom of Religion.*—Israeli law provides for freedom of worship, and the Government generally respected this right in practice in the occupied territories. Israel did not ban any group on religious grounds, and permitted all faiths to operate schools and institutions.

Religious publications in East Jerusalem were subject to the Publications Laws, including prohibition against the publication of sermons that incite violence against Israelis or against the State of Israel. However, Israel's imposed closure of the West Bank and Gaza, including the internal closure that severely restricted travel between towns and cities within the occupied territories, significantly impeded freedom of worship for Muslims and Christians. Israeli closure policies prevented tens of thousands of Palestinians from reaching their places of worship in Jerusalem and the West Bank, including during religious holidays such as Ramadan, Christmas, and Easter. On numerous occasions, the Israeli government prevented worshippers under the age of 45 from attending Friday prayers inside the Haram al-Sharif. The Israeli government stated that such actions were necessary for security reasons.

During the year, the Government of Israel's continued closure policy prevented a number of Palestinian religious leaders (both Muslim and Christian) from reaching their congregations. In March 2001, the Israeli government pledged to create a "hot line" to facilitate the movement of clerics through checkpoints; however, at year's end, it had not done so. In previous years, several clergymen reported that they were subject to harassment at checkpoints.

The PA has no law that specifically protects religious freedom; however, the PA generally respected religious freedom in practice.

The PA required individuals to be at least nominally affiliated with some religion. Religion must be declared on identification papers, and all personal status legal matters must be handled in either Shari'a or Christian ecclesiastical courts. Islam is the de facto official religion of the PA, and its Islamic institutions and places of worship received preferential treatment. The PA had a Ministry of Waqf and Religious Affairs that paid for the construction and maintenance of mosques and the salaries of many Palestinian imams. The Ministry also provided some Christian clergymen and Christian charitable organizations with limited financial support. The PA did not provide financial support to any Jewish institutions or holy sites in the occupied territories.

The PA required that religion be taught in PA schools. There were separate classes for Muslim and Christian students. In 2001 the PA implemented a compulsory curriculum that required the study of Christianity for Christian students in grades one through six.

SHATSKY-008459

1987

For a more detailed discussion see the *2002 International Religious Freedom Report*.

*d. Freedom of Movement Within the Occupied Territories, Foreign Travel, Emigration, and Repatriation.*—During the year, the Israeli government severely restricted freedom of movement for Palestinians, in response to the continuing violence of the Intifada. During the year, most Palestinians from the West Bank and Gaza were prohibited from entering Israel, and the IDF instituted a massive network of checkpoints and roadblocks across the occupied territories, which impeded the movement of people and goods between Palestinian cities, villages, and towns. Numerous cities were placed under strict curfews that ran for weeks and even months. During the year, the restrictions on movement were the most severe that Israel had imposed since it occupied East Jerusalem, the West Bank, and Gaza in 1967.

Since March 1993, Israel has required that all West Bank and Gaza residents obtain permits to enter Israel and Jerusalem. However, Israel often denied applicants permits with no explanation and did not allow effective means of appeal. Palestinian officials with VIP passes, including PA cabinet officials and members of the Palestinian Council, regularly have been subjected to long delays and searches at Israeli checkpoints in the West Bank, despite the fact that they were traveling on special passes issued by the Israeli government. During the year, this practice increased markedly, severely restricting PA officials from conducting administrative functions and implementing reform.

Even in periods before the Intifada, Palestinians in the West Bank and Gaza Strip found it difficult to obtain permits to work, visit, study, or obtain medical care in Israel. Israeli authorities permitted only a small number of Gazans to bring vehicles into Israel and sometimes did not permit West Bank vehicles to enter Jerusalem or Israel. Except for senior PA officials, Palestinians of all ages crossing between the Gaza Strip and Israel were not permitted to travel by automobile across the main checkpoint. Instead they were forced to travel along a narrow walkway almost a mile long. Israelis moving into and out of the Gaza Strip were permitted to use their automobile. Israeli regulations prohibited Palestinian residents of Jerusalem from entering the West Bank, although this ban only intermittently was enforced. Israeli authorities also required that these Palestinian residents provide written notice to the Israeli government if they intended to travel to the Gaza Strip; however, provision of such notice did not ensure that the Government would permit the travel.

