# LOWELL DECL. EX. 90

Exhibit 53

Report Pursuant to Title VIII of Public Law 101-246 Foreign Relations Authorization Act for Fiscal Year 1990-91, As Amended

    This report is submitted in accordance with Title VIII of Public Law 101-246 (the PLO Commitments Compliance Act of 1989 -PLOCCA), as amended. It covers the period from June 16, 2001 to December 15, 2001 and-is consistent with Section 566 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2002.

    This report describes actions and statements of the Palestine Liberation Organization (PLO) and, as relevant, the performance of the Palestinian Authority (PA) with respect to commitments set forth in Chairman Arafat's September 9, 1993, letters to Israeli Prime Minister Rabin and Norwegian Foreign Minister Holst and to those contained in, and resulting from, the good faith implementation of the Declaration of Principles (DOP). Under the commitments in these letters and accords, the PLO, <u>inter alia,</u> (1) recognizes Israel's right to exist in peace and security; (2) accepts UN Security Council Resolutions 242 and 338; (3) commits itself to the Middle East peace process and to a peaceful resolution of its conflict with Israel; (4) undertakes to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right to exist; (5) renounces the use of terrorism and other acts of violence, confirms that it will call on Palestinians in the West Bank and Gaza Strip to refrain from violence, and assumes responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators; and (6) agrees to strengthen cooperation with Israel on a wide range of security issues. The Wye River Memorandum of October 23, 1998, signed by Prime Minister Netanyahu and Chairman Arafat, further detailed both parties' commitments related to the 1995 Interim Agreement, including Palestinian obligations regarding security cooperation and revision of the PLO Charter. In the Sharm el-Sheikh Memorandum of September 4, 1999, signed by Prime Minister Barak and Chairman Arafat, both sides reiterated their commitment to implement the obligations emanating from the Wye River Memorandum, and further undertook to ensure the effective handling of any incident involving a threat or act of terrorism. This specifically included cooperating in the exchange of information, coordinating policies, and taking measures to prevent an act of terrorism, violence or incitement.

Overview of the Reporting Period

    The sustained violence between Israelis and Palestinians, which broke out on September 28, 2000, continued throughout this reporting period. According to statistics maintained by the U.S. government, between July 20, 2001 and December 15, 114 Israelis (including 99 civilians and 15 IDF members) were killed and 1022 Israelis (including IDF members and 784 civilians) were wounded in violent incidents. During the same period, 394 Palestinians were killed and 2,223 were wounded. (Although the reporting period began on June 15 no statistics using that date were available.)

    Terrorist groups including Hamas, Palestinian Islamic Jihad (PIJ) and the Al Aqsa Martyrs Brigades continued to be very active during the reporting period. The violence during this reporting period was characterized by a wide range of activities, including demonstrations, shooting and' throwing rocks and Molotov cocktails at Israeli checkpoints and settlements, and random shootings directed at civilian neighborhoods on the outskirts of Jerusalem. The period saw continuing incidents of terrorism including suicide bombers, pipe bombs, mortar attacks, roadside bombings and ambushes, drive-by shootings, and shooting at Israeli homes and military

SHATSKY-005036

and civilian vehicles,

There were numerous successful suicide bombings during the reporting period, including an August 9 suicide attack at a pizzeria in Jerusalem that killed 15 Israelis and suicide attacks in Haifa and a dual suicide 'attack in Jerusalem on December 2 that killed 10 and injured 150 more. Hamas claimed responsibility for these and other attacks. Palestinian Islamic Jihad and the Al Aqsa Martyrs Brigade carried out other bombing attacks. There were numerous shooting attacks directed against Israeli civilians and security forces, as well as mortar attacks on settlements, carried out by a variety of groups and individuals. The near constant violence during this reporting period would make it difficult to assemble a detailed chronology.

