# LOWELL DECL. EX. 91

Exhibit 50

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 3 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 2 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 2 of 12

Report Pursuant to Title VIII of Public Law 101-246
Foreign Relations Authorization Act
for Fiscal Year 1990-91, As Amended

This report is submitted in accordance with Title VIII of Public Law 101-246 (the PLO Commitments Compliance Act of 1989 - PLOCCA), as amended. It covers the period from December 15, 2000 to June 15, 2001.

This report describes actions and statements of the Palestine Liberation Organization (PLO) and, as relevant, the performance of the Palestinian Authority (PA) with respect to commitments set forth in Chairman Arafat's September 9, 1993, letters to Israeli Prime Minister Rabin and Norwegian Foreign Minister Holst and to those contained in, and resulting from, the good faith implementation of the Declaration of Principles (DOP). Under the commitments in these letters and accords, the PLO, inter alia, (1) recognizes Israel's right to exist in peace and security; (2) accepts UN Security Council Resolutions 242 and 338; (3) commits itself to the Middle East peace process and to a peaceful resolution of its conflict with Israel; (4) undertakes to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right to exist; (5) renounces the use of terrorism and other acts of violence, confirms that it will call on Palestinians in the West Bank and Gaza Strip to refrain from violence, and assumes responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators; and (6) agrees to strengthen cooperation with Israel on a wide range of security issues. The Wye River Memorandum of October 23, 1998, signed by Prime Minister Netanyahu and Chairman Arafat, further detailed both parties' commitments related to the 1995 Interim Agreement, including Palestinian obligations regarding security cooperation and revision of the PLO Charter. In the Sharm el-Sheikh Memorandum of September 4, 1999, signed by Prime Minister Barak and Chairman Arafat, both sides reiterated their commitment to implement the obligations emanating from the Wye River Memorandum, and further undertook to ensure the effective handling of any incident involving a threat or act of terrorism. This specifically included cooperating in the exchange of information, coordinating policies, and taking measures to prevent an act of terrorism, violence or incitement.

Overview of the Reporting Period

Gilmore 00514

SHATSKY-009449

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 4 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 3 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 3 of 12

The sustained violence between Israelis and Palestinians, which broke out on September 28, 2000, continued throughout this reporting period. According to Israeli statistics, from the beginning of the violence until the end of July there were over 6,000 serious incidents of violence directed at Israeli settlements, security forces, or civilians, in the West Bank, Gaza, or Israel itself. This did not include stone throwing or other less serious incidents. (Although the reporting period ended on June 15, no statistics using that date were found.) From the time the violence broke out up to July 15, 2001, approximately 473 Palestinians, 13 Israeli Arabs, and 121 other Israeli civilians and soldiers were killed. A much higher number of Palestinians and Israelis were wounded. During the current reporting period between December 15, 2000 and June 15, 2001, approximately 83 Israelis and at least 197 Palestinians were killed. (According to the Palestinian Red Crescent Society 244 Palestinians were killed during the reporting period, 786 wounded by live ammunition, 1,039 injured by rubber or plastic bullets, and 1170 from the effects of tear gas. NOTE: The PRCS numbers include people whose deaths were not necessarily directly attributed to the violence such as victims of heart attacks, auto accidents, and deaths by natural causes at checkpoints.)

The nature of the violence also changed during the reporting period, leading to increased Israeli casualties. The initial period after September 28 was characterized by mass demonstrations, shooting and throwing rocks and Molotov cocktails at Israeli checkpoints and settlements, and random shootings directed at civilian neighborhoods on the outskirts of Jerusalem. More recent incidents, however, have consisted of suicide bombers, pipe bombs, mortar attacks, roadside bombings and ambushes, drive-by shootings, and shooting at Israeli military and civilian vehicles.

There were five successful suicide bombings during the reporting period in which 33 Israeli civilians were killed, and over 300 were wounded. This included a June 1 suicide bombing in Tel Aviv that left 22 Israelis dead and over 120 wounded. According to press reports Hamas claimed responsibility for three of the attacks. Hamas or other rejectionist Palestinian groups not under Chairman Arafat's control likely committed the other two. Hamas and Palestinian Islamic Jihad were, according to press reports, also responsible for a number of attempted suicide bombings that did not result in fatalities such as the May 25 bombing in Hadera in which 66 people were injured, or the May 30 attempted suicide bombing of a Netanya school in which no

Gilmore 00515

SHATSKY-009450

Case 1:18-cv-12355-MKV-DCF Document 136-104 Filed 10/05/21 Page 5 of 13
Case 1:02-cv-02280-RJL Document 255-6 Filed 11/12/13 Page 4 of 12
Case 1:01-cv-00853-GK Document 334-1 Filed 10/01/13 Page 4 of 12

casualties were reported. The near constant violence during this reporting period would make it difficult to assemble a detailed chronology.

