**LOWELL DECL. EX. 95**

Exhibit 55

# MIDDLE EAST PEACE COMMITMENTS ACT AND THE ARAFAT ACCOUNTABILITY ACT

# HEARING

BEFORE THE

## SUBCOMMITTEE ON THE MIDDLE EAST AND SOUTH ASIA

OF THE

# COMMITTEE ON INTERNATIONAL RELATIONS HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

ON

## H.R. 1795 and H.R. 4693

JULY 11, 2002

## Serial No. 107–104

Printed for the use of the Committee on International Relations



Available via the World Wide Web: http://www.house.gov/international_relations

U.S. GOVERNMENT PRINTING OFFICE

80–641PDF WASHINGTON : 2002

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250 Mail: Stop SSOP, Washington, DC 20402–0001

H461-64

SHATSKY-008146

## COMMITTEE ON INTERNATIONAL RELATIONS

HENRY J. HYDE, Illinois, *Chairman*

BENJAMIN A. GILMAN, New York
JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
CHRISTOPHER H. SMITH, New Jersey
DAN BURTON, Indiana
ELTON GALLEGLY, California
ILEANA ROS-LEHTINEN, Florida
CASS BALLENGER, North Carolina
DANA ROHRABACHER, California
EDWARD R. ROYCE, California
PETER T. KING, New York
STEVE CHABOT, Ohio
AMO HOUGHTON, New York
JOHN M. McHUGH, New York
JOHN COOKSEY, Louisiana
THOMAS G. TANCREDO, Colorado
RON PAUL, Texas
NICK SMITH, Michigan
JOSEPH R. PITTS, Pennsylvania
DARRELL E. ISSA, California
ERIC CANTOR, Virginia
JEFF FLAKE, Arizona
BRIAN D. KERNS, Indiana
JO ANN DAVIS, Virginia
MARK GREEN, Wisconsin

TOM LANTOS, California
HOWARD L. BERMAN, California
GARY L. ACKERMAN, New York
ENI F.H. FALEOMAVAEGA, American Samoa
DONALD M. PAYNE, New Jersey
ROBERT MENENDEZ, New Jersey
SHERROD BROWN, Ohio
CYNTHIA A. McKINNEY, Georgia
EARL F. HILLIARD, Alabama
BRAD SHERMAN, California
ROBERT WEXLER, Florida
JIM DAVIS, Florida
ELIOT L. ENGEL, New York
WILLIAM D. DELAHUNT, Massachusetts
GREGORY W. MEEKS, New York
BARBARA LEE, California
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
EARL BLUMENAUER, Oregon
SHELLEY BERKLEY, Nevada
GRACE NAPOLITANO, California
ADAM B. SCHIFF, California
DIANE E. WATSON, California

THOMAS E. MOONEY, SR., *Staff Director/General Counsel*
ROBERT R. KING, *Democratic Staff Director*

---

### SUBCOMMITTEE ON THE MIDDLE EAST AND SOUTH ASIA

BENJAMIN A. GILMAN, New York, *Chairman*

DAN BURTON, Indiana
STEVE CHABOT, Ohio
JOHN M. McHUGH, New York
JOSEPH R. PITTS, Pennsylvania
DARRELL E. ISSA, California
ERIC CANTOR, Virginia
JO ANN DAVIS, Virginia
DANA ROHRABACHER, California
PETER T. KING, New York
JOHN COOKSEY, Louisiana

GARY L. ACKERMAN, New York
HOWARD L. BERMAN, California
BRAD SHERMAN, California
ROBERT WEXLER, Florida
ELIOT L. ENGEL, New York
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
SHELLEY BERKLEY, Nevada
ADAM B. SCHIFF, California

HILLEL WEINBERG, *Subcommittee Staff Director & Counsel*
DAVID S. ADAMS, *Democratic Professional Staff Member*
DEBORAH BODLANDER, *Professional Staff Member*
PAUL BERKOWITZ, *Professional Staff Member*
MATTHEW ZWEIG, *Staff Associate*

SHATSKY-008147

# CONTENTS

Page

### WITNESSES

The Honorable Roy Blunt, a Representative in Congress from the State of Missouri .................................................................................................... 16

The Honorable Robert Menendez, a Representative in Congress from the State of New Jersey ................................................................................... 19

The Honorable David Satterfield, Deputy Assistant Secretary, Bureau of Near Eastern Affairs, U.S. Department of State .......................................... 22

### LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

The Honorable Benjamin A. Gilman, a Representative in Congress from the State of New York, and Chairman, Subcommittee on the Middle East and South Asia: Prepared statement ................................................................ 3

The Honorable Roy Blunt: Prepared statement ............................................ 18

The Honorable David Satterfield: Prepared statement ............................... 24

### APPENDIX

The Honorable Joseph Crowley, a Representative in Congress from the State of New York: Prepared statement ............................................................ 37

(III)

SHATSKY-008148

# MIDDLE EAST PEACE COMMITMENTS ACT AND THE ARAFAT ACCOUNTABILITY ACT

---

## THURSDAY, JULY 11, 2002

House of Representatives,
Subcommittee on the Middle East and South Asia,
Committee on International Relations,
*Washington, DC.*

The Subcommittee met, pursuant to call, at 2:15 p.m. in Room 2172, Rayburn House Office Building, Hon. Benjamin A. Gilman [Chairman of the Subcommittee] presiding.

Mr. GILMAN. The Committee will come to order. After many months of unremitting violence in the Middle East, the seemingly endless deaths of innocents, and the unceasing terrorization of Israel's population, it appears that the foreign policy of our Nation regarding Israel-Palestinian violence has, for the first time in years, begun to reflect the reality of the conflict, rather than a romantic and always-optimistic approach that perpetuated a failed political process.

I commend President Bush for his visionary address on the Middle East delivered in the Rose Garden on June 24th. His address marked a watershed in the development of a U.S.-Middle East policy rooted in the moral clarity that is a hallmark of the doctrine so thoughtfully articulated by our President regarding the region. States and their leaders are either with us or against us in the war on terrorism—there is no room for hesitation and no room for wavering, if a regime is to be truly considered an ally in our war on terror.

Yasser Arafat is a man who has cavorted with terrorists and indeed has spent most of his life sponsoring and supporting terrorism. Credible evidence has been uncovered by the Israelis, and the authenticity of this evidence is confirmed by U.S. counterterrorism authorities. This evidence links Arafat and many of his associates directly to the planning and financing of specific terrorist acts as well as the illegal importation of 50 tons of heavy weaponry into the Palestinian-controlled territories. In calling upon the Palestinian people to elect new leaders, President Bush, without mentioning Arafat by name, foresaw the even of an era.

Over the course of a 24-year career as the Chairman of the PLO, Mr. Arafat has not achieved for his people either his organization's founding goal, namely the destruction of the state of Israel, nor the peaceful two-state solution he supposedly endorsed upon signing the Declaration of Principles with Israel in September 1993. Mr. Arafat has proved that he is not capable of delivering a state to his people, nor delivering peace and security to his Israeli peace part-

SHATSKY-008149

2

ners. Instead of peace and security, Mr. Arafat, who could have been the leader of a Palestinian state had he accepted Israel's generous offer at Camp David two years ago, has directed against Israel a campaign of terror that, to this day, has resulted in the deaths of more than 560 Israelis. Similarly, hundreds of Palestinians have been the victims of Arafat's fateful decision to wage war against Israel.

None of these deaths need to have taken place. Prior to Israel's decision to bring Mr. Arafat back from Tunis in 1993, a terrorist campaign of this magnitude would not have been possible. In fact, Arafat has demonstrated to the world community that his very presence on the ground in the West Bank and Gaza, at the helm of the Palestinian Authority, has been the root cause of the current violence that terrorizes not only the Israeli public, but freedom-loving Palestinians as well.

After the historic handshake on the White House lawn in 1993, Congress, through the Middle East Peace Facilitation Act, relaxed a series of mandatory restrictions on the operations of the PLO. The thrust of the pending legislation is to provide a framework to restructure some of the concessions that the United States gave the Palestinians, essentially a form of recognition, support for a negotiated two-state solution, and aid to the Palestinian people, all in exchange for the fulfillment of a series of commitments.

Congress has an important role to play in helping to transform President Bush's vision of a new Palestinian leadership, a leadership not compromised by terror and committed to governing over their own people within a practicing democracy, based on tolerance and liberty, into concrete actions that will once again revive the hopes of millions of Israelis and Palestinians for a peaceful resolution to their conflict.

By supporting legislation that takes action against those whom the President has referred to as an unaccountable few in whose hands power over the Palestinian population is concentrated, Congress can be playing a constructive control not only in combating Palestinian terrorism, but in helping a new generation of Palestinian leaders to emerge from under the authoritarian control of the present regime, where their voices now are stifled.

The two pieces of legislation that we will be discussing today are H.R. 1795, the Middle East Peace Commitments Act, and H.R. 4693, the Arafat Accountability Act.

H.R. 1795, the Middle East Peace Commitments Act, requires the President to submit a report to the appropriate congressional Committees concurrent with the report submitted under the PLO Commitments Compliance Act of 1989 determining whether the PLO or the Palestinian authority has complied with its commitments under Oslo.

The President is to impose one or more sanctions if he determines that the PLO or the Palestinian Authority has not complied with its commitments under Oslo, the President must either deny visas to PLO and Palestinian Authority officials, downgrade the status of the PLO office in the United States, designate the PLO or one or more of its constituent group a foreign terrorist organization, or prohibit U.S. assistance to the West Bank and Gaza, except for humanitarian assistance.

SHATSKY-008150

3

H.R. 4693, the Arafat Accountability Act, takes this one step further. It requires the Secretary of State to deny visas to and prohibits the Attorney General from admitting to the U.S. any member of the PLO or any official of the Palestinian Authority. It requires the President to terminate the maintenance of a Palestinian information officer in the United States, and requires the Secretary of State to impose travel restrictions on the senior official of the Permanent Observer Mission of Palestine at the United Nations.

Furthermore, it requires the President to identify and freeze assets of the PLO and the Palestinian Authority in the United States, except required to carry out the functions of the Permanent Observer Mission of Palestine at the United Nations.

This measure also requires the President to submit a report to Congress detailing acts of terrorism committed by the Palestinian Authority, the Palestinian Liberation Organization, or any of their constituent elements. Included in the report is a determination of whether the Palestinian Authority, the PLO, or any of their constituent elements will be designated as a foreign terrorist organization.

These two measures, if acted upon, may need amending to reflect President Bush's vision, and I would welcome any thoughts Members might have now or during preparations for a markup. We welcome our two principal witnesses, our colleague from Missouri, Representative Roy Blunt, a former Member of our Committee and the Chief Deputy Majority Whip, who is the sponsor of H.R. 4693, and Deputy Assistant Secretary of State for Near East Affairs, David Satterfield, who is certainly one of the most qualified Middle East experts we have in the Department of State.

We are also pleased that Mr. Menendez is with us who will be delivering his thoughts with regard to this legislation.

[The statement of Mr. Gilman follows:]

PREPARED STATEMENT OF THE HONORABLE BENJAMIN A. GILMAN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW YORK, AND CHAIRMAN, SUBCOMMITTEE ON THE MIDDLE EAST AND SOUTH ASIA

After many months of unremitting violence in the Middle East, the seemingly endless deaths of innocents, and the unceasing terrorization of Israel's population, it appears that the foreign policy of our nation regarding Israeli-Palestinian violence has, for the first time in years, begun to reflect the reality of the conflict, rather than a romantic and always optimistic approach that perpetuated a failed political process.

I commend President Bush for his visionary address on the Middle East delivered in the Rose Garden on June 24. His address marked a watershed in the development of a US Middle East policy rooted in the moral clarity that is a hallmark of the doctrine so thoughtfully articulated by our President regarding the region. States and their leaders are either with us or against us in the war on terrorism—there is no room for hesitation, no room for wavering, if a regime is to be truly considered an ally in our war on terror.

Yasser Arafat is a man who has cavorted with terror, and indeed, has spent most of his life sponsoring and supporting terrorism. Credible evidence has been uncovered by the Israelis—and the authenticity of this evidence is confirmed by U.S. counter-terrorism authorities. This evidence links Arafat and many of his associates directly to the planning and financing of specific terrorist acts, as well as the illegal importation of 50 tons of heavy weaponry into the Palestinian-controlled territories.

In calling upon the Palestinian people to elect new leaders, President Bush, without mentioning Arafat by name, foresaw the end of an era.

Over the course of a 34-year career as the Chairman of the PLO, Arafat has not achieved for his people either his organization's founding goal, namely the destruc-

SHATSKY-008151

4

tion of the State of Israel, nor the peaceful two-state solution he supposedly endorsed upon signing the Declaration of Principles with Israel in September 1993.

Arafat has proved that he is not capable of delivering a state to his people, nor delivering peace and security to his Israeli peace partners. Instead of peace and security, Arafat—who could have been the leader of a Palestinian state had he accepted Israel's generous offer at Camp David two years ago, has directed against Israel a campaign of terror that to this day has resulted in the deaths of more than 560 Israelis. Similarly, hundreds of Palestinians have been the victims of Arafat's fateful decision to wage war against Israel.

None of these deaths need to have taken place. Prior to Israel's decision to bring Arafat back from Tunis in 1993, a terrorist campaign of this magnitude would not have been possible. In fact, Arafat has demonstrated to the world community that his very presence on the ground in the West Bank and Gaza, at the helm of the Palestinian Authority, is the root cause of the current violence that terrorizes not only the Israeli public, but freedom-loving Palestinians as well.

After the "handshake on the lawn" in 1993, Congress, through the Middle East Peace Facilitation Act, relaxed a series of mandatory restrictions on the operations of the PLO. The thrust of the pending legislation is to provide a framework to restructure some of the concessions that the United States gave the Palestinians—essentially a form of recognition, support for a negotiated two-state solution, and aid to the Palestinian people, all in exchange for the fulfillment of a series of commitments.

Congress has an important role to play in helping to transform President Bush's vision of a new Palestinian leadership—a leadership not compromised by terror, and committed to governing over their own people within a practicing democracy, based on tolerance and liberty—into concrete actions that will once again revive the hopes of millions of Israelis and Palestinians for a peaceful resolution to their conflict. By supporting legislation that takes action against those whom the President has referred to as an unaccountable few in whose hands power over the Palestinian population is concentrated, Congress can be playing a constructive role not only in combating Palestinian terrorism, but in helping a new generation of Palestinian leaders to emerge from under the authoritarian control of the present regime, where their voices now are stifled.

The two pieces of legislation that we will be discussing today are H.R. 1795, the Middle East Peace Commitments Act, and H.R. 4693, the Arafat Accountability Act. H.R. 1795, the Middle East Peace Commitments Act, requires the President to submit a report to the appropriate congressional committees concurrent with the report submitted under the PLO Commitments Compliance Act of 1989, determining whether the PLO or the Palestinian Authority has complied with its commitments under Oslo.

If the President to impose one or more sanctions if he determines that the PLO or the Palestinian Authority has not complied with its commitments under Oslo, the President must either deny visas to PLO and Palestinian Authority officials; downgrade the status of the PLO office in the United States, designate the PLO or one or more of its constituent groups a foreign terrorist organization, or prohibit U.S. assistance to the West Bank and Gaza, except for humanitarian assistance.

H.R. 4693, the Arafat Accountability Act, takes this one step further. It requires the Secretary of State to deny visas to and prohibits the Attorney General from admitting to the U.S., any member of the PLO or any official of the Palestinian Authority. It requires the President to terminate the maintenance of a Palestinian information office in the United States, and requires the Secretary of State to impose travel restrictions on the senior official of the Permanent Observer Mission of Palestine at the United Nations. Furthermore, it requires the President to identify and freeze assets of the P.L.O. and the Palestinian Authority in the United States, except required to carry out the functions of the Permanent Observer Mission of Palestine at the United Nations.

This measure also requires the President to submit a report to Congress detailing acts of terrorism committed by the Palestinian Authority, the Palestinian Liberation Organization, or any of their constituent elements. Included in the report is a determination of whether the Palestinian Authority, the PLO, or any of their constituent elements will be designated as a foreign terrorist organization.

These two measures, if acted upon, may need amending to reflect President Bush's vision, and I would welcome any thoughts Members may have now or during preparations for a markup. We welcome our two principal witnesses, our colleague from Missouri, Rep. Roy Blunt, a former Member of our Committee and the Chief Deputy Majority Whip, who is the sponsor of H.R. 4693, and Deputy Assistant Secretary of State for Near East Affairs, David Satterfield, who is certainly one of the most qualified Middle East experts we have in the Department of State.

SHATSKY-008152

5

Mr. GILMAN. I call on our Ranking Member, Mr. Ackerman, for any opening statement.

Mr. ACKERMAN. Thank you very much. Mr. Chairman, I would like to begin on a personal note. Some days ago you announced that you would not be seeking a 16th term in the United States Congress. I, and I think every Member of this Committee, are deeply saddened by your decision. With your departure, the House will lose one of its most honorable, decent, loyal and committed Members.

Our home State of New York will lose one of its most able and energetic advocates that the Congress has ever seen, and this Committee will lose one of its preeminent most knowledgeable leaders. For me, serving at your side has been an honor and a privilege, and, I would like to add, a lot of fun.

So I want to thank you, Ben, for all of your achievements in law and your legacy and policy for your leadership in this Committee and the House, and most of all, for your friendship and many wonderful memories that I and all of us will cherish of our service together. I know that the Ranking Member of our Full Committee and so many others will have a lot more to say when the Full Committee convenes, but I wanted to take this opportunity as your Ranking Member to express to you my thoughts.

Mr. GILMAN. Thank you, Mr. Ackerman, for your kind words.

Mr. ACKERMAN. A long time ago, long before September 11th, way before Enron or WorldCom, all the way back to March of 2001, 189 Members of the House signed a letter to the President calling for a reassessment of our relations with the Palestinian leadership. The letter, drafted by Mr. Hyde, Mr. Lantos, yourself, Mr. Chairman, and me, expressed our deep sense of frustration and our concern over recent events in the Middle East, we said. We pointed out that only 8 months earlier than then, that the Israeli government had "offered a final status proposal to the Palestinians that was extraordinary in the scope of its concessions."

The Palestinian response we noted, was not only to reject Israel's offer, but to embark on a deliberate campaign of violence against Israelis derailing prospects for a final peace agreement. We continue to say, given the drastic change that have taken place in recent months in Palestinian behavior, we concluded, we believe it is time for the United States to reassess our relations with the Palestinians.

So in the absence of any administrative initiative to impose real consequences on the Palestinian Authority for its conscious resort to violence in May 2001, you, Mr. Chairman, Mr. Lantos and I introduced the Middle East Peace Commitments Act, H.R. 1795. That bill, which now has 157 co-sponsors, would require the President to impose sanctions on the Palestinians if he determined that they had violated their commitments to non violence there dealing with Israel. When we introduced the bill, Mr. Chairman, we sent out a letter to our colleagues stating that:

"We offer this legislation with heavy hearts. Like all Americans, we fervently hope to see peace blossom and we recognize that the solution for the conflict must come from the parties themselves. But we cannot work during the day with Pales-

SHATSKY-008153

**6**

tinian leaders on the so-called peace of the brave, while in the evening they plan bombings and shootings and mayhem."

With violence continuing without let-up, the Administration continuing to engage without conditions and without consequences, Mr. Chairman, you and I and Mr. Menendez join together with Mr. Blunt to introduce the Arafat Accountability Act, H.R. 4693.

I want to take a moment to recognize the great effort by our first two witnesses here today, Mr. Menendez, who is a Member of our Committee of long-standing, and to the courageous leadership of Congressman Blunt, and to thank him for his continuous and ongoing effort since he began his professional career in government service and to thank him for introducing H.R. 4693.

The premise of this bill, again, was to insist on imposing consequences on the Palestinian leadership for their reprehensible behavior. Just as he did with the Middle East Peace Commitments Act, the Secretary of State urged Congress not to adopt what he called one-sided legislation. Indeed, in his May letter to Chairman Hyde, referring to the Arafat Accountability Act and another bill regarding Syria, the Secretary predicted that:

> "Consideration of these or similar bills will have a negative effect on our efforts to bring down the violence, avoid the outbreak of regional war and help the parties back to a path to comprehensive peace."

So said the Secretary.

Mr. Chairman, let's be clear, the ideas and principles that prompted the introduction of the two bills, which we will discuss today, are just as valid this day as they were in the spring of 2001. Only today it would seem the Administration has come to recognize that a policy of "all carrot, no stick" will not move the existing Palestinian leadership. It will not reduce violence. It will not energize our diplomatic partners in Europe or the Middle East, and most of all, it will not bring peace.

As the President forcibly declared in his June 24th address, today Palestinian authorities are encouraging, not opposing, terrorism. This is unacceptable. And the United States will not support the establishment of a Palestinian state until its leaders engage in a sustained fight against the terrorists and dismantle their infrastructure. So said our President.

In my view, if the Administration is going to continue to oppose legislative efforts to insist upon the accountability as the President so clearly called for in his speech, at a minimum, they now have a clear obligation to prepare for Congress a list of the benchmarks the Administration is going to adhere to in judging Palestinian performance. The good cop/bad cop routine will not work in the Middle East.

What is necessary is consistency, consistency, consistency, consistency from us, consistency from our allies and the quartet, and consistency from our partners in the Middle East. Some of us have sought this consistency in legislation. The State Department, up to this point, has opposed our efforts on the grounds that such measures would "tie the President's hands."

SHATSKY-008154

7

Unless I am mistaken, I would say the President agrees with us. There have to be consequences for those who use violence and terror to advance their political goals.

Mr. Chairman, I look forward to a vigorous debate in our Subcommittee on how the U.S. Government can best address the need for reform and transition of the Palestinian Authority, and what benchmarks we should insist upon in order to judge future developments in this process. This is a crucial time in the Middle East, Mr. Chairman, and I commend and thank you for holding this important hearing on the pending legislation.

Mr. ISSA [presiding]. The Chair will grant itself 5 minutes at this time for a short opening statement. I too would like to associate myself with both of the previous speakers the frustration that led to these bills, and particularly Mr. Blunt's bill, which I believe is founded on the same frustrations that I have felt in my visits to and study of the situation in Gaza and the West Bank. There is no doubt that the current situation in the West Bank and Gaza is unacceptable and deplorable.

Innocent Israeli people and innocent Arabs are both dying and suffering every day. Much of this as a result of the failure on the part of Yasser Arafat of the Palestinian Authority to successfully crack down on terrorism. There are even allegations that Yasser Arafat himself has been directly involved in some aspects of terror. Something needs to be done, and we need to change the current situation.

We can no longer hope for the best and continue the status quo. But we need ask ourselves how we can make a change that is both effective and conducive to peace in the region.

It is my belief that President Bush has gone a long way in establishing, as I would share with my Ranking Member, that we are no longer going to have a carrot-only solution. He has called for elections and significant change in the leadership of the Palestinian Authority. I believe that this legislation, as it is presently written, would be premature, that prior to the success of those elections, this legislation could only serve to frustrate the State Department. Because even after a successful election and the beginning of a transition of government, it is unlikely that there will be an overnight success. Only this morning I met with former Secretary of State Henry Kissinger, who said that in spite of the darkness, he still believes there is a possibility for a provisional Palestinian state within a year, so long as the security requirements can be significantly changed to where Israel can safely assure that without its further intervention, steps will be taken on an ongoing basis to reduce violence.

And I note that the Secretary said to reduce violence, not to eliminate it. It is unlikely that overnight there would be a reduction. As a matter of fact, even within both Jordan and Egypt after years of peace and years of joint effort by forces on both sides of the border on a daily basis, they are still following up leads about terrorist cells attempting to get a foothold or lead to some attack.

H.R. 1795 does have a provision that would still allow for humanitarian assistance. But I believe that when we look at an exception for humanitarian assistance, we miss the point. One hundred percent of the money that we really give to the Palestinian

SHATSKY-008155

8

people today is all humanitarian assistance of one sort or the other. The vast majority of it does not see its way into Yasser Arafat or the Palestinian Authority's hands.

As a matter of fact, in my last visit to the West Bank, I visited YMCAs and other facilities which were stifled by an absence of an ability to spend the money that we had appropriated to build these facilities so that Arab and Jew, Christian and Muslim could come together and enjoy the benefits that peace would bring to the region.

I look forward to listening to our speakers today. I come with an open mind as to how we can change this legislation to make it a positive, a carrot, and at the same time, retain a stick that would be useful should the prospects for peace once again take a turn for the worse.

With that, I am yielding back the balance of my time. You want 5 minutes. You got it.

Mr. SHERMAN. I want to echo Mr. Ackerman's comments about his fellow New Yorker, our Chairman, Ben Gilman. And I want to comment that I think the theme here is whether the President's values and rhetoric are going to be translated into policy, particularly at the State Department. And as Chairman Gilman pointed out, the theme there among others is that countries are either with us or against us in our efforts against terrorism.

Now, I want to go a little outside the scope of these hearings, because Mr. Satterfield is here, and it is certainly within his bailiwick to focus not only on Israel and the Palestinians, but also on Iran and Europe's involvement with Iran. Europe today can only be described as engaged in an effort that will finance, or help finance the nuclear weapons program of the Islamic Republic of Iran.

Not only are they doing it with their own trade and their own aid, but they stand ready this year to hijack our money along with theirs by outvoting us at the World Bank and sending perhaps $755 million to terror. I have talked to the President about this. I have talked to the Secretary of State about this. And perhaps Mr. Satterfield could depart from his prepared remarks and indicate whether the plan is simply vote against these loan at the World Bank, get outvoted, and then go have tea with our friendly diplomatic colleagues from Europe or whether we plan to take action, which the State Department would categorize as extreme, such as taking definitive foreign policy moves adverse to the wishes of those who would finance the nuclear weapon program of Iran, a country that has been identified as the number one sponsor, state sponsor of terrorism.

Focusing on the Middle East more narrowly defined, the President made an outstanding speech. We should commend him for it. We should also commend the government of Israel for eliminating ten of the outpost settlements for announcing that they plan to eliminate another 10. And I look forward to perhaps commending the Israeli government in the future for the elimination, or downgrading, or non expansion of other settlements that are outside the Barak line, or the Barak nonline, or whatever you want to call it.

I want to commend Mr. Blunt, our colleague for being the chief sponsor of the Arafat Accountability Act. I would hope that Mr. Satterfield is here to enforce that Act. Because it reflects the Presi-

SHATSKY-008156

dent's values. It reflects the President's rhetoric. It gives content
and detail to the President's speech. Needless to say, I am not cer-
tain that that's what I will hear, but certainly we should, because
as the President said, you are either for us or against us in the war
on terror.

If you listen to his speech about Arafat I don't think the Presi-
dent categorizes Mr. Arafat as with us in the war against terror.
So why are his representatives accorded special quasi-diplomatic
status here in this country? We would think that those who rep-
resent organizations which are currently not with us in the war
against terror should not be accorded immunity from prosecution
and all the rest that goes with diplomatic status to a degree not
required by our United Nations commitments.

So I look forward to a State Department which carries out,
through its detailed policies, the overall values announced by our
President, and I know that that will start by an endorsement of
Mr. Blunt's legislation when we hear from the State Department
representative. I yield back.

Mr. ISSA. The gentleman yields back. The Chair now recognizes
the gentleman from California, Mr. Rohrabacher, for opening re-
marks.

Mr. ROHRABACHER. Before I mention anything about the legisla-
tion, I certainly agree with my friend and colleague from California
about Iran and although that is not what this hearing is about, we
should certainly be on the side of the young people of Iran who
hate their oppressive mullahs and should join them in a mullah re-
moval program as soon as possible. But democratically, if at all fea-
sible.

I also agree with my good friend and colleague, Mr. Ackerman,
and just Ben is not here now, so I am not just kissing up to the
Chairman by saying this, that Ben is one of the most respected
Members of the House and I have a deep affection for Ben Gilman,
because he has a wonderful heart. And all over the world, there are
people who have benefited from his ideals and his commitment to
those higher standards that we as Americans are so proud of.

So I am just sorry that he will be leaving us. But I am sure that
his skills and talents will be taken advantage of by the Administra-
tion once he leaves. But we are going to use them to the maximum
until the end of this year. So we all love Ben and I certainly echo
that praise.

In terms of this legislation today, I think I would be more happy
with the bill if it was called "Hold Everybody Accountable Act"
rather than just holding Arafat Accountable Act.

The Middle East Peace Commitments Act I will have to take a
look at, but what is most important I believe to achieving peace in
that region is that we have a single standard. And believe it or not,
most of the people in the Muslim world believe that the United
States doesn't have a single standard. They think that we do not
hold Israel to the same standards that we hold Mr. Arafat. And I
would hope as this legislation moves forward if it is only aimed at
holding Mr. Arafat accountable that we put things in the bill that
hold all parties accountable to a single standard. I haven't read the
bill yet. I will be looking forward to seeing if that is included in
the bill.

SHATSKY-008157

10

And consistency, you know, that is right single standard is consistency. With most people unfortunately on the other side, our influence wanes because they believe we have been consistently inconsistent. I believe the United States should be a peacemaker in the Middle East. I mean, it is a horrible cycle of violence and our hearts should be going out, yes, every time there is a bomb that is exploded and Israeli children or senior citizens or noncombatants of any kind are murdered. We have to care about them and we have to express that as adamantly as possible, but let us not ignore the dead bodies of the Palestinian children and the Palestinian elderly that are also there.

We need to reach out to both sides, hold both sides accountable and just set a single standard of that it is wrong and it is never justified to kill noncombatants in order to achieve a political end. And I have no problem in voting for a piece of legislation that condemns anyone, whether it is one side or the other for killing noncombatants. But I would hope we condemn both sides when this happens. And I had a letter from a member of the Israeli Embassy recently who was very upset when I suggested perhaps the Israelis have killed noncombatants as well.

I took his—he said I was insulting him, et cetera. So I wrote him back a very sincere letter. I said look just please correct me if I am wrong. Was it Israeli policy? And has been it been Israeli policy to if an Israeli had been killed, especially when they were in Lebanon but at other times as well that to immediately respond with a bombardment of some kind of a Palestinian refugee settlement or populated area?

At the end of that exchange, did it not leave Palestinian elderly and young people and women and children dead on the ground, and at the end of the whole exchange, an Israeli soldier dead and you had a bunch of noncombatants dead? That has to be wrong. That is wrong if that happened. I said if that is not correct, if I have been lied to, that that was Israeli policy, please let me know.

And you thought what, I have received no response from that letter. And I would plead right now for my colleagues think that I am wrong, please show me that and I will quit saying this. But until then, I have to assume that the immorality and the cycle of violence that is going on in the Middle East is something that is taking place on both sides, and that we need to reach out to both sides in this conflict to try to find an answer so that Israel can live in peace and that Palestinians can have some modicum of decency and have peace side by side.

My time is up, but I will end by saying that is what, I hope, I know our President is trying to have that policy in the past, and maybe Colin Powell, Secretary Powell's opposition to these bills a couple of years ago reflected that. But if these bills will help bring about peace, I will support them, especially if they are one standard bill. Thank you very much.

Mr. ISSA. The Chair would ask unanimous consent for 30 seconds for Mr. Ackerman.

Mr. ACKERMAN. I appreciate the gentleman's concern and his passion. But I didn't want his remarks to go unanswered, lest anybody think that everybody agrees with them. There is a basic difference between people responding to being attacked as we do as

SHATSKY-008158

11

Americans, despite the fact that in Afghanistan when we go after the people who committed heinous acts against America that sometimes unfortunately innocent people do get killed. That is the price of war. It is regrettable and unfortunate. But there is a difference between the perpetrator and the victim. The victim is allowed to respond.

Mr. ISSA. In accordance with the Chairman's policy, I would now recognize the gentlewoman from Nevada, Ms. Berkeley for 5 minutes. Any portion of which you can share with Mr. Sherman.

Ms. BERKLEY. Yes, I would yield as much time as you may consume, Mr. Sherman.

Mr. SHERMAN. I would just point out that it is Israeli policy when retaliation for a terrorist act or another act is called for to go after military targets, and just as when the United States has gone after military targets in Serbia or in Afghanistan, there often is very regrettable collateral damage, but it is never Israeli policy to shell an area that—other than aiming at military targets. I yield back to Ms. Berkeley.

Ms. BERKLEY. Thank you, Mr. Sherman. Thank you, Mr. Chairman, for giving us this opportunity to speak. Long before I came to Congress, I was consumed with a great passion to have peace in the Middle East. And I worked very hard to help with that effort. I was among those millions of Americans who were most supportive of Oslo and longed for the peace plan to have a successful conclusion.

I had a change of heart after Camp David. When Arafat walked away from a peace plan that Prime Minister Barak set forth, which was far more generous and encompassing than any other Prime Minister from the state of Israel had ever set forth, I became convinced that after being offered 97 percent of the West Bank, 100 percent of the Gaza Strip, control over parts of Jerusalem and billions of dollars in guarantees from the United States and our European allies to build a Palestinian infrastructure—when Arafat walked away from that, it was an indication to me that what has transpired in the last 24 months since then has nothing whatsoever to do with the Palestinian homeland.

If, in fact, Arafat wanted a Palestinian homeland, there would be one now. What this has to do with, and what the last 24 months of the second intifada has to do with the extermination and elimination of the state of Israel. I was extremely pleased with the President's speech on June 24th that laid down clear and unambiguous steps that the Palestinians must take before the establishment of a Palestinian state, not coincidentally, not after but before. My view is unequivocal.

We must first see real and lasting change by the Palestinians a new leadership free of corruption, and this new leadership must destroy the terrorist infrastructure, even the terrorist attacks against innocent Israelis and finally, finally and truly recognize the right of the state of Israel to exist.

Now, I say it is the height of hypocrisy on this Committee, or in the United States Congress to criticize Israel for doing no more than the United States is doing to protect and defend its own citizens. The first act of any government is to protect and defend its people. The Israelis have the same right. And I have never read

SHATSKY-008159

anywhere where it says Israelis have a right to die and the United States has a right to self-defense. The Israelis are doing no more than the United States is doing.

I agree with my colleagues when they point out the horrors of war and the inadvertent error. We ourselves have made errors in Afghanistan as we go after the terrorists who would blow up themselves in order to kill innocent Americans. The Israelis have the same right. My vision for a peaceful Middle East is yet to be seen. One of the main reasons is Yasser Arafat, a man who lies, who cheats, and who distorts the truth. He thrives on terrorism.

That is why I fully support and I am a proud cosponsor of the Arafat Accountability Act. The bill is a good start. It calls for the leader of the Palestinian Authority to publicly condemn all acts of terror, destroy the infrastructure and tools of terrorism and all financial and rhetorical support of terrorism, and urge all Arab nations who are involved in or support these egregious, despicable, to cease their efforts immediately.

It takes a big step by denying visas to any member of the Palestinian Authority. But the bill doesn't go far enough because it doesn't call for the immediate removal of Arafat from office. This is a necessary step if we are to achieve peace. This man has proven he doesn't want peace, and he will never accept peace with the Israelis. And more than that, more than his war against the Israelis, he is hurting his own people in a dramatic and painful and intergenerational way.

I also fully support H.R. 1795, the Middle East Peace Commitments Act, which I am also a proud cosponsor of. This bill imposes sanctions again the Palestinian Authority if the President determines they are not living up to their commitments. Their connections with all terrorist groups have got to be severed completely and immediately and without exception. Earlier this year, the United States designated the Al-Aqsa Martyrs Brigade as a terrorist organization. But Arafat lied and he disagreed with the President on CNN when he denied that the brigades were involved in terrorism. With Arafat it is the same old story, the same old lie year after year, month after month, day after day. It is time to move on and let's bring genuine peace to the Middle East.

Mr. ISSA. Thank you. The Chair would remind all the Members that you can revise and extend your written remarks. So if you would like to submit your written remarks and do an abbreviated statement, it would be greatly appreciated by all of us, so that we can get to asking our questions and hearing the statements. But you all certainly have the opportunity to make an opening remark. The Chair would recognize Mr. Cantor for his opening remarks which he assures me will have the greatest brevity.

Mr. CANTOR. Thank you, Mr. Chairman. First of all, I would like to commend the gentleman from Missouri and the gentleman from New Jersey on their leadership in bringing this legislation forward. I think it is badly needed. I am so glad you are here. And I would also like to just respond to the use of the term "cycle of violence" as it applies to the situation in Israel. I would have hoped that we would no longer have listened and be able to hear that use of that term in this discussion, because in my mind, it has been clear for some time that there would be no violence in Israel were it not for

SHATSKY-008160

Case 1:18-cv-12355-MKV-DCF Document 536-108 Filed 10/05/21 Page 18 of 42
Case 1:02-cv-02280-RJL-DCF Document 256-6 Filed 11/13/15 Page 19 of 41

13

the continuous aggression and violent terrorism by the Palestinians, their leadership and their associated terrorist groups.

But Mr. Chairman, in his speech last month and has been said before, President Bush made a very bold statement that the only way for the Palestinian people to achieve real peace is to elect new leaders who are not compromised by terror. In my humble opinion, Palestinian leader Yasser Arafat is a terrorist who has never demonstrated any intention to be a partner in peace. And so doing, he has wiped away the hope to many, many innocent Palestinian citizens. And the resumption of violence and terror came on the part of the Palestinian Authority, under Mr. Arafat, came as Israel was offering historic compromises to end the conflict. Instead of seizing that opportunity, Mr. Arafat released over a hundred known terrorists from prison on permitting them to kill innocent Israelis. In the past 19 months, more than 3,600 innocent Israelis have been wounded, and more than 420 killed. Israelis face an average of 25 live fire attacks per day.

The Palestinian use of violence and terror as a political tool is specifically prohibited in every agreement signed with Israel even the United States. Documents that have been uncovered in the past few months have shown that Arafat was personally involved in the authorization of payments for weaponry as well as payments to the very people executing the bombing of innocent men, women and children. The proposed legislation would require the imposition of sanctions unless and until the Palestinians fulfill their commitments to fundamental change, democratic change. I have like my friend from Nevada, who I see is no longer here, I have consistently advocated the stance to end U.S. taxpayer support, either directly or indirectly, to the current Palestinian leadership under Mr. Arafat. I wholeheartedly support these bills and their underlying message that the U.S. will not deal with terrorists. Mr. Chairman, I yield back the balance of my time.

Mr. ISSA. The Chair thanks you very much for yielding back. The Chair now recognizes the gentleman from Pennsylvania, Mr. Hoeffel.

Mr. HOEFFEL. Thank you, Mr. Chairman. I want to echo the kind words about our colleague, Ben Gilman. I want to congratulate Mr. Blunt and Mr. Menendez and Mr. Ackerman for bringing these two bills forward. I have proudly cosponsored both and congratulate all of you for your fine work in this area. And one question I would like to pose to our two witnesses is the question of the Presidential waiver for national security reasons, which both proposals include which whether—which is sort of a standard congressional tip of the hat, I guess, to the executive branch.

We always seem to include a Presidential waiver for national security purposes. And I wonder if we should rethink that or modify that some or whether it remain absolutely necessary to include a pretty broad waiver as we try to frankly limit the Administration's actions somewhat in a particular area in this case in deals with the Palestinian Authority. I would be interested if your comments about that.

And for Ambassador Satterfield, I gather that the Administration's testimony today from the Ambassador will not be supportive of these bills. I would ask that he address the notion that if these

SHATSKY-008161

**14**

bills are unacceptable, what conditions should we place on the behavior of the Palestinian Authority. Now the President has been clear in his opposition to Mr. Arafat.

Of course, the elections the President has called for may result in the reelection of Mr. Arafat. And that will surely frustrate the White House and its position. Would we not be better in setting forth conditions that any Palestinian leader would have to meet. I would suggest too that there is a full renouncing of terror, both in word and deed, and a full recognition of Israel and her right to exist as a Jewish state.

And Arafat would not meet those conditions today and the question is, if we set those conditions, do we encourage some alternative leadership within the Palestinian Authority to step up to either push Arafat aside, kick him upstairs, challenge him directly, defeat him? I was fortunate to travel to Israel briefly just after the House passed our resolution of solidarity with Israel in the face of the terror attacks with Congressmen Saxton, Deutsch and Kingston. And Minister Uzi Landau of the Internal Security Ministry and General Kupervaser of military intelligence both suggested that the setting of conditions indicating what we would insist upon in any Palestinian leader, whether it is Arafat, a changed Arafat, or someone new, is the best way to go to maintain consistency, and for us, to perhaps positively influence the upcoming elections. I would be interested in answers to those comments, and I thank the Chair.

I am glad to see Mr. Gilman back in the Chair. I want the Chair to know I said very nice things about him, only echoing what everybody else said and we salute you, Mr. Gilman, and I yield back.

Mr. GILMAN [presiding.] Thank you for your kind remarks.

Mr. Engel.

Mr. ENGEL. Thank you, Mr. Chairman, and let me also echo the kind remarks that have been said about you and as I go around my new district, parts of which are in your current district, I know that if I can work as effectively as you have for the people of Rockland County, everyone I speak with has only the best things to say about you. But I already knew that since we have been colleagues for 14 years. I want to echo the comments of Ms. Berkley, Mr. Cantor and others who have spoken, Mr. Hoeffel, certainly Mr. Ackerman, who have spoken.

You know, let me say I am very glad we are having this hearing. I have a bill which is the Syria Accountability Act, and I hope before we break for the summer recess that we will also have a hearing for my Syria Accountability Act because I think it is important when we are dealing with the Middle East that we have these hearings to air the views and to say the things that really need to be said.

Two Israelis that I remember in the 60s had sayings, and I would like to repeat them because I think they are very appropriate. Golda Meir, who of course grew up in the United States in Milwaukee and became the first woman Prime Minister of Israel, had a statement where she said that "there will be peace in the Middle East when the Palestinians decide that they love their own children more than they hate Israelis." And I think that is something that we can say again today. And then it was Abba Eban who had the phrase that "the Palestinians never miss an opportunity to

SHATSKY-008162

miss an opportunity." And I think that is also very, very appropriate.

I, too, like Ms. Berkley, was a strong supporter of Oslo. I always felt that Arafat's feet had to be held to the fire, but I felt when it comes to making peace there are times you look the other way and hope that things will work. When Arafat walked away from the peace process after generous offers by the Administration and by Prime Minister Barak, it also opened my eyes and I no longer feel that Arafat or any of the people that are connected with him—that have been in his inner circle—really accept a Jewish state in the Middle East.

And, indeed, walking away from a generous offer, as Ms. Berkley pointed out, 100 percent of Gaza, 97 percent of the West Bank, billions of dollars aid, a state of their own, international recognition—to walk away and unleash the intifada calls into question whether the goal is a Palestinian state or to wipe Israel off the face of the Earth, out of the Middle East as a Jewish state. And I have not come to any other conclusion other than to say that Mr. Arafat remains a terrorist and still does not accept the right of Israel as a Jewish state to exist.

I too, was very pleased when President Bush came out with his policy statement several weeks ago. I don't think we can just plod along with the same old tired policies, we can't look the other way every time there is a suicide bombing, we can't say that America should continue to be a neutral partner or should broker the two sides as if somehow there is a moral equivalency between suicide bombing, murder and homicide, and with self-defense. I reject that moral equivalency.

I reject the so-called cycle of violence that we hear from the State Department. The cycle of violence is when innocent Israelis are being murdered by fanatics and Israel is retaliating trying to get in and destroy the nests of terror. I think it is very interesting that Israel in the past several weeks has tightened its grip around the nests of terror in the West Bank and you haven't seen the daily suicide bombings. So it is very clear that these suicide bombings come from the West Bank and could be controlled.

And no foolish question that so many people in the State Department ask, well, Arafat has got to show that he can control terror and Arafat has got to show that he means it. And can Arafat really control it? Well, it is clear to me Arafat is terror. Arafat and terror are one. He has been doing the terror. It is not a matter of can he control, will he control it. He is doing the terror. He is using terror as a negotiating tool, and that is totally unacceptable.

And President Bush's statement was a refreshing break from the old tired policies of the past, which we had hoped would work but didn't work. So don't we learn anything from our experiences?

I read Ambassador Satterfield's testimony and I have enormous respect for him, but I must wholeheartedly disagree. Any administration that comes in, it doesn't matter which party, always says if Congress somehow mandates what it wants to see—I will read Mr. Satterfield's remarks—"both pieces of legislation would eliminate the flexibility we will need to attain these goals." Well, how much flexibility do we need?

SHATSKY-008163

Case 1:18-cv-12355-MKV-DCF Document 56-18 Filed 10/05/21 Page 21 of 42
Case 1:02-cv-02280-RJL-CFC Document 256-6 Filed 11/13/18 Page 20 of 41

16

President Bush said it right. He said you are either with us or you are with the terrorists, and it is black and white. And it is very clear for anyone to see where the terrorism is coming from. It seems to me that we in the United States, in the United States Congress and the Administration, needs to say to the Palestinians once and for all, yes, we support your aspirations for a state if you act like civilized human beings. But if you are going to use terror as a negotiating tool, if you are going to think that you can continue to do all these things, we will not be even-handed. We will strike terror wherever we see it and we will not stop.

Mr. GILMAN. Gentleman's time has expired.

Mr. ENGEL. Can I conclude my sentence, Mr. Chairman, and I will stop.

If we can go halfway around the world, rightfully so, to fight terrorism in Afghanistan, then truly the Israelis can do it in their own backyard. We have a stake and just the way 10 years ago, 11 years ago, we had Operation Desert Storm with the first President Bush, which I supported and voted for, the United States has a moral commitment to do what is right in the United States and I don't want to hear any talk of even-handedness. There is right and there is wrong, and it is easy to see what side is right and what side is terror.

Mr. GILMAN. Now we are pleased to hear testimony by our Chief Deputy Majority Whip, Roy Blunt, sponsor of H.R. 4693, the Arafat Accountability Act.

Mr. Blunt.

## STATEMENT OF THE HONORABLE ROY BLUNT, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MISSOURI

Mr. BLUNT. Mr. Chairman, let me begin by thanking you for scheduling this important hearing and inviting me to testify regarding our bill, the Arafat Accountability Act. And let me join my colleagues in thanking you for your service to our country and your leadership of this Committee, this Subcommittee and the Full Committee. It continues to be an honor to serve with you, and all of us appreciate the great work you do here and around the world for our country.

As you have seen many times on your visits there, the situation in the Middle East is constantly changing, but there are certain facts related to the volatile region that we in Congress have a responsibility to address. One of the most critical factors, some would say the factor contributing to the volatility to the Middle East, is the long time presence of Yasser Arafat as the Palestinian leader.

I am here today because I want to see peace in the Middle East as soon as possible. It is clear, however, that peace is impossible without Mr. Arafat's complete and total abdication of all acts of terror.

That is why I joined with 64 of my colleagues, originally, Mr. Chairman, you, myself, Mr. Ackerman and Mr. Menendez, to introduce a bill that we feel really holds Arafat's feet to the fire over his reign of terror in the Middle East.

The Arafat Accountability Act condemns in no uncertain terms the violence that is supported and funded by Yasser Arafat and the PLO. It also sends a strong message that the United States will

SHATSKY-008164

neither tolerate nor ignore Arafat's blatant refusal to work for the peace he says he seeks. It would impose sanctions on travel, visa restrictions and asset seizure against those members of the Palestinian Authority and the PLO who are in the United States for nonofficial purposes. It would also require the President to report to Congress every 90 days detailing Palestinian acts of terrorism, including actions by the Palestinian Authority, the Palestinian Liberation Organization or any of their constituent elements.

Before June 24, this bill would have gone a long way toward addressing the United States problem with the Palestinian Authority by helping establish our position. However, the President's speech on June 24 changed the paradigm of American policy toward the Middle East.

For years under both the Clinton and Bush Administrations, American policy was built on the hope that Palestinian leader Yasser Arafat would change himself and his regime just enough to meet Israeli and American concerns and allow a peace process to go forward. The hope was Arafat would eventually see the obvious, that peace with Israel was in his people's own self-interest and it was time to stop the violence and accept Israel's generous offers of statehood and virtually complete land withdrawals.

But 21 months of horrific and inexplicable terror against Israel's civilian population with what evidence now shows is the direct complicity of Arafat and his security forces has taught us that Yasser Arafat has no intention of working with us and Israel for peace. Arafat refused to work with Israel and led his people into a self-destructive tirade of homicidal bombings and shooting of innocent Israelis.

On June 24, the President told the world that peace and stability were impossible without a new Palestinian leadership that would work to fight against terror rather than engaging in it. Congress should help the President by codifying into law the very ideas he outlined in his historic June 24 speech. I believe this legislation should and can be altered by this Committee to more truly reflect the President's new foreign policy strategy within the spirit of the legislation we filed before the President made his June the 24 speech.

First, we should make it clear that the United States' recognition will be denied unless there are fundamental changes to Palestinian governance. Palestinians must have new leadership that is chosen through truly free and competitive elections. Elections alone are not enough. If Arafat controls the process, the press, and the police, free elections are not really possible.

Second, future recognition and support for a Palestinian state must also depend on those new leaders actively dismantling the terrorist infrastructure established in a unified and accountable security force and cooperating with Israel to prevent terrorist attacks and to break up any militia or cells.

I might also say in response to Mr. Hoeffel's question, I think we can change this legislation easily and clearly so that the same standards would apply to all, whoever is the leader of the Palestinian organization, the Palestinian state, not as we originally had stated a specific reference to Arafat but a reference to this leadership.

SHATSKY-008165

18

Third, the Palestinian Authority must make the necessary legal and constitutional changes to institutionalize all of these changes. Without an accountable government free of corruption, with legal safeguards for its citizens, any hope for future statehood will deteriorate into the chaotic government structure we see today, and terror, if temporarily controlled, will soon reappear.

I look forward working with the Committee to amend this bill as necessary to reflect the President's new foreign policy and encourage lasting peace in the Middle East. Certainly as we would all anticipate those of you who are Members of this Committee and particularly from my enjoyable service on the Committee, no Administration ever steps forward and applauds Congress for helping do what they see is their job. I think it is significant that this legislation was out there, was responded to by our colleagues like it was, that in many ways if it didn't provide a foundation, certainly would have provided a ready reference to the President as he stepped forward with his remarks to know that those remarks and that attitude and that approach would be heartily supported by this Congress.

We can with this legislation send a message to the world, send a message to our friends in the Middle East and also provide a foundation and a monitoring system that will help this Administration, our country and, more importantly, people in Israel and Palestine move toward peace.

And I am grateful, Mr. Chairman, that you are holding this hearing today. I eagerly look forward to working with you and the Committee as we work to move this piece of legislation, as you have an opportunity to modify it, to the Full Committee, to the Floor, and hopefully to the President's desk.

Mr. GILMAN. Thank you very much, Mr. Blunt, for your extensive analysis of the problem. I would hope that you could stay a few moments while Mr. Menendez makes his presentation and we may have some questions for both of you.

[The prepared statement of Mr. Blunt follows:]

PREPARED STATEMENT OF THE HONORABLE ROY BLUNT, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MISSOURI

Mr. Chairman, let me begin by thanking you for scheduling this important hearing and for inviting me to testify regarding our bill, the Arafat Accountability Act. And let me join my colleagues in thanking you for your service to our country and your leadership of this committee. It continues to be an honor to serve with you, and all of us appreciate all of the work you do here and around the world.

As you've seen many times in your visits there, the situation in the Middle East is constantly changing, but there are certain facts related to that volatile region that we in Congress have a responsibility to address.

One of the most critical factors—some would say the factor—contributing to the volatility in the Middle East is the longtime presence of Yasser Arafat as Palestinian leader.

I'm here today because I want to see peace in the Middle East as soon as possible. It is clear, however, that peace is impossible without Mr. Arafat's complete and total abdication of all acts of terror.

That's why I've joined with 64 of my colleagues, originally that was just you, myself, Mr. Ackerman and Mr. Menendez, to introduce a bill that we feel really holds Arafat's feet to the fire over his reign of terror in the Middle East.

The Arafat Accountability Act condemns in no uncertain terms the violence that is supported and funded by Yasser Arafat and the PLO. It also sends a strong message that the United States will neither tolerate nor ignore Arafat's blatant refusal to work for the peace he says he seeks. It would impose sanctions on travel, visa restrictions and asset seizure against those members of the Palestinian Authority

SHATSKY-008166

Case 1:18-cv-12355-MKV-DCF Document 136-108 Filed 10/05/21 Page 24 of 42
Case 1:02-cv-02280-RJL-CF Document 256-6 Filed 11/13/18 Page 23 of 41

19

and the PLO who are in the United States for non-official purposes. It would also require the President to report to Congress every 90 days detailing Palestinian acts of terrorism, including actions by the Palestinian Authority, the Palestinian Liberation Organization or any of their constituent elements.

Before June 24th, this bill would have gone a long way toward addressing the United States' problems with the Palestinian Authority by helping establish our position. However, President Bush's speech on June 24th changed the paradigm of American policy towards the Middle East. For years, under both the Clinton and Bush Administrations, American policy was built on the hope that Palestinian leader Yasser Arafat would change himself and his regime just enough to meet Israeli and American concerns and allow a peace process to go forward. The hope was that Arafat would eventually see the obvious, that peace with Israel was in his people's own self-interest and that it was time to stop the violence and accept Israel's generous offers of statehood and virtually complete land withdrawals.

But 21 months of horrific and inexplicable terror against Israel's civilian population, with what evidence now shows is the direct complicity of Arafat and his security forces, has taught us that Yasser Arafat has no intention of working with us and Israel for peace. Arafat refused to work with Israel and led his people into a self-destructive tirade of homicidal bombings and shootings of innocent Israelis. On June 24th, the President told the world that peace and stability were impossible without new Palestinian leadership that would work to fight against terror, rather than engaging in it.

Congress should help the President by codifying into law the very ideas he outlined in his historic June 24th speech. I believe this legislation should and can be altered by this committee to more truly reflect the President's new foreign policy strategy within the spirit of the legislation we filed before the President made his June 24th speech.

First, we should make clear that United States recognition will be denied unless there are fundamental changes to Palestinian governance. Palestinians must have new leadership that is chosen through truly free and competitive elections. Elections alone are not enough; if Arafat controls the process, the press, and the police, free elections are not possible.

Second, future recognition and support for a Palestinian state must also depend on these new leaders actively dismantling the terrorist infrastructure, establishing a unified and accountable security force and cooperating with Israel to prevent terrorist attacks and to break up any militias or cells.

Third, the Palestinian Authority must make the necessary legal and constitutional changes to institutionalize all of these changes. Without an accountable government free of corruption with legal safeguards for its citizens, any hope for a future statehood will deteriorate into the chaotic governance structure we see today. And terror, even if temporarily controlled, will soon reappear.

I look forward to working with the Committee to amend this bill as necessary to reflect President Bush's new foreign policy and to encourage lasting peace in the Middle East.

Mr. GILMAN. Mr. Menendez, a senior Member of our International Relations Committee and of the Democratic leadership.

## STATEMENT OF THE HONORABLE ROBERT MENENDEZ, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY

Mr. MENENDEZ. Thank you, Mr. Chairman. I want to thank you and the ranking Democrat for holding this hearing and for the opportunity to testify, and I want to join in the chorus of voices in commending you for your service in the Congress and certainly on this Committee. You have served with great distinction certainly over the years that you were Chairman, and I was privileged to serve on the Committee during that period of time and your chairmanship of the Subcommittee and in policy in different parts of the world, the Middle East and beyond. So we want to join in those chorus of voices of our colleagues who are congratulating you, Mr. Chairman, on your work, and we look forward for the continued work that you will have for the rest of this session of which I hope these bills are a part of the hallmark of how you finish your career.

SHATSKY-008167

Case 1:18-cv-12355-MKV-DCF Document 536-108 Filed 10/05/21 Page 25 of 42
Case 1:02-cv-02280-RJL-CF Document 256-6 Filed 11/13/18 Page 24 of 41

20

I remember well on the day that we introduced this bill with Mr. Ackerman, Mr. Blunt, yourself and myself, the news organizations reported that Chairman Arafat had planned a series of reforms of the Palestinian Authority. Now that was a coincidence perhaps, but it is telling, isn't it? Coincidence or not, the prospect of penalties that include financial measures to prohibit fund-raising here, prevent the travel to the United States of top Palestinian leaders and downgrades the status of the PLO offices, seems to have a positive effect.

Apparently, the Palestinian Authority has been proceeding to make reforms in the direction of democracy and openness, but nowhere near what we believe needs to be done.

These are peaceful diplomatic measures. They are tough, but I would not view them as hostile.

Many would say that authoritarian regimes or leaders simply ignore sanctions. I believe the record shows otherwise. Dictators will often seek to avoid sanctions to the extent that they can. But often they are compelled by the threat of sanctions enforcement to make amends. And I believe that clearly that is part of the nature of what we are trying to accomplish in this bill.

Our goal is ultimately to have a different governance of the Palestinian Authority in behalf of its own people. Let me State, Mr. Chairman, that these sanctions are not aimed at the Palestinian people. We must try to do what we can to help the Palestinian people out of our sense of humanity, our values and our interests. I believe that in the hearts of Israelis and the Palestinian people they share the same goals of living in freedom, security and prosperity.

But, unfortunately, at the most critical moments when statesmanship, vision and peace were called for, Mr. Arafat embraced rather than renounced—and I don't mean renounce in word, I mean renounce in action, murder as politics. He condoned the suicide bombings and the terrorist groups that promote them. His range of positions has comprised an extremely narrow band between active support and passive encouragement of militant extremism.

At a critical time when the olive branch was extended, he reverted to his terrorist past, which some argued he never really had abandoned. When he said he could not accept Barak's peace plan, he confirmed before the whole world that he could not make peace. He could have made a counter offer. Instead he chose violence. The months since have been a most painful reminder for both sides of this consequential choice.

The document discoveries of a few months ago in his headquarters and elsewhere in the West Bank confirm his active involvement with terrorism. The Karine-A incident showed his contempt for his Oslo obligations—as if the creation of an armed terrorist base in the West Bank did not.

At the end of the day, and I know that in the Middle East days can seem to be an eternity, there must be a peace process that focuses inevitably on the process of democratic change within the Palestinian Authority and, in my view, in the Arab and Muslims world.

SHATSKY-008168

21

In the last 20 years, every other region of the world has experienced democratic renewal and peaceful regime change, so it should be in the Middle East as well.

As we proceed with our Middle East policy, we must not lose focus on our other objective, and that is the fight against terrorism: But we must not lose sight either of the importance of backing up our words with consequences. That is what this bill is about. This bill provides backup to our words with actions—peaceful yet meaningful. Already they have shown, I believe, to some extent of what effect they can have. Let us make sure they do by passing it.

And lastly, to respond to Mr. Hoeffel's comments and also having read the Secretary's testimony, I have never in my decade on the Committee found the State Department ever—regardless of which Administration—to echo what Mr. Blunt said, to ever come forth and say that they embrace Congress' role or certainly their desire to create some standards under which we as the representatives of the American people and of their treasury, from which we are spending enormous amounts of money here, have ever embraced anything that they consider a restriction. The State Department always has an aversion to any limiting or constraining provision of law, and that has been the case certainly for the last decade that I have seen.

That does not mean that the Congress has not seen fit to provide for such limitations or such standards in order to pursue the national interest of the United States. And Mr. Hoeffel, I think we strengthen the Administration's hands by expressing Congress' will. So when the President turns to the Palestinian Authority, he is not only speaking with the power of the authority of the executive branch but speaking with the voice of the American people in this regard through their representatives.

I do believe, however, that it needs to be tempered by the waiver provisions that are here because I think that gives us a legitimate basis to say that the President has sufficient flexibility while still proposing some very tough standards.

So I urge my colleagues on the Subcommittee to support the Arafat Accountability Act and to support the Middle East Peace Commitments Act as well. I look forward to working as a Member of the Full Committee to achieve its passage before the Committee and ultimately to work with my colleagues on the other side of the aisle and in our Democratic Caucus to achieve its passage in the House.

Mr. GILMAN. Thank you, Mr. Menendez, and I would like to address both of our panelists. The President has indicated and Colin Powell has substantiated that we no longer want to negotiate with Mr. Arafat, it is time for new leadership. Do you agree with that and, if so, how do we obtain new leadership?

Mr. BLUNT. I do agree with that. I had an op-ed piece in the Washington Times last November, the purpose of which to say that I thought it was time to move on to find other leaders to negotiate with if we wanted to have peace in this area, that Mr. Arafat has proven even at that point that he was not willing to be a partner for peace, ready to be a partner for peace or apparently interested. So I do think that.

SHATSKY-008169

22

However, this legislation, should Mr. Arafat be chosen in elections or for some reason those elections are postponed beyond the 90 days, we would have the first chance under this bill to evaluate his actions, does provide a way that the Administration can constantly go in and see whoever is the leader of the Palestinian Authority is maintaining the commitments that have been agreed to and can report back both to the Congress and the world whether or not that is the case.

Mr. GILMAN. Thank you, Mr. Blunt. Mr. Menendez.

Mr. MENENDEZ. Mr. Chairman, I agree that Arafat is not capable of bringing to the table the opportunities for peace to take place. I also, however, believe that we cannot dictate who someone's leadership is and we have to let the Palestinian people make their own choices, which is all the more reason why I think this legislation is so important, because we send to the Palestinian people a message of, "here are our standards. We want to work with you. We desire for you to achieve some of your goals, which we believe are in common, to live alongside with Israel in peace and security and for prosperity in the region," which is certainly something that on the Palestinian side has not been achieved.

By sending this message through our legislation, while the Palestinians would choose their own leadership, we would clearly give them choices and they may understand how the United States would view any leadership that they would elect and what standards that the United States would apply towards that leadership in our bilateral relationship with them. I think that is important. In doing so, and in sending such a strong message, I think the Palestinian people will hopefully choose for a new day, a new opportunity, in which their hopes and dreams and aspirations can be achieved.

Mr. GILMAN. Thank you, Mr. Menendez, and I want to thank our panelists for taking their time to be with us today. Mr. Ackerman.

Mr. ACKERMAN. I just want to thank our two sponsors of the legislation for their diligence, hard work and determination in helping us get this shepherded through the Subcommittee, Full Committee and the full House. Good job.

Mr. GILMAN. Mr. Cantor?

Mr. CANTOR. I have no questions, Mr. Chairman.

Just want to thank the two gentlemen again for their leadership.

Mr. GILMAN. Thank you, Mr. Cantor. Mr. Engel.

Mr. ENGEL. I would concur. I think it shows the strong bipartisan feeling that we have in this Congress about combating terrorism and calling it the way we see it, who is doing the terrorism and who is the victim of the terrorism.

Mr. GILMAN. Thank you. No further questions again, I want to thank our panelists. Mr. Blunt, Mr. Menendez, thank you for taking the time to be with us today.

We now call on Deputy Assistant Secretary of State Satterfield.

## STATEMENT OF THE HONORABLE DAVID SATTERFIELD, DEPUTY ASSISTANT SECRETARY, BUREAU OF NEAR EASTERN AFFAIRS, U.S. DEPARTMENT OF STATE

Mr. SATTERFIELD. Thank you very much, Mr. Chairman, and appreciate the opportunity to appear before the Subcommittee today.

SHATSKY-008170

If agreeable, I would like to submit the prepared remarks for the record and make a few brief opening remarks.

Mr. GILMAN. Without objection.

Mr. SATTERFIELD. The President in his June 24 remarks spoke quite eloquently on behalf of the government and the people of the United States of two fundamental things, the absolute requirement for fundamental transformation in the Palestinian leadership, a transformation which would produce a leadership for the Palestinian people as they prepare for the goal of statehood, a goal elaborated by the President free of connection, free of the taint of corruption or terror, committed to the basic principles necessary to see the Palestinian people working side by side with the people of Israel and move forward into a very different kind of future.

The President articulated the path to that different future. The President articulated the steps that would be necessary to see the Palestinians advance, security, institutional reform and transformation, economic reform and development, a political process which would move the Palestinians forward through the possibility of an early state with provisional borders and attributes of statehood to ultimately, and, as the President stated, within the possibility of a 3-year time line, a final permanent status agreement.

The Members of the Subcommittee who have spoken today have talked about the need for consequences, the need for benchmarks, the need for accountability. The Administration certainly agrees with these principles. Congressman Ackerman spoke of the need for consequences of the Palestinian leadership if they fail to perform, for the need for benchmarks, of consequences of those who support rather than oppose terror and violence. We concur. That is the thrust of the President's speech. It is the thrust of the current diplomacy in which we are engaged, not just unilaterally but also with our allies in the quartet and other parties in the international community and around the world.

We believe holding forward the vision outlined by the President, but also maintaining the absolute requirement of transformation in Palestinian institutions and Palestinian leadership is the best way to advance what I believe is the common goal of the Congress and the Administration to see a genuine peace, genuine security prevail for all the peoples in the Middle East.

The Administration's objection to the two pieces of legislation currently before the Subcommittee do not have to do with the ultimate purposes of the legislation. The goals are ones upon which we all agree. We believe, however, that the specific provisions of these two pieces of legislation in fact work against the principles and goals outlined by the President, goals which I heard articulated by the Members of the Subcommittee here today.

We do not believe imposing strictures in a blanket fashion, even with waiver authority granted, on all of the officials contained in these acts is appropriate. The idea of the diplomacy necessary to implement the President's ideas, the President's goals, is to encourage new leadership to arise to encourage the development of very new transformed institutions among the Palestinians. That requires dialogue and it is dialogue which will produce those results, not exclusion.

SHATSKY-008171

24

We are absolutely committed as an Administration to avoiding the inclusion in any dialogue of those involved in terror and violence. We could not be more clear on this point. You have our assurance that will remain our policy.But we do not believe that the sweeping provisions of these pieces of legislation are appropriate or useful in advancing those goals.

Thank you, Mr. Chairman.

[The statement of Mr. Satterfield follows:]

PREPARED STATEMENT OF THE HONORABLE DAVID SATTERFIELD, DEPUTY ASSISTANT SECRETARY, BUREAU OF NEAR EASTERN AFFAIRS, U.S. DEPARTMENT OF STATE

Thank you, Chairman Gilman. And thank you to all the Members of the Committee for giving me this opportunity to discuss our efforts to promote peace in the Middle East and the potential effect on those efforts of HR 1795, the Middle East Peace Commitments Act, and HR 4693, the Arafat Accountability Act. Mr. Chairman, we remain committed to helping the Israelis and Palestinians achieve the future they deserve—a future that puts an end to terror and violence, a future that removes the daily threats to ordinary Israelis who worry about whether their children will return safely from school or their spouses from the market, a future that preserves Israel as a strong and vibrant Jewish state, a future that grants Palestinians the chance for normal, dignified lives in their own state, with responsible and responsive governance. Both peoples deserve a future without violence or humiliation.

We will play our part, and help lead the parties along the path to peace. But the parties also must play their separate parts, as the President made clear in his June 24 speech. In his remarks, the President spoke plainly on the need for new Palestinian leadership and for transparent, accountable Palestinian institutions. The President was clear that it is unacceptable for Palestinian authorities to encourage, rather than oppose, terrorism and that this must cease. He also underlined the need for an externally supervised effort to rebuild and reform the Palestinian security services. Finally, the President stated that the United States will not support the establishment of a Palestinian state until its leaders engage in a sustained fight against the terrorists and dismantle their infrastructure.

The President also noted the large stake Israel has in the success of a democratic Palestine, and challenged Israel to take concrete steps to support the emergence of a viable, credible Palestinian state.

I can report to you, Mr. Chairman, that there is broad international support for the president's vision for two states living side-by-side within secure and recognized borders, and recognition of the urgent need for reform of Palestinian institutions and its economy, and for free and fair elections. The president also stressed that as we make progress toward security, Israeli forces need to withdraw fully to positions they held prior to September 28, 2000, and consistent with the recommendations of the Mitchell committee, Israeli settlement activity must stop.

We have already begun to see some signs of change in Palestinian governance, although these changes will have to become permanent and institutionalized. A new, leaner and hopefully more accountable Palestinian cabinet has been sworn in, which has endorsed a "100 day" plan detailing reforms to be undertaken in the public security, financial, judicial, and other domains. Presidential and legislative elections are expected early next year to give Palestinians the opportunity to elect leaders committed to peace and who oppose terror.

We are working intensively with the parties in the region, with our key European, UN and Russian colleagues, and with major international donors to encourage these and further fundamental reforms in Palestinian governance, without which our goal of peace in the Middle East will remain elusive. The President has discussed this rebuilding with Prime Minister Sharon, Arab leaders and we have engaged the "Quartet"—a forum composed of the United States, the European Union, the United Nations and Russia—which has endorsed this rebuilding. Next week, Secretary Powell will chair a meeting of the Quartet to determine the most effective way for the international community to encourage reform of Palestinian institutions.

As the Secretary and other U.S. officials continue to discuss with the parties and regional leaders on how we can best move forward with this strategy, it is essential that we retain the flexibility needed to encourage the Palestinian Authority to move in a new direction. To be successful, it must be the Palestinian people who own this reform process, and it is our job to support their desire for real change. We are convinced that the overwhelming majority of Palestinians want real reform, but we

SHATSKY-008172

Case 1:18-cv-12355-MKV-DCF Document 536-108 Filed 10/05/21 Page 30 of 42
Case 1:02-cv-02280-RJL-CFD Document 2566-1 Filed 11/13/15 Page 30 of 41

25

have to recognize that if we want the reform process to succeed, we cannot be seen as imposing new structures from outside, or the support that currently exists will quickly dissipate.

We therefore see two objectives that must be attained if we are to achieve our goal of fundamentally reforming Palestinian governance. First, we must identify and encourage Palestinian leaders and elements receptive to reform. Second, we must build support among ordinary Palestinians for reform.

Mr. Chairman, it is the pursuit of these two objectives that leads to our concerns about the proposed legislation that is the topic of today's hearing. Although we agree that the Palestinians must fulfill their peace process commitments, both pieces of legislation would eliminate the flexibility we will need to attain these goals.

HR 1795 would do so by imposing sanctions, or waiving such sanctions following a determination that would have triggered sanctions, against the PLO and PA officials. Such an imposition would be highly counterproductive to our efforts to focus on positive outcomes, fueling instead Palestinian and Arab doubts about our readiness to support an eventual Palestinian state.

We remain engaged with the Palestinians to ensure that the PLO and PA understand exactly what the Palestinians have to do to meet their commitments. But requiring the President to make formal determinations of the compliance of only one of the parties—the Palestinians—would undermine our efforts to build support among Palestinians for the institutional reforms advocated by the President.

Imposing restrictions on the operation of the PLO office in the U.S., or on the issuance of visas to Palestinian officials, would send the signal that the U.S. does not welcome communication with Palestinians, even those committed to reform and peace.

Additionally, imposing restrictions on U.S. economic assistance to the Palestinians would worsen the already dire economic situation of the Palestinian population—not the Palestinian Authority—and further undermine regional stability.

Regionally, this legislation would undermine our relations with Arab allies by bolstering segments of Arab public opinion that are already very critical of their regimes' warm relations with the U.S., their relations with Israel, and their support for Middle East peace.

HR 4693, the Arafat Accountability Act, would also undercut the very goal we share of encouraging fundamental, democratic reform of Palestinian governance. We certainly share Congress's concerns about the Palestinian Authority's failure to end violence and terror, and appreciate the support and confidence that has been expressed for Secretary Powell's efforts.

While the Act is ostensibly aimed at Chairman Arafat, its extensive requirements would significantly complicate our ability to maintain a dialogue with other Palestinians on reform and the need for a new Palestinian leadership.

For example, PA officials, including those with impeccable reform credentials, will be forced to go through a cumbersome waiver process before becoming eligible for a visa to visit the United States. By freezing the PA's assets in the United States we will also make it more difficult for these officials to pay their expenses while in this country. We need *more* contact with the reformers, not less.

In addition, Palestinians will likely perceive the Act as signaling that we oppose all Palestinians, not just Arafat. That impression will enhance Arafat's standing among Palestinians and make it more difficult for Palestinians who agree with our agenda to be seen as working closely with us.

The bottom line is that we agree with the need for the Palestinians to comply with their commitments and control the violence, and to move toward building the institutions necessary for the two-state solution the President envisions as part of a comprehensive, negotiated peace between the parties. We do not wish to be seen as promoting punitive measures in a lead-up to Palestinian elections from which we hope new Palestinian leaders committed to security and peace in the region will emerge.

Thank you very much. I'd be pleased to take your questions.

Mr. GILMAN. Thank you, Mr. Satterfield. Three weeks ago Assistant Secretary Burns was before us testifying with regard to Palestinian progress, and I quote, "must be performance-driven," he said. Your own statement today emphasizes that we agree with the need for Palestinians to comply with their commitments, and yet you indicate opposition to legislation pending before our Sub-

SHATSKY-008173

committee, which is intended to measure the Palestinian compliance.

Would you state what measures the Administration will use to determine Palestinian progress and what would be the consequences by our government if the Palestinians do not comply with their commitments?

Mr. SATTERFIELD. Mr. Chairman, we have outlined again, with the support of a broad consensus of key allies and partners who are engaged with the Palestinians precisely the benchmarks, the performance standards necessary to judge whether or not institutional reform, economic progress, leadership transformation is happening in a substantive fashion or is cosmetic only.

We share the concerns of this Committee and the Congress and the American people to hold the Palestinians, indeed to hold this entire process to the highest standards, because if there is a cosmetic change only we are not going to advance. Nothing is going to be advanced. This is going to be another show.

We believe that by setting out very clear, very explicit benchmarks, both the leadership transformation and institutional transformation, a process we are now embarked upon, we offer the best chance for Palestinians to be able to move forward in reforms, the best chance for us to impact those reforms in a positive manner.

We intend to be involved as the United States, in conjunction with others in the region and the international community, in the highest degree of scrutiny and engagement with Palestinian interlocutors as these processes move forward.

Mr. GILMAN. Mr. Secretary, the Secretary's letter to our Committee states,

"We do not encourage or support the introduction of legislation during this critical period that appears one-sided to a majority of the nations in the Middle East region . . ."

and then goes on to name some other criteria which would also disqualify legislation.

My question is, is it proper for the State Department to establish as a criterion in support of legislation whether it would get the approval of the Arab League on a one country-one vote basis? The suggestion I think by the State Department is somewhat extravagant to say the least. I welcome your comment.

Mr. SATTERFIELD. That certainly is not our intent and that is not our policy. We are concerned, as the Committee is, in seeing meaningful reforms and leadership transformation take place as rapidly as possible. Our criteria for that are absolute performance based standards laid out in advance, carefully monitored, carefully observed and judgments taken on the basis of those observations. We believe to be effective it is very important to be able to sustain the flexibility necessary to maintain a dialogue with Palestinian reformers, and I speak of reformers in the sense of those committed to opposition to terror and violence, truly committed to a transformation of Palestinian institutions.

We do not believe the pieces of legislation before the Committee now facilitate that goal.

Mr. GILMAN. Well, let me ask you one more question. What would be the problem of our setting forth some of the sanctions or

SHATSKY-008174

27

some of the penalties in the event the Palestinians do not comply with the agreements made and with the necessity for bringing about peace?

Mr. SATTERFIELD. We think, Mr. Chairman, that the consequences of failure by the Palestinian leadership, any Palestinian leadership, current or transformed, to move forward in the direction that we have spoken of, you have spoken of, is self evident. The consequences are that we will not as the United States be able to participate with or support those leaders or that process if it is not a genuine one committed to the types of reforms in the combating of terror that we all believe is essential to this process. That I think is a profound consequence, as the President has described it in very blunt and very explicit terms. It simply won't work and we won't work with them.

Mr. GILMAN. Thank you, Mr. Satterfield.

Mr. Ackerman.

Mr. ACKERMAN. Thank you very much, Mr. Secretary. I have been listening very carefully to what you have had to say. Indeed, our intentions are your intentions; what you would like to see is what we would like to see. Question is and always has been, however, how do we get there from here? The way that the State Department has always described and the course that we have always followed has not gotten us there. As a matter of fact, in the last 20 or so months has gotten us further from the goal that we have all agreed upon.

I don't understand, even though you said that you have carefully articulated the performance based standards and benchmarks, I don't see a benchmark. I haven't heard a benchmark. I haven't heard a date. In order for something to be performance-based you need to set not just a standard but a timetable. I don't see a timetable for anything and I don't hear anything. I am very concerned about that.

What I am hearing is trust me, there will be some. What we are doing in this legislation that is before us today is we are laying down some lines. We are saying if that doesn't happen, that will happen. If you don't do this, you get that. To me and I think to most people, that is performance-based. If there are no consequences, some people don't take actions.

I remember very well growing up and my mother of blessed memory would say if you don't do this by the time I count to 3, and then she would start counting, one, two, two and a quarter, two and three-eighths, I learned fractions. But if my mother said you don't do this by the time——

Mr. ENGEL. M.. Ackerman, I wonder if you would yield. Do you and I have the same mother?

Mr. ACKERMAN. We do. If my mother would say if you don't do this by the time I count to 3 then you are not going out to play with your friends, I knew what the consequences were. I knew when she was serious. I knew where the benchmarks were. I knew where my trip wires were. I knew what the parameters were. Otherwise it is a big group hug. We would like to see you get to there, and maybe you will get there and maybe you won't, and if you don't it is going to be too bad and you are not going to be happy.

SHATSKY-008175

28

Where are your benchmarks? What are your benchmarks? Do you have them?

Mr. SATTERFIELD. Congressman, the President laid out the greatest of those benchmarks and the greatest of the consequences in his speech on the 24th. The President said there is a political horizon available for the Palestinian people. It is a horizon which he described in quite detailed terms and attached a time line to.

Mr. ACKERMAN. He gave within 3 years.

Mr. SATTERFIELD. The President also made clear, Mr. Congressman, that if there was not first a transformation in the Palestinian leadership, secondly, a fundamental transformation of Palestinian——

Mr. ACKERMAN. In your mind a transformation in Palestinian leadership means the absence of Yasser Arafat from the political— as the factual political head of the Palestinian Authority?

Mr. SATTERFIELD. The President has made clear the present Palestinian leadership cannot take the Palestinian people forward.

Mr. ACKERMAN. In your mind does that include Yasser Arafat?

Mr. SATTERFIELD. Yes.

Mr. ACKERMAN. So Yasser Arafat in your view cannot take the Palestinian leadership forward?

Mr. SATTERFIELD. The President has said there must be a transformation in the current Palestinian leadership.

Mr. ACKERMAN. And that, as you have said, includes Yasser Arafat?

Mr. SATTERFIELD. That is reflected in our policy towards Chairman Arafat.

Mr. ACKERMAN. So what is wrong with saying that if Chairman Arafat can't close the deal he can't come here to visit me?

Mr. SATTERFIELD. If the act were specific to Chairman Arafat, we would be speaking to a different set of issues. The act is not. The act was aimed——

Mr. ACKERMAN. If I speak to my co-sponsors, the 157 other co-sponsors of the legislation, and we made this Arafat specific you are saying you could support it?

Mr. SATTERFIELD. Mr. Ackerman, I would have to take that issue back for consideration. Our concern with the provisions of the act, which in a sweeping fashion imposes sanctions on all PLO and Palestinian Authority officials, was a principal source of our concern with these restrictions. We believe that impedes dialogue unnecessarily.

Mr. ACKERMAN. Would you get back to me with an answer to my question that if we make that Arafat specific rather than others that this legislation would enjoy the support of the Administration?

Mr. SATTERFIELD. There were other provisions of the act, Mr. Congressman, that we also have concerns about, but I will certainly get you a response on the points that you raised.

Mr. GILMAN. Thank you, Mr. Ackerman.

Mr. Cantor?

Mr. CANTOR. Thank you, Mr. Chairman. Ambassador Satterfield, thank you very much for being here. I appreciate your testimony. We are talking today about accountability, about American support for the peace effort, and ultimately we all hope there to be a peace and that will most likely involve commitment of U.S. taxpayer dol-

SHATSKY-008176

Case 1:18-cv-12355-MKV-DCF Document 126-18 Filed 10/05/21 Page 34 of 42
Case 1:02-cv-02280-RJL-CF Document 256-6 Filed 11/13/13 Page 89 of 41

29

lars to facilitate, you know, rebuilding the security of innocent people, et cetera.

And one of the things that continues to alert me and cause me to pause in terms of accountability of the expenditure of U.S. taxpayer dollars is the question of UNRWA, United Nations Relief and Works Agency. And I know for 50 years it has been the sole agency dedicated to the plight of the Palestinian refugees. In fact, the Palestinian refugees have their own refugee agency while worldwide all other refugees come under The High Commission for Refugees. And I know that for the first 20 years the United States provided, I think, about two-thirds of the budget of UNRWA and the last 20 years we have been a main donor of that.

But I also know that one of the provisions of the 1961 Foreign Assistance Act says that no expenditure or contribution of the United States can be made unless we know that all possible measures to assure that no part of those funds would be used to furnish assistance to any refugee that received military training, is a member of at that time so-called Palestinian Liberation Army or another guerilla type organization or who has engaged in any act of terrorism.

There has been a recent spat of reports in the press about Jenin and other camps that have been specifically identified even by the Palestinian citizens themselves as the suicide capital. To me, the U.S. law is very clear in that Foreign Assistance Act. And my question to you is what are we doing? What mechanisms are in place to ensure that UNRWA facilities are not being used for terrorist purposes and that no individual involved in terror are receiving any of the assistance that ultimately comes from the United States taxpayers?

Mr. SATTERFIELD. Mr. Congressman, we take very seriously the issues raised regarding UNRWA's role with respect to Palestinian refugee issues, particularly in the West Bank and Gaza. We have made very clear to the United Nations' leadership and to UNRWA specifically the need for the highest possible standards in the Administration of UNRWA's budget as well as in the conduct of UNRWA's activities on the ground.

Challenges faced on the issues that you raised are quite extraordinary given the circumstances on the ground. UNRWA is responsible for the status of its own facilities. It is not responsible for the security of the Palestinian refugee camps. That is the responsibility of host government or governments.

In the case of West Bank that is split between areas A, B and C, Palestinian Authority, Israeli and split between Israel and the Palestinian Authority. But with respect to UNRWA's facilities and those programs that UNRWA directly administers, yes, they are responsible and accountable for that.

Mr. CANTOR. How is it that we are holding them accountable? How are we ensuring the U.S. taxpayers that we are not spending their hard earned dollars in support of terrorist activity?

Mr. SATTERFIELD. We have pursued with the government of Israel as well as with UNRWA very closely and very carefully and on an ongoing basis, this is a process which literally this week we have been engaged in with representatives of Israel, any and all allegations that UNRWA facilities or individuals associated with

SHATSKY-008177

Case 1:18-cv-12355-MKV-DCF Document 536-108 Filed 10/05/21 Page 35 of 42
Case 1:02-cv-02280-RJL Document 256-6 Filed 11/13/08 Page 34 of 41

30

UNRWA may have been involved in terrorist activities. There has been no definitive information on either of those allegations available to us as yet, but we continue to be in touch with both the government of Israel and UNRWA on this issue.

Mr. CANTOR. As a follow up, Mr. Ambassador, I would ask about the efforts that we intend—and I know in your written testimony you talk about the meeting of the quartet that is going to be next week, that is going to be held by Secretary Powell and the discussions that might ensue there about the situation of the incitement of the population at the schools. How is it we are going to hold the Palestinian schools accountable if what they are doing is teaching incitement?

Mr. SATTERFIELD. Congressman, you raise here one of the most important issues I think that underlies the real peace process as opposed to peace processes that occur on paper. Signatures are fine. Treaty ceremonies are fine and they have their place. But there needs to be for genuine peace to prevail between peoples a fundamental transformation in the psychology of peoples and that means an end to incitement. And an end to incitement to start requires a change in the school systems at the youngest levels moving forward through society. It is going to take time, but it has to begin.

That process is one on which we have focused in the years since Oslo. We have not been successful as much as we would have hoped in this process. Clearly much, much more needs to be done. Some positive progress at least in textbook replacement has begun, but a lot more needs to be done.

We take this issue very seriously. You are correct to single it out as an important issue both for now and for the future.

Mr. CANTOR. Mr. Chairman, before I yield back, I thank the Ambassador and I would be very interested in your office if they would contact me about the information that we are receiving in UNRWA——

Mr. SATTERFIELD [continuing]. And the assessment.

Mr. CANTOR [continuing]. As the United Nations then begins to review UNRWA's budget.

Mr. GILMAN. Thank you, Mr. Cantor.

Mr. Engel.

Mr. ENGEL. Thank you, Mr. Chairman. I have many questions about UNRWA. In the past, the executive branch has withheld U.S. funding for UNRWA because of the legal activity going on in those camps. The UNRWA facilities we think have been used in terror, inciting terror. Nearly half or almost half of the homicide bombers have come from Jenin and we are told that Hamas and Tanzim activists have used UNRWA schools and ambulances to train and mount terrorist attacks. And there was a piece last week in the *Boston Globe* which talked about incitement in UNRWA schools which ties into the question that Mr. Cantor mentioned.

So U.S. law is clear. I hope, and you said that we were but I wanted to reiterate it, that we have mechanisms in place to ensure that UNRWA facilities are not being used for terrorist purposes and that no individuals involved in terror are receiving UNRWA assistance, and I would like you to get back to my office with that because I need that.

SHATSKY-008178

31

In response to what Mr. Ackerman said, does the State Department support the policy of no meetings with Yasser Arafat?

Mr. SATTERFIELD. Yes.

Mr. ENGEL. I am happy to hear that because it broke my heart when Secretary Powell met with Yasser Arafat and Arafat and his people were rude and just broke my heart that the Secretary of State seemed to be going hat-in-hand to this terrorist, and I commend President Bush for not meeting with Yasser Arafat during his tenure. I want to talk a bit about even-handedness.

We hear this all the time and it really, really irritates me. The State Department and the Administrations have always resented, as was mentioned before, Congress imposing its views and law in terms of what should we be doing. I mentioned before that in your written testimony, that by passing these laws we would be undermining the flexibility. Flexibility sort of encourages I think or implies even-handedness.

Now I want to discuss Secretary Powell's letter to Chairman Hyde of May 11 regarding this act, the Arafat Accountability Act and the Syrian Accountability Act, which I am the lead sponsor along with Majority Leader Armey. Secretary Powell urged Congress not to act on either piece of legislation. But I was very shocked by some of his reasons. In one point of the letter, I am going to read it, he stated he didn't support legislation because the legislation, "appears one-sided to the majority of the nations in the Middle East region."

I feel very strongly that what the United States does, we ought to do what we feel serves our interest and the interest of peace in the region and not what the majority of non-democratic States in the Middle East might feel, and I think that is very, very important and I would like you to comment on that.

Later in the letter the Secretary states, and again I am quoting, "We must be perceived as evenhanded in our approach." Again I must strongly disagree. Our goal is not to act evenhanded when it comes to terrorism, homicide bombings, incitement and corruption. I don't think we can be evenhanded and I believe we play an important role in the Middle East. We play an important role because we have stated very clearly, as has President Bush, that you are either with us or with the terrorists, that we are committed to Israel's existence and security as a Jewish state and that therefore we have the ability to facilitate a peace process between Israel and the Palestinians as a result.

So I would like you to comment on do you believe that a majority of states in the Middle East should be the criteria by which we build our foreign policy and should evenhandedness be the basis of our policy in the Middle East?

Mr. SATTERFIELD. We certainly believe that U.S. policy should be just, fair and effective. We believe the President's vision and the President's requirements as articulated in his June 24 statement meet that criteria. That is the policy of the United States. It is a policy that we believe enjoys broad support not just in the international community but in the region, and it is support for that policy and its implementation that we are now actively engaged in mobilizing and putting into place on the ground.

SHATSKY-008179

32

Mr. ENGEL. I don't disagree with any of your statements, but I do think again that what we are trying to do here is set benchmarks. We cannot keep saying to the Palestinians, we want you to reform and we want you to reform, and it is the same old tired statement and yet around and around and around we go, and that is why I think we need this legislation.

I would like to ask you a question. News reports are indicating that al-Qaeda is increasing its presence in Palestinian refugee camps, particularly the Ein al-Hilweh refugee camp. Have you heard these reports and are they true?

I want to ask you if the Lebanese government is properly policing these camps, and I believe that it is true and the Lebanese government is not properly policing the camps because of pressure from Syria, and that is another reason why we need the Syria Accountability Act, but I would like your answer.

Mr. SATTERFIELD. Without going into information in open session, which would be inappropriate, I can say we are quite concerned at any indication that elements of al-Qaeda might be moving to any other countries in the region, including Lebanon. It is particularly dangerous if such elements move to camps where the enforcement of law and order is beyond problematic. This is an issue which we have raised and continue to raise in an operational sense with all of the governments concerned. It is a very important one to us.

Mr. ENGEL. I would like the ability to see if we could have a private session where you could go into some of these details. I am very concerned about Lebanon and the integrity of Lebanon and of course terrorism coming down from the border into Israel.

Thank you, Mr. Chairman.

Mr. ISSA [presiding.] And I would like to note for the record the presence of a full house of mostly students and I think it bodes well for the region to have so many young people, many of whom obviously come from areas of the Middle East or have an interest in it, to attend and to stay throughout this entire meeting. So although that is not the most formal part of this, Ambassador Satterfield, you realize there is the youth of America and the youth of the region are both holding out a lot of hope of what we do here, not just today but every day.

Ambassador, in the years since I first met you when you were Ambassador in Lebanon when a series of armored cars had to drive you through the city and we were all too close to remembering a series of bombings that killed so many Americans and so many Embassy personnel, we have in some ways come a long way in the region and some ways we have gone the other way. And so as much as I think we have asked a great deal of what can be asked of this particular legislation, I would like to get your input for us and for the record on a couple of areas, first on the Palestinian one.

Do you have an estimate of how much nonmilitary—in any way usable for any purpose other than for education and training and normal meeting rooms, assets have been damaged within the Palestinian areas of the West Bank and Gaza as a result of this 2-year-old intifada?

Mr. SATTERFIELD. A number of institutions have done studies on that issue and we can provide that information to you.

SHATSKY-008180

33

Mr. ISSA. Would it be fair to say that most of the studies come up to a couple hundred million at least?

Mr. SATTERFIELD. I would have to refer to the studies to quantify.

Mr. ISSA. And if we were to cut back on aid to USAID programs in the West Bank and Gaza, do you believe it would provide pressure on militant groups to cease their actions?

Mr. SATTERFIELD. Congressman, the assistance that the U.S. provides is directed to two fundamentally different sets of issues. One is straightforward urgent humanitarian aid, restoration of basic service. The other large basket of aid is directed at medium and longer term infrastructure development.

It is the view of the Administration that curtailing, reducing either these two baskets of assistance would have the contrary effect. It would only accelerate the type of disaffection, and extremism that has been—which has been all too prevalent over the course of the violence of the last 20 months. We do not believe it would have a positive impact. This aid does not go and has never gone since October of 1993 to the Palestinian Authority, to the PLO.

Mr. ISSA. Ambassador, when I am in the region and people there, leaders, heads of states or even private citizens talk about America's role in funding Israel and that Israel then uses that funding and/or weapons to attack Palestinians, I often point to the fact that we are one of the two large funders of humanitarian aid, nations building, and so on, and we have people on the ground, both Embassy people and NGOs, every single day helping build the West Bank. And to be honest, it goes a long way toward their understanding that we don't just support Israel, that in fact we support the process that can lead to progress and we simply look for opportunities on both sides to make those investments. It is not always received well, but at least it is understood that it is not all one-sided and we have always been at the table to try to help in this region.

But I would like to have your insight because you represent the whole theater today, but as Ambassador you have been posted in many of these areas. What do you think, if this bill became law today and the President did not assert any of the out clauses, would be the effect on his coalition that he is putting together on the war on terrorism and, separately, any future initiatives he might introduce in regard to peace within the Palestinian area.

Mr. SATTERFIELD. Mr. Chairman, the impact of the scenario you described would be most profound with respect to the implementation of the goals and objectives that the President articulated in his June 24 statement that have to do squarely with the possibility, the hope of a lasting, genuine peace with true security between Israel and the Palestinians. It would be extremely difficult to see that process advanced in the scenario that you described, and that would be the most immediate consequence.

It is the fundamental reason why the Administration has stated its opposition to those two pieces of legislation as they are drawn.

Mr. ISSA. Eliot, do you want another round? I will finish up with one question and go to Mr. Engel for another round.

The security cooperation that goes on in the other two, or two of the other three nations that surround Israel, Egypt and Jordan,

SHATSKY-008181

34

could you characterize the quality, the effectiveness, the cooperation that exists between the Israeli Defense Forces and these two other countries' forces so we have an understanding, since we all understand the Palestinian Authority has failed in its war on terrorism in the West Bank and Gaza. But I would like to have a better understanding for the record of the other two nations, the only two Arab nations that have made full and lasting peace with Israel.

Mr. SATTERFIELD. Jordan has a close relationship in terms of security and counterterrorism efforts both for its own merits, with respect to Jordanian security fundamentally, but also in cooperation with its neighbors, including Israel, to address the common threats posed by terror, whether the terror comes from al-Qaeda or other sources. Each has been engaged over these years, having been one of the major victims of internal terror and externally funded and supported terror. They paid a terrible price inside for this in their society. They have also been active with regard—with respect to the military security dialogue between Egypt and Israel, there is such a dialogue that is carried on at the highest levels and it is ongoing.

Mr. ISSA. Thank you very much. Mr. Engel, if you would like to ask some follow-up questions.

Mr. ENGEL. Thank you, Mr. Chairman. I am glad you mentioned security because I would like to ask the Ambassador questions on the security front. The President said that we want a new Palestinian leadership free of corruption and one willing to destroy the terrorist infrastructure. What we have seen so far, a few of the players moved around. A few of the portfolios remained. We haven't seen reform and it is particularly the case on the security front. If there have been any changes related to security, it seems to me that Arafat has solidified his control of the security services. And we also haven't seen any concerted effort by the Palestinians to destroy the terrorist infrastructure or to stop incitement or curtail any kind of terrorist organizations.

So if we are going to talk about a reshuffling of security organizations, we can write it off I think as changing names or just a reshuffling, but not really anything concrete. So I have a bunch of questions that I would like you to comment on if you would.

What steps in your opinion must the Palestinian leadership take on the security front? When will they streamline security forces and install transparency and accountability? I can go on and on. When will they cease to allow terrorist organizations such as Hamas and Jihad to operate and Tanzim, which are organizations under Arafat's Fatah leadership? When will they be shut down? And I can go on and on.

You mentioned before about the incitement and the still spinning, revolving doors on PA prisons. When will that stop? And I am wondering if you could just tell us your vision of what you see as to what the Palestinians need to do in order to have a real restructuring on the security front.

Mr. SATTERFIELD. Congressman, the government has provided Palestinian security interlocutors, quite detailed. It includes both the structural changes which you alluded, setting up very different, very much streamlined and effective institutions which can do the

SHATSKY-008182

35

job of combating terror and enforcing law and order, not another job of encouraging, supporting, tolerating terror and violence. There are clear performance goals which those new structures and institutions will have to achieve. Those goals are fundamentally what you have described. They are the bringing back under control of all armed elements, whatever the name, whatever the organization, whatever the membership may be. It is the act of combating of those groups that are outside the PLO and outside the Palestinian Authority and ceasing their engagement in terror or confronting them to the point that they are no longer able to be a source of terror and violence.

We are in the process of conducting a dialogue. Our close partners in the region are engaged in a dialogue to support this process.

Mr. ENGEL. When the State of Israel was founded in 1948, there was an important decision made that would be not to allow any private militias, and I believe that that obviously would go a long way if the Palestinians were to make such proclamations as well. I agree with you when you talk about getting rid of the terrorist organizations and going after the terrorist organizations.

What it appears to me, however, it is really a two-track thing. The terrorist organizations have to be gone after. But Yasser Arafat, if you look at the suicide bombings in Israel during the past 2 years, three-quarters of them have been conducted by the al-Aqsa Brigades and Tanzim and Force 17 and all these groups that are Arafat's groups. They are under the Fatah umbrella. He is not only not going after terrorists, his own group is perpetuating the terrorism.

Mr. SATTERFIELD. Which is why we placed the emphasis on the multiple tracks that have to be advanced here, institutional and leadership information, security transformation, all of it performance based in all of these elements, and a political process.

Mr. ENGEL. What assistance are we providing to Palestinian security services?

Mr. SATTERFIELD. Congressman, that is an issue I would have to address with you in other fora.

Mr. ENGEL. Thank you very much.

Mr. ISSA. Thank you. I probably just have one closing question, and it goes back to a basic concern that I have with, as a follow-up to your earlier comments, on both Jordan and Egypt's ability and history of improving their ability to enforce terrorist attacks not only internally but externally against Israel. It is my understanding that there has always been, and particularly after 1994 when originally there were going to be direct Jordanian involvement in security and then Chairman Arafat and others said they didn't want to have that, that they would develop their own, there has always been a push-back on these two moderate Arab states having a more direct involvement in the nation building with the Palestinians.

Both from a security standpoint and from, if you will, nations building, how would you envision if there were no push-back, if we were defining the most effective case, how would you envision the cooperation of these two countries with their contiguous neighbors?

SHATSKY-008183

36

Mr. SATTERFIELD. Mr. Chairman, I will expand a bit on my response on the question you posed.

Mr. ISSA. You can go as long and as expanded as you want.

Mr. SATTERFIELD. You touched upon a very important issue, what is the role and responsibilities and obligations of the states in the region, and I would expand it beyond Egypt and Jordan but other states, including in the Gulf, to help support a process which leads to a region at peace, a more stable region which we believe is in the interest of all of our friends and partners.

What is needed and what we have been encouraged to see in the past months is a much more active engagement based upon a much clear recognition that the basic interests at home of all states in the region are tied up in a resolution to this terrible conflict, this terrible crisis, that an end to the violence between Israelis and Palestinians is key to robbing, taking away from extremists, whether secular or religious, the ability to spread their message of hate, their message of violence, their message of instability.

We have seen states in the region which played a very low key, quiet role through the years of the peace process whether Oslo or before, that are now taking responsibility for the broadest regional issues, Saudi Arabia, Crown Prince Abdullah's Initiative, the Arab League's endorsement of that Initiative, these are enormously positive steps. They very much need to be sustained. Egypt and Jordan clearly have a stake in achieving resolution of this conflict, and they are playing a very direct role with us, with the parties concerned. We need to see this continued.

Mr. ISSA. Thank you, Ambassador. If I can paraphrase your expanded remarks because I think it sums up a lot of what we are trying to discover here today. If I heard you correctly and I think you made it very clear, although this is a terrible time in Israel and there is bloodshed and hopelessness, in fact there are key elements that were not in place in the past that are now being brought to bear, including, as you said, Crown Prince Abdullah, the Arab League and a focus by Arab nations, both moderate and not so moderate, in trying to bring about a solution. Would that be a fair summing up?

Mr. SATTERFIELD. Mr. Chairman, that is a very fair summing up, but I would add to it that we are also seeing real welling up of Palestinian interest and activity towards the type of institutional reform that we have spoken of, and this is very important because at the end of the day this is a Palestinian process and it is the future and fate of Palestinians as well as Israelis which is at stake here. And the Palestinians themselves must take ownership and hold of this process. We in the collective can help and assist. We can watch and monitor, and we can help guide, and that is fully appropriate and indeed it is necessary. But at its fundamental level this must be a Palestinian process and we are encouraged by steps we have seen there.

Mr. ISSA. Thank you, Mr. Ambassador, and on behalf of the International Relations Subcommittee on the Middle East I would like to thank you for coming before us again and leaving us with hope at the end of this hearing. Thank you, and we stand adjourned.

[Whereupon, at 4:20 p.m., the Subcommittee was adjourned.]

SHATSKY-008184

# APPENDIX

---

## MATERIAL SUBMITTED FOR THE HEARING RECORD

### PREPARED STATEMENT OF THE HONORABLE JOSEPH CROWLEY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW YORK

Mr. Chairman, I want to express my strong support for H.R. 1795, The Middle East Peace Commitments Act and H.R. 4693, The Arafat Accountability Act.

The Palestine Liberation Organization (PLO) and the Palestinian Authority (PA) had been, for a time, partners of the Israeli government in implementing an unprecedented series of agreements that were on track to create a Palestinian state. All the Palestinian leadership had to provide in exchange was peace and security for the State of Israel.

It is not accurate to say that Yasser Arafat and the Palestinian leadership failed to live up to their commitments. They have *refused* to meet their commitments.

- Instead of cracking down on Islamic militants, Arafat releases them from jail.
- Instead of putting a stop to terrorist operations, Arafat funds them.
- And instead of working to create an atmosphere of peace and cooperation that would enable his people to live side by side with the Israelis, Arafat continues to foment hatred and intolerance.

The United States should no longer tolerate Yasser Arafat's reliance on violence to achieve political objectives.

Whereas the Palestinian leadership was once a partner for peace and accorded the status of a responsible international actor by the United States, Israel, and others, it has returned to its original roots. The Palestinian Authority, just like the PLO of old, is a terrorist organization responsible for the murder of innocent Israeli civilians. The United States should no longer treat it as a legitimate international entity, nor should it accord any privileges to its leadership.

Yasser Arafat does not represent his people. Growing discontent in the Palestinian territories demonstrates that Palestinians have grown tired of the corruption, mismanagement, and greed of the Palestinian leadership.

We must give the Palestinian Authority no choice but to destroy the infrastructures of terrorism and end financial support for terrorism. Arafat is an opportunist, motivated solely by self-interest. Applying sanctions to the PA would hit Yasser Arafat and his cronies personally and hopefully motivate them to engage in a peaceful political negotiation over the future of the Palestinian territories.

Applying sanctions on the Palestinian leadership would also tell the world that the United States considers Yasser Arafat and his corrupt administration as pariahs. Such a statement should help persuade the European Union and other interested states to echo our message that Arafat must renounce violence. Most importantly, it would show the Palestinians that they have no hope of improving their lot as long as Arafat and his gang of murderers are in charge, thereby encouraging them to vote for a change in leadership when elections are held by early 2003.

Mr. Chairman, these two bills send a clear signal that the United States stands strongly behind Israel as it defends itself from terrorism and that the Palestinian leadership must leave the scene if peace is to come to the region.

I would like to thank my distinguished colleagues Mr. Ackerman and Mr. Blunt for introducing these important pieces of legislation, and I urge all of my colleagues to vote in favor.

Thank you.

○

(37)

SHATSKY-008185