# LOWELL DECL. EX. 96a

Exhibit 31

**The Courts**

| | |
|---|---|
| <u>**In the Tel Aviv-Jaffa District Court**</u>    **Serious Crime Case 1158/02** | |

<u>**Before the panel:**</u>

**The Honorable Judge Sarah Sirota, Deputy Presiding Judge**
**The Honorable Judge Avraham Tal**
**The Honorable Judge Dr. Amiram Benyamini**

**The State of Israel**                                    <u>**The Prosecution**</u>
**The Department for Criminal Matters, Security and Special**
**Affairs in the Attorney General's Office**
**Represented by Counsel, D. Chen, R. Hazan and A. Bar-Natan**

**- v. -**

**Marwan Bin Khatib Barghouti**                          <u>**The Defendant**</u>
**Born in 1959, Identity No. 959251745**
**Of Ramallah (in custody since April 15, 2002)**
**Represented by the Office of the Public Defender**

<u>**Verdict**</u>

[Stamp] Gilmore 00749

1

SHATSKY-009286-433

# **Table of Contents**

Part I: Introduction                                                                                    p. 2

Part II: The Evidence                                                                                   p. 6

    **A.** **The Fatah, the Tanzim and the Al Aqsa Martyrs Brigade as Terrorist Organizations**                                                                          p.6

    **B.** **The Status of the Defendant and His Position in Terrorist Organizations and His Support for Terrorist Attacks on Israel**                                  p. 8

    **C.** **Testimony of Terrorism Operatives from the Movement for the Liberation of Palestine with Respect to Their Relationship with the Defendant, His Involvement in Terrorist Attacks and the Defendant's Responses to this**   p. 16

        (1) Nasser Aweis ........................................................... p. 16

        (2) Nasser Naji Abu Hamid ............................................. p. 20

        (3) Ahmed Barghouti ..................................................... p. 22

        (4) Muhammad Musalah (Abu Satha) ............................ p. 27

        (5) Jamal Ahawil .......................................................... p. 28

        (6) Nasser al-Shawish .................................................... p. 30

        (7) Ali Aidiya ................................................................ p. 30

        (8) Ismail Radaida, Muhaned Abu Halawa and Khamal Abu Wahr ................. p. 34

        (9) Nasser (Haloum) Naji Abu- ...................................... p. 34

        (10) Ziyad Hamuda ....................................................... p. 35

        (11) Riad Amor ............................................................. p. 35

        (12) Nasser Haj ............................................................. p. 36

        (13) Tahrir Barghouti ..................................................... p. 37

        (14) Ahmed Musafar ..................................................... p. 37

        (15) Sharif Naji ............................................................. p. 37

        (16) Amid Abu Radaha ................................................... p. 38

        (17) Ashraf Jabar ........................................................... p. 39

    **D.** **Statements of the Defendant During Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks against Israel**                                                                            p. 40

        (1) The responsibility of the Defendant for the activity of the terrorist cells and the degree of his control over them ....................... p. 40

[Stamp] Gilmore 00750

2

SHATSKY-009286-433

(2) The Defendant's personal involvement in the terrorist attacks that have
been carried out by the cells under his command ........................................... p. 44

    (aa) Terrorist attack at the gas station in Givat Ze'ev ................................. p. 47

    (bb) Murder of the Greek Orthodox monk in Ma'ale Adumim .................. p. 48

    (cc) Terrorist attack on the restaurant Seafood Market in Tel Aviv ........... p. 48

    (dd) Attempted terrorist attack near the Malha Mall in Jerusalem ............. p. 49

(3) Provision of funds, weapons and explosives for carrying out terrorist
attacks ......................................................................................................... p. 49

(4) Assistance for wanted men and the families of the people arrested or killed p. 51

(5) Recruiting and training operatives for terrorist organizations ...................... p. 52

(6) The Defendant's public calls to carry out terrorist attacks against Israel ...... p. 53

[Stamp] Gilmore 00750 [continued]

3

SHATSKY-009286-433

**E.** **The Connection of the Defendant to the Terrorist Attacks That Are the Subject of the Indictment** .......... p. 56

    (1) Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra ............ p. 56

    (2) Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area ..... p. 57

    (3) Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim .................................................................... p. 59

    (4) Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443 ............................................... p. 59

    (5) Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in ................. p. 61

    (6) Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev ...................................................................... p. 62

    (7) Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443 ............................................................................................................ p. 63

    (8) Murder of six people in David's Palace Banquet Hall in Hadera ..................... p. 64

    (9) Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in .......................................................................... p. 66

    (10) Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was ............................... p. 66

    (11) Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in ...... p. 69

    (12) Terrorist attack in the Seafood Market restaurant in Tel ............................... p. 70

    (13) Shooting terrorist attack in the Jeremy Hotel in Netanya ............................... p. 72

    (14) Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh ..... p. 73

    (15) Shooting terrorist attack between Ateret and Bir Zeit .................................... p. 72

    (16) Attempted terrorist attack in the Biancini Pub in Jerusalem ......................... p. 75

    (17) Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem ........ p. 77

    (18) Attempted suicide terrorist attack in Beit Hanina in ..................................... p. 78

    (19) Shooting terrorist attack on the Beit El-Psagot ............................................. p. 78

    (20) Attempted terrorist attack in the Malha Mall in ............................................ p. 79

**Part III: Evaluation of the Evidence and Its Significance**      p. 81

**Part IV: Legal Analysis and Conclusions**      p. 92

    **1.** **Activity and Membership in a Terrorist Organization**      p. 92

    **2.** **Responsibility of the Joint Perpetrator, the Solicitor and the Accessory and the Differences Between Them**      p. 94

        A. The Joint Perpetrator in Comparison to the Accessory ..................................... p. 96

        B. The Crime of the Accessory ............................................................................. p. 104

[Stamp] Gilmore 00751

4

SHATSKY-009286-433

    C. The Crime of Solicitation and the Distinction between the Joint Perpetrator
       and the Solicitor ................................................................................ p. 112

    D. The Responsibility of the Leader of the Criminal Group as a Joint Perpetrator
       or as a Solicitor ................................................................................ p. 117

**3.**   **Conclusions with Respect to the Defendant's Responsibility as a Joint
     Perpetrator, Solicitor and Accessory**                            p. 123

    A. The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev .................... p. 135

    B. Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of blessed
       memory, in Ma'ale Adumim .......................................................... p. 136

    C. Murderous Terrorist Attack in the Seafood Market Restaurant in Tel Aviv ........ p. 138

    D. The Attempted Terrorist Attack Near The Malha Mall In Jerusalem ................. p. 139

**Part V: Summation**                                                    p. 139

# <u>Verdict</u>

## Part I:     <u>Introduction</u>

[Stamp] Gilmore 00751 [continued]

SHATSKY-009286-433

1. On August 14, 2002, an Indictment was filed against Defendant, which charged him with several counts of **premeditated murder**, in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 (hereinafter: "the Penal Code"); **Accessory to murder**, in accordance with Section 300 (a) (2) together with Section 31 of the Penal Code; **Incitement to murder**, in accordance with Section 300 (a) (2) together with Section 30 of the Penal Code; **Attempted murder**, in accordance with Section 305(1) of the Penal Code; **Conspiracy to commit a crime**, in accordance with Section 499 of the Penal Code; **Activity and membership in a terrorist organization**, in accordance with Sections 2 and 3 of the Prevention of Terrorism Ordinance 5708 – 1948.

2. The Indictment charges the Defendant with participation in [and] the organization and execution of acts of terrorism against Israeli targets, which commenced in September 2000, within the framework of the events that are referred to as the "Al Aqsa *Intifada*" (hereinafter – "the ***intifada***"). According to that which has been alleged in the Indictment, the Defendant headed terrorist organizations in the region of Judea and Samaria: the "Fatah" Organization (hereinafter – the "**Fatah**"), the "Tanzim" Organization (hereinafter – the "**Tanzim**") that is part of Fatah, and the "Al Aqsa Martyrs Brigades" Organization, which includes the groups of Tanzim terrorism operatives that perpetrate acts of terrorism against Israeli targets (hereinafter – "**Al Aqsa Martyrs Brigades**"). The Defendant was the one who coordinated between and communicated with the senior operatives in the field in all three of these organizations (which shall jointly be called the "**Terrorist Organizations**") that were responsible for the perpetration of acts of terrorism against Israeli targets.

The Indictment lists the names of eight senior terrorism operatives, who acted under the Defendant's leadership and who perpetrated acts of terrorism. They are Nasser Aweis (hereinafter – "**Aweis**"), Ahmed Barghouti, Nasser Abu Hamid (hereinafter – "**Abu Hamid**"), Ra'ed Karmi (hereinafter – "**Karmi**"), Muhaned Diria (Abu Halawa), (hereinafter – **"Muhaned"**) Muhammad Musalah (Abu Satha) (hereinafter – "**Abu Satha**"), Mansour Shrim (hereinafter – "**Shrim**") and Mahmoud Titi (hereinafter – "**Titi**").

The Defendant and the field commanders recruited operatives for the terrorist organizations, deployed them and supplied them with weapons, explosives and money. The Defendant was also involved in training the terrorism operatives for their purpose and raising funds for terrorist organizations. In addition, the Defendant solicited and encouraged the terrorism operatives to wage offensives against the State of Israel through the media, at various conferences and by way of the distribution of inflammatory posters.

[Stamp] Gilmore 00752

6

SHATSKY-009286-433

**Sections 8-15** of the Indictment charge the Defendant with involvement in and responsibility for the perpetration of 37 terrorist attacks and acts of terrorism, most of which were perpetrated within the borders of the State of Israel, by the field commanders and operatives during the period of time from December 2000 through April 2002, in which many civilians and soldiers of the State of Israel lost their lives and many more were injured. Some of the acts of terrorism have been set forth in the Indictment and most of them have been set forth only in the appendix thereto.

3.    **The Prosecution's evidence includes** the testimony of officials from the defense establishment, Israel Security Agency interrogators and police officers who were involved in the interrogation of the Defendant; documents that were seized by the Israeli Defense Forces at the offices of the Fatah and at the office of the Defendant; Expert Opinions from specialists in the security forces with respect to the activities of the terrorist organizations and the status and the role of the Defendant in them; testimony that was given by operatives in the terrorist organizations and the information that they gave during their interrogations by the Israel Security Agency and the police; statements by the Defendant that were documented by Israel Security Agency personnel in written reports and, in some cases, were recorded and transcribed; things that Defendant said to agents who were planted in his cell during the course of the interrogation, as well as to his close associate, Ahmed Barghouti, who was arrested with him; statements that were made by the Defendant to the media prior to his arrest and the statements of the Defendant to the police.

The transcripts of the interrogation of the Defendant by the Israel Security Agency were submitted by the Israel Security Agency interrogators who conducted the interrogation, which was recorded, and who identified the voice of the Defendant in the recording ("Mofaz", on page 58, "Nadav", on page 79, "Smith", on pages 85 – 86, and "Danny", on page 90). The Defendant's conversation with Ahmed Barghouti was submitted by an interrogator by the name of "Robert" (on page 65). The recordings from the interrogation of the Defendant and the interrogations of agents John Doe No. 1 and John Doe No. 3 were transcribed by Natan Basso (on page 174).

The Israel Security Agency interrogators who testified confirmed that the content of the transcript written during the course of the interrogation of the Defendant is accurate (Transcript Prosecution/6 – Prosecution/96). This refers to reports that were recorded in Hebrew, and which pertained to an interrogation that was conducted in Hebrew and in Arabic

[Stamp] Gilmore 00752 [continued]

7

(the Defendant speaks Hebrew well), in which the main points of the things that were stated by the Defendant were taken down (see the interrogator by the name of "Steve", on page 53, the interrogator by the name of "Emil", on page 55 and the interrogator by the name of "Ron", on page 60).

4.  With respect to the statement of the Defendant to the police: indeed the Defendant declared throughout the course of his interrogations by the police, in contrast to his behavior during the course of his interrogation by the Israel Security Agency, that he denies the right of the police to interrogate him and that he therefore refused to answer the questions by an interrogator by the name of (see Statements Prosecution/99 – Prosecution/109). Therefore, the statements of the Defendant include many questions that were presented to him by an interrogator by the name of s and which he refused to answer. In a very few cases, the Defendant briefly related to what the interrogator said to him and, on those occasions, he completely denied all of the claims that were presented to him, including those to which he had confessed while being interrogated by the General Security Service. The Defendant denied that he was a leader of the Al Aqsa Martyrs Brigade or the Tanzim (Statement Prosecution/101 on page 6, Statement Prosecution/105 on page 2, Statement Prosecution/106 on page 3); he denied that he was acquainted with the terrorist operatives who testified that they were in contact with him (as shall be described below) and even denied that he was acquainted with Ra'ed Karmi (Prosecution/104 on page 8). All of these points were proven, as will be clarified below, not only by the statements by the field operatives but also by those of the Defendant himself, and the documents that were seized in his office, to which the Defendant denied any connection during the course of his interrogation, claiming that his handwriting does not appear on any of them (see Statement Prosecution/108 – Prosecution/109).

The statements of the Defendant were submitted by an interrogator by the name of s David Zrihan and Rafi Nuriel (on pages 88 and 113), who explained that the Defendant had refused to sign the warning and the statement, because he was questioned in Hebrew. Zrihan even testified that the Defendant refused to give fingerprints or to be photographed. In his Statement Prosecution/106, the Defendant stated in general that all of the charges against him are incorrect and that he is innocent of any guilt.

[Stamp] Gilmore 00753

SHATSKY-009286-433

5.    At the outset of his trial, the Defendant set forth preliminary arguments with respect to the authority of this Court to judge him, and these arguments were rejected in the decision that was handed down by the Court, which was dated January 19, 2003 (on pages 1 – 34 of the transcript). The Defendant chose not to be helped by the services of a defense attorney and even strenuously and consistently rejected every attempt that was made by the Court to convince him to be assisted by the Office of the Public Defender or a defense attorney on his own behalf.

In spite of this, the Court did assign the Office of the Public Defender to represent the Defendant, despite its repeated requests to be released from his representation, and for practical purposes, it does represent the Defendant even today and was present at all of the Court sessions. Notwithstanding, the Office of the Public Defender did choose to accede to the request of the Defendant that it not set forth any arguments on his behalf during the trial, including legal arguments, and that it not even examine the witnesses.

The proceedings were conducted in this manner as per the wishes of the Defendant, who continues to deny the authority of this Court to judge him. For this reason, the Defendant also chose not to respond to the Indictment. In addition, the Defendant refrained from testifying himself or from bringing forth witnesses on his own behalf. In spite of this, the Defendant did occasionally respond to statements that were made by the witnesses or to arguments that were set forth by Counsel for the Prosecution during the course of the hearings, and his words were recorded in the transcript verbatim. In addition, the Defendant responded orally to the summations of the Prosecution (which were filed in written form, as well), in the context of the defense speech that he delivered within the framework of the summations, however he did not relate in a material manner to the essence of the charges that had been set forth against him. It would be superfluous to note that the Defendant received, through the Office of the Public Defender, all of the evidence, transcripts and summations.

[Stamp] Gilmore 00753 [continued]

SHATSKY-009286-433

6.   The majority of the offenses that are the subject of the Indictment are "domestic crimes" that pertain to terrorist attacks that have been perpetrated in Israel, and some of them are "external crimes" that have been carried out in the Region (in other words: in Judea and Samaria). However, as we have clarified in the decision that was handed down in response to the preliminary arguments of the Defendant, Israeli Courts have the authority to rule in cases of external crimes against the security of the state or against an Israeli citizen or resident, regardless of the venue where the crime may have taken place (see Section 13 (a) – (b) of the Penal Code, 5737-1977). This is the same "protective application" that was intended in order to protect Israeli citizens and residents against acts of terrorism that have been carried out with the sponsorship and support of other countries (S. Z. Feller and M. Kremnizter, "Response to Article Condemning the Nationalist Application of a the Penal Code" in *Plilim* 5.1 (1996) 65, on page 83, and compare with the Expert Opinion of Y. Shoham, *op cit.,* on page 5). Further, we have ruled in the decision that is handed down in response to the preliminary arguments of the Defendant that the conditions that have been set forth within the framework of Section 14 (b) of the Penal Code do not appear to be relevant to this matter, if they apply at all to the protective authority in Section 13 of the Penal Code (in contrast with the

[Stamp] Gilmore 00753 [continued]

10

SHATSKY-009286-433

personal authority in Section 14) insofar as the Palestinian Authority is not a state. The offenses that have been attributed to the Defendant in the Indictment are offenses against the security of the state, and against its citizens and residents, Therefore, they fall within the purview of Section 13 of the Penal Code, and this Court is competent to hear them.

## Part II:     The Evidence

### A.     The Fatah, the Tanzim and the Al Aqsa Martyrs Brigade as Terrorist Organizations

7.      During the course of his testimony (on page 38), the head of the Research Division of the Intelligence Branch of the Israeli Defense Forces, Brigadier General Y. Cooperwasser, filed an Expert Opinion in which he addressed the operations of the Fatah, the Tanzim and the Al Aqsa Martyrs Brigade (Prosecution/1). Appended to the expert opinion were captured documents that had been seized by the Israeli Defense Forces during Operation Defensive Shield that are pertinent in this regard. Since the "Fatah" (the inverted Arabic acronym of its name "The Movement for the Liberation of Palestine") was founded by Yasser Arafat in 1959, it has espoused armed struggle against Israel, which has manifested in the form of the perpetration of terrorist attacks against Israeli targets in Israel and abroad. After the Oslo Accords were signed, the principle of "armed struggle" took on a marginal role, however it remained as an option for the achievement of the goals of the organization, in the event that negotiations with Israel were to prove unsuccessful. When the second *intifada* broke out in September 2000, the Fatah led the terrorist attacks in the territories, by way of the two Supreme Committees that manage its operations, one of them in the Judea and Samaria region and the second one in the Gaza Strip region. The Defendant headed the Supreme Committee in the Judea and Samaria region up until the day of his arrest (Sections 1 – 3 of the Expert Opinion).

The operational echelon of the Fatah included the movement's field operatives – the Tanzim ("the organization" in Arabic). The Tanzim operatives make up the forefront of the Fatah's terrorist activity against Israel. The "Al Aqsa Martyrs Brigades" is a cover name for the terrorist organizations of the Fatah, which assume public responsibility for the acts of terrorism. Members of the Al Aqsa Martyrs Brigades are actually Fatah operatives and the majority of these organizations consider the Defendant to be a central source of authority for their operations (Sections 4 – 5 of the Expert Opinion).

[Stamp] Gilmore 00754

11

SHATSKY-009286-433

The Tanzim and the Al Aqsa Martyrs Brigades constitute, in accordance with the Expert Opinion of Brigadier General Cooperwasser, the unofficial military arm of the Fatah, which was headed by the Defendant. A captured document that is appended to the Expert Opinion of Brigadier General Cooperwasser as Appendix A is a letter that was jointly signed by both the Tanzim and the Al Aqsa Martyrs Brigades.

Other captured documents that have been appended to the Expert Opinion show that the Al Aqsa Martyrs Brigades asked Yasser Arafat for financial support (Document 2) and that the Fatah and Al Aqsa Martyrs Brigades are signatories to proclamations that were issued in praise of terrorist operations that have been carried out within the borders of Israel (Documents 3 – 5). Document 6, which was appended to the Expert Opinion, and which was sent on May 8, 2001, by the Al Aqsa Martyrs Brigades to the Defendant, lists the operations of the Al Aqsa Martyrs Brigades in the Jenin district (including a terrorist attack in Um el-Faham) and asks for assistance in the form of weapons, explosives and money, in order to continue in the perpetration of such operations. Other documents of the Al Aqsa Martyrs Brigades, which were addressed to Yasser Arafat, include requests for assisting wanted men who were being pursued by Israel and the families of operatives who had been killed (Appendix B and Documents 2 – 4 to this Appendix). Some of these documents had been written by the Defendant. It should be noted that the Defendant's nickname, based on the name of his eldest son was "**Abu Alkasam**" (Defendant's statement Prosecution/107, on page 1, and the manner in which Aweil addresses the Defendant on page 164).

8.  According to the Expert Opinion of Brigadier General Cooperwasser, Fatah operatives have perpetrated more than 1200 terrorist attacks against Israel (as of August 18, 2002) in which 176 Israelis have been killed and many more have been injured. These terrorist attacks included suicide [attacks] [and] the firing of mortar shells and light weapons. During the course of the *intifada*, the terrorist organizations of the Fatah moved increasingly towards the perpetration of suicide terrorist attacks within the borders of Israel (see Section 5 of the Expert Opinion). In the months that preceded Operation Defensive Shield, the Al Aqsa Martyrs Brigades perpetrated suicide terrorist attacks in Hadera, Jerusalem, Tel Aviv, Mehula, [Israeli Defense Forces Military] Base No. 80, the Maccabim roadblock, Netanya, Ashdod, Kfar Saba and Efrat. As a result, it was included in the American list of terrorist organizations that was dated March 27, 2002 (see Section 10 of the Expert Opinion and Appendix C, which lists the suicide terrorist attacks that have been perpetrated by the Fatah movement).

[Stamp] Gilmore 00754 [continued]

SHATSKY-009286-433

9.  With respect to the Expert Opinion of Brigadier General Goldwasser, it should be noted that pursuant to the Rules of Evidence, we are not permitted to rely on intelligence assessments and conclusions that are based on various sources of information that have not been brought before the Court, insofar as these constitute hearsay testimony. We are allowed to rely on this Expert Opinion only to the extent that it is compatible with other admissible evidence that has been brought before us. Nevertheless, the terrorist operations of the three above mentioned organizations that are under the auspices of the Fatah, emerge clearly from a great deal of the direct evidence that has been presented in Court, including the confessions that the Defendant and other terrorist operatives have given during the course of their interrogations, as shall be set forth later on in this verdict, below.

Nasser Abu Hamid, who was one of the senior field commanders in Judea and Samaria, said in his statement to the police (Prosecution/149 (8), on pages 2 – 3, 7 – 8, 13 – 17) that the Al Aqsa Martyrs Brigades was established on January 1, 2001, in order to serve as a militia for the Fatah and to carry out terrorist attacks against settlers and soldiers in the Israel Defense Forces. In the above mentioned statement, as well as in Statement Prosecution/149 (c)), he specified the terrorist attacks that had been perpetrated by his operatives against Israeli civilian and military targets, under the leadership and with the assistance of the Defendant (as shall be set forth below).

10. It is also possible to learn about the operations of the above mentioned terrorist organizations from statements that were made by the Defendant during the course of his interrogation, as well as documents that were written in his handwriting. The Defendant explained the manner in which the cells that are called as "Al Aqsa Martyrs Brigades" operated, and which he said had carried out "military operations" (Prosecution/19 Section 14, which was filed and approved by an interrogator by the name of by the name of "Mofaz", on page 58). In the same manner, the Defendant explained, during the course of his interrogation, the manner in which the Al Aqsa Martyrs Brigades had been formed in the Judea and Samaria region, and how it and worked in an uncentralized fashion, He claimed that the Fatah did not supervise their activity; but he also admitted that these cells approached him in order to receive money because they considered him "**the person who was in charge of the Fatah in the West Bank**" (Transcript Prosecution/98 (e), on pages 60 – 61). As shall be explained below, the terrorism operatives from the Al Aqsa Martyrs Brigades directed their requests for financial assistance for the purchase of weapons and the perpetration of terrorist attacks to the Defendant, who would subsequently approach the chairman of the Palestinian Authority and leader of the Fatah, Yasser Arafat, in their name and on their behalf. Hence, this makes the relationship between the Al Aqsa Martyrs Brigades and the Fatah clear, as well as the relationship between the Defendant and the Al Aqsa Martyrs Brigades.

[Stamp] Gilmore 00755

13

SHATSKY-009286-433

## B. The Status of the Defendant and His Position in Terrorist Organizations and His Support for Terrorist Attacks on Israel

11. In his testimony, Brigadier General Goldwasser presented an additional Expert Opinion, which pertained to the involvement of the Defendant in terrorism (Prosecution/2). A series of appendices are attached to this Expert Opinion, which includes interviews that were held with the Defendant by different media outlets, as well as documents that were written by the Defendant or that were found in his office. This Expert Opinion is also subject to the note that has been set forth in Section 9 above, with respect to the admissibility of intelligence assessments that rely on information sources that have not been specified and that have not been brought before the Court. Therefore, in this respect as well, require independent, admissible evidence that has been set forth in Court.

12. In the Expert Opinion of Brigadier General Goldwasser, Prosecution/2, it win accordance with that which has been set forth that the Defendant was head of the Fatah Supreme Committee in Judea and Samaria until the time of his arrest and that he accordingly served as the leader of the Fatah in the West Bank. This can be learned from the various documents that the Defendant wrote and which were written to him, and which are appended to Expert Opinions Prosecution/1 and Prosecution/2. In the above mentioned position, the Defendant constituted a central source of authority for senior members of the Fatah and served as a conduit connecting the chairman of the Palestinian Authority Yasser Arafat to the movement's field echelons (Sections 1 – 2).

It was further stated in the above mentioned Expert Opinion (see Section 4) that when the *intifada* broke out in September 2000, the Defendant played an extremely central role in leading the terrorism against Israel that was carried out by members of the Fatah, as well as in a general sense. His involvement manifested in a variety of different ways: **First of all**, the Defendant constituted a source of inspiration and created the policy for the terrorist attacks through personal meetings with terrorist operatives in the Fatah movement and by way of his public statements. **Second**, the Defendant was a source of authority and funding for terrorist operatives in the Fatah movement: he was perceived by the Al Aqsa Martyrs Brigades as the main leader of their operations, who served as a conduit that connected them to the chairman of the Palestinian Authority and who transferred sums of money to them that amounted to tens of thousands of shekels, for the purpose of terrorist activity. **Third**, the Defendant issued direct orders to terrorist operatives, on both the strategic level and on the tactical level, with respect to specific terrorist attacks.

[Stamp] Gilmore 00755 [continued]

SHATSKY-009286-433

13. During the course of his interrogation by the Israel Security Agency, the Defendant did not hide his clear position whereby the Fatah movement must be the one to lead "the armed struggle against Israel" and that this is the only way to achieve the goals of the Palestinian people after the failure of the peace process and after the Defendant himself had been a peace activist for many years (Transcript Prosecution/59, Sections 2-5, that was submitted and verified by an interrogator by the name of "Wadi", on page 96). He made it clear that when he used the term "armed struggle" he was referring to terrorist attacks (Transcript of the Interrogation Prosecution/98 (k), on pages 2 – 3). The Defendant explained that the Fatah leaders feared a weakening of their power on the Palestinian street, in comparison to the Islamic movements and that this encouraged them to take a position that espoused terrorist attacks against Israel (Transcript Prosecution/21 Section 5, that was submitted and verified by an interrogator by the name of "Robert", on page 63 (recorded in error the in the transcript Prosecution/41); Transcript Prosecution/23 Section 5, that was submitted and verified by an interrogator by the name of "Danny", on page 90; Transcript Prosecution/27 Sections 10-12 and Transcript Prosecution/55 Section 3 that were submitted and verified by an interrogator by the name of "Smith", on page 85; Transcript Prosecution/30 Sections 8-12 and Transcript Prosecution/58 Section 5 that were submitted and verified by an interrogator by the name of "Emile", on page 54; Transcript Prosecution/40 Section 15 that was submitted and verified by an interrogator by the name of "Mofaz", on page 58; Transcript Prosecution/70 Section 3 that was submitted and verified by an interrogator by the name of "Steve", on page 53).

During the course of his interrogation, the Defendant said that "**his declared position is for armed struggle against the Israeli occupation and that anyone who has a weapon should perpetrate terrorist attacks, this is the general position**" (Prosecution/23 Section 5, see also Transcript Prosecution/6 Section 11 – 12 that was submitted and verified by an interrogator by the name of "Robert", on page 62). He explained that in accordance with his perspective, terrorist attacks that will be painful for Israel will promote peace and will cause Israelis to understand that they have something to lose (Prosecution/40 Section 15, and Prosecution/70 Section 4). The Defendant made it clear that from his point of view Israelis who live in settlements are an enemy that should be attacked (Transcript Prosecution/63, Section 16, that was submitted and verified by an interrogator by the name of "Naor", on page 82). He even said that terrorist attacks against settlers in Judea and Samaria are legitimate even when they involved women and children (Transcript Prosecution/6 Section 13 that was submitted and verified by an interrogator by the name of "Robert", on page 62; Transcript Prosecution/7 Section 2 that was submitted and verified by interrogators by the names of "Tzadok" and "Ofir", on pages 83, 87).

[Stamp] Gilmore 00756 [continued]

SHATSKY-009286-433

The Defendant reiterated repeatedly during the course of his interrogation that in the debate that was taking place between the Authority and the Fatah with respect to the type of terrorist attacks against Israel, Arafat and he espoused a policy whereby terrorist attacks should be focused against the Israeli Defense Forces and the settlers, while other leaders such as Abu Ala and Abu Mazen opposed any type of violence; only a few members of the Fatah supported terrorist attacks within Israel (Prosecution/27 Sections 12 – 13; Prosecution/30 Section 8; Prosecution/70 Section 3). Despite the opposition of Arafat and the Defendant to terrorist attacks within Israel, they lost control of the cells and field operatives during the *intifada* (Transcript Prosecution/55 Section 3 (f), that was submitted and verified by an interrogator by the name of "Smith", on page 85).

14. The Defendant's position, as it has been set forth above, is also manifested within the framework of his statements during interrogations, that have been transcribed. The Defendant explained his position that suicide terrorist attacks should not be perpetrated within Israel, saying that terrorist attacks against the settlements are the same as terrorist attacks against the army and there was no argument on this point within Fatah. Notwithstanding, he did confess that during the period of time that immediately preceded his arrest, the Fatah did begin to perpetrate suicide terrorist attacks within Israel and even confirmed that the Fatah had been drawn into this activity in order not to leave control of the field in the hands of the Islamic organizations (Prosecution/98 (d), on pages 27 – 29). The Defendant explained that he personally disagreed with any activity within Israel but that he supported "the armed struggle against the Israeli occupation" and did this publicly on television (Prosecution/98 (g), on pages 7, 10).

The Defendant confirmed that during the five months that had led up to his arrest, the Fatah had assumed a central role in the escalation of violence and had led the war; the Defendant did not deny that he had taken part in this (Prosecution/98 (l), on page 35; Prosecution/98 (d), on pages 3 – 4).

During the course of the interrogation, the Defendant emphasized that he had supported the peace accords and worked on their behalf for 10 years but the escalation in violence was caused, he claimed, by a lack of hope that a political solution could be reached with Prime Minister Sharon (Prosecution/98 (l), on pages 44 – 45). The Defendant even expressed his opinion that the Palestinians had made a mistake when they rejected Israel's proposal and, especially, the proposal of President Clinton at the Camp David summit, because if they had accepted those proposals, they would now have an independent state (Transcript Prosecution/95 that was submitted and verified by an interrogator by the name of "Ofir", on page 87).

[Stamp] Gilmore 00756 [continued]

16

SHATSKY-009286-433

15. It is also possible to learn about the position of the Defendant with respect to terrorist attacks and his role in the perpetration of terrorist attacks against Israel by the Fatah from the conversations that he had with the agents who were planted in a cell. The agent who was referred to as John Doe No. 1 introduced himself to the Defendant as a Palestinian from Nablus. He reported the things that the Defendant had told him to Israel Security Agency interrogators after the conversations had taken place, and these were recorded in the transcript that was taken down by the Israel Security Agency interrogators who had testified in the trial ("Robert", on page 154, "Mickey", on page 155, "Ofir", on page 156 and "Mofaz", on page 157). In addition, John Doe No. 1 testified himself (on pages 101 – 107). John Doe No. 1 testified that he read all of the reports that had been recorded by Israel Security Agency agents with respect to his conversations with the Defendant, and that he had confirmed their content (on page 105). The agent, John Doe No. 3, operated and was employed in a similar matter. He also identified the voice of the Defendant on the recording Prosecution/124 (b) (see his testimony on pages 107 – 110 and in the exhibits Prosecution/122 – Prosecution/125).

According to the testimony of John Doe No. 1, the Defendant had told him that he was the one who had established the Al Aqsa Martyrs Brigade and that he was in charge of that organization (on page 106). In the transcript that was written on the basis of his oral statements (Prosecution/117 that was submitted and verified by an interrogator by the name of "Robert", on page 154), John Doe No. 1 said that the Defendant told him that the *intifada* had actually been planned because of the political situation, the expansion of the settlements, the continued occupation and pressure from Palestinians in the territories and that the visit of Ariel Sharon on the Temple Mount was only "the straw that broke the camel's back" and ignited the *intifada* that would have happened anyway (see also Transcript Prosecution/25 Section 18, that was submitted and verified by an interrogator by the name of "Mofaz", on page 58).

[Stamp] Gilmore 00757

SHATSKY-009286-433

After the incident on the Temple Mount, the Fatah security apparatus asked Arafat to order the halting of the *intifada*, but Arafat did not respond. The Defendant himself said that he left the meeting in a fury in light of the request and that he is hated by the apparatus because he "dragged the people into an escalation of the situation." The Defendant told John Doe No. 1 that the purpose of the *intifada* was to attack soldiers and settlers in order to cause their departure, and in order to prove to the world that the Palestinians are fighting the occupation. However, after Israel had begun its policy of targeted assassinations, and especially after it targeted Ra'ed Karmi, the Fatah began to act within Israel, with the objective of harming civilians and in order to cause damage to the Israeli economy and tourism and to exert pressure on the Israeli street to pressure the government to withdraw from the territories (*op. cit.,* Sections 12 – 13, 17, 20 – 21). Similarly, the Defendant told John Doe No. 1 that, from his perspective, terrorist attacks constitute self-defense for the Palestinians, who are willing to extend a hand in peace, and that suicide terrorist attacks are an outcome of the occupation and the condition of the Palestinians in the territories (Transcript Prosecution/110 Sections 22, 27).

The position of the Defendant in support of the continuation of the *intifada* was further expressed in the letter that he had sent to Yasser Arafat on December 31, 2000 (Prosecution/5 (42a)).

[Stamp] Gilmore 00757 [continued]

18

SHATSKY-009286-433

16. With respect to Fatah's policy on terrorist attacks, the Defendant explained, during the course of his interrogation, that when Arafat was interested in a cease fire he would take pains to convey the guideline to many different people, including the Defendant; but that when he was interested in the continuation of the activity, he would make sure that the operatives, including the Defendant, would understand this from his responses and especially from his non-responses. The Defendant said: "**If he** (Arafat) **for example did not want a cease fire, he would take care of matters differently. He would not say anything at all**" (Transcript Prosecution/24 Section 3 (b) that was submitted and verified by an interrogator by the name of "Smith", on page 85, and the transcript of the interrogation of the Defendant Prosecution/98 (i), on pages 32-33). The Defendant said that Arafat had never explicitly ordered him to carry out terrorist attacks. Notwithstanding, he did add that from the fact that Arafat only opposed the perpetration of terrorist attacks within Israel, it was possible to understand that he supported terrorist attacks in the territories and therefore he did not order that they be stopped; on several occasions, Arafat stated in the media that "**a million** *shahids* **[martyrs] are on their way to Jerusalem**" and the Defendant asked rhetorically whether the statement wasn't a statement of support for terrorist attacks (Transcript Prosecution/60 Section 4-7 that was submitted and verified by an interrogator by the name of "Emile", on page 54; Transcript Prosecution/61 Sections 1 – 8 that was submitted and verified by an interrogator by the name of "Mickey", on page 81; Transcript Prosecution/62 Sections 3-5 that was submitted and verified by an interrogator by the name of "Danny", on page 90).

The Defendant explained that there was no need for direct orders from Arafat in order to carry out terrorist attacks since this was self-evident between the lines (Transcript Prosecution/63 Sections 11-13 that was submitted and verified by an interrogator by the name of "Naor", on page 82). The Defendant added that even if the *intifada* had not commenced at the order of Arafat, it would not have continued if he did not support it, even though was not necessary for him to give explicit orders with respect to the perpetration of terrorist attacks (Transcript Prosecution/64 that was submitted and verified by an interrogator by the name of "Robert", on page 62, and Prosecution/66 that was submitted and verified by an interrogator by the name of "Emile", on page

[Stamp] Gilmore 00757 [continued]

19

54). It should also be noted that the Defendant understood that Arafat supported the terrorist attacks from the fact that Arafat would approve the financial requests that he submitted for the Fatah field operatives who were implementing the terrorist attacks (Transcript Prosecution/70 Section 17 (h) that was submitted and verified by an interrogator by the name of "Steve", on page 53). The Defendant described his connection to Arafat as "**personal and direct**" (Transcription of Conversation Prosecution/98 (h), on page 55).

It became evident that the Defendant also had his own way to inform members of the cells of the cessation or renewal of terrorist attacks. During the course of his interrogation, he explained that when he wanted a cease fire he would make contact with the large cells, although it would happen that there would be people who would not obey his order; when the Defendant was interested in renewing fire, he would announce it on television by calling for an "armed struggle." When he was asked how he would announce his desire to renew attacks, the Defendant answered:

> **"I do not want fire, I talk on television if I want peace, meaning I do not call up some random person and say 'Hey, do a terrorist attack for us. Hey, do this or that for us.' That is not the way we work. I speak in the name of the movement and I am actually calling for an *intifada* when I call for an armed struggle" (Prosecution/98 (h), on page 3).**

In spite of these statements on the part of the Defendant, it emerges from the testimony of terror operative Aweis that the Defendant did instruct him to cease the perpetration of terrorist attacks during the visit of the United States emissary Anthony Zinni (see below). From the testimony of Agent John Doe No. 1 during his questioning, subsequent to his conversations with the Defendant, it transpires that the Defendant had expressed great anger about the fact that Aweis had provided this information during the course of his interrogation (Transcript Prosecution/113 (a), Sections 8-9, Transcript Prosecution/114 (a) Section 8 that were submitted and verified by an interrogator by the name of "Robert", on page 154). In addition, evidence was set forth with respect to other situations in which the Defendant had issued direct orders to terrorist operatives who were close to him, in order to carry out terrorist attacks against Israelis (see below).

[Stamp] Gilmore 00758

20

SHATSKY-009286-433

17.     At the outset of his interrogation by the Israel Security Agency, the Defendant denied that he was a leader of the Tanzim and the Al Aqsa Martyrs Brigades, but confirmed that he was the person in charge of the military operations of the Fatah (Transcript Prosecution/17 Section 6, which was submitted and verified by an interrogator by the name of "Arbel", on page 80, Transcript Prosecution/43 Section 6 that was submitted and verified by an interrogator by the name of "Robert", on page 62, and a Transcript of the Interrogation Prosecution/98 (a), on pages 43-44). The Defendant claimed that the Brigades were nothing more than scattered cells throughout the area of the West Bank and that they did not have any orderly organizational structure or central command (Transcript of Conversation Prosecution/98 (e), on pages 60-61). The Defendant also said during the course of his interrogation that Arafat was effectively his direct commander and superior and he defined himself as "**responsible for all of the operations of the Fatah in the West Bank itself because he was secretary general of the organization in the West Bank**" (Prosecution/24 Section 3 (b), 5).

The Defendant confirmed that he was the leader of Fatah in the "field" while Yasser Arafat held the position of the head of the Fatah (Transcript of Conversation Prosecution/98 (a), on page 67). In this manner, the Defendant also explained during the course of his interrogation the fact that members of the cells approached him with requests for money because they considered him the "**commander**" as well as "**the person who was in charge of the Fatah in the West Bank**," insofar as he was the political spokesperson of the movement and because he maintained a policy and a position that supported the continuation of the struggle against the occupation (Transcript of Conversation Prosecution/98 (e), on pages 3-4, 61; Prosecution/98 (d), on pages 33-35). The Defendant explained how he was seen in the eyes of cell members when he said: "**I am their commander and they consider me to be their symbol**." He also confirmed that there is no one else whom they consider to be their leader (Prosecution 98 (i), on pages 6-7).

In statements that he made during the course of his trial, the Defendant claimed more than once that he was "political leader" of the Fatah and emphasized his position as secretary general of Fatah in the West Bank, as well as the fact that he is a member of the Palestinian Parliament [Legislative Council]. He also made these claims at the outset of his interrogation by the Israel Security Agency. During the course of his interrogation by the police, the Defendant also denied that he was in charge of the Tanzim or the Al Aqsa Martyrs Brigades (Prosecution/106, on pages 3, 6). Notwithstanding, during the course of his interrogation by the Israel Security Agency, the Defendant admitted that he was the commander of the Fatah in the West Bank and the commander of the Tanzim (Transcript Prosecution/18 Section 3 that was submitted and verified by an interrogator by the name of "Nadav", on page 78), that he established the Al Aqsa Martyrs Brigades and was responsible for their operations; for this reason he objected to the activity of the security forces belonging to the Palestinian Authority (in accordance with statements by John Doe No. 1 in Transcript Prosecution/117 Section 15, which was submitted by an interrogator by the name of "Robert", on page 154).

[Stamp] Gilmore 00758 [continued]

21

SHATSKY-009286-433

The Defendant told Agent John Doe No. 3 in their conversation that he was indeed responsible for the Fatah and for the Al Aqsa Martyrs Brigades but that he was "not crazy to sign" his name on a piece of paper where that would be written; when the agent asked the Defendant if he was, In spite of this, responsible for the acts of the terrorists, the Defendant responded that he was indeed responsible but "not stupid enough to tell this to the interrogators" (Transcript Prosecution/123, on page 2, which was submitted by an interrogator by the name of by the name of "Ofir"). In a meeting between the Defendant and Ahmed Barghouti when they were arrested, which was recorded without their knowledge, the Defendant told Ahmed that he said during the course of his interrogation that he has no connection to the Al Aqsa Martyrs Brigades. The two laughed and Ahmed advised the Defendant to say that only he – Ahmed – had a connection to the Brigades; the Defendant responded that he had said during the course of his interrogation that he would have fired Ahmed if he knew that he had a connection to the Al Aqsa Martyrs Brigades and Ahmed laughed when he heard this (Transcription of Conversation Prosecution/127 (c) on page 87).

The Defendant confirmed during the course of his interrogation that beyond being a political leader he was also in charge of the military aspects of the Fatah (Transcript Prosecution/59 Section 6 that was submitted and verified by an interrogator by the name of "Wadi", on page 96). The Defendant defined himself as "**in charge of all the activity of the Tanzim in the Fatah in his region**" (Transcription of Conversation Prosecution/98 (d) on page 42). He even confessed that he was "**in charge of everything done including supplying money to the cells, purchasing weapons and carrying out terrorist attacks**" (Transcript Prosecution/29 Section 1 (c) that was submitted and verified by an interrogator by the name of "Smith", on page 85) and that he was considered "**military commander**" and "**in charge of the military aspects of Fatah**," in addition to being a political leader and elected official (Transcript Prosecution/19 Section 2 and Transcript Prosecution/59 Sections 5-6, which were submitted and verified by an interrogator by the name of "Mofaz", on page 58).

The Defendant said that in the year prior to his arrest, "**I began to find myself more involved in dealing with issues of weapons and explosives and issues of military operations**" (Transcript Prosecution/25 Section 19, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58; see also Transcript of Conversation Prosecution/98 (d) on page 15). He explained that he was required to take part in "military operations" in order to control the Palestinian street and push the Hamas and Islamic Jihad aside, so that in the future, he could point to himself as someone who had been in favor of both peace and war (Transcript Prosecution/52, which was submitted and verified by an interrogator by the name of "Smith", on page 85).

[Stamp] Gilmore 00759

22

**C.** **Testimony of Terrorism Operatives from the Movement for the Liberation of Palestine with Respect to Their Relationship with the Defendant, His Involvement in Terrorist Attacks and the Defendant's Responses to this Testimony**

18. The Prosecution does not claim that the Defendant initiated or took a direct part in the perpetration of the terrorist attacks that are the subject of the Indictment, since it is aware of the fact that the evidence indicates that the field commanders and field operatives were given broad authority and much room for maneuvering when carrying out terrorist attacks, and that they were not required to obtain the Defendant's approval for each terrorist attack. The Prosecution also agrees that the Defendant did not know in advance about each individual terrorist attack: he was aware of the activities of the field commanders and field operatives subordinate to him in a general way, and that they were acting in accordance with the terrorist attack policy that he had helped design; sometimes he was informed before a terrorist attack and sometimes only afterwards (on page 47 of the Prosecution Summation).

As is shown by the evidence described below, the Defendant was the leader of terror cells that were part of Tanzim and Al Aqsa Martyrs Brigades. At least some members of these cells followed his orders and acted in accordance with policy that he set. In addition, it clearly emerges from the evidence that the Defendant assisted the commanders of the cells and terrorism operatives by supplying weapons, explosives and funding. In several cases, the Defendant approved terrorist attacks against Israel in advance. Therefore, this Chapter will examine who the terrorist operatives who acted under the Defendant's leadership were and the relationship of the Defendant to these operatives. The next Chapter will examine the terrorist attacks in which these terrorism operatives were involved and the degree of the Defendant's connection to them.

**(1) Nasser Aweis**

19. Nasser Aweis (hereinafter – "**Aweis**"), is one of the senior terrorism operatives of the Tanzim in the Nablus region. As result of his activity, he was sentenced by this Court to 14 terms of life imprisonment and another 50 cumulative years in prison (Prosecution/172 (a) – (b)). In his testimony (on pages 180 – 182), Aweis refused to answer questions, and after he was declared a hostile witness, his police statements were submitted in accordance with Section 10 (A) of the Rules of Evidence (Prosecution/172 – Prosecution/177). The only thing that Aweis was willing to say in his testimony was that everything that was recorded in his statement were lies of the Israel Security Agency and that the handwriting that appears in his statement is also that of Israel Security Agency personnel. He claimed that he suffered through very difficult means of interrogation.

[Stamp] Gilmore 00760

23

The statements that Aweis made to the police were written in his handwriting and translated into Hebrew by an interrogator by the name of who gathered the statements, confirmed them and even testified that the statements were made by Aweis of his own free will (Advanced Staff Sergeant Ronny Amar on pages 191 – 192). Similarly, reports prepared by the Israel Security Agency of Aweis's statements during interrogation were also submitted (Prosecution/178 (a) – (d)). These were verified by the Israel Security Agency interrogators who testified that Aweis said what he said of his own free will, even though this document is only a summary rather than a word for word transcript of his words ("Ariel", on page 203, "Adi", on page 204, "Yoel", on pages 204 – 205). Transcript Prosecution/178 (c) was recorded by an interrogator by the name of "Zadok" who did not refer to it in his testimony (on pages 83 – 84) and did not return to testify after Aweis's testimony and therefore should be ignored.

20. Aweis says in Statement Prosecution/172 (b) (on pages 1 – 2), which is written in his own handwriting, that after the Al Aqsa *intifada* began in September 2000, he began to carry out terrorist attacks against Israeli targets while also serving in the Palestinian national security forces in Nablus with the rank of captain (Nakiv). He perpetrated shooting terrorist attacks and other terrorist attacks against Israeli targets in the Judea and Samaria region and also within Israel. In his Statements Prosecution/172 – Prosecution/174, he lists these attacks, which included shooting on military posts and military vehicles; transferring weapons and explosives to others in order for them to perpetrate suicide terrorist attacks in Jerusalem, Netanya and Hadera, etc.

21. In his statement, Aweis said that he perpetrated the terrorist attacks in the name of the Al Aqsa Martyrs Brigades and explained that this organization belongs to the Fatah movement and the Tanzim Fatah (Prosecution/172 (b), on page 3). Aweis said that funding for the terrorist attacks came from Tanzim personnel and that the Defendant himself funded the weapons for the terrorist attacks in which

[Stamp] Gilmore 00760 [continued]

SHATSKY-009286-433

he, Aweis, was involved – sometimes directly and sometimes through Majad Almitzri – knowing that Aweis carried out terrorist attacks against Israeli targets. In one case, the Defendant gave Aweis a check that had been approved by Chairman Arafat (on pages 6 – 7). Aweis also said during the course of his interrogation that he was in contact with the Defendant for an extended period of time; when asked if the Defendant knew that he was carrying out terrorist attacks against Israeli targets, he answered (on pages 4-5):

> **"Yes he knows and my name was also publicized in newspapers, on television and on the radio and I would speak with him occasionally and when the political situation deteriorated and was bad for us, he asked that we continue the terrorist attacks and when Shimon Peres and Omri Sharon met with leaders from the Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks… During that period, Zinni was in the area and Marwan said that it would be preferable not to carry out terrorist attacks in the name of the Al Aqsa Martyrs Brigades while General Zinni was meeting with leaders of the Authority. It should be noted that when the talks progressed, no terrorist attacks were perpetrated."**

Speaking to Agent John Doe No. 1, the Defendant expressed anger that Aweis had spoken, under interrogation, about the Defendant's behavior during General Zinni's visit to the region (Prosecution/113 (a) Sections 8 – 9, Prosecution/114 (a) Section 8, which were submitted and verified by an interrogator by the name of "Robert", on page 154; and transcript of the interrogation of the Defendant Prosecution/98 (h), on page 3).

22. With respect to his relationship with the Defendant, Aweis said in his Israel Security Agency interrogation that he had submitted requests for assistance from several field operatives to the Defendant and that he himself had received money from the Defendant three times (Transcript Prosecution/178 (a) Section 10). The Defendant was a supervisor in the Tanzim and sometimes transferred financial assistance to himself and to other operatives, after receiving approval from Chairman Arafat (Prosecution/178 (b) Section 10). Generally, Aweis received the money from the Defendant through the middleman Majad Almitzri but sometimes the Defendant would send him money directly; Aweis did not usually tell the Defendant the purpose of the money, but throughout the West Bank, the nature of Aweis's activity was well-known (Prosecution/178 (d) Section 5 (k)).

[Stamp] Gilmore 00761

SHATSKY-009286-433

Aweis said during the course of his interrogation that the terrorist attacks of the Tanzim were perpetrated with the knowledge and assistance of the Tanzim leadership. After the terrorist attack in the Hadera banquet hall and the entire time that they were discussions with Israel they would give orders to cease the terrorist attack; however when the talks did not progress, the operatives renewed the terrorist attacks until they were given a new order by their leaders to stop them. In this framework, the Defendant gave orders to cease the terrorist attacks during the visit of General Zinni and leaders from Russia and Europe in Israel (Prosecution/170 8 (d) Section 5 (j)).

23.   Aweis's description of his relationship with the Defendant, in accordance with that which has been set forthduring the course of his interrogation, is supported by comments that the Defendant made during his Israel Security Agency interrogation. When the Defendant and Aweis met during their interrogation (Prosecution/79 (b)) and Aweis began to read his police statement, the Defendant ordered him to say that it was a forgery, and indeed Aweis quickly said this (interrogator "Zadok", on page 84). However, the Defendant himself confirmed during interrogation that Aweis was the most senior military operative of the Tanzim Fatah in Nablus and was in charge of Al Aqsa Martyrs Brigades in Nablus (Transcript Prosecution/90 Section 7, which was submitted and verified by an interrogator by the name of "Steve", on page 53). The Defendant admitted that he knew that Aweis was involved in extensive "military operations" and when he wanted to ensure that the terrorist attacks were halted, he would contact Aweis and instruct him to cease the terrorist attacks (Transcript Prosecution/24 Section 6, which was submitted and verified by an interrogator by the name of "Smith", on page 85; and Transcript of Conversation Prosecution/98 (i) on pages 2 – 3).

The Defendant admitted that he sent Aweis, through Majad Almitzri and Ahmed Barghouti, approximately 20,000 New Israeli Shekels (NIS) and possibly even NIS 50,000 – NIS 70,000 in order to finance his activities and that he had received approval for this from Chairman Arafat, but without noting the purpose of the financial aid (Transcript Prosecution/19 Section 16, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58; Transcript Prosecution/38 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on page 85; Transcripts Prosecution/40 Section 8 and Prosecution/41 Section 9, which were submitted and verified by an interrogator by the name of "Mofaz", on page 58; Conversation Transcript Prosecution/98 (i) on pages 3-4). The Defendant even admitted

[Stamp] Gilmore 00761 [continued]

26

SHATSKY-009286-433

that some of the money that he gave Aweis was intended for the purchase of 1,000 bullets for an M-16 rifle and for a Galil-type rifle and even declared that he "**takes responsibility for all of the money that Nasser (Aweis) had obtained for the funding of terrorist attacks in the Occupied Territories, for the purchase of weapons and ammunition**" (Prosecution/41 Sections 6 – 9).

The Defendant also confirmed during the course of his interrogation that Aweis operated cells that were organized under the command of the Defendant (Transcript Prosecution/29 Section 1, which was submitted and verified by an interrogator by the name of "Smith", on page 85). However, the Defendant emphasized that he himself did not order Aweis to carry out terrorist attacks (Transcript Prosecution/31 Section 6). In spite of this, Agent John Doe No. 1 testified that the Defendant told him that he had given Aweis orders to carry out terrorist attacks (on page 104).

The Defendant also admitted that subsequent to the terrorist attack in Neve Ya'akov or on the Atarot Bridge (the Defendant could not remember which) Aweis sent him the poster taking responsibility and the Defendant approved it in a conversation with Aweis (Transcript Prosecution/49 Section 7, which was submitted and approved by an interrogator by the name of "Emile", on page 54; and Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith", on page 85).

**(2) Nasser Naji Abu Hamid**

24. Nasser Abu Hamid (hereinafter – "**Abu Hamid**") is one of the senior terrorism operatives of the Tanzim and Al Aqsa Martyrs Brigade in the Jerusalem and Ramallah and he, too, was subordinate to the Defendant and received assistance from him in order to carry out terrorist attacks against Israel. For this activity, Abu Hamid was sentenced, on the basis of his confession, to seven life sentences and another 50 consecutive years in prison (Prosecution/148 (a) – (b)). In his testimony, Abu Hamid refused to answer any questions; he was declared a hostile witness and his police statements were submitted in accordance with Section 10 (A) of the Rules of Evidence (on pages 40 – 41). These statements (Prosecution 149 (a) – (d)) were submitted by the police interrogators Ibrahim Elkura'an, Ya'akov Barazani and Moshe Levy (on pages 194 – 195, 207, 211) who testified that Abu Hamid gave them of his own free will and signed them. The statements were made in Hebrew, at the request of Abu Hamid, whom the interrogators said speaks Hebrew well.

[Stamp] Gilmore 00762

27

SHATSKY-009286-433

25. In his statement, Abu Hamid listed the murderous terrorist attacks against Israelis in which he was involved, and said that he approached the Defendant for financial assistance in order to purchase ammunition, and that the Defendant had referred him to his associate, Ahmed Barghouti, who is known as "The Frenchman," who did in fact give Abu Hamid money for the purchase of weapons and ammunition on several occasions (Prosecution/149 (a), on page 9; Prosecution/149 (c), on pages 5 – 6). Other members of Abu Hamid's cell also approached the Defendant for money in order to purchase weapons (Prosecution/149, on page 6). At a certain stage, Abu Hamid asked the Defendant to pay for the purchase of a machine gun, and he eventually was given money for this purpose by Ahmed Barghouti (Prosecution/149 (c), on page 7). Abu Hamid also said that the Defendant met with a weapons dealer with respect to the purchase of hand grenades but in the end they were only shock grenades (on pages 7 – 8).

Abu Hamid said that he established the Al Aqsa Martyrs Brigade after the beginning of the *intifada* in December 2000 (on page 4). He explained that he received an offer to join the cell that was under the leadership of the head of the Palestinian Authority's security agency, Tawfik Tirawi, but that he preferred the Defendant's offer that he be subordinate to him and receive a salary for himself and his men, since he considered the Defendant "a political leader who would not lie" (Prosecution/149 (a), on pages 15 – 16).

After that, Abu Hamid recruited additional operatives to support the Defendant, established the Al Aqsa Martyrs Brigades and began to carry out terrorist attacks against Israel Defense Forces roadblocks and settlers (on page 17). With respect to the Defendant, he said that he considered him "a political leader" although he himself was a member of the military branch of the organization (on page 17). When the commander of the cell was killed, Abu Hamid introduced the successor to the Defendant (Prosecution/149, on page 7).

In one of his statements, Abu Hamid related an event at which he was present, together with other members of the cell, and one of them told the Defendant of his intention to perpetrate a terrorist attack in the Nablus area, and asked the Defendant for assistance in purchasing a weapon and a car. He also asked the Defendant to contact Aweis for him so that he could help him with the terrorist attack. Abu Hamid said the Defendant contacted Aweis who did indeed help the cell perpetrate a terrorist attack; after the terrorist attack he reported to the Defendant that in an encounter with Israel Defense Forces soldiers, the cell members lost their weapons, and the Defendant promised to take care of the matter (Prosecution 149 (c), on page 9).

[Stamp] Gilmore 00762 [continued]

28

Towards the end of 2001, when mortar shells began to be fired at Israeli settlements, Abu Hamid discussed with the Defendant the necessity of obtaining mortars with a larger range. Abu Hamid approach the Defendant in order to finance the purchase of mortar shells but the Defendant answered that they were too expensive and that "he has a surprise" in this regard and Ahmed Barghouti would explain; the latter explained to Abu Hamid that they already had a mortar and shells (Prosecution/149 (c), on page 10). Abu Hamid also reported to the Defendant that mortars shells had been fired at the settlement Psagot and the Defendant asked him not to tell anyone about and said that if Arafat knew he would jail him (on page 11).

26. From the statements of Abu Hamid, it is possible to get the impression that he tried to prevent the Defendant from becoming directly involved in terrorist attacks and that he even told other operatives not to ensnare the Defendant in their actions, since the Defendant needed to remain "a political leader" (Prosecution/149 (c) on pages 8 – 9, 12). In the context of Abu Hamid's attempts to cover up the involvement of the in terrorist attacks, he also tried to minimize the involvement of Ahmed Barghouti in the murder of Talia and Benyamin Kahane, of blessed memory, who were killed with the weapon that Ahmed Barghouti had given to the terrorist (Prosecution/149 (d), on page 5; see also details of the incident in Chapter E (1) below).

27. The Defendant admitted during the course of his interrogation that he had instructed Ali Aidiya (his finance person) to purchase weapons and explosives for Tanzim activities and to transfer them to Abu Hamid. During the course of his interrogation, the Defendant also referred to the event that Abu Hamid had described in the statement, with respect to the purchase of non-functional hand grenades (Transcript Prosecution/43 Sections 2 – 5, which was submitted and verified by an interrogator by the name of "Robert", on page 62). The Defendant admitted that the cells that had been led by Abu Hamid had received assistance from him totaling approximately NIS 40,000 (Transcript Prosecution/63 Section 20, which was submitted and verified by an interrogator by the name of "Naor", on page 82). The Defendant said that when he made the strategic decision to carry out terrorist attacks, he established the cell, while the terrorist attacks were led by, *inter alia*, Abu Hamid (Transcript Prosecution/35 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on page 90). When the Defendant was asked during the course of his interrogation who were the people who belonged to the terrorist cells under his control, he said of Abu Hamid: "**he is considered by me**" (Transcription of Conversation Prosecution/98 (k), on page 34, where it mistakenly says "Ahmed" in the Hebrew instead of Abu Hamid).

[Stamp] Gilmore 00763

29

SHATSKY-009286-433

### (3) __Ahmed Barghouti__

28.  Ahmed Barghouti (who is known as "the Frenchman") is a family member of the
     Defendant and was his close assistant, in addition to being the Defendant's driver and
     bodyguard (see his Statement Prosecution/165 (a) on page 1; and Transcript
     Prosecution/165 (f), which was submitted and verified by an interrogator by the name of
     "Adam" and "Danny", on pages 200-201).

     During the course of his interrogation, Ahmed Barghouti said that he had been under the
     complete direct control of the Defendant (Transcript Prosecution/165 (j), which was
     submitted and verified by an interrogator by the name of "Adam", on page 201). It is not a
     coincidence that Ahmed Barghouti was arrested together with the Defendant, since his
     name appears in the evidence in many contexts related to the terrorist attacks perpetrated
     by the field operatives of the Tanzim and Al Aqsa Martyrs Brigades.

     Ahmed Barghouti refused to answer any questions during his testimony (on pages 161-
     163), and after he was declared a hostile witness, his police statements were submitted in
     accordance with Section 10 (A) of the Rules of Evidence (Prosecution/165 (a)-(e)).

     These statements were submitted and verified by the police officers David Mizrahi,
     Yitzchak Ya'akoboff and Moshe Moshe (on pages 171, 184 and 206-207). The
     interrogators testified that they interrogated Ahmed Barghouti in Arabic but that they wrote
     down his testimony in Hebrew (which is not in accordance with that which is accepted and
     required). All of the interrogators testified that he gave all of the statements of his own free
     will.

     Similarly, a document was submitted that was written by Ahmed Barghouti in his own
     handwriting and in Arabic and was translated (Prosecution/165(c) (1 – 2)). During the
     course of his interrogation, he admitted that the handwriting in this document is his
     handwriting (Mizrahi, on page 185). In addition, Israel Security Agency interrogators
     submitted the transcripts that were taken down during the interrogation of Ahmed
     Barghouti (Prosecution/165 (f)-(p), which were submitted and verified as follows:
     Prosecution/165 (f) by "Adam", on page 201 and by "Danny", on page 200;
     Prosecution/165 (j) by "Adam", on page 201; Prosecution/165 (m) by

[Stamp] Gilmore 00763 [continued]

SHATSKY-009286-433

"Adam", on page 201; Prosecution/165 (n) by "Danny", on page 200). Transcripts Prosecution/165 (g) – (h), Prosecution/165 (k) – (l) and Prosecution/165 (p) were not mentioned in the testimony of any of the Israel Security Agency interrogators, "Mickey," "Arbel," "Adam" and "Dekel" and therefore they are to be ignored.

29.   Ahmed Barghouti said during the course of his interrogation that he and Aweis were in charge of the Al Aqsa Martyrs Brigades during the year preceding his arrest (Statement Prosecution/165 (e)). In his statement he also related his direct and indirect involvement in terrorist attacks that have been carried out against Israel and about the weapons and vehicle that he supplied to the field operatives who went out to carry out the various terrorist attacks in the Judea and Samaria area and also within Israel, including suicide terrorist attacks.

With respect to the terrorist attack at the restaurant **Seafood Market** in Tel Aviv, Ahmed Barghouti said when he received the announcement that the terrorist Ibrahim Hasouna would soon depart for the terrorist attack, and when he was told that he had already departed with his escort, he called the Defendant and told him about this; the Defendant authorized the terrorist attack **before** it was carried out but gave orders that it should not be perpetrated in Israel but rather than the territories; Ahmed Barghouti told him, "It will be okay" (Transcript Prosecution/165 (m), which was submitted and verified by an interrogator by the name of "Adam", on page 201; and Transcript Prosecution/165 (n), which was submitted and verified by an interrogator by the name of "Danny", on page 200). Immediately after the terrorist attack at Seafood Market, in which Ahmed Barghouti himself was personally involved, he called the Defendant at 3:15 a.m. and reported to him about perpetration of the terrorist attack; the Defendant sounded annoyed (Statement Prosecution/165 (c) on page 1, Transcript Prosecution/165 (n)). According to Ahmed Barghouti, the Defendant told him to tell Aweis not to take responsibility for this attack before speaking with the Defendant, since the Defendant was interested in wording the announcement (Prosecution/165 (d) on page 1, Transcript Prosecution/165 (n)) Ahmed Barghouti was asked why he reported on the terrorist attack to the Defendant and he answered: "**I reported to Marwan Barghouti in the usual manner**."

[Stamp] Gilmore 00764

31

SHATSKY-009286-433

30. During the course of his interrogation, Ahmed Barghouti also spoke about the terrorist attack at the **gas station in Givat Ze'ev,** which was carried out as revenge for the targeted assassination of Ra'ed Karmi. He claimed that he asked that the perpetrator, Abu Satha, not inform the Defendant about it in advance. However, Abu Satha did discuss it with the Defendant and the Defendant told him not to carry out the terrorist attack, apparently because he feared for the life of Abu Satha, who was his bodyguard (Transcript Prosecution/165 (c) on page 2 and Transcript Prosecution/165 (m) that was submitted and verified by an interrogator by the name of "Adam", on page 201). This is one example of Ahmed Barghouti's efforts during the course of his interrogation to cover up the Defendant's actions, since the Defendant himself took responsibility for this terrorist attack during his own interrogation and it is clear from his statements that he gave orders for its perpetration (see Sections 66 (5) and Chapter E (7), below).

In another instance that Ahmed Barghouti related during the course of his interrogation, the Defendant rejected the request of the young 15 year old woman to perpetrate a suicide terrorist attack, saying, "**She is too young to do this**", and instructed Ahmed Barghouti that to tell her that (Prosecution/165 (c), on page 4; and Transcript Prosecution/165 (m) Section 2 (j), which was submitted and verified by an interrogator by the name of "Adam", on page 201). A similar version emerges from the comments of the Defendant during the course of his interrogation (Transcript Prosecution/25 Sections 6 – 7, which was submitted and verified by an interrogator by the name of "Smith"; on page 85, and the transcript of the Interrogation Prosecution/98 (j), on pages 8 – 9).

In an additional incident described by Ahmed Barghouti, Jihad Jawara called the Defendant and asked to commit a terrorist attack, and Defendant told him not to do it in Israel or in Jerusalem. However, Jawara left the car bomb that exploded the following day next to the Malha Mall in Jerusalem despite the Defendant's orders (Prosecution/165 on page 18). This description was confirmed by the Defendant during the course of his interrogation (see Section 66 (e) and Chapter E (20), below).

31. Throughout the course of his entire interrogation, Ahmed Barghouti showed a clear tendency to minimize the Defendant's involvement in various terrorist attacks. When he referred to the Defendant by name he would usually do so in order to say that the Defendant opposed the perpetration of the terrorist attack. However, Ahmed Barghouti did confirm in the statement, which he wrote by his own hand, that a series of field operatives in the cells received money from office of the Defendant, with his knowledge, and that the money received from the Defendant was used, by himself and by others, to carry out terrorist attacks (Statement Prosecution/165 (c) (1) on page 6, Statement Prosecution/

[Stamp] Gilmore 00764 [continued]

SHATSKY-009286-433

165 (c) on page 2 and Statement Prosecution/165 (m) Sections 2 (c) and 2 (g) that was submitted and verified by an interrogator by the name of "Adam", on page 201).

Similarly, it is clear from the statements that were made by Ahmed Barghouti that the Defendant would occasionally instruct him to cease or to postpone the perpetration of a terrorist attack (Transcript Prosecution/165 (m) Section 2 (g), which was submitted and verified by an interrogator by the name of "Adam", on page 201). From this, it becomes apparent that in other cases, they were perpetrated with the Defendant's authorization, even if he did not know in advance about each and every terrorist attack.

32. At the beginning of his interrogation, the Defendant tried to protect his family member, Ahmed Barghouti, and he claimed that he had been arrested with him because he "just happened to be passing by" (Transcript Prosecution/9 Section 10 that was submitted and verified by an interrogator by the name of "Robert", on page 62). The Defendant claimed that Ahmed Barghouti had stopped working for him as a driver eight months before his arrest and that there was no connection between them with regard to the perpetration of terrorist attacks (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on page 90; and Transcript Persecution/21 Section 23, which was submitted and verified by an interrogator by the name of "Robert", on page 63). In his police interrogation, Defendant claimed that Ahmed Barghouti was neither his secretary nor his bodyguard (Prosecution/104 on page 4). In a meeting between the Defendant and Ahmed Barghouti at the time they were arrested, which was recorded without their knowledge, the two coordinated their positions with respect to the interrogation, and Ahmed Barghouti told the Defendant that he had claimed during the course of his interrogation that he is not connected to the Defendant but only served as his driver; the Defendant said he told them the same thing (Transcription of Conversation Prosecution/127 (c) on pages 2-3). Ahmed Barghouti told the Defendant at that meeting exactly what he had said during the course of his interrogation with respect to the Defendant and his relationship to the various terrorist attacks that Ahmed Barghouti mentioned during the course of his interrogation (on page 4).

[Stamp] Gilmore 00765

33

SHATSKY-009286-433

However, during his Israel Security Agency interrogation, the Defendant confirmed that he knew that Ahmed Barghouti was connected to several cells and the perpetration of many terrorist attacks against Israel, and that when he wanted to stop the terrorist attacks, he would also tell this to Ahmed Barghouti. He claimed that he had told Ahmed Barghouti that he "does not permit" carrying out terrorist attacks within Israel (Transcript Prosecution/98 (k) on pages 18-20). The Defendant said that there was coordination between himself and Ahmed Barghouti, which included reporting and providing money, and that he considered Ahmed Barghouti in charge of military operations in the Ramallah region, together with Abu Hamid, and that the two would carry out terrorist attacks by using several cells (Transcript Prosecution/27 Sections 2-3 that was submitted and verified by an interrogator by the name of "Smith", on page 85).

The Defendant admitted that he gave money to Ahmed Barghouti and supported his activity although he claimed that Ahmed Barghouti did not report to him **prior** to the perpetration of terrorist attacks (Transcript Prosecution/98 (h) on pages 3, 17, 20-24; and Transcript/24 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on page 85).

The Defendant admitted that Ahmed Barghouti would report to him **subsequent to** carrying out terrorist attacks (Transcript Prosecution/98 (g) on pages 19-25, 40; Transcript Prosecution 98 (k) on page 9). In his conversation with Agent John Doe No. 1, the Defendant said that Ahmed Barghouti dispatched four suicide terrorist attacks with his approval (Testimony of the agent on page 106). These statements are consistent with those stated by the Defendant during the course of his interrogation when he took responsibility for several terrorist attacks that he had personally authorized (see Section 66, below).

[Stamp] Gilmore 00765 [continued]

SHATSKY-009286-433

The Defendant did not hide the fact that he had given Ahmed Barghouti tens of thousand of dollars for the purchase of a variety of weapons, including assault rifles and pistols, for members of the cells that mounted terrorist attacks against Israel. Ahmed Barghouti was responsible, on behalf of the Defendant, for the purchase of the weapons. He worked under the command of the Defendant and was in charge of "military operations" in the Ramallah region. The Defendant admitted that he knew that Ahmed Barghouti was connected to terrorist attacks against Israel, including the terrorist attacks in Jerusalem and at the Seafood Market restaurant in Tel Aviv (with respect to all of these see: Transcript Prosecution/23 Sections 4-5 that was submitted and verified by an interrogator by the name of "Danny", on page 90; Transcript Prosecution/25 Sections 10-11 that was submitted and verified by an interrogator by the name of "Mofaz", on page 58; Prosecution/27 Sections 2, 4 and Prosecution/29 Section 1 that were submitted and verified by an interrogator by the name of "Smith", on page 85; Prosecution/28 Section 4 that was submitted and verified by an interrogator by the name of "Abu Wadi", on page 96; Prosecution/65 Section 4 and Prosecution/70 Section 9 that were submitted and verified by an interrogator by the name of "Steve", on page 53; see also the Defendant's comments in Transcript Prosecution/98 (g) on pages 2-6, Transcript Prosecution/98 (h) on pages 20-24, Prosecution/98 (j) on pages 10-11 and Prosecution/98 (k) on page 8).

**In order to summarize the relationship between the Defendant and Ahmed Barghouti**, it can be stated that the connection of the Defendant with terrorism operatives was through his family member and close associate, Ahmed Barghouti. As the Defendant stated when he was being questioned about Ahmed: "**He makes contact with the cells, both directly and indirectly. That is to say that without him I would not have direct communication with any**

[Stamp] Gilmore 00765 [continued]

SHATSKY-009286-433

**cells**" (Transcript Prosecution/98 (k) on page 8). When the Defendant was asked during questioning who headed the terrorist cells that operated under his control, the Defendant said, "**Ahmed Barghouti was partially under my control and partially worked with Nassar (Aweis)**" (Transcript of Conversation Prosecution/98 (k) on page 34).

## (4) Muhammad Musalah (Abu Satha)

33.  Muhammad Musalah "Abu Satha" (hereinafter – "**Abu Satha**") was another field operative who headed a cell that perpetrated murderous terrorist attacks. He was also the Defendant's bodyguard for a time and his close associate. For this activity, Abu Satha was convicted, on the basis of his confession, and sentenced to nine cumulative terms of life imprisonment (Prosecution/155 (a) – (c)). In his testimony, Abu Satha began by stating that he did not have any connection with the Defendant and the Defendant was "**a political person**" who had no connection to the "military operations." Beyond this, Abu Satha was not willing to answer any other questions and therefore was declared a hostile witness and his police statements Prosecution/156 (a) – (c) were submitted in accordance with Section 10 (A) of the Rules of Evidence (on pages 66 – 68). The Statement Prosecution/156 (a) was not submitted by an interrogator by the name of to whom it was given (the police officer Ya'akov Barazani) and therefore should be ignored. The Statements Prosecution/156 (b) – (c) that were submitted and verified by the police officers Marco Dahan and Moshe Levi (on pages 198, 210) who testified that the statements were given by Abu Satha of his own free will. The interrogation was conducted in Arabic but the statements were written in Hebrew (which is not in accordance with that which is accepted and required).

In his statement, Abu Satha describes the terrorist attacks that he perpetrated and from his statements it becomes apparent that Ahmed Barghouti, the Defendant's close assistant, was involved in many of them in a concrete manner.

34.  The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and operated under his responsibility, through Ahmed Barghouti, and that he knew that Abu Satha had carried out various terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (Transcript Prosecution/30 Sections 2 – 3, which was submitted and verified by an interrogator by the name of "Emile", on page 54, Prosecution/98 (k) on page 35). When the Defendant was asked about the leaders of the terrorist attacks cells that operated under his control, he included Abu Satha among them, and said "**I am not running away from this**" (Transcript Prosecution/98 (k) on page 34).

[Stamp] Gilmore 00766

36

SHATSKY-009286-433

### (5) **Jamal Ahawil**

35.  Jamal Ahawil (hereinafter – "**Ahawil**") was an additional field operative who assisted the Defendant and was his contact person in the Jenin refugee camp.

Ahawil was not willing to answer any questions during the course of his testimony; he was declared a hostile witness and his police statements were submitted Prosecution/166, in accordance with Section 10 (A) of the Rules of Evidence (on pages 164 – 165), by the police officer Matans Hadad to whom it was made (on page 169). Ahawil gave his statement in his own handwriting and Hadad translated it into Hebrew.

Ahawil operated within the framework of the Al Aqsa Martyrs Brigades and stated during the course of his interrogation that he had received financial, among other, assistance from the Defendant and that he would distribute this money to other operatives, including some operatives who were wanted by the Israel Defense Forces; some of the money was used for the purchase of weapons (Prosecution/166 on page 1). Ahawil was in continuous contact with the Defendant and would report to him about the operations of the Al Aqsa Martyrs Brigades and on offenses in the Jenin camp; sometimes operatives from these Brigades would report to the Defendant directly, as was the case with Aweis (Prosecution/166 on page 5).

The Defendant, in his police interrogation, denied that he was acquainted with Ahawil (Prosecution/106 on page 6). However, while being interrogated by the Israel Security Agency, the Defendant did say that Ahawil was a leader from the Jenin refugee camp and a member of the Al Aqsa Martyrs Brigades that belong to the cells of Aweis. The Defendant was well acquainted with Ahawil but claimed that he never gave him weapons or money, although

[Stamp] Gilmore 00766 [continued]

37

SHATSKY-009286-433

Ahawil had asked him for assistance; the Defendant explained that he worked with Aweis, and Aweis was the one who would answer Ahawil's requests (Transcript Prosecution/31 Sections 7 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58). Similarly, the Defendant confirmed that he sent requests for assistance from Ahawil to Arafat (Transcript Prosecution/67 Section 4 that was submitted and verified by an interrogator by the name of "Emile", on page 54).

### (6) Nasser al-Shawish

36.  Nasser al-Shawish (hereinafter "**Shawish**") was another operative who was involved in terrorist attacks that were carried out by the Al Asqa Martyrs Brigades. For this activity he was convicted, on the basis of his confession, and sentenced to four cumulative life sentences (Prosecution/157 (a) – (d)). Shawish refused to answer any questions during his testimony but did claim that the Defendant was a political leader who did not have any connection to "military affairs." He was declared a hostile witness, denying the things that he said during the course of his interrogation and even claimed that he had not admitted anything (on pages 69 – 71). Shawish's Statements Prosecution/158 (a) – (b) were submitted in accordance with Section 10 (A) of the Rules of Evidence by the police officers Matans Hadad and Awad Ataaf to whom it was made (on pages 165, 168).

Reagarding his statement he testified that it was written in Arabic in his own handwriting, of his own free will, and translated into Hebrew by an interrogator by the name of s. Police officer Hadad testified that he was present at the trial of Shawish and that he verified his statement before his conviction, since he did not have a defense attorney.

37.  During the course of his interrogation (Statement Prosecution/158 (a), on page 6 and Statement Prosecution/158 (b), on pages 2 – 4) Shawish said that he had received an explosive belt weighing approximately 18 kg from the headquarters of the Counter-intelligence Force in Ramallah in order to store it in his car. Later, he met the Defendant at the hospital where his wife was being treated and Defendant asked to speak with him privately. During the course of their conversation, he was asked by the Defendant if he was acquainted with anyone who knew how to prepare an explosive belt or any one who had an explosive belt. At that time, Shawish called the person who had given him the explosive belt (Muzid Almitzri) called him and received his agreement for giving it to the Defendant. The Defendant informed him that Ahmed Barghouti would discuss the matter with him. The next day Ahmed Barghouti called Shawish and the latter gave him the explosive belt. Shawish heard later that day that the person who was carrying the belt had been caught in Jerusalem on his way to perpetrate a suicide terrorist attack.

[Stamp] Gilmore 00767

38

Shawish was asked during the course of his interrogation if the Defendant knew about the suicide terror attacks and military operations. He answered that the day before the suicide terrorist attack was carried out by Mohammed Hashayka, Shawish met with the Defendant and told him that a person named Abed al-Kareem was supposed to be sending the suicide bomber to Israel; the Defendant told Shawish to call him if he needed anything for the terrorist attack and gave him $600 and asked to be informed of details of the terrorist attack (on pages 6 – 7). The terrorist attack was carried out in Jerusalem, and then the Defendant called Shawish, who told him that the terrorist attack had been perpetrated by the Al Aqsa Martyrs Brigades. The Defendant asked him to bring him the videotape of the suicide [bomber] Hashayka (on pages 6 – 7 of statement Prosecution/158 (a)). In his second statement Prosecution/158 (b), Shawish related the financial assistance that he received from the Defendant (on page 5).

38. The Defendant denied in his police interrogation that he was acquainted with Shawish and in his statement he also denied the statements made by Shawish (Prosecution/106 on pages 7 – 9). No additional evidence was presented to us with respect to the events that Shawish described during the course of his interrogation and therefore they are not supported and it is not possible to use them to support findings.

## (7) Ali Aidiya

39. Ali Aidiya (hereinafter – "**Aidiya**") was a Tanzim operative who was primarily involved in training young people in the use of weapons, and in this matter he received orders from the Defendant. Similarly, he participated in shooting terrorist attacks aimed at soldiers. Aidiya refused to answer any questions during his testimony and claimed that the Defendant was a "man of peace" (on pages 169 – 171). Therefore, he was declared a hostile witness and his Statement Prosecution/168 was submitted in accordance with Section 10 (A) of the Rules of Evidence by the police officer Ya'akov Barazani to whom it was made in Arabic and who translated it into Hebrew (on page 208).

[Stamp] Gilmore 00767 [continued]

SHATSKY-009286-433

40. During the course of his interrogation, Aidiya spoke of the Defendant's participation in the shooting course for young people (Prosecution/168, on pages 1 – 2) and the terrorist attacks that he himself perpetrated. Similarly, Aidiya said: "**The head of the Tanzim Marwan Barghouti would know about all of the shooting incidents that have been carried out by Tanzim operatives beforehand and would approve them**" (on page 5). He noted that several months before his arrest, the Defendant asked him "to buy a weapon of any type" and transfer it by way of Abu Hamid (Transcript Prosecution/43 Section 3, which was submitted and verified by an interrogator by the name of "Robert", on page 92), which supports what Aidiya said during the course of his interrogation.

## (8) Ismail Radaida, Muhaned Abu Halawa and Khamal Abu Wahr

41. Ismail Radaida (hereinafter – "**Radaida**") wanted to perpetrate a terrorist attack and approached the Defendant for that purpose. He perpetrated the shooting terrorist attack near Ma'ale Adumin, where the Greek Orthodox monk Germanos Tsibouktzakis [Translator's note: as written], of blessed memory, was murdered (see Chapter E (3), below). For his terrorist activity, Radaida was convicted, on the basis of his confession, and sentenced to life in prison and another 20 consecutive years' imprisonment. In his testimony in this case (on pages 42 – 44), Radaida refused to answer questions; he was declared a hostile witness and his police statement was submitted on the basis of Section 10 (A) of the Rules of Evidence (Statements Prosecution/151 (a) – Prosecution/151 (c), handwritten Statement Prosecution 151 (d) that was torn, reconstructed and translated and the recording in which Radaida reenacted the murder of the monk and its transcript – Prosecution/151 (a)).

Radaida's statement was submitted by an interrogator by the name of s Marco Dahan and Yitzchak Ya'akoboff who heard his statement in Arabic but recorded in Hebrew (which is not in accordance with that which is accepted and required), and testified that it was given by Radaida of his own free will. Radaida wrote his Statement Prosecution/151 (d) in his own handwriting, in the presence of Ya'akoboff (on pages 171, 198). The person who conducted the re-enactment (Marco Dahan) made no reference to this fact in his testimony and therefore the recording of the re-enactment is not to be considered, as it is an external statement of a witness that was not submitted as required by law.

[Stamp] Gilmore 00768

SHATSKY-009286-433

42.  In his first statement, Radaida (Prosecution/15 (a)) said that he decided to perpetrate the terrorist attack when he saw on television that a Palestinian baby girl had been killed, and therefore he went to the office of the Defendant. The conversation between them was held in private and Radaida told the Defendant that he wanted to perpetrate the terrorist attack and demanded a weapon for that purpose. The Defendant referred Radaida to a person named Muhaned (Abu Halawa) who is known as "Alea" (hereinafter – "**Muhaned**") and instructed Muhaned to obtain a weapon for Radaida. In his second statement (Prosecution/15 (b)), Radaida added that he made it clear to the Defendant that he required the weapon in order to carry out terrorist attacks against Israeli targets, and then the Defendant referred him to Muhaned. Muhaned told Radaida that that he would obtain two Kalashnikov rifles for him and that from now on his contact would be with Muhaned and not with the Defendant. About two weeks later, Muhaned called Radaida – who had meanwhile added another person to the terrorist attack – and told him that the weapons were ready. Radaida received weapons and ammunition from Muhaned, who instructed him and his comrade in their operation.

After several days of preparation for the terrorist attack, Radaida and his comrade Yasser went to an observation point on the Ma'ale Adumin Road; they perpetrated the terrorist attack by shooting at the car in which the monk was traveling, and then fled. The next day, Radaida learned from the news that he had killed a Greek monk and Muhaned called him to complain about this; Radaida explained that he thought it was a settler. During the course of his interrogation, Radaida was asked why he went to the Defendant when he wanted to perpetrate a terrorist attack and he answered that he had seen the Defendant several times on television and understood "**that he is the only person who could help me obtain a weapon**" (on page 5).

In his third Statement (Prosecution/15 (c)), Radaida revealed that his original intention was to perpetrate a suicide terrorist attack but the Defendant told him, "**Suicide terrorist attacks are the work of Hamas and the Islamic Jihad; the Tanzim perpetrates terrorist attacks against the army and the settlers**.".

[Stamp] Gilmore 00768 [continued]

SHATSKY-009286-433

**Radaida** continued, saying, "**Marwan Barghouti said that he was willing to give me weapons and explosives so that I could commit terrorist attacks against soldiers and settlers**" (on page 1). This version by Radaida also emerges from the document that he wrote in his own hand (Prosecution/15 (d)), although in a more condensed version.

43. Radaida's story is also supported by the Defendant's version during the course of his interrogation (Transcript Prosecution/98 (k) on pages 37-38; and Transcript Prosecution/98 (d) on pages 2-4, 11-12, where it mistakenly reads Ismail Aldeba instead of Ismail Radaida). In his police interrogation, the Defendant denied that Muhaned worked in his office or was his deputy and said that Muhaned was not connected to the Tanzim (Statement Prosecution/102 on page 3, Prosecution/103 on page 5, Prosecution/105 on page 2, Prosecution/106 on page 1). Early during the course of his interrogation by the Israel Security Agency, the Defendant also denied that he was acquainted with Radaida and said that Muhaned worked in his office (Transcript Prosecution/9 Sections 8-9 and Transcript Prosecution/21 Section 22 that were submitted and verified by an interrogator by the name of "Robert", on pages 62-63).

However, as the interrogation continued, the Defendant admitted that Radaida had come to him to proprose the perpetration of a suicide terrorist attack and that the Defendant told him, "**We do not work with suicide terrorist attacks**." The Defendant referred Radaida to Muhaned and told Muhaned that Radaida "**needs training… find something for him**." Similar the Defendant said, "**Muhaned reached an agreement with him that he would try to perpetrate a terrorist attack here on Ma'ale Adumim or somewhere else, I knew about it later… then they fired on a car and injured some Elhouri… meaning they killed him**" ("Elhouri" means "Priest" in Arabic – A.B.). A similar confession with respect to the recruitment of Radaida through Muhaned emerges from points he made during the interrogation (see: Transcript Prosecution/22 Sections 12-16 and Transcript Prosecution/40 Section 9 that were submitted and verified by an interrogator by the name of "Mofaz", on page 58, Transcript Prosecution/23 Section 6 that was submitted and verified by an interrogator by the name of "Danny", on page 90; and transcript of the interrogation of the Defendant Prosecution/98 (d) on pages 21-26; and Prosecution/98 (g), on page 8).

The Defendant further admitted that he met with Muhaned and gave him money for the purpose of carrying out terrorist attacks, after Muhaned told him that his cell had perpetrated several terrorist attacks, including the murder of the Kahane couple, of blessed memory. The Defendant said that he gave Muhaned a sum of approximately $3,000 and also weapons (Transcript Prosecution/43 Sections 14-16 that was submitted and verified by

[Stamp] Gilmore 00769

42

SHATSKY-009286-433

an interrogator by the name of "Robert", on page 62; Transcript Prosecution/59 Section 10 that was submitted and verified by an interrogator by the name of "Wadi", on page 56; Transcript Prosecution/67 Section 6 that was submitted and verified by an interrogator by the name of "Emile", on page 54; Transcript Prosecution/68 that was submitted and verified by an interrogator by the name of "Steve", on page 53).

In the transcript of the interrogation of the Defendant (Prosecution/98 (d), on pages 21-23) he said that Muhaned informed him that his cell had been caught and explained that Muhaned was referring to "**those for whom we arranged weapons**."

44. The relationship between the Defendant and Muhaned also emerges from remarks that Khamal Abu Wahr (hereinafter – "**Wahr**") made in his statement regard on the subject of money that he had received from Muhaned, with the knowledge and the approval of the Defendant. In this manner, he received from the Defendant, by way of Muhaned, the sum of approximately NIS 25,000, most of which was intended for the purpose of the manufacture of mortars and the purchase of pistols. At a certain stage, the Defendant began to call Wahr directly, in order to clarify his needs. In addition, Wahr said said during the course of his interrogation that the Defendant would also transfer money to him by way of Jamal Ahawil, and that, after the terrorist attack in Meirav, the Defendant contacted him in order to find out the names of the people who participated in that terrorist attack, in order to transfer money to them (Prosecution/181 (b), on pages 4-5; and Transcript Prosecution/181 Section 6). Wahr stated during the course of his interrogation that he and Muhaned would decide between them what he needed and then the Defendant would send them the money; the Defendant would call Wahr to verify that the money that he had sent him by way of Muhaned had in fact arrived (Transcript Prosecution/18 (d) Section 6.1). At a certain stage, the relationship between Wahr and Muhaned was broken off and the Defendant told Wahr that he was having financial problems and that he did not have money to buy bullets. At this point, the Defendant referred Wahr to Jamal Ahawil, in order to receive money (Transcript Prosecution/181 (c) Section 15 and Prosecution/18 (d) Section 6.1).

45. Wahr carried out several shooting terrorist attacks in the context of the Al Aqsa Martyrs Brigades' activities and he listed the terrorist attacks in which he participated in his police statement and during the course of his interrogation by the General Security Service. During his testimony, he refused to answer questions (on pages 181-189), and therefore his police statement (Prosecution/181 (a)-b) was submitted in accordance with Section 10 (A) of the Rules of Evidence, by an interrogator by the name of Gadir Salah who testified that Wahr gave the statement of his own free will in Arabic, but that it

[Stamp] Gilmore 00769 [continued]

43

was written down in Hebrew (on page 209). Similarly, the transcript from Wahr's interrogation by the Israel Security Agency was submitted (Prosecution/181 (c) – (d) which was submitted by an interrogator by the name of "Naveh", on page 205). Although Wahr's external statements are not supported by additional evidence, there is a great deal of other evidence with respect to the assistance that the Defendant offered to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

**(9) Nasser (Haloum) Naji Abu-Hamid**

46.  Nasser Haloum Naji Abu-Hamid (hereinafter – "**Haloum**") is the brother of Abu Hamid and he perpetrated shooting terrorist attacks within the framework of the Al Aqsa Martyrs Brigades. Haloum was involved in the terrorist attack in which the policewoman Galit Arbiv, blessed memory, was shot to death in Neve Ya'akov, Jerusalem (see Chapter E (10), below). He also participated in preparing the fatal terrorist attack at the restaurant Seafood Market in Tel Aviv (see Chapter E (12), below). He was convicted, on the basis of his confession, and sentenced to five consecutive life sentences (Prosecution/161 (a)-b).

In his testimony, Haloum refused to answer questions (on pages 73-76) but claimed that the Defendant was a political leader who has no connection with "military issues." Therefore his police statement (Prosecution/162 (a)-c) was submitted by police officers Mizrahi and Elkaua'an on pages 184, 194). Haloum's connection was with Ahmed Barghouti who was the Defendant's close assistant.

**(10) Ziyad Hamuda**

47.  Ziyad Hamuda (hereinafter – "**Hamuda**") was an operative in the Tanzim. In his testimony, Hamuda refused to respond to questions and his police statement was submitted in accordance with Section 10 (A) of the Rules of Evidence, after he was declared a hostile witness. He claimed that he had signed his statement so that he could undergo surgery for appendicitis (on pages 166-197). He denied that which he had set forth in his Statement Prosecution/167 (b) and claimed that the Defendant was "a man of peace." The statement by Hamuda was taken by police officer Avi Akiva, who was not brought to testify and therefore, the statement was not filed in a lawful manner and it must be ignored.

Hamuda was convicted, on the basis of his confession, for a long series of security crimes (Prosecution/167 (a)). In the Indictment to which Hamuda confessed, it is claimed that he had been recruited to the Tanzim by the Defendant, for the purpose of military training, and that he had been promised that the Defendant would see to financial assistance for him. In addition, in the Indictment to which Hamuda confessed, it is similarly claimed that that he

[Stamp] Gilmore 00770

44

had asked the Defendant for a weapon, in order to perpetrate a shooting terrorist attack near the Psagot settlement and that the Defendant had referred him to Muhaned in order to receive the weapon (Items No. 5 and No. 7 of the Indictment). In his Israel Security Agency interrogation, the Defendant confirmed that Hamuda asked him for a weapon but that, to the best of his recollection, he did not receive it (Transcript Prosecution/34 Section 5 that was submitted and then verified by an interrogator by the name of "Itai", on page 52).

On another occasion, during the course of his interrogation, the Defendant said that it was likely that Hamuda had received an MP5 rifle from him (Transcript of Interrogation Prosecution/98 (e), on page 67). There is nothing in the evidence that incriminates the Defendant other than the confession by Hamuda to the charges in the Indictment, on the basis of which he was convicted and it is not possible to substantiate any findings on the basis of a confession of this type (see Section 132 (c), below). However, a great deal of additional evidence was brought forth with respect to the assistance that the Defendant gave to people in the field in order to purchase weapons for the purpose of the perpetration of terrorist attacks.

### (11) Riad Amor

48. Riad Amor (hereinafter – "**Amor**") was another field operative of the Tanzim who described, during the course of his interrogation, the terrorist attacks in which he took part. During his testimony, he refused to respond to questions (on pages 172 – 174), and claimed that he did not have any connection with the Defendant. He was declared a hostile witness and his statements Prosecution/169 (a) – (b) were submitted by police officers David Mizrahi and Ya'akov Barazani, who testified that Amor had made these statements and signed them of his own free will (on pages 186, 208). The statements were taken in Arabic but were written down in Hebrew (which is not in accordance with that which is accepted and required). Amor was convicted of perpetrating a large number of terrorist attacks, on the basis of his confession (Prosecution/169 (c)-(d)).

[Stamp] Gilmore 00770 [continued]

SHATSKY-009286-433

49. During the course of his interrogation, Amor said that he met the Defendant approximately six months prior to his arrest and that the Defendant told him that he was pleased with the activities of Amor and his comrades in Bethlehem, but that he would prefer that they perpetrate terrorist attacks against the army, not against civilian targets, because "**this creates problems**" and "**it causes a headache for the Chairman**" (Prosecution/169 (a), on page 3, Prosecution/169 (b), on page 11). The Defendant claimed in his police interrogation that he is not acquainted with Riad Amor in any way. (Prosecution/14 on page 9) and there is no evidence to contradict this claim other than an external statement by Amor which requires support that was not found. Notwithstanding, there is a great deal of additional evidence with respect to the general position of the Defendant favoring terrorist attacks against soldiers and settlers.

## (12) <u>Nasser Haj</u>

50. Nasser Haj (hereinafter – "**Haj**") also worked in the framework of Fatah and described in his statement Prosecution/178, the terrorist attacks in which he took part. In his testimony, he refused to respond to any questions and later denied everything that he had said during the course of his interrogation (on pages 175 – 176). Therefore, his statement was filed in accordance with Section 10 (A) of the Rules of Evidence, by an interrogator by the name of Moshe Levy, who testified that Haj gave his statement of his own free will, after he was given a warning with respect to his rights (on pages 211-212).

In his above mentioned statement, Haj said that he, together with other operatives, had approached the office of the Defendant with a request to receive money and weapons. The Defendant told them to look for weapons because he would finance the purchase. Later, the Defendant gave him $1,200 in order to purchase weapons (on pages 4-5). There is nothing in the evidence that supports this above mentioned external statement by Haj, which requires support, but there is a great deal of additional evidence of the assistance that the Defendant gave to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

## (13) <u>Tahrir Barghouti</u>

[Stamp] Gilmore 00771

SHATSKY-009286-433

51. Tahrir Barghouti (hereinafter – "**Tahrir**") is a family member of the Defendant who, in accordance with his statements during the course of his interrogation, perpetrated a large number of shooting terrorist attacks. He refused to respond to questions in Court (on pages 177 – 178) and therefore his statements were filed in accordance with Section 10 (A) of the Rules of Evidence, (Prosecution/171 (a) – (d)) by police officer Ya'akov Barazani, who took them and testified that the statements were given by Tahrir, of his own free will, in the Arabic language, and that they were later translated into Hebrew (on page 207).

52. During the course of his interrogation, Tahrir stated that he had asked the Defendant to help him to establish a cell. The Defendant promised to help Tahrir with money and ammunition and to help his people in the event that they were arrested. The Defendant also proposed that Tahrir be in charge of the cell, but that he distance himself from the actual operations. Tahrir explained during the course of his interrogation that he had approached the Defendant in order to receive weapons for the cell that he had established (Prosecution/171 (d), on page 3). Later, the relationship was continued through Muhaned, who hinted to him that the Defendant was not interested in having him take part in the activity; the Defendant himself explained to Tahrir that this position derived from the fact that the members of the cell were scoundrels (Prosecution/171, on page 4).

In his police interrogation, the Defendant denied that Tahrir said (Prosecution/104, on pages 9 – 10). However, in his Israel Security Agency interrogation, the Defendant did admit that Tahrir had approached him with respect to the perpetration of terrorist attacks and had asked for weapons for this purpose. Yet, the Defendant claimed that he did not accede to this request (Transcript Prosecution/30 Section 1 that was submitted and verified by an interrogator by the name of "Emile", on page 54). There is nothing in the evidence that supports this external statement by Tahrir, which requires support that was not found for the contradiction of the claim of the Defendant. However, there is a great deal of additional evidence of the assistance that the Defendant had rendered to people in the field for the purchase of weapons in order to perpetrate suicide attacks.

**(14) <u>Ahmed Musafar</u>**

[Stamp] Gilmore 00771 [continued]

SHATSKY-009286-433

53. Ahmed Musafar was a weapons dealer who supplied weapons to members of the Tanzim and the Al Aqsa Martyrs Brigades. In his testimony (on pages 186 – 188), he refused to respond to questions and he denied everything that he had stated during the course of his interrogation. Musafar was declared a hostile witness and his police statements were filed in accordance with Section 10 (A) of the Rules of Evidence (Prosecution/179) by an interrogator by the name of Ya'akov Barazani, who testified that the statement had been made after Musafar had been warned about his rights and that he had signed the statement, which had been taken in Arabic but had been written down in Hebrew (on page 208).

In his statement, Musafar spoke about his meeting and that of his comrades at the office of the Defendant, two days before Ra'ed Karmi was killed. The Defendant told them that they need to continue their operations in the village where they reside, not in Ramallah, and he promised to help them. After the death of Karmi, Musafar received orders to perpetrate a terrorist attack in revenge; the order came from Mahmoud Jabar, who worked at the office of the Defendant, and therefore Musafar understood that it came from the Defendant (Prosecution/179, on pages 6 – 7). During the course of his police interrogation, the Defendant denied what Musafar had said (Prosecution/104, on page 3), and there is no evidence that supports this external statement by Musafar, with the exception of the many pieces of evidence that were presented with respect to the Defendant's call to avenge the death of the Karmi in the form of a terrorist attack.

## (15) Sharif Naji

54. Sharif Naji (hereinafter – "**Sharif**") was a member of the cell that was led by his brother, Abu Hamid, which carried out terrorist attacks against Israeli citizens. He was also the bodyguard for the Defendant. Sharif was the one who escorted the suicide [terrorist] Ibrahim Hasouna, who perpetrated the terrorist attack on the Seafood Market [restaurant] in Tel Aviv. In his statement, he set forth all of his deeds.

Sharif, like all of his comrades, refused during his testimony to respond to questions other than claiming that he was acquainted with the Defendant only from television. He was declared a hostile witness and his statement Prosecution/182, to which his handwritten translation into Arabic Prosecution/182a was appended, was submitted by an interrogator by the name of Avi Ben Lulu, who testified that the statement was given by Sharif of his own free will (on page 210).

[Stamp] Gilmore 00772

48

SHATSKY-009286-433

55. In his statement Prosecution/182, Sharif talked about the shooting terrorist attacks that he had perpetrated against soldiers and settlers, within the framework of the Fatah Tanzim. He explained that he had perpetrated the terrorist attacks so that the *intifada* would continue, specifically because he was interested in peace and added: "**That is what Arafat, Marwan Barghouti and Hussein al-Sheikh were saying on Palestinian television and Al Jazeera… they would say that if the *intifada* were to continue, we can receive more territory and more things from Israel**" (on page 4). During the course of his police interrogation, Defendant denied having said these things (Prosecution/103, on page 5).

After Sharif's cell was dismantled, due to the death of Mohammed Omasi, Sharif began to serve as a bodyguard for the Defendant, for a period of approximately six months until his arrest. When interrogated about the Defendant he said: "**I would hear him telling his people that they should continue to carry out terrorist attacks and he would say this freely on Israeli and Arabic television**" (on page 5). In the second part of his statement, Sharif spoke about his role in a terrorist attack at the Seafood Market restaurant in Tel Aviv and the involvement of Ahmed Barghouti in the attack (on pages 5 – 11). During the course of his interrogation, the Defendant denied having any connection at all with Sharif, although he was acquainted with him (Transcript Prosecution/34 Section 4, which was submitted and verified by an interrogator by the name of "Itai", on page 52). However, the statements that were made by Sharif are supported by many pieces of evidence that were submitted with respect to the manner in which the Defendant would make use of the media in order to call for terrorist attacks against Israel and how he called on his people to do so, as well.

**(16) Amid Abu Radaha**

56. Amid Abu Radaha (hereinafter – "**Abu Radaha**") was another Tanzim operative who perpetrated shooting terrorist attacks that targeted soldiers and settlers, as he talked about during the course of his interrogation. During his testimony, he claimed that he did not have any connection with the Defendant or with Ahmed Barghouti and that he did not receive a weapon from the Defendant but rather from the Palestinian Authority.

[Stamp] Gilmore 00772 [continued]

49

SHATSKY-009286-433

He claimed that the interrogators wrote things in his statement that he had not said and denied the contents of his statement (on pages 192 – 194). Abu Radaha's statement (Prosecution/183) was submitted by an interrogator by the name of Meir Cohen, who testified that the statement was given by Abu Radaha of his own free will and that it was taken in Arabic but written down in Hebrew (which is not in accordance with that which is accepted and required) and that he had signed it.

57. In his statement, Abu Radaha stated that the weapons and ammunition that he had used in order to perpetrate the terrorist attack had been received from the Defendant and Ahmed Barghouti, who also gave the members of the cell money for ongoing expenses (on pages 2 – 6). In his police interrogation, the Defendant denied what Abu Radaha had said (Prosecution/104, on page 3). However, his statements are supported by many pieces of evidence with respect to the Defendant's activity supplying money and weapons to members of the Tanzim in the field for the perpetration of terrorist attacks against Israel.

**(17) <u>Ashraf Jabar</u>**

58. Ashraf Jabar (hereinafter – "**Jabar**") was also a Tanzim operative who carried out terrorist attacks against Israeli targets, together with others, including Abu Radaha. Jabar refused to respond to questions during his testimony (on page 185 – 197) and therefore his statement was submitted, together with the diagram that he drew, (Prosecution/184 (a) – (b)) by an interrogator by the name of Moshe Levy, who testified that the statement was given by Jabar of his own free will; it was taken in Arabic and translated into Hebrew (on page 212).

59. In his statement Prosecution/1848, Jabar talked about the terrorist attacks that he had perpetrated and noted that he had approached the office of the Defendant with a request for ammunition and money for members of the cell; the Defendant promised that he would pay for the ammunition and did indeed do so through Ahmed Barghouti; the bullets were given to him in exchange for NIS 3000. Jabar explained that he gave the bullets to the Defendant because he was the head of the Tanzim and that he would distribute them to Tanzim operatives (on pages 3 – 4).

During the course of his interrogation, the Defendant confessed that Jabar had asked him for financial support and weapons, but said that he did not remember exactly what he had given him (Transcript Prosecution/48 Sections 2 – 3, that was submitted and verified by an interrogator by the name of "Robert", on page 62).

[Stamp] Gilmore 00773

50

**D.** **Statements of the Defendant During Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks against Israel**

**(1)** **The responsibility of the Defendant for the activity of the terrorist cells and the degree of his control over them**

60.    In accordance with that which has been set forth above, during his Israel Security Agency interrogation, the Defendant did not deny that he was the commander and leader of the Fatah field operatives on the West Bank and that he was the commander of the Fatah and the Tanzim in the West Bank, that he had established the Al Aqsa Martyrs Brigades and that he was in charge of their operations. He also confirmed that he was in charge of the supply of money, weapons and explosives to the field cells and that he was in charge of their military operations (see Section 17, above). The Defendant explained during the course of his interrogation that he found himself involved more and more with the "military cells," which would approach him with requests for various types of assistance, since people such as Ra'ed Karmi and Nassar Awis considered him to be the commander. He also said that his connection with the members of the cells was through his assistant and personal driver Ahmed Barghouti. The Defendant made a distinction between terrorist attacks in Israel, for which he refused to take responsibility, and terrorist attacks that the Fatah had carried out in the West Bank, for which he assumed full responsibility during the course of his interrogation (Transcript Prosecution/25 Section 20 that was submitted and verified by an interrogator by the name of "Mofaz", on page 58). The Defendant emphasized that he was in charge of the operations of the Fatah on the West Bank but was not an expert on the details, such as the type of weapons that had been used, the way in which they had been purchased, the planning of terrorist attacks and their perpetration (Transcript Prosecution/27 Section 1 that was submitted and verified by an interrogator by the name of "Smith", on page 85).

During the course of some of his interrogations, the Defendant claimed that he was not directly responsible, from the command perspective, for the operations of field cells (Transcript Prosecution/42 Section 7, that was submitted and authorized by an interrogator by the name of Wadi, on page 96). However, in later stages

[Stamp] Gilmore 00773 [continued]

51

of his interrogation, the Defendant confessed that he was responsible for the operations of the cells that worked with Ahmed Barghouti and Abu Satha, because these were close to them and he funded their operations; in further detail, he noted that he considered himself to be responsible for three terrorist attacks, in Givat Ze'ev, French Hill and the Atarot Bridge (Introduction to Transcript Prosecution/38 that was submitted and verified by an interrogator by the name of "Smith", on page 85. By his own description here, the Defendant did not consider himself responsible for terrorist attacks that have been carried out by the cells of Aweis, Mansour Shrim and others and he did not consider himself to be their commander. Of his relationship with Aweis, the Defendant said: "**I have control because of respect over Nassar but not actual control**" (Transcription of Conversation Prosecution/98 (k) on page 17). When speaking about the field cells that had carried out terrorist attacks against Israel during the course of his interrogation the Defendant said**:**

> "**These cells found themselves more than one address. What is an address? An address is someone you can turn to ask for money, to coordinate work. I am one of those addresses, I am one address among several addresses. The heads of the security forces are also an address.**"

Based upon these statements by the Defendant, it seems that at least some of the cells coordinated their terrorist attacks with him and considered him an address for funding, as indeed emerges from much of the evidence presented before us. In this regard, the Defendant said that his connection with the cells was indirect because he did not want to get involved in the military field and did not want to be involved in "destruction" (Transcription of Conversation Prosecution/90 8 (k), on page 6). Indeed, for the most part, the Defendant's connection with the terrorist attack cells was through the contact people who were close associates of the Defendant, especially Ahmed Barghouti. As the Defendant said about Ahmed Barghouti: "**He makes contact with these cells either directly or indirectly, meaning that without him I would not have a direct connection with any cell**" (Transcription of Conversation Prosecution/98 (k), on page 8).

The Defendant claimed that the field cells would have perpetrated terrorist attacks even in the absence of his support and even without the financial and organizational support that he gave them (Transcript Prosecution/63 Section 18 - 20 that was submitted and verified by an interrogator by the name of "Naor", on page 82). This claim does not in any way mitigate the responsibility of the Defendant for the terrorist attacks that were carried out by these cells.

[Stamp] Gilmore 00774

SHATSKY-009286-433

61. At the beginning of his Israel Security Agency interrogation, the Defendant denied that he was responsible for the provision of money and weapons for the purposes of carrying out terrorist attacks (Transcript Prosecution/14 Section 4, that was submitted and verified by an interrogator by the name of "Gabi", on page 93, Transcript Prosecution/10 Section 1 that was submitted and verified by an interrogator by the name of "Danny", on page 90). However, as the interrogation continued, the Defendant admitted (Transcript Prosecution/29 Section 1 (c)-(d) that was submitted and verified by an interrogator by the name of Smith, on page 85):

> **"Within the framework of my position as secretary general of the Fatah, I was responsible for everything that was done, such as the supply of money to cells, the purchase of weapons and the perpetration of terrorist attacks. There are many cells in the field, some of them organized under my command by way of a number of people such as Ahmed Barghouti [and] Nassar Aweis. In the field, there are also cells that were not organized by the Fatah and I did not have any connection with them."**

The Defendant did not deny his ability to influence terrorist cells that he helped with money and by the provision of weapons; when speaking about these cells he said (Interrogation Transcript Prosecution/98 (d) on page 32): "**If you buy them weapons, if you give them weapons, if you plan for them, you can influence them**." However the Defendant also added, "**Influence, you cannot control**." (*op. cit.*, on page 37).

62. During the course of his interrogation, the Defendant said that when he made a strategic decision to carry out terrorist attacks against Israel in order to oppose the occupation, he established cells and supplied them, indirectly, with money, weapons and explosives for the purpose of carrying out terrorist attacks. He noted that the terrorist attacks were led by mainly by Abu Hamid, Ahmed Barghouti, and Aweis (Transcript Prosecution/35 Section 1, that was submitted and verified by an interrogator by the name of Danny, on page 90). From his perspective, the people who handled the military operations in the Ramallah area were Ahmed Barghouti and Abu Hamid, who operated several cells (Transcript Prosecution/27, Section 2) that was submitted and verified by an interrogator by the name of Smith, on page 85).

[Stamp] Gilmore 00774 [continued]

SHATSKY-009286-433

The Defendant confessed that he had supported Ahmed Barghouti and had supplied him with money and that he knew that he was responsible for the perpetration of a variety of terrorist attacks (Transcript Prosecution/98 (h) on pages 20 – 24). In addition, the Defendant confessed that he had encouraged Ra'ed Karmi to carry out "operations against the occupation," and assisted him financially, while requests for assistance were transferred to Arafat, who approved them (Transcript Prosecution/67 Section 8, that was submitted and verified by an interrogator by the name of "Emile", on page 54). By contrast, during the course of his police interrogation, the Defendant denied any connection to Ra'ed Karmi (Prosecution/104, on page 8) and at the beginning of his Israel Security Agency interrogation claimed that he transferred money to him without knowing for what purpose it was intended (Transcript, Prosecution/18 Section 5 that was submitted and verified by an interrogator by the name of "Nadav", on page 78).

63. The Defendant's connections with terrorism operatives of the Fatah and the regular assistance that he provided for them emerge clearly from the documents that were seized by the Israel Defense Forces from the offices of the organizations including the office of the Defendant during Operation Protective Shield (Binder Prosecution/5).

The Prosecution submitted an Expert Opinion by an expert from the Division of Identification and Forensic Science (DIFS) of the Israel Police, stating that the Defendant had signed some of the documents and from others it is possible to draw the necessary conclusions from the very fact that they were sent to the Defendant and were found in his office. Major L., the deputy commander of the unit that deals with the collection of captured documents, testified about the capture of the documents, their marking and the manner in which they were sorted (on pages 46 – 48). The captured documents were transferred to a Israel Security Agency interrogator by the name of "Ogen" (see his testimony on page 48). During his testimony, he identified the documents that were appended to the transcript from the interrogation of the Defendant (on pages 48 – 50). In the conversation between the Defendant and Ahmed Barghouti, which was recorded without their knowledge, the Defendant said that this referred to documents that had been seized in his office and the two were very concerned about the fact that the Defendant's "entire archive" had been seized. The Defendant said, "**the entire archive of the office [is] here**" (Prosecution/127 (c), on pages 61 – 62).

The Expert Opinion of the DIFS with respect to the Defendant's handwriting (Prosecution/5) was rendered by Yair Ben Shemesh and is based on three samples of his handwriting that the Defendant confirmed during the course of his interrogation as being written in his hand (the three documents in Prosecution/5 are 94 – 96, 112 and 35, which the Defendant related to in Transcript Prosecution/28, Prosecution/28 (b), Prosecution/47,

[Stamp] Gilmore 00775

SHATSKY-009286-433

Prosecution/85, and Prosecution/85 (a) that were submitted and verified by the Israel Security Agency interrogators "Wadi", on page 96 and "Ofir", on page 37). The interrogator from the DIFS divided the documents into four categories: those with respect to which there is no real doubt were written by the Defendant, those that might reasonably have been written by the Defendant, those that very likely were written by him, and those that the Defendant identified during the course of his interrogation as having been written by him. During the course of his police interrogation, the Defendant denied that his handwriting appeared on any of the documents that he had been shown (Prosecution/108-109).

64. Document Prosecution/5 (3-5) is a report that was sent to the Defendant on May 8, 2001, and which reviews the operations of the Al Aqsa Martyrs Brigades in the Jenin area. This report includes the number of people in the Al Aqsa Martyrs Brigades, their division into Brigades, details of their activities and the results of the terrorist attacks that they had perpetrated.

The activities listed in this document include shooting terrorist attacks on roads in Judea and Samaria, killing and injuring settlers, and terrorist attacks within Israeli territory (Uhm al-Fahm) in which an Israeli officer was killed and a civilian was injured. In addition, it includes a letter that requested financial assistance for the Brigades.

**(2)** **The Defendant's personal involvement in the terrorist attacks that have been carried out by the cells under his command**

65. Immediately subsequent to his arrest, the Defendant claimed that he was a "political person" who is not involved in military operations or in the perpetration, planning, funding or guidance of terrorist attacks against security forces or against Israelis (Transcript Prosecution/6 Section 3 and Prosecution/9 Section 2 that were submitted and verified by an interrogator by the name of "Robert", on page 62; Transcript Prosecution/14 Section 4 that was submitted and verified by an interrogator by the name of "Gabi", on page 93). However, as his Israel Security Agency interrogation continued, the Defendant admitted to deep involvement in "military" operations, which is a euphemism for the perpetration of murderous terrorist attacks against Israeli civilians. In certain instances, it can be understood from the Defendant's statements, he even issued specific orders for the perpetration of terrorist attacks or gave his

[Stamp] Gilmore 00775 [continued]

55

SHATSKY-009286-433

advance approval for their perpetration.

The Defendant claimed during the course of his interrogation that he himself never planned the details of a terrorist attack and that the cells would involve Ahmed Barghouti and not himself in carrying out terrorist attacks and he did not always agree with them (Transcript Prosecution/72 Section 3 that was submitted and verified by an interrogator by the name of "Danny", on page 90). Thus, for example, the Defendant emphasized that he rejected all of Ahmed Barghouti's attempts introduce him to people who would perpetrate suicide terrorist attacks (Transcript Prosecution/53 Sections 11 – 13 that was submitted and verified by an interrogator by the name of "Mofaz", on page 58). In spite of this, the Defendant confessed that "**there is collective responsibility for the activity of Fatah's military members**" (Transcript Prosecution/21 Section 14, which was submitted and verified by an interrogator by the name of "Robert", on page 63). The Defendant said during the course of his interrogation: "**I did not issue orders to any cells** [that said] **'hey we've come, and hey we want to carry out a certain terrorist attack in a particular place, this we are leaving for it and for its atmosphere, and personal desire…**" (Transcript of Conversation Prosecution/98 (k) on page 9).

According to the Defendant, after Ra'ed Karmi was killed in January 2001, the terrorist attacks were brought into Israeli territory. He tried to use his influence over the cells that followed his orders in order to moderate the terrorist attacks within Israel, but he was not always able to do so (Transcript Prosecution/70 Section 17 (g) that was submitted and verified by an interrogator by the name of "Steve", on page 53). An example of this is the case of Mansour Shrim, who was responsible for the suicide terrorist attack in Hadera in revenge for the killing of Karmi.

The Defendant discussed this with Aweis and Mansour after the attack and reported it to Arafat (Transcript Prosecution/45 Sections 6 – 11 that was submitted and verified by an interrogator by the name of "Wadi", on page 96). It should be noted that Mansour Shrim was Ra'ed Karmi's replacement, and this appointment was approved by the Defendant (see the comments by Ahmed Barghouti in his Statement Prosecution/165 (m) on page 5).

During the course of his interrogation, the Defendant said that in general he heard about the terrorist attacks after they were perpetrated, from either Aweis or Ahmed Barghouti, and that he would not go into details about how exactly the terrorist attack was carried out and by which cell; during the course of his interrogation, he listed the terrorist attacks about which he received reports after they were perpetrated (Transcript Prosecution/70 Sections 9, 12, 17 that was submitted and verified by an interrogator by the name of "Steve", on

[Stamp] Gilmore 00776

SHATSKY-009286-433

page 53; and Transcript Prosecution/39 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on page 96). However, throughout the course of his entire interrogation, the Defendant emphasized that with one exception he had not been personally involved in taking public responsibility for terrorist attacks that have been carried out by the Al Aqsa Martyrs Brigades. The person who issued the public statements subsequent to attacks was Aweis, in coordination with Ahmed Barghouti. Beyond this, Ahmed Barghouti served as an extension of the long arm of the Defendant, but the Defendant himself added to the above mentioned comment and said: "**I provide coverage for this issue. Politically in the media… I talk about the issue… I call for a struggle, I appraise the terrorist attacks as part of the struggle etc**…" (Transcript of Conversation Prosecution/98 (m) pages 40 – 46). In other words, the Defendant would take responsibility for the terrorist attacks through the media in an indirect and general manner without relating to a specific terrorist attack, while his subordinates would take specific responsibility for each individual attack.

What is clear from the Defendant's words is that the terrorist cell commanders considered him their leader and he supported them and assisted them by supplying weapons and explosives for the duration of their activity, although he knew that they were perpetrating murderous terrorist attacks against military and civilian targets in the Judea and Samaria region as well as within Israel, including suicide terrorist attacks, which the Defendant claims displeased him. When the Defendant continued supporting these operatives and assisting them after they reported the terrorist attacks to him, even when these were suicide terrorist attacks within Israel, the Defendant thereby expressed his support for their continued activity, including the activity that he supposedly did not support.

During the course of his interrogation, the Defendant himself said that Yasser Arafat reprimanded him for the terrorist attacks that have been carried out within Israel (Transcript Prosecution/141 Section 10, which was submitted and verified by an interrogator by the name of "Robert", on page 58); from this it follows that Arafat also considered the Defendant responsible for all of the terrorist attacks that have been carried out by the Tanzim and Al Aqsa Martyrs Brigades cells that were under the command of the Defendant.

[Stamp] Gilmore 00776 [continued]

57

SHATSKY-009286-433

The Defendant gave his approval, if only after the fact, to the terrorist attacks that have been carried out by the cells that accepted his authority: some he supported explicitly and some he supported by his behavior or with his silent agreement. He operated the cells under his command in an indirect manner through his subordinates and close associates such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis, while keeping his distance from the people who actually perpetrated the attacks and intentionally avoiding getting himself personally involved with the planning and perpetration of the terrorist attacks. Even taking responsibility for the terrorist attacks was done by the Defendant in a "clean," indirect manner, not by way of a public statement issued by the Al Aqsa Martyrs Brigades, but rather in a political – as it were – implied manner in the media.

66. From everything that has been set forth above, it becomes apparent that the Defendant confessed during the course of his interrogation to the things that also emerge from the testimony of the terrorist operatives, meaning that from a command perspective, he was responsible for the operations of the Tanzim and of the Al Aqsa Martyrs Brigade in the West Bank, which considered him their leader; he assisted terrorism operatives by providing money, weapons and explosives in order to carry out terrorist attacks; he personally led some of the terrorism cells, through his close associates; he encouraged the terrorist cells to carry out terrorist attacks against Israel; he received reports from the cells subsequent to the perpetration of terrorist – all of this while knowing that these cells were perpetrating murderous and suicidal terrorist attacks both within Israel and against civilians.

Furthermore: during the course of his interrogation, the Defendant even confessed to **personal** involvement in specific murderous terrorist attacks of the cells that he led, as follows:

### (aa) Terrorist attack at the gas station in Givat Ze'ev

After the killing of Ra'ed Karmi on January 14, 2002, the Defendant, speaking on Abu Dhabi television, called on the Al Aqsa Martyrs Brigades to perpetrate revenge attacks against Israel (Prosecution/3 from January 14, 2002); however, the Defendant was not satisfied with this public statement. He instructed Ahmed Barghouti to bring to fruition a terrorist attack avenging Karmi. Indeed, in the evening of January 15, 2002, Ahmed Barghouti gave a weapon to Abu Satha for the purpose of perpetrating the above mentioned terrorist attack. On the evening of that day, members of Abu Satha's cell fired at the car of Yoela Chen, of blessed memory, near Givat Ze'ev, murdered her and injured the passenger who was with her (on this terrorist attack, see Chapter E (7), below).

[Stamp] Gilmore 00777

58

The Defendant confessed during the course of his interrogation that after the death of Karmi, he told Ahmed Barghouti that he was interested in a revenge terrorist attack, and that Ahmed and his comrades perpetrated the terrorist attack in Givat Ze'ev and reported to him later that one person was killed in the terrorist attack (Transcript Prosecution/98 (k), on pages 44 – 45). He even confessed that this terrorist attack was carried out in accordance with his orders and took responsibility for its perpetration (Transcript Prosecution/23 Sections 8 – 10, which was submitted and verified by an interrogator by the name of "Danny", on page 90; Transcript Prosecution/24 Section 5 and the introduction to Transcript Prosecution/38 that were submitted and verified by an interrogator by the name of "Smith", on page 85; Transcript Prosecution/26 Sections 3 – 6, which was submitted and verified by an interrogator by the name of "Nadav", on page 79). The Defendant said, "**I said in the mourners' tent, that we need to avenge and respond to an event like this**… ", although he claimed that he did not "command" Ahmed Barghouti. During one of his interrogations, the Defendant confessed, "**We said to Ahmed something like implement a terrorist attack**" (Conversation Transcript Prosecution/98 (g) on page 19 and also on pages 20 – 45).

The Defendant explained that the targeted assassination of Karmi led him to lose control of Fatah, and therefore he "**called for a response to the targeted assassination of Ra'ed Karmi in all media outlets… and responses did begin. For the first time Fatah crossed the red line and carried out terrorist attacks within Israel**" (Transcript of Interrogation Prosecution/98 (j) on pages 30-31 and Prosecution/98 (k) on pages 9-

[Stamp] Gilmore 00777 [continued]

SHATSKY-009286-433

10, 12-15, 44-45). He noted during the course of his interrogation that the instruction that was given to perpetrate terrorist attack in a revenge for the killing of Ra'ed Karmi followed from his feeling of responsibility for the death of Karmi during a cease-fire, when the Defendant had called on all of the factions to stop the terrorist attacks because of the commitment given by the head of the Israel Security Agency that there would not be any targeted assassinations against leaders of Fatah; this was the only time when he went against Arafat who, at the time, asked that there be no terrorist attacks (Transcript Prosecution/31 Section 12, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58; Conversation Transcript Prosecution/98 (j) on pages 29 – 31; Conversation Transcript Prosecution/98 (k) on pages 11 – 13).

This confession of the Defendant correlates with statements made by Ahmed Barghouti during the course of his interrogation (see Section 30, above) and also with things said by Abu Satha (statement Prosecution/156 (b) on page 5) and Masafur (see Section 53 above).

### (bb) Murder of the Greek Orthodox monk in Ma'ale Adumim

The Defendant confirmed that when Radaida proposed perpetrating a suicide terrorist attack, he referred him to Muhaned so that he could direct him towards the type of terrorist attacks that Fatah cells perpetrated. The result of this was the terrorist attack in Ma'ale Adumim in which the Greek Orthodox monk was murdered because it was thought he was a Jew (see statements by Radaida in Sections 42 – 43 above and Chapter E (3) below that deals with this terrorist attack).

### (cc) Terrorist attack on the restaurant Seafood Market in Tel Aviv

During the course of his interrogation, the Defendant clearly connected himself to the terrorist attack at the restaurant Seafood Market in Tel Aviv, in which three people were murdered (on this terrorist attack see Chapter E (12) below). Although at the beginning of his Israel Security Agency interrogation, the Defendant claimed that he did not have any connection to this terrorist attack, which Aweis was behind, and that Arafat was very angry about the perpetration of this terrorist attack (Transcript Prosecution/25 Section 12-13, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58). However, as his interrogation continued, the Defendant admitted that he knew about the intention to perpetrate this terrorist attack from his close associate Ahmed Barghouti, who was one of the people who planned the terrorist attack, and this was approximately one week **before** it was carried out ; Ahmed informed the Defendant that Ibrahim Hasouna – the terrorist – was ready to perpetrate a terrorist attack. The Defendant emphasized that he was not the one who supervised the perpetration of the terrorist attack and that he had instructed Ahmed Barghouti to perpetrate the attack in Judea and Samaria,

[Stamp] Gilmore 00778

SHATSKY-009286-433

in a settlement or at a military roadblock, and not within Israel (Transcript Prosecution/44 Sections 3-7 and Prosecution/53 Section 3, which were submitted and verified by an interrogator by the name of "Mofaz", on page 58; Transcript Prosecution/50 Section 1, which was submitted and verified by an interrogator by the name of "Wadi", on page 96; Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith" on page 85).

These statements by the Defendant correlate with the version that Ahmed Barghouti gave during the course of his interrogation, aside from the fact that the latter said during the course of his interrogation that he reported to the Defendant not a short time before the terrorist attack but rather when the terrorist was already on his way, and that the Defendant was involved in wording the announcement taking responsibility after the terrorist attack was carried out (see Section 29 above). The Defendant, in contrast, said that he was not involved in wording the announcement taking responsibility for this terrorist attack although he did admit to giving his approval to the announcement taking responsibility for another terrorist attack that was carried out on the Atara Bridge (Terrorist Attack No. 18 in the appendix to the Indictment) (Transcript Prosecution/52 as referenced above and Transcript Prosecution/58 Section 3, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58).

**In conclusion**: Despite what emerges from the words of Ahmed Barghouti, the Defendant admitted that he gave advance approval for perpetrating this particular terrorist attack, even if the orders were to kill other people in a different place.

### (dd) Attempted terrorist attack near the Malha Mall in Jerusalem

During his interrogation, the Defendant said that he granted assistance, by means of Ahmed Barghouti, to the terrorism operatives who perpetrated attacks in the Hebron area. One day, Ahmed Barghouti reported that one of these operatives (Jihad Jawara) was planning a suicide terrorist attack in Jerusalem. The Defendant said that he issued orders, by means of Ahmed Barghouti, that the terrorist attack should be in the Occupied Territories and not within Israel (for more on this terrorist attack, see Chapter E (20) below). The next day, he received a report that the suicide terrorist attack

[Stamp] Gilmore 00778 [continued]

SHATSKY-009286-433

near the Malha Mall in Jerusalem had failed (Transcript Prosecution/36, which was submitted and verified by an interrogator by the name of "Smith", on page 85). In this case, too, the Defendant approved the terrorist attack against Israel, although in a different location.

**(3)   Provision of funds, weapons and explosives for carrying out terrorist attacks**

67.   At the beginning of his Israel Security Agency interrogation, the Defendant claimed that he was not involved in terrorism and that he never given anyone weapons and had not shot a gun (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on page 90). However, later in the interrogation the Defendent did admit that he had been responsible for giving money, weapons and explosives to the field cells belonging to the Tanzim and Al Aqsa Martyrs Brigades and that he knew that they were using them for terrorist attacks against Israel.

As the Defendant said, "**As part of my position as Secretary General of the Fatah, I was responsible for everything that was done, including supplying money to cells, purchasing weapons and carrying out terrorist attacks.**" (See the quote in Transcript Prosecution/29 Section 61 as mentioned above, and also Transcript Prosecution/59 Section 7, which was submitted and verified by an interrogator by the name of "Wadi", on page 96).

The Defendant explained that he would transmit cells' requests for the purchase of weapons to Yasser Arafat under the heading "Personal Assistance" or "Financial Assistance" (Transcripts Prosecution/22 Section 6 and Prosecution/25 Section 14 that were submitted and verified by an interrogator by the name of "Mofaz", on page 58). The Defendant also admitted that by purchasing weapons for cells, he acquired influence over their activities (see Section 61, above). In addition, the Defendant admitted that he gave financial assistance to Ahmed Barghoui and Ra'ed Karmi and supported them so they could perpetrate terrorist attacks (see Section 62 above).

Document Prosecution/5 (70 – 73) that was seized during Operation "Protective Shield" is a letter dated January 20, 2002, from Ra'ed Karmi to the Defendant, in which Karmi requests assistance for a list of operatives, including those who were involved in terrorists attacks in accordance with evidence presented in this case; the Defendant directed the request to Yasser Arafat in his own handwriting (in accordance with the Opinion of DIFS Prosecution/5). Another seized letter is Prosecution/5 (104) in which a wanted man named Salah Abu Hanish wrote to the Defendant asking that he return his weapons that had been confiscated; the Defendant's handwriting appears on the document (Opinion of DIFS Prosecution/5). In Letter Prosecution/5 (103), a group of operatives approach the

[Stamp] Gilmore 00779

62

SHATSKY-009286-433

Defendant with a request to purchase weapons and note that they have perpetrated many attacks against the army and settlers and have become wanted; the Defendant's handwriting is also found on this document (in accordance with the Opinion of DIFS Prosecution/5).

68. The Defendant explained during the course of his interrogation that the cells, and individual cell members, would approach him to ask for money to finance the purchase of weapons and for other reasons, and he would submit their requests to Yasser Arafat (Transcript Prosecution/19 Section 14, Transcript Prosecution/22 Section 6 and Transcript Prosecution/25 Sections 14, 19, which were submitted and verified by an interrogator by the name of "Mofaz", on page 58; Transcript Prosecution/70 Section 10, which was submitted and verified by an interrogator by the name of "Steve", on page 53; transcripts of the Defendant's interrogation: Prosecution/98 (d) on pages 13 – 16, 20 – 21; Prosecution/98 (k) on pages 7, 17 – 18, 30; and Prosecution/90 8 (j) on pages 13 – 14). He said that his requests to Arafat would not specify that the money was intended for the purchase of weapons (Transcript Prosecution/30 Section 6, which was submitted and verified by an interrogator by the name of "Emile", on page 54). In context of this activity, approximately 15 weapons and ammunition for them were purchased and used for terrorist attacks (Transcript Prosecution/29 Section E, which was submitted and verified by an interrogator by the name of "Smith", on page 85; Transcript Prosecution/60 Section 5, which was submitted and verified by an interrogator by the name of "Emile", on page 54).

The Defendant emphasized that the military operations could not have taken place without financing from Arafat (Prosecution/60, as mentioned above, Section 7). He explained the issue: "**There is someone who comes and says 'I want a thousand shekels', he might receive a thousand shekels. I do not ask him, maybe next week he will go shoot, I do not care**" (Prosecutions/98 (k) on page 30). During the course of his interrogation, the Defendant could not remember the details of the financial assistance that he gave to Fatah field operatives and explained that hundreds of operatives would approach him with requests for financial assistance in order to fund military activities (Transcript Prosecution/49 Section 10, which was submitted and verified by an interrogator by the name of Emile on page 54).

69. Within the framework of purchasing weapons for terrorism operatives, the Defendant agreed to purchase a mortar for the price of 1,500 dinar, and the Defendant described the operational problems involved in its operation during the course of his interrogation (Transcript Prosecution/29 Section F and Transcript Prosecution/38 Section 2, which were submitted and verified by an interrogator by the name of "Smith", on page 85; Transcript Prosecution/42 Sections 13-15, which were submitted and verified by an interrogator by the name of "Wadi", on page 96; Transcript of the interrogation of the Defendant Prosecution/98 (k) on pages 7-8). The Defendant said

[Stamp] Gilmore 00779 [continued]

63

SHATSKY-009286-433

during interrogation that he himself opposed firing mortars at Israel because it had been proven that this does not cause damage to Israelis but could cause significant damage to the Palestinians (Transcript Prosecution/38 as mentioned above). The Defendant's version corresponds with that given by Abu Hamid, who explained that the mortar was fired at the settlement Psagot but the Defendant asked him not to talk about it with anyone (see Section 25 above).

**(4)** **Assistance for wanted men and the families of the people arrested or killed**

70. The Defendant financed not only terrorism operatives but also members of their families. He admitted during interrogation that he submitted to Yasser Arafat requests for assistance to families of suicides, and even justified this by saying that there is no difference between someone who perpetrated a suicide attack and someone who was killed; in his eyes they were all "martyrs", meaning they had died a holy death (Transcript Prosecution/10 that was submitted and verified by an interrogator by the name of "Danny", on page 90; Transcript Prosecution/54 Section 5, which was submitted and verified by an interrogator by the name of "Wadi", on page 96; Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pages 7, 22 – 23). Similarly, the Defendant took care to finance families of Fatah operatives who had been arrested or were wanted (Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pages 22 – 23).

Several documents related to this subject were seized during Operation "Protective Shield", which are requests for assistance that wanted men address to the Defendant, asking to purchase weapons or explosives, and in order to relieve them of the necessity of earning a living (see: Prosecution/5 (2 – 12), which the Defendant verified during the course of his interrogation and that was documented in Transcript Prosecution/47 that was submitted and verified by an interrogator by the name of "Wadi", on page 96; Prosecution/5 (64 – 65); Prosecution/5 (87); Prosecution/5 (105); Prosecution/5 (117); Prosecution/5 (118)). Correspondingly, the Defendant took the trouble to arrange for job appointments or work places for wanted men (see, for example, the Letters Prosecution/5 (78 – 79), which, in accordance with the Expert Opinion of DIFS Prosecution/5 is very likely to have been written by the Defendant).

An additional document is Prosecution/5 (133), which includes a request to the Defendant for assistance to members of the Fatah movement who carried out terrorist attacks and were arrested by Israel, and for other wanted men; the Defendant noted on this document: "**It is a priority to include them in the assistance**" and in accordance with the Expert Opinion of DIFS Prosecution/5 this comment was, leaving no reasonable doubt, written by the Defendant.

[Stamp] Gilmore 00780

64

Imad al-Shakir was a Tanzim operative who murdered in an Israeli in Salfit and when he became a wanted man, he asked the Defendant for assistance and even told him about the murder he had perpetrated. He explained in his testimony that he approached the Defendant because the Defendant was known as a person who would help in cases like his but he also described the Defendant as "**a political person who did not participate in military affairs**" (on pages 182 – 184).

**(5)** **Recruiting and training operatives for terrorist organizations**

71. During his Israel Security Agency interrogation, the Defendant confirmed the points that Abu Hamid told the Police regarding the financial assistance that the Defendant gave for constructing a military training camp for Tanzim operatives, in order to train them in guerrilla warfare and in the use of weapons (Statement of Abu Hamid Prosecution/149 (c) on pages 1 – 2). The Defendant even confirmed that he personally interviewed the young people who were training in his office (Transcript Prosecution/28 Sections 10 – 11, which was submitted and verified by an interrogator by the name of "Wadi", on page 96; Transcript Prosecution/34 Section 3, which was submitted and verified by an interrogator by the name of "Itai", on page 52; and Transcript of the Defendant's interrogation Prosecution/98 (k), on page 9). In his police interrogation, the Defendant denied any connection to the training or instruction of field operatives (Prosecution/106 on page 3).

In his above mentioned statement (on pages 6-7), Abu Hamid told how the Defendant appointed Muhaned as the cell commander after the death of the previous commander. During the course of his interrogation, the Defendant also confirmed the statements that Radaida told the Police with respect to the process by which he was recruited by means of the Defendant's involvement (see Section 43 above). From the comments of the Defendant and Radaida, it becomes apparent that the Defendant heard from Radaida that he intended to perpetrate a shooting terrorist attack and, therefore, referred him to Muhaned, who was a senior field commander and had carried out terrorist attacks against Israeli targets. The terrorist attack in which the Greek Orthodox monk was murdered a result of this contact.

[Stamp] Gilmore 00780 [continued]

SHATSKY-009286-433

**(6)** **The Defendant's public calls to carry out terrorist attacks against Israel**

72.  As already explained above, the Defendant did not deny, during the course of his interrogation, his support for terrorist attacks against military and civilian targets in the West Bank, meaning soldiers and settlers (see Sections 13 – 16 above). The Defendant also explained that he would sometimes instruct the cells that accepted his authority to stop the terrorist attacks and would then inform them to resume them anew, using public television broadcasts (see Section 16 above). The Defendant was aware of the influence his words had on people carrying out terrorist attacks and said, "**I have influence because I speak through the media. That is to say that I state the position using media outlets**… **My word is heard as if I were speaking in the name of the Fatah movement**." (Transcript of interrogation Prosecution/98 (d) on page 33; see also pages 37-39). The Defendant did not deny that cell members would turn to him to ask for assistance because he appeared as a spokesman for Fatah in the media and took a position calling for an armed struggle (Transcript of interrogation Prosecution/98 (e) on page 61). He admitted that during his public appearances he would encourage the operatives to carry out terrorist attacks within the territories against the army (Transcript of Investigation Prosecution/98 (j) on page 25, and Transcript Prosecution/29 Section 1 (b), which was submitted and verified by an interrogator by the name of Smith, on page 85.)

73.  The Defendant's public calls for the perpetration of terrorist attacks against Israel were documented by the Intelligence Branch and were submitted in Binder Prosecution/3 (including the original cassettes, Prosecution/3 (a) – (b)) by the head of the Research Division of the Intelligence Branch, Brigadier General Y. Cooperwasser (on page 38). With respect to this issue, the documents that have been included in Binder Prosecution/3, which do not document the words that the Defendant himself said on radio and television and were recorded, are to be ignored. Newspaper articles or other news items that attribute statements of one type or another to the Defendant are not admissible in accordance with the Rules of Evidence, due to the fact that their testimony is considered to constitute hearsay.

[Stamp] Gilmore 00781 [continued]

SHATSKY-009286-433

In general, based on statements that were made by the Defendant in the various media outlets, it can be said that he clearly emerges as someone speaking in the name of the Al Aqsa Martyrs Brigades and the Tanzim, and as their leader. The Defendant calls in these organizations – sometimes clearly and sometimes by inference – for the continuation of the perpetration of terrorist attacks against Israel. After each Israeli action, he announced on behalf of the Fatah movement and the Al Aqsa Martyrs Brigades that revenge would not be slow to follow (see, for example, the interviews on Abu Dhabi television on January 14, 2002, and August 15, 2001). Despite the Defendant's claims that he opposed terrorist attacks within Israel, in several interviews he is heard supporting terrorist attacks that have been carried out within Israel and even praised the perpetrators (see justification of the terrorist attack in Netanya in the television interview with Al Jazeera on May 18, 2001; justification for the terrorist attack in Jerusalem on Al Jazeera television on August 9, 2001; and an additional attack in Jerusalem that the Defendant justified on Watan Television on October 31, 2002.)

74. During the funeral of Emad Elanati on October 2, 2000, the Defendant said on Watan Television Ramallah, "**The days in which we just offer sacrifices are over. We must seek revenge. Israelis should be killed. Israelis should be killed. Yes. We have bullets. We have rifles and they are aimed at the occupation**."

In a telephone interview with the newspaper Asharq al-Awasat on March 1, 2001, the Defendant was asked if Palestinian resistance might evolve from rocks to weapons, and he answered, "**The armed struggle is a part of the *intifada* already and it is not limited to rocks. Since the *intifada* began, we have succeeded in killing 66 of them and injuring 416, and this is a good outcome**."

On October 29, 2001, the Defendant was interviewed on Watan Television Ramallah and he was asked his reaction to the two terrorist attacks that had been perpetrated that day in Hadera and in Baka al-Gharbiya, and he answered: "**It is the right of Palestinian people, and in essence an obligation of its fighters, to respond to aggression and to avenge the slaughter that has taken place in Beit Rima, Bethlehem and Tulkarm. Therefore, what happened today is a natural response of Palestinian fighters to Israeli acts of slaughter**."

On March 4, 2002, the Defendant was interviewed for the al-Zamam newspaper, which is published in London, and in accordance with reporter Nitzal Alliyati, the Defendant said

SHATSKY-009286-433

that the two suicide terrorist attacks (in Beit Yisrael and Ofra) were "**Messages addressed to the Israelis that they should cease their support for Sharon.**"

After the death of Ra'ed Karmi on January 14, 2002, the Defendant spoke on Abu Dhabi television and called on the Al Aqsa Martyrs Brigades to carry out terrorist attacks against Israelis in revenge, (Prosecution/3 – dated January 14, 2002). The Defendant admitted this during the course of his interrogation (Transcript of Conversation Prosecution/98 (g) on page 78).

On May 19, 2001, Watan Television Ramallah broadcast a procession that was led by the Defendant and a senior official from Hamas. During the procession, the Defendant spoke to the crowd using a loudspeaker and praised those people who had been killed during the course of the *intifada*, including the perpetrator of the terrorist attack in Netanya. In addition, the Defendant promised to continue terrorist attacks against the settlers and praised those perpetrating suicide attacks against settlers.

[Stamp] Gilmore 00782

68

SHATSKY-009286-433

### E. The Connection of the Defendant to the Terrorist Attacks That Are the Subject of the Indictment

75. In the Indictment, the Defendant is charged with involvement in 37 terrorist attacks that were set forth in the appendix to the Indictment, and which were perpetrated by field commanders and terrorism operatives who were subordinate to the Defendant.

In its summation, the Prosecution attributed to the Defendant only 21 terrorist attacks from the list that had been appended to the Indictment, and therefore this verdict will relate only to those 21 terrorist attacks for which, in accordance with the Prosecution's claims, evidence was presented that connects the Defendant to the perpetration of the attacks. Discussion of these terrorist attacks will include the evidence that was submitted with respect to the events of the terrorist attack itself, who planned and perpetrated it, and what the Defendant's relationship was to the terrorist attack or its planners or its perpetrators.

### (1) Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra

76. On December 31, 2000, at 6:30 a.m., shots were fired from an ambush on the car of the couple, Talia and Binyamin Kahane, of blessed memory, and their five children, on Route No. 60 near the settlement Ofra. As a result of the shots, the car rolled into a ditch alongside the road. The Kahane couple were murdered in this terrorist attack (Death Certificate Prosecution/128 (a)-(b)) and their five children were injured (See the Action Report of Eli Kojman and Superintendent Ofer Chelouche Prosecution/128 (c)-(d), Photograph Boards Prosecution/128 (h)-(i) that were submitted by Kojman and Chelouche during their testimony, on pages 121, 127; and the Statement of a Public Employee given by Superintendent Ovadya Prosecution/128 (e)). The interrogation conducted by DIFS found, on the basis of the bullet shells from a Kalashnikov rifle that were collected at the scene, that the weapon used in this terrorist attack was also used in terrorist attack No. 6 on the list appended to the Indictment, in which Eliahu Cohen, of blessed memory, was murdered near Givat Ze'ev (Expert Opinion of Howard Silverwater Prosecution/128 (f)-(g)).

77. In his police interrogation, Abu Hamid intimated that he was the one who supplied the weapon and ammunition to the terrorist who murdered the Kahane couple, of blessed memory, Ahmed Gandor (Statement by Abu Hamid Prosecution/149 (a) on pages 4-6, which was collected by staff Sergeant Major Ibrahim Elkura'an, on the basis his testimony on page 194). In the statement, Abu Hamid said that Gandor asked him for a weapon (Kalashnikov) and ammunition in order to perpetrate a terrorist shooting attack on an Israeli vehicle near Ramallah and the next day the murder of the Kahane couple, of blessed memory was reported to him, as he learned from the report on the radio.

[Stamp] Gilmore 00783

69

SHATSKY-009286-433

In this case we are permitted to consider only the testimony of Abu Hamid and commanded to ignore the things that Gandor told him about the manner in which the terrorist attack was carried out , because this is hearsay evidence. Consequently, this Court does not have admissible evidence showing that this murder was committed using the weapon that Abu Hamid gave to Gandor. Therefore, we do not have any evidence connecting the Defendant to the murder of the Kahane couple, of blessed memory (the Defendant said during the course of his interrogation that he was acquainted with Gandor, who was killed by an accidentally discharged bullet – Transcript Prosecution/68 Section 2). Indeed, a large quantity of evidence was submitted with respect to the Defendant's comprehensive and supreme responsibility for the terrorist attacks perpetrated by members of Fatah on the West Bank, as the person who led this activity, who called for its perpetration and who assisted its actualization by supplying money, weapons and explosives. However, there is no admissible evidence that this particular terrorist attack was indeed perpetrated by members of the Fatah.

The only admissible evidence in this matter is that the Defendant assisted Abu Hamid to purchase weapons and ammunition for the purpose of carrying out terrorist attacks, as Abu Hamid and the Defendant admitted during interrogation (see Chapter C (2) above) and that Abu Hamid did indeed give a weapon that he purchased with the assistance the Defendant to Gandor for the purpose of perpetrating a terrorist attack. Beyond this, we have no evidence.

**(2)** **Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area**

78. On January 25, 2001, at 6:25 p.m., shots were fired from an ambush at the vehicle of Elazar Akiva Pashkos, of blessed memory, in the Atarot industrial area. The deceased was traveling in a GMC van and was shot with a 9 mm caliber pistol (see DIFS Opinion Prosecution/129 (c)). As a result of this shooting, the deceased died (Death Certificate Prosecution/129 (a)) and was found lifeless in his van approximately one minute after the shooting (See the testimony of Herman Sapek on page 150, report of Superintendent Leor Nadivi, Prosecution/129 (b), and his testimony on page 132). The event is also depicted by pictures photographed by Avinoam Alia that are appended

[Stamp] Gilmore 00783 [continued]

SHATSKY-009286-433

to the public documents that were submitted (Prosecution/129 (d)).

79. Ahmed Barghouti admitted during interrogation that he gave Abu Satha and another person a vehicle in order to perpetrate a terrorist attack, and after several hours, the two reported to him that they had shot a Jew traveling in a GMC in the Atarot area, who was injured by the shots (Statement Prosecution/165 (a) on page 3, which was submitted by Staff Sergeant Major David Mizrahi on page 184.)

Abu Satha admitted that he perpetrated a terrorist attack in the Atarot industrial area and shot a pistol at the driver of a gray GMC Safari (as can be seen in the pictures Prosecution/129 (d) which were photographed after the terrorist attack) and later reported this to Ahmed Barghouti, who was, in accordance with Abu Satha, the Defendant's "**driver and right-hand man**" (Statement Prosecution/156 (b), which was submitted and verified by the police officer Marco Dahan, on page 198).

80. The Prosecution does not have any evidence that directly connects the Defendant to the above mentioned terrorist attack. However, a large quantity of general evidence has been presented showing that Ahmed Barghouti was the Defendant's close assistant and operated with his knowledge and under his sponsorship for organizing and carrying out terrorist attacks. The Defendant admitted that he financed terrorist attacks in which Ahmed Barghouti was involved, that he supported his activity and that Ahmed Barghouti would report to him after the terrorist attack was completed. The Defendant also admitted that from his perspective, Ahmed Barghouti was responsible for the military operations in the Ramallah area and that he operated in coordination with Defendant. The Defendant explained during the course of his interrogation that his connection with the terrorist cells was through Ahmed Barghouti (see Chapter C (3) above).

Abu Satha was also close to the Defendant and during one period served as his bodyguard. The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and under his responsibility, through Ahmed Barghouti, and he knew that the two were carrying out terrorist attacks against civilians in the Jerusalem area (see Chapter see C (4) above).

The Defendant also said during interrogation that he considered himself responsible for the activities of the cells that worked with Ahmed Barghouti and Abu Satha – unlike other cells – because the two were close to him and he financed their activities (see Section 60 above). The Defendant also acknowledged that he acquired influence over the cells' activities through the assistance and weapons that he gave them (see Section 61 above).

[Stamp] Gilmore 00784

71

All this is in addition to the Defendant's overall responsibility as the commander and leader of all of the terrorism operatives of the Fatah on the West Bank, as he himself admitted (see Section 65 above) and in addition to the fact that the Defendant encouraged terrorism operatives, both publicly and individually, to carry out terrorist attacks.

The difficult legal question is whether this is enough to substantiate the Defendant's criminal responsibility for the act of murder that was committed in this case – when there is no evidence that ties him directly to the terrorist attack – will be considered in the Chapter of conclusions.

**(3)** **Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

81. On June 12, 2001, at 10:30 p.m., shots were fired from an ambush on the road between Jerusalem and Ma'ale Adumim, at the private car of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory. The car, a Peugot utility-type model, had Israeli license plates. Germanos, of blessed memory, was murdered by those shots (Certificate of Death Prosecution/132 (a) and Pathology Expert Opinion of Professor Hiss Prosecution/130 (b)). Superintendent Nissim Mizrahi (on page 131), who submitted the report of the preliminary visit to the scene and photographs (Prosecution/130 (c)-(d)), and Senior Staff Sergeant Major Avi Levi of DIFS, who submitted a Statement of a Public Employee (Prosecution/130 (f)) both testified on this terrorist attack. The bullet shells that were gathered at the scene were checked by the DIFS (see the expert opinion of Superintendent Avi Kaufman, Prosecution/130 (g)-(i)).

[Stamp] Gilmore 00784 [continued]

72

SHATSKY-009286-433

82. Radaida admitted during interrogation that he perpetrated the above mentioned terrorist attack and described the reasons for it. He said that he asked the Defendant about perpetrating a suicide terror attack. The Defendant referred him to Muhaned and instructed Muhaned to give a weapon to Radaida, and so he did. The Defendant also told Radaida that the Tanzim perpetrates terrorist attacks against the army and the settlers but not suicide terrorist attacks and that he had given him the weapon for this purpose. And indeed, the weapon (Kalashnikov) that Radaida received from Muhaned, in accordance with the Defendant's direct orders, was the one used to murder the monk Germanos, of blessed memory, as he described during the course of his interrogation, explaining that he erroneously thought that he was a settler (see Chapter C (8) above Sections 41-42).

83. The Defendant himself confirmed Radaida's words during the course of his interrogation and said that he had referred him to Muhaned after he asked to commit suicide, and later heard that he had erroneously killed a Greek monk (see Section 43 above). On the basis of all this, the direct personal responsibility of the Defendant to this terrorist attack is clear.

**(4)** **Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443**

84. On August 5, 2001, at 10:30 p.m., the couple Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory (Sharon's brother) were murdered while traveling together with their two children in a Passat model car with Israeli license plates, on Route 443 by the Dor Energy gas station (see Death Certificates and Pathology Opinion Prosecution/131 (a) – (c)).

The results of the terrorist attack were described by police officers Haim Toledano and Advanced Staff Sergeant Major Shaby Ovadya (on pages 123, 139 and their Action Report Prosecution/131 (d) – (e), accompanied by Photograph Board Prosecution/131 (f)). The bullets that were gathered at the site were sent to DIFS for study and it was found that they were fired from two weapons: an MP5 submachine gun and a Kalashnikov (Expert Opinion Prosecution/131 (f)).

[Stamp] Gilmore 00785

SHATSKY-009286-433

85. Ahmed Barghouti said during the course of his interrogation that he gave his MP5 rifle to Abu Satha after Abu Satha requested it for his cell, and a short time later, he heard from Abu Satha and also on the news that a member of his cell perpetrated a terrorist attack in which three Jews were killed near Beit Ghur (Statement Prosecution/165 (a) on page 2, which was submitted by Staff Sergeant Major Mizrahi, on page 184). Abu Satha also said during interrogation that he received the MP5 rifle and a full cartridge of bullets from Ahmed Barghouti and gave them to two members of his cell, Husam and Faris. The two told him that they perpetrated the terrorist attack near Beit Ghur in which three Israelis were killed (Statement Prosecution/156 (b) on page 3, which was submitted by an interrogator by the name of Dahan on page 198).

The terrorist who perpetrated the attack, Husam Shehade, confirmed during interrogation that he and another person perpetrated the terrorist attack near Beit Ghur on Route 443 by the Dor Energy gas station by firing at a white Passat car (see photographs). He noted that the shots were fired with an MP5 rifle that he received from Ahmed Barghouti and that his partner in the terrorist attack was armed with a Kalashnikov. On the following day, Shehade heard that three Israelis were killed as a result of the terrorist attack and reported this to Ahmed Barghouti, who passed a report on to the Defendant (Statement Prosecution/160 (a) on pages 4 – 5, which was submitted by Dahan on page 198). Shehade refused to answer questions during his testimony. Consequently, he was declared a hostile witness and his statements Prosecution/160 (a) – (c) were submitted together with the Indictment verdict and sentence in his case (Prosecution/159 (a) – (d)). During his testimony said only, "**I have said what I had to say and do not want to say anything else**" (on page 73). Shehade was convicted of perpetrating this terrorist attack.

86. No evidence was presented connecting the Defendant to this terrorist attack other than his indirect connection, in accordance with that which has been set forth above, in the cases of the terrorist attacks in which his close associates, Ahmed Barghouti and Abu Satha, were involved (see Section 80 above). The Defendant supplied money and weapons to the members of the cell, by way of Ahmed Barghouti, in order to carry out terrorist attacks and the weaponry used for this terrorist attack was supplied by Ahmed Barghouti.

The question of whether this is sufficient to substantiate the Defendant's criminal responsibility for the acts of murder which were perpetrated during this terrorist attack when there is no evidence connecting the Defendant directly to this terrorist attack, will be examined in the Chapter of conclusions.

**(5)** **Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem**

[Stamp] Gilmore 00785 [continued]

74

87. On September 15, 2001, at 9:15 p.m., shots were fired from an ambush on a vehicle traveling on Route No. 9 in Jerusalem, from French Hill towards Golda Meir Boulevard. The vehicle, a white Renault Express, was driven by Moshe Weiss, who testified that he was injured by a bullet that is lodged in his body – in his spine – to this day, and his cousin Meir Weissboiz, of blessed memory, was killed by the shots (on page 138, Death Certificate Prosecution/132 (b), Action Report of Superintendent Leor Nadivi Prosecution/132 (c) and the testimony of Nadivi on page 132, and also the Photograph Board Prosecution/132 (c)). Bullet shells were collected the scene and sent to DIFS for examination, which determined that they were apparently fired from a pistol and an MP5 submachine gun from which the fatal shots that killed the three people mentioned in incident No. 4, above, were fired (DIFS Expert Opinion Prosecution/132 (d)).

88. Husam Shehade said in his Statement Prosecution/160 (a) on page 6, that was collected by Advanced Staff Sergeant Major Mark Dahan (on page 198 of the transcript) that he received the pistol and the MP5 submachine gun from Ahmed Barghouti and traveled with two other people (Faris and Heitham) in the car until they reached Route No. 9 in the direction of Ramot and French Hill. When they saw the white utility vehicle, they began to fire at its passengers and fled to Ramallah. After the incident, Shehada asked Abu Satha, who worked in the office of the Defendant, to report to the Defendant and to Ahmed Barghouti about the shooting. The following day, he heard that one of the passengers who was injured by the shots had died of his wounds (see also Section 85 above, with respect to Shehade's testimony). Shehade's statements are supported by comments said by Ahmed Barghouti and Abu Satha in their interrogations (see Section 85 above).

89. The connection of the Defendant to this terrorist attack, like the attack in Section 4 above, which was also perpetrated by Shehade, is not direct, since no evidence was submitted with respect to the Defendant's involvement in this terrorist attack. The indirect connection of the Defendant to this terrorist attack is derived from the fact that it was brought into being by his close associates and assistants, Ahmed Barghouti and Abu Satha, whose activities the Defendant financed, including the purchase of weapons.

The legal question of whether this is sufficient to substantiate the criminal responsibility of the Defendant for the act of murder that was carried out during this terrorist attack, when there is no evidence connecting the Defendant directly to this particular terrorist attack, will be examined in the Chapter of conclusions.

**(6)** **Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev**

[Stamp] Gilmore 00786

75

90. On December 21, 2000, at 8:30 p.m., shots were fired from an ambush at the car of Eliahu Cohen, of blessed memory, traveling on Route 443 approximately 1.5 km [0.93 miles] from the settlement Givat Ze'ev (see the Death Certificate Prosecution/133 (a), Pathology Opinion Prosecution/133 (c) and the report of the mobile DIFS Laboratory Prosecution/133 (c) about which Superintendent Chelouche testified on page 127). Brian Malcolm Shapiro, an eyewitness to the terrorist attack, testified about it (on page 149). Examination of the bullet shells that were gathered at the scene found that the weaponry used in this terrorist attack was apparently the Kalashnikov rifle that was also used to murder the Kahane couple, of blessed memory (see Opinion Prosecution/133 (d) and Prosecution/128 (f)).

91. During the course of his interrogation, Abu Hamid spoke about the activities of the Ahmed Gandor cell, which perpetrated this terrorist attack (Statement Prosecution/149 (a) on pages 10 – 12, which was collected by Elkura'an: his testimony is on page 194). Abu Hamid said during interrogation that he supplied Gandor with the Kalashnikov rifle and ammunition that he received for this purpose from Ahmed Barghouti and that he gave Gandor permission to perpetrate a shooting terrorist attack on Route 443 where Eliahu Cohen, of blessed memory, was killed. Abu Hamid also said that the terrorist attack was carried out by Muhaned and Shawish on the basis of what Muhaned told him after the terrorist act. Muhaned was not a witness in this trial, and the interrogation of Shawish, who did testifiy before us, did not relate to this event and this terrorist attack was not included in the Indictment filed against Shawish (Prosecution/157 (a)).

In light of that which was mentioned above, we have before us only the testimony of Abu Hamid, in which he said that he approved a shooting terrorist attack against an Israeli vehicle on Route 443 in late 2000, and that he supplied the weapon to the perpetrators. We do not have before us any admissible evidence with respect to the identity of the person who perpetrated the terrorist attack, meaning that we do not have any admissible evidence connecting the Defendant to a terrorist attack perpetrated through Abu Hamid.

[Stamp] Gilmore 00786 [continued]

76

SHATSKY-009286-433

The only evidence before us is that the Defendant assisted Abu Hamid in purchasing weapons and ammunition for terrorist attacks and that Abu Hamid gave the weapon that was purchased with the assistance of the Defendant to Gandor in order to perpetrate a shooting terrorist attack (this is the same situation as in the case of the murder of the Kahane couple, of blessed memory, which was carried out using the same weapon; see Chapter E (1) above).

### (7) Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443

92. On January 15, 2002, at 7:55 p.m., Yoela Chen, of blessed memory, arrived in a Fiat Uno at the gas station near the Givonim intersection. Rochelle Eini was sitting next to her. Two terrorists approached her car and shot dozens of bullets at the two, from short range. As a result of the shooting, Yoela Chen, of blessed memory, was murdered (Death Certificate 134 (a)) and Rochelle Eini was injured in her head and shoulder. An eyewitness to the event, Sammy Vaknin, testified he saw a young man running away towards the neighboring village of al-Jib after the shooting, and he helped rescue the travelers (on page 143). Superintendent Ami Leifer and Senior Staff Sergeant Major Eli Kojman described the incidents in similar manner (on page 130 of the transcript and Reports Prosecution/134 (b)-(d.1), in addition to the Photograph Board Prosecution/134 (b) and Prosecution/134 (d.2)).

93. The terrorist attack in which Yoela Chen, of blessed memory, was murdered was carried out following direct orders given by the Defendant in revenge for the killing of Ra'ed Karmi the day before the terrorist attack, as the Defendant admitted during the course of his interrogation. During the interrogation, the Defendant said that he instructed his close associate, Ahmed Barghouti, to perpetrate this revenge terrorist attack and that Ahmed reported to him that the terrorist attack had been perpetrated. The Defendant even took responsibility for perpetrating this attack and noted that this was the first time that Fatah perpetrated an attack deep within Israel (see Section 66 (a) above.)

The Defendant's comments during the course of his interrogation are consistent with thosee of Ahmed Barghouti, Abu Satha and Musafar during their interrogations (see Sections 30 and 53 above; Abu Satha's Statement Prosecution/156 (b) on pages 5-6 about which collection Dahan testified, on page 198; and the Statement of Ahmed Barghouti Prosecution/165 (a) on page 3 and Prosecution/165 (c) on pages 1-2, about which collection Mizrahi testified, on page 184.) They described the terrorist attack that was carried out at the gas station by shooting at a Fiat Uno car in which one woman was murdered in her companion was injured. Abu Satha, who actually fired the shots, claimed that he originally decided not to shoot at the two because they were women but after they began to shout, he shot at them, as did his comrade Tarek.

[Stamp] Gilmore 00787

77

Abu Satha claimed that he perpetrated the terrorist attack in accordance with the orders given by Ahmed Barghouti, while the latter claimed that Abu Satha was the one who initiated a terrorist attack and therefore he gave him the MP5 rifle. Ahmed Barghouti claimed in his statement that Abu Satha told him that he had reported his intentions to perpetrate a terrorist attack before he perpetrated it and the Defendant told him not to undertake this terrorist attack.

Ahmed Barghouti explained that Abu Satha was the Defendant's bodyguard and driver and that the Defendant feared for his life. In the conversation between the Defendant and Ahmed Barghouti after they were arrested, which was recorded without their knowledge, the two coordinated versions with respect to this terrorist attack and Ahmed Barghouti told the Defendant that he emphasized during the course of his interrogation he had given the orders to perpetrate this terrorist attack behind the Defendant's back (Transcript of Conversation Prosecution/128 (c) on pages 14, 17). However, the Defendant, as noted above, admitted that he gave orders to perpetrate this terrorist attack and therefore it is clear that his close associate Ahmed Barghouti tried to save him from being directly involved in this terrorist attack, like other terrorist attacks.

### (8) Murder of six people in David's Palace Banquet Hall in Hadera

94. On January 17, 2002, at 10:45 p.m., a shooting terrorist attack was carried out at David's Palace Banquet Hall in Hadera. The terrorist, Abed al-Salaam Hasouna, shot the security guard at the entrance to the hall, charged in, and began firing an automatic weapon at the crowd, until several people overtook him and he was shot to death (Pathologist's Opinion Prosecution/135 (j)). They were celebrating at the Bat Mitzvah party of Nina Kardashova. As a result of this shooting, six people were murdered and tens were injured, some of them seriously. Those who were murdered are: Boris Melikhov, of blessed memory, (Death Certificate Prosecution/135 (b)); Dina Binayev, of blessed memory, (Death Certificate Prosecution/135 (c)); Anatoly Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (d)); Avi Yazdi, of blessed memory, (Death Certificate Prosecution/135 (e)); Edward

[Stamp] Gilmore 00787 [continued]

78

SHATSKY-009286-433

Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (f)); and Aharon Ben Yisrael-Ellis, of blessed memory, (Death Certificate Prosecution/135 (g)). During his testimony, eyewitness Constantine Kardashov related the course of events (on page 125), and the incident can also be seen in the police presentation and cassettes that were recorded during the incident (Prosecution/135 (a), Prosecution/135 (k) – (l)). An M-16 assault rifle and a grenade that were use by the terrorist were seized at the scene (see Opinion Prosecution/135 (g) – (i) and the testimony of Superintendent Leifer on page 130).

95.   Nasser Aweis was responsible for the perpetration of this terrorist attack and he was the one who provided the terrorist Hasouna with weapon for this purpose (see his statement Prosecution/172 (b), about which collection Major Amar testified on page 191). This also emerges from the statement given by Ahmed Barghouti who said that Aweis reported to him on the terrorist attack that was carried out in the banquet hall in Hadera (Statement Prosecution/165 (d) about which collection Staff Sergeant Major Ya'akoboff testified on page 171). Ahmed Barghouti said that he heard about perpetration of the terrorist attack on television while he was with the Defendant and immediately called Aweis, who took responsibility for perpetrating the terrorist attack.

Abdul Hamid also related to this terrorist attack during the course of his interrogation and he also explained that it was in revenge for the targeted assassination of Ra'ed Karmi and therefore the terrorist departed from Tulkarm, where Karmi had lived (Prosecution/149 (b) on pages 14-15 about which collection Staff Sergeant Major Elkura'an testified on page 194).

96.   There is no direct evidence that the Defendant was directly involved in the planning of the above mentioned terrorist attack or knew about its perpetration in advance. The Defendant claimed that he would hear reports of terrorist attacks from Ahmed Barghouti and Aweis only after they occurred, and in his conversation with Agent John Doe No. 1 he said that he knew about this terrorist attack only after the fact (Report Prosecution/118 Section 4 that was submitted by "Robert"). The indirect connection of the Defendant to the terrorist attack in Hadera is created by the fact that he supplied Aweis with money, weapons and explosives in order to carry out terrorist attacks and that the latter considered him a leader and commander and therefore reported to him after every terrorist attack. The Defendant admitted to providing Aweis with money in order to purchase weapons and said that when he wanted to insure that terrorist attacks would cease he would also contact Aweis about this (see Section 23, above). In spite of this, the Defendant did not consider himself responsibility for the activities of Aweis unlike the activities of Ahmed Barghouti, Abu Satha and Abu Hamid (see Sections 60 and 65, above). During the course of his

[Stamp] Gilmore 00788

79

SHATSKY-009286-433

interrogation, Aweis also said that he perpetrated the terrorist attacks that he initiated within the framework of Tanzim Fatah for which the Defendant was responsible, and that the Defendant helped them with financing terrorist attacks and supplying weapons. He noted that the Defendant was his superior (see Sections 21-22, above).

The legal question of whether all this is sufficient to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out during this terrorist attack – when there is no evidence directly connecting the Defendant to the terrorist attack – will be examined in the chapter of conclusions.

**(9)** **Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in Jerusalem**

97. On January 22, 2002, at 4:20 p.m., the terrorist Sa'id Ramadan opened fire with an M-16 rifle at passersby on Jaffa Street, at the corner of Lunz, in Jerusalem until he was shot and killed. As a result of the shooting, Sarah Hamburger, of blessed memory, and Ora Sandler, of blessed memory, were murdered (Death Certificates Prosecution/136 (b) – (c)), and dozens of civilians were injured. Hanan Ben Naim, who killed the terrorist, testified regarding this incident (on page 121). Similarly, a police presentation with respect to the incident was submitted in addition to the action report of Superintendent Nadivi, who testified during the trial (Prosecution/136 (a), Prosecution/136 (d) and testimony on page 132). The terrorist weapon was captured and sent to DIFS (Prosecution/136 (e) and testimony of Sergeant Major Azulai and Superintendent Leifer on pages 130 – 134).

98. Ahmed Barghouti took responsibility for the perpetration of this terrorist attack (see Statement Prosecution/165 (a) on pages 4 – 5, about which collection Mizrahi testified on page 184). He said that he decided to insert a suicide terrorist bomber into Israel and for that was assisted by Aweis, who sent the terrorist Sa'id Ramadan to him. The two prepared the terrorist for the terrorist attack, took him to pray, bought him clothing and obtained an M-16 rifle and bullets for him. That day, in the afternoon, Ahmed heard about the terrorist attack that had been perpetrated in Jerusalem.

[Stamp] Gilmore 00788 [continued]

SHATSKY-009286-433

There is no direct evidence that connects the Defendant to this terrorist attack and he even said during the course of his interrogation that he and Arafat were angry at Ahmed Barghouti because this terrorist attack had been perpetrated (Transcript of Conversation Prosecution/98 (k) on page 32). The indirect involvement of the Defendant in the terrorist attacks that have been carried out by Ahmed Barghouti and Aweis, by themselves or through others, was explained above. The legal question about whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out by this terrorist attack – where there is no evidence connecting the Defendant directly to the terrorist attacks – will be examined in the Chapter of conclusions.

**(10)** **Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was killed**

99.  On February 25, 2002, at 6:25 p.m., a terrorist attack was carried out by a single terrorist armed with an M-16 rifle and a hand grenade on the main road of the Neve Ya'akov neighborhood in Jerusalem.

From the testimony of an eyewitness, police officer Adam Garfield, it becomes apparent that the terrorist opened fire on vehicles that were traveling on the road and also at civilians and police officers who were at the scene. Police officer Galit Arbiv, of blessed memory, was sitting in the police car with Garfield, and charged at the terrorist with her pistol drawn. The terrorist murdered police officer Arbiv, of blessed memory, by shooting her (Death Certificate Prosecution/137 (b)), seriously injured police officer Garfield, who remains disabled to this day, and police officer Amihai Dahan. The grenade that was thrown by the terrorist did not explode (see Garfield's testimony on page 127, the testimony of Superintendent Leor Nadivi on page 132 and the reports and photographs that were submitted in Prosecution/137 (c), Prosecution/137 (g) plus Presentation Prosecution/137 (a) and the Photograph Board Prosecution/137 (g)). The terrorist weapons, the hand grenade that did not explode and the spent bullet shells were collected and sent to DIFS for examination (testimony of Superintendent Ami Leifer on page 130, Opinion of Superintendent Avi Kaufman Prosecution/137 (d) – (e) and the Opinion of Superintendent Yaniv Ron Prosecution/137 (e)).

100. The terrorist who was captured during the attack is Rami Nur, in accordance with that which has been set forthby Abu Hamid in his Statement Prosecution/149 (c) on pages 11 – 12 (which was submitted by Sergeant Major Ya'akov Barazani on page 207). Abu Hamid said that when he and his brother Haloum Abu Hamid saw the terrorist attack in Neve Ya'akov on television, his brother reminded him that the terrorist Rami Nur had been in their home the previous day, and Haloum said that he was the one who had given Rami Nur

[Stamp] Gilmore 00789

81

the M-16 rifle and bullets and sent him to perpetrate a terrorist attack after filming a video cassette, which he showed his brother Nasser after the terrorist attack. Haloum told his brother that he received the weapon and the terrorist Rami Nur from Ahmed Barghouti. In his above mentioned statement, Abu Hamid expressed anger about this and explained that this terrorist attack might entrap the Defendant because of his close ties to Ahmed Barghouti, when it would be discovered that the terrorist had survived and would be interrogated by the General Security Service.

In his above mentioned statement, Abu Hamid also said that Yasser Arafat summoned the Defendant and Ahmed Barghouti to his office as a result of this terrorist attack. Ahmed Barghouti fled and told Abu Hamid that it is likely that they would arrest the Defendant because of this terrorist attack. The Defendant told Abu Hamid later that he explained to Arafat that there was no instruction with respect to a cease-fire at that time and then he – the Defendant – stood behind his people as long as Arafat had not issued a presidential order to stop the terrorist attacks. Abu Hamid also said in his statement that Ahmed Barghouti admitted to him that he had given the weapon to the brother of Abu Hamid (Haloum) in order to perpetrate the terrorist attack in Neve Ya'akov.

101. From all that has been stated above, it becomes apparent that Nasser Abu Hamid did not take part in planning and implementing this terrorist attack but that it was done by his brother Haloum and by Ahmed Barghouti, who were witnesses at the trial. Haloum Abu Hamid was convicted, the basis of his confession, for several acts of terrorism, including responsibility for implementing the above mentioned terrorist attack in Neve Ya'akov (see item 13 in the amended Indictment Prosecution/161 (a), and Ruling Prosecution/161 (b)). Haloum told of his responsibility for the above mentioned terrorist attack, in accordance with that which has been set forth above, in his Statement Prosecution/162 (a)-(b), which was collected by Ibrahim Elkura'an (his testimony is on page 194) and Staff Sergeant Major David Mizrahi (his testimony is on page 184).

In his above mentioned statement (Prosecution/162 (a) on pages 6-9, Prosecution/162 (b) on pages 2-4), Haloum said that he prepared Rami Nur for the terrorist attack, arranged for someone to transport him, and gave him the shrapnel grenade and an M-16 rifle with bullets. While he was preparing Rami Nur for the terrorist attack, Ahmed Barghouti came to inquire about how preparations for the terrorist attack were progressing. Ahmed Barghouti wanted the terrorist attack to be perpetrated in a crowded part of Jerusalem; however, they finally agreed that it would perpetrated in northern Jerusalem

[Stamp] Gilmore 00789 [continued]

SHATSKY-009286-433

because of the roadblocks, and Ahmed Barghouti gave his approval for this.

102. During the course of his interrogation, Ahmed Barghouti confirmed his connection to the terrorist attack in Neve Ya'akov. In his Statement Prosecution/165 (a), he said that Nasser Aweis sent the terrorist Rami Nur to him in order to perpetrate the terrorist attack in Neve Ya'akov, and he referred Rami Nur to Haloum Abu Hamid so that he could assist him in entering Jerusalem (Statement Prosecution/165 (a) on page 6, which was gathered by Staff Sergeant Major Mizrahi in accordance with his testimony on page 184). Ahmed Barghouti, like his friend Nasser Abu Hamid, said during the course of his interrogation that he was summoned, together with the Defendant, to Arafat's office as a result of this terrorist attack; the Defendant asked him if he was responsible for the terrorist attack and Ahmed Barghouti responded in the affirmative, and heard from the Defendant that Arafat was angry about the terrorist attack (Statement Prosecution/165 (c) on page 5 that was collected by Staff Sergeant Major Mizrahi in accordance with his testimony on page 184).

103. On the basis of the above mentioned, the terrorist attack was planned by Aweis and Ahmed Barghouti. During the meeting between Ahmed Barghouti and the Defendant after their arrests, when they were recorded without their knowledge, Ahmed repeated several times and emphasized to the Defendant that during the course of his interrogation he had said that the Defendant heard about this terrorist attack only after it was carried out (Transcript of the Conversation Prosecution/127 (c) on pages 4, 11).

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by Ahmed Barghouti and Aweis, as explained above (see Sections 80, 86 and 96 above). It is not for nothing that Yasser Arafat summoned Barghouti for clarification after this terrorist attack was carried out , since he also thought that the Defendant was the end-point for claims in this matter. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the Chapter of conclusions.

**(11)** **Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in Atarot**

104. On February 22, 2002, at 6:30 a.m., Gad Rejwan, of blessed memory, was murdered in the Bashkevitz factory in the Atarot industrial area by Abed el-Majid Mehadi, who had in the past been employed in the factory (Death Certificate Prosecution/138 (a) and Pathologist's Opinion Prosecution/138 (b)). Zaharan Shehade, who was at the scene, said that when he

[Stamp] Gilmore 00790

83

SHATSKY-009286-433

heard shots, he saw a man running from the scene and Gad Rejwan lying on the floor and asking for someone to call for help (on page 146).

Gad Rejwan, of blessed memory, died from the shooting, and his death was declared at the scene (see Action Report 138 (c) and the testimony of Superintendent Leor Nadivi on page 132, also the report from the mobile laboratory that was recorded by Superintendent Nissim Mizrahi Prosecution/138 (d) and his testimony on page 131). The photographs of the scene of this event were submitted as Exhibition Prosecution/138 (d) and 138 (f) by Mizrahi and Nadivi during their testimony. The murder was carried out with a pistol (Opinion Prosecution/138 (e)); a number of the bullets fired from it caused fatal wounds in the body of the deceased (Opinion Prosecution/138 (b)).

105. Abu Hamid said in his Statement Prosecution/149 (b) (on pages 25-28) that he was approached by Abed al-Majid who said that he had worked in the Rejwan family's factory and wanted to perpetrate a terrorist attack together with a person named the Ramzi. The three met together and planned the attack; Abu Hamid gave each of them a pistol. Twenty minutes later, Ramzi reported to Abu Hamid that they had perpetrated a terrorist attack, and Abed al-Majid related how he had shot Rejwan, of blessed memory, to death.

Abu Hamid called the police and took responsibility for the terrorist attack in the name of the Al Aqsa Martyrs Brigades (Statement of Abu Hamid that was submitted by Staff Sergeant Major Elkura'an on page 194).

106. From that which has been set forth above, it becomes apparent that there is no direct evidence with respect to the identity of the perpetrators, since that which Abed al-Majid, who did not testify in this Court, told Abu Hamid is inadmissible hearsay evidence.

However, on the basis of unequivocal circumstantial evidence it can be determined that the terrorist attack was carried out by al-Majid with Abu Hamid's assistance and authorization, as Abu Hamid said in his testimony. Abu Hamid said that Abed al-Majid told him that he was going to perpetrate a terrorist attack in the factory of the Rejwan family, in which he had once worked, and for this purpose he equipped him

[Stamp] Gilmore 00790 [continued]

SHATSKY-009286-433

with a pistol. A short time later, Abed al-Majid reported to him that he had shot and killed Gad Rejwan, of blessed memory, who was indeed murdered by pistol shots.

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by Abu Hamid, as explained above (see Sections 27 and 60 – 65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the Chapter of conclusions.

**(12)** **Terrorist attack in the Seafood Market restaurant in Tel Aviv**

107. On March 5, 2002, at 2:30 a.m., a terrorist attack was carried out at the Seafood Market restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who arrived at the scene armed with an M-16 rifle, hand grenades and a knife. The incident was described by eyewitnesses Willis Hazan (on page 148) and Leon Gorenstein (on page 129), who were present in the restaurant at the time the terrorist attack. With the rifle in his hands, the terrorist opened fire at the people sitting in the restaurant until the weapon jammed and the hand grenade he threw did not explode. At this stage Hasouna began to stab people, including police officer Staff Sergeant Major Salim Barakat, of blessed memory, who tried to stop the shooting campaign and was stabbed to death by the terrorist. In addition to Staff Sergeant Major Barakat, Yosef Habi, of blessed memory, and Elihu Dahan, of blessed memory, were also murdered in this terrorist attack (see the Pathologist's Opinion Prosecution/139 (b) through Prosecution/139 (d)). Many others were injured. The terrorist himself was shot and killed during the terrorist attack and it was learned that he was Ibrahim Hasouna (Pathologist's Opinion Prosecution/139 (k) and the DNA Tests Prosecution/139 (g)).

The result of this terrorist attack can be seen on the Photograph Board Prosecution/139 (f) that was submitted by police officer Effi Yamin (on page 151) and the presentation prepared by the Police (Prosecution/139 (a)). Effi Yamin also submitted the Action Report that he wrote at the time. He was the person who took the terrorist's bloodied knife, a smashed bullet, bullet shells, bullets and the M-16 rifle (Prosecution/139 (e)). The weapon that was seized was brought to the DIFS for examination (Prosecution/139 (h) and testimony of Superintendent Ami Leifer on page 130).

108. The terrorist attack at Seafood Market was carried out by Ibrahim Hasouna and was planned by Ahmed Barghouti, Abu Hamid and Aweis, as Ahmed Barghouti said during the course of his interrogation (see Section 29 above). Abu Hamid's brother (Sharif Naji) was

[Stamp] Gilmore 00791

SHATSKY-009286-433

also involved in the terrorist attack, as he explained during the course of his interrogation (see Section 55 above). He also connected Ahmed Barghouti to its planning. During the course of his interrogation, Ahmed Barghouti said that the terrorist Ibrahim Hasouna had been sent to him by Aweis and he gave him money, bought him clothing and made sure that there was someone who could drive him to Israel in order to perpetrate the attack (Tarek Malahi). He reported to the Defendant by telephone that the terrorist attack was ready to go, and the Defendant said that he was not interested in having it perpetrated within Israel. Ahmed Barghouti also said that that after the terrorist attack, the Defendant told him to tell Aweis not take responsibility for the terrorist attack in the media before he discussed it with the Defendant (see Section 29 above).

During the course of the conversation between the Defendant and Ahmed Barghouti after their arrests, when they were recorded without their knowledge, Ahmed made certain to emphasize to the Defendant several times that he had said that he only discussed the terrorist attack on the telephone with the Defendant **after** it had occurred and added, "**Be careful, I was not with you, I was not with you, I talked with you on the telephone**" (Transcript of Conversation Prosecution/127 (c) on pages 4 – 5, 11). The two coordinated their versions with respect to their interrogation on this point.

During the course of his interrogation, Abu Hamid also told about his involvement in the terrorist attack (Statement Prosecution/149 (b) on page 6 that was submitted by Staff Sergeant Major Elkura'an on page 194). He supplied hand grenades, and bullets for an M-16 rifle for the purpose of the terrorist attack when he saw that Hasouna was equipped with an M-16 rifle, before he departed for the terrorist attack. When the terrorist attack was reported during the night, including the fact that Hasouna had stabbed a police officer to death, Abu Hamid remembered that Nasser Haloum (Abu Hamid's brother) had given the terrorist a knife and explained to him to use it if the rifle jammed.

During the course of his interrogation, Haloum Abu Hamid explained his involvement in the terrorist attack (Statement Prosecution/162 on page 9, which was submitted by Staff Sergeant Major Elkura'an on page

[Stamp] Gilmore 00791 [continued]

SHATSKY-009286-433

194, and Statement Prosecution/162 (b) on page 4 that was submitted by Staff Sergeant Major Mizrahi on page 184). Haloum said that he trained Hasouna in the use of the M-16 rifle. Sharif Naji Abu Hamid (he is Abu Hamid's brother) said during the course of his interrogation that he accompanied the terrorist to Tel Aviv and obtained a car for the terrorist attack (Statement Prosecution/182, which was submitted by Staff Sergeant Major Ben Lulu on page 182).

109. The Defendant is indirectly connected to the terrorist attacks that were planned and perpetrated by Ahmed Barghouti, Abu Hamid and Aweis, in accordance with that which has been set forth above. However, with regard to the terrorist attack at the Seafood Market, which was planned and brought about by all three, the Defendant is also personally responsible for its perpetration. The subject of the responsibility of the Defendant for this terrorist attack win accordance with that which has been set forth above (see Sections 29, 55 and 66 (c) above). The Defendant admitted during interrogation that he gave Ahmed Barghouti his approval for this terrorist attack **before** it actually happened, although he did give orders that the terrorist attack should be in the Judea and Samaria region and not within Israel. This also emerges from that which Ahmed Barghouti said during the course of his interrogation.

**(13) <u>Shooting terrorist attack in the Jeremy Hotel in Netanya</u>**

110. On March 9, 2002, at 8:25 p.m., two terrorists entered the Jeremy Hotel in Netanya armed with M-16 rifles and hand grenades. The two of them threw the hand grenades and fired at passersby and tourists. The incident was described by the eyewitness known by his initial "G", who was squad commander in the "Almog" Border Police unit. He arrived at the hotel within 30 seconds after hearing shots fired and encountered injured people while the terrorists were still shooting. "G" began to chase the terrorists, and both of them were identified on the stairs of a shopping mall in the immediate vicinity; they were shot and killed (see Pathologist's Opinion on the terrorist Shahdi al-Najimi Prosecution/140 (h) and also the Expert Opinion with respect to the second terrorist Prosecution/140 (i)). "G" confirmed in his testimony that, most unfortunately, some of the injured were hurt by shots fired by border police (on pages 117 – 118). In this terrorist attack, the infant Avia Malka, of blessed memory, and Israel Yihye, of blessed memory, were murdered (see the Notification of Death Form Prosecution/140 (b)).

Cadet Rami Malka submitted the report of DIFS technician's attendance at the scene of the terrorist attack, which describes the resultant findings of the scene (Prosecution/140 (f) and his testimony on page 118) and photographs of the scene (Prosecution/140 (g)). The Expert

[Stamp] Gilmore 00792

SHATSKY-009286-433

Opinion of the Police Bomb Disposal Department states that a hand grenade was thrown at the hotel, and it did explode (Prosecution/140 (e)). From the report of Staff Sergeant Major Malka it becomes apparent that the two M-16 rifles that were used by the terrorists were seized at the scene (see also the testimony of Superintendent Leifer on page 130).

111. During the course of his interrogation, Nasser Aweis said that he perpetrated this shooting terrorist attack in Netanya but that it was carried out by two people whose names he did not know. The two were sent to him by another terrorism operative (Ahmed Abu Khadr), and Aweis organized transportation for the two through Mahmoud Titi, and even gave Ahmed Abu Khadr two hand grenades and two M-16 rifles. Several hours after the two were transported to Baka el-Sharkia, whence they entered Israel on foot, Aweis heard on television that there had been a terrorist attack in a hotel in Netanya. He called media outlets and took responsibility for the perpetration of the terrorist attack (Aweis's Statement Prosecution/174 (b) on page 5, which was submitted by Advanced Staff Sergeant Major Ronny Amar, on page 119).

With regard to this terrorist attack: it is again possible to determine on the basis of unequivocal circumstantial evidence that Aweis was behind this above mentioned terrorist attack, which was carried out a short time after he equipped the terrorists with M-16 rifles and hand grenades and transported them to the point on the Green Line closest to Netanya. The terrorist attack was indeed perpetrated by two terrorists armed with M-16 rifles and hand grenades just several hours after Aweis arrange transportation for them to Netanya, and from all this it is clear that this is the terrorist attack about which Aweis talked during the course of his interrogation.

There is no evidence that directly connects the Defendant to this terrorist attack, other than the connection created by his general and indirect involvement in the terrorist attacks that were planned and perpetrated by Aweis (see Section 96 above). The legal question of whether this is sufficient

[Stamp] Gilmore 00792 [continued]

SHATSKY-009286-433

in order to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the Chapter of conclusions.

**(14)** **Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh**

112. On March 30, 2002, at 1:00 p.m., a team of Border Police officers identified a vehicle traveling at very high speed in the direction of Baka al-Garbiyeh with two suspicious individuals in it. As the team followed the terrorists, they began shooting and murdered Constantine Danilov, of blessed memory, (see Death Certificate Prosecution/141 (i)). The other members of the team shot the terrorists and the explosive belt that one of them was wearing exploded. The two terrorists were killed, after they threw a hand grenade at the team (see the testimony of Chief Superintendent Farid Ghanem, who participated in the incident, on page 122).

Photographs of the incident were submitted with the Public Employee Statement of Prosper Ohana (Prosecution/141 (c)). The DIFS examination determined that one of the terrorists was carrying an explosive belt that exploded on his body (Prosecution/141 (e)).

113. During the course of his interrogation, Aweis said that he sent the terrorists with Mahmoud Titi and Ahmed Abu Khadr, and that he obtained an explosive belt for one of them, for perpetrating a terrorist attack within Israel. That same suicide [bomber] traveled, wearing the explosive belt, with another person to perpetrate terrorist attack in Israel, but was killed with his companion an exchange of fire with Border Police officers in Baka al-Garbiyeh, after they killed another Border Police officer (Statement Prosecution/173 (b) on pages 9-10 that was submitted by Advanced Staff Sergeant Major Amar on page 191). Aweis also said during the course of his interrogation that this terrorist attack was supposed to have been perpetrated in Hadera (Statement Prosecution/172 (b) on page 3 that was submitted by Amar on page 191).

114. There is also unequivocal circumstantial evidence that this terrorist attack was carried out by people who were dispatched by Aweis after he equipped them with an explosive belt. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the Chapter of conclusions.

**(15)** **Shooting terrorist attack between Ateret and Bir Zeit**

[Stamp] Gilmore 00793

89

SHATSKY-009286-433

On February 25, 2001, at 1:00 p.m., shots were fired from an ambush on Route 465 in the direction of Yosef Cohen's car (GMC), which was traveling in the direction from Ateret to Bir Zeit. The shots were fired from a passing car. Cohen was seriously injured in the terrorist attack and his car went off the road onto the shoulder (his testimony is on page 142). Dozens of bullets were fired at his car and he was hit in the head by three [bullets] and in the neck by two [bullets], but he miraculously remained alive (see Transcript with regard to the condition of the car Prosecution/142 (c) and the Report on Capture and Marking of the Bullet Casings Prosecution/142 (b) that was submitted by Moshe Lavie on page 124, and also the Report of the Car Inspection Prosecution/142 (d) that was submitted by police officer Mizrahi on page 131).

A description of the scene of the terrorist attack appears on Photograph Board Prosecution/142 that was submitted by Superintendent Mizrahi on page 139.

116. Ahmed Barghouti explained during the course of his interrogation about this terrorist attack (Statement Prosecution/165 (a) on page 1 that was submitted by Staff Sergeant Major Mizrahi, on page 184; and Transcript Prosecution/165 (f) that was submitted by an interrogator by the name of "Danny" on page 200) how he planned this terrorist attack together with Muhaned, Abu Satha and others, who asked him for weapons and a car in order to perpetrate a terrorist attack. Ahmed Barghouti gave them

[Stamp] Gilmore 00793 [continued]

90

SHATSKY-009286-433

an MP5 rifle and bullets, and also his car. Several hours, later they returned the car and the gun to him and told them that they had shot at a car in the area of the Atara Bridge while passing it, and that the driver of the car had been injured. Ahmed Barghouti's description is consistent with the evidence with regard to the way in which the terrorist attack was carried out , its location and results; therefore, there is unequivocal circumstantial evidence from which it becomes apparent that the terrorist attack about which Ahmed Barghouti told is the above mentioned attack near the Atara Bridge.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection to the terrorist attacks planned by Ahmed Barghouti and Abu Satha (see Section 80 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the Chapter of conclusions.

**(16)** **Attempted terrorist attack in the Biancini Pub in Jerusalem**

117. On May 19, 2001, at 3:00 a.m., Dina Dagan, owner of the Biancini Pub in Jerusalemm, discovered an explosive device that had been placed in the lavatory by Sa'ad A-Din Jabar, who was known to her as a Palestinian from Ramot who occasionally sold her supplies for hookah water pipes. In her testimony (on pages 139 – 142), Dagan said that Jabar sat with her in the restaurant in order to write an order for products and then went into the lavatory without anything in his hands. Several moments later, he exited the lavatory with a plastic bag that he placed in the center of the pub. When she asked him what was in the bag, he told her that it contained clothes. She approached the bag in order to check it and discovered that it was an explosive device hidden under a jacket, and at this stage Jabar disappeared.

At the time, there were approximately 150 – 170 adolescents in the pub. Dagan displayed praiseworthy resourcefulness and bravery: she picked up the explosive device and yelled to one of the Palestinian employees there to evacuate the young people. He also helped her move the explosive device outside of the restaurant. The police arrived at the scene and exploded the device, in a manner that caused damage to stores in the area. This is the picture that emerges from the testimony of police sapper Eyal Albo (on page 119, see also Expert Opinion from the Explosives Laboratory Chief Inspector Yaniv Ron Prosecution/143 (a); Expert Opinion of DIFS given by Sarah Abramowitz-Bar Prosecution/143 (b); and the Photograph Board Prosecution/143 (a)).

[Stamp] Gilmore 00794

91

SHATSKY-009286-433

118. During the course of his interrogation, Abu Hamid said (Statement Prosecution/149 (b) on pages 10 – 12, which was submitted by Staff Sergeant Major Elkura'an, on page 194) that Sa'ad A-la-Din approached him at the beginning of May 2002, and asked him to prepare an explosive device so that he could place it in a pub on Jaffa Street in Jerusalem. He explained to Abu Hamid that the owner of the establishment customarily bought products for hookahs from him and he drew the pub for Abu Hamid. Abu Hamid instructed him where to place the explosive device and explained to him how to connect the wires to a fire extinguisher that housed the charge. (Indeed, it emerges from Opinion Prosecution/143 (a) that the charge was housed in a fire extinguisher.)

Later, Abu Hamid sent Jabar to the pub, and Jabar covered the device with a jacket. When Jabar arrived at the pub, he called Abu Hamid and used a code sentence to inform Abu Hamid that he was about to place the explosive device in the pub, which Abu Hamid authorized him to do.

Jabar called Abu Hamid and told him that the pub owner had seen him place the explosive device and heard on the news that the charge was exploded by the police.

119. From the above, it becomes apparent that the attempted terrorist attack in the pub was carried out by Jabar, with guidance and assistance from Abu Hamid. The details that Abu Hamid gave during the course of his interrogation are consistent with the testimony of Dagan and the findings at the scene.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection

[Stamp] Gilmore 00794 [continued]

SHATSKY-009286-433

to the terrorist attacks planned by Abu Hamid (see Sections 27, 60-65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the Chapter of conclusions.

**(17)** **Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem**

120. On October 3, 2001, at 11:30 p.m., shots were fired at a passing car that was traveling towards French Hill, in which Molly and Pinhas Cohen were traveling. They were injured by the shots (see the Report of Preliminary Visit to the Scene by Superintendent Leor Nadivi and his testimony on page 132; Capture and Marking Report by Superintendent Nadivi Prosecution/144 (b), Report of Preliminary Visit to the Scene by Superintendent Leifer and his testimony on page 130, and the Report of the Weapons Lab Prosecution/144 (d)).

121. During the course of his interrogation, Abu Satha (Statement Prosecution/156 (b) on pages 4 – 5, which was submitted by Advanced Staff Sergeant Major Dahan, on page 198) said that he perpetrated this terrorist attack together with Muhammad Sami Abdullah when they were traveling in a Mazda car and he had with him the MP5 rifle, which he had received from Ahmed Barghouti for the purpose of shooting at Israeli targets. During the course of his interrogation, he said that after he shot at the car going into the tunnel in the direction of French Hill, he realized that it was a female driver and therefore he stopped shooting and told his companion that the gun jammed. After this, he continued traveling in the direction of French Hill, and there he shot another car while passing it. The next day they heard on the radio that a man and woman had been injured.

122. The Prosecution's evidence with regard to this terrorist attack is very weak and includes only the reports of the police's preliminary visits to the scene, meaning that any information about the way in which the terrorist attack was carried out is hearsay evidence. Similarly, it is difficult to know if Abu Satha's statements relate to this terrorist attack since the date of the events he described and the type of car at which he shot are not clear.

The only evidence we have before us is that Abu Satha perpetrated shooting terrorist attacks against Israeli targets, using a weapon that he received from Ahmed Barghouti, who was the Defendant's assistant and close associate. Furthermore, Abu Satha himself was the Defendant's bodyguard. The Defendant himself confirmed that Abu Satha worked in his office, was subordinate to him, and that he knew that Abu Satha carried out terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (see Sections 33-34 above).

[Stamp] Gilmore 00795

SHATSKY-009286-433

**(18) Attempted suicide terrorist attack in Beit Hanina in Jerusalem**

123. On March 8, 2002, at 4:15 p.m., the terrorist Mahmoud Salah was captured on his way to perpetrating a suicide terrorist attack in Jerusalem, while he was wearing an explosive belt. The terrorist attempted to detonate the charge while he was lying on the ground and was then shot and killed (see the testimony of Chief Superintendent Doron Yedid on page 133, and the Report from the Explosives Lab Prosecution/145 (d)).

124. During the course of his interrogation, Ahmed Barghouti said that Lawi Uda asked him to prepare an explosive belt for a suicide [bomber] and he referred Uda to Nassar Shawish, who gave him an explosive belt. The suicide [bomber] stayed in an apartment that Ahmed Barghouti rented in Ramallah, and was dressed in the explosive belt there. Later, Ahmed Barghouti learned that he had been killed by shots fired by Israel Defense Forces soldiers in the Beit Hanina area, on his way to perpetrating the terrorist attack (Statement Prosecution/165 (b) on pages 2, 11, which was submitted by Staff Sergeant Major Ya'akoboff, on page 171).

    Aweis also related during the course of his interrogation, (Statement Prosecution/173 (b) on page 4, which was submitted by Advanced Sergeant Major Amar, on page 191) also said that Lawi Uda, whom he had recruited for the Al Aqsa Martyrs Brigades, recruited a suicide [bomber] for him but that the terrorist attack failed because the suicide [bomber] was shot by police officers before perpetrating the attack, at the entrance to Jerusalem.

125. From that which has been set forth above, it becomes apparent that Aweis and Ahmed Barghouti were involved in this attempted terrorist attack. There is no evidence tying the Defendant to this terrorist attack in a direct manner other than the connection derived from his general indirect involvement

[Stamp] Gilmore 00795 [continued]

SHATSKY-009286-433

in terrorist attacks that were prepared and perpetrated by the two, in accordance with that which has been set forth above. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal responsibility for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the Chapter of conclusions.

**(19)  <u>Shooting terrorist attack on the Beit El – Psagot Road</u>**

126.  On March 17, 2002, at 6:45 a.m., shots were fired from an ambush with automatic weaponry at the car (Volkswagen Passat) of Samir Kersh, and he was injured by the shooting (see the Report of Visit to the Crime Scene Prosecution/146 (a) and photographs of Senior Staff Sergeant Major Eli Kojman that were submitted during his testimony on page 121).

The Prosecution did not submit any additional evidence about this terrorist attack and Kojman's report is only hearsay evidence with regard to the manner in which the terrorist attack was carried out .

In its summation, the Prosecution attributes responsibility for this terrorist attack to Ahmed Barghouti, and he did admit to his involvement in this terrorist attack and was convicted for this (Prosecution/165 (g) – (q), Indictment Item No. 43). Other than this, the Prosecution did not refer to any other evidence from statements by Ahmed Barghouti or things that he said during his Israel Security Agency interrogation. Therefore, no evidence was presented with regard to this terrorist attack that makes it possible to establish a clear, factual foundation for Ahmed Barghouti's connection to this terrorist attack, and the evidence with regard to the actual manner in which the terrorist attack was carried out is very weak.

**(20)  <u>Attempted terrorist attack in the Malha Mall in Jerusalem</u>**

127.  On March 26, 2002, at 10:30 a.m., a Renault Express car with two sappers (Shahadi Ibrahim Hamamra and Musa Yusaf Muhammad Haled – see Corpse Transport Report Prosecution/147b, which was submitted by Ilan Granot on page 135, and Report Prosecution/147 (c) that was submitted by Senior Staff Sergeant Major Asaf Azulai in his testimony on page 134) who were on their way to perpetrate a terrorist attack, exploded.

[Stamp] Gilmore 00796

95

SHATSKY-009286-433

128. During the course of his interrogation, Ahmed Barghouti (Statement Prosecution/165 (c) on page 5 that was submitted by Staff Sergeant Major Ya'akoboff on page 171, and Transcript Prosecution/165 (k) Section 15 that was submitted by Israel Security Agency interrogator "Adam", on page 201) that Jihad Jawara called the Defendant the day before the car was found next to the mall in Jerusalem and told him that he wanted to perpetrated a terrorist attack. The Defendant told him not to perpetrate the attack within Israel, and referred Jawara to Ahmed Barghouti to discuss it with him. Ahmed Barghouti claimed that he also told Jawara not to perpetrate the terrorist attack in Israel or Jerusalem. However, the next day Jawara called Ahmed Barghouti and told him that he had sent the car that exploded next to the mall in Jerusalem to perpetrate terrorist attack in Jerusalem.

129. The Defendant himself said during the course of his interrogation (Transcript Prosecution/36 that was submitted by Israel Security Agency interrogator "Smith", on page 85) that Ahmed Barghouti reported to him on the plans of Jihad's men to perpetrate a suicide terrorist attack in Jerusalem. The Defendant said that he instructed Ahmed Barghouti that the terrorist attack should not take place within Israel, but rather within the Judea and Samaria region. The Defendant said on this matter during the course of his interrogation, that when talks about Ahmed Barghouti's appeal to him about Jihad's desire to perpetrate a terrorist attack (Transcript of Conversation Prosecution/198 (k) on pages 19-20):

> "Defendant: ... that Jihad, he said to him that we have an action. We have terrorist attacks, etc. So I said to Ahmed, I said to him that what is important is that there should be no terrorist attack within Israel.
>
> Investigator: OK and when he comes officially and tells you that they want to perpetrate a suicide terrorist attack, what did you say to them?
>
> Defendant: I told him no, I do not allow it.
>
> Investigator: No. That is not what you told me. You said to him, no problem. But not 'inside' (within

[Stamp] Gilmore 00796 [continued]

SHATSKY-009286-433

Israel).

**Defendant:**   **Yes, not in Israel… that is to say, that I do not want terrorist attacks in Israel."**

The Defendant said that the next day he received a report from Ahmed Barghouti with regard to the failed attempt at a suicide terrorist attack, and that the car had exploded not far from the roadblock and two cell members were killed.

130. Based on the above, it becomes apparent that there is proof of the Defendant's involvement in approving this suicide terrorist attack, even in accordance with his version. The Defendant did give orders that the terrorist attack be perpetrated in a different place, however this is not significant for his criminal responsibility for this attempted terrorist attack. That Defendant's version during the course of his interrogation is supported by the version of his close associate, Ahmed Barghouti, even though the latter "renovated" the facts and claimed that the Defendant gave orders not to perpetrate terrorist attack at all. From the statements by the Defendant, it is clear that he gave orders to perpetrate the terrorist attack in another location.

[Stamp] Gilmore 00797

SHATSKY-009286-433

# Part III: Evaluation of the Evidence and Its Significance

131. Since the Defendant chose not to testify or bring any witnesses on his behalf and even instructed the representatives of the Office of the Public Defender that were appointed to represent him to abstain from the cross-examination of the Prosecution witnesses, the evidence against the Defendant is founded on several different layers.

**First**, comments that were made by the Defendant during the course of his Israel Security Agency interrogation. Some were summarized and written up in the transcript that had been prepared and submitted by the interrogators and some were recorded and transcribed. This category also includes those statements that were made by the Defendant in conversations that were recorded without his knowledge, with his close associate Ahmed Barghouti and with agents John Doe No. 1 and John Doe No. 3.

**Second**, incriminating testimony against the Defendant that was given by terrorism operatives from the Fatah after their arrest, meaning the statements which they gave during the course of Israel Security Agency and police interrogations, since all of them – as if in unison – refused to answer any questions in Court, when they were brought as Prosecution witnesses.

**Third**, statements that were made by the Defendant by way of the media, during the period of time prior to his arrest.

**Fourth**, documents that were seized in the office of the Defendant and at the offices of the Palestinian Authority during the course of Operation Defensive Shield.

**Fifth**, testimony that was given by victims of the terrorist attacks, eyewitnesses to the terrorist attacks that are the subject of the Indictment, and witnesses involved in their interrogation.

132. With respect to the evaluation of the evidence and its significance, the following comments must be made:

[Stamp] Gilmore 00798

98

SHATSKY-009286-433

A. The Defendant's abstention from testifying during the trial and exposing himself to cross-examination can be used to reinforce the significance of the evidence against him and even in order to support Prosecution evidence in places where support is necessary, in accordance with that which has been set forth in Section 162 (b) of the Criminal Procedures Law [Consolidated Version] 5742 – 1982 (hereinafter – "the **Criminal Procedures Law**"). Similarly, the Defendant's abstention from responding to the Indictment, as he did, can be used to reinforce the significance of Prosecution evidence, in accordance with that which has been set forth in Section 152 (b) of the Criminal Procedures Law. These points were made clear to the Defendant by the Court.

This matter acquires additional significance in light of the fact that, in accordance with law, statements made by witnesses who refuse to testify in Court, or who deny the content of their statements during interrogation, require support (see Subsection C (5) below). This is in accordance with the Supreme Court's ruling that a Defendant's abstention from testifying serves as significant reinforcement of the statements given by witnesses during the trial that require reinforcement, in accordance with Section 10 (A) (d) of the Rules of Evidence [New Version] 5731 – 1971 (hereinafter: "the **Rules of Evidence**") (Criminal Appeal 1497/92 **State of Israel v. Tzubari**, PD 47 (4) 177, on page 202). The Court explained this matter: "**The silent Defendant – differentiated from the silent witness – is acting within the framework of the Law; however, the Court is given the right to interpret his behavior on the basis of its perceptions and understanding**" (on page 203, see also Additional Proceeding 308/91 **Kuzli v. The State of Israel**, PD 45 (4) 441, on page 486).

Indeed, the Court is entitled not to give any weight to the silence of the Defendant when there is a reasonable explanation for it (see: Criminal Appeal 277/81 **Halevy v. The State of Israel**, PD 38 (2) 369, on page 386). However, since the Defendant's preliminary claims with respect to be authority of this Court to try him were rejected, we did not have any reasonable and justifiable explanation for his abstention from giving evidence. It is quite clear that the Defendant, who during the course of

[Stamp] Gilmore 00798 [continued]

99

SHATSKY-009286-433

his interrogation was exposed to the incriminating evidence that was accumulated against him, knew full well that he was unable to deal with it on the legal level and therefore fled to the warm embrace of the political level. Several times during the course of his interrogation, the Defendant said that it was clear to him that he would be tried and convicted and, therefore, planned to conduct a political trial.

In this matter, is important to note that despite the fact that the Defendant declared that he would not conduct a defense case, as indeed he did not, he did give political speeches and sometimes even related to the evidence presented against him – but from the Defendant's bench and not from the witness stand. By law, we are unable to give any significance to statements that were made in this manner, which did not give the Prosecution the possibility of questioning the Defendant about them. With respect to the many things that the Defendant said on the diplomatic and political levels, both during the trial and during the summations, we are not permitted to relate to them since they are irrelevant to the question of the Defendant's guilt of the crimes with which he is charged. These issues were explained in the Ruling with respect to the authority of the Court: a person who acts outside of the framework of legal combat, and who perpetrates acts of terrorism for the purpose of causing injury, without distinction, to the civilian population, exposes himself to the ordinary criminal sanctions of national criminal law (see the decision that was handed down by the Court in this case, dated January 19, 2003 on pages 29 – 33). Opposition to the occupation, as claimed by the Defendant, does not serve as justification, in accordance with any law, for acts of killing that have been carried out against innocent civilians. Furthermore: The place for this claim – if any – is during sentencing claims, since it relates to the motivation for the crime as distinguished from the criminal intention required in order to prove them.

B.  Since the Defendant chose not to conduct a defense case, he also did not bring any claims against the admissibility of the evidence or its significance. However, the Court considered itself obligated to consider this question of its own initiative and to ignore the inadmissible evidence that was submitted by the Prosecution or which was used in his summation (including hearsay evidence included in witnesses' statements, transcripts and statements that were not submitted by an interrogator by the name of s who recorded them, expert opinions based on intelligence information and evidence that was not submitted during the trial, and points in the transcript that relate to polygraph findings.)

[Stamp] Gilmore 00799

SHATSKY-009286-433

We also examined the evidentiary material from the Defendant's perspective, not only from the perspective of the Prosecution, as described in his summation. In spite of this, we are subject to the general principle by which the Defendant who does not testify in his case is not entitled to rely on comments from external statements that he gave: these statements are valid as evidence against him but not in his favor since it was not possible to question him about those statements (see Criminal Appeal 205/75 **Krantz v. The State of Israel**, PD 30 (2) 471, on page 474).

C.  The Prosecution subpoenaed 21 field commanders and terrorism operatives who were involved in the terrorist attacks that are subject of the Indictment to testify about the Defendant's connection to them, in accordance with that which has been set forth above. These witnesses – without exception – refused to answer the questions of the attorney for the Prosecution, and it seems that this was not a personal decision of each individual but rather an instruction given from above. These witnesses were not willing to testify against their commander and leader; this is clear. In a conversation conducted between the Defendant and Ahmed Barghouti after they were arrested, which was recorded without their knowledge, Ahmed warned the Defendant about the testimony that would be given by terrorism operatives who had been arrested, and the Defendant replied, with laughter in his voice, "**In Court everyone will deny everything they admit… everything will be canceled… the interrogators told me. I told them that no one will admit anything in Court**" (Transcript 127 (c) on page 109). So the Defendant said, and so it happened.

In these circumstances, all of the terrorism operatives were declared hostile witnesses and their statements during interrogation were submitted under Section 10 (A) of the Rules of Evidence. With respect to these witnesses, we comment as follows:

(1)  Most of the Prosecution witnesses testified after they themselves were tried, and mostly convicted, on the basis of their own confessions for crimes including their involvement in the terrorist attacks that are the subject of the Indictment. In their confessions to the facts

[Stamp] Gilmore 00799 [continued]

101

SHATSKY-009286-433

in the Indictments filed against them, these witnesses incriminated the Defendant. However, the law with respect to a Defendant's confessions of this type when they are given by a person who is a witness in Court, is that they are considered an external statement that is covered by Section 10 (A) of the Rules of Evidence, but confessions of this type are not ascribed the weight of truth. From the point of view of the witness – the confession that he gives during his trial focuses entirely on the facts relating to him, and it is highly doubtful that he was aware at that time of the implications that part of his confession might have on others (see: Criminal Appeal 4541/90 **Eliyahu Sela v. The State of Israel**, High Court Compendium 91 (2) 2086.)

(2) In general, an external statement made by a witness is hearsay evidence that is discounted as testimony on the veracity of its content. An exception to this generalization is stated in Section 10 (A) (a) of the Rules of Evidence, in accordance with which the Court is permitted to accept a statement of this kind and even rely on it and prefer it over the witness's testimony in Court, when a witness in the case refuses to testify or he denies the version that he gave during interrogation.

The purpose of this Section is to deal with the common phenomenon of witnesses who deny the version that they gave during their interrogation, in order to prevent a situation in which it is impossible to confront them in Court with the version that they gave during their interrogation. (See the explanation of the proposed legislation for amending the Rules of Evidence, 5734 – 1974.) And note: a witness who is subpoenaed to testify and has taken his place on the witness stand is considered a "witness in the trial", even if he refuses to answer questions and therefore the above mentioned Section 10 (a) (a) applies to him rather than Section 10 (a) (b), which deals with the case of a witness who it is impossible to bring to Court at all, for reasons enumerated in that Section. (See: Additional Criminal Proceedings 4390/91 **State of Israel v. Haj Yihe**, PD 47 (3) 673; compare with the expert opinion of A. Stein, "*Section 10 (A) of the Rules of Evidence: Its Proper Interpretation and Rulings of the Supreme Court*", [the journal] Mishpatim 21, 5752 [1992], on page 325, on pages 336 – 338.)

(3) According to Section 10 (A) (a) of the Rules of Evidence, admission of an external statement of a witness in the trial, when that witness denies the contents of the testimony he gave during the course of his interrogation, is conditional on proving that the statement was given, that it was given by that witness in the trial, and that the parties were given an opportunity to question him. In our case, these conditions are met for the 21 terrorism operatives mentioned above.

[Stamp] Gilmore 00800

102

SHATSKY-009286-433

(4) The Court is entitled to rely on findings from an external statement that was admitted in accordance with Section 10 (A) of the Rules of Evidence and even to prefer it to testimony given by the witness in Court "**if it sees fit to do so, considering the circumstances of the case, including the circumstances in which the statement was given, the evidence that was presented in Court, the behavior of the witness in Court and signs of the truth revealed during the trial; its reasons shall be recorded**" (see Section 10 (A) (c) of the Rules of Evidence).

(5) According to Section 10 (A) (d) of the Rules of Evidence, a person may not be convicted on the basis of external statements admitted, in accordance with this Section, unless there is something in the evidentiary material to reinforce it. The intention is additional evidence that reinforces the reliability of the external statement and dispels the concern that it not truthful (see: Y. Kedmi, **On Evidence**, on pages 354 – 365.)

On this issue it should be noted that the external statement of one witness, which itself requires reinforcement, can serve as reinforcement for the external statement of another witness (the above mentioned by Y. Kedmi on page 366, and the rulings cited therein). As noted above, the Defendant's silence during the trial can also serve as the reinforcement of a witness's external statements, as can abstention from cross-examination (Y. Kedmi, *op. cit.* on pages 369 – 371, and the rulings cited therein).

The clear ruling is that the Defendant's abstention from cross-examining witnesses also reinforces the Prosecution's evidence (see Criminal Appeal 4736/91 **Patir v. The State of Israel** (High Court Compendium 94 (2) 1866). The Defendant may not thereafter bring any claims based on the fact that the witnesses were not cross-examined

[Stamp] Gilmore 00800 [continued]

SHATSKY-009286-433

(see: Criminal Appeal 1632/95 **Uzi Meshulam v. The State of Israel**, PD 49 (5) 534, on page 550, where the trial was held without the Defendant being present, at his request, and the Defense was instructed not to question the witnesses). A Defendant cannot thwart the legal proceedings being conducted against him by simply abstaining from offering a defense.

**In the current case**, the Defendant's conviction is supported by a broad reliable network of evidence that includes confessions that the Defendant gave during the course of his interrogation, statements that the Defendant made in the media, documents that were seized from the Defendant and the Palestinian Authority and a large amount of testimony given by the terrorism operatives during their interrogations, which supports and reinforces each other. It emerges from the evidentiary infrastructure described above that it is completely clear that the terrorism operatives decided to abstain from testifying during the trial in order to thwart the process and to avoid revealing the versions that they gave during their interrogations. The Defendant expressed anger during the course of his interrogation over the incriminating comments that field operatives said against him (see: Report of the Meeting of the Defendant with Aweis Prosecution/77 (b); comments that the Defendant said to Agent John Doe No. 3 Prosecution/123 on page 1 and Prosecution/124 (a) Section 1; comments that the Defendant said to Agent John Doe No. 1 Prosecution/112 (a) Sections 6 – 7, Prosecution/ 114 (a) Section 7, Prosecution/115 (a) Sections 13, 14, Prosecution/116 Section 9; and the Defendant's conversation with Ahmed Barghouti Prosecution/127 (c) on pages 3, 4, 72, 84), and this fact reinforces the conclusion that the terrorism operatives said correct things about the Defendant during their interrogation.

Under these circumstances, the statements given by the witnesses during their interrogations are to be preferred over their testimony in Court since there is much more than "reinforcement" for the statements that they gave during their interrogation. The statements that the terrorism operatives made correspond very well with each other, and together with comments that the Defendant said during the course of his interrogation as well as the documents that were seized from the Palestinian Authority reveal a clear picture that points to the Defendant's role and position in the terrorist attacks that are the subject of the Indictment.

133. We do not find any reason to cast doubt on the reliability of the Israel Security Agency interrogators who testified that the transcript they recorded during the interrogation of the Defendant reasonably reflect the main points of the Defendant's statements. When considering the significance of these points, it is necessary to consider the guidelines that we explained at length in Serious Crimes Case 1074/02 **State of Israel v. A'asi Muhsin** (District Court Compendium 2003 (2) on page 3553, Sections 76 – 84). These transcripts

[Stamp] Gilmore 00801

104

SHATSKY-009286-433

are composed of the Defendant's statements, but unlike accepted practice in police interrogations, they contain only a summary of the interrogation; the person being interrogated is not always warned with respect to his rights; the person being interrogated does not read what is being recorded in the transcript and does not sign them; transcripts are not infrequently written in Hebrew even when the interrogation was conducted in Arabic despite the clear guidelines given in Court rulings. In spite of this, it is important to emphasize that these transcripts certainly constitute admissible evidence, although when considering their significance, the extent and manner in which they are recorded and documented must be considered (see: Criminal Appeal 6613/99 **Samrik v. The State of Israel**, Ruling of the Israel Supreme Court 56 (3), 529, on page 553).

**In the current case**, many of the transcripts were backed up by transcripts of recordings made during the interrogation in which the Defendant is heard speaking his own voice, in Hebrew [*Translator's note: as written*], a language in which he knows how to express himself quite well. This removes the doubt with respect to their reliability. Similarly, the Defendant was told explicitly throughout his entire interrogation that he is not obligated to say anything, and anything that he does say can be used as evidence against him. The Defendant even met with a lawyer during the course of his interrogation (see below). Furthermore: the comments that the Defendant said during his Israel Security Agency interrogation, as they were written in the transcript and largely recorded and transcribed, are well supported by the testimony of the terrorism operatives that win accordance with that which has been set forth above, and sometimes also by the documents that were seized from the Defendant's [office] and the interviews that he gave to the electronic media. In this situation, we do not need to rely only on the transcripts that were recorded by the Israel Security Agency interrogators as the Defendant spoke, and not only on the comments that were said by the terrorism operatives during their interrogations (since they refused to testify in Court and denied the things that they had said during their interrogationas). Rather, we are able to form a direct impression based on comments the Defendant said during his Israel Security Agency interrogation, based on the recordings and transcripts.

134. When evaluating the significance of the Defendant's words during his Israel Security Agency interrogation, we considered the fact that although the Defendant himself did not bring any claims in this regard, this was a long and exhausting interrogation. The Defendant was

[Stamp] Gilmore 00801 [continued]

105

SHATSKY-009286-433

interrogated for very long periods of time during which he slept only a little and sat fettered to the chair, which he described in a conversation with Agent John Doe No. 1 (Prosecution/112 (c) (1) on pages 3-4) as torture.

It was made clear to the Defendant that as long as he did not cooperate with his interrogators it would be necessary to continue the interrogation. It was even hinted to him that the way to meet with members of his family would be to cooperate (Transcript Prosecution/12 Section 13). During one of the interrogations, the Defendant was told that his interrogation would not end until he told the truth, as was the case for all of the terrorism operatives who eventually admitted the Defendant's part in the acts ascribed to him (Transcript Prosecution/63 Section 9 – 10). During one of the interrogations, the Defendant refused to continue with the interrogation until he was given a reasonable amount of time to sleep and the interrogator explained that he would not be allowed to sleep until he admitted to at least the main points with respect to his activities, but the Defendant rejected this proposal (Transcript Prosecution/21 Section 26 – 28). Similarly, moral pressure was used against the Defendant to encourage him to confess and behave like a leader who takes responsibility for the acts of his subordinates, instead of denying the things that his subordinates did and presenting them as liars (Transcripts Prosecution/16 – Prosecution/17).

When considering the fact that the Defendant was interrogated for many long hours, it is important to note that the Defendant was arrested and interrogated during Operation Defensive Shield, during a period in which many terrorist attacks were perpetrated against Israel. In this situation, it is clear that it was important to complete the interrogation as quickly as possible, because it was being conducted not only in order to determine his guilt but also, and perhaps primarily, in order to thwart additional attacks. The Israel Security Agency interrogators explained how important it was to them to reach the terrorism operatives and terrorist cells that were connected to the Defendant quickly, and that the interrogation of the Defendant was primarily for purposes of intelligence (interrogator "Itai" on page 154 and interrogator "Wadi" on page 97.)

Investigation of the Serious Crimes with which the Defendant is charged and the intelligence needed to obtain information from him as quickly as possible required his continuous interrogation for many hours. This does not lead to invalidating the Defendant's statements, since it is clear that he said to his interrogators only those things that he wanted to say and there were justifiable, relevant reasons to use this means of interrogation, because of the security situation that prevailed at that time (see: Y. Kedmi, **On Evidence**, Part One, 5764/2003 Edition, on pages 55 – 58).

[Stamp] Gilmore 00802

SHATSKY-009286-433

135. It was clear during the interrogation process that the Defendant gave much thought, aloud, to whether he should admit his connection to the terrorist attacks with which he was charged in the Indictment. He even explained that this could be an obstacle for him in his future as a leader of the Palestinian people (for example, see Transcript Prosecution/24 Section 7; Transcript Prosecution/68 Section 6). In the end, the Defendant decided to admit to some of the things that he had done after he understood that the field operatives had confessed during their interrogation and incriminated him, meaning that the interrogators had solid evidence with respect to the accusations against him. Therefore, the Defendant admitted only to those things that his people had previously admitted, and he repeatedly explained and made clear that he would admit only to those items that were presented to him and which were correct (Transcript Prosecution/22 Sections 8 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58, and Transcript Prosecution/23 Section 9, which was submitted and verified by an interrogator by the name of "Danny", on page 90). The Defendant asked to meet with the head of the Israel Security Agency and said that he would be willing to admit to those things for which he was responsible if he could be shown that others had already admitted to them (Transcript of Interrogation Prosecution/98 (a) on pages 16 – 18, 26 – 28).

In this context it should be emphasized that the Defendant himself said, in his conversation with Agent John Doe No. 1, that he learned during the course of his interrogation that the field operatives who had been arrested provided a large amount of reliable information about him. When the agent asked him if the information they give about him was true, he answered, "**much of it, that is to say there is proof and accuracy**" (Transcript of Conversation Prosecution/112 (c) (1) on page 6). Further, the Defendant told Agent John Doe No. 1 that his driver (Ahmed Barghouti) provided a confession that connected the Defendant to eight suicide terrorist attacks in Israel, and when the Defendant was asked if Ahmed Barghouti "closed him in with his confession" – he responded positively (Transcript Prosecution/114 (a) Section 7). Throughout all the conversations between the Defendant and Agent John Doe No. 1, it is possible to see that the subject of the confessions given by the field operatives during their interrogations bothered him greatly, and he was aware of the fact that they had given correct information with respect to him (see Reports Prosecution/112 (a) (1), Prosecution/113 (a), Prosecution/.113 (c), Prosecution/114 (a), Prosecution/114 (c), Prosecution/115 (a), Prosecution/115 (g) (1) (a), Prosecution/116.)

The Defendant told John Doe No. 1 that he claimed during the course of his interrogation to be a political leader, but the confessions given by others against him and the large amount of material that was seized from his office and from the offices of the Palestinian Authority would force him "**to talk**

[Stamp] Gilmore 00802 [continued]

SHATSKY-009286-433

**during the interrogation**" (Report Prosecution/117 Sections 29, 32 that was submitted by an interrogator by the name of "Robert").

136. The turning point in the interrogation of the Defendant began on April 21, 2002, approximately one week after the Defendant had been arrested, when he decided to tell the facts from his perspective and at his responsibility, but he asked if first the information that his men had given during interrogation could be presented to him, and if he could be allowed to meet with the head of the Israel Security Agency or his deputy (Transcript Prosecution/19 – Prosecution/20). The Defendant accepted the interrogators' proposal to distinguish between his refusal to make incriminating statements to the police, which could be revealed in the future, and his providing details of his activity during the Israel Security Agency interrogation (Transcript Prosecution/20 Sections 10 – 12, Transcript Prosecution/24 Section 7). The Defendant based himself on the assumption that things he said to the police would be revealed to the public and obligate him, as opposed to things that he said during the Israel Security Agency interrogation, which the Defendant planned to deny, as indeed he did during his police interrogation and his trial. The Defendant said this explicitly during the course of his interrogation by the Israel Security Agency, when he was told atht the transcript recorded during the course of his interrogation would be submitted as evidence in Court as if they were police testimony (Transcript Prosecution/25 Section 23, which was submitted and verified by an interrogator by the name of "Mofaz", on page 58).

In this regard, it should be noted that six days after his arrest, the Defendant was questioned and warned in the customary manner, that by law he is not obligated to say anything, and that anything he would say could be used as evidence against him (see Transcript Prosecution/40 Section 1, and testimony of the interrogator "Mofaz", on page 59). The interrogator "Mofaz" testified that these warnings were given to the Defendant during all of his interrogations, and the interrogator "Emile" also testified to this (on pages 57, 59 and the warnings included in the Transcript Prosecution/41 Section 1; Prosecution/44, Prosecution/25; Transcript of Interrogation Prosecution/98 (j) on page 37). Although it was sometimes hinted to the Defendant that he might not actually be brought to trial, because there was a possibility that he would be deported, the Defendant noted that he preferred the option of standing trial, even if it was clear that he would be tried and sent to jail for many years (Transcript Prosecution/10, Prosecution/11, Prosecution/14 and Prosecution/19 Section 5, and Transcript Prosecution/63 Section 25).

[Stamp] Gilmore 00803

SHATSKY-009286-433

137. During the course of his interrogation, the Defendant said that he planned to conduct a political trial while ignoring evidence that had been developed against him during the trial (Transcript Prosecution/42 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on page 96; and Transcript Prosecution/56 Section 3 that was submitted and verified by an interrogator by the name of "Smith", on page 85). During the Defendant's conversation with Agent John Doe No. 1, he explained to him that the tactics he would take during the interrogation – namely he would not admit to anything other than things about which the interrogators already knew and would try to buy time in order to understand what the interrogators knew so as not to incriminate others. He also told his attorney that he would not make any statements to the police (see Report Prosecution/118 Section 3, Prosecution/120 Section 2, and his comments to John Doe No. 3 in Report Prosecution/122 Section 1). At this point, it should be noted that the Defendant first met with his lawyer, Attorney Boulos, three days after he was arrested (Exhibit **Prosecution/164**, and Transcript **Prosecution/111** Section 14). During the course of his interrogation, the Defendant met with Attorney Boulos several times (Transcript Prosecution/90 Section 1.)

138. **In conclusion**: We have no reason to assume that the Defendant's confessions during his Israel Security Agency interrogation were given because any sort of illegitimate means were used against him that led the Defendant to negate his free will. The Defendant never claimed that this happened. During the trial, as well as during his police interrogation, when comments that he had said during his Israel Security Agency interrogation were presented to the Defendant, he repeatedly claimed that they were "lies and forgeries." He did not claim that any illegitimate means were used against him during the interrogation and our clear impression is that the interrogators treated the Defendant respectfully, as the Defendant himself said during his Israel Security Agency interrogation (Transcript Prosecution/75 Section 2, Transcript Prosecution/90 Section 1 and Transcript of the Defendant's Interrogation Prosecution/98 (f) on page 29). At the time that testimony was given in Court, the Defendant shook hands with some of the Israel Security Agency interrogators, and this fact also testifies that the Defendant does not harbor any negative feelings against his interrogators.

The Defendant had full control of the comments that he said to his Israel Security Agency interrogators: he decided what things he was willing to say during the course of his interrogation , which he expected were already known to the interrogators anyway, and which things he intended to hide from them. The Defendant was very cautious during the course of his interrogation and more than once refused to answer a question that had been asked or

[Stamp] Gilmore 00803 [continued]

109

SHATSKY-009286-433

answered in an indirect, implied manner. He chose the tactics that he used during interrogation, namely to expand on political subjects, be brief with respect to those related to acts of terrorism and, in any case not to provide any details other than those which he expected that the interrogators already knew.

As Agent John Doe No. 1 testified, the Defendant told him, "**Even if the entire Palestinian people admits to something, he will decide what to say during interrogation**" (Prosecution/110 Section 10). From all which is stated above, it is clear that the Defendant gave his statements of his own free will.

[Stamp] Gilmore 00804

SHATSKY-009286-433

## Part IV:  Legal Analysis and Conclusions

### 1.  Activity and Membership in a Terrorist Organization

139.  In the Indictment, the Defendant is charged with the crimes, among others, of activity and membership in a terrorist organization, in accordance with Sections 1 – 3 of the Prevention of Terrorism Ordinance, 5708 – 1948, which states:

### "1.  Interpretation

'Terrorist organization' means a group of persons that uses, in its activities, acts of violence calculated to cause death or injury to a person or to threats of such acts of violence; a 'member of a terrorist organization' means a person belonging to it and includes a person who participates in its activities, publishes propaganda in favor of a terrorist organization, its activities or aims, or collects money or goods for the benefit of a terrorist organization or its activities.

### 2.  Activity in a terrorist organization

A person fulfilling a managerial or instructional position in a terrorist organization or participating in the deliberations or decision-making of a terrorist organization or acting as a member of a tribunal of a terrorist organization or delivering a propaganda speech at a public meeting or on the radio on behalf of a terrorist organization shall be guilty of an offence and shall be liable, upon conviction, to imprisonment for a term not exceeding twenty years.

### 3.  *Membership in a terrorist organization*

A person who is a member of a terrorist organization shall be guilty of an offence and be liable, upon conviction, to imprisonment for a term not exceeding five years."

Section 7 of the Prevention of Terrorism Ordinance states:

### "7.  *Proof of the existence of a terrorist organization*

In order to prove in any legal proceeding that a particular group of persons is a terrorist organization, it shall be sufficient to prove that –

(a)  One or more of its members, on behalf of or by order of that group of persons, at any time after 5 Iyar 5708 (May 14, 1948), committed acts of violence calculated to cause death or injury to a person or made threats of such acts of violence; or

[Stamp] Gilmore 00805

111

SHATSKY-009286-433

    **(b)**   **The group of persons, or one or more of its members on its behalf or by its order, has or have declared that that body of persons is responsible for acts of violence calculated to cause death or injury to a person or for threats of such acts of violence, or has or have declared that that body of persons has been involved in such acts of violence or threats, provided that the acts of violence or threats were committed or made after 5 Iyar 5708 (May 14, 1948)."**

[Stamp] Gilmore 00805 [continued]

112

SHATSKY-009286-433

140. The fact that Fatah, Tanzim and Al Aqsa Martyrs Brigades are terrorist organizations, in accordance with that which has been set forth in the Expert Opinion of Brigadier General Cooperwasser Prosecution/1, is clearly proven by the seized documents that were taken during Operation Protective Shield, which were presented as evidence in this Court, and also from the testimony of the terrorism operatives and the Defendant himself (see above, Sections 7 – 10; testimony of Aweis in Sections 21 – 23; testimony of Abu Hamid in Section 25; testimony of Ahmed Barghouti in Section 29; testimony of Ahawil in Section 35; testimony of Aidiya in Section 40; testimony of Sharif in Section 55; testimony of Abu Radaha in Section 57; and the Defendant's statements from his interrogation as described in Sections 60 – 64). The terrorist attacks covered by this Indictment, and many others, were brought into being by the field operatives of Fatah – members of the Tanzim – and by cells that were organized within the framework that is called "the Al Aqsa Martyrs Brigades". The Defendant was the leader of Fatah in the West Bank and commander of the Tanzim and Al Aqsa Martyrs Brigades, as he admitted during the course of his interrogation and is proven by much additional evidence (see Section 17 and Sections 60 – 65 above).

The Defendant's roles in leadership of the terrorist organizations was also described at length (see Part II, Chapter D above). The Defendant was the commander of terrorist organizations and terrorist cells, even if sometimes they did not follow his orders, and he made an effort to supply them with weapons, explosives and money for the purpose of their activities (see Part II, Chapter D (1) and (3) above). He was also personally involved in some of the terrorist attacks that have been carried out by the organizations that he led (see Part II, Chapter D (2) above). The Defendant also handled assistance for wanted men and the families of people who were arrested or killed, recruited operatives for the terrorist organizations and trained them (see Part II, Chapter D (4) – (5) above). He was the person who expressed the positions of the terrorist organizations in the media (see Chapter D (6) above).

In this case, therefore, we are not dealing merely with "a person fulfilling a managerial or instructional position in a terrorist organization" in accordance with that which has been set forth in Section 2 of the Prevention of Terrorism Ordinance, rather the Defendant was the person who headed these terrorist organizations, created their policy and made propaganda speeches on their behalf in the media.

Therefore, the foundations of Sections 2 and 3 of the Prevention of Terrorism Ordinance, namely membership in a terrorist organization and activity in such an organization, are proven.

[Stamp] Gilmore 00806

SHATSKY-009286-433

## 2. **Responsibility of the Joint Perpetrator, the Solicitor and the Accessory and the Differences Between Them**

141. The Indictment charges the Defendant with the direct responsibility of a "joint perpetrator" in all of the acts of murder and attempted murder that are the subject of the Indictment, which lists 37 different terrorist attacks.

    The Indictment also charges the Defendant with the crimes of being an accessory to murder and soliciting murder, even though the Prosecution's claim in its summation is that the Defendant should be considered a joint perpetrator in these crimes, and not only an accessory or one who solicits others, because he was a leader of terrorist organizations and the main person responsible for perpetrating murderous terrorist attacks that were brought into being by these terrorist organizations. Therefore, it is necessary to review the degree of responsibility claimed for the Defendant in the terrorist attacks that are the subject of the Indictment: first – as one who committed acts of murder as a joint perpetrator together with the field operatives and the terrorists who actually perpetrated the attacks; second – as the person who solicited others to perpetrate the attacks; third – as an accessory to acts of murder. In this framework, is necessary to examine the traits that characterize "the joint perpetrator" and to distinguish between them and those that characterize the accessory and the one who solicits [the offense].

142. In Section 29 (b) of the Penal Code, 5737-1977, the responsibility of the joint perpetrator is defined as follows:

    > **"The participants in the perpetration of a crime who take action in order to commit it are joint perpetrators and it makes no difference if all of the actions are done together or if some are accomplished by one and some by**

[Stamp] Gilmore 00806 [continued]

114

SHATSKY-009286-433

another."

Section 30 of the Penal Code, 5737 – 1977, defines the responsibility of the solicitor as follows:

> **"Anyone who causes another to perpetrate a crime by persuasion, encouragement, demand, pleading or any other manner that exerts pressure is soliciting a crime."**

Section 31 of the Penal Code, 5737 – 1977, defines the responsibility of the accessory as follows:

> **"Anyone who, before the commission of crime or during its commission, does anything to make commission of the crime possible, who makes it easier, secures it or prevents the capture of the perpetrator, its discovery or negation or contributes in any other manner to the creation of conditions for committing the crime, is an accessory."**

143. In order for a person to be considered a joint perpetrator who commits a crime together with others, there needs to be a foundation of "taking action in order to perpetrate" the crime, as Section 29 (b) of the law instructs.

Rulings have interpreted the concept "perpetrate" broadly when defining the essence of the act that it requires. Similarly, rulings have set flexible criteria with respect to the degree to which the participant needs to be close to the circle of perpetrators and for his ability to influence their deeds (Additional Proceeding 1294/96 **Uzi Meshulam v. The State of Israel** PD 52 (5) 1, on page 21 (the Honorable Justice A. Matza), on page 54 – 55 (the Honorable Justice M. Cheshin) and on pages 63 – 64 (the Honorable Justice Y. Kedmi)).

With respect to the act that is required in order for it to be possible to consider a person to be a joint perpetrator, it has been ruled that it sufficient for the act of perpetrating the crime to be beyond simple preparation (this is also the criteria for the existence of attempt), and be accompanied by the appropriate mental basis (Additional Proceeding 1294/96, as above, in the case of **Meshulam**, on pages 23 – 24). This act is not required to be essential for the success of the crime nor does it need to be an act that is part the basic factual foundation of the crime; it is sufficient that the act is included in the plan for the crime or the division of tasks among the participants (the above mentioned Additional Proceeding 1294/96, in the case of **Meshulam**, on pages 63 – 64 (the Honorable Justice Y. Kedmi)).

A. **The Joint Perpetrator in Comparison to the Accessory**

[Stamp] Gilmore 00807

115

SHATSKY-009286-433

144. The distinction between the "joint perpetrator" in a crime, in accordance with Section 29 (b) of the Penal Code, and the "accessory", in accordance with Section 31 of the law, has become a matter of major importance since amendment to the Penal Code (Amendment No. 39) (Preliminary Part and General Part), 5754 – 1984 [*Translator's note: date as written*] came into force because in accordance with Section 32 of the law in its new version, the punishment of an accessory is half that of a joint perpetrator, whereas in accordance with the previous law their punishment was the same. The maximum punishment for an accessory to murder is 20 years' imprisonment (see Section 32 (1) of the Penal Code) while the mandatory sentence for a joint perpetrator murderer, in the absence of circumstances for reduced responsibility, is life imprisonment.

In Criminal Appeals 8901, 8873, 8710, 8620, and 8573/96 **Mercado *et al*. v. The State of Israel ("the discount banker's trial"**), PD 51 (5) 481, the Honorable Justice Goldberg wrote on page 545:

> **"Amendment No. 39 to the Code expresses the recognition that the moral guilt and the subjective and objective danger adhering to the accessory is less than that of the joint perpetrator. This disparity is the foundation for the distinction in sentencing between the joint perpetrator and the accessory and it is what should guide us when determining the test to be used for distinguishing between a principal offender and an accessory."**

145. The distinction between a "joint perpetrator" and an "accessory" was clarified in Criminal Appeals 4389/93 and 4497/93, **Yossi Mordecai *et al*. v. The State of Israel**, PD 50 (3) 239, in Criminal Appeals 2796/95, 2813/95, and 2814/95, **John Does v. The State of Israel**, PD 51 (3) 388, the above mentioned Additional Proceeding 1294/96 in the matter of **Meshulam**; the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on pages 543 – 550; and Criminal Appeal 2111/99 **Heyro v. The State of Israel**, PD 58 (1) 411. The distinction between a joint perpetrator and accessory is found in both its factual basis and its mental basis. In principle, "**The quality of the accessory's contribution to perpetration of the crime is a lower one than the quality of the contribution of the principal offender**" (the above mentioned Criminal Appeal 8573/96, on page 545).

[Stamp] Gilmore 00808

116

SHATSKY-009286-433

With respect to the **factual basis** of the crime – the main distinction between is between direct and indirect partners in perpetrating the crime. The joint perpetrators are those "**participants who take action in order to perpetrate**" the crime, but each one is not required to personally perpetrate all of the factual bases of the crime (see Section 29 (b) of the Code). In contrast, the accessory does something that in some way contributes to "**creating conditions for committing the crime**" (see Section 31 of the Code). The joint perpetrator is part of the inner circle that commits the crime while the contribution of the accessory to the commission of the crime is entirely external. Therefore, the Court examines the degree of proximity for each participant in the crime, meaning is he part of the inner circle of the criminal task (Criminal Appeal 3390/98 **Rosh v. The State of Israel**, PD 53 (5) 871,

[Stamp] Gilmore 00808 [continued]

SHATSKY-009286-433

878). This, then, is "**the proximity test**" that was explained by the Honorable Presiding Justice A. Barak in the above mentioend Criminal Appeal 4389/93, the matter of **Mordecai**, on page 250:

> "**The difference between the joint perpetrator and the accessory is expressed in that the joint perpetrators act as a single unit to commit a criminal task. They are all chief offenders… The contribution of each of the joint perpetrators is "internal"… therefore, with respect to the joint perpetrators, it may be possible to divide the work between the offenders so that they act in different places and at different times without each of them completing the crime, but each part is significant for implementing their common plan. Uniform time and place are not essential, as long as the role of each is an internal role for the criminal task.**"

146. In the rulings that were cited above, the Supreme Court reviewed the various distinctions that have been proposed in rulings and in legal literature in order to set boundaries between a joint perpetrator and an accessory. There are those who emphasize "**the test of control**" as a characteristic of the joint perpetrator: the joint perpetrator has control, together with others, over commission of the crime; he is part of a joint plan for committing a crime, and works together with others in order to carry out it. On the status of the joint perpetrator in light of the "test of control," the Honorable Presiding Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/93, in the matter of **John Does** (see Section 28):

> "**The characteristic of the joint perpetrator is that he is master of the criminal activity. He has functional – substantive control, together with the other joint perpetrators, over the criminal act. He is part of the joint decision to commit the crime and he is part of the overall plan to commit the crime, and works together with the others to realize the forbidden criminal act. He works together with the other joint perpetrators so that each one of them has control – together with the others – over the entire activity. His status with regard to the decision to commit the crime is one of a person who is 'inside.' His contribution is 'internal.' He has a substantial share in completing the joint plan…**"

Similarly, in the ruling that was handed down on the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on pages 547 – 548. In contrast, in regard to the accessory, the Honorable Presiding Justice A. Barak wrote that the accessory "**is not the father of the idea**" to commit the crime and in Section 30 he wrote as follows:

[Stamp] Gilmore 00809

118

SHATSKY-009286-433

  "The accessory is an indirect secondary partner (Mordecai case, Section 14). He is found outside of the inner circle of perpetration. He is an 'external' force. He does not initiate the perpetration and he does not solicit it… He does not decide to commit the crime and he does not control it…"

[Stamp] Gilmore 00809 [continued]

119

SHATSKY-009286-433

(See also the above mentioned Criminal Appeal 4389/93, in the matter of **Mordecai**, Sections 13-14).

147. In contrast to the "test of control," there are those who emphasize the "**test of functionality**," in accordance with which the joint perpetrator is a person who takes a substantial role in committing the crime itself, while the share of the accessory is expressed in an act of assistance and is external to the crime.

This test finds expression in the language of Section 29 (b) of the law ("**participants in the commission of an offense while taking action in order to commit it**"). In the above mentioned Criminal Appeal 2792/93, in the case of **John Does**, (see Section 27) the Honorable Presiding Justice A. Barak wrote with regard to joint perpetrators:

> "**They are the main partners in the commission of the crime. The partnership between them is expressed in that they have taken part in the commission of a crime as direct perpetrators. They work as a single unit to commit a criminal task… Each takes a principal part in of commission of the crime.**"

In continuation of his words (see Section 27), Honorable Presiding Justice A. Barak wrote:

> "**Being a joint perpetrator requires joint planning. It is based on a division of work among the perpetrators… **"

The Honorable Justice Y. Kedmi wrote clearly about the decisive importance of the "test of functionality" in Criminal Appeal 5206/98 **Halil Abud v. The State of Israel**, PD 52 (4) 185 (see Section 2):

> "**'The joint perpetrators' are not only the partners in the commission of the 'act' of the crime itself; rather, they include everyone who 'took part' in the commission of the crime, in the broadest sense of the word 'commission.' Whereas anyone who only 'contributed' to its commission, without actually taking part – which is to say without having a 'role' in its framework – remains in the 'outer circle' of those who are responsible for its commission. He is not the partner in commission; his role is limited to simple 'assistance' for the commission of the crime.**

[Stamp] Gilmore 00810

SHATSKY-009286-433

> The distinction between those who are included in the 'inner circle' – 'the joint perpetrators' – and those who are included in the 'outer circle' – 'the accessories' – is to be found in the quality and character of their involvement in its commission: if 'they took part in its commission' – meaning if they have a 'role' in its commission, then they are 'co-conspirators'; but if they only 'contributed' to it from the outside – then they are merely 'accessories.'"

Further on in the ruling, the Honorable Justice Kedmi explains that the distinction between the joint perpetrator and the accessory **is not** dependent on the question of whether the Defendant's behavior assisted in the commission of the crime, since a joint perpetrator can also assist its commission; the question is "**if he took part – meaning: if he played a role – in the commission of the crime.**"

In Additional Proceedings **1294/9 6, 1365 Meshulam _et al._ v. The State of Israel**, PD 52 (5) 1, on page 63, the Honorable Justice Kedmi wrote:

> "'An active partnership' need not be expressed in joint action in committing an 'act' that is an element of the factual basis of the crime, and the broad comprehensive meaning of 'act' expresses 'partnership' in committing the crime. In Section 29 of the Penal Code, the definition of 'active partnership' does not require that the 'act' be done while committing the factual basis of the crime but it certainly expresses 'partnership' in its commission. The 'partnership', as noted, can begin with the suggestion of the idea to the people who are designated to commit the crime."

The Honorable Justice M. Cheshin noted in the same manner that the law does not require that an act of partnership in the commission of a crime be done while the crime is actually being committed or is adjacent to it (on pages 53 – 54).

148. In the above mentioned Additional Proceeding 1294/96, in the matter of **Meshulam**, the Supreme Court explained that "the test of control" is a auxiliary test that is not the sole or exclusive test, and that it should be combined with other tests and considerations; controlling the commission of the crime is important evidence of a person being a joint perpetrator but the lack of control or a lack of critical physical contribution to commission a crime does not necessarily negate this conclusion (Honorable Presiding Justice A. Barak on page 50; Honorable Justice A. Matza on pages 24 – 27; Honorable Justice Y. Kedmi on page 65). Furthermore, even when the Court is aided by the "test of control" this is done while emphasizing that it does not mean continuous control throughout the commission of the entire crime but rather "control of a certain portion of the crime that was allotted to a particular perpetrator" (Honorable Justice Y. Kedmi on page 64).

[Stamp] Gilmore 00811

121

SHATSKY-009286-433

149. With respect to the mental basis for the crime – certainly the mental attitude of the accessory is on a lower level than that of a principal perpetrator, for everything related to the degree of his awareness of details that are related to the commission of the crime and his desire to realize it. We would rule that for the accessory, it is sufficient if he is aware of the fact that his behavior contributes to creating the conditions necessary for committing the main crime and that the principal is about to commit it. In addition, the accessory needs to have in mind the purpose of assisting the principal in committing the crime and making it easier for him to do so. However, when the principal crime is consequential and it requires an element of haste or special intention – it is not necessary to prove that the accessory acted out of intention of this type or that he intended that the principal perpetrator would realize his goals. For example, in the case of murder, it is not necessary to prove that the accessory intended for the principal to murder the victim or that he wanted that outcome; it is sufficient that the accessory's intention be to aid the principal criminal, whatever the motivations of the accessory might be (these rules were clarified in Criminal Appeal 320/99 **John Does v. The State of Israel**, PD 55 (3) 22, on pages 31 – 37).

In contrast to this, when dealing with the joint perpetrator, it must be proven that he had a high level of mental involvement and awareness of the details of the crime being committed in the addition to his desire to realize it:

> **"The co-conspirator contributes his contribution to a criminal act with multiple participants with a mental attitude of creating a crime *onimo auctoris*. He considers the commission of the crime his business and not that of someone else** (words of S. Z. Feller in his book **Foundations of Criminal Law**, quoted in Criminal Appeal 4389/93, as above, in the case **Mordecai,** on page 251).

**In summation**: The joint perpetrator, as opposed to the accessory, needs to have a mental basis that is equal to that of the other principals in the crime and he needs to have all the elements of the mental basis that are determined by law for the crime in which he has taken part (the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on page 402).

In the above mentioned Criminal Appeal 8573/96, in the case of **Mercado**, the Honorable Justice A. Goldberg wrote, on pages 548 – 549, that the categorization of the Defendant as a joint perpetrator or as an accessory is the result of combined test of the mental basis and the factual basis – a test which is like a parallelogram of forces:

[Stamp] Gilmore 00812

122

"The greater the mental basis (with regard to his degree of interest in its commission) of the person who committed the crime, the more it is possible to be satisfied with a lower level of factual basis. In this spirit, it has already been said that 'when the "mental" basis is proven (the awareness – A.G.), the division of the tasks among the participants involved in the event is no longer important' (the above mentioned Criminal Appeal 4188/95, 5235, [43], on page 550). Conversely, the greater

[Stamp] Gilmore 00812 [continued]

SHATSKY-009286-433

> **the factual basis for the commission of the crime, from the perspective of the quality of his contribution to its perpetration, it is possible to be satisfied with the lower level of mental basis."**

These points were confirmed in the above mentioned Additional Preceedings 1294/96 in the matter of **Meshulam** (on page 27, in accordance with that which has been set forthby the Honorable Justice A. Matza).

150. From the law that was cited above, it becomes apparent that participation in planning a crime serves as a clear sign of a joint perpetrator. In this case, is not necessary for him to be physically present at the scene of the crime in order to be considered a joint perpetrator.

In the above mentioned Additional Preceedings 1294/96 in matter of **Meshulam** (on page 64), the Honorable Justice Y. Kedmi ruled:

> **"'Participation', as stated, can begin with proposing an idea to the people who intend to commit the crime, and in any case, by my method, there is no doubt that planning the perpetration, giving orders and delineating the lines of action, including assigning roles to the participants, compose an 'act' that expresses 'participation', as stated."**

In Criminal Appeal 3596/93 **Hamoud Abu Sror v. The State of Israel**, PD 52 (3) 481, the Honorable Justice A. Matza wrote on page 491:

> **"The practical contribution of the appellant to the commission of murder was indeed smaller than that of his two companions. However, his active participation in the preparations and the warning role he played gave him control over bringing the murderous plan into being. From the fact that he participated in the preparation for its perpetration and acted for the success of the program, it becomes apparent that he had the required criminal intention for inclusion in responsibility for the crime of premeditated murder."**

[Stamp] Gilmore 00813

124

SHATSKY-009286-433

In the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, four adolescents were convicted of premeditated murder despite the fact that only one of them throw the grenade that caused the death of the crime's victims. One (Ze'ev) was convicted as a joint perpetrator because he took part in all stages of planning and perpetration, and was present at the scene when the crime was committed, despite the fact that he decided not to throw that the fatal grenade himself ("**he did not implement the act of killing. This is meaningless since a joint perpetrator is responsible even if he himself did not commit all bases of the crime…** " – on page 407). The second (Gershon) was convicted as a joint perpetrator even though he was not even present at the scene by crime and his entire function was to report the deed to media after it was done, because he fulfilled the role that was assigned to him in advance, for the purpose of realizing the crime (on page 408). The third (Tal) was convicted as a joint perpetrator, despite the fact that he, too, was not present at the scene of the murder because

[Stamp] Gilmore 00813 [continued]

125

SHATSKY-009286-433

he participated in the planning of the crime, and was part of the group that decided to commit the murder and even was its leader (on pages 408-409).

151. When the principal crime is preceded by a conspiracy to commit the crime, there is a tendency to consider each of the conspirators as a joint perpetrator in the main crime, and only if they took a genuine part in the commission thereof. The reason for this is that the conspiracy to commit a crime is evidence of the fact that each of the conspirators is interested in its commission. According to the statements that were set forth by S. Z. Feller, which were quoted in the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on page 550: "**Conspiracy between two or more people to commit a criminal offense includes the development of joint thought in order to realize the goal of the conspiracy – each is a future candidate to be the direct perpetrator, in the spirit of creating *animo auctoris*.**"

In the above mentioned Criminal Appeal 3390/98, in the matter of **Rosh**, on page 878, the Honorable Justice A. Matza wrote:

> **"The additional test with respect to 'proximity to the act', which requires that the share of each joint perpetrator be an 'internal part of the criminal act', is intended to ensure that commission of a marginal act, which on the basis of its nature could be included in the definition of 'perpetration', will not make its doer responsible as a joint perpetrator when the nature of his mental basis for committing the crime is doubtful (Additional Proceeding 1294/96 *Meshulam v. The State of Israel* (hereinafter – 'the *Meshulam* matter [3],' on pages 21-22).**
>
> **It is not the same when determining the responsibility of someone who, as a matter of principle, is included as a participant in preparing the criminal plan, and no doubt arises with respect to his having the required criminal intention for inclusion in the planned crime. This type of party to a crime carries the responsibility of a 'joint perpetrator' even if his physical contribution to commission is no greater than that of an accessory (Criminal Appeal 3596/93, *Abu Sror v. The State of Israel*, [4], on page 491)."**

[Stamp] Gilmore 00814

126

SHATSKY-009286-433

**152.** With respect to **presence at the scene of the crime**, indeed it is not essential in order for person to be considered a joint perpetrator, and in the language of the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 2796/95, in the matter of <u>**John Does**</u> (see Section 27): "**Being a joint perpetrator is not necessarily based on uniform place and time**" (see also the above mentioned Additional Proceeding 1294/96, in the matter of <u>**Meshulam**</u>, on pages 30, 38, 49, 51, 53 – 54 and 64). However, the non-random presence of a person at the scene where a crime is being committed does create an assumption, which may be contradicted, that he is a joint perpetrator in the crime (see: Criminal Appeal 3006/96 <u>**Matias v. The State of Israel**</u>, Supreme Court Laws, Volume 52 526).

**B.** <u>**The Crime of the Accessory**</u>

[Stamp] Gilmore 00814 [continued]

SHATSKY-009286-433

153. The factual basis and the mental basis of the crime of the accessory in general, and of the accessory to murder specifically, were recently clarified in a verdict that was written by the Honorable Presiding Justice A. Barak in Criminal Appeal 320/99 **John Does v. The State of Israel**, PD 55 (3) 22, on pages 31 – 37 (which was upheld in Criminal Appeal 11131/02 **Angelika Yosefov v. The State of Israel**, not yet published). The law, as determined by these rulings, can be summarized as follows:

a. The characteristic behavior of the accessory is that it is an indirect, secondary contribution to the commission of the main crime: the contribution of the accessory is considered indirect and secondary because he does not take part in the main commission of the crime but only makes an indirect contribution to the realization of the main crime. The accessory is an "external" force who is outside the inner circle of the crime (see also: Criminal Appeal 7085/93 **Najar *et al.* v. The State of Israel**, PD 51 (4) 221, on page 238).

b. **The factual basis** for the crime of the accessory, which is a crime of behavior, is the action or lack of action which creates the conditions for realization of the factual basis of the crime being committed by the principal. The accessory needs to be "able" to help in realization of the main crime but is not required to be effective or the condition without which the main crime could not have been realized (see also Criminal Appeal 4317/97 **Poliakov v. The State of Israel**, PD 53 (1) 289, on page 307). Similarly, it is not necessary that the principle crime actually be committed since the crime of an accessory is not a consequential crime. In addition, it is necessary to prove as part of the factual basis of the crime of the accessory, that the circumstances relating to the criminality of his behavior is secondary and indirect.

c. The accessory must be directed towards a crime that has a concrete purpose, meaning the action is done in order to **assist** the commission of a specific crime, rather than simply crime (see also Criminal Appeal 426/67 **Yosef Be'eri *et al.* v. The State of Israel**, PD 22 (1) 477, on page 481; the above mentioned Criminal Appeal 7085/93, in the matter of **Najar**, on pages 238 – 239).

d. **The mental basis** of the crime of the accessory includes three cumulative conditions:

(1) Awareness of the nature of the accessory behavior, meaning: of the fact that this behavior contributes to the creation of conditions for committing the main crime, which has a concrete goal;

[Stamp] Gilmore 00815

128

SHATSKY-009286-433

(2) Awareness of the existence of the relevant circumstances at the time of the accessory's behavior, meaning: awareness that the principal is committing or about to commit the crime, even though awareness of the specific details of the crime is not necessary (see also the above mentioned Criminal Appeal 7085/93, in the matter of **Najar**, on pages 238 – 239).

(3) The accessory must be aware of having the goal of assisting the principal in committing the crime or make it easier for him to commit the crime.

The "ability to anticipate" can be applied to this requirement, meaning: the awareness of the accessory to the fact that his behavior might almost certainly be the contribution that assists the principal is weighed against his purpose for aiding him, even if he is not at all interested in the commission of the main crime (see also the minority opinion of the Honorable Justice Y. Engelard in the above mentioned Criminal Appeal 4317/97 in the matter of **Poliakov**, on pages 320 – 323 and the expert opinion of the Honorable Justice M. Ilan in Criminal Appeal 807/97 **State of Israel v. Azizian**, PD 53 (5) 747, on pages 757 – 758).

e. When the principal crime is consequential and it requires a mental basis of haste or special intention,

[Stamp] Gilmore 00815 [continued]

129

SHATSKY-009286-433

it is not necessary to prove that the accessory acted out of intention of this type or that he intended that the principal perpetrator would realize his goals. For example, in the case of murder, it is not necessary to prove that the accessory intended for the principal to murder the victim or that he wanted that outcome; it is sufficient that the accessory's intention be to aid the principal criminal, whatever the accessory's motivation might be.

154. With respect to the required degree of likelihood that the principal defender will commit the crime, it is important to note that in accordance with the law stated by the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 320/99, in the matter of **John Does**, it is sufficient that the accessory is **aware** of the fact that the principal offender is going to commit a crime with a concrete goal (on pages 31 – 32 of the ruling). The requirement for awareness of the **almost certain** likelihood relates to the basis of the purpose, meaning: the accessory's awareness that his behavior is likely almost certainly to contribute to commission of the principal crime; this type of awareness is equivalent to the goal of assisting the principal criminal. As stated by Presiding Justice A. Barak : "**The mental basis of the goal ('in order that') is therefore directed towards the act of assisting and not towards the act of the main crime**" (on page 35).

In this context, the question arises of when it can be said that the Defendant was "aware" that the main criminal would be committing a crime with a concrete purpose.

The law is that "turning a blind eye", which is also referred to as "intentional blindness", is considered in comparison to awareness of the character of the act and other existing circumstances. This ruling is currently expressed in Section 20 (c) (1) of the Penal Code which states as follows:

> "**A person who suspects something about the nature of his behavior or the possibility of existing circumstances is considered that he was aware of them, if he avoided clarification.**"

(See: Y. Kedmi, **On Criminal Law**, updated and expanded edition (1966), Part One, on page 37, and Criminal Appeal 3417/99 **Margalit Har-Shefi v. The State of Israel**, PD 55 (2) 735, on pages 757 – 758).

In Y. Kedmi's above mentioned book, it is written on page 37:

[Stamp] Gilmore 00816

130

"a.        Section 20 (c) (1) of the amendment anchors in firm instruction the general principle in accordance with which: in a place where a person actually 'suspects' that the nature of his behavior could lead him into the bounds of forbidden behavior, if there is a practical possibility that they are circumstances that require clarification and he avoids clarifying the 'veracity' of the suspicion, he is considered as someone who is aware of the true nature of his behavior and the existence of the circumstances of (if it is found that they actually exist).

b.        Also… it seems that the level of suspicion needs to be at least 'the level of likelihood' meaning: it is more reasonable that the suspicion is true than that it is unfounded."

The law in this regard is clarified by Professor S. Z. Feller, **Fundamentals of Criminal Law** (Volume 1, 5744 [1984]), on page 519, which was also referred to by the Honorable Justice M. Cheshin in the above mentioned Criminal Appeal 3417/99, on page 758, stating:

"**Awareness of** *the possibility* **of the existence of a circumstance, on which the crime is dependent, obligate a person to check, in practice, his actions in that circumstance, in order to desist from it if the existence of that circumstance is confirmed.**

[Stamp] Gilmore 00816 [continued]

131

SHATSKY-009286-433

> If, despite a suspicion, the person did not do so, whether because he was determined to complete the act regardless of the circumstances or because it was convenient for him not to know or for any other reason, it means that he accepted the existence of the circumstances.
>
> Therefore, *conscious* disregard of the possibility that there exists a set of circumstances is considered consciousness that they do exist; since this set of circumstances stood before the person but he did not bother to examine the situation or to clarify them. If it turns out after the fact that the relevant circumstances did indeed exist, awareness of the possibility that they might exist, because of a suspicion, is considered awareness of their existence.

In the above mentioned book by Y. Kedmi, on page 37, he wrote that the level of suspicion necessary in order to carry out the law of "turning a blind eye" legal rulings ranged from the level of "reasonable" prior to the amendment of 5754 [1994] to the Penal Code, to the level of "high." In this matter, Professor Feller, **Fundamentals of Criminal Law** (Volume 1) wrote on page 523 as follows:

> "In our opinion there is no basis to the assumption that other than the rationality of the suspicion – which is obviously subjective – or more precisely in place of its rationality, the suspicion needs to be of a high level to the point of being nearly certain or lacking in any real doubt in the mind of the person with respect to its veracity…
>
> In order to compare "turning a blind eye" to awareness, it is sufficient that awareness of this rational suspicion with respect to the possible existence of circumstances and avoidance of clarifying the situation in order to confirm it."

And on page 524 it says:

> In conclusion, it is sufficient for the suspicion to be anchored in reality, meaning rational, in order to define the act as being done by "turning a blind eye" if, in practice the person avoids checking the suspicion and understanding it in order to verify it. It is not necessary for there to be a high degree of objective likelihood that the suspicion is true.

[Stamp] Gilmore 00817

132

SHATSKY-009286-433

The test for the existence of "turning a blind eye" emerges from the awareness that it is, in accordance with that which has been set forth above, subjective. In spite of this, the Courts regularly determine a Defendant's subjective awareness using the test of a reasonable person's objectiveness as the test (see also: Criminal Appeal 15/78 **Moshe Bibas v. The State of Israel**, PD 32 (3) 64, on page 83; Criminal Appeal 5612/92 **The State of Israel v. Be'eri** *et al.*, PD 48 (1) 302, on page 363; compare with the application of the test of a reasonable man for the Defendant's awareness to be high likelihood of damage to national security: Criminal Appeal 3116/99 **Yehuda Gil v. The State of Israel**, PD 54 (4) 193, on page 204).

155. From the decisions in accordance with that which has been set forth above, especially those in the ruling of the above mentioned Criminal Appeal 320/99 in the matter of **John Does**, it becomes apparent that a person who suspects that his companion is about to commit a certain crime but avoids clarifying the issue and even helps his companion commit the crimes despite the awareness that he is, almost certainly, helping his companion to commit the crime – if it is committed – is considered an accessory in accordance with Section 31 of the Penal Code. From these rulings, it becomes apparent that it is not necessary to prove that the accessory expected the commission of the main crime as a nearly certain possibility: it is sufficient that he is aware of the logical, reasonable and realistic possibility that the main crime will be committed and, In spite of this, he assists the person's commision, he does so with an awareness that his behavior is likely, almost certainly, to assist the principal. Similarly, it is not necessary prove that the accessory desired the commission of the principal crime or that he acted out of intention that the principal crime be committed.

However, in the above mentioned Criminal Appeal 11131/02, in the case of **Yosefov,** the Honorable Justice A. Rivlin ruled that the Prosecution needs to prove that the Defendant knew that his behavior would be likely, almost certainly, to assist the crime of murder committed by the

[Stamp] Gilmore 00817 [continued]

SHATSKY-009286-433

principal and that: **"in order for the rule of expectations to apply, it is necessary to show, as stated, awareness of near absolute certainty of the possibility for commission of the crime…"** (see Section 13 of the ruling). This statement is different in its overtones from that in the above mentioned Criminal Appeal 320/99, in the matter of **John Does**, where the Honorable Justice Rivlin said in the above mentioned Criminal Appeal 11131/02, at the beginning of the ruling (see Section 9), that:

> **"awareness – both of the nature of the accessory act and of the circumstances of the commission of the main crime – can be replaced by a suspicion with respect to the accessory nature of the act and awareness of the possibility that they are circumstances for the commission of a crime by the principal, in accordance with the orders of Section 20 (c) (1) of the Penal Code ('turning a blind eye')."**

156. From the rulings above it becomes apparent that it is not necessary to prove that the Defendant was aware of every detail with respect to the crime to which he is an accessory. In this regard, the Honorable Justice A. Rivlin wrote, in the above mentioned Criminal Appeal 1131/02, in the matter of **Yosefov**, the following words, which are important to our case:

> **"The previous Court has rightly said that awareness that the principal is going to a commit a crime does not mean awareness of all of the details of the crime that he is planning (see for example: Criminal Appeal 7085/93 Najar v. The State of Israel, PD 51 (4) 221, 239). In the matter before us, the appellant knew that Zayid, whom she accompanied, was carrying explosives with him, and that he had already carried out terrorist attacks in the past, and that he wanted revenge for the death of his brother who was killed by an action of the security forces. Based on the appellant's testimony, the previous Court was impressed that she understood quite well that Zayid was planning to perpetrate a terrorist attack in the city of Tel Aviv. In this context, the question of whether she knew the exact location at which he planned to place the explosives is unimportant."**

On the same issue, the Honorable Justice Rivlin also wrote:

[Stamp] Gilmore 00818

134

SHATSKY-009286-433

"Indeed, as we already noted, the accessory does not need to be aware of all the details of the crime which the principal intends to commit. In spite of this, he must be aware, at the time he proffers assistance to the principal, that there is a possibility that he is assisting the principal in committing a genuine crime, and in other words – to the fact that the principal crime has a 'concrete target' see also: Criminal Appeal 426/67 Be'eri v. The State of Israel, PD 22 (1) 477, on pages 481 – 482; Criminal Appeal 5544/91 Moyel v. The State of Israel (not yet published). It is not sufficient to have knowledge of a vague or hypothetical willingness of the principal to commit a crime in order for a person to be an accessory.

Therefore it is likely, as we have noted, that the awareness of circumstances of the factual basis – which is to say awareness of the fact that the principal will commit a crime – can be replaced by awareness of the possibility that he is going to commit a crime.

However, in order for it to be said that the accessory 'turned a blind eye', we must be convinced that there actually existed a rational-subjective suspicion in the accessory's mind that the principal was going to commit a crime (S. Z. Feller, in his above mentioned book (Volume 1) pages 521 – 524, 530).

Furthermore, the accessory must be aware of the fact that the crime may be committed when he offers the assistance. If the accessory believed, at the time that he performed the acts that were accessory to the crime, that there was no longer any substantial possibility that the principal would commit the crime he then cannot be considered an accessory – even if he evaluated at an earlier stage that a possibility such as

[Stamp] Gilmore 00818 [continued]

SHATSKY-009286-433

this existed."

With respect to the requirement for awareness of the principal's intentions to commit a crime with a concrete purpose, the Honorable Justice M. Landoy (as he was known at the time) in Criminal Appeal 426/67 **Yosef Be'eri *et al.* v. The State of Israel**, Supreme Court PD 22 (1) 477, on page 481, wrote that when the accessory supplies a tool for committing the crime, such as a vehicle or weapon – it is sufficient that the accessory supplied the tool that is used to commit the crime for the purpose of committing a crime of the same type that was committed, but not necessarily for exactly the same crime. The Honorable Justice Landoy said that this ruling, which is based on English rulings, applies "**at least in those cases in which the accessory leaves it to the principal's 'discretion' to choose the appropriate time and place for realizing their joint criminal intentions**."

In the above mentioned case, the Honorable Justice Landoy ruled that even if the appellant (who was acquitted in the end) were to prove that he gave his car to the perpetrator of the robbery in order to make it easier for him to escape from the scene of the crime – it is not necessary to prove that he planned for him to rob the tourists who were in fact robbed.

157. The requirement that the Defendant be aware of the existence of a specific crime with a concrete purpose also consists of the "principle with respect to involved intent", which is expressed in Section 20 (c) (2) of the Penal Code, 5737 – 1977.

This Section states with respect to criminal intent that "**it makes no difference if the act was committed by another person or another object than the one that was planned**" (see: Y. Kedmi, **On Criminal Law – Updated and Completed**, 1996 edition, Part One, on page 38). On the basis of this principle it was ruled, even before Section 20 (c) (2) of the law was enacted in 5754 [1994], that, "**if he intended to murder this person and he did kill that person, he is judged as a murderer**" (Criminal Appeal 406/72 in **Snir v. The State of Israel**, High Court PD 28 (1) 234, on pages 242 – 243; Criminal Appeal 388/76 **Ibrahim v. The State of Israel**, High Court PD 31 (1) 601, on page 607; Criminal Appeal 6059/92 **Shibam v. The State of Israel**, High Court Compendium 93 (4) 255; Criminal Appeal 887/96, **Biton v. The State of Israel**, High Court Compendium 97 (1) 848). As the Honorable Justice H. Cohen wrote in the above mentioned matter of **Snir**, "**We do not consider that criminal intent must be directed at a particular person specifically.**" This is also a principal of English law, as is noted by the Honorable Justice H. Cohen.

[Stamp] Gilmore 00819

SHATSKY-009286-433

**C.** **The Crime of Solicitation and the Distinction between the Joint Perpetrator and the Solicitor**

158. Section 34 (d) of the Penal Code, 5737 – 1977, states:

> "Beyond what is clearly stated in the statute or derived from it, every law that applies to the principal perpetrator of a completed crime also applies to an attempt, solicitation, attempt to solicit or aid the same crime."

From here it follows that it the liability of the solicitor is the same as that of the primary perpetrator, insofar as the solicitor is considered a main partner of the joint perpetrator – unlike the accessory, who is considered to be a secondary partner – in that he makes a substantial contribution to the occurrence of the crime, which is manifested by the fact that he caused another person to commit a crime (see: the statements by the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on page 404, which relates to the solicitor, despite these points, as an "indirect partner", and the statements by the Honorable Justice D. Beinish in Criminal Appeal 8464/99 **Avigdor Eskin v. The State of Israel**, PD 55 (2) 65, on pages 82 – 83, in comparison with the statements by the Honorable Justice M. Cheshin in the above mentioned matter of **John Does** on page 416, which express reservation with respect to the expression "indirect partner", insofar as in his opinion, the contribution of the solicitor is a direct contribution, just like the contribution of the primary perpetrator.

[Stamp] Gilmore 00819 [continued]

137

SHATSKY-009286-433

The provision contained in Section 34 (d) of the Penal Code is derived from the reference to the solicitor as a primary partner to the perpetrator of the offense. Therefore, it was established in this provision, which is also emphasized in case law, that the punishment of the solicitor is identical to that of the primary perpetrator. (See: the above mentioned Civil Appeal 2796/95 **John Does**, on pages 401 – 402, 415; the above mentioned Criminal Appeal 8464/99 in the matter of **Eskin**, on page 82; the above mentioned Additional Proceeding 1294/96 in the matter of **Meshulam**, on pages 42 – 43).

159.  In the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, the Honorable Presiding Justice A. Barak clarified (on page 404) the liability of the solicitor for the commission of the crime and its significance, saying:

> **"The contribution of the person who solicits the crime is manifested in the fact that he caused the perpetrator to decide to commit the crime (S. Z. Feller in his above mentioned book (8) on page 228). He is the one who influenced the perpetrator – whether he is an independent perpetrator (or principal) or a joint perpetrator – to the state at which he made the decision to commit the crime and took the steps to realize it (whether an attempted or a completed crime). He is the 'spiritual father of the crime' (M. Gur-Arye "Proposed Penal Code (preamble and general), 5752 – 1992" (13), on page 46). Therefore, society wishes to protect itself not only against one who perpetrates a crime – whether he is an independent perpetrator or a joint perpetrator – but also against a broader group of people who cause others to commit crimes…**

> **'The proximity' of the person who solicits the crime is expressed by the fact that he is the one who planted in the principal criminal's heart the criminal thought to perpetrate the crime. He is the '*auteur intellectuel*' of the crime (see Feller in his above mentioned book (8), on pages 225 – 226). He is the one who causes the perpetrator to develop the idea of perpetrating the crime – whether he planted the idea in advance or whether he tipped the scales when the perpetrator was hesitant.**

The Honorable Justice M. Cheshin ruled in the above mentioned matter of **John Does**, on page 415, that the act of the person who solicits is primarily manifested though his conversation with the other, which causes him to commit a crime that, in the absence of the solicitor, would not have been committed at all.

[Stamp] Gilmore 00820

138

SHATSKY-009286-433

These points lead to the question of the causal relationship required between the solicitation and the commission of the crime by the one who was solicited. The Honorable Presiding Justice Barak ruled, in the Section quoted above, that the solicitor is the one who influenced the perpetrator to decide to commit the crime, whether he planted the idea in advance or whether he tipped the scales when the perpetrator was hesitant (on page 404).

In the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**, the Honorable Justice D. Beinish ruled (on pages 78 – 79), with regard to the essence of soliciting and the requirement for a causal relationship that, "**the main point is that the behavior of the solicitor has 'potential effectiveness' that is likely to influence the person being solicited to commit the crime being solicited such that there is circumstantial connection between the soliciting behavior and the initial perpetration of the crime.**" However – the Honorable Justice Beinish continued (on page 79):

> **"In the context of the framework for solicitation, it is not essential, and it is not even adequate, for the initiative or for the idea for commission of the crime be that of the 'solicitor.' The circumstantial element of the crime of soliciting – is the existence of another ('the solicited') who is mentally moved to make a decision to carry out the crime – which can also exist in situations where the criminal idea first arose in the thoughts of the person being solicited**

[Stamp] Gilmore 00820 [continued]

139

SHATSKY-009286-433

but did not develop into a decision to commit it. In this case, if the behavior of the solicitor caused the final decision of the person solicited to commit the crime, then the factual basis for the crime of solicitation has been established."

160. With respect to the mental basis for the crime of solicitation, the Honorable Justice D. Beinish ruled in the above mentioned Criminal Appeal 8469/99, in the case at **Eskin**, on page 81:

"In general, in order to establish the mental basis within the context of the act of solicitation it must be proven that two requirements have been met: first, that the person soliciting be aware that his behavior is capable of bringing another, ("the solicited") to commit the crime being solicited. This requirement relates to awareness of the quality of the soliciting behavior and also aware of the existence of the other who requires mental motivation in order to commit the crime that is the subject of solicitation. Second, the one soliciting intends to bring the one being solicited to the point of committing the crime to the solicitation. In other words, the solicitation needs to be accompanied by an aspiration – and goal – on the part of the person soliciting that the crime in question indeed be perpetrated, with all of its elements, by the "solicited" (S. Z. Feller in his above mentioned book (Volume 2) (18) on page 234)."

161. In rulings that pertain to the responsibility of the person who is soliciting – in contrast to rulings that pertain to the responsibility of the accessory – it is not stated that the solicitation must relate to a particular crime with a concrete purpose, perhaps because this is self-evident. However, this requirement is structured within the basis of the solicitation and required *a fortiori* by the nature of solicitation, which carries the same punishment as that of the principal perpetrator (as opposed to the accessory, whose punishment is half of that of the principal perpetrator). In order to prove the crime of solicitation, it is necessary to show a circumstantial connection between the solicitation and the commission of the main crime by the person solicited, and even the goal and aspiration of the solicitor that the crime be committed. All of these require that the solicitation relate to a specific crime with a concrete purpose, as has also been ruled in the case of the accessory. Thus, Professor S. Z. Feller wrote in his book, **Fundamentals of Criminal Law**, 5747 – 1987, Volume 2, on page 226:

[Stamp] Gilmore 00821

SHATSKY-009286-433

> "It is appropriate to explain that the concept of solicitation, as a form of participation in the crime, has a meaning that is not always apparent from the ordinary use of this language. This is a meaning that gives expression to the relationship between one individual in another, the solicitor and the solicited, and not to the relationship between an individual and the public in a situation where the individual incites, agitates, and provokes a certain public, without any distinction between the individual identities of the people in that public, to perpetrate criminal offenses.
>
> These actions are unlikely to nurture specific crimes and even using the word "solicit" for them, this is not "solicitation" in its form as a partnership in crime, which we will consider below."

However, as has been determined in the case of the accessory, it is not necessary to prove that the solicitor was aware of all of the details involved in the crime that he solicited and it is sufficient that he solicited the perpetrator of a crime of the same type as the crime that was finally committed (see Section 145 above). Furthermore, with respect to the case of solicitation, obviously, the principal with respect to intent is transferable: it makes no difference if the crime is eventually committed by another person.

**In summation**: It is not possible to convict a person for the general crime of solicitation for an act of murder when he calls

[Stamp] Gilmore 00821 [continued]

SHATSKY-009286-433

for carrying out terrorist attacks against Israel; therefore, there is the crime of inciting to violence or terrorism (see Section 1448 (d) (2) of the Penal Code, 5737 – 1977). Similarly, it is not possible to convict person for the general crime of being accessory to murder when he supplies money or weapons or explosives for various crimes that are not specific. For this, there is the crime of supplying means for the perpetration of a crime in accordance with Section 498 of the Penal Code, 5737 – 1977, that was legislated especially in order to deal with situations in which definite knowledge of the intent to perpetrate a particular crime cannot be proven, so that the person cannot be considered an accessory (see the explanation of the proposed legislation for amending the Penal Code (No. 36) 5733 – 1972, Propose Legislation 5733 [1972] 1021, on page 20).

162. With respect to that line distinguishing between the solicitor and the joint perpetrator, the Honorable Presiding Justice A. Barak ruled in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on page 406, that, **"the contribution of the solicitor is in that he caused the creation of the mental basis of the principal"** and that, **"the more intensive the solicitation of the solicitor and the more it involves not only activities on the mental level but also on the factual level, the closer the solicitor moves to being a joint perpetrator."** In the above mentioned matter of **John Does**, the minor referred to as "T" was convicted of murder as a joint perpetrator and not only as a solicitor because he threw a grenade at Arabs even though he refused to join the action itself; therefore, it was ruled that he was a joint perpetrator in planning the crime and was "the leader and first of them all" (on pages 408 – 409).

With respect to the distinction between the accessory and the solicitor, the Honorable Presiding Justice A. Barak said (on page 406) that when assistance is "spiritual", the accessory may be a solicitor: **"The dividing line distinguishes between assistance to someone who has already developed his own criminal thoughts (the accessory) and contributing to the development of that criminal thought (solicitor)."**

In the above mentioned Additional Preceedings 1294/96 in the matter of **Meshulam**, the Honorable Justice Y. Kedmi ruled (on page 63):

[Stamp] Gilmore 00822

142

SHATSKY-009286-433

"As stated, the responsibility of the 'joint perpetrator' rests on – in accordance with that which has been set forth in Section 29 of the Penal Code – 'participation' – commission of a crime by 'taking action' to commit it… and the absence of an 'act of participation' – in accordance with that which has been set forth– is not a basis for responsibility of this type… By contrast, the responsibility of the 'solicitor' for the commission of a crime by another person is found in doing an 'act of solicitation', one of the acts listed in Section 30 of the Penal Code. This act does not constitute an 'act of participation' in the perpetration but rather leaves the person 'outside' of the circle of perpetration."

On page 66, the Honorable Justice Y. Kedmi wrote:

"Theoretically, the distinction between the solicitor and the joint perpetrator rests on the fact that the contribution of the solicitor to the commission of the crime is creation of the 'mental basis' required for the person being solicited to commit the crime of which he is the principal; and while the contribution of the joint perpetrator is, primarily, on the behavioral level of the crime since he is required to 'participate' while taking action to commit the crime (see this subject in Feller's above mentioned book (Volume 2) [20] on pages 196, 228). While from the practical point of view, the boundary line between the solicitor and the co-conspirator is drawn between the person who 'participates' in committing the crime, meaning someone who is included in the inner core of the people committing the crime – and someone who is only 'involved', meaning that he is outside of the inner circle of principals."

## D. The Responsibility of the Leader of the Criminal Group as a Joint Perpetrator or as a Solicitor

163. When determining a responsibility of the Defendant as a joint perpetrator or a solicitor, Courts have given decisive weight to the fact that the Defendant is a leader of a criminal group that perpetrated one of the main crimes. According to the above mentioned Criminal Appeal 2796/95 in the matter of **John Does**, the minor referred to as "T" was convicted as a joint perpetrator and not simply for solicitation, although he did not actually participate

[Stamp] Gilmore 00822 [continued]

SHATSKY-009286-433

in the act of murder itself, because he participated in planning and was a leader of the group, and in the language of Honorable Presiding Justice A. Barak, he was "the leader and first of them all".

In the above mentioned Criminal Appeal 8461/99 in the matter of **Eskin**, the Defendant was convicted for soliciting the crimes of arson and unauthorized entry to place of ritual or burial that was committed by a person who was subordinate to the Defendant and accepted his authority; the Court emphasized the fact that the Defendant was "a leader and a guide" and the fact that the Defendant was the one who gave his "agreement and authorization" for commission of the crime and received a report after was completed (on pages 77 – 81, 84, 90 – 91). In spite of this, it should be noted that the Defendant in that case took part in planning the crime and provided monetary aid for its commission. In those circumstances, the Honorable Justice D. Beinish noted, by the way, that it might have been possible to convict him as a joint perpetrator and not only for solicitation when she said (on page 84):

> **"Even if we were to have said that the main 'contribution' of the appellant to commission of the crime was giving his 'authorization' to the criminal plan and its realization, in these special circumstances, it is possible that 'agreement' to committing the crime could be considered participation 'in committing a crime by taking action so that it is committed', in accordance with that which has been set forth in Section 29 of the Penal Code."**

In this statement, the Honorable Justice Beinish refers to the statements by the Honorable Justice Y. Kedmi in Criminal Appeal 5589/98 **Bisan Sultan v. The State of Israel**, High Court Compendium 99 (3) 98, Section 9. In that case, the appellant was convicted for premeditated murder when it was proven that he had given his agreement and authorization for perpetration of the murder, and sent the joint perpetrator to actually commit the murder and even instructed him in the method to be used.

Judge Kedmi emphasized that without the agreement of the appellants, the murder would not have taken place and therefore the approval he gave for the murder could be compared to "**the opening shot that starts the athlete running**," and can be considered "an act of participation in committing the crime." Therefore, the appellant was convicted as a joint perpetrator and as a solicitor, and the Court emphasized that he was found to be "in the inner circle of perpetration", as someone who had a role in its perpetration and was "the brains of the group", while someone who solicits a crime is outside of the inner circle of perpetration.

[Stamp] Gilmore 00823

SHATSKY-009286-433

The Honorable Justice Kedmi added that in the circumstances described above, in which the appellant had given "a green light for murder" and provided operational orders for how it should be done, his behavior was at the least "**a full measure of solicitation, on the way to being encouragement**." Also in the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**, it was ruled sufficient that the appellant approved setting the fire as a leader or guide in order to reach the conclusion that giving his approval was encouragement for the principal to actually implement the idea of arson and move it from the potential to the kinetic (on page 93).

164. The question of the responsibility of the leader of a criminal group who did not physically participate in the crime committed by those who accepted his authority was raised in its severity in the above mentioned Additional Procedure 1294/96 in the matter of **Meshulam**. In a majority of six justices, the Court ruled that a master criminal, who is a leader of a group of criminals that commits crimes as his agent and in accordance with his planning and his orders, is not simply someone who solicits a crime: he is considered a joint perpetrator because of the complete control that he has on commission of the crime and its perpetrators. The Honorable Justice D. Dorner explained in the minority opinion that a person of this type should be seen only as one who solicits (on pages 42 – 47). Another opinion, in accordance with which the leader of a criminal organization should be considered "committing the crime through another", in accordance with Section 29 (c) of the Penal Code, emerges from the articles written by M. Kremnitzer "**The Perpetrator in Criminal Law: Main Characteristics**" in [the journal] *Plilim* 1 (5750 – 1990) 65 on page 72 and M. Gur-Arye "**Aspects of Crime – Amendment 39 to the Penal Code as Tested in Rulings**" in *Trends in Criminal Law*, on page 83. In the article by Professor Kremnitzer, it is written on page 72:

> "**It seems that we do not need to explain at length that the usual concepts of indirect participation (accessory and solicitation) are not appropriate for criminal phenomena such as war crimes, crimes committed**

[Stamp] Gilmore 00823 [continued]

145

by a criminal state (Nazi crimes) or by a criminal organization ('the Mafia'). A person who is in a position of control in these type of systems (and not only the person at the top of the hierarchy) who gives the order to kill a person is not simply soliciting or an accessory to murder when his command is perpetrated. The special nature of this act is evident in the fact that when he gives the command, he can rest assured that his orders will be followed without being acquainted with the physical perpetrator. He knows that if one of the possible organizations that might implement the order does not, another will. The main point is – the task will be done.

The direct perpetrator does indeed control the acts (he commits it with his own hands with the required mental basis and not under duress), although from the perspective of the one who gives the order, he is perceived in an entirely different manner – as an anonymous, expendable figure who can be replaced much like a bolt or a wheel in the operating mechanism of the organization, in the hands of the person who gave the orders. The fungibility of the direct perpetrator makes one who controls of the organization into someone who commits a crime through another."

165. In the above mentioned Additional Proceeding 1294/96 in the matter of **Meshulam**, the Honorable Justice A. Matza ruled that "**a participant of this type – who has full control over the perpetration and overall activity and not only solicits and prepares but also gives orders to the worker-criminals and supervises their activities – is a joint perpetrator in every way**" (on page 27). He emphasized that presence at the scene of the crime is not an essential basis for person to be a joint perpetrator, and he said (on page 30):

"**In the new legal reality, making direct responsibility dependent on presence means that the 'godfathers' and leaders of criminal groups who send 'little fish' who accept the authority to the scene to perpetrate the crimes while they direct the criminal activity from a distance would not be considered joint perpetrators but only people who solicit the crime. This possibility, which certainly does not reflect the desirable law, is also not required by the actual law.**"

The Honorable Justice A. Matza emphasized, regarding the control the leader has over his people, the fact that the Defendant was able to order his people to desist from committing the crime (on page 32, and see also the statements by the Honorable Justice Kedmi on page 63).

[Stamp] Gilmore 00824

146

SHATSKY-009286-433

The Honorable Presiding Justice A. Barak joined the Expert Opinion of the Honorable Justice A. Matza but emphasized the fact that the Defendant in that case was present at the scene of the crime until he was arrested and that he put the criminal plan into motion (on page 50). The Honorable Presiding Justice Barak ruled (on page 51:

> **"The status of Meshulam does not allow considering him merely as soliciting the crime. Meshulam was the head of the group. He was a leader. He planned the operation. This was his operation. He is not one with a criminal idea: he is not simply the 'spiritual father' of the crime. He is not an external person who is asking someone else commit a crime. He made an internal contribution to the commission of the crime… In Meshulam's hands, as leader of the group, was effective control of the criminal event and he had the criminal thought required to determine his responsibility as a joint perpetrator."**

The Honorable Justice M. Cheshin also ruled (on page 55): "**Master criminal John Doe, who initiates, plans, determines**

[Stamp] Gilmore 00824 [continued]

SHATSKY-009286-433

the tasks and sends his 'soldiers' to commit the crime" – is considered a joint perpetrator even if he is not present at the scene of the crime. He added that a person of this type is not considered merely a solicitor, whose responsibility is less than that of a joint perpetrator. The Honorable Justice M. Cheshin wrote (on page 59):

> "From this, we know that our classification of the master criminal as a solicitor – as opposed to a as joint perpetrator – is like reducing his responsibility and making it easier for him. 'The soldiers' that the master criminal dispatched to commit the crime will bear full responsibility for the various crimes that they committed while he – the mastermind and supreme leader – will bear lesser responsibility, even though 'an ordinary person could have been aware of the possibility' that one of the various crimes was being committed. This conclusion is puzzling, strange and hard to accept."

The Honorable Justice M. Cheshin additionally wrote (on page 59):

> "Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding? If indeed the mastermind is the mastermind – without whom the octopus-participants in the crime could not have moved his tentacles – is hard for us to accept that his responsibility could be less in the responsibility of a joint perpetrator. The evil spirit of the leader pervades the entire criminal operation, his mind wound the operating spring before it was set in action and while the crime was being committed he was 'present' with the criminals as a joint perpetrator with them. He will continue to be 'present' with them unless or until he takes visible action to stop the crime, nothing less."

The Honorable Justice Cheshin justified this conclusion with an analogy that he drew from Section 29 (c) of the Penal Code when he considered the leader sending his "soldiers" to commit a crime as if he were someone "committing the crime through another" when he said, **"'Soldiers' will obey the orders of their leader to the point that they completely erase their will in favor of his"** (on page 60). With respect to the Defendant in that case, the Honorable Justice Cheshin emphasized that, **"his responsibility is derived from the fact that he planned and perpetrated the 'rebellion' before he was arrested – the planning and perpetration of the leader – that responsibility is continued even after his arrest as long as he did not do anything apparent to stop the wagon rolling down the hill"** (on page 61).

The Honorable Justice Y. Kedmi ruled in this spirit when he wrote (on pages 66 – 67):

[Stamp] Gilmore 00825

148

SHATSKY-009286-433

"In this situation, when the involvement of the leader in the group that has decided to commit a crime is expressed through planning, guidance and division of responsibilities, the question of whether the person before the Court is a 'joint perpetrator' or a 'solicitor' will be determined by the nature of his 'involvement': if this was 'involvement' that makes a contribution equivalent to 'participation' in the perpetration or whether it is only the external 'involvement' of solicitation.

Implementing this distinction is not always easy but it is always possible. In any case, when considering a leader – or the head of a group – who presents his followers and minions with a concrete plan for committing a crime, when this includes a division of tasks and orders for the manner of its commission, there can be no doubt that this is not a 'solicitor' but rather a leader whose 'participation" is expressed in stated the 'act of planning.' The 'act of planning' – as distinguished from the 'act of solicitation' – is an act of 'participation' in the act because it is actually the first stage of bringing the criminal plan into being, meaning of the perpetration. This is unlike 'solicitation', which is not part

[Stamp] Gilmore 00825 [continued]

149

SHATSKY-009286-433

of the perpetration but rather an external motivation for the operation.

As was explained above, assistance for this determination can be found in testing for the existence of a 'controlling connection.' The existence of a 'controlling connection' will confirm that the group leader is a 'joint perpetrator' with all the ramifications thereof; in an instance where there is no 'controlling connection' as explained above, this will be an indication of the possibility that is a case of involvement that bears only the responsibility of a solicitor."

166. The Honorable Justice Y. Kedmi repeated this approach in Criminal Appeal 4720/98, 5310/98, 5454/98, **Nahman Cohen _et al._ v. The State of Israel**, High Court Law, Volume 57 366. In this case, Nahman was convicted as a joint perpetrator after it was proven that he was the one who initiated, requested and led the murder plot and the one who confirmed the identification of the intended victim when he was presented with it. The Honorable Justice Y. Kedmi wrote (in Section 9):

"**According to my method, which I have presented more than once in the past, 'the leader' of a group, who initiates and leads the perpetration of a crime by the group, is included among the 'perpetrators." The leader 'participates' in committing the crime in accordance with the meaning of this requirement in Section 29 of the Penal Code. His fate is entwined with the fate of the actual perpetrator; he is responsible as if he were 'next to' the perpetrators while they were committing the crime. This is the legal standing of the 'leader' and this is the legal standing of 'the planners' and those who fulfill other 'essential roles' whose contribution to the act formally 'end' before it actually begins but remain an inseparable part thereof. The fate of these – the leader, the planner and their ilk – is connected to the fate of those will actually commit the act: they are one body, and all of the limbs bear responsibility for what the 'hands' do.**

**According to my method, the leader of the 'group' whose members have committed a crime did not 'solicit' the members of the group but rather he is their leader who 'guides' them to realizing their joint intrigue. The solicitor is outside of the inner circle of 'commission'; the act of solicitation is solicitation, with no more meaning: it is an independent and separate act from the overall effort of perpetration. Whoever 'participates' in the perpetration – and in my method, as required by the above mentioned, must give the concept 'participation' in this context a broad meaning – cannot be a 'solicitor.' The 'solicitor' and the perpetration are 'separated' by the perpetrator who is characterized by 'taking a part' in the perpetration, in accordance with that which has been set forth– the person before us is not a 'solicitor' but rather a joint perpetrator.**

[Stamp] Gilmore 00826

150

SHATSKY-009286-433

3. **Conclusions with Respect to the Defendant's Responsibility as a Joint Perpetrator, Solicitor and Accessory**

167. Analysis of the evidence presented above leads to the following factual conclusions with respect to the share and role of the Defendant in the terrorist attacks that are the subject of the Indictment:

a. The Defendant was the commander of the Fatah and Tanzim in the West Bank. He was a field leader of the Fatah in the [West] Bank and responsible for the "military operations" of the Fatah in all parts of the [West] Bank. The expression used by the Defendant, such as "military operations", is nothing more than a euphemism for terrorist attacks against Israel that have been carried out by the field cells of the Fatah, which were organized into the Tanzim movement and the framework of the Al Aqsa Martyrs Brigades. The Defendant established the Al Aqsa Martyrs Brigades and was responsible for their activities as the leader and commander of the members of the field cells and their commanders. For these activities, the Defendant was directly subordinate to the chairman of the Palestinian Authority, Yasser Arafat. The "military" activity of the Defendant described above continued in parallel with his political activity as Secretary General of the Fatah in the [West] Bank and as a member of the Palestinian Legislative Council.

b. The Defendant was of the opinion that Fatah was obligated to lead the "armed struggle against Israel," and therefore publicly supported terrorist attacks against soldiers and settlers. This was the declared position of the Defendant, who explained that from his perspective, women and children living in the settlements were also considered an enemy to be attacked. The Defendant was opposed, a matter of principle, to terrorist attacks within Israel, meaning over the Green Line, and also opposed suicide terrorist attacks. However, in practice he did not cease his support for his men and helped them by supplying money, weapons and explosives even after he learned time and again that they were carrying out terrorist attacks, including suicide terror attacks, inside Israel. Thus, the Defendant expressed his agreement to all types of terrorist attacks that have been carried out by people in the field who were affiliated with Fatah. This position of the Defendant was also expressed in his media appearances, in which he encouraged Fatah operatives and others to carry out terrorist attacks against Israel and also praised those who perpetrate the terrorist attacks – including those that were made within Israel.

[Stamp] Gilmore 00827

151

c. The Defendant did not have complete control over members of the cell and their commanders. However, he did have a great degree of influence over them, because he was their leader and because of the assistance that he extended to them, including money, weapons and explosives. The influence of the Defendant on members and commanders of the cells is also evident in that he would, on occasion, instruct them to cease the terrorist attacks against Israel and then later call for them to renew the terrorist attacks – sometimes in accordance with orders that he received from Arafat. Yasser Arafat would not give his orders in an explicit manner, but would make sure that his subordinates clearly understood when he was interested in a cease-fire and when he was interested in terrorist attacks against Israel. Arafat himself also considered the Defendant to be the person who controlled people in the field and therefore he would reprimand him when a terrorist attack was carried out against the opinion of the Chairman.

d. Members of cells in the field and their commanders did have a great degree of independence when carrying out terrorist attacks. They generally did not involve the Defendant in the planning of the terrorist attacks and there is no evidence that they would report to him prior to the perpetration of a terrorist attack (other than a few solitary cases). In spite of this, the Defendant would receive a report from the commanders after every terrorist attack. This pattern of activities is an outgrowth of the Defendant's desire, and the desire of the field commanders, to protect the Defendant from Israel and maintain him as a "political figure," who is not involved, as it were, in the murderous terrorist attacks against Israel. For this reason the Defendant did not have direct contact with those who carried out terrorist attacks, other than for exceptional cases. Thus, the Defendant also was careful not to personally assume responsibility in the name of the Fatah or Al Aqsa Martyrs Brigades after the terrorist attacks were completed; this was done by the cell commanders. The Defendant was satisfied with taking general responsibility through the media in an indirect overall manner, without relating to any specific terrorist attack, by expressing support for the terrorist attacks that had been perpetrated.

[Stamp] Gilmore 00827 [continued]

152

SHATSKY-009286-433

e. Other than the overall supreme responsibility of the Defendant for all of the members of the Tanzim and Al Aqsa Martyrs Brigades because he was the commander, he also had better control over a few cells that operated under the command of people who were his close advisors and benefited from his special assistance and support, such as Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha.

The Defendant took responsibility during an interrogation for the activities of the groups that operate under the command of these people (other than Aweis), although he claimed that he was only one of the "addresses" to which these people turned in order to receive assistance and financing, and that he did not have complete control of them but rather only influence over them.

f. The Defendant generally did not have direct contact with people in the field who perpetrated the terrorist attacks; the connection was through people who were close associates of Defendant and who worked around him, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. These people worked in the Defendant's environs and with his support, planned and brought about murderous attacks, using the money, weapons and explosives with which the Defendant was careful to supply them for this purpose.

g. The Defendant was responsible for the supply of money, weapons and explosives to cells in the field through his associates, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. He would refer their requests to Arafat for his approval and was responsible for the purchase of weapons and supplying the cell members through his close associates. The Defendant also proffered assistance to wanted men and to the families of the terrorists.

h. Despite the fact that Defendant, like his men, was generally careful not to involve himself personally in the planning and the perpetration of the terrorist attacks, unequivocal evidence was submitted with respect to four terrorist attacks that had been carried out with the knowledge, approval and encouragement of the Defendant. He even initiated two of them.

The terrorist attack at the gas station in Givat Ze'ev, in which Yoela Chen, of blessed memory, was murdered, was carried out as a result of direct orders given by the Defendant to his men, in revenge for the targeted assassination of Ra'ed Karmi, and the Defendant admitted to responsibility for this terrorist attack during the course of his interrogation.

[Stamp] Gilmore 00828

153

SHATSKY-009286-433

Thus, too, in the case of terrorist attack in which the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim as a result of the Defendant's being contacted by the terrorist Radaida, who wished to perpetrate a suicide terrorist attack.

The Defendant referred Radaida to a person who could teach him and supply him with a weapon and instructed him to perpetrate a shooting terrorist attack rather than a suicide terrorist attack. As a result, Radaida set out to perpetrate the terrorist attack and shot a Greek Orthodox monk to death, thinking that he was a Jew.

In addition, the Defendant gave his approval for the terrorist attack at the Seafood Market restaurant in Tel Aviv, and that was before the terrorist departed. The Defendant did indeed instruct his people that the terrorist attack should take place in a settlement or near a military roadblock and not within Israel, but he did approve the terrorist attack itself.

Similarly, Defendant gave approval to his men for the perpetration of a suicide terrorist attack by exploding a car bomb, even though he did instruct them that the terrorist attack should take place in the Occupied Territories and not within Israel. This incident ended with the death of the two terrorists near the Malha Mall in Jerusalem, when they exploded in their car on the way to the terrorist attack.

[Stamp] Gilmore 00828 [continued]

154

SHATSKY-009286-433

i. Other than the four terrorist attacks that have been listed in Subsection (h) above, no evidence was submitted connecting the Defendant personally and directly to involvement in the terrorist attacks that are the subject of the Indictment. From the Defendant's conversation with his associate, Ahmed Barghouti, which was recorded without their knowledge, there emerges significant concern that the Defendant knew far more than what he and his people have revealed during the course of interrogation, but is not possible to determine this with the degree of certainty that is required by a criminal Court on the basis of the existing evidence.

One way or another: it is clear from the evidence that has been submitted that more than a few of the murderous terrorist attacks that have been listed in the Indictment were planned and brought into being by field commanders who operated in proximity to the Defendant and with his support, using weapons that the Defendant helped supply and which were given to the terrorists by the cell commanders who were close to the Defendant (Ahmed Barghouti, Aweis, Abu Satha and Abu Hamid). The Defendant received reports from his men with regard to these terrorist attacks after they were perpetrated and gave his consent – at least by way of his silence and behavior – to continuing the attacks.

168. The analysis of the evidentiary material in accordance with that which has been set forth above leads to the conclusion that the Defendant made a substantive contribution to the terrorist attacks that have been carried out by the Fatah cells, the Tanzim and the Al Aqsa Martyrs Brigades, even if he did not take part in the perpetration.

The assistance in the form of the provision of weapons, explosives and money to those cells, the recruitment of field operatives, the making of arrangements for their training and the assistance to their families – all of these created the necessary conditions for the perpetration of acts of murder by the terrorist cells. Without a doubt, the Defendant was aware of this fact. He also knew that the field operatives that he supported were going to continue perpetrating murderous terrorist attacks against Israel, and he acted with the clear goal of helping them continue in this way. This is not simply a reasonable suspicion or "turning a blind eye" on the part of the Defendant, but rather genuine knowledge of what the members of the cells were perpetrating, and would continue to perpetrate, murderous terrorist attacks against Israel using the weapons, explosives and money that the Defendant supplied to them for this specific purpose. More than that: the Defendant was not only aware of the acts of murder that some members were perpetrating but rather he gave them assistance, in accordance with that which has been set forth above, out of a goal and aspiration that they would act in this manner.

[Stamp] Gilmore 00829

SHATSKY-009286-433

In spite of this, other than the four instances that have been set forth above, there is no evidence that the Defendant was involved in planning and perpetrating the terrorist attacks or that he knew in advance about the terrorist attacks that were going to be perpetrated by the men in the field and the commanders of the cells, who he supported and for whom he was, effectively, their commander. In fact, Ali Aidiya did say during the course of his interrogation that the Defendant knew about the events and approved the shooting terrorist attacks perpetrated by members of the Tanzim (see Section 40 above). However, other than this sole testimony, given by a person who was not close to the Defendant, there is no other evidence that the Defendant knew in advance about all of the terrorist attacks that were going to be perpetrated, and he himself denied this claim. The Prosecution also does not claim that Defendant knew in advance about all of the terrorist attacks (see page 47 of its summation).

169. Furthermore: from the evidentiary material it becomes apparent that the Defendant did not have total control over the commanders of the cells and the men in the field. Although he was considered their leader and commander and did have influence over them, they did in any case have a significant degree of independent discretion in planning the terrorist attacks and their perpetration; there is no evidence that they would consult with the Defendant in this regard. From the overall body of evidence it becomes apparent that the Al Aqsa Martyrs Brigades were not an organized body under one leader, but rather a collection of field cells, with each one having its own commander. It emerges from the evidentiary material that the Defendant's men did indeed perpetrate suicide terrorist attacks, and terrorist attacks inside the Green Line, contrary to the Defendant's stated position and sometimes contrary even to the opinion of Chairman Arafat. In addition, it emerges from the evidentiary material that the men the field who were involved in the terrorist attacks made an effort to distance the Defendant and separate him from personal involvement in those terrorist attacks in order protect him from Israel and maintain him as a "political figure."

[Stamp] Gilmore 00829 [continued]

SHATSKY-009286-433

The Defendant himself also tried to keep as far as possible from "military" activity and any direct connection to the cells that perpetrated the terrorist attacks which were carried out by the field commanders, some of whom were close associates of the Defendant and operated under his control, with his assistance and with his encouragement (such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis). This fact reinforces the conclusion that the Defendant generally did not know in advance about the terrorist attacks and was not personally involved in their planning or approval because this pattern of activity was intentionally chosen by him and by his people.

Therefore, the Prosecution states in its summation (on page 47) that:

> **"Within the context of the organizational arrangement of terrorist organizations, the field commanders and operatives were given broad authority and wide space for maneuvering when carrying out terrorist attacks, and they were not required to obtain the Defendant's approval for all of the terrorist activities that were perpetrated, in accordance with the policy that was designed by the Defendant and the organizations' leadership, in accordance with that which has been set forth above.**
>
> **The Defendant was aware of the activities conducted by the people subordinate to him and he was kept up to date about them, sometimes in advance and sometimes after the fact, in accordance with the these organizations' operational concept as mentioned above."**

170. The law, in accordance with that which has been set forth above, is that assistance must be **consciously directed to a particular crime with a concrete purpose**, and it must be proven that the accessory was aware of the fact that the principal was almost certainly going to perpetrate this crime, meaning – a crime with a concrete purpose. It is not sufficient that the accessory knows that the principal has a vague willingness to commit a crime. Although there is no need to prove that an accessory was aware of all the details of the crime, such as its exact location (the above mentioned Criminal Appeal 11131/02, in the matter of **Yosefov**) or the identity of the victim of a crime or the time its commission (the above mentioned Criminal Appeal 426/67, the matter of **Be'eri**): it is sufficient that he was aware of the fact that the principal was going to commit a particular crime of the type that was ultimately committed and In spite of this assisted in its commission.

[Stamp] Gilmore 00830

157

However, in the current case – with respect to most of the terrorist attacks that are the subject of the Indictment, other than the four terrorist attacks in which the Defendant was personally involved – there is no evidence that the Defendant knew of the intent to commit them, in the sense of an intent to commit a **specific crime with a concrete purpose**, as required by the rulings. The Defendant had general knowledge that the men in the field who belonged to the organization that he led occasionally perpetrated murderous terrorist attacks against Israelis, using the weapons, explosives and money that he took care to provide them. However, no evidence was brought connecting the assistance provided by the Defendant to any specific terrorist attack (other than the murder of the Greek Orthodox monk, which will be discussed below). There is no evidence that the Defendant supplied weapons, explosives or money for the purpose of committing any specific terrorist attack. Indeed, in some cases it was proven that the terrorist attack was carried out using a weapon that was given to the terrorist by one of the Defendant's close associates, such as Aweis, Abu Hamid or Ahmed Barghouti.

According to the evidence submitted, the assistance that the Defendant gave to his close associates in this regard was general, and did not relate to any particular terrorist attack or any particular terrorist: in general, the Defendant made certain that men in the field were equipped with weapons, explosives and money, and this was through his close associates and the field commanders who accepted his authority, knowing that the weapons, explosives and money would be used for the purpose of terrorist attacks. However, in accordance with the law cited above, this is not sufficient in order to convict the Defendant as an accessory for each of the murderous terrorist attacks that have been carried out by the men who received his general assistance, through his associates, for the purpose of carrying out terrorist attacks.

171. This is a situation in which a person assists people who accept his authority with the knowledge that they are about to commit a particular

[Stamp] Gilmore 00830 [continued]

SHATSKY-009286-433

concrete crime although he does not know where, when, by what manner or by whom his people will commit the crime and who will be its victim. In this case, there is no evidence that connects the Defendant to the commission of a particular crime, with respect to either the factual basis for the crime or its mental basis, since has not been proven that the Defendant knew anything of the plans for committing them. In these circumstances, for most of the terrorist attacks that are the subject of the Indictment – it is not possible to ascribe to the Defendant the general comprehensive crime of being an accessory to premeditated murder in the cases of these terrorist attacks because of his only general knowledge that his men were carrying out terrorist attacks using the weapons, explosives and money that he took care to obtain for them.

This does not mean that the Defendant does not bear any criminal responsibility for his deeds that led to the terrorist attacks being perpetrated using the weapons, explosives and money that he took care to obtain for the commanders in the field. For this purpose, there is the general crime of activity in a terrorist organization, which carries a sentence of imprisonment of up to 20 years, and the general crime (for which the Defendant is not been indicted) of providing means for committing a crime in accordance with Section 498 of the Penal Code, 5737 – 1977. This crime was intended for the case of providing means for implementing **any crime**, when is not possible to prove that the person providing the means had knowledge of the intent to commit a particular crime (see: Criminal Appeal 507/79 **State of Israel v. Eliyahu Asraf**, High Court Decision 33 (3) 620, on pages 622 – 623). This is the case before us.

172. The above mentioned conclusions relating to the crime of being an accessory also apply to the crime of soliciting murder, with which the Defendant is charged. Just as it is not possible to convict person in Israel for a general crime of being an accessory to an act of murder, so it is not possible to convict him for general crime of soliciting an act of murder. Just as the accessory must relate to a particular crime with a concrete purpose, so, too, must solicitation occur between one specific person and another, and the solicitation must relate to a particular crime with a concrete purpose. This conclusion is necessary for solicitation *a fortiori*, since the punishment of one who solicits a crime, unlike the accessory, is identical to the punishment of the principal criminal. When a Defendant is not aware in any way of the intention to commit a particular crime, it is not possible to prove the circumstantial connection, namely: that the principle perpetrator was solicited by him to perpetrate the crime.

[Stamp] Gilmore 00831

159

SHATSKY-009286-433

In the current instance, with regard to the group of terrorist attacks that are the subject of the Indictment (other than the four terrorist attacks that will be discussed below) there is no evidence that the Defendant influenced the field commanders under his leadership or the members of the cells to perpetrate them because, there is no proof that the Defendant even knew of any intent to perpetrate these terrorist attacks. From the evidence submitted, it seems that no one needed to solicit them: the field commanders and the members of the cells acted, in general, in accordance with their independent initiative and judgment, while being careful not to involve the Defendant personally in the planning or the perpetration of the terrorist attacks. Similarly, it is not possible to convict the Defendant of an overall crime of soliciting the acts of murder that are the subject of this Indictment because of what could be called "solicitation directed to all", meaning: the Defendant's words of incitement to the media, when he called on the people under his leadership and others to carry out terrorist attacks against Israel. For this, there are the general crimes of inciting to violence or terrorism, activity in a terrorist organization, etc. (see Section 161 above).

173. On the basis of the legal principles and the law described above, it is also impossible to consider the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the Indictment, together with the terrorists and planners who actually perpetrated them, since there is no evidence they he was aware of the intention to perpetrate them (other than the four terrorist attacks in which he was personally involved, as will be described below). Despite the very broad interpretation that rulings have given to the words "participation in perpetrating a crime by taking action to commit them" and the rulings relating to the responsibility of a leader in a criminal group – it is not possible to accept the Prosecution's claim that this Defendant should be considered a joint perpetrator in all of the terrorist attacks that are the subject of the Indictment. According to the rulings explained above,

[Stamp] Gilmore 00831 [continued]

SHATSKY-009286-433

the minimum requirement for assigning the responsibility of a co-defendant to the leader of a group who was not present at the scene of the crime, is participation in the planning of the crime or in conspiracy to commit it; the giving of orders for approval before the crime; the supervision of the crimes perpetrated; or proposing the idea for the crime, in addition to assistance or planning. Each of these might be considered in accordance with the rulings as "acting to commit the crime", which is the basis for the responsibility of a joint perpetrator. However, it is not sufficient that the leader controls his men and those who accept his authority, in order to assign to him the responsibility of joint perpetrator for all of the crimes committed by his men, when there is no evidence connecting the leader in any way to their planning or perpetration, and there is not even any evidence that he knew about the intentions to commit them.

The Prosecution must prove that the Defendant is connected in some way to a **particular** crime – both the factual basis of the crime and the mental basis, and this was not proven except in the four cases that will be listed below.

The Prosecution has placed trust in the law that was ruled in the above mentioned Additional Proceeding 1294/96 in the matter of **Meshulam**, in its petition to consider the Defendant a joint perpetrator in all of the terrorist attacks that are the subject of the Indictment.

However, **Meshulam** was convicted as a joint perpetrator, together with his group of disciples who surrounded him and committed a variety of crimes, after it was determined that he gave orders to his men, supervised their activities, had control over them and intentionally avoided instructing them to cease committing the crimes (the Honorable Justice A. Matza on pages 30, 32). In addition, it was determined that he was present at the scene of the crimes close to the time they began, while simultaneously propelling the criminal plan forward, and was even the one who planned the operation (the Honorable Presiding Justice A. Barak on pages 50 – 51); and planned and perpetrated the "rebellion" before his arrest (the Honorable Justice Cheshin on page 61).

The Honorable Justice Kedmi also related to **Meshulam** as someone whose involvement in the perpetration was expressed through planning, guidance and assigning roles, and noted that Meshulam desisted from instructing his men to cease committing the crimes (on page 63, 66 – 67).

[Stamp] Gilmore 00832

161

SHATSKY-009286-433

These characteristics – of total control over the perpetrators of the crime, attendance with them at the scene of the crime until it began, involvement in planning the crime, giving of orders for its perpetration and supervision thereof – do not exist in our matter , where it has not been proven that the Defendant knew in advance of intention to perpetrate most of the terrorist attacks that are the subject of the Indictment.

The Defendant was not personally involved in initiating, planning or implementing the terrorist attacks that are the subject of the Indictment (other than the few terrorist attacks that will be described below). The Defendant did not give orders or approval for the perpetration of these terrorist attacks, and he also did not assist or solicit [these terrorist attacks] specifically, as explained above. Despite the Defendant having the unofficial title of Commander of the Tanzim and Al Aqsa Martyrs Brigades, there is no proof that the Defendant was part of a joint decision to commit the terrorist attacks covered by this Indictment, or that he worked together with others in order to realize these terrorist attacks, or that he took part in their perpetration or planning. Lacking all these, and on basis of the principles that have been established in rulings and in the orders of the Penal Code, it is not possible to consider the Defendant a joint perpetrator in the terrorist attacks that are the subject of the Indictment, in regard to which he had no personal involvement or knowledge, simply because he was the uncrowned leader of the Tanzim and the Al Aqsa Martyrs Brigades, or because of his closeness to the planners of the terrorist attacks and the general assistance that he provided them.

174. To summarize the above, the legal situation that prevails in the State of Israel does not make it possible to convict the leader of a criminal group or a terrorist organization for crimes that were committed by members of the said group or organization, not even for being an accessory or soliciting them, when he himself was not personally involved, on an individual basis, in any part of the crimes themselves, either before or during their commission. This is the situation, even when it is clear that this

[Stamp] Gilmore 00832 [continued]

SHATSKY-009286-433

leader gave his blessing to the commission of these crimes and gave his men general assistance although not for the purpose of the specific crime.

In the current case, the Defendant encouraged and urged the cell commanders and the men in the field to carry out terrorist attacks and made sure that they would have the money, weapons and explosives necessary to perpetrate the terrorist attacks. He was the leader of the commanders and of the men in the field, and he had a not insignificant degree of influence over them.

Many of the terrorist attacks that are the subject of the Indictment came into being and were planned by the field commanders who were close to the Defendant and were supported by him. Despite all of this, it is not possible to attribute the Defendant, in accordance with Israeli law, the criminal responsibility of a joint perpetrator, an accessory or a solicitor for those terrorist attacks for which there is no evidence connecting the Defendant to them and where it has not been proven that he knew of the intention to commit them.

Therefore, there is a gap between the general and collective responsibility of the Defendant for a commission of the terrorist attacks covered by this Indictment, not to mention the moral responsibly for them, and the legal possibility to attribute criminal responsibility for perpetrating specific terrorist attacks to him when it was not proven that he knew about plans to perpetrate them. We are unaware of any precedent for convicting a person for the crime of murder, or solicitation or accessory to murder, when there is no evidence connecting him to the specific act. The Defendant does indeed bear heavy and terrible responsibility for the terrorist attacks covered by this Indictment, in which many people lost their lives, because he was the leader and commander of the terrorist cells that perpetrated the terrorist attacks. However, this is command responsibility that is "almost ministerial" and not responsibility they can be substantiated as required by the Penal Code. We must not extend the orders of the Penal Code beyond their natural limits, even when faced with a problem that is difficult for the Court to resolve using the orders of existing law.

[Stamp] Gilmore 00833

163

SHATSKY-009286-433

The legal outcome is far from satisfactory, even offensive. This is what Professor M. Kremnitzer was referring to in his words quoted above with respect to the accepted categories of accessory and solicitation that are not appropriate for the phenomena of organized crime and terrorism, and therefore a proposal made by Professor M. Gur-Arye to amend the code in order to consider a leader of this type as "committing a crime through another" (see Section 164 above). In the above mentioned Additional Proceeding 1294/96 in the case of **Meshulam**, the Court rejected the possibility of considering the leader of a criminal group as "committing a crime through another" in accordance with Section 29 (c) of the Penal Code, although Justice M. Cheshin fashioned an analogy based on the orders of the law with respect to the responsibility of the joint perpetrator as compared to the responsibility of solicitor (on pages 59 – 60).

175. Recently, the Legislature has made an effort to deal with this legal problem, if only partially. The Knesset [Israeli Parliament] enacted the Law on Combating Criminal Organizations, 5763 – 2003, which makes it possible to sentence the head of a criminal organization to imprisonment of up to 20 years, when the organization commit felonies for which the punishment is more than 20 years' imprisonment. This law does not apply to the crimes of the type subject of this Indictment, which were committed before it was enacted; however, it does apply to terrorist organizations and their leaders (see the first extension that applies the law to crimes in accordance with Section 4 of the Prevention of Terrorism Ordinance, and the explanations of the proposed legislation: Proposed Legislation 5762 [2002] 3155, on page 762). From the explanation of the proposed legislation, it is possible to understand that the Legislature is aware of the legal problem arising from the inability to convict people who head criminal organizations for the crimes committed by their subordinates because of their distance from the crime. The explanation states (on page 762):

> **"The proposed Law on Combating Criminal Organizations, 5762 – 2002, is intended to address, on the legislative level, the phenomena of organized crime and the structure of criminal organizations that frequently make it difficult to prove the connection between the heads and leaders of organizations of this type and the crimes that were committed by others, all because of the hierarchal structure of some of these organizations,**

[Stamp] Gilmore 00833 [continued]

SHATSKY-009286-433

which creates distance between the decision-makers and policy-setters and those who commit the crimes."

The explanation of the proposed legislation also states (on page 763) that Section 2 of the law that permits a sentence of up to 20 years' imprisonment for the head of a criminal organization "**is intended to address the difficulty in proving the connection between officials in criminal organizations and the crimes actually committed. It states that the very act of heading, managing or financing the organization, etc. is sufficient to be considered a crime…** "

The continuation of the explanation says that for members of criminal organizations on a lower level, "**it will remain necessary to prove connection to specific crimes**."

From this it is clear that the law is intended to deal with the issue that is also being decided in this case, specifically, the inability, in accordance with the current legal situation, to convict the leader of a criminal organization or a terrorist organization for committing, soliciting or being an accessory to a specific crime that is committed by members of the organization.

However, this law does not provide a response to the question asked by the Honorable Judge M. Cheshin in the above mentioned Additional Preceedings 1294/96 in the matter of **Meshulam** (on page 59), where he asks: "**Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding?**" Even in accordance with this law, the punishment of the person heading the organization is less that for than those who accept his authority who have committed the crime of murder, which carries a sentence of life imprisonment. Furthermore, in the case of a terrorist organization, this law is unnecessary since in accordance with Section 2 of the Prevention of Terrorism Ordinance, the head of a terrorist organization can in any case be sentenced to 20 years simply for holding a managerial official in the organization (see Subchapter I above).

176. The above mentioned applies to most of the terrorist attacks attributed to the Defendant in the Indictment, as listed in Chapter 5 of Part II of this verdict. For these terrorist attacks, as explained above, it is not possible to convict the Defendant for the crimes of being an accessory or for soliciting an act of murder, and not even for being a joint perpetrator. In spite of this, clear convincing evidence has been submitted for the Defendant's involvement in three acts of murder that have been carried out by his men and an additional case of attempted murder, as follows:

A. **The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev**

[Stamp] Gilmore 00834

SHATSKY-009286-433

In this terrorist attack, which occurred on January 15, 2002, Yoela Chen, of the blessed memory, was murdered and the passenger traveling with her was injured. From the evidence submitted it emerges clearly that when they were in the mourners' tent that was set up after the targeted assassination of Ra'ed Karmi on January 14, 2002, the Defendant ordered his close associate, Ahmed Barghouti, to perpetrate a terrorist attack in revenge. Ahmed Barghouti gave a weapon to Abu Satha, who was also a close associate of the Defendant and accepted his authority, and members of Abu Satha's cell perpetrated the murder, and immediately thereafter reported to the Defendant on its results.

The Defendant emphasized that this was the first terrorist attack that Fatah committed within Israel. In this case, the Defendant is directly responsible for the act of murder because he himself gave orders for it to be committed.

Certainly this type of instruction given by the Defendant to people who accept his authority is solicitation to murder, even if the Defendant did not take specific interest in the location and manner in which the terrorist attack was committed. When the Defendant gave orders to commit a revenge terrorist attack, it was clear to him and to his people that the intention was to murder Israelis. However, the responsibility of the Defendant is not just that of a solicitor but rather that of a joint perpetrator, together with the other perpetrators, Ahmed Barghouti, Abu Satha and his men. The Defendant was part of the joint plan to

[Stamp] Gilmore 00834 [continued]

SHATSKY-009286-433

commit the terrorist attack, as the one who initiated it. He had a high level of mental involvement and knowledge that the crime was going to be committed in accordance with his instruction. The Defendant not only caused others to commit a crime in this case and not only gave his approval for commission of the crime but he also **instructed** them to commit crime; and because of his standing as the leader and commander and on account of his relationships with Ahmed Barghouti and Abu Satha, this instruction can be compared to pulling the trigger that caused the murder of Yoela Chen, of blessed memory.

The Honorable Justice D. Beinish was referring to a case of this type in the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**: "**In special circumstances, it is possible that 'agreement' to commission of the crime can be considered participation 'in committing a crime by taking action so that it is committed' in accordance with that which has been set forth in Section 29 of the Penal Code.**" The Honorable Justice Justice Y. Kedmi also ruled in this manner in the above mentioned Criminal Appeal 5589/98 in the matter of **Sultan**, that giving the "**green light to murder**" is analogous to "**the opening shot that starts the athlete running**" and can be considered "an act of participation in committing the crime" (see Section 163 above).

In the above mentioned Additional Preceedings 1294/96 in the matter of the **Meshulam**, the Honorable Judge M. Cheshin wrote (on page 59): "**The evil spirit of the leader pervades the entire criminal operation, his mind wound the operating spring before it was set in action and while the crime was being committed he was 'present' among the criminals as a joint perpetrator with them**." This also can be said of the Defendant before us and therefore he should be convicted for this murderous terrorist attack as a joint perpetrator in premeditated murder and not only for solicitation.

**B.** **Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

This terrorist attack was also perpetrated the instruction and initiative of the Defendant, on June 12, 2001. The terrorist Radaida asked the Defendant for a weapon to perpetrate a suicide terrorist attack.

[Stamp] Gilmore 00835

SHATSKY-009286-433

The Defendant instructed him not to perpetrate a suicide terrorist attack, but rather a terrorist shooting attack "as is customary for the Tanzim", and referred him to Muhaned in order to receive a weapon and training in shooting, with clear knowledge that Radaida would commit a shooting terrorist attack and would murder Israelis in accordance with his orders. Indeed, Radaida did this together with another terrorist, when they received two Kalashnikov rifles from Muhaned and also training in how to use them – all this at the instruction of the Defendant. In this terrorist attack, the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim, because the terrorists thought that he was a Jew.

In this case, too, the responsibility of the Defendant for the murder of the Greek Orthodox monk is that of joint perpetrator, not merely of solicitor. The Defendant not only convinced Radaida to perpetrate the murderous shooting terrorist attack but also instructed him how to do it, helped him obtain a weapon and training for the purpose of the terrorist attack and instructed him to whom he should turn in order to bring the terrorist attack into being. At the same time, the Defendant instructed his people to assist Radaida in perpetrating the terrorist attack, and they indeed acted in accordance with the Defendant's orders.

According to law, solicitation, if it is accompanied by an act of perpetration such as planning or giving orders for perpetration – becomes participation in the commission of the crime, not merely solicitation. As the Honorable Presiding Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/95 in the matter of **John Does**: "**the more intensive the solicitation of the solicitor and the more it involves only not only activities on the mental level but also on the factual level, the closer the solicitor moves to being a joint perpetrator**." (See Section 161 above). Therefore, in the same case of the minor known as "T", he was convicted as a joint perpetrator and not simply for solicitation because he participated in the planning of the crime and was "the leader and first of them all".

In this case as well, the liability of the Defendant as the joint perpetrator is derived from his status as leader and commander, and from the orders that he gave to Radaida and to his people with regard to the manner in which the terrorist attack should be perpetrated. The Defendant was not only an accessory to the terrorist attack and did not only solicit its perpetration by encouraging Radaida to act as he did, but rather the Defendant was

[Stamp] Gilmore 00835 [continued]

168

SHATSKY-009286-433

part of a joint plan to perpetrate this terrorist attack and he effectively gave orders for it. We have explained the significance of orders of this kind in Subsection (A) above, and therefore the Defendant should also be convicted for this terrorist attack as a joint perpetrator in premeditated murder.

## C. Murderous Terrorist Attack in the Seafood Market Restaurant in Tel Aviv

This terrorist attack was carried out on March 5, 2002, in the Seafood Market restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who murdered Yosef Habi, of blessed memory; Elihu Dahan, of blessed memory; and Staff Sergeant Major Barakat, of blessed memory, during the attack. From the evidence that was submitted it becomes apparent that this terrorist attack was planned and brought into being by close associates of the Defendant, Ahmed Barghouti, Abu Hamis and Aweis, and that Ahmed Barghouti reported to the Defendant before the terrorist attack was carried out that it was about to happen. The Defendant authorized the terrorist attack although he instructed that it not take place within Israel but rather in a settlement or at the military check point in the West Bank. Immediately after the terrorist attack was carried out, Ahmed Barghouti called the Defendant in order to report to him about it. The Defendant ordered Aweis not to take responsibility for the terrorist attack since it was carried out within Israel.

From the evidence in accordance with that which has been set forth above, the responsibility of the Defendant for this terrorist attack as a joint perpetrator is clear. The Defendant was a partner in planning the terrorist attack, gave orders with respect to the location and approved it. The fact that the perpetrators did not follow the orders of the Defendant does not detract from his criminal responsibility. As was explained above, the responsibility of the Defendant for this terrorist attack is not only for solicitation, because he also gave approval for the perpetrating murderous terrorist attack, which is an act of participation in committing the crime. The Defendant was the part of the plan for the terrorist attack, and gave orders to the people perpetrating the terrorist attack regarding its location, and also received a report from them immediately after the attack. The leader of a criminal group who authorizes murder and gives orders for its commission bears responsibility for murder as a joint perpetrator, not only for solicitation, in accordance with the law explained above. Therefore, in this case, too, the Defendant should be convicted of responsibility as a joint perpetrator for the premeditated murder of three people.

[Stamp] Gilmore 00836

169

SHATSKY-009286-433

**D.**    **The Attempted Terrorist Attack Near The Malha Mall In Jerusalem**

The day before this terrorist attack, its perpetrator, Jihad Jawara, informed the Defendant of his plan to explode a car bomb, and the Defendant authorized the terrorist attack but ordered him not perpetrate it within Israel but rather on the West Bank. In fact, the two terrorists exploded with a car bomb outside of the Malha Mall in Jerusalem on their way to perpetrate in the attack. In this terrorist attack, the Defendant was assisted by his close associate Ahmed Barghouti.

Here, too, the responsibility of the Defendant is not simply for solicitation but rather as a joint perpetrator who gave the "green light for murder" together with orders for perpetration. Since the terrorist attack failed, the Defendant is to be convicted, in this case, for the crime of attempted murder.

# Part V:    **Summation**

177. The Defendant declared during summations: "**I am opposed to the killing of innocent people, I am against the murder of children and women. We need**

[Stamp] Gilmore 00836 [continued]

SHATSKY-009286-433

to oppose the occupation of the territories, I am against military operations or suicides. It is not true that I am responsible for the fact that there were suicides" (on page 24 of the session that was dated September 29, 2003). However, in actuality it has been proven beyond all doubt that the Defendant has taken part in and led murderous activities with the goal of harming innocent people – both in the areas of Judea and Samaria and within the "Green Line" – including suicide terrorist attacks.

178. The Defendant chose not to defend himself against the serious charges that arise from the evidence that has accumulated against him, in accordance with that which has been set forth above. The claims that he raised during the Court sessions and his summation focus on the question of this Court's authority to judge this case and the justification for what he considers opposition to Israeli occupation. We related to these claims of the Defendant in the Preliminary Decision that was handed down on January 19, 2003 – as far as the are claims that are not limited only to the political level. We have rejected these claims and ruled as follows:

a. Courts in Israel are authorized to judge "external crimes" against the security of the state, or against Israeli citizens or residents, wherever they may be perpetrated in accordance with Sections 13 (a) – (b) of the Penal Code, 5737 – 1977, although most of the crimes that are the subject of the Indictment are "internal crimes" that relate to terrorist attacks that have been carried out within Israel.

b. The Law on Perpetration of the Interim Agreement on the West Bank and the Gaza Strip (Jurisdictional authorities and other Provisions) 5756 – 1996, which validates the Israeli-Palestinian interim agreement with respect to the West Bank and Gaza Strip, as well as the Regulation 2, Extension of the Law of Emergency Regulations (Judea and Samaria and the Gaza Strip – Jurisdiction Over Offenses and Legal Aisistance), 5738 – 1977) do not negate the authority of an Israeli Court to judge the external crimes or internal crimes attributed to the Defendant. These laws transfer to the Palestinian Authority the authority to judge Palestinians who committed a crime within its territory, but not for crimes against Israeli citizens or residents in the Territory of the State of Israel or in the areas of Judea and Samaria and the Gaza Strip.

c. The Defendant does not have any immunity from the crimes with which he is charged in this Indictment even though he was serving as a member the Palestinian Legislative Council, for international law does not recognize immunity of this type.

[Stamp] Gilmore 00837

SHATSKY-009286-433

d. Defendant is not entitled to the status of "prisoner of war" in accordance with the Third Geneva Convention, and therefore there is no reason not to try him for the crimes he committed as an illegal combatant. A person who acts outside of the framework of legal combat and against the rules of war, who is involved in perpetrating acts of terrorism for the purpose of injuring the civilian population without distinction exposes himself to the ordinary criminal sanctions of international criminal law, and is not entitled to any the protection provided by international law.

e. Opposition to occupation, as claimed by the Defendant, is not justification in accordance with any law for acts of killing directed at innocent civilians. Acts of terrorism that violate the rules of war and do not distinguish between military targets and civilian targets are not considered recognized combat activities in accordance with the principles of international law, even if the goal is the removal of occupation – as claimed by the Defendant.

179. **In conclusion**: Considering all of the reasons that have been explained in this verdict, we did not find any legal basis for convicting the Defendant for the commission of the entire list of terrorist attacks that are the subject of this Indictment, and based on law, we convict him for the general crimes with which he is charged in the Indictment, and crimes of murder and attempted murder in four of the terrorist attacks that are the subject of the Indictment (No. 3,

[Stamp] Gilmore 00837 [continued]

SHATSKY-009286-433

7, 12 and 36 in the appendix to the Indictment).

On the basis of the infrastructure of evidence and the legal analysis above, we convict the Defendant for the following crimes:

a. **Premeditated murder in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 (for three cases in which five people were murdered);**

b. **Attempted murder in accordance with Section 305 (1) of the Penal Code, 5737 – 1977;**

c. **Activity in a terrorist organization in accordance with Section 2 of the Prevention of Terrorism Ordinance, 5708 – 1948;**

d. **Membership in a terrorist organization in accordance with Section 3 of the Prevention of Terrorism Ordinance, 5708 – 1948;**

e. Crime of **conspiracy to commit a crime in accordance with Section 499 of the Penal Code, 5737 – 1977** was also proven with regard to four terrorist attacks for which the Defendant was convicted and is subsumed within the principal crimes of premeditated murder and attempted murder.

**Handed down and announced this day, 29 Iyar 5764 (May 20, 2004) in the presence of Counsel for the Prosecution, the Public Defender and the Defendant.**

| | | |
|---|---|---|
| **Sarah Sirota, Vice President Presiding Judge** | **Avraham Tal, Judge** | **Dr. Amiram Benyamini, Judge** |

[Stamp] Gilmore 00838

SHATSKY-009286-433