**LOWELL DECL. EX. 96c**

69



בתי המשפט

106.   מן האמור לעיל עולה כי לגבי פיגוע זה אין ראיה ישירה לגבי זהות מבצעו, שכן הדברים שנאמרו לאבו חמיד על ידי עבד אלמגיד שלא העיד בפניו הם בבחינת עדות שמיעה לא קבילה.

ואולם, ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי עבד אלמגיד, בסיועו ובאישורו של אבו חמיד, כפי שסיפר אבו חמיד בעדותו. אבו חמיד סיפר כי עבד אלמגיד הודיע לו שהוא יוצא לבצע פיגוע במפעל של משפחת רגיואן בו עבד בעבר, ולצורך כך הוא צייד אותו באקדח; זמן קצר לאחר מכן דיווח לו עבד אלמגיד על כך שירה למוות בגד רגיואן ז"ל, והוא אכן נרצח ביריות אקדח.

אין ראיית הקשורות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 60-65 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (12)   הפיגוע במסעדת "סי פוד מרקט" בתל אביב

107.   ביום 5.3.02 בשעה 02:30 בוצע פיגוע במסעדת "סי פוד מרקט" בתל אביב על ידי המחבל אברהים חסונה, שהגיע למקום חמוש ברובה 16-M, רימוני יד וסכין. את האירוע תיארו עדי הראיה ויליס חזן (עמ' 148) וליאון גורנשטיין (עמ' 129) שנכחו במסעדה בעת הפיגוע. המחבל פתח באש עם הרובה שבידו לעבר היושבים במסעדה, עד אשר ארע מעצור בנשק, ורימוני היד שהשליך לא התפוצצו. בשלב זה החל חסונה לדקור אנשים, כולל השוטר רס"ר סלים בריכאת ז"ל שניסה להפסיק את מסע הירי ונדקר למוות בידי המחבל. בפיגוע נרצחו פרט לרס"ר בריכאת גם יוסף הבי ז"ל ואליהו דהן ז"ל (ראה חוו"ד פתולוגיית ת/139ב-עד ת/139ד). רבים אחרים נפצעו. המחבל עצמו נורה ונהרג בפיגוע, והתברר כי מדובר באברהים חסונה (חוו"ד פתולוגית ת/139יא, ובדיקת ד.נ.א. ת/139ז).



Gilmore 00673

SHATSKY-009358



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                    תפ"ח 1158/02

תוצאות הפיגוע נראות בלוח התצלומים ת/139ו שהוגש על ידי השוטר אפי ימין (עמ' 151),
וכן במצגת שהכינה המשטרה (ת/139א). אפי ימין הגיש גם דו"ח פעולה שרשם במקום,
והוא זה שתפס את סכינו של המחבל המגואלת בדם, קליע מרוסק, תרמילים, כדורים
ורובה M-16 (ת/139ה). הנשק נתפס והובא לבדיקת מז"פ (ת/139ח, ועדותו של רפ"ק עמי
לייפר בעמ' 130).


108.    הפיגוע ב"סי פוד מרקט" בוצע על ידי אברהים חסונה, והוא תוכנן על ידי אחמד
ברגותי, אבו חמיד ועויס, כפי שסיפר אחמד ברגותי בחקירתו (ראה סעיף 29 לעיל). גם
אחיו של אבו חמיד (שריף נאג'י) היה מעורב בפיגוע, כפי שסיפר אחמד ברגותי בחקירתו (ראה סעיף 55
לעיל), ואף הוא הוא קושר את אחמד ברגותי לתכנונו. אחמד ברגותי סיפר בחקירתו כי המפגע
חסונה נשלח אליו על ידי עויס, והוא נתן לו כסף, קנה לו בגדים ודאג לכך שיהיה מי שיסיע
אותו לישראל לצורך ביצוע הפיגוע (טארק מלחי). הוא דיווח לנאשם בטלפון כי הפיגוע
יוצא לדרך, והנאשם אמר כי איננו מעוניין שהפיגוע יתבצע בתוך ישראל. עוד סיפר אחמד
ברגותי כי לאחר הפיגוע אמר לו הנאשם להודיע לעויס שלא ליטול אחריות על הפיגוע
בתקשורת קודם שישוחח על כך עם הנאשם (ראה סעיף 29 לעיל).


במהלך שיחה שהתקיימה בין הנאשם לבין אחמד ברגותי בעת מעצרם, כאשר הם הוקלטו
ללא ידיעתם, טרח אחמד להדגיש בפני הנאשם כמה פעמים כי הוא אמר שרק שוחח עם
הנאשם בטלפון לאחר הפיגוע, והוסיף: "תזהר, אני לא הייתי איתך, אני לא הייתי איתך,
דיברתי איתך בטלפון" (תמליל שיחה ת/127ג עמי 4-5, 11). השניים תיאמו עמדות לגבי
חקירתם בנקודה זו.


גם אבו חמיד סיפר בחקירתו על מעורבותו בפיגוע (הודעה ת/149ב עמי 6 שהוגשה על ידי
רס"ר אלקוראאען בעמ' 194). הוא סיפק לצורך הפיגוע רימוני יד וכדורים לרובה 16-M,
כאשר ראה את חסונה מצויד ברובה 16-M לפני צאתו לפיגוע. כאשר דווח בלילה על
הפיגוע, ועל כך שחסונה דקר למוות שוטר, נזכר אבו חמיד כי נאסר חלום (אחיו של אבו
חמיד) נתן למפגע את הסכין, והסביר לו להשתמש בו אם יהיה לו מעצור בנשק.

Gilmore 00674
SHATSKY-009359

בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו      תפ"ח 1158/02

כך גם אמר בחקירתו חלום אבו חמיד (הודעתו ת/162 עמ' 9, שהוגשה על ידי רס"ר קוראען בעמ' 194, והודעה ת/162ב עמ' 4 שהוגשה על ידי רס"ר מזרחי בעמ' 184). חלום סיפר כי הוא אמן את חסונה בשימוש ברובה M-16. שריף נ'אג'י אבו חמיד (אף הוא אח של אבו חמיד) סיפר בחקירתו על כך שליווה את המפגע לתל אביב, והשיג רכב עבור הפיגוע (הודעתו ת/182, שהוגשה על ידי רס"ר בן לולו בעמ' 182).

109.    הנאשם קשור בצורה עקיפה לפיגועים שתכננו והוציאו לפועל אחמד ברגותי, אבו חמיד ועויס, כפי שפורט לעיל. ואולם, ככל שמדובר בפיגוע-בפיגוע במסעדת "סי פוד מרקט", שתוכנן והוצא לפועל על ידי השלושה, אחראי הנאשם גם באופן אישי לביצועו. נושא אחריותו של הנאשם לפיגוע זה פורטה לעיל (ראה סעיפים 29, 55 ו- 66(ג) לעיל). הנאשם הודה בחקירתו כי אישר לאחמד ברגותי את ביצוע הפיגוע הנ"ל לפני הוצאתו לפועל, אם כי נתן הנחיה שהפיגוע יבוצע בשטחי יהודה ושומרון ולא בתוך ישראל. כך גם עולה מן הדברים שאמר אחמד ברגותי בחקירתו.

(13)    פיגוע ירי במלון "ג'רמי" בנתניה

110.    ביום 9.3.02 בשעה 20:25 נכנסו שני מחבלים למלון "ג'רמי" בנתניה, כשהם חמושים ברובי M-16 ורימוני יד. השניים השליכו רימוני יד וירו על עוברי אורח ותיירים. את האירוע תיאר עד ראייה שכונה י'ג, שהיה מפקד צוות ביחידת "אלמוג" של מג"ב. כאשר שמע את היריות הוא הגיע למלון בתוך 30 שניות, נתקל בפצועים בשעה שעדיין נמשכו היריות. י'ג פתח במרדף אחרי המחבלים, ושניהם אותרו במדרגות של קניון הנמצא בסביבה, נורו ונהרגו (ראה חוו"ד פתולוגית של המחבל שאדי נג'מי ת/140ח, וכן חוו"ד של המחבל השני ת/140ט). י'ג אישר בעדותו כי למרבה הצער חלק מן הנפגעים היו מאנשי מג"ב (עמ' 117-118). בפיגוע נרצחו התינוקת אביה מלכה ז"יל וישראל יחזקאל ז"יל (ראה טופס הודעה על פטירה ת/140ב).

Gilmore 00675
SHATSKY-009360

72



בתי המשפט

צוער רמי מלכה הגיש דו"ח ביקור טכנאי מז"פ בזירת הפיגוע, המתאר את תוצאותיו ואת הממצאים בזירה (ת/140ו ועדותו בעמ' 118), ותצלומים מהזירה (ת/140ז). חוו"ד של מחלקת החבלה של המשטרה קבעה כי למלון הושלך רימון יד שהתפוצץ (ת/140ה). מהדו"ח של רס"ר מלכה עולה כי במקום נתפסו שני רובי M‏-16 ששימשו את המחבלים (ראה גם עדותו של רפ"ק לייפר בעמ' 130).

‏111.    נאסר עויס סיפר בחקירתו כי הוא הוציא לפועל את פיגוע הירי הנ"ל בנתניה, שבוצע על ידי שני אנשים ששמותיהם לא היו ידועים לו. השניים נשלחו אליו על ידי פעיל טרור אחר (אחמד אבו חדיר), ועויס ארגן את הסעתם של השניים באמצעות מחמוד טיטי, ואף מסר לאחמד אבו חדיר שני רימונים ושני רובי M‏-16. כמה שעות לאחר שהשניים הוסעו לבאקה אל שרקיה, משם נכנסו לישראל ברגל, שמע עויס בטלוויזיה על הפיגוע במלון בנתניה. הוא התקשר לכלי התקשורת ונטל אחריות על ביצוע הפיגוע (הודעתו של עויס ת/174ב עמ' 5, שהוגשה על ידי רס"מ רוני עמר בעמ' 191).

גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי עויס עומד מאחורי הפיגוע הנ"ל, אשר בוצע זמן קצר לאחר שצייד את המחבלים ברובי M‏-16 ורימונים, והסיעם לנקודה על הקו הירוק הקרובה לנתניה. הפיגוע אכן בוצע על ידי שני מחבלים שהיו מצוידים ברובי M‏-16 וברימונים, כמה שעות לאחר שעויס ארגן את הסעתם לנתניה, ומכאן ברור שזה הפיגוע עליו דיבר עויס בחקירתו.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.



Gilmore 00676

SHATSKY-009361



בתי המשפט

<div dir="rtl">

**בית המשפט המחוזי בתל-אביב-יפו**                    תפ"ח 1158/02

**(14)   רצח קונסטנטין דנילוב ז"ל בבאקה אלע'רביה**

112.   ביום 30.3.02 בשעה 13:00 זיהה צוות של מג"ב רכב שנסע במהירות מופרזת לכיוון באקה אלע'רביה, ובו שני חשודים. בעת שהצוות עקב אחר המחבלים, הם פתחו באש ורצחו את קונסטנטין דנילוב ז"ל (ראה תעודת פטירה ת/141ט). שאר אנשי הצוות ירו על המחבלים, וחגורת הנפץ שהיתה על אחד מהם התפוצצה. שני המחבלים נהרגו, לאחר שקודם לכן השליכו רימונים לעבר הצוות (ראה עדותו של סנ"צ פריד ג'אנם בעמ' 122, שהשתתף באירוע).

צילומי האירוע הוגשו עם תעודת עובד ציבור של פרוספר אוחנה (ת/141ל). בבדיקת מז"פ נקבע כי אחד המחבלים החזיק חגורת נפץ מאולתרת שהתפוצצה על גופו (ת/141ה).

113.   עויס אמר בחקירתו כי שלח מתאבדים יחד עם מחמוד אל טיטי ואחמד אבו חד"ר, וכי השיג לאחד מהם חגורת נפץ כדי לבצע פיגוע בתוך ישראל. אותו מתאבד נסע עם אדם נוסף כשעליו חגורת נפץ לשם ביצוע פיגוע בישראל, אך נהרג עם חברו בחילופי ירי עם שוטרי משמר הגבול בבאקה אלע'רביה, לאחר שהרגו שוטר מג"ב (הודעה ת/173ב עמ' 9-10 שהוגשה על ידי רס"מ עמר בעמ' 191). עוד סיפר עויס בחקירתו כי הפיגוע הנ"ל היה אמור להתבצע בחדרה (הודעה ת/172ב עמ' 3 שהוגשה על ידי עמר בעמ' 191).

114.   גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי אנשים שנשלחו על ידי עויס, וצוידו על ידו בחגורת נפץ. ברור מחקירתו של עויס כי הפיגוע אליו התייחס בחקירתו הוא הפיגוע הנדון.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם שירות לפיגוע ־ תידון בפרק המסקנות.

</div>



Gilmore 00677

SHATSKY-009362

74



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>        תפ"ח 1158/02

(15)     <u>פיגוע ירי בין עטרות לבִּיר-זית</u>

115.     ביום 25.2.01 בשעה 13:00 בוצע ירי מן המארב בכביש 465 לכיוון רכבו של יוסף כהן (.G.M.C), שנע מכיוון עטרות אל בִּיר-זית. היריי בוצע מרכב עוקף. כהן נפצע קשה בפיגוע, ורכבו הדרדר לשוליים (עדותו בעמ' 142). עשרות כדורים נורו לעבר רכבו, והוא נפגע משלושה כדורים בראש ושניים בצוואר, ובדרך נס נותר בחיים (ראה מזכר לגבי מצב הרכב ת/142ג ודו"ח תפיסה וסימון של תרמילי הכדורים ת/142א שהוגשו על ידי משה לביא בעמ' 124, וכן דו"ח בדיקת הרכב ת/142ד שהוגש על ידי השוטר מזרחי בעמ' 131).

תיאור של זירת הפיגוע מופיע בלוח התצלומים ת/142 שהוגש על ידי רפ"ק מזרחי בעמ' (139).

116.     אחמד ברגותי סיפר בחקירתו על פיגוע זה (הודעתו ת/165א עמ' 1 שהוגשה על ידי רס"ר מזרחי בעמ' 184, וזכ"ד ת/165ו שהוגש על ידי החוקר "דני" בעמ' 200) כיצד תכנן את הפיגוע יחד עם מוחנד, אבו סטחה ואחרים, שביקשו ממנו נשק ורכב כדי לבצע פיגוע. אחמד ברגותי מסר להם רובה 5-MP וכדורים, וכן נתן להם את רכבו. כעבור כמה שעות הם החזירו לו את הרכב והנשק, וסיפרו לו כי ירו על רכב באיזור גשר עטרה תוך כדי עקיפתו, וכי הנהג של הרכב נפצע. דבריו של אחמד ברגותי מתיישבים עם הראיות לגבי דרך ביצוע הפיגוע, מקום ביצועו ותוצאותיו, ולפיכך יש ראיות נסיבתיות חד-משמעיות מהן עולה כי הפיגוע עליו סיפר אחמד ברגותי הוא הפיגוע הנ"ל בגשר עטרה.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנוגע ממעורבותו הכוללת והעקיפה בפיגועים בפיגועים שתכננו וביצעו אחמד ברגותי ואבו סטחה (ראה סעיף 80 לעיל). השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תיבחן בפרק המסקנות.

Gilmore 00678
SHATSKY-009363



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                              תפ"ח 1158/02

<u>(16)    ניסיון פיגוע בפאב "ביאנקיני" בירושלים</u>

117.    ביום 19.05.01 בשעה 03:00 גילתה דינה דגן, בעלת פאב "ביאנקיני" בירושלים,
מטען חבלה שהונח בשירותים של המקום על ידי סאעד ג'אבר, שהיה מוכר לה כפלסטינאי
מרמאללה שמכר לה מידי פעם מוצרים לנרגילה. בעדותה (עמ' 139-142) סיפרה דגן כי
ג'אבר ישב איתה במסעדה כדי לרשום הזמנה למוצרים, ואז נכנס לשירותים כשאין בידיו
דבר. כעבור כמה דקות יצא מהשירותים עם שקית ניילון, הניח אותה במרכז הפאב,
וכאשר שאלה אותו מה יש בשקית הוא אמר לה כי היא מכילה בגדים. היא ניגשה לבדוק
את השקית, גילתה כי מדובר במטען חבלה מוסתר מתחת למעיל, ובשלב זה ג'אבר נעלם.

במקום ישבו באותה עת כ- 150-170 בני נוער. דגן גילתה תושיה ואומץ לב ראויים לשבח:
היא נטלה את המטען בידיה, צעקה לאחד העובדים הפלסטינאים במקום לפנות את
הצעירים, והוא היה גם זה שעזר לה להרחיק את המטען מחוץ למסעדה. המשטרה
שהגיעה למקום פוצצה את המטען, באופן שגרם נזק לחנויות באזור. כך עולה מעדותו של
חבלן המשטרה אייל אלבו (עמ' 119, וכן ראה חוו"ד מומחה במעבדת החבלה, פקד יניב
רון, ת/143א, חוו"ד מומחה של מז"פ שניתנה על ידי שרה אברמוביץ'-בר, ת/143ב, ולוח
תצלומים ת/143א).

118.    אבו חמיד סיפר בחקירתו (הודעה ת/149ב עמ' 10-12, שהוגשה על ידי רס"ר
אלקורעאן בעמ' 194), כי סאעד אלדין פנה אליו בתחילת חודש מאי 2002, וביקש ממנו
להכין עבורו מטען חבלה, על מנת להניחו בירושלים בפאב ברחוב יפו. הלה הסביר לאבו
חמיד כי בעלת המקום נוהגת לקנות ממנו מוצרים לנרגילה, וצייר לאבו חמיד את הפאב.
אבו חמיד הנחה אותו היכן להטמין את המטען, והסביר לו כיצד לחבר את החוטים למתג
כיבוי אש שהכיל את המטען (אכן המטען היה בתוך מטף כעולה מחוו"ד ת/143א).

לאחר מכן שלח אבו חמיד את ג'אבר לפאב, וג'אבר כיסה את המטען במעיל. כאשר הגיע
ג'אבר לפאב הוא התקשר לאבו חמיד, אמר לו משפט קוד ממנו הבין אבו חמיד שהוא עומד
להניח את הפצצה בפאב, ואבו חמיד אישר זאת.

Gilmore 00679
SHATSKY-009364

76



בתי המשפט

ג'אבר התקשר לאבו חמיד וסיפר לו שבעלת המקום ראתה אותו מניח את המטען, והוא
שמע בחדשות כי המטען פוצץ על ידי המשטרה.

119.    מן האמור לעיל עולה כי הוכח בבירור שניסיון הפיגוע בפאב ג'אבר בוצע על ידי ג'אבר
בהנחייתו ובסיועו של אבו חמיד. הפרטים שמסר אבו חמיד בחקירתו תואמים את עדותה
של דגן ואת הממצאים בשטח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו
הכוללת והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 60-65
לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה
הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן
בפרק המסקנות.

### (17)    פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים

120.    ביום 3.10.01 בשעה 23:30 בוצע ירי לעבר רכב חולף שנע לכיוון הגבעה הצרפתית,
בו נסעו מלי ופנחס כהן שנפגעו מן הירי (ראה דו"ח ביקור ראשוני בזירה של רפ"ק ליאור
נדיבי, ועדותו בעמ' 132, דו"ח תפיסה וסימון של רפ"ק נדיבי ת/144ב, דו"ח ביקור ראשוני
בזירה של רפ"ק עמי לייפר ועדותו בעמ' 130, וחוו"ד של מעבדת נשק ת/144ד).

121.    אבו סטחה אמר בחקירתו (הודעה ת/156ג עמ' 4-5, שהוגשה על ידי רס"מ זהן
בעמ' 198), כי הוא ביצע פיגוע זה יחד עם מוחמד סמי עבדאללה, כשהם נוסעים במכונית
מאזדה וברשותם רובה MP-5, אותו קיבל מאחמד ברגותי לצורך ירי לעבר מטרות
ישראליות. הוא סיפר בחקירתו כי לאחר שירה לעבר רכב הנוסע במנהרה בכיוון הגבעה
הצרפתית הוא הבחין כי מדובר בנהגת, ולכן הפסיק לירות ואמר לחברו שיש מעצור בנשק.
לאחר מכן הוא המשיך לנסוע לכיוון הגבעה הצרפתית, ושם ירה לעבר רכב תוך כדי
עקיפתו. למחרת שמע ברדיו כי בפיגוע נפצעו גבר ואישה.

Gilmore 00680
SHATSKY-009365



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>    תפ"ח 1158/02

122.    הראיות שהובאו על ידי התביעה לגבי פיגוע זה דלות ביותר, וכוללות אך ורק דו"ח ביקור ראשוני בזירה של המשטרה, באופן שכל מידע לגבי ביצוע הפיגוע הוא בבחינת עדות שמיעה. כמו כן קשה לדעת מעדותו של אבו סטחה אם דבריו מתייחסים לפיגוע הנדון, שכן לא ברור מה מועד הפיגוע אליו מתייחס אבו סטחה, ובאיזה רכב ירה.

כל שיש בפנינו הוא ראיה על כך שאבו סטחה ביצע פיגועי ירי כנגד מטרות ישראליות, תוך שימוש בנשק שקיבל מאחמד ברגותי, שהיה עוזרו ומקורבו של הנאשם. זאת ועוד, אבו סטחה עצמו היה שומר ראשו של הנאשם, והנאשם עצמו אישר כי אבו סטחה עבד במשרדו והיה תחת אחריותו, וכי הוא ידע שאבו סטחה מבצע פיגועים כנגד אזרחים בגבעת זאב ובפסגת זאב (ראה סעיפים 33-34 לעיל).

<u>(18)   ניסיון לפיגוע התאבדות בבית חנינא בירושלים</u>

123.    ביום 8.03.02 בשעה 16:15 נלכד המחבל מחמוד סאלה בדרכו לביצוע פיגוע התאבדות בירושלים, כשהוא נושא על גופו חגורת נפץ. המחבל ניסה להפעיל את המטען כאשר שכב על הרצפה, ואז נורה ונהרג (ראה עדותו של סנ"צ דורון ידיד בעמ' 133, ודו"ח מעבדת חבלה ת/145ד).

124.    אחמד ברגותי סיפר בחקירתו כי לואי עודה ביקש ממנו להכין חגורת נפץ למתאבד, והוא הפנה את עודה אל נזצר שווייש שנתן לו חגורת נפץ. המתאבד שוכן בדירה ששכר אחמד ברגותי ברמאללה, ושם הלבישו עליו את חגורת הנפץ. מאוחר יותר נודע לאחמד ברגותי כי הוא נהרג מירי כוחות צה"ל באיזור בית חנינא בדרכו לביצוע הפיגוע (הודעה ת/ 165ב עמ' 2, 11, שהוגשה על ידי רס"ר יעקובוף בעמ' 171).

גם עויס סיפר בחקירתו (הודעה ת/173ב בעמ' 4, שהוגשה על ידי רס"מ עמאר בעמ' 191), כי לואי עודה, שגויס על ידו לגדודי חללי אלאקצא, איתר עבורו מתאבד, אך הפיגוע נכשל מכיוון שהמתאבד נורה על ידי שוטרים לפני הביצוע בכניסה לירושלים.

Gilmore 00681
SHATSKY-009366

78



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו

125. מן האמור לעיל עולה כי עויס ואחמד ברגותי היה מעורבים בניסיון הפיגוע הנ"ל. אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכננו וביצעו השניים, כמפורט לעיל. השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם לפיגוע ישירות לפיגוע - תבחן בפרק המסקנות.

### (19) פיגוע ירי בכביש בית אל - פסגות

126. ביום 17.03.02 בשעה 06:45 בוצע ירי מן המארב מנשק אוטומטי לעבר רכבו של סמיר קרש (פולסונוג פסאט), והוא נפצע מן הירי (ראה דו"ח ביקור בזירת העבירה ת/146א ותצלומים של רס"ב אלי קונ'מן שהוגשו בעדותו בעמ' 121).

התביעה לא הגישה ראיות נוספות לגבי פיגוע זה, והדו"ח של קונ'מן הינו בבחינת עדות שמיעה בכל הנוגע לדרך ביצוע הפיגוע.

התביעה מייחסת בסיכומיה את האחריות לפיגוע זה לאחמד ברגותי, והוא אכן הודה במעורבותו בפיגוע זה והורשע בכך (ת/165 ת/ז-יז פרט אישום 43). פרט לכך לא הפנתה התביעה לכל ראיה אחרת מבין הודעותיו של אחמד ברגותי, או הדברים שמסר בחקירתו בשב"כ. לאור האמור לעיל לא הובאו לגבי פיגוע זה ראיות המאפשרות לקבוע ממצא עובדתי ברור בדבר הקשר של אחמד ברגותי לפיגוע הנ"ל, וגם הראיות לגבי עצם ביצוע הפיגוע דלות ביותר.

### (20) ניסיון פיגוע בקניון מלחה בירושלים

127. ביום 26.03.02 בשעה 10:30 התפוצץ רכב מסוג "רנו אקספרס" ובו שני חבלנים שהיו בדרכם לביצוע פיגוע (שאדי אברהים חמאמרה ומוסא יוסף מוחמד חאלד - ראה דו"ח הובלת גופות ת/147ב, שהוגש על ידי אילן גרנות בעמ' 135, ודו"ח פעולה ת/147ג שהוגש על ידי רס"מ אסף אזולאי בעדותו בעמ' 134).

Gilmore 00682
SHATSKY-009367

79



בתי המשפט

128.‏ אחמד ברגותי סיפר בחקירתו (הודעה ת/165ג עמ' 5 שהוגשה על ידי רס"ר יעקובוף
בעמ' 171, וכי"ד ת/165יא סעיף 15 שהוגש על ידי חוקר השב"כ "אדם" בעמ' 201), כי
גייהאד גיערה התקשר אל הנאשם יום לפני שמצאו את המכונית ליד הקניון בירושלים,
ואמר לו שהוא רוצה לבצע פיגוע. הנאשם אמר לו שלא יבצע פיגוע בתוך ישראל, והעביר
את גיערה אל אחמד ברגותי על מנת שישוחח איתו. אחמד ברגותי טען כי גם הוא אמר
לגיערה שלא לבצע פיגוע בישראל או בירושלים. ואולם, למחרת התקשר גיערה אל אחמד
ברגותי, ואמר לו כי המכונית שהתפוצצה ליד הקניון בירושלים נשלחה על ידו לביצוע פיגוע
בירושלים.

129.‏ הנאשם עצמו אמר בחקירתו (זכ"ד ת/36 שהוגש על ידי חוקר השב"כ "סמית"
בעמ' 85), כי אחמד ברגותי דיווח לו על כוונת אנשיו של גייהאד לבצע פיגוע התאבדות
בירושלים. הנאשם אמר כי הוא הורה לאחמד ברגותי שהפיגוע לא יבוצע בתחומי ישראל,
אלא בשטחי יהודה ושומרון. הנאשם אמר בחקירתו בעניין זה, כשהוא מסופר על פניייתו של
אחמד ברגותי אליו בעניין רצונו של גייהאד לבצע פיגוע (תמליל שיחה ת/98יא עמי 19-20):

"הנאשם : ‏ ... שג'יהאד', הוא אמר לו שאנחנו יש לנו פעילות. ויש לנו פיגועים
וכו'. או אני אמרתי לאחמד, אמרתי לו מה שחשוב זה שלא יעשו
שום פיגוע בתוך ישראל.

החוקר : ‏ או.קי וכשבא רשמית ואמר לך שהם רוצים לבצע פיגוע התאבדות,
מה אתה אמרת לו?!

הנאשם : ‏ אמרתי לו לא, אני לא מרשה.

החוקר : ‏ לא. זה לא כמו שטיפרת לי. אמרת לו, אין בעיה. אבל לא 'בפנים'
(בתוך ישראל).

הנאשם : ‏ כן, לא בישראל... זאת אומרת שאני לא רוצה פיגועים בישראל".

הנאשם סיפר כי למחרת קיבל דיווח מאחמד ברגותי שפיגוע ההתאבדות נכשל, וכי הרכב
התפוצץ לא רחוק מהמחסום, ושני חברי החוליה נהרגו.

Gilmore 00683

SHATSKY-009368

80



בתי המשפט

<u>בית המשפט המחוזי בתל-אביב-יפו</u>                    ת"פ 1158/02

130. מן האמור לעיל עולה כי הוכחה מעורבותו של הנאשם באישור פיגוע ההתאבדות
הנ"ל, וזאת גם על פי גרסתו. הנאשם אמנם הורה שהפיגוע יתבצע במקום אחר, אך לכך
אין כל משמעות מבחינת אחריותו הפלילית לניסיון הפיגוע. דברי הנאשם בחקירתו
נתמכים בגרסת מקורבו אחמד ברגותי, אם כי הלה "שיפץ" את העובדות, וטען כי הנאשם
הורה שלא לבצע את הפיגוע כלל. מדברי הנאשם ברור כי הוא הורה לבצע את הפיגוע
במקום אחר.



Gilmore 00684

SHATSKY-009369

81



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו



חלק שלישי:    הערכת הראיות ומשקלן

131.    הואיל והנאשם בחר שלא להעיד ולא להביא עדים מטעמו, ואף הורה לנציגי הסנגוריה הציבורית שמונו לייצגו להמנע מחקירתם הנגדית של עדי התביעה - מבוססות הראיות כנגד הנאשם על כמה נדבכים שונים.

ראשית, דברים שאמר הנאשם בחקירתו בשב"כ, אשר חלקם הועלו על הכתב בתמצית בזכרידים שרשמו החוקרים, ואשר הוגשו על ידם, וחלקם הוקלטו ותומללו. במסגרת זו כלולים גם דברים שאמר הנאשם בשיחות שהוקלטו ללא ידיעתו עם מקורבו אחמד ברגותי, ועם המדובבים "פלוני 1" ו-"פלוני 3".

שנית, עדויות המפילות את הנאשם, שמסרו פעילי הטרור מקרב הפתיח לאחר מעצרם. הכוונה להודעות שמסרו בחקירותיהם בשב"כ ובמשטרה, שכן כולם - כאיש אחד - סרבו להשיב על שאלות כלשהן בבית המשפט, כאשר הובאו כעדים מטעם התביעה.

שלישית, דברים שאמר הנאשם בכלי התקשורת בתקופה שקדמה למעצרו.

רביעית, מסמכים שנתפסו במשרדו של הנאשם ובמשרדי הרשות הפלסטינאית במבצע "חומת מגן".

חמישית, עדויותיהם של נפגעי הטרור, עדי הראיה לפיגועים נשוא כתב האישום והעדים שעסקו בחקירתם.

132.    לענין הערכת הראיות ומשקלן יש להעיר את ההערות הבאות:

Gilmore 00685
SHATSKY-009370

Case 1:18-cv-02248-CRC Document 94-36 Filed 11/20/20 Page 200 of 325
Case 1:02-cv-02280-RJL Document 254-36 Filed 11/20/20 Page 15 of 77




82

**בתי המשפט**



בבית המשפט המחוזי בתל-אביב-יפו        תפ"ח 1158/02

א.   המנעותו של הנאשם מלהעיד במשפט ולחשוף עצמו לחקירה נגדית עשויים לשמש
חיזוק למשקל הראיות הראיות כנגדו, ואף להוות סיוע לראיות התביעה מקום שדרוש להן
סיוע, כקבוע בסעיף 162(ב) לחוק סדר הדין הפלילי [נוסח משולב], התשמ"ב-1982
(להלן: "החסד"פ"). כמו-כן, המנעותו של הנאשם מלהשיב על כתב האישום, כפי
שעשה, עשויה לשמש חיזוק למשקל ראיות התביעה, כקבוע בסעיף 152(ב)
לחסד"פ. דברים אלו הובהרו לנאשם על ידי בית המשפט.

ענין זה מקבל משנה חשיבות לאור העובדה שעל פי הדין נדרש חיזוק להודעות של
עדים שסרבו להעיד במשפט, או התכחשו לתוכן הדברים שמסרו בחקירותיהם
(ראה ס"ק ג(5) להלן). כך פסק בית המשפט העליון כי הימנעות נאשם ממתן עדות
מהווה חיזוק משמעותי להודעות בחקירה שמסרו עדים במשפט, ואשר טעונות
חיזוק לפי סעיף 10א(ד) לפקודת הראיות [נוסח חדש], התשל"יא-1971 (להלן:
"פקודת הראיות") (ע"פ 1497/92 *מדינת ישראל נ' צוברי*, פ"ד מז(4) 177, בעמ'
202). בית המשפט הבהיר באותו ענין: "הנאשם השותק - להבדיל מן העד השותק
- פועל במסגרת הדין; אולם לבית המשפט נתונה הרשות לפרש את התנהגותו
לפי התרשמותו והבנתו" (בעמ' 203, וראה גם ד"נ 308/91 *קוזלי נ' מדינת ישראל*,
פ"ד מה(4) 441, בעמ' 486).

אמנם, בית המשפט רשאי שלא ליתן משקל לשתיקת הנאשם כאשר יש לה הסבר
סביר (ראה: ע"פ 277/81 *הלוי נ' מדינת ישראל*, פ"ד לח(2) 369, בעמ' 386). אולם,
משנדחו הטענות המקדמיות של הנאשם בענין סמכות בית המשפט לשפוט אותו -
לא היה בידיו כל הסבר סביר ומוצדק להימנעותו ממתן עדות. ברור למדי כי
הנאשם, אשר נחשף במהלך חקירתו לראיות המפלילות שנצברו כנגדו, ידע היטב
כי הוא איננו יכול להתמודד איתן במישור המשפטי, ולכן נמלט אל חיקו החם של
המישור הפוליטי. כך אמר הנאשם מספר פעמים בחקירתו, כי ברור לו שהוא
יועמד לדין ויורשע, וכי הוא מתכוון לנהל משפט פוליטי.

Gilmore 00686
SHATSKY-009371

83



**בתי המשפט**



בבית המשפט המחוזי בתל-אביב-יפו      תפ"ח 1158/02

בענין זה חשוב לציין כי למרות שהנאשם הצהיר שהוא איננו מנהל פרשת הגנה, כפי שאכן נהג, הוא נשא נאומים פוליטיים, ולעתים אף התייחס לראיות שהוגשו כנגדו - אך זאת מספסל הנאשמים, ולא מדוכן העדים. על פי הדין, איננו יכולים ליתן משקל לדברים שנאמרו בצורה זו, באופן שלא ניתנה לתביעה אפשרות לחקור את הנאשם עליהם. אשר לדברים הרבים שהשמיע הנאשם במישור המדיני והפוליטי, הן במהלך המשפט והן בסיכומיו, איננו רשאים להתייחס אליהם, בהיותם בלתי רלבנטיים לשאלת אשמתו של הנאשם בעבירות המיוחסות לו. דברים אלו הובחרו בהחלטה הנוגעת לענין סמכות בית המשפט: אדם הפועל מחוץ למסגרת של לחימה חוקית, ואשר מבצע פעולות טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי הלאומי (ראה החלטה של בית המשפט בתיק זה מיום 19.1.03 בעמ' 29-33). התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי הרג כנגד אזרחים חפים מפשע. זאת ועוד: מקומה של טענה זו - אם בכלל - הוא בטיעונים לעונש, שכן היא נוגעת למניע לביצוע העבירות, להבדיל מן הכוונה הפלילית הדרושה לשם הוכחתן.

3.    הואיל והנאשם בחר שלא לנהל פרשת הגנה, הוא גם לא העלה טענות כלשהן כנגד קבילות הראיות או משקלן. ואולם בית המשפט ראה עצמו מחויב לבחון שאלה זו ביוזמתו, ולהתעלם מראיות בלתי קבילות שהתביעה הגישה או הסתמכה עליהן בסיכומיה (כגון, עדויות שמיעה הכלולות בהודעות העדים, זכ"דים ותודעות שלא הוגשו על ידי החוקרים שרשמו אותם, חוות דעת הנסמכות על ידיעות מודיעיניות ראיות שלא הוגשו במשפט, והתייחסות בזכ"דים לממצאי פוליגרף). בחנו את חומר הראיות גם מזוית הראיה של הנאשם, ולא רק מנקודת מבטה של התביעה כפי שפורטה בסיכומיה. עם זאת, כפופים אנו לכלל לפיו נאשם שלא העיד במשפטו איננו רשאי להסתמך על דברים הכלולים באמרות חוץ שמסר: אמרות אלו כשרות כראיות כנגדו, אך לא לטובתו, שהרי לא ניתן היה לחקור אותו על אמרותיו (ראה ע"פ 205/75 *קלנץ ג' מדינת ישראל*, פ"ד ל(2) 471, בעמ' 474).

Gilmore 00687

SHATSKY-009372

94





בתי המשפט

בבית המשפט המחוזי בתל־אביב־יפו                    תפ"ח 1158/02

ג. התביעה זימנה לעדות 21 מפקדי שטח ופעילי טרור הקשורים לפיגועים נשוא כתב
האישום, והקשר של הנאשם איתם פורט לעיל. עדים אלו, בלא יוצא מן הכלל,
סרבו להשיב על שאלות ב"כ התביעה, ונראה כי אין מדובר בהחלטה אישית של כל
אחד מהם, אלא בהנחיה מגבוה. עדים אלו לא היו מוכנים להעיד כנגד מפקדם
ומנהיגם, והדברים ברורים. בשיחה שהתנהלה בין הנאשם לבין אחמד ברגותי בעת
מעצרם, ואשר הוקלטה ללא ידיעתם, הזהיר אחמד מפני העדויות שימסרו פעילי
הטרור שנעצרו, והנאשם השיב לו, כשהוא נשמע צוחק: **"כולם בבית המשפט**
**יכחישו את מה שהיו בו... כולם יבטלו... אמרג'לי החוקרים. אמרתי להם שאיש**
**לא יודה בבית משפט"** (תמליל 127ג' עמ' 109). כך אמר הנאשם, וכך אכן אירע.

בנסיבות אלו הוכרזו כל אותם פעילי טרור כעדים עוינים, והודעותיהם בחקירה
הוגשו לפי סעיף 10א. לפקודת הראיות. לגבי עדים אלו יש לחעיר כדלקמן:

(1)    חלק מעדי התביעה העידו לאחר סיום משפטם, ורובם הורשעו, בין היתר,
במעורבותם בפיגועים נשוא כתב אישום זה על פי הודאתם. בהודאותיהם
בעובדות כתבי האישום שהוגשו כנגדם, מפלילים עדים אלו את הנאשם.
אולם, ההלכה בענין זה כי הודאת נאשם שכזו, מפי אדם שהוא עד במשפט,
נחשבת אמנם כאמרת חוץ שחל עליה סעיף 10א. לפקודת הראיות, אך אין
ליתן להודאה זו משקל של ממש. מבחינתו של העד - ההודאה שהוא מוסר
במשפטו מרוכזת כל כולה בעובדות הנוגעות אליו, וספק רב אם הוא מודע
אותה שעה להשלכות שיש לחלקים בהודאתו על אחרים (ראה: ע"פ
4541/90 **אליהו סלע נ' מדינת ישראל**, תק־על (2)91, 2086).

(2)    ככלל, אמרת חוץ של עד היא עדות שמיעה הפסולה כראיה לאמיתות
תוכנה. החריג לכלל נקבע בסעיף 10א(א) לפקודת הראיות ולפיו בית
המשפט רשאי לקבל אמירה שכזו, ואף להסתמך עליה ולהעדיפה על עדות
העד בבית המשפט, כאשר העד במשפט מסרב להעיד, או שהוא מתכחש
לגרסה שמסר בחקירתו.

Gilmore 00688

SHATSKY-009373





85

בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו

מטרתו של סעיף זה להתמודד עם התופעה הנפוצה של עדים המתכחשים
לגרסה שמסרו בחקירתם, ועל מנת למנוע מצב שבו לא ניתן יהיה לעמת
אותם במשפט עם הגרסה שמסרו בחקירתם (ראה: דברי ההסבר להצעת
החוק לתיקון פקודת הראיות, תשל"ד-1974). ודוק: עד אשר הוזמן להעיד
והתייצב על דוכן העדים נחשב כ"יעד במשפטי", גם אם סרב להשיב על
שאלות, ולפיכך חל עליו סעיף 10א(א) הנ"ל, ולא סעיף 10א(ב) המתייחס
למקרה בו לא ניתן כלל להביא עד לבית המשפט מהטעמים המפורטים
בסעיף (ראה: דנ"פ 4390/91 <u>מדינת ישראל נ. חאג' יחיא,</u> פ"ד מז(3) 673;
והשווה דעתו של א. שטיין, "סעיף 10א. לפקודת הראיות: פרשנותו
הראויה ופסיקתו של בית המשפט העליון", משפטים כ"א תשנ"ב, עמ'
325, בעמ' 336-338).

(3)   על פי סעיף 10א(א) לפקודת הראיות, קבלת אמרת חוץ של עד במשפט,
אשר מכחיש את תוכן העדות שמסר בחקירתו, מותנו בכך שמתן האמרה
הוכח, שנותן האמרה הוא עד במשפט ושניתנה לצדדים הזדמנות לחקרו.
תנאים אלה מתקיימים בעניינו לגבי 21 פעילי הטרור הנ"ל.

(4)   בית המשפט רשאי לסמוך ממצאיו על אמרת חוץ שהתקבלה לפי סעיף
10א. לפקודת הראיות, ואף להעדיפה על פני עדות העד במשפט, "אם ראה
לעשות כן לנוכח נסיבות הענין, לרבות נסיבות מתן האמרה, הראיות
שהובאו במשפט, התנהגות העד במשפט ואותות האמת שנתגלו במהלך
המשפט, והטעמים ירשמו" (סעיף 10א(ג) לפקודת הראיות).

(5)   על פי סעיף 10א(ד) לפקודת הראיות, לא יורשע אדם על סמך אמרת חוץ
שהתקבלה לפי סעיף זה, אלא אם יש בחומר הראיות דבר לחיזוקה.
הכוונה היא לתוספת ראייתית המחזקת את אמינותה של אמרת החוץ,
ומפיגה את החשש כי אין בה אמת (ראה: י. קדמי, על הראיות, בעמ' 354-
365).

Gilmore 00689

SHATSKY-009374





בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

בענין זה יש לציין כי אמרת חוץ של עד אחד, שהיא עצמה טענה חיזוק,
יכולה לשמש כחיזוק לאמרת חוץ של עד אחר (ספרו הנ"ל י. קדמי בעמ'
366, והפסיקה המצוטטת שם). כאמור לעיל, גם שתיקת הנאשם במשפט
עשויה להוות חיזוק לאמרת חוץ של עד, וכך גם הימנעותו מלחקור עד זה
בחקירה נגדית (י. קדמי הנ"ל בעמ' 369-371, והפסיקה המצוטטת שם).

ההלכה הפסוקה היא כי הימנעות נאשם מחקירת עדי התביעה - מחזקת
אף היא את ראיות התביעה (ראה: ע"פ 4736/91 <u>פטאיר נ' מדינת ישראל</u>,
תק-על 94(2) 1866). הנאשם לא ישמע לאחר מכן בטענה שהעדים לא
נחקרו בחקירה נגדית (ראה: ע"פ 1632/95 <u>עוזי משולם נ' מדינת ישראל</u>,
פ"ד מט(5) 534, בעמ' 550, שבו התנהל המשפט ללא נוכחות הנאשם, על פי
רצונו, והסנגור הונחה שלא לחקור את העדים). נאשם איננו יכול לסכל את
ההליך המשפטי המתנהל נגדו בעצם הימנעותו מלהתגונן.

<u>במקרה דנא</u>, הרשעתו של הנאשם נסמכת על מארג רחב ואמין של ראיות,
הכוללות הודאות שמסר הנאשם בחקירתו, דברים שאמר הנאשם בכלי התקשורת,
מסמכים שנתפסו אצל הנאשם וברשות הפלסטינאית, ועדויות רבות של פעילי
הטרור שנמסרו בחקירתם, ואשר תומכות זו בזו ומהוות חיזוק הדדית לרעותה.
כפי שעולה מן התשתית הראייתית שפורטה לעיל, ברור לחלוטין כי פעילי הטרור
החליטו להימנע ממתן עדויות במשפט על מנת לסכל את ההליך, ולהימנע מחשיפת
הגרסה שמסרו בחקירותיהם. הנאשם הביע כעס בחקירתו על הדברים המפלילים
שמסרו פעילי השטח נגדו (ראה: דו"ח הפגשה של הנאשם עם עו"ס ת/77ב; דברים
שאמר הנאשם למדובב "פלוני 3" ת/123 עמי 1 ות/124א ס' 1; דברים שאמר
הנאשם למדובב "פלוני 1" ת/112א ס/ 7-6, ת/114א ס' 7, ת/115א ס' 13, 14, ת/116
ס' 9, ושיחתו של הנאשם עם אחמד ברגותי ת/127ג עמי 3, 4, 72, 84), ועובדה זו
מחזקת את המסקנה שפעילי הטרור אמרו בחקירתם דברים נכונים לגבי הנאשם.

Gilmore 00690

SHATSKY-009375





87

בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

בנסיבות אלו, יש להעדיף את האמרות שמסרו עדים אלו בחקירותיהם על פני
עדויותיהם במשפט, כאשר נמצא הרבה יותר מאשר "חיזוק" לאמרות החוץ
שמסרו בחקירות. ההודעות שמסרו פעילי הטרור משתלבות כדבעי האחת ברעותה,
ויחד עם הדברים שאמר הנאשם בחקירתו, והמסמכים שנתפסו ברשות
הפלסטינאית, נחשפת תמונה ברורה המצביעה על חלקו של הנאשם ותפקידו
בפיגועים נשוא כתב האישום.

133.    לא מצאנו כל סיבה להטיל ספק במהימנותם של חוקרי השב"כ, אשר העידו כי
הזכ"דים שרשמו בחקירותיו של הנאשם משקפים בצורה הולמת את עיקרי הדברים
שאמר. ככל שמדובר במשקל הדברים, יש להביא בחשבון את הכללים שביארנו בהרחבה
בתפ"ח 1074/02 מדינת ישראל נ' עאצי מותסין (תק-מח 2003 (2) עמ' 3553, ס' 76-84).
זכ"דים אלה מהווים אמרות של הנאשם, אך בניגוד למקובל בחקירה משטרתית הם
כוללים רק תמצית של החקירה; לא תמיד ניתנת לנחקר אזהרה בדבר זכויותיו; הנחקר
אינו יכול לקרוא את הדברים הנרשמים בזכ"ד, ואינו חותם עליו; הזכ"ד נרשם לא פעם
בשפה העברית גם כאשר החקירה היא בערבית, בניגוד להנחיה הברורה בפסיקה. עם זאת,
חשוב להדגיש כי, זכ"דים אלו בהחלט מהווים ראיות קבילות, כאשר לעניין משקלם יש
להביא בחשבון את היקף וצורת הרישום והתיעוד שלהם (ראה: ע"פ 6613/99 שמירק נ'
מדינת ישראל, פד"י נו(3), 529, בעמ' 553).

במקרה דנא, גובו וכו'דים רבים בתמלילי הקלטות מהחקירה, בהם נשמע הנאשם מדבר
בקולו, בשפה העברית בה הוא מיטיב להתבטא, דבר המסיר חשש לגבי מהימנותם. כמו כן,
נאמר לנאשם במפורש לאורך כל חקירתו כי אינו חייב לומר דבר, וכי הדברים שיאמר
עשויים לשמש כראייה נגדו, והנאשם אף נפגש עם עו"ד במהלך חקירתו (ראה להלן). זאת
ועוד : הדברים שאמר הנאשם בחקירתו בשב"כ, כפי שנרשמו בזכ"דים והוקלטו ותומללו
בחלקים ניכרים מהם, נתמכים היטב בעדויותיהם של פעילי הטרור שפורטו לעיל, ולעיתים
גם במסמכים שנתפסו אצל הנאשם, ובראיונות שנתן באמצעי התקשורת האלקטרוניים.
במצב דברים זה, אין עלינו לסמוך אך ורק על הזכ"דים שרשמו חוקרי השב"כ מפי
הנאשם, ואף לא רק על הדברים שאמרו פעילי הטרור בחקירותיהם (שהרי אלה סירבו
להעיד במשפט, או שהתכחשו לדברים שאמרו בחקירותיהם). אלא יכולים אנו להתרשם
מדברי הנאשם בחקירתו בשב"כ, בצורה בלתי אמצעית, כפי שאלה הוקלטו ותומללו.

Gilmore 00691
SHATSKY-009376

88



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

134.    בעניין הערכת משקל דבריו של הנאשם בחקירתו בשב"כ, הבאנו בחשבון - הגם שהנאשם עצמו לא העלה טענות כלשהן בנושא זה - כי מדובר בחקירה ארוכה ומתישה. הנאשם היה נתון לחקירות ארוכות ביותר במהלכן ישן שינה מועטת, כשהוא יושב כבול על כסא, והוא הגדיר זאת בשיחתו עם המדובב "פלוני 1" (ת/1112,1,ג(1) עמ' 3-4) – כעינוי. לנאשם הובהר כי כל עוד לא ישתף פעולה בחקירה יהיה צורך להמשיכה, ואף נרמז לו כי הדרך לפגוש את בני משפחתו היא לשתף פעולה (זכ"יד ת/12 ס' 13). באחת החקירות נאמר לנאשם כי חקירתו לא תסתיים עד אשר ימסור את האמת, כפי שהיה הדבר לגבי פעילי הטרור שהודו בסופו של דבר בחלקו של הנאשם במעשים המיוחסים לו (זכ"יד ת/63 ס' 9-10). באחת החקירות סרב הנאשם להמשיך בחקירה כל עוד לא יינתן לו פרק זמן סביר לישון, והחוקר הבהיר לו כי לא יתאפשר לו לישון עד אשר יודה לפחות בראשי פרקים לגבי פעילותו, אך הנאשם דחה הצעה זו (זכ"יד ת/21 ס' 26-28). כמו כן, הופעל על הנאשם לחץ מוסרי להודות ולהתנהג כמנהיג הנוטל אחריות על מעשי פקודיו, במקום להתכחש לדברים שעשו פקודיו, ולהציג אותם כשקרנים (זכ"דים ת/16-ת/17).


בעניין חקירתו של הנאשם במשך שעות ארוכות, חשוב לציין כי הנאשם נעצר ונחקר במהלך מבצע "חומת מגן", בתקופה של בצוע פיגועי טרור רבים כנגד ישראל. בנסיבות אלו ברור כי היתה חשיבות רבה להשלים את חקירתו במהירות האפשרית, שכן חקירתו התנהלה לא רק לצורך בירור אשמתו, אלא גם, ואולי בעיקר, לצורך סיכול פיגועים נוספים. חוקרי השב"כ הסבירו עד כמה היה חשוב להם להגיע במהרה לפעילי טרור ולחוליות טרור שהיו קשורות לנאשם, וכי חקירת הנאשם היתה בעיקרה מודיעינית (החוקר "אויתי" בעמ' 154 והחוקר "ואדי" בעמ' 97).


חקירת הפשעים החמורים בהם הואשם הנאשם, והצורך המודיעיני בקבלת מידע מפיו מהר ככל האפשר, חייבו את חקירתו הרצופה במשך שעות רבות. אין בכך להביא לפסילת הודעותיו של הנאשם, כאשר ברור שהוא מסר לחוקריו רק את הדברים שרצה לומר, וכאשר היתה הצדקה ענייניות לדרך חקירה זו בנסיבות הביטחוניות ששררו אז (ראה: י. קדמי, על הראיות, חלק ראשון, מהד' תשס"ד-2003 בעמ' 55-58).

Gilmore 00692
SHATSKY-009377

89



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו

335. ברור ממהלך החקירה כי הנאשם התלבט רבות, ובקול רם, אם להודות בקשר שלו לפיגועים נשוא כתב האישום, והוא אף הסביר כי הדבר עלול להכשילו בעתיד כמנהיג העם הפלסטינאי (ראה למשל, זכ"יד ת/24 ס' 7, זכ"יד ת/68 ס' 6). בסופו של דבר החליט הנאשם להודות בחלק מהדברים שעשה, לאחר שהבין שפעילי השטח הודו בחקירותיהם והפלילו אותו, וכי יש בידי החוקרים ראיות מוצקות בנוגע לאשמות שייחסו לו. לכן הודה הנאשם רק בדברים שאנשיו הודו בהם קודם לכן, ורק לאחר שדבריהם הוצגו לו על פי דרישתו, והוא אף הבהיר חזור והבהר כי יודה אך רק בדברים שיוצגו בפניו, ואשר הינם נכונים (זכ"יד ת/22 ס' 8-9, שהוגש ואושר על ידי החוקר "מופזי" בעמ' 58, וזכ"יד ת/23 ס' 9, שהוגש ואושר על ידי החוקר "זני" בעמ' 90). הנאשם ביקש להיפגש עם ראש השב"כ, ואמר כי הוא מוכן להודות בדברים שיש לו אחריות עליהם, אם יראו לו שאחרים כבר הודו בהם (תמליל חקירה ת/98אי עמ' 16-18, 28-26).

יש להדגיש בהקשר זה כי הנאשם עצמו אמר בשיחתו עם המדובב "פלוני 1", כי הסתבר לו בחקירתו שפעילי השטח שנעצרו מסרו ידיעות רבות ומהימנות לגביו. כאשר נשאל על ידי המדובב אם הידיעות שמסרו לגביו הן אמיתיות השיב: "רבות, יעני יש הוכחה וזיוק" (תמליל שיחה ת/112א (1) עמ' 6). עוד אמר הנאשם למדובב "פלוני 1" כי הנהג שלו (אחמד ברגותי) מסר הודאה הקושרת את הנאשם ל- 8 פיגועי התאבדות בישראל, וכאשר נשאל הנאשם האם אחמד ברגותי "סגר אותו בהודאות" - הוא השיב בחיוב (זכ"יד ת/114א סעיף 7). לכל אורך שיחותיו של הנאשם עם "פלוני 1" ניתן לראות כי נושא ההודאות שמסרו פעילי השטח בחקירותיהם הטריד אותו מאוד, והוא היה מודע לכך שהם מסרו מידע אמיתי לגביו (ראה דו"חות ת/112א(1), ת/113א, ת/113א, ת/114א, ת/114א, ת/114ג, ת/115א, ת/115ג(1)(א), ת/116/).

הנאשם אמר ל"פלוני 1" כי הוא אמנם טוען בחקירתו שהוא מנהיג פוליטי, אך ההודאות שמסרו אחרים כנגדו, והחומר הרב שנתפס במשרדו ובמשרדי הרשות הפלסטינאית יאלצו אותו "לדבר בחקירה" (דו"ח ת/117 ס' 29, 32 שהוגש על ידי החוקר "רוברטו"). זה היה הרקע שהביא את הנאשם להודות בדברים שממילא כבר היו ידועים לחוקרים ממקורות אחרים.

Gilmore 00693
SHATSKY-009378

90



בתי המשפט



136. המפנה בחקירת הנאשם חל ביום 21.4.02, כשבוע לאחר מעצרו של הנאשם, כאשר הוא החליט לספר את העובדות מנקודות ראותו ואחריותו, אך דרש כי קודם לכן יוצגו בפניו הדברים שנאמרו אנשיו בחקירה, ושיתאפשר לו להיפגש עם ראש השב"כ או סגנו (זכ"דים ת/19-ת/20). הנאשם קיבל את הצעת החוקרים לעשות אבחנה בין סירובו למסור הודעה מפלילה במשטרה, שתיחשף בעתיד, לבין מסירת פרטים על פעילותו בחקירתו בשב"כ (זכ"ד ת/20 סי 10-12, זכ"ד ת/24 סי 7). הנאשם יצא מתוך הנחה שדברים שיאמר במשטרה יחשפו בציבור ויחייבו אותו, וזאת בניגוד לדברים שיאמר בחקירתו בשב"כ - שאותם תכן הנאשם להכחיש, כפי שאכן עשה בחקירתו במשטרה ובמשפטו. כך אמר הנאשם במפורש בחקירתו בשב"כ, כאשר נאמר לו כי הזכ"דיים הנרשמים במהלך חקירתו יוגשו כראיה בבית המשפט כאילו היו עדות משטרתית (זכ"ד ת/25 סי 23, שהוגש ואושר על ידי החוקר "מופז" בעמי 58).

בענין זה יש לציין כי שישה ימים לאחר מעצרו נחקר הנאשם, והוזהר בדרך המקובלת כי איננו חייב לומר דבר על פי החוק, וכי הדברים שיאמר עשויים לשמש ראיה כנגדו (ראה זכ"ד ת/40 סי 1, ועדותו של החוקר "מופז" בעמי 59). החוקר "מופז" העיד כי אזהרות כאלה ניתנו לנאשם במהלך כל חקירתו, וכך גם העיד החוקר "אמילי" (עמי 57, 59, ואזהרות הכלולות בזכ"דיים ת/41 סי 1, ת/44, ת/25, תמליל חקירה ת/98י עמי 37). לעיתים אמנם נרמז לנאשם כי לא בהכרח יועמד לדין, שכן קיימת אפשרות שהוא יגרש, אך הנאשם ציין כי הוא מעדיף את האפשרות של העמדה לדין, ואף אמר כי ברור לו שהוא יועמד לדין ויישלח לכלא לשנים רבות (זכ"דיים ת/10, ת/11, ת/14 ו- ת/19 סי 5, וזכ"ד ת/63 סי 25).

137. הנאשם אמר בחקירתו כי הוא מתכוון לנהל משפט פוליטי, תוך התעלמות מהראיות שתוגשנה נגדו במשפטו (זכ"ד ת/42 סי 8 שהוגש ואושר על ידי החוקר "יואד"יי בעמי 96, וזכ"ד ת/56 סי 3 שהוגש ואושר על ידי החוקר "סטמיתי" בעמי 85). בשיחותיו של הנאשם עם המדובב "פלוני 1", הוא הסביר לו את הטקטיקה בה הוא נוקט בחקירה, לפיה הוא איננו מודה אלא בדברים שהחוקרים יודעים עליו, ומנסה למשוך זמן ולהבין מה החוקרים יודעים עליו, כדי לא להפליל אחרים.

Gilmore 00694
SHATSKY-009379

91





בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו        תפ"ח 1158/02

הוא גם אמר לעורך-דינו כי לא ימסור כל הודעה במשטרה (ראה דו"חות ת/118 סי' 3, ת/120 סי' 2, ודבריו לייפלוני 3" בדו"ח ת/122 סי' 1). יש לציין בהקשר זה כי הנאשם נפגש לראשונה עם פרקליטו, עו"ד בולוס, שלושה ימים לאחר מעצרו (מוצג ת/164, וזכ"ד ת/111 סעיף 14). במהלך חקירתו נפגש הנאשם עם עו"ד בולוס כמה פעמים (זכ"ד ת/90 סי' 1).

138.   **סיכומו של דבר**: אין לנו סיבה לסבור שהודעתו של הנאשם בחקירתו בשב"כ ניתנה עקב אמצעים פסולים כלשהם שהופעלו כנגדו, אשר הביאו לשלילת רצונו החופשי של הנאשם, והנאשם גם לא טען זאת. במהלך המשפט, וכן בעת חקירתו במשטרה, כאשר הוצגו לנאשם הדברים שאמר בחקירתו בשב"כ, הוא חזר וטען כי מדובר "בבשקר וזיוף". הוא לא טען כי הופעלו כנגדו אמצעים פסולים בחקירה, והתרשמנו בבירור שהחוקרים נהגו בנאשם בכבוד, כפי שגם אמר הנאשם בחקירתו בשב"כ (זכ"ד ת/75 סי' 2, זכ"ד ת/90 סי' 1 ותמליל חקירת הנאשם ת/98 עמי 29). בעת מתן עדויותיהם במשפט, לתץ הנאשם את ידם של חלק מחוקרי השב"כ, וגם עובדה זו מעידה כי אין בלבו של הנאשם תחושות כלשהן כנגד חוקריו.

לנאשם היתה שליטה מלאה על הדברים שאמר לחוקרי השב"כ: הוא החליט אלה דברים היה מוכן לומר בחקירתו, ואשר להערכתו כבר היו ידועים לחוקרים ממילא, ואלה דברים הוא מתכוון להסתיר מהם. הנאשם היה זהיר ביותר בחקירתו, ולא פעם סירב לענות על שאלות שנשאל, או שענה בצורה עקיפה ומרומזת. הוא בחר לעצמו טקטיקה במהלך החקירה, לפיה ירחיב בעניינים פוליטיים ויקמץ בעניינים הקשורים לפעולות הטרור, ובכל מקרה לא ימסור אלא פרטים שלהערכתו כבר נמצאים בידיעת החוקרים.

כפי שהעיד המדובב "פלוני 1", אמר לו הנאשם: "גם אם כל העם הפלסטינאי מודה עליו, הוא יקבע מה יאמר בחקירתו" (ת/110 סי' 10). מכל האמור לעיל, ברור שהנאשם מסר את הודעותיו מרצון חופשי.

Gilmore 00695
SHATSKY-009380

92





בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו     ת.פ"ח 1158/02

**חלק רביעי:**     **ניתוח משפטי ומסקנות**

### 1.   פעילות וחברות בארגון טרוריסטי

139. בכתב האישום מיוחסות לנאשם, בין היתר, העבירות של פעילות וחברות בארגון
טרוריסטי. סעיפים 1-3 לפקודת מניעת טרור, התש"ח-1948 קובעים לאמור:

> *"1.*   *פירושים*
>
> "ארגון טרוריסטי" פירושו חבר אנשים המשתמש בפעולותיו
> במעשי אלימות העלולים לגרום למותו של אדם או לחבלתו, או
> באיומים במעשי אלימות כאלה;
>
> "חבר בארגון טרוריסטי" פירושו אדם הנמנה עליו, וכולל אדם
> המשתתתף בפעולותיו, המפרסם דברי תעמולה לטובת ארגון
> טרוריסטי, פעולותיו או מטרותיו, או אוסף כספים או חפצים
> לטובת ארגון טרוריסטי או פעולותיו".
>
> *2.*   *פעילות בארגון טרוריסטי*
>
> אדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי, או
> משתתף בדיוניו או בקבלת החלטותיו של ארגון טרוריסטי, או
> משמש חבר בבית-דין של ארגון טרוריסטי, או נואם נאום
> תעמולה באסיפה פומבית או ברדיו מטעם ארגון טרוריסטי,
> ייאשם בעבירה, ובצאתו חייב בדין, יהא צפוי לעונש מאסר עד
> עשרים שנה.
>
> *3.*   *חברות בארגון טרוריסטי*
>
> אדם שהוא חבר בארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב
> בדין, יהא צפוי לעונש מאסר עד חמש שנים".

Gilmore 00696

SHATSKY-009381

93



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו                                      תפ"ח 1158/02

סעיף 7 לפקודת מניעת טרור קובע כי :

**7. הוכחה על קיום ארגון טרוריסטי**

כדי להוכיח בכל דיון משפטי, שחבר אנשים מסויים הוא ארגון
טרוריסטי, יספיק להוכיח כי –

(א)      מטעם אותו חבר אנשים או בפקודתו בוצע אחד או יותר מחבריו
בכל זמן שהוא לאחר ה' באייר תש"ח (14 במאי 1948) מעשי
אלימות העלולים לגרום למותו של אדם או לחבלתו, או איומים
במעשי אלימות כאלה; או

(ב)      חבר אנשים, או אחד או יותר מחבריו מטעמו או בפקודתו, הכריז
שאותו חבר אנשים אחראי למעשי אלימות העלולים לגרום למותו
של אדם או לחבלתו, או איומים במעשי אלימות כאלה, או
שהכריז שחבר האנשים היה מעורב במעשי אלימות או איומים
כאלה, בתנאי שמעשה האלימות או האיומים נעשו אחרי ה'
באייר תש"ח (14 במאי 1948)."

140.     עובדת היותם של הפת"ח, התנזים וגדודי חללי אלאקצא ארגונים טרוריסטיים,
כפי שנאמר בחוות דעתו של תא"ל קופרווסר ת/1, הוכחה בבירור ממסמכי השלל שנתפסו
במבצע "חומת מגן" והוגשו כראיות בפנינו, כמו גם מעדויותיהם של פעילי הטרור והנאשם
עצמו (ראה לעיל: סעיפים 7-10; עדותו של עויס בסעיפים 21-23; עדותו של אבו חמיד
בסעיף 25; עדותו של אחמד ברגותי בסעיף 29; עדותו של אחויל בסעיף 35; עדותו של
עיאדיה בסעיף 40; עדותו של שריף בסעיף 55; עדותו של אבו רדאחה בסעיף 57; ודברי
הנאשם בחקירתו כמפורט בסעיפים 60-64). הפיגועים נשוא כתב האישום, ורבים אחרים,
בוצעו על ידי פעילי השטח של הפת"ח – אנשי התנזים – ועל ידי חוליות שהתהאגדו במסגרת
המכונה "גדודי חללי אלאקצא". הנאשם היה מנהיג הפת"ח בגדה, ומפקד התנזים וגדודי
חללי אלאקצא, כפי שהודה בחקירתו, וכפי שהוכח בראיות נוספות רבות (ראה סעיף 17
וסעיפים 60-65 לעיל).

Gilmore 00697

SHATSKY-009382

94



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

תפקידיו של הנאשם בהנהגת ארגוני הטרור פורטו בהרחבה אף הם (ראה חלק שני, פרק ד'
לעיל). הנאשם היה מפקדם של ארגוני הטרור וחוליות הטרור, גם אם לעיתים אלה חרגו
מהנחיותיו, והוא דאג לספק להם אמצעי לחימה וכספים לצורך פעילותם (ראה חלק שני
פרק ד(1) ו-(3) לעיל). הוא אף היה מעורב באופן אישי בחלק מן הפיגועים שביצעו
הארגונים שבהנהגתו (ראה חלק שני פרק ד(2) לעיל). הנאשם אף טיפל בסיוע למבוקשים
ולמשפחות העצורים והחללים, ובגיוס פעילים לארגוני הטרור והדרכתם (ראה חלק שני
פרק ד(4)-(5) לעיל). הוא היה האדם אשר ביטא את עמדתם של ארגוני הטרור באמצעי
התקשורת (ראה פרק ד(6) לעיל).

אין מדובר, איפוא, אך ורק "באדם הממלא תפקיד בהנהלה או בהדרכה של ארגון
טרוריסטי", כלשון סעיף 2 לפקודת מניעת טרור, אלא הנאשם הוא מי שעמד בראש ארגוני
הטרור הנ"ל, התווה את מדיניותם ונשא נאומי תעמולה מטעמם באמצעי התקשורת.
בכך הוכחו יסודות סעיפים 2 ו- 3 לפקודת מניעת טרור, קרי חברות בארגון טרוריסטי
ופעילות בארגון שכזה.

## 2.    אחריותם של מבצע בצוותא, משדל ומסייע והאבחנה ביניהם

141.    כתב האישום מייחס לנאשם אחריות ישירה של "מבצע בצוותא" לגבי כל מעשי
הרצח וניסיון הרצח נשוא כתב האישום, כאשר מדובר ב- 37 פיגועים שונים.
כתב האישום מייחס לנאשם גם את העבירות של סיוע ושידול לרצח, אם כי טענת
המאשימה בסיכומיה היא, כי יש לראות בנאשם מבצע בצוותא של עבירות אלו, ולא רק
מסייע או משדל לביצוען, וזאת עקב היותו מנהיג ארגוני טרור, והאחראי העיקרי לביצוע
פיגועי הרצח שהוציאו ארגונים אלה לפועל. יש לסקור, איפוא, את מידת אחריותו הנטענת
של הנאשם לפיגועי הטרור נשוא כתב האישום: ראשית - כמי שביצע את מעשי הרצח
בצוותא חדא עם פעילי השטח והמפגעים; שנית – כמי ששידל לביצוע מעשים אלה;
ושלישית – כמי שסייע לביצוע מעשי הרצח. במסגרת זו יש לבחון מה הקווים המאפיינים
את "המבצע בצוותא", תוך הבחנתם מן המאפיינים את המסייע והמשדל.

Gilmore 00698

SHATSKY-009383






בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

142.    סעיף 29(ב) לחוק העונשין, התשל"ז-1977 קובע את אחריותו של המבצע בצוותא,
כדלקמן:

"המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה, הם מבצעים בצוותא,
ואין נפקה מינה אם כל המעשים נעשו ביחד, או אם נעשו מקצתם בידי אחד
ומקצתם בידי אחר".

סעיף 30 לחוק העונשין, התשל"ז-1997 קובע את אחריותו של המשדל כדלקמן:

"המביא אחר לידי עשיית עבירה בשכנוע, בעידוד, בדרישה, בהפצרה או בכל דרך
שיש בה משום הפעלת לחץ, הוא משדל לדבר עבירה".

סעיף 31 לחוק העונשין, התשל"ז-1977 קובע את אחריותו של המסייע כדלקמן:

"מי אשר, לפני עשיית העבירה או בשעות עשייתה, עשה מעשה כדי לאפשר את
הביצוע, להקל עליו או לאבטח אותו, או למנוע את תפיסת המבצע, גילוי העבירה
או שללה, או כדי לתרום בדרך אחרת ליצירת תנאים לשם עשיית העבירה, הוא
מסייע".

143.    על מנת שאדם יחשב כמבצע העבירה בצוותא עם אחרים, צריך להתקיים התנאי
הבסיסי של "עשיית מעשים לביצועה" של העבירה, כפי שמורה סעיף 29(ב) לחוק.
הפסיקה נתנה פירוש רחב למושג "ביצוע", כשהיא מגדירה בצורה רחבה את מהות המעשה
הנדרש לצורך כך. באופן דומה קבעה הפסיקה אמות מידה גמישות בנוגע למידת הקירבה
הנדרשת של המשתתף למעגל המבצעים, ויכולתו להשפיע על הביצוע (דנ"פ 1294/96,
1365/96 *עוזי משולם ואח' נ' מדינת ישראל*, פ"ד נב(5) 1, בעמ' 21 (כב' השופט א. מצא),
בעמ' 54-55 (כב' השופט מ. חשין), ובעמ' 63-64 (כב' השופט י.קדמי)).

Gilmore 00699

SHATSKY-009384

96



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו                    ת"פ 1158/02

אשר למעשה הנדרש על מנת שניתן יהיה לראות באדם מבצע בצוותא, נפסק כי די במעשה לביצוע העבירה החורג מהכנה גרידא (זה אף המבחן לקיומה של עבירת ניסיון), ואשר מלווה ביסוד הנפשי המתאים (דנ"פ 1294/96 הנ"ל בעניין **משולם**, בעמ' 23-24). מעשה זה איננו חייב להיות חיוני להצלחת העבירה, ואף איננו חייב להיות מעשה הנמנה עם רכיבי היסוד העובדתי שבעבירה; די בכך שהמעשה משולב בתוכנית העבירה, ומהווה השתתפות בביצועה, כמו למשל תכנון העבירה, מתן הנחיות לביצועה או חלוקת התפקידים בין המשתתפים (דנ"פ 1294/96 הנ"ל בעניין **משולם**, בעמ' 63-64 (כב' השופט י. קדמי).

A.          **מבצע בצוותא לעומת מסייע**

144.    ההבחנה בין "מבצע בצוותא" של העבירה לפי סעיף 29(ב) לחוק העונשין, לבין "מסייע" לפי סעיף 31 לחוק, הפכה להיות בעלת חשיבות מעשית רבה לאחר שנכנס לתוקף חוק העונשין (תיקון מס' 39) (חלק מקדמי וחלק כללי), התשנ"ד-1984, שכן על-פי סעיף 32 לחוק כנוסחו היום - עונשו של המסייע הוא מחצית מעונשו של המבצע בצוותא, בעוד שעל-פי הדין הקודם עונשם היה זהה. עונשו המירבי של המסייע לרצח הוא 20 שנות מאסר (סעיף 32(1) לחוק), בעוד שהמבצע עבירת רצח בצוותא עם אחר, בהעדר נסיבות של אחריות מופחתת, דינו מאסר-עולם חובה.

בעי"פ 8573/96, 8620, 8710, 8873, 8901 **מרקדו ואח' נ. מדינת ישראל** ("משפט הדיסקונטאים"), פ"ד נא(5) 481, אמר כבוד השופט א. גולדברג בעמ' 545:

"תיקון מס' 39 לחוק מבטא את ההכרה שהאשמה המוסרית, והמסוכנות הסוביקטיבית והאוביקטיבית שבסיוע פחותות מאלה שבביצוע בצוותא. פער זה הוא שעומד ביסוד ההבחנה בתוצאות העונשיות בין מבצע בצוותא למסייע, והוא זה שגם צריך להנחות אותנו בקביעת המבחנים המשמשים להבחנה בין מבצע עיקרי למסייע".

Gilmore 00700

SHATSKY-009385

97





בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו



145. ההבחנה בין "מבצע בצוותא" לבין "מסייע" הובהרה בע"פ 4389/93, 4497/93 <u>יוסי</u> <u>מרדכי ואח' נ. מדינת ישראל</u>, פ"ד נ(3) 239, בע"פ 2796/95, 2813/95, 2814/95 <u>פלונים נ.</u> <u>מדינת ישראל</u>, פ"ד נא(3) 388, דנ"פ 1294/96 הנ"ל בעניין <u>משולם</u>; ע"פ 8573/96 הנ"ל בעניין <u>מרקדו</u>, בעמ' 543-550; וע"פ 2111/99 <u>חיירו נ' מדינת ישראל</u>, פ"ד נ(1) 411 ההבחנה בין מבצע בצוותא לבין מסייע מצויה הן ביסוד העובדתי של העבירה, והן ביסוד-הנפשי שלה. בעיקרון, "איכות תרומתו של המסייע לביצוע העבירה פחותה מאיכות תרומתו של המבצע העיקרי" (ע"פ 8573/96 הנ"ל, בעמ' 545).

אשר ליסוד העובדתי של העבירה - ההבחנה העיקרית היא בין שותף ישיר לביצוע העבירה לבין שותף עקיף לביצועה. המבצעים בצוותא הם "משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה", אך לא נדרש כי כל אחד מהם יבצע בעצמו את כל היסודות העובדתיים של העבירה (סעיף 29(ב) לחוק). לעומת זאת, המסייע עושה מעשה שיש בו כדי לתרום בדרך כלשהי "ליצירת תנאים לשם עשיית העבירה" (סעיף 31 לחוק). המבצע בצוותא הוא חלק מן המעגל הפנימי של ביצוע העבירה, בעוד שתרומתו של המסייע לביצוע העבירה היא חיצונית בלבד. לכן, בוחן בית-המשפט את מידת הקירבה של כל אחד מן המשתתפים לביצוע העבירה, קרי: האם הוא מהווה חלק מן המעגל הפנימי של המשימה העבריינית (ע"פ 3390/98 <u>רוש נ. מדינת ישראל</u>, פ"ד נג(5) 871, 878). זהו, איפוא, "מבחן הקירבה", שהובהר על ידי כב' הנשיא א. ברק בע"פ 4389/93 הנ"ל בעניין <u>מרדכי</u>, בעמ' 250:

"השוני בין המבצע בצוותא לבין המסייע מתבטא בכך שהמבצעים בצוותא משמשים גוף אחד לביצוע המשימה העבריינית. כולם עבריינים ראשיים... תרומתו של כל אחד מהמבצעים בצוותא היא 'פנימית'... אכן, לעניין הביצוע בצוותא תיתכן חלוקת עבודה בין העבריינים, באופן שהם יפעלו במקומות שונים ובזמנים שונים, ובלי שכל אחד מהם מיצה את העבירה, ובלבד שחלקו הוא מהותי להגשמת התכנית המשותפת. אחדות המקום והזמן אינה חיונית, ובלבד שחלקו של כל אחד מהם הוא חלק פנימי של המשימה העבריינית".

Gilmore 00701

SHATSKY-009386

98



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו



146. בפסקי הדין שצוטטו לעיל, סקר בית-המשפט העליון את המבחנים השונים שהוצעו בפסיקה ובספרות המשפטית לשם תיחום הגבולות בין מבצע בצוותא לבין מסייע. יש אשר שמים דגש על "מבחן השליטה", כמאפיין של המבצע בצוותא: למבצע בצוותא יש שליטה, יחד עם האחרים, על ביצוע העבירה; הוא מהווה חלק מן התוכנית המשותפת לביצוע העבירה, ופועל יחד עם האחרים להגשמתה. על מעמדו של המבצע בצוותא לאור "מבחן השליטה", אמר כבוד הנשיא א. ברק בע"פ 2796/93 הנ"ל בענין פלוניס (פסקה 28):

"המאפיין את המבצע בצוותא שהוא אדון לפעילותו העבריינית. בידיו השליטה הפונקציונאלית-מהותית, יחד עם המבצעים בצוותא האחרים, על העשיה העבריינית. הוא חלק מהחלטה משותפת לביצוע העבירה. הוא חלק מהתוכנית הכוללת להגשמת הפעולה העבריינית האסורה. הוא פועל יחד עם המבצעים בצוותא האחרים, כך שכל אחד מהם שולט - יחד עם האחרים -- על הפעילות כולה. מעמדו ביחס להחלטה לביצוע העבירה הוא של איש 'פנים'. תרומתו היא 'פנימית'. חלקו הוא מהותי להגשמת התוכנית המשותפת...."

כך גם נפסק בע"פ 8573/96 הנ"ל בענין מרקדו, בעמ' 548-547. לעומת זאת, בהתייחסו למסייע אמר כבוד הנשיא ברק כי המסייע "אינו אבי הרעיון" לביצוע העבירה, ובפסקה 30 אמר כדלקמן:

"המסייע הוא שותף עקיף ומשני (פרשת מרדכי, פסקה 14). הוא מוצוי מחוץ למעגל הפנימי של הביצוע. הוא גורם "חיצוני". אין הוא יוזם הביצוע ואף לא משודל לביצוע... אין הוא המחליט על הביצוע ואין הוא שולט על הביצוע...."

(ראה גם ע"פ 4389/93 הנ"ל בענין מרדכי, פסקאות 13-14).

147. לעומת "מבחן השליטה", יש המדגישים את ה"מבחן הפונקציונאלי", לפיו מבצע בצוותא הוא מי שנטל חלק מהותי בביצוע העבירה גופה, בעוד שחלקו של הנוסע מתבטא בפעולות עזר החיצוניות לעבירה.

Gilmore 00702

SHATSKY-009387

99





בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו          תפ"ח 02/1158

מבחן זה מוצא את ביטויו בלשון סעיף 29(ב) לחוק ("משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה"). בע"פ 2796/93 הנ"ל בענין פלונים (פסקה 27), אמר כבוד הנשיא א. ברק בהתייחסו למבצעים בצוותא:

"הם השותפים הראשיים בביצוע העבירה. השותפות ביניהם מונבטאת בכך שהם נטלו חלק בביצוע העבירה כמבצעים ישירים. הם משמשים גוף אחד לביצוע המשימה העבריינית... כל אחד מהם נוטל חלק בביצוע העיקרי של העבירה".

ובהמשך דבריו (פסקה 27) אמר כבוד הנשיא ברק:

"ביצוע בצוותא מחייב תיכנון משותף. הוא מבוסס על חלוקת עבודה בין המבצעים...".

דברים ברורים באשר לחשיבותו המכרעת של ה"מבחן הפונקציונאלי" אמר כבוד השופט י. קדמי בע"פ 5206/98 הליל עבוד נ. מדינת ישראל, פ"ד נב(4) 185 (פסקה 2):

"'המבצעים בצוותא' אינם רק אלה המשתתפים בעשיית 'מעשה' העבירה גופו; אלא – נמנה עליהם כל מי ש'נוטל חלק' בביצועה של העבירה, במובן הרחב של המושג 'ביצוע'. ואילו כל מי שרק 'תורם' לביצוע, מבלי לקחת בו חלק – לאמור: מבלי למלא 'תפקיד' במסגרתו – נותר ב'מעגל החיצוני' של האחראים לביצועו. הוא אינו משתתף בביצוע; וחלקו מצטמצם ל'סיוע' גרידא למימושו של הביצוע.

ההבחנה בין הנמנים עם ה'מעגל הפנימי' – 'המבצעים בצוותא' – לבין הנמנים עם ה'מעגל החיצוני' – 'המסייעים', נעוצה, איפוא, בטיב ואופי מעורבותם בביצוע: אם 'נטלו-חלק-בביצוע' – קרי: אם היה להם 'תפקיד' בביצוע היו הם 'מבצעים בצוותא'; ואילו אם אך 'תרמו' לו מבחוץ – הריהם 'מסייעים' בלבד".

Gilmore 00703

SHATSKY-009388

100





בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו     תפ"ח 1158/02

בהמשך דבריו מבהיר כבוד השופט קדמי כי ההבחנה בין מבצע בצוותא למסייע אינה
תלויה בשאלה האם היה בהתנהגותו של הנאשם משום סיוע לביצוע העבירה, שכן גם
מבצע בצוותא מסייע לביצועה; השאלה היא "אם נטל חלק – קרי: אם מילא תפקיד –
בביצוע העבירה".

בדנ"פ 1294/96, 1365 **משולם ואח' נגד מדינת ישראל**, פ"ד נב(5)1, בעמ' 63, אמר כבוד
השופט י. קדמי:

"'מעשה-של-השתתפות' אינו חייב לבטא פעילות המשולבת בביצוע ה'מעשה',
הנמנה עם רכיבי היסוד העובדתי שבעבירה, ומשמעותו ריחפת ומקיפה כל
'מעשה' המבטא 'השתתפות' בביצועה של העבירה. סעיף 29 לחוק העונשין,
המגדיר 'מעשה-של השתתפות', אינו דורש ש'המעשה' ייעשה תוך כדי ביצוע
היסוד העובדתי של העבירה, ודי שיהא בו לבטא 'השתתפות' בביצוע.
'השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את
העבירה...".

כבוד השופט מ. חשין ציין באותו עניין כי החוק אינו דורש שמעשה ההשתתפות בביצוע
העבירה ייעשה תוך כדי ביצועה בפועל, או בסמוך לכך (עמ' 53-54).

148. בדנ"פ 1294/96 הנ"ל בעניין **משולם**, הבהיר בית-המשפט העליון כי "מבחן
השליטה" הינו מבחן עזר, שאיננו מבחן יחיד ובלעדי, ויש לשלבו עם מבחנים ושיקולים
אחרים; שליטה בביצוע מהווה אמנם ראיה חשובה להיותו של אדם מבצע בצוותא, אך
היעדר שליטה, או העדר תרומה פיזית חיונית לביצוע העבירה, אינם שוללים בהכרח
מסקנה זו (כבוד הנשיא א. ברק בעמ' 50; כבוד השופט א. מצא בעמ' 24-27; כבוד השופט
י. קדמי בעמ' 65). זאת ועוד; גם כאשר בית-המשפט נעזר ב"מבחן השליטה", נעשה הדבר
תוך הדגשה כי אין מדובר ביכולת שליטה רצופה במהלך ביצוע העבירה כולה, אלא מדובר
ב"שליטה במשבצת הביצוע שהוקנתה למבצע המסוים" (כבוד השופט י. קדמי בעמ' 64).

Gilmore 00704

SHATSKY-009389

101





בתי המשפט



149.     אשר ליסוד הנפשי של העבירה – הרי שיחסו הנפשי של המסייע נמצא בדרגה נמוכה יותר מזו של המבצע העיקרי, בכל הנוגע למידת מודעותו לפרטים הנוגעים לביצוע העבירה, ורצונו להגשימה. לגבי מסייע, נפסק כי די בכך שהוא מודע לכך שהתנהגותו תורמת ליצירת התנאים הדרושים לשם ביצוע העבירה העיקרית, ושהמבצע העיקרי עומד לבצעה. בנוסף, לנגד עיני המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לעבור את העבירה, או להקל עליו את ביצועה. ואולם, כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד של פזיזות או כוונה מיוחדת – אין צורך להוכיח שגם המסייע פעל מתוך כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כך למשל, בעבירת רצח אין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצח את הקורבן, או שהוא חפץ בכך: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של המסייע אשר יהיו (הלכות אלו הובהרו בע"פ 320/99 פלוניח נ' מדינת ישראל, פ"ד נה(3) 22, בעמ' 31-37).

לעומת זאת, כאשר במבצע בצוותא עסקינן, יש להוכיח מעורבות נפשית גבוהה ומודעות מצידו לפרטי העבירה המתבצעת, בנוסף על רצונו להגשימה:

"המבצע בצוותא תורם את ותרומתו לאירוע עבריני רב-משתתפים מתוך יחס נפשי של יוצר העבירה animo auctoris. הוא רואה את עשיית העבירה כעניינו הוא, ולא של אחר" (דברי ש"ז פלר, בספרו יסודות בדיני עונשין, שצוטטו בע"פ 4389/93 הנ"ל בעניין מרדכי, בעמ' 251).

כללו של דבר: המבצע בצוותא, בניגוד למסייע, צריך להיות בעל יסוד נפשי זהה לזה של מבצעי העבירה האחרים, וצריכים להתקיים לגביו כל מרכיבי היסוד הנפשי שנקבעו בחוק לגבי העבירה שהוא נוטל חלק בביצועה (ע"פ 2796/95 הנ"ל בעניין פלונים, בעמ' 402).

בע"פ 8573/96 הנ"ל בעניין מרקדו, אמר כבוד השופט א. גולדברג, בעמ' 548-549, כי סיווגו של הנאשם כמבצע בצוותא או כמסייע מתקבל כתוצאה ממובחן משולב של היסוד הנפשי והיסוד העובדתי – מובחן אשר כמותו כמקבילית כוחות:

Gilmore 00705
SHATSKY-009390

102



בתי המשפט



בית המשפט המחוזי בתל-אביב-יפו      ופ"ח 1158/02

"בכל שהיסוד הנפשי של עושה העבירה (מבחינת מידת העניין שלו בביצועה) רב
יותר, יש מקום להסתפק בדרגה נמוכה יותר של היסוד העובדתי. ברוח זו כבר
נאמר כי 'משהוכח יסוד 'נפשי' זה (המודעות – א' ג'), אין עוד חשיבות לחלוקת
התפקידים בין המעורבים באירוע' (ע"פ 4188/95, 5236 הנ"ל [43], בעמ' 550).
ולהפך, ככל שמידתו של היסוד העובדתי אצל עושה העבירה, מבחינת איכות
תרומתו לביצועה, רבה יותר, כן ניתן להסתפק בדרגה נמוכה יותר של היסוד
הנפשי".

דברים אלו אושרו בדנ"פ 1294/96 בעניין משולם הנ"ל (בעמ' 27, מפי כב' השופט א. מצא).

150.   מן ההלכות שצוטטו לעיל עולה, כי השתתפות בתכנון העבירה מהווה טמטמן
מובהק של מבצע בצוותא, ובמקרה שכזה אין צורך בנוכחות פיזית בזירת העבירה על מנת
להיחשב כמבצע בצוותא.

בדנ"פ 1294/96 הנ"ל בעניין משולם, בעמ' 64, פסק כב' השופט י. קדמי:

"השותפות', כאמור', יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את
העבירה, ומכל מקום, לשיטתי, אין ספק, שתכנון וביצוע, מתן הנחיות והתווית
קווי הפעולה, לריבות חלוקת הפקידים בין המשתתפים, מהווים 'מעשה' המבטא
'השתתפות' כאמור".

בע"פ 3596/93 חמודי אבו סרור נ. מדינת ישראל, פ"ד נב(3) 481, אמר כבוד השופט א' מצא
בעמ' 491:

"תרומתו המעשית של המערער לביצוע הרצח אכן היתה קטנה מושל שני מרעיו.
ואולם השתתפותו בפעילות המכינה, ותפקיד המתריע אותו מילא, היקנו לו
שליטה על הוצאתה לפועל של התוכנית הרצחנית. מכך שהשתותף בהכנות לביצוע
ופעל להצלחת התוכנית עולה, כי היה בעל המחשבה הפלילית הנדרשת לשכלול
אחריותו בגין עבירת רצח בכוונה תחילה".

Gilmore 00706

SHATSKY-009391

103



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו     תפ"ח 1158/02

בע"פ 2796/95 הנ"ל בעניין **פלוני**, הורשעו ארבעה נידרים בביצוע רצח בכוונה ותחילה, למרות שרק אחד מהם השליך את הרימון שגרם למותו של קורבן העבירה. האחד (ואב) הורשע כמבצע בצוותא משום שנטל חלק בכל שלבי התכנון והביצוע, ונכח בזירת ביצוע העבירה, למרות שהחליט שלא לזרוק את הרימון הקטלני בעצמו ("הוא לא ביצע את אקט הקטילה. אין בכך ולא כלום, שכן מבצע בצוותא אחראי גם אם לא ביצע בעצמו את כל יסודות העבירה..." – עמ' 407). השני (גרשון) הורשע כמבצע בצוותא, אף כי לא נכח כלל בזירת הרצח, וכל תפקידו היה לדווח לתושרת על המעשה לאחר ביצועו, משום שביצע את התפקיד שהוקצה לו מראש לשם הגשמת העבירה (עמ' 408). השלישי (טל) הורשע כמבצע בצוותא, למרות שגם הוא לא נכח בזירת ביצוע הרצח, משום שהשתתף בתכנון העבירה, היווה חלק מן החבורה שהחליטה לבצע את הרצח, ואף עמד בראשה (עמ' 408-409).

151. כאשר לעבירה העיקרית קדמה קשירת קשר לביצועה, תהא ונטיה לראות בכל אחד מן הקושרים מבצע בצוותא של העבירה העיקרית, ובלבד שנטל חלק ממשי בביצועה. הטעם לכך הוא שקשירת קשר לביצוע עבירה מעידה על עניין שיש לכל אחד מהקושרים בביצועה. כדברי ש"ז פלר, שצוטטו בע"פ 8573/96 הנ"ל בעניין *מרקדו*, בעמ' 550: "*קשירת קשר בין שני אנשים, או יותר, לביצועה עבירה פלילית, טומנת בחובה גיבוש מחשבה משותפת למימוש מטרת הקשר – כל אחד במעמד עתידי של מבצע ישיר, ברוח יצירת* "*animo auctoris*."

בע"פ 3390/98 הנ"ל בעניין *רינ"ץ*, בעמ' 878, אמר כבוד השופט א' מצא: "*המבחן הנוסף בדבר 'קירבת המעשה', שעל-פיו נדרש שחלקו של כל אחד מהמבצעים בצוותא יהיה 'חלק פנימי של המשימה העבריינית', נועד אך להבטיח שעשייתו מעשה גבולי, שלפי טיבו עשוי להיכנס להגדרת של 'ביצוע', לא תטיל על העושה אחריות כמבצע בצוותא כאשר טיב יחסו הנפשי לביצוע העבירה מוטל בספק (דנ"פ 1294/96 משולם נ' מדינת ישראל (להלן – פרשת משולם) [3]), בעמ' 21-22*.

Gilmore 00707

SHATSKY-009392



104

בתי המשפט



לא כן הדבר ביחס לקביעת אחריותו של מי אשר מעיקרה נימנה עם המשתתפים
בהכנת התוכנית העבריינית, ואין מנועורי כל ספק ביחס להיותו בעל ומחשבה
הפלילית הנדרשת לשכלולה של העבירה המתוכננת. צד כזה לעבירה נושא
באחריות כ'מבצע בצוותא', אפילו אם תרומתו הפיזית לביצועה אינה גדולה
מתרומתו של מסייע (ע"פ 3596/93 אבו סרור נ' מדינת ישראל [4], בעמ' 491)".

152.   אשר לנוכחות בזירת ביצוע העבירה, הרי שזו אינה הכרחיו על מנת לראות באדם
מבצע בצוותא, ובלשונו של כבוד הנשיא א. ברק בע"פ 2796/95 הנ"ל בעניין פלוניים (פסקה
(27): "ביצוע בצוותא אינו מבוסס בהכרח על אחידות המקום והזמן" (ראה גם דנ"פ
1294/96 הנ"ל בעניין משולם, בעמ' 30, 38, 49, 51, 53-54 ו-64). עם זאת, נוכחות שאינה
אקראית של אדם בזירה בה מתבצעת עבירה, יוצרת חזקה הניתנת לסתירה להיותו מבצע
בצוותא של העבירה (ראה: ע"פ 3006/96 מטיאס נ. מדינת ישראל, דינים עליון, כרך נב
.(526

ב.   עבירת הסיוע

153.   היסוד העובדתי והנפשי של עבירת הסיוע בכלל, והסיוע לרצח בפרט, הובהרו
לאחרונה בפסק דינו של כבוד הנשיא א' ברק בע"פ 320/99 פלונית נגד מדינת ישראל, פ"ד
נה(3) 22, בעמ' 31-37 (אושר בע"פ 11131/02 אנג'ליקה יוסופוב נ' מדינת ישראל, טרם
פורסם). ניתן לסכם את ההלכות שנפסקו בפסק דין זה כדלקמן :

א.   המאפיין את ההתנהגות המסייעת הוא, שהיא מהווה תרומה עקיפה ומשנית
לביצועה של העבירה העיקרית: התרומה של המסייע נחשבת עקיפה ומשנית,
משום שהוא אינו נוטל וחלק בביצוע העיקרי של העבירה, אלא רק תורם בעקיפין
להגשמתה של העבירה העיקרית. המסייע והוא גורם יחיצוניי, אשר מצוי מחוץ
למעגל הפנימי של ביצוע העבירה (ראה גם: ע"פ 7085/93 נג'אר ואח' נ' מדינת
ישראל, פ"ד נא(4) 221, בעמ' 238).

Gilmore 00708
SHATSKY-009393

105



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו     תפ"ח 1158/02

ב.   היסוד העובדתי של עבירת הסיוע, שהיא עבירת התנהגות, הוא מעשה או מחדל
שיש בו כדי ליצור את התנאים להגשמתו של היסוד העובדתי בעבירה המבוצעת על
ידי המבצע העיקרי. הסיוע צריך להיות "מנוסגל" לסייע להגשמת העבירה
העיקרית, אך אין דרישה שהסיוע יהיה אפקטיבי, או הנאי שבלעדיו העבירה
העיקרית לא היתה מתגבשת (ראה גם ע"פ 4317/97 **פולאקוב נ' מדינת ישראל**,
פ"ד נג(1) 289, בעמ' 307). כמו כן אין דרישה שהעבירה העיקרית תתבצע בפועל,
שכן עבירת סיוע איננה עבירה תוצאתית. בנוסף, יש צורך להוכיח, כחלק מהיסוד
העובדתי של עבירת סיוע, את הנסיבה הנוגעת לפליליותה של התנהגותו שהסיוע
מהווה לה גורם משני ועקיף.

ג.   הסיוע צריך שיופנה כלפי עבירה בעלת ייעוד מוחשי, דהיינו, פעולה המעשית על
מנת לסייע לביצועה של עבירה מסוימת, להבדיל מעבירה סתם (ראה גם ע"פ
426/67 **יוסף באני ואח' נ' מדינת ישראל**, פ"ד כב(1) 477, בעמ' 481 ; ע"פ 7085/93
הנ"ל בעניין **נג'אר**, בעמ' 239-238).

ד.   היסוד הנפשי של עבירת הסיוע כולל שלושה תנאים מצטברים :

(1)   מודעות לטיב ההתנהגות המסייעת, קרי : לכך שהההתנהגות ותורמת ליצירת
התנאים לשנו עשיית עבירה עיקרית בעלת ייעוד מוחשי ;

(2)   מודעות לקיום הנסיבות הרלבנטיות בעת וההתנהגות המסייעת, דהיינו :
מודעות לכך שהמבצע העיקרי מבצע, או עומד לבצע עבירה, הגם שלא
נדרשת מודעות לכל פרט מפרטי העבירה (ראה גם ע"פ 7085/93 הנ"ל בעניין
**נג'אר**, בעמ' 239-238).

(3)   לנגד עיניו של המסייע צריכה לעמוד המטרה לסייע לנובצע העיקרי לבצע
את העבירה, או להקל עליו את הביצוע.

Gilmore 00709

SHATSKY-009394

106



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו          תפ"ח 1158/02

על דרישה זו ניתן להחיל את "הילכת הצפיות", דהיינו: מודעותו של המסייע לכך שהתנהגותו עשויה, קרוב לוודאי, להוות תרומה מסייעת לביצוע העיקרי – שקולה כנגד המטרה לסייע לו, גם אם הוא לא חפץ כלל בביצוע העבירה העיקרית (ראה גם דעת המיעוט של כבוד השופט י' אנגלרד בע"פ 4317/97 הנ"ל בעניין **פוליאקוב**, בעמ' 320- 323, ודעתו של כבוד השופט מ' אילן בע"פ 807/99 **מדינת ישראל נ' עזיזיאן**, פ"ד נג(5) 747, בעמ' 757-758).

ה.    כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד נפשי של פזיזות או כוונה מיוחדת – אין צורך להוכיח שגם המסייע פעל מתוך פזיזות או כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כאשר מדובר בסייוע לרצח, פירוש הדבר הוא שאין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצח את הקורבן, או אפילו שהוא חפץ בכך. המחשבה הפלילית של המסייע איננה צריכה להיות זהה למחשבתו של העבריין העיקרי: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של המסייע אשר יהיו.

154.    לעניין דרגת ההסתברות כי העבריין העיקרי יבצע את העבירה, חשוב לציין כי על פי ההלכה שנפסקה מפי כבוד הנשיא א' ברק בע"פ 320/99 הנ"ל בעניין **פלונית**, די בכך שהמסייע **מודע** לכך שהמבצע העיקרי עומד לבצע עבירה בעלת ייעוד מוחשי (עמ' 31-32 לפסק הדין). הדרישה למודעות בדרגת הסתברות **קרובה לוודאי**, נוגעת ליסוד המטרה, קרי: מודעותו של המסייע לכך שהתנהגותו עשויה, קרוב לוודאי, לתרום לביצוע העבירה העיקרית; מודעות שכזו, שקולה כנגד המטרה לסייע לעבריין העיקרי. כפי שאמר הנשיא א' ברק: "**היסוד הנפשי של מסירה (יבלי) מכוון (איפוא) כלפי פעולת הסייוע ולא כלפי פעולתו של העבריין העיקרי**" (עמ' 35).

בהקשר זה מתעוררת השאלה מתי נאמר כי לנאשם היתה "מודעות" לכך שהעבריין העיקרי עומד לבצע עבירה בעלת ייעוד מוחשי.

Gilmore 00710
SHATSKY-009395

107



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

ההלכה היא כי "עצימת עיניים", המכונה אף "עיוורון מכוון", שקולה כנגד מודעות לטיב
המעשה ולקיום הנסיבות. הלכה זו, מוצאת כיום את ביטויה בסעיף 20(ג)(1) לחוק
העונשין, אשר קובע כדלקמן:

"רואים אדם שחשד בדבר טיב ההתנהגות או בדבר אפשרות קיום הנסיבות
כמי שהיה מודע להם, אם נמנע מלברר".

(וראה: י' קדמי, על הדין בפלילים, עדכון והשלמה (1996), חלק ראשון, בעמ' 37, וע"פ
3417/99 מרגלית הר-שפי נ' מדינת ישראל, פ"ד נה(2) 735, בעמ' 757-758).

בספרו הנ"ל של י' קדמי נאמר, בעמ' 37:

"א.    סעיף 20(ג)(1) לתיקון, מעגן בהוראה חקוקה, את הכלל שלפיו: מקום
שאדם 'חושד', בפועל, שטיב ההתנהגות מביא אותה בגדרה של התנהגות אסורה
או שיש אפשרות, מעשית, שמתקיימות הנסיבות הדרושות להרשעה, והוא נמנע
מלברר את 'אמיתותו' של החשד, רואים אותו כמי שהיה מודע לטיבה האמיתי
של ההתנהגות ולקיומה של הנסיבה (אם מתברר כי נתקיימה בפועל).

ב.    גם כאן... נראה כי רמת החשד צריכה להיות לפחות 'רמה מסתברת',
לאמור: כי סביר יותר שהחשד אמיתי מאשר שאין לו אחיזה'".

ההלכה בעניין זה מבוארת בספרו של פרופ' ש"ז פלר, יסודות בדיני עונשין (כרך א',
תשמ"ד), בעמ' 519, כפי שאף הפנה אליה כבוד השופט מי חשין בע"פ 3417/99 הנ"ל, בעמ'
758, לאמור:

"מודעות לאפשרות קיום הנסיבה, בה תלויה העבירה, מחייבת את האדם לבדוק,
עובר לביצוע מעשהו, את המצב בכל הנוגע לאותה נסיבה, כדי להימנע ממנו,
במקרה שקיום הנסיבה מתאושש.

Gilmore 00711

SHATSKY-009396

106



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו       תפ"ח 02/1158

אם חרף החשד, לא עשה האדם כן, בין משום שבכל תנאי היה מנוי וגמור עמו לעשות את המעשה, ובין משום שהיה לו נוח יותר שלא לדעת או מכל שיקול אחר, פירוש הדבר שהשלים עם דבר קיומה של הנסיבה.

לכן, שקולה ההתעלמות *המודעת* מאפשרות הקיום של מערכת נסיבות כנגד *מודעות* לעצם קיום זה; שהרי מערכת נסיבות זו עמדה לנגד עיני האדם, אלא שלא טרח לבדוק את מצב הדברים כדי לבררם. אם מתברר בדיעבד כי הנסיבות הרלוואנטיות אכן התקיימו, שקולה המודעות לאפשרות קיומן עקב החשד בכך, כנגד המודעות לעצם קיומן".

בספרו הנ"ל של י' קדמי, בעמ' 37, נאמר באשר לרמת החשד הדרושה לצורך יישום ההלכה בדבר "עצימת עיניים", כי לפני תיקון תשנ"ד לחוק העונשין נעה ההלכה הפסוקה בין רמה "סבירה" לבין רמה "גבוהה". בעניין זה נאמר בספרו של פרופ' פלר, דיני עונשין, כרך א', עמ' 523, כדלקמן:

"אין לדעתנו כל יסוד לסברה כי, מלבד רציונאליות החשד – הסובייקטיבית כמובן – או, ביתר דיוק, במקום הרציונאליות שלו, צריך החשד להיות גם בדרגה גבוהה, עד כדי הסתברות קרובה לוודאי, או עד כדי העדר ספק של ממש בלבו של אדם בדבר אמיתותו...
לשם השתוות 'עצימת עיניים' למודעות, די במודעות לחשד רציונאלי בדבר אפשרות קיומן של הנסיבות ובהמנעות מלברר את הדבר לאשורו".

ובעמ' 524 נאמר:

"לסיכום, די בהיות החשד מעוגן במציאות, כלומר רציונאלי, כדי להגדיר את המעשה כמבוצע תוך 'עצימת עיניים', אם, עובר למעשה, נמנע העושה מלבדוק את החשד ומלעמוד על מצב הדברים לאשורו. אין צורך במידת גבוהה של הסתברות אובייקטיבית של אמיתות החשד".

Gilmore 00712

SHATSKY-009397



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו

תפ"ח 1158/02

המבחן לקיומה של "עצימת עיניים" העולה כדי מודעות הוא, כאמור לעיל, סובייקטיבי. עם זאת, בתי המשפט נוהגים להיעזר לצורך קביעת רמת מודעותו הסובייקטיבית של הנאשם גם במבחן האובייקטיבי של האדם הסביר: (וראה: ע"פ 15/78 <u>משה ביבס נ. מדינת ישראל</u>, פ"ד לב(3) 64, בעמ' 83; ע"פ 5612/92 <u>מדינת ישראל נ. בארי ואח'</u>, פ"ד מח(1) 302, בעמ' 363; והשווה להחלת מבחן האדם הסביר בנוגע למודעות הנאשם להסתברות גבוהה של פגיעה בבטחון המדינה: ע"פ 3116/99 <u>יהודה גיל נ. מדינת ישראל</u>, פ"ד נד (4) 193, בעמ' 204).

**155.** מן ההלכות שפורטו לעיל, ובעיקר אלו שנפסקו בע"פ 320/99 הנ"ל בעניין <u>פלונית</u>, עולה כי אדם אשר חושד כי חברו עומד לבצע עבירה מסוימת, אך נמנע מלברר את העניין, ואף מסייע לחברו לבצע את העבירה מתוך מודעות לכך שמעשהו יסייע, קרוב לודאי, לביצוע העבירה בידי חברו - אם תבוצע - נחשב כמסייע על פי סעיף 31 לחוק העונשין. מהלכות אלו עולה כי אין צורך להוכיח שהמסייע צפה את ביצוע העבירה העיקרית כאפשרות קרובה לודאי: די בכך שהיה מודע לאפשרות ההגיונית, הסבירה והמהותית של ביצוע העבירה העיקרית, וחרף כך סייע לביצועה, מתוך מודעות לכך שהתנהגותו עשויה, קרוב לודאי, לסייע למבצע העיקרי. כמו כן אין צורך להוכיח שהמסייע חפץ בביצוע העבירה העיקרית, או כי פעל מתוך כוונה שהעבירה העיקרית תבוצע.

ואולם, בע"פ 11131/02 הנ"ל בעניין <u>יוסופוב</u> נפסק מפי כב' השופט א. ריבלין כי התביעה צריכה להוכיח שהנאשם ידע שהתנהגותו עשויה לסייע, קרוב לודאי, לביצוע עבירת רצח על ידי העבריין העיקרי וכי: "**על מנת שתוחל הלכת הצפיות, יש להראות, כאמור, מודעות בדרגה של קרוב לודאי לאפשרות לאפשרות ביצוע העבירה...**" (פסקה 19 לפסק הדין). דברים אלו שונים בניסוחם מאלה שנאמרו בע"פ 320/99 הנ"ל בעניין <u>פלונית</u>, כאשר גם כב' השופט ריבלין אמר בע"פ 11131/02 הנ"ל בתחילת פסק הדין (פסקה 9), כי:

"**המודעות – הן לטיב ההתנהגות המסייעת והן לנסיבה של ביצוע העבירה העיקרית – יכול שתהיה מוחלפת בחשד באשר לטיבה המסייע של ההתנהגות, ובמודעות לאפשרות התקיימות הנסיבה של ביצוע העבירה על ידי העבריין העיקרי, בהתאם להוראות סעיף 20(ג)(1) לחוק העונשין ("עצימת עיניים")".**

Gilmore 00713
SHATSKY-009398

110



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו     תפ"ח 1158/02

156. מן ההלכות דלעיל עולה כי לא נדרשת הוכחה לכך שהנאשם היה מודע לכל פרט מפרטי העבירה שלביצועה הוא מסייע. בעניין זה נאמרו בע"פ 11131/02 הנ"ל בעניין **יוסופוב**, מפי כב' השופט א. ריבלין, דברים בעיל חשיבות לעניינו :

"בצדק ציין בית המשפט קמא, כי מודעות לכך שהמבצע העיקרי עומד לבצע עבירה אין משמעה מודעות לכל פרט מפרטי העבירה אותה הוא מונכן (ראו למשל : ע"פ 7085/93 **נג'אר נ' מדינת ישראל**, פ"ד נא(4) 221, 239). בענייננו, המערערת ידעה כי זייד, אליו התלוותה, נושא עימו חומר נפץ, כי הוא ביצע כבר פיגוע בעבר, וכי הוא מבקש לנקום את מות אחיו, אשר נהרג בפעולה של כוחות הביטחון. בית המשפט קמא הניחשם מעדותה של המערערת, כי זו הבינה היטב שזייד עומד לבצע פיגוע בעיר תל אביב. אין חשיבות, בהקשר זה, לשאלה אם ידעה באיזה מיקום מדויק מתכוון הוא להניח את חומר הנפץ"".

עוד נפסק מפי כב' השופט ריבלין באותו עניין :

"אכן, כפי שכבר ציינו, אין המסייע נדרש להיות מודע לכל הפרטים של העבירה אותה עומד לבצע המבצע העיקרי. יחד עם זאת, עליו להיות מודע, בעת שהוא מגיש את הסיוע למבצע העיקרי, לכך שקיימת אפשרות כי פעולתו תסייע למבצע העיקרי בביצועה של עבירה ממשית, ובמילים אחרות – לכך שלמבצע העבירה היה "ייעוד פוחשיי" (ראו גם : ע"פ 426/67 באריי נ' מדינת ישראל, פ"ד כב(1) 477, 482-481; ע"פ 5544/91 מויאל נ' מדינת ישראל (לא פורטם). אין די בידיעה על נכונות ערטילאית והיפותטית של המבצע לבצע עבירה, כדי להפוך אדם למסייע.

ייתכן אמנם, כפי שכבר ציינו, כי המודעות לקיום הסיבה הנסיבה שבביסוד העובדתי – כלומר מודעות לכך שהמבצע העיקרי עומד לבצע עבירה – תוחלף במודעות לאפשרות שהוא עומד לבצע עבירה.

Gilmore 00714

SHATSKY-009399

111



בתי המשפט



בית המשפט המחוזי בתל-אביב-יפו

ת"פ 1158/02

אך על מנת שנאמר כי המסייע "עצם את עיניו" עלינו להשתכנע כי התקיים, בפועל, חשד רציונאלי-סוביייקטיבי בעיני דווחו של המסייע, לפיו עומדת להתבצע עבירה (ש"ז פלר בספרו הנ"ל (כרך א') 521-524, 530).

זאת ועוד, על המסייע להיות ער לאפשרות שהעבירה תבוצע, בעת שהוא מושיט את הסיוע. אם סבור המסייע, בעת שהוא מבצע את הפעולות העולות לכדי סיוע, כי לא מתקיימת עוד אפשרות ממשית שהמבצע העיקרי עומד לבצע את העבירה, הרי שאין לראות בו מסייע – אף אם העריך, בשלב קודם, כי התקיימה אפשרות שכזו".

בעניין הדרישה למודעות לגבי כוונת המבצע העיקרי לבצע עבירה בעלת יעוד מוחשי, פסק כב' השופט מ. לנדוי (כתוארו אז) בע"פ 426/67 יוסף באצרי ואח' נ' מדינת ישראל, פד"י כב (1) 477, בעמ' 481, כי כאשר הסיוע מתבטא באספקת כלי לביצוע העבירה, כגון רכב או נשק – די בכך שהמסייע מספק את הכלי ששימש לביצוע העבירה למטרות ביצוע עבירה מאותו סוג שבוצע, ולאו דווקא אותה עבירה ממש. כב' השופט לנדוי אמר שהלכה זו, הנסמכת על פסיקה אנגלית, תחול "לפחות לגבי אותם מקרים, בהם משאירי המסייע 'שיקול דעת' לעבריין העיקרי, לבחירת שעת הכושר ומקום הכושר להגשמת הכוונה הפלילית המשותפת לשניהם".

כך פסק כב' השופט לנדוי, במקרה הנ"ל, כי אילו הוכח שהמערער (אשר זוכה לבסוף) מסר את מכוניתו למבצע העיקרי של מעשה השוד על מנת להקל על הסתלקותם ממקום הפשע – לא היה צורך להוכיח שהוא התכוון דווקא לשוד התיירת שנשדדה לבסוף.

157. הדרישה למודעות הנאשם לקיומה של עבירה ספציפית בעלת יעוד מוחשי, מרוככת גם על ידי "הכלל בדבר כוונה מועברת", המוצא את ביטויו בסעיף 20(א)(2) לחוק העונשין, התשל"ז-1977.

Gilmore 00715
SHATSKY-009400

112

 

בתי המשפט

בבית המשפט המחוזי בתל־אביב־יפו                                    תפ"ח 1158/02

סעיף זה קובע לגבי הכוונה הפלילית כי: "אין נפקה מינה אם נעשה מעשה באדם אחד או
בנפש אחר, מזה שלגביו אמור היה המעשה להיעשות" (וראה: י. קדמי, על הדין בפלילים
– עדכון והשלמה, מהד' 1966, חלק ראשון, בעמ' 38). על יסוד כלל זה נפסק עוד לפני
שחוקק סעיף 20(א)(2) לחוק בשנת תשנ"ד, כי: "המתכוון לרצוח את זה והרג את זה, דינו
דין רוצח" (ע"פ 406/72 שניר נ' מדינת ישראל, פד"י כח(1) 234, בעמ' 242-243; ע"פ
388/76 אברהים נ' מדינת ישראל, פד"י לא(1) 601, בעמ' 607; ע"פ 6059/92 שיבאם נ'
מדינת ישראל, תק־על 93(4) 255; ע"פ 887/96 בטון נ' מדינת ישראל, תק־על 97(1) 848).
כפי שאמר כב' השופט ח. כהן בענין שניר הנ"ל: "אין רואים כוונה פלילית כאילו מכוונת
היא לאדם מסוים דווקא". זהו אף הכלל במשפט האנגלי, כפי שציין כב' השופט ח. כהן.

ג.      עבירת השידול והאבחנה בין מבצע בצוותא למשדל

158.    סעיף 34ד. לחוק העונשין, תשל"ז-1977 קובע:

"מלבד אם נאמר בחיקוק או משתמע ממנו אחרת, כל דין החל על הביצוע העיקרי
של העבירה המושלמת חל גם על ניסיון, שידול, ניסיון לשידול או סיוע, לאותה
עבירה".

מכאן נובע כי חבותו של המשדל היא כחבותו של המבצע העיקרי, שכן המשדל נחשב
כשותף ראשי של המבצע בצוותא – שלא כמו המסייע הנחשב כשותף משני – בשל תרומתו
המהותית להתרחשות העבירה, המתבטאת בכך שהוא מביא אדם אחר לידי ביצוע עבירה
(ראה: דברי כב' הנשיא א. ברק בע"פ 2796/95 הנ"ל בענין פלוניס, בעמ' 404, אשר מתייחס
אל המשדל, חרף הדברים הללו, כאל "שותף עקיף", ודברי כב' השופטת ד. ביניש בע"פ
8464/99 אביגדור אסקין נ. מדינת ישראל, פ"ד נה(2) 65, בעמ' 82-83, למול דברי כב'
השופט מ. חשין בענין פלונים הנ"ל, בעמ' 416, המסתייג מן הביטוי "שותף עקיף", שכן
לדעתו תרומתו של משדל הינה תרומה ישירה, ממש כתרומתו של המבצע העיקרי).

Gilmore 00716

SHATSKY-009401

113




בתי המשפט



ההוראה הכלולה בסעיף 34ד. לחוק העונשין, נגזרת מן וההתייחסות אל המשדל כאל שותף
ראשי לביצוע העבירה: לכן נקבע בהוראה זו, דבר שהודגש אף בפסיקה, כי עונשו של
המשדל זהה לעונשו של המבצע העיקרי (ראה: ע"פ 2796/95 הנ"ל בעניין פלוניט, בעמ' 401-
402, 415; ע"פ 8469/99 הנ"ל בעניין אסקין, בעמ' 82; דנ"פ 1294/96 הנ"ל בעניין משולם,
בעמ' 42-43).

159.    בע"פ 2796/95 הנ"ל בעניין פלוניט, הבחיר כב' הנשיא א. ברק (בעמ' 404) את
אחריותו של המשדל לביצוע העבירה ומהוותה, לאמור:

"תרומתו של המשדל מתבטאת בכך שהוא הביא את המבצע לידי קבלת ההחלטה
לבצע את העבירה (ו'אה פלר, בספרו הנ"ל (8), בעמ' 228). הוא זה שהשפיע על
המבצע – אם המבצע העצמי (או העיקרי) ואם המבצע בצוותא – והביא לידי כך
שהתגבשה בו ההחלטה לבצע העבירה, ונעשו צעדים להגשמתה (בגדרי ניסיון או
ביצוע מושלם). הוא 'האב הרוחני' של העבירה' (מ. גור אריה ''הצעת חוק העונשין
(חלק מקדמי וחלק כללי), התשנ"ב-1992'' (13), בעמ' 46). אכן, ההברה מבקשות
להגן על עצמה לא ריק כלפי מי שמבצע עבירה -- אם כמבצע עצמו ואם כמבצע
בצוותא – אלא גם כלפי חוג רחב יותר של אנשים המביאים לידי כך שאחרים
מבצעים עבירות...

'קירבתו' של המשדל מתבטאת בכך שהוא זה שנטע בלב העבריין ועיקרי את
המחשבה הפלילית לביצוע עבירה. הוא 'המבצע האינטלקטואלי' -
'auteur intellectuel' של העבירה' (ראה פלר, בספרו הנ"ל (8), בעמ' 225-226).
הוא זה שהביא לידי כך שאצל המבצע נתגבש הרעיון לבצע את העבירה -- אם בכך
שהוא נטע בו את הרעיון מראש, ואם על ידי כך שהטה אותו הכף במקום בו המבצע
היסס''.

Gilmore 00717

SHATSKY-009402

114



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו                                    ופ"ח 1158/02

כב' השופט מ. חשין פסק בענין **פלוני**ם הנ"ל בעמ' 415, כי פעילותו של המשדל מתבטאת
בעיקרה בכך שבשיחו עם אחר הוא גורם לו לבצע עבירה, אשר לולא המשדל אפשר שלא
היתה מתבצעת כלל.

דברים אלו מובילים לשאלת קשר הסיבתי הנדרש בין השידול לבין ביצוע העבירה בידי
המשודל. כב' הנשיא ברק פסק, בקטע המצוטט לעיל, כי המשדל הוא זה שהשפיע על
המבצע להחליט לבצע את העבירה, בין אם נטע בראשו את הרעיון, ובין אם הטה את הכף
במקום בו המבצע היסס (עמ' 404).

בע"פ 8469/99 הנ"ל בענין **אסקין**, פסקה כב' השופטת ד. ביניש (בעמ' 78-79), לגבי מהות
השידול ודרישת הקשר הסיבתי, כי: "העיקר הוא כי התנהגות המשדל תהא בעלת
'אפקטיביות פוטנציאלית' העשויה להשפיע על המשודל לבצע את העבירה נשוא
השידול, כך שמתקיים קשר סיבתי בין ההתנהגות המשדלת לתחילת ביצוע העבירה".
ואולם – הוסיפה כב' השופטת ביניש (בעמ' 79):

"במסגרת יסודות השידול, אין זה הכרחי, ואף אין זה מספיק, כי היוזמה או
הרעיון לביצוע העבירה יתיו של 'המשדל'. הרכיב הנסיבתי בעבירות השידול --
קיומו של אחר ('משודל') הטעון הנעה מנטלית לצורך קבלת ההחלטה לבצע את
העבירה – עשוי להתקיים גם במצבים שבהם הרעיון העברייני עלה לראשונה
במחשבתו של 'המשודל', אך טרם גובשה אצלו ההחלטה לבצעו. במקרה כאמור,
אם ההתנהגות המשדלת הביאה להחלטתו הסופית של 'המשודל' לבצע את
העבירה, הרי נתקיים היסוד העובדתי הנדרש בעבירות השידול".

160.    לענין היסוד הנפשי של עבירת השידול פסקה כב' השופטת ד. ביניש בע"פ 8469/99
הנ"ל בענין **אסקין**, בעמ' 81:

Gilmore 00718

SHATSKY-009403

115



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו        1158/02 תפ"ח

"ככלל, לצורך התקיימותה היסוד הנפשי במסגרת פעולת השידול יש להוכיח התקיימותן של שתי דרישות: ראשית, על המשדל להיות מודע לכך שיש בהתנהגותו כדי להביא את האחר (ה'משודל') לידי ביצוע העבירה נושא השידול. דרישה זו עניינה מודעות לטיב ההתנהגות המשדלת וכן מודעות לקיומו של אחר הזקוק להנעה מנטלית על מנת לבצע את העבירה נושא השידול. שנית, על המשדל להתכוון להביא את המשודל לידי ביצוע העבירה יעד השידול. לשון אחר, השידול צריך להיות מלווה בשאיפה – מטרה – מצד המשדל כי העבירה נושא השידול אכן תבוצע, על כל יסודותיה, על ידי ה'משודל' (ראו פלר בספרו וגו'ל (כרך ב') (18), בעמ' 234)".

161.    בפסיקה הנוגעת לאחריותו של משדל – להבדיל מן הפסיקה הנוגעת לאחריותו של מסייע – לא צוין שהשידול צריך להתייחס לעבירה מסוימת בעלת יעוד מוחשי, אולי משום שהדבר ברור מאליו. אך דרישה זו מובנת ביסודות עבירת השידול, ומתבקשת מקל וחומר בעניינו של המשדל, שעונשו זהה לעונשו של המבצע העיקרי (לעומת ומסייע שעונשו הוא מחצית מעונשו של המבצע העיקרי). לצורך הוכחת עבירת השידול יש להראות קשר סיבתי בין השידול לבין ביצוע העבירה העיקרית בידי המשודל, ואף נטרד ושאיפה מצד המשדל שהעבירה אכן תבוצע. כל אלו מחייבים שהשידול יתייחס לעבירה בעלת יעוד מוחשי, כפי שנפסק אף לגבי עבירת הסיוע. וכך נאמר בספרו של ש"ז פלר, יסודות בדיני עונשין, תשמ"ז – 1987, כרך ב' בעמ' 226:

"ראוי להבהיר מרוגש כי מושג השידול, כצורת שותפות לדבר עבירה, הוא בעל משמעות שאינה ומימד הולמימ את המשמעות הרגילה של מובע לשון זה. המדובר במשמעות הנותנת ביטוי ליחס בין פרט לפרט, ושידול לגושודל, ולא גם ליחס בין פרט לבין קהל מקום שהפרט מסית, מדיח, מונסיט, קהל מסויים או קהל בלתי מוגדר, ללא הבדל הזהות הפרטית של תמנמיס של אותו קהל, לבצע עבירה פלילית.

Gilmore 00719

SHATSKY-009404

116



בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו     ת.פ"ח 1158/02

פעולות כאלה עשויות להצמיח עבירות ספציפיות, ואפילו משתמשים בו בהגדרה
"שידול" לשם הגדרתן, אין זה אותו "שידול", כצורה של שותפות לדבר עבירה, בו
נדון בהמשך".

עם זאת, כפי שנפסק לגבי סיוע, אין צורך להוכיח שהמשדל היה מודע לכל פרט מפרטי
העבירה נשוא השידול, ודי בכך שהוא שידל את המבצע לעבור עבירה מאותו סוג של
העבירה שבוצעה לבסוף (ראה סעיף 156 לעיל). זאת ועוד, גם לעניין השידול, כמובן, חל
הכלל בדבר כוונה מועברת: אין נפקא מינה שהעבירה נשוא השידול נעשתה לבסוף לגבי
אדם אחר.

כללו של דבר: לא ניתן להרשיע אדם בעבירת שידול כללית לביצוע מעשי רצח, כאשר הוא
קורא לביצוע פיגועים כנגד ישראל; לכך קיימת העבירה של הסתה לאלימות או לטרור
(סעיף 144ד2 לחוק העונשין, התשל"ז-1977). כך גם לא ניתן להרשיע אדם בעבירה כללית
של סיוע למעשי רצח, כאשר הוא מספק כספים או אמצעי לחימה לשם ביצוע עבירות
שונות שאינן מסוימות. לכן קיימת העבירה של מתן אמצעים לביצוע פשע לפי סעיף 498
לחוק העונשין, התשל"ז-1977, שחוקקה במיוחד על מנת להתמודד עם מצבים בהם לא
ניתן להוכיח ידיעה ודאית של מוסר האמצעים על כוונת מקבלם לבצע עבירה מסוימת,
באופן שלא ניתן לראות בו מסייע (ראה דברי ההסבר להצעת חוק לתיקון פקודת החוק
הפלילי (מס' 36), תשל"ג-1972, ה"ח תשל"ג 1021, בעמ' 20).

162.    אשר לקו המבחין בין משדל לבין מבצע בצוותא, פסק כב' הנשיא א. ברק בע"פ
2796/95 הנ"ל בעניין **פלוניס** בעמ' 406, כי: "**תרומתו של המשדל היא בכך שהוא גרם
ליצירת היסוד הנפשי של המבצעים**", וכי: "**כבל שהשידול של המשדל אינטנסיבי יותר
וכבל שמתלווות אליו לא רק פעולות במישור הנפשי אלא גם פעולות במישור העובדתי, כך
מתקרב המשדל למבצע בצוותא**". בעניין **פלוניס** הנ"ל הורשע הקטין ט. בעבירות רצח,
כמבצע בצוותא ולא רק כמשדל, בשל זריקת רימון לעבר ערבים, אף שהוא טרב להצטרף
לפעולה עצמה, משום שנפסק כי הוא השתתף בתכנון העבירה, והיה "ראש וראשון לכולם"
(עמי 408-409).

Gilmore 00720

SHATSKY-009405

117



בתי המשפט



בית המשפט המחוזי בתל-אביב-יפו      תפ"ח 1158/02

בנוגע לאבחנה בין מסייע לבין משדל, אמר כב' הנשיא ברק (בעמ' 406), כי כאשר הסיוע
הוא "רוחני" – עשוי המסייע להפוך למשדל: "קו הגבול עובר באבחנה בין עוזר למי שכבר
גיבש לעצמו מחשבה פלילית (המסייע) לבין תרומה לגיבוש עצם המחשבה הפלילית
(המשדל)".

בדנ"פ 1294/96 הנ"ל בענין משולם, פסק כב' השופט י. קדמי (בעמ' 63) :

"כאמור, אחריותו של ה'מבצע בצוותא' נעוצה – כאמור בסיפא ף 29 לחוק העונשין –
ב'השתתפות' – בביצוע של עבירה תוך 'עשיית מעשים' לביצוע... ובהיעדרו של
'מעשה השתתפות' – כאמור – אין בסיס לאחריות בתור שכזה... לעומת זאת,
אחריותו של 'משדל' לביצוע של עבירה על-ידי אחר נעוצה בעשיית 'מעשה-של-
שידול', מן המעשים המפורטים בסעיף 30 לחוק העונשין. מעשה כזה אינו מהווה
'מעשה-של-השתתפות' בביצוע, אלא מותיר את העושה 'מחוץ' למטגוריית
הביצוע".

בעמ' 66 אמר כב' השופט י. קדמי :

"עיונית, המבחין בין המשדל לבין המבצע בצוותא נעוץ בכך שתרומתו של המשדל
לביצועה של העבירה היא ביצירת ה'יסוד הנפשי' הדרוש לביצוע העבירה אצל
המשודל, שהוא המבצע העיקרי; בעוד שתרומתו של המבצע בצוותא היא,
בעיקרה, במישור ההתנהגותי של הביצוע, שהרי נדרשת ממנו 'השתתפות' תוך
עשיית מעשים לביצועה של העבירה (ראה בענין זה פלר בספרו הנ"ל (כרך ב)
[20], בעמ' 196, 228). ואילו מן ההיבט המעשי, קו הגבול בין המשדל למבצע
בצוותא מתוח בין נ"ו ש'משתתף' בביצוע – דהיינו נמצא על הגרעין הפנימי של
המבצעים – לבין מי ש'מעורב' בביצוע בלבד, דהיינו מצוי מחוץ למעגל הפנימי של
המבצעים".

Gilmore 00721

SHATSKY-009406

Case 1:18-cv-02192-RJD Document 294-36 Filed 11/22/20 Page 290 of 325 77
Case 1:02-cv-02280-RJD Document 294-36 Filed 11/22/20 Page 290 of 325

118





בתי המשפט



בבית המשפט המחוזי בתל-אביב-יפו תפ"ח 1158/02

---

ד. **אחריותו של מנהיג חבורה עבריינית כמבצע בצוותא או כמשדל**

163. לעניין קביעת אחריותו של נאשם כמבצע בצוותא או כמשדל, העניקו בתי המשפט משקל מכריע לעובדת היותו של הנאשם מנהיג החבורה העבריינית שביצעה את העבירה העיקרית. בע"פ 2796/95 הנ"ל בעניין **פלוניים** הורשע הקטין ט. כמבצע בצוותא, ולא רק כמשדל, בלא שהצטרף לביצוע עבירת הרצח עצמה, משום שהשתתף בתכנון והיה מנהיג החבורה, ובלשונו של כב' הנשיא א. ברק "ראש וראשון לכולם".

בע"פ 8469/99 הנ"ל בעניין **אסקין**, הורשע הנאשם כמשדל לביצוע עבירות של הצתה וכניסה ללא רשות למקום פולחן או קבורה, שבוצעו על ידי אדם שהיה כפוף לנאשם וסר למרותו; בית המשפט הדגיש את היותו של הנאשם "מנהיג ומוביל", וכן את העובדה שהנאשם היה זה ששנתן את "הסכמתו ואישורו" לביצוע העבירות, וקיבל דיווח לאחר השלמת הביצוע (עמ' 77-81, 84, 90-91). עם זאת, יש לציין כי הנאשם באותו מקרה נטל חלק בתכנון העבירה, וסייע בכסף לביצועה. בנסיבות אלה, העירה כב' השופטת ד. ביניש, אגב אורחא, כי ייתכן שהיה מקום להרשיעו כמבצע בצוותא, ולא רק כמשדל, באומרה (בעמ' 84):

"אף לו היינו אומרים כי עיקר 'תרומתו' של המערער לביצוע העבירה היה במתן 'אישורו' לתוכנית העבריינית ולמימושה, הרי שבנסיבות מיוחדות אפשר ש'הסכמה' לביצוע וגתווה השתתפות 'בביצוע עבירה תוך עשייה מעשים לביצועה', כאמור בסעיף 29 לחוק העונשין".

בדבריה אלו הפנתה כב' השופטת ביניש לדברי כב' השופט י. קדמי בע"פ 5589/98 **ביטאן סולטאן נ. מדינת ישראל**, ונק-על 98 (3)99, פסקה 9. באותו עניין הורשע המערער בעבירת רצח בכוונת תחילה, כאשר הוכח שנתן את הסכמתו ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא לפועל את הרצח, ואף הנחה אותו לגבי שיטת הביצוע.

Gilmore 00722

SHATSKY-009407

119



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו     תפ"ח 1158/02

השופט קדמי הדגיש שלולא הסכמתו של המערער לא והיה הרצח מתבצע, ולכן מתן
האישור לבצע את הרצח היה משול "לידיעת הזקנה הממשלחת ספורטאי למרוץ", והיא
עולה כדי "מעשה של השתתפות בביצוע העבירה". לכן הורשע המערער כמבצע בצוותא
ולא כמשדל, ובית המשפט הדגיש כי הוא היה מצוי "במעגל הפנימי של הביצועי", כמי
שהיה לו תפקיד בביצוע, והיה "המוח של החבורה", בעוד שמשדל מצוי מחוץ למעגל
הפנימי של הביצוע.

כב' השופט קדמי הוסיף ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק
לרצח" וההנחיות אופרטיביות בדבר דרך הביצוע, היה בהתנהגותו לפחות "מגע גדושה של
שידול על דרך העידוד". גם בע"פ 8469/99 הנ"ל בעניין אטשין, נפסק כי די היה בכך
שהמערער אישר את ביצוע ההצתה, בהיותו המנהיג והמוביל, כדי להגיע למסקנה שהיה
במתן אישור זה משום עידוד למבצע העיקרי להוציא את רעיון ההצתה מן הכוח אל הפועל
(בעמ' 93).

164. שאלת אחריותו של מנהיג קבוצת עבריינים, אשר איננו משתתף באופן פיזי בביצוע
העבירה בידי אלו חסרים למרותו, התעוררה במלוא חריפותה בדנ"פ 1294/96 הנ"ל בעניין
משולם. בית המשפט פסק בדעת רוב של ששה שופטים, כי רב-עבריינים אשר מנהיג
קבוצת עבריינים המבצעת עבירות בשליחותו ועל-פי תכנונו והנחיותיו, איננו רק משדל:
הוא נחשב כמבצע בצוותא בשל השליטה המלאה שיש לו על על ביצוע העבירה ועל מבצעיה.
כב' השופטת ד. דורנר סברה בדעת מיעוט כי יש לראות באדם שכזה משדל בלבד (עמ' 42-
47). דעה אחרת, לפיה יש לראות במנהיג ארגון פשע כ"מבצע באמצעות אחר" לפי סעיף 29
(ג) לחוק העונשין, מובעת במאמריהם של מ. קרמניצר "המבצע בדיני העונשין קווים
לדמותו", פלילים-אי (תשי"ק-1990) 65, בעמ' 72, ומ. גור-אריה, "יצדדינו לעבירה - תיקון 39
לחוק העונשין במבחן הפסיקה", מגמות בפלילים, עמ' 83. במאמרו של פרופ' קרמניצר
נאמר בעמ' 72:

Gilmore 00723

SHATSKY-009408

120



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו                                   תפ"ח 1158/02

"דומה כי לא צריך להכביר מילים על כך שהמושגים הרגילים של השתתפות
עקיפה (סיוע ושידול) אינם הולמים תופעות עברייניות, כגון פשעי מלחמה.
פשעים המתבצעים על ידי מדינה פושעת (פשעי הנאצים) או על ידי ארגון פשע
('המאפיה'). מי שנמצא בעמדת שליטה במערכות כזו (ולא רק ראש ההיירוכיה)
הנותן פקודה להמית אדם, אינני סתם משדל או מסייע לרצח כאשר פקודתו
מתבצעת. האופי המיוחד של מעשהו מתבטא בכך שבעת מתן הפקודה הוא יכול
לסמוך על כך שהוראתו תבוצע, מבלי שיהיה עליו להכיר את המנצע הפיזי. הוא
יודע שאם אחד האורגנים הבאים בחשבון לביצוע לא ימלא את המשימה, יבוא
אחר במקומו, והעיקר – המשימה תבוצע.

המבצע הישיר שולט אמנם על המעשה (הוא מבצע גמי-ידיו את המעשה, מתוך
היסוד הנפשי הנדרש, וללא כפייה), ואולם מבחינתו של נותן ההוראה הוא נתפס
לגמרי אחרת – כפיגורה אנונימית וניתנת להחלפה, כבורג או גלגל בתוך מנגנון
הפעולה של הארגון הנתון בידיו של נותן ההוראה. הפונגיביליות של המבצע
הישיר הופכת את השליט בארגון למבצע באמצעות אחר".

165. בדנ"פ 1294/96 הנ"ל בעניין משולם, פסק כב' השופט א. מצא כי: "יש לראות
במשתתף כזה – שבידו שליטה מלאה על הביצוע ושעשייתו כוללות לא רק פעולות שידול
והכנה, אלא גם הנחיית העבריינים הפועלים ופיקוח על פעילותם - מבצע בצוותא לכל
דבר" (עמי 27). הוא הדגיש כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם
מבצע בצוותא, ואמר (בעמי 30):

"במציאות המשפטית החדשה, התניית האחריות הישירה בנוכחות, פרושה
ש'סנדיקים' ומנהיגי קבוצות עברייניים, המשלחים לזירת הביצוע אנו 'דגי הרקק',
הסרים למרותם, בעוד הם מנהיגים את הפעילות הפלילית מרחוק, ירהזו לא
כמבצעים בצוותא אלא רק כמשדלים. ואפשרות זו, שבודאי איננה משקפת את
הדין הרצוי, איננה מתחייבת אף מן הדין המצוי".

Gilmore 00724
SHATSKY-009409



בתי המשפט

כב' השופט א. מצא הדגיש לענין השליטה של המנהיג באנשיו, את העובדה שהנאשם יכו־
היה להורות לאנשיו לחדול מביצוע העבירה (עמ' 32, וראה גם דברי כב' השופט קדמי בענ־
(63

כב' הנשיא ברק הצטרף לדעתו של כב' השופט א. מצא, אך הדגיש גם את העובדד
שהנאשם באותו מקרה היה נוכח בזירת ביצוע העבירה עד למעצרו, ובאותה עת הניע את
תוכנית העבירה (עמ' 50). כב' הנשיא ברק פסק (בעמ' 51):

"מעמדו של משולם אינו מאפשר לראות בו משדל בלבד. משולם והוא ראש
הקבוצה. הוא המנהיג. הוא תכנן את המבצע. זהו מבצע שלו. הוא אינגו בעל רעיון
עברייני; הוא אינגו רק 'אב רוחני' של העבירה. הוא אינגו אדם חיצוני המבקש כי
מישהו אחר יבצע עבירה. הוא בעל תרומה פנימית לביצוע העבריין... בידיו של
משולם, כראש הקבוצה, השליטה האפקטיבית על האירוע העבריין, ואצלו
המחשבה הפלילית הנדרשת לגיבוש אחריותו כמבצע בצוותא".

כב' השופט מ. חשין פסק (בעמ' 55) אף הוא כי: 'רב-עבריינים פלוני, היוזם, המתכנן,
קובע משימות והשולח את 'חייליו' לביצוע העבירה" – נחשב כמבצע בצוותא וגם שאינו
נוכח בזירת ביצוע העבירה. הוא הוסיף כי אדם שכזה, שהוא "יורה הרינה בכל מעשה
העבריינות" אינגו יכול להחשב כמשדל בלבד, שאחריותו תהיה פחותה מאחריותו של
המבצע בצוותא. וכך אמר כב' השופט חשין (בעמ' 59):

"ידע מכאן, כי בטווגגו את רב-העבריינים כמשדל – להגדילו ממבצע-בצוותא –
כמו הפחתנו באחריותו והקלנו עימו. 'חיילים' ששלח רב-העבריינים לביצוע
מעשה פשע, אלה ישאו באחריות מלאה לעבירה שונה ונוטפת שבצעו, ואילו
הוא – הרב-מוח והמנהיג העליון – ישא באחריות פחותה, אף כש'אדם' מן היישוב
יכול היה להיות מודע לאפשרות לאפשרות עשייתו' של אותה עבירה שונה ונוטפת. מסקנה
זו תמוהה ומוזרה ויקשה עלי לקבלה'".

Gilmore 00725

SHATSKY-009410

122



## בתי המשפט

ועוד אמר כב' השופט חשין (בעמ' 59):

"הנקבל כי הרב-מוח יהא זוטר ל'חייליו' עושי-דברו! אכן, אם הרב-מוח אכן רב-
מוח הוא – שבלעדיו לא יוכל תמנון-השותפות-לעבירה להגיע את זרועותיו –
יקשה עלינו לקבל כי אחריותו תהא פחותה מאחריות המבצע בצוותא. רוחו הרעה
של המנהיג שורה על כל המבצע העבריינ, מוחו מילא את הקפיץ מפעיל-
העבירה קודם תחילתה, ולעת עשייתה של העבירה הוא 'נמצא' עם העבריינים
כמבצע – בצוותא עימהם. הוא ימשיך ויימצא' בינותם עד אם יעשה מעשה גלוי
לעין למניעת העבירה, לא פחות".

כב' השופט חשין נימק מסקנה זו גם באנלוגיה שהקיש מסעיף 29(ג) לחוק העונשין.
בראותו את המנהיג המשלח את 'חייליו' לביצוע העבירה כמעין 'מבצע באמצעות אחר'.
ובאומרו : "'חיילים' ישמעו להוראות מנהיגם עד שיבטלו את רצונם לחלוטין מפני רצונו"
(בעמ' 60). לגבי הנאשם באותו מקרה, הדגיש כב' השופט חשין כי : "אחריותו נגזרת מתוך
תכנון וביצוע 'המרד' קודם מעצרו – תכנון וביצוע של מנהיג – ואותה אחריות נמשכה
והלכה גם לאחר מעצרו וכל-עוד לא עשה מעשה גלוי לעין לעצור את הענגלה המתדרדרת
במדרון" (עמ' 61).

כב' השופט י. קדמי פסק ברוח דברים אלו (בעמ' 66-67), באומרו :

"במצב דברים זה, במקום שמעורבותו של מנהיג של חבורה, שהחליטה על
ביצועה של עבירה, באה לכלל ביטוי בתכנון, בהנחיה ובחלוקת תפקידים.
השאלה אם בפנינו 'מבצע בצוותא' או 'משדל', תוכרע על-פי אופייה של
ה'מעורבות': אם היתה זו 'מעורבות' שיש בה תרומה של 'השתתפות' בביצוע; או
שמא 'מעורבות' חיצונית של שידול בלבד.



Gilmore 00726

SHATSKY-009411

123



בתי המשפט

<div dir="rtl">

בבית המשפט המחוזי בתל-אביב-יפו     תפ"ח 1158/02

יישומה של ההבחנה האמורה אינו תמיד קל, אך תמיד אפשרי. מכל מקום,
כאשר מדובר במנהיג – או בראש חבורה – המציג לנוהים אחריו ולעושי דברו
תכנית קונקרטית לביצועה של עבירה, כאשר זו כוללת חלוקת תפקידים ומתן
הנחיות בדבר אורח הביצוע, לא יכול להיות ספק כי לא ב'משדל' המדובר. אלא
במנהיג ש'השתתפותו' בביצוע באה לכלל ביטוי ב'מעשה התכנון' האמור. 'מעשה
של תכנון' – להבדיל מ'מעשה-של-שידול' – מהווה מעשה של 'השתתפות
בביצוע, משום שבפועל יש בו משום שלב ראשון של הוצאה לפועל של התכנית
העבריינית, קרי: של הביצוע. זאת, להבדיל מן ה'שידול', שאינו חלק מן הביצוע,
אלא גורם חיצוני המניע את המבצע.

כפי שהוסבר לעיל, ניתן להסתייע בעניין זה, בבחינת קיומה של 'זיקת שליטה'.
קיומה של 'זיקת שליטה' תאשר, כי ראש החבורה הינו 'מבצע בצוותא' על כל
הנובע מכך; כאשר במקום שבו אין מתקיימת 'זיקת שליטה' כמוסבר לעיל,
תהיה אינדיקציה לאפשרות שהמדובר במעורבות המקימה אחריות של 'משדל'
בלבד".

166.   על גישתו דלעיל, חזר כב' השופט י. קדמי בע"פ 4720/98, 5310/98, 5454/98 <u>נחמן
כהן ואח' נגד מדינת ישראל</u>, דינים עליון, כרך נ"ז 366. במקרה זה הורשע נחמן כמבצע
בצוותא, לאחר שהוכח כי היה היוזם, המזמין והמוביל של מזימת הרצח, ומי שאישר את
זהות המתנקש המיועד שהוצג בפניו. כב' השופט י. קדמי אמר (בפסקה 9):

"לשיטתי, אותה הצגתי לא פעם בעבר, 'מנהיגה' של חבורה, היוזם ומוביל
ביצוע של עבירה ע"י חבורתו, נמנה בין 'מבצעיה'. המנהיג, 'משתתף' בביצוע
העבירה במשמעות שיש לדרישה זו בסעיף 29 לחוק העונשין. גורלו קשור בגורלם
של המבצעים בפועל; והוא נושא באחריות לביצוע כולו היה 'לצידם' של
המבצעים בשעת הביצוע. זה דינו של 'המנהיג' וזה דינם של ה'מתכננים' וממלאי
'תפקידים חיוניים' אחרים, שתרומתם לביצוע 'מסתיימת' אמנם פורמלית לפני
תחילתו, אך היא נותרת חלק בלתי נפרד ממנו. גורלם של אלה – המנהיג, המתכנן
ודומיהם – קשור בגורלם של המבצעים בפועל: הם מהווים גוף אחד, שכל איבריו
נושאים באחריות למעשים שעושות ידיו".

</div>

Gilmore 00727

SHATSKY-009412

124



## בתי המשפט

לשיטתי, מנהיג של 'חבורה' שחברה לביצועה של עבירה, אינו 'משדל' של חבריו לחבורה, אלא מי שעומד בראשם ו'מוביל' אותם להגשמת מזימתם המשותפת. המשדל מצוי מחוץ למעגל הפנימי של ה'ביצוע'; ומעשה השידול הינו שידול 'נטו', לאמור: מעשה עצמאי ונפרד מן המאמץ הכולל של הביצוע. מי ש'משתתף' בביצוע – ולשיטתי, כמתחייב מן האמור לעיל, יש ליתן למונג 'השתתפות' בהקשר זה משמעות רחבה – אינו יכול להיות 'משדל'. בין ה'משדל' לבין ביצוע העבירה 'חוצץ' המבצע שסימנו 'מילוי תפקיד' בביצוע; ובמקום ש'שידול' מלווה ב'מילוי תפקיד' כאמור – לא 'משדל' ניצב בפנינו, אלא 'מבצע בצוותא'".



Gilmore 00728

SHATSKY-009413

125



בתי המשפט

3.   **מסקנות בעניין אחריותו של הנאשם כמבצע בצוותא, משדל ומסייע**

167.   ניתוח חומר הראיות כמפורט לעיל, מביא למסקנות העובדתיות הבאות לגבי חלקו
ותפקידו של הנאשם בפיגועים נשוא כתב האישום:

א.   הנאשם היה מפקד הפת"ח והתנזים בגדה המערבית. הוא היה מנהיג השטח של
הפת"ח בגדה, ואחראי על ה"פעילות הצבאית" של הפת"ח בכל שטחי הגדה.
הביטוי בו השתמש הנאשם, קרי: "הפעילות הצבאית", איננו אלא שפה נקיה
לפיגועי הטרור כנגד ישראל, שבוצעו על ידי חוליות השטח של הפת"ח, שהתארגנו
בתנועת התנזים ובמסגרת גדודי חללי אלאקצא. הנאשם הקים את גדודי חללי
אלאקצא, והיה אחראי על פעילותם, בהיותו מנהיגם ומפקדם של אנשי חוליות
השטח ומפקדיהם. בפעילותו זו היה הנאשם כפוף באופן ישיר ליו"ר הרשות
הפלסטינאית יאסר ערפאת. פעילותו "הצבאית" של הנאשם כמתואר לעיל, נעשתה
במקביל לפעילותו הפוליטית כמזכ"ל הפת"ח בגדה, והיותו חבר הפרלמנט
הפלסטינאי.

ב.   הנאשם החזיק בדעה כי תנועת הפת"ח חייבת להוביל את "המאבק המזוין כנגד
ישראל", ולכן תמך בגלוי בביצוע פיגועים כנגד חיילים ומתנחלים. זו היתה עמדתו
המוצהרת של הנאשם, אשר הבהיר כי מבחינתו גם נשים וילדים המתגוררים
בהתנחלויות נחשבים כאויב שיש לפגוע בו. הנאשם התנגד באופן עקרוני לפיגועים
בתוך ישראל, קרי: מעבר לקו הירוק, וכן היה נגד פיגועי התאבדות. ואולם בפועל,
הוא לא חדל מלתמוך באנשיו, ולסייע להם באספקת כספים ואמצעי לחימה, גם
כאשר נוכח שוב ושוב שהם מבצעים פיגועים, כולל פיגועי התאבדות, בתוך ישראל.
בכך הביע הנאשם את הסכמתו לכל סוגי הפיגועים שביצעו אנשי השטח של
הפת"ח. עמדתו של הנאשם כמתואר לעיל, באה לידי ביטוי גם בהופעותיו באמצעי
התקשורת, בהן עודד את פעילי הפת"ח לבצע פיגועים כנגד ישראל, ואף שיבח את
מבצעי הפיגועים – כולל אלו שבוצעו בתוך ישראל.

Gilmore 00729

SHATSKY-009414



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו

ג. לנאשם לא היתה שליטה מוחלטת באנשי החוליות ומפקדיהם. אך היתה לו מידה
רבה של השפעה עליהם, מכוח היותו מנהיגם, ובשל הסיוע שהגיש להם, אשר
התבטא באספקת כספים ואמצעי לחימה. השפעתו של הנאשם על אנשי החוליות
ומפקדיהם באה לידי ביטוי בכך שמידי פעם היה מורה להם להפסיק את הפיגועים
כנגד ישראל, ולאחר מכן היה קורא לחידוש הפיגועים — בין היתר על פי הנחיות
שקיבל מערפאת. יאסר ערפאת לא היה נותן את הנחיותיו בצורה מפורשת, אך דאג
שהכפופים לו יבינו היטב מתי הוא מעוניין בהפסקת אש, ומתי הוא מעוניין
בפיגועים כנגד ישראל. גם ערפאת עצמו ראה בנאשם כמי ששולט באנשי השטח,
ולכן היה נוזף בו כאשר בוצע פיגוע שלא על דעתו של היו"ר.

ד. לאנשי חוליות השטח ולמפקדיהם היתה מידה רבה של עצמאות בביצוע הפיגועים.
הם לא נהגו בדרך כלל לערב את הנאשם בתכנון הפיגועים, ואין גם ראיות כי נהגו
לדווח לו לפני ביצוע הפיגועים (למעט מקרים בודדים). עם זאת, הנאשם היה
מקבל מהמפקדים דיווח לאחר כל פיגוע. מתכונת פעילות זו נבעה מרצונו של
הנאשם, כמו גם רצונם של מפקדי החוליות, להגן על הנאשם מפני ישראל, ולשמר
אותו כ"דמות פוליטית", שאיננה מעורבת, כביכול, בפיגועי הרצח כנגד ישראל.
מטעם זה לא היה לנאשם קשר ישיר עם מבצעי הפיגועים, למעט מקרים חריגים.
כך גם נזהר הנאשם שלא ליטול בעצמו אחריות בשם הפת"ח או גדודי חללי
אלאקצא לאחר ביצוע הפיגועים, דבר שנעשה על ידי מפקדי החוליות. הנאשם
הסתפק בנטילת אחריות באמצעי התקשורת בצורה עקיפה וכוללנית, מבלי
להתייחס לפיגוע ספציפי, וזאת על ידי הבעת תמיכה בפיגועים שבוצעו.

ח. לבד מאחריותו הכוללת והעליונה של הנאשם על כל אנשי התנזים וגדודי חללי
אלאקצא, בהיותו מפקדם, הוא שלט בצורה טובה יותר בכמה מן החוליות
שהתנהלו תחת פיקודם של אנשים שהיו עוזריו הקרובים, ונהנו מסיוע ותמיכה
מיוחדת שלו, כמו אחמד ברגותי, עיש, אבו חמיד ואבו סטאחה.

Gilmore 00730

SHATSKY-009415



בתי המשפט

הנאשם נטל אחריות בחקירתו לפעילותן של החוליות שפעלו בפיקודם של אנשים אלה (למעט עויס), אם כי טען שהוא היה רק אחת מן "הכתובבות" אליהן פנו אנשים אלה לשם קבלת סיוע ומימון, וכי לא היתה לו שליטה מלאה בהם, אלא רק השפעה עליהם.

ו.    לנאשם לא היה בדרך כלל קשר ישיר עם אנשי השטח שביצעו את הפיגועים: הקשר היה באמצעות המקורבים לנאשם, שפעלו בסביבתו, ובהם: אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. אנשים אלו, שפעלו בסביבתו של הנאשם ובתמיכתו, תכננו והוציאו לפועל פיגועי רצח, כשהם משתמשים בכספים ובאמצעי הלחימה שהנאשם דאג לספק להם לצורך כך.

ז.    הנאשם היה אחראי על אספקת כספים ואמצעי לחימה לחוליות השטח, באמצעות המקורבים אליו, כגון אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. הוא היה מפנה את הבקשות לאישורו של ערפאת, והיה אחראי על רכישות הנשק ואספקתו לאנשי החוליות באמצעות מקורביו. הנאשם גם הגיש סיוע למבוקשים ולמשפחות המפגעים.

ח.    למרות שהנאשם, כמו גם אנשיו, נזהרו בדרך כלל שלא לערב אותו באופן אישי בתכנון והוצאה לפועל של פיגועים, הרי שהובאו ראיות חד-משמעיות לגבי ארבעה פיגועים שבוצעו בידיעתו, באישורו ובעידודו של הנאשם, ושניים מהם אף ביוזמתו.

הפיגוע בתחנת הדלק בגבעת זאב, בו נרצחה יואלה חן ז"ל, בוצע על פי הוראתו הישירה של הנאשם לאנשיו, כנקמה על חיסולו של ראיד כרמי, והנאשם הודה בחקירתו באחריות לפיגוע זה.

כך גם בוצע הפיגוע בו נרצח הנזיר היווני ציפוקטיקיס גרמנוס ז"ל במעלה אדומים, בעקבות פניה של המפגע רדאידה אל הנאשם לשם ביצוע פיגוע התאבדות.

Gilmore 00731

SHATSKY-009416



בתי המשפט

הנאשם הפנה את רדאידה אל האדם שידריך אותו ויספק לו נשק, והנחה אותו
לבצע פיגוע ירי ולא פיגוע התאבדות. כתוצאה מכך יצא רדאידה לביצוע הפיגוע,
וירה בנזיר היווני למוות מתוך מחשבה שהוא יהודי.

בנוסף, נתן הנאשם את אישורו לביצוע הפיגוע במסעדת "סי פוד מרקט" בתל
אביב, וזאת בטרם יצא המפגע לדרכו. הנאשם אמנם הורה לאנשיו שהפיגוע יבוצע
בהתנחלות או במחסום צבאי, ולא בתוך ישראל, אך הוא אישר את הפיגוע עצמו.

כמו כן, אישר הנאשם לאנשיו לבצע פיגוע התאבדות באמצעות פיצוץ מכונית
תופת, אם כי הנחה את אנשיו שהפיגוע יבוצע בשטחים הכבושים ולא בתוך
ישראל. הפיגוע הסתיים במותם של שני המחבלים ליד קניון מלחה בירושלים,
אשר התפוצצו ברכב בדרכם לביצוע הפיגוע.

ט.    זולת ארבעת הפיגועים שפורטו בס"ק ח' לעיל, לא הובאו ראיות הקושרות את
הנאשם באופן אישי וישיר למעורבות בפיגועים נשוא כתב האישום. משיחתו של
הנאשם עם מקורבו אחמד ברגותי, שהוקלטה ללא ידיעתם, עולה חשש ממשי כי
הנאשם ידע הרבה יותר ממה שהוא ואנשיו חשפו בחקירותיהם, אך לא ניתן לקבוע
זאת במידת הוודאות הנדרשת במשפט פלילי על סמך הראיות הקיינמות.
כך או כך : ברור מן הראיות שהובאו, כי פיגועי רצח לא מעטים מאלו שפורטו
בכתב האישום תוכננו והוצאו לפועל על ידי מפקדי השטח שפעלו בקרבת הנאשם
ובתמיכתו, תוך שימוש בנשק שהנאשם סייע ברכישתו, ואשר נמסר למפגעים על
ידי מפקדי החוליות המקורבים אל הנאשם (אחמד ברגותי, עויס, אבו סטחה ואבו
חמיד). הנאשם קיבל מאנשיו דיווחים על פיגועים אלה לאחר ביצועם, ונתן את
הסכמתו - לפחות בשתיקה ובהתנהגות - להמשך ביצועם.

168.    ניתוח חומר הראיות כמפורט לעיל, מביא למסקנה הברורה שהנאשם תרם תרומה
ממשית לפיגועי הטרור שבוצעו על ידי חוליות הפתי"ח, התנזים וגדודי חללי אלאקצא, גם
כאשר לא נטל חלק בביצועם.

Gilmore 00732
SHATSKY-009417

129



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו

הסיוע במתן אמצעי לחימה וכספים לאותן חוליות, גיוס פעילי השטח, הטיפול בהדרכתם
והסיוע למשפחותיהם - כל אלה יצרו את התנאים שנדרשו לביצוע מעשי הרצח של חוליות
הטרור. הנאשם היה מודע, ללא ספק, לעובדה זו, וגם ידע שאנשי השטח הנתמכים על ידו
עומדים להמשיך ולבצע פיגועי רצח כנגד ישראל, והוא פעל מתוך מטרה ברורה לסייע להם
לפעול בדרך זו. אין מדובר רק בחשד סביר או ב"עצימת עיניים" מצד הנאשם, אלא בידיעה
ממשית שאנשי החוליות מבצעים, ועתידים להמשיך לבצע, פיגועי רצח כנגד ישראל, תוך
שימוש באמצעי הלחימה והכספים שהעמיד לרשותם למטרה ספציפית זו. יתר על כן:
הנאשם לא רק היה מודע למעשי הרצח שמבצעים אנשי החוליות, אלא שהוא העניק להם
סיוע, כמפורט לעיל, מתוך מטרה ושאיפה שהם יפעלו בדרך זו.

עם זאת, למעט ארבעה מקרים שיפורטו בהמשך, אין ראיות שהנאשם היה מעורב בתכנון
ובביצוע הפיגועים, או כי ידע מראש על הפיגועים העומדים להתבצע על ידי אנשי השטח
ומפקדי החוליות שנתמכו על ידו, ושהוא למעשה היה מפקדם. אמנם עלי עיאד'ה סיפר
בחקירתו כי הנאשם ידע ואישר מראש את כל פיגועי הירי של אנשי התנזים (ראה סעיף 40
לעיל). אך פרט לעדות בודדת זו, מפי אדם שלא היה מקורב לנאשם, אין ראייה אחרונה על
כך שהנאשם ידע מראש על כל פיגוע העומד להתבצע, והוא עצמו הכחיש טענה זו. גם
התביעה אינה טוענת כי הנאשם ידע מראש על כל הפיגועים (ראה עמ' 47 לסיכומיה).

169. וזאת ועוד: מחומר הראיות עולה כי לנאשם לא היתה שליטה מוחלטת במפקדי
החוליות ואנשי השטח. אמנם הוא נחשב למנהיגם ומפקדם, והיתה לו השפעה עליהם, אך
בכל זאת היתה להם מידה לא מבוטלת של שיקול דעת עצמאי בתכנון הפיגועים וביצועם,
ואין כל ראיה שהם היו מתייעצים עם הנאשם בעניין זה. ממכלול הראיות עולה כי גדודי
חללי אלאקצא אינם גוף המאורגן תחת הנהגה אחת, אלא מקבץ של חוליות שטח, שלכל
אחת מהן יש מפקד משלה. עובדה העולה מחומר הראיות, היא כי אנשיו של הנאשם ביצעו
פיגועי התאבדות, ופיגועים בתחומי הקו הירוק, בניגוד לעמדתו המוצהרת של הנאשם,
ולעיתים גם בניגוד לדעתו של היו"ר ערפאת. בנוסף, מחומר הראיות עולה שאנשי השטח
שהיו מעורבים בביצוע הפיגועים השתדלו להרחיק את הנאשם ולנתקו ממעורבות אישית
בפיגועים על מנת להגן עליו מפני ישראל, ולשמרו כ"דמות פוליטית".

Gilmore 00733

SHATSKY-009418

130



בתי המשפט

גם הנאשם עצמו ביקש להתרחק ככל האפשר מפעילות "צבאית", ומקשר ישיר עם החוליות שביצעו פיגועים, ואלו הופעלו למעשה על ידי מפקדי השטח, שחלקם היו מקורביו של הנאשם, ופעלו תחת שליטתו, בסיועו ובעידודו (כגון, אחמד ברגותי, אבו-חמיד אבו סטחה ועוד). עובדה זו מחזקת את המסקנה שהנאשם לא ידע מראש בדרך כלל על ביצוע הפיגועים, ולא היה מעורב באופן אישי בתכנונם או באישורם, שכן זו היתה מתכונת הפעילות שנבחרה על ידו ועל ידי אנשיו במתכוון.

אכן, הונביעה מסכימה בסיכומיה (עמ' 47), כי:

"במסגרת ההיערכות הארגונית של הארגונים הטרוריסטים, הוקנו למפקדים ולפעילי השטח סמכויות נרחבות ומרחב תמרון רב בביצוע פעולות הטרור, והם לא נדרשו לקבל אישור מהנאשם לכל פעילות טרור, שבוצעה בהתאם למדיניות שעיצבו הנאשם והנהגת הארגונים, כאמור לעיל.

לנאשם היתה מודעות לפעילותם של הכפופים לו והוא עודכן בעניין זה, בחלק מהמקרים מראש ולעיתים בדיעבד, וזאת בהתאם לתפיסתו על פיה התנהלה הפעילות של הארגונים הנ"ל".

170.   ההלכה, כאמור לעיל, היא שהסיוע צריך שיופנה במודע כלפי עבירה מסוימת בעלת יעוד מוחשי, ויש להוכיח כי המסייע היה מודע לכך שהמבצע העיקרי עומד לבצע, קרוב לוודאי, עבירה שכזו, קרי: עבירה בעלת יעוד מוחשי; אין די בידיעה של המסייע על נכונות ערטילאית של המבצע העיקרי לבצע עבירה. אמנם אין צורך להוכיח כי המסייע היה מודע לכל פרט מפרטי העבירה, כגון המיקום המדויק של העבירה (ע"פ 11131/02 הנ"ל בעניין **יוסופוב**), או זהותו של קורבן העבירה וזמן הביצוע (ע"פ 426/67 הנ"ל בעניין **בארי**); די בכך שהוא מודע לכך שהמבצע העיקרי עומד לבצע עבירה מסוימת מן הסוג שבוצע לבסוף, וחרף כך מסייע לביצועה.

Gilmore 00734

SHATSKY-009419

131



בתי המשפט

ואולם במקרה דנא – ככל שהדבר נוגע למרבית הפיגועים נשוא כתב האישום, ולמעט
ארבעה פיגועים בהם היה הנאשם מעורב אישית - אין כל ראיה שהנאשם ידע על הכוונה
לבצע, במובן של מודעות לכוונה לבצע עבירה מסוימת בעלת יעד מוחשי, כפי שנדרש
בפסיקה. היתה לנאשם ידיעה כללית שאנשי השטח המשתייכים לארגון שבהנהגתו
מבצעים מעת לעת פיגועי רצח כנגד ישראלים, תוך שימוש באמצעי לחימה וכספים שהוא
דאג לאספקתם. אך לא הובאו ראיות כלשהן הקושרות סיוע מצד הנאשם באופן ספציפי
לפיגוע זה או אחר (למעט רצח הנזיר היווני שידון בהמשך). אין כל ראיה כי הנאשם סיפק
אמצעי לחימה או כספים לצורך ביצוע פיגוע מסוים. אמנם בחלק מן המקרים הוכח
שהפיגוע בוצע באמצעות כלי נשק שנמסר למפגע על ידי אחד ממקורבי הנאשם, כמו עויס,
אבו חמיד או אחמד ברגותי.

אך על פי הראיות שהובאו, הסיוע שהגיש הנאשם למקורביו בעניין זה היה כללי, ולא
התייחס לפיגוע זה או אחר, או למפגע זה או אחר: הנאשם דאג באופן כללי לכך שאנשי
השטח יהיו מצוידים באמצעי לחימה ובכספים, וזאת באמצעות מקורביו ומפקדי השטח
שסרו למרותו, וביודעו שאמצעי הלחימה והכספים משמשים אותם למטרות פיגועים.
ואולם על פי ההלכות שבוארו לעיל, אין די בכל אלו על מנת להרשיע את הנאשם בסיוע
לכל אחת מעבירות הרצח שבוצעו על ידי אנשים שנעזרו בסיוע כללי זה, באמצעות
מקורביו של הנאשם, לצורך ביצוע פיגועים.

‏171.   אין זה המקרה בו אדם מסייע לאנשים הסרים למרותו, ביודעו כי הם עומדים
לבצע עבירה מסוימת ומוחשית, אלא שהוא רק אינו יודע היכן, מתי, באיזה אופן ועל ידי
מי מאנשיו תבוצע העבירה, ומי יהיה קורבנה. מדובר במקרה בו אין כל ראיה הקושרת את
הנאשם לביצועה של עבירה מסוימת, הן מבחינת היסוד העובדתי של העבירה, והן מבחינת
היסוד הנפשי שלה, שכן לא הוכח שהנאשם ידע כלל על התוכנית לבצעה. בנסיבות אלו,
וככל שהדבר נוגע למרבית הפיגועים נשוא כתב האישום, לא ניתן לייחס לנאשם עבירה
כוללנית וגורפת של סיוע לרצח בכוונת תחילה בגין כל פיגוע ופיגוע, רק בשל מודעותו
הכללית לכך שאנשיו מבצעים פיגועים תוך שימוש בנשק ובכספים שהוא דאג להשיג
עבורם

Gilmore 00735

SHATSKY-009420

132



**בתי המשפט**

אין זאת אומרת שהנאשם איננו נושא כלל באחריות פלילית למעשיו, שהביאו לפיגועים
שבוצעו תוך שימוש באמצעי הלחימה והכספים שדאג להעביר למפקדי השטח. לשם כך
קיימת העבירה הכללית של פעילות בארגון טרוריסטי, שדינה מאסר עד 20 שנה, וכן
העבירה הכללית (בה לא הואשם הנאשם), של מתן אמצעים לביצוע פשע לפי סעיף 498
לחוק העונשין התשל"ז-1977. עבירה זו נועדה למקרה של מסירת אמצעים לביצוע פשע
**כלשהו**, כאשר לא ניתן להוכיח ידיעה של המוסר על כוונה לבצע עבירה מסוימת (ראה:
ע"פ 507/79 **מדינת ישראל נ' אליהו אסרף**, פד"י לג(3) 620, בעמ' 622-623). זה המקרה
שבפנינו.

172.   המסקנות דלעיל הנוגעות לעבירת הסיוע, ישימות גם לגבי העבירה של שידול
למעשי רצח המיוחסת לנאשם. כשם שלא ניתן להרשיע אדם בישראל בעבירה כללית של
סיוע למעשי רצח, כך גם לא ניתן להרשיע בעבירה כללית של שידול למעשי רצח. כשם
שהסיוע חייב להתייחס לעבירה מסוימת בעלת יעוד מוחשי, כך גם חייב השידול להיות בין
פרט לפרט, ולהתייחס לשידול לבצע עבירה מסוימת בעלת יעוד מוחשי. מסקנה זו
מתבקשת לגבי שידול מקל וחומר, שהרי עונשו של המשדל, שלא כמו המסייע, זהה לעונשו
של העבריין העיקרי. כאשר נאשם איננו מודע כלל לכוונה לבצע עבירה מסוימת, לא ניתן
להוכיח את גורם הקשר הסיבתי, דהיינו: שהמבצע העיקרי שודל על ידו לבצע את העבירה.

במקרה דנא, וככל שהדבר נוגע למכלול הפיגועים נשוא כתב האישום (פרט לארבעה
פיגועים שידונו בהמשך), אין כל ראיה כי הנאשם השפיע על מפקדי השטח שבהנהגתו, או
על אנשי החוליות, לבצעם, שהרי אין הוכחה שהנאשם ידע כלל על הכוונה לבצע פיגועים
אלו. כן הן הראיות שהובאו נראה כי איש לא היה צריך לשדל אותם לכך: מפקדי השטח
ואנשי החוליות פעלו, בדרך כלל, על פי יוזמה ושיקול דעת עצמאיים, כשהם מקפידים שלא
לערב את הנאשם באופן אישי בתכנון או ביצוע הפיגועים. כמו כן, לא ניתן להרשיע את
הנאשם בעבירה גורפת של שידול למעשי הרצח נשוא כתב האישום בשל מה שניתן לכנות
"שידול המופנה אל הכלל", קרי: דברי ההסתה של הנאשם באמצעי התקשורת, בהם קרא
לאנשים שתחת הנהגתו, ולאחרים, לבצע פיגועים כנגד ישראל. לשם כך קיימות העבירות
הכלליות של הסתה לאלימות או לטרור, פעילות בארגון טרור, וכו' (ראה סעיף 163 לעיל).

Gilmore 00736

SHATSKY-009421

133



בתי המשפט

173. על פי העקרונות המשפטיים וההלכות שפורטו לעיל, גם לא ניתן לראות בנאשם
מבצע בצוותא של כל הפיגועים נשוא כתב האישום, יחד עם המפגעים והמתכננים
שהוציאו אותם אל הפועל, שכן אין כל ראיה לכך שהוא היה מודע לכוונה לבצעם (פרט
לארבעת הפיגועים בהם היה מעורב אישית, כפי שיפורטו בהמשך). חרף הפרשנות הרחבה
מאוד שניתנה בפסיקה למילים "המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה",
וההלכות הנוגעות לאחריותו של מנהיג חבורת פשע – לא ניתן לקבל את טענת התביעה,
לפיה יש לראות בנאשם מבצע בצוותא של כל הפיגועים נשוא כתב האישום. המינימום
הנדרש על פי הפסיקה שבוארה לעיל, לצורך הטלת אחריות של מבצע בצוותא על מנהיג
חבורה שאיננו נוכח בזירת העבירה, הוא השתתפות בתכנון העבירה או קשירת קשר
לביצועה; מתן הנחיות או אישור לביצוע העבירה; פיקוח על ביצוע העבירה; או העלאת
הרעיון לביצוע העבירה בצירוף סיוע או תכנון. כל אחד מאלו עשוי להיחשב על פי הפסיקה
כ"עשיית מעשים לביצוע העבירה", אשר מבססת אחריות של מבצע בצוותא. אך אין די
בכך שהמנהיג שולט באנשיו, ואלה סרים למרותו, כדי להטיל עליו אחריות של מבצע
בצוותא למכלול העבירות שביצעו אנשיו, כאשר אין כל ראיה הקושרת את המנהיג בדרך
כלשהי לתכנון או לביצוע, ואף אין כל ראיה כי ידע על הכוונה לבצען.

התביעה חייבת להוכיח שהנאשם קשור בדרך זו או אחרת לעבירה מסוימת – הן ביסוד
העובדתי של העבירה, והן ביסוד הנפשי שלה, וזאת לא הוכיחה פרט לארבעת הפיגועים
שיפורטו להלן.

התביעה משליכה את יהבה על ההלכה שנפסקה בדנ"פ 1294/96 הנ"ל בעניין משולם,
בעתירתה להרשיע את הנאשם כמבצע בצוותא בכל הפיגועים נשוא כתב האישום.
ואולם, משולם הורשע כמבצע בצוותא, יחד עם חברת החסידים שהקיפה אותו ושביצעה
עבירות שונות, לאחר שנקבע לגביו כי הוא נתן הנחיות לאנשיו, פיקח על פעילותם, היה
בעל שליטה עליהם ונמנע במתכוון מלחזור להם לחדול מביצוע העבירות (כב' השופט
מצא בעמ' 30, 32). כן נקבע כי היה נוכח בזירת ביצוע העבירות בסמוך לפני תחילתן,
ובאותה עת הגיע את תוכנית העבירה, והוא אף היה מי שתכנן את המבצע (כב' הנשיא א.
ברק בעמ' 50-51), ותכנן וביצע את ה"מרד" קודם למעצרו (כב' השופט חשין בעמ' 61).



Gilmore 00737
SHATSKY-009422

134



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

גם כב' השופט קדמי, התייחס בדבריו בעניין **משולם** למי שמעורבותו בביצוע באה לידי
ביטוי בתכנון, בהנחיה ובחלוקת תפקידים, וציין כי משולם נמנע מלהורות לאנשיו לחדול
מביצוע העבירות (עמ' 63, 66-67).

מאפיינים אלה של שליטה מלאה במבצעי העבירה, נוכחות לצד המבצעים בזירת
האירועים עד לתחילתם, מעורבות בתכנון העבירות, מתן הנחיות לביצוע ופיקוח על מעשי
המבצעים - אינם מתקיימים בענייננו, כאשר לא הוכח שהנאשם ידע מראש על הכוונה
לבצע את מרבית הפיגועים נשוא כתב האישום.

הנאשם לא היה מעורב אישית ביזום, תכנון או ביצוע של הפיגועים נשוא כתב האישום
(פרט לפיגועים בודדים שיפורטו בהמשך). הנאשם גם לא נתן הנחיות או אישור לביצוע
פיגועים אלה, והוא גם לא סייע או שידל באופן ספציפי לביצועם, כאמור לעיל. כך גם נושא
השליטה של הנאשם במבצעי הפיגועים ומתכנניהם איננו נקי מספקות, כפי שפורט לעיל.
על אף היותו של הנאשם נושא בתואר הלא-רשמי של מפקד התנזים וגדודי חללי אלאקצא.
אין כל ראיה שהנאשם היה חלק מן ההחלטה המשותפת לביצוע הפיגועים נשוא כתב
האישום, או כי פעל יחד עם האחרים למען הגשמת פיגועים אלה, או כי נטל חלק בביצועם
או בתכנונם. בהעדר כל אלה, ועל פי הכללים שנקבעו בפסיקה לאור הוראות חוק העונשין,
לא ניתן לראות בנאשם מבצע בצוותא של הפיגועים נשוא כתב האישום, שלגביהם לא
היתה לו כל מעורבות וידיעה אישית, רק מכוח היותו המנהיג הלא מוכתר של התנזים
וגדודי חללי אלאקצא, או בשל קרבתו למתכנני הפיגועים והסיוע הכללי שהגיש להם.

174.    לסיכום כל האמור לעיל, המצב החוקי השורר במדינת ישראל אינו מאפשר
להרשיע מנהיג של חבורה עבריינית או ארגון טרור כמבצע בצוותא של עבירות שנעשו על
ידי חברי אותה חבורה או אותו ארגון, ואף לא בסיוע או בשידול לביצוען, כאשר הוא עצמו
איננו מעורב אישית ובצורה פרטנית בשום אופן בעבירות עצמן, לא לפני ולא בעת ביצוען.
כזה הוא המצב, הגם שברור כי אותו מנהיג נותן את ברכתו לביצוע העבירות, ומעניק
לאנשיו סיוע כללי שלא לצורך ביצוע עבירה זו או אחרת.

Gilmore 00738
SHATSKY-009423

135



# בתי המשפט

## בבית המשפט המחוזי בתל-אביב-יפו

הנאשם, במקרה דנא, עודד והמריץ את מפקדי החוליות ואנשי השטח לבצע פיגועים, ודאג
שיהיו בידיהם כספים ואמצעי לחימה לצורך ביצוע הפיגועים. הוא היה מנהיגם של
המפקדים ואנשי השטח, והיתה לו מידה לא מבוטלת של השפעה עליהם.

רבים מן הפיגועים נשוא כתב האישום הוצאו לפועל ותוכננו בידי מפקדי השטח שהיו
מקורבים אל הנאשם, ונתמכו על ידו. חרף כל אלה, לא ניתן לייחס לנאשם על פי הדין
הישראלי אחריות פלילית של מבצע בצוותא, מסייע או משדל - ככל שהדבר נוגע לפיגועים
שאין כל ראיה הקושרת את הנאשם אליהם, וכאשר לא הוכח כי ידע על הכוונה לבצעם.

אכן, קיים פער בין אחריותו הכללית והקולקטיבית של הנאשם לביצוע הפיגועים נשוא
כתב האישום, שלא לדבר על האחריות המוסרית לביצועם, לבין האפשרות המשפטית
לייחס לו אחריות פלילית לביצועם של פיגועים ספציפיים שלא הוכח כי ידע על התוכנית
לבצעם. לא מוכר לנו תקדים להרשעת אדם בעבירת רצח, או בשידול או סיוע לרצח, כאשר
אין כל ראיה הקושרת אותו למעשה זה באופן ספציפי. הנאשם נושא אמנם באחריות
הכבדה והנוראית לפיגועים נשוא כתב האישום, בהם קפדו את חייהם אנשים רבים,
בהיותו מנהיג ומפקד חוליות הטרור שביצעו את הפיגועים. אך זוהי אחריות פיקודית
"מעין מיניסטריאלית", ולא אחריות שניתן לבסס מבחינת דיני העונשין. אל לנו למתוח
את הוראות חוק העונשין אל מעבר לגבולותיו הטבעיים, הגם שבמקרה זה ניצבת בפנינו
בעיה שקשה לפתרה באמצעות הוראות החוק הקיימות.

תוצאה משפטית זו רחוקה מלהשביע רצון, ואף מקוממת. לכך כוונו דבריו של פרופ' מ.
קרמניצר שצוטטו לעיל, כי המושגים המקובלים של סיוע ושידול אינם הולמים תופעות
עברייניות של ארגוני פשע וטרור, ולכן גם הועלתה הצעתה של פרופ' מ. גור-אריה לתקן את
החוק באופן שניתן יהיה לראות במנהיג שכזה "מבצע באמצעות אחר" (ראה סעיף 164
לעיל). בדנ"פ 1294/96 הנ"ל בעניין **משולם**, דחה בית המשפט את האפשרות לראות במנהיג
חבורת עבריינים "מבצע באמצעות אחר" לפי סעיף 29(ג) לחוק העונשין, אף שהשופט מ.
חשין גזר מהוראת חוק זו אנלוגיה לעניין אחריותו של מבצע בצוותא לעונשו אחריותו של
משדל (עמ' 59-60).


Gilmore 00739
SHATSKY-009424



בתי המשפט

בבית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

175.    לאחרונה נעשה ניסיון של המחוקק להתמודד, ולו בצורה חלקית, עם בעיה משפטית זו. הכנסת חוקקה חוק מאבק בארגוני פשיעה, התשס"ג-2003, המאפשר להטיל על העומד בראש ארגון פשיעה עונש של עד 20 שנות מאסר, כאשר הארגון מבצע עבירות מסוג פשע שעונשו עולה על 20 שנות מאסר. חוק זה איננו חל על העבירות נשוא כתב האישום, שבוצעו קודם לחקיקתו. אך הוא משתרע גם על ארגוני טרור ומנהיגיהם (ראה התוספת הראשונה המחילה את החוק על עבירות לפי סעיף 4 לפקודת מניעת טרור, ודברי ההסבר להצעת החוק: ה"ח תשס"ב 3155, בעמ' 762). מדברי ההסבר להצעת החוק ניתן להבין כי המחוקק היה ער לבעיה המשפטית הנובעת מהעדר היכולת להרשיע את העומדים בראש ארגוני פשע בביצוע עבירות הנעשות על ידי הכפופים להם, בשל ריחוקם מן העבירות. וכך נאמר בדברי ההסבר (עמ' 762):

"הצעת חוק מאבק בארגוני פשיעה, התשס"ב-2002, באה להתמודד במישור החקיקתי עם התופעות של פשיעה מאורגנת ועם המבנה של ארגוני פשיעה, הגורם לעתים קרובות קושי בהוכחת הקשר בין ראשיהם ומובליהם של ארגונים נסוג זה לבין ביצוען של עבירות שנעברו על ידי אחרים; זאת לאור המבנה ההיררכי של אחדים מארגונים אלו, היוצר מרחק בין מקבלי ההחלטות ומתווי המדיניות לבין מבצעי העבירות".

כך גם נאמר בדברי ההסבר להצעת החוק (עמ' 763), כי סעיף 2 לחוק המאפשר להטיל עונש עד 20 שנות מאסר על העומד בראש ארגון פשיעה "בא להתמודד עם הקושי להוכיח את הקשר בין נושאי תפקידים בארגוני פשיעה לבין עבירות שנעברו בפועל, והוא קובע, כי די בעצם העמידה בראש הארגון, ניהולו, מימונו וכד' כדי שהדבר יהווה עבירה...". עוד נאמר בהמשך לדברים אלה כי לגבי חברי ארגון פשיעה בדרג נמוך יותר, "יוותר הצורך להוכיח קשר לעבירה מסוימת".

מכאן ברור שהחוק בא להתמודד עם הבעיה העומדת להכרעה גם בתיק זה, דהיינו, העדר היכולת, על פי המצב החוקי הקיים, להרשיע מנהיג של ארגון פשיעה או ארגון טרור בביצוע, בשידול או בסיוע לעבירות המבוצעות על ידי אנשי הארגון.

Gilmore 00740
SHATSKY-009425



בתי המשפט

ואולם, אין בחוק זה מענה לשאלה שהציב כב' השופט מ. חשין בדנ"פ 1294/96 הנ"ל בעניין **משולם** (בעמ' 59), לאמור: **"הנקבל כי הרב-מוח יהא זוטר ל'חיילים' עושי דברו?!"**. גם לפי חוק זה יהא עונשו של העומד בראש ארגון פשיעה קל מעונשם של הסרים למרותו, כאשר אלו ביצעו עבירה של רצח שדינה מאסר עולם. זאת ועוד, ככל שמדובר בארגון טרור אין צורך בחוק זה, שכן על פי סעיף 2 לפקודת מניעת טרור צפוי מנהיג בארגון טרור, ממילא, לעונש מאסר עד 20 שנה בשל עצם היותו ממלא תפקיד ניהולי בארגון (ראה תת-פרק (1) לעיל).

176. הדברים האמורים לעיל נוגעים למרבית הפיגועים המיוחסים לנאשם בכתב האישום, כפי שפורטו בפרק ה' לחלק השני של הכרעת הדין. בפיגועים אלה, כפי שבואר לעיל, לא ניתן להרשיע את הנאשם בעבירות של סיוע או שידול למעשי רצח, ואף לא כמבצע בצוותא. יחד עם זאת, הובאו ראיות ברורות ומשכנעות למעורבותו של הנאשם בשלושה פיגועי רצח שבוצעו על ידי אנשיו, ובניסיון לבצע פיגוע רצח נוסף, ואלה הם:

### א.    פיגוע הרצח בתחנת הדלק בגבעות זאב

בפיגוע זה, שבוצע ביום 15.1.02, נרצחה יואלה חן ז"ל, ונפצעה נוסעת שהייתה עמה. מן הראיות שהובאו עולה בבירור כי בעת היותם בסוכת האבלים שהוקמה לאחר חיסולו של ראיד כרמי ביום 14.1.02, הורה הנאשם למקורבו אחמד בורגותי לבצע פיגוע נקם. אחמד בורגותי מסר נשק לאבו סטחה, אף הוא מקורב של הנאשם הסר למרותו, ואנשי החוליה של אבו סטחה ביצעו את הרצח, ומיד לאחר מכן דיווחו לנאשם על תוצאותיו.

הנאשם הודה כי פיגוע זה בוצע בהוראתו, ונטל אחריות לביצועו, כשהוא מדגיש כי זה הפיגוע הראשון של הפת"ח שבוצע בתוך ישראל. במקרה זה אחראי הנאשם באופן ישיר לביצוע הרצח, משום שהוא עצמו הורה על ביצועו.

Gilmore 00741

SHATSKY-009426



138



בתי המשפט

בוודאי שהוראה שכזו של הנאשם לאנשים הסרים למרותו מהווה שידול לרצח, גם אם הנאשם לא התעניין באופן ספציפי באיזה מקום ובאיזה אופן יבוצע הפיגוע. כאשר הנאשם הורה לבצע פיגוע נקם, היה ברור לו ולאנשיו שהכוונה היא לרצח ישראלים. אולם אחריותו של הנאשם אינה רק כשל משדל, אלא כמבצע בצוותא יחד עם המבצעים האחרים, שהם אחמד ברגותי, אבו סטחה ואנשיו. הנאשם היה חלק מן התוכנית המשותפת לביצוע הפיגוע, כמי שיזם את ביצועו. היתה לו מעורבות נפשית גבוהה וידיעה על כך שהעבירה עומדת להתבצע על פי הוראתו. הנאשם לא רק הביא אחרים לידי ביצוע העבירה במקרה זה, ולא רק נתן את אישורו לביצוע העבירה, אלא הוא הורה לבצע את העבירה, ובשל מעמדו כמנהיג ומפקד, ומערכת יחסיו עם אחמד ברגותי ואבו סטחה, היתה הוראה זו משולה ללחיצה על ההדק שהביאה לרציחתו של יואלה חן ז"ל.

למצב דברים כגון זה כוונו דבריה של כב' השופטת ד. ביניש בע"פ 8469/99 הנ"ל בעניין אסקין, כי: "בנסיבות מיוחדות אפשר ש'הסכמה' לביצוע תהווה השתתפות 'בביצוע עבירה תוך עשיית מעשים לביצועה' כאמור בסעיף 29 לחוק העונשין". כך גם פסק כב' השופט י. קדמי בע"פ 5589/98 הנ"ל בעניין סולטאן, כי מתן "אור ירוק לרצח" משול ל"יריית ההזנקה המשלחת ספורטאי למרוץ", והוא עולה כדי "מעשה של השתתפות בביצוע העבירה" (ראה סעיף 163 לעיל). בדנ"פ 1294/96 הנ"ל בעניין משולם אמר כב' השופט מ. חשין (בעמ' 59): "רוחו הרעה של המנהיג שורה על כל המבצע העבריינים, מוחו מילא את הקפיץ מפעיל-העבירה קודם תחילתה, ולעת עשייונה של העבירה הוא 'נמצא' עם העבריינים כמבצע – בצוותא עימהם". כך יש לומר על הנאשם שבפנינו, ולפיכך יש להרשיעו לגבי פיגוע רצח זה כמבצע בצוותא של רצח בכוונת תחילה, ולא רק כמשדל.

ב.    <u>רצח הנזיר היווני ציפוקטסקיס גרמנוס ז"ל במעלה אדומים</u>

גם פיגוע זה בוצע בהוראת הנאשם וביוזמתו ביום 12.6.01. המפגע ר'דיאדה פנה אל הנאשם על מנת לקבל נשק ולבצע פיגוע התאבדות.

Gilmore 00742

SHATSKY-009427

139



בתי המשפט

<u>בבית המשפט המחוזי בתל-אביב-יפו</u>

הנאשם הנחה אותו שלא לבצע פיגוע התאבדות, אלא פיגוע ירי "כמקובל בתנזים", והפנה אותו אל מוהנד לצורך קבלת נשק והדרכה בירי, בידיעה ברורה שרדאיידה עומד לבצע פיגוע ירי ולרצוח ישראלים על פי הנחייתו. כך אכן עשה רדאיידה יחד עם מפגע נוסף, כאשר קיבלו שני רובי קלצ'ניקוב ממוהנד, ואף קיבלו ממנו הדרכה כיצד להשתמש בהם - כל זאת על פי הוראות הנאשם. בפיגוע נרצח הנזיר היווני ציפוקטיסיס גרמנוט זייל במעלה אדומים, כאשר המפגעים חשבו אותו בטעות ליהודי.

גם במקרה זה אחריותו של הנאשם לרצח הנזיר היווני היא כשל מבצע בצוותא, ולא רק כמסדל. הנאשם לא רק שכנע את רדאיידה לבצע פיגוע ירי רצחני אלא הוא הנחה אותו כיצד לבצע את הפיגוע, סייע לו בהשגת נשק והדרכה לצורך הפיגוע, והורה לו למי עליו לפנות על מנת להוציא לפועל את הפיגוע. במקביל הורה הנאשם לאנשיו לסייע לרדאיידה לבצע את הפיגוע, ואלה אכן פעלו על פי הוראות הנאשם. על פי ההלכה, שידול שמתלווה אליו מעשה לביצוע, כגון: תכנון או מתן הוראות ביצוע - מהווה השתתפות בביצוע, ולא רק שידול. כפי שאמר כבי הנשיא א. ברק בע"פ 2796/95 הנ"ל בעניין <u>פלוניה</u>: "**בכל שהשידול של המסדל אינטנסיבי יותר, וככל שמתלווה אליו לא רק פעולות במישור הנפשי אלא גם פעולות במישור העובדתי, כך מתקרב המסדל למבצע בצוותא**" (ראה סעיף 161 לעיל). לכן הורשע אותו מקרה הקטין ט' כמבצע בצוותא, ולא רק כמסדל, משום שהשתתף בתכנון העבירה, והיה "ראש וראשון לכולם".

גם במקרה דנא, אחריותו של הנאשם כמבצע בצוותא נגזרת ממעמדו כמנהיג ומפקד, ומן ההנחיות שנתן לרדאיידה ולאנשיו לגבי דרך ביצוע הפיגוע. הנאשם לא רק סייע לביצוע הפיגוע, ולא רק שידל לביצועו על ידי עידודו של רדאיידה לפעול כפי שפעל, אלא הנאשם היה חלק מן התוכנית המשותפת לביצוע פיגוע זה, ולמעשה הורה על ביצועו. על משמעותה של הוראה שכזו עמדנו בס"ק אי לעיל, ולפיכך יש להרשיע את הנאשם גם לגבי פיגוע זה בעבירה של רצח בכוונה תחילה.

Gilmore 00743

SHATSKY-009428



בתי המשפט



**בבית המשפט המחוזי בתל-אביב-יפו**　　　　　　תפ"ח 1158/02

**ג.**　**פיגוע הרצח במסעדת "סי פוד מרקט" בתל אביב**

פיגוע זה בוצע ביום 5.3.02 במסעדת "סי פוד מרקט" בתל אביב על ידי המפגע
אברהים חסונה, שרצח במהלכו את יוסף הבי ז"ל, אליהו דהן ז"ל והשוטר רס"ר
סלים בריכאת ז"ל. מן הראיות שהובאו עולה כי הפיגוע תוכנן והוצא לפועל על ידי
מקורביו של הנאשם אחמד ברגותי, אבו חמיד ועויס, וכי אחמד ברגותי דיווח
לנאשם לפני שהפיגוע יצא לדרך על כך שהוא עומד להתבצע. הנאשם אישר את
ביצוע הפיגוע, ורק הורה לבצעו שלא בתוך ישראל, אלא בהתנחלות או במחסום
צבאי בגדה המערבית. מיד לאחר ביצוע הפיגוע התקשר אחמד ברגותי לנאשם על
מנת לדווח לו על כך, והנאשם הורה לעויס שלא ליטול אחריות על הפיגוע, כיוון
שבוצע בתוך ישראל.

מן הראיות שפורטו לעיל, ברורה אחריותו של הנאשם לפיגוע זה כמבצע בצוותא.
הנאשם היה שותף לתוכנית הפיגוע, נתן הנחיות לגבי מקום ביצועו ואישר לבצעו.
העובדה שהמבצעים סטו מהנחיותיו שנתן להם הנאשם, אינה מעלה ואינה מורידה
דבר לעניין אחריותו הפלילית. כפי שבואר לעיל, אחריותו של הנאשם לפיגוע זה
איננה רק כשל משדל, שכן הוא נתן את אישורו לביצוע פיגוע רצח, דבר שמהווה
מעשה של השתתפות בביצוע העבירה. הנאשם היה חלק מתוכניית הפיגוע, ונתן
למתכנני הפיגוע הנחיות לגבי מקום הביצוע, ולכן גם קיבל ממנו דיווח מיד לאחר
על הביצוע. מנחיגי חבורה עבריינית המאשר ביצע רצח, ונותן הנחיות לביצועו,
נושא באחריות לרצח כמבצע בצוותא, ולא רק כמשדל, על פי הוכלכת שבוארו
לעיל. לפיכך יש להרשיע את הנאשם גם בגין פיגוע זה באחריוונ של מבצע בצוותא
לעבירה של רצח בכוונה תחילה של שלושה אנשים.

Gilmore 00744

SHATSKY-009429

141



בתי המשפט



בית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

ז.    ניסיון פיגוע ליד קניון מלחה בירושלים

מתכנן הפיגוע, ג'יהאד ג'יוערה, הודיע לנאשם יום לפני הפיגוע על הכוונה לפוצץ
מכונית תופת, והנאשם אישר את הפיגוע, אך הורה לבצעו שלא בתוך ישראל, אלא
בגדה המערבית. בפועל התפוצצו שני המחבלים עם מכונית התופת ליד קניון מלחה
בירושלים, בדרכם לבצע את הפיגוע. גם בפיגוע זה נעזר הנאשם במקורבו אחמד
ברגותי.

גם כאן אחריותו של הנאשם אינה רק כמשדל, אלא כמבצע בצוותא אשר נתן "אור
ירוק לרצח", בצירוף הנחיות ביצוע. הואיל והפיגוע נכשל, יש להרשיע את הנאשם
במקרה זה בעבירה של ניסיון לרצח.

חלק חמישי:    סיכום

177.    הנאשם הצהיר בשלב הסיכומים: "אני נגד הרג חפים מפשע, נגד רצח ילדים
ונשים. צריך להתנגד לכיבוש בשטחים, אני נגד פעולה צבאית או התאבדות. לא נכון
שהייתי אחראי לכך שהיו התאבדויות" (עמ' 24 לישיבה מיום 29.9.03). אולם בפועל הוכח
מעבר לכל ספק שהנאשם נטל חלק, ועמד בראש, פעילות רצחנית שמטרתה פגיעה בחפים
מפשע - הן בשטחי יהודה ושומרון והן בתחומי "הקו הירוק" - כולל פיגועי התאבדות.

178.    הנאשם בחר שלא להתגונן כנגד האשמות החמורות העולות מחומר הראיות
שנצבר כנגדו, כפי שפורט לעיל. טענותיו שהועלו במהלך הדיון ובדברי הסיכום שנשא
התמקדו בשאלת סמכותו של בית משפט זה לדון בעניינו, ובהצדקת מה שהוא רואה
כהתנגדות לכיבוש הישראלי. לטענות אלו של הנאשם התייחסנו בהחלטותנו המקדמית
שניתנה ביום 19.01.03 – ככל שמדובר בטענות שאינן במישור הפוליטי בלבד. דחינו טענות
אלו, ופסקנו כדלקמן:

Gilmore 00745
SHATSKY-009430

142





בתי המשפט



<u>בית המשפט המחוזי בתל-אביב-יפו</u>                                    תפ"ח 1158/02

א.   בית משפט בישראל מוסמך לדון ב"עבירות חוץ" כנגד בטחון המדינה, או כנגד
     אזרח או תושב ישראלי, יהא מקום ביצוע העבירה אשר יהא, על פי סעיף 13(א)-(ב)
     לחוק העונשין, התשל"ז-1977, אם כי רוב העבירות נשוא העבירות נשוא כתב האישום הן
     "עבירות פנים" הנוגעות לפיגועים שבוצעו בישראל.

ב.   חוק יישום הסכם הביניים בדבר הגדה המערבית ורצועת עזה (סמכויות שיפוט
     והוראות אחרות), התשנ"ו-1996, הנותן תוקף להסכם הביניים ישראלי-פלסטיני
     בדבר הגדה המערבית ורצועת עזה, כמו גם תקנה 2 לתוספת לחוק להארכת תוקפן
     של תקנות שעת חירום (יהודה והשומרון וחבל עזה – שיפוט בעבירות ועזרה
     משפטית), התשל"ח-1977 – אינם שוללים את סמכותו של בית משפט בישראל
     לדון בעבירות חוץ או בעבירות פנים המיוחסות לנאשם. חיקוקים אלו העבירו
     לרשות הפלסטינאית את סמכות השיפוט לגבי פלסטינאים שביצעו עבירות
     בשטחה, אך לא בגין עבירות שבוצעו כנגד אזרחי או תושבי ישראל בשטח מדינת
     ישראל או בשטחי יהודה ושומרון ורצועת עזה.

ג.   לנאשם לא עומדת חסינות כלשהי בגין העבירות שיוחסו לו בכתב האישום, גם אם
     כיהן כחבר הפרלמנט הפלסטינאי, שכן המשפט הבינלאומי אינו מכיר בחסינות
     שכזו.

ד.   הנאשם אינו זכאי למעמד של "שבוי מלחמה" על פי אמנת ז'נבה השלישית, ועל כן
     אין מניעה להעמידו לדין על מעשים שביצע כלוחם בלתי וזקי. אדם הפועל מחוץ
     למסגרת הלחימה החוקית, ובניגוד לדיני המלחמה, ואשר מעורב בביצוע פעולות
     טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות
     הפליליות הרגילות של המשפט הפלילי הבינלאומי, ואיננו זכאי להגנה הניתנת
     במשפט הבינלאומי.

Gilmore 00746

SHATSKY-009431

163



בתי המשפט

בית המשפט המחוזי בתל-אביב-יפו                    תפ"ח 1158/02

ה.    התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע
מעשי הרג של אזרחים חפים מפשע. פעילות טרור שמפרה את דיני המלחמה,
ואיננה מבחינה בין מטרות צבאיות לבין מטרות אזרחיות, איננה נחשבת כפעילות
לוחמתית המוכרת על פי כללי המשפט הבינלאומי, גם אם מטרתה היא הסרת
הכיבוש – כפי שטוען הנאשם.

179.    לסיכום: לאור כל הטעמים שפורטו בהכרעת הדין לא מצאנו בטיס משפטי
להרשעת הנאשם בביצוע מכלול הפיגועים נשוא כתב האישום, ומן הדין להרשיעו בעבירות
הכלליות שיוחסו לו בכתב האישום, ובעבירות הרצח וניסיון הרצח הנוגעות לארבעה
פיגועים שבכתב האישום (מס' 3, 7, 12 ו- 36 בנספח לכתב האישום).

על סמך התשתית הראייתית, ולאור הניתוח המשפטי דלעיל, אנו מרשיעים את הנאשם
בביצוע העבירות הבאות:

א.    רצח בכוונה תחילה לפי סעיף 300(א)(2) לחוק העונשין, התשל"ז- 1977 (בשלושה
מקרים בהם נרצחו חמישה בני אדם);

ב.    ניסיון לרצח לפי סעיף 305(1) לחוק העונשין, התשל"ז- 1977;

ג.    פעילות בארגון טרור לפי סעיף 2 לפקודת מניעת טרור, התש"ח- 1948;

ד.    חברות בארגון טרור לפי סעיף 3 לפקודת מניעת טרור, התש"ח- 1948.

ה.    העבירה של קשירות קשר לביצוע פשע לפי סעיף 499 לחוק העונשין, תשל"ז- 1977
הוכחה אף היא, ככל שהדבר נוגע לארבעת הפיגועים בהם הורשע הנאשם, והיא
נבלעת בעבירה העיקרית של רצח בכוונה תחילה וניסיון רצח.

ניתן והודע היום כ"ט באייר תשס"ד (20 במאי, 2004) במנוכחות ב"כ התונביעה, הסניגוריה
הציבורית והנאשם.

_____          _____          _____
שרה סירוטה, ס"נ          אברהם טל, שופט          ד"יר עמירם בנימיני, שופט
אב"ד

בית משפט המחוזי בתל-אביב
אני מאשר
שהעתק זה נכון ומתאים למקור
לבירה עסקה ט.א.
SPATSKY 00747

העתק העתק נאמן למקור

העתק מאושר בית המשפט המחוזי תל אביב-יפו
תיק _____ תאריך _____
שהעתק זה נכון ומתאים למקור
106 _____ 03/05/11



אני גיא שני, רשם ביהמ"ש העליון
מאשר בזה, כי החתימה על מסמך מעבר
לדף היא חתימה של _זכריה ב _____
נשיא/נשיאה-תורן/רשם/שופט ב_____
מזכיר ראשי של ביהמ"ש המחוזי/שלום
וכי החותמת היא החותמת של בית משפט
המחוזי/שלום _____
תאריך: 15.5.11

I, Guy Shani
Registrar of the **Supreme Court,**
certify that the signature and seal
appearing on the document overleaf
are the signature and seal of
_Zehava Akefa, Dep Gen_ Se District court TelAviv.

Date: _15.5.11_

---

# APOSTILLE
## (CONVENTION DE LA HAYE 5 DU OCTOBER 1961)

| | | | |
|---|---|---|---|
| 1. | STATE OF ISRAEL | | מדינת ישראל 1. |
| 2. | THIS PUBLIC DOCUMENT HAS BEEN SIGNED BY MR./MS | שני גיא SHANI GUY | מסמך ציבורי זה נחתם בידי מר/גב' 2. |
| 3. | ACTING IN THE CAPACITY OF | | המכהן בתור רשם בית משפט העליון 3. |
| 4. | BEARS THE SEAL/STAMP OF THE MINISTRY OF | בית משפט עליון JUSTICE | נשא את החותם/חותמת של משרד 4. |
| 5. | CERTIFIED AT THE MINISTRY OF FOREIGN AFFAIRS | | אושר במשרד החוץ 5. |
| 6. | THE | 15/5/2011 | ביום 6. |
| 7. | BY | | על-ידי 7. |
| 8. | NO 495528. | | מס' 495528 8. |
| 9. | SEAL/STAMP | | חותם/חותמת 9. |
| 10. | SIGNATURE/ JERUSALEM | | חתימה/ ירושלים 10. |

ORIT BEN-SHIMON
CONSULAR BUREAU
אורית בן שמעון
החטיבה הקונסולרית

Gilmore 00748

SHATSKY-009433