Since 1993 Israel applied varying levels of "closure," or enhanced restrictions, on the movement of Palestinians and their goods, often for lengthy periods, in response to Palestinian terrorist attacks and other changing security conditions. The Government of Israel imposed a tightened version of closure, called "comprehensive, external closure" during periods of violent protest in the West Bank or Gaza, or when it believed that there was an increased likelihood of such unrest. Comprehensive closures also were instituted regularly during major Israeli holidays and during some Muslim holidays. During such closures, the Israel government cancelled travel permits and prevented Palestinians—even those with valid work permits—from entering Israel or Jerusalem. During comprehensive closures, the authorities severely restricted the movement of goods between Israel and the occupied territories and between the West Bank and Gaza. Due to the ongoing unrest, Israel imposed strict and consistent external closure throughout the year, compared with 210 days in 2001 and 88 days in 2000.

During periods of unrest in the West Bank and Gaza, in the aftermath of terrorist attacks, or during military exercises, the Israeli government prohibited travel between towns and villages within the West Bank. These "internal" closures cut off the flow of goods, including food and fuel, and restricted the movement of persons. During the year, Israel expanded internal closures further, sometimes in response to specific acts of violence and sometimes as a preventive measure imposed on entire cities and towns. The internal closures were even more severe when Palestinians were prohibited from using primary roads and physical barricades close off many secondary roads.

The Israeli government further constrained the movement of Palestinians and goods in the West Bank and Gaza by imposing total closures on specific areas or villages, sometimes for weeks at a time, and by intermittently closing the Gaza Airport and the Allenby and Rafah crossing points to Jordan and Egypt. Israel also consistently imposed curfews in some areas, often for extended periods. During the curfews, Palestinians generally were confined to their homes for all but a few hours per week during which they were allowed to buy food and other provisions.

The prolonged closures and curfews imposed by the Government of Israel on Palestinian cities and towns during the year had a severely negative impact on every

SHATSKY-008460

1988

sector of the Palestinian economy. They impeded Palestinians from reaching jobs or markets and disrupted internal and external trade (*see* Section 1.g.).

The prolonged closure also seriously impacted students' ability to attend school and university (*see* Sections 2.a. and 5.). The Government of Israel stated that they were necessary security measures (*see* Section 1.g.).

Israel carried out policies of strict curfews and closures that directly punished innocent civilians. The IDF delayed or prohibited ambulances from crossing checkpoints (*see* Section 1.g.). In 1998 the Israeli government established a "continuous employment program" that allowed selected Palestinian workers who were approved by the Ministry of Defense, married, over 28-years-old, and worked in Israel for a long period of time, to enter Israel to work even in the event of a tightened closure. During the year, the program was not implemented.

The Israeli government required all Palestinian residents to obtain permits for foreign travel and restricted the travel of some political activists. Bridge-crossing permits to Jordan may be obtained at post offices without a screening process.

Palestinians who live in East Jerusalem, which Israel occupied during the 1967 War, generally have chosen not to accept Israeli citizenship, choosing instead to seek a residence permit or Jerusalem identification card. Israel applied the 1952 Law of Permanent Residency and its 1974 amendments to Jerusalem identification card holders. The law stipulates that a Jerusalem resident loses the right of residence if he or she leaves Israeli territory for more than 7 years, acquires the nationality of another country, or acquires permanent residence in another country. Such persons are permitted to return only as tourists and sometimes are denied entry. The Government of Israel government does not apply these same restrictions to Israeli citizens.

In 2000 the Israeli Ministry of Interior published new instructions regarding residency rights in Jerusalem. According to these instructions, residents of Israel whose identity cards had been revoked since 1995 and who returned to live in Israel since 1998 and had maintained "an appropriate connection" were entitled to restoration of their identity cards. Although the new guidelines still permitted the revocation of residency in cases in which East Jerusalem Palestinians obtained new citizenship or residency rights while living abroad, human rights groups reported a significant reduction in such revocations.

Israeli authorities also placed restrictions on family reunification. Most Palestinians who were abroad before or during the 1967 War, or who lost their residence permits for other reasons since then, were not permitted to reside permanently with their families in Jerusalem or the occupied territories. Foreign-born spouses and children of Palestinian residents also experienced difficulty in obtaining permission to reside with their family members. For example, a Palestinian with a West Bank identification card must apply to the Government of Israel for permission to live with his or her Jerusalem-resident spouse in Jerusalem. In May the Israeli Knesset declared a freeze on providing residency permits. At year's end, the freeze remained in effect. Palestinians reported delays of several years or more before spouses were granted residency permits. The Government of Israel occasionally issued limited-duration permits, which must be renewed. Renewing the permits may take up to 8 months, a common delay that resulted in many Palestinians falling out of status. Palestinians also reported extensive delays in registering newborn children with Israeli authorities. In practice women with Jerusalem residence rights found it more difficult to obtain permission for their spouses to reside in Jerusalem than did men, since Israeli security authorities considered Palestinian males to be greater security risks.

The PA issued passports and identification cards for Palestinians who resided in the West Bank and Gaza, and the Israeli government required residents of the West Bank and Gaza to use their Palestinian passports to exit and enter Israel. Bearers of Palestinian passports did not need special exit permits from the PA; however, when leaving the area via Ben Gurion Airport, the Israeli government required Palestinians to obtain permits to transit Israel to reach the airport. Since 2001 Israeli authorities rarely granted these requests except in humanitarian or special interest cases. Without this permit, travelers must depart via land crossings and may experience delays lasting days or weeks. Palestinian residents of the West Bank and Gaza were prohibited from using the Sheikh Hussein or Arava crossings. As a result, most Palestinians could exit and enter the West Bank and Gaza only via the Allenby Bridge or Rafah crossing points, which were closed completely several times during the year. Internal closures made it difficult for Palestinians to reach even these crossing points and begin the wait at the border.

Palestinians who held Jerusalem identification cards, issued by the Israeli government, must obtain special travel documents from the Israeli government to travel abroad. Human rights groups reported that Palestinian residents of East Jerusalem

SHATSKY-008461

1989

often did not apply for Israeli travel documents because they feared that the application might prompt a reexamination of their residency status and lead to the revocation of their identity cards.

Upon request the Jordanian government also issued travel documents to Palestinians in the West Bank and East Jerusalem. Palestinians who wish to travel to Jordan must leave their Israeli identification documents with Israeli authorities at the Allenby Bridge. The Israeli authorities also required that Palestinians from East Jerusalem obtain a special permit to cross the Allenby Bridge, which they must purchase from the Ministry of Interior. Restrictions on residency, reentry, and family reunification only applied to Palestinian residents of the occupied territories.

The PA generally did not restrict freedom of movement.

*Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government*

In 1996 Palestinian residents of the West Bank, Gaza Strip, and East Jerusalem chose their first popularly elected government in elections that generally were free and fair; the 88-member Palestinian Legislative Council and Chairman of the Executive Authority were elected. PLO Chairman Yasir Arafat won almost 89 percent of the vote in a two-person race for Chairman. Approximately 700 candidates competed for Council seats. Voters elected Council members to multimember electoral districts. As many as 35 of the elected members were independent candidates. International observers concluded that the election could reasonably be regarded as generally free and fair, despite some irregularities. During the year, the Council debated numerous draft laws and resolutions. Some members of the Council stated that it lacked power in relation to the executive branch. In September Arafat issued a decree setting January 20, 2003 as the date for elections for Ra'is and the Legislative Council.

The last municipal elections in the West Bank and Gaza took place in 1996, and in September PA officials announced that new elections will be held in March 2003. Incumbent municipal officials serve until the following elections. In the case of the death or resignation of an incumbent, the Ministry of Local government appoints a replacement, with the approval of the PA Chairman.

Most Palestinians in East Jerusalem do not recognize the jurisdiction of the Israeli municipality of Jerusalem. While all Palestinians with residency permits are eligible, only a very small percentage of Jerusalem's Palestinian population voted in the municipal council elections. There were no Palestinian residents of Jerusalem on the city council. There were 5 women on the 88-member Council, and 1 woman served in a ministerial-level position.

*Section 4. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights*

During the year, Israel obstructed the movement and activity of human rights monitors and NGO workers by imposing strict internal and external closures. In many cases, such groups refused to apply for special travel permits in order to protest Israel's regulation of their activities. Israeli, Palestinian, and international humanitarian and human rights NGOs monitored the Israeli government's human rights practices in the occupied territories. Some of these organizations were critical of the Israeli government's practices and cooperation. The Israeli government permitted human rights groups to publish and hold press conferences.

The U.N. Relief and Works Agency (UNRWA) reported increased delays for its personnel and vehicles at checkpoints. Other humanitarian groups, such as PRCS, faced similar problems.

During their 2001 seizure of the Orient House, Israeli security officials confiscated office equipment, as well as documents belonging to the organization and other Palestinian groups in Jerusalem. At year's end, the Government of Israel still had not provided representatives of the Orient House a full accounting of the documents and property seized and Orient House remained closed (*see* Section 2.b.).

Local human rights groups, most of which were Palestinian, and several international organizations monitored the PA's human rights practices. PA officials usually met with their representatives. Public criticism from these groups has been somewhat less forthcoming since the outbreak of the Intifada, with several NGOs voluntarily deciding to focus their efforts on the Palestinian struggle for basic rights and defer comprehensive critiques of the PA's human rights performance. During the year, human rights organizations reported that they sometimes were denied access to detainees in Palestinian prisons during the year (*see* Section 1.d.). Observers noted that documentation of abuses was very limited because victims were hesitant to file or make public claims of abuse against PA authorities.

SHATSKY-008462

1990

From April 27 to May 6, the Government of Israel permitted the International Labor Organization (ILO) to visit the occupied territories, in a period of heightened tension, to assess worker rights and the economic situation. The ILO released a report documenting the "socioeconomic meltdown" in the occupied territories and the humanitarian and economic crisis of the Palestinians as a result of Israeli closures, curfews, and military actions. The report also emphasized the sense of "insecurity in Israel due to suicide bombings" and the impact on the Israeli economy.

Some PA security organizations, including the General Intelligence Organization in the West Bank and the police, appointed officials to act as liaisons with human rights groups. These officers met with human rights organizations and members of the diplomatic community to discuss human rights cases.

The ICRC operated in the West Bank and Gaza under the terms of 1996 memorandum of understanding between the ICRC and the PLO. Other human rights groups, including the Palestinian Independent Commission for Citizens' Rights and the Mandela Institute, regularly visited PA prisons and detention centers. During the year, some human rights and international humanitarian organizations reported that they occasionally encountered delays in obtaining access to detainees in Palestinian prisons. PA officials reportedly were less responsive to queries regarding the PA's policies toward and treatment of collaborators and members of Islamist opposition groups than to queries on other detainees (see Sections 1.c. and 1.d.).

In 2000 Chairman Arafat approved the NGO law, which had been passed by the PLC in 1998, and which governs the activities of NGOs and their relations with the PA. The PA issued registration certificates for 150 of the approximately 350 new and existing NGOs that submitted applications. The remaining applications still were under review at year's end. In a June government reshuffle, the PA Ministry of NGOs was downgraded to an agency (see Section 2.d.).

*Section 5. Discrimination Based on Race, Sex, Disability, Language, or Social Status*

Under the complex mixture of laws and regulations that apply to the occupied territories, Palestinians were disadvantaged under Israeli law and practices compared with the treatment received by Israeli settlers. This included discrimination in residency and land use.

In the Palestinian territories, homosexuals were persecuted by both the public and by PA security officers. Homosexuals were subject to harassment and physical abuse, and some were arrested. Several Palestinians alleged that PA security officers tortured them because of their sexual orientation.

*Women.*—The law does not explicitly prohibit domestic violence, but assault and battery are crimes. There were reports indicating that domestic violence increased during the Intifada.

The problems of rape, domestic violence, and violence related to "family honor" gained greater attention in the Palestinian community as a result of a significant effort by Palestinian women's groups; however, public discussion generally remained muted. The crimes almost exclusively were tied to alleged sexual interactions of female family members with men who were not their husbands. This could include rape, a sexual encounter with any man except a woman's husband, or being seen alone with a male who was not her family member. Honor crimes resulted when family members beat or killed women in response to such alleged violations of their family's honor. Victims of violence often were encouraged by relatives to remain quiet and were punished themselves or blamed for the "shame" that had been brought upon them and their families. Women's groups sought to educate women on these problems, but women's rights advocates stated that few resources were available to shelter the victims of violence because women's shelters are not accepted culturally in Palestinian society. Activists also maintained that society was not receptive to providing counseling or outreach services to victims of violence, which these advocates saw as more widespread than was acknowledged. According to women's groups, there was no reliable data on the incidence of violence against women.

Spousal abuse, sexual abuse, and "honor killings" occurred, but societal pressures prevented most incidents from being reported and most cases were handled within the families concerned, usually by male family members. However, there were increasing anecdotal reports from women's and humanitarian groups that the incidence of domestic abuse rose significantly during the year.

Rape is illegal and spousal rape is not explicitly prohibited. During the year, there were no figures available regarding the extent of the problem.

Palestinian women endured various forms of social prejudice and repression within their own society. Due to early marriages, some girls, especially in rural areas, did not finish the mandatory level of schooling. Cultural restrictions occasionally prevented women from attending colleges and universities. Women who married outside of their faith, particularly Christian women who married Muslim men, often

SHATSKY-008463

1991

were disowned by their families and sometimes were harassed and threatened with death by members of their community. Local officials sometimes attempted to convince such women to leave their communities in order to protect themselves.

Before the Intifada began in 2000, a growing number of Palestinian women worked outside the home, where they often encountered discrimination and occasionally experienced sexual harassment. There were no special laws that provide for women's rights in the workplace. Women were underrepresented in most aspects of professional life. Despite the fact that there is a small group of women who were prominent in politics, medicine, law, teaching, and NGOs, women for the most part were seriously underrepresented in the decision-making positions in these fields.

Personal status law for Palestinians is based on religious law. For Muslim Palestinians, personal status law is derived from Shari'a (Islamic law). The varied ecclesiastical courts ruled on personal status issues for Christians. In the West Bank and Gaza, Shari'a pertaining to women is part of the Jordanian Status Law of 1976, which includes inheritance and marriage laws. Under the law, women inherit less than male members of the family. The marriage law allows men to take more than one wife, although few did so. Women were permitted to make "stipulations" in the marriage contract to protect them in the event of divorce and questions of child custody; however, only an estimated 1 percent of women took advantage of this provision, leaving most women at a disadvantage in the areas of divorce or child custody. Ecclesiastical courts also often favored men over women in divorce and child custody cases.

While there was an active women's movement in the West Bank, serious attention has shifted only recently from nationalist aspirations to issues that greatly affected women, such as domestic violence, equal access to education and employment, and laws concerning marriage and inheritance.

*Children.*—The PA provides for compulsory education through the ninth grade, when children usually reach 15 years of age. However, early marriage in certain sectors of society at times prevented girls from completing the mandatory level of schooling. Especially in rural areas and refugee camps, boys often left school before they reached the mandatory age in order to help support their families.

The internal closure across the occupied territories and extended periods of curfew in most major cities significantly impeded the ability of both students and teachers to reach educational facilities (*see* Sections 2.a. and 2.d.). In areas under curfew, all classes were cancelled.

Numerous education and health care professionals acknowledged that students were badly affected by the violent security situation, which interfered with learning and manifested itself in lack of focus, nightmares, daytime and nighttime incontinence, and other behavioral problems. Closures and curfews impeded school attendance and UNRWA reported that 72,000 teacher workdays were lost in the 2001–02 academic year. UNRWA reported that test scores in its West Bank and Gaza schools dropped dramatically, and dropout rates rose for the first time in a decade.

The PA Ministry of Health provided for children's immunizations. The PA insurance program provided basic medical care for children, for a small monthly fee.

Child abuse is not prohibited explicitly by law. Abuse existed but was not a widespread problem. Parents or families that failed to protect children from abuse may be penalized by law. PA courts may provide protections for children in "difficult situations," including cases of neglect or abuse. The Ministry of Social Affairs may intervene by bringing a case before a court, which would decide how to best protect the child. The judge may decide to place a child in an official protective institution, or with an alternate family. There was one protective institution for children in Gaza and one in the West Bank.

British Mandate, Jordanian, and military laws, from which West Bank and Gaza law is derived, offered protection to children under the Penal Code and a new Labor Code passed and published during the year. The new Labor Code set a higher minimum age for any employment of children. No children 14 or under can work, and children aged 15–18 could be employed only for certain types of work and under certain conditions (*see* Section 6.d.). While there was no juvenile court system, judges specializing in children's cases generally adjudicated on juvenile cases. In cases in which the child was the victim, judges had the discretion to remove the child from a situation considered harmful. However, the system was not sophisticated in the protection it afforded children.

Palestinians living in East Jerusalem continued to be discriminated against in terms of their access to municipal services, compared to other residents of Jerusalem. According to the Association for Civil Rights in Israel, the Government of Israel and the municipality have not kept their pledge to the High Court to build three new infant-care clinics in East Jerusalem. In addition East Jerusalem schools remained underfunded and overcrowded, and many students were denied an edu-

SHATSKY-008464

1992

cation in public schools due to lack of space. In 2001 the Government agreed to build 245 new classrooms within the next 4 years in order to alleviate this problem; however, no funds were budgeted for that purpose. This year's budget included enough funds for 60 new classrooms.

International and domestic NGOs, including UNICEF, Save the Children, and Defense for Children International, promoted the rights and welfare of children in the occupied territories. There also were numerous Palestinian social welfare organizations that focused on developing and providing educational, medical, and cultural services to children. A number of other groups specialized in addressing the needs of children with disabilities.

*Persons with Disabilities.*—There was no mandated accessibility to public facilities in the occupied territories under either Israeli law or Palestinian authority. Many Palestinians with disabilities were segregated and isolated from Palestinian society; they were discriminated against in most spheres, including education, employment, transportation, and access to public buildings and facilities. There were approximately 130,000 Palestinians with disabilities in the West Bank and Gaza. Prior to the outbreak of the current Intifada. The Health, Development, Information, and Policy Institute estimated that one-tenth of the approximately 21,000 Palestinians injured in the Intifada will have permanent disabilities.

Some Palestinian institutions cared for and trained persons with disabilities; however, their efforts consistently were under-funded.

*Section 6. Worker Rights*

*a. The Right of Association.*—Labor affairs in the West Bank and Gaza came under Palestinian responsibility with the signing of the Interim Agreement in September 1995. During the year, labor affairs in the West Bank were governed by Jordanian Law 21 of 1965, as amended by Israeli military orders, and in Gaza by PA decisions. In 2001 Arafat signed a labor law that took effect in January; however, it has faced strong resistance from the Palestinian business community. The Palestinian law permits workers to establish and join unions without government authorization. The previous Israeli requirement that all proposed West Bank unions apply for a permit no longer was enforced. Following a process to consolidate trade unions in the West Bank, there were 12 trade unions. Four trade unions were in Gaza. During the year, no unions were dissolved by administrative or legislative action.

Israeli labor law governs Palestinian workers in Jerusalem. They were free to establish their own unions. Although the Israeli government restricted unions in Jerusalem from joining West Bank trade union federations, this restriction was not enforced. Individual Palestinian workers in Jerusalem may belong simultaneously to unions affiliated with West Bank federations and the Israeli Histadrut Labor Federation.

West Bank unions were not affiliated with the Israeli Histadrut Federation. Palestinians from the West Bank and Gaza who worked in Israel or Jerusalem were not full members of Histadrut, but they were required to contribute 1 percent of their wages to Histadrut. Their partial membership entitled them to limited benefits, including compensation in the case of on-the-job injuries, maternity leave, and compensation in the case the employer declares bankruptcy. (Full members of Histadrut also received health insurance, social security benefits, pensions, and unemployment benefits.) Negotiations between Histadrut and West Bank union officials to return half of this fee to the Palestinian Union Federation were completed in 1996, but funds have yet to be transferred. Palestinians from the occupied territories who worked in Israel were not permitted to join Israeli trade unions or to organize their own in Israel.

The great majority of West Bank and Gaza unions belonged to the Palestinian General Federation of Trade Unions (PGFTU), an estimated 95,000 to 100,000 workers in the West Bank were members of the PGFTU, the largest union bloc, which consisted of 12 trade unions in the West Bank and 8 in Gaza. The organization had approximately 46,500 members in Gaza. The PGFTU estimated that actual organized membership of dues-paying members, included approximately 75 percent of all Palestinian workers. The PGFTU was involved in the completion of the negotiations with Histadrut regarding workers' fees. The reorganization of unions under the PGFTU was intended to enable the West Bank and Gaza unions to better represent the union members' interests.

Palestinian unions that seek to strike must submit to arbitration by the PA Ministry of Labor. If the union disagrees with the final arbitration and strikes, a tribunal of senior judges appointed by the PA decides what, if any, disciplinary action is to be taken, such as a fine. There are no laws in the occupied territories that specifically protect the rights of striking workers. In practice such workers had little

SHATSKY-008465

1993

or no protection from an employer's retribution. During the year, there were no reported labor strikes.

The PGFTU participated in some programs of the International Confederation of Free Trade Unions, but was not a member.

*b. The Right to Organize and Bargain Collectively.*—A majority of workers in the occupied territories were self-employed or unpaid family helpers in agriculture or commerce. Only 35 percent of employment in the occupied territories historically has consisted of wage jobs. Most of this employment has been through the U.N. Relief and Works Agency (UNRWA), the PA, or municipalities. Collective bargaining was protected. Committees of 3 to 5 members adjudicated Labor disputes in businesses employing more than 20 workers. The PGFTU reported one strike during the year. Existing laws and regulations do not offer real protection against antiunion discrimination.

There were no export processing zones in the occupied territories, although the Gaza Industrial Estate did enjoy free trade access to foreign markets. Israeli closures and curfews impeded the right to organize and bargain collectively.

*c. Prohibition of Forced or Bonded Labor.*—PA law does not prohibit specifically forced or bonded labor, including forced and bonded labor by children, and during the year there were no reports of such practices.

*d. Status of Child Labor Practices and Minimum Age for Employment.*—The minimum legal working age in the West Bank and Gaza is 15 years, and there are special limits governing the conditions of employment for juveniles between 15 and 18 years, including prohibitions against working at night, under conditions of hard labor, or in jobs that require them to travel outside their area of domicile. However, in practice many Palestinian children under the age of 15 were engaged in some form of work. Most such employment was believed to involve work on family farms and in family shops, or as urban street vendors. Some employment of children also reportedly occurred in small manufacturing enterprises, such as shoe and textile factories. The PA's capacity to enforce existing labor laws was limited. It had only 40 labor inspectors to inspect an estimated 65,000 enterprises. The ILO and UNICEF were working with the PA to study the nature and extent of the problem and to develop the capacity to enforce and update child labor laws.

*e. Acceptable Conditions of Work.*—There was no minimum wage in the West Bank or Gaza Strip. Prior to the outbreak of the Intifada in 2000, which severely disrupted employment patters for the majority of working Palestinians, the average wage for full-time workers appeared to provide a worker and family with a decent standard of living. The majority of Palestinians currently were unemployed or underemployed and the standard of living has dropped dramatically over the last 2 years. The dependency ratio increased more than 50 percent since the start of the Intifada. In 2000 one Palestinian supported 4.3 persons in the West Bank and 5.9 persons in Gaza. During the year, those figures reached 6.9 persons and 9.4 persons, respectively. As wage earners were forced to support 50 percent more persons, the standard of living seriously deteriorated.

In the West Bank, the normal workweek was 48 hours in most areas; in Gaza, the workweek was 45 hours for day laborers and 40 hours for salaried employees. There was no effective enforcement of maximum workweek laws.

The PA Ministry of Labor was responsible for inspecting workplaces and enforcing safety standards in the West Bank and Gaza. The Ministry's ability to enforce the standard was limited due to lack of resources for inspections and other constraints; however, it carried out inspections. The Ministry reported that closures, curfews, and ongoing Israeli military operations further limited its ability to carry out inspections. The Ministry of Labor stated that new factories and workplaces met international health and safety standards, but that older ones failed to meet such standards. There was no specific legal protection afforded workers that allows them to remove themselves from an unhealthy or unsafe work setting without risking loss of employment.

Like all Israeli workers, Palestinians who worked in Israel were required to contribute to the National Insurance Institute (NII), which provided unemployment insurance and other benefits. Palestinians from the West Bank and Gaza were eligible for some, but not all, NII benefits. According to the Interim Agreement, Palestinians who worked in Israel and Jerusalem benefit from NII in cases of injuries that occurred in Israel, the bankruptcy of a worker's employer, and allowances for maternity leave.

There were outstanding cases of Palestinian workers who attempted to sue their Israeli employers for non-payment of wages but were unable to travel to the relevant courts because they were unable to receive the proper permits.

SHATSKY-008466

1994

*f. Trafficking in Persons.*—Palestinian law does not prohibit trafficking in persons; however, there were no reports that persons were trafficked to, from, or within the occupied territories.

---

# JORDAN

The Hashemite Kingdom of Jordan is a constitutional monarchy ruled by King Abdullah II bin Hussein since the death of his father, King Hussein bin Talal. The Constitution concentrates a high degree of executive and legislative authority in the King, who determines domestic and foreign policy. In the King's absence, a regent, whose authority is outlined in the Constitution, assumes many of the King's responsibilities. The Prime Minister and other members of the Cabinet are appointed by the King and manage the daily affairs of the Government. The Parliament consists of the 40-member Senate, appointed by the King, and a lower house, the Chamber of Deputies which is elected every 4 years. The lower house exerts influence only intermittently on domestic and foreign policy issues. The 1997 parliamentary elections were marred by reports of registration irregularities, fraud, and restrictions on the press and on campaign materials. The King dissolved Parliament in June 2001 and subsequently postponed elections until spring 2003. A new election law enacted by the Government in July 2001 increased the size of the lower house from 80 seats to 104. According to the Constitution, the judiciary is independent, and the Government took steps in 2001 to strengthen the judiciary's administrative independence. However, in practice, it remained susceptible to political pressure and interference by the executive.

General police functions were the responsibility of the Public Security Directorate (PSD). The PSD, the General Intelligence Directorate (GID), and the military shared responsibility for maintaining internal security, and had authority to monitor the activities of persons believed to be security threats. Elements of the security forces continued to commit human rights abuses.

Foreign assistance, remittances from citizens working abroad, exports of minerals, and, increasingly, revenues from export of manufactured goods and tourism were the mainstays of the country's economy. The Government made substantial progress in deregulation, privatizing state owned companies and opening up to foreign trade and investment. As the country makes a transition to a market driven economic system, the main economic problems it faced were high unemployment and persistent poverty, especially in rural areas. Other drags on economic growth included the political uncertainty in the region, limited water resources, and the lack of a viable market for the country's products in its traditional trading partners in the region, particularly Iraq. Economic growth, which has improved in recent years after stagnating in the mid-1990s, is only partially addressing these problems.

The Government generally respected the human rights of its citizens in some areas; however, there were significant problems in other areas. There were significant restrictions on citizens' right to change their government. Citizens may participate in the political system through their elected representatives in Parliament; however, the King has discretionary authority to appoint and dismiss the Prime Minister, Cabinet, and upper house of Parliament, to dissolve Parliament, and to establish public policy. Other human rights problems included police abuse and mistreatment of detainees, allegations of torture, arbitrary arrest and detention, lack of transparent investigations and accountability within the security services, prolonged detention without charge, denial of due process of law stemming from the expanded authority of the State Security Court and interference in the judicial process, infringements on citizens' privacy rights, harassment of members of opposition political parties, and significant restrictions on freedom of speech, press, assembly, and association.

A law enacted by the Government in October 2001 gave the Government broad powers to restrict and prosecute journalists and to close publications. This royal decree, or temporary law, in the absence of Parliament effectively superseded the 1999 amendments to the Press and Publications Law, which had reduced somewhat the restrictions in previous laws regarding the ability of journalists and publications to function and report freely. Significant restrictions continued throughout the year. The Government limited academic freedom. In July, several professors were dismissed from local faculties, apparently for political reasons. The Government imposes some limits on freedom of religion, and there was official and societal discrimination against adherents of unrecognized religions. The evangelical Christian community reported incidents of governmental harassment during the year. One foreign Protestant pastor and his family reportedly left the country after being harassed by the Government. There were some restrictions on freedom of movement. Violence

SHATSKY-008467