This report will focus on the requirements of the PLO Commitments and Compliance Act of 1989 and will therefore not address Israel's compliance with its commitments, Palestinian allegations of use of excessive force by Israel, numerous cases of "targeted killings," or claims by human rights groups that Israeli forces used live ammunition against Palestinian demonstrators when their lives were not endangered. Specifically, it will concentrate on Palestinian performance with respect to the following specific commitments:

(1)   to recognize Israel's right to exist in peace and security;

(2)   to accept UN Security Council Resolutions 242 and 338;

(3)   to commit itself to the Middle East peace process and to a peaceful resolution of its conflict with Israel;

(4)   to undertake to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right. to exist;

(5)   to renounce the use of terrorism and other acts of violence, call on Palestinians in the West Bank an Gaza to refrain from violence, and assume responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators; and

(6)   to strengthen cooperation with Israel on a wide range of security issues.

The Palestinian's record regarding these commitments during the reporting period is mixed. The renunciation of violence and the pursuit of a negotiated solution to the conflict between Israel and the Palestinians have remained the official policy of both the PLO and the PA. Further, the PLO has continued to stand by the recognition of Israel's right to exist in peace and security, acceptance of Security Council Resolutions 242 and 338, and commitment to the peace process, as contained in Chairman Arafat's letter of September 9, 1993 to former Israeli Prime Minister Rabin. Even PLO or PA figures implicated in the violence have said that their objective was to force an Israeli withdrawal from the West Bank, Gaza, and East Jerusalem, not the destruction of Israel.

At the same time, available evidence indicates that elements with varying degrees of affiliation with the PLO, specifically the Al Aqsa Martyrs Brigade, Tanzim, Force 17 and members of other security forces, were frequently involved in acts of-violence against Israelis. While there is no conclusive evidence that these elements acted with the prior approval and encouragement of the PLO and PA leaderships, it is clear that these armed elements were not disciplined. At the same time, the senior leadership made only sporadic and ineffective efforts to

SHATSKY-005037

issue clear instructions to refrain from violence or to assume responsibility over violent 'elements. Moreover, some senior PLO and PA leaders did little to prevent - and may even have encouraged - an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials.

PLO Involvement in Violence

The renunciation of terrorism and violence remained the Palestinian leadership's official policy. However, they failed to consistently and effectively call on Palestinians to refrain from violence, did not assume responsibility over all PLO elements and personnel to assure their compliance, and did not make an effort to discipline PA and PLO officials who instigated or engaged in violence.

There is no conclusive evidence that the senior leaderships of the PA or PLO were involved in planning or approving specific acts of violence. However, press reports indicate many analysts are convinced that some leaders of Palestinian security forces have been involved in planning and/or supporting violent attacks on Israelis. Further, during this reporting period some high level PA and PLO officials were involved in planning the smuggling of more sophisticated weapons into the West Bank and Gaza. If successful, that attempt could have dramatically escalated the level of Palestinian violence. Similarly, there are indications that some PA or PLO officials have fomented violence at some points, while working to bring it under control at others.

Just prior to the beginning of this reporting period, on June 13, the PA declared its acceptance of the Tenet security work plan as a basis for resuming security cooperation and moving into the implementation of the Mitchell Committee recommendations. Hamas denounced the PA's action the next day, and other militant groups rejected the concept of renewed security cooperation. The Tenet work plan envisions a comprehensive ceasefire between the parties and the implementation of a set of specific, concrete and realistic security steps to reestablish security cooperation and the situation on the ground as it existed prior to September 29, 2000, prior to the outbreak of violence. The PA and Chairman Arafat during the reporting period consistently pledged in public their readiness to abide by the Tenet plans provisions. Arafat publicly declared ceasefires several times during the reporting period, most prominently following a series of meetings with Israeli FM Shimon Peres in September.

The PA on a number of occasions took action against Islamic militant groups that rejected his calls for a ceasefire. Violent clashes between PA security forces and Hamas supporters in September resulted in may have resulted in several deaths. There was evidence that at times during the reporting period PA security forces in Jericho and Hebron acted effectively to quell violence. Following the assassination of Tourism Minister Rehavam Zeevi on October 17, the PA announced the closure of the "military wings" of a number of rejectionist groups. The PFLP, Hamas and the Palestinian Islamic Jihad sharply criticized these moves and related arrests *on* December 12, the PA condemned an attack near the Immanuel settlement on a bus that killed seven Israelis. The Al-Aqsa Martyrs brigade carried out the attack.

Despite these actions, PA efforts to control violence were not consistent or effective during the reporting period. As a result, this period saw the steady occurrence of terrorist attacks and violent confrontations with Israeli security forces, punctuated by only brief periods of relative calm. Repeated PA calls for a ceasefire were largely ineffective, and violence intensified toward the end of the reporting period. Just following the end of the reporting period, on

SHATSKY-005038

December 16, 2001, PA Chairman Arafat addressed the Palestinians in a television address again calling for a comprehensive ceasefire and a return to negotiations. The several weeks of relative calm that followed this address will be covered in the next report.

During the reporting period the PLO did not abide in a consistent or effective manner by its commitment to "call on Palestinians to refrain from violence." The PA has in some important respects at least tolerated an atmosphere that promoted or supported the use of violence. Some programs broadcast on the PA and PLO controlled or influenced mass media had the effect of inciting Palestinians to violence. For example, some Palestinian TV and radio broadcasts were accused of glorifying martyrdom and legitimizing the use of violence. In some instances, the PA did act to suppress an atmosphere of incitement particularly after the September 11 terrorist bombings in the United States. For example, on September 23, Arafat ordered the closure of a Hamas exhibit in Nablus that glorified a suicide bombing in a Jerusalem pizza parlor after extensive coverage of the exhibit appeared in U.S. newspapers.

During the reporting period, the PA routinely condemned publicly acts of violence directed at Israeli civilians. For example, Arafat condemned the assassination of Israeli Tourism Minister Rehavam Zeevi by Popular Front for the Liberation of Palestine (PFLF) terrorists on October 17, and announced the arrests of several PFLP members the next day, Arafat announced the closure of the PFLP's "military wing" as well, and eventually arrested the PFLP's chief, but arrests of the killers (three of whom were picked up by the Palestinian police in Area 8, which is under Israeli security control) were only accomplished months later despite pressure from Israel, the United States, and the international community. In addition, the PA and PA Chairman Arafat repeatedly called publicly for a return to security cooperation and political negotiations based on the Tenet security work plan and the Mitchell Committee report.

The PLO did not abide in a clear and sustained manner by its commitment to "'assume responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators." It was clear that some members of the PA security forces and Chairman Arafat's Fatah faction within the PLO were deeply involved in the violence. The Al Aqsa Martyr's Brigades, loosely organized groups of Fatah-affiliated militants, emerged as a significant factor in increasing violent attacks in the West Bank. Although the PA apparently made some efforts to suppress attacks from this group, those efforts were neither serious nor sustained. The PA claimed that Israeli attacks on its security forces made a more effective crackdown impossible. Fatah's "Tanzim," a term used for street-level Fatah activists, also were involved in a significant number of attacks. In addition, there is evidence that members of the Presidential Security Force (Force 17) were involved in violent attacks, in some cases in coordination with other Fatah-affiliated groups or with Hamas or Palestinian Islamic Jihad. However, there is little evidence that Force 17 as an organization assisted or carried out attacks. Some midlevel PA and Fatah officials, including those associated with the Tanzim, have publicly advocated violence.

While there is no conclusive evidence that the senior PA or PLO leadership approved or had advanced knowledge of planned attacks, the weight of evidence would indicate that they knew of Al Aqsa Martyrs Brigade, Tanzim and elements of Force 17 involvement in the violence and did little to rein them in. Nor have we seen reports that elements that committed acts of violence were ever disciplined.

Security Cooperation

SHATSKY-005039

The ongoing violence has had a profoundly negative effect on the PLO's carrying out its commitment to "strengthen cooperation with Israel on a wide range of security issues." While there were occasional high-level meetings between Israeli and Palestinian security officials during the reporting period, as well as trilateral meetings that included U.S. participation, the extensive working level contacts maintained prior to the outbreak of violence were sporadic and ineffective during the reporting period.

The PR claimed to have arrested hundreds of Hamas, Islamic Jihad, and other members of militant groups over the course of the reporting period. Further, the PA on occasion cooperated in arresting suspected Palestinian militants from lists provided by Israel and the U.S. However, often those arrested were quickly released or were kept under questionable conditions of arrest (such as "house arrest") in which the detained person was kept in comfortable surroundings and allowed to stay in touch with associates. On several occasions Israeli security forces tracked down and killed alleged Palestinian militants who were ostensibly "arrested," according to the PA.

PLO Charter

As mentioned in previous reports, the PLO convened its Executive Committee and the Palestinian Central Council to reaffirm the letter of January 22, 1998, from Chairman Arafat to former President Clinton concerning the nullification of the PLO Charter provisions that are inconsistent with the letters exchanged between the PLO and the Government of Israel on September 9-10, 1993. The Israeli government's position continues to be that the Palestinians have met their obligations concerning the revision of the PLO Charter.

Arab League Boycott of Israel

As previously reported the PLO reiterated its stand against the Arab boycott of Israel when it signed the September 28, 1995, Joint Declaration of the Washington Summit which called, inter alia, for an end to the boycott as soon as possible. Additionally, senior Palestinian Authority economic and trade official Ahmed Quray (now Speaker of the Palestinian Council) made the following commitment in an October 17, 1996, letter to then U.S. Trade Representative Mickey Kantor: "The PLO and the Palestinian Authority and its successors will support all efforts to end the boycott of Israel and will not enforce any elements of the boycott within the West Bank and Gaza Strip." That remains the Palestinian position on the Arab boycott, although in practice the PA has occasionally tried to prevent the entry of Israeli goods into the Gaza Strip in response to Israeli blocking of Palestinian exports.

Status Of the PLO Office

The State Department's Office of Foreign Missions designated the PLO office in Washington a "foreign mission" under the Foreign Missions Act on June 21, 1994, to provide a statutory basis for regulating the office. The designation was published in the Federal Register on July 20, 1994. The PLO office and personnel are not accorded diplomatic status, privileges or immunities. The office may not portray itself as a diplomatic mission or embassy, but may portray itself as representing the PLO. Office personnel support U.S. travel by members of the PLO and the Palestinian Authority and have testified before Congress and participated in discussions with U.S. Government officials and in numerous meetings and media events. Mr. Hasan Abdel Rahman currently heads the office.

SHATSKY-005040

On October 16, 2001, President Bush exercised his authority to permit the PLO Office to remain open for an additional six months.

Assistance to Palestinians

The United States has continued to work with the international donor community to meet the humanitarian and developmental needs of the Palestinians. The United States provides no programmatic funds to the Palestinian Authority, Palestinian Legislative Council, PLO, or to any international funds established to contribute money directly to these entities. U.S. foreign assistance to the West Bank and Gaza funds contractors and non-governmental organizations hired to carry out specific projects and these organizations are carefully audited by USAID. Furthermore, USAID vets all Palestinian NGOs that are the recipients of funds to ensure that there are no links to terrorist organizations or to organizations that advocate or practice violence. In some cases -- primarily related to water projects -equipment, materials, and infrastructure developed by these contractors and NGOs have been turned over to PA agencies or instrumentalities.

The U.S. Agency for International Development continues to implement scrupulously its procedures for the monitoring and supervision of activities performed by USG-funded non governmental organizations and contractors to ensure that funds are only used for their intended purposes. The secretary of state has certified, in accordance with Section 571 of the FY 2002 Foreign operations, Export Financing and Related Programs Appropriations Act, that procedures have been established to assure that the Comptroller General will have access to appropriate U.S. financial information in order to review the uses of United States assistance for the ESF Program for the West Bank and Gaza.

The United States had been actively engaged, together with other donors, in supporting ongoing efforts to increase the accountability of the Palestinian Authority's financial operations. The PA made significant progress on economic reform during the first half of 2000. On January 11, 2000, Arafat signed a presidential decree on economic reform that the PA began to implement. The outbreak of violence, and resulting Israeli economic and security measures, have severely affected the local economy and made it difficult to assess compliance with the decree.

OTHER PLOCCA ISSUES

The PLO Commitments Compliance Act calls for information on several other issues:

On June 3, 1998, FBI agents arrested Muhammad Rashid. He is currently being prosecuted in the U.S. District Court for the District of Columbia for the August 11, 1982 bombing of a Pan Am flight from Tokyo to Honolulu. We have no further information on developments in this case.

As reported in previous reports there are no U.S. criminal charges against Abu Abbas and the Israeli government has announced that it has no plans to seek his arrest. There were no further developments during the reporting period.

Regarding the issue of PLO compensation to American citizen victims of PLO terrorism, the PLO, among others, was sued in Federal District Court in Rhode Island in connection with a

SHATSKY-005041

1996 drive-by shooting in Israel in which American citizen Yaron Ungar was killed and two other Americans injured. One of the suspects in that shooting is in Palestinian custody and four are in Israeli custody. The State Department is not a participant in these legal proceedings and is not in a position to address the positions of any of the parties to the suit. The State Department was also not a participant in the Klinghoffer family's litigation and has no information on the terms of the 1997 settlement.

Issues relating to the Hawari group were reported in the January 1994 report. We have no further information.

The *PLO has* cooperated in the past with our requests for information available to them that could shed light on the status of U.S. nationals known to have been held by the PLO or factions thereof in the past. There have been no new developments.

Unilateral Declaration of Palestinian Statehood

In the Interim Agreement, both Israel and the PLO agreed that, "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." The Wye River Memorandum states "neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip in accordance with the Interim Agreement." The sides reiterated that commitment in the Sharm el-Sheikh Memorandum. In the trilateral statement issued after the Camp David summit, the two leaders agreed to a set of principles to guide their negotiations. Point four of that statement says "the two sides understand the importance of avoiding unilateral actions that prejudge the outcome of negotiations and that their differences will be resolved only by good faith negotiations." On September 11, 2000, the Palestinian National Council (PNC) decided to defer declaring statehood and agreed to meet again on November 15 on November 15 the PNC, citing Israeli restrictions on travel within the West Bank and Gaza and the ongoing violence, announced that its meeting had been postponed, There was no further official action by the PLO or PA toward a unilateral declaration during the reporting period.

Agreements Signed by the PLO

We have no evidence the PLO has signed any agreements for the benefit of the PA not within the areas allowed in its agreements with Israel (economic agreements, agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council, agreements for the purpose of implementing the regional development plans, and cultural, scientific, *and* educational agreements). We also have not seen any evidence that Palestinian offices abroad issue Palestinian passports or other Palestinian travel documents.

PA Offices Outside Its Jurisdiction

Under Israeli-Palestinian agreements, the Palestinian Authority may only maintain offices in the areas under its territorial jurisdiction, which do not include Jerusalem. In response to Israeli complaints in previous years, the Palestinians moved several institutions -- including the Vocational Training Center, the Mapping and Geography Department, the Central Bureau of Statistics, the Palestinian Broadcasting Corporation, Institute for Professional Training, the Society for Development and Welfare of Jerusalem and the Youth and Sports Department -- of Jerusalem, mostly to Ramallah. The PA produced written declarations that offices that remained in Jerusalem did not carry out functions for the PA. Israeli officials welcomed these moves and

SHATSKY-005042

allowed the offices to remain open. On April 5, 1999, Israeli police distributed orders to close three offices in the orient House building in East Jerusalem. A court order suspended implementation of the closure acts, and the two sides conducted some discussions to try to reach a solution out of court. The Israeli government had until August 9, 2001 effectively suspended .those efforts. However, on August 9, following a suicide bomb attack at a pizzeria in Jerusalem that killed 14 Israelis and wounded 140 more, the Israeli government seized and shut down P alestinian offices at Orient House and several other locations in East Jerusalem. Israel later claimed documents found at Orient House and elsewhere showed unauthorized PA activity was carried out at these locations, a charge the Palestinians denied.

Role of the Council

One of the obstacles to a stronger legislative role in PA governance is the weakness of the Council as an institution; thus, an important component of USAID's Democracy and Governance program is aimed at strengthening the Council and enhancing its ability to act as a legislative body. Key legislation passed by the council, including the Basic Law, remains unsigned by the executive.  There has been no measurable progress toward long-delayed municipal elections during the reporting period. By regional standards, the Palestinians have a relatively free media. Certain subjects -- especially criticism of the senior PA leadership - are taboo, and there have been several apparent attempts by security forces to intimidate members of the media who engaged in such criticism. The press is free to report on the activities of the Council, but is not currently permitted to broadcast debate from within the Council.

SHATSKY-005043