This report will focus on the requirements of the PLO Commitments and Compliance Act of 1989 and will therefore not address Israel's compliance with its commitments, Palestinian allegations of use of excessive force by Israel, or claims by human rights groups that Israeli forces used live ammunition against Palestinian demonstrators when their lives were not endangered. Specifically, it will concentrate on Palestinian performance with respect to the following specific commitments:

(1) to recognize Israel's right to exist in peace and security;

(2) to accept UN Security Council Resolutions 242 and 338;

(3) to commit itself to the Middle East peace process and to a peaceful resolution of its conflict with Israel;

(4) to undertake to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right to exist;

(5) to renounce the use of terrorism and other acts of violence, call on Palestinians in the West Bank an Gaza to refrain from violence, and assume responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators; and

(6) to strengthen cooperation with Israel on a wide range of security issues.

The Palestinian's record regarding these commitments during the reporting period is mixed. The renunciation of violence and the pursuit of a negotiated solution to the conflict between Israel and the Palestinians have remained the official policy of both the PLO and the PA. Further, the PLO has continued to stand by the recognition of Israel's right to exist in peace and security, acceptance of Security Council Resolutions 242 and 338, and commitment to the peace process, as contained in Chairman Arafat's letter of September 9, 1993 to former Israeli Prime Minister Rabin. Even PLO or PA figures involved in the violence have said

Gilmore 00516

SHATSKY-009451

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 6 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 5 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 5 of 12

that their objective was to force an Israeli withdrawal from the West Bank, Gaza, and East Jerusalem, not the destruction of Israel.

At the same time, available evidence indicates that elements within the PLO, specifically Tanzim, Force 17 and members of other security forces, were involved in acts of violence against Israelis. While there is no conclusive evidence that these elements acted with the prior approval and encouragement of the PLO and PA leaderships, it is clear that these armed elements were not disciplined. Equally important, there was no serious and sustained effort by the senior leadership to prevent acts of violence through clear instructions nor to assume responsibility over these elements to assure their compliance until very late in the reporting period. Moreover, senior PLO and PA leaders did little to prevent - and may even have encouraged - an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials.

PLO Involvement in Violence

The renunciation of terrorism and violence remained the Palestinian leadership's official policy. However, they failed to consistently call on Palestinians to refrain from violence, did not assume responsibility over all PLO elements and personnel to assure their compliance, and did not make an effort to discipline PA and PLO officials who instigated or engaged in violence.

There is no conclusive evidence that the senior leaderships of the PA or PLO were involved in planning or approving specific acts of violence. According to press reports Israeli security forces have continued to debate the degree of responsibility by senior PLO and PA officials for carrying out acts of violence or encouraging others to do so. Israeli journalists have written that while some security officials believed the PA instigated the violence and then actively encouraged it, others believe it represented a "popular movement" that took the PA leadership by surprise and which they were unwilling to use force to contain. Israeli security officials have also reportedly noted that while leaders of some PA security organizations, or elements within them, have been involved in carrying out acts of violence, others have not. Similarly, the press has reported that the Israelis also believe that some PA or PLO officials have fomented violence at some points, while working to bring it under control at others.

Gilmore 00517

SHATSKY-009452

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 7 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 6 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 6 of 12

Press reports claim that during a speech at a Palestinian refugee camp in Lebanon the PA Communications Minister said that the violence had been carefully planned and denied it had been a spontaneous eruption of popular protests. The Minister reportedly told his audience that Arafat had instructed his followers to prepare for violent confrontation immediately after returning from Camp David. The PA immediately denied the accuracy of the Minister's statement. It is worth noting that the Sharm el-Sheikh Fact-Finding Committee (the Mitchell Committee) concluded in its report that "we have no basis to conclude that there was a deliberate plan by the PA to initiate a campaign of violence." The Committee's report also stated that "there is also no evidence on which to conclude that the PA made a consistent effort to contain the demonstrations and control the violence once it began."

Senior PA and PLO leaders condemned particular acts of violence during the reporting period, but did not call for an end to all forms of violence until the last two weeks of the period. On June 2, the day after the Tel Aviv suicide bombing, Arafat read a statement, after coming under intense pressure, condemning the bombing and "all other operations that lead to the killing of civilians, be they Israelis or Palestinians." Arafat went on to call for an immediate and unconditional cease-fire. According to press reports Arafat subsequently called a meeting of his security chiefs and other key figures and ordered them to observe the cease-fire. On July 13 the Palestinians and Israelis agreed to a workplan for implementing the cease-fire. Although the end of the reporting period came too soon for a comprehensive evaluation of Palestinian efforts to implement the cease-fire it is worth noting that the level of violence declined significantly from June 2 to the end of the reporting period on June 15.

During the reporting period the PLO did not abide in a clear and sustained manner by its commitment to "call on Palestinians to refrain from violence." While Israeli security forces have differed over the extent senior PA or PLO officials planned or encouraged specific instances of violence, there was a near consensus that the PA had at least tolerated an atmosphere that promoted or supported the use of violence. Some programs broadcast on the PA and PLO controlled or influenced mass media had the effect of inciting Palestinians to violence. For example, some Palestinian TV and radio broadcasts were accused of glorifying martyrdom and legitimizing the use of violence. A video-clip produced by the PA's Ministry of Information

Gilmore 00518

SHATSKY-009453

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 8 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 7 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 7 of 12

and broadcast on Palestinian television on May 3 reportedly called on Palestinian children to become martyrs.

The PA did condemn some specific acts of violence during the reporting period. For example, the PA condemned the January 23 murder of two Israelis in Tulkarm and the January 17 murder of an Israeli teenager, and the June 1 attack that killed over 20 people at the Dolphinarium Disco.

The PLO also did not abide in a clear and sustained manner by its commitment to "assume responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators." It was clear that some elements of the PA security forces and Chairman Arafat's Fatah faction within the PLO were deeply involved in the violence. In particular, the Tanzim wing of Fatah and the Presidential Security force (Force 17) were responsible for a significant percentage of the violent attacks on Israelis. Israeli security officials have publicly alleged that in addition to its role in carrying out acts of violence, Force 17 was acting as the senior PA leadership's liaison with extremist groups including Hamas and Hizballah. Mid-level PA and Fatah officials, including of the Tanzim, have publicly advocated violence. For example, after two Israelis were murdered in Tulkarm on January 23, reportedly in retaliation for an Israeli killing of a Fatah activist, a PA official was quoted in the press as saying the murders were "legitimate." A prominent Tanzim leader was quoted in the press as saying that "the Intifada will continue and will be escalated in the coming weeks" and a Fatah leaflet distributed in East Jerusalem in March threatened to "Burn Jerusalem from under the feet of the Zionist occupiers." Moreover, some of these individuals have publicly acknowledged their role in instigating, planning, and carrying out acts of violence.

While there is no conclusive evidence that the senior PA or PLO leadership approved or had advanced knowledge of planned attacks, the weight of evidence supports that they knew of Tanzim and Force 17 involvement in the violence and did little to rein them in. Nor have we seen reports that elements that committed acts of violence were ever disciplined.

Security Cooperation

The ongoing violence has had a profoundly negative effect on the PLO's commitment to "strengthen cooperation with Israel on a wide range of security issues." While there were occasional high level meetings between Israeli

Gilmore 00519

SHATSKY-009454

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 9 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 8 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 8 of 12

and Palestinian security officials during the reporting period, the web of working level contacts that preceded the outbreak of violence all but broke down.

On several dozen occasions during the reporting period PA security forces did act to save Israelis from harm. For example, according to press reports on March 24 Tanzim in Tulkarm kidnapped four Israelis. Palestinian police intervened and handed over the Israelis to the Israeli police.

PLO Charter

As mentioned in previous reports the PLO convened its Executive Committee and the Palestinian Central Council to reaffirm the letter of January 22, 1998, from Chairman Arafat to former President Clinton concerning the nullification of the PLO Charter provisions that are inconsistent with the letters exchanged between the PLO and the Government of Israel on September 9-10, 1993. The Government of Israel has not changed its position that the Palestinians have met their obligations concerning the revision of the PLO Charter.

Arab League Boycott of Israel

As previously reported the PLO reiterated its stand against the Arab boycott of Israel when it signed the September 28, 1995, Joint Declaration of the Washington Summit which called, inter alia, for an end to the boycott as soon as possible. Additionally, senior Palestinian Authority economic and trade official Ahmed Quray (now Speaker of the Palestinian Council) made the following commitment in an October 17, 1996, letter to then U.S. Trade Representative Mickey Kantor: "The PLO and the Palestinian Authority and its successors will support all efforts to end the boycott of Israel and will not enforce any elements of the boycott within the West Bank and Gaza Strip." That remains the Palestinian position on the Arab boycott, although in practice the PA has occasionally tried to prevent the entry of Israeli goods into the Gaza Strip in response to Israeli blocking of Palestinian exports.

Status of the PLO Office

The State Department's Office of Foreign Missions designated the PLO office in Washington a "foreign mission" under the Foreign Missions Act on June 21, 1994, to provide a statutory basis for regulating the office. The designation was published in the Federal Register on

Gilmore 00520

SHATSKY-009455

Case 1:18-cv-12355-MKV-DCF Document 136-104 Filed 10/05/21 Page 10 of 13
Case 1:02-cv-02280-RJL Document 259-6 Filed 11/12/13 Page 10 of 12
Case 1:01-cv-00853-GK Document 334-1 Filed 10/01/13 Page 9 of 12

July 20, 1994. The PLO office and personnel are not accorded diplomatic status, privileges or immunities. The office may not portray itself as a diplomatic mission or embassy, but may portray itself as representing the PLO. Office personnel support U.S. travel by members of the PLO and the Palestinian Authority and have testified before Congress and participated in discussions with U.S. Government officials and in numerous meetings and media events. The office is currently headed by Mr. Hasan Abdel Rahman.

On April 17, 2001, President Bush exercised his authority to permit the PLO Office to remain open for an additional six months.

Assistance to Palestinians

The United States has continued to work with the international donor community to meet the humanitarian needs of the Palestinians. We also have ensured that all U.S. assistance is handled in a transparent and accountable manner. The USG is confident that all U.S. assistance for use in projects and activities in the West Bank and Gaza has been properly accounted for. The United States does not provide funds to the Palestinian Authority, Palestinian Council, PLO, or to any international funds established to contribute money directly to these entities. U.S. foreign assistance to the West Bank and Gaza is provided to contractors or non-governmental organizations hired to carry out specific assistance projects. In some cases, primarily related to water treatment facilities, equipment, materials, or infrastructure developed by these contractors and NGOs have been turned over to PA agencies or instrumentalities.

There have been no credible reports to indicate that other U.S. assistance projects have been used for other than their intended purposes. The U.S. Agency for International Development continues to implement scrupulously its procedures for the monitoring and supervision of activities performed by USG-funded non-governmental organizations and contractors. The Secretary of State has certified, in accordance with Section 578 of the FY 2001 Foreign Operations, Export Financing and Related Programs Appropriations Act, that procedures have been established to assure that the Comptroller General will have access to appropriate U.S. financial information in order to review the uses of United States assistance for the ESF Program for the West Bank and Gaza.

Gilmore 00521

SHATSKY-009456

Case 1:18-cv-12355-MKV-DCF Document 136-104 Filed 10/05/21 Page 11 of 13
Case 1:02-cv-02280-RJL Document 255-6 Filed 11/12/13 Page 10 of 12
Case 1:01-cv-00853-GK Document 334-1 Filed 10/01/13 Page 10 of 12

The United States had been actively engaged, together with other donors, in supporting ongoing efforts to increase the accountability of the Palestinian Authority's financial operations. The PA made significant progress on economic reform during the first half of 2000. On January 11 Arafat signed a presidential decree on economic reform which the PA began to implement. The outbreak of violence, and resulting Israeli economic and security measures, have severely affected the local economy and made it difficult to assess compliance with the decree.

OTHER PLOCCA ISSUES

The PLO Commitments Compliance Act calls for information on several other issues:

- On June 3, 1998, FBI agents arrested Muhammad Rashid. He is currently being prosecuted in the U.S. District Court for the District of Columbia for the August 11, 1982 bombing of a Pan Am flight from Tokyo to Honolulu. We have no further information on developments in this case.

- As reported in previous reports there are no U.S. criminal charges against Abu Abbas and the Israeli government has announced that it has no plans to seek his arrest. There were no further developments during the reporting period.

- Regarding the issue of PLO compensation to American citizen victims of PLO terrorism, the PLO, among others, was sued in Federal District Court in Rhode Island in connection with a 1996 drive-by shooting in Israel in which American citizen Yaron Ungar was killed and two other Americans injured. One of the suspects in that shooting is in Palestinian custody and four are in Israeli custody. The State Department is not a participant in these legal proceedings and is not in a position to address the positions of any of the parties to the suit. The State Department was also not a participant in the Klinghoffer family's litigation and has no information on the terms of the 1997 settlement.

- Issues relating to the Hawari group were reported in the January 1994 report. We have no further information.

- The PLO has cooperated in the past with our requests for information available to them that could shed light on the status of U.S. nationals known to have been held by the PLO or factions thereof in the past. There have been no new developments.

Gilmore 00522

SHATSKY-009457

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 12 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/13   Page 13 of 42
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 11 of 12

Unilateral Declaration of Palestinian Statehood

In the Interim Agreement, both Israel and the PLO agreed that, "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." The Wye River Memorandum states that "neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip in accordance with the Interim Agreement." The sides reiterated that commitment in the Sharm el-Sheikh Memorandum. In the trilateral statement issued after the Camp David summit the two leaders agreed to a set of principles to guide their negotiations. Point four of that statement says that "the two sides understand the importance of avoiding unilateral actions that prejudge the outcome of negotiations and that their differences will be resolved only by good faith negotiations." On September 11, 2000, the Palestinian National Council (PNC) decided to defer declaring statehood and agreed to meet again on November 15. On November 15 the PNC, citing Israeli restrictions on travel within the West Bank and Gaza and the ongoing violence, announced that its meeting had been postponed.

Agreements Signed by the PLO

We have no evidence the PLO has signed any agreements for the benefit of the PA not within the areas allowed in its agreements with Israel (economic agreements, agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council, agreements for the purpose of implementing the regional development plans, and cultural, scientific, and educational agreements). We also have not seen any evidence that Palestinian offices abroad issue Palestinian passports or other Palestinian travel documents.

PA Offices Outside Its Jurisdiction

Under Israeli-Palestinian agreements, the Palestinian Authority may only maintain offices in the areas under its territorial jurisdiction, which do not include Jerusalem. In response to Israeli complaints in previous years, the Palestinians moved several institutions -- including the Vocational Training Center, the Mapping and Geography Department, the Central Bureau of Statistics, the Palestinian Broadcasting Corporation, Institute for Professional Training, the Society for Development and Welfare of Jerusalem and the Youth and Sports Department -- out of Jerusalem, mostly to Ramallah. The PA produced written declarations that these offices do not carry out

Gilmore 00523

SHATSKY-009458

Case 1:18-cv-12355-MKV-DCF   Document 136-104   Filed 10/05/21   Page 13 of 13
Case 1:02-cv-02280-RJL   Document 255-6   Filed 11/12/15   Page 12 of 12
Case 1:01-cv-00853-GK   Document 334-1   Filed 10/01/13   Page 12 of 12

functions for the PA. Israeli officials welcomed these moves. On April 5, 1999, Israeli police distributed orders to close three offices in the Orient House building in East Jerusalem. A court order suspended implementation of the closure acts, and the two sides conducted some discussions to try to reach a solution out of court. The current Israeli government effectively suspended those efforts. The Barak government reaffirmed that Orient House could not be the center of any political activity, but concluded that the Palestinians had complied with their commitments in that regard. There were no further developments regarding Orient House during this reporting period. The Israeli government's August 9 action against Orient House will be covered in the next report.

Role of the Council

One of the obstacles to a stronger legislative role in PA governance is the weakness of the Council as an institution; thus, an important component of USAID's Democracy and Governance program is aimed at strengthening the Council and enhancing its ability to act as a legislative body. Key legislation passed by the council, including the Basic Law, remains unsigned by the executive. There has been no measurable progress toward long-delayed municipal elections during the reporting period. By regional standards, the Palestinians have a relatively free media. Certain subjects -- especially criticism of the senior PA leadership - are taboo, and there were several apparent attempts by security forces to intimidate members of the media who engaged in such criticism. The press is free to report on the activities of the Council, but is not currently permitted to broadcast debate from within the Council.

Gilmore 00524

SHATSKY